# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE HUMACYTE, INC. SECURITIES LITIGATION | Case No. 1:24-cv-00954-TDS-JEP <br><br> <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | **FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

**TABLE OF CONTENTS**

<u>Page</u>

I.    NATURE OF THE ACTION ........................................................... 1

II.   JURISDICTION AND VENUE .................................................... 10

III.   PARTIES ...................................................................................... 11

IV.   SUBSTANTIVE ALLEGATIONS ........................................... 13

     A.    Humacyte's Business And Operations ..................................... 13

         1.    Formation and Early Development (Private Company Phase) ........................................................................... 13

         2.    Transition to a Public Company (Initial Public Offering) ........................................................................ 15

     B.    Post-IPO Financing Activities Provide Additional Substantial Financing ............................................................. 17

     C.    The BLA Submission ............................................................. 18

     D.    Humacyte's Close Knit Leadership During the Class Period. ........ 20

     E.    Undisclosed, Material, Negative Facts. ................................. 20

         1.    Undisclosed Facts and Risks Described by the CWs. ...... 20

         2.    Undisclosed Facts and Risks Disclosed in the Form 483. ........................................................................... 36

         3.    Undisclosed Facts and Risks Disclosed in FDA Approval Letter. ............................................................ 38

         4.    Undisclosed Facts and Risks Revealed by Investigative Reporting. ...................................................................... 40

             a.    The March 24, 2025 New York Times Investigative Bombshell ........................................ 40

             b.    March 25, 2025, Bloomberg Additional Investigation ................................................................ 42

5.      Undisclosed Facts and Risks Contained In FDA Review Documents ........................................................ 45

      a.     The PMC Response Review .................................. 45

      b.     Late-Cycle Meeting Summary ............................. 45

      c.     The Statistical Review Memorandum.................... 49

      d.     The Clinical Review Memorandum ....................... 54

6.      Expert Review of FDA Materials Confirms Undisclosed Facts Were Known By Defendants. ............................ 60

      a.     Defendants Knew of Deep Flaws in Clinical Trials and Data Integrity. ..................................... 62

      b.     Humacyte Had Direct Knowledge of FDA Concerns and Emerging Problems Long Before Approval............................................................. 63

F.      Materially False or Misleading Statements and Omissions ....................... 65

    1.      Product Safety Fraud. ................................................... 66

    2.      Facility Fraud. ............................................................ 102

    3.      Liquidity Fraud............................................................ 113

V.      ADDITIONAL FACTS SUPPORTING SCIENTER ......................................... 136

    1.      Defendants' Admissions ............................................... 136

    2.      Knowledge Established by FDA Documents Concerning Meetings or Correspondence ..................... 137

    3.      Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter. ....................................... 141

    4.      The Individual Defendants Were Financially Motivated to Commit Fraud............................................ 144

    5.      Humacyte Raised Funds During the Class Period. ......... 151

    6.      The Fraud Implicated Core Operations. ......................... 152

7.      The Individual Defendants Signed, Were Quoted in, or
        SOX-Certified the Alleged Misstatements....................................... 154

8.      The Fraud Violated Humacyte's Corporate Code of
        Conduct and Insider Trading Policy. ............................................... 155

9.      Insider Resignations and Suspicious Employment
        Status Changes Support Scienter. ................................................... 157

VI.     NO SAFE HARBOR ............................................................................... 158

VII.    LOSS CAUSATION / ECONOMIC LOSS ........................................... 158

VIII.   PRESUMPTION OF RELIANCE ......................................................... 160

IX.     CO-LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS ......... 162

X.      CLAIMS FOR RELIEF ........................................................................ 164

FIRST CLAIM (Against All Defendants For Violation of Exchange Act
        Section 10(b) and SEC Rule 10b-5 Promulgated Thereunder) ........... 164

SECOND CLAIM (Against the Individual Defendants For Violation of
        Section 20(a) of the Exchange Act) ...................................................... 168

XI.     PRAYER FOR RELIEF ........................................................................ 170

XII.    DEMAND FOR TRIAL BY JURY ..................................................... 170

Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood ("Lead Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing independent investigation of its undersigned counsel, including the following sources: (i) Humacyte Inc.'s ("Humacyte") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports from securities and financial analysts; (iii) Humacyte press releases, reports, and earnings calls with analysts; (iv) Humacyte's website and marketing materials; (v) news and media reports concerning Humacyte and other facts related to this action; (vi) price and volume data for Humacyte securities; (vii) consultation with experts; (viii) accounts from former Humacyte employees; and (ix) additional materials and data concerning Humacyte and its industry as identified herein.

## I.  NATURE OF THE ACTION

1.    Lead Plaintiffs bring this securities fraud class action arising from defendants' three-pronged fraud to deceive investors about Humacyte's sole product—an artificial blood vessel that FDA scientists warned could rupture without warning with 'unpredictable, catastrophic and life-threatening' consequences. While Humacyte touted the product's safety and its manufacturing readiness, concealed FDA documents and former employee and whistleblower accounts evidenced a starkly different reality: dangerous product failures, systemic manufacturing deficiencies yielding only 25-40% success rates,

-1-

and a company burning through cash at an unsustainable rate. When the truth emerged through investigative reporting and surprise capital raises, Humacyte's stock price collapsed from over $9 to $2 per share, destroying hundreds of millions in market value.

2.      This securities fraud class action lawsuit on behalf of themselves and a class (the "Class") consisting of all persons or entities who purchased or otherwise acquired Humacyte common stock, warrants, sold put options or bought call options between August 14, 2023 and March 25, 2025, both dates inclusive (the "Class Period") . Lead Plaintiffs bring claims on their own behalf and that of the Class members against Humacyte and certain of its current and former officers and directors identified below (collectively, "Defendants") under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5(a)-(c) promulgated thereunder. Excluded from the Class are Defendants, the officers and directors of Humacyte, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

3.      Humacyte develops and manufactures off-the-shelf, implantable, and bioengineered human tissues. It is currently engaged in engineering and manufacturing the Acellular Tissue Engineered Vessel ("ATEV"), also known as the Human Acellular Vessel ("HAV"), which is a lab-grown blood vessel implant that can act as a replacement for an injured or damaged blood vessel. The product was later, upon approval by the U.S. Food

and Drug Administration ("FDA"), given the trademarked name Symvess™.[1]  As of March

31, 2025, Humacyte has generated $147,000 in product revenue.

4.     During the Class Period, while Humacyte pursued its Biologics License

Application ("BLA"), seeking and later obtaining approval of its HAV, Defendants

engaged in a three-prong fraud, with materially false or misleading statements and

omissions that artificially inflated the price of Humacyte's securities.

(a)     The Product Safety Fraud, starting August 14, 2023, touted the HAV's safety

and efficacy while downplaying and/or not acknowledging serious known safety concerns,

as well as reporting positive aspects of Humacyte's V005 Phase 2/3 clinical trial and V017

Ukraine trial results, without acknowledging the inherent flaws in Humacyte's statistical

analysis.  Defendants downplayed the risk of HAV rupture and anastomotic failure (tearing

at the seam after implementation) in favor of Humacyte's purportedly positive trial data

concerning the infection rates for the HAV, *e.g.*, stating, "***the HAV had higher rates of***

***patency, and lower rates of amputation and infection, compared to historic synthetic***

***graft benchmarks***," "***[t]here were no unexpected safety signals for the HAV in the V005***

***and V017 studies***," "***we have observed that our HAV's functioned as intended***," and "***[w]e***

***have also observed consistent durability with a strong tolerability profile***."  They touted

the HAV's positive 30-day safety results – *e.g.*, reporting "***an observed 30-day HAV***

---

[1]     Herein, unless otherwise noted, or if quoting an external source, Humacyte's  HAV
/ ATEV / Symvess product is referred to as "the HAV" for ease of reference.  Over the
Class Period, its name changed as the HAV proceeded through the FDA approval process.

Case 1:24-cv-00954-TDS-JEP     Document 34     Filed 05/22/25     Page 7 of 188

patency (presence of blood flow) of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAV" – while counting patients without 30-day follow up (including those who died) as successes. They touted the HAV's positive 30-day efficacy and safety data – *e.g.,* "**that the 30-day patency, or blood flow in the HAV was present in 95% of patients**" and "**there were no instances of infection of the HAV**" – while downplaying the need for long-term data. They presented HAV clinical data against inapplicable data sets, while falsely and misleadingly claiming the benchmarks were agreed to with the FDA, *e.g.*, stating, "**And the structure of the literature review and the meta-analysis was actually something that we agreed upon with the FDA before undertaking this. So, this is really a comprehensive review of the world's literature over the last 20 years using any type of synthetic graft**." Defendants presented purportedly successful data from the V017 Ukraine trial – *e.g.*, "**a 30-day limb salvage and 30-day patient survival were 100%**" and "**30-day patency or blood flow was 95%, and there were no reported instances of infection of the HAV**" – while concealing that the study was retrospective and observational, meaning researchers could cherry-pick positive results. After lauding the FDA's acceptance of the BLA and claiming "**[b]ased on the strength of our BLA data package, combined with our Priority Review and the RMAT designation from the FDA, we're looking forward to the PDUFA date**," Defendants misled the market about why the FDA delayed approval of the BLA for the HAV in August 2024 for 19 weeks, claiming "**FDA leadership expressed an apology for their inability to complete the review by the PDUFA date**" and "**said simply that they need more time**." As late as

-4-

December 2024, Defendants continued to tout the "***positive results***" of the HAV's clinical trials.

(b)     Defendants also engaged in a Facility Fraud, which involved material misstatements and omissions about Humacyte's Durham, NC facility ("Durham Facility"), including its readiness to safely manufacture the HAV, the sufficiency of the facility's quality assurance and oversight for FDA approval in the vascular trauma indication, and the FDA's inspections of the Durham Facility.  For instance, they said, "***The HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities***," which they described as "***a scalable modular manufacturing process that enables us to engineer our HAVs in commercial quantities in a system designed for cGMP compliance.***"  After the FDA inspected the Durham Facility, Defendants said, "***the FDA completed its Pre-Licensing Inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process.  We remain on track with our BLA review and commercial launch preparations***."  They also said, "***[W]e completed our pre-license inspection of our manufacturing facility and had a very successful outcome***," "***it was a very successful interaction that we have with the FDA, and we feel like it concluded very successfully***," and "***I would say all of those inspections went very well***."

(c)     Defendants also engaged in a Liquidity Fraud, whereby they repeatedly made some version of this statement, over time: "***The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance***

-5-

*date of these interim financial statements.*" As time passed, the statements became more closely tethered to the status of the BLA for the HAV, *e.g.*, "**Humacyte believes that its cash and cash equivalents will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication.**" These statements were closely watched by the market, given Humacyte's lack of revenues and high demand for capital to fund the HAV's development and approval.

5. Unbeknownst to investors, material, undisclosed facts rendered Defendants' statements materially false or misleading. Instead of the positive results Humacyte was touting to investors, the FDA conducted its own data analysis, consistent with its preferred practice and as described to Defendants before Humacyte began the trials. The FDA found the HAV was not an improvement over its synthetic graft comparator. Instead, the HAV had worse primary patency, secondary patency, limb salvage, and infection rates compared to synthetic grafts in civilian trauma. Humacyte's reported trial results included two major statistical problems. First, Humacyte counted patients with no 30-day follow up as successes, even if those patients died in the interim, but the FDA considered patients with no follow up as failures. Second, Humacyte used a biased benchmark to compare the HAV's efficacy and safety, using miliary studies as part of its benchmark group, biasing results in favor of the HAV. Additionally, while Defendants reported limb salvage and infection rates to tout the HAV's safety profile, they downplayed the more severe risk of mid-graft rupture and anastomotic failure (tearing at the seams after implementation).

These concealed risks were so severe that the FDA ultimately required its most serious black-box warning for the HAV. and a much narrower approved indication for the HAV's commercial use upon approval. Investors were also not made aware that Humacyte had significant manufacturing and quality control problems at its Durham Facility that limited Humacyte's ability to safely manufacture the HAV's once approved. For example, only 25-40% of HAVs passed quality inspection. Finally, investors were not made aware that Humacyte's cash position left it unable to operate without accessing the capital markets multiple times during the Class Period.

6.     While Defendants fraud was not yet revealed, they engaged in extensive transactions that demonstrated their motive to commit fraud. The Individual Defendants engaged in transactions involving Humacyte stock and stock options, during the alleged fraud, which yielded Defendant Niklason $38.8 million, Defendant Prichard $1.2 million, and Defendant Sander $162,000 in ill-gotten gains. Their transactions are suspicious in timing vis-à-vis the dates of the alleged misstatements and omissions and corrective disclosures, and they are suspicious in amount, as compared against their total compensation and their prior transactions in a comparable time period predating the Class Period. Humacyte also repeatedly raised funds while its securities prices were artificially inflated by the fraud, a fact that supports corporate scienter.

7.     Humacyte ultimately disclosed setbacks regarding the Durham Facility and the HAV. On August 9, 2024, after hours, Humacyte disclosed that the FDA would require additional time to complete review of the BLA for the HAV, prompting negative analyst

reactions. Its stock price fell -$1.29 (-16.37%) per share on the next trading day. On October 17, 2024, the FDA released the Form 483 concerning its investigation of the Durham Facility, as part of the BLA process, which observed deficiencies, including "no microbial quality assurance" "no microbial testing" for certain processes or equipment, and "quality oversight is insufficient" for four issues. These disclosures caused Humacyte's stock to fall -$0.95 (-16.35%) per share on October 17, 2024.

8.      Meanwhile, throughout the Class Period, despite insisting that its cash and cash equivalents were sufficient to fund operations, Humacyte repeatedly surprised investors by raising capital at disadvantageous pricing. On each of February 29, 2024, August 13, 2024, September 24, 2024, and November 14, 2024, Humacyte announced that it needed to access the capital markets to raise cash, issuing dilutive new stock at discounts over Humacyte's prevailing stock price. To date, Humacyte raised over $60 million in net proceeds with the ability to raise almost $50 million more. Each disclosure caused a significant drop in Humacyte's stock price: -$1.11 (-25.52%) per share on March 1, 2024; -$0.64 (-9.62%) on August 14, 2024; -$0.66 (-10.87%) per share on September 25, 2024; -$0.50 (-9.36%) on November 14, 2024.

9.      Finally, on March 24-25, 2025, a series of disclosures decimated Humacyte's stock price.

(a)      On March 24, 2025, through an after-market *New York Times* ("*NYT*") exposé, investors learned the shocking truth: the FDA had approved Humacyte's artificial blood vessel even though its "own scientists flagged questionable study results and

-8-

potentially fatal ruptures" of the HAV. The *NYT* revealed that FDA staff members had found Humacyte's HAV study "severely lacking" with "dire consequences when the vessels fell apart," and an FDA reviewer noting that 37 of 54 patients were not properly assessed for a four-month safety check, with many dead or lost to follow up. The *NYT* quoted Dr. Robert E. Lee, an FDA medical device reviewer who retired in protest over FDA's decision to approve the Humacyte BLA, as saying the HAV could rupture with no warning with "unpredictable, catastrophic, and life-threatening" consequences that posed an "unacceptable risk for whatever slim benefit, if any, this product provides above current standard treatments." The *NYT* added that the HAV's success rate in its key study was only 67%, not 84% as the company claimed. It quoted FDA biostatistician Thomas Zhou, who said regarding Humacyte's two clinical studies, "Neither study met the usual criteria for an adequate and well-controlled trial." It quoted Dr. Hooman Norrchashm, co-director of the Amy J. Reed Medical Device Safety Collaborative at Northwestern School of Law, who said the HAV should not have been approved, as it is inferior to existing options, and if it falls apart, "it is basically akin to the patient getting shot." Similarly, when the FDA properly analyzed the data, the HAV's actual success rate was only 67% - far below both Humacyte's claimed 84% and the 82% rate for existing synthetic grafts.

(b)    On March 25, 2025, *Bloomberg* published an article reporting that an FDA reviewer said that Humacyte's two trials could not be combined, due to differences in the patients, and revealing Humacyte's multi-year attempts to change its clinical studies while they were ongoing and FDA's pushback. It reported on FDA documents revealing that

outside experts privately raised concerns about the product, which had a "serious risk" of failure and "did not demonstrate superiority to existing treatment options." It also quoted Dr. Lee as expressing "grave safety concerns," and described his attempts to secure a public advisory panel meeting of outside experts and his desire to have the approval rescinded.

(c)     On March 25, 2025, after the market close, Humacyte, announced the pricing of a public offering of 25 million shares. While the preliminary prospectus filed that day and the final prospectus filed on March 26, 2025, both noted that on March 24, 2025, the last reported sale price of common stock was $3.32 per share, the final prospectus finalized the public offering price substantially lower at $2.00 per share – a roughly 30% discount from the closing price on March 25, 2025.

On this news, Humacyte's stock price fell -$0.44 (-13.40%) on March 25, 2025 and -$0.88 (-30.43%) on March 26, 2025.

10.     As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of Humacyte's securities upon revelation of the true facts, all as alleged herein, Humacyte's stock plummeted from a high of $9.46 high in July 2024, to $2.00 on March 26, 2024. Thus, Lead Plaintiffs and the Class members suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

11.     This action arises under Sections 10(b), and 20(a), of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, Humacyte's principle executive offices are located in this District.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### III.     PARTIES

15.     Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood, as set forth in the accompanying certifications, incorporated by reference herein, purchased Humacyte securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Humacyte Inc. is incorporated under Delaware law with its principal executive offices in Durham, North Carolina. Its common stock traded during the

Class Period on the NASDAQ exchange under the symbol "HUMA." Defendant Niklason co-founded Humacyte in 2004.

17. Defendant Dr. Laura E. Niklason ("Niklason") was Humacyte's co-founder, President, and CEO at all relevant times. She was a member of Humacyte's Board of Directors since the Business Combination, and previously served as President and CEO of pre-Merger Humacyte ("Legacy Humacyte") since November 2020 and a member of its Board of Directors since 2004.

18. Defendant Dale A. Sander ("Sander") was Humacyte's CFO at all relevant times. Sander previously served as Legacy Humacyte's CFO and Treasurer since May 2021, as its Chief Corporate Development Officer since November 2020, and as a member of its Board of Directors since September 2015.

19. Defendant Heather Prichard ("Prichard") was Humacyte's Chief Operating Officer ("COO") at all relevant times. Prichard served as Humacyte's COO since the Business Combination and was Legacy Humacyte's COO since March 2019.

20. Defendants Niklason, Sander, and Prichard (together, the "Individual Defendants"), because of their positions with Humacyte, possessed the power and authority to control the contents of Humacyte's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were given copies of Humacyte's reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information available to them, they knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Humacyte's Business And Operations

#### 1.     Formation and Early Development (Private Company Phase)

21.     Defendant Niklason founded Humacyte in 2004, along with Dr. Juliana Blum, Ph.D, and Dr. Shannon Dahl, Ph.D., as a privately held entity focused on the development and manufacture of universally implantable, bioengineered human tissues. These engineered blood vessels are designed to be implanted in patients requiring vascular access for dialysis or to treat peripheral arterial disease. Humacyte's core technology platform centers on the creation of HAVs, which it claims are designed to address critical unmet needs in vascular repair, reconstruction, and replacement. Humacyte's operations are based in Durham, North Carolina.

22.     As a pre-revenue biotechnology company engaged in research and development of a novel therapeutic platform, Humacyte required and secured substantial capital investment to fund its operations, research and development activities, pre-clinical studies, and clinical trials through multiple rounds of private equity financing.

-13-

23.    In March 2017, Humacyte received the first Regenerative Medicine Advanced Therapy ("RMAT") designation from the FDA, for the creation of vascular access for performing hemodialysis.  An RMAT designation facilitates an efficient development program for, and expedites FDA review of, any biological product that meets three criteria: (i) the product is an RMAT (which includes human tissue products like the HAV); (ii) the product is intended to treat, modify, reverse, or cure a serious or life-threatening disease or condition; and (iii) preliminary clinical evidence indicates that the product has potential to address unmet medical needs for such a disease or condition. RMAT designation provides benefits, including more frequent meetings with FDA to discuss the development plan for a product candidate and eligibility for rolling review and priority review.  RMAT designation does not change the standards for approval, but may expedite the development or approval process, which may include priority review of a BLA.

24.    In 2018, the HAV was assigned a priority designation by the Secretary of Defense under Public Law 115-92, enacted to expedite the FDA's review of products that are intended to diagnose, treat, or prevent serious or life-threatening conditions facing American military personnel.  Under Public Law 115-92, FDA and the Department of Defense ("DoD") work together to expedite development and review of critical technologies and therapies requested by DoD.  Similar to the RMAT designation, priority designation under Public Law 115-92 does not change the standards for approval, but may expedite the development or approval process.

-14-

### 2. Transition to a Public Company (Initial Public Offering)

25. Humacyte became a public company through the Merger with AHAC, which closed on August 26, 2021. The Merger valued Humacyte at approximately $1.1 billion. Such a "de-SPAC" merger provided Humacyte with access to public capital markets. The combined entity was renamed Humacyte, Inc. and its common stock and warrants began trading on the NASDAQ under the ticker symbols "HUMA" and "HUMAW."

26. The stated purpose of the de-SPAC, allowing Humacyte to go public, as articulated in filings with the SEC, was to provide Humacyte with the capital necessary to advance its clinical programs, including the completion of Phase 3 clinical trials for its HAV, to support commercialization efforts upon regulatory approval, and to fund further research and development of its pipeline.

27. The HAVs are biologics subject to FDA regulation. Before the HAV could be approved for sale in the United States, Humacyte was required to submit a BLA that included sufficient evidence to establish the safety, purity, and potency of the HAV for its intended indications, including from the results of preclinical studies and clinical trials. A BLA must also contain extensive information about manufacturing and product quality control testing. Then Humacyte needed to pass an FDA preapproval inspection of the Durham Facility, where the HAV is produced, at which FDA assessed compliance with good manufacturing practices ("GMP").

28.     Humacyte generally described the BLA review process in its Form 10-K filed with the SEC on March 24, 2023, for the fiscal year ended December 31, 2022 ("2022 10-K"), which was signed and SOX-certified by Defendants Niklason and Sander.  It said:

(a)     A BLA is supported by preclinical studies and clinical trials results and extensive manufacturing and composition information, as well as proposed labeling.  The BLA requests approval to market the biologic for one or more specified indications.  The FDA reviews a BLA to determine, among other things, whether a biologic is safe and effective for its intended use.

(b)     Within 60 days of receipt, the FDA must determine whether the application will be accepted for filing and may refuse the application if it is incomplete or not reviewable.  After it is accepted, the FDA reviews the BLA to determine, *inter alia*, whether the product is safe and potent, or effective, for its intended use, and has an acceptable purity profile, and whether the product is being manufactured in accordance with GMP to assure and preserve the product's identity, safety, strength, quality, potency, and purity, and biological product standards.

(c)     The FDA may refer applications for biological products that present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes outside clinicians and other experts for review, evaluation and a recommendation as to whether the application should be approved and, if so, under what conditions.

(d)     Before approving an application, the FDA will, among other things, inspect the manufacturing and distribution facilities, and will not approve the product unless GMP

-16-

compliance is satisfactory.  FDA may also refuse if the product is not in compliance with FDA's current good tissue practices ("GTP") requirements.

(e)     Biologics may be marketed only for the FDA approved indications and in accordance with the provisions of the approved labeling.

## B.     Post-IPO Financing Activities Provide Additional Substantial Financing

29.     The August 2021 Merger financing, also known as reverse recapitalization, provided Humacyte with much needed financing in the form of cash from AHAC's trust account of $163.8 million and a private investment in public equity ("PIPE") of $83.6 million for a total of $279.2 million. Net proceeds, after costs, were $247.4 million.

30.     On May 12, 2023, Humacyte entered into a Revenue Interest Purchase Agreement ("Oberland Funding Agreement") with three affiliates of Oberland Capital Management LLC ("Oberland") to obtain financing for the HAV's further development and commercialization, to repay its then outstanding credit facility with Silicon Valley Bank ("SVB"), and for other general corporate purposes. Pursuant to the agreement, on May 12, 2023, two of the Oberland affiliates purchased certain revenue interests from Humacyte in exchange for an aggregate investment amount of up to $150.0 million.  On May 12, 2023, Humacyte received an initial payment of $40.0 million, less expenses, which was used to fully repay all outstanding obligations under Humacyte's loan agreement with SVB.  Humacyte was still entitled to receive up to approximately $110.0 million in subsequent installments subject to the terms and conditions set forth in the Oberland Funding Agreement, as follows: (i) *$20.0 million upon Humacyte's BLA for*

*an indication in vascular trauma being accepted on or prior to March 31, 2024*, (ii) *$40.0 million*, at Humacyte's option, *upon Humacyte's receiving FDA approval of the HAV for the vascular trauma indication on or prior to December 31, 2024* and (iii) *$50.0 million*, at Humacyte's option, *upon reaching $35.0 million trailing worldwide three-month net sales any time prior to December 31, 2025*.

31.     The HAV was given RMAT designation for vascular trauma by the FDA on May 4, 2023 as Humacyte was nearing the anticipated completion of its V005 Phase 2/3 clinical trial and while Humacyte was planning and preparing to file the BLA in late 2023. Humacyte also had been assigned a priority designation under Public Law 115-92 since 2018. On information and belief, based on these designations and the status of the clinical trial, Defendants internally modeled Humacyte's cash and cash equivalents position as if the Oberland Funding Agreement milestones would pay out on or before the dates set forth above.

**C.     The BLA Submission**

32.     Humacyte submitted a BLA to the FDA for the HAV in vascular trauma repair on December 12, 2023. The BLA for use in treating vascular trauma was accepted for filing on February 9, 2024 and given a PDUFA date of August 10, 2024. The PDUFA is the date by which the FDA must respond to a New Drug Application or a BLA.

33.     On December 12, 2023, Humacyte issued a press release to its corporate website ("12/12/2023 Press Release"), which quoted Defendant Niklason and was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Sander

-18-

("12/12/2023 8-K"), announcing the filing of a BLA with the FDA seeking approval for the Humacyte's HAV in urgent arterial repair following extremity vascular trauma when a synthetic graft is not indicated and when an autologous vein use is not feasible. The press release highlighted that Humacyte was seeking priority review.

(a)     It stated:

> Humacyte, Inc. . . . today announced that it has submitted a Biologics License Application (BLA) to U.S. Food and Drug Administration (FDA) seeking approval of the Human Acellular Vessel (HAV) *in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible*. The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial as well as from the treatment of wartime injuries in Ukraine. The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.

(b)     Niklason was quoted as saying, "Submitting the BLA to the FDA is a pivotal milestone in achieving our goal of providing regenerative human tissues to injured patients, at commercial scale."

(c)     The press release added:

> The FDA has a 60-day review period to determine whether the BLA is complete and acceptable for filing. Humacyte has requested Priority Review of the application and, if granted, the review should be completed within six months of the filing acceptance date.

34.     On February 9, 2024, Humacyte issued a press release to its corporate website ("2/9/2024 Press Release"), which quoted Defendant Niklason and was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Sander

-19-

("2/9/2024 8-K"), announcing FDA had accepted and granted Priority Review to Humacyte's BLA. It highlighted that such approval expedited review to 6 months, instead of 10 months for a standard review, and setting the August 10, 2024 PDUFA date.

**D.     Humacyte's Close Knit Leadership During the Class Period.**

35.     Humacyte was a relatively small company in 2023. As of December 31, 2022, it had only 164 employees. Throughout the Class Period, it had just one facility – the Durham Facility – for its corporate headquarters, manufacturing, and research and development and roughly 180-220 employees.

36.     As of August 2023, and throughout the Class Period, Humacyte had a small and close-knit leadership structure, principally comprised of Defendant Niklason, Defendant Sander, Defendant Prichard, Chief Medical Officer ("CMO") Dr. Shamik J. Parikh ("Parikh"), and Senior Vice-President, Quality Harold Alterson ("Alterson") (later the Chief Quality Officer ("CQO")).

**E.     Undisclosed, Material, Negative Facts.**

37.     Throughout the Class Period, material, negative, undisclosed facts concealed from investors serious problems with, among other things, the HAV, Humacyte's clinical trials, and the Durham Facility.

**1.     Undisclosed Facts and Risks Described by the CWs.**

38.     The CWs collectively illustrate, through first-hand accounts, the myriad manufacturing, quality control and stability problems. Their statements corroborate, and

are corroborated by, FDA reports and memoranda, FDA whistleblower accounts, and investigative journalism as set forth below.

39.  **CW1** was a Technician at Humacyte from October 2022 to June 2024.  CW1 worked at the Durham Facility, and reported to Greg Miller, Senior Director, Engineering and Facilities Operations. CW1 believes Miller reported to COO Heather Prichard.  CW1's job involved checking and maintaining instrumentation at the plant.  CW1 stated the C-Suite offices were located on-site at the Durham Facility where the HAV was manufactured, and COO Heather Prichard was on site full-time.  The Durham Facility was Humacyte's only site.  Humacyte did not have offices elsewhere.  The C-Suite all had offices on site in Durham, including CEO Laura Niklason, CFO Dale Sander, and COO Heather Prichard.  Prichard appeared to be the head person in charge of the manufacturing facility.  Any discussions that the company had with FDA regarding the manufacturing facility would likely have involved Prichard and Greg Miller.

40.  **CW3** was a Sr. Director, Supply Chain, that worked for Humacyte from December 2023 to August 2024.  CW3 was responsible for creating and executing plans for supply chain, planning, logistics and warehousing.  CW3 supervised a team of approximately 12-14 people including an Associate Director of Procurement, planning managers, logistics managers, and inventory coordinators, and reported to COO Heather Prichard and CQO Harold Alterson.

(a)     CW3 had no direct contact with CEO Laura Niklason, except during quarterly town hall meetings, led by Niklason, during which all approximately 100

employees were present in person or remotely. CW3 specifically remembered CFO Dale Sander being present for the meetings, as well, either in-person or remotely. CW3 was also involved in weekly/bi-weekly one-on-one, face-to-face meetings with COO Heather Prichard to prepare for a mock FDA inspection, as well as to discuss long range planning strategies for supply chain and other issues. CW3 was not involved with meetings involving other C-suite members but would answer questions for Prichard, which she would take to C-suite meetings. CW3 could physically see Prichard meet with Niklason numerous times in her office as the office walls were made of glass. CW3 could also see Prichard meeting with the scientific teams in her office as well.

(b)     CW3 stated that after the actual FDA inspection was completed, ad-hoc meetings were conducted (May/June 2024), which resulted in requests for information for how the BDS material in trays was behaving and how a repeatable process could be maintained. This was in preparation for responses to the audit. A Form 483 was shared in June/July after the FDA inspection. One area of concern noted was microbial quality. CW3 observed Prichard and Alterson through the glass walls, having numerous meetings in their offices and conference rooms regarding the findings.

(c)     **Meetings with Heather Prichard.** CW3 recalled meeting with Heather Prichard and her establishing three primary objectives for 2024: preparing for a mock FDA inspection, preparing for the real FDA inspection, and establishing logistics for sales and distribution of product releases after the FDA inspection and anticipated BLA approval. CW3 recalled specific meeting dates where CW3 met face-to-face with Prichard on June

5, 2024; July 3, 2024; July 10, 2024 and July 18, 2024. During the July 10, 2024, meeting, Prichard shared information with CW3 regarding issues with the BDS, gas exchanger, and Tracelink affecting ability to track transportation temperatures, including how the batches of material were not consistently repeatable, how the batches were achieving low yields of the finished product (*i.e.*, the HAV), and how they were losing entire batches of finished product.

(d) **"Go / No-Go" Meetings.** "Go/No-Go" meetings were conducted in anticipation of and preparation for the results of the FDA inspection. They started out as monthly meetings but increased in frequency as the FDA inspection date approached. CW3 had some discussions with Prichard on whether a third-party inspection team should be hired to conduct warehouse inspections. Several other critical issues were discussed, including concerns of one of the suppliers of BDS trays, the Meissner Corporation. There was an issue of leaks in the BDS trays and the gas exchanger which affected the performance manufacturing process, lowering the yield of usable material. Prichard never made a decision without obtaining approval from Harold Alterson. CW3 observed Prichard and Alterson in numerous meetings with the scientific teams, research and development teams, quality teams, and product development teams, which CW3 was able to observe through the glass walls of the conference rooms. These meetings occurred on a weekly basis. After approaching Matt Panning, a director of manufacturing, about the issues, Panning mentioned to CW3 that the discussions were about problems with

-23-

repeatability in quality of the batches being produced and that there was added pressure to achieve a repeatable, sustainable process.

(e)     CW3 sent anonymous letters to four specific FDA officials, directing them to review specific batch numbers of tissue that Humacyte did not know were stable. These were really test batches that they did not know were stable or even viable because they did not have a repeatable process. CW3 signed this letter "A Concerned Employee" which is why they referred to it as the ACE memo. While CW3 did not have knowledge of the FDA inspection findings or issues, Humacyte was in no way ready for commercial release of the HAV. CW3 explained that the tissue was produced by machines known as "LUNA-50, LUNA-100, and LUNA-200." Humacyte was desperately looking for positive results, but failing to make a stable batch of tissue. For example, batches produced by LUNA-200, batch numbers 50-56, were failing and unstable. It was an inside joke at Humacyte that they were not ready to go commercial. Humacyte had no idea why the HAV was unstable, and Humacyte was constantly searching for solutions. The senior executives made it appear to employees that they were on track and everything was good. COO Prichard was the decision maker responsible, but, in CW3's view, she was incompetent and followed the advice of CQO Harold Alterson, who was really running the show. CW3 was terminated abruptly in August 2024, and CW3's access to all of their files was cut immediately. CW3 believes CW3 was terminated for raising issues about the quality of the tissue.

