IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE HUMACYTE, INC. SECURITIES LITIGATION | Case No. 1:24-cv-954-TDS-JEP |
| This Document Relates to:<br><br>ALL ACTIONS | CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ........ **1**

**BACKGROUND** ........ **4**

I. HUMACYTE AND THE INDIVIDUAL DEFENDANTS. ........ 4

II. HUMACYTE DEVELOPS AND SUBMITS SYMVESS FOR BLA APPROVAL ........ 4

A. Humacyte Works with the FDA to Develop Clinical Trials. ........ 5

B. The FDA Inspects Humacyte's Facility. ........ 8

III. THE FDA EXTENDS ITS APPROVAL DATE AND PUBLICLY RELEASES THE FORM 483. ........ 9

IV. THE INITIAL COMPLAINT. ........ 10

V. THE FDA APPROVES SYMVESS. ........ 10

VI. THE ARTICLES. ........ 12

VII. THE FIRST AMENDED COMPLAINT. ........ 12

**ARGUMENT** ........ **13**

I. PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD AN ACTIONABLE MISREPRESENTATION OR OMISSION. ........ 14

A. Plaintiffs Fail to Plead that Defendants Misled Investors About Product Safety. ........ 14

1. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About Safety Risks. ........ 15

2. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About the Trials. ........ 16

3. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About the FDA Delay. ........ 19

4. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About Quality Control. ........ 19

B. Plaintiffs Fail to Plead that Defendants Misled Investors About Their Manufacturing Facility. ........ 20

1. Plaintiffs Do Not Allege Facts Establishing That Defendants Misled Investors About the FDA Inspection. ........ 20

2. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About Manufacturing Capabilities. ........ 24

C. Plaintiffs Fail to Plead that Defendants Misled Investors About Liquidity. .......... 25
1. Purported Failure to Disclose Reliance on Oberland Funding Agreement. .......... 26
2. 12-Month Liquidity Projections. .......... 26
3. Alleged Negative Effects of Insufficient Capital. .......... 27
II. PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED FOR FAILURE TO PLEAD SCIENTER. .......... 28
A. Plaintiffs Fail to Plead Scienter for the Alleged Product Safety Fraud. .......... 29
B. Plaintiffs Fail to Plead Scienter for the Alleged Facility Fraud. .......... 30
C. Plaintiffs Fail to Plead Scienter for the Alleged Liquidity Fraud. .......... 32
D. Plaintiffs' Generalized Theories of Scienter Fail. .......... 33
1. Plaintiffs Fail to Plead Motive and Opportunity. .......... 33
2. Plaintiffs' Other Miscellaneous Allegations Fail to Plead Scienter. .......... 36
III. PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED. .......... 38
**CONCLUSION .......... 39**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aramic LLC v. Revance Therapeutics, Inc.*,
2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) ........ 20

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ........ 14

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ........ 33

*Cozzarelli v. Inspire Pharms, Inc.*,
549 F.3d 618 (4th Cir. 2008) ........ 33, 36, 37

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023) ........ 34

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014) ........ 21, 22, 31

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
42 F.3d 204 (4th Cir. 1994) ........ 22

*Hirtenstein v. Cempra, Inc.*,
348 F. Supp. 3d 530 (M.D.N.C. 2018) ........ 16, 22, 38

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ........ 31

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) ........ 27

*Luo v. Spectrum Pharms., Inc.*,
2024 WL 4443323 (D. Nev. Oct. 7, 2024) ........ 21

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) ........ 29

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........ 28

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ... 29

*In re Novan, Inc.*,
2018 WL 6732990 (M.D.N.C. Nov. 30, 2018) ... 17, 21

*Ollila v. Babcock & Wilson Enters., Inc.*,
2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ... 29

*In re PEC Sols., Inc. Sec. Litig.*,
418 F.3d 379 (4th Cir. 2005) ... 33

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
966 F. Supp. 2d 525 (M.D.N.C. 2013) ... 24

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ... 20, 22

*Schaeffer v. Nabriva Therapeutics PLC*,
2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) ... 21

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ... 38

*Slayton v. Am. Exp. Co.*,
604 F.3d 758 (2d Cir. 2010) ... 23

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
552 U.S. 148 (2008) ... 14

*In re SunEdison, Inc. Sec. Litig.*,
300 F. Supp. 3d 444 (S.D.N.Y. 2018) ... 27

*Svezzese v. Duratek, Inc.*,
67 F. App'x 169 (4th Cir. 2003) ... 38

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ... 35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ... 13

*TransEnterix Inv. Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017) ... 23, 25

*In re Triangle Cap. Corp. Sec. Litig.*,
988 F.3d 743 (4th Cir. 2021) ....................................................................... 30, 32

*United States v. Garcia*,
2015 WL 7313425 (W.D.N.C. Nov. 19, 2015)............................................................ 8

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ........................................................................... 23

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ................................................. 31, 32, 35, 37, 38

**Statutes**

15 U.S.C. § 78u-4(b) ........................................................................ 13, 28, 29

15 U.S.C. § 78u-5c(1)................................................................................ 23

**Other Authorities**

21 C.F.R. ¶ 312.42(b)(2) ................................................................................ 18

*About Warning and Close-Out Letters*, U.S. Food & Drug Admin. (Mar.
30, 2024), https://bit.ly/44LxnOD ....................................................................... 8

Federal Rule of Civil Procedure 9(b) ........................................................................ 13

*Frequently Asked Questions*, U.S. Food & Drug Admin. (Jan. 9, 2020),
https://bit.ly/4euPdbT...................................................................................... 8

*Inspection Classification Database*, U.S. Food & Drug Admin. (Sept. 13,
2024), https://bit.ly/3Id7Rck;............................................................................ 8

## INDEX OF DEFINED TERMS

| | |
|---|---|
| Articles | The March 25–26, 2025 news articles published in the *New York Times* and *Bloomberg* |
| ATEV | Acellular Tissue Engineered Vessel |
| BLA | Biologics License Application |
| CEO | Humacyte's Chief Executive Officer |
| CFO | Humacyte's Chief Financial Officer |
| COO | Humacyte's Chief Operating Officer |
| Class Period | August 14, 2023 through March 25, 2025 |
| Company | Humacyte, Inc. |
| Complaint | First Amended Class Action Complaint for Violations of the Federal Securities Laws, filed May 22, 2025, ECF No. 37 |
| Confidential Witnesses or CW(s) | Confidential Witness(es), as identified in the First Amended Class Action Complaint |
| Defendants | The Individual Defendants and the Company |
| Facility | Humacyte's Durham, North Carolina facility |
| FDA | United States Food and Drug Administration |
| BLA File | Public documents released in support of the FDA's decision to approve Symvess, including the Statistical Review Memorandum, Clinical Review Memorandum, and Summary Basis of Regulatory Action |
| HAV | Human Acellular Vessel |
| Humacyte | Humacyte, Inc. |
| Individual Defendants | Laura E. Niklason, Dale A. Sander, Heather Prichard |
| Initial Complaint | Complaint for Violations of the Federal Securities Laws—Class Action, filed November 18, 2024, ECF No. 1. |

| | |
|---|---|
| OAI | “Official Action Indicated”; FDA inspectional classification meaning that “a facility is in an unacceptable state of compliance.” |
| Plaintiffs | Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damon Hopwood |
| PDUFA | “Prescription Drug User Free Act” date |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| VAI | “Voluntary Action Indicated”; FDA inspectional classification meaning that “the inspection found objectionable conditions or practices but the agency has determined the facility can voluntarily correct its deficiencies and will not recommend any action.” |

## PRELIMINARY STATEMENT

Humacyte is a leading regenerative medicine company that recently obtained FDA approval for its first product — Symvess, a groundbreaking acellular tissue engineered vessel ("ATEV") for treating traumatic arterial injuries. The Company expected Symvess to be approved on its Prescription Drug User Fee Act ("PDUFA") date of August 10, 2024. On August 9, 2024, however, the FDA notified Humacyte that it had decided to take additional time to complete its review of Humacyte's Biologics License Application ("BLA") for Symvess. Two months later, on October 17, 2024, while the BLA for Symvess was still pending, the FDA released a Form 483 from its April 2024 inspection of Humacyte's Durham, North Carolina manufacturing facility, noting certain issues that would need to be addressed at the facility. Thereafter, on November 18, 2024, Plaintiff filed this action, weaving these disparate events into a conspiracy theory, alleging that the Defendants knowingly failed to disclose to investors that (i) the Durham facility failed to comply with good manufacturing practices; (ii) "the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies"; and (iii) "as a result, there was a substantial risk" that Symvess would never be approved. Initial Compl. (ECF No. 1) ¶ 8.