-24-

41.    **CW4** was a Technician at Humacyte from March 2022 to May 2024, based at the Durham Facility.    As a Technician, CW4's job involved performing regular maintenance on equipment at the Durham Facility.

(a)    CW4 stated Humacyte was aware of a Corrective and Preventive Action ("CAPA") in early 2024 of equipment that was failing to make the right mix of gas that fed into incubators where the blood vessels were grown.  When equipment or processes for manufacturing the blood vessels fell outside quality control criteria, such as proper temperature in the clean room, a "quality event" was initiated.  CW4 said quality employees, in collaboration with manufacturing employees, conducted a review of what happened and tried to correct it, then retested the equipment or process to ensure it was back within acceptable criteria.  If the issue was not fixed or the severity of the issue was high, a CAPA was opened. On a regular basis, maybe once a month, senior members of the quality department met to go over the status of quality events and CAPAs.  CW4 observed Harold Alterson, SVP of Quality at the time (currently CQO), sit in on these meetings.  CW4 was not certain how often COO Prichard sat in on the meetings to discuss quality events, but CW4 was certain that Prichard was aware of at least one serious CAPA that was ongoing just weeks prior to the FDA inspection.

(b)    CW4 stated that Humacyte, aware of its issues with the equipment, purchased replacement equipment in late 2023 and/or early 2024, but could not put the new equipment in operation prior to the FDA inspection.  Humacyte was aware that it had problems with some of its equipment, which prompted Humacyte to buy new equipment to address the

problem. CW4 said Humacyte purchased a new tray sealer in late 2023 or early 2024 – prior to the FDA inspection. CW4 said Prichard knew about the replacement equipment because CW4 was aware that Prichard had to sign off on the purchase of the equipment. CW4 said Prichard inspected the new equipment after it was installed at the Durham Facility. Humacyte also purchased new air quality testing equipment – also before the FDA inspection. Despite recognizing the need for new equipment, Humacyte did not put the new machines into operation prior to the inspection, because the FDA requires that equipment be operational for at least year before the inspection. CW4 said Humacyte did not want to install the new equipment because waiting a year for an inspection would have significantly delayed the HAV's approval process.

(c)     CW4 stated that Humacyte did not have a Quality Assurance employee overseeing the Quality Control Microbiology activities at the time of the FDA inspection. CW4 agreed with the FDA's Form 483 observation that Humacyte had "no microbial quality assurance." During CW4's tenure, the employee who conducted quality assurance over the quality control group in microbiology left Humacyte, prior to the FDA inspection, and no one replaced her by the time of the inspection. CW4 said that Aimee Atkinson, who was a Senior Quality Specialist at Humacyte (May 2019 to December 2023), performed the job of quality assurance of overseeing the work that the quality control team in microbiology did. CW4 said Aimee Atkinson's job had been to make sure the quality control team was following proper procedures, conducting quality control tests correctly and recording the results correctly. Alterson, SVP of Quality at the time, would have been

aware that CW4's team was down a quality assurance person overseeing Quality Control Microbiology.

(d)     CW4 **witnessed Quality Control employees testing the clean rooms for microbial contamination only once a month**.  When asked about the Form 483 observation that Humacyte had "no microbial testing," CW4 recalled that the quality control microbiology team did not appear to do much testing at the facility.  CW4 observed that the team only conducted air quality and surface testing of the clean room once a month. CW4 based this statement on observing a calendar that scheduled who was allowed to be in the rooms on certain days.

(e)     CW4 stated that **only 25% to 40% of the lab grown blood vessels passed quality inspection.**  Those rates were discussed internally at Humacyte, and CW4 recalls learning of failures and failure rates in the course of CW4's job at Humacyte.  When CW4 first joined Humacyte, only about 25% to 30% of the lab grown blood vessels passed manufacturing quality tests.  The rest were scrapped as failures.  The success rate only improved to about 40% during CW4's tenure.

(f)     CW4 heard **a significantly large percentage of the lab grown blood vessels did not pass suture testing.**  After the vessels went through the standard manufacturing quality tests, the vessels that passed were then put through suture testing.  Quality Control team or the New Product Development team was responsible for the suture testing.  The suture testing was done off-site and, from what CW4 heard in the course of CW4's employment, the failure rate at suture testing was also significant.  For example, in one

batch only 50 of 200 incubated vessels passed manufacturing tests, and that only 25 of those 50 vessels passed suture testing. "Two to four batches that had, like, a 25% yield rate on suture testing."

(g) CW4 stated that **COO Prichard discussed the failure rate of the vessels during meetings with the maintenance team**. CW4 recalled COO Prichard discussing the blood vessel failure rate in at least one meeting with the maintenance team: "We had a breakout meeting with [Prichard] to see if it was a maintenance thing causing [the failures], or if it was just something else." **The MSAT (Manufacturing Science and Technology) engineering department kept track of the success and failure trends; prepared reports for higher management.** CW4 said quality failures were reported to the MSAT engineering department, which tracked the failure and success rate of manufacturing output. CW4 added, "They would…do an analysis chart based off the batches," and "They created a PowerPoint presentation to take to higher ups to say, 'Hey, this is what we're finding, here is the success rate, here is the failure rate.'" CW4 said that CW4 personally saw the MSAT reports because they were "sent out to pretty much everybody who would touch the equipment; it was an internal document for everyone to see what was going on." CW4 further stated that the issue was also discussed during quarterly "townhall" meetings attended by companywide employees, including "the higher ups."

(h) CW4 recalled that, toward the end of 2023, senior leaders told employees at a companywide meeting that Humacyte had enough funds to get through the end of 2024, but they wanted to extend that runway by cutting back on spending. At the end of 2023,

-28-

the senior leadership talked to the entire company, in a companywide meeting, about the limits of its cash runway. "I do know in 2023, toward the end of the year, they held off on some things they budgeted for," CW4 said. "They said we have enough money to get us through the end of 2024. They wanted to cut back on spending to extend that money past end of 2024." "It was in a town hall where the CEO addressed it." "All the higher-ups were in that meeting," CW4 said.

42. **CW5** was a quality employee at Humacyte from late 2019 to late 2024. CW5 was based at Humacyte's Durham Facility and initially reported to Jeremy Mainville, Director of Quality Assurance. In 2023, when Mainville left, CW5 began to report to Cara Miller Kell, the new Director of Quality Assurance. Toward the end of CW5's tenure, CW5 reported to Darren Smith, Manager – Quality Systems. CW5's job involved participating in investigations of deviations from procedure and deviations from quality criteria. CW5 also assisted with document maintenance and retrieval, including a mock inspection at the facility prior to the FDA inspection.

(a) According to CW5, Humacyte received a number of document requests from the FDA in the months after FDA conducted the preauthorization inspection at Humacyte in April 2024. CW5's co-workers were doing the work. The FDA requested a number of batch records, which detail all steps of the process for manufacturing the blood vessels, including any quality or procedural deviations. "It was all very hush, hush," CW5 said. "They were holed up in a room going through these batch records." A co-worker told CW5 that the FDA's request was made in a way that indicated the agency had received insider

-29-

information that prompted the request. CW5 said, "The way that this information was requested, only someone inside would have known to use that (identifying reference) number" and "it was weird that the FDA was requesting it." CW5 said the effort was ongoing in August 2024, because one of CW5's co-workers who worked on the project did not start at Humacyte until that August. CW5 said some of the people who were pulling the documents were quality employees that the new Director of Quality Cara Miller Kell brought in and whom Miller Kell had worked with previously. "She trusted them with that information," CW5 said. "They knew things that other people didn't know."

(b)     According to CW5, COO Prichard, who was a key contact for the FDA at Humacyte, would have known about the document requests, and the SVP of Quality Harold Alterson also would have known about FDA requests for quality documents. Asked if Prichard was aware of the FDA's requests for batch records in the months after the inspection, CW5 said, "I'm sure she was aware that this activity was going on." CW5 understood that Prichard was a key point of contact at Humacyte for the FDA and that Prichard would have therefore been aware of any request for documents that came in from the agency. CW5 said Alterson also would have been aware of the FDA's request for batch records because those documents were maintained and were pulled by members of the quality team.

(c)     CW5 stated that the quality department experienced a high turnover rate in 2023 and 2024 due to the new management of the department. Like other former employees, CW5 spoke about the leadership changes in the quality department in 2023 that

-30-

prompted a lot of turn-over. CW5 said when Alterson took over leading the department and brought in Miller Kell, the former Director of Quality Jeremy Mainville was forced out. CW5 said the new quality leadership hired new quality employees who were previous co-workers of Miller Kell, and those employees took on jobs that existing quality employees had previously handled. For example, CW5 and a few other experienced quality assurance employees assisted with the mock inspections of the facility sometime in the fall and winter of 2023-24. But during a second mock inspection and the actual FDA inspection in April, CW5 and a number of other senior quality people were replaced by new employees and employees who were not actually on the quality team.

43. **CW2** was a Senior Electrical Technician at Humacyte from March 2019 to May 2024. CW2 was based at Humacyte's Durham Facility and reported to a succession of maintenance supervisors. During CW2's last year, CW2 reported to Greg Miller, Senior Director, Engineering and Facilities Operations. CW2's job involved performing maintenance on the equipment in the manufacturing facility, including preventative maintenance, repairs, and upgrades. As part of the job, CW2 used Humacyte's internal maintenance management software system. The system is supposed to help with scheduling maintenance and maintaining records of maintenance work, such as work orders, maintenance schedules, and all documentation needed to show the facility was complying with Good Manufacturing Practices ("GMP") regarding its equipment.

(a)    CW2 said the software system Humacyte used for managing maintenance work on manufacturing equipment was "a disaster," was not designed for that purpose, and

was one of the biggest problems and frustrations CW2 encountered at Humacyte. CW2 said the software system, called ProCal, was designed for managing calibration of instrumentation – not maintenance. "ProCal is a calibration software designed strictly for doing calibrations for instrumentation," CW2 said. "They (Humacyte) tried to finagle it where it was being used for preventative maintenance and corrective work orders." "The calibration part of that software was great," CW2 continued. "But for preventative maintenance work orders and that kind of thing, it was horrible. It was a terrible system because it wasn't designed for that. Things were falling through the cracks big time." Poor management system led to preventative maintenance "not getting done," as well as poor documentation of work done. Humacyte hired an expert, Cynthia Crawford, in maintenance management software to help address the problem, but the situation remained problematic, and actually got worse as time went on as it relates to GMP and vendor work.

(b)     CW2 stated that, due to problems with the software system, Humacyte would have been out of compliance with GMP. For a pharmaceutical manufacturing company to be in compliance with GMP, the manufacturing facility must show that it is following the maintenance schedule and maintaining proper documentation of that work for all of the equipment in its plant. CW2 believes that Humacyte was "out of compliance with the work order system" and the actual maintenance work in regard to GMP. "If it's GMP equipment, you have to show you've done your due diligence in maintaining that equipment," CW2 said. But the software system that Humacyte was using was allowing work orders to linger, CW2 said.

-32-

(c)     CW2 and co-workers in maintenance repeatedly told their managers that Humacyte needed a new maintenance management system. CW2 and co-workers in maintenance repeatedly told their managers that the ProCal system was inadequate for maintenance management. "We warned them and warned them and told them we needed a new system, that it's terrible." During CW2's tenure, Humacyte talked about buying a new CMMS (computerized maintenance management system), but they did not follow through. "They looked at four to six systems for maintenance management, but they never pulled the trigger," CW2 said. CW2 said there is "no way [Prichard] would not have been involved with that." CW2 said Humacyte was paying about $100,000 annually for the ProCal system, and CW2 thinks a new system would have cost about the same amount.

(d)     CW2 stated Humacyte sometimes delayed preventative maintenance and calibration on equipment for months, which put Humacyte out of compliance with GMP. Humacyte was not always doing timely preventative maintenance on the equipment and calibration of instrumentation. "It was the things you're not supposed to do with GMP equipment that was happening," CW2 said. "A lot of it was because of scheduling conflicts. If they were using a piece of equipment, they wouldn't take it down long enough to do the correct maintenance procedure. Or like, preventative maintenance was pushed back months and months, which you're not supposed to do. You're supposed to stick to (the maintenance schedule) best as you can. Things were getting pushed out and pushed out, extension after extension." CW2 noted that a number of pieces of equipment in the facility were specialized and required a visit from the vendor to complete preventative

maintenance. Humacyte often claimed scheduling conflicts in which the company did not want to shut the equipment down to do the maintenance, CW2 said. "That process was a disaster and a nightmare."

(e)     CW2 also noted the way Humacyte was classifying the delays was improper as well. When work was delayed, Humacyte was calling it an "extension, which is not legal – it's made up grammar they came up with." When GMP maintenance is delayed, Humacyte was "supposed to do a 'deviation.'" "That's what real GMP (facilities) do," CW2 said. "But they hate doing [deviations] because it looks bad. Quality has to sign off on it. You have to get three or four signatures for a deviation to go through."

(f)     CW2 stated that after the FDA inspection in April 2024, COO Prichard met with maintenance workers in what CW2 said was "not a friendly meeting," during which she expressed unhappiness about the maintenance management situation, generally "concerned in the meeting with the way the work orders in the system were falling through the cracks, and she was not happy about the cracks even though we warned my supervisors." However, "she (Prichard) created a problem and let it linger. There is no way she (Prichard) didn't know," particularly in light of the succession of managers that had problems with ProCal, CW2 said. "We had been through four different managers in five years. All of them were on the same page as far as ProCal goes – how much of a disaster it was."

(g)     At some point and including the months leading up to the FDA inspection in April 2024, senior managers told CW2 and at least one co-worker to close out old,

-34-

incomplete work orders in the maintenance management system. "They kept asking us, 'Just go ahead and close them out' even though the work hadn't been done, and paperwork wasn't attached," CW2 said. "They were over my head, so I didn't have a lot of say so." CW2 followed management instructions, because at that point CW2 was so frustrated by the mess and Humacyte's inability to fix the problems that CW2 did not care anymore. "At a certain point, you don't give a crap anymore," CW2 said. "You throw your hands up. If they won't fix the real issue, it's their problem." The instructions to close out incomplete work orders were given at maintenance team meetings by Greg Miller, and Crawford. CW2 expressed disapproval and surprise that CW2 and co-workers were asked to close out incomplete work orders without the work being done. CW2 said everybody who has worked at a pharmaceutical manufacturing facility would know this request was highly inappropriate. "If you've ever worked in a GMP environment for any amount of time, you know better not to do that," CW2 said. "That's a big no-no... It's falsifying documents. They usually fire people for that. That will get you fired really quick. But evidently, not at Humacyte." One of CW2's co-workers, Brandon Duty, a Senior Facility Maintenance Mechanic, started to refuse to close out incomplete work orders in the system. Shortly after, Duty was fired. "There were lots of things going on that were a little shady," CW2 said.

(h)     CW2 said the managers who instructed CW2 to close out incomplete work orders reported directly to Prichard, and due to the nature of the instruction, they would not have risked issuing the instructions without higher level approval. Asked if Prichard was

involved with or aware of the instructions to close out incomplete work orders in the software system, CW2 said she had to have given the instructions or known about the instructions. Instructing employees to falsify documents in a GMP manufacturing plant was a fireable offense, ***so Crawford and Miller would not have taken the risk to give those instructions if they did not have higher level approval.*** Crawford and Miller both reported directly to Prichard, who had taken a focused interest in the maintenance management system because of the problems. Asked if Crawford and/or Miller would have made the decision on their own to instruct employees to close out incomplete work orders, CW2 said, "Heck no! No way, no way." CW2 believes that Humacyte was closing out the incomplete work orders because the company was "trying to make the books look pretty for whoever wants to look at it."

       **2.**      **Undisclosed Facts and Risks Disclosed in the Form 483.**

      44.     On October 17, 2024, during market hours, the FDA released a Form 483 concerning Humacyte's Durham Facility. An FDA Form 483 is issued to inform management at the conclusion of an inspection when an investigator has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic Act and related Acts. The Form 483 for the Durham Facility inspection reflected that it had been issued to Humacyte on April 5, 2024, yet it was never disclosed to investors by Defendants, despite their glowing statements about the inspection and their confidence in the HAV's approval. Rather, the Form 483 was not glowing – it highlighted glaring issues.

45. The Form 483 issued to Humacyte on April 5, 2024 showed that during FDA's inspection of the Durham Facility from April 1, 2024 - April 5, 2024, the FDA identified a number of violations including, among other things, references to "***no microbial quality assurance***," "***no microbial testing***," and "quality oversight is inadequate" for a number of issues, including the failure to investigate "Out of Specification" issues for as long at 710 days (almost 2 years). Specifically, the Form 483 stated, in relevant part:

46.    Defendants never commented on the FDA's release nor the contents of the Form 483 inspection results.

3.    **Undisclosed Facts and Risks Disclosed in FDA Approval Letter.**

47.    On December 19, 2024, the FDA issued a BLA approval letter to Humacyte ("12/19/2024 BLA Approval"). While the letter was received with great fanfare, and a significant bump in Humacyte's deteriorated stock price, all was not rosy. The initial BLA sought approval for the HAV, now Symvess, more broadly for use "***in urgent arterial repair*** following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible." The final approved indication is much narrower than requested: "use in adults as a vascular conduit for extremity arterial injury when urgent revascularization ***is needed to avoid imminent limb loss***, and autologous vein graft is not feasible."

48.    The FDA approval letter also included several unusual requirements and commitments beyond standard practice, namely:

(a)    Humacyte cannot distribute any product lots until it receives a specific release notification from the Center for Biologics Evaluation and Research ("CBER") Director.

(b)    For the first three years post-approval, reports of graft rupture and anastomotic failure must be submitted as expedited 15-day reports, in addition to standard adverse event reporting.

(c)     A pediatric study for patients 17 years or younger (who have reached Tanner Stage 5) is deferred, with the final protocol due March 31, 2025, and the final report due June 30, 2029.

(d)     A long-term observational study is required post-marketing to further assess risks like graft failure (rupture, thrombosis, anastomotic failure) and infection in patients receiving the HAV for the approved indication. The final report is due April 30, 2031.

(e)     Completion and submission of the final report for Study CLN-PRO-V005 (treating life- or limb-threatening vascular trauma) must be done by December 31, 2026.

(f)     A PMC shipping validation study must be conducted to evaluate the critical, quality attributes of the HAV (due February 28, 2025). (Corroborated by CW3).[2]

(g)     Humacyte must submit an 18-month PMC leachables study to address potential contaminants and an additional method validation report (due January 31, 2025).

(h)     Humacyte must establish and justify updated acceptance criteria for product release via a Prior Approval Supplement, due September 30, 2025.

---

[2]     Specifically, under the heading "CMC PMC items not subject to reporting requirements under section 506B." In the FDA regulatory context, CMC means "Chemistry, Manufacturing, and Controls." CMC refers to the procedures ensuring pharmaceutical products are consistently manufactured to meet quality standards. It encompasses specifications for raw materials, manufacturing processes, and final product testing to guarantee identity, safety, strength, and purity. PMC means "Post Marketing Commitment." A PMC is a study or trial a company agrees to conduct post-approval, often to address residual concerns (*e.g.*, manufacturing consistency or long-term stability). Unlike PMRs (Postmarketing Requirements), which are mandated by statute or regulation, PMCs are voluntarily agreed upon during regulatory negotiations.

(i) Humacyte must submit annual reports detailing the status of all required post-marketing studies and commitments.

49. These hurdles underscored regulatory concerns about the HAV's product consistency and quality assurance.

**4.    Undisclosed Facts and Risks Revealed by Investigative Reporting.**

**a.    The March 24, 2025 New York Times Investigative Bombshell**

50. On March 24, 2025, NYT published an article ("3/24/2025 *NYT* Article") that brought to light numerous significant and adverse facts Humacyte failed to disclose to investors during the Class Period concerning the clinical trial results, safety profile, and regulatory assessment of the HAV and FDA's serious concerns about granting the BLA.

51. The article reported that Humacyte's methodology improperly counted catastrophic patient outcomes, including the *four patients who died*, the *four patients who required limb amputation* (one following a clot and infection in the HAV), and *one patient lost to follow-up within the small 54-patient study group*, as instances of product "success." This accounting method misrepresented the true performance and risks of the HAV device.

52. The article revealed that FDA scientists, applying *standard* assessment criteria, counted these same severe adverse outcomes (deaths, amputations, lost cases) as failures due to the lack of definitive evidence that the grafts were functioning properly. ***This FDA analysis resulted in a calculated actual 30-day success rate of only 67%.*** This

data showed **the HAV performed inferiorly to the approximate 82% success rate documented for existing artificial graft options already available to surgeons**.

53. The article discussed how FDA medical device reviewer Dr. Robert E. Lee, a vascular surgeon, had reviewed patient cases and identified a significant, alarming risk of "unpredictable, catastrophic and life-threatening" ruptures or blowouts occurring in the mid-section of the HAV graft, events he described as occurring without warning. Compounding the safety concerns, Humacyte failed to disclose that, according to another FDA reviewer, **reliable longer-term safety data was severely lacking because a substantial majority of the trial participants (37 out of 54) were missing from a crucial four-month safety assessment, many due to death or being lost to follow-up**. **This absence of data created what the reviewer termed "significant uncertainty regarding the safety and effectiveness of this product beyond 30 days."** Thus the FDA's internal review explicitly found "no clinical evidence" to support this purported benefit.

54. The article discussed the FDA statistician's deeply critical assessment of the trial data submitted for approval. Defendants failed to disclose that this internal expert deemed the primary U.S. trial **"poorly conducted"** and **subject to "multiple major changes" during its course**, found the supportive data from the V017 Ukraine trial potentially **compromised by selection bias ("skewed to shrapnel injuries")** and of **"poor" quality**, and ultimately concluded that **neither study met the "usual criteria for an adequate and well-controlled trial," rendering the evidence base for efficacy questionable**.

55.     Dr. Lee was quoted in the article as saying the chance of HAV rupture is "an unacceptable risk for whatever slim benefit, if any, this product provides above the current standard treatments."   According to the article, Dr. Lee unsuccessfully sought a public advisory hearing on the HAV.   An advisory committee meeting would have opened the V005 Phase 2/3 clinical trial and V017 Ukraine trial results to review and discussion by independent experts.   Instead, FDA sent the records to three external reviewers who identified failure of the HAV was a serious risk, but they also said that vascular trauma patients could still benefit from treatment with the HAV.

### b.     March 25, 2025, Bloomberg Additional Investigation

56.     On March 25, 2025, Bloomberg published a further article ("3/25/2025 *Bloomberg* Article") detailing further undisclosed adverse facts that painted an even more troubling picture of the HAV's approval process and the questionable conduct of its supporting clinical trials.

57.     The 3/25/2025 *Bloomberg* Article detailed serious allegations from Dr. Lee regarding dynamics of the Humacyte / FDA process leading up to the HAV's approval. Dr. Lee said the FDA reviewers were pressured to approve the HAV even after he repeatedly raised "grave safety concerns" which were buried.

58.     The article details the profound instability and questionable scientific validity of Humacyte's primary HAV clinical trial.  For example, Humacyte **repeatedly requested and implemented significant changes to fundamental trial parameters while the trial was already ongoing**.   These mid-stream alterations included **modifications to the types of**

-42-

*patients enrolled, the number of patients studied, and even the core metrics used to define and measure success*.  As noted by FDA reviewers, such constant changes fundamentally undermine the reliability and interpretability of trial results, introducing potential biases and deviating from the rigorous, pre-defined protocols expected for pivotal studies.  Yet, Defendants did not reveal this lack of a stable, consistent trial design to investors.

59.    Furthermore, according to an FDA statistician's document referenced in the 3/25/2025 *Bloomberg* Article, the HAV was ultimately approved despite the documented *trial instability and over significant disagreements among FDA reviewers regarding safety and efficacy*.  Between 2020 and August 2023, Humacyte was locked in a back-and-forth with the FDA, as Humacyte repeatedly asked to change aspects of the study.  Finally, in August 2023, leaders within the FDA's biologics division utilized an "Informal Dispute Resolution" process to permit Humacyte to submit its application for the HAV's approval. This mechanism allowed the BLA to proceed over internal objections and documented deficiencies.

60.    As reported in the article, Dr. Lee further revealed how, even in 2024, the Humacyte / FDA approval process was further compromised and highly irregular.  Dr. Lee repeatedly raised "grave safety concerns" that the HAV had "catastrophic life-threatening failures" and that its risks "are unacceptable when compared to current alternate treatment options" directly with senior FDA leadership during July or August 2024, just as Humacyte told investors it was expecting approval, but his concerns were effectively being "buried,"

-43-

as he was told by FDA reviewers that they faced significant internal pressure to approve the device "one way or another."

61.     Indeed, the degree to which FDA's approval of the HAV deviated from the norm was significant and remained undisclosed to investors.  The article reported that Dr. Lee was rebuffed by FDA leadership before August 9, 2024, then sought out an FDA ombudsman, before reaching the acting head of the FDA's device division, Michelle Tarver, who said she secured a commitment from the biologics division (the division ultimately responsible for the HAV's approval) that a public advisory committee meeting would be held to discuss the HAV's risks and benefits.  Adding to the severe irregularity of the process, the promised public advisory committee meeting – a standard forum for independent expert scrutiny of novel or controversial products, particularly those with safety signals – was never convened, despite Ms. Tarver's commitment.  Instead, FDA privately consulted three external experts. However, these experts reportedly echoed the serious safety concerns, specifically identified the potential for graft failure as a "serious risk," and critically concluded that the HAV "did not demonstrate superiority to existing treatment options."

62.     The 3/25/2025 *Bloomberg* Article discussed how the FDA's review, based on proper accounting for patient outcomes including deaths and device removals, showed ***a concerningly higher rate of infection at the HAV site (5.6%) compared to the established rate for synthetic grafts (approximately 2.5%)***, directly contradicting claims of superior infection resistance.  The article also said the FDA found ***the rate of limbs***

-44-

*salvaged using HAV was only 76%*, offering no demonstrable improvement over existing synthetic products and undermining Humacyte's narrative of superior amputation prevention.

### 5. Undisclosed Facts and Risks Contained In FDA Review Documents

63. The 3/24/2025 *NYT* Article and the 3/25/2025 *Bloomberg* Article revealed that the FDA had quietly posted deep on its website, a series of documents in a compressed zip folder entitled "Letters, Reviews, Related Documents -Symvess." This folder contained 16 separate documents, including some apparently referred in the articles, including a PMC Response Review, a Late Cycle Meeting Summary, a Statistical Review Memo, and a Clinical Review Memo, which confirm the investigative reporting as to problems and issues raised by the FDA and the timeline of Defendants' knowledge thereof. Specifically:

### a. The PMC Response Review

64. The undated memo entitled *PMC Response Review* shows that as early as May 10, 2024, Humacyte was still under deep scrutiny as it had failed to provide a "sterilization validation of the bioreactor disposable set (BDS)." Rather, it committed to provide one after the PDUFA date, by September 30, 2024. As the memo explains, Humacyte only submitted a response on August 22, 2024—weeks after the August 9, 2024, PDUFA date.

### b. Late-Cycle Meeting Summary

65. The May 20, 2024, *Late-Cycle Meeting Summar*y ("LCM Summary") describes a meeting between the FDA and Humacyte personnel, including Defendants

Niklason and Prichard and other senior Humacyte employees. It makes clear the FDA issued "Late-Cycle Meeting Materials" on May 10, 2024, ten days before the meeting. The LCM Summary discusses serious ongoing issues and FDA concerns regarding the HAV's safety, efficacy, manufacturing, and approvability, all of which were communicated to Defendants by, at latest, May 20, 2024. The LCM Summary, which "constitutes the official record of the meeting," evidences the following issues and concerns.

66.     The FDA identified numerous, critical Chemistry, Manufacturing, and Controls ("CMC") issues that were then-still under FDA scrutiny and required further action or information from Humacyte. These known deficiencies and uncertainties included:

(a)     *Known insufficient and late extractables and leachables studies*. The FDA noted that an extractables study data for the final container closure was pending from Humacyte and that its study approach "did not follow the common practice," potentially causing the leachables evaluation to "miss detection of some leachable compounds." During the meeting, Humacyte agreed to provide a list of all final container closure components and a report to address this gap.

(b)     *Known inadequacy of testing for sterility and endotoxins.* The FDA required "clarification and further information" regarding excipient sample suitability. Specifically, FDA was concerned with sterility testing and endotoxin testing. FDA was concerned that Humacyte's excipient suitability "did not include any anaerobic organisms," and it "recommended an anaerobic microorganism be tested."

-46-

(c) *Known inadequacy of Humacyte's shipping validation study.* The FDA found that Humacyte's submitted shipping study was "limited to information on the temperature control capability of the shipper and does not include any evaluations for drug product quality and safety." The FDA expressed concerns about relying on shipper validation that was not representative of real-world conditions and "recommended that Humacyte consider the worst-case scenario ... in the shipping validation study."

(d) *Known issues with the sterilization validation of the bioreactor disposable set (BDS).* FDA noted that sterilization validation for bioreactor components was ongoing. While Humacyte planned to submit information about its continuing validation study by July 24, 2024, the FDA wanted the information earlier, because it was too close to the PDUFA date.

(e) *Known requirement that Humacyte commit to and meet and sterility assurance corrective action plan.* The FDA elaborated on its Form 483 observation that Humacyte had a problem with its sterility assurance. Humacyte wanted to address the problem no later than November 13, 2024.

67. The LCM Summary shows the FDA and Defendants discussed, on May 20, 2024, significant FDA concerns about Humacyte's clinical trial results and the HAV's safety profile.

(a) *The FDA was concerned with insufficient long-term follow-up data.* The FDA noted that the BLA submission included long-term follow-up data for only "7 of 54 subjects" in the primary analysis set for clinical trial V005, and that "37 patients (69%) had

less than one year follow-up." The LCM Summary says FDA's "***review is ongoing to determine whether the extent of follow up for safety is sufficient to describe the risks of HAV***." According to the LCM Summary, Humacyte agreed to provide long-term follow-up, which the FDA said it would consider.

(b) *The FDA was considering a "Boxed Warning" for rupture risk*. The FDA informed Humacyte that "FDA is considering a boxed warning about rupture risk in the setting of HAV infection which was noted in both extremity and torso/iatrogenic groups." The possibility of a black-box warning indicates a significant concern that was already communicated to Humacyte on May 20, 2024.

(c) *FDA had concerns about Humacyte's infection resistance claims.* In the same labeling discussion, the FDA highlighted ongoing concerns regarding Humacyte's claim of infection resistance.

68. The LCM Summary shows that the scope of the HAV's approval was not settled. According to the LCM Summary, as of May 20, 2024, "FDA's review of the proposed indication is ongoing and will likely require additional clarity from the applicant regarding the patients in whom use of the autologous vein is not 'feasible.'" Thus, the FDA was considering a narrowed indication approval, to be discussed at another time (by no later than July 11, 2024): "Further discussion regarding the appropriate phrasing of the clinical indication will occur during labeling negotiations."

### c. The Statistical Review Memorandum

69.     The FDA's Statistical Review ("Statistical Review Memo") discusses FDA concerns with Humacyte's clinical trial results supporting the BLA, including the HAV's efficacy, safety, and regulatory approvability.   The Statistical Review Memo, which analyzed data from the V005 Phase 2/3 clinical trial and V017 Ukraine trial, highlights numerous deficiencies and negative findings.   It includes interspersed "Reviewer's comments" with Thomas Zhou's thoughts about the BLA.   Its text includes the following.

70.     *Humacyte's Clinical Trial designs and conduct were fundamentally flawed, undermining reliability*.   The FDA Statistical Review Memo concluded that "Neither study met the usual criteria for an adequate and well-controlled trial."

(a)     **V005 Phase 2/3 clinical trial (Study CLN-PRO-V005)** lacked scientific rigor.   For example, the Statistical Review Memo noted the study "underwent multiple major changes while the study was ongoing, and the ongoing clinical outcomes were known."   These changes included "major changes to the study design, study population, primary efficacy endpoints, sample size, and SAP [Statistical Analysis Plan]."   Crucially, "the performance benchmarks based on literature review were derived while this open label trial was ongoing" and were "finalized when all the primary and key secondary efficacy endpoints in the original submission were known."   The  Statistical Review Memo stated, "In a well-controlled study, the performance benchmark should be chosen prior to trial initiation ... Therefore, [Humacyte's] frequent changing of key study elements and the analysis plans while the trial was ongoing introduced selection bias."   The Statistical

-49-

Review Memo noted "major issues with data quality," including "low imaging compliance used to determine patency status" and "poor adjudication of patency status in subjects who were not followed up to 30 days post-implantation." Due to "poor data quality and discrepanc[ies]," the FDA performed its own "internal adjudication of the efficacy data." The Statistical Review Memo also identified "several cases where the HAV occluded, and the limb survived without revascularization, raising the question if the HAV was needed in the first place," and other cases where "subjects treated with the HAV were later identified to have vein available for autologous graft, in which case HAV use would not be mandatory or preferred," raising concerns about trial conduct and patient selection.