Virtually as soon as the Initial Complaint was filed, the allegations collapsed. On December 19, 2024, the FDA approved Symvess for commercial sale, belying Plaintiff's claim that there was "a substantial risk" of non-approval. Moreover, the FDA's file, publicly released several weeks later, made clear that the manufacturing issues identified at the Durham site were neither a cause of the brief delay nor a threat to the approval

decision. Rather, the FDA found that Humacyte "adequately responded to the observations" in the Form 483; "[a]ll inspectional issues were resolved"; and the Company's "manufacturing material, process, and controls can yield SYMVESS with consistent quality attributes." Ex. 1, Summary Basis for Regulatory Action ("SBRA") at 6, 10. The delay in approval resulted not from the issues identified in the Form 483, but instead from the FDA's decision that some "further clarification [was] needed for the clinical benefit/risk assessment." Ex. 2, CBER CMC BLA Review Addendum, at iii.

Undeterred by the collapse of the Initial Complaint, Plaintiffs now seek to reinvent their case in a sprawling First Amended Class Action Complaint (the "Complaint"). The new Complaint, which totals 170 pages, asserts that the Defendants engaged not just in one fraud, but three — (1) a so-called "Product Safety Fraud," which involves alleged misrepresentations and omissions concerning the safety of Symvess; (2) a "Facility Fraud," which involves alleged misrepresentations and omissions concerning manufacturing deficiencies; and (3) a "Liquidity Fraud," which involves alleged misrepresentations and omissions concerning Humacyte's financial condition and liquidity. All three theories fail on the pleadings.

Plaintiffs' purported Product Safety Fraud claim fails because they allege no false or misleading statement about the safety of Symvess, and Defendants disclosed all of the safety-related issues that Plaintiffs identify. While the Complaint asserts that Humacyte concealed disagreements with the FDA over aspects of the Company's clinical trial methodology, courts repeatedly have rejected efforts to manufacture securities claims

based on purported omissions concerning FDA commentary about clinical trial methodology.

The Facility Fraud claim is no more viable. Plaintiffs allege that it was misleading for Defendants to state that the Company's BLA remained on track following the inspection of its manufacturing facility in Durham, when the Form 483 that the FDA later issued purportedly proves otherwise. But the minor issues identified in the Form 483 did not delay or derail the BLA. To the contrary, the FDA approved Symvess just months after the inspection of the Durham facility, noting that "all inspectional issues were resolved." Ex. 1, SBRA at 10. While this is reason enough to reject Plaintiffs' Facility Fraud allegations, the statements Plaintiffs challenge are also not actionable for other reasons, including that they are opinions and/or forward-looking statements protected under the safe harbor of the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The "Liquidity Fraud" claim is equally baseless. Plaintiffs assert that Defendants concealed risks about the Company's financial condition and liquidity, but Humacyte's SEC filings demonstrate that it disclosed all such risks. Moreover, Defendants' liquidity projections are opinions that are not actionable as a matter of law and constitute forward-looking statements protected under the PSLRA's safe harbor.

Even if the Complaint adequately alleged a false statement or omission, Plaintiffs' claims would fail because the allegations do not raise any inference of scienter on the part of any Defendant — let alone the "strong inference" the PSLRA requires. The Complaint pleads no information known to the Defendants that contradicted their public statements.

Nor does it include any compelling allegations of motive and opportunity. The absence of basis for asserting that any Defendant acted with scienter provides yet another reason why the Complaint should be dismissed.

## BACKGROUND

### I. Humacyte and the Individual Defendants.

Humacyte is a regenerative medicine company that develops and manufactures bioengineered human tissues. Compl. (ECF No. 37) ¶ 3. The Individual Defendants are current or former Humacyte officers. Dr. Laura Niklason is Humacyte's founder, President, and CEO; Dale Sander is the company's CFO; and Heather Prichard is its former COO. *Id.* ¶¶ 17–19.

### II. Humacyte Develops and Submits Symvess for BLA Approval.

Traumatic arterial injuries — such as those suffered by soldiers in combat, or civilians in car crashes or firearm discharges — frequently require urgent repair. Ex. 1, SBRA at 5, 13. Traditionally, the primary repair options used either undamaged veins harvested from the patient (called "autologous vessels") or synthetic grafts. *Id.* at 5. As the FDA has recognized, however, those treatment options have drawbacks: they may be inadvisable for some patients for medical reasons or they may introduce "additional risks," including infection or thrombosis. Ex. 3, Statistical Review Memorandum ("SR") at 8; Ex. 4, Clinical Review Memorandum ("CR") at 9, 72, 74; Ex. 1, SBRA at 5, 17; *see also* Ex. 5, 2023 Form 10-K ("2023 10-K"), at 5, 15, 44. Humacyte developed Symvess, a

bioengineered blood vessel, as an alternative treatment, which is sometimes referred to as an ATEV or "Human Acellular Vessel" ("HAV"). *See id.* at 9, 15, 44–45; Compl. ¶ 3.

Before it could market its ATEV, Humacyte needed FDA approval through the Biologics License Application ("BLA") process. *Id.* ¶ 27. In December 2023, Humacyte submitted its BLA. *Id.* ¶ 32. The FDA accepted the BLA and assigned a PDUFA date of August 10, 2024. *Id.* A PDUFA date is the date by which FDA anticipates completing its review of a BLA, although the deadline is not binding under any statute. *See* Ex. 5, 2023 10-K, at 5.

As Humacyte cautioned investors, the BLA process is rigorous. The FDA only grants approval if it determines, inter alia, that a product is safe and effective for its intended use and is manufactured in accordance with current good manufacturing practices. *Id.* at 46–47. In making that determination, the FDA considers materials that may include clinical trial data and the FDA's own inspection of the manufacturer's facilities. *Id.* at 46–49; Compl. ¶¶ 27–28.

### A. Humacyte Works with the FDA to Develop Clinical Trials.

Humacyte proposed two clinical trials to the FDA: the "V005" trial, which studied traumatically injured patients treated with the HAV in the United States and Israel, and the "V017" trial, which reviewed results from patients treated with the HAV in wartime Ukraine through Humacyte's Humanitarian Aid Program. Ex. 1, SBRA at 6–7. The primary "endpoints" of each study focused on the HAV's efficacy after thirty days. *See* Ex. 4, CR at 74.

Humacyte explained the design for both trials in public documents, including FDA and SEC filings. *See* Ex. 3, SR at 18; Ex. 5, 2023 10-K at 16, 18. In August 2023, the FDA informed Humacyte that the trials would be "sufficient to support a request for traditional approval of biological license application," paving the way for Humacyte to submit its application in December 2023. Ex. 3, SR at 11, 21, 24; Ex. 4, CR at 13.

Because Symvess is designed to treat urgent injuries in the chaos of the battlefield or trauma center — not in a calm clinical environment — developing appropriate clinical trials presented a number of challenges, including the following.

***Method of counting patients without thirty-day results.*** Patients with traumatic injuries may lose limbs or die regardless of treatment and, indeed, even if an HAV is successful in restoring blood flow. *See* Ex. 3, SR at 22. This creates a risk that subjects will not complete a clinical trial in which they are enrolled for reasons unrelated to the efficacy of the treatment being tested. To address this issue, Humacyte adopted a "while-on-treatment" approach. Ex. 4, CR at 33. For any participant who lost a limb or died before the end of the thirty-day observation period, an independent adjudication committee would determine whether Symvess caused the intercurrent event ("IE")—i.e., the death or loss of limb. *Id.* at 33–34. If the IE was "confidently determined to be unrelated to the ATEV," then researchers would count the patient's last known status as their trial result. *Id.* at 34. On March 7, 2023, "[t]he FDA agreed with using the while-on-treatment strategy" that Humacyte proposed, although the agency and Humacyte did not reach a

"formal agreement" about how the independent adjudication committee would make its determinations about what caused an IE. *Id.* at 13, 33, 41.