(b)  **V017 Ukraine trial (Study CLN-PRO-V017)** was biased and of limited value. The Statistical Review Memo noted the study was "a retrospective, observational ... single-arm study" which "is prone to selection bias and offers only limited supportive evidence due to the different study population and settings." Further, the Statistical Review Memo noted that positive efficacy results in the V017 Ukraine trial "could be attributed to selection bias," that the data were "skewed to shrapnel injuries and not the more typical devastating severe limb or polytraumatic military injuries that could provide robust data of HAV in terms of infection resistance," and it "consisted of less severe injuries compared to [the V005 Phase 2/3 clinical trial]."

71. *FDA's independent data assessment generated significantly worse results than those included with the BLA.* The FDA rejected Humacyte's method of handling missing data and intercurrent events (like death or amputation), finding it systematically

-50-

biased the results in favor of the HAV. FDA's own analysis showed notably worse HAV performance than what Humacyte submitted supporting the BLA. These data were often worse than historical benchmarks for synthetic grafts. They were also worse than Defendants reported to investors.

(a) **Primary Patency (V005)**. The FDA's primary patency rate at Day 30 was 66.7%, significantly lower than the 84.3% Humacyte submitted and below the synthetic graft benchmark of 82.4%. A reviewer comment noted that Humacyte's "while-on-treatment strategy represents an overestimate ... because the adjudicated subjects are counted as patent at the time of the intercurrent event despite the fact many died or were amputated within the first 10 days after implant and had no definitive imaging assessments." In other words, Humacyte wrongly counted dead and amputated patients as patency successes for its BLA.

(b) **Secondary Patency (V005)**. The FDA's secondary patency rate at Day 30 was 72.2%, lower than Humacyte's claimed 90.2% and the synthetic graft benchmark of 78.9%. Similar analytical flaws by Humacyte led to this overestimation.

(c) **Infection Rate (V005)**. The FDA's HAV infection rate at Day 30 was 3.7%. A reviewer comment noted this was "higher than the mean infection rate of 2.5% for synthetic grafts in civilian trauma (based on literature search)," contrary to Humacyte's claims of superiority. The Statistical Review Memo said Humacyte's analysis (reporting 2.0% infection rate) "underestimated the risk of HAV infection as it counted subjects who were not evaluable for Day 30 and/or had no culture taken for infection evaluation as

-51-

having no infection," and "The risk of HAV infection was likely underestimated due to the 13 subjects not evaluable for infection at Day 30 but counted as HAV infection-free." A review comment says:

> [Humacyte] did not evaluate HAV infection for many of the subjects who were amputated or died. This analysis used the while-on-treatment strategy of handling the [intercurrent events] for estimation of infection rate, which was not pre-specified in the SAP. It is unknown whether HAV was infected for many of the subjects who were amputated or died or were lost to follow-up. Including subjects with missing data on HAV infection as having no infection for Day [30] potentially underestimated the risk of infection, biasing in favor of HAV.

(d) *Limb Salvage Rate (V005).* The FDA's limb salvage rate at Day 30 was 75.9%, drastically lower than Humacyte's reported 90.2%. A reviewer comment noted this "large discrepancy was due to [Humacyte's] use of the while-on-treatment strategy ... which considered subjects who died, had HAV explanted, HAV occlusion, or were lost to follow up as limb salvaged," whereas the "FDA assumed the conservative values of limb not salvaged for these subjects."

72. The FDA Statistical Review Memo said, "There was no clinical evidence submitted that demonstrates HAV's infection resistance." "Consequently, there was no evidence to support HAV's use in grossly contaminated wounds" or "heavily contaminated wounds." It also said Humacyte's chosen infection benchmark for synthetic grafts (8.4%) was "much higher due to the inclusion of ... military trauma papers and thus biased in favor of HAV." According to the Statistical Review Memo, a more appropriate benchmark for civilian trauma trials (like V005) was 2.5%, which the HAV's 3.7% infection rate exceeded.

-52-

73.     A reviewer comment in the FDA Statistical Review said, "The data on long-term efficacy and safety were very limited by the large number of dropouts."   Patient follow-up was often short, with only 55.6% followed for at least six months in the V005 Phase 2/3 clinical trial.  Thus, "[t]he long-term efficacy and safety of HAV is unknown."

74.     The FDA Statistical Review Memo quoted Dr. Robert Lee's clinical consult memo: "The observed risks of infection associated HAV blowout and of anastomotic disruption are unacceptable when compared to current alternate treatment options," and "This observed failure mode of the HAV is unpredictable, catastrophic and life threatening. The risk benefit balance when using the HAV is highly unfavorable...."   The clinical consult memo also said that data had "NOT been provided to support that the HAV is safe or effective in this setting [military use] and the available data raises major concerns that the HAV would result in worse outcomes than alternative options...."

75.     The FDA Statistical Review Memo detailed a "Summary of Pre- and Post-submission Regulatory Activity," showing a years-long history of the FDA communicating "major statistical concerns" and "major issues" to Humacyte regarding its trial designs, choice of comparators, endpoints, sample sizes, handling of missing data, intercurrent events, and the risk of "serious selection bias."  Despite exercising "regulatory flexibility on numerous occasions," the FDA clearly communicated that "the data submitted do not offer the same level of certainty expected from a well-designed clinical study" and that these flexibilities "introduce many challenges in the interpretation of results, such as presence of selection bias and no Type 1 error control."

-53-

76.     The FDA Statistical Review Memo concluded: "It is not apparent from the study data whether there are situations where the benefit of HAV outweighs the risk." Thomas Zhou deferred to the clinical reviewer on the approval recommendation.

### d.     The Clinical Review Memorandum

77.     The FDA's December 18, 2024, Clinical Review Memorandum ("Clinical Review Memo") expanded on the revelations in the Statistical Review Memo. Like the Statistical Review Memo, the Clinical Review Memo interspersed reviewer comments by Dr. Prateek Shukla.

78.     The Clinical Review Memo explained the indication was revised in labeling negotiations to restrict HAV's approved use. The Clinical Review Memo explained the restricted indication was in response to data deficiencies detailed in the Statistical Review Memo, and the change was done to "limit use of this product to the population who would have the greatest benefit from its use."

79.     Like the Statistical Review Memo, the Clinical Review Memo discussed the V005 Phase 2/3 clinical trial's deficiencies:

(a)     ***Compromised Study Integrity.*** A reviewer comment discussed how the V005 study protocol "underwent multiple major changes while the study was ongoing, and the clinical outcomes were known due to the open-label single-arm study design." These "included major changes to the study design, study population, primary efficacy endpoints, and sample size." It said, "The frequent changing of key study elements and the analysis plans while the trial was ongoing limit the total number of evaluable patients for this

indication and affect our ability to draw definitive conclusions from the data." The Clinical Review Memo further incorporated the statistical reviewer's conclusion that the V005 Phase 2/3 clinical trial "was not an adequate and well-controlled trial" and "seemed to be poorly conducted with missing data related to evaluation of adverse and intercurrent events and patient follow up."

(b)    *The Clinical Review Memo illuminates disagreements with Humacyte on data interpretation.* A reviewer comment noted that discussions between Humacyte and FDA "regarding... how best to determine Day 30 patency for patients who discontinued prior to this timepoint were ongoing prior to BLA submission and we did not reach agreement." A reviewer comment also said "inconsistent and/or inadequate methods to ascertain patency status in different patients by [Humacyte's] adjudication committee."

80.    The Clinical Review Memo details how Humacyte's analyses yielded more favorable results than the FDA's analyses. The findings almost precisely mirrored the findings in the Statistical Review Memo, and are summarized as follows.

(a)    *Primary Patency*: The FDA's primary patency rate for the V005 Phase 2/3 clinical trial was 66.7%, significantly lower than the 84.3% claimed by Humacyte. A reviewer comment noted Humacyte's strategy "overestimated the primary patency rate as the adjudicated patients were assumed as patent for Day 30 despite the fact many died or were amputated within the first 10 days after implant and had no definitive imaging assessments ... prior to death or amputation to confirm patency." For 7 of 12 non-evaluable patients whom Humacyte adjudicated as patent, the FDA "found no definitive assessment

-55-

of patency prior to death or limb amputation to support the Applicant's conclusion of patency."

(b)     ***Secondary Patency***: The FDA determined a secondary patency rate of 72.2% whereas Humacyte had claimed 90.2%.  A reviewer comment noted Humacyte's strategy "appears to overestimate the secondary patency rate" for similar reasons.

(c)     ***Infection Rate***: Humacyte reported a 1.9% HAV infection rate at 30 days in the V005 Phase 2/3 clinical trial. But FDA's review of case summaries identified an additional patient, leading to an FDA-calculated infection rate of 3.7% at Day 30. The Clinical Review Memo noted that "ATEV infection in the study V005 was only noted in cases where culture, histology or surgical evaluation of the ATEV was possible at the time of surgical reintervention."   A reviewer comment noted concern "that identification of ATEV infection in this manner underestimates the true incidence of ATEV infection but note there was no prespecified evaluation of infection included in the clinical protocol." Thus, as another reviewer comment noted, "the observed ATEV infection rate ... may not be an accurate assessment of the true ATEV infection rate."

(d)     ***Limb Salvage***: The FDA calculated a limb salvage rate of 75.9% at Day 30, contrasting with Humacyte's claim of 90.2%.  The discrepancy was due to the fact that Humacyte's method did "not take into consideration patients who are no longer at risk of amputation as a result of death" or other discontinuations.

81.     The Clinical Review Memo also described how Bioresearch Monitoring inspections at two V005 Phase 2/3 clinical trial sites found the initial primary investigator

-56-

was "replaced due to compliance issues," including issues with informed consent documentation and serious adverse event reporting.

82.     The Clinical Review Memo described the V017 Ukraine trial as a "retrospective, observational study," which "offers only limited support of efficacy due to the different study population and settings," and it was "unsuitable to combine data with that from the prospective study V005." The V017 Ukraine trial involved "lower severity injuries often treated in a not urgent manner." A reviewer comment said the "lack of active monitoring underestimates the incidence of adverse events and safety signals in this retrospective evaluation." This was consistent with the Statistical Review Memo's assessment of the V017 Ukraine trial's limitations.

83.     The Clinical Review Memo highlighted a "concerning signal for graft failure as a result of mid-graft rupture or anastomotic failure." In the V005 Phase 2/3 clinical trial, seven (9.9%) of 71 total patients experienced graft failures resulting in "major post implantation bleeding" (four from mid-graft rupture, three from anastomotic failure). Within the V005 Phase 2/3 clinical trial extremity group, four of 54 patients (7.4%) developed graft failure. And one patient in the torso/iatrogenic group died following anastomotic failure.

(a)     As the Clinical Review Memo said, this risk was deemed significant enough to warrant a "boxed warning for graft rupture and anastomotic failure" in the HAV's labeling. The memo described the observed rupture rate of 7.4% in the extremity group and 9.9% overall in the V005 Phase 2/3 clinical trial as "worrisome and requires further

characterization." It noted the risk was potentially higher than the 0-6% suggested in literature for other grafts. The Clinical Review Memo also noted Humacyte had misclassified one rupture as a "vascular graft complication," which the FDA reclassified.

84. The Clinical Review Memo repeatedly stated that long-term efficacy and safety were not well-characterized: "Evidence of long-term efficacy of this product is limited," and "Long term patency and limb salvage cannot be accurately assessed as 69% of patients did not complete the study." It also said there was "significant uncertainty regarding the safety and effectiveness of this product beyond 30 days due to the limited number of patients who have completed the expected follow up." Only 7 out of 54 V005 Phase 2/3 clinical trial extremity patients completed the 36-month follow-up. The attempt to estimate long-term patency "provide[d] limited clinically meaningful conclusions." These findings were consistent with the Statistical Review Memo's conclusions on limited long-term data.

85. The Clinical Review Memo also details Dr. Lee's conclusions. First, the HAV had a "concerning benefit risk profile, coupled with a catastrophic [HAV] failure mode, and less than robust trauma data set." He noted HAV "blow-outs or disruptions were generally associated with major, life-threatening hemorrhage," and HAV use resulted in "catastrophic life-threatening failures" with risks that "are unacceptable when compared to current alternate treatment options." The Clinical Review memo reported Dr. Lee's opinion that the *HAV "does not have a niche role in potentially saving limbs that would otherwise be lost,"* and that *existing synthetic grafts could be used for patients without*

-58-

*autologous vein which "does not expose patients to the same level of risks seen with the*

*ATEV."* This assessment mirrored the summary in the Statistical Review Memo.

86.     The Clinical Review Memo provided individual patient analysis for each of the patients that suffered a rupture or anastomotic failure.  The discussions showed that some patients experienced these serious adverse events weeks after HAV implementation. It included a table showing patients experienced rupture or HAV failure events ranging from day 8 post-implementation to day 35, with three patients experiencing rupture on day 30 or later (two on day 30, one on day 35).  The memo also noted that anastomotic failure and rupture were both considered "adverse events of special interest," for the V005 Phase 2/3 clinical trial.

87.     The Clinical Review Memo provides evidence that Defendants were aware of the FDA's significant concerns throughout the BLA review process.  For instance, the memo stated, "Discussions between the agency and [Humacyte] regarding ... how best to determine Day 30 patency for patients who discontinued prior to this timepoint were ongoing prior to BLA submission and we did not reach agreement."  Per the Clinical Review Memo, discussions persisted over missing data issue. The memos stated:

> Comments about missing data handling and imputation strategies were sent to [Humacyte] during the [investigational new drug] stage but the FDA and [Humacyte] did not reach agreement prior to this BLA submission and these changes were not implemented in the submitted Applicant analyses. Based on the Type C meeting on March 7, 2023, FDA agreed that a while-on-treatment strategy can be used to handle intercurrent events only if they can be confidently determined to be unrelated to the ATEV. During review of this BLA, inconsistent and/or inadequate methods to ascertain patency status in different patients by the adjudication committee were identified. In addition, if there was missing data such as no definitive patency assessment

-59-

or no culture taken for ATEV infection evaluation, the best outcomes (i.e., patency, no infection assumed) were used in the analyses. ***FDA recommendations during previous discussion were that these should be handled conservatively. As a result, FDA also performed its own internal adjudication of the missing data***.

88.     The memo further details the long history of regulatory interactions where the FDA repeatedly communicated "major concerns about the study design, including study population, sample size, handling of missing data and intercurrent events (IE), noninferiority design, and interim analyses" for the V005 Phase 2/3 clinical trial similar to the list from the Statistical Review Memo.

### 6.     Expert Review of FDA Materials Confirms Undisclosed Facts Were Known By Defendants.

89.     Unbeknownst to investors during the Class Period, Defendants knew of significant deficiencies in the HAV clinical development program, and Humacyte had disregard for FDA recommendations.  Plaintiffs consulted expert Todd Clark to assess Humacyte's HAV BLA program, and issues of which Defendants were aware given their interaction with the FDA.  Mr. Clark's analysis demonstrates that Humacyte was aware of the critical issues raised, the seriousness of the issues, and the substantial risks to the HAV's full approval because of the underlying problems.

90.     Mr. Clark has a Master of Science degree in drug development and regulation from Johns Hopkins University and an MBA from the Kellogg School of Business at Northwestern University. He is a pharmaceutical expert with over thirty years of experience consulting for branded and generic drug companies, as well as biotech firms, investment banks, and health technology services to advise them on, among other things,

drug development and clinical trial design. He served in an executive role at the largest pharmaceutical marketing communications firm in the world prior to 1998, at which time he founded the consulting company he runs today. In his consulting role, Mr. Clark has consulted with many of the top pharmaceutical companies in the world, has published extensively on industry topics, including clinical trial issues, has been quoted frequently in trade journals and by academics, and has testified in numerous cases as an expert on pharmaceutical matters.

91. For purposes of his review, analysis and findings, Mr. Clark reviewed FDA materials relating to the approval process of the HAV including the Clinical Review Memo, the Statistical Review Memo, the LCM Summary, and other FDA review materials, an article published in JAMA Surgery discussing HAV trial results, the 3/24/2025 *NYT* Article and the 3/25/2025 *Bloomberg* Article. Mr. Clark's expert analysis demonstrates that Defendants knew that Humacyte's HAV clinical development program was deeply flawed, and the data supporting its approval was exceptionally thin. While the HAV was approved by the FDA on December 19, 2024, it was for a narrower indication than Humacyte sought: use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. This approval was based on two small, open-label, non-randomized, unblinded trials, only one of which was prospective.

92. Mr. Clark is of the opinion that the HAV would not have been approved under normal circumstances and notes that some FDA reviewers expressed little

confidence in the HAV's safety and efficacy or in its improvement over existing alternatives. A pattern of disregarding FDA feedback occurred throughout the development process, including at early stages where corrective action might have avoided the narrow indication and allowed for more robust marketing claims.

a. **Defendants Knew of Deep Flaws in Clinical Trials and Data Integrity.**

93.    Throughout the BLA process, Humacyte deliberately disregarded the FDA's recommendations on trial design.   Instead the V005 Phase 2/3 clinical trial protocol "underwent multiple major changes while the study was ongoing," affecting study design, population, primary endpoints, and sample size.   Many of the changes were made after Humacyte had information on outcomes, a practice that violates clinical trial principles and introduces bias.   Most strikingly, the primary endpoint was not determined until five weeks before data cutoff, meaning Humacyte established what it was trying to measure only after having data on product performance.

94.    For example, in December 2021, the FDA recommended Humacyte conduct a randomized, controlled trial; Humacyte never did so.   Instead, Humacyte used a literature-based benchmark from 12 articles, an approach the FDA explicitly stated was "generally unacceptable."   The benchmark for the primary endpoint was based on just a single article. Humacyte did not define a success rate before the trial began and only proposed this deficient comparative benchmark after 41 patients had been enrolled and some outcomes were known, without reaching an agreement with the FDA at the time of BLA submission.

95.     Humacyte also consistently interpreted data in the most favorable light, especially for subjects with intercurrent events like death or loss to follow-up.  Humacyte employed an approach similar to last observation carried forward ("LOCF"), an approach disfavored by regulatory agencies. The FDA used a more conservative approach, considering missing observations as failures, and the FDA's analysis—not Humacyte's— is reflected on the prescribing label.  The FDA communicated suggestions for handling missing data, but Humacyte did not incorporate these comments; where definitive patency assessments were missing, Humacyte assumed the "best outcomes."

96.     Humacyte also used a retroactive data cutoff, which the FDA did not follow. The data cutoff date (June 30, 2023) was selected retroactively, despite some patients being enrolled after that date and "poor outcomes for at least one of the patients may have been known to the Applicant" when the cutoff was chosen.

### b.     Humacyte Had Direct Knowledge of FDA Concerns and Emerging Problems Long Before Approval

97.     *Humacyte had near real-time awareness of adverse events*. Humacyte knew about serious adverse events ("SAE"), including deaths, ruptures, and anastomotic failure, almost immediately.  The V005 Phase 2/3 clinical trial protocol mandated investigators notify the Contract Research Organization ("CRO") within 24 hours of an SAE, and the CRO to inform Humacyte within one business day thereafter.  Humacyte, not the CRO, was responsible for disseminating SAE information to other sites and regulatory agencies. (V005 Protocol, Section 9.5.)

-63-

98.    *Humacyte had extensive communication with the FDA revealing problems and skepticism.* Humacyte and the FDA had numerous communications before and after the BLA submission where issues and skepticism would be communicated. These included a pre-BLA meeting (November 23, 2022) and an official CBER Director response (August 11, 2023) to discuss submission content. Between October 2019 and May 2023, the FDA communicated statistical concerns affecting data analysis. Post-submission meetings included a mid-cycle review (April 2, 2024) and a late-cycle review (May 20, 2024). FDA documents list numerous information requests sent to Humacyte. One such request— identified on page 22 of the Clinical Review Memo—concerned a 3-person review following Dr. Lee's concerns, where Humacyte provided follow-up data to help evaluate missing data. Humacyte was aware the FDA had not agreed on how to determine Day 30 patency for patients discontinuing early prior to BLA submission.

99.    *Humacyte had 7-month advance notice of potential Black Box Warning.* Humacyte was informed the FDA was considering a black-box warning no later than the May 20, 2024 Late-Cycle Meeting, likely receiving materials indicating this around May 10, 2024—as expressed on page 10 of the LCM Summary. The FDA indicated ongoing labeling review and further communication about rupture risks during negotiations. As such, Humacyte would have known that the Black Box Warning was a possibility and learned more about the (increasing) probability thereof over time. The prescribing label ultimately included a warning: "Loss of SYMVESS integrity due to mid-graft rupture or

-64-

anastomotic failure can result in life threatening hemorrhage." This warning posed a severe risk to the HAV's market perception and commercial uptake.

100. Given the FDA's regular communications with Humacyte preceding the BLA submission and during the review process, it is highly likely that the FDA communicated to Humacyte that the PDUFA delay was to allow for the external review of HAV's safety. It is also highly likely that the FDA explained that the external review was in response to concerns raised by reviewers, Dr. Lee and Dr. Zhou. Additionally, in Mr. Clark's experience, in situations like this, the applicant is given an opportunity to present its case. Thus, even if Defendants did not know the reason for the delay on the day it was announced, they would have known shortly thereafter.

## F. Materially False or Misleading Statements and Omissions

101. The Class Period begins on August 14, 2023, when Defendants released Humacyte's 2Q23 financial results and business updates – its first quarterly reporting after closing the Oberland Funding Agreement. It was the first time Defendants spoke about Humacyte's liquidity position with that agreement in place and falsely claimed it had sufficient cash or cash equivalents to fund operations. The same day, Defendants announced topline results from the V017 Ukraine trial, reporting efficacy and safety data they knew or recklessly disregarded was false or misleading because it was not in line with FDA expectations, due to, *inter alia*, counting patients that were lost to follow up as successes, even if they had died or suffered limb loss; representing the V017 Ukraine trial methodology as consistent with FDA expectations despite the trial's lacking defensibility;

-65-

offering inappropriate comparative benchmarks creating a misleading picture of the HAV's efficacy and safety profile as versus synthetic grafts already available on the market; and downplaying known, serious risks of graft rupture and anastomotic failure while reporting more favorable infection data.  By September 12, 2023, Defendants were repeating those false or misleading statements while reporting the V005 Phase 2/3 clinical trial data, and they also began making false or misleading statements about the sufficiency of Humacyte's Durham Facility and its preparedness to safely manufacture the HAV in line with FDA expectations necessary for Humacyte to begin commercialization on the expedited timeline implied by FDA's grant of Priority Review for the BLA.

102.    These materially false and misleading statements and omissions that can be organized into three primary threads of the alleged fraud: (i) the Product Safety Fraud; (ii) the Facility Fraud; and (iii) the Liquidity Fraud.

### 1.    Product Safety Fraud.

103.    Defendants made a series of filings and public statements which included material misrepresentations and omissions about the safety of Humacyte's sole product, the HAV, and the results of Humacyte's clinical trials supporting its BLA.  These materially false and misleading statements and omissions included, *inter alia*, touting the efficacy of the HAV while downplaying and/or not acknowledging known, dire safety concerns, as well as reporting positive aspects of Humacyte's V005 Phase 2/3 clinical trial and V017 Ukraine trial results, without acknowledging the failures inherent in Humacyte's statistical analysis.  Specifically, Defendants (i) downplayed the risk of HAV rupture and

anastomotic failure (tearing at the seam after implementation) in favor of Humacyte's purportedly positive trial data concerning the infection rates for the HAV; (ii) touted the HAV's positive 30-day safety results while counting patients without 30-day follow up (including those suffering death) as successes; (iii) touted the HAV's positive 30-day efficacy and safety data while downplaying the need for long-term data; (iv) presented HAV clinical data against inapplicable data sets while falsely and misleadingly claiming the benchmarks were agreed to with the FDA; (v) presented successful data from the V017 Ukraine trial while concealing that the V017 Ukraine study was retrospective and observational meaning researchers could cherry-pick positive results; and (vi) misled the market about why the FDA delayed approval of the BLA. The "Product Safety Fraud" included the following material misstatements and omissions.

104.     Humacyte announced its 2Q23 financial results and business updates in a series of public statements made on August 14, 2023, as follows.

(a)     Humacyte issued an earnings press release to its corporate website ("8/14/2023 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Sander ("8/14/2023 8-K"), announcing its 2Q23 financial results. Its "Second Quarter 2023 and Recent Corporate Highlights" section reported results for the V017 Ukraine trial, which were being presented in detail that day. It said, "Clinicians reported that the rate of success in treating patients with the HAV was high, *with an observed 30-day HAV patency (presence of blood flow) of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAV.*"

(b)     Humacyte also held an earnings call with analysts and investors in conjunction with its 2Q23 financial results ("8/14/2023 Earnings Call"), on which Defendants Niklason, Sander, and Prichard spoke. During prepared remarks, Niklason said about the V017 Ukraine trial results: "Ukrainian surgeons treating war-wounded patients with the HAV are reporting *a very high success rate*. *At 30 days after implantation, the limb salvage in patients treated with the HAV is 100%.* This is a remarkable result, especially in light of the fact that an estimated 20,000 to 50,000 war-wounded patients have lost limbs in Ukraine since the start of the conflict only 18 months ago." She added, "In addition, *available data from our humanitarian aid experience indicate that the 30-day patency, or blood flow in the HAV was present in 95% of patients. Importantly, in the treatment of these wartime traumatic injuries, there were no instances of infection of the HAV.*" Responding to an analyst question about comparing the V017 Ukraine trial against prior studies, Niklason said, "[T]he patency results in Ukraine have been outstanding. *They're actually not that different from some of the early patency results that we've talked about for V005 [trial]* in some calls that we've done earlier." She added that, because the Ukrainian patients were relatively healthy, aside from their injuries, "*the 100% patency at 30 days really reflects the inherent properties of the HAV.*" Niklason also responded to an analyst question about the benchmarking Humacyte was using for its V005 Phase 2/3 clinical trial, saying:

> [T]he historical control benchmark for the V005 trial is based on a comprehensive literature review. And *the structure of the literature review and the meta-analysis was actually something that we agreed upon with the FDA before undertaking this.* So, *this is really a comprehensive review*

*of the world's literature over the last 20 years using any type of synthetic graft.* So, this means anything made out of a plastic. So, this is excluding things like CryoVein or xenografts, for example, but any synthetic graft of any type used in vascular trauma over the last 20 years. *But this is also high-quality studies.* So…the surgical literature is sometimes messy, and there's a lot of single-arm studies that are of low quality. Those studies were excluded with agreement from the FDA. *So, we're focusing on high-quality studies. And because of that, the benchmark that we've obtained, we feel is robust and we feel will provide excellent support for eventual approval of the HAV and trauma.*

105. On September 12, 2023, Humacyte issued a press release to its corporate website ("9/12/2023 Press Release"), which quoted Defendant Niklason and was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Sander ("9/12/2023 8-K"). Saying that Humacyte planned to file its vascular trauma BLA with the FDA in 4Q23, it claimed, "[Humacyte] . . . announced positive top line results from its V005 Phase 2/3 trial of the Human Acellular Vessel (HAV) in vascular trauma repair. *The single-arm clinical trial was a success and showed that the HAV in this study had higher rates of patency, and lower rates of amputation and infection, compared to historic synthetic graft benchmarks.*" It said: "As a single-arm study, *the comparators for the HAV results were benchmark outcomes for treatment with synthetics grafts based on a systematic literature search. The principal means of evaluation was comparability of secondary patency (blood flow) at 30 days, with primary patency (blood flow without intervention) also evaluated. Secondary comparisons comprised of improvement in rates of amputation and rates of infection at 30 days.*" It further described the results:

> *The V005 trial was a success, and the principal comparison of 30-day secondary patency for the HAV in the clinical trial was 90.2% for the extremity patients (89.9% for total patients) compared to 81.1% historically*

-69-

*reported for synthetic grafts. Primary patency for total HAV patients and for extremity patients was 81.2% and 84.3%,* respectively, although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark publications. *For the secondary comparison of amputation rates, the HAV demonstrated an improvement with a rate of 9.8% for extremity patients (10.1% for total patients) compared to 20.6% historically reported for synthetic grafts. For the secondary comparison of infection rate, the HAV demonstrated an improvement, with a rate of 2.0% for the extremity patients (2.9% for the total patients) compared to 8.9% historically reported for synthetic grafts. There were no unexpected safety signals for the HAV in this study.*

It added about the V017 Ukraine trial results: "For this population, *30-day secondary patency for the HAV was 93.8% compared to 81.1% historically reported for synthetic grafts. The rate of amputation for the HAV was 0.0% compared to 20.6% historically reported for synthetic grafts. The rate of infection for the HAV was 0.0% compared to 8.9% historically reported for synthetic grafts.*"

106.    On September 12, 2023, Humacyte held a key opinion leader webinar with analysts in connection with the top line data release for the V005 Phase 2/3 clinical trial ("9/12/2023 KOL Webinar"), on which Defendants Niklason and Sander spoke.

(a)    During prepared remarks, Humacyte's Chief Medical Officer, Dr. Shamik Parikh, said about the V005 Phase 2/3 clinical trial, "*Our primary endpoint is 30-day patency in patients with extremity injuries.*" He continued:

> The patients with the extremity injuries were all assessed to be at a high risk of contamination or infection. Because this is a single-arm study, we are comparing it with a historical benchmark that has been discussed with the agency. *The benchmark is a systematic literature review of synthetic vascular trauma. The primary comparison will be a 30-day endpoint of patency.* Our secondary comparisons are infection and amputation rates. Our success criteria when comparing to synthetic graft, is that we should have comparable patency. *Our infection rate would be comparable or lower*

-70-

*than synthetic graft. Amputation rate would be comparable or lower than synthetic graft and no unexpected safety signals.*

(b)    Dr. Parikh also presented the purported results, based on the 69 total patients,

stating in relevant part:

*So the 30-day patency, which is secondary patency was 89.9% for the total group and 90.2% for the extremity subset. This 90.2% will be compared to the synthetic graft point estimate of 81.1%.*

*The primary patency in our study was 81.2% for [the] overall group and 84.3% in the extremity subset.* However, there was no clearly reportable primary patency in the synthetic graft literature, and hence, it's not reported here. So our point estimate for HAV patency is higher than [the] synthetic graft point estimate. *The lower end of 95% confidence interval for HAV patency is consistent with the synthetic benchmark point estimate. We have successfully met the patency outcome for this study.*

*Amputations. Amputation rate in the total V005 patient population was 10.1% and it was 9.8% in the extremity subset, which has been compared to the synthetic graft point estimate for 20.6% for amputations in synthetic grafts. Conversely, limb salvage rate is 90% in the total group and 90.2% in the extremity group compared to 79.4% for the synthetic grafts.* Again, based on aforementioned criteria, *we have successfully met the amputation rate endpoint.* The point estimate being lower than that of synthetic grafts and the 95% confidence interval at the top end being consistent with the point estimate for the synthetic graft.

Infections. *The conduit infection rate overall in the study was 2.9%. We had one patient with HAV infection in the extremity subset for infection rate of 2%, and this has been compared to a synthetic graft infection rate of 8.9% in the literature. Again, this meets the aforementioned success criteria for infections in this study.* The V005 study enrolled very sick patients with vascular injuries…. Many injuries were contaminated and were typical for high risk of infection.

All patients in V005 trial had no autologous vein available for vascular repair. *The top line results for V005 trials show that V005 that in this study, point estimate of patency for HAV was greater than for historical synthetics. Our limb salvage point estimate with HAV was better than historical for synthetics and our point estimate for HAV infection rate is lower than*

-71-

*reported for synthetic grafts. There have been no unexpected safety signals in this sick and diverse from our population.*

*The V005 trial was successful* and it demonstrates the potential benefit of HAV. In addition to V005 study, we also have Ukraine real word experience for the use of HAV in vascular repair. … In all, 19 patients were treated with an HAV in Ukraine, 17 of these have consented for data collection and steady participation, 16 of these had extremity trauma repair, 1 patient required HAV for iatrogenic trauma repair.

*… The 30-day patency in Ukraine population is 94.1% overall and 93.8%. There was 1 person in Ukraine who did not meet the patency endpoint. Amputation rate was 0. Limb salvage conversely was 100%, conduit infection rate was 0%. …*

(c)     Responding to a question about the V005 Phase 2/3 clinical trial data comparison, Niklason said:

So yes, so the historical comparator data set, I looked at the world's literature of using synthetic grafts to treat extremity vascular trauma, upper and lower extremity, over the last 20 years. *We actually worked out the protocol for doing the meta analysis with the agency before we performed it. And we've already submitted the results of the meta analysis to the agency. So we have a high degree of confidence, that the agency will accept this benchmark, given that it was developed in collaboration with folks of the FDA.*

(d)     Responding to a question about patient follow-up results, Niklason added:

I would say that in terms of the decision of which conduit to use in the setting of acute injury, the caregivers are primarily interested in saving life and limb, and getting the patient out of the operating room as quickly as possible. *So certainly, long-term patency is a factor. But in the setting of trauma, it is not the primary factor. The primary factor is saving life and limb at the time of the acute crisis. And this is why the FDA has acknowledged that 30-day patency is actually a salient endpoint*. It's a clinically meaningful endpoint in the trauma population. So while we expect that our longer-term outcomes will be good, based on what we've seen in the PAD literature, *we also believe that in the trauma population, short-term endpoints matter a lot.*

(e)     Responding to a question about the V017 Ukraine trial's composition, Niklason said "even though this was not a clinical trial per se, but **the inclusion criteria for the humanitarian effort, actually mirrored the inclusion criteria for the V005 trial.**"

107.    On September 20, 2023, Humacyte held a live key opinion leader event in New York City ("9/20/2023 KOL Event"), at which Defendant Niklason spoke.