***Benchmarking.*** Another challenge Humacyte faced was how to compare the results achieved by Symvess to existing arterial-repair options. Humacyte proposed that it would compare results of trial participants treated with Symvess to a "benchmark" data set from literature on patients treated with synthetic grafts. *Id.* at 20, 33. Humacyte explained to investors that its clinical trial methodology was "subject to various limitations" as compared to other methods. Ex. 5, 2023 10-K at 59. One limitation was susceptibility to "bias" — specifically, that the trial data might "not be predictive of future clinical trial results with any of our product candidates when studied in an environment with an active control." *Id.* Another was that "primary patency,"[1] the primary endpoint the trials studied, "could not be compared to synthetic grafts," because that data generally "was not reported in the benchmark publications." *Id.* at 16. Humacyte disclosed such limitations candidly, telling investors that "[b]ecause of these and other factors, we may experience substantial difficulties in agreeing with FDA and other regulatory authorities on clinical trial design." *Id.* at 58.

Humacyte conducted the V005 and V017 trials and reported top-level results to the market on several occasions. *See, e.g.*, *id.* at 16–19. It also reported adverse events that occurred during the trials, even though both Humacyte and the FDA determined that the

[1] Primary patency is a measure of how long blood can flow through a blood vessel or implanted graft without the need for intervention to preserve its functionality. *See* Ex. 4, CR at 24.

most serious of those events were caused by the patients' injuries, and not by the HAV itself. *Id.* at 17–18, 29; Ex. 4, CR at 41, 49, 53; Ex. 3, SR at 6, 40.

**B. The FDA Inspects Humacyte's Facility.**

In April 2024, as part of its BLA review, the FDA inspected Humacyte's manufacturing facility in Durham, North Carolina. Compl. ¶ 45. After the inspection, it gave Humacyte a "Form 483." *Id.* A Form 483 is a document the FDA issues if it observes any issues requiring attention. *See also FDA Form 483 Frequently Asked Questions*, U.S. Food & Drug Admin. (Jan. 9, 2020), https://bit.ly/4euPdbT.[2] A Form 483 issuance in itself does not indicate that a company "is in an unacceptable state of compliance," and is different than a "warning letter," which the FDA uses to address "significant violation(s) of federal requirement(s)." *Inspection Classification Database*, U.S. Food & Drug Admin. (Sept. 13, 2024), https://bit.ly/3Id7Rck; *About Warning and Close-Out Letters*, U.S. Food & Drug Admin. (Mar. 30, 2024), https://bit.ly/44LxnOD. The Form 483 issued to Humacyte made two observations about Humacyte's facility: first, that "[t]here is no microbial quality assurance," and second, that "[q]uality oversight is inadequate" in certain respects. Compl. ¶ 45. The Form explained, however, that these observations "do not represent a final agency determination regarding your compliance." *Id.* (capitalization omitted).

[2] The Court may take judicial notice of information on the FDA website. *See, e.g.*, *United States v. Garcia*, 2015 WL 7313425, at *2 (W.D.N.C. Nov. 19, 2015).

Approximately a month after the inspection, Humacyte referenced the inspection on an earnings call. Defendant Niklason reported that the FDA had "completed its pre-licensing inspection of our manufacturing facilities in Durham, North Carolina as part of the BLA review process" and that "[w]e remain on track with our BLA review and commercial launch preparations, and we remain confident in the approvability of the HAV in vascular trauma." *Id.* ¶ 133(a). In response to a question, Defendant Prichard stated that "we feel like [the inspection] concluded very successfully," and "we have no indication that we're not on track" for approval. *Id.* ¶ 133(b), (d).

Thereafter, the FDA confirmed that Humacyte had successfully addressed all issues raised in the Form 483. It explained that Humacyte "adequately responded to the observations," "[a]ll inspectional issues were resolved," and "the inspection was classified as VAI." Ex. 1, SBRA at 10. "VAI," or "Voluntary Action Indicated," is a positive result, meaning "the agency has determined that the facility can voluntarily correct its deficiencies and *will not recommend any action.*" *Inspection Classification Database* (emphasis added). That is a different result than "OAI," or "Official Action Indicated," which means that "a facility is in an unacceptable state of compliance." *Id.*

## III. The FDA Extends its Approval Date and Publicly Releases the Form 483.

On August 9, 2024 — the day before the FDA's anticipated PDUFA date — the FDA told Humacyte that "additional time was required for review" of the BLA. Compl. ¶ 118(a). "FDA leadership expressed an apology for their inability to complete the review by the

PDUFA date . . . ." *Id.* ¶¶ 118–19. Humacyte immediately informed investors, issuing a press release about the delay. *Id.* The Company's stock dropped after the news. *Id.* ¶ 149.

Approximately two months later, on October 17, 2025, the FDA publicly released the Form 483 that it had previously issued to Humacyte. The Complaint alleges that the Company's stock price dropped once again following the release of the Form. *Id.* ¶ 155.

## IV. The Initial Complaint.

One month later, on November 18, 2024, James A. Cutshall filed the Initial Complaint against Humacyte and Individual Defendants, seeking to recover losses allegedly sustained from stock drops that occurred following the announcement that the FDA had delayed decision on the BLA and publication of the Form 483. Cutshall alleged that the Defendants had misled the market by failing "to disclose to investors that: (1) the Company's Durham, North Carolina facility failed to comply with good manufacturing practices . . . ; (2) that the FDA's review of the BLA would be delayed while Humacyte remediated these deficiencies; and (3) that as a result, there was a substantial risk to FDA approval of ATEV for vascular trauma . . . ." Initial Compl. ¶ 8.

## V. The FDA Approves Symvess.

On December 19, 2024 — about a month after the Initial Complaint — the FDA approved Humacyte's BLA for Symvess. The FDA released a number of documents supporting its approval decision, including its Summary Basis for Regulatory Action ("SBRA") and other materials (collectively, the "BLA File").

The SBRA explains that FDA approval of Symvess was warranted because "the benefits outweigh the risks." Ex. 1, SBRA at 17. Although reviewers noted "safety risks of graft rupture, anastomotic failure, and thrombosis" — the same risks associated with existing arterial-repair methods — they concluded that those risks "can be adequately mitigated through product labeling" and that Symvess should be approved given the "lack of appropriate treatment options for the indicated population." *Id.* at 4, 17.

Significantly, the BLA File offers no support for Plaintiffs' theory that the FDA's inspection of the Durham facility caused the delay. To the contrary, the File reflects that Humacyte's facility was "found to be sufficient and acceptable" and that, as noted above, the Company successfully addressed all issues identified in the inspection. Ex. 1, SBRA at 9–10. The FDA found that Humacyte had "validated the manufacturing process at the Humacyte commercial manufacturing site" by demonstrating "reliable and consistent manufacture of SYMVESS batches which met established release acceptance criteria." *Id.* at 6. The agency thus "conclude[d] that the manufacturing material, process, and controls can yield SYMVESS with consistent quality attributes." *Id.*

Consistent with the FDA's rigorous review, the File carefully weighed Humacyte's clinical trial methodology. In several respects, FDA adopted a more "conservative" approach to interpreting the results of Humacyte's trials than Humacyte did. Ex. 4, CR at 19. For example, the FDA counted all patients for whom Humacyte could not collect thirty-day data as treatment failures, and classified one adverse event as a "rupture" that Humacyte's independent adjudication committee deemed a "vascular graft complication."

*Id.* at 19, 55. Despite these conservative adjustments, the FDA concluded that in "both studies, the ATEV demonstrates a clinically meaningful benefit in restoring blood flow in the affected limb and ultimately limb salvage," and that the trials thus demonstrated "substantial evidence of effectiveness" outweighing any risks. *Id.* at 6, 74. The BLA File included a long list of FDA reviewers who signed off on approval and consented to having their names disclosed. *See, e.g.*, Ex. 1, SBRA at 2. On news of the FDA's approval, Humacyte's stock price increased. Compl. ¶ 47.