(a)     In prepared remarks describing the results of the V005 Phase 2/3 clinical trial, Defendant Niklason said:

> So how did we do?  ***Well, when we look at how well blood flow was performing in the HAV after 30 days after implant, what we saw is that roughly 90% of patients had good blood flow at the 30-day endpoint.*** When we compare that to what's been published in the literature with synthetic grafts or plastic grafts that you can also pull off-the-shelf, that number came in around 81%, which means that ***our patency values were substantially better than those that have been reported for synthetic grafts,*** so that's already – in our view, that's already a win.
>
> If you can pull an HAV off-the-shelf or you pull a synthetic graft off-the-shelf, if you pull the HAV off-the-shelf, the patient is about half as likely to lose their blood flow.  So that's – in my view, that's win #1.
>
> Win #2 is at least as important and probably more important.  So if we look at the rate of amputation in patients who have injuries in their limbs, and were treated with plastic grafts off the shelf.  ***What we see is that, that amputation rate was about 20%, 21%, which means 1 in 5 patients who get an injury like this who are treated with the plastic graft will go on to amputation.***
>
> ***In our study with a lot of very sick patients, what we saw was slightly less than 10% of patients went on to amputation.*** … [W]hat I can tell you is that for every single patient in our trial, if they had an amputation, it was in the setting of the HAV working, but the patient's limb was just too badly damaged.
>
> … Avoiding infection, being able to resist getting infected if you're putting an HAV into a wound that has contamination.  Avoiding infection is

-73-

important. ***And what we saw is that our infection rate was only 2% in the first month and the synthetic grafts were almost 10%. So there was a more than fourfold improvement in your risk of infection.***

(b)     Niklason further described the purported results of the V017 Ukraine trial, which took place over one year, at five hospitals, and treated 19 patients. She said, "All of these patients were viewed by the surgeons as not having any vein. So I think a lot of these patients would have had to undergo amputation if they had not had the HAV. ***What I can tell you is that in the 19 patients we treated, we had 0 amputations, and 100% limb salvage, and we had 0 infections.***"

108.    On November 9, 2023, Humacyte issued an earnings press release to its corporate website ("11/9/2023 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Sander ("11/9/2023 8-K").

(a)     Its "Third Quarter 2023 Corporate Highlights" section discussed the V005 Phase 2/3 clinical trial:

**Positive Phase 2/3 Trauma Results** – In September 2023, Humacyte announced positive top line results from its V005 Phase 2/3 trial of the HAV in vascular trauma repair. In this single-arm clinical trial, ***the HAV had higher rates of patency, and lower rates of amputation and infection, compared to historic synthetic graft benchmarks.*** A total of 69 patients were enrolled in the V005 trial, of which 51 had vascular injury of the extremities and comprised the primary evaluation group for the study. ***The 30-day patency (presence of blood flow) for the HAV in the clinical trial was 90.2% for the extremity patients compared to approximately 81% historically reported for synthetic grafts. The HAV demonstrated lower amputation rates, with a rate of 9.8% compared to over 20% historically reported for synthetic grafts. The HAV also demonstrated lower rates of infection, with a rate of 2.0% compared to over 8% historically reported for synthetic grafts.***

(b)     It also discussed the V017 Ukraine data, and said, "***Clinicians reported that the rate of success in treating patients with the HAV was high, with an observed 30-day HAV patency of 95%, 30-day limb salvage of 100%, 30-day survival of 100%, and zero cases of infection of the HAV.***"

109.    The same day, Humacyte held an earnings call with analysts and investors in conjunction with its 3Q23 financial results ("11/9/2023 Earnings Call"), on which Defendants Niklason and Sander spoke.

(a)     During prepared remarks, Niklason discussed the V005 Phase 2/3 clinical trial:

> I'll begin with our HAV program in vascular trauma and the positive top line results that we announced from our V005 Phase 2/3 clinical trial of the HAV in trauma repair. ***In this clinical trial, the HAV had higher rates of patency and lower rates of amputation and infection as compared to historical published benchmarks of synthetic graft function in trauma patients.***
>
> A total of 69 patients were enrolled in the V005 trial, and 51 of these had vascular injury of the extremities and comprise the primary evaluation group for the study. ***The 30-day patency or presence of blood flow for the HAV in the clinical trial was 90% as compared to approximately 81% historically reported for synthetic graphs.***
>
> ***Importantly, the HAV also demonstrated lower amputation rate with a rate of 9.8% for the HAV as compared to over 20% being reported historically for synthetic grafts. This means that for a vascular trauma patient receiving the HAV, the chances of amputation are less than half of the chances associated with receiving a synthetic graft.***
>
> It's also important to note that in the V005 trial, there were no amputations that occurred because of failure of the HAV. All of the amputations occurred because of severe injuries to the limb and not due to loss of blood flow from the HAV implant.

-75-

***The HAV also demonstrated lower rates of infection, with an infection rate of 2% compared to over 8% historically reported for synthetic graft.*** In other words, patients receiving the HAV in this trial were less than half as likely to suffer an amputation, and one-fourth is likely to have an infection of their graft as patients who historically got synthetic graphs for their injuries.

(b)     She also discussed the V017 Ukraine trial data, saying "In war wounded patients in Ukraine, who suffered blast and shrapnel injuries that were often severe, ***both a 30-day limb salvage and 30-day patient survival were 100%. 30-day patency or blood flow was 95%, and there were no reported instances of infection of the HAV.***"

110.     On November 17, 2023, Humacyte issued a press release to its corporate website ("11/17/2023 Press Release"), which described results for the V005 Phase 2/3 clinical trial and the V017 Ukraine trial. On information and belief, the 11/17/2023 Press Release was written and published after writing, editing, approval, and authorization by Defendant Niklason, who, as company co-founder and CEO, closely controlled corporate communications regarding the HAV, including on Humacyte's corporate website.

(a)     It discussed Humacyte's presentation of V005 Phase 2/3 clinical trial and V017 Ukraine trial results at the VEITHsymposium®, touting results against comparative benchmarks: "***Results showed the HAV had higher rates of patency (blood flow), and lower rates of amputation and infection, compared to historic synthetic graft benchmarks.***" It continued, "***[T]he comparators for the HAV results were a systematic literature review and meta-analysis of studies conducted with synthetics grafts, providing a benchmark for comparison.***"

(b)     The 11/17/2023 Press Release touted V005 Phase 2/3 clinical trial's success:

-76-

*The V005 trial met its objectives, and the HAV demonstrated a higher 30-day secondary patency rate of 90.2% for the extremity patients compared to 78.9% historically reported for synthetic grafts. Primary patency for the HAV was 81.2% for the extremity patients,* although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark publications. *The HAV also demonstrated lower amputation rates, with a rate of 9.8% for extremity patients compared to 24.3% historically reported for synthetic grafts. Furthermore, the HAV demonstrated lower rates of infection, with a rate of 2.0% for the extremity patients compared to 8.4% historically reported for synthetic grafts.*

(c)     It also discussed the V017 Ukraine trial: "***The rate of success for treatment of patients with the HAV in the V017 trial was high, with a 30-day secondary patency of 93.8%, zero amputations, and zero cases of infection of the HAV.***"

(d)     The 11/17/2023 Press Release also reported combined results:

The results of a meta-analysis combining the V005 and V017 trials concluded that *the HAV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for the extremity patients compared to 78.9% historically reported for synthetic grafts.* For the secondary comparison of amputation rates, *the HAV demonstrated an improvement with a rate of 4.5% for extremity patients compared to 24.3% historically reported for synthetic grafts.* For the secondary comparison of infection, *the HAV demonstrated an improvement with a rate of 0.9% for the extremity patients compared to 8.4% historically reported for synthetic grafts.*

(e)     The press release also touted the safety profile of the HAV in both trials, underplaying the serious risks of rupture and anastomotic failure:

*There were no unexpected safety signals for the HAV in the V005 and V017 studies.* Common adverse events reported were anemia, vascular graft thrombosis, blood loss anemia, pyrexia, thrombocytopenia, constipation, nausea peripheral edema, and tachycardia. *There were* four deaths among the extremity patients in the V005 trial, and *zero deaths in the V017 trial. There were no deaths among extremity patients in the V005 trial attributed to the HAV. A meta-analysis combing the V005 and V017 trials showed a rate of death for extremity patients comparable to that historically reported for synthetic grafts, with a 30-day rate for the HAV of 3.5%, and a 30-day*

-77-

*rate of deaths attributed to the HAV of 0.0%. A 30-day rate of death of 3.4% is reported historically for synthetic grafts, although deaths attributed to the synthetic grafts were not reported.*

111. On December 12, 2023, Humacyte issued the 12/12/2023 Press Release, which quoted Defendant Niklason and was filed with the SEC the same day as Exhibit 99.1 to the 12/12/2023 8-K. Among other things, it discussed the BLA submission for the HAV.

(a)　It reported: "The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial as well as from the treatment of wartime injuries in Ukraine. *The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.*"

(b)　It claimed the V005 Phase 2/3 clinical trial results compared positively to clinical benchmarks:

> As a single-arm study, *the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair. . . . The V005 trial met its objectives, and the HAV demonstrated a higher 30-day secondary patency rate of 90.2% for the patients with extremity vascular trauma compared to 78.9% historically reported for synthetic grafts. Primary patency for the HAV was 84.3% for the patients with extremity vascular trauma,* although no comparison to synthetic graft primary patency was possible since this measure was not reported in the benchmark publications. *The HAV also demonstrated lower amputation rates, with a rate of 9.8% for patients with extremity vascular trauma, compared to 24.3% historically reported for synthetic grafts. Furthermore, the HAV demonstrated lower rates of infection, with a rate of 2.0% for the V005 patients with extremity vascular trauma compared to 8.4% historically reported for synthetic grafts.*

(c)　The 12/12/2023 Press Release also discussed the V017 Ukraine trial: "*A high success rate for patients in the V017 trial was observed, with a 30-day primary and secondary patency of 93.8%, zero amputations, and zero cases of infection of the HAV.*"

-78-

(d)     It also discussed the combined results from the two trials:

An analysis of an integration of results from the V005 and V017 trials concluded that *the HAV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for patients with extremity vascular trauma compared to 78.9% historically reported for synthetic grafts. For* the secondary comparison of *amputation rates*, *the HAV demonstrated an improvement, with a rate of 4.5% for integrated V005 and V017 results, compared to 24.3% historically reported for synthetic grafts. For* the secondary comparison of *infection*, *the HAV demonstrated an improvement, with a rate of 0.9% for integrated data as compared to 8.4% historically reported for synthetic grafts.*

112.    On February 9, 2024, Humacyte issued the 2/9/2024 Press Release, which quoted Defendant Niklason and was filed with the SEC the same day as Exhibit 99.1 to the 2/9/2024 8-K. It reported that the FDA granted Humacyte's BLA priority review, adding, "The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a Humanitarian Aid Program supported by the FDA. *The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.*"

113.    Humacyte announced its 4Q23 and year end 2023 financial results and business updates in a series of public statements on March 22, 2024 and March 28, 2024, which included:

(a)     On March 22, 2024, Humacyte issued an earnings press release to its corporate website ("3/22/2024 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K ("3/22/2024 8-K"), signed by Defendant Sander. The 3/22/2024 Earnings Release's "Fourth Quarter 2023 and Recent Corporate Highlights"

section announced that Humacyte's BLA was granted priority review, stating, "The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. ***The HAV was observed to have higher rates of patency (blood flow), and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks in both the V005 Phase 2/3 clinical trial and the Ukraine humanitarian program.***" Regarding Humacyte's data presentations at the VEITHsymposium®, it added: "These include an expanded presentation of positive results of the V005 vascular trauma trial, with ***the HAV observed to have higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks.***

(b) Humacyte also held an earnings call with analysts and investors in conjunction with its 4Q23 and year end 2023 financial results ("3/22/2024 Earnings Call"), on which Defendants Niklason and Sander spoke. During prepared remarks, Niklason described the results of the V005 Phase 2/3 clinical trial and V017 Ukraine trial:

> Our data package showed that ***the HAV had higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks***. ***In the two trials combined***, ***the 30-day patency or presence of blood flow for the HAV was 91.5% for extremity patients compared to 78.9% historically reported for synthetic grafts. The HAV also demonstrated lower amputation rates with a rate of 4.5% as compared to 24.3% for synthetic grafts.*** And furthermore, ***the HAV had lower infection rates at 30 days, with a rate of 0.9% as compared to 8.4% historically for synthetic grafts.***

She added that "*patients treated with the HAV were only 40% as likely to lose blood flow through their conduit after one month*, which is *a key period for recovery after traumatic injury*" and "*only 1/5th as likely to suffer an amputation and only 1/9th as likely to have an infection of their graft as compared to patients who were treated with the synthetic graft.*"

114.    On March 28, 2024, Humacyte filed a Form 10-K with the SEC for the fiscal year ended December 31, 2023 ("2023 10-K"), which was signed and SOX-certified by Defendants Niklason and Sander.

(a)    The 2023 10-K touted the strength of Humacyte's HAVs:

Based on observations to date, *the HAV has withstood maximal pressures that are comparable to those reported for native arteries*. For example, the human aorta is reported to have rupture strengths around 1,400 mmHg, while human cerebral arteries rupture around 1,800 mmHg. *We have observed HAVs withstanding maximal pressures of approximately 3,200 mmHg before rupturing, making their mechanical properties on par with native human blood vessels.*

(b)    It also touted the HAV's safety profile during all of Humacyte's trials: "*[W]e have observed that our HAVs functioned as intended* and provided functional blood flow to affected limbs. *We have also observed consistent durability with a strong tolerability profile.*" It added:

*Overall, the HAV has functioned well and as intended, across ten different clinical trials in three clinical indications.* The HAV has been implanted in approximately 573 patients, across more than 85 clinical sites in seven countries, over more than ten years (as of December 31, 2023). *Rates of primary and secondary patency were similar across trial designs and disease states, with 30-day primary patency ranging from 84% – 100%. Six-month secondary patency ranges from 84% – 100%, and 12-month*

-81-

She added that "*patients treated with the HAV were only 40% as likely to lose blood flow through their conduit after one month*, which is *a key period for recovery after traumatic injury*" and "*only 1/5th as likely to suffer an amputation and only 1/9th as likely to have an infection of their graft as compared to patients who were treated with the synthetic graft.*"

114.    On March 28, 2024, Humacyte filed a Form 10-K with the SEC for the fiscal year ended December 31, 2023 ("2023 10-K"), which was signed and SOX-certified by Defendants Niklason and Sander.

(a)    The 2023 10-K touted the strength of Humacyte's HAVs:

Based on observations to date, *the HAV has withstood maximal pressures that are comparable to those reported for native arteries*. For example, the human aorta is reported to have rupture strengths around 1,400 mmHg, while human cerebral arteries rupture around 1,800 mmHg. *We have observed HAVs withstanding maximal pressures of approximately 3,200 mmHg before rupturing, making their mechanical properties on par with native human blood vessels.*

(b)    It also touted the HAV's safety profile during all of Humacyte's trials: "*[W]e have observed that our HAVs functioned as intended* and provided functional blood flow to affected limbs. *We have also observed consistent durability with a strong tolerability profile.*" It added:

*Overall, the HAV has functioned well and as intended, across ten different clinical trials in three clinical indications.* The HAV has been implanted in approximately 573 patients, across more than 85 clinical sites in seven countries, over more than ten years (as of December 31, 2023). *Rates of primary and secondary patency were similar across trial designs and disease states, with 30-day primary patency ranging from 84% – 100%. Six-month secondary patency ranges from 84% – 100%, and 12-month*

-81-

*secondary patency ranges from 81% – 97%,* across multiple clinical trials, disease states, and patient age ranges and demographics.

*We have observed zero instances of clinical rejection of the HAV in any clinical trial over the past ten years, suggesting that the HAV was not immunologically rejected after implantation.*

(c)    The 2023 10-K highlighted the HAV's purported resistance to infection—downplaying rupture and anastomotic failure—in describing its safety profile: "***Based on clinical trial results to date, we have observed that the HAVs were highly resistant to infection***, with an infection rate averaging approximately 1.0% per patient-year in our AV access trials, and low infection rates currently in our trauma and PAD trials."  Describing a preclinical study focused on infection, the 2023 10-K said, "The laboratory results suggest that the bioengineered human tissue of the HAV may have ***superior compatibility with the body's own white blood cells as compared to ePTFE***."  It added, "***we have observed no evidence of clinically relevant immunologic reactions to our HAVs***."

(d)    The 2023 10-K also described the V005 Phase 2/3 clinical trial, stating:

**Trial Design:** Our V005 trial is a single-arm, multi-center, non-randomized clinical trial to evaluate the efficacy, safety and tolerability of our 6 millimeter HAV in replacement or reconstruction of vascular tissues in patients with life or limb-threatening vascular trauma for whom the standard of care, saphenous vein, was not feasible or available for vascular repair.  As a single-arm study, ***the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair.***  A total of 72 patients were enrolled in the V005 trial, of which 51 had vascular injury of the extremities and comprised the primary evaluation group for the study.  ***The primary efficacy endpoint was patency of the HAV at 30 days, with 30-day rates of infection and amputation comprising the secondary endpoints***.

(e)　　It provided more detailed results, saying, "***[T]he V005 trial met its objectives, and the HAV was observed to have a higher 30-day secondary patency rate, lower amputation rate and lower rate of infection compared to that historically reported for synthetic grafts.*** Primary patency for the HAV could not be compared to synthetic grafts as this measure was not reported in the benchmark publications." It included a chart comparing the V005 Phase 2/3 clinical trial results against Humacyte's benchmarks:

*V005 Phase 2/3 HAV Results in Vascular Trauma Compared to Synthetic Graft Benchmark*

| 30-Day Endpoint | V005 Trial HAV Extremity Group (%) | Synthetic Graft Benchmark (%) |
|---|---|---|
| Primary Patency | 84.3% | Not reported |
| Secondary Patency | 90.2% | 78.9% |
| Conduit Infections | 2.0% | 8.4% |
| Amputations | 9.8% | 24.3% |

(f)　　The 2023 10-K also said: "***The safety profile of the HAV in the V005 trial was consistent with previous studies*** and there were no cases of clinical rejection of the HAV." According to the 2023 10-K:

> ***There were no unexpected safety signals for the HAV in the V005 trial.*** The most common adverse events were thrombosis, anemia, pyrexia, thrombocytopenia, constipation, nausea, peripheral edema, and tachycardia. The most common non-fatal Serious Adverse Events were thrombosis, anastomotic stenosis, wound infection, muscle necrosis, wound infection, hemorrhage shock, and cardiac arrest. ***Deaths occurring prior to day 30 were adjudicated as not casually related to the HAV by an Independent Adjudication Committee.***

It included this table of adverse events:

-83-

*V005 Phase 2/3 HAV Adverse Events*

| Adverse Event | V005 Trial - HAV Extremity Group (n=51) Number of Patients (%) |
|---|---|
| Total Adverse Events | 50 (98.0%) |
| Non-Fatal Serious Adverse Events | 28 (54.9%) |
| Deaths: | |
| At Day 30 | 3 (5.9%) |
| Over Duration of Study | 4 (7.8%) |
| HAV Infections | 2 (3.9%) |
| HAV Rupture | 1 (2.0%) |
| HAV Occlusion/Thrombosis | 15 (29.4%) |
| Pseudoaneurysm | 1 (2.0%) |
| Aneurysm | 1 (2.0%) |
| Other | 2 (3.9%) |

(g)     The 2023 10-K also described the V017 Ukraine trial: "***A high success rate for the 16 extremity patients in the V017 trial was observed,*** despite the presence of contaminated wound beds, as summarized in the table below."

*V017 Ukraine Humanitarian HAV Results in Vascular Trauma*

| 30-Day Endpoint | V017 Trial HAV Extremity Group (%) |
|---|---|
| Primary Patency | 93.8% |
| Secondary Patency | 93.8% |
| Conduit Infections | 0.0% |
| Amputations | 0.0% |

(h)     The 2023 10-K added: "***The safety profile of the HAV in the V017 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV.***" It included this table of adverse events for the V017 Ukraine trial:

*V017 Ukraine Humanitarian HAV Adverse Events*

| Adverse Event | V017 Trial - HAV Extremity Group (n=16) Number of Patients (%) |
|---|---|
| Total Adverse Events | 4 (25.0%) |
| Non-Fatal Serious Adverse Events | 1 (6.3%) |
| Deaths: | |
| At Day 30 | 0 (0.0%) |
| Over Duration of Study | 0 (0.0%) |
| HAV Infections | 0 (0.0%) |
| HAV Rupture* | 1 (6.3%) |
| HAV Occlusion/Thrombosis | 1 (6.3%) |
| Pseudoaneurysm | 0 (0.0%) |
| Aneurysm | 0 (0.0%) |

*One HAV rupture associated with extensive shrapnel remnants that caused bleeding.

(i)     The 2023 10-K also reported combined results of the V005 Phase 2/3 clinical trial and the V017 Ukraine trial in the below table:

*Combined V005 Phase 2/3 HAV and V017 Ukraine Real-World Results in Vascular Trauma*
*Compared to Synthetic Graft Benchmark*

| 30-Day Endpoint | V005 Trial HAV Extremity Group (%) | Synthetic Graft Benchmark (%) |
|---|---|---|
| Secondary Patency | 91.5% | 78.9% |
| Conduit Infections | 0.9% | 8.4% |
| Amputations | 4.5% | 24.3% |

It said, "***The HAV demonstrated a higher 30-day secondary patency rate, and patients treated with the HAV were only 40% as likely to lose blood flow through their conduit after one month compared to the rate historically reported for synthetic grafts,*** which is a key period for recovery after traumatic injury."  It added "***In addition, patients treated with the HAV had approximately 1/5th the amputation rate, and approximately 1/9th rate of infection compared to that historically reported for synthetic grafts.***"

115.    On May 10, 2024, Humacyte issued an earnings press release to its corporate website ("5/10/2024 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K signed by Defendant Sander ("5/10/2024 8-K").  Defendant Niklason was quoted therein as saying "During the first quarter of 2024, ***we achieved a major milestone with the acceptance by the Food and Drug Administration (FDA) of our Biologics License Application (BLA) seeking approval of the HAV in the vascular trauma indication,***" and "The FDA's decision to grant Priority Review sets a Prescription Drug User Fee Act (PDUFA) date of August 10, 2024, …. ***In addition, the FDA completed its Pre-Licensing Inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations and remain confident in the approvability of the HAV in vascular trauma.***"  The press release added, in relevant part:

-85-

In February 2024, the FDA accepted and granted Priority Review to Humacyte's BLA seeking approval of the HAV in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use not feasible. ***The BLA submission is supported by positive results from the V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. The HAV was observed to have higher rates of patency, or blood flow, and lower rates of amputation and infection, as compared to historic synthetic graft benchmarks.***

116.     That same day, Humacyte held an earnings call with analysts and investors in conjunction with its 1Q24 financial results ("5/10/2024 Earnings Call"), on which Defendants Niklason, Sander, and Prichard spoke.   In prepared remarks, Defendant Niklason started the call highlighting that the HAV was granted Priority Review by the FDA, that it was a highly productive start to 2024, and the FDA established a PDUFA date of August 10, 2024, stating:

During our last quarterly call, we discussed in detail the robust data package supporting our submission, ***which included positive results from our V005 Phase 2/3 clinical trial, as well as real-world evidence from the treatment of wartime injuries in Ukraine under the humanitarian aid program that was supported by the FDA.*** In February of 2024, the FDA accepted our BLA in vascular trauma, granting Priority Review and establishing a PDUFA goal date for action of August 10. The FDA has completed its Pre-Licensing Inspection of our manufacturing facilities in Durham, North Carolina, as part of the BLA review process. ***We remain on track with our BLA review and commercial launch preparations, and we remain confident in the approvability of the HAV in vascular trauma.***

She added, "Based on ***the strength of our BLA data package, combined with our Priority Review and the RMAT designation from the FDA, we're looking forward to the PDUFA date.***"

117. On June 6, 2024, Humacyte presented at the Jeffries Global Healthcare Conference ("6/6/2024 Jeffries Conference").

(a) During its presentation, Defendant Niklason indicated there were no issues with the FDA review of its BLA application, stating: "we're very excited, we filed for approval with the FDA in our lead indication last year and we've got a PDUFA date upcoming in August." Speaking of the results from the V017 Ukraine trial, Niklason stated:

> [S]urgeons in Ukraine treated a total of 19 patients over a yearlong humanitarian effort, and you can see the outcomes there. ***Out of those patients, 94% retained blood flow through the graft after a month, which was our primary endpoint. But in addition, none of those patients suffered amputation and none of those patients suffered infection of their vascular conduit. And that was an impressive result…Okay. So the patency number's about 91.5% at 30 days, and that compared well to 79% with synthetic grafts. But probably more importantly, the infection rate with our vessels was only about one-ninth the infection rate of synthetic grafts.*** This was not surprising to us based on what we knew about our product. And lastly and most importantly, the risk of amputation was about one-fifth. So historically, if you were a patient who had an extremity wound and you got a plastic graft to restore blood flow, you had about a one in four chance of having that limb amputated. ***In our case, if they got our vessel, you had a 1 in 20 chance of having your limb amputated. So these are the data that really provided the undergird of the BLA filing that went in, in December.***

(b) Defendant Niklason continued about the FDA inspections and process to date, giving no indication of the extent of issues raised during at Late-Cycle meeting with the FDA, stating:

> So as I mentioned, we filed in December. The BLA package was accepted by the FDA in February. As we let investors know in our May quarterly earnings call, ***we completed an inspection of our facility by the FDA in April***, and ***we've been continuing to march through our interactions with the FDA*** and ***we look forward with enthusiasm to our August 10 PDUFA date***.

118.     On August 9, 2024, Humacyte issued a press release to its corporate website ("8/9/2024 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K dated August 13, 2024 ("8/13/2024 8-K") and signed by Defendant Sander.

(a)     The press release said how Humacyte heard about the delay:

> "We received a call from FDA CBER leadership this afternoon apologizing to us and stating that additional time was required for review." said Laura Niklason, M.D., Ph.D., Chief Executive Officer of Humacyte. "***FDA leadership noted that Humacyte's ATEV is a first-in-class product***, and that Priority Review had been granted, which allows only a six-month review cycle, as compared to the standard ten-month review cycle for most products. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. ***Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma. The FDA leadership expressed an apology for their inability to complete the review by the PDUFA date, and currently we do not yet have a revised action date.***"

(b)     It also said about Humacyte's V005 Phase 2/3 clinical trial and V017 Ukraine trial results:

> ***Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program.*** ATEV was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat war injuries. ***In both the civilian and military clinical studies, ATEV was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.***

119.    On August 13, 2024, Humacyte issued an earnings press release to its corporate website ("8/13/2024 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.2 to the 8/13/2024 8-K signed by Sander.

(a)     Defendant Niklason was quoted saying, "*We were surprised to be notified by the FDA that they will require additional time to complete their review of the BLA for our ATEV (acellular tissue engineered vessel) in vascular trauma,*" and:

> FDA leadership noted that Humacyte's ATEV is a first-in-class product, and that Priority Review had been granted, which involves only a six-month review cycle, as compared to the standard ten-month review cycle for most products. During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites and *has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions*. Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma, although we currently do not yet have a revised action date.

(b)     The earnings release also said:

> On August 9, 2024, in a phone call, Center for Biologics Evaluation and Research (CBER) leadership from the U.S. Food and Drug Administration (FDA) notified the Company that *the FDA will require additional time to complete its review of the Company's Biologics License Application (BLA) for the ATEV in the vascular trauma indication*. The ATEV trauma BLA was submitted to FDA in December 2023, FDA granted a Priority Review in February 2024, and assigned a PDUFA date of August 10, 2024.

120.    Also on August 13, 2024, Humacyte held an earnings call with analysts and investors in conjunction with its 2Q24 financial and business results ("8/13/2024 Earnings Call"), on which Defendants Niklason and Sander spoke.  During the earnings call, an analyst asked: "if the FDA does communicate with [Humacyte] . . . should we expect a new date for clearance, or will it simply provide a clearance at a future date . . . ?"  Niklason

responded, "I wish I could provide more clarity for this group, ***but I can't***. Again, the phone call from the senior leadership at CBER on Friday ***said simply that they need more time*** and ***they did not give us insight*** into a new date or how we would be informed." Defendant Sander reiterated in a follow up answer: "I think [to] extrapolate from what Laura said, ***we don't know what the delay will be*** at this instance."

121. On November 8, 2024, Humacyte issued an earnings press release to its corporate website ("11/8/2024 Earnings Release"), which was filed with the SEC the same day as Exhibit 99.1 to a Form 8-K ("11/8/2024 8-K") and signed by Defendant Sander.

(a) Defendant Niklason was quoted as saying "Our biologics license application (BLA) for our ATEV in vascular trauma ***remains under review by the U.S. Food and Drug Administration (FDA)***," and "FDA leadership has not provided us a timeline for the completion of their review. As noted in our previous announcements, during the course of the BLA review the FDA conducted inspections of our manufacturing facilities and clinical sites ***and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions***. Based on these interactions, we remain confident in the approvability of the ATEV in treating vascular trauma."

(b) The earnings release also said:

On August 9, 2024, in a phone call, Center for Biologics Evaluation and Research (CBER) leadership from the FDA notified Humacyte that ***the FDA will require additional time to complete its review of the Company's BLA for the ATEV in the vascular trauma indication***. The ATEV trauma BLA was submitted to FDA in December 2023. FDA granted a Priority Review in February 2024, and assigned an original PDUFA date of August 10, 2024. The FDA has not provided a timeline for the completion of their review.

122.    Also on November 8, 2024, Humacyte held an earnings call with analysts and investors in conjunction with its 3Q24 financial and business results ("11/8/2024 Earnings Call"), on which Defendants Niklason and Sander spoke.  Niklason again discussed the PDUFA delay but omitted discussion of the external reviewers or FDA's safety concerns: "During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and our clinical trial sites. ***They've also actively engaged with us in multiple discussions regarding our BLA filing, including agreement on post-marketing commitments, as well as labeling discussions***. We continue to maintain confidence in the approvability of the ATEV in vascular trauma based upon our interactions with the agency to-date."  In response to a question about the delay, Niklason said:

> So since the PDUFA date, and when the FDA told us they needed more time, we've since had occasional, what I'm calling, pinging. ***We reach out to the CBER leadership every few weeks and offer them material that may help in the review, ask them if they have timelines or questions for us***. And we have offered additional material, for example, some of the webinars that we've shown that they've accepted. But they have not given us a new date, and they have not really engaged in much question asking. ***I will say that we've gotten a couple requests for sort of standard documentation on the CMC side just in the last couple of weeks that our quality team and our CMC team are responding to timely***. But it would be too far to say that we're having substantive discussions with them. That's... we are offering them that material, and they've asked us ***a couple of paperwork questions.***

123.    On November 21, 2024, Humacyte issued a press release to its corporate website ("11/21/2024 Press Release").  On information and belief, the 11/21/2024 Press Release was written and published after writing, editing, approval, and authorization by Defendant Niklason, who, as company co-founder and CEO, closely controlled corporate

-91-

communications regarding the HAV, including on Humacyte's corporate website. The 11/21/2024 Press Release announced presentation of Humacyte's clinical results being published in JAMA Surgery. Humacyte's CMO, Dr. Parikh, was the corresponding author. He and Defendant Niklason were listed as "Author Contributions" who "had full access to all of the data in the study and take responsibility for the integrity of the data and the accuracy of the data analysis." The other authors all received funds from Humacyte or were employees at some point during the study. None were disinterested.

(a)     The press release went on to state that the publication, entitled "Bioengineered Human Arteries for the Repair of Vascular Injuries," describes two clinical studies in which the HAV demonstrated benefits in terms of patency (blood flow), limb salvage, and infection resistance compared to synthetic graft benchmarks in the treatment of acute vascular injuries of the extremities.