## VI. The Articles.

On March 25 and 26, 2025, articles about Symvess were published in the *New York Times* and *Bloomberg* (the "Articles"). Compl. ¶¶ 50–62. Both Articles reported the opinions of Dr. Robert E. Lee, a disgruntled former FDA employee who dissented from the FDA's approval decision and claimed that Symvess presented unacceptable risks including the possibility of rupture without warning. The Articles also cited details from the BLA File discussed above, including discussion of adverse events from Humacyte's trials and the FDA's critiques of those trials. Although the Articles generated attention, most of the information they contained was already public, including Dr. Lee's dissenting opinions, which already had been publicly released in the BLA File. *See* Ex. 4, CR at 22.

## VII. The First Amended Complaint.

Shortly after the Articles were published, Plaintiffs successfully moved the Court for an extension of time to file an amended complaint — in part, to include reference to the Articles. ECF 31, at 3. On May 22, 2025, Plaintiffs filed a 170-page Complaint that

reinvented their case. Instead of focusing on the purported delay and risk of non-approval arising from the manufacturing facility conditions observed in the FDA Form 483, the Complaint alleges three separate "frauds": a "Product Safety" fraud, based on alleged misrepresentations and omissions concerning the safety of Symvess; a "Facility" fraud, based on alleged misrepresentations and omissions concerning manufacturing problems; and a "Liquidity" fraud, based on alleged misrepresentations and omissions concerning the Company's finances. Compl. ¶ 4. As explained below, all three theories fail.

## ARGUMENT

Securities fraud claims are subject to stringent pleading requirements. *First*, under Federal Rule of Civil Procedure 9(b), any complaint alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). *Second*, plaintiffs must satisfy the PSLRA's "[e]xacting pleading requirements," which serve "[a]s a check against abusive litigation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The plaintiff must also state with particularity, as to each defendant, facts giving rise to a "strong inference" that the defendant acted with the required state of mind — here, scienter. *Id.* § 78u-4(b)(2)(A).

Plaintiffs fall far short of meeting these standards, because the Complaint fails both (1) to plead an actionable false statement or omission, and (2) to establish a "strong inference" that any of the Defendants acted with scienter.

## I. Plaintiffs' Section 10(b) Claim Should Be Dismissed for Failure to Plead an Actionable Misrepresentation or Omission.

The first element of any Section 10(b) claim is "a material misrepresentation or omission by the defendant." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Here, the Complaint fails to plead a material misrepresentation or omission with the particularity the PSLRA requires. Instead of specifying each alleged misleading statement and the reasons it is misleading, Plaintiffs simply block quote dozens of different statements. Courts repeatedly have rejected such scattershot pleading, which leaves "the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37–38 (2d Cir. 2012). While this is reason enough to dismiss the Complaint, the pleading also fails because none of the statements Plaintiffs challenge include any actionable misrepresentation or omission.

### A. Plaintiffs Fail to Plead that Defendants Misled Investors About Product Safety.

Plaintiffs' "Product Safety" claim accuses Defendants of misleading investors in four basic ways. First, Plaintiffs allege that Defendants "omitted or downplayed" the safety risks discussed in the BLA File and Articles. Compl. ¶ 125(a). Second, they claim that Defendants hid purported flaws in Humacyte's clinical trial design from investors. *Id.* ¶ 125(b)–(f). Third, they assert that the FDA delayed approval *because of* safety concerns, and that Defendants knew and concealed that fact. *Id.* ¶ 125(g). Finally, they allege that

Defendants concealed quality-control issues that purportedly made Symvess unsafe. *Id.* ¶ 125(h). None of these theories is viable.

### 1. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About Safety Risks.

Notwithstanding Plaintiffs' conclusory allegation that Defendants "omitted or downplayed" safety risks, *id.* ¶ 125(a), the Complaint fails to allege any facts establishing that Defendants actually concealed any safety risk. To the contrary, materials referenced in the Complaint, or that the Court may judicially notice, demonstrate that Defendants disclosed all of the risks Plaintiffs identify. Humacyte reported adverse events that occurred during the trials, including deaths. *See id.* ¶ 158; Ex. 5, 2023 10-K, at 17–18. It also reported the risk of "thrombosis" and "rupture" — which are, again, risks associated with existing arterial-repair treatments." *Id.* at 8, 17–18. Similarly, Humacyte issued a press release within hours of receiving FDA approval that prominently disclosed the FDA's boxed warning, other key safety considerations, and contraindications. *See* Ex. 6, Dec. 19, 2024 Press Release at 2. Thus, Defendants fully disclosed material product safety risks to investors.

Unable to demonstrate that any product risk was actually concealed, Plaintiffs focus on arguments that the Defendants *interpreted* data differently than some FDA reviewers. For example, the Complaint alleges that, while Humacyte's independent adjudication committee deemed one incident a "vascular graft complication," FDA reviewers classified that incident as a "rupture." Compl. ¶ 125(a). Similarly, the Complaint notes that (i) the FDA Approval file characterized certain risks as "worrisome" or "concerning" and

(ii) these "dire safety risks" were significant to Dr. Robert E. Lee, who disagreed with the FDA's conclusion that Symvess' benefits outweighed its risks. *Id.* These allegations do not and cannot state a claim for securities fraud, because the fact that Humacyte may have interpreted data differently than certain other parties cannot establish that it made *a false representation of fact*.

As the Fourth Circuit has explained, "[i]t would be a stretch for us to find the existence of false or misleading statements where 'a defendant's competing analysis or interpretation of data is itself reasonable,' regardless of Plaintiffs' disagreement with the study's 'researchers and scientists.'" *Employees' Ret. Sys. of Baton Rouge & E. Baton Rouge*, 61 F.4th 369, 385 (4th Cir. 2023) (citation omitted); *see also Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 567 (M.D.N.C. 2018). Here, nothing in the BLA File suggests that Humacyte's interpretation was unreasonable — let alone nefarious, as Plaintiffs intimate.

At bottom, "[i]nterpretations of clinical trial data are considered opinions." *Employees'*, 61 F.4th at 387 (citation omitted). And under securities law, opinions are not actionable unless they are "both false and not honestly believed when they were made." *Id.* (citation omitted); *see also Hirtenstein*, 348 F. Supp. 3d at 555–56. Plaintiffs make no plausible allegations of that kind here.

**2. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About the Trials.**

The bulk of Plaintiffs' Product Safety allegations criticize Humacyte's clinical trials. But although Plaintiffs try to frame these criticisms as securities fraud, they boil down to

disagreements with how Humacyte designed and conducted clinical trials — differences in scientific judgment that are not actionable under the federal securities laws. As the Fourth Circuit has explained, "[s]ecurities law is simply not a vehicle through which courts will police … the parameters of clinical trials." *Employees'*, 61 F.4th at 388 (citation omitted).

Moreover, none of Plaintiffs' criticisms demonstrate that Defendants made any false or misleading statement. Plaintiffs' chief contention appears to be that Defendants concealed limitations in Humacyte's trial methodology. But "[w]here a company accurately reports the results of a scientific study," — as Humacyte did — "it is under no obligation to second-guess the methodology of that study." *Id.* at 385 (citation omitted). That Defendants worked with the FDA on various trial-design issues does not change that result. Courts have "rejected claims of material omissions where pharmaceutical companies did not reveal procedural or methodological commentary . . . from the FDA" during the review process. *In re Novan, Inc.*, 2018 WL 6732990, at *10 (M.D.N.C. Nov. 30, 2018).

Even if that were not the law, Plaintiffs' claim would fail because Defendants disclosed that its clinical trials had various limitations that might lead to a determination "that such trials do not adequately establish the safety and effectiveness of our products." Ex. 5, 2023 10-K at 59. For example, Humacyte explained to investors the "limitations," potential "bias," and resulting regulatory risks of its clinical trial methodology. *Id.* The Company thus disclosed the potential limitations of its clinical trials.