(b)     It also states, in relevant part:

The *JAMA Surgery* publication described the results of two studies in which the ATEV was evaluated in patients with extremity vascular trauma. The V005 clinical trial was a single-arm study conducted in the United States and Israel in patients with arterial injuries resulting from gun shots, workplace injuries, car accidents, or other traumatic events for whom the standard of care, saphenous vein, was not feasible or available to use as a bypass graft. The V017 single-arm clinical trial evaluated patient outcomes from a humanitarian program which patients with wartime injuries were treated in Ukraine. As single-arm studies, the comparators for the ATEV results were a systematic literature review and meta-analysis of studies conducted with synthetics grafts, providing a current treatment benchmark comparison. ***In a meta-analysis combining the V005 and V017 trials, the ATEV demonstrated higher patency with a 30-day secondary patency rate of 91.5% for the extremity patients compared to 78.9% historically reported for synthetic grafts. For the secondary comparison of amputation rates, the ATEV demonstrated an improvement with a rate of 4.5% for extremity***

*patients compared to 24.3% historically reported for synthetic grafts. For the secondary comparison of infection, the ATEV demonstrated an improvement with a reduced rate of 0.9% for the extremity patients compared to 8.4% historically reported for synthetic grafts.* In summary, researchers concluded that *the 30-day outcomes in civilian and military trauma patients indicate superior secondary patency, limb salvage, and resistance to infection of the ATEV conduit compared to synthetic grafts*.

(c)     It explained also described longer-term follow-up results, published in

JAMA Surgery:

The ATEV was *observed to be mechanically durable* and does not appear to dilate or become stenotic over time. Long-term outcomes for secondary patency, limb salvage, freedom from conduit infection, and patient survival were evaluated by Kaplan-Meier analysis. The average follow-up duration for patients receiving the ATEV for extremity trauma is 334.4 days, with a total patient exposure of 61.3 years. *These results showcased the potential of the ATEV to retain patency over the longer duration of follow up.* No ATEV infections or patient deaths were reported after month three.

(d)     It continued:

*Evaluation of the safety of the ATEV indicated no safety signals attributable to ATEV mechanical weakness,* contamination, or immune rejection. Overall, Adverse Events (AEs) and Serious Adverse Events (SAEs) were consistent with patients suffering from acute injuries. *Adverse Events of Special Interest (AESIs) including thrombosis, rupture, aneurysm, and pseudoaneurysm, occurred at rates that were consistent with reports of other vascular conduits, including autologous vein and synthetic grafts. The meta-analysis combing the V005 and V017 trials showed a 30-day rate of death in ATEV patients of 3.5%, comparable to the 3.4% rate historically reported for synthetic grafts. There were no deaths attributable to the ATEV.*

124.    On December 19, 2024, Humacyte issued a press release to its corporate

website ("12/19/2024 Press Release"), which was filed with the SEC as Exhibit 99.1 to a

Form 8-K dated December 20, 2024 ("12/20/2024 8-K") and signed by Defendant Sander.

(a)     The press release announced:

[Humacyte] . . . today **announced that the U.S. Food and Drug Administration (FDA) has granted a full approval for SYMVESS** (acellular tissue engineered vessel-tyod) for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and when autologous vein graft is not feasible.

(b)     Defendant Niklason was quoted as saying, "SYMVESS approval in this first indication for arterial injury repair is a milestone for regenerative medicine overall, as well as for Humacyte. **The FDA's full approval of SYMVESS** is a transformational event for the Company and our bioengineering technology platform."

(c)     It also stated in relevant part concerning safety and efficacy:

SYMVESS, or the ATEV™, is a first-in-class bioengineered human tissue that is designed to be a universally implantable vascular conduit for use in arterial replacement and repair. While harvesting vein from a trauma patient takes valuable surgical time, SYMVESS is available off-the-shelf, and does not require further injuring the patient to obtain vascular repair material. **Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. SYMVESS was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds, and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat wartime injuries. Results from these studies were published in JAMA Surgery on November 20, 2024. In the civilian and military clinical studies, SYMVESS was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.**

125.    The foregoing Product Safety Fraud misstatements and omissions were materially false or misleading, for the following reasons.

(a)     First, the 8/14/2023 Earnings Release; 8/14/2023 Earnings Call; 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings

Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release; 2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 6/6/2024 Jeffries Conference; 8/9/2024 Press Release; 11/21/2024 Press Release; and 12/19/2024 Press Release were materially false and misleading because, unbeknownst to investors, the HAV suffered from dire safety risks of mid-graft rupture and anastomotic failure that Defendants omitted or downplayed when discussing the HAV's safety profile and infection rate results. FDA's 12/19/2024 BLA Approval highlighted the 7 of 54 patients from the V005 and V017 trials who experienced adverse effects "which resulted in serious bleeding: three from mid-graft rupture and four from anastomotic failure" and imposed FDA's most-serious, black-box warning:

> Given the serious risk of arterial bleeding from mid-graft rupture or anastomotic failure (9.9%) following implantation of SYMVESS in this small cohort, the clinical team included this information as a boxed warning in SYMVESS prescribing information.

Despite what Defendants consistently touted as positive safety results concerning HAV infection rates, in the FDA's assessment, "More concerning is the risk of mid-graft rupture or anastomotic failure of SYMVESS. This risk has not been adequately characterized in the studies included in this BLA submission." These misstatements also downplayed the risks of rupture in their data categorization, as Defendants classified one rupture as a vascular graft complication when it was actually a rupture. As discussed in the FDA Clinical Review Memo made public as part of the BLA approval process, with the additional rupture, the 9.9% rupture/anastomotic failure rate for both trials exceeded the rupture rate of 0-6% for synthetic grafts. The Clinical Review Memo explained the

rupture/anastomotic failure rate was "worrisome and requires further characterization." These concealed, dire safety risks were top of mind for former FDA medical device reviewer, Dr. Robert Lee, whose grave concerns from the time period of the HAV's BLA pre-approval review were revealed to investors in the 3/24/2025 *NYT* Article, and the 3/25/2025 *Bloomberg* Article. He said the HAV could rupture with no warning which was "unpredictable, catastrophic and life-threatening," for patients. Dr. Lee said of the HAV's chance of rupture or anastomotic failure: "That's an unacceptable risk for whatever slim benefit, if any, this product provides above the current standard treatments." He said those risks were unheard-of for synthetic grafts. In the 3/24/2025 *NYT* Article, Dr. Lee explained why the rupture risk matters more than (Defendants' touted safety metric) infections where "you know the patients are sick, . . . [y]ou know something's brewing, and you usually have time to take care of it." As he said about the HAV in the 3/25/2025 *Bloomberg* Article, "This thing has grave safety concerns and they buried it."

(b)     Second, the 8/14/2023 Earnings Release; 8/14/2023 Earnings Call; 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release; 2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 5/10/2024 Earnings Call; 6/6/2024 Jeffries Conference; 8/9/2024 Press Release; 11/21/2024 Press Release; and 12/19/2024 Press Release were materially false and misleading because, unbeknownst to investors, Defendants were applying a "while on treatment" or "last observation carried forward"

statistical model to report patients who lacked 30-day follow-up data as successes, even if those patients actually had died or had limbs amputated, in clear contrast to the FDA's favored data analysis practices. As Todd Clark explained, regulatory agencies like the FDA disfavor this approach and apply, as the FDA did here, a more conservative data analysis. Instead of accepting Defendants' reports of success for patients without follow up, the FDA treated these patients as failures, which significantly worsened the HAV's efficacy and safety data compared to the data Defendants had reported to investors. According to the FDA Statistical Review Memo, when the FDA treated the patients lacking 30-day follow up as failures, the HAV's primary patency rate, secondary patency rate, limb salvage rate, and infection rate were all worse than those observed with synthetic grafts. The FDA had explained its concerns to Defendants before the trials even began. The Statistical Review includes a Summary of Pre- and Post-submission Regulatory Activity detailing a years-long history of interactions between the FDA and Humacyte where FDA communicated statistical concerns. The FDA reiterated its statistical concerns during the BLA review as reflected in the LCM Summary. Defendants knew, or recklessly disregarded, that the FDA would treat patients without 30-day follow up data as failures.

(c)     Third, the 8/14/2023 Earnings Release; 8/14/2023 Earnings Call; 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release; 2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 5/10/2024 Earnings Call; 6/6/2024 Jeffries Conference;

8/9/2024 Press Release; 11/21/2024 Press Release; and 12/19/2024 Press Release were materially false and misleading because, unbeknownst to investors, the V005 trial and the V017 trial data overstated the HAV's efficacy and safety profile by ignoring long-term safety data relevant to the FDA. At the time of FDA's review of the BLA, only "seven patients completed the study with 36 months of follow-up," a problem that led FDA to conclude—as set forth in the Clinical Review Memo—Humacyte's long-term patency estimates "provide limited clinically meaningful conclusions" and "Long-term efficacy of ATEV has not been established as only 7 subjects completed the trial of the time of this review." Hidden from investors was the conclusion expressed in the Clinical Review Memo (later quoted in the 3/24/2025 *NYT* Article) that: "There is significant uncertainty regarding the safety and effectiveness of this product beyond 30 days due to the limited number of patients who have completed the expected follow up." Indeed, the Clinical Review Memo highlighted the need for follow-up after 30 days, noting two patients who suffered rupture events on day 30 and one on day 35.

(d)     Fourth, the 8/14/2023 Earnings Call; 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release; 2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 6/6/2024 Jeffries Conference; and 11/21/2024 Press Release were materially false and misleading because, unbeknownst to investors, benchmarks Defendants used to compare the HAV's efficacy and safety against autologous vein and synthetic graft were

inappropriate and had not been agreed to by the FDA before or during the V005 trial or the V017 trial. The FDA Statistical Review Memo demonstrated that the population in the benchmarks cited by Defendants were not comparable. Additionally, of the five published studies Humacyte submitted with its BLA, two concerned military populations, which skewed the overall results of the benchmark studies, as military populations had higher infection rates. Submitting military data to benchmark against the V005 trial "biased in favor of HAV."

(e)      Fifth, the 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release; 2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 5/10/2024 Earnings Call; 8/9/2024 Press Release; 11/21/2024 Press Release; and 12/19/2024 Press Release were materially false and misleading because, unbeknownst to investors, the V005 trial was poorly designed and underwent multiple major changes while ongoing. The FDA Statistical Review Memo said the V005 trial "underwent multiple major changes while the study was ongoing, and the ongoing clinical outcomes were known," including changes to study design, study population, primary efficacy endpoints, sample size, and statistical analysis plan. According to the memo, "the performance benchmarks were finalized when all the primary and key secondary efficacy endpoints in the original submission were known." Contrary to the impression Defendants gave to investors about how the trial was put together and what its results demonstrated, the FDA Statistical Review Memo cast

doubt on its reliability: "[i]n a well-controlled study, the performance benchmark should be chosen prior to trial initiation and used to power the study to meet a pre-specified primary objective. Therefore [Humacyte's] frequent changing of key study elements and the analysis plans while the trial was ongoing introduced selection bias." Reflecting on the FDA's statistical review, the FDA Clinical Review Memo noted the V005 trial "was not an adequate and well-controlled trial," and that it "seemed to be poorly conducted with missing data related to evaluation of adverse and intercurrent events and patient follow up." These changes to the study and the lack of controls undermined the value of the trial's results.

(f)     Sixth, the 8/14/2023 Earnings Release; 8/14/2023 Earnings Call; 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release; 2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 5/10/2024 Earnings Call; 6/6/2024 Jeffries Conference; 8/9/2024 Press Release; 11/21/2024 Press Release; and 12/19/2024 Press Release were materially false and misleading because, unbeknownst to investors, the V017 trial was retrospective and observational, meaning researchers could look back and cherry-pick the best results for inclusion. The FDA Statistical Review Memo noted the study "is prone to selection bias and offers only limited supportive evidence due to the different study population and settings." Positive data reported from the V017 trial "could be attributed to selection bias."

(g) Seventh, the 8/9/2024 Press Release; 8/13/2024 Earnings Release; 8/13/2024 Earnings Call; 11/8/2024 Earnings Release; and 11/8/2024 Earnings Call were materially false and misleading because the FDA delayed the PDUFA date, in response to dire, non-public safety and statistical concerns raised by Dr. Lee and Dr. Zhou, so a panel of three external reviewers could assess the BLA. As Defendants later admitted, FDA at least communicated to Defendants that it was considering an Advisory Committee (Dr. Lee's preferred course of action). In a March 27, 2025 press release issued to Humacyte's corporate website ("3/27/2025 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K the same day ("3/27/2025 8-K"), Defendant Niklason was quoted as saying, "[a]fter a consultant on the file Dr. Robert E. Lee raised his concerns during the review, the agency considered convening an Advisory Committee of outside experts," which Humacyte "did not object to," and "The FDA decided against convening an Advisory Committee, and instead engaged in extensive internal consultation, and also asked three experienced vascular surgeons outside the FDA to offer their perspectives on Symvess for treating traumatic injuries." As Mr. Clark explained, given FDA's and Humacyte's regular communication about the BLA, it is highly unlikely Defendants were not told about the reason for the PDUFA delay. In fact, they likely would have been given an opportunity to present its case to the external reviewers.

(h) Eighth, the 8/14/2023 Earnings Release; 8/14/2023 Earnings Call; 9/12/2023 Press Release; 9/12/2023 KOL Webinar; 9/20/2023 KOL Event; 11/9/2023 Earnings Release; 11/9/2023 Earnings Call; 11/17/2023 Press Release; 12/12/2023 Press Release;

2/9/2024 Press Release; 3/22/2024 Earnings Release; 3/22/2024 Earnings Call; 2023 10-K; 5/10/2024 Earnings Release; 5/10/2024 Earnings Call; 6/6/2024 Jeffries Conference; 8/9/2024 Press Release; 11/21/2024 Press Release; and 12/19/2024 Press Release were materially false and misleading because, unbeknownst to investors, quality control failure was a known risk at Humacyte, as revealed, *inter alia*, by CW4.  Per CW4, only 25% - 40% of the HAVs made at the Durham Facility passed quality inspection during the Class Period, with the rest – the majority – being scrapped as failures.  Additionally, a significant percentage of the scrapped HAVs failed because they did not pass suture testing.  Failures of the HAV at the sutures would cause anastomotic failure after implanted in patients, the exact problem the FDA highlighted in imposing a black-box warning.

### 2.   Facility Fraud.

126.   Defendants made material misrepresentations and omissions about Humacyte's Durham Facility's readiness to safely manufacture the HAV, the sufficiency of the facility's quality assurance and oversight for FDA approval in the vascular trauma indication, and the FDA's facility inspections.  The "Facility Fraud" included the following misstatements and omissions.

127.   On September 12, 2023, Humacyte held the 9/12/2023 KOL Webinar, on which Defendants Niklason and Sander participated.  In response to a question about Humacyte's quick work preparing the BLA, Niklason said, in relevant part:

> [O]ur manufacturing system, called the Luna200 system, which allows us to make HAVs at commercial scale, has already been in use. ***We've been using this system to produce vessels for our ongoing clinical trials since the middle of 2021.***

As part of transitioning to that commercial scale system, *we did a very detailed filing to our IND with the FDA back in 2020. And they reviewed that filing and have given us a sign-off to use our current commercial system in our clinical studies.*

In prepared closing remarks, she added, "[W]e're currently using systems that allow us to perform commercial scale manufacturing. *And the total capacity in the building* in which we now occupy, *will allow us to produce approximately $1 billion worth of product, when we're fully built out.*"

128.  On November 17, 2023, Humacyte issued the 11/17/2023 Press Release which, stated, in relevant part: "*The HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities, which are expected to have the capacity to provide thousands of vessels for treating patients in need.*"

129.  On February 9, 2024, Humacyte issued the 2/9/2024 Press Release, which quoted Defendant Niklason and was filed with the SEC as Exhibit 99.1 to the 2/9/2024 8-K signed by Defendant Sander.  It reported that the FDA had granted Humacyte's BLA priority review and said  in relevant part, "*The HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities, which are expected to have the capacity to provide thousands of vessels for treating patients in need.*"

130.  Humacyte announced its 4Q23 and YE 2023 financial results and business updates in a series of public statements on March 22, 2024 and March 28, 2024.  On March 22, 2024, Humacyte held the 3/22/2024 Earnings Call, on which Defendants Niklason and Sander spoke.  In response to a question about Humacyte's manufacturing readiness and it was doing to prepare for inspections, Niklason said:

So yes, certainly, after the BLA file was accepted and we got our PDUFA date in August, the FDA moved rapidly to begin scheduling interim meetings and also our inspection, which is upcoming in the near future. As far as what we've been doing to prepare for this, we've actually run two mock inspections, one last summer and one just last month in February, where we brought consultants in to Humacyte who were all ex-FDA inspectors. And they really did a deep dive on two separate occasions, really helping us be as prepared as possible for this upcoming inspection. ***I would say that since we began preparing for this last summer, we've really been able to execute on all of the remediations that were picked out, certainly from 2023. And we're feeling very confident about how this inspection is going to go. We believe that the facility is in great shape.*** Our manufacturing processes are well characterized and well understood. Obviously, with the Center for Biologics, you're right, a big focus is always on manufacturing and the facility and the robustness of the process. ***But we believe we're in good shape.***

In response to a question about Humacyte's work on additional HAV platforms, Niklason said: "One of the beauties of the platform, and this was designed with intention, is that our LUNA manufacturing machines, ***each of which right now can make up to about 1,000 40-centimeter HAV's per year***." Responding to a question about potential margin improvements, she said, in relevant part, "Right now, we have built out only a fraction of our manufacturing floor because we have eight LUNA's installed, although we have room for 40."

131. On March 28, 2024, Humacyte filed the 2023 10-K, which was signed and SOX-certified by Defendants Niklason and Sander.

(a) The 2023 10-K discussed, *inter alia*, the Durham Facility, saying:

We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. ***We have an 83,000 square foot bioprocessing facility housing our modular manufacturing process with the ability to manufacture HAVs of different diameters and lengths at commercial scale.*** As we continue to expand production, we believe we will have the ability to take advantage of economies of scale to

-104-

reduce costs of production. ***We believe our established, controlled manufacturing process demonstrates a significant competitive advantage in the regenerative medicine market***.

(b)     It detailed Humacyte's manufacturing platform and "Novel Manufacturing Paradigm," stating:

> ***Our proprietary manufacturing process was designed with a modular approach allowing us to produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing***. The manufacturing system used to supply our clinical trials from 2016 to 2021, including our Phase 3 trials conducted during that time period, utilized a single tray within one growth drawer holding ten HAVs per batch. In 2021 we commenced supplying our ongoing clinical trials with HAVs produced in our current, commercial-scale LUNA200TM system, which consists of 20 growth drawers per production unit for a total of 200 HAVs per batch. ***Each growth drawer is capable of producing ten 42cm HAVs***, each of which is contained within an individual bioreactor bag. Inside a LUNA200, a tubing network connects all HAVs, allowing the entire system to share nutritive media. ***In this way, a single LUNA200 can produce up to 200 HAVs (42cm in length) per batch while maintaining the critical operating parameters, such as biomechanical pulsing, that affect growth***.

It added, "Since 2021 this system has been utilized to produce clinical product for use in our ongoing Phase 3 trials, and is planned for use to supply our anticipated commercial launches upon approval."

(c)     The 2023 10-K claimed that HAV products made in the LUNA200 system purportedly: (i) were "comparable" to ones made in the single-drawer system based on a study that "assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product" produced in both and (ii) had a "comparable safety profile" to HAVs used in previous studies based on a V011 cross-over study "to evaluate the safety, efficacy and immunogenicity of the LUNA-

-105-

200 manufactured HAVs" in 30 subjects. It said Humacyte submitted the data, and FDA authorized use of the LUNA200-produced HAVs in ongoing clinical trials. It added: "We also plan to use the LUNA200 system to manufacture HAVs for anticipated commercial launch of the HAV if it is approved."

(d)     The 2023 10-K touted the Durham Facility's then-current manufacturing capacity, stating, "***We currently have eight LUNA200 systems installed, commissioned and qualified in our manufacturing facility, creating an annual gross HAV capacity of approximately 7,200 HAVs.***"

(e)     The 2023 10-K added, in relevant part, regarding the Durham Facility's compliance with current Good Manufacturing Practice ("cGMP"):

> Recognizing that commercial scale production capacity of bioengineered tissue has been non-existent, we prioritized the development of a scalable, reproduceable, commercial biomanufacturing process. ***At our 83,000 square foot manufacturing facility in Durham, North Carolina, we have industrialized this concept and created a scalable modular manufacturing process that enables us to engineer our HAVs in commercial quantities in a system designed for cGMP compliance.***

It added, regarding the LUNA200 system: "***[W]e believe [it] will enable us to manufacture our HAVs, if approved, in commercial quantities in compliance with cGMPs***."

(f)     The 2023 10-K also touted the Durham Facility's "***space to further expand manufacturing capacity as needed to over 40 LUNA200 systems***" instead of the eight then in operation. It illustrated the point with this graphic:



The 2023 10-K touted how the LUNA200 system is "functionally closed," "fully automated," and "*allows us to control and maximize HAV production.*" It added:

> **We have designed the LUNA200 to have the ability to produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline.** We intend to introduce a 13cm HAV line extension after commercial launch of the 42cm HAV. **Using our existing LUNA manufacturing equipment, we can generate 400 13cm HAVs per batch. Our modular manufacturing platform can be scaled without impacting the operating parameters that support the HAV growth process.**

132. Humacyte announced its 1Q24 financial results and business updates in a series of public statements made on May 10, 2024. On May 10, 2024, Humacyte issued the 5/10/2024 Earnings Release, which was filed with the SEC the same day as Exhibit 99.1 to the 5/10/2024 8-K and signed by Defendant Sander, in which Defendant Niklason is quoted as saying, "*[T]he FDA completed its Pre-Licensing Inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations* and remain confident in the approvability of the HAV in vascular trauma."

133.   Also on May 10, 2024, Humacyte held the 5/10/2024 Earnings Call, on which Defendants Niklason, Sander, and Prichard spoke.  Both in prepared remarks and in questions from analysts, Defendants touted the completion of FDA's inspection of the Durham Facility between April 1-5, 2024.

(a)   During prepared remarks, Niklason said:

*The FDA has completed its pre-licensing inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations*, and we remain confident in the approvability of the HAV in vascular trauma.

(b)   An analyst asked, "[C]an you talk about the facility inspection with FDA? Any observations?  Anything that you guys had to correct?  How clean was that?  And just help us know that we're kind of checking those boxes before PDUFA."   In response, Prichard said:

*[W]e completed our pre-license inspection of our manufacturing facility and had a very successful outcome.* And based on the outcome of inspection and all of the other FDA interactions on the whole, we remain very confident in approval of the HAV in vascular trauma. And we won't necessarily comment on any single interaction or the details, but we do feel very confident. *And it was a very successful interaction that we have with the FDA, and we feel like it concluded very successfully.*

(c)   In response to a question about manufacturing capacity and steps required to ramp up if the BLA is approved, Prichard said:

[A]s our manufacturing capacity stands now, as you know, at about 8,000 HAVs growth per year. And as far as scaling that out with the LUNA system that we have that manufactures our product, that is just a case of putting in more LUNA lines. *Our facility is already ready* in a shelled out space that's already plumbed for electrical and gases and utilities *for us to add additional units LUNAs up to about 40,000 HAVs per year annual gross yield.*

Case 1:24-cv-00954-TDS-JEP    Document 34    Filed 05/22/25    Page 112 of 188

So we're prepared, and ***we're prepared for a launch to be able to produce enough vessels in the first few years***. And then we're also prepared and have begun planning for that expansion within the space. So as demand grows, we can produce enough HAVs for the market.

(d)      In response to a question about FDA interactions, Niklason said:

***[A]s we mentioned, we've already completed the inspection of our facility. So things are tracking along exactly as we would have expected, given the timelines for a Priority Review.*** So again, ***we see no reason that the PDUFA date will shift***. Of course, what -- exactly what the FDA does is always out of our control, but ***we have no indication that we're not on track. Everything just seems to be progressing along as we would have expected.***

134.    On June 17, 2024, Humacyte issued a press release to its corporate website ("6/17/2024 Press Release"), which said, in relevant part, "***The company's manufacturing facilities are capable of producing ATEVs at commercial scale*** to meet the potential needs of thousands of patients."   On information and belief, the 6/17/2024 Press Release was written and published after writing, editing, approval, and authorization by Defendant Niklason, who, as company co-founder and CEO, closely controlled corporate communications regarding ATEV, including on Humacyte's corporate website.

135.    On August 9, 2024, Humacyte issued the 8/9/2024 Press Release, which was filed with the SEC as Exhibit 99.1 to the 8/13/2024 8-K and signed by Defendant Sander. In the 8/9/2024 Press Release Defendant Niklason is quoted as saying:

***During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites*** and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions.  ***Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma***.

-109-

136.    Humacyte announced its 2Q24 financial results and business updates in a series of releases and filings on August 13, 2024, which included:

(a)    On August 13, 2024, Humacyte issued the 8/13/2024 Earnings Release, which was filed with the SEC the same day as Exhibit 99.2 to the 8/13/2024 8-K signed by Sander, in which Defendant Niklason is quoted as saying:

> ***During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and clinical sites*** and has actively engaged with us in multiple discussions regarding our BLA filing, including post-marketing and labeling discussions. ***Based on these interactions, we are confident in the approvability of the ATEV in treating vascular trauma***, although we currently do not yet have a revised action date.

(b)    Humacyte also held the 8/13/2024 Earnings Call, on which Defendants Niklason and Sander spoke. During prepared remarks, Defendant Niklason said:

> Despite the FDA's delay, I want to emphasize that we remain confident in the approvability of the ATEV in vascular trauma based on our interactions with the agency to date. ***During the course of the BLA review, the FDA has conducted inspections of our manufacturing facilities and our clinical sites.*** They've also actively engaged with us in multiple discussions regarding the BLA filing, including post-approval marketing and labeling discussions.

In response to a question about FDA's inspections and any follow-ups, Niklason said:

> So we had a total of five inspections. ***I would say all of those inspections went very well. In terms of follow-up items, there are – there's a small number of standard follow-up items on assays and CMC having to do with validation of certain methods. But these are sort of standard things that we've worked out with the agency.***
>
> Some of those were completed pre-PDUFA. Some of those were slated for post-PDUFA. For example, one study is shipping the product during winter, and we couldn't do that until winter, so we agreed to do that in winter. So but these are sort of standard, I don't want to say cookie cutter, but these are standard validation and test procedures that we do not believe are impacting the timing of the file.

137.    The foregoing Facility Fraud misstatements and omissions were materially false or misleading for the following reasons.  First, all Facility Fraud misstatements were materially false and misleading because they concealed that Humacyte's Durham Facility did not have the quality oversight needed to safely manufacture HAVs at the scale Defendants were then claiming could be achieved using the LUNA200 manufacturing platform, as revealed by the FDA's Form 483.  Second, the 9/12/2023 KOL Webinar, 11/17/2023 Press Release, 2/9/2024 Press Release, 3/22/2024 Earnings Call, 2023 10-K, 5/10/2024 Earnings Call, and 6/17/2024 Press Release were materially false and misleading because they said Humacyte was in a position to expand HAV/ATEV manufacturing, at a time when the Durham Facility was experiencing quality oversight and manufacturing problems with then-existing levels of production, making safe, reliable expansion of manufacturing into commercial levels impossible at that time.  Third, the 3/22/2024 Earnings Call was false and misleading because Defendant Niklason described Humacyte's readiness for the FDA inspection when the Durham Facility had serious quality oversight and manufacturing problems, which resulted in a Form 483.  Fourth, the 5/10/2024 Earnings Release, 5/10/2024 Earnings Call, 8/9/2024 Press Release, 8/13/2024 Earnings Release, and 8/13/2024 Earnings Call were false and misleading because they described the FDA's inspection of the Durham Facility as successful without disclosing the serious problems with quality oversight and microbial testing identified by the FDA in the Form 483.  Fifth, all of the Facility Fraud misstatements were false and misleading because they concealed that Humacyte was then unable to safely manufacture the HAVs

with an adequate yield rate and that HAVs manufactured at the Durham Facility were failing quality control checks at rates as high as 80%. Sixth, all of the Facility Fraud misstatements were false and misleading because manufacturing and quality problems at the Durham Facility, resulting in low yields and unsafe HAV's, was well known. CW3 explained that, before the FDA inspection, Defendant Prichard discussed concerns about a supplier of BDS trays where the trays were leaking, resulting in low yield; Humacyte was desperately looking for positive results but failing to make a stable batch of tissue. According to CW3, Humacyte leadership did not know why the HAV was unstable. CW4 agreed and said that early in 2024 equipment was failing to make the right mix of gas to feed into incubators growing the HAV. According to CW4, only 25%-40% of the lab grown blood vessels passed quality inspection. CW4 said Humacyte purchased new equipment in late 2023/early 2024 because the old equipment had problems, but it could not put the new equipment into place prior to the FDA inspection. According to CW2, the Durham Facility's equipment was not complying with GMP because it could not show it was following the maintenance schedule or document work. CW2 also said Humacyte sometimes delayed preventative maintenance and calibration, putting Humacyte out of compliance with GMP, and then misclassifying the delays. CW3 explained that as late as July 2024, Humacyte had unresolved problems with the BDS, gas exchanger, and transportation temperature. Humacyte was still achieving low yields and they were losing entire batches of finished product. According to CW5, Humacyte receive many requests for documents from the FDA after the inspection. And according to CW2, employees were

told to improperly close out old work orders even though the work was not done. The manufacturing issues at Humacyte were so bad that CW3 sent the ACE memo to the FDA directing them to review specific batches of tissue that Humacyte did not know were stable. CW4 also said Humacyte lacked a quality assurance employee to oversee quality control microbiology activities at the time of the FDA inspection, and thus lacked "microbial quality assurance." According to CW4, quality control employees tested the clean rooms for microbial contamination, performing air quality and surface testing, only once per month. As CW3 believed, Humacyte was in no way ready for commercial release of the HAV in August 2024.

### 3. Liquidity Fraud.

138. During the Class Period, Humacyte's liquidity was a serious concern to investors and analysts, who closely tracked its cash and "cash equivalents," a term Humacyte defined in its Form 10-Ks: "The Company considers all short-term, highly liquid investments, including certificates of deposit ('CDs') purchased with an original maturity of three months or less at the date of purchase, to be cash equivalents." In the Liquidity Fraud, Defendants made material misrepresentations and omissions about whether Humacyte had sufficient cash and cash equivalents to fund its operations, as follows.

139. Humacyte announced its 2023 second quarter financial results in a series of public statements on August 14, 2023, which each said Humacyte had sufficient cash and cash equivalents to fund its operations, as follows.

(a)     Humacyte issued the 8/14/2023 Earnings Release, which was filed with the

SEC as Exhibit 99.1 to the 8/14/2023 8-K, signed by Defendant Sander, announcing its

2023 second quarter financial results.  It said:

> The Company reported cash and cash equivalents of $114.6 million as of June 30, 2023.  In May 2023, Humacyte reported the completion of an up to $160 million funding arrangement with Oberland Capital Management, of which it has received $40 million.  ***Humacyte believes that its cash and cash equivalents and expected funding from the Oberland funding agreement are adequate to fund operations past the anticipated timelines for potential FDA approval and commercialization of the HAV in the vascular trauma indication.***

(b)     Humacyte also held the 8/14/2023 Earnings Call, on which Defendants

Niklason, Sander, and Prichard spoke.  During prepared remarks, Defendant Sander said:

> As of June 30, 2023, we had cash and cash equivalents of $114.6 million.  In May 2023, we reported the completion of a funding arrangement with Oberland Capital of up to $160 million, of which we have received $40 million.  ***We believe our cash and cash equivalents and planned funding from the Oberland funding agreement are adequate to fund operations past the anticipated timelines for approval and commercialization of the HAV in vascular trauma.***

Also, in response to a question about Humacyte's cash burn, Defendant Sander said:

> I would not expect more than $40 million burn for the remainder of the year.  ***And we've given a sense that the Oberland transaction, combined with how we expect to operate, and also the cash on hand we expect takes us well past the approval and commercialization in vascular trauma.***  But from a calendar point of view, that means going to the end of 2025 at a minimum in terms of how we expect to operate.

(c)     Also on August 14, 2023, Humacyte filed a Form 10-Q with the SEC for the

second quarter of 2023 ("2Q23 10-Q"), signed and SOX-certified by Defendants Niklason

and Sander.  It said, "As of June 30, 2023, the Company had cash and cash equivalents of

$114.6 million.  ***The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these interim financial statements.***"  It repeated, with slightly different wording, "As of June 30, 2023, we had cash and cash equivalents of $114.6 million.  ***We believe our cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Quarterly Report***."  It further reiterated: "As of June 30, 2023, we had cash and cash equivalents of $114.6 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million.  ***We believe our cash and cash equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.***"

140.    Humacyte announced its 2023 third quarter financial results in a series of public statements on November 9, 2023 which each said Humacyte had sufficient cash and cash equivalents to fund its operations, as follows.