Plaintiffs also overstate their case in suggesting that Humacyte's clinical trials were hopelessly flawed. Notwithstanding Plaintiffs' effort to cherry pick and amplify every negative-sounding detail from the BLA File, the FDA accepted the design of Humacyte's clinical trials and relied on the results from those trials in approving Humacyte's BLA. The FDA had the authority to place either trial on clinical hold if it was "clearly deficient in its design to meet its stated objectives" or if it deemed the trial unsafe. 21 C.F.R. ¶ 312.42(b)(2). But instead, the FDA determined that the trials were "sufficient to support a request for traditional approval." Ex. 4, CR at 13. And, after the clinical trials were completed, the FDA approved Humacyte's BLA based on its conclusion that "both studies" demonstrated "clinically meaningful benefit" and "substantial evidence of effectiveness." *Id.* at 74; Ex. 1, SBRA at 17.

In sum, although Plaintiffs devote large portions of the Complaint to attacking Humacyte's clinical trials, disagreements over trial design do not amount to securities fraud. In the absence of any well-pleaded facts showing that Humacyte made misrepresentations concerning either of its clinical trials — and there are none[3] — the Complaint does not demonstrate any "Product Safety Fraud."

[3] In an effort to manufacture a false statement, Plaintiffs allege that the Defendants falsely informed investors that "benchmarks were agreed to with the FDA." Compl. ¶¶ 103, 125(d). The only example they give, however, is Niklason's statement that the FDA agreed to "*the literature review and the meta-analysis*" — as opposed to the benchmarking method as a whole. *Id.* ¶ 104(b) (emphasis added); *see also id.* ¶ 106(b). Nowhere does the Complaint plead facts demonstrating that this statement was false — i.e., that the FDA did not agree to the literature review or meta-analysis.

### 3. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About the FDA Delay.

Plaintiffs try to manufacture another category of "Product Safety Fraud" by asserting that the Defendants misled investors by concealing, in press releases and earnings calls, that "the FDA delayed the PDUFA date, in response to dire, nonpublic safety and statistical concerns . . . so a panel of three external reviewers could assess the BLA." Compl. ¶ 125(g). In reality, while Humacyte disclosed the delay, it said nothing about the FDA's reasons and thus cannot have misled investors about why the FDA required additional time. Moreover, the Complaint contains no well-pleaded factual allegations establishing the reasons for the delay — much less that the reasons were known to Humacyte at the relevant time.

### 4. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About Quality Control.

The final way that Plaintiffs allege Defendants misled investors about product safety is by not disclosing that "quality control failure was a known risk at Humacyte." Compl. ¶ 125(h). The claim fails for myriad reasons. First, Plaintiffs do not identify any false statement about quality control. Second, contrary to Plaintiffs' assertion that Humacyte had significant quality control problems, the FDA concluded that Humacyte could "yield SYMVESS with consistent quality attributes." Ex. 1, SBRA at 6. Third, Defendants disclosed quality control risks — extensively. For example, Defendants' 2023 10-K included a substantial section titled "Risks Related to Manufacturing Our Product Candidates" that explained, among other things, that "[t]he process of manufacturing our

HAVs is complex, highly regulated and subject to multiple risks" and is "susceptible to product loss due to a range of factors," which they detailed. Ex. 5, 2023 10-K at 66. These disclosures fully apprised investors of the risk of quality control problems.

### B. Plaintiffs Fail to Plead that Defendants Misled Investors About Their Manufacturing Facility.

Plaintiffs challenge (i) statements about the FDA's inspection of Humacyte's Durham manufacturing facility, and (ii) statements about Humacyte's manufacturing capabilities more generally. Despite Plaintiffs' allegations, none of these statements were false or misleading.

#### 1. Plaintiffs Do Not Allege Facts Establishing That Defendants Misled Investors About the FDA Inspection.

During the March 22, 2024 earnings call, Defendant Niklason stated that "we're feeling very confident about how this inspection is going to go," "[w]e believe that the facility is in great shape," and "we believe we're in good shape." Compl. ¶ 130. Although Plaintiffs assert that these statements were misleading because the FDA *subsequently* issued a Form 483, it is black letter law that a statement must be false *when made* in order to give rise to liability; claims of fraud by hindsight are not actionable. *See generally Raab v. Gen. Physics Corp.*, 4 F.3d 286, 291 (4th Cir. 1993) ("hindsight does not establish fraud"). In keeping with this rule, courts repeatedly have held that positive statements about expectations for an upcoming FDA inspection are not rendered false or actionable simply because the FDA *later* identifies issues in a Form 483. *See, e.g.*, *Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *8 (N.D. Cal. Apr. 2, 2024) (statements

that defendants felt "good" or "confident" about upcoming FDA inspection were not "false when made" even though FDA *later* made observations on Form 483); *Luo v. Spectrum Pharms., Inc.*, 2024 WL 4443323, at *14 (D. Nev. Oct. 7, 2024) ("Nor does the fact that the FDA found multiple deficiencies at the actual inspection mean that [defendants] must have known the facility was not ready or that it was likely to be deficient.").

Plaintiffs also challenge various post-inspection statements on or after the Company's May 2024 earnings call to the effect that "we feel like [the inspection] concluded very successfully," and "we have no indication that we're not on track" for BLA approval. Compl. ¶ 133(b), (d). The Complaint alleges that these statements were misleading because they concealed that the FDA had by then issued the Form 483 to Humacyte. But a Form 483 is a non-final document that Defendants were under no duty to disclose. *See, e.g.*, *Schaeffer v. Nabriva Therapeutics PLC*, 2020 WL 7701463, at *9 (S.D.N.Y. Apr. 28, 2020) ("Because a Form 483 is interim FDA feedback, there is no standalone duty to disclose its existence."); *In re Novan*, 2018 WL 6732990, at *11 ("[C]ourts have rejected claims of material omissions where pharmaceutical companies did not reveal . . . interim status reports, received from the FDA . . . ." (citation omitted)). And Plaintiffs' theory concerning the Form 483 is one that was rejected by the First Circuit in a case with strikingly similar allegations.

In *In re Genzyme Corporation Securities Litigation*, 754 F.3d 31 (1st Cir. 2014), after the FDA inspected the defendants' biologics plant, the defendants expressed the belief that "the likelihood of approval seems to be more certain" without disclosing that the

agency had issued a Form 483. *Id.* at 36. As in this case, the Form 483 was subsequently disclosed to the market, and the FDA announced a delay in the PDUFA date. The plaintiffs argued that the defendants misleadingly failed to disclose that a Form 483 had been issued and would likely delay approval of the BLA. The First Circuit rejected the claim "for several reasons," including that there is no duty to disclose a Form 483 and that no facts showed that the Form 483 caused the delay. *Id.* at 41–42. Each of those reasons apply with equal force here.

Here, moreover, none of the issues the FDA identified in the Form 483 were inconsistent with Defendants' statements. As explained in the BLA File, although the FDA observed manufacturing issues in its Form 483, Humacyte "adequately responded to the observations," "[a]ll inspectional issues were resolved," and the FDA rated the inspection "VAI," not "OAI." Ex. 1, SBRA at 10. The inspection thus concluded successfully, just as Niklason opined it had. The Company also remained on track for BLA approval, as evidenced by the FDA's approval of the BLA months later in December of 2024. In short, the challenged statements were neither false when made nor false in hindsight. And, of course, even if they had proven wrong in hindsight, that would not suffice to state a claim. *See Raab*, 4 F.3d at 290.

Defendants' pre- and post-inspection statements are also not actionable because they are opinions. *See, e.g.*, *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 214 (4th Cir. 1994) (statements of belief about what company was "on track" to do were non-actionable opinions); *Hirtenstein*, 348 F. Supp. 3d at 557 (discussing case finding that

"statements of opinion that biopharmaceutical company was 'confident'" were non-actionable "when couched in phrases like . . . 'we felt'" (citation omitted)). Opinions "are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis." *Employees'*, 61 F.4th at 387 (citation omitted). Plaintiffs allege no facts showing that Defendants did not believe the opinions they expressed — about the Company being "in good shape," the inspection concluding successfully, or the BLA remaining on track. Nor do they plead any facts showing that the Defendants lacked a reasonable basis for those opinions. To the contrary, Plaintiffs ultimately concede, as they must, that the inspection issues were resolved, and the BLA was approved.