(a)    Humacyte issued the 11/9/2023 Earnings Release, which was filed with the SEC as Exhibit 99.1 to the 11/9/2023 8-K, signed by Defendant Sander.  It said:

> The Company reported cash and cash equivalents of $100.0 million as of September 30, 2023.  In May 2023, Humacyte reported the completion of a funding arrangement of up to $160 million with Oberland Capital Management, $40 million of which has been received.  Total net cash was $49.4 million for the first nine months of 2023, compared to $53.8 million for the first nine months of 2022.  ***Humacyte believes that its cash and cash equivalents and expected funding from the Oberland arrangement are adequate to finance operations past the currently anticipated timelines for***

-115-

*potential FDA approval and commercialization of the HAV in the vascular trauma indication.*

(b)     Humacyte held the 11/9/2023 Earnings Call, on which Defendants Niklason and Sander spoke.  During prepared remarks, Defendant Sander said:

> As of September 30, 2023, we had cash and cash equivalents of $100 million. In May 2023, we reported the completion of a funding arrangement with Oberland Capital of up to $160 million, of which we have received $40 million to date.  Total net cash used was $49.4 million for the first nine months of 2023, compared to $53.8 million for the first nine months of 2022. *We believe that our cash and cash equivalents and expected funding from the Oberland funding arrangement are adequate to finance operations past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.*

(c)     Also on November 9, 2023, Humacyte filed a Form 10-Q with the SEC for the third quarter of 2023 ("3Q23 10-Q"), signed and SOX-certified by Defendants Niklason and Sander.  It said, "As of September 30, 2023, the Company had cash and cash equivalents of $100.0 million.  *The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these interim financial statements.*"  It repeated, with slightly different wording, "As of September 30, 2023, we had cash and cash equivalents of $100.0 million.  *We believe our cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Quarterly Report*."  It further reiterated: "As of September 30, 2023, we had cash and cash equivalents of $100.0 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million.  *We believe our cash and cash*

*equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.*"

141.    Humacyte announced its 2023 fourth quarter and year end 2023 financial results in a series of public statements on March 22, 2024 and March 28, 2024, which each said Humacyte had sufficient cash and cash equivalents to fund its operations, as follows.

(a)    Humacyte issued the 3/22/2024 Earnings Release, which was filed with the SEC as Exhibit 99.1 to the 3/22/2024 8-K signed by Defendant Sander, announcing its 2023 fourth quarter financial results.  It said:

> The Company reported cash and cash equivalents of $80.4 million as of December 31, 2023.  In addition, Humacyte completed two transactions in early 2024 which added to its cash balance.  On March 5, 2024, the Company closed an underwritten public offering of its common stock and raised net proceeds of approximately $43.1 million.  Furthermore, on March 11, 2024, the Company received $20 million in proceeds from an additional draw under its previously disclosed funding arrangement with Oberland Capital Management.  Total net cash used was $69.0 million for the year ended December 31, 2023, compared to $67.7 million for the year ended December 31, 2022.  ***Humacyte believes that its cash and cash equivalents, including net proceeds from the March offering and additional draw under the Oberland funding arrangement, will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication.***

(b)    Humacyte held the 3/22/2024 Earnings Call, on which Defendants Niklason and Sander spoke.  During prepared remarks, Defendant Sander said:

> We had cash and cash equivalents of $80.4 million as of December 31, 2023.  We also completed two transactions in early 2024, which added substantially to our cash balances.  On March 5, 2024, we closed an underwritten public offering of common stock and raised net proceeds of approximately $43.1

-117-

million. In addition, on March 11, 2024, we've received $20 million in proceeds from an additional draw under our revenue purchase agreement with Oberland Capital. Total net cash used was $69.0 million for the year ended December 31, 2023, compared to $67.7 million for the year ended December 31, 2022. *We believe that our cash and cash equivalents are adequate to finance operations past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.*

Also, in response to a question about Humacyte's cash burn, Defendant Sander said:

The way we look at it is we ended December 31 with a little more than – well, right around $81 million in cash. And when we add on the $63-plus million that we achieved through the equity financing as well as the additional draw into our Oberland facility. *That means we're entering the year with about $144 million in cash, which leaves us very well positioned.* Our net cash burn for 2023 rounded to about $69 million. But if you back out the effect of some net financing transactions from an operating cash point of view and from a capital expenditure point of view, we've burned about $73.5 million in 2023 in those activities. *So suggesting we're very well positioned with the cash that we have on hand right now.*

In terms of how we'll proceed in the upcoming year, we haven't given super specific guidance, but I'll share what we've guided in the past is that certainly, we expect to expand our commercialization activities during the year, including near the time of launch, bringing on a relatively small sales force to address this very concentrated market. So we will have, obviously, higher commercialization expenses during this year. But we do also have a wind down of certain clinical costs during the year with the V005 study just in long-term follow-up and not as intensive activities as we had during 2023 as we prepared for the close out of that study and for filing of the BLA. And then also our dialysis trial [V007] will be winding down in the second half of the year, too. So we expect somewhat of an increase in overall cash burn for the upcoming year, but not to a great extent on a net basis. *And we believe that the cash on hand is certainly adequate to take us well past the commercial launches in trauma and AV access and well passed or certainly through 2026. So we certainly don't have any cash concerns at this point in time.*

(c)     On March 28, 2024, Humacyte filed the 2023 10-K, signed and SOX-certified by Defendants Niklason and Sander. It said, "As of December 31, 2023, we had

-118-

cash and cash equivalents of $80.4 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering [], which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement []. Based upon our current operating plan, *we believe that our cash and cash equivalents will be sufficient to fund our operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K.*" It repeated, with slightly different wording, "As of December 31, 2023, we had cash and cash equivalents of $80.4 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering [], which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement[.] *We believe our cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K*." It further reiterated: "As of December 31, 2023 and 2022, we had working capital of $64.8 million and $134.6 million, respectively. As of December 31, 2023, we had cash and cash equivalents of $80.4 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement. *We believe our cash and cash equivalents will be sufficient to fund*

*operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Annual Report on Form 10-K.*"  It later reiterated "As of December 31, 2023, the Company had cash and cash equivalents of $80.4 million. On March 5, 2024, the Company closed the Offering [], raising net proceeds of approximately $43.1 million.  On March 11, 2024, the Company received an additional $20.0 million under the Purchase Agreement . . . .  *The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the issuance date of these financial statements.*"

142.    Humacyte announced its 2024 first quarter financial results in a series of public statements on May 10, 2024 and May 13, 2024, which each said Humacyte had sufficient cash and cash equivalents to fund its operations, as follows:

(a)    Humacyte issued the 5/10/2024 Earnings Release, filed as Exhibit 99.1 to the 5/10/2024 8-K, signed by Defendant Sander, announcing Humacyte's 2024 first quarter financial results.  It said:

> The Company reported cash and cash equivalents of $115.5 million as of March 31, 2024.  Total net cash provided was $35.1 million for the first three months of 2024, compared to net cash used of $20.2 million for the first three months of 2023.  The increase in net cash provided resulted primarily from the receipt of approximately $43.0 million in net proceeds from an underwritten public offering of Humacyte's common stock in March 2024, and $20 million in proceeds from an additional draw under its previously disclosed funding arrangement with Oberland Capital Management. *Humacyte believes that its cash and cash equivalents will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication.*

(b)      Humacyte held the 5/10/2024 Earnings Call, on which Defendants Niklason,

Sander, and Prichard spoke.  During prepared remarks, Defendant Sander said:

> As of March 31, 2024, we had cash and cash equivalents of $115.5 million.
> Total net cash provided was $35.1 million for the first three months of 2024
> compared to net cash used of $20.2 million for the first three months of 2023.
> The increase in net cash provided resulted primarily from $43 million in net
> proceeds from a public offering of Humacyte's common stock in March 2024
> and $20 million in proceeds from an additional draw under our funding
> arrangement with Oberland Capital Management. ***We believe that our cash
> and cash equivalents will be adequate to finance operations for at least 12
> months from the date of this financial report, well past the currently
> anticipated timelines for FDA approval and commercialization of the HAV
> in the vascular trauma indication.***

(c)      On May 13, 2024, Humacyte filed the 1Q24 10-Q, signed and SOX-certified

by Defendants Niklason and Sander.  It said, "As of March 31, 2024, the Company had

cash and cash equivalents of $115.5 million. ***The Company believes its cash and cash

equivalents on hand will be sufficient to fund operations, including clinical trial

expenses and capital expenditure requirements, for at least 12 months from the issuance

date of these interim financial statements.***"  It repeated, with slightly different wording,

"As of March 31, 2024, we had cash and cash equivalents of $115.5 million. ***We believe

our cash and cash equivalents on hand will be sufficient to fund operations, including

clinical trial expenses and capital expenditure requirements, for at least 12 months from

the date of this Quarterly Report***."  It further reiterated: "As of March 31, 2024 and

December 31, 2023, we had working capital of $103.8 million and $64.8 million,

respectively. ***We believe our cash and cash equivalents will be sufficient to fund***

-121-

*operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Quarterly Report.*"

143. The foregoing Liquidity Fraud misstatements and omissions were materially false and misleading for the following reasons.

(a)    First, the 8/14/2023 Earnings Release, 8/14/2023 Earnings Call, 2Q23 10-Q, 11/9/2023 Earnings Release, 11/9/2023 Earnings Call, and 3Q23 10-Q were materially false and misleading because unbeknownst to investors, Humacyte could only fund its operations through February 2024. That undisclosed fact was evidenced and revealed by Humacyte's February 29, 2024 announcement of an offering (which closed on March 5, 2024) of over 13 million shares at $3.00 per share, a significant discount on the prevailing stock price, just three to six months after these misstatements.

(b)    Second, the 2Q23 10-Q, 3Q23 10-Q, 3/22/2024 Earnings Release, 3/22/2024 Earnings Call, 2023 10-K, 5/10/2024 Earnings Release, 5/10/2024 Earnings Call, and 1Q24 10-Q were materially false and misleading because in these misstatements, Defendants reassured investors about Humacyte's liquidity, using the phrase "cash and cash equivalents," which did not include any expected funds from the Oberland Funding Agreement. To the contrary, unbeknownst to investors, Humacyte did not have sufficient cash and cash equivalents to fund its operations without accounting for the funds contingently available via the Oberland Funding Agreement. That undisclosed fact was evidenced and revealed, *e.g.*, by Humacyte's 2Q24 10-Q disclosing on August 13, 2024 – just days after Humacyte learned the PDUFA date would be delayed and Humacyte would

not be able to access contingent funds at that time – that Humacyte did not have sufficient cash and cash equivalents to fund 12 months of operations, without receiving funding it had expected from the Oberland Funding Agreement.

(c)     Third, all Liquidity Fraud misstatements were materially false and misleading because they could not be true unless Humacyte both achieved the Oberland Funding Agreement benchmarks and achieved them on Humacyte's expected timeline. That undisclosed fact was evidenced and revealed, *e.g.*, by Humacyte's accessing the capital markets three times in the three months after the PDUFA date was delayed, and with it Humacyte's access to related contingent milestone payments.   Humacyte's announcements of these purchase agreements and offerings on September 24, 2024, on October 4, 2024, and November 14, 2024 were less than 12 months from the misstatements.

(d)     Fourth, all Liquidity Fraud misstatements were materially false and misleading because they concealed that Humacyte needed to repeatedly access the capital markets, diluting shareholders' stock at significant discounts on prevailing market rates. That undisclosed fact was evidenced and revealed, by Humacyte's announcements, *e.g.*, on February 29, 2024, September 24, 2024, November 14, 2024, and March 25, 2025, whereby Humacyte said it was raising approximately $150 million in net proceeds, with the ability to raise an additional $50 million in the LP Agreements.

(e)     Fifth, all Liquidity Fraud misstatements were materially false and misleading because they concealed problems at Humacyte's Durham Facility caused by insufficient capital.  CW4 recalled Humacyte leadership telling employees in a companywide meeting

-123-

toward the end of 2023 that although Humacyte had enough funds to get through 2024, they wanted to extend the runway by cutting back on spending. CW2 discussed an example of a consequence of Humacyte's lack of capital. Even though Humacyte needed a new maintenance management system to stay current with cGMP, Humacyte never purchased a new system, resulting in GMP failures.The truth begins to emerge/ Loss Causation

144. Interspersed with the foregoing misstatements were a series of partial corrective disclosures that have incrementally revealed aspects of the three threads of Defendants' fraud, causing artificial inflation to be removed from Humacyte's stock price.

145. On February 29, 2024, after the close of the markets, Humacyte published two press releases to its corporate website as follows.

(a) Humacyte published a press release to its corporate website ("Initial 2/29/2024 Press Release") announcing that it had commenced an underwritten public offering of its common stock, with TD Cowen and Cantor as joint book-running managers and BTIG as lead manager. It said the securities would be offered by means of both a prospectus supplement and new prospectus related to the new offering. It also said the offering would be pursuant to a shelf registration statement ("2022 Shelf Registration") filed with the SEC on September 1, 2022 and declared effective by the SEC on September 9, 2022. It also announced that Humacyte intended to grant the underwriters an option for a period of 30 days to purchase up to an additional 15% of the number of shares sold in the offering.

(b)     Later that night, Humacyte published a press release to its corporate website ("Second 2/29/2024 Press Release") announcing that the underwritten public offering would be for 13.4 million shares of Humacyte common stock at a public offering price of $3.00 per share, for aggregate gross proceeds of $40.2 million before deducting underwriting discounts and commissions and other offering expenses.  The $3.00 per share price was a 31%+ discount off the February 29, 2024 closing market price of $4.35 per share of Humacyte stock.  The Second 2/29/2024 Press Release clarified that Humacyte had granted the underwriters an option for a period of 30 days to purchase up to an additional 2,010,000 shares at the public offering price, less underwriting discounts and commissions.

146.    On this news, Humacyte's stock price substantially declined, on high trading volume, from a close of $4.35 per share on February 29, 2024, to close at $3.24 per share on March 1, 2024—a drop of $1.11, or -25.52%, per share.

147.    On Friday August 9, 2024, after the market close, Humacyte published the 8/9/2024 Press Release to its corporate website which was filed with the SEC as Exhibit 99.1 to the 8/13/2024 8-K, signed by Defendant Sander.  It announced that the FDA "*will require additional time to complete its review of its Biologic License Application (BLA)* for the acellular tissue engineered vessel (ATEV) in the vascular trauma indication."  The press release acknowledged the FDA had originally assigned a PDUFA date of August 10, 2024 – then just one day away – before stating, "*In a phone call from FDA CBER leadership today*, the Company was informed that the FDA required additional time to

complete its review."  It quoted Defendant Niklason as stating: "During the course of the BLA review, **the FDA has conducted inspections of our manufacturing facilities and clinical sites** and has actively engaged with us in multiple discussions regarding our BLA filing" and  "**FDA leadership noted that Humacyte's ATEV is a first-in-class product, and that Priority Review had been granted, which allows only a six-month review cycle, as compared to the standard ten-month review cycle for most products**."

148.    Between Humacyte's issuing the 8/9/2024 Press Release and close of the markets on the next trading day, August 12, 2024, analysts covering Humacyte expressed concerns about the delay.  For instance, on August 9, 2024, BTIG published a report ("8/9/2024 BTIG Report") explaining "investors were surprised by the news late Friday that the FDA would need additional time to complete its review of the ATEV," and calling the news "a disappointment."   On the same day, Piper Sandler published a report ("8/9/2024 Piper Report") explaining the delay "adds incremental regulatory risk to the story" and "[w]e are admittedly puzzled by this turn of events."  On August 11, 2024, TD Cowen published a report ("8/11/2024 TD Report") which said, "the extension to HUMA's BLA review is not ideal."

149.    On this news from August 9-12, 2024, Humacyte's stock price substantially declined, on high trading volume, from a close of $7.91 per share on August 9, 2024, to close at $6.62 per share on August 12, 2024—a drop of $1.29, or -16.37%, per share.

150.    On August 13, 2024, after the market close, Humacyte filed the 2Q24 10-Q, signed and SOX-certified by Defendants Niklason and Sander, announcing Humacyte's financial results for the quarter.  It revealed:

> As of June 30, 2024, we had cash and cash equivalents of $93.6 million.  The extension of time required by the FDA to review our vascular trauma BLA, and the delay in potential approval, has delayed, among other items, our ability to draw an additional $40.0 million in [Oberland Funding Agreement] proceeds.  ***Accordingly, we do not believe our available cash and cash equivalents on hand will be sufficient to fund operations***, including clinical trial expenses and capital expenditure requirements, for at least one year from the date of this Quarterly Report without achieving approval of the ATEV for vascular trauma and generating sufficient cash Flows from commercial sales on a timely basis ***and/or obtaining additional capital.***

The 2Q24 10-Q also included a going concern warning not present in earlier 10-Qs: "***These factors raise substantial doubt about the Company's ability to continue as a going concern.  Accordingly, the Company will, over the course of the next year, require additional financing to continue its operations.***"

151.    On this news, Humacyte's stock price declined, on high trading volume, from a close of $6.65 per share on August 13, 2024, to close at $6.01 per share on August 14, 2024—a drop of $0.64, or -9.62%, per share.

152.    On September 24, 2024, after the market close, Humacyte filed a Form 8-K with the SEC ("9/24/2024 8-K"), signed by Defendant Sander, disclosing that Humacyte and Lincoln Park Capital Fund, LLC ("Lincoln Park") had entered into two agreements, attached to the 9/24/2024 8-K as Exhibits 10.1 and 10.2 ("LP Agreements") – "a purchase agreement [] and registration rights agreement [], pursuant to which [Humacyte] has the right, in its sole discretion, ***to sell to Lincoln Park shares of the Company's common stock***

*. . . having an aggregate value of up to $50,000,000*."  Pursuant to the LP Agreements, Humacyte had the right to require Lincoln Park to purchase new Humacyte shares (subject to daily maximums) *at a 3% discount* off the *lesser* of (i) the lowest sale price on the date of purchase or (ii) the average of the three lowest closing sale prices in the 10 days preceding.  The LP Agreements thus allowed Humacyte to sell dilutive shares, at a discount.

153.    On this news, Humacyte's stock price substantially declined, on high trading volume, from a close of $6.12 per share on September 24, 2024, to close at $5.46 per share on September 25, 2024—a drop of $0.66, or -10.87%, per share.

154.    On October 17, 2024, during market hours, the FDA released the Form 483 concerning its investigation of the Durham Facility, as part of the BLA approval process. The Form 483 revealed that, FDA's inspection between April 1, 2024 and April 5, 2024, yielded two observations indicating concern about the facility's readiness to safely manufacture the HAV and quality assurance and oversight.  First, the Form 483 identified an issue where there was "*no microbial quality assurance*" and "*no microbial testing,*" of some process or piece of equipment, the name of which was redacted in the Form 483. Second, it identified that "*[q]uality oversight is insufficient*" for four issues.  A copy of the Form 483 is reproduced in relevant part in §IV.E.2. herein.

155.    On this news, Humacyte's stock price substantially declined, on high trading volume, from a close of $5.81 per share on October 16, 2024, to close at $4.86 per share on October 17, 2024—a drop of $0.95, or -16.35%, per share.

156.    On November 14, 2024, before the market open, Humacyte made a series of filings disclosing yet another offering.  Humacyte published a press release to its corporate website ("11/14/2024 Press Release"), which was filed with the SEC as Exhibit 99.1 to a Form 8-K, signed by Defendant Sander, that day ("11/14/2024 8-K").  The 11/14/2024 Press Release announced pricing of a $15 million registered direct offering of Humacyte stock via a securities purchase agreement.  It said Humacyte "agreed to sell 2,808,988 shares of its common stock and warrants to purchase up to 2,808,988 shares of common stock."  The warrants had a $5.34 per share exercise price, and half of the warrants would not expire for four and one-half years from the agreement date.  The purchase price of the common stock sold was also $5.34 per share.  The 11/14/2024 Press Release said the offering was expected to close on November 15, 2024, and that the offering was pursuant to the 2022 Shelf Registration and 9/9/2022 Prospectus.  Also on November 14, 2024, before the market open, Humacyte filed a Prospectus Supplement to the 9/9/2022 Prospectus pursuant to SEC Rule 424(b)(3) (17 C.F.R. § 230.424 (2024)) with the SEC ("11/14/2024 Prospectus Supplement").  It said Humacyte "intend[ed] to use the net proceeds from this offering to fund the development of the product candidates in our pipeline, the planned commercial launch of the ATEV in the vascular trauma indication, if approved, and for working capital and general corporate purposes."

157.    On this news, Humacyte's stock price substantially declined, on high trading volume, from a close of $5.34 per share on November 13, 2024, to close at $4.84 per share on November 14, 2024—a drop of $0.50, or -9.36%, per share.

158.    On March 24, 2025, after the market close, the 3/24/2025 *NYT* Article was published online.  It revealed that the FDA granted Humacyte's vascular trauma BLA "even though ***[FDA's] own scientists flagged questionable study results and potentially fatal ruptures***" of the HAV.  Specifically:

(a)    The 3/24/2025 *NYT* Article highlighted patients from Humacyte's V005 Phase 2/3 clinical trial and V017 Ukraine trial that researchers lost track of before follow-up, died, or had limbs amputated after treatment with the HAV.  While Humacyte had reported the four deaths and four amputations as proof of success in public statements, FDA "***scientists counted the deaths, amputations and the lost case as failures***, records show, noting a lack of information to determine if the vessels were clear."  The 3/24/2025 *NYT* Article also revealed that top FDA "***officials authorized [the HAV] over the concerns of staff members who said in F.D.A. records that they found the study severely lacking or were alarmed by the dire consequences for patients when the vessels fell apart.***"  It reported on FDA records and said, "Before the vessel was approved, ***one F.D.A. medical reviewer pointed out that 37 of the 54 patients were not assessed in a safety check four months after getting the implant***, with many dead or lost to follow-up."

(b)    The 3/24/2025 *NYT* Article discussed Dr. Robert E. Lee, a vascular surgeon who cared for gunshot-wounded patients in Detroit for 30 years, who said he retired from the FDA as a medical device reviewer in fall 2024 in protest over FDA's decision to approve Humacyte's BLA.  It said:

> In a review of more than 2,000 pages of company records conducted when he was an F.D.A. medical officer, ***Dr. Lee found that the vessel could***

-130-

*rupture with no warning*.  Those events were *'unpredictable, catastrophic and life-threatening,'* he wrote in his F.D.A. review.

It quoted Dr. Lee as saying, "*That's an unacceptable risk for whatever slim benefit, if any, this product provides above the current standard treatments.*"  The article reported about Dr. Lee:

> He said he was alarmed by the account of *a man in Ukraine who began bleeding at the site of his surgical wound eight days after the vessel was implanted*.  Doctors discovered *a two-millimeter hole in the Humacyte vessel* and repaired it with sutures, according to F.D.A. records.  Four days later, *the patient was bleeding again, requiring removal of the graft the next day*.

> The article quoted Dr. Lee as saying:  "*Plastic arteries, they don't usually present with catastrophic hemorrhage, unexpected like this,*" "You know the patients are sick," and "*You know something's brewing, and you usually have time to take care of it.*"

(c)    The 3/24/2025 *NYT* Article said Dr. Lee hoped to "glean more information about the root cause of the mid-vessel blowouts – and to be sure doctors were aware of the possibility" by seeking a public advisory hearing on the device, but one was never held.  It reported:

> *Dr. Lee failed to persuade top F.D.A. officials to hold a public advisory committee meeting* where the study results could be discussed and reviewed by independent experts.  The agency decided instead to send records to *three external reviewers, who in turn identified failure of the Humacyte vessels "as a serious risk."*

It added: "Dr. Lee said he hoped the F.D.A., with new leadership under the Trump administration, would still hold a public meeting.  '*Every surgeon who uses it needs to see the things that I did,*' he said."

(d)     The 3/24/2025 *NYT* Article also discussed how FDA scientists rejected Humacyte's claim that deaths or amputations could be positive results "citing a lack of information or imaging studies.  As a result, the F.D.A. concluded that ***the vessel's success rate for that key study was 67 percent, rather than the company's 84 percent***, F.D.A. records show."  It noted the comparison to existing artificial grafts and their higher blood flow rates of 82 percent.

(e)     The 3/24/2025 *NYT* Article also referenced concerns raised in a statistical review prepared by Thomas Zhou, a biostatistician in the biologics division of the FDA, later made public by the FDA on its website.  The article quoted the statistical review's finding that "***Neither study met the usual criteria for an adequate and well-controlled trial.***"  The article also described concerns raised in the statistical review about the V017 Ukraine trial data, saying:

> The study of 16 patients treated in Ukraine was retrospective and observational, meaning ***researchers could look back at a larger pool of data and select the best cases***.  It showed '***limited support of efficacy***,' partly because the injuries were 'skewed to shrapnel injuries' and not the devastating wounds typically seen on the battlefield, he said.

> ***The U.S. study was "poorly conducted" and underwent "multiple major changes"*** during the trail, the statistical review said.

(f)     The 3/24/2025 *NYT* Article also quoted Dr. Hooman Noorchashm, co-director of the Amy J. Reed Medical Device Safety Collaborative at Northwestern School of Law.  According to the article, Dr. Noorchashm said, "the F.D.A. ***should not have approved*** a product that scientists deemed inferior to existing options."  He added "***If the graft falls apart,***" "***it is basically akin to the patient getting shot.***"

-132-

159.    During market hours on March 25, 2025, the 3/25/2025 *Bloomberg* Article was published online, expanding on these concerns, as follows.

(a)    The 3/25/2025 *Bloomberg* Article said that the ATEV "***was highly sought after by military officials*** to stem battlefield bleeding and save limbs," so it was approved "despite internal warnings among regulators that ***the product poses serious risks that could lead to death***."  It says Dr. Lee "***repeatedly raised concerns with senior FDA leadership*** and asked them to hold a public advisory panel meeting of outside experts to discuss the risks and benefits of the product,"  The 3/25/2025 *Bloomberg* Article also revealed Dr. Lee "***approached FDA leadership with his concerns in July or August, and was warned about breaking ranks,***" and he "then sought out an ombudsman at the FDA and relayed that agency reviewers had told him ***they were under pressure to get the device approved 'one way or another.'***"  It also said the ombudsmen "ultimately told Lee to file some paperwork that would set in motion a committee to review the issue."

(b)    Dr. Lee was also quoted in the 3/25/2025 *Bloomberg* Article.  He said, "***This thing [the HAV] has grave safety concerns and they buried it***," and "So here we are today ***with a product that's been released to market that has potential to kill soldiers and citizens.***"

(c)    The 3/25/2025 *Bloomberg* Article revealed Humacyte and FDA had been at loggerheads about its clinical trials for many years.  It reported:

> Humacyte officials began meeting with the FDA in 2015 to discuss potential clinical trials for the device, according to an agency document.  ***Four years later the company wanted to change the parameters of the trial it had undertaken***, but agency reviewers disagreed.

-133-

In 2020, after the [Department of Defense] designated Symvess a "priority product," *Humacyte began meeting regularly with the FDA and Pentagon officials,* the document shows. *For the next three years, the company was locked in a back-and-forth with the agency as Humacyte repeatedly asked to change aspects of the study, varying from the type and number of patients it was studying to how success was measured, all while the trial was ongoing,* according to the document.

In August 2023, via an "Informal Dispute Resolution," leaders in the FDA's biologics division allowed the company to submit an application for Symvess to be approved, according to an FDA document outlining an agency statistician's work on the application.

The article also said, "Lee wants FDA Commissioner Marty Makary, set to be confirmed as soon as this week, *to rescind Symvess's approval* until experts can meet publicly."

(d)     The 3/25/2025 *Bloomberg* Article also raised concerns about the V017 Ukraine trial data, reporting: "An FDA reviewer said the trials cannot be combined [with the V005 Phase 2/3 clinical trial data] because *patients in Ukraine had less severe injuries than most patients in the main trial,* and some were treated weeks after their initial injury."

(e)     The 3/25/2025 *Bloomberg* Article also discussed internal FDA documents and said they "show that Lee wrote that *the device had 'catastrophic life-threatening failures'* and that *the risks 'are unacceptable when compared to current alternate treatment options.'"* and "show that [Dr. Lee] recommended that FDA should convene a public panel meeting." It reported that the FDA documents revealed that FDA instead "privately sought opinions from three outside experts, who also *raised concerns and said that Symvess 'did not demonstrate superiority to existing treatment options.'"* The FDA documents also showed the potential for the device to fail was a *"serious risk."*

-134-

160.    On this news, Humacyte's stock price substantially declined, on high trading volume, from a close of $3.32 per share on March 24, 2025, to close at $2.88 per share on March 25, 2025—a drop of $0.44, or -13.40%, per share.

161.    On March 25, 2025, after the market close, Humacyte published two press releases to its corporate website, as follows.

(a)     Humacyte published a press release to its corporate website ("Initial 3/25/2025 Press Release") announcing that it had commenced an underwritten public offering of its common stock, with TD Cowen, Barclays, and BTIG acting as joint book-runners and H.C. Wainwright & Co. and The Benchmark Company acting as lead managers.   It said securities would be offered by means of both a prospectus supplement and a new prospectus related to the new offering.   It also said the offering would be pursuant to the 9/9/2022 Prospectus and 2022 Shelf Registration.   It also announced that Humacyte would grant the underwriters an option for a period of 30 days to purchase up to an additional 15% of the number of shares sold in the offering.

(b)     Later that night, Humacyte published a press release to its corporate website ("Second 3/25/2025 Press Release") announcing that the underwritten public offering would be for 25 million shares of Humacyte common stock at a public offering price of $2.00 per share, for aggregate gross proceeds of $50 million before deducting underwriting discounts and commissions and other offering expenses.   The $2.00 per share price was a more than 30% discount off the March 25, 2025 closing market price of $2.88 per share of Humacyte stock.   The Second 3/25/2025 Press Release also clarified that Humacyte had

granted the underwriters an option for a period of 30 days to purchase up to an additional 3,750,000 shares of Humacyte's common stock at the public offering price, less underwriting discounts and commissions.

162. On this news, Humacyte's stock price substantially declined, on extremely high trading volume, from a close of $2.88 per share on March 25, 2025, to close at $2.00 per share on March 26, 2025—a drop of $0.88, or -30.43%, per share.

163. As a result of Defendants' materially false and misleading statements and omissions, and the precipitous decline in market value of Humacyte's stock, Lead Plaintiffs and other Class Members have suffered significant losses and damages.

## V. ADDITIONAL FACTS SUPPORTING SCIENTER

164. As alleged herein, Defendants acted with scienter since they knew or were reckless in not knowing that the public statements and documents issued or disseminated in the name of Humacyte were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially authored, spoke, participated, or approved the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. The following facts also strongly inferring scienter.

### 1. Defendants' Admissions

165. Contrary to Defendant's claimed ignorance of the reasons for the FDA delay, in response to the 3/24/2025 *NYT* Article, Defendant Niklason admitted in the 3/27/2025 Press Release that after Dr. Lee approached the FDA (which according to Dr. Lee was prior

to the August 9, 2024 decision deadline) the FDA informed Humacyte of the reasons for the delay, or at a minimum, that it was considering "convening an Advisory Committee of outside experts, which they were entitled to do." ***And Humacyte "did not object to this,"*** thus establishing knowledge of the reason for the delay.

166.    The press release also shows the extent of Defendants' non-public knowledge of the FDA process and commitments Humacyte was required to agree to before approval during the 19-week delay:

> ***It took time to complete the internal discussions at the FDA regarding Dr. Lee's objections, and to compile responses from outside experts.*** Although our original PDUFA date was August 10, 2024, the FDA took an additional 19 weeks to complete its review of the risks and benefits of Symvess. ***After taking all views into account***, the FDA ***agreed*** that our product was safe and effective for use in repair of vascular trauma of the extremities in situations where there is an urgent need for revascularization and where autologous vein grafting is not feasible. The agency issued its approval of Symvess on December 19, 2024.
>
> ***The FDA's review process was conservative and time consuming,*** but that's how it should work. We all want federal agencies to take their responsibilities seriously, and I appreciate that the FDA took the time it needed to evaluate our product. Furthermore, ***as part of the FDA's review of Symvess, we are committed to conducting a post-approval study*** to continue to assess the rate and severity of adverse events in trauma patients treated with Symvess.

### 2.    Knowledge Established by FDA Documents Concerning Meetings or Correspondence

167.    FDA documents, including the Clinical Review Memo, the Statistical Review Memo, the Late Cycle Meeting Summary, demonstrate that Defendants were aware that the FDA has serious safety concerns related to the HAV, that FDA was

considering a black-box warning, that the FDA had concerns about the clinical trial methodologies, and that Humacyte's proposed benchmark studies were insufficient.

168. During a late-cycle meeting on May 20, 2024, attended by Niklason, Prichard, Parikh and Alterson, amongst others from Humacyte, the FDA raised several issues concerning the BLA that could potentially delay its approval or lead to substantial modifications of its proposed indication.

169. Manufacturing concerns dominated. The FDA had concerns about (i) Humacyte's extractables study not following recommended practices; (ii) the suitability of samples used for sterility testing; (iii) the thoroughness of Humacyte's shipping study; (iv) Humacyte's proposed timeline to provide study results; and (v) Humacyte's lack of a firm deadline to add a sterilization step the FDA requested earlier. Coming out of the Late Cycle Meeting, Humacyte committed to provide extensive additional data to FDA and run new manufacturing studies. In sum, the Late Cycle Meeting Summary showed Humacyte was aware the PDUFA date was at risk.

170. The FDA also raised critical clinical issues:

(a) The BLA included long-term follow-up for **only 7 of 54 subjects in the extremity trauma population, with 69% having less than one year of follow-up**. The FDA said it was reviewing whether this extent of safety follow-up is sufficient to describe the HAV's risks. Humacyte presented tangential long-term safety data and agreed to provide additional information.