In addition, several of the challenged statements — including predictions that the Company remained on track for BLA approval — are forward-looking statements that are protected from liability under the PSLRA's safe harbor. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (statements that company was "on track" for "projected timelines" protected by safe harbor). Under the safe harbor, a "forward-looking statement" is not actionable if (a) it is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (b) the plaintiff fails to prove it was made with "actual knowledge" of falsity. 15 U.S.C. § 78u-5c(1). The provision "is written in the disjunctive," meaning that a forward-looking statement is non-actionable if *either* condition applies. *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 757 (E.D.N.C. 2017) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).

Here, both conditions apply. Plaintiffs do not allege any facts showing that Defendants actually knew that these forward-looking statements were false. And Humacyte identified the statements as forward-looking and accompanied them with meaningful cautionary language apprising investors of the relevant risks. *See, e.g.*, Ex. 7, March 22, 2024 Earnings Call at 4; Ex. 8, May 10, 2024 Earnings Call at 4. Among other risk factors, Humacyte pointed investors to warnings in its 10-K that "[m]anufacturing facilities are subject to significant government regulations and approvals," that "the FDA issues what are referred to as 'Form 483s' that set forth . . . concerns that are identified during its inspections" and that failure to correct regulatory issues could ultimately "delay or prevent filing or approval." Ex. 5, 2023 10-K at 66–67; Ex. 9, 2022 Form 10-K at 66; *see also Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 550 (M.D.N.C. 2013) (cautionary language in 10-K "incorporated by reference" in other forward-looking statements "sufficient as a matter of law to activate the PSLRA's safe harbor"). The challenged statements are therefore protected from liability under the PSLRA safe harbor.

### 2. Plaintiffs Do Not Allege Facts Establishing that Defendants Misled Investors About Manufacturing Capabilities.

The remaining facility-related statements Plaintiffs challenge concern Humacyte's manufacturing capabilities generally. Plaintiffs assert that these statements were shown false by either the Form 483 or Confidential Witness accounts. Plaintiffs are wrong.

Plaintiffs allege no facts showing that Defendants' statements about their manufacturing capabilities were ever proven false — much less that they were false when

made. Nor could they: the FDA concluded that Humacyte could produce Symvess with sufficient yield and quality.

Further, many of the statements Plaintiffs challenge — including comments about what Defendants "believe[d]" or "expected" with respect to their manufacturing capabilities — are opinions. Compl. ¶¶ 128–129, 131(a), 131(c). As discussed above, opinions are not actionable absent facts establishing that they were not subjectively believed or lacked a reasonable basis. *See supra* Section I.A.1. The Complaint alleges no such facts.[4]

### C. Plaintiffs Fail to Plead that Defendants Misled Investors About Liquidity.

Finally, Plaintiffs assert that Defendants made false or misleading statements about Humacyte's "liquidity" in three ways. First, they claim that Defendants did not explain that their liquidity projections were contingent on the Oberland Funding Agreement. Compl. ¶ 143(b)–(c). Second, they assert that various statements projecting that Humacyte had at least 12 months of liquidity were false. *Id.* ¶ 143(a), (d). And third, they accuse

[4] Additionally, many of the statements are protected under the PSRA's safe harbor. Humacyte identified its statements about "our ability to manufacture HAVs and other product candidates in sufficient quantities" as "forward-looking statements" under the PSLRA. Ex. 5, 2023 10-K, at 3. Plaintiffs do not allege facts showing Defendants actually knew that these statements were false, as the safe harbor requires to impose liability for a forward-looking statement. Defendants also framed their statements in meaningful cautionary language, warning, inter alia, that "[t]he manufacture of our product candidates is complex, we have not manufactured commercial product, and we may encounter difficulties in production." *Id.* at 57. That language alone shields Humacyte's forward-looking statements about manufacturing capabilities from liability. *See TransEnterix, Inc.*, 272 F. Supp. 3d at 757

Defendants of concealing problems caused by Humacyte's purportedly "insufficient capital." *Id.* ¶ 143(e). Each of those assertions fails.

**1. Purported Failure to Disclose Reliance on Oberland Funding Agreement.**

Plaintiffs allege that various projections that Humacyte would have sufficient cash and cash equivalents on hand to fund operations for 12 months were misleading, because Defendants allegedly failed to disclose that the projections relied on funds from the Oberland Funding Agreement that would be available only if Humacyte met certain milestones on a specified timeline. *Id.* ¶¶ 143(b)–(c). But Defendants explained just that. Humacyte disclosed that the projections were based on "cash and cash equivalents *and planned funding from the Oberland funding agreement*." *Id.* ¶ 139(b) (emphasis added). The Company also described the Oberland Funding Agreement in detail, including by disclosing that each tranche of funding under the Agreement was tied to milestones in commercializing Symvess. Ex. 5, 2023 10-K at 100. There is thus no merit to these allegations.

**2. 12-Month Liquidity Projections.**

Plaintiffs also challenge various statements projecting that Humacyte would have sufficient cash to fund operations for 12 months, alleging that the statements were misleading because they "concealed that Humacyte needed to repeatedly access the capital markets," including in February, September, and November of 2024 and March of 2025. Compl. ¶ 143(a), (d). But the fact that Humacyte raised funds at those times does not mean that any of its earlier 12-month liquidity projections were false when made. A company

may decide to raise funds well before it runs out of capital and, indeed, it is only prudent to do so.

Moreover, the projections also cannot support a securities fraud claim for the independent reason that they are opinion statements that are not actionable absent proof that they lacked a reasonable basis or were not subjectively believed — neither of which Plaintiffs allege. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 289 (S.D.N.Y. 2011) ("statements that [defendant's] liquidity pool was sufficient to meet its expected needs over the next twelve months and that its liquidity position was 'strong' were statements of opinion"). In addition, the projections are protected by the PSLRA safe harbor because they were identified as forward-looking and accompanied by meaningful cautionary language including statements explaining that "[o]ur liquidity plans are subject to a number of risks and uncertainties," which Defendants detailed. Ex. 5, 2023 10-K at 3, 100; *see also In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 482 (S.D.N.Y. 2018) (defendants' "liquidity descriptions fall comfortably within the safe harbor provision of the PSLRA" where they are forward-looking and accompanied by cautionary statements).

**3. Alleged Negative Effects of Insufficient Capital.**

Finally, Plaintiffs assert that Defendants' liquidity projections were misleading because they allegedly "concealed problems at Humacyte's Durham Facility caused by insufficient capital," including the Company's unwillingness or inability to purchase a new maintenance management system. Compl. ¶ 143(e). This theory is equally flawed.

The Defendants' liquidity projections did not guarantee or even imply that Humacyte would have sufficient capital to purchase particular equipment or information systems. Moreover, Humacyte disclosed that "[a]dequate capital may not be available to us when needed or on acceptable terms," and that "[i]f we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts." Ex. 5, 2023 10-K at 100. The Company had no duty to go beyond these warnings and specifically disclose that it would not purchase specific equipment or systems, even assuming an investor might view that information as material. *See, e.g.*, *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information.").

## II. Plaintiffs' Section 10(b) Claim Should Be Dismissed for Failure to Plead Scienter.

Even if the Complaint had pleaded a false or misleading statement or omission, the Section 10(b) claim would fail because Plaintiffs do not adequately plead scienter. Under the PSLRA's heightened standard, plaintiffs must plead "with particularity facts giving rise to a strong inference" that each defendant acted with "the required state of mind" with respect to each alleged misleading statement. 15 U.S.C. § 78u-4(b)(2). As explained below, Plaintiffs' factual allegations fail to create any inference of scienter for any of the alleged frauds, let alone the required "strong inference."