-138-

(b)     The FDA discussed issues with how patients were included in the clinical trial population where autologous vein is not "feasible," because the definition was not clear. FDA also had concerns about the indication wording. FDA's review of the proposed indication was ongoing and required more clarity from Humacyte; further discussion on the indication's phrasing would occur during labeling negotiations.

(c)     The FDA also raised issues with labeling and the potential of a boxed warning. Significantly, ***the FDA was considering a boxed warning regarding rupture risk in the setting of HAV infection, observed in both the extremity patients (those who were treated with the HAV on a limb) and the torso and iatrogenic patients (those who were treated with the HAV on the torso combined with those who suffered an injury as a result of medical treatment)***. Humacyte attempted to fight back, contending that rupture risks are not unique to their product and proposing additional verbiage to the warnings and precautions section of the label. The FDA also ***expressed ongoing concerns about Humacyte's claim of infection resistance*** and requested more long-term data to assess rupture risk from other clinical trials. Humacyte agreed to submit this data.

171.    The FDA stated it would continue to send Information Requests (IRs) as needed to clarify Humacyte's submissions.

172.    So too, FDA PMC Response Review, indicates Humacyte's slow response to the FDA.  As of August 9, 2024, Humacyte had yet to submit a response to an FDA request concerning sterilization validation.  Instead Humacyte's committed on May 20, 2024 "to perform sterilization validation of the commercial bioreactor disposable set and

provide the final report, including a summary of the dose verification study and the applicable data." Humacyte's response was only submitted on August 22, 2024.

173.    The Statistical Review Memo showed that Defendants were aware of problems with its V005 Phase 2/3 clinical trial and V017 Ukraine trial pre-submission. The memo shows Humacyte's proposed clinical trials were regularly rejected by the FDA because of major statistical concerns about the study design, study population, study duration, choice of endpoints, sample size, handling of missing data and intercurrent events, selection bias, and choice of comparators. The memo, augmented by the Clinical Review Memo, provides a summary of regulatory activity related to the BLA and shows that Humacyte was in contact with the FDA starting in 2016 about a proposed study to evaluate the HAV.

174.    The FDA made recommendations for Humacyte, but they were not pursued. Instead, on August 11, 2023, as part of an informal dispute resolution, CBER leadership communicated to Humacyte that "clinical efficacy data obtained from V005 study combined with the Ukrainian treatment experience, totaling 50 patients with Day 30 patency data, will be sufficient to support a request for traditional approval of [BLA] for the proposed indication." Humacyte also ignored FDA's communication that an historical mean for a benchmark was generally unacceptable, but Humacyte proceeded regardless. A reviewer note in the Statistical Review Memo makes clear that FDA was committed to working with Humacyte and "exercised regulatory flexibility on numerous occasions to further the product development." Still Humacyte did not meet FDA's expectations.

175. Humacyte's access to the FDA was more extensive than a normal applicant because the HAV had been granted DoD priority review and had also been given an RMAT designation in vascular trauma in May 2023. The Statistical Review Memo notes the DoD priority designation was a large reason for the regulatory flexibility, and the Clinical Review Memo notes that many pre-submission meetings between FDA and Humacyte were attended by DoD as well. A detailed description of FDA's documents, and what they say about Defendants' knowledge of undisclosed facts, is set forth in §IV.E.5. *supra*.

176. As Todd Clark clarified, Defendants would have known that their proposed statistical analysis was improper and unlikely to be accepted by the FDA given their extensive communication both pre- and post-submission. A detailed description of Mr. Clark's findings, and his conclusions about Defendants' knowledge of undisclosed facts, is set forth in §IV.E.6. *supra*.

### 3. Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter.

177. For many of the same reasons why Defendants' alleged misstatements and omissions were materially false or misleading when made, there is also a strong inference that they were made with the requisite scienter.

178. As described in §IV.E.1. *supra*, statements by the CW former employees establish relevant first-hand knowledge.

179. CW1, a technician, established that CEO Laura Niklason, COO Heather Prichard, and CFO Dale Sander all had offices on-site at the Durham Facility, which was Humacyte's sole manufacturing location. Given that COO Prichard was on-site full-time,

-141-

appeared to be the head person in charge of the manufacturing facility, and would likely be involved in any FDA discussions regarding the facility, her direct and constant presence alongside Niklason in the same, and only, Humacyte building makes it highly probable that Niklason was aware of significant operational and manufacturing issues being managed by her COO.

180.    CW3, a Sr. Director of Supply Chain reporting to COO Heather Prichard and CQO Harold Alterson, stated that CEO Laura Niklason led quarterly town hall meetings with all employees where major company updates would be discussed. More directly, CW3 physically observed Prichard meeting with Niklason numerous times in her glass-walled office. Prichard explicitly shared with CW3 critical issues such as problems with BDS trays, gas exchangers, inconsistent batch repeatability, low yields, and losing entire batches of finished product, and also discussed Humacyte's response to the Form 483 citing microbial quality concerns. Given Prichard's direct knowledge of these severe, ongoing manufacturing and quality problems, her frequent observed meetings with Niklason, and Niklason's leadership at company-wide town halls, it is highly probable that Niklason was made aware of these significant issues.

181.    CW4, a Technician, confirmed COO Heather Prichard's direct awareness of a CAPA in early 2024 for critical equipment failures and her knowledge of new equipment purchases intended to address these problems, which were deliberately not installed pre-FDA inspection to avoid approval delays. Prichard also discussed the product's low pass rates (25-40%) in meetings with the maintenance team, and MSAT engineering prepared

-142-

reports on these failure rates for "higher management" that were widely circulated internally. Furthermore, CW4 stated CEO Laura Niklason personally addressed Humacyte's limited cash runway at a company-wide town hall meeting attended by all higher-ups. Prichard's direct engagement with these significant quality and operational failures, the reporting of failure rates to higher management, and Niklason's role in communicating critical company status to all employees strongly suggest Niklason was aware of these pervasive issues.

182.   CW5, a Quality Specialist, indicated that COO Heather Prichard, as a key FDA contact, and SVP of Quality Harold Alterson would have known about numerous FDA requests for batch records post-inspection, which were made in a manner suggesting the FDA had insider information. CW5 also highlighted a high turnover in the quality department under new leadership (Alterson and Cara Miller Kell) and a critical lapse where no in-process microbial sterility testing of the product was conducted, with the new Director of Quality Assurance reportedly not fulfilling these oversight responsibilities. Prichard's awareness of these significant regulatory interactions and critical internal quality deficiencies, combined with information from CW1 and CW3 about Prichard's close working relationship and frequent meetings with CEO Laura Niklason at the sole Humacyte facility, makes it probable that Niklason was informed of these serious quality and regulatory compliance problems.

183.   CW2, a Technician, detailed a disastrous maintenance management software system leading to GMP non-compliance, an issue repeatedly raised to managers who

reported to COO Heather Prichard; Prichard herself expressed unhappiness post-FDA inspection about maintenance system "cracks." Most critically, CW2 stated that senior managers Greg Miller and Cynthia Crawford, who reported directly to Prichard, instructed maintenance staff to close out old, incomplete work orders, effectively falsifying GMP documents, to "make the books look pretty." CW2 asserted Prichard "had to have given the instructions or knew" because her direct reports would not risk issuing such a directive otherwise. Given Prichard's direct oversight and intimate involvement in these maintenance issues, and the extreme nature of falsifying documents at the sole manufacturing facility where CEO Laura Niklason was also based (as per CW1), it is highly probable that Niklason was aware of or willfully ignorant of these deeply problematic and fraudulent practices.

184. Given the foregoing, Defendants knew that their public misrepresentations and omissions, as pled herein, would mislead investors or were deliberately reckless as to the danger of misleading investors, which was known to them or was so obvious that they must have been aware of it.

### 4. The Individual Defendants Were Financially Motivated to Commit Fraud.

185. The strong inference of Defendants' scienter is further evidenced by the insider transactions reported by Defendants Niklason, Prichard, and Sander during the Class Period, involving Humacyte common stock and stock options.

(a)    Defendant Niklason Insider Transactions During The Class Period

Defendant Niklason conducted most of her trading, indirectly, through Ayabudge LLC, the entity she co-owns with her husband, Humacyte Chairman  Brady Dougan.  As such, to accurately assess Defendant Niklason's motive, it is necessary to scrutinize her combined transactions in Humacyte's securities, both individually and through Ayabudge. Entering the Class Period, Defendant Niklason had balances of 11,260,976 shares of Humacyte common stock (1,270,240 shares individually and 9,990,736 shares via Ayabudge) and the right to acquire 2,487,286 additional shares by way of Humacyte stock options.  Defendant Niklason's transactions during the Class Period, with Ayabudge transactions marked as "AB," were as follows:

| Common Stock & Stock Option Transactions | | | | |
|---|---|---|---|---|
| Transaction Date | Option Grants / Exercises | Shares | Price | Funds Spent / Gained |
| 10/10/2023 | Exercise of Option | (114,420) | $1.19 | ($136,159.80) |
| 12/8/2023 | Grant of Option | 803,000 | $2.80 | |
| 1/21/2025 | Grant of Option | 1,130,311 | $4.56 | N/a |
| | | | | |
| | Sub-Total Options Awarded | 1,933,311 | Cost | $0 |
| | Sub-Total Options Exercised | (114,420) | Cost | ($136,159.80) |
| Transaction Date | Stock Sales / Purchases / Transfers | Shares | Price | Funds Spent / Gained |
| 8/17/2023 | Stock Sale (AB) | (570,174) | $3.68 | $2,098,240.32 |
| 8/18/2023 | Stock Sale (AB) | (626,979) | $3.57 | $2,238,315.03 |
| 8/21/2023 | Stock Sale (AB) | (602,443) | $3.39 | $2,042,281.77 |
| 9/14/2023 | Stock Sale (AB) | (2,000,000) | $2.78 | $5,560,000.00 |
| 4/19/2024 | Stock Transfer (to trust) | (1,148,240) | N/a | N/a |
| 5/31/2024 | Stock Sale (AB) | (716,573) | $7.78 | $5,574,937.94 |
| 5/31/2024 | Stock Sale (AB) | (93,213) | $8.93 | $832,392.09 |

-145-

| Date | Transaction | Shares | Price | Amount |
|---|---|---|---|---|
| 6/3/2024 | Stock Purchase | 2,050 | $7.37 | ($15,108.50) |
| 6/3/2024 | Stock Sale (AB) | (190,214) | $7.42 | $1,411,387.88 |
| 6/4/2024 | Stock Purchase | 2,362 | $6.35 | ($14,998.70) |
| 6/4/2024 | Stock Sale (AB) | (1,852) | $7.28 | $13,482.56 |
| 6/11/2024 | Stock Sale (AB) | (282,000) | $7.09 | $2,000,000.40 |
| 6/11/2024 | Stock Sale (AB) | (76,630) | $7.02 | $537,942.60 |
| 6/11/2024 | Stock Sale (AB) | (271,518) | $7.30 | $1,982,081.40 |
| 8/27/2024 | Stock Sale (AB) | (252,676) | $6.71 | $1,695,454.96 |
| 8/28/2024 | Stock Sale (AB) | (277,090) | $6.47 | $1,792,772.30 |
| 8/29/2024 | Stock Purchase | 1,222 | $6.55 | ($7,997.99) |
| 8/29/2024 | Stock Sale (AB) | (352,112) | $6.35 | $2,235,911.20 |
| 9/9/2024 | Stock Sale (AB) | (157,704) | $5.42 | $854,755.68 |
| 9/10/2024 | Stock Sale (AB) | (288,674) | $5.23 | $1,509,765.02 |
| 11/18/2024 | Stock Sale (AB) | (811,172) | $4.44 | $3,601,603.68 |
| 11/19/2024 | Stock Purchase | 1,797 | $4.44 | ($7,978.68) |
| 11/19/2024 | Stock Sale (AB) | (427,459) | $4.34 | $1,855,172.06 |
| 11/20/2024 | Stock Sale (AB) | (261,369) | $4.40 | $1,150,023.60 |
| | | | | |
| | **Sub-Total Purchases** | **7,431** | **Cost** | **($46,083.87)** |
| | **Sub-Total Transfers** | **(1,148,240)** | **Cost** | **$0** |
| | **Sub-Total Sales** | **(8,259,852)** | **Proceeds** | **$38,986,521.490** |

| Totals | | | | |
|---|---|---|---|---|
| | **Shares Purchased** | **+7,431** | **Transaction Costs** | **($46,083.87)** |
| | **Shares Transferred** | **(1,148,240)** | **Transaction Costs** | **$0** |
| | **Option Shares Gained** | **+114,420** | **Transaction Costs** | **($136,159.80)** |
| | **Shares Sold** | **(8,259,852)** | **Transaction Proceeds** | **+$38,986,521.49** |
| | **Net Gain to Defendant Niklason** | | | **+$38,804,277.82** |

(b)   <u>Defendant Prichard Insider Transactions During The Class Period</u>

Entering the Class Period, Defendant Prichard had balances of 64,566 shares of Humacyte common stock and the right to acquire 374,962 additional shares by way of Humacyte stock options. Defendant Prichard's transactions during the Class Period were as follows:

| Common Stock & Stock Option Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Option Grants / Exercises** | **Shares** | **Price** | **Funds Spent / Gained** |
| 12/8/2023 | Grant of Option | 290,000 | $2.80 | N/a |
| 5/30/2024 | Exercise of Option | (78,779) | $2.56 | ($201,674.24) |
| 5/30/2024 | Exercise of Option | (48,166) | $3.07 | ($147,869.62) |
| 1/21/2025 | Grant of Option | 283,101 | $4.56 | N/a |
| | | | | |
| | **Sub-Total Options Awarded** | **573,101** | **Cost** | **$0** |
| | **Sub-Total Options Exercised** | **(126,945)** | **Cost** | **($349,543.86)** |
| **Transaction Date** | **Stock Sales / Purchases / Transfers** | **Shares** | **Price** | **Funds Spent / Gained** |
| 5/30/2024 | Stock Sale | (61,941) | $7.71 | $477,565.11 |
| 5/30/2024 | Stock Sale | (78,779) | $8.36 | $658,592.44 |
| 5/30/2024 | Stock Sale | (48,166) | $8.32 | $400,741.12 |
| 5/31/2024 | Stock Sale | (2,625) | $9.41 | $24,706.50 |
| | | | | |
| | **Sub-Total Sales** | **(191,511)** | **Proceeds** | **$1,561,605.17** |
| | | | | |
| **Totals** | **Shares Purchased** | **+0** | **Transaction Costs** | **($0)** |
| | **Shares Transferred** | **(0)** | **Transaction Costs** | **$0** |
| | **Option Shares Gained** | **+126,945** | **Transaction Costs** | **($349,543.86)** |
| | **Shares Sold** | **(191,511)** | **Transaction Proceeds** | **+$1,561,605.17** |
| | | **Net Gain to Defendant Prichard** | | **+$1,212,061.31** |

-147-

(c)   <u>Defendant Sander Insider Transactions During The Class Period</u>

Entering the Class Period, Defendant Sander had balances of 2,000 shares of Humacyte common stock and the right to acquire 588,975 additional shares by way of Humacyte stock options. Defendant Sander's transactions during the Class Period were as follows:

| Common Stock & Stock Option Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Option Grants / Exercises** | **Shares** | **Price** | **Funds Spent / Gained** |
| 12/8/2023 | Grant of Option | 301,000 | $2.80 | N/a |
| 8/27/2024 | Exercise of Option | (39,389) | $2.56 | ($100,835.84) |
| 1/21/2025 | Grant of Option | 283,101 | $4.56 | N/a |
| | **Sub-Total Options Awarded** | **584,101** | **Cost** | **$0** |
| | **Sub-Total Options Exercised** | **(39,389)** | **Cost** | **($100,835.84)** |
| **Transaction Date** | **Stock Sales / Purchases / Transfers** | **Shares** | **Price** | **Funds Spent / Gained** |
| 8/27/2024 | Stock Sale | (39,389) | $6.68 | $263,118.52 |
| | **Sub-Total Sales** | **(39,389)** | **Proceeds** | **$263,118.52** |
| **Totals** | **Shares Purchased** | **+0** | **Transaction Costs** | **($0)** |
| | **Shares Transferred** | **(0)** | **Transaction Costs** | **$0** |
| | **Option Shares Gained** | **+39,389** | **Transaction Costs** | **($100,835.84)** |
| | **Shares Sold** | **(39,389)** | **Transaction Proceeds** | **+$263,118.52** |
| | **Net Gain to Defendant Sander** | | | **+$162,282.68** |

186.   The dates of the transactions by Defendants Niklason, Prichard, and Sander were suspicious in timing vis-à-vis the dates of their alleged fraudulent misstatements and

omissions and the dates of the alleged partial corrective disclosures, such that they capitalized on the artificially inflated prices of Humacyte's securities due to the alleged fraud. These facts further support the scienter inference. Defendant Niklason's transfer of nearly all her directly held Humacyte stock to the Niklason Living Trust, a non-reporting entity, on April 19, 2024, was also highly suspicious, even though the transfer did not immediately generate proceeds. Defendant Niklason effectuated the transfer just two weeks after FDA's April 1-5, 2024 inspection of the Durham Facility – the same inspection that gave rise to the FDA's Form 483 concerns. Per Niklason's Form 4 filed with the SEC in connection with the transfer, the Niklason Living Trust is "exempt from reporting pursuant to Rule 16a-13 under the Securities Exchange Act of 1934." Defendant Prichard also completely sold out of her Humacyte position ten days after the Late Cycle meeting on May 20, 2024, when the FDA presented non-public concerns about Humacyte's clinical data, potential labeling issues, and the potential for a black box warning for Symvess.

187. Defendants' transactions were also suspicious in amount, a fact that further supports the scienter inference. Specifically:

(a)    Defendant Niklason reaped ***$38,804,277.82*** in ill-gotten net proceeds from transactions at prices artificially inflated by the alleged fraud. That amount is highly suspicious by every metric. Excluding the shares she suspiciously transferred to a non-reporting family trust, Niklason sold the vast majority of her other directly and indirectly held stock during the alleged fraud, reducing her other holdings from 10,112,736 shares (122,000 shares directly held and 9,990,736 shares indirectly held through Ayabudge) at

the Class Period's start to just 1,974,735 shares (243,851 shares directly held and 1,730,884 shares indirectly held through Ayabudge) at its end – an **80.47%** reduction. Defendant Niklason's $38,804,277.82 in total net transaction proceeds from 17.5-month Class Period also compare suspiciously against those from the 17.5 months immediately preceding the Class Period, when she netted $29,893,060.56, a **$8,911,217.26** difference, meaning her net Class Period transaction proceeds were **29.81% higher** than those during the comparable pre-Class Period time frame. Defendant Niklason's Class Period transactions also compare suspiciously against her executive salary ($603,574 in 2023; $612,400 in 2024) and bonus ($281,704 in 2023; $278,642 in 2024) – her net transaction proceeds were over **33.5 times** larger than her total compensation in 2023 and 2024.

(b)    Defendant Prichard reaped **$1,212,061.31** in ill-gotten net proceeds from transactions at prices artificially inflated by the alleged fraud. That amount is highly suspicious, as is the fact that Defendant Prichard **fully sold out** of her Humacyte position on May 31, 2024 – mid-way through the Class Period while the alleged fraud was ongoing. Defendant Prichard's transactions during the 17.5 months immediately preceding the Class Period, when she exercised 85,343 options at a cost of $101,295.61 and sold 23,402 shares for $93,904.25 in proceeds, actually resulted in a **net loss** of -$7,391.36. Defendant Prichard's Class Period transactions also compare suspiciously against her executive salary ($461,705 in 2023; $468,400 in 2024) and bonus ($172,371 in 2023; $170,498 in 2024) – her net transaction proceeds were **over 2.5 times** her salary and nearly **double** her total compensation in 2023 and 2024.

(c)     Defendant Sander made *$162,282.68* in ill-gotten net proceeds from transactions at prices artificially inflated by the alleged fraud.  That figure compares suspiciously against his transactions during the 17.5 months preceding the Class Period, when he *bought* 2,000 shares at a cost of $9,060.  It also compares suspiciously against his executive salary ($504,471 in 2023; $505,750 in 2024) and bonus ($186,116 in 2023; $184,093 in 2024) – his net transaction proceeds were *32.2%* of his salary and *23.5%* of his total compensation in 2023 and 2024.

### 5.     Humacyte Raised Funds During the Class Period.

188.     During the Class Period, Humacyte raised funds while the price of its securities was inflated by the alleged fraud, as follows.

(a)     On February 29, 2024, it announced a public offering of 13.4 million shares of common stock (with an underwriter option to purchase over 2 million more, which was fully exercised) at a price of $3.00 per share.  As later disclosed, the offering, which closed on March 5, 2024, raised approximately $43.0 million in net proceeds.

(b)     On September 24, 2024, Humacyte announced the LP Agreements allowing it to sell up to $50 million worth of stock to Lincoln Park.  As of March 31, 2025, Humacyte had completed sales equivalent to $2.5 million in gross proceeds.

(c)     On October 4, 2024, Humacyte announced a $30 million registered direct offering of common stock and warrants, where it agreed to sell 5,681,820 shares of common stock and the same number of warrants at $5.28 for a share and warrant package.  The warrant exercise price was also $5.28 per share.  Humacyte later disclosed that the

October 4, 2024 direct offering, which closed on October 7, 2024, raised $28.1 million in net proceeds.

(d)     On November 14, 2024, Humacyte announced a $15 million registered direct offering of common stock and warrants whereby it agreed to sell 2,808,988 shares of common stock and the same number of warrants at $5.34 for a share and warrant package. The warrant exercise price was also $5.34 per share.  Humacyte later disclosed that the November 14, 2024 direct offering, which closed on November 15, 2024, raised $14.9 million in net proceeds.

(e)     On March 25, 2025, Humacyte announced a public offering of 25 million shares of common stock (with an underwriter option to purchase 3.75 million more) at a price of $2.00 per share.  Humacyte later disclosed that the March 25, 2025 direct offering, which closed on March 27, 2025,  raised approximately $46.6 million in net proceeds.

189.   These transactions, which occurred during the fraudulent period alleged herein, when Humacyte's stock price was artificially inflated by the alleged fraud, evidence Humacyte's corporate scienter because it was highly motivated to complete its offerings and other capital raises at the highest price possible to capitalize on the fraud inflation.

### 6.     The Fraud Implicated Core Operations.

190.   The fraud alleged herein implicates Humacyte's core operations.   As discussed *supra*, the HAV (or ATEV), trademarked Symvess, is Humacyte's only product to have even advanced to the clinical trial stage.  Moreover, during the Class Period, Humacyte had aspirations of submitting the HAV for FDA approval in additional

indications, using the same product and manufacturing process, which would further deepen the company's dependence on the HAV. Additionally, the entire company was heavily focused on the FDA approval process for the vascular trauma indication and the subsequent commercial launch. The BLA's status and Humacyte's forthcoming commercial launch of the HAV were of consistent concern to analysts covering Humacyte, and Defendant Niklason provided quarterly updates on each earnings call in the Class Period. As alleged herein, Humacyte's capital flow was highly dependent on FDA approval. As of December 31, 2024, Humacyte had never generated any product revenue since its 2004 inception. The Oberland Funding Agreement included contingent funds accessible only upon Humacyte's reaching certain milestones advancing the product through its vascular trauma indication development and approval. Humacyte's CEO and co-founder, Defendant Niklason, regularly participated in speeches and events where she presented results from Humacyte's clinical trials supporting the BLA, and she presented the results of both the V005 Phase 2/3 clinical trial and the V017 Ukraine trial at the VEITHsymposium® in November 2023.

191. Further, the Individual Defendants, by virtue of their positions and relationships to each other, and the core aspect of the HAV to the survival of Humacyte, were highly likely to be in receipt of information reflecting the true facts regarding Humacyte, their control over, and/or receipt and/or modification of Humacyte's allegedly materially misleading misstatements and/or their associations with the company which

-153-

made them privy to confidential proprietary information concerning Humacyte, participated in the fraudulent scheme alleged herein.

192.    In light of these facts, it is inconceivable that the Individual Defendants and executive management did not know the facts and circumstances of the frauds as alleged herein.  Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within Humacyte, the regular meetings between Defendants Prichard and Niklason, the facts alleged regarding the funneling of information to the Individual Defendants, and their personal involvement in the key events and circumstances at issue.

### 7.    The Individual Defendants Signed, Were Quoted in, or SOX-Certified the Alleged Misstatements.

193.    As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, Defendants Niklason, Sander, and Prichard were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

194.    As the individuals who SOX-certified SEC filings as described *supra*, Defendants Niklason and Sander were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them. As alleged herein, they violated such duties.

**8.    The Fraud Violated Humacyte's Corporate Code of Conduct and Insider Trading Policy.**

195.    Humacyte's Code of Conduct and Ethics ("Code of Conduct"), published on its corporate website throughout the Class Period, was expressly binding on all "employees, officers, and directors" and barred all of the misconduct alleged above. Specifically, the Code of Conduct stated as follows.

(a)    It expressly required compliance with all laws and regulations:

> ***The Company intends that its business practices will comply with the laws of all of the jurisdictions*** in which it operates and that honesty, integrity and accountability will always characterize the Company's business activity. ***No employee, officer or director may achieve results through violations of laws or regulations or unscrupulous dealings.***

It added: "***No individual, regardless of stature or position, can authorize actions that are illegal***, or that jeopardize or violate Company standards."

(b)    Its "Compliance with Laws, Rules and Regulations" section added:

> Compliance with both the letter and spirit of all laws, rules and regulations applicable to the Company, including any stock exchange or other organization or body that regulates the Company, is critical to our reputation and continued success. ***All employees, officers and directors must respect and obey the laws of the cities, states and countries in which the Company operates and avoid even the appearance of impropriety.***

(c)    Its "Public Reporting" section said, "***Full, fair, accurate and timely disclosure must be made in the reports and other documents that the Company files with, or submits to, the SEC and in its other public communications***." It added: "Persons responsible for the preparation of such documents and reports and other public communications must exercise the highest standard of care."

(d)    It also includes a section on Insider Trading, which says:

Insider trading is unethical and illegal. ***Employees, officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company.*** It is also illegal to "tip" or pass on inside information to any other person who might make an investment decision based on that information or pass the information to third parties. The Company has an Insider Trading Policy, which sets forth obligations with respect of trading in the Company's securities.

196.    As noted in the Code of Conduct, Humacyte also has a specific Insider Trading Policy, which was published on Humacyte's corporate website at all times during the Class Period and also applies to Humacyte's "board of directors, officers and employees." It states: "Any covered person, or any other person designated by this policy, who has material nonpublic information relating to Humacyte ***may not, until the information becomes public or is no longer material: engage in transactions in Humacyte securities, directly or indirectly***," unless otherwise noted in the policy, *e.g.*, as part of a Rule 10b5-1 plan.   Notably, while the prohibition against directly-made transactions applies to the Individual Defendants' transactions in their own names, by forbidding indirectly-made transactions while in possession of material nonpublic information, the Insider Trading Policy expressly applies to trades by Ayabudge LLC, which indirectly benefitted Defendant Niklason.  The Insider Trading Policy also assigns Defendant Sander as the point person for questions and says the "CFO is generally responsible for the implementation of these policies and procedures."

197.    Humacyte's Code of Conduct and Insider Trading Policy, as detailed herein, barred Defendants' misconduct alleged herein, including their materially false or

misleading statements and omissions about the safety of Humacyte's core product, the HAV, Humacyte's ability to safely manufacture HAVs at commercial scale, and Humacyte's need for cash to fund operations, as well as Defendants' transactions in Humacyte stock and stock options at prices artificially inflated by the alleged fraud. Defendants' violations of these express and binding corporate policies further buttress the inference of their scienter, whether based on their knowledge or their recklessness.

9. **Insider Resignations and Suspicious Employment Status Changes Support Scienter.**

198. Defendants' scienter is further evidenced by the suspiciously timed resignation of Humacyte Directors during the Class Period.

199. In a Schedule 14A Proxy Statement filed with the SEC on April 29, 2024 ("2024 Proxy Statement"), while the alleged fraud was ongoing, Humacyte said that on April 26, 2024, two Humacyte Directors, Gordon Binder and Rajiv Shukla, notified the company of their intent to resign from the Board. Mr. Binder had served as a director since 2021 and Mr. Shukla since 2020. These resignations are suspicious and support the inference of scienter.

200. In March 2025, CQO Harold Alterson quietly left Humacyte. Humacyte did not publish an announcement with his departure, either in a press release or in any public filing with the SEC. This departure, so close to the end of the fraud is suspicious and supports scienter.

## VI.    NO SAFE HARBOR

201.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Humacyte who knew that the statement was false when made

## VII.    LOSS CAUSATION / ECONOMIC LOSS

202.    The market for Humacyte shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive investors that artificially inflated Humacyte securities and operated as a fraud or deceit on Class Period purchasers or acquirors of its securities by misrepresenting the material facts alleged herein.  As detailed above, at the

Class Period end, when Defendants' prior misrepresentations became known to the public, the price of Humacyte securities fell, as the artificial inflation came out. As a result of their purchases or acquisitions of Humacyte securities during the Class Period, Lead Plaintiff and the Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

203. During the Class Period, Defendants presented a misleading picture of Humacyte's financial condition, performance, and business prospects, including as regards the sufficiency of the clinical trials for the HAV BLA, the true safety and risk profile of the HAV, the sufficiency and preparedness of the Durham Facility, and Humacyte's ability to fund its operations from existing cash and cash equivalents. Defendants' false and misleading statements had the intended effect and caused Humacyte securities to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

204. As detailed herein, the price of Humacyte securities dropped, on high volume, in response to the issuance of each corrective disclosure alleged herein. These stock drops removed inflation from the price of Humacyte securities, causing real economic loss to investors who had purchased or acquired Humacyte securities during the Class Period.

205. These declines were a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price declines in Humacyte securities negate any inference that the loss suffered by

Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic factors or Humacyte-specific facts unrelated to Defendants' fraudulent conduct.

206.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate Humacyte's share price and the subsequent declines in the value of Humacyte securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.  PRESUMPTION OF RELIANCE

207.    The market for Humacyte's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose alleged herein, Humacyte's securities traded at artificially inflated prices during the Class Period.  On July 31, 2024, Humacyte's stock price closed at a Class Period high of $9.46 per share.  Lead Plaintiffs and other members of the Class purchased or otherwise acquired Humacyte's securities relying upon the integrity of the market price of Humacyte's securities and market information relating to Humacyte and have been damaged thereby.

208.    During the Class Period, the artificial inflation of Humacyte's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Lead Plaintiffs and other Class members.  As described herein, during the Class Period, Defendants made or caused to be made a series

of materially false and/or misleading statements about Humacyte's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Humacyte and its business, operations, and prospects, thus causing the price of its securities to be artificially inflated at all relevant times, and when revealed, negatively affected the value of Humacyte's securities. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiffs and other Class members purchasing Humacyte's securities at artificially inflated prices, and each of them has been damaged as a result.

209. At all relevant times, the market for Humacyte's securities was an efficient market for the following reasons, among others:

(a) Humacyte securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Humacyte filed periodic public reports with the SEC and/or the NASDAQ;

(c) Humacyte regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Humacyte was followed by securities analysts employed by brokerage firms who wrote reports about Humacyte, and these reports were distributed to the sales force

and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

210.    As a result of the foregoing, the market for Humacyte's securities promptly digested current information regarding Humacyte from all publicly available sources and reflected such information in Humacyte's share price. Under these circumstances, all purchasers of Humacyte's securities during the Class Period suffered similar injury through their purchase of Humacyte's securities at artificially inflated prices and a presumption of reliance applies.

211.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding Humacyte's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    CO-LEAD PLAINTIFFS' CLASS ACTION ALLEGATIONS

212.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities

that purchased or otherwise acquired Humacyte common stock, warrants, sold put options or bought call options between August 14, 2023, and March 25, 2025, both dates inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Humacyte, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

213.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Humacyte's securities actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe there are at least hundreds or thousands of Class members. Millions of Humacyte shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Humacyte or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214.    Lead Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

215.    Lead Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action and securities litigation.

216.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Humacyte; and

(c)     to what extent the Class members have sustained damages and the proper measure of damages.

217.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.     CLAIMS FOR RELIEF

## FIRST CLAIM

### (Against All Defendants For Violation of
### Exchange Act Section 10(b) and SEC Rule 10b-5 Promulgated Thereunder)

218.     Lead Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

219.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to purchase Humacyte's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

220.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Humacyte's securities in an effort to maintain artificially high market prices for Humacyte's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

221.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Humacyte's financial well-being and prospects, as specified herein.

222.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Humacyte's value

-165-

and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Humacyte and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Humacyte's securities during the Class Period.

223.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Humacyte during the Class Period and members of its management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of Humacyte, was privy to and participated in the creation, development and reporting of Humacyte's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of Humacyte's management team, internal reports and other data and information about Humacyte's finances, operations, and sales at all relevant times; and (iv) each of the Individual Defendants was aware of Humacyte's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

-166-

224. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Humacyte's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of Humacyte's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

225. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Humacyte's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Humacyte's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiffs and

the other members of the Class acquired Humacyte's securities during the Class Period at artificially high prices and were damaged thereby.