### A. Plaintiffs Fail to Plead Scienter for the Alleged Product Safety Fraud.

The PSLRA requires that a Complaint plead "*facts*" establishing scienter. 15 U.S.C. § 78u-4(b)(2) (emphasis added). Accordingly, a plaintiff cannot "stack inference upon inference to satisfy the PSLRA's pleading standard." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017). Here, in an effort to establish scienter for their Product Safety claim, Plaintiffs rely on just such an impermissible chain of inferences. First, they ask the Court to draw the inference that certain purported safety or manufacturing issues were the reason for the FDA's delay, even though they allege no *facts* establishing that the FDA ever gave a reason for its delay. Second, they ask the Court to infer that the Defendants were aware that this was the reason for the delay. And third, they ask that the Court infer from these inferences that the Defendants acted culpably to conceal the FDA's safety-related reasons for the delay. The PSLRA does not allow a plaintiff to manufacture scienter from such a chain of unsupported inferences. *See id.* Instead, a complaint must plead specific facts known to the defendants that contradicted their public statements. *See Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *3 (W.D.N.C. Feb. 8, 2018) (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

Here, Plaintiffs plead no facts known to any Defendant that contradicted the statements challenged in the Complaint. While Plaintiffs attempt to plead that Humacyte had knowledge contradicting its statements that the BLA was on track — by suggesting that the Company was aware of safety-related concerns at FDA that would delay the application, *see, e.g.*, Compl. ¶¶ 168–69 — none of the BLA File documents on which

Plaintiffs rely establish that Humacyte knew that the BLA would be delayed before August 9, 2024, when the Company was first notified of the delay and disclosed it to the market. Plaintiffs allege that the FDA raised a variety of concerns with Humacyte at points during the review process — and on one unspecified occasion noted that it was "considering convening an Advisory Committee of outside experts," *id.* ¶ 165 — but these facts do not establish that the PDUFA date would necessarily be delayed, let alone that Humacyte reached this conclusion before the FDA informed it of the delay.

Plaintiffs also assert that Humacyte's correspondence with the FDA shows Defendants knew about safety concerns. *Id.* ¶¶ 167–76. But the fact that Defendants worked with the FDA to analyze and properly disclose safety-related information does not create a strong inference that Defendants acted culpably to *conceal* those issues. Quite the opposite: Defendants' candid correspondence with the FDA and their equally candid disclosures to investors about safety risks and clinical trial limitations supports the competing inference that Defendants had no desire to mislead the market. *See In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 755 (4th Cir. 2021) ("The breadth of Defendants' risk disclosures to investors further strengthens the competing inference of innocence.").

**B. Plaintiffs Fail to Plead Scienter for the Alleged Facility Fraud.**

Similarly, Plaintiffs assert that the Form 483, and references to discussions about manufacturing issues in the BLA File, establish that Defendants knowingly concealed manufacturing problems. But the fact that Defendants discussed Humacyte's

manufacturing facility or received a Form 483 does not establish that they culpably misled investors about manufacturing issues. Instead, the facts show that Defendants disclosed risks about manufacturing, corrected the minor issues identified in the FDA inspection, and kept investors updated throughout. *See supra* Section I.B.1. That Defendants did not immediately disclose the Form 483 — which they had no duty to do — does not show intent to deceive; rather, as the First Circuit recognized in *Genzyme*, the stronger inference is that Defendants simply believed that it would not result in any material issue or jeopardize the PDUFA date. *See In re Genzyme*, 754 F.3d at 42. And Plaintiffs identify no evidence that it did.

Plaintiffs also allege that Confidential Witness accounts establish Defendants' knowledge of facility-related "red flags" that give rise to an inference of scienter. Compl. ¶¶ 177–84. But even if the Confidential Witness accounts demonstrated that serious facility issues existed at Humacyte — which they do not — "red flags . . . do not give rise to a strong inference of scienter" in and of themselves. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 890 (4th Cir. 2014). Rather, Plaintiffs must allege facts establishing that Defendants knew about and concealed those problems from investors. *Id.* at 889–90. Plaintiffs fail to do so.

For the most part, Plaintiffs allege no direct contact between the Confidential Witnesses and Defendants. When confidential witnesses have a "general lack of direct contact with Defendants," that "weakens the inference" that the defendants knew about and concealed the issues alleged. *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609

(4th Cir. 2021). To the extent Plaintiffs allege any direct contact, it is only between certain Confidential Witnesses and Prichard. Compl. ¶¶ 180–81. But the most those allegations show is that Prichard worked with employees to address certain issues, not that she acted culpably to conceal them or that she knew any fact contradicting the Company's public statements. If anything, allegations that Prichard worked to address issues are "a sign of diligence" that supports the inference she is innocent, rather than being "evidence of a nefarious purpose." *Yates*, 744 F.3d at 889.

Plaintiffs make no allegations that Confidential Witnesses had direct contact with Niklason or Sander. Indeed, the only allegation they make about Sander's mental state concerning the purported facility fraud is that he had an "office[] on-site" at Humacyte's manufacturing facility. Compl. ¶ 179. These allegations are plainly insufficient to raise the requisite "strong inference" of scienter.

### C. Plaintiffs Fail to Plead Scienter for the Alleged Liquidity Fraud.

Finally, as to the alleged "liquidity" fraud, Plaintiffs advance hardly any theory of scienter, and identify nothing in Defendants' detailed disclosures about their finances that suggests any intent to defraud. If anything, those disclosures create a strong inference that Defendants are innocent by disclosing facts that Plaintiffs erroneously claim were concealed (e.g., the Oberland Funding Agreement) and otherwise warning investors about liquidity risks (e.g., that adequate capital might not be available). *See In re Triangle*, 988 F.3d at 755.

### D. Plaintiffs' Generalized Theories of Scienter Fail.

Plaintiffs also assert several more generalized theories of scienter. They allege that Defendants' trading activity evinces motive and opportunity to commit fraud. They also weakly raise a variety of other allegations. All fail.

#### 1. Plaintiffs Fail to Plead Motive and Opportunity.

Plaintiffs assert that the fact the Individual Defendants sold stock during the class period shows their "motive" to commit fraud. Compl. ¶¶ 185–87. But "[w]hile insider trading may also support an inference of scienter by revealing a motive and opportunity for profiting from the fraud, it only will do so if the timing and amount of the sale(s) are 'unusual or suspicious.'" *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (citation omitted). No such unusual or suspicious sales are alleged here.

As to Niklason, Plaintiffs do not allege that she sold any shares during the class period. In fact, they acknowledge that she *acquired* 121,851 shares. Compl. ¶ 187(a); *see Cozzarelli v. Inspire Pharms, Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (noting that "the total holdings of each defendant increased . . . , hardly suggesting that the defendants sought to dump their shares at an inflated price").

All of the stock sales that Plaintiffs associate with Niklason were conducted by her husband, Brady Dougan, through his LLC. Although Plaintiffs allege that Niklason "co-owns" the LLC, that is incorrect. Compl. ¶ 185(a). As explained in SEC filings, Dougan solely controls the LLC. Ex. 10, Aug. 21, 2023 Form 4. Dougan's sales do not establish Niklason's scienter. *See, e.g.*, *City of N. Miami Beach Police Officers' & Firefighters' Ret.*

*Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *7 (S.D.N.Y. Jan. 21, 2021) ("The Court is unaware of any decision finding sufficient motive and opportunity to commit securities fraud when family members of an individual defendant sold shares without any individual defendant also selling shares . . . .").

Nor do Plaintiffs allege anything else about Dougan's sales that raises a strong inference of Niklason's scienter. Indeed, the trading history they provide shows that on some of the days Dougan sold stock, Niklason *bought* shares, which forecloses any inference that she was orchestrating Dougan's sales to take advantage of an inflated price. Moreover, SEC filings explain the reason for Dougan's sales: that Dougan made them to pay down leverage and allow for investors to acquire Humacyte shares. Ex. 10, Aug. 21, 2023 Form 4. Plaintiffs do not address that innocent explanation.

The only transaction related to Niklason that Plaintiffs allege was suspiciously timed is not a sale, but a transfer of stock to a living trust, a normal estate-planning action. But as Plaintiffs acknowledge, a transfer — which simply changes the stock's ownership — is not a sale that realizes any gain. *See* Compl. ¶ 186. Accordingly, the transfer does not support Plaintiffs' theory that Niklason sold shares to take advantage of an inflated price. *See In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 n.31 (S.D.N.Y. 2023) (declining to find scienter based on transfer of shares to trust where complaint did "not allege any facts to support the claim that an intra-family transfer, unaccompanied by a sale, would be indicative of scienter").