226. At the time of said misrepresentations and/or omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Humacyte was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Humacyte securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

227. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

228. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of Humacyte's securities during the Class Period.

## SECOND CLAIM

### (Against the Individual Defendants For Violation of Section 20(a) of the Exchange Act)

229. Lead Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

230. Individual Defendants acted as controlling persons of Humacyte within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-

level positions and their ownership and contractual rights, participation in, and/or awareness of Humacyte's operations and intimate knowledge of the false financial statements filed by Humacyte with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Humacyte, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of Humacyte's reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

231.   In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of Humacyte and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

232.   As set forth above, Humacyte and Individual Defendants each violated Section 10(b) and SEC Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Humacyte's securities during the Class Period.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## XII.   DEMAND FOR TRIAL BY JURY

Lead Plaintiffs hereby demand a trial by jury.


DATED: May 22, 2025                **TIN FULTON WALKER & OWEN PLLC**

By: /s/ *Gagan Gupta*
      Gagan Gupta (NC Bar # 53119)
119 Orange Street
Durham, North Carolina 27701
Telephone: (919) 370-8807
ggupta@tinfulton.com

*Counsel for Co-Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood*

**POMERANTZ LLP**

By: /s/ *Matthew L. Tuccillo*
   Matthew L. Tuccillo (*special appearance*)
Jeremy A. Lieberman (*special appearance*)
Zachary Denver (*special appearance*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
mltuccillo@pomlaw.com
jalieberman@pomlaw.com
zdenver@pomlaw.com

*Counsel for Co-Lead Plaintiffs Frederick Foote,
Matthew Cognetti, and Damion Hopwood, and
Co-Lead Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: /s/ *Reed Kathrein*
   Reed Kathrein (*special appearance*)
Lucas Gilmore (*special appearance*)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Co-Lead Plaintiffs Frederick Foote,
Matthew Cognetti, and Damion Hopwood, and
Co-Lead Counsel for the Class*

# SUPPLEMENTAL CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Matthew Cognetti, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I understand that, by court order, I was appointed as one of three Co-Lead Plaintiffs in the action *Cutshall v. Humacyte, Inc. et al.*, 1:24-cv-00954 (M.D.N.C.) (the "Action") for all claims. I remain willing to serve as a representative party for all claims on behalf of a class of investors who purchased, acquired, or sold the securities of Humacyte, Inc. ("Humacyte") during the Class Period as specified in the First Amended Class Action Complaint For Violations Of The Federal Securities Laws (the "Amended Complaint"), including providing testimony at deposition and trial, if necessary.

3.      I have reviewed the initial Complaint filed against Humacyte and the pertinent lead plaintiff filings in the Action, and do hereby authorize the filing of the Amended Complaint on my behalf.

4.      I did not purchase, acquire, or sell Humacyte securities at the direction of plaintiffs' counsel or in order to participate in any private action under the Securities Act or Exchange Act.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Humacyte securities during the Class Period as specified in the Amended Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, apart from this Action, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Amended Complaint, beyond my *pro rata* share of any recovery, except

1

such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed   _____May 22, 2025_____
                    (Date)

*Matthew Cognetti*
_____
                    (Signature)

Matthew Cognetti

2

**Humacyte, Inc. (HUMA)**                                                        **Matthew Cognetti**

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Account 1 | | | | |
| Purchase/Acquisition | Common Stock | 8/9/2024 | 1 | $6.8000 |
| Purchase/Acquisition | P 20240621 2.5 | 1/22/2024 | 2 | $0.4500 |
| Purchase/Acquisition | P 20240621 2.5 | 1/22/2024 | 6 | $0.4500 |
| Purchase/Acquisition | P 20240920 2.5 | 1/22/2024 | 3 | $0.6000 |
| Purchase/Acquisition | P 20240216 2.5 | 1/29/2024 | 10 | $0.0300 |
| Purchase/Acquisition | P 20240216 2.5 | 1/29/2024 | 20 | $0.0500 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 3 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 10 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 3 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 8 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 3 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 3 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 14 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 8 | $0.0600 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 1 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 14 | $0.1000 |
| Purchase/Acquisition | P 20240216 2.5 | 2/7/2024 | 3 | $0.1000 |
| Purchase/Acquisition | P 20240315 2.5 | 2/7/2024 | 70 | $0.1500 |
| Purchase/Acquisition | P 20240315 2.5 | 2/7/2024 | 50 | $0.1500 |
| Purchase/Acquisition | P 20240816 5 | 8/7/2024 | 1 | $0.1500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 32 | $0.2300 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 4 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 10 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 2 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 3 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 6 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 6 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 2 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 3 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 35 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 7 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 15 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 100 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 100 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 60 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/8/2024 | 40 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 2 | $0.2300 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 5 | $0.2200 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 100 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 33 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 6 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 13 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 6 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 6 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 9 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 10 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 8 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 1 | $0.2500 |

Humacyte, Inc. (HUMA)                                                    Matthew Cognetti

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 6 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 2 | $0.2400 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 1 | $0.2400 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 9 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 9 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 3 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 5 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/9/2024 | 1 | $0.2500 |
| Purchase/Acquisition | P 20240816 5 | 8/12/2024 | 4 | $0.0500 |
| Purchase/Acquisition | C 20240816 10 | 8/9/2024 | 20 | $0.5000 |
| Purchase/Acquisition | C 20240816 7.5 | 8/12/2024 | 20 | $0.2000 |
| Purchase/Acquisition | P 20250117 5 | 11/15/2024 | 1 | $1.2000 |
| Purchase/Acquisition | P 20241220 2.5 | 8/30/2024 | 1 | $0.1500 |
| Purchase/Acquisition | P 20241220 2.5 | 11/26/2024 | 59 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/26/2024 | 49 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/26/2024 | 17 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/26/2024 | 8 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/26/2024 | 4 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/26/2024 | 3 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/27/2024 | 1 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/27/2024 | 2 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/27/2024 | 1 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 11/29/2024 | 145 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 12/6/2024 | 18 | $0.1000 |
| Purchase/Acquisition | P 20241220 2.5 | 12/17/2024 | 150 | $0.0500 |
| Sale | Common Stock | 8/9/2024 | (1) | $6.7500 |
| Sale | P 20240621 2.5 | 2/9/2024 | (8) | $0.4000 |
| Sale | P 20240920 2.5 | 1/24/2024 | (2) | $0.5000 |
| Sale | P 20240920 2.5 | 2/7/2024 | (1) | $0.5000 |
| Sale | P 20240216 2.5 | 2/8/2024 | (1) | $0.1000 |
| Sale | P 20240216 2.5 | 2/8/2024 | (5) | $0.1000 |
| Sale | P 20240216 2.5 | 2/8/2024 | (94) | $0.1000 |
| Sale | P 20240315 2.5 | 2/9/2024 | (120) | $0.3000 |
| Sale | C 20240816 10 | 8/12/2024 | (20) | $0.0100 |
| Sale | C 20240816 7.5 | 8/9/2024 | (20) | $1.3300 |
| Sale | P 20250117 5 | 12/2/2024 | (1) | $1.4000 |
| Sale | P 20241220 2.5 | 12/9/2024 | (150) | $0.1000 |
| Sale | P 20241220 2.5 | 12/17/2024 | (52) | $0.0500 |
| Sale | P 20241220 2.5 | 12/17/2024 | (7) | $0.0500 |
| Sale | P 20241220 2.5 | 12/17/2024 | (20) | $0.0500 |
| Sale | P 20241220 2.5 | 12/17/2024 | (79) | $0.0500 |
| | | | | |
| Account 2 | | | | |
| Purchase/Acquisition | Common Stock | 11/1/2024 | 4,089 | $5.4200 |
| Purchase/Acquisition | Common Stock | 11/5/2024 | 2,940 | $5.3600 |
| Purchase/Acquisition | Common Stock | 11/15/2024 | 50 | $4.9500 |
| Purchase/Acquisition | Common Stock | 11/15/2024 | 3,281 | $5.0200 |
| Purchase/Acquisition | Common Stock | 12/20/2024 | 1,700 | $4.7900 |
| Purchase/Acquisition | Common Stock | 12/20/2024 | 5,373 | $4.9400 |
| Purchase/Acquisition | Common Stock | 12/20/2024 | 2 | $4.7500 |
| Purchase/Acquisition | Common Stock | 12/26/2024 | 2,372 | $4.8500 |
| Purchase/Acquisition | Common Stock | 1/8/2025 | 99 | $4.5700 |
| Purchase/Acquisition | Common Stock | 1/8/2025 | 1,000 | $4.6000 |
| Purchase/Acquisition | Common Stock | 1/13/2025 | 2,701 | $4.3400 |
| Purchase/Acquisition | Common Stock | 2/24/2025 | 299 | $3.3100 |
| Purchase/Acquisition | Common Stock | 2/24/2025 | 26 | $3.3100 |
| Purchase/Acquisition | Common Stock | 3/26/2025 | 1 | $2.0400 |
| Purchase/Acquisition | C 20241115 7.5 | 11/15/2024 | 30 | $0.0400 |

Humacyte, Inc. (HUMA)                                                                    Matthew Cognetti

**List of Purchases/Acquisitions and Sales**

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| Purchase/Acquisition | C 20241220 12.5 | 12/20/2024 | 30 | $0.0500 |
| Purchase/Acquisition | C 20241220 15 | 12/20/2024 | 10 | $0.0500 |
| Purchase/Acquisition | C 20241220 15 | 12/20/2024 | 3 | $0.0500 |
| Purchase/Acquisition | C 2025117 7.5 | 11/14/2024 | 3 | $0.6000 |
| Purchase/Acquisition | C 2025117 7.5 | 11/14/2024 | 5 | $0.6000 |
| Purchase/Acquisition | C 2025117 7.5 | 11/14/2024 | 3 | $0.6500 |
| Purchase/Acquisition | C 2025117 7.5 | 11/14/2024 | 5 | $0.6000 |
| Purchase/Acquisition | C 2025117 7.5 | 11/14/2024 | 1 | $0.6500 |
| Purchase/Acquisition | C 20250221 7.5 | 1/7/2025 | 1 | $0.1500 |
| Purchase/Acquisition | C 20250321 7.5 | 2/21/2025 | 2 | $0.0500 |
| Purchase/Acquisition | C 20250321 7.5 | 2/21/2025 | 1 | $0.0200 |
| Sale | Common Stock | 9/18/2024 | (20) | $5.2800 |
| Sale | Common Stock | 9/18/2024 | (150) | $5.2900 |
| Sale | Common Stock | 9/18/2024 | (200) | $5.3100 |
| Sale | Common Stock | 9/25/2024 | (72) | $5.5300 |
| Sale | Common Stock | 9/26/2024 | (17) | $5.3300 |
| Sale | Common Stock | 9/26/2024 | (10) | $5.4200 |
| Sale | Common Stock | 10/2/2024 | (49) | $5.7000 |
| Sale | Common Stock | 10/2/2024 | (15) | $5.9000 |
| Sale | Common Stock | 10/2/2024 | (320) | $5.9500 |
| Sale | Common Stock | 10/3/2024 | (68) | $5.4300 |
| Sale | Common Stock | 10/4/2024 | (55) | $5.4500 |
| Sale | Common Stock | 10/7/2024 | (20) | $5.5100 |
| Sale | Common Stock | 10/7/2024 | (130) | $5.5100 |
| Sale | Common Stock | 10/7/2024 | (100) | $5.4700 |
| Sale | Common Stock | 10/7/2024 | (100) | $5.4800 |
| Sale | Common Stock | 10/10/2024 | (40) | $5.4300 |
| Sale | Common Stock | 10/11/2024 | (65) | $5.6000 |
| Sale | Common Stock | 10/11/2024 | (38) | $5.6700 |
| Sale | Common Stock | 10/11/2024 | (1,220) | $5.6600 |
| Sale | Common Stock | 10/11/2024 | (1,000) | $5.5900 |
| Sale | Common Stock | 10/17/2024 | (400) | $5.2500 |
| Sale | Common Stock | 11/1/2024 | (2,940) | $5.4500 |
| Sale | Common Stock | 11/5/2024 | (3,050) | $5.2400 |
| Sale | Common Stock | 11/7/2024 | (39) | $5.2400 |
| Sale | Common Stock | 11/8/2024 | (27) | $5.2000 |
| Sale | Common Stock | 11/14/2024 | (250) | $4.8500 |
| Sale | Common Stock | 11/14/2024 | (1,330) | $4.8300 |
| Sale | Common Stock | 11/14/2024 | (190) | $4.9700 |
| Sale | Common Stock | 11/14/2024 | (45) | $5.1600 |
| Sale | Common Stock | 11/15/2024 | (2,354) | $4.8800 |
| Sale | Common Stock | 11/15/2024 | (3,120) | $4.8600 |
| Sale | Common Stock | 11/15/2024 | (1) | $4.9600 |
| Sale | Common Stock | 12/20/2024 | (50) | $5.5300 |
| Sale | Common Stock | 12/20/2024 | (800) | $5.7600 |
| Sale | Common Stock | 12/20/2024 | (422) | $5.9500 |
| Sale | Common Stock | 12/20/2024 | (1,100) | $5.9700 |
| Sale | Common Stock | 1/7/2025 | (1,100) | $4.7300 |
| Sale | Common Stock | 1/13/2025 | (1) | $4.3400 |
| Sale | Common Stock | 1/13/2025 | (2,700) | $4.3500 |
| Sale | Common Stock | 2/21/2025 | (251) | $3.5400 |
| Sale | Common Stock | 2/21/2025 | (44) | $3.6700 |
| Sale | Common Stock | 2/21/2025 | (30) | $3.6800 |
| Sale | C 2025117 7.5 | 12/20/2024 | (17) | $1.0000 |
| Sale | C 20250221 7.5 | 1/8/2025 | (1) | $0.1000 |

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAW

I, Frederick Foote, duly certify and declare, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed the complaint to which this certification is attached and authorized its filing.

2.      I did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      As reflected in my previous lead plaintiff motion submissions, I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transaction(s) in Humacyte, Inc. which are the subject of this litigation during the class period set forth in the complaint to which this certification is attached are set forth in the chart appended hereto.

5.      Within the last three years, I have not sought to serve or served as a class representative in any federal securities fraud case except in this Action.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 17th day of May, 2025.



Frederick Foote

**Frederick Foote - Humacyte, Inc. (HUMA) Transactions**
**Class Period 08/14/23 - 03/25/25**

### Common Stock Account 1

| | PURCHASES | | | SALES | |
| Date | Shares | Share Price | Date | Shares | Share Price |
|---|---|---|---|---|---|
| 07/12/2024 | 206 | $6.59 | 07/15/2024 | 5,000 | $8.41 |
| 07/12/2024 | 1,800 | $6.90 | 07/15/2024 | 5,000 | $8.51 |
| 07/12/2024 | 700 | $6.90 | 08/09/2024 | 5,000 | $7.00 |
| 07/12/2024 | 4,794 | $6.59 | 08/09/2024 | 2,500 | $6.92 |
| 07/12/2024 | 5,000 | $6.69 | 08/09/2024 | 1,772 | $6.55 |
| 07/15/2024 | 201 | $8.48 | 08/09/2024 | 728 | $6.75 |
| 07/15/2024 | 5,000 | $7.35 | 08/29/2024 | 2,332 | $6.11 |
| 07/15/2024 | 2,500 | $7.43 | 08/29/2024 | 5,000 | $6.11 |
| 07/15/2024 | 2,500 | $8.57 | 08/29/2024 | 1,517 | $6.15 |
| 07/15/2024 | 1,179 | $8.50 | 08/29/2024 | 1,151 | $6.16 |
| 07/15/2024 | 1,120 | $8.58 | 08/30/2024 | 260 | $6.13 |
| 07/16/2024 | 2,500 | $8.50 | 08/30/2024 | 1,100 | $6.02 |
| 07/16/2024 | 500 | $8.64 | 08/30/2024 | 1,800 | $6.01 |
| 07/16/2024 | 2,500 | $8.35 | 08/30/2024 | 4,611 | $6.14 |
| 07/16/2024 | 4,500 | $8.64 | 08/30/2024 | 5,000 | $6.03 |
| 07/17/2024 | 5,000 | $8.55 | 08/30/2024 | 5,000 | $6.03 |
| 07/17/2024 | 5,000 | $8.05 | 08/30/2024 | 7,100 | $6.01 |
| 07/17/2024 | 5,000 | $8.00 | 08/30/2024 | 4,740 | $6.11 |
| 08/19/2024 | 5,000 | $6.31 | 08/30/2024 | 389 | $6.13 |
| 08/21/2024 | 1,000 | $6.35 | | | |
| 08/21/2024 | 1,500 | $6.45 | | | |
| 08/23/2024 | 220 | $6.87 | | | |
| 08/23/2024 | 2,280 | $6.87 | | | |

### Common Stock Account 2

| | PURCHASES | | | SALES | |
| Date | Shares | Share Price | Date | Shares | Share Price |
|---|---|---|---|---|---|
| 07/29/2024 | 400 | $7.59 | 07/31/2024 | 9,000 | $9.46 |
| 07/29/2024 | 325 | $7.58 | 07/31/2024 | 325 | $8.61 |
| 07/29/2024 | 632 | $7.59 | 08/08/2024 | 675 | $8.05 |
| 07/29/2024 | 1,868 | $7.68 | | | |
| 07/29/2024 | 6,100 | $7.59 | | | |
| 08/01/2024 | 900 | $9.07 | | | |
| 08/01/2024 | 900 | $9.07 | | | |
| 08/01/2024 | 3,200 | $9.07 | | | |
| 08/01/2024 | 4,420 | $8.97 | | | |
| 08/06/2024 | 580 | $8.51 | | | |
| 08/08/2024 | 35 | $8.22 | | | |
| 08/08/2024 | 115 | $8.23 | | | |

### Common Stock Account 3

| | PURCHASES | | | SALES | |
| Date | Shares | Share Price | Date | Shares | Share Price |
|---|---|---|---|---|---|
| 07/24/24 | 7500 | $8.17 | | | |
| 07/26/24 | 2500 | $8.23 | | | |
| 07/29/24 | 750 | $7.98 | | | |
| 07/29/24 | 9,900 | $7.90 | | | |
| 07/29/24 | 100 | $7.85 | | | |

### HUMA250321C5

| | PURCHASES | | | SALES | |
| Date | Shares | Share Price | Date | Shares | Share Price |
|---|---|---|---|---|---|
| 10/17/24 | 100 | $2.20 | | | |

### HUMA241220C7.5

| | PURCHASES | | | SALES | |
| Date | Shares | Share Price | Date | Shares | Share Price |
|---|---|---|---|---|---|
| 08/27/24 | 50 | $1.45 | 08/30/24 | 77 | $1.00 |
| 08/27/24 | 50 | $1.39 | 08/30/24 | 20 | $1.00 |
| | | | 08/30/24 | 3 | $1.00 |

### HUMA241220C5

| | PURCHASES | | | SALES | |
| Date | Shares | Share Price | Date | Shares | Share Price |
|---|---|---|---|---|---|
| 08/30/2024 | 50 | $2.00 | 10/17/2024 | 100 | $1.20 |
| 08/30/2024 | 24 | $1.99 | 10/17/2024 | 3 | $1.10 |
| 08/30/2024 | 20 | $1.90 | 10/17/2024 | 5 | $1.10 |
| 08/30/2024 | 10 | $2.00 | 10/17/2024 | 6 | $1.10 |
| 08/30/2024 | 66 | $2.00 | 10/17/2024 | 30 | $1.10 |
| 08/30/2024 | 50 | $2.00 | 10/17/2024 | 70 | $1.10 |

| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 08/30/2024 | 80 | $1.89 | | 10/17/2024 | 72 | $1.11 |
| 08/30/2024 | 100 | $2.10 | | 10/17/2024 | 100 | $1.00 |
| 08/30/2024 | 100 | $1.95 | | 10/17/2024 | 98 | $1.50 |
| | | | | 10/17/2024 | 10 | $1.10 |
| | | | | 10/17/2024 | 2 | $1.50 |
| | | | | 10/17/2024 | 1 | $1.10 |
| | | | | 10/17/2024 | 1 | $1.10 |
| | | | | 10/17/2025 | 1 | $1.10 |
| | | | | 10/17/2026 | 1 | $1.10 |

### HUMA240816C15

| | PURCHASES | | | | SALES | |
|---|---|---|---|---|---|---|
| Date | Shares | Share Price | | Date | Shares | Share Price |
| 07/29/2024 | 1 | $0.20 | | 07/23/24 | 100 | $0.45 |
| 07/29/2024 | 9 | $0.25 | | 07/23/24 | 100 | $0.40 |
| 07/29/2024 | 13 | $0.25 | | 08/08/24 | 90 | $0.10 |
| 07/31/2024 | 77 | $0.20 | | | | |
| 07/31/2024 | 100 | $0.14 | | | | |

### HUMA240816C10

| | PURCHASES | | | | SALES | |
|---|---|---|---|---|---|---|
| Date | Shares | Share Price | | Date | Shares | Share Price |
| 07/19/2024 | 1 | $0.85 | | 07/18/2024 | 17 | $1.35 |
| 07/19/2024 | 49 | $0.85 | | 07/18/2024 | 75 | $1.25 |
| 07/19/2024 | 50 | $0.85 | | 07/18/2024 | 5 | $1.40 |
| 07/31/2024 | 1 | $1.10 | | 07/18/2024 | 2 | $1.30 |
| 07/31/2024 | 35 | $1.10 | | 07/18/2024 | 1 | $1.35 |
| 07/31/2024 | 54 | $1.10 | | 07/31/2024 | 90 | $0.80 |
| 08/08/2024 | 90 | $0.57 | | 08/06/2024 | 88 | $0.55 |
| | | | | 08/06/2024 | 2 | $0.55 |

### HUMA240719C10

| | PURCHASES | | | | SALES | |
|---|---|---|---|---|---|---|
| Date | Shares | Share Price | | Date | Shares | Share Price |
| 07/15/2024 | 4 | $0.25 | | 07/15/2024 | 45 | $0.20 |
| 07/15/2024 | 3 | $0.25 | | 07/15/2024 | 5 | $0.20 |
| 07/15/2024 | 1 | $0.25 | | 07/16/2024 | 100 | $0.20 |
| 07/15/2024 | 6 | $0.25 | | | | |
| 07/15/2024 | 12 | $0.25 | | | | |
| 07/15/2024 | 24 | $0.25 | | | | |
| 07/18/2024 | 100 | $0.05 | | | | |

**Frederick Foote - Humacyte, Inc. (HUMA) Transactions**
**Class Period 08/14/23 - 03/25/25**

### Common Stock Account 1

| | PURCHASES | | | | SALES | |
| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 07/12/2024 | 206 | $6.59 | | 07/15/2024 | 5,000 | $8.41 |
| 07/12/2024 | 1,800 | $6.90 | | 07/15/2024 | 5,000 | $8.51 |
| 07/12/2024 | 700 | $6.90 | | 08/09/2024 | 5,000 | $7.00 |
| 07/12/2024 | 4,794 | $6.59 | | 08/09/2024 | 2,500 | $6.92 |
| 07/12/2024 | 5,000 | $6.69 | | 08/09/2024 | 1,772 | $6.55 |
| 07/15/2024 | 201 | $8.48 | | 08/09/2024 | 728 | $6.75 |
| 07/15/2024 | 5,000 | $7.35 | | 08/29/2024 | 2,332 | $6.11 |
| 07/15/2024 | 2,500 | $7.43 | | 08/29/2024 | 5,000 | $6.11 |
| 07/15/2024 | 2,500 | $8.57 | | 08/29/2024 | 1,517 | $6.15 |
| 07/15/2024 | 1,179 | $8.50 | | 08/29/2024 | 1,151 | $6.16 |
| 07/15/2024 | 1,120 | $8.58 | | 08/30/2024 | 260 | $6.13 |
| 07/16/2024 | 2,500 | $8.50 | | 08/30/2024 | 1,100 | $6.02 |
| 07/16/2024 | 500 | $8.64 | | 08/30/2024 | 1,800 | $6.01 |
| 07/16/2024 | 2,500 | $8.35 | | 08/30/2024 | 4,611 | $6.14 |
| 07/16/2024 | 4,500 | $8.64 | | 08/30/2024 | 5,000 | $6.03 |
| 07/17/2024 | 5,000 | $8.55 | | 08/30/2024 | 5,000 | $6.03 |
| 07/17/2024 | 5,000 | $8.05 | | 08/30/2024 | 7,100 | $6.01 |
| 07/17/2024 | 5,000 | $8.00 | | 08/30/2024 | 4,740 | $6.11 |
| 08/19/2024 | 5,000 | $6.31 | | 08/30/2024 | 389 | $6.13 |
| 08/21/2024 | 1,000 | $6.35 | | | | |
| 08/21/2024 | 1,500 | $6.45 | | | | |
| 08/23/2024 | 220 | $6.87 | | | | |
| 08/23/2024 | 2,280 | $6.87 | | | | |

### Common Stock Account 2

| | PURCHASES | | | | SALES | |
| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 07/29/2024 | 400 | $7.59 | | 07/31/2024 | 9,000 | $9.46 |
| 07/29/2024 | 325 | $7.58 | | 07/31/2024 | 325 | $8.61 |
| 07/29/2024 | 632 | $7.59 | | 08/08/2024 | 675 | $8.05 |
| 07/29/2024 | 1,868 | $7.68 | | | | |
| 07/29/2024 | 6,100 | $7.59 | | | | |
| 08/01/2024 | 900 | $9.07 | | | | |
| 08/01/2024 | 900 | $9.07 | | | | |
| 08/01/2024 | 3,200 | $9.07 | | | | |
| 08/01/2024 | 4,420 | $8.97 | | | | |
| 08/06/2024 | 580 | $8.51 | | | | |
| 08/08/2024 | 35 | $8.22 | | | | |
| 08/08/2024 | 115 | $8.23 | | | | |

### Common Stock Account 3

| | PURCHASES | | | | SALES | |
| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 07/24/24 | 7500 | $8.17 | | | | |
| 07/26/24 | 2500 | $8.23 | | | | |
| 07/29/24 | 750 | $7.98 | | | | |
| 07/29/24 | 9,900 | $7.90 | | | | |
| 07/29/24 | 100 | $7.85 | | | | |

### HUMA250321C5

| | PURCHASES | | | | SALES | |
| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 10/17/24 | 100 | $2.20 | | | | |

### HUMA241220C7.5

| | PURCHASES | | | | SALES | |
| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 08/27/24 | 50 | $1.45 | | 08/30/24 | 77 | $1.00 |
| 08/27/24 | 50 | $1.39 | | 08/30/24 | 20 | $1.00 |
| | | | | 08/30/24 | 3 | $1.00 |

### HUMA241220C5

| | PURCHASES | | | | SALES | |
| Date | Shares | Share Price | | Date | Shares | Share Price |
|---|---|---|---|---|---|---|
| 08/30/2024 | 50 | $2.00 | | 10/17/2024 | 100 | $1.20 |
| 08/30/2024 | 24 | $1.99 | | 10/17/2024 | 3 | $1.10 |
| 08/30/2024 | 20 | $1.90 | | 10/17/2024 | 5 | $1.10 |
| 08/30/2024 | 10 | $2.00 | | 10/17/2024 | 6 | $1.10 |
| 08/30/2024 | 66 | $2.00 | | 10/17/2024 | 30 | $1.10 |
| 08/30/2024 | 50 | $2.00 | | 10/17/2024 | 70 | $1.10 |

| 08/30/2024 | 80 | $1.89 |
|---|---|---|
| 08/30/2024 | 100 | $2.10 |
| 08/30/2024 | 100 | $1.95 |

| 10/17/2024 | 72 | $1.11 |
|---|---|---|
| 10/17/2024 | 100 | $1.00 |
| 10/17/2024 | 98 | $1.50 |
| 10/17/2024 | 10 | $1.10 |
| 10/17/2024 | 2 | $1.50 |
| 10/17/2024 | 1 | $1.10 |
| 10/17/2024 | 1 | $1.10 |
| 10/17/2025 | 1 | $1.10 |
| 10/17/2026 | 1 | $1.10 |

### HUMA240816C15

| Date | PURCHASES Shares | Share Price | Date | SALES Shares | Share Price |
|---|---|---|---|---|---|
| 07/29/2024 | 1 | $0.20 | 07/23/24 | 100 | $0.45 |
| 07/29/2024 | 9 | $0.25 | 07/23/24 | 100 | $0.40 |
| 07/29/2024 | 13 | $0.25 | 08/08/24 | 90 | $0.10 |
| 07/31/2024 | 77 | $0.20 | | | |
| 07/31/2024 | 100 | $0.14 | | | |

### HUMA240816C10

| Date | PURCHASES Shares | Share Price | Date | SALES Shares | Share Price |
|---|---|---|---|---|---|
| 07/19/2024 | 1 | $0.85 | 07/18/2024 | 17 | $1.35 |
| 07/19/2024 | 49 | $0.85 | 07/18/2024 | 75 | $1.25 |
| 07/19/2024 | 50 | $0.85 | 07/18/2024 | 5 | $1.40 |
| 07/31/2024 | 1 | $1.10 | 07/18/2024 | 2 | $1.30 |
| 07/31/2024 | 35 | $1.10 | 07/18/2024 | 1 | $1.35 |
| 07/31/2024 | 54 | $1.10 | 07/31/2024 | 90 | $0.80 |
| 08/08/2024 | 90 | $0.57 | 08/06/2024 | 88 | $0.55 |
| | | | 08/06/2024 | 2 | $0.55 |

### HUMA240719C10

| Date | PURCHASES Shares | Share Price | Date | SALES Shares | Share Price |
|---|---|---|---|---|---|
| 07/15/2024 | 4 | $0.25 | 07/15/2024 | 45 | $0.20 |
| 07/15/2024 | 3 | $0.25 | 07/15/2024 | 5 | $0.20 |
| 07/15/2024 | 1 | $0.25 | 07/16/2024 | 100 | $0.20 |
| 07/15/2024 | 6 | $0.25 | | | |
| 07/15/2024 | 12 | $0.25 | | | |
| 07/15/2024 | 24 | $0.25 | | | |
| 07/18/2024 | 100 | $0.05 | | | |

## SUPPLEMENTAL CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Damion Hopwood, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I understand that, by court order, I was appointed as one of three Co-Lead Plaintiffs in the action *Cutshall v. Humacyte, Inc. et al.*, 1:24-cv-00954 (M.D.N.C.) (the "Action") for all claims.  I remain willing to serve as a representative party for all claims on behalf of a class of investors who purchased, acquired, or sold the securities of Humacyte, Inc. ("Humacyte") during the Class Period as specified in the First Amended Class Action Complaint For Violations Of The Federal Securities Laws (the "Amended Complaint"), including providing testimony at deposition and trial, if necessary.

3.      I have reviewed the initial Complaint filed against Humacyte and the pertinent lead plaintiff filings in the Action, and do hereby authorize the filing of the Amended Complaint on my behalf.

4.      I did not purchase, acquire, or sell Humacyte securities at the direction of plaintiffs' counsel or in order to participate in any private action under the Securities Act or Exchange Act.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Humacyte securities during the Class Period as specified in the Amended Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, apart from this Action, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Amended Complaint, beyond my *pro rata* share of any recovery, except

1

such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

        8.     I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed _____
                May 22, 2025
                    (Date)

                               Signed by:

                               8B3D289918624FA
_____
                                   (Signature)
                        Damion Hopwood

2

**Humacyte, Inc. (HUMA)**                                                                                    **Damion Hopwood**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Security Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|---|
| _Account 1_ | | | | |
| Purchase/Acquisition | Common Stock | 8/19/2024 | 500 | $7.5000 |
| Purchase/Acquisition | C 20240920 7.5 | 8/8/2024 | 3 | $2.1400 |
| Sale | P 20240816 7.5 | 7/23/2024 | (5) | $1.4000 |
| Sale | C 20240920 7.5 | 8/19/2024 | (3) | $0.4000 |
| | | | | |
| _Account 2_ | | | | |
| Purchase/Acquisition | Common Stock | 8/19/2024 | 3,300 | $7.5000 |
| Purchase/Acquisition | Common Stock | 2/14/2025 | 302 | $3.9649 |
| Purchase/Acquisition | C 20240920 7.5 | 8/8/2024 | 1 | $2.1500 |
| Sale | P 20240816 7.5 | 7/16/2024 | (1) | $1.4500 |
| Sale | P 20240816 7.5 | 7/17/2024 | (10) | $1.1300 |
| Sale | P 20240816 7.5 | 7/17/2024 | (1) | $1.2800 |
| Sale | P 20240816 7.5 | 7/23/2024 | (3) | $1.4400 |
| Sale | P 20240816 7.5 | 7/23/2024 | (15) | $1.4000 |
| Sale | P 20240816 7.5 | 7/23/2024 | (3) | $1.4000 |
| Sale | C 20240920 7.5 | 8/19/2024 | (1) | $0.4000 |
| Sale | C 20241115 7.5 | 11/12/2024 | (33) | $0.0500 |
| | | | | |
| _Account 3_ | | | | |
| Purchase/Acquisition | Common Stock | 3/25/2025 | 1,000 | $2.2700 |