Plaintiffs allege that Prichard sold all her stock on May 31, 2024. But this ignores the fact that Prichard retained a large equity stake in the form of stock options, continuing to hold them during the Class Period for months after they became vested and exercisable. *See* Ex. 11, Dec. 12, 2022 Form 4 (explaining that Prichard held 136,000 options that vested in monthly installments); Ex. 12, Dec. 20, 2024 Form 4 (showing no sales after May 31, 2024, despite options vesting each month). This evidence of Prichard's continuing equity stake undermines Plaintiffs' argument.

And even if Prichard had sold her entire equity stake, the Fourth Circuit has recognized that a defendant's selling "100%" of her shares does not establish scienter unless accompanied by other "facts sufficient to generate the required 'strong inference'" of culpability. *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007). Plaintiffs allege no such facts here. The sole additional fact they allege is that Prichard sold a week-and-a-half after Humacyte's meeting with the FDA on May 20, 2024. Compl. ¶ 186. But that data point proves nothing. It is "difficult to infer intent from the mere fact of a stock sale" during a "lengthy class period," because "it is not unusual for insiders to trade at some point during their tenure with a company." *Yates*, 744 F.3d at 891. Moreover, Plaintiffs allege that Humacyte and the FDA communicated constantly through much of the class period, so in context, Prichard's selling several days after one of those meetings is nearly meaningless. And, despite Plaintiffs' effort to suggest that Prichard learned negative information in the FDA meeting that was withheld from investors, the FDA ultimately approved Symvess, leading the stock price to spike on the approval date.

Knowing what the FDA knew would have incentivized Prichard to hold her stock until the approval decision — not sell it.

As with many of Plaintiffs' other assertions about scienter, their allegations about Sander are an afterthought. Plaintiffs allege that Sander sold stock once in August 2024, for an amount less than a quarter of his annual compensation. Compl. ¶¶ 185(c), 187(c). They allege nothing suspicious about the timing of Sander's sale. In fact, Sander sold two-and-a-half weeks after the FDA announced its delay and the stock price fell, *see id.*, undermining Plaintiffs' theory that Defendants concealed information for personal gain.

#### 2. Plaintiffs' Other Miscellaneous Allegations Fail to Plead Scienter.

Finally, Plaintiffs raise a hodgepodge of other points that they assert support scienter. Each fails.

***Raising Funds.*** Plaintiffs assert that Humacyte's raising funds establishes scienter. *Id.* ¶¶ 188–89. But courts have consistently rejected arguments that corporate capital raising creates a strong inference of scienter. *See Cozzarelli*, 549 F.3d at 627. As those courts have recognized, "the motivations to raise capital . . . are common to every company and thus add little to an inference of fraud" — particularly for biotechnology startups like Humacyte, for which capital is the "lifeblood of innovation." *Id.* Indeed, Plaintiffs themselves acknowledge that as a "pre-revenue biotechnology company . . . Humacyte required and secured substantial capital investment" to address entirely legitimate capital needs. Compl. ¶ 22. Moreover, the timing of the activities Plaintiffs allege utterly fails to support their theory that "Humacyte raised funds while the price of its securities was

inflated by the alleged fraud." *Id.* ¶ 188. Most of the fundraising Plaintiffs identify happened after the FDA's delay and after the March 2025 Articles, when the Complaint alleges that Humacyte's stock price dropped. If the Company had been engaged in a nefarious scheme to raise capital by selling stock at an inflated price, it would have done so before these disclosures allegedly caused its stock to drop.

***"Core Operations."*** Plaintiffs assert scienter under a "core operations" theory. But the Fourth Circuit has stated that "in accordance with several of our sister circuits, we reject plaintiffs' contention that the individual defendants must have acted intentionally or recklessly with respect to the [alleged fraud] merely because (1) they were senior executives, and (2) the [alleged fraud] represented a core business of the Company." *Yates*, 744 F.3d at 890 (citation omitted). Plaintiffs allege nothing more.

***SEC Filings.*** Plaintiffs briefly argue that Defendants' filing SEC disclosures demonstrates scienter as to alleged misrepresentations in those filings. Compl. ¶¶ 193–94. That is another theory that the Fourth Circuit has rejected, stating that the "bare allegation" that a defendant signed documents "does not provide independent support for an inference of scienter." *Cozzarelli*, 549 F.3d at 628 n.2. Plaintiffs' cursory paragraphs on this theory contain nothing beyond such bare allegations.

***Alleged Violation of Company Policies.*** Plaintiffs also allege that Defendants violated company policies, and that those violations establish scienter. Compl. ¶¶ 195–97. The Fourth Circuit has rejected that theory, too, explaining that alleging a defendant "violated its own . . . policy" does not establish scienter unless the plaintiff alleges

additional "indicia of fraudulent intent." *Svezzese v. Duratek, Inc.*, 67 F. App'x 169, 173 (4th Cir. 2003). Plaintiffs allege no such facts.

***Personnel Changes.*** Plaintiffs' attempt to allege scienter by identifying three individuals — and only three, during the entire nineteen-and-a-half-month class period — who left Humacyte. Compl. ¶¶ 198–200. This small number of departures provides no basis to infer scienter; to the contrary, even a "high turnover" of executives does not raise a strong inference of scienter on its own. *Yates*, 744 F.3d at 889; *see also Hirtenstein*, 348 F. Supp. 3d at 561 ("Without additional relevant factual allegations, '[s]ubsequent resignations by executives are insufficient to support a strong inference of scienter.'" (alteration in original) (citation omitted)). And Plaintiffs allege no other facts about the departures that raises such an inference. Indeed, the timing inferences Plaintiffs suggest contradict each other. Plaintiffs call it "suspicious" that two board members left before FDA approval and "while the alleged fraud was ongoing," but also "suspicious" that an officer left nearly a year later, *after* FDA approval and "close to the end of the fraud." Compl. ¶¶ 199–200. Under that reasoning, *any* departure during the class period would support scienter.

## III. Plaintiffs' Section 20(a) Claim Should Be Dismissed.

"Control person" liability under Section 20(a) is derivative of — and dependent upon — the primary liability of a controlled person under section 10(b)." *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018). Because Plaintiffs fail to establish primary liability under Section 10(b), their Section 20(a) claim necessarily fails. *See Yates*, 744 F.3d at 894

n.8 ("Because the complaint is legally insufficient with respect to the § 10(b) claim, the § 20(a) claim must also fail.").

**CONCLUSION**

For the forgoing reasons, the Complaint should be dismissed with prejudice.

By /s/ *Mark P. Gimbel*

COVINGTON & BURLING LLP

Mark P. Gimbel
N.Y. State Bar No. 2998102
James H. Fitch
N.Y. State Bar No. 6150411
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Ph: (212) 841-1000
mgimbel@cov.com
jhfitch@cov.com

SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P.

*/s/ Clifton L. Brinson*
Clifton L. Brinson
N.C. Bar No. 34331
Mary Stewart Wilson
N.C. Bar No. 61169
P.O. Box 2611
Raleigh, NC 27602-2611
Ph: (919) 821-1220
Fax: (919) 821-6800
cbrinson@smithlaw.com
mswilson@smithlaw.com

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE WITH LR 7.3(d)(1)

Pursuant to Local Rule 7.3(d)(1) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina, and the Court's order modifying Rule 7.3(d)(1)'s word-limit, *see* ECF No. 39, counsel for Defendants Humacyte, Inc., Laura E. Niklason, Dale A. Sander, and Heather Prichard certify that the foregoing brief, which was prepared using Times New Roman 13-point proportional font, is 9,980 words.

By *<u>/s/ Mark P. Gimbel</u>*

COVINGTON & BURLING LLP

Mark P. Gimbel
N.Y. State Bar No. 2998102
James H. Fitch
N.Y. State Bar No. 6150411
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Ph: (212) 841-1000
mgimbel@cov.com
jhfitch@cov.com

SMITH, ANDERSON, BLOUNT, DORSETT, MITCHELL & JERNIGAN, L.L.P.

*<u>/s/ Clifton L. Brinson</u>*
Clifton L. Brinson
N.C. Bar No. 34331
Mary Stewart Wilson
N.C. Bar No. 61169
P.O. Box 2611
Raleigh, NC 27602-2611
Ph: (919) 821-1220
Fax: (919) 821-6800
cbrinson@smithlaw.com

mswilson@smithlaw.com

*Attorneys for Defendants*