IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE HUMACYTE, INC. SECURITIES LITIGATION | Case No. 1:24-cv-954-WO-JEP |
| This Document Relates to:<br><br>ALL ACTIONS | CLASS ACTION |

**DECLARATION OF MARK P. GIMBEL IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

**MARK P. GIMBEL** declares pursuant to 28 U.S.C. § 1746 as follows:

1. I am a partner of Covington & Burling LLP, counsel to Humacyte, Inc. ("Humacyte"), Laura E. Niklason, Dale A. Sander, and Heather Prichard (collectively, "Defendants"). I make this declaration in support of Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint for Violations of the Federal Securities Laws in order to place before the Court documents relevant to its determination of the Motion.

2. Attached as **Exhibit 1** is a true and correct copy of the Summary Basis for Regulatory Action released by the U.S. Food and Drug Administration ("FDA") in connection with its approval of Humacyte's Biologics License Application ("BLA") for Symvess.

3. Attached as **Exhibit 2** is a true and correct copy of the CBER CMC BLA Review Addendum released by the FDA in connection with its approval of Humacyte's BLA for Symvess.

4. Attached as **Exhibit 3** is a true and correct copy of the Statistical Review Memorandum released by the FDA in connection with its approval of Humacyte's BLA for Symvess.

5. Attached as **Exhibit 4** is a true and correct copy of the Clinical Review Memorandum released by the FDA in connection with its approval of Humacyte's BLA for Symvess.

6. Attached as **Exhibit 5** is a true and correct copy of Humacyte's 2023 Form 10-K filed for the 2023 Humacyte fiscal year ending December 31, 2023.

7. Attached as **Exhibit 6** is a true and correct copy of a Humacyte press release dated December 19, 2024.

8. Attached as **Exhibit 7** is a true and correct copy of the transcript of Humacyte's Q4 2023 earnings call held on March 22, 2024.

9. Attached as **Exhibit 8** is a true and correct copy of the transcript of Humacyte's Q1 2024 earnings call held on May 10, 2024.

10. Attached as **Exhibit 9** is a true and correct copy of Humacyte's 2022 Form 10-K filed for the 2022 Humacyte fiscal year ending December 31, 2022.

11. Attached as **Exhibit 10** is a true and correct copy of the Form 4 filed by Laura Niklason dated August 21, 2023.

12. Attached as **Exhibit 11** is a true and correct copy of the Form 4 filed by Heather Prichard dated December 12, 2022.

13. Attached as **Exhibit 12** is a true and correct copy of the Form 4 filed by Heather Prichard dated December 20, 2024.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2025 in New York, New York.

By: */s/ Mark. P. Gimbel*
Mark P. Gimbel

# EXHIBIT 1

# Summary Basis for Regulatory Action

| | |
|---|---|
| **Date:** | December 19, 2024 |
| **From:** | Jin Sung Hong, PhD<br>Review Committee Chair<br>Office of Cell Therapy and Human Tissues (OCTHT)<br>Office of Therapeutic Products (OTP) |
| **BLA STN:** | BLA 125812/0 |
| **Applicant:** | Humacyte Global, Inc. |
| **Submission Receipt Date:** | December 11, 2023 |
| **PDUFA*<br>Action Due Date:** | *August 10, 2024<br>Action Date: December 19, 2024 |
| **Proper Name:** | acellular tissue engineered vessel-tyod |
| **Proprietary Name:** | SYMVESS |
| **Indication:** | SYMVESS is an acellular tissue engineered vessel indicated for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. |

* PDUFA=Prescription Drug User Fee Act

**Recommended Action:** The Review Committee recommends approval of this product.

**Director, Product Office**

**Director, Office of Compliance and Biologics Quality**

| Discipline Reviews | Reviewer / Consultant - Office/Division |
|---|---|
| **CMC**<br>• CMC Product (Product Office and OCBQ/DBSQC)<br>• Facilities review (OCBQ/DMPQ)<br>• Establishment Inspection Report (OCBQ/DMPQ and Product Office)<br>• QC, Test Methods, Product Quality (OCBQ/DBSQC) | Jin Sung Hong, PhD, OTP/OCTHT<br>Wen (Aaron) Seeto, PhD, OTP/OCTHT<br>Pratima Labroo, PhD, OTP/OCTHT<br>Zainab Mansaray Storms, PhD, OCBQ/DMPQ<br>Hyesuk Kong, OCBQ/DBSQC<br>James Kenney, OCBQ/DBSQC<br>Wei Tu, OCBQ/DBSQC/LBVI<br>Salil Ghosh, MS, PhD, OCBQ/DBSQC<br>Kenneth Phillips, OCBQ/DBSQC<br>Marie Anderson, MS, PhD, OCBQ/DBSQC<br>Iryna Zubkova, PhD, CBER/OCBQ/DMPQ |
| **Clinical**<br>• Clinical (Product Office)<br>• Postmarketing safety Pharmacovigilance review (OBPV/DE)<br>• BIMO | Prateek Shukla, MD, OTP/OCE<br>Bethany Baer, MD, OBPV/DPV<br>Triet Tran, PharmD, BCSCP, OCBQ/DIS |
| **Statistical**<br>• Clinical data (OBPV/DB)<br>• Non-clinical data | Thomas Zhou, PhD, OBPV/DB |
| **Non-clinical/Pharmacology/Toxicology**<br>• Toxicology (Product Office)<br>• Developmental toxicology (Product Office)<br>• Animal pharmacology | David Cantu, PhD, OTP/OPT |
| **Labeling**<br>• Promotional (OCBQ/APLB)<br>• USPI Review | Michael Brony, PharmD, OCBQ/DCM/APLB<br>Afsah Amin, MD, MPH, OTP/OCE |
| **Other Review(s) not captured above categories, for example**:<br>Consults:<br>• OBPV Clinical Analyst<br>• CRDH<br>• OPPT/Hemostasis Branch<br>• DHT<br>• ORMRR Regulatory Project Manager | Elin Cho, MS, OBPV/<br>Robert Lee, MD, CDRH/OPEQ/OHTII/DHTIIB<br>Andrey Sarafanov, PhD CBER/OTP/OPPT/DH/HB2<br>Hanh Khuu, MD, CBER/OTP/OCTHT<br>Helen Sansone, CBER/OTP/ORMRR |
| Advisory Committee Summary | N/A |

**Table of Contents**

1. Introduction ........................................................................3
2. Background ........................................................................4

3. Chemistry Manufacturing and Controls (CMC) ......5
   a. Product Quality ......6
   b. Testing Specifications ......8
   c. CBER Lot Release ......9
   d. Facilities Review / Inspection ......9
   e. Container/Closure System ......10
   f. Environmental Assessment ......11
4. Nonclinical Pharmacology/Toxicology ......11
5. Clinical/Statistical ......12
   a. Clinical Program ......12
   b. Bioresearch Monitoring (BIMO) – Clinical/Statistical/Pharmacovigilance ......14
   c. Pediatrics ......14
   d. Other Special Populations ......15
6. Safety and Pharmacovigilance ......15
7. Labeling ......16
8. Advisory Committee Meeting ......16
9. Other Relevant Regulatory Issues ......17
10. Recommendations and Benefit/Risk Assessment ......17
   a. Recommended Regulatory Action ......17
   b. Benefit/Risk Assessment ......17
   c. Recommendation for Postmarketing Activities ......18


## 1. Introduction

Humacyte Global, Inc. submitted a Biologics License Application (BLA), STN 125812, for licensure of acellular tissue engineered vessel-tyod, with the proprietary name of SYMVESS. SYMVESS is an acellular tissue engineered vessel that is 42 cm in length and 6 mm in diameter. It is composed of extracellular matrix (ECM) proteins, mostly consisting of (b) (4) that are generated from (b) (4) from the final product. SYMVESS is manufactured at the Humacyte facility located at 2525 E Highway 54 Durham, NC 27713, USA. SYMVESS is supplied on a (b) (4) immersed in (b) (4) Phosphate Buffered Saline (b) (4) in a sealed and labeled container. At the surgical site, the length of SYMVESS is customized by the surgeon based on the need and is sutured to treat arterial repair.

The safety and effectiveness of SYMVESS was evaluated in patients enrolled in Study V005 (CLN-PRO-V005; NCT03005418), a prospective, open-label, single-arm, multicenter Phase 2/3 study evaluating SYMVESS for vascular replacement or reconstruction in patients with life- or limb-threatening vascular trauma. Seventy-one (71)

patients received SYMVESS in this study as a conduit, and efficacy was evaluated in a subset of 54 patients who received SYMVESS for replacement of an extremity artery. The primary efficacy outcome measure was the rate of primary vascular graft patency at Day 30 in patients with extremity arterial injury as assessed by functional graft patency without intervention, using Duplex ultrasound or equivalent (i.e., CTA, MRI). Among the 54 patients included in the primary efficacy analysis, 36 patients (66.7%) had primary patency and 39 (72.2%) patients had secondary patency at Day 30. Five (9%) patients underwent amputation of the treated limb by Day 30.

Safety was evaluated for all 71 patients receiving SYMVESS as a conduit in Study V005 for either an extremity or torso/iatrogenic indication. However, the primary efficacy analysis population consists of the 54 patients who received SYMVESS for vascular replacement or reconstruction in an extremity following life- or limb-threatening vascular trauma. The most common adverse reactions were vascular graft thrombosis, pyrexia, pain, anastomotic stenosis, vascular graft rupture or anastomotic failure and vascular graft infection. Seven patients had vascular graft rupture or anastomotic failure from SYMVESS during the study period which resulted in serious bleeding: three from mid-graft rupture and four from anastomotic failure. Six patients developed SYMVESS infection during the study. There was one death following bleeding from the proximal anastomoses of SYMVESS and the common iliac artery in a patient who had SYMVESS implanted in the torso. Following this death, SYMVESS (b) (4) to use in the extremities.

Supportive safety and effectiveness data was provided in Study V017 (CLN-PRO-V017; NCT05873959), a retrospective, observational study of SYMVESS used on a humanitarian basis in Ukrainian patients with life- or limb-threatening vascular trauma. In this retrospective study, 15 out of 16 (93.8%) patients had primary patency confirmed at Day 30. SYMVESS was deemed not patent in one patient following mid-graft rupture. No patients underwent limb amputation.

The clinical review team concluded that the benefits outweighed the risks of SYMVESS. Substantial evidence of effectiveness was provided, and given the indication and lack of appropriate treatment options for the indicated population in patients with extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, the review team recommends traditional approval of this BLA. We also recommend clinical Postmarketing Requirements (PMR) to (1) further characterize the risk of graft failure following SYMVESS placement and (2) assess the safety and efficacy of SYMVESS in patients 17 years of age or less who have reached Tanner Sexual Maturity Rating Stage 5, in the approved indication. Clinical Postmarketing Commitments are to complete the ongoing open-label, single-arm study conducted in patients treated with SYMVESS as a vascular replacement or reconstruction in life or limb-threatening vascular trauma (Study V005).

Chemistry, Manufacturing, and Control (CMC) Postmarketing Commitments (PMCs) are recommended for shipping validation, leachable study data, and establishment of upper limits for certain final product release testing.

## 2. Background

Arterial damage resulting from traumatic extremity injuries is a serious condition, with a high incidence of complication and risk of exsanguination and death. In the absence of vascular reconstruction, tourniquet application of the affected limb is the primary life-saving measure. The frequency and severity of vascular trauma also varies by population. In civilian trauma patients, vascular injuries account for 1% to 2% of all injuries, and patients with vascular injury account for greater than 20% of all trauma-related deaths. Vascular trauma is also a leading cause of morbidity and mortality in the military, where vascular injuries make up a small percentage of trauma injuries but are the leading cause of exsanguination, limb ischemia, and amputation.

Vascular trauma treatment depends on severity of the injury. The goal is to restore blood flow and prevent complications. This may sometimes be achieved by primary repair or endovascular stenting but requires a new conduit when the injury is not amenable to these techniques. Available options for new conduit include use of autologous vein for arterial reconstruction, synthetic grafts and temporary shunts. When arterial grafting is required, autologous vein grafts are preferred over synthetic grafts, such as Teflon (expanded polytetrafluoroethylene) or Dacron. Autologous graft is commonly the saphenous vein harvested from the leg. However, autologous blood vessel availability can be limited due to extensive trauma or preexisting peripheral vascular disease. Harvesting of the autologous vein also places the patient at risk of complications such as infection and neuropathy.

Due to the limited availability of healthy autologous vessels as well as the incidence of postoperative complications, synthetic grafts have been used as alternatives, especially for medium to large-diameter vessels. The mechanical properties of synthetic grafts provide some benefits over autologous veins such as durability, strength, and availability; however, their use is limited to instances when the autologous vein is not available due to increased rate of thrombosis and atherosclerosis affecting long-term durability, mechanical degradation, dilatation, localized aneurysmal formation, and graft rupture.

**Table 1. Regulatory History**

| Regulatory Events / Milestones | Date |
|---|---|
| 1. Pre-IND meeting | May 19, 2015 |
| 2. IND submission | June 27, 2016 |
| 3. Pre-BLA meeting | October 24, 2022 |
| 4. Regenerative Medicine Advanced Therapy designation granted | May 4, 2023 |
| 5. BLA 125812/0 submission | December 11, 2023 |
| 6. BLA filed | February 8, 2024 |
| 7. Mid-Cycle communication | March 28, 2024 |
| 8. Late-Cycle meeting | May 20, 2024 |
| 9. Action Due Date | December 19, 2024 |

## 3. Chemistry Manufacturing and Controls (CMC)

**a. Product Quality**

This BLA includes an adequate description of the manufacturing process of SYMVESS. The CMC review team concludes that the manufacturing material, process, and controls can yield SYMVESS with consistent quality attributes. Thus, the CMC review team recommends approval.

**Product Description**
SYMVESS is an acellular tissue engineered vessel composed of organized ECM proteins generated from allogeneic smooth muscle cells in culture. The product is approximately 6 mm in inner diameter and 42 cm in length.

**Manufacturing Summary**
SYMVESS is a tissue engineered product manufactured using a (b) (4) process. Human vascular smooth muscle cells that are derived from human aortic tissue deemed suitable for transplant are banked, expanded in (b) (4) and seeded onto a tubular (b) (4) mesh scaffold (b) (4). These cells are further cultured in a (b) (4) bioreactor system for (b) (4) to generate an intermediate tubular construct containing vascular smooth muscle cells and extracellular matrix deposited by the vascular smooth muscle cells. A final decellularization process, (b) (4) removes the human cellular and genetic material while maintaining the extracellular matrix structure, mechanical properties, and biological activity. A manufactured acellular tissue engineered vessel (SYMVESS) is submerged in (b) (4) (b) (4) within a (b) (4) which acts as a primary container. SYMVESS has an 18 month shelf-life at 2-8°C.

**Manufacturing Controls**
(b) (4) The final product tests and release criteria are acceptable and are sufficient to meet regulatory requirements for identity, purity, and potency. Stability studies (conventional and accelerated conditions) are appropriate and support product expiration dating. The process is well controlled and has demonstrated the ability to produce drug product of acceptable quality.

**Process Validation**
The Applicant validated the manufacturing process at the Humacyte commercial manufacturing site, 2525 Highway NC-54, Durham, NC 27713, using process performance qualification (PPQ) batches manufactured using the (b) (4) The process validation was supported by reliable and consistent manufacture of SYMVESS batches which met established release acceptance criteria. Stability of the final product was established using PPQ and clinical batches. Although shipper validation is performed, shipping validation is not complete and data from worst-case scenario

shipping conditions (i.e., (b) (4) conditions) are pending and will be evaluated as a PMC.

**Manufacturing Risks, Potential Safety Concerns, and Management**
Transmission of infectious disease is controlled by meeting donor eligibility requirements for the source material, by using adequately controlled reagents and materials for the SYMVESS manufacturing process, and by implementing an adequate manufacturing process to mitigate any potential risk.

SYMVESS is manufactured using the source material from a single donor who met the donor eligibility requirements for transmissible infectious diseases which include screening and testing of risks associated with human immunodeficiency virus 1 (HIV-1), human immunodeficiency virus 2 (HIV-2), hepatitis B virus (HBV), hepatitis C virus (HCV), and syphilis (*Treponema pallidum*). The cell banks generated from the source material are tested negative for human and animal viruses, retroviruses, bacteria, fungi, yeast, and mycoplasma. All animal-derived reagents are tested for animal viruses, bacteria, fungi, and mycoplasma before use. Fetal bovine serum is controlled to minimize the risk of transmitting a prion protein that causes bovine spongiform encephalopathy and the cause of a rare fatal condition in humans called variant Creutzfeldt-Jakob disease.

Risk mitigating measures include aseptic operations for (b) (4) under an (b) (4) biosafety cabinet with (b) (4) background and for (b) (4) under (b) (4) background. Adequate operator training and use of personal protective equipment, use of sterile single use materials, validated cleaning procedures, and environmental monitoring is being implemented.

**Drug Product Stability and Shelf Life**
The real-time stability studies determine the product is stable for 18 months at 2-8°C. The final container closure was evaluated for extractables and leachables and assessed to be acceptable. However, the Applicant committed to submit ≥ 18-month leachable study data to target specific compounds (i.e., (b) (4) that may need additional evaluation based on their risk assessment as a PMC.

**Comparability**
To support the product comparability, a comprehensive comparability study between (b) (4) system has been reviewed and found to be acceptable. In CLN-PRO-V005 and CLN-PRO-V017, SYMVESS manufactured from (b) (4) (b) (4) were used to support this BLA.

**CMC PMCs**
The CMC team recommends three PMCs. The rationale for the PMCs is described below, and the PMC agreements are detailed in Section 11c of this document:

1. SYMVESS is shipped using a cold shipper at a shipping temperature of 2-8°C. Humacyte provided shipping validation information for temperature control and (b) (4) testing. However, no information is available to support the shipping conditions are validated to ensure SYMVESS quality under worst-case shipping conditions in a real world situation (e.g.,

(b) (4) The Applicant agreed to perform a PMC study to evaluate product quality following worst-case shipping conditions under (b) (4) conditions.

2. The Applicant provided a full summary report of extractables and toxicology risk assessment of extractables and leachables which was assessed to be acceptable based on the available data. Additionally, toxicology safety concerns were not identified based on the available extractable and leachable toxicology risk assessment provided by the Applicant since the detected levels of leachables were below the parental permissible daily exposure (PDE) and maximum allowable concentration (MAC). The Applicant indicated that screening and toxicological assessment for the (b) (4) specific compounds (b) (4) that are missing from the current available data will be completed no later than July 5, 2024. The Applicant will also determine if additional methods validation is needed based on the results of the additional screening and toxicological assessments. Furthermore, an additional leachables study at an ≥ 18-month time point will be performed, which requires 12 weeks for completion. The Applicant committed to perform the additional screening and method validations (if needed), and provide the study report as a PMC.

3. The Applicant established lower limits for acceptance criteria for testing (b) (4) performed on the final product but did not establish upper limits. The Applicant committed to establish upper limits for the acceptance criteria after accumulating data from (b) (4) additional commercial batches. The upper limits for the acceptance criteria will be provided as a PAS.

### b. Testing Specifications

The analytical methods and their validations and/or qualifications reviewed for the SYMVESS drug product were found to be adequate for their intended use.

The final product commercial release specifications are shown in Table 2.

**Table 2. Final Product Commercial Release Specifications**

| Attribute | Analytical Method | Acceptance Criteria |
|---|---|---|
| Mechanical Property | (b) (4) | (b) (4) |
| Appearance | (b) (4) | (b) (4) |

| | | |
|---|---|---|
| | | (b) (4) |
| Identity | (b) (4) | (b) (4) |
| Purity | (b) (4) | (b) (4) |
| | (b) (4) | (b) (4) |
| | (b) (4) | (b) (4) |
| Potency | (b) (4) | (b) (4) |
| | (b) (4) | (b) (4) |
| Safety | (b) (4) | (b) (4) |
| | (b) (4) | (b) (4) |
| | (b) (4) | (b) (4) |

### c. CBER Lot Release

The lot release protocol template was submitted to CBER for review and found to be acceptable after revisions. A lot release testing plan was developed by CBER and will be used for routine lot release.

### d. Facilities Review / Inspection

Facility information and data provided in the BLA were reviewed by CBER and found to be sufficient and acceptable. The facilities involved in the manufacture of the acellular tissue engineered vessel (SYMVESS) are listed in Table 3. The activities performed and inspectional histories are also noted in Table 3.

**Table 3. Manufacturing Facilities Table for Acellular Tissue Engineered Vessel (SYMVESS)**

| Name/Address | FEI Number | DUNS number | Inspection/ Waiver | Justification /Results |
|---|---|---|---|---|
| Humacyte Global Inc<br>2525 E. NC Hwy 54<br>Durham, NC 27713<br>DP manufacturing, DP release testing | 3014294024 | 557190449 | PLI | CBER/DMPQ<br>April 2024<br>VAI |
| (b) (4) | (b) (4) | (b) (4) | Waiver | ORA/OBPO<br>(b) (4)<br>VAI |
| (b) (4) | (b) (4) | (b) (4) | Waiver | ORA/OPQO<br>(b) (4)<br>NAI |

DP – Drug Product; OBPO – Office of Biological Products Operations; OPQO – Office of Pharmaceutical Quality Operations; ORA – Office of Regulatory Affairs; NAI – No Action Indicated; PLI – Pre-license Inspection; VAI – Voluntary Action Indicated; WCB- Working Cell Bank

CBER/DMPQ conducted a PLI at Humacyte Global, Inc. in April 2024 and a Form FDA 483 was issued at the end of the inspection. The firm adequately responded to the observations. All inspectional issues were resolved, and the inspection was classified as VAI.

ORA/OBPO conducted a surveillance inspection at (b) (4) in (b) (4), and a Form FDA 483 was issued at the end of the inspection. The firm adequately responded to the observations. All inspectional issues were resolved, and the inspection was classified as VAI. The firm has experience in performing microbial testing on tissue samples.

ORA/OPQO conducted a surveillance inspection at (b) (4) in (b) (4) and the inspection was classified as NAI. The firm has experience in performing mycoplasma testing of unprocessed bulk harvest.

**e. Container/Closure System**

SYMVESS is manufactured within a custom bioreactor (b) (4) that serves as the primary container closure system. The primary packaging is composed of (b) (4)

The container closure integrity testing was performed by (b) (4) employing the (b) (4) (b) (4) test method; all acceptance criteria were met.

### f. Environmental Assessment

The BLA included a request for categorical exclusion from an Environmental Assessment under 21 CFR 25.31. The FDA concluded that this request is justified, and no extraordinary circumstances exist that would require an environmental assessment.

## 4. Nonclinical Pharmacology/Toxicology

In vivo studies to evaluate HAV performance and safety were conducted in non-human primates (NHPs). In an initial study, an earlier HAV prototype was implanted in baboons as an upper limb arteriovenous (AV) graft. Graft patency was maintained in 5 of 8 animals at the planned 3- and 6-month timepoints. HAV suture retention strength pre-implantation and post-explant indicated that the graft retained its mechanical strength during the implantation period. Occlusions were observed in 3 baboons, with 2 HAVs partially resorbed with evidence of a severe inflammatory reaction and localized infection in 1 of the 2 baboons, possibly due to opening of the surgical incision. There were no signs of graft dilation, constriction, or aneurysm observed following angiogram assessment for the grafts that remained patent.

In two subsequent NHP studies using an updated decellularization process, four baboons were implanted with HAV AV grafts and were followed for up to 6 months. In the second week post-implantation, 3 of the 4 grafts were occluded and required clot removal and surgical revision. After surgical revision, the grafts showed favorable blood flow and remained patent for the remainder of the study. A fourth baboon had persistent inflammation and wound infection for the first 2 weeks after HAV implantation. An aneurysm was detected following ultrasound imaging at Week 12 and was subsequently resected and the section replaced with an expanded polyfluoroethylene (ePTFE; (b) (4) (b) (4) graft. The animal was sacrificed at Week 14 due to thrombosis in the ePTFE portion of the AV graft and histological examination showed moderate to severe inflammation and graft resorption throughout the aneurysmal portion of the graft. In the HAV grafts that retained patency, minimal to mild infiltration of host cells including SMCs and endothelial cells were observed in the HAV graft wall and modest accumulation of immune cells were observed. ECM analysis showed increased collagen type I, glycosaminoglycans (GAGs), and elastin with a more circumferential alignment of collagen fibers for the 6-month explanted HAV as compared to the pre-implant HAV.

An in vivo study was also conducted to compare HAV and ePTFE grafts in a porcine hind limb ischemia model with a 0- or 6-hour ischemia time. At day 28, patency rates for grafts implanted within the 0-hour ischemia groups were 85.7% (6/7 animals) for HAV and 66.7% (6/9) for ePTFE grafts, while patency rates in the 6-hour ischemia groups were 100% (8/8) for HAV and 75% (6/8) for ePTFE grafts. In the grafts that remained patent, no aneurysms were observed and animals in the HAV group had similar mean velocity values and Tarlov gait scores as compared to the ePTFE group for the respective ischemia times (i.e., 0- or 6-hour). The clinical pathology results similarly

showed no apparent difference between animals receiving the HAV or ePTFE grafts. Histological analysis of the explants showed that both the HAV and ePTFE grafts had some native intimal hyperplasia and host reactivity. Both the HAV and ePTFE grafts showed evidence of immune cell and myofibroblast infiltration, typically from the exterior surrounding tissues, and a subset of the HAV sections showed partial luminal coverage by endothelial cells.

Additional intramuscular implantation tests were conducted in male and female adult rabbits (n = 3) for each timepoint (i.e., 1 week and 4 weeks) comparing the HAV to a (b) (4) high density polyethylene reference standard (RS) for characterization of biocompatibility in accordance with (b) (4) guidelines. The HAV test article was considered a slight irritant based on the histological observations [i.e., macrophages, eosinophils, lymphocytes, multinucleated foreign body giant cells (FBGCs), and fibrosis] as compared to the RS control article.

An additional study in a subcutaneous abscess model in (b) (4) rats (n = 21 for each bacterial species) compared the bilateral implantation of HAV to ePTFE graft inoculated with either (b) (4) The HAV showed a lower bacterial bioburden as compared to the ePTFE graft at 2 weeks post-implantation.

No dedicated carcinogenicity or tumorigenicity studies were conducted. However, an Ames test of HAV extracts did not show evidence of bacterial mutagenicity when compared to the negative control. Additionally, an in vitro mammalian chromosome aberration test conducted using human peripheral blood lymphocytes exposed to HAV extracts showed no evidence of genotoxic activity.

No animal reproductive or developmental toxicity (DART) studies were conducted with SYMVESS. These studies are not warranted based on the product characteristics and intended use.

## 5. Clinical/Statistical

### a. Clinical Program

Primary evidence of effectiveness for SYMVESS comes from Study V005, a prospective, open-label, single-arm, multicenter Phase 2/3 study evaluating SYMVESS for vascular replacement or reconstruction in patients with life- or limb-threatening vascular trauma, conducted under IND16746. The planned duration of follow-up for patients enrolled in the study was 36 months.

The primary efficacy outcome measure was the rate of primary vascular graft patency at Day 30 in patients with extremity arterial injury as assessed by functional graft patency without intervention using Duplex ultrasound or equivalent (i.e., CTA, MRI). Additional efficacy outcome measures included Day 30 rate of secondary patency, conduit infection, and limb salvage.

Supportive evidence of efficacy comes from Study V017, a retrospective, observational study of SYMVESS used on a humanitarian basis in Ukrainian patients with life- or limb-threatening vascular trauma. Endpoints for Study V017 were the same as for Study V005, and patients were followed for at least 6 months.

Efficacy

In Study V005, 54 patients had SYMVESS placed as a conduit for repair of an artery in the extremity and were included in the primary analysis population. The median age was 30.0 years (range: 18 to 72 years) and 74.1% were male. The demographic characteristics were as follows: 26 (48.1%) patients were Black or African American and 23 (42.6%) patients were white. The distribution of type of trauma was 31 (57.4%) penetrating trauma and 23 (42.6%) blunt trauma. Gunshot wounds represented the most frequent cause of vascular trauma followed by motor vehicle accidents. Nine (17%) patients were not evaluable at Day 30 due to death, amputation, of loss to follow-up.

The primary efficacy endpoint of Day 30 primary patency rate was 66.7% and the key secondary efficacy endpoint of Day 30 secondary patency rate was 72.2%. The secondary endpoint of limb salvage rate at Day 30 was 75.9%.

There were eight patients (14.8%) who had amputations in the primary analysis population, five (9.3%) who underwent amputation of the treated limb within the first 30 days and an additional three who underwent amputation of the treated limb by end of study at Month 36. FDA evaluated a limb salvage rate where patients who died, had SYMVESS explanted, or were lost to follow up were not included as amputation free. When taking into consideration these intercurrent events, the FDA calculated limb salvage rate at Day 30 to be 75.9% (95% CI: 63.1%, 85.4%) in 41 out of 54 patients.

One patient developed SYMVESS infection in the first 30 days with an additional two patients developing SYMVESS infection on days 35 and 36. This is discussed further in Section 6 - Safety and Pharmacovigilance.

Thirteen (13) of the 54 patients were not evaluable for primary patency at day 30 due to amputation (n=5), death (n=4), intraoperative thrombus (n=2), and loss to follow up (n=2). Of the 13, SYMVESS was deemed not patent in four patients. FDA had agreed to impute 30-day patency based on patency immediately before the intercurrent event in cases where the intercurrent event could be confidently adjudicated to be unrelated to SYMVESS. However, there was insufficient interim evaluation to conclude patency status at the time of intercurrent event for the remaining patients who were not evaluated at Day 30; for these patients, the patency status was considered non patent. For patency up to 36 months, a total of 37 of the 54 patients (68.5%) with SYMVESS implantation for extremity vascular trauma were non- evaluable having discontinued for reasons of due to loss to follow up (n=15), SYMVESS explant/abandonment (9), limb amputation (6), death (6) or withdrawal of consent (1).

In Study V017, which provided supportive evidence of efficacy, 15 out of 16 (93.8%) patients had primary patency confirmed at Day 30. SYMVESS was deemed not patent in one patient following mid-graft rupture. No patients underwent limb amputation.

**b. Bioresearch Monitoring (BIMO) – Clinical/Statistical/Pharmacovigilance**

Bioresearch Monitoring (BIMO) inspection assignments were issued for the sponsor and three domestic clinical study sites that participated in the conduct of Study V005. The inspections did not reveal significant issues and did not impact the data submitted in this original BLA.

**c. Pediatrics**

This application triggers the Pediatric Research Equity Act (PREA) for a new active ingredient and indication and was presented to the FDA Pediatric Review Committee (PeRC) on June 4, 2024.

During the IND phase, the Applicant requested informal dispute resolution regarding the requirement for pediatric studies of the HAV for the proposed trauma indication. In an informal dispute resolution from August 11, 2023, the Applicant was advised by CBER leadership in that a deferral for the pediatric studies in adolescents who have reached Tanner Maturity Rating Stage V appeared to be appropriate, as would be a partial waiver that covers the remainder of the pediatric population.

The Applicant previously requested a waiver for pediatric patients who have not completed pubertal development or have not reached Tanner Stage 5 because recruitment would be impossible or highly impracticable. Study V005 had been opened to enrollment of adolescent patients with protocol version 3.3 submitted under IND amendment 16746.64 on August 15, 2022 but the Applicant has not enrolled any adolescent patients by the time of this BLA submission. The Applicant states that it has been challenging to enroll pediatric patients due to the availability of an autologous vessel, vessel size mismatch and rarity of vascular trauma requiring repair in pediatric patients. There are also theoretical concerns that the product would be ineffective and/or unsafe in one or more of the
pediatric group(s) for which a waiver is being requested due to uncertainty regarding the ability of this product to grow with the patient.

The Applicant requested a deferral for adolescent patients between 14 and 17 years of age with sexual maturity rating of Tanner Stage 5. The Division agreed with granting the deferral of pediatric studies for adolescent patients who have reached a sexual maturity rating of Tanner Stage 5 because this product is ready for approval for use in adults and the amount of pediatric safety, efficacy and pharmacokinetic data are insufficient to ensure adequate safety/efficacy and instructions for dosing in this pediatric group. i iBased on discussion with the PeRC team, the clinical team recommend the following approach to labeling and PREA fulfillment: iiThe indication statement will include the qualifier “adults” since the product will not be approved for pediatric patients.

- Section 8.4 of the prescribing information will include the statement that “the safety and efficacy of SYMVESS in pediatric patients (0 to 17 years old) have not been established.”

- Section 8.4 of the prescribing information will not state that the product is not recommended for use in pediatric patients because there is no strong evidence to demonstrate that. The concern of potential unsafety in patients

less than Tanner Maturity Rating Stage V is valid but there is no clinical, nonclinical or product data to strongly support this safety concern.

- The approval will include a PREA PMR for evaluation of adolescent patients who have reached Tanner Maturity Rating Stage V.

### d. Other Special Populations

None

## 6. Safety and Pharmacovigilance

Safety
Safety of SYMVESS was evaluated in all 71 patients who received SYMVESS as a conduit for arterial repair in the prospective Study V005. This included the 54 patients evaluated for efficacy who received SYMVESS as a conduit in an extremity and 17 patients who received SYMVESS for a torso or iatrogenic indication. The most frequently occurring adverse reactions reported following implantation of SYMVESS were graft thrombosis, fever, pain, anastomotic stenosis, SYMVESS rupture or anastomotic failure, and SYMVESS infection.

Six (8.5%) patients developed SYMVESS infection during the study. The analysis of SYMVESS infection includes patients who had graft infection confirmed during surgical reintervention with either positive graft culture, histology demonstrating bacteria in the graft or signs of graft infection noted by the surgeon.

During the study period, seven (9.9%) patients had loss of SYMVESS integrity following mid-graft rupture or anastomotic failure. Four (5.6%) patients had either proximal or distal anastomotic failure and three (4.2%) patients had mid-graft rupture of SYMVESS. Failure of the proximal anastomosis occurred in one patient who died.

Given the serious risk of arterial bleeding from mid-graft rupture or anastomotic failure (9.9%) following implantation of SYMVESS in this small cohort, the clinical team included this information as a boxed warning in SYMVESS prescribing information. Additionally, a prospective observational post-marketing study to further characterize the risk of graft failure in patients who have received SYMVESS for the approved extremity indication will be required upon approval. Institution of these mitigation measures provides an acceptable level of risk in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible.

Pharmacovigilance Plan

The Applicant submitted a pharmacovigilance plan for SYMVESS. The important identified risks associated with SYMVESS include thrombosis/occlusion of SYMVESS during surgery, post-operative thrombosis/occlusion, SYMVESS rupture due to prolonged air exposure after implantation, anastomotic stenosis and anastomotic site bleeding. Postmarketing safety monitoring will include:

- Routine pharmacovigilance: Adverse event reporting in accordance with 21 CFR 600.80 and submission of quarterly periodic safety reports for 3 years and annual thereafter.

Data available at this time do not suggest safety signals that warrant a Risk Evaluation and Mitigation Strategy. Completion of the ongoing clinical study V005 and a safety-related postmarketing requirement study to further characterize the risk of graft failure in patients with extremity vascular injury who have received SYMVESS for the approved indication will further characterize the safety of SYMVESS in the indicated population.

## 7. Labeling

The proposed proprietary name, SYMVESS, was reviewed by the Advertising and Promotional Labeling Branch (APLB) on February 27, 2024, and was found acceptable. CBER communicated the acceptability of the proprietary name to the applicant on March 1, 2024.

Proposed proper name suffixes were reviewed on March 18, 2024, and May 21, 2024, and the proposed suffix *-tyod* was found conditionally acceptable.

The Advertising and Promotional Labeling Branch (APLB) reviewed the proposed Prescribing Information and package and container labels on May 7, 2024.

Tissue engineered products are excluded from USAN naming schemes for cell-based products. Thus, the Agency designated a proper name "acellular tissue engineered vessel" based on the nature of the product.

The proposed prescribing information was reviewed and revised by the relevant review teams to ensure that it meets regulatory/statutory requirements, is consistent with current labeling practice, conveys clinically meaningful and scientifically accurate information needed for the safe and effective use of the product, and provides clear and concise information for the healthcare providers. With the agreed revisions, the prescribing information is acceptable.

Boxed Warning, Warnings and Precautions
Risk mitigation strategies will be instituted in the United States Prescribing Information (USPI) through a Boxed Warning for graft failure and Warnings and Precautions section for graft rupture, anastomotic failure, and thrombosis as well as via the Patient Counseling Information section.

## 8. Advisory Committee Meeting

No advisory committee meeting was held because initial review of information submitted in the BLA did not raise concerns or controversial issues that would have benefited from an advisory committee discussion. Three government employees external to the FDA with expertise in trauma vascular surgery were individually consulted to obtain additional input regarding specific questions that arose during the review of the file.

## 9. Other Relevant Regulatory Issues

This application received RMAT and Priority Review designations.

The application is designated as a Priority Product by the Department of Defense (DoD). Public Law 115-92 authorized DoD to request, and the U.S. FDA to provide, assistance to expedite development and the FDA's review of products to diagnose, treat, or prevent serious or life-threatening diseases or conditions facing American military personnel.

## 10. Recommendations and Benefit/Risk Assessment

### a. Recommended Regulatory Action

The Applicant has provided substantial evidence of effectiveness based on patency at Day 30 from a single open label study. The observed safety risks of graft rupture, anastomotic failure, and thrombosis can be adequately mitigated through product labeling.

Based on the totality of presented data and in consideration of the risk mitigation measures, the benefits outweigh the risks for this product. We therefore recommend traditional approval.

### b. Benefit/Risk Assessment

The benefit of SYMVESS was demonstrated in Study V005. The study demonstrated a Day 30 primary patency rate of 66.7% and a Day 30 secondary patency rate of 72.2% which is considered a clinically meaningful benefit in the indicated population. SYMVESS' effects on the key secondary endpoint of limb salvage provides supportive evidence of benefit with a rate of 75.9% at Day 30. SYMVESS is indicated for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible.

Supportive evidence of benefit derives from Study V017 which showed Day 30 primary and secondary patency rates of 93.8%. All patients had limb salvaged at Day 30.

Vascular graft thrombosis, pyrexia, pain, and anastomotic stenosis were common adverse reactions identified during this study and consistent with the risks seen with existing vascular repair options. More concerning is the risk of mid-graft rupture or anastomotic failure of SYMVESS. This risk has not been adequately characterized in the studies included in this BLA submission. While the risk of mid-graft rupture or anastomotic failure is seen in other vascular grafts (i.e., autologous vein or synthetic graft), there is insufficient information in the literature to support the observed rates seen in Study V005. Therefore, risk mitigation strategies will be instituted including limiting use of this product to extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. Inclusions to the United States Prescribing Information (USPI) via the Boxed Warning for graft failure and Warnings and Precautions section for graft rupture or anastomotic failure will also be instituted. The Applicant has also agreed to a postmarketing requirement to further characterize the risk of graft failure in patients with extremity vascular injury who have received SYMVESS for the approved indication. SYMVESS infection was also identified

as a risk in the setting of overlying wound infection during this study. This is a known risk of existing vascular grafts. Based on the totality of presented data and the unmet need for a vascular conduit when current therapies are not available, the benefit outweighs the risks for this product.

**c. Recommendation for Postmarketing Activities**

The Applicant agreed to the following PMRs and PMCs:

Post Marketing Requirements (PMR)

Clinical PMR Items

PMR #1: Conduct a prospective, multi-center, open-label study, to assess the safety and efficacy of SYMVESS in patients 17 years of age or younger who have reached Tanner Sexual Maturity Rating Stage 5, in the approved indication. The study will enroll a minimum of 10 patients who will be followed for a minimum of 1 year and will evaluate primary and secondary patency rate, and characterize the incidence of graft thrombosis, rupture, anastomotic failure, infection, limb amputation, and safety and tolerability.

Final Protocol Submission Date: March 31, 2025
Study Completion Date: December 31, 2028
Final Report Submission Date: June 30, 2029

PMR #2: Conduct long-term observational study to further characterize the risk of graft failure and infection in patients with extremity vascular injury who have received SYMVESS for the approved indication. The study should evaluate a minimum of 100 patients for a minimum follow up period of 1 year and should evaluate the incidence of graft rupture, anastomotic failure, and thrombosis, and describe the incidence of limb amputation and death.

Final Protocol Submission Date: April 30, 2025

Study Completion Date: September 30, 2030

Final Report Submission Date: April 30, 2031

Post Marketing Commitments (PMC)

Clinical PMC item subject to reporting requirements under section 506B:

PMC #3: Complete and submit the study report and dataset for Study CLN-PRO-V005, an open-label, single-arm study conducted in patients

treated with SYMVESS as a vascular replacement or reconstruction in life or limb-threatening vascular trauma.

Final Protocol Submission Date: n/a
Study Completion Date: August 31, 2026
Final Report Submission Date: December 31, 2026

CMC PMC items not subject to reporting requirements under section 506B:

PMC #4: Humacyte commits to conduct a shipping validation study to evaluate relevant critical quality attributes of SYMVESS following shipment in (b) (4) shipping conditions. Humacyte will submit the final study report by February 28, 2025.

Final Report Submission: February 28, 2025

PMC #5: Humacyte commits to submit ≥18-month leachable study data targeting (b) (4) specific compounds (b) (4) (b) (4) identified in additional extractables assessment requested by FDA, and additional method validation report (if found required) by January 31, 2025.

Final Report Submission: January 31, 2025

PMC #6: Humacyte commits to establish upper limits for the (b) (4) (b) (4) acceptance criteria used for final product release testing. The upper limits will be established based on data from a total of (b) (4) SYMVESS batches. Humaycte will provide a justification for the updated acceptance release criteria based on the collected information (i.e., data from at (b) (4) SYMVESS batches) and submit a study report as a Prior Approval Supplement by September 30, 2025.

Prior Approval Supplement Submission: September 30, 2025

# EXHIBIT 2

**CBER CMC BLA Review Addendum**

**BLA STN 125812**

**Product Name: SYMVESS [acellular tissue engineered vessel-tyod]**

**Jin Sung Hong, PhD, CBER/OTP/OCTHTH/DCT2/TEB2**

1. **BLA#:** STN 125812

2. **APPPLICANT NAME AND LICENSE NUMBER: Brainstorm Therapeutics**
Humacyte Global Inc. (i.e., Humacyte in the rest of the document)
License Number: 2336 (pending)

3. **PRODUCT NAME/PRODUCT TYPE**
Non-Proprietary/Proper: acellular tissue engineered vessel-tyod
Proprietary Name: SYMVESS

4. **GENERAL DESCRIPTION OF THE FINAL PRODUCT**
   a. Pharmacological category: acellular tissue engineered vessel
   b. Dosage form: SYMVESS has an internal diameter of 6 mm and is approximately 42 cm in length (approximately 40 cm of usable length).
   c. Strength/Potency: the length of SYMVESS will vary depending on the clinical need.
   d. Route of administration: surgical implantation.
   e. Indication(s): SYMVESS is a tissue engineered human acellular vessel indicated for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated and when autologous vein is not feasible.

5. **MAJOR MILESTONES**

| | |
|---|---|
| Original Submission | December 11, 2023 |
| Application Filed | February 9, 2024 |
| Mid-Cycle Communication | March 28, 2024 |
| Late-Cycle Communication | May 20, 2024 |
| Advisory Committee Meeting | Not Held |
| Inspections | Pre-License Inspection (PLI): April 1-5, 2024 |
| PDUFA Action Date | August 10, 2024 |
| Approval Date | December 20, 2024 |

6. **CMC/QUALITY REVIEW TEAM**

| Reviewer/Affiliation | Section/Subject Matter |
|---|---|
| Jin Sung Hong (JH), CBER/OTP/OCTHT/DCT2/TEB2 | 3.2.P.3.2 Batch Formula<br>3.2.P.5.3. Validation of Analytical Procedures |

7. **INTER-CENTER CONSULTS REQUESTED**

| Reviewer/Affiliation | Section/Topic | In agreement with consult recommendations (Yes/No [1]) |
|---|---|---|
| N/A | N/A | N/A |

**8. SUBMISSION(S) REVIEWED**

| Date Received | Submission | Comments/ Status |
|---|---|---|
| August 22, 2024 | 125812/0.69 | Communicated PMC Response - Sterilization validation of the bioreactor disposable set (BDS) – DMPQ related PMC item |
| August 30, 2024 | 125812/0.70 | Communicated PMC Response - Excipient sample suitability study – OTP related PMC item |
| August 30, 2024 | 125812/0.71 | Communicated PMC Response - In-house environmental isolates related to sterility method qualification – DBSQC related PMC item |
| November 7, 2024 | 125812/0.72 | Response to CMC IR sent on October 17, 2024 related to batches mentioned in a Whistle Blower complaint |
| November 8, 2024 | 125812/0.73 | Response to CMC IR sent on October 29, 2024 on sterilization validation study for the bioreactor disposable set (BDS) |
| November 26, 2024 | 125812/0.74 | Communicated PMC Response - Sterility assurance strategy on the (b) (4) OTP related PMC item |
| December 9, 2024 | 125812/0.75 | Response to CMC IR sent on December 4, 2024 on (b) (4) process |
| December 13, 2024 | 125812/0.76 | Response to CMC IR sent on December 12, 2024 on PMC updates and lot information for launch |

**9. Referenced REGULATORY SUBMISSIONS (e.g., IND BLA, 510K, Master File, etc.)**

| Submission Type & # | Holder | Referenced Item | Letter of Cross-Reference | Comments/Status |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| (b) (4) | (b) (4) | (b) (4) | Yes | (b) (4) |
| (b) (4) | (b) (4) | (b) (4) | Yes | (b) (4) |
| IND 16746 (Active) | Humacyte | HAV for Vascular Trauma (b) (4) | N/A | CMC information reviewed and documented in the memo by Zehra Tosun. |
| (b) (4) | (b) (4) | (b) (4) | N/A | (b) (4) |
| (b) (4) | (b) (4) | (b) (4) | Yes | (b) (4) |
| (b) (4) | (b) (4) | (b) (4) | Yse | (b) (4) |

## 10. REVIEWER SUMMARY AND RECOMMENDATION

### A. EXECUTIVE SUMMARY

This addendum memo is prepared to incorporate information received and reviewed after the PDUFA action date. There was no decision on the PDUFA action date due to further clarification needed for the clinical benefit/risk assessment. Prior to the PDUFA action date, the Applicant had agreed to seven CMC post-marketing commitment (PMC) items. The Applicant subsequently submitted information to address four of the previously agreed upon CMC PMC items. In this addendum, assessment on those four CMC PMC items is documented. The Applicant sufficiently addressed the concerns related to (b) (4) preparation safety, sterilization of bioreactor disposable set, risk assessment of environmental isolates, and suitability of excipient sample for sterility testing.

There are three remaining PMC items that are related to shipping validation, leachable study data, and establishing upper limits for release tests. The Applicant agreed to these PMC items on December 13, 2024. In BLA 125812/0.76, the Applicant agreed to conduct three remaining PMCs with updated dates. There are no other CMC issues. We recommend approval.

In BLA 125812/0.76, the Applicant indicated that they plan to submit a CBER lot release protocol for batch (b) (4) after the BLA approval and for batch (b) (4) on January 15, 2024. They state these batches will provide sufficient supply for (b) (4) (b) (4) based on their forecast.

Please reference the original submission memo for further information.

**B. RECOMMENDATION**

**C. APPROVAL**

a. Approval Letter:

Humacyte, Inc.
2525 E Highway 54
Durham, NC 27713, USA

b. PMC:

PMC #4: Humacyte commits to conduct a shipping validation study to evaluate relevant critical quality attributes of SYMVESS following shipment in (b) (4) shipping conditions. Humacyte will submit the final study report by February 28, 2025.

Final Report Submission: February 28, 2025

PMC #5: Humacyte commits to submit ≥18-month leachable study data targeting (b) (4) specific compounds (b) (4) (b) (4) identified in additional extractables assessment requested by FDA, and additional method validation report (if found required) by January 31, 2025.

Final Report Submission: January 31, 2025

PMC #6: Humacyte commits to establish upper limits for the (b) (4) acceptance criteria used for final product release testing. The upper limits will be established based on data from a total of (b) (4) SYMVESS batches. Humaycte will provide a justification for the updated acceptance release criteria based on the collected information (i.e., data from (b) (4) SYMVESS batches) and submit a study report as a Prior Approval Supplement by September 30, 2025.

Prior Approval Supplement Submission: September 30, 2025

**II. COMPLETE RESPONSE (CR)**

The BLA will not be subject to CR

**III. SIGNATURE BLOCK**

| Reviewer/Title/Affiliation | Concurrence | Signature and Date |
|---|---|---|
| | | |

| | | |
|---|---|---|
| Jin Sung Hong, PhD,<br>CMC Reviewer<br>CBER/OTP/OCTHT/DCT2/TEB2 | Concurred | |
| Zehra Tosun, PhD,<br>Branch Chief,<br>CBER/OTP/OCTHT/DCT2/TEB1 | Concurred | |
| Laura Ricles, PhD<br>Division Director,<br>CBER/OTP/OCTHT/DCT2 | Concurred | |
| Heather Lombardi, PhD<br>Office Director<br>CBER/OTP/OCTHT | Concurred | |

**Review of CTD**

**Table Contents**

3.2.P.3.2 Batch Formula ........ 1
3.2.P.5 Control of Drug Product ........ 4
3.2.P.5.2 and 3.2.P.5.3 Analytical Procedures and Validation of Analytical Procedures ........ 4
3.2.P.5.3 Validation of Analytical Procedures ........ 5

**Table of Figures**

Figure 1 Sterility Sample from (b) (4) ........ 2
Figure 2 Sterility Sample from (b) (4) ........ 2

**Table of Tables**

Table 1 Sterility Testing Data for (b) (4) ........ 6

**Module 3**

**3.2.P.3.2 Batch Formula**
**3.2.P.3.2.2 Cell Culture Reagents and Components used in manufacture of SYMVESS**

The Applicant submitted BLA 125812/0.74 on November 26, 2024 in response to the study requested under PMC #9, which was agreed upon previously in BLA 125812/0.61 submitted on July 29, 2024. The agreed PMC #9 was as below:

> *Humacyte commits to implement a validated sterility assurance strategy on the* (b) (4) *based on the proposed feasibility study for a* (b) (4) *procedure in* (b) (4) (b) (4) *process and submit the study report as a Prior Approval Supplement by November 30, 2024.*
>
> *Prior Approval Supplement Submission: November 30, 2024.*

In BLA 125812/0.74, the Applicant provided information to support that adding a (b) (4) procedure in (b) (4) process is unacceptable and indicated that they will sample (b) (4) (b) (4) to perform bioburden testing to support (b) (4) (b) (4) sterility assurance. The information provided was insufficient and an information request was sent to the Applicant..

In BLA 125812/0.75, Humacyte provided their response to the information request and agreed to (b) (4) for sterility testing prior use and adjust manufacturing schedule to allow time for the receipt of sterility results before use. For (b) (4) (b) (4) from the (b) (4) (b) (4) of (b) (4) (b) (4) from the (b) (4) (b) (4) (b) (4) and (b) (4) from (b) (4) (b) (4) will be sampled (Figure 1).

Figure 1 Sterility Sample from (b) (4)

(b) (4)

Figure 2 Sterility Sample from (b) (4)

(b) (4)

These sterility testing will be performed in addition to the bioburden testing on (b) (4) samples at (b) (4) The Applicant will implement this testing on all batches initiated after November 30, 2024.

*Reviewer comment: During the pre-license inspection (PLI), an observation was made related to sterility validation assurance for* (b) (4) *The Applicant did not perform adequate microbial quality assurance of the* (b) (4) *used for the* (b) (4) (b) (4) *Specifically, although the* (b) (4) *was formulated using* (b) (4) (b) (4) *was performed. The Applicant indicated that* (b) (4) *was not feasible due to essential nutrients that are formulated in the* (b) (4) *However, no sterility testing is performed on the* (b) (4) *Thus, after our communication of the observation, they opened CAPA-2024-031 to assess the feasibility of* (b) (4) (b) (4) *procedure which was due on August 31, 2024. Additionally, at the Late-Cycle Communication on May 20, 2024, they indicated that they plan to implement a sterility assurance strategy no later than November 13, 2024. Since the committed due dates were after the PDUFA action date, the issue remaining with the sterility validation assurance for* (b) (4) *was negotiated as a PMC study to the Applicant in an information request. The agreed upon date for submission of the final study report as a prior approval supplement (PAS) was November 13, 2024.*

*In BLA 125812/0.74, Humacyte submitted their assessment of adding a* (b) (4) *step in the* (b) (4) *preparation process. The Applicant provided information on* (b) (4) *assessment and feasibility study of using* (b) (4) *in* (b) (4) *preparation. However, the assessment concluded that using* (b) (4) *is unfeasible. Thus, the Applicant proposed to mitigate the risk of contamination in* (b) (4) *preparation by* (b) (4) *bioburden testing at* (b) (4) *2) and* (b) (4) *3) using* (b) (4) *In BLA 125812/0.75, Humacyte further provided statistical analysis to support their* (b) (4) *feasibility study and explained the reasons in detail. For example,* (b) (4) *of* (b) (4) *resulted in longer cell* (b) (4) *time at the* (b) (4) *during the* (b) (4) (b) (4) *process. The Applicant reasoned that cells with longer* (b) (4) *time are not applicable to meet* (b) (4) *of critical in-process controls (CIPC), the* (b) (4) *and the* (b) (4) *Due to this conclusion, the Applicant proposed to implement sampling of each of the final containers from* (b) (4) *and* (b) (4) *and perform sterility testing on the samples to ensure sterility of the* (b) (4) *prior to use. Based on the provided information, the Applicant has adequately provided information to ensure safety of* (b) (4) *preparation and no additional PMC studies are needed.*

**3.2.P.3.2.3 Bioreactor System Components used in manufacture of SYMVESS Bioreactor disposable set assembly**

The Applicant submitted BLA 125812/0.69 on August 22, 2024 in response to the study requested under PMC #5, which was agreed upon previously in BLA 125812/0.61 submitted on July 29, 2024. The agreed PMC #5 was as below:

*Humacyte commits to perform sterilization validation of the commercial bioreactor disposable set and provide the final report, including the summary of the dose verification study and the applicable data. Humacyte commits to continue performing aseptic process simulation of the full manufacturing process* (b) (4) *process steps) every* (b) (4) *until this post-marketing commitment is fulfilled. Humacyte will submit the final study report by September 30, 2024.*

*Final Report Submission: September 30, 2024*

In BLA 125812/0.69, Humacyte submitted BDS (b) (4) Sterilization Validation Report which supports the (b) (4) of the bioreactor disposable set.

*Reviewer comment: DMPQ reviewed the information on sterilization of the BDS assembly. In BLA 125812/0.46, the Applicant provided sterility validation information with* (b) (4) *BDS design. However, since this information (i.e.,* (b) (4) (b) (4) *did not meet the* (b) (4) *Establishing the Sterilization Dose standards for initial bioburden level, the Applicant indicated that they would perform another validation study using* (b) (4) *BDS design. The Applicant stated that the study results would be available no later than July 24, 2024. Since the due date was close to the PDUFA action date, this outstanding issue was negotiated as a PMC study to the Applicant in an information request. In BLA 125812/0.69, the Applicant provided the study results using* (b) (4) *BDS design. The DMPQ reviewer (Dr. Zainab Mansary-Storm) assessed the submitted information to be adequate to resolve this issue. Please refer to DMPQ addendum memo for relevant assessment.*

**3.2.P.5 Control of Drug Product**
**3.2.P.5.2 and 3.2.P.5.3 Analytical Procedures and Validation of Analytical Procedures**

The Applicant submitted BLA 125812/0.71 on August 30, 2024 in response to the study requested under PMC #4 which was agreed upon previously in BLA 125812/0.61 submitted on July 29, 2024. The agreed PMC #4 was as below:

*Humacyte commits to conduct a risk assessment of environmental isolates and perform necessary sterility method qualification using in-house environmental isolates. Humacyte will submit the final study report, which includes a risk assessment and results of any method qualification studies, by August 31, 2024.*

*Final Report Submission: August 31, 2024*

In BLA125812/0.71, the Applicant provided Risk Assessment: Sterility Test Method and the Use of Environmental isolates for System Suitability Testing. They conducted a risk estimation assessment following the principles in SOP-0321, Quality Risk Management

to determine the risk level of not including the 2023 environmental isolates (b) (4) in an additional system suitability test for Sterility Testing. Based on their risk estimation, the risk not including the environmental isolates was 'Low Risk'.

*Review Comment: Dr. Hyesuk Kong (DBSQC) assessed sterility assay. In response to IR#8 (DBSQC IR#1) sent on February 8, 2024, Humacyte agreed that environmental isolates from their manufacturing facility will be used in the qualification of their sterility test method (BLA 125812/0.11). Humacyte was in the process of preparing their 2023 Annual Environmental Monitoring Trend Report. They stated a risk assessment will be performed on EM isolates identified in the report to determine the risk associates with using only USP indicator organisms during sterility method qualification. If it is determined that additional sterility method qualification is required using in-house EM isolates, this additional sterility method qualification will be completed. Humacyte opened a corrective and preventive action (i.e., CAPA-2024-011) to capture this commitment with a completion date of August 30, 2024. Since this completion date was after the PDUFA action date, this assessment was negotiated as a PMC to the Applicant in an information request. In BLA 125812/0.71, the Applicant submitted information related to sterility method qualification that is related to in-house environmental isolates. The DBSQC reviewer assessed the submitted information to be adequate to resolve this issue. Please refer to DBSQC addendum memo for relevant assessment.*

### 3.2.P.5.3 Validation of Analytical Procedures

The Applicant submitted BLA 125812/0.70 on August 30, 2024 in response to the study requested under PMC #6 which was agreed upon previously in BLA 125812/0.61 submitted on July 29, 2024. The agreed PMC #6 was as below:

> *Humacyte commits to perform an excipient sample suitability study for the sterility assay by conducting a (b) (4) study with an (b) (4) (b) (4) and submit the final study report by August 31, 2024.*
>
> *Final Report Submission: August 31, 2024*

In (b) (4) 125812/0.70, the Applicant provided a study report of sterility testing per (b) (4) (b) (4) for (b) (4) of (b) (4) ((b) (4) per (b) (4) in the excipient (b) (4) from (b) (4) The data show that (b) (4) were recovered from the excipient solution following a (b) (4) (b) (4) after (b) (4) culture period as below (Table 1).

Table 1 Sterility Testing Data for (b) (4)

(b) (4)

The study report supports that SYMVESS does not inhibit or interfere with the sterility testing. This completes the excipient suitability for the sterility assay. The Applicant has performed agreed study under the PMC #6.

*Review Comment: The Applicant previously submitted a sample suitability study under* (b) (4) *In* (b) (4)*, received on March 12, 2013, the Applicant submitted a Complete Response to Clinical Hold including issues related to sample suitability regarding sterility and endotoxin testing. However, the information was not sufficient to support the BLA. They performed a* (b) (4) *study on SYMVESS and tested for microbial recovery after* (b) (4) *using* (b) (4) (b) (4) *specified in* (b) (4) *and* (b) (4) *with* (b) (4) *However, the testing method was not* (b) (4) *which utilizes* (b) (4) (b) (4) (b) (4) (b) (4) (b) (4) (b) (4) (b) (4) *Additionally, they did not include* (b) (4) *organism in the testing. During the Late-Cycle Communication on May 20, 2024, the Agency raised a concern about missing an* (b) (4) *microorganism testing for sterility sample suitability. Since the bioburden testing performed previously can support excipient suitability for* (b) (4) *other microorganisms that overlap with* (b) (4) *recommendation, the Applicant was asked to perform* (b) (4) *study using an* (b) (4) *microorganism on* (b) (4) *sampling timing per* (b) (4) *In response to IR#29 (CMC IR#12) sent on June 13, 2024, the Applicant indicated that the PRO-119, HAV* (b) (4) *Microbial Recovery Study was developed in order to perform a* (b) (4) *study with an* (b) (4)

*organism,* (b) (4) *at* (b) (4) *for* (b) (4) *incubation in* (b) (4) *They indicated that the study report would be available no later than July 22, 2024. However, since this due date was close to the PDUFA action date, this item was negotiated as a PMC study to the Applicant in an information request. The Applicant provided their response to PMC #6 in BLA 125812/0.61, submitted on July 29, 2024. Based on the provided information, the Applicant has adequately provided information to support excipient suitability for the sterility assay and no additional PMC studies are needed.*

# EXHIBIT 3

| | |
|---|---|
| Application Type | Original BLA |
| STN | 125812/0 |
| CBER Received Date | December 11, 2023 |
| PDUFA Goal Date | August 10, 2024 |
| Division / Office | DCGT/OTP |
| Committee Chair | Jin Sung Hong, Ph.D. |
| Clinical Reviewer(s) | Prateek Shukla, M.D. |
| Project Manager | Helen Sansone |
| Priority Review | Yes |
| Reviewer Name(s) | Thomas Zhou, Ph.D. |
| Review Completion Date / Stamped Date | |
| Supervisory Concurrence | Tingting Zhou, Ph.D., Team Leader<br>OBPV/DB/TEB1 |
| | Boguang Zhen, Ph.D., Branch Chief<br>OBPV/DB/TEB1 |
| | John Scott, Ph.D., Director<br>OBPV/DB |
| Applicant | Humacyte Global, Inc. |
| Established Name | Human Acellular Vessel (HAV) |
| (Proposed) Trade Name | SYMVESS (pending) |
| Pharmacologic Class | Acellular tissue-engineered vessel |

| | |
|---|---|
| Formulation(s), including Adjuvants, etc | The HAV is a sterile, (b) (4) acellular tubular vessel composed of human collagen (b) (4) along with other extracellular matrix proteins.<br><br>The product is supplied on a silicone mandrel immersed in sterile phosphate-buffered saline (PBS) in a sealed and labeled plastic container. |
| Dosage Form(s) and Route(s) of Administration | Implanted using standard vascular surgical techniques that are similar to placement of autologous or synthetic peripheral vascular prostheses |
| Dosing Regimen | One time implantation |
| Indication(s) and Intended Population(s) | Use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. |

## Table of Contents

**Glossary ..... 5**

**1. Executive Summary ..... 6**

**2. Clinical and Regulatory Background ..... 8**

**2.1 Disease or Health-Related Condition(s) Studied ..... 8**
**2.2 Currently Available, Pharmacologically Unrelated Treatment(s)/Intervention(s) for the Proposed Indication(s) ..... 8**
**2.4 Previous Human Experience with the Product (Including Foreign Experience) ..... 9**
**2.5 Summary of Pre- and Post-submission Regulatory Activity Related to the Submission ..... 9**

**3. Submission Quality and Good Clinical Practices ..... 13**

**3.1 Submission Quality and Completeness ..... 13**
**3.2 Compliance With Good Clinical Practices And Data Integrity ..... 13**

**5. Sources of Clinical Data and Other Information Considered in the Review ..... 14**

**5.1 Review Strategy ..... 14**
**5.2 BLA/IND Documents That Serve as the Basis for the Statistical Review ..... 14**
**5.3 Table of Studies/Clinical Trials ..... 15**
**5.4 Consultations ..... 15**
5.4.2 External Consults/Collaborations (if applicable) ..... 15
**5.5 Literature Reviewed (if applicable) ..... 16**

**6. Discussion of Individual Studies/Clinical Trials ..... 18**

**6.1 Study #1: CLN-PRO-V005 ..... 18**
6.1.1 Objectives (Primary, Secondary, etc) ..... 18
6.1.2 Design Overview ..... 19
6.1.3 Population ..... 19
6.1.4 Study Treatments or Agents Mandated by the Protocol ..... 20
6.1.6 Sites and Centers ..... 20
6.1.7 Surveillance/Monitoring ..... 20
6.1.8 Endpoints and Criteria for Study Success ..... 20
6.1.9 Statistical Considerations & Statistical Analysis Plan ..... 21
6.1.10 Study Population and Disposition ..... 24
6.1.11 Efficacy Analyses ..... 29
6.1.12 Safety Analyses ..... 40
**6.2 Study #2: CLN-PRO-V017 ..... 40**
6.2.1 Objectives (Primary, Secondary, etc) ..... 41
6.2.2 Design Overview ..... 41
6.2.3 Population ..... 41
6.2.6 Sites and Centers ..... 41
6.2.8 Endpoints and Criteria for Study Success ..... 41
6.2.9 Statistical Considerations & Statistical Analysis Plan ..... 42
6.2.10 Study Population and Disposition ..... 42
6.2.11 Efficacy Analyses ..... 45
6.2.12 Safety Analyses ..... 45



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 41 of 674

10. Conclusions ....................................................................................46
10.1 Statistical Issues and Collective Evidence ............................................................. 46
10.2 Conclusions and Recommendations...................................................................... 47

## GLOSSARY

| | |
|---|---|
| AE | Adverse Event |
| AESI | Adverse Event of Special Interest |
| AFS | Amputation Free Survival |
| AIC | Akaike Information Criterion |
| AIS | Abbreviated Injury Scale |
| AVF | Arteriovenous Fistula |
| BLA | Biologics License Application |
| CBER | Center for Biologics Evaluation and Research |
| CDRH | Center for Devices and Radiological Health |
| CI | Confidence Interval |
| DMC | Data Monitoring Committee |
| DoD | Department of Defense |
| ECMO | Extracorporeal Membrane Oxygenation |
| ESRD | End-Stage Renal Disease |
| FDA | Food and Drug Administration |
| HAV | Human Acellular Vessel |
| IE | Intercurrent Event |
| IED | Improvised Explosive Device |
| IND | Investigational New Drug |
| IR | Information Request |
| ISE | Integrated Summary of Efficacy |
| ISS | Integrated Summary of Safety |
| MAIC | Matching Adjusted Indirect Comparison |
| MI | Multiple Imputation |
| PAD | Peripheral Arterial Disease |
| PDUFA | Prescription Drug User Fee Act |
| PROOVIT | PROspective Observational Vascular Injury Treatment |
| PTFE | Polytetrafluoroethylene |
| RMAT | Regenerative Medicine Advanced Therapy |
| RWD | Real World Data |
| RWE | Real World Evidence |
| SAE | Serious Adverse Event |
| SAP | Statistical Analysis Plan |
| SD | Standard Deviation |
| SLR | Systematic Literature Review |
| US | United States |

## 1. Executive Summary

Human acellular vessel (HAV), under the trade name SYMVESS, is an acellular tissue-engineered vessel composed of human extracellular matrix (ECM) proteins typically found in human blood vessels. Humacyte Global Inc. submitted results from two studies, CLN-PRO-V005 and CLN-PRO-V017, in this original Biologics Licensing Application (BLA) to support the indication of HAV's use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. Study CLN-PRO-V005 serves as the primary evidence of efficacy and safety. Study CLN-PRO-V017 serves as supportive evidence.

Study CLN-PRO-V005 was a Phase 2/3, prospective, multicenter, non-randomized, open-label, single-arm study in a total of 72 subjects aged 18 to 85 years old, with life- or limb-threatening traumatic injury to an arterial vessel in the limb or torso, who need replacement or reconstruction. Of the 72 subjects, 54 subjects with non-iatrogenic, extremity arterial injuries who received HAV as a conduit were included in the primary efficacy evaluation. The primary endpoint was primary vessel patency at Day 30. The key secondary endpoints included secondary vessel patency at Day 30, HAV infection at Day 30, and limb-salvage at Day 30. Among the 54 subjects, 13 subjects were not evaluable at Day 30 due to death (n=4), amputation (n=5), intraoperative thrombosis (n=2), or loss to follow up (n=2). Twelve of the thirteen subjects were not evaluable for patency at Day 30, while one subject was determined to be non-patent before Day 30; all thirteen subjects were not evaluable for infection and limb-salvage at Day 30. The Food and Drug Administration (FDA) performed an internal adjudication for these subjects. Results from CLN-PRO-V005 reported in this memo are based on FDA's adjudicated data with a cut-off date of January 15, 2024.

Based on the FDA adjudication, the primary patency rate at Day 30 was 66.7% (95% CI: 53.4%, 77.8%), which was lower than the mean primary patency rate for synthetic grafts of 82.4% (based on a literature search). The secondary patency rate at Day 30 was 72.2% (95% CI: 59.1%, 82.4%), which was lower than that for synthetic grafts of 78.9% (based on literature search). The limb salvage rate at Day 30 was 75.9% (95% CI: 63.1%, 85.4%). The HAV infection rate at Day 30 was 3.7% (95% CI: 1.0%, 12.5%), which was higher than the mean infection rate of 2.5% for synthetic grafts in civilian trauma (based on literature search). The risk of HAV infection was likely underestimated due to the 13 subjects not evaluable for infection at Day 30 but counted as HAV infection-free.

There were six deaths (11.1%) in this extremity group, of which four deaths occurred in the first 30 days, one on Day 42, and one on Day 128. None of the deaths were deemed related to the HAV. Of the 54 subjects, 15 (28%) experienced HAV thrombosis, 5 (9%) developed anastomotic stenosis of the



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 44 of 674

HAV, 4 (7%) had HAV rupture or anastomotic failure, and 3 (6%) had HAV infection. Other adverse events included fever in 9 (17%) subjects and procedural pain in 8 (15%) subjects.

Study CLN-PRO-V017 was a retrospective, observational, open-label, single-arm study in 17 subjects aged ≥ 18 to ≤ 85 years old, with arterial injury of the extremity, who received the HAV under the Humacyte Humanitarian Aid Program in Ukraine between June 2022 and 15 May 2023. Of the 17 subjects, 16 subjects with non-iatrogenic arterial injury to the limb were included in the primary efficacy evaluation.

Results from CLN-PRO-V017 were based on data with a cut-off date of July 31, 2023. The primary and secondary patency rates at Day 30 were both 93.8% (95% CI: 71.7%, 98.9%). The HAV infection rate was 6.3% (95% CI: 1.1%, 28.3%). None of the subjects were amputated, and no deaths were reported. One subject was reported to have 3 instances of serious adverse event (SAE), due to persistent bleeding caused by a rupture in the HAV which was consequently excised and removed. Another subject was reported to have HAV occlusion and the HAV was abandoned.

The efficacy results in CLN-PRO-V017 appeared to be better than those in CLN-PRO-V005. However, this could be attributed to selection bias, because CLN-PRO-V017 data were skewed to shrapnel injuries and not the more typical devastating severe limb or polytraumatic military injuries that could provide robust data of HAV in terms of infection resistance. Study CLN-PRO-V017 also consisted of less severe injuries compared to CLN-PRO-V005, based on the injury severity score (ISS).

Neither study met the usual criteria for an adequate and well-controlled trial. Study CLN-PRO-V017 was a retrospective observational study, which is prone to selection bias. In Study CLN-PRO-V005, the analyses were not pre-specified before outcomes were already known, and the analyses were all descriptive without formal hypothesis testing planned. Multiple major changes were introduced while the open-label study was ongoing. The study also had conduct issues with poor data quality and questionable trial integrity. For example, several cases were identified in which an implanted HAV subsequently became occluded, but the limb survived without revascularization, which raises the question of whether HAV implantation was necessary in the first place for these subjects. Other subjects treated with the HAV were later identified to have vein available for autologous graft, in which case HAV use would not be mandatory or preferred.

I performed efficacy analyses as specified in the statistical analysis plan (SAP) based on FDA's adjudicated data. There was no clinical evidence submitted that demonstrates HAV's infection resistance. Consequently, there was no evidence to support HAV's use in grossly contaminated wounds. However, the analysis

results did show that HAV may be efficacious, with an unknown long-term safety and efficacy profile, for some adults needing urgent arterial repair following extremity vascular trauma who do have alternative treatment options available (e.g., autologous vein or synthetic graft). In these subjects, there is uncertainty on how HAV compares to other treatment options. It is not apparent from the study data whether there are situations where the benefit of HAV outweighs the risk. Therefore, I defer to the clinical reviewer on the approval recommendation based on the overall benefit risk assessment and aspects of unmet need.

## 2. Clinical and Regulatory Background

### 2.1 Disease or Health-Related Condition(s) Studied

In the civilian population, traumatic vascular injuries are mainly concentrated to the limbs and torso. In the United States (US), lower extremity vascular injuries are the most common, often due to motor vehicle accidents, gunshot wounds, dog bites, and other situations resulting in blunt or penetrating trauma.

In the military population, combat resulting vascular injuries can occur in all locations of the body, with injuries to the lower extremities being most common, followed by vascular injuries to the upper extremities, neck, and torso. Improvised explosive devices (IEDs) are a major cause of vascular injuries, with over 3,000 casualties per year during recent conflicts.

### 2.2 Currently Available, Pharmacologically Unrelated Treatment(s)/Intervention(s) for the Proposed Indication(s)

Currently, to salvage injured limbs or end-organs in distal vascular bed and to prevent life threatening hemorrhage, the vascular component of the injuries is treated with interposition or bypass grafting. The gold standard for this type of reconstruction is performed by using an autologous vein from the subject (typically great saphenous vein). Alternatively, synthetic grafts, such as expanded polytetrafluoroethylene (PTFE) or Dacron, may also be used.

However, the use of these grafts is not always possible or without additional risks. For example, the subject may not have adequate autologous vein for harvest. Although synthetic grafts are approved for use in “trauma patients requiring vascular replacement” and are being used to repair vascular trauma in practice, one might say “subjects with massive fecal contamination or crush injuries or necrotic should not have gotten” synthetic grafts, according to Dr. Robert Lee, FDA’s vascular surgeon consult from the Center for Devices and Radiological Health (CDRH).

### 2.4 Previous Human Experience with the Product (Including Foreign Experience)

The HAV has been studied in 8 clinical studies in the US, Europe, and Israel, in patients with end-stage renal disease (ESRD), peripheral arterial disease (PAD), and vascular trauma.

Studies CLN-PRO-V001, CLN-PRO-V003, CLN-PRO-V006, CLN-PRO-V011 enrolled ESRD subjects requiring hemodialysis access, who were not suitable for arteriovenous fistula (AVF) creation. Study CLN-PRO-V007 enrolled ESRD subjects requiring hemodialysis access, who were candidates for AVF creation.

CLN-PRO-V002 and CLN-PRO-V004 enrolled subjects with symptomatic PAD requiring femoral-popliteal bypass when autologous vein was not available. CLN-PRO-V002 was a pilot study in Poland in 20 subjects. CLN-PRO-V004 was a Phase 2 single arm uncontrolled study in the US in 15 subjects.

All studies have completed, aside from CLN-PRO-V007 which is still ongoing. An additional 45 expanded-access subjects and 19 Ukraine Humanitarian Aid subjects have been treated. As of the Development Safety Update Report Version 10.0 with a data cutoff date of April 10, 2023, a total of 389 ESRD subjects and 35 PAD subjects have been treated.

### 2.5 Summary of Pre- and Post-submission Regulatory Activity Related to the Submission

Major regulatory history with statistical implications is summarized below:

*Pre-submission:*

1. On June 27, 2016, the Sponsor proposed Study CLN-PRO-V005 as a Phase 2, single arm, non-randomized study in 20 subjects to evaluate safety and efficacy of HAV for use as a vascular interposition graft in subjects with limb-threatening peripheral arterial trauma.

2. On August 1, 2019, the Sponsor proposed to convert Study CLN-PRO-V005 from a proof-of-concept study to a registrational study. The Sponsor proposed to compare HAV with external controls from the PROspective Observational Vascular Injury Treatment (PROOVIT) database. The FDA expressed concerns about comparability of study subjects and external controls and lack of long-term data in the PROOVIT database. The FDA requested adequate prospective clinical and statistical plans.

3. On October 1, 2020, the Department of Defense (DoD) designated the HAV as a Priority Product in accordance with Public Law 115-92.

4. On October 20, 2020, the Sponsor proposed Study CLN-PRO-V005 as a Phase 2/3 non-randomized, open-label, adaptive study in 100 eligible HAV subjects comparing to external controls from PROOVIT who received

autologous vein graft. The FDA communicated major statistical concerns about the study design, including study population, sample size, handling of missing data and intercurrent events (IE), non-inferiority design, and interim analyses.

5. On December 21, 2020, the Sponsor proposed to revise the study to compare 120 HAV subjects to matched subjects selected from the PROOVIT registry. The FDA communicated major statistical concerns in the study design, including limitations of the PROOVIT registry to serve as external controls, inadequate matching criteria, and inflated Type 1 error rate. FDA recommended non-inferiority analysis on the composite endpoint of 3-month or longer assessment of limb salvage, aneurysmal degeneration, and mortality, and superiority analysis on infection rates, compared to synthetic graft.

6. On January 28, 2021, the Sponsor proposed a revised Study CLN-PRO-V005 as a non-inferiority study in which 50 HAV subjects (with lower extremity arterial repair and where autologous vein is not feasible) would be compared to a meta-analysis derived performance goal based on PTFE synthetic graft. The proposed primary efficacy endpoint was amputation free survival (AFS), and the secondary efficacy endpoint was infection rate. The Sponsor proposed to demonstrate non-inferiority on AFS and superiority on infection. The FDA requested details on the selection of publications for inclusion and meta-analysis methodology.

7. On December 7, 2021, the Sponsor proposed to revise the primary efficacy endpoint from AFS to infection within 30 days after implantation of HAV conduit. The FDA did not agree with infection rate as the primary efficacy endpoint and communicated concerns of serious selection bias in introducing multiple changes in the study design while the open-label single-arm trial was on-going. The FDA also communicated statistical issues remained unresolved, which included Type 1 error control, handling of missing data and IEs, and analysis population. The FDA recommended a new randomized controlled trial with co-primary endpoints be conducted.

8. On March 30, 2022, the Sponsor proposed two options for a revised study design for CLN-PRO-V005. In Option 1, the Sponsor proposed to compare HAV to synthetic grafts based on the co-primary endpoints of superiority on infection and non-inferiority on AFS, both evaluated at 90 days. Performance metrics of synthetic graft were derived from meta-analysis literature review, and a matching adjusted indirect comparison (MAIC) approach would be used to match subjects to external controls. In Option 2, the Sponsor proposed to compare HAV to autologous vein based on the primary endpoint of non-inferiority on primary patency rate at 30 days. The PROOVIT registry would serve as external control in the primary analysis. In addition, the Sponsor proposed to conduct a supplemental



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 48 of 674

comparison of HAV to synthetic graft on the functional endpoints of superiority on infection and non-inferiority on amputation rates at 3 months.

The FDA responded that either proposal was inadequate due to concerns including study population, study duration, choice of endpoints, sample size, handling of missing data and IEs, selection bias, and choice of comparator. The FDA suggested that the Sponsor may reconsider an earlier proposal from 12/21/2020 informal meeting, in which the Sponsor proposed to pursue an indication for "urgent arterial repair following extremity arterial trauma (b) (4) where autologous vein is not feasible."

9. On October 26, 2022, the Sponsor presented key new data from the Ukraine Humanitarian Effort real world evidence (RWE) study during the pre-BLA meeting. The FDA did not agree with the Sponsor's proposal for BLA submission targeting accelerated approval, the main concerns being insufficient number of study subjects, insufficient data in the targeted population, absence of a clearly pre-specified comparator and SAP, absence of a clear Phase 4 confirmatory study protocol, and imprecise secondary endpoint selection. Major statistical concerns remained, including the choice of a comparator control group or benchmark and sample size.

10. On March 7, 2023, the Sponsor proposed an observational study (CLN-PRO-V017) in 30 subjects with traumatic injury sustained in Ukraine. The FDA did not agree with the Sponsor's proposal to combine the efficacy data from Study CLN-PRO-V017 with CLN-PRO-V005 due to heterogeneity between the studies. The FDA agreed with using the while-on-treatment strategy for handling IEs of deaths and amputations for the narrow indication, only in cases where the IE can be "confidently adjudicated to be unrelated to the study intervention." The FDA also recommended that supplemental analyses should be performed to address the IEs using a composite strategy. The FDA communicated concerns with using a mean-based benchmark derived from meta-analysis as the external comparator.

11. On August 11, 2023, the FDA Center for Biologics Evaluation and Research (CBER) leadership communicated to the Sponsor that "clinical efficacy data obtained from V005 study combined with the Ukrainian treatment experience, totaling 50 patients with Day 30 patency data, will be sufficient to support a request for traditional approval of biological license application (BLA) for the proposed indication [of urgent arterial repair following extremity vascular trauma (b) (4) (b) (4) when autologous vein is not feasible] along with all the safety data relevant to this indication."

12. On December 8, 2023, the Applicant submitted BLA 125812/0.

*Post-submission:*

1. On April 11, 2024, the Applicant submitted safety and efficacy data for 3 additional subjects in Study CLN-PRO-V005 as part of the 120-day safety update in amendment BLA 125812/19.

2. On May 24, 2024, in response to FDA's clinical information request (IR) #25, the Applicant submitted individual clinical summaries for the 3 additional subjects in the 120-day safety report and an imaging compliance table in amendment BLA 125812/36.

3. On June 7, 2024, in response to FDA clinical IR #27, the Applicant explained that Subject (b) (6) was included in the torso group instead of the extremity group was because this subject was enrolled in 2019 under CLN-PRO-V005 Protocol Version 3.0, which stated that "vascular repair in which any portion originates or terminates in the torso will be considered a patient in the torso cohort even if the other end of the repair resides in an extremity." The IR response was submitted to amendment BLA 125812/38.

4. During the BLA review, the proposed indication of "urgent arterial repair following extremity vascular trauma (b) (4) (b) (4) when autologous vein is not feasible" was changed to the current indication in the package insert of "use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible." The FDA clinical review team recommended this change because it was thought to be more reflective of the study population.

*Reviewer comment: The clinical development of the HAV in CLN-PRO-V005 study involved numerous and complex regulatory, clinical, and statistical issues. Study CLN-PRO-V005 underwent multiple major changes while the study was ongoing, and the ongoing clinical outcomes were known. These included major changes to the study design, study population, primary efficacy endpoints, sample size, and SAP. The performance benchmarks based on literature review were derived while this open label trial was ongoing. The performance benchmarks were finalized when all the primary and key secondary efficacy endpoints in the original submission were known. In a well-controlled study, the performance benchmark should be chosen prior to trial initiation, and used to power the study to meet a pre-specified primary objective. Therefore, the Sponsor's frequent changing of key study elements and the analysis plans while the trial was ongoing introduced selection bias.*

*The FDA was committed to working with the Sponsor and exercised regulatory flexibility on numerous occasions to further the product development. For example, the FDA review team communicated to the Sponsor that 50 subjects with 30-day primary patency rate within Study CLN-PRO-V005 would be required for adequate efficacy and safety evaluation. CBER leadership later communicated to the Sponsor that a combined 50 subjects with 30-day patency rate from both CLN-PRO-V005 and CLN-PRO-V017 would be adequate to support an application for the narrow indication of* (b) (4) [redacted] *along with adequate and sufficient safety data. This represents a significant degree of flexibility because CLN-PRO-V017 was an observational study where the HAV was given under a Humanitarian Aid Program in Ukraine, and likely to be biased.*

*The FDA also communicated that a historical mean for a benchmark as the external comparator is generally unacceptable. Substantial evidence of efficacy typically requires an accepted benchmark that is chosen towards the upper bound of the possible range of values, and not simply a mean point estimate, which can bias efficacy assessment in favor of the investigational product. Given the unmet medical need in this narrow indication and DoD Priority Product designation, the FDA exercised regulatory flexibility to allow the use of a mean-based benchmark as external comparator as supportive evidence.*

*While regulatory flexibilities helped further the product development, the data submitted do not offer the same level of certainty expected from a well-designed clinical study, especially from a randomized trial. On the contrary, these flexibilities introduce many challenges in the interpretation of results, such as presence of selection bias and no Type 1 error control.*

## 3. Submission Quality and Good Clinical Practices

### 3.1 Submission Quality and Completeness

The submission was adequately organized for conducting a complete statistical review without unreasonable difficulty.

### 3.2 Compliance With Good Clinical Practices And Data Integrity

There were major issues with data quality. During the BLA review, the FDA clinical review team identified low imaging compliance used to determine patency status (i.e., the use of Duplex versus simple ultrasound or doppler scans) and poor adjudication of patency status in subjects who were not followed up to 30 days post-implantation. As a result of the poor data quality and discrepancy between the datasets and the case report forms, the FDA performed its own internal adjudication of the efficacy data.

The clinical team, including a vascular surgeon consult, Dr. Robert Lee, found that there were several cases where the HAV occluded, and the limb survived without revascularization, raising the question if the HAV was needed in the first place, as well as some subjects for whom HAV use was not mandatory or preferred because they had available vein for transplant.

For further details, refer to the clinical review memo by Dr. Prateek Shukla.

## 5. Sources of Clinical Data and Other Information Considered in the Review

### 5.1 Review Strategy

For this review, Study CLN-PRO-V005 constitutes the primary source of evidence for safety and efficacy of HAV. Study CLN-PRO-V017 serves as supportive evidence. I verified the Applicant's efficacy results based on the Applicant's datasets and conducted the same efficacy analyses based on FDA's adjudicated datasets. Primary efficacy evaluation focused on the set of subjects in the extremity group, as defined in Section 6.1.9.

### 5.2 BLA/IND Documents That Serve as the Basis for the Statistical Review

The documents considered for statistical review include:

- Submission in BLA 125812/0 (Original submission)
  - Module 1.2 Cover Letters
  - Module 1.6 Meetings
  - Module 1.14 Labeling
  - Module 2.5 Clinical Overview
  - Module 2.7 Clinical Summary
  - Module 5.3 Clinical Study Reports
  - Module 5 Datasets
- Submission in BLA 125812/19 (Day 120 Safety Update)
  - Module 1.2 Cover Letters
  - Module 2.5 Clinical Overview
  - Module 2.7 Clinical Summary
  - Module 5.3 Clinical Study Reports
  - Module 5 Datasets
- Amendment BLA 125812/36 (Imaging Compliance Table)
  - Module 5.3 Clinical Study Reports
- Amendment BLA 125812/38 (IR Response)
  - Module 1.1.1 Information Amendment

## 5.3 Table of Studies/Clinical Trials

Table 1 summarizes the overview of clinical studies submitted in BLA 125812.

**Table 1.** Overview of clinical studies submitted in BLA 125812.

| Study Identifier | Objective(s) of the Study | Study Design | Study Population | Number of Subjects |
|---|---|---|---|---|
| CLN-PRO-V005 (Phase 2/3) | Evaluate the safety and efficacy of the HAV for use as an interposition replacement or bypass in patients with vascular trauma undergoing surgery for vascular replacement or reconstruction in size-appropriate vessels | Prospective multicenter, non-randomized, open-label, single-arm, single dose (implantation) | Adults, ≥ 18 to ≤ 85 years of age, with life- or limb-threatening traumatic injury to an arterial vessel in the limb or torso, other than the heart, which requires replacement or reconstruction when autologous vein graft is either not feasible in the judgement of the treating surgeon or is not desirable because of the urgency of revascularization | 54 subjects received HAV as a conduit to repair non-iatrogenic arterial injuries of the extremities |
| CLN-PRO-V017 (Observational) | Evaluate the efficacy and safety of the HAV in patients who had an HAV implanted to repair or reconstruct an arterial vessel following life- or limb-threatening traumatic injury of an extremity | Retrospective multicenter (3 sites in Ukraine), non-randomized, open-label, single-arm, single dose (implantation) | Adults, ≥ 18 to ≤ 85 years of age, with life- or limb-threatening traumatic injury of the extremity suffered during the Ukraine conflict between June 2022 and May 2023 | 16 subjects received HAV to repair non-iatrogenic arterial injury of an extremity |

Source: FDA reviewer.

## 5.4 Consultations

### 5.4.2 External Consults/Collaborations (if applicable)

Dr. Robert Lee from the Center for Devices and Radiological Health (CDRH) was consulted on various review issues. Dr. Lee is a vascular surgeon with 30 years of clinical experience in treating trauma patients, including those with blunt and penetrating vascular trauma due to urban violence, industrial accidents, and multiple freeways converging. Specifically, Dr. Lee provided expert opinion on the proper adjudication of clinical outcomes and adverse events of specific interest.

In Dr. Lee's clinical consult memo, he concluded:

*"The observed risks of infection associated HAV blowout and of anastomotic disruption are unacceptable when compared to current alternate treatment options. This observed failure mode of the HAV is unpredictable, catastrophic and life threatening. The risk benefit balance when using the HAV is highly unfavorable, and no suitable niche populations are apparent.*

*It is important to acknowledge that the Department of Defense has identified the need for an off the shelf vascular graft that could be used to treat America's wounded warriors. Although the sponsor's desire to market their device for this use is clear, data has NOT been provided to support that the HAV is safe or effective in this setting and the available data raises major concerns that the HAV would result in worse outcomes than alternative options available to American soldiers and other trauma patients."*

Based on the concerning benefit risk profile for the HAV, Dr. Lee recommended that *"no favorable final marketing decision should be made until the sponsor addresses key outstanding clinical questions."* These include providing follow-up data to identify the extent of missing data, conduct outcome analyses on key measures including length of HAV and blunt versus penetrating trauma, and perform analysis limited to the trauma indication excluding iatrogenic injuries and arteriovenous access revisions. Dr. Lee also recommended that there should be an external review of the Sponsor's adjudications by appropriate experts due to data discrepancies identified during the BLA review. For further details, refer to the clinical consult memo by Dr. Robert Lee.

### 5.5 Literature Reviewed (if applicable)

Literature reviewed for synthetic graft systematic literature review (Search 1):


- Chong VE, Lee WS, Miraflor E, Victorino GP, Applying peripheral vascular injury guidelines to penetrating trauma. J Surg Res. 2014 Jul;190(1):300-4.
- Fox CJ, Gillespie DL, O'Donnell SD, Rasmussen TE, Goff JM, Johnson CA, Galgon RE, Sarac TP, Rich NM, Contemporary management of wartime vascular trauma. J Vasc Surg. 2005 Apr;41(4):638-44.
- Galambos B, Tamás L, Zsoldos P, Czigány T, Jakab L, Németh J, Csönge L. Gefässverletzungen in der täglichen Praxis [Vascular injuries in everyday practice]. Zentralbl Chir. 2004 Apr;129(2):81-6.
- Laverty RB, Brock SG, Walters TJ, Kauvar DS., Outcomes of Arterial Grafts for the Reconstruction of Military Lower Extremity Arterial Injuries. Ann Vasc Surg. 2021 Oct;76:59-65.
- Lin CH, Consuegra MDL, Lin TS, Revisiting Management Strategies for Popliteal Artery Injuries. Ann Plast Surg. 2022 Mar 1;88(1s Suppl 1):S44-S49.
- Perkins ZB, Yet B, Glasgow S, Marsh DWR, Tai NRM, Rasmussen TE, Long-term, patientcentered outcomes of lower-extremity vascular trauma. J Trauma Acute Care Surg. 2018 Jul;85(1S Suppl 2):S104-S111.
- Ramdass MJ, Harnarayan P. A decade of major vascular trauma: Lessons learned from gang and civilian warfare. Ann R Coll Surg Engl. 2017 Jan;99(1):70-75.
- Rayamajhi S, Murugan N, Nicol A, Edu S, Klopper J, Naidoo N, Navsaria P., Penetrating femoral artery injuries: an urban trauma centre experience. Eur J Trauma Emerg Surg 2019 Oct;45(5):909-917.

- Rudström H, Bergqvist D, Ogren M, Björck M, Iatrogenic vascular injuries in Sweden. A nationwide study 1987-2005. Eur J Vasc Endovasc Surg. 2008 Feb;35(2):131-8.
- Sharrock AE, Tai N, Perkins Z, White JM, Remick KN, Rickard RF, Rasmussen TE. Management and outcome of 597 wartime penetrating lower extremity arterial injuries from an international military cohort. J Vasc Surg. 2019 Jul;70(1):224-232.
- Stonko DP, Betzold RD, Abdou H, Edwards J, Azar FK, Elansary NN, Treffalls RN, Savidge SG, DuBose JJ, Feliciano DV, Morrison JJ; AAST PROOVIT Study Group. , In-hospital outcomes in autogenous vein versus synthetic graft interposition for traumatic arterial injury: A propensity-matched cohort from PROOVIT. J Trauma Acute Care Surg. 2022 Feb 1;92(2):407-412.
- Urrechaga E, Jabori S, Kang N, Kenel-Pierre S, Lopez A, Rattan R, Rey J, Bornak A. Traumatic Lower Extremity Vascular Injuries and Limb Salvage in a Civilian Urban Trauma Center. Ann Vasc Surg. 2022 May;82:30-40.
- Vertrees A, Fox CJ, Quan RW, Cox MW, Adams ED, Gillespie DL. , The use of prosthetic grafts in complex military vascular trauma: a limb salvage strategy for patients with severely limited autologous conduit. J Trauma. 2009 Apr;66(4):980-3.
- Watson JD, Houston R 4th, Morrison JJ, Gifford SM, Rasmussen TE. , A retrospective cohort comparison of expanded polytetrafluorethylene to autologous vein for vascular reconstruction in modern combat casualty care. Ann Vasc Surg. 2015;29(4):822-9.

Literature reviewed for non-vein, non-synthetic graft and ligation SLR (Search 2):

- Aksoy M, Tunca F, Yanar H, Guloglu R, Ertekin C, Kurtoglu M. Traumatic injuries to the subclavian and axillary arteries: a 13-year review. Surg Today. 2005;35(7):561-5.
- Croman M, Lamberton T, Covington A, Keeley JA. Outcomes Following Below Knee Arterial Trauma. Am Surg. 2023 May 13:31348231175502.
- Franz RW, Skytta CK, Shah KJ, Hartman JF, Wright ML. A five-year review of management of upper-extremity arterial injuries at an urban level I trauma center. Ann Vasc Surg. 2012 Jul;26(5):655-64.
- Franz RW, Goodwin RB, Hartman JF, Wright ML. Management of upper extremity arterial injuries at an urban level I trauma center. Ann Vasc Surg. 2009 Jan-Feb;23(1):8-16.
- Nanobashvili J, Kopadze T, Tvaladze M, Buachidze T, Nazvlishvili G. War injuries of major extremity arteries. World J Surg. 2003 Feb;27(2):134-9.
- Reilly B, Khan S, Dosluoglu H, Harris L, O'Brien-Irr M, Lukan J, Dryjski M, Blochle R. Comparison of Autologous Vein and Bovine Carotid Artery Graft as a Bypass Conduit in Arterial Trauma. Ann Vasc Surg. 2019 Nov;61:246-253.
- Rozycki GS, Tremblay LN, Feliciano DV, McClelland WB. Blunt vascular trauma in the extremity: diagnosis, management, and outcome. J Trauma. 2003 Nov;55(5):814-24.

- Soares LT, Bastos CC, Junior AK, Pereira AJ. Traumatismos vasculares no Estado do Pará, Brasil, período de 2011 a 2013, e sua relação com variáveis clínicas e demográficas. J Vasc Bras. 2015 Abr.-Jun.; 14(2):123-132.
- Wallin D, Yaghoubian A, Rosing D, Walot I, Chauvapun J, de Virgilio C. Computed tomographic angiography as the primary diagnostic modality in penetrating lower extremity vascular injuries: a level I trauma experience. Ann Vasc Surg. 2011 Jul;25(5):620-3.

Literature reviewed for meta-analysis methodology:

- Stroup DF, Berlin JA, Morton SC, Olkin I, Williamson GD, Rennie D, Moher D, Becker BJ, Sipe TA, Thacker SB. Meta-analysis of observational studies in epidemiology: a proposal for reporting. Meta-analysis Of Observational Studies in Epidemiology (MOOSE) group. JAMA. 2000 Apr 19;283(15):2008-12.
- Page MJ, McKenzie JE, Bossuyt PM, Boutron I, Hoffmann TC, Mulrow CD, et al. The PRISMA 2020 statement: an updated guideline for reporting systematic reviews. BMJ 2021;372:n71. doi: 10.1136/bmj.n71.
- Murad MH, Sultan S, Haffar S, Bazerbachi F. Methodological quality and synthesis of case series and case reports. BMJ Evidence-Based Medicine 2018;23: 60-63.

## 6. Discussion of Individual Studies/Clinical Trials

### 6.1 Study #1: CLN-PRO-V005

The protocol for Study CLN-PRO-V005 was titled "A Phase 2/3 Study for the Evaluation of Safety and Efficacy of Humacyte's Human Accellular Vessel for Vascular Replacement or Reconstruction in Patients with Life or Limb-threatening Vascular Trauma". Here, I reviewed the protocol Version 4.0 dated May 24, 2023, and the statistical analysis plan (SAP) Version 8.0 dated May 25, 2023. Substantial statistical changes to the protocol and SAP are summarized in Section 2.5. CLN-PRO-V005 was the first-in-human study in which HAV was used to repair vascular injuries in the limb or torso, other than the heart.

#### 6.1.1 Objectives (Primary, Secondary, etc)

Primary efficacy objective:

- To determine the primary patency of the HAV at Day 30 in vascular trauma patients following surgery for vascular replacement or reconstruction due to life- or limb-threatening trauma of the extremities.

Key secondary efficacy objectives:

- To determine the patency of the HAV at least 30 days, regardless of interventions
- To determine the ability of the HAV to remain infection-free for 30 days
- To determine the rate of limb salvage for 30 days

Secondary objectives:

- To determine the long-term primary patency of the HAV
- To determine the long-term patency of the HAV, regardless of interventions
- To determine the long-term ability of HAV to stay infection-free
- To determine the long-term rate of limb salvage
- To determine the rates of interventions needed to maintain/restore patency in the HAV
- To determine patient survival
- To evaluate remodeling of the HAV

### 6.1.2 Design Overview

CLN-PRO-V005 was a Phase 2/3, prospective, multicenter, non-randomized, open-label, single-arm study to evaluate the safety and efficacy of HAV in subjects with vascular trauma to size appropriate vessels in the limb or torso, requiring replacement or reconstruction. The study planned up to 100 subjects. All subjects were to be followed for the initial 12 months, and beyond 12 months, only subjects with a patent HAV were to be followed out to a total of 36 months from the date of HAV implantation.

### 6.1.3 Population

Key eligibility criteria are described below.

Selected inclusion criteria:

- With life- or limb-threatening traumatic injury to an arterial vessel in the limb or torso, other than the heart, which requires replacement or reconstruction.
- Preoperative imaging or clinical examination indicates the damaged vessel has a defect length of ≤ 38 cm and is appropriately size matched to the 6 mm diameter of the HAV per the judgment of the treating surgeon, taking into account vasoconstriction and situational inflow and outflow considerations.
- Autologous vein graft is either not feasible in the judgment of the treating surgeon (e.g., because of lack of availability of suitable conduit, presence of severe venous insufficiency) or is not desirable because of the urgency of revascularization.
- Aged 18 to 85 inclusive (all sites) and adolescents who have achieved Tanner Stage V Sexual Maturity Rating (US sites only). As in adults, vascular injuries in this pediatric population can be treated with the HAV only if the vascular trauma involves size-appropriate vessels, per the judgment of the treating surgeon.
- Life expectancy of at least 1 year.

Selected exclusion criteria:

- Mangled Extremity Severity Score (MESS) of ≥ 7.
- Affected limb is at high risk of amputation despite vascular reconstruction (e.g., because of crush injury).
- Catastrophic injuries that make survival unlikely (e.g., Abbreviated Injury Scale (AIS) > 5 or Injury Severity Score (ISS) > 60).
- HAV may not be used for coronary artery repair.

### 6.1.4 Study Treatments or Agents Mandated by the Protocol

Investigational product: HAV

Route of administration: Implanted (single time) using standard vascular surgical techniques that are similar to the placement of autologous or synthetic peripheral vascular prostheses.

Additional medications: Essential medications include both antibiotic and antithrombotic prophylaxis in conjunction with HAV implantation in accordance with local hospital guidelines. Concomitant medications may include systemic anti-infective medications, non-steroidal anti-inflammatory drugs, systemic glucocorticoids, immunomodulatory drugs, blood products, chemotherapy or radiation used to treat malignancy, and lipid lowering agent. Particular attention was made to identify the use of antithrombotic or antiplatelet agents.

### 6.1.6 Sites and Centers

The study was conducted at 19 centers, including 17 in the US and 2 in Israel.

### 6.1.7 Surveillance/Monitoring

A Data Monitoring Committee (DMC) was implemented to review safety on an ongoing basis and provide recommendations about stopping, continuing, or otherwise modifying the study.

### 6.1.8 Endpoints and Criteria for Study Success

Primary efficacy endpoint:

- Primary HAV patency for at least 30 days after implant
    - Primary patency is defined as functional access patency until any type of intervention.

Key secondary efficacy endpoints:

- Secondary patency for at least 30 days after implant
    - Secondary patency is defined as functional HAV patency, with or without preceding successful interventional or surgical procedures to maintain or reestablish patency, until the HAV is abandoned.
- Conduit infection at Day 30 after implant
- Limb salvage rate at Day 30 after implant

Other secondary endpoints:

- Primary patency (long term)
- Secondary patency (long term)
- HAV infection (long term)
- Amputation (long term)
- HAV interventions to maintain/restore patency
- Death
- Histopathology of any clinical explants

*Reviewer comment: The FDA and the Applicant had numerous discussions and interactions regarding the efficacy endpoints throughout the pre-BLA phase and after study initiation. Section 2.5 summarizes the key regulatory history and major changes to the endpoints.*

### 6.1.9 Statistical Considerations & Statistical Analysis Plan

This was a non-randomized, single-arm, open-label study. There was no formal hypothesis testing, no pre-specified Type 1 error control, and no multiplicity adjustment. Efficacy endpoints were summarized descriptively.

<u>Analysis Population:</u>
The analysis populations are summarized as follows:

- All HAV set (AHS): All subjects who received HAV, regardless of the location of the vessel repaired and the type of injury.
- Extremity set (ES): All subjects in the AHS who underwent non-iatrogenic arterial vascular repair with HAV in an extremity.
- Torso+Iatrogenic set (TIS): All subjects in the AHS who received HAV in torso as well as subjects who received HAV to repair an iatrogenic injury. Some subjects may belong to both ES and TIS if multiple HAVs were implanted.

<u>Sample Size:</u>
No formal power calculations were performed as no formal hypothesis testing was planned.

*Reviewer comment: The planned sample size for this study had changed multiple times. On August 11, 2023, CBER leadership communicated to the Sponsor that "clinical efficacy data obtained from V005 study combined with the Ukrainian treatment experience, totaling 50 patients with day 30 patency data, will be sufficient to support a request for traditional approval of biological license application (BLA) for the proposed indication [of urgent arterial repair following extremity vascular trauma* (b) (4) *when autologous vein is not feasible] along with all the safety data relevant to this indication."*

<u>Statistical methodology:</u>
***Primary patency at Day 30 after implantation*****:** The proportion of subjects who had 30-day patency was estimated along with a 2-sided 95% score confidence interval without continuity correction.

***Secondary patency for at least 30 days after implantation*****:** The proportion of subjects who maintained secondary patency for at least 30 days was estimated along with an associated 2-sided 95% score confidence interval.

***Conduit infection at Day 30 after implant*****:** The proportion of subjects whose HAV remained infection-free for at least 30 days was estimated along with a 2-sided 95% score interval.

***Limb salvage rate at Day 30 days after implant*****:** The proportion of subjects who remain amputation-free for at least 30 days was estimated along with a 2-sided 95% score interval.

*Reviewer comment: The FDA also computed exact binomial 95% CIs for these endpoints. The exact intervals were slightly wider than the score intervals, but produced similar results and did not change the statistical interpretations of the results.*

<u>Handling of intercurrent events:</u>
Death and amputation are two frequent IEs that occur in trauma subjects. The Applicant proposed to use the while-on-treatment strategy for handling these IEs for patency, where if the IE was determined to be causally unrelated to the HAV, the last known post-implant patency status at the time of IE would be used in the primary efficacy analysis. The Applicant created an independent adjudication committee to adjudicate patency status for subjects who were not evaluable due to IEs.

- If the IE is deemed causally related to the HAV, subjects would be included as patency failure
- If causality of the IE cannot be determined, or where patency status is missing post-implant, subjects would be included as patency failure

*Reviewer Comment: The FDA agreed to the use of while-on-treatment strategy for handling of deaths and amputations for primary and secondary patency. Based on the Type C meeting on March 7, 2023, a while-on-treatment strategy can be used to handle these IEs only if they can be confidently determined to be unrelated to HAV. During review of the BLA, the FDA clinical review team expressed concerns that inconsistent and/or inadequate methods may have been used to ascertain patency status in different subjects by the adjudication committee (e.g., Applicant's use of ultrasound imaging instead of Duplex scans to determine patency rate, where the Duplex scan is the preferred method). As a result, FDA also performed its own internal adjudication. For further details, refer to the clinical review memo by Dr. Prateek Shukla.*

Handling of missing data:
No missing data handling strategies was provided.

*Reviewer's comment: Comments about missing data handling approaches were communicated to the Sponsor during the IND stage but the comments were not incorporated. The Sponsor used the same while-on-treatment strategy for missing data due to loss to follow up. In addition, if there was no definitive patency assessment such as Duplex imaging or no culture taken for HAV infection evaluation, the best outcomes (i.e., patency, no infection assumed) were used in the Sponsor's analyses.*

Supplementary analysis:
- The main analyses were repeated in AHS and TIS.
- Complete case analysis, where the main estimator will be repeated excluding all missing 30-day patency cases.

*Reviewer comment: Supplementary analyses in the AHS and TIS were not performed since the results would not inform regulatory decision on HAV's efficacy and safety for the proposed indication. The Applicant also referred to the complete case analysis as 'Sensitivity Estimator 3' in the SAP, but this is a misnomer and is in fact a supplementary analysis.*

Sensitivity analysis:
The main estimator was supported by sensitivity estimators as follows:
- Sensitivity Estimator 1: The main estimator will be repeated, after imputing all unadjudicated causality and missing patency cases as patent.
- Sensitivity Estimator 2: Complete adjudicated case analysis, where the main estimator will be repeated excluding unadjudicated causality and missing patency cases.
- Sensitivity Estimator 4: Best-case scenario, the main estimator will be repeated after inputting all missing 30-day patency cases as patent.
- Sensitivity Estimator 5: Worst-case scenario, the main estimator will be repeated after imputing all missing 30-day patency cases as not patent. This corresponds to the composite strategy where all IEs were counted as failures events.
- Sensitivity Estimator 6: Using multiple imputation (MI) for all missing 30-day patency assuming missingness depends on covariates but not on HAV patency. Logistic regression will be used including age, sex, ISS, and location (lower vs upper) as potential covariates. Additional covariates may be added if they reduce the model Akaike information criterion (AIC).

*Reviewer comment: The numbering for 'Sensitivity Estimator' corresponds to the Applicant's numbering in the SAP. Sensitivity Estimator 3 corresponds to the complete case analysis, which is a supplementary analysis.*



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 61 of 674

<u>Subgroup Analyses:</u>
Exploratory analyses of efficacy endpoints may be performed on the following subgroups, contingent on adequate enrollment: upper versus lower extremity, severity of injury, degree of ischemia, location of injury, mechanism of injury, and interval between injury and repair.

<u>Benchmark and Literature review:</u>
The Applicant performed a systematic literature review (SLR) of studies of subjects with traumatic arterial injury or injury to the upper or lower extremity. Studies included randomized controlled trials, single-arm trials, observational prospective cohort or registry studies, observational retrospective studies, and registry or case control studies, published between 2002 and through May 2023.

The Applicant performed two searches: one for vascular reconstruction via synthetic graft (Search 1), and one for non-autologous vein non-synthetic vascular graft (Search 2). Only papers with a score of 4 on the Murad scale (Murad 2018) were included in the meta-analysis for benchmark calculation.

Search 1 screened a total of 6,215 papers of synthetic grafts used in the repair of traumatic arterial injury to the extremities. Search 2 screened a total of 1,582 papers in non-vein non-synthetic grafts and ligation in the same population as in Search 1.

6.1.10 Study Population and Disposition

6.1.10.1 Populations Enrolled/Analyzed

In the original BLA submission (125812/0), 69 subjects who received the HAV were included, with 51 subjects in the ES group and 18 subjects in the TIS group, with a data cut-off date of June 30, 2023. In the Day 120 safety update (125812/19), the Applicant submitted the safety and efficacy data for 3 additional subjects (b) (6) with a data cut-off date of January 15, 2024. These 3 subjects were all in the ES group. To reduce selection bias and maximize information in this small trial, the FDA included them in the analysis population. The FDA also determined that one subject (b) (6) who was initially assigned to the TIS group, should belong to the ES group. Furthermore, the HAV was used as a patch instead of a conduit in another subject (b) (6) in the ES group, so was removed from analyses. In total, 54 subjects who received the HAV as a conduit were included the ES group and 17 in the TIS group.

*Reviewer comment: On August 11, 2023, the Applicant received the informal dispute resolution letter from CBER leadership that "clinical efficacy data obtained from V005 study combined with the Ukrainian treatment experience, totaling 50 patients with day 30 patency data, will be sufficient to support a request for traditional approval of biological license application (BLA) for the proposed indication [of urgent arterial repair following extremity vascular trauma* (b) (4) *autologous vein is not feasible]*

*along with all the safety data relevant to this indication." However, the Applicant retrospectively made a data cutoff on June 30, 2023, for the V005 study. Consequently, 3 ES subjects were excluded, although outcomes for two of the subjects were already known at the time of informational dispute resolution letter.*

- *Subject* (b) (6) *was enrolled on July 5, 2023*
- *Subject* (b) (6) *was enrolled on July 13, 2023, and died on* (b) (6)
- *Subject* (b) (6) *was enrolled on August 19, 2023, and died on* (b) (6) (b) (6)

*These 3 subjects were all in the ES group. To reduce selection bias and maximize information in this small trial, the FDA included them in the efficacy analyses.*

*On June 7, 2024, in response to a clinical IR, the Applicant clarified that one subject* (b) (6) *was included in the torso group instead of the extremity group because this subject was enrolled under CLN-PRO-V005 Protocol Version 3.0. The enrollment criteria under this protocol stated that "vascular repair in which any portion originates or terminates in the torso will be considered a patient in the torso cohort even if the other end of the repair resides in an extremity." Based on the FDA clinical reviewer's assessments, although this subject was presented with a gunshot wound to the left upper chest (torso), the HAV was implanted as an interposition graft from the left subclavian artery to the left axillary artery. Thus, this subject met the definition of ES and the FDA included this subject in the ES group for analysis.*

6.1.10.1.1 Demographics

Subjects in the ES group had a median age of 30 years old, with a minimum age of 18 and maximum age of 72 years old, were mostly male (74.1%), either white (42.6%) or black/African American (48.1%) race, and non-Hispanic or Latino ethnicity (77.8%). Subjects in the TIS group were older, with a median age of 54 years old, but otherwise had similar baseline demographics. Baseline demographics in CLN-PRO-V005 are summarized in Table 2.

**Table 2.** Baseline demographics in Study CLN-PRO-V005.

| Parameter | ES (N = 54) | TIS (N = 17) | Total HAV (N = 71) |
|---|---|---|---|
| Age (years) | - | - | - |
| n | 54 | 17 | 71 |
| Mean (SD) | 33.4 (13.6) | 48.1 (20.7) | 36.9 (16.7) |
| Median (Min, Max) | 30.0 (18, 72) | 54.0 (18, 81) | 30.0 (18, 81) |
| Sex, n (%) | - | - | - |
| Male | 40 (74.1%) | 11 (64.7%) | 51 (71.8%) |
| Female | 14 (25.9%) | 6 (35.3%) | 20 (28.2%) |
| Race, n (%) | - | - | - |
| Black or African American | 26 (48.1%) | 8 (47.1%) | 34 (47.9%) |
| White | 23 (42.6%) | 8 (47.1%) | 31 (43.7%) |
| Other | 5 (9.3%) | 1 (5.9%) | 6 (8.5%) |
| Ethnicity: Hispanic or Latino, n (%) | - | - | - |
| Yes | 12 (22.2%) | 2 (11.8%) | 14 (19.7%) |
| No | 42 (77.8%) | 15 (88.2%) | 57 (80.3%) |

Abbreviations: SD = Standard Deviation; Min = Minimum; Max = Maximum

Source: Adapted from BLA125812/0; Module 5.3.5.2, Clinical Study Report, p.75.

6.1.10.1.2 Medical/Behavioral Characterization of the Enrolled Population

In the ES group, 26 (48.2%) subjects had an Abbreviated Injury Scale (AIS) of severe and 14 (25.9%) subjects an AIS of critical. The median Injury Severity Score (ISS) in the ES group was 17, with a minimum score of 9 and a maximum score of 50. The two most common types of injuries in the ES group were gunshot wounds (53.7%) and motor vehicle accidents (25.9%). Penetrating trauma was more common than blunt trauma, with 31 (57.4%) extremity subjects compared to 23 (42.6%), respectively. Comorbid conditions and medical history issues were infrequent in this population. The baseline disease and medical characteristics in CLN-PRO-V005 are summarized in Table 3.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 64 of 674

**Table 3.** Baseline disease and medical characteristics in Study CLN-PRO-V005.

| Parameter | ES (N = 54) | TIS (N = 17) | Total HAV (N = 71) |
|---|---|---|---|
| Abbreviated Injury Scale (AIS), n (%) | - | - | - |
| Moderate | 0 (0%) | 2 (11.8%) | 2 (2.8%) |
| Serious | 14 (25.9%) | 1 (5.9%) | 15 (21.1%) |
| Severe | 26 (48.2%) | 4 (23.5%) | 30 (42.3%) |
| Critical | 14 (25.9%) | 6 (35.3%) | 20 (28.2%) |
| Missing | 0 (0%) | 4 (23.5%) | 4 (5.6%) |
| Injury Severity Score (ISS) | - | - | - |
| n | 54 | 13 | 67 |
| Mean (SD) | 21.1 (10.2) | 21.8 (13.4) | 21.2 (10.8) |
| Median (Min, Max) | 17.0 (9, 50) | 24.0 (4, 50) | 17.0 (4, 50) |
| Injury Location, n (%) | - | - | - |
| Abdomen | 0 (0%) | 1 (5.9%) | 1 (1.4%) |
| Chest | 0 (0%) | 3 (17.7%) | 3 (4.2%) |
| Pelvis | 0 (0%) | 1 (5.9%) | 1 (1.4%) |
| Lower extremity | 42 (77.8%) | 8 (47.1%) | 50 (70.4%) |
| Upper extremity[1] | 12 (22.2%) | 4 (23.5%) | 16 (22.5%) |
| Artery Category, n (%) | - | - | - |
| Femoral artery | 18 (33.3%) | 7 (41.2%) | 25 (35.2%) |
| Popliteal artery | 22 (40.7%) | 1 (5.9%) | 23 (32.4%) |
| Other | 14 (25.9%) | 9 (52.9%) | 23 (32.4%) |
| Cause of Trauma, n (%) | - | - | - |
| Crush | 2 (3.7%) | 0 (0%) | 2 (2.8%) |
| Fall | 3 (5.6%) | 0 (0%) | 3 (4.2%) |
| Gunshot injury | 29 (53.7%) | 4 (23.5%) | 33 (46.5%) |
| Iatrogenic injury | 0 (0%) | 12 (70.6%) | 12 (16.9%) |
| Industrial accident | 3 (5.6%) | 0 (0%) | 3 (4.2%) |
| Motor vehicle accident | 14 (25.9%) | 1 (5.9%) | 15 (21.1%) |
| Other[2] | 3 (5.6%) | 0 (0%) | 3 (4.2%) |
| Nature of Trauma, n (%) | - | - | - |
| Blunt trauma | 23 (42.6%) | 1 (5.9%) | 24 (33.8%) |
| Penetrating trauma | 31 (57.4%) | 16 (94.1%) | 47 (66.2%) |
| Deep tissue injury | 52 (96.3%) | 5 (29.4%) | 57 (80.3%) |
| Open fracture injury | 31 (57.4%) | 5 (29.4%) | 36 (50.7%) |
| Contaminated wound | 50 (92.6%) | 9 (52.9%) | 59 (83.1%) |

Abbreviations: SD = Standard Deviation; Min = Minimum; Max = Maximum

[1]One subject (b) (6) presented with a gunshot wound to the left upper chest (torso) but received the HAV as an interposition graft from the left subclavian artery to the left axillary artery. This subject was included in the upper extremity category of the ES group.

[2]Other causes of trauma in the ES group include laceration from broken glass, rotary saw injury, and skateboard accident.

Source: FDA reviewer.

Autologous vein is the gold standard for repair of vascular trauma. The reasons for not using autologous vein included 3 (5.6%) for patient's preference, 8 (14.8%) for concomitant injury to the vein, 19 (35.2%) for poor quality or size of vein, and 22 (40.7%) for time limitation so harvest not possible. There were 14 (25.9%) instances for other reasons, including body habitus; both legs with external fixation made harvesting problematic; complexity of global care; contralateral limb trauma; saphenous vein transposition was performed initially but failed; saphenous vein harvest not possible; saphenous vein previously removed; heavy contamination; risk of injury to vein due to adjacent injuries to the area; subject on extracorporeal membrane oxygenation (ECMO) did not want to create another wound; obesity resulting in difficult saphenous vein harvest; and prone positioning.

*Reviewer's comment: FDA's vascular surgeon consult from CDRH, Dr. Robert Lee, said that "there were several cases where the HAV occluded, and the limb survived without revascularization, raising the question if the HAV was needed in the first place." The clinical reviewer identified four "potential subjects who had HAV abandoned without replacement:* (b) (6) *Furthermore, one subject* (b) (6) *was treated with HAV but had HAV removed on Day 1 due to thrombosis; subsequently, this subject received autologous vein graft. Based on the operative note, "the patient had been consented for Humacyte conduit bypass as part of a clinical trial and therefore we elected to use this conduit and not harvest the saphenous vein." These cases represent situations in which HAV use was not mandatory and raise concerns about trial conduct.*

6.1.10.1.3 Subject Disposition
A total of 87 subjects were screened, of whom 15 were screen failures and 72 subjects received HAV. One subject (b) (6) received the HAV as a "patch" instead of as a conduit and was excluded from the efficacy analysis sets. Fifty-four (54) subjects who received the HAV as a conduit were included in the ES group for FDA's efficacy analyses.

Of the 54 subjects in the ES group, 13 subjects were not evaluable at Day 30 for some or all efficacy endpoints. These subjects included 4 deaths, 5 amputations, 2 HAV explantations on Day 1 due to immediate thrombosis, and 2 lost to follow-up. Twelve of the 54 (22.2%) subjects did not have patency data at Day 30.

*Reviewer comment: Of these 13 subjects, one subject* (b) (6) *was lost to follow up on Day 19, but was determined to be non-patent on Day 4. Thus, this subject was evaluable for patency, but not for infection or limb salvage.*



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 66 of 674

## 6.1.11 Efficacy Analyses

### 6.1.11.1 Analyses of Primary Endpoint(s)

*Adjudication of subjects not evaluable for Day 30*

Of the 54 subjects in the ES group, 12 subjects were not evaluable for primary patency at Day 30 due to amputation (n=5), death (n=4), intraoperative thrombosis (n=2), and loss to follow-up (n=1). The Applicant adjudicated only 3 subjects as non-patent due to thrombosis and HAV explant and adjudicated the remaining 9 subjects as patent despite lack of definitive imaging assessment of patency and presence of histology evidence of non-patency.

The FDA's clinical review team performed an internal re-adjudication of the 12 subjects based on the subjects' case reports. The FDA agreed with the Applicant on 3 subjects (b) (6) who were not patent due to thrombosis and HAV explant. The FDA disagreed with the Applicant and determined that one subject (b) (6) was not patent at Day 30 because the subject was amputated on Day 4 with myonecrosis, worrisome explant histology with bacteria, and thrombus on histology. The FDA adjudicated the remaining 8 subjects as non-patent due to the lack of definitive imaging assessment or histology evidence for patency. For further details, refer to the clinical review memo by Dr. Prateek Shukla.

*Applicant's analysis*

The Applicant's analyses were based on the 51 subjects' data submitted in the original BLA submission with a data cut-off date of June 30, 3023. The Applicant's data did not exclude the "patch" subject (b) (6) from the ES group, did not count subject (b) (6) who met the definition of ES but was originally assigned to the torso group, and did not include the 3 additional subjects (b) (6) (b) (6) submitted in the 120-day safety update.

Based on the Applicant's data, the primary patency rate at Day 30 using the while-on-treatment strategy was 84.3% (95% CI: 72.0%, 91.8%). Sensitivity analysis using the composite strategy and a complete case analysis yielded a primary patency rate of 68.6% (95% CI: 55.0%, 79.7%) and 81.4% (95% CI: 67.4%, 90.3%), respectively. The analysis results for Day 30 primary patency rate in the ES group are summarized in Table 4.

**Table 4.** Primary patency rate at Day 30 in the extremity group in Study CLN-PRO-V005 based on Applicant's data.

| | Patency Rate % (n/N) | 95% CI |
|---|---|---|
| Primary efficacy analysis:<br>Primary patency rate at Day 30 (While-on-treatment)[1] | 84.3% (43/51) | 72.0%, 91.8% |
| Sensitivity analysis:<br>Primary patency rate at Day 30 (Composite)[2] | 68.6% (35/51) | 55.0%, 79.7% |
| Supplementary analysis:<br>Primary patency rate at Day 30 (Complete case)[3] | 81.4% (35/43) | 67.4%, 90.3% |

[1]IEs were handled using while-on-treatment strategy.
[2]IEs were handled using composite strategy, where missing 30-day patency due to IE was assigned not patent.
[3]IEs were excluded as a complete case analysis.

Source: Adapted from BLA125812/0; Module 5.3.5.2, Clinical Study Report, p.87.

*Reviewer's comment: The while-on-treatment strategy represents an overestimate of the Day 30 primary patency rate because the adjudicated subjects are counted as patent at the time of the intercurrent event despite the fact many died or were amputated within the first 10 days after implant and had no definitive imaging assessments prior to death or amputation. A composite strategy in which deaths and amputations without definitive imaging assessments for patency are considered non-patent should have been used. The complete case analysis is likely biased due to selection bias introduced by excluding non-evaluable subjects who had worse outcomes than subjects who were evaluable for Day 30.*

*FDA's analysis*
The FDA's analysis was based on 54 subjects in the ES group, which excluded the one "patch" subject (b) (6) included the one torso subject (b) (6) in the ES group, and included the 3 new subjects (b) (6) in the 120-day safety update.

Based on FDA's adjudication, the primary patency rate at Day 30 was 66.7% (95% CI: 53.4%, 77.8%). The while-on-treatment strategy and the composite strategy were the same because many of the non-evaluable subjects had no data to support patency. The complete case analysis resulted in a primary patency rate of 78.3% (95% CI: 64.4%, 87.7%), which is likely biased due to selection bias. The analysis results for primary patency at Day 30 in the ES group are summarized in Table 5.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 68 of 674

**Table 5.** Primary patency rate at Day 30 in the extremity group in Study CLN-PRO-V005 based on FDA's data.

| Analysis | Patency Rate % (n/N) | 95% CI |
|---|---|---|
| Primary efficacy analysis: Primary patency rate at Day 30 (While-on-treatment)[1] | 66.7% (36/54) | 53.4%, 77.8% |
| Sensitivity analysis: Primary patency rate at Day 30 (Composite)[2] | 66.7% (36/54) | 53.4%, 77.8% |
| Supplementary analysis: Primary patency rate at Day 30 (Complete case)[3] | 78.3% (36/46) | 64.4%, 87.7% |

[1]IEs were handled using while-on-treatment strategy.
[2]IEs were handled using composite strategy, where missing 30-day patency due to IE was assigned not patent.
[3]IEs were excluded as a complete case analysis.

Source: FDA reviewer.

*Benchmark from literature*

Primary patency for synthetic grafts was extracted from only 1 publication (Stonko et al. 2022), which reported 9 cases out of 51 total patients who needed re-operative interventions. Here, we inferred no need for re-operative interventions meant primary patency, so the estimate from this article was 82.4% (95% CI: 69.7%, 90.4%).

The Applicant also identified only 1 study (Reilly 2019) with 12 non-vein non-synthetic grafts which reported a primary or secondary patency estimate of 78% (95% CI: 49.5%, 97.6%).

*Tipping point analysis: primary patency at Day 30*

A "tipping point" analysis was conducted to evaluate the impact of adjudicating the 8 subjects who had no definitive imaging assessment or histology evidence and were adjudicated as failures in the FDA's primary analysis. The results of this sensitivity analysis are illustrated in Figure 1.

**Figure 1.** Tipping point analysis for the primary patency rate at Day 30.




Source: FDA reviewer.

The tipping point analysis shown in Figure 1 illustrated that at least 7 subjects without definitive imaging assessment or histology evidence would need to be patent in order for the primary patency rate to meet the external benchmark of 78% for non-autologous non-synthetic grafts, and all 8 subjects would need to be patent to meet the benchmark of synthetic graft.

*Reviewer comment: Comparison to the mean of the benchmark was descriptive in nature and served as supportive evidence. It is unknown whether the trial population and the population included in the meta-analysis were comparable. The primary patency rate of HAV at Day 30 might be lower or comparable to that of synthetic graft. It is difficult to make a conclusion without a randomized controlled trial.*

6.1.11.2 Analyses of Secondary Endpoints

<u>Secondary patency at Day 30</u>

*Applicant's analysis*

Based on the Applicant's adjudication, the secondary patency rate at Day 30 using the while-on-treatment strategy was 90.2% (95% CI: 79.0%, 95.7%). Sensitivity analysis using the composite strategy and a complete case analysis yielded a secondary patency rate of 74.5% (95% CI: 61.1.0%, 84.5%) and 90.5% (95% CI: 77.9%, 96.2%), respectively. The analysis results for secondary patency at Day 30 in the ES group are summarized in Table 6.

*Reviewer's comment: As for the primary endpoint, the while-on-treatment strategy represents an overestimate of the Day 30 secondary patency rate because the adjudicated subjects are counted as patent at the time of the intercurrent event despite the fact many died or were amputated within the first 10 days after implant and had no definitive imaging assessments prior to death or amputation. A composite strategy in which deaths and amputations without definitive imaging assessments for patency are considered non-patent should have been used. The complete case analysis is likely biased due to selection bias introduced by excluding non-evaluable subjects who had worst outcomes than subjects who were evaluable for Day 30.*

**Table 6.** Secondary patency rate at Day 30 in the extremity group in Study CLN-PRO-V005 based on Applicant's data.

| | Patency Rate % (n/N) | 95% CI |
|---|---|---|
| Key secondary efficacy endpoint: Secondary patency rate at Day 30 (While-on-treatment)[1] | 90.2% (46/51) | 79.0%, 95.7% |
| Sensitivity analysis: Secondary patency rate at Day 30 (Composite)[2] | 74.5% (38/51) | 61.1%, 84.5% |
| Supplementary analysis: Secondary patency rate at Day 30 (Complete case)[3] | 90.5% (38/42) | 77.9%, 96.2% |

[1]IEs were handled using while-on-treatment strategy.
[2]IEs were handled using composite strategy, where missing 30-day patency due to IE was assigned not patent.
[3]IEs were excluded as a complete case analysis.

Source: Adapted from BLA125812/0; Module 5.3.5.2, Clinical Study Report, p.89.

*FDA's analysis*

In the FDA's dataset, all the subjects that the FDA adjudicated as patent for Day 30 primary patency were counted as patent for Day 30 secondary patency, in addition to the 3 subjects (b) (6) who were included as patent for secondary patency.

Based on the FDA's adjudication, the secondary patency rate at Day 30 using the while-on-treatment strategy was 72.2% (95% CI: 59.1%, 82.4%). The while-on-treatment strategy and the composite strategy were the same because many of the non-evaluable subjects had no data to support patency. The complete case analysis resulted in a secondary patency rate of 84.8% (95% CI: 71.8%, 92.4%), which is likely biased due to selection bias. The analysis results for secondary patency at Day 30 in the ES group are summarized in Table 7.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 71 of 674

**Table 7.** Secondary patency rate at Day 30 in the extremity group in Study CLN-PRO-V005 based on FDA's data.

| | Patency Rate % (n/N) | 95% CI |
|---|---|---|
| Key secondary efficacy endpoint: Secondary patency rate at Day 30 (While-on-treatment)[1] | 72.2% (39/54) | 59.1%, 82.4% |
| Sensitivity analysis: Secondary patency rate at Day 30 (Composite)[2] | 72.2% (39/54) | 59.1%, 82.4% |
| Supplementary analysis: Secondary patency rate at Day 30 (Complete case)[3] | 84.8% (39/46) | 71.8%, 92.4% |

[1]IEs were handled using while-on-treatment strategy.
[2]IEs were handled using composite strategy, where missing 30-day patency due to IE was assigned not patent.
[3]IEs were excluded as a complete case analysis.

Source: FDA Reviewer.

*Benchmark from literature*

The benchmark for secondary patency rate was derived from 7 studies on synthetic grafts. The meta-analysis resulted in a mean estimate of 78.9% (95% CI: 68.0%, 88.4%).

*Tipping point analysis: secondary patency at Day 30*

A "tipping point" analysis was performed to assess the robustness of the secondary patency rate. This sensitivity analysis is illustrated in Figure 2. At least 4 subjects would need to be patent for the secondary patency rate to be 78%, and 5 subjects would need to be patent to achieve a patency rate of 80%.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 72 of 674

**Figure 2.** Tipping point analysis for the secondary patency rate at Day 30.




Source: FDA Reviewer.

<u>HAV Infection rate at Day 30</u>

*Applicant's analysis*

Based on the Applicant's dataset, only 1 subject (b) (6) had HAV infection by Day 30. The HAV infection rate at Day 30 was 2.0% (95% CI: 0.4%, 10.3%). This analysis underestimated the risk of HAV infection as it counted subjects who were not evaluable for Day 30 and/or had no culture taken for infection evaluation as having no infection for Day 30. Nine out of the 12 subjects did not make it to Day 10 and two subjects had HAVs removed on Day 1, but all were counted as not infected for Day 30.

*Reviewer's comment: The 12 subjects in the Applicant's dataset not evaluable for infection included: subject (b) (6) (amputation on Day 4), (b) (6) (death on Day 4),(b) (6) (LTFU on Day 5), (b) (6) (amputation on Day 19), (b) (6) (amputation on Day 6), (b) (6) (explant/amputation on Day 17), (b) (6) (LTFU on Day 20), (b) (6) (death on Day 9), (b) (6) (explant due to thrombosis on Day 1), (b) (6) (amputation on Day 9), (b) (6) (death on Day 8), (b) (6) (explant due to thrombosis on Day 1).*

*The Applicant did not evaluate HAV infection for many of the subjects who were amputated or died. This analysis used the while-on-treatment strategy of handling the IEs for estimation of infection rate, which was not pre-specified in the SAP. It is unknown whether HAV was infected for many of the subjects who were amputated or died or were lost to follow-up. Including subjects with missing*

*data on HAV infection as having no infection for Day potentially underestimated the risk of infection, biasing in favor of HAV.*

*FDA's analysis*
Based on the FDA's adjudicated dataset, the HAV infection rate at Day 30 was 3.7% (95% CI: 1.0%, 12.5%) in 2 subjects (b) (6) The FDA also identified one subject (b) (6) who had HAV infection past Day 30, but it was unknown when infection took place. The HAV infection rate over the entire study duration was 5.6% (95% CI: 1.9%, 15.1%). For further details, refer to the clinical review memo by Dr. Prateek Shukla.

*Benchmark from literature*
To establish an external benchmark comparator, the Applicant performed a SLR for synthetic graft infection in a similar manner as described previously for patency rates. Of the 5 papers included in the Applicant's meta-analysis, 3 papers concerned a civilian population while 2 papers concerned a military population.

Much lower infection rates were reported in civilian trauma than in military trauma: 0% in 0 out of 51 subjects, 6.4% in 3 out of 47 subjects, and 6.3% in 1 out of 16 subjects in the three civilian population papers, compared to 28.6% in 4 out of 14 subjects and 40.0% in 2 out of 5 subjects in the two military population papers. The 8.4% infection rate that the Applicant initially reported as benchmark was much higher due to the inclusion of the 2 military trauma papers and thus biased in favor of HAV.

Because Study CLN-PRO-V005 enrolled only civilian trauma subjects, an appropriate external benchmark should be based on the 3 civilian trauma papers. Based on the 3 papers in civilian trauma, the infection rate benchmark could have been 2.5% (95% CI: 0%, 11%). The HAV infection rate of 3.7% exceeded this benchmark. In addition, one paper (Stonko et al., 2022) that enrolled 51 civilian trauma subjects with an injury severity score (mean: 21.1, median, 17.5) very similar to subjects in CLN-PRO-V005 (mean: 20.8, median, 17.0), did not report any infections.

Based on these findings, the data do not support the Applicant's claim that the HAV is infection resistant and can be used in grossly contaminated trauma wounds.

Limb salvage rate at Day 30
*Applicant's analysis*
Based on the Applicant's data, the limb salvage rate at Day 30 was 90.2% (95% CI: 79.0%, 95.7%).

*FDA's analysis*
Based on the FDA's adjudicated data, the limb salvage rate at Day 30 was 75.9% (95% CI: 63.1%, 85.4%) in 41 out of 54 subjects. Five subjects were amputated and 4 died. The amputation rate at Day 30 was 9.3% (95% CI: 4.0%, 19.9%). For further details, refer to the clinical review memo by Dr. Prateek Shukla.

*Reviewer's comment: The limb salvage rate was estimated to be much lower in FDA's analysis compared to the Applicant's. This large discrepancy was due to the Applicant's use of the while-on-treatment strategy in handling intercurrent events, which considered subjects who died, had HAV explanted, HAV occlusion, or were lost to follow up as limb salvaged. In contrast, the FDA assumed the conservative values of limb not salvaged for these subjects. In particular, subjects who died and were no longer at risk for amputation should not be counted as limb salvage.*

*<u>Benchmark from literature</u>*
To establish an external benchmark comparator, the Applicant performed a SLR for synthetic graft amputation rate in a similar manner as described previously for patency rates. Amputations for synthetic graft subjects were extracted from 86 grafts reported in 6 papers. The meta-analysis pooled amputation rate was 24.3% (95% CI: 8.7%, 43.7%). Only one study (Reilly 2019) was identified with non-vein non-synthetic grafts (n = 12), which reported an amputation rate of 16.7% (95% CI: 4.7%, 44.8%). The amputation rate throughout the study was similar to the rate reported in the non-vein non-synthetic graft population.

6.1.11.3 Subpopulation Analyses

The FDA conducted post-hoc exploratory subgroup analyses to assess the patency rate based on FDA's adjudicated patency data.

*<u>By age</u>*
Subgroup analysis by age was not performed due to insufficient pediatric or older adult subjects enrolled in the study.

*<u>By sex</u>*
The primary patency rate at Day 30 in males was 65.0% (n = 40; 95% CI: 49.5%, 77.9%) and in females was 71.4% (n = 14; 95% CI: 45.4%, 88.3%). The primary patency rate at Day 30 was similar between males and females.

*<u>By race</u>*
The primary patency rate at Day 30 in black or African American subjects was 76.9% (n = 26; 95% CI: 58.0%, 89.0%) and in white subjects it was 65.2% (n = 23; 95% CI: 44.9%, 81.2%). Only 1 subject out of 5 was patent in the 'Other' (non-black, non-white) race group, so the patency rate was 20.0% (95% CI: 3.6%, 62.5%). The primary patency rate at Day 30 was similar between black

and white subjects. The patency rate was much lower in subjects of other races, but this subgroup was limited by the small sample size.

*Primary patency at Day 30 by HAV lengths*

There is currently no accepted graft length in literature that would suggest a threshold for subgroup analysis. Based on the clinical reviewer's recommendation, FDA conducted subgroup analyses by HAV length, < 15 cm versus ≥ 15 cm. One subject (b) (6) did not have HAV length recorded. The following results were reported assuming this subject received an HAV < 15cm in the subgroup analysis.

Twenty-seven (69.2%) subjects were patent at Day 30 for those with HAV < 15 cm, compared to 9 (60.0%) with HAV ≥ 15 cm. The subgroup analyses were then repeated assuming subject (b) (6) received an HAV ≥ 15 cm in the subgroup analysis, with similar results. Subjects with longer HAV lengths had somewhat lower primary patency rate at Day 30. However, no conclusions about the relationship between HAV lengths and patency can be reached due to limited sample size in the subgroups and the post hoc nature of the analysis.

*Primary patency at Day 30 by trauma type*

A subgroup analysis by blunt versus penetrating trauma was performed. The primary patency rate at Day 30 among subjects with blunt trauma was 65.2% (95% CI: 44.9%, 81.2%) in 15 out of 23 subjects. The primary patency rate at Day 30 among subjects with penetrating trauma was 67.7% (95% CI: 50.1%, 81.4%) in 21 out of 31 subjects. The patency rates were similar between the two trauma types.

#### 6.1.11.4 Dropouts and/or Discontinuations

In total, 13 subjects in the ES experienced IEs or discontinued from the study before Day 30. These subjects were adjudicated by both the Applicant and the FDA. Of these 13 subjects, 4 died, 5 were amputated, 2 had HAV explanted on Day 1 due to immediate thrombosis, and 2 were lost to follow-up. For further details, refer to the clinical review memo by Dr. Prateek Shukla.

Section 6.1.9 describes the planned strategy for handling intercurrent events and missing data due to loss to follow up.

#### 6.1.11.5 Exploratory and Post Hoc Analyses

The FDA conducted post-hoc exploratory analyses per FDA clinical review team's request.

*Long term primary patency rate*

The 30-day landmark primary patency estimate based on a Kaplan-Meier (KM) survival curve was 68.5% (95% CI: 57.2%, 82.1%) and the 6-month landmark estimate was 58.0% (95% CI: 45.9%, 73.2%). The KM plot for the primary patency rate is illustrated in Figure 3.

**Figure 3.** Kaplan-Meier plot for primary patency.




Source: FDA Reviewer.

*<u>Long term secondary patency rate</u>*
The 30-day landmark secondary patency estimate based on a KM survival curve was 74.1% (95% CI: 63.3%, 86.7%) and the 6-month estimate was 63.5% (95% CI: 51.6%, 78.2%). The KM plot for secondary patency rate is illustrated in Figure 4.

**Figure 4.** Kaplan-Meier plot for secondary patency.




Source: FDA Reviewer.

The KM analysis of primary and secondary patency are limited by the availability of long-term patency data after 1 year. The KM estimates for patency rates at Day 30 are aligned with estimates reported in Sections 6.1.11.1 and 6.1.11.2.

*Reviewer's comment: The data on long-term efficacy and safety were very limited by the large number of dropouts. Subject follow-up ranged from 1-1134 days (median = 188.5 days) with 41 subjects (75.9%) followed through day 30 and 30 subjects (55.6%) followed for at least six months. The KM analyses also assumed non-informative censoring which might not be reasonable. The long-term efficacy and safety of HAV is unknown.*

#### 6.1.12 Safety Analyses

Descriptive statistics were used to summarize safety data for Study CLN-PRO-V005. AEs were reported from the time of informed consent through the data cutoff date of June 30, 2023.

#### 6.1.12.3 Deaths

Six subjects in the extremity group died. Four deaths occurred in the first 30 days of the study. Two additional subjects died on days 42 and 128, respectively. None of the deaths was deemed related to HAV.

#### 6.1.12.4 Nonfatal Serious Adverse Events

In the ES group, 28 subjects experienced 78 SAEs. The most frequent adverse events (≥3% of subjects) reported in the ES were wound infection, thrombosis, pyrexia (fever), pain, anastomotic stenosis, HAV rupture and infection. Sixteen subjects (29.6%) had wound infection, 15 (27.8%) had thrombosis, 5 (9.3%) anastomotic stenosis, 4 (7.4%) had HAV rupture, and 3 (5.6%) had HAV infection. Out of the 5 cases of anastomotic stenosis, two cases (3%) were assessed as serious adverse events.

#### 6.1.12.5 Adverse Events of Special Interest (AESI)

In the ES group, 15 out of 54 subjects (27.8%) experienced a thrombotic event involving the HAV, and 5 out of 54 extremity subjects (9.3%) developed anastomotic stenosis of the HAV. Other complications of the HAV include anastomotic bleeding or rupture (n = 4, 7.3%), pseudoaneurysm (n = 2, 3.7%), and aneurysm (n = 1, 1.9%).

*Reviewer's comment: We defer to the clinical review team to assess the impact of the 7.4% rupture risk on the overall benefit-risk profile of HAV.*

### 6.2 Study #2: CLN-PRO-V017

Study CLN-PRO-V017 was a retrospective, observational study to evaluate the safety and efficacy of the HAV for arterial repair or reconstruction in Ukrainian subjects with life or limb-threatening vascular trauma. This study serves as supportive evidence of safety and efficacy of HAV.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 78 of 674

### 6.2.1 Objectives (Primary, Secondary, etc)

Primary efficacy objective:

- To determine the rate of primary patency at 30 days after HAV implantation.

Secondary efficacy objectives include:

- To determine the rate of affected limb salvage/amputations up to 6 months after HAV implantation
- To determine the patency of the HAV (primary, primary assisted and secondary) up to 6 months after HAV implantation

### 6.2.2 Design Overview

CLN-PRO-V017 was a retrospective, observational, cohort, multicenter study in 19 Ukrainian subjects, aged ≥ 18 to ≤ 85 years old, to evaluate the safety and efficacy of the HAV for arterial replacement or reconstruction in subjects with life- or limb-threatening vascular trauma.

### 6.2.3 Population

The study population included Ukrainian subjects, aged ≥ 18 to ≤ 85 years old, with HAV implanted to repair or reconstruct an arterial vessel following life- or limb-threatening traumatic injury of the extremity between June 2022 and 15 May 2023 (inclusive). The subjects received the HAV under the Humacyte Humanitarian Aid Program in Ukraine.

*Reviewer comment: Based on the CLN-PRO-V017 clinical study report, surgeons who received HAVs for humanitarian aid were provided a document entitled "Humacyte Human Acellular Vessel (HAV) for Arterial Replacement or Reconstruction in Patients with Limb-threatening Vascular Trauma (Recommendations for UKRAINE)", that recommended the use of the same inclusion and exclusion criteria as CLN-PRO-V005. However, the inclusion/exclusion criteria in the CLN-PRO-V017 protocol simply stated that the study population included subjects 18 to 85 years old with a need for arterial repair following extremity trauma, with no mention of severity of injuries, feasibility of autologous vein graft, size of conduit, or life expectancy. It is unknown if the recommendations were followed in practice.*

### 6.2.6 Sites and Centers

The study was conducted at 3 sites located in Ukraine.

### 6.2.8 Endpoints and Criteria for Study Success

Primary efficacy endpoint:

- Primary HAV patency for at least 30 days after implant

Key secondary efficacy endpoints:

- Secondary patency for at least 30 days after implant
- HAV infection free rate for 30 days
- Limb salvage rate for 30 days

Other secondary endpoints:

- HAV interventions to maintain/restore patency
- Long term primary patency
- Long term secondary patency
- Long term limb salvage

6.2.9 Statistical Considerations & Statistical Analysis Plan

CLN-PRO-V017 was a retrospective, observational study in which subjects received the HAV. There was no formal hypothesis testing, no pre-specified significance level or Type 1 error control, and no multiplicity adjustment. Efficacy evaluation was based on descriptive statistics.

The analysis populations included the AHS and ES. The AHS includes all subjects who underwent arterial repair with an HAV in an extremity and has been consented for the study. The ES includes all subjects in the AHS who underwent non-iatrogenic arterial vascular repair with an HAV in an extremity.

No formal sample size calculations were performed. The sample size was determined by the number of subjects available who consented to the study at each site. Analyses of the primary and key secondary efficacy endpoints were the same as described in Section 6.1.9 for study CLN-PRO-V005. Missing data and intercurrent event handling strategies were also the same as study CLN-PRO-V005.

6.2.10 Study Population and Disposition

6.2.10.1 Populations Enrolled/Analyzed

In total, 19 subjects received the HAV in Ukraine under the Humanitarian program. Two subjects were lost to follow-up and could not be contacted for informed consent.

Among the remaining 17 subjects, one subject had iatrogenic injury to the limb, and 16 subjects had non-iatrogenic arterial injury to the limb. The 16 subjects were included in the ES group, the primary analysis population for efficacy endpoints.

6.2.10.1.1 Demographics

The 16 subjects in the ES were all male, white, with ethnicity not Hispanic or Latino, and had a mean age of 34.2 (SD 9.0) and median age of 30.5, ranging

from 22 to 54 years old. The subject with iatrogenic injury (b) (6) was a 55 years old, non-Hispanic, white male.

6.2.10.1.2 Medical/Behavioral Characterization of the Enrolled Population
Comorbid conditions and medical history issues were infrequent in this population. Subject (b) (6) sustained a right common femoral artery iatrogenic injury (penetrating trauma).

The baseline medical characteristics for the 16 subjects in the ES are summarized in Table 10. The majority of subjects sustained injury to the femoral artery (68.8%) in the lower extremity (87.5%). The nature of injuries was mostly penetrating trauma (87.8%) and the cause of injuries were mostly due to blast shrapnel (75%). The majority of subjects were categorized severe (31.3%) on the AIS, followed by serious (18.8%) and critical (12.5%). Four subjects had missing AIS. The median Injury Severity Score (ISS) was 16, with a minimum score of 1 and a maximum score of 73.

The reasons for not using autologous vein included 4 (23.5%) for concomitant injury to the vein, 12 (70.6%) for poor quality or size of vein, 7 (41.2%) for time limitation-harvest not possible, and 3 (17.6%) for other.

**Table 10.** Baseline disease and medical characteristics in study CLN-PRO-V017.

| Parameter | ES (N = 16) |
|---|---|
| Abbreviated Injury Scale (AIS), n (%) | - |
| Minor | 2 (12.5%) |
| Serious | 3 (18.8%) |
| Severe | 5 (31.3%) |
| Critical | 2 (12.5%) |
| Missing | 4 (25.0%) |
| Injury Severity Score (ISS), n | 13 |
| Mean (SD) | 20.1 (18.9) |
| Median (Minimum, Maximum) | 16 (1, 73) |
| Injury Location, n (%) | - |
| Lower extremity | 14 (87.5%) |
| Upper extremity | 2 (12.5%) |
| Artery Category, n (%) | - |
| Femoral artery | 11 (68.8%) |
| Popliteal artery | 3 (18.8%) |
| Other | 2 (12.5%) |
| Cause of Trauma, n (%) | - |
| Blast shrapnel injury | 12 (75.0%) |
| Gunshot injury | 2 (12.5%) |
| Industrial accident | 1 (6.3%) |
| Motor vehicle accident | 1 (6.3%) |
| Nature of Trauma, n (%) | - |
| Blunt trauma | 2 (12.5%) |
| Penetrating trauma | 14 (87.5%) |
| Open fracture injury | 13 (81.3%) |

Abbreviations: SD = Standard Deviations; Min = Minimum; Max = Maximum

Source: FDA reviewer.

*Reviewer's comment: The subjects enrolled in CLN-PRO-V017 likely did not represent the typical serious military trauma. In terms of AIS, V017 subjects were categorized severe (31.3%), serious (18.8%), critical (12.5%), and minor (12.5%) and missing (25.0%). The ES group in CLN-PRO-V005 had overall more serious injuries, with 26 (47.3%) subjects of severe AIS,14 (25.5%) of critical, 15 (27.3%) of serious. Among the subjects with non-missing ISS scores in CLN-PRO-V017 the mean and median ISS were 21 and 16 (with range: 1, 73), respectively. The ES group in the CLN-PRO-V005 had similar ISS scores, with mean and median ISS of 20.8 and 17 (range: 9, 50), respectively.*

6.2.10.1.3 Subject Disposition

In total, 17 subjects provided informed consent to allow retrospective data collection for Study CLN-PRO-V017, with a data cutoff date of July 31, 2023. Of the 17 subjects, HAV was implanted in 16 subjects to repair non-iatrogenic vascular injuries to an extremity, and in one patient to repair an iatrogenic

vascular injury. The length of follow-up was limited, where 3 subjects did not have follow-up past 30 days and 7 subjects did not have follow-up past 6 months. No subjects died or were amputated.

6.2.11 Efficacy Analyses

6.2.11.1 Analyses of Primary Endpoint(s)

The primary patency rate at Day 30 was 93.8% (95% CI: 71.7%, 98.9%) in 15 of the 16 subjects in the ES group. Duplex imaging was performed in 15 subjects at Day 30, and confirmed patency of the conduit in all cases where ultrasound was performed. One subject, who lost patency prior to Day 30 and had the HAV removed, did not complete Duplex imaging.

*Reviewer comment: Because the study population consisted of all white and male subjects, subgroup analysis for race and sex was not performed. The one non-patent subject* (b) (6) *was 54 years old.*

6.2.11.2 Analyses of Secondary Endpoints

The secondary patency rate at Day 30 was also 93.8%. No subjects were reported to have died or amputated at Day 30. All subjects were evaluated as having successful limb salvage at Day 30.

One subject (b) (6) who lost patency prior to Day 30, was observed in one section of the HAV to have the presence of bacteria along the abluminal surface, suggestive of extension of infection from the surrounding tissues. The HAV infection rate in the ES group was 6.3% (95% CI: 1.1%, 28.3%).

*Reviewer's comment: The efficacy results in CLN-PRO-V017 were more positive than the efficacy results in CLN-PRO-V005. This could be due to differing populations and/or selection bias impacting the patency and infection rates favorably toward HAV. In addition, Dr. Robert Lee noted that "the data were skewed to shrapnel injuries and not the more typical devastating sever limb or polytraumatic injuries that could provide robust data of HAV in terms of infection resistance."*

6.2.12 Safety Analyses

6.2.12.3 Deaths

No deaths were reported in this study.

6.2.12.4 Nonfatal Serious Adverse Events (SAE)

One subject (b) (6) who was non-patent at Day 30, was reported to have 3 instances of SAE. On Day 8, bleeding from the surgical site led to the discovery of a "2 mm" rupture in the HAV that was repaired with sutures. On Day 12, the subject was operated on again for bleeding from the sutured HAV site. This was

repaired with a new end to end anastomosis after resecting 1 cm of the HAV. The surgeon noted at the time of operation that there were signs of wound infection. On Day 13, due to persistent bleeding from the postoperative site, the HAV was excised and removed.

Another subject (b) (6) was reported to have HAV occlusion on Day 235. Reintervention failed and the HAV was abandoned on Day 293.

#### 6.2.12.5 Adverse Events of Special Interest (AESI)

Two AESIs were reported during the data review period. As described in Section 6.2.12.4, one subject had HAV rupture with HAV infection. The other AESI was a vascular graft thrombosis in Subject (b) (6) after Month 6.

## 10. CONCLUSIONS

### 10.1 Statistical Issues and Collective Evidence

HAV is an acellular tissue-engineered vessel composed of human extracellular matrix (ECM) proteins typically found in human blood vessels. Results from CLN-PRO-V005 and CLN-PRO-V017 were submitted in this BLA to support the indication of HAV's use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible.

The primary source of evidence to support this BLA is from study CLN-PRO-V005. Study CLN-PRO-V005 was a Phase 2/3, prospective, multicenter, non-randomized, open-label, single-arm study in a total of 72 subjects aged 18 to 85 years old, with life or limb threatening traumatic injury to an arterial vessel in the limb or torso, who need replacement or reconstruction. Of the 72 subjects, 54 subjects with non-iatrogenic, extremity arterial injuries who received HAV as a conduit were included in the primary efficacy evaluation. The primary endpoint was primary vessel patency at Day 30. The key secondary endpoints included secondary vessel patency at Day 30, HAV infection at Day 30, and limb-salvage at Day 30. Among the 54 subjects, 13 subjects were not evaluable at Day 30 due to death (n=4), amputation (n=5), intraoperative thrombosis (n=2) or loss to follow up (n=2). Twelve of the thirteen subjects were not evaluable for patency at Day 30, while one subject was determined to be non-patent before 30 days; all thirteen subjects were not evaluable for infection and limb-salvage at 30 days. The Food and Drug Administration (FDA) performed an internal adjudication for these subjects.

Based on the FDA adjudication, the primary patency rate at Day 30 was 66.7% (95% CI: 53.4%, 77.8%), which was lower than the mean primary patency rate for synthetic grafts of 82.4% (based on literature search). The secondary patency rate at Day 30 was 72.2% (95% CI: 59.1%, 82.4%), which was lower than that for synthetic grafts of 78.9% (based on literature search). The limb salvage rate at Day 30 was 75.9% (95% CI: 63.1%, 85.4%). The HAV infection rate at Day 30

was 3.7% (95% CI: 1.0%, 12.5%), which was higher than the mean infection rate of 2.5% for synthetic grafts in civilian trauma (based on literature search). The risk of HAV infection was likely underestimated due to the 13 subjects not evaluable for infection at Day 30 but counted as HAV infection-free.

There were six deaths (11.1%) in this extremity group, of which four deaths occurred in the first 30 days, one on Day 42, and one on Day 128. None of the deaths were deemed related to the HAV. Of the 54 subjects, 15 (28%) experienced HAV thrombosis, 5 (9%) developed anastomotic stenosis of the HAV, 4 (7%) had HAV rupture or anastomotic failure, and 3 (6%) had HAV infection. Other adverse events included fever in 9 (17%) subjects and procedural pain in 8 (15%) subjects.

Study CLN-PRO-V017 was a retrospective, observational, open-label, single-arm study in 17 subjects aged ≥ 18 to ≤ 85 years old, with arterial injury of the extremity, who received the HAV under the Humacyte Humanitarian Aid Program in Ukraine between June 2022 and 15 May 2023. One subject had iatrogenic injury to the limb and 16 subjects had non-iatrogenic arterial injury to the limb. Results from the 16 subjects with a data cut-off date of July 31, 2023 serve as supportive evidence of efficacy and safety.

The primary and secondary patency rates at Day 30 were both 93.8% (95% CI: 71.7%, 98.9%). The HAV infection rate in this group was 6.3% (95% CI: 1.1%, 28.3%). None of the subjects were amputated, and no deaths were reported. One subject was reported to have 3 instances of SAE, due to persistent bleeding caused by a rupture in the HAV which was consequently excised and removed. Another subject was reported to have HAV occlusion and the HAV was abandoned.

### 10.2 Conclusions and Recommendations

Neither study met the usual criteria for an adequate and well-controlled trial. In Study CLN-PRO-V005, the analyses were not prespecified before the outcomes were known, and the analyses were all descriptive without formal hypothesis testing planned. Multiple major changes were introduced while the open-label study was ongoing. The study also had conduct issues with poor data quality and questionable trial integrity. For example, several cases were identified in which an implanted HAV subsequently became occluded, but the limb survived without revascularization, which raises the question of whether HAV implantation was necessary in the first place for these subjects. Other subjects treated with the HAV were later identified to have vein available for autologous graft, in which case HAV use would not be mandatory or preferred.

Study CLN-PRO-V017 was a retrospective observational study, which is prone to selection bias and offers only limited supportive evidence due to the different study population and settings. The efficacy results in CLN-PRO-V017 appeared to be better than those in CLN-PRO-V005. However, this could be attributed to

selection bias, because CLN-PRO-V017 data were skewed to shrapnel injuries and not the more typical devastating severe limb or polytraumatic military injuries that could provide robust data of HAV in terms of infection resistance. Study CLN-PRO-V017 also consisted of less severe injuries compared to CLN-PRO-V005, based on the injury severity score. Comparing the results between the two studies is difficult.

There was no clinical evidence submitted that demonstrates that HAV's infection resistance. Consequently, there was no evidence to support HAV's use in heavily contaminated wounds. However, the analysis results did show that HAV may be efficacious, with an unknown long-term safety and efficacy profile, for some adults needing urgent arterial repair following extremity vascular trauma who have alternative treatment options available (e.g., autologous vein or synthetic graft). In these subjects, there is uncertainty on how HAV compares to other treatment options. It is not apparent from the study data whether there are situations where the benefit of HAV outweighs the risk. Therefore, I defer to the clinical reviewer on the approval recommendation based on the overall benefit risk assessment and aspects of unmet need.

# EXHIBIT 4

# BLA Clinical Review Memorandum

| | |
|---|---|
| Application Type | BLA, Original Application |
| STN | 125812/0 |
| CBER Received Date | December 11, 2023 |
| PDUFA Goal Date | August 9, 2024 |
| Division / Office | DCEGM/OTP |
| Priority Review (Yes/No) | Yes |
| Reviewer Name(s) | Prateek Shukla, MD |
| Review Completion Date / Stamped Date | December 18, 2024 |
| Supervisory Concurrence | Vaishali Popat, MD, MPH<br>Branch Chief, GMB3/OCE/OTP<br><br>'Lola Fashoyin-Aje, MD, MPH<br>Director, OCE/OTP |
| Applicant | Humacyte Global, Inc. |
| Established Name | acellular tissue engineered vessel-tyod |
| (Proposed) Trade Name | SYMVESS |
| Pharmacologic Class | acellular tissue engineered vessel |
| Formulation(s), including Adjuvants, etc. | SYMVESS is an acellular tissue engineered vessel composed of organized extracellular matrix (ECM) proteins. |
| Dosage Form(s) and Route(s) of Administration | SYMVESS has dimensions of 6 mm in inner diameter and 42 cm in length (approximately 40 cm of usable length), which may be trimmed lengthwise to provide the length required for each vascular repair. |
| Dosing Regimen | Single treatment |
| Indication(s) and Intended Population(s) | For use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. |
| Orphan Designated (Yes/No) | No |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 88 of 674

## TABLE OF CONTENTS

GLOSSARY ....................4

1. EXECUTIVE SUMMARY ....................5

1.1 Demographic Information: Subgroup Demographics .................... 7
1.2 Patient Experience Data .................... 8

2. CLINICAL AND REGULATORY BACKGROUND ....................8

2.1 Disease or Health-Related Condition(s) Studied .................... 8
2.2 Currently Available, Pharmacologically Unrelated Treatment(s)/Intervention(s) for the Proposed Indication(s) .................... 9
2.3 Safety and Efficacy of Pharmacologically Related Products .................... 10
2.4 Previous Human Experience with the Product (Including Foreign Experience) .................... 10
2.5 Summary of Pre- and Post-Submission Regulatory Activity Related to the Submission . 11
2.6 Other Relevant Background Information .................... 13

3. SUBMISSION QUALITY AND GOOD CLINICAL PRACTICES ....................14

3.1 Submission Quality and Completeness .................... 14
3.2 Compliance with Good Clinical Practices and Submission Integrity .................... 14
3.3 Financial Disclosures .................... 15

4. SIGNIFICANT EFFICACY/SAFETY ISSUES RELATED TO OTHER REVIEW DISCIPLINES ........17

4.1 Chemistry, Manufacturing, and Controls .................... 17
4.2 Assay Validation .................... 18
4.3 Nonclinical Pharmacology/Toxicology .................... 18
4.4 Clinical Pharmacology .................... 18
4.4.1 Mechanism of Action .................... 18
4.4.2 Human Pharmacodynamics .................... 18
4.4.3 Human Pharmacokinetics .................... 18
4.5 Statistical .................... 18
4.6 Pharmacovigilance .................... 19

5. SOURCES OF CLINICAL DATA AND OTHER INFORMATION CONSIDERED IN THE REVIEW ...19

5.1 Review Strategy .................... 19
5.2 BLA/IND Documents That Serve as the Basis for the Clinical Review .................... 20
5.3 Table of Studies/Clinical Trials .................... 21
5.4 Consultations .................... 22
5.4.1 Advisory Committee Meeting .................... 23
5.4.2 External Consults/Collaborations .................... 23

6. DISCUSSION OF INDIVIDUAL STUDIES/CLINICAL TRIALS ....................24

6.1 Trial #1 – CLN-PRO-V005 .................... 24
6.1.1 Objectives (Primary, Secondary, etc.) .................... 24
6.1.2 Design Overview .................... 25
6.1.3 Population .................... 29
6.1.4 Study Treatments or Agents Mandated by the Protocol .................... 30
6.1.5 Directions for Use .................... 31
6.1.6 Sites and Centers .................... 31
6.1.7 Surveillance/Monitoring .................... 31
6.1.8 Endpoints and Criteria for Study Success .................... 32
6.1.9 Statistical Considerations & Statistical Analysis Plan .................... 33
6.1.10 Study Population and Disposition .................... 34
6.1.11 Efficacy Analyses .................... 39
6.1.12 Safety Analyses .................... 47

6.1.13 Study Summary and Conclusions ........ 61
6.2 Trial #2 – CLN-PRO-V017 ........ 61
6.2.1 Objectives (Primary, Secondary, etc) ........ 62
6.2.2 Design Overview ........ 62
6.2.3 Population ........ 62
6.2.4 Study Treatments or Agents Mandated by the Protocol ........ 62
6.2.5 Directions for Use ........ 62
6.2.6 Sites and Centers ........ 62
6.2.7 Surveillance/Monitoring ........ 62
6.2.8 Endpoints and Criteria for Study Success ........ 63
6.2.9 Statistical Considerations & Statistical Analysis Plan ........ 64
6.2.10 Study Population and Disposition ........ 64
6.2.11 Efficacy Analyses ........ 66
6.2.12 Safety Analyses ........ 67
6.2.13 Study Summary and Conclusions ........ 69

**7. INTEGRATED OVERVIEW OF EFFICACY ........ 70**

7.1 Indication #1 ........ 70
7.1.8 Persistence of Efficacy ........ 70

**9. ADDITIONAL CLINICAL ISSUES ........ 72**

9.1 Special Populations ........ 72
9.1.1 Human Reproduction and Pregnancy Data ........ 72
9.1.2 Use During Lactation ........ 72
9.1.3 Pediatric Use and PREA Considerations ........ 72
9.1.4 Immunocompromised Patients ........ 73
9.1.5 Geriatric Use ........ 73
9.2 Aspect(s) of the Clinical Evaluation Not Previously Covered ........ 74

**10. CONCLUSIONS ........ 74**

**11. RISK-BENEFIT CONSIDERATIONS AND RECOMMENDATIONS ........ 75**

11.1 Risk-Benefit Considerations ........ 75
11.3 Discussion of Regulatory Options ........ 78
11.4 Recommendations on Regulatory Actions ........ 79
11.5 Labeling Review and Recommendations ........ 79
11.6 Recommendations on Postmarketing Actions ........ 79

**12. LITERATURE REVIEWED ........ 80**

**13. APPENDICES ........ 83**

13.1 Appendix 1. Mangled Extremity Severity Score (MESS) ........ 83
13.2 Appendix 2. Abbreviated Injury Score (AIS) ........ 83

## GLOSSARY

| | |
|---|---|
| AAC | Applicant's adjudication committee |
| AE | adverse event |
| AESI | Adverse Events of Special Interest |
| AIS | abbreviated injury scale |
| ATEV | acellular tissue engineered vessel-tyod |
| AV | arteriovenous |
| AVF | arteriovenous fistula |
| BIMO | Bioresearch Monitoring |
| BLA | Biologics License Application |
| CBER | Center for Biologics Evaluation and Research |
| CDRH | Center for Device and Radiological Health |
| DSUR | Development Safety Update Report |
| ECM | extracellular matrix |
| ESRD | end-stage renal disease |
| FDA | Food and Drug Administration |
| HAV | human acellular vessel |
| ICH | International Council for Harmonisation Technical Requirements for Pharmaceuticals for Human Use |
| IE | intercurrent events |
| IND | investigational new drug |
| IR | information request |
| ISS | injury severity score |
| KM | Kaplan-Meier |
| LAR | legally authorized representative |
| MESS | mangled extremity severity score |
| PAD | peripheral artery disease |
| PeRC | Pediatric Review Committee |
| PREA | Pediatric Research Equity Act |
| PT | preferred term |
| USPI | United States Prescribing Information |

## 1. Executive Summary

On Dec. 11, 2023, Humacyte Global, Inc. (the Applicant) submitted an original BLA 125812 for licensure of Acellular tissue engineered vessel-tyod (ATEV) for the indication, "for urgent arterial repair following extremity vascular trauma (b) (4) indicated, and when autologous vein is not feasible." During labeling negotiations, the indication was revised to "for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible".

ATEV is an acellular tubular engineered vessel composed of human extracellular matrix (ECM) proteins. It has the proprietary name SYMVESS, and has previously been referred to as HAV (human acellular vessel).

For the purpose of demonstrating safety and effectiveness, the Applicant submitted data from two clinical studies of ATEV in vascular[1] trauma:

1) CLN-PRO-V005 (V005) is a prospective, open-label, single-arm, multicenter Phase 2/3 study evaluating the ATEV for vascular replacement or reconstruction in patients with life- or limb-threatening vascular trauma conducted under IND 16746. V005 provided the primary evidence of safety and effectiveness in the BLA. Out of 71 patients, 54 who had ATEV placed in the extremity are the primary analysis population. Seventeen patients had torso or iatrogenic injuries and were not included in the primary analysis as the proposed indication is limited for use in traumatic extremity injury. Patients were to be followed for 36 months. In this pivotal study, the primary efficacy outcome measure was the rate of primary vascular graft patency at Day 30 in 54 patients with extremity arterial injury as assessed by functional graft patency without intervention using Duplex ultrasound or equivalent (i.e., CTA, MRI). Key secondary outcome measures included Day 30 rate of secondary patency, conduit infection and limb salvage rate.

2) CLN-PRO-V017 (V017) was a retrospective, observational study of ATEV used on a humanitarian basis in Ukrainian patients with life- or limb-threatening vascular trauma. This retrospective study provided supportive safety and effectiveness data from 16 patients who received ATEV as a conduit in the extremities. Primary patency was evaluated at Day 30 as the primary endpoint. Key secondary endpoints included secondary patency at Day 30 and limb salvage rate at Day 30.

The primary evidence of effectiveness is based on primary patency at 30 days following use of the ATEV graft for vascular repair in extremity trauma in trial V005. 54 patients with extremity trauma in this trial demonstrated a primary patency rate at Day 30 of 66.7% (95% CI: 53.4%, 77.8%) and a secondary patency rate of 72.2% (95% CI: 59.1%, 82.4%). The limb salvage rate at Day 30 was 75.5% (95% CI: 62.4%, 85.1%). The ATEV infection rate was 1.9% in the first 30 days. Supporting data from Humanitarian use in the Ukraine provides a 30-day patency rate of 93.8%. No patients in study V017 required amputation. Day 30 outcomes in this acute trauma population is considered clinically

[1] In this review, "vascular" (e.g., vascular trauma, vascular repair, etc.) refers to arterial and not venous trauma, repair, etc.

meaningful, as this 30-day period of restoration of blood flow provides an opportunity to save a limb in clinical situations of imminent limb loss. Additionally, this period provides an opportunity for the establishment of the collateral circulation which would make later interventions possible, if needed. Based on these findings from both studies, the ATEV demonstrates a clinically meaningful benefit in restoring blood flow in the affected limb and ultimately limb salvage.

Evidence of long-term efficacy of this product is limited. Out of the 54 patients evaluated for efficacy, between Day 30 and the end of the study at Month 36, there were 10 additional patients who lost ATEV patency and 3 additional patients who underwent limb amputation. A further two patients who developed ATEV infection on days 35 and 36 following placement of ATEV in the extremity are included in the safety analysis. Long term patency and limb salvage cannot be accurately assessed as 69% of patients did not complete the study and therefore have unknown long-term outcomes.

Safety outcomes were evaluated from all 71 patients who received the ATEV for vascular repair including extremity and torso or iatrogenic indications. Despite the small number of patients in the dataset and limited long-term follow up, we identified a concerning signal for graft failure as a result of mid-graft rupture or anastomotic failure. Seven (9.9%) patients out of 71 in study V005 had graft failure which resulted in major post implantation bleeding, four from mid-graft rupture and three from anastomotic failure. Within the extremity group of 54 patients, four (7.4%) developed graft failure. One patient who received ATEV for a torso indication developed anastomotic failure and subsequently died.

When evaluating infection as a safety outcome, six (8.5%) of the 71 patients developed ATEV infection between days 7 and 40. Because there was no protocol specified evaluation of infection prior to Day 30, identified infections were limited to instances when reintervention to the graft was required due to bleeding from the ATEV.

The evidence of effectiveness provided from study V005 demonstrates a benefit in terms of 30-day patency rates and limb salvage. This product would provide an option for vascular replacement which would preserve the limb when the autologous vein is not available.

The risk mitigation includes limitation of indication to extremity trauma when urgent revascularization is needed to avoid imminent limb loss, and only when autologous vein is not feasible. In addition, a boxed warning for graft rupture and anastomotic failure is included in the United States Prescribing Information. A postmarketing requirement to further characterize the risk of graft failure and infection in patients who receive ATEV for the approved indication has been instituted along with a commitment to complete the study V005 for further characterization of risks and generate long-term follow-up data.

There is an unmet medical need for an alternative vascular graft to preserve the limb when the autologous vein is not feasible following extremity vascular injury. Use of existing synthetic graft materials is limited in the extremities due to the higher risk of complications including graft occlusion, infection, and graft failure due to repetitive motion in joint spaces.

The clinical review team concluded that substantial evidence of effectiveness was provided given the observed primary patency rate of 66.7% and limb salvage rates of

75.9% in this single arm pivotal trial. Given the identified risks and the risk mitigation strategies instituted, totality of presented data, and the unmet need, the benefits outweigh the risks for this product. This reviewer therefore recommends approval.

### 1.1 Demographic Information: Subgroup Demographics

Demographic information for the 88 patients who received the ATEV as a conduit in studies V005 and V017 are shown in Table 1. One patient received the ATEV as a patch in V005 and one in V017. Both patients who received the ATEV as a patch were excluded from analysis.

**Table 1. Key Demographic Characteristics, Study V005 and Study V017**

| Characteristic | Study V005 Extremity Group n=54 | Study V005 Torso/Iatrogenic Group n=17 | Study V017 n=17 |
|---|---|---|---|
| Sex, n (%) | | | |
| Male | 40 (74.1%) | 11 (64.7%) | 17 (100%) |
| Female | 14 (25.9%) | 6 (35.3%) | 0 (0) |
| Age, years | | | |
| Mean (SD) | 33.4 (13.6%) | 48.1 (20.7%) | 34.2 (9.0%) |
| Median (min, max) | 30.0 (18,72) | 54.0 (18,81) | 30.5 (22,54) |
| Race, n (%) | | | |
| Black or African American | 26 (48.2%) | 8 (47.1%) | 0 (0) |
| Native Hawaiian or other Pacific Islander | 0 (0) | 1 (5.9%) | 0 (0) |
| White | 23 (42.6%) | 8 (47.1%) | 17 (100%) |
| Other | 5 (9.3%) | 0 (0) | 0 (0) |
| Ethnicity, n (%) | | | |
| Hispanic or Latino | 12 (22.2%) | 2 (11.8%) | 0 (0) |
| Not Hispanic or Latino | 42 (77.8%) | 15 (88.2%) | 17 (100%) |
| Country of participation, n (%) | | | |
| United States | 50 (92.6%) | 17 (100%) | 0 (0) |
| Israel | 4 (7.4%) | 0 (0) | 0 (0) |
| Ukraine | 0 (0) | 0 (0) | 17 (100%) |

Source: Applicant dataset and 120-day safety update
Data Cut-off: January 15, 2024
[1]Race, Other: Bedoiun, Mexican, Mixed, Unknown
Abbreviations: max = maximum, min = minimum, n = sample size, SD = standard deviation

Reviewer comment:
Demographic characteristics of the extremity group (the primary analysis group for efficacy analyses) were comparable to those of the entire study population. Examination of the demographic characteristics of the screen failure patients indicated no selection bias in demographic characteristics for patients screened and enrolled versus those who failed screening. The mean and median ages were similar for patients receiving the ATEV for an extremity indication in studies V005 and V017.

## 1.2 Patient Experience Data

Please see Patient Experience Data reviewed in this BLA, summarized in Table 2 below:

**Table 2. Data Submitted in the Application**

| Check if Submitted | Type of Data | Section Where Discussed, if Applicable |
|---|---|---|
| ☐ | Patient-reported outcome | |
| ☐ | Observer-reported outcome | |
| ☐ | Clinician-reported outcome | |
| ☐ | Performance outcome | |
| ☐ | Patient-focused drug development meeting summary | |
| ☐ | FDA Patient Listening Session | |
| ☐ | Qualitative studies (e.g., individual patient/caregiver interviews, focus group interviews, expert interviews, Delphi Panel) | |
| ☐ | Observational survey studies | |
| ☐ | Natural history studies | |
| ☐ | Patient preference studies | |
| ☐ | Other: (please specify) | |
| ☒ | **If no patient experience data were submitted by Applicant, indicate here.** | |
| **Check if Considered** | **Type of Data** | **Section Where Discussed, if Applicable** |
| ☐ | Perspectives shared at patient stakeholder meeting | |
| ☐ | Patient-focused drug development meeting | |
| ☐ | FDA Patient Listening Session | |
| ☐ | Other stakeholder meeting summary report | |
| ☐ | Observational survey studies | |
| ☐ | Other: (please specify) | |

# 2. Clinical and Regulatory Background

## 2.1 Disease or Health-Related Condition(s) Studied

Extremity arterial trauma is a serious condition with severity based on the mechanism of injury, anatomic location, concomitant injuries, and the setting in which the trauma occurs. Mechanism can be blunt, penetrating, or both. Penetrating trauma can be from objects that are missiles (e.g., bullets, fragments from a blast, etc.) or stabs (e.g., knife, coat hangers, keys, etc.). Blunt trauma often occurs in the setting of fractures or dislocations. Extremity trauma has a high incidence of complication, including wound complications (infection, necrosis, nonunion, osteomyelitis), venous thromboembolism, rhabdomyolysis, limb loss and death. Without intervention, extremity arterial trauma will lead to exsanguination and death. In the absence of vascular reconstruction, tourniquet application of the affected limb is the primary life-saving measure.

In the civilian population, vascular injuries account for 1% to 2% of all injuries reported in trauma patients. However, patients who have vascular injury account for greater than 20% of all trauma-related deaths. The most common causes of civilian vascular injury are motor vehicle accident-associated lower extremity bone fractures, gunshot wounds, and dog bites. According to the PROspective Observational Vascular Injury Treatment (PROOVIT) database, designed to collect vascular trauma injuries from 24 Level I and Level II trauma centers in the United States, vascular injuries in the lower limb, torso, upper limb and neck have a distribution of 41%, 30%, 22%, and 6%, respectively .

Vascular trauma is also a leading cause of morbidity and mortality in the military. Military injuries are often due to penetrating or combined mechanisms. While vascular injuries make up a small percentage of trauma injuries in the military setting, they are the leading cause of exsanguination, limb ischemia, and amputation.

Grading scales are used to classify and describe the severity of injuries and assess the threat to life and limb associated with the injury. The mangled extremity severity score (MESS) utilizes the extent of skeletal and soft tissue injury, limb ischemia, shock, and age to predict the need for amputation after extremity injury. Clinical and demographic data early in a patient's course are used to predict the likelihood of success in limb salvage efforts. MESS scores can range from 2 to 11. A score of 7 or higher considered predictive of amputation . The abbreviated injury scale (AIS) is based on the type, location and severity of a traumatic injury . The AIS scale is a measurement tool for injuries ranging from mild (AIS score =1) to fatal (AIS score =6) with a score of 5 or more making survival uncertain.

## 2.2 Currently Available, Pharmacologically Unrelated Treatment(s)/Intervention(s) for the Proposed Indication(s)

Vascular trauma treatment depends on severity of the injury. The goal is to restore blood flow and prevent complications. This may sometimes be achieved by primary repair or endovascular stenting but requires a new conduit when the injury is not amenable to these techniques. Available options for new conduit include use of autologous vein for arterial reconstruction, synthetic grafts and temporary shunts.

When arterial grafting is required, autologous vein grafts are preferred over synthetic grafts, such as Teflon (expanded polytetrafluoroethylene) or Dacron because of their durability of patency and lower risk of complications including thrombosis. The saphenous vein harvested from the leg is most commonly used as an autologous graft. However, autologous blood vessel availability can be limited due to extensive trauma or preexisting peripheral vascular disease. Harvesting of the autologous vein may also place the patient at increased risk of complications such as infection and neuropathy.

Due to the limited availability of healthy autologous vessels as well as the incidence of postoperative complications, synthetic grafts have been used as alternatives, especially for medium to large-diameter vessels ranging between 6 to 8 millimeters in diameter. Synthetic grafts provide some benefits over autologous veins such as strength and availability; however, their use is limited in the extremities due to the higher risk of complications including graft occlusion, infection, and graft failure due to repetitive motion in joint spaces. There are no clinical guidelines advising when synthetic grafts should be used in the extremities, but clinical guidelines used by the military state that

prosthetic conduits may be acceptable as a last resort in extremities when the vein cannot be harvested and use in joint spaces should be avoided. (Rasmussen, 2016)

There is a paucity of data regarding long-term outcomes following arterial graft placement. Table 3 summarizes available data on the expected outcomes following arterial vascular repair in the extremities for the civilian population. There is some variability in the published outcomes of existing therapies.

**Table 3. Published Outcomes of Existing Therapies for Arterial Vascular Grafts**

| Outcome | Autologous Vein | Synthetic Graft |
|---|---|---|
| Primary patency | 85-92%[A,B] | 82%[B] |
| Secondary patency | 97%[A] | 79%[D-J] |
| Conduit infection | 0-2%[K,O] | 3% (0-6%)[B,C,D] |
| Conduit/anastomotic failure | 0-6%[K,N] | 2%[M] |
| Thrombosis | 9.3% (intraoperative)<br>15-24.3% (graft thrombosis)[A] | 6% (early)[1]<br>17% (late) |
| Amputation | 2.8-30%[A] | 6-24.3%[D,E,G,H,L] |
| Death | – | 3%[B,D,E] |

Source: FDA literature review, [A]Forsyth 2024, [B]Stonko 2022, [C]Rudstrom 2008, [D]Rayamajhi 2019, [E]Vertrees 2009, [F]Watson 2015, [G]Shamrock 2019, [H]Lin 2022, [I]Laverty 2021, [J]Fox 2005, [K]Rehman 2020, [L]Urrechaga 2022, [M]Feliciano 1985, [N]Greer 2012, [O]Reilly 2019

[1]Early refers to thrombosis occurring within the first 30 days. Late refers to thrombosis occurring at any point after 30 days.

Reviewer comment:
Review of the literature is limited by a paucity of data for outcomes following extremity arterial repair in the civilian population.

The BLA included the Applicant's meta-analysis of published studies aiming to determine incidence of primary patency, secondary patency, amputations and conduit infections with synthetic grafts in patients undergoing extremity arterial repair. However, the meta-analysis included data from the military which were not the population evaluated in this study. We have provided a list of published outcomes in the civilian population in Table 3. Further limitations of the Applicant's meta-analysis have been outlined in the statistical review.

### 2.3 Safety and Efficacy of Pharmacologically Related Products

There are no pharmacologically related products currently available.

### 2.4 Previous Human Experience with the Product (Including Foreign Experience)

The ATEV has not been approved in any country. Experience with the ATEV comes from clinical studies conducted in patients with end-stage renal disease (ESRD), peripheral artery disease (PAD) in addition to vascular trauma (Table 4). In addition to the 10 clinical studies, the ATEV has been implanted in 26 patients through expanded-access including 20 (77%) patients for peripheral arterial disease, five (19%) for hemodialysis access and one (4%) for traumatic injury.

The Applicant reports that in total, more than 550 patients have been treated with the ATEV since December 2012.

**Table 4. Clinical Studies of the ATEV Conducted for Other Indications**

| Study | Indication | Study Details | n= | Status |
|---|---|---|---|---|
| CLN-PRO-V001 | ESRD | Pilot study evaluating safety and efficacy of investigational product for use as a vascular prosthesis for hemodialysis access | 40 | Ongoing |
| CLN-PRO-V003 | ESRD | Phase I study evaluating safety and efficacy of the investigational product for use as a vascular prosthesis for hemodialysis access | 20 | Ongoing |
| CLN-PRO-V006 | ESRD | Assessment of the investigational product in patients needing renal replacement therapy: A comparison with ePTFE grafts as conduits for hemodialysis (HUMANITY) | 177 | Ongoing |
| CLN-PRO-V007 | ESRD | Phase 3 study comparing the efficacy and safety of the investigational product with that of an autologous arteriovenous fistula | 240 | Ongoing |
| CLN-PRO-V011 | ESRD | Phase 2 assessment of investigational product in patients needing vascular access for dialysis | 30 | Completed |
| CLN-PRO-V012 | ESRD | Phase 3 randomized study comparing efficacy and safety of investigational product with that of an autogenous arteriovenous fistula in female patients requiring hemodialysis | 14 | Ongoing |
| CLN-PRO-V002 | PAD | Open-label, single-arm, multicenter pilot study evaluating safety and efficacy of investigational product as an above-knee femoro-popliteal bypass graft | 20 | Ongoing |
| CLN-PRO-V004 | PAD | Phase 2 evaluation of safety and efficacy of investigational product as a vascular prosthesis for femoropopliteal bypass | 15 | Completed |
| CLN-PRO-V005 | Vascular Trauma | Phase 2/3 study evaluating safety and efficacy of the investigational product for vascular replacement or reconstruction in patients with life or limb-threatening vascular trauma | 72 | Ongoing |
| CLN-PRO-V017 | Vascular Trauma | Observational multicenter study evaluating safety and efficacy of the investigational product in a real world setting for arterial replacement or reconstruction in Ukrainian patients with life or limb-threatening vascular trauma. | 18 | Ongoing |

Source: Annual report IND 16746.
Abbreviations: ePTFE = expanded polytetrafluoroethylene, ESRD = End Stage Renal Disease, n = number of patients, PAD = Peripheral Vascular Disease

## 2.5 Summary of Pre- and Post-Submission Regulatory Activity Related to the Submission

The clinical development of the ATEV for this arterial vascular indication was originally submitted under IND 16746 and has undergone multiple major changes while the study was ongoing. These included major changes to the study design, study population, primary efficacy endpoints, sample size, and the statistical analysis plan. FDA has worked with the Applicant and exercised regulatory flexibility to further product development.

The application received Regenerative Medicine Advanced Therapy designation on May 2, 2023.

**Table 5. Key Applicant Regulatory Interactions**

| Date | Interaction |
|---|---|
| **May 19, 2015** | Pre-IND Type B Meeting |
| **June 27, 2016** | Original IND Submission |
| **August 01, 2019** | **Type C Meeting** proposing conversion of study V005 from a proof-of-concept study to a registrational study. The Applicant proposed to compare ATEV with external controls from the PROspective Observational Vascular Injury Treatment (PROOVIT) database. The FDA expressed concerns about comparability of study patients and external controls and lack of long-term data in the PROOVIT database. The FDA requested adequate prospective clinical and statistical plans. |
| **October 1, 2020** | Department of Defense (DoD) designated the ATEV as a Priority Product in accordance with Public Law 115-92. |
| **October 20, 2020** | **Informal Meeting**: Applicant proposed study V005 as a Phase 2/3 nonrandomized, open-label, adaptive study in 100 eligible ATEV patients comparing to external controls from PROOVIT who received autologous vein graft. The FDA communicated major concerns about the study design, including study population, sample size, handling of missing data and intercurrent events (IE), noninferiority design, and interim analyses. |
| **December 21, 2020** | **Informal Meeting with FDA and DoD**: Applicant proposed to revise the study to compare 120 ATEV patients to matched patients selected from the PROOVIT registry. The FDA communicated major statistical concerns in the study design, including limitations of the PROOVIT registry to serve as external controls, inadequate matching criteria, and inflated Type 1 error rate. FDA recommended noninferiority analysis on the composite endpoint of 3-month or longer assessment of limb salvage, aneurysmal degeneration, and mortality, and superiority analysis on infection rates, compared to synthetic graft. |
| **January 28, 2021** | **Informal Meeting with FDA and DoD**: Applicant proposed a revised study V005 as a noninferiority study in which 50 ATEV patients (with lower extremity arterial repair and where autologous vein is not feasible) would be compared to a meta-analysis derived performance goal based on PTFE synthetic graft. The proposed primary efficacy endpoint was amputation free survival (AFS), and the secondary efficacy endpoint was infection. The Applicant proposed to demonstrate noninferiority on AFS and superiority on infection. The FDA requested details on the selection of publications for inclusion and meta-analysis methodology. |
| **December 7, 2021** | **Informal Meeting with FDA and DoD**: proposed to revise the primary efficacy endpoint from AFS to infection within 30 days after implantation of ATEV conduit. The FDA did not agree with infection rate as the primary efficacy endpoint and communicated concerns of serious selection bias in introducing multiple changes in the study design while the open-label single-arm trial was on-going. The FDA also communicated that statistical issues remained unresolved, which included Type 1 error control, handling of missing data and IEs, and analysis population. The FDA recommended a new randomized controlled trial with coprimary endpoints be conducted. |
| **March 30, 2022** | **Type B Meeting**: proposed two options for a revised study design for CLN-PRO-V005. In Option 1, the Applicant proposed to compare ATEV to synthetic grafts based on the coprimary endpoints of superiority on infection and noninferiority on AFS, both evaluated at 90 days. Performance metrics of |

| Date | Interaction |
|---|---|
| | synthetic graft were derived from meta-analysis literature review, and a matching adjusted indirect comparison (MAIC) approach would be used to match patients to external controls. In Option 2, the Applicant proposed to compare ATEV to autologous vein based on the primary endpoint of noninferiority on primary patency rate at 30 days. The PROOVIT registry would serve as external control in the primary analysis. In addition, the Applicant proposed to conduct a supplemental comparison of ATEV to synthetic graft on the functional endpoints of superiority on infection and noninferiority on amputation rates at 3 months.<br>The FDA responded that either proposal was inadequate due to concerns including study population, study duration, choice of endpoints, sample size, handling of missing data and IEs, selection bias, and choice of comparator. The FDA suggested that the Applicant may reconsider an earlier proposal from 12/21/2020 informal meeting, in which the Applicant proposed to pursue an indication for "urgent arterial repair following extremity arterial trauma (b) (4) (b) (4) where autologous vein is not feasible." |
| **October 26, 2022** | **Pre-BLA Type B Meeting**: the Applicant presented key new data from the Ukraine Humanitarian Effort real world evidence (RWE) study during the pre-BLA meeting. The FDA did not agree with the Applicant's proposal for BLA submission, the main concerns being insufficient number of study patients, insufficient data in the targeted population, absence of a clearly prespecified comparator and SAP, absence of a clear Phase 4 confirmatory study protocol, and imprecise secondary endpoint selection. Major statistical concerns remained, including the choice of a comparator control group or benchmark and sample size. |
| **March 7, 2023** | **Type C Meeting**: Applicant proposed an observational study (V017) in 30 patients with traumatic injury sustained in Ukraine. The FDA did not agree with the Applicant's proposal to combine the efficacy data from Study V017 with study V005 due to heterogeneity between the studies. The FDA agreed with using the while-on-treatment strategy for handling IEs of deaths and amputations for the narrow indication, only in cases where the IE can be "confidently adjudicated to be unrelated to the study intervention." The FDA also recommended that supplemental analyses should be performed to address the IEs using a composite strategy. The FDA communicated concerns with using a mean-based benchmark derived from meta-analysis as the external comparator. |
| **August 11, 2023** | **Informal Dispute Resolution**: "clinical efficacy data obtained from V005 study combined with the Ukrainian treatment experience, totaling 50 patients with Day 30 patency data, will be sufficient to support a request for traditional approval of biological license application (BLA) for the proposed indication along with all the safety data relevant to this indication." |

Source: Reviewer table
Abbreviations: AFS = amputation free survival, ATEV = acellular tissue engineered vessel, IE = intercurrent events, iPSP = initial pediatric study plan, MAIC=, matching adjusted indirect comparison, OTP = Office of Therapeutic Products, PROOVIT = PROspective Observational Vascular Injury Treatment, PTFE = polytetrafluoroethylene, RMAT = Regenerative Medicine Advanced Therapy, RWE = real world evidence, SAP = statistical analysis plan

## 2.6 Other Relevant Background Information

This product is designated as a Priority Product by the Department of Defense (DoD). Public Law 115-92 authorized DoD to request, and the U.S. FDA to provide, assistance to expedite development and the FDA's review of products to diagnose, treat, or prevent serious or life-threatening diseases or conditions facing American military personnel.

# 3. Submission Quality and Good Clinical Practices

## 3.1 Submission Quality and Completeness

The submission was sufficiently organized and integrated to accommodate the conduct of a complete clinical review. It was submitted electronically and formatted as an electronic Common Technical Document according to the FDA Guidance for Electronic Submissions. The submission contained the five modules in the common technical document structure.

## 3.2 Compliance with Good Clinical Practices and Submission Integrity

The prospective study V005 was performed in accordance with Good Clinical Practice, according to the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH) guidelines including the archival of essential documents. This report was prepared according to the ICH E3 clinical study report guidelines.

A summary of the Bioresearch Monitoring (BIMO) inspections conducted at three study V005 sites that participated in support of the clinical review of the BLA is included in Table 6. No violations of the Food, Drug, and Cosmetic Act and other Acts or regulations were identified, however the BIMO inspectors noted the following:

- Site 2: The initial primary investigator at this site, Jonathan Morrison, MD, was replaced due to compliance issues. Informed consent documents were signed at a later date than the patient and there was missing documentation that SAE were reported within 24 hours. To better uphold the study requirements, Dr. Rishi Kundi, MD assumed control of the study and ensured that all issues were addressed.
- Site 6: Charles Fox, MD was removed from the study as the clinical investigator due to study compliance issues and his failure to apply appropriate corrective actions. He was using verbal consent from legally authorized representatives (LARs) to allow patients onto the trial and was receiving verbal consent from LARs over the phone. Additionally, several serious adverse events (SAEs) were reported after the 24-hour period required by the protocol. To better uphold the study requirements, Dr. Ernest Moore, MD assumed control of the study. Dr. Moore reviewed the prior patients' binders to ensure all required information was present and all the issues that occurred were addressed and corrected.

**Table 6. Summary of Bioresearch Monitoring Inspections**

| Site ID | Number of Patients | Investigator and Location | Form 483 Issued | Final Inspection Classification |
|---|---|---|---|---|
| Site 2 | 7 (extremity group)<br>2 (torso/iatrogenic group) | Jonathan Morrison, MD<br>Rishi Kundi, MD<br>Baltimore, MD | No | NAI, Previous PI replaced due to ongoing compliance issues |
| Site 4 | 4 (extremity group)<br>1 (torso/iatrogenic group) | Ravi Rajani, MD<br>Atlanta, GA | No | NAI |
| Site 6 | 10 (extremity group)<br>6 (torso/iatrogenic group) | Charles Fox, MD (04/10/2018-10/25/2019)<br>Ernest Moore, MD (10/25/2019-present)<br>Denver, CO | No | NAI, Previous PI replaced due to ongoing compliance issues |
| Applicant inspection | – | Humacyte Global, Inc | No | NAI |

Source: Reviewer table
Abbreviations: NAI = no action indicated, PI = principal investigator

### 3.3 Financial Disclosures

| |
|---|
| **Covered clinical study** (name and/or number):<br>CLN-PRO-V005 |
| Was a list of clinical investigators provided? ☒ Yes ☐ No (Request list from applicant) |
| Total number of investigators identified: 32 |
| Number of investigators who are sponsor employees (including both full-time and part-time employees): 0 |
| Number of investigators with disclosable financial interests/arrangements (Form FDA 3455): 1 |

| |
|---|
| If there are investigators with disclosable financial interests/arrangements, identify the number of investigators with interests/arrangements in each category (as defined in 21 CFR 54.2(a), (b), (c) and (f)):<br>Compensation to the investigator for conducting the study where the value could be influenced by the outcome of the study: __0__<br>Significant payments of other sorts: __1__<br>Proprietary interest in the product tested held by investigator: __0__<br>Significant equity interest held by investigator in sponsor of covered study: __0__<br>Is an attachment provided with details of the disclosable financial interests/arrangements? ☒ Yes ☐ No (Request details from Applicant)<br>Is a description of the steps taken to minimize potential bias provided? ☒ Yes ☐ No (Request information from applicant) |
| Number of investigators with certification of due diligence (Form FDA 3454, box 3): __0__<br>Is an attachment provided with the reason? ☐ Yes ☐ No (Request explanation from applicant) |

| |
|---|
| **Covered clinical study** (name and/or number):<br>CLN-PRO-V017 |
| Was a list of clinical investigators provided? ☒ Yes ☐ No (Request list from applicant) |
| Total number of investigators identified: 3 |
| Number of investigators who are sponsor employees (including both full-time and part-time employees): 0 |
| Number of investigators with disclosable financial interests/arrangements (Form FDA 3455): 0 |

| |
|---|
| If there are investigators with disclosable financial interests/arrangements, identify the number of investigators with interests/arrangements in each category (as defined in 21 CFR 54.2(a), (b), (c) and (f)):<br><br>Compensation to the investigator for conducting the study where the value could be influenced by the outcome of the study: __0__<br><br>Significant payments of other sorts: __0__<br><br>Proprietary interest in the product tested held by investigator: __0__<br><br>Significant equity interest held by investigator in sponsor of covered study: __0__<br><br>Is an attachment provided with details of the disclosable financial interests/arrangements? ☒ Yes ☐ No (Request details from applicant)<br><br>Is a description of the steps taken to minimize potential bias provided? ☒ Yes ☐ No (Request information from applicant) |
| Number of investigators with certification of due diligence (Form FDA 3454, box 3): __0__<br><br>Is an attachment provided with the reason? ☐ Yes ☐ No (Request explanation from applicant) |

Reviewer comment:
No significant issues with financial disclosures were identified that could suggest undue bias in the data submitted in support of this BLA. The disclosed financial interests/arrangements provided for one investigator in study V005 do not affect the approvability of this application. The Applicant has provided a sufficient description of steps taken to minimize potential bias.

## 4. Significant Efficacy/Safety Issues Related to Other Review Disciplines

### 4.1 Chemistry, Manufacturing, and Controls

The ATEV is an acellular tissue engineered vessel that is 42 cm in length and 6 mm in inner diameter. It is composed of extracellular matrix proteins which are mostly collagen that are generated from allogeneic smooth muscle cells during (b) (4) The ATEV is manufactured using a tissue engineering process. Human vascular smooth muscle cells that are derived from human aortic tissue deemed suitable for transplant are banked, expanded, and seeded onto a tubular mesh (b) (4) scaffold. The cell-seeded scaffold is cultured in a biomimetic bioreactor system to generate an intermediate tubular construct containing vascular smooth muscle cells and the extracellular matrix the cells deposited. A final decellularization process removes the human cellular and genetic material while maintaining the extracellular matrix structure, mechanical properties, and biological activity. The product has 18 months of shelf-life under 2 to 8°C. The ATEV is packaged in a single unit. Please see Chemistry, Manufacturing and Controls review memo for further details.

Reviewer comment:
The structural integrity of the ATEV has not been evaluated when used in a (b) (4) configuration. It is hypothesized that the ATEV may lack adequate transverse strength when used as a (b) (4)

### 4.2 Assay Validation

No assays were used to evaluate the ATEV placement and function.

### 4.3 Nonclinical Pharmacology/Toxicology

No nonclinical pharmacology/toxicology review issues were identified. Please refer to the nonclinical pharmacology/toxicology review for details.

Reviewer comment:
There are no nonclinical data that characterize the behavior of the investigational product after implantation, including its potential to grow after implantation in a patient who has not reached their adult height. This product has both structural and biological components but the mechanism of action isn't entirely clear. Non-clinical histological evidence suggests remodeling in the presence of increased (b) (4) (b) (4) however the Applicant has not conducted any definitive studies that would estimate how long it would take for the cells to migrate and entirely repopulate the ATEV.

### 4.4 Clinical Pharmacology

The ATEV is an implanted product intended to serve as a mechanical conduit to re-establish blood flow. It is not expected to have any systemic effects and no clinical pharmacology studies were conducted.

#### 4.4.1 Mechanism of Action

The ATEV is an acellular tissue engineered vessel composed of human ECM that allows mechanical and biological activity. In vitro studies have shown that the ATEV can withstand the forces associated with the arterial blood flow and suture during the implantation process and can allow cell binding and proliferation. However, the exact mechanism of action has not been established.

#### 4.4.2 Human Pharmacodynamics

The pharmacodynamic effects of the ATEV are not known.

#### 4.4.3 Human Pharmacokinetics

The pharmacokinetic effects of the ATEV are not known.

### 4.5 Statistical

The statistical reviewer concluded that the pivotal trial, study V005, was not an adequate and well-controlled trial and identified the following concerns:

- The trial population did not align with the proposed indication.
- The analyses were not prespecified before the outcomes were known.
- The analyses were descriptive without formal hypothesis testing.
- Multiple major changes made while the trial was ongoing introduced high selection bias.
- The study seemed to be poorly conducted with missing data related to evaluation of adverse and intercurrent events and patient follow up.

Reviewer's comment:
Further discussion of these considerations are included in section 6.1 which discusses study V005. Given the objective endpoints, the clinical team concluded that regulatory flexibility can be exercised to accept this single arm trial as an adequate study due to the alternate outcome of imminent limb loss. To address the concerns raised by the statistical team about the trial design and missing data, a conservative approach to primary efficacy analysis was taken and patients with missing data at Day 30 were considered not patent for analysis. The Applicant provided data from both studies V005 and V017 to support safety and efficacy of ATEV; however, both the clinical and statistical teams determined that study V017 offers only limited support of efficacy due to the different study population and settings. Furthermore, the retrospective, observational study design of V017 makes it unsuitable to combine data with that from the prospective study V005.

Please refer to the memo from the statistical reviewer for further details.

### 4.6 Pharmacovigilance

Enhanced pharmacovigilance will be done following approval and will include periodic reports submitted to the Agency as required as well as expedited reports for three years following the date of product licensure for graft rupture and anastomotic failure. Benefit-Risk Evaluation Reports will be submitted for marketed product as per FDA guidance (i.e., at quarterly intervals, for 3 years from the date of issuance of the biologics license, and then at annual intervals) and DSUR for investigational product(s) as per applicable FDA guidance (e.g., annually).

Additionally, since routine pharmacovigilance was thought to be insufficient to address the risk of graft failure and infection, a long-term observational study comprising of at least 100 patients with extremity vascular injury is to be implemented with a minimum follow up period of 1 year. This study will evaluate the incidence of graft rupture, anastomotic failure, infection and thrombosis, and describe the incidence of limb amputation and death.

The Applicant will also complete study V005 under a post marketing commitment (PMC) in addition to Chemistry, Manufacturing, and Control PMCs recommended for shipping validation, environmental isolates information to support qualification of the sterility test method for product testing, sterilization validation of the bioreactor disposable set, excipient sample suitability for sterility assay, sterility assurance of the (b) (4) and establishment of upper limits for certain final product release testing.

## 5. Sources of Clinical Data and Other Information Considered in the Review

### 5.1 Review Strategy

In this original BLA submission the clinical reviewer evaluated the clinical study report and accompanying datasets for Studies V005 and V017 in addition to the individual case summaries of each patient enrolled in either study. Case summaries for each patient included a longitudinal history of each patient enrolled in the study and were comprised of a medical monitor summary and surgical operative note in addition to clinical notes which may have included: emergency room provider notes, clinical progress notes, imaging reports, histology reports, serious adverse event report forms, and/or autopsy

reports. Summaries were reviewed separately by the clinical reviewer and CDRH vascular surgery consultant prior to compilation of findings into an internal database for use in FDA clinical and statistical reviews. Key outcome measures reviewed included: primary patency, secondary patency, amputation, requirement for repeat surgical intervention, infection of the investigational product, disruption of the ATEV's integrity and comments on the clinical outcome for each patient enrolled in either V005 or V017. In addition to clinical study data and literature references, the Applicant also provided a meta-analysis to provide current efficacy and safety benchmarks for key endpoints in synthetic grafts. The meta-analysis combined both military and civilian studies and therefore was not able to be used for comparison in the civilian studies conducted in this application. Therefore, this reviewer independently evaluated published medical literature about autologous and synthetic grafts to assess outcomes for patency and potential complications (Table3).

For evaluation of safety, the clinical reviewer focused on data from the ongoing study V005, inclusive of patients in both the extremity and torso/iatrogenic treatment arms. Evaluation of efficacy was based on the subset of patients with extremity trauma in V005 consistent with the proposed indication. Data from V017 was used as supportive data due to the retrospective study design and included a different population than that included in study V005.

5.2 BLA/IND Documents That Serve as the Basis for the Clinical Review

The sources for this review are the data submitted in the licensing application, which includes data from the two ATEV studies (Table 7) and the relevant modules in the BLA submission:

- The administrative and prescribing information in module 1.
- Summary clinical information in modules 2.5 and 2.7
- Clinical study reports in module 5 including the narrative clinical study reports, appendices, tabulation and analysis datasets, case report forms, and literature references submitted by the Applicant.
- 120-day safety update submitted under BLA 125812/19
- Clinical information request (IR) responses received under the following amendments:
    - BLA 125812/36 – imaging compliance table
    - BLA 125812/38 – clinical IR
    - BLA 125812/40 – clinical IR

In addition, the reviewer used publicly available resources including UpToDate and PubMed.

## 5.3 Table of Studies/Clinical Trials

The BLA includes two studies of the ATEV (Table 7).

**Table 7. Clinical Studies Submitted in the Biological License Application**

| Trial Identifier | Trial Design | Study Primary Endpoints | Study Objective | Study Population | No. of Study Sites, Countries and Patients enrolled |
|---|---|---|---|---|---|
| CLN-PRO-V005 NCT#03005418 | Phase 2/3 prospective, multicenter, open-label, single-arm, efficacy and safety study | Primary patency at 30 days.<br><br>Safety and tolerability. | Evaluate the safety and efficacy of the ATEV for use as an interposition replacement or bypass in patients with vascular trauma undergoing surgery for vascular replacement or reconstruction in size-appropriate vessels | ≥18 to ≤85 years of age, with life- or limb-threatening traumatic injury to an arterial vessel in the limb or torso, other than the heart, which requires replacement or reconstruction when autologous vein graft is either not feasible in the judgement of the treating surgeon or is not desirable because of the urgency of revascularization | Study sites: 19<br>Countries: 2<br><br>Enrolled: 72<br><br>Extremity: 55<br>Torso/Iatrogenic: 17 |
| CLN-PRO-V017 NCT#05873959 | Observational, multicenter, single-arm, open-label, observational study with retrospective data collection | Efficacy: Primary patency at 30 days.<br><br>Safety and tolerability | Evaluate the efficacy and safety of the ATEV in patients who had an ATEV implanted to repair or reconstruct an arterial vessel following life- or limb-threatening traumatic injury of an extremity | ≥18 to ≤85 years of age, with life- or limb-threatening traumatic injury of the extremity suffered during the Ukraine conflict between June 2022 and May 2023 | Study sites: 3<br>Countries: 1<br><br>Enrolled: 17<br><br>Extremity: 16<br>Iatrogenic: 1 |

Source: FDA reviewer
Abbreviations: ATEV = acellular tissue engineered vessel
Data Cut-off: January 15, 2024

## 5.4 Consultations

Dr. Robert Lee, a vascular surgeon in the Center for Device and Radiological Health (CDRH) was consulted regarding the proper adjudication of clinical outcomes and adverse events of special interest. Throughout the course of this review he provided expert opinion on this product submission evaluation.

Dr. Lee's assessment is that the ATEV had a concerning benefit risk profile, coupled with a catastrophic ATEV failure mode, and less than robust trauma data set. In his consult memo he notes that ATEV blow-outs or disruptions were generally associated with major, life-threatening hemorrhage. He further notes that disrupted ATEVs were associated with infection. Three patients experienced multiple bleeding episodes when attempts were made to salvage the ATEV by treating disrupted anastomoses with covered stents, or when suture repair or buttressing of an ATEV defect was attempted. Following review of the clinical data, the CDRH consultant noted that in his opinion ATEV use has resulted in "catastrophic life-threatening failures" and that the risks "are unacceptable when compared to current alternate treatment options." Based on the outcomes noted, the CDRH consultant stated that ATEV does not have a niche role in potentially saving limbs that would otherwise be lost. In his opinion, for the rare trauma patients who absolutely have no saphenous vein, synthetic graft can be used and does not expose patients to the same level of risks seen with the ATEV.

The CDRH consultant recommends the following:

- No favorable final marketing decision should be made until the Applicant addresses key outstanding clinical questions. For example:
    - presenting follow-up data in a manner to readily identify the extent of missing data
    - outcomes analysis based on key measures including length of ATEV, blunt vs. penetrating trauma
    - providing a data analysis limited to the trauma indication that excludes the iatrogenic injuries and AV access revisions
- There should be external review of the sponsor's adjudications by appropriate experts to resolve discordance in adjudication between the FDA and the Applicant.
- FDA should hold a public panel meeting, engaging members who have the appropriate expertise in vascular surgery, trauma surgery, military medicine and surgical infections to discuss the clinical performance data and provide recommendations whether there is a role for ATEV or what possible role the ATEV might play in managing trauma patients.

Reviewer comment:
As a result of some of the concerns raised by the CDRH consultant, the CBER clinical team took the following actions:

- Sent IR communications to the Applicant who provided follow up data which helped evaluation of missing data.
- Conducted exploratory analyses on key measures including type of trauma and length of ATEV used which did not find any significant changes warranting further evaluation.

- Performed a primary efficacy analysis for the extremity trauma indication which excluded iatrogenic injuries or torso indications.
- Decided on a conservative approach to adjudication of patency. Patients who did not have Day 30 evaluation were considered not patent (discussed further in Section 6.1.11.1 Analyses of Primary Endpoint).
- Conducted a review of the literature which suggests an unmet medical need for the ATEV in the extremities when the autologous vein is not feasible and use of a synthetic graft is not recommended, such as due to location in a joint.

### 5.4.1 Advisory Committee Meeting

Initial review of information submitted in the BLA did not raise concerns or controversial issues that would have benefited from an Advisory Committee discussion. Late in the review cycle, the risk of graft failure was identified. In light of the safety signal identified, the clinical and statistical review teams raised the possibility of an advisory committee review. However, with further internal discussion with the review team and leadership, the decision was made that an advisory committee meeting was not needed.

### 5.4.2 External Consultations

To further address questions raised by the CDRH consultant and clinical review team and to obtain an independent expert evaluation of the evidence, external consultation was requested from three experienced vascular surgeons who are non-FDA government employees and practicing in academic medical centers.

The external consultants reviewed a summary of FDA and Sponsor data reflected in this review memo and provided their responses to the following questions:

1) Considering the patency rate and infection risk of existing treatment options for extremity arterial injury repair (i.e., autologous vein, synthetic graft), is there a population of patients who would benefit from treatment with ATEV? If so, please define this population and provide your rationale.

2) Provide your assessment of whether ATEV's risks of graft failure and infection are acceptable for the patient population you identify in response to Question #1a when weighed against the benefit of limb salvage.

3) Summarize your assessment of the benefits and risks of treatment with ATEV, based on the data provided to support the biologics license application for ATEV. Discuss if and how ATEV could contribute to the currently available treatment options, such as PTFE grafts, for restoring arterial blood flow to extremities.

All three consultants agreed that vascular trauma patients represent the population who could benefit from treatment with ATEV but that the ATEV did not demonstrate superiority to existing treatment options. Furthermore, they agreed overall that the observed infection rate is acceptable in the context of the observed benefit for the studied patient population.

All three consultants identified graft failure as a serious risk with ATEV use; however, they had different opinions on the acceptability of observed graft failure rates and how best to mitigate the observed risk. Suggestions provided by the consultants include

possible replacement of ATEV with an autologous vein in the setting of post-implantation infection, prolonged antibiotic prophylaxis and additional testing to identify the root cause of graft failure with ATEV use.

Reviewer comment:
The consultants' input aligns with the review team's assessment that the appropriate patient population that would benefit from treatment with ATEV is reflected in the final labeled indication agreed upon with the Applicant during labeling negotiations. The observed serious risk of graft failure, noted by the consultants and identified by the review team, has been incorporated into risk mitigation measures and into the benefit-risk evaluation of the product. The identified risks can be appropriately mitigated through product labeling, routine pharmacovigilance, and an additional longer-term study of graft failure and infection risks in a post-marketing study as part of the agreed-upon PMR.

## 6. Discussion of Individual Studies/Clinical Trials

### 6.1 Trial #1 – CLN-PRO-V005

Study Title: A Phase 2/3 Study for the Evaluation of Safety and Efficacy of Humacyte's Human Acellular Vessel for Vascular Replacement or Reconstruction in Patients with Life- or Limb-threatening Vascular Trauma.

Clinical Trial Registry Identifiers: NCT03005418, EudraCT 2020-003383-12

Enrollment has completed (First patient enrolled: September 1, 2018; last patient enrolled June 5, 2023) Follow-up evaluation is ongoing.

#### 6.1.1 Objectives (Primary, Secondary, etc.)

Primary Efficacy Objective:

- To determine the primary patency of the ATEV at 30 days in vascular trauma patients following surgery for vascular replacement or reconstruction due to life- or limb-threatening trauma of the extremities.

In the clinical protocol, primary patency is defined as functional access patency until any type of intervention to restore blood flow. Secondary patency is defined as functional patency, with or without preceding successful interventional or surgical procedures to maintain or reestablish patency, until the ATEV is abandoned. Long-term refers to a time point beyond 30 days and includes findings through the end of study at 36 months.

Safety Objective:

- To evaluate the safety and tolerability of the ATEV in vascular trauma patients following surgery for vascular replacement or reconstruction due to life- or limb-threatening trauma of the extremities.

Reviewer comment:
Results for patients who received ATEV in the extremity as a conduit are reported in this review as the primary efficacy endpoint in this study. All patients enrolled in study V005 inclusive of the extremity and torso/iatrogenic group are included in safety reporting.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 111 of 674

6.1.2 Design Overview

The study is a prospective, multicenter, non-randomized, open-label Phase 2/Phase 3 study to evaluate the safety and efficacy of the ATEV in patients with life- or limb-threatening vascular trauma. The study was conducted at 19 sites in the United States and Israel.

The protocol was revised during the course of the study with the following major amendments:

- The location of arterial trauma was changed to include non-iatrogenic arterial trauma of the extremities only.
- Eligibility was amended to include adult patients with a MESS ≤7.
- Use was limited to patients with no alternate graft consideration (i.e., Autologous vein graft is either not feasible in the judgment of the treating surgeon (e.g., because of lack of availability of suitable conduit, presence of severe venous insufficiency) or is not desirable because of the urgency of revascularization).
- Study size was modified to include at least 50 patients with non-iatrogenic extremity injury. This value previously ranged from 20 to 100 patients in various versions of the protocol.

A summary of major changes with each revision follows in Table 8. Drafts of version 4.0 of the CLN-PRO-V005 protocol dated October 23, 2019 through May 24, 2023 were discussed between the FDA and the Applicant while the study was open to patient enrollment. During this time period, FDA communicated statistical concerns which would affect analysis of the study data. Agreement was reached on primary and secondary endpoints with the version of the clinical protocol submitted on May 24, 2023.

**Table 8. Protocol Revision History, CLN-PRO-V005**

| Characteristic | Version 1.0 (29 Dec 2015) and Version 2.0 (24 Oct 2016) | Version 3.0 (18 Jul 2018) to version 3.3 (12 Aug 2022) | Draft Version 4.0 (23 Oct 2019) | Draft Version 4.0 (20 April 2020) | Draft Version 4.0 (30 Jul 2021) | Version 4.0 (24 May 2023) |
|---|---|---|---|---|---|---|
| Objective | P2/ Safety and tolerability | P2/ Safety and tolerability | Adaptive P2/3 – Efficacy and Safety using RWE | Adaptive P2/3 – Efficacy and Safety using RWE | Adaptive P2/3 – Efficacy and Safety using RWE | Adaptive P2/3 – Efficacy and Safety using RWE |
| Location of arterial trauma | Lower Limb | Vessel in the upper or lower limb or torso, other than the heart | Vessel in the upper or lower limb or torso, other than the heart; Iatrogenic Injuries | Vessel in the upper or lower limb or torso, other than the heart; Iatrogenic Injuries | Non-iatrogenic; Arterial Trauma – in limb only | Non-iatrogenic; Arterial Trauma – in limb only |
| Eligibility | 18-85 yrs; | 18-85 yrs; MESS ≤ 7 Expanded to include pediatrics 14-17 years of age who have reached Tanner stage 5 in version 3.3 | 18-85 yrs; MESS ≤ 7 | 18-85 yrs; MESS ≤ 7 | 14-85 yrs; MESS ≤ 7 | 14-85 yrs; MESS ≤ 7 |
| Alternate vascular options | Autologous Vein Graft not feasible or desirable | Autologous Vein Graft not feasible or desirable | Autologous Vein Graft not feasible or desirable | AVG not feasible or desirable | No alternate graft consideration | No alternate graft consideration |

| Characteristic | Version 1.0 (29 Dec 2015) and Version 2.0 (24 Oct 2016) | Version 3.0 (18 Jul 2018) to version 3.3 (12 Aug 2022) | Draft Version 4.0 (23 Oct 2019) | Draft Version 4.0 (20 April 2020) | Draft Version 4.0 (30 Jul 2021) | Version 4.0 (24 May 2023) |
|---|---|---|---|---|---|---|
| Primary endpoints | Patency (primary, primary assisted and secondary) rate of ATEV at 12 months<br><br>Rate of limb salvage | Primary patency at 30 days | Primary patency at 30 days. | Primary patency at 30 days | Superiority of early conduit infection (defined as Szilagyi Grade III or higher at 30 days) | Primary unassisted patency at day 30 |
| Secondary endpoints | Patency rate at 3, 6 and 9 months<br><br>Rates of intervention needed to maintain / restore patency - 12 months | Rate of limb salvage<br><br>(12m)<br><br>Patient survival<br><br>Rate of infections<br><br>Frequency of AESI | Rate of limb salvage<br><br>Patient survival<br><br>Rate of Interventions;<br><br>Rate of infections<br><br>Frequency of AESI | Rate of Interventions;<br><br>Rate of infections;<br><br>Rate of Limb Salvage<br><br>Frequency of AESI | Non-inferiority on amputation rates at Day 30; mechanical stability of the ATEV based on freedom from ATEV removal or replacement | Secondary patency at day 30<br><br>Limb salvage at day 30<br><br>Infection at Day 30 |
| Size | 20 patients– 3 sites | 40 patients; at least 10 in limb and 10 in torso cohort (10 sites) | 60 eligible patients (12 sites) | 100 eligible patients; (25 sites – United States +Israel) | 50 evaluable patients (35 sites) | 50 evaluable patients (35 sites) |
| Study Enrollment | 0 | 0 | 22 | 29 | 41 | 63 |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 114 of 674

| Characteristic | Version 1.0 (29 Dec 2015) and Version 2.0 (24 Oct 2016) | Version 3.0 (18 Jul 2018) to version 3.3 (12 Aug 2022) | Draft Version 4.0 (23 Oct 2019) | Draft Version 4.0 (20 April 2020) | Draft Version 4.0 (30 Jul 2021) | Version 4.0 (24 May 2023) |
|---|---|---|---|---|---|---|
| Comparator | None | None | An external, non-interventional control group - PROOVIT Registry Autologous Vein Graft | An external, non-interventional control group - PROOVIT Registry | Comparator – Meta-Analysis Data; Synthetic Grafts | Comparator – Meta-Analysis Data; Synthetic Grafts |
| Stats | No formal hypothesis testing<br><br>Descriptive Tabulation added in version 2.0 | No formal hypothesis testing<br><br>Descriptive Tabulation | Non-inferiority if Patency > 72%; Futility if patency < 50% at 30 days | Non-Inferiority (margin 10%) to matched PROOVIT comparator | Superiority to Registry infection rate (21%).<br><br>No statistical comparison for patency. | No statistical comparison for patency. |

Source: Table generated by the reviewer

Abbreviations: AESI = Adverse Events of Special Interest, AVG = Autologous Vein Graft, ATEV = acellular tissue engineered vessel, MESS = Mangled Extremity Severity Score, PROOVIT = PROspective Observational Vascular Injury Treatment, RWE = real world evidence, yrs = years

A total of 72 adult patients (≥18 years old) were enrolled and received the ATEV to repair an arterial vessel in the limb or torso, other than the heart. One patient was excluded due to use of the ATEV as a patch instead of a conduit. Among the 71 eligible patients who received the ATEV as a conduit for vascular repair, 54 (76%) were administered the implant to repair an artery in the extremity and 17 (24%) received ATEV for repair of an artery in either the torso or for an iatrogenic injury.

The primary efficacy endpoint was to determine the primary patency of the ATEV at 30 days in vascular trauma patients following surgery for vascular replacement or reconstruction due to life- or limb-threatening trauma of the extremities. Key secondary efficacy endpoints were measured at Day 30 and included secondary patency of the ATEV, infection rate, and the rate of limb salvage.

The study follow-up duration was 36 months.

Reviewer comment:
This study protocol underwent multiple major changes while the study was ongoing, and the clinical outcomes were known due to the open-label single-arm study design. These included major changes to the study design, study population, primary efficacy endpoints, and sample size. The frequent changing of key study elements and the analysis plans while the trial was ongoing limit the total number of evaluable patients for this indication and affect our ability to draw definitive conclusions from the data. Discussions between the agency and Applicant regarding the number of patients evaluated at day 30 and how best to determine Day 30 patency for patients who discontinued prior to this timepoint were ongoing prior to BLA submission and we did not reach agreement.

### 6.1.3 Population

Patients were considered for enrollment if they sustained life or limb threatening traumatic injury to an arterial vessel in the limb or torso, other than the heart, which required replacement or reconstruction.

*Key Inclusion Criteria*

Men and women aged 18 to 85 years and adolescents who have achieved Tanner Sexual Maturity Rating Stage V (U.S. sites only)

- Life or limb threatening traumatic injury to an arterial vessel in the limb or torso, other than the heart, which requires replacement or reconstruction
- Damaged vessel with a defect length of ≤38cm and appropriately size matched to the 6 mm ATEV inner diameter
- Autologous vein graft is either not feasible in the judgement of the treating surgeon (e.g., because of lack of availability of suitable conduit, presence of severe venous insufficiency) or is not desirable because of the urgency of revascularization.

*Key Exclusion Criteria*

- MESS of ≥7
- Limb at high risk of amputation despite vascular reconstruction
- Catastrophic injuries that make survival unlikely (e.g., AIS >5 or Injury Severity Score (ISS) >60)

- Pregnancy
- Unable to continue long-term antiplatelet therapy after resolution of acute injuries.

Reviewer comment:
During the course of development, the study was amended to include adolescent patients who have achieved Tanner sexual maturity stage V, however, due to challenges with recruitment for this subpopulation, no pediatric patients (i.e.,<18 years of age) were enrolled in this study.

The AIS classifies individual injury severity on a scale of 1-6 where 1 is minor and 6 is untreatable. The ISS takes the sum of the squares of the highest AIS from each of the three most severely injured body regions to achieve a score that ranges from 3 (least) to 75 (most) injured. Exclusion of patients with MESS $\geq$7, AIS >5 or ISS >60 is meant to limit this population to patients in whom limb preservation is possible. However, this also serves to skew the data towards limb salvage by selecting out patients in whom amputation risk is high.

This study enrolled patients with life or limb threatening traumatic injury to an arterial vessel in the limb or torso. During the course of this study, the intended population was reviewed at multiple timepoints in the context of emerging safety signals and the proposed indication was limited to urgent arterial repair following *extremity* vascular trauma when autologous vein is not feasible. Suitability for synthetic graft placement was not discussed in the clinical protocol. Changes made to the study design while the study was ongoing make it difficult to accurately assess the data due to confounders such as type of injury and indication for vascular replacement.

Following the data cutoff date of June 30, 2023, three additional patients were enrolled into study V005 and included in the 120 day safety update.

### 6.1.4 Study Treatments or Agents Mandated by the Protocol

All patients received an ATEV graft manufactured at either (b) (4) (b) (4) or Humacyte, Durham, North Carolina which was cut to the length required for arterial repair ranging in length from 1 to 40 cm.

Within the protocol, patients were to receive both antibiotic and antithrombotic prophylaxis in conjunction with the ATEV implantation in accordance with local hospital guidelines. All patients must have at least 1 day of antibiotic prophylaxis initiated on the same day as surgery with longer antibiotic prophylaxis administered at the discretion of the investigator based on clinical need.

Antithrombotic prophylaxis was to be commenced intraoperatively with heparin and if not ongoing at the time of surgery, should be commenced as soon as medically appropriate post operatively. The protocol recommended antiplatelet therapy (aspirin 81 to 325 mg and/or clopidogrel 75 mg daily) is at the discretion of the investigator and should continue long term while the ATEV is in place. If the patient is unable to tolerate aspirin and/or clopidogrel the choice of antiplatelet regimen was at the investigator's discretion.

Reviewer comment:

Currently available therapies rely on antibiotic and antithrombotic prophylaxis at the time of vascular graft placement. The Applicant has provided provision for same consistent with standard of care. In their protocol, there is no clear instruction on when antiplatelet therapy may be discontinued. It is understood that antiplatelet therapy should be continued life-long.

6.1.5 Directions for Use

The ATEV is administered by surgical implantation to repair or replace a patient's damaged blood artery after sustaining trauma. The anatomical location and length are decided upon at the discretion of the implanting surgeon and based on appropriate clinical evaluation, vessel mapping and/or imaging.

The ATEV has dimensions of 6 mm in inner diameter and 42 cm in length (approximately 40 cm of usable length). Since the length of the ATEV to be implanted is dependent on the surgical needs, it is trimmed to provide the length required for each vascular replacement by the surgeon in the operating room. Additionally, the ATEV can be cut and used to replace more than one injured artery in the same patient. Each ATEV unit is for use in a single patient only.

6.1.6 Sites and Centers

Study V005 was conducted at 17 sites in the United States and 2 in Israel.

6.1.7 Surveillance/Monitoring

Patients were followed on Days 5 and 30, and every 3 months from Months 3 to 36 with assessments as noted in Table 9:

**Table 9. Schedule of Events, Study V005**

| Event | Pre-Op screening D1 | D1 | D5 or Prior to d/c | D30 +/- 5 Days | M3 +/- 14 Days | M6 +/- 14 Days | M9 +/- 14 Days | M12/ET† +/- 14 Days | M15-M36† +/- 30 Days |
|---|---|---|---|---|---|---|---|---|---|
| **Informed consent** | X | | | | | | | | |
| **Medical history and nature of trauma** | X | | | | | | | | |
| **Concomitant medication** | X | X | X | X | X | X | X | X | |
| **Physical exam**[1] | X | X | X | X | X | X | X | X | X[7] |
| **Pre-op ultrasound or CT angiography**[2] | X | | | | | | | | |
| **Vital signs** | | | X | | | | | | |
| **Eligibility (inclusion/exclusion criteria)** | X | | | | | | | | |
| **ATEV implantation and intraoperative confirmation of patency** | | X | | | | | | | |
| **Documentation of surgery and any complications** | | X | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Clinical chemistry** | X[3] | | X | | | | | | |
| **Hematology** | X[3] | | X | | | | | | |
| **PRA** | X[3] | | | X | | X | | X | |
| **Duplex ultrasound[4]** | | | | X | X | X | X | X | X[4] |
| **CT angiography** | | | | | | | | X | |
| **AEs** | | X | X | X | X | X | X | X | X[5] |
| **Documentation of ATEV interventions** | | X | X | X | X | X | X | X | X[5] |

Source: Table 1 Protocol CLN-PRO-V005 v4.0 in 16.1.1.6.
[1]Physical examination includes clinical exam of the operative limb and ATEV at all postoperative visits (incl. patency assessment on D1) and distal vascular bed (extremity injury only)
[2]Pre-op imaging is at the discretion of the investigator based on the clinical condition of the patient.
[3]Measured at preoperative screening when possible; if PRA titer not obtained preoperatively, it must be completed within 12 hours after ATEV implantation.
[4]Visits at Month 24 and Month 36 to be conducted in person with physical exam of the ATEV site and duplex ultrasound imaging of ATEV.
[5]The status of the patient and ATEV will be ascertained every 3 months post Month 12 until 36 months after ATEV implantation by telephone contact with the patient and/or his physician. Only related SAEs and all AESI will be reported after 12 months. If a suspected SAE related to ATEV is discovered an unscheduled visit should be conducted to investigate.
†Patients withdrawn before Month 12 will perform ET visit that correlates with the procedures at Month 12. Patients withdrawn after Month 12 and prior to Month 36 should complete an ET visit that correlates with procedures post Month 12 through Month 36.
Abbreviations: AE = adverse event, CT = computed tomography, D = day, d/c = discharge, ET = early termination, ATEV = acellular tissue engineered vessel, M = month, PRA = panel reactive antibodies

A Data Monitoring Committee was implemented to review safety on an ongoing basis and provide recommendations about stopping, continuing, or modifying the study.

Reviewer comment:
Duplex imaging or alternative appropriate imaging methods (i.e., computed tomography angiography or magnetic resonance imaging are recommended to evaluate patency following vascular graft placement both in the initial few days after placement and then at regular intervals every 3 months for the first year and annually thereafter (Forsyth, Haqqani et al. 2024). Imaging can also be used to identify structural irregularities which would be suggestive of graft infection. The earliest patency assessment included in the clinical protocol was at Day 30, and lack of definitive evaluation of patency prior to study discontinuation made it difficult to impute patency for 12 (21.8%) patients who were not evaluated at Day 30. Patients who did not have definitive evaluation of patency prior to study discontinuation were evaluated as a worse case scenario and included as not patent for FDA analysis. Infection rate during the first 30 days is a key secondary endpoint, however the protocol did not evaluate for structural abnormalities suggestive of infection with imaging as is commonly done in clinical practice.

### 6.1.8 Endpoints and Criteria for Study Success

Primary Efficacy Endpoint:

- Primary ATEV patency at Day 30 after implant

Key Secondary Efficacy Endpoints:

- Secondary patency at Day 30 after implant
- Conduit infection at Day 30 after implant
- Limb salvage rate at Day 30 after implant

Reviewer comment:
For the efficacy assessment, the Applicant evaluated patency, infection and limb salvage rates at 30 days. This time period of 30 days has been cited in the literature following vascular surgery, as there is a higher risk of complications during the first 30 days and reliable follow up beyond 30 days is a known challenge in the civilian trauma population. The Applicant did not predefine a success rate in their statistical analysis plan. They proposed a comparison against a standard of care benchmark after 41 patients had been enrolled and some outcomes were already known; however, agreement on a benchmark was not reached prior to BLA submission.

### 6.1.9 Statistical Considerations & Statistical Analysis Plan

Study Hypothesis:
This was a nonrandomized, single-arm, open-label study. The Applicant did not provide formal hypothesis testing, prespecified Type 1 error control, or multiplicity adjustment in their statistical analysis plan. Efficacy endpoints were summarized descriptively.

Sample Size:
No formal power calculations were performed as no formal hypothesis testing was planned.

Analysis Population:
The analysis population of the extremity group is defined as any patient who received the ATEV graft and who underwent non-iatrogenic arterial vascular repair with the ATEV in an extremity.

Handling of Intercurrent Events):
The Applicant used a while-on-treatment strategy for imputing patency in patients with intercurrent events (IEs), such as death and amputation; if the IE was determined to be causally unrelated to the ATEV, the last known patency status prior to the IE would be used in the primary efficacy analysis. An independent adjudication committee determined whether the IE may have been related to the ATEV and concluded patency at the time of IE for patients who were not evaluable for the primary endpoint due to IEs. In discussions with the Applicant prior to BLA submission, the FDA recommended that if the IE is deemed causally related to the ATEV, or if causality of the IE could not be determined, or patency status is missing postimplant, patients would be included as patency failure.

Handling of Missing Data:
No missing data handling strategies were provided.

Reviewer comment:
The planned sample size for this study had changed multiple times from 20 patients in the initial study protocol to 100 patients in protocol version 4.0 from April 2020. The Applicant and the FDA discussed the possibility of evaluating non-inferiority to existing standard of care treatments, but no consensus was reached related to establishment of benchmarks for comparison due to a paucity of extremity vascular trauma data.

Comments about missing data handling and imputation strategies were sent to the Applicant during the IND stage but the FDA and the Applicant did not reach agreement prior to this BLA submission and these changes were not implemented in the submitted

Applicant analyses. Based on the Type C meeting on March 7, 2023, FDA agreed that a while-on-treatment strategy can be used to handle intercurrent events only if they can be confidently determined to be unrelated to the ATEV. During review of this BLA, inconsistent and/or inadequate methods to ascertain patency status in different patients by the adjudication committee were identified. In addition, if there was missing data such as no definitive patency assessment or no culture taken for ATEV infection evaluation, the best outcomes (i.e., patency, no infection assumed) were used in the analyses. FDA recommendations during previous discussion were that these should be handled conservatively. As a result, FDA also performed its own internal adjudication of the missing data.

### 6.1.10 Study Population and Disposition

The study population evaluated for efficacy included 54 patients who had placement of the investigational product to treat extremity vascular trauma. This includes three patients (b) (6) who were enrolled following the initial data cutoff date and were included in the 120-day safety update and one patient who was reclassified from the torso cohort following the most recent protocol revision. All 71 patients who received ATEV as a conduit for vascular replacement in study V005 were included for safety analysis.

87 patients were screened for enrollment in study V005, with 15 (17.2%) screen failures. One patient was excluded from the analysis group due to placement of the ATEV as a patch instead of a conduit. 71 patients received the ATEV as a conduit for either the extremity or a torso/iatrogenic vascular injury. 54 of the 71 received the investigational product as a conduit for an extremity indication and 17 for torso or iatrogenic vascular trauma.

**Table 10. Indication Cohorts Within Study V005**

| Patient Disposition | Patients, n (%) |
|---|---|
| Total number of patients enrolled and treated | 71 (100%)[1] |
| All ATEV group | 71 (100%) |
| Extremity group (extremity arterial placement as a conduit following non-iatrogenic trauma) | 54 (76.1%)[1] |
| Iatrogenic and torso group | 17 (24.0%) |

Source: Derived from Table 14.1.1.2 and Table 14.1.5 and clinical dataset
[1]one patient excluded from this group for use of ATEV in a patch configuration.
Abbreviations: ATEV = acellular tissue engineered vessel, n = sample size
Data Cut-off: January 15, 2024

Of the 71 patients in study V005 who received an ATEV as a conduit, 11 patients had completed the study with 36 months of follow-up, 15 patients were ongoing, and 43 patients had discontinued prior to Month 36. Within the group of 54 patients who received an ATEV as as a conduit for an extremity indication, 7 patients had completed the study with 36 months of follow-up, 10 patients were ongoing, and 37 patients discontinued from the study prior to Month 36 due to loss to follow up, death, ATEV abandonment or withdrawal of consent. Further details about patient disposition are provided in 6.1.10.1.3 Patient Disposition.

Reviewer comment:
Patients (b) (6) were enrolled in this study between July 5 and August 19, 2023, after the original data cutoff date of June 30, 2023. FDA included these patients in the efficacy analysis to maximize data for analysis from this small trial and to reduce selection bias, as poor outcomes for at least one of the patients may have been known to the Applicant at the time of selection of the data cutoff date. The data cutoff date of June 30, 2023, was selected after the official CBER response to the Applicant's request for of the informal dispute resolution finalized on August 11, 2023.

#### 6.1.10.1 Populations Enrolled/Analyzed

The safety population consisted of all study patients who received any amount of the ATEV, regardless of follow-up status. Sub analysis was performed to further evaluate risk within the extremity and torso/iatrogenic groups.

Reviewer comment:
FDA review of the patient narratives revealed that one patient (b) (6) was erroneously assigned to the torso and iatrogenic group by the Applicant based on an earlier version of the protocol. Following IR communication, the Applicant clarified that patient (b) (6) had been assigned to the torso/iatrogenic group based on a previous version of the protocol in which any patient with any portion of the ATEV graft originating in the torso would be classified to the torso cohort. Within the case summary, it is noted that this patient presented with a gunshot wound to the left upper chest which required the ATEV placement as an interposition graft from the left subclavian artery to the left axillary artery. Per the most recent version of the clinical protocol (version 4), this patient meets the definition for classification within the extremity cohort based on the termination of the graft within the extremity. This patient was reassigned to the extremity group for analysis based on criteria in the most recent version of study V005 (version 4).

FDA also identified one patient (b) (6) in the extremity group where the ATEV was used as a patch instead of a conduit. This patient was removed from safety and efficacy analyses. The efficacy analysis relied on a study population of 54 patients and the safety analysis relied on a study population of 71.

##### 6.1.10.1.1 Demographics

Patient demographics are presented in Table 11. The extremity group population is predominantly male (74.1%) and made up of primarily Black or African American (48.2%) and White (42.6%) patients. The age of patients ranged from 18 to 72 years with a median of 30.0 years and a mean of 33.4 years.

**Table 11. Patient Demographics for Study V005**

| Characteristic | Extremity Group n=54 | Torso/Iatrogenic Group n=17 | Total n=71 |
|---|---|---|---|
| Sex, n (%) | | | |
| Male | 40 (74.1%) | 11 (64.7%) | 51 (71.8%) |
| Female | 14 (25.9%) | 6 (35.3%) | 20 (28.2%) |
| Age, years | | | |
| Mean (SD) | 33.4 (13.6) | 48.1 (20.7) | 36.9 (16.7) |
| Median (min, max) | 30.0 (18,72) | 54.0 (18,81) | 30.0 (18,81) |
| Race, n (%) | | | |
| Black or African American | 26 (48.2%) | 8 (47.1%) | 34 (47.9%) |
| Native Hawaiian or other Pacific Islander | 0 (0) | 1 (5.9%) | 1 (1.4%) |
| White | 23 (42.6%) | 8 (47.1%) | 31 (43.7%) |
| Other | 5 (9.3%) | 0 (0) | 5 (7.0%) |
| Ethnicity, n (%) | | | |
| Hispanic or Latino | 12 (22.2%) | 2 (11.8%) | 14 (19.7%) |
| Not Hispanic or Latino | 42 (77.8%) | 15 (88.2%) | 57 (80.3%) |
| Country of participation, n (%) | | | |
| United States | 50 (92.6%) | 17 (100%) | 67 (93.1%) |
| Israel | 4 (7.4%) | 0 (0%) | 4 (5.6%) |

Source: Derived from BLA 125812/0; Module 5.3.5.2, Clinical Study Report, p.75.
Abbreviations: max = maximum, min = minimum, n = sample size
Data Cut-off: January 15, 2024

6.1.10.1.2 Medical/Behavioral Characterization of the Enrolled Population

In the extremity group, 26 (48.2%) patients had an AIS of severe and 14 (25.9%) patients had an AIS of critical (Table 12). Table 13 demonstrates injury characteristics within the study population. The median ISS in the extremity group was 17, with a minimum score of 9 and a maximum score of 50. 31 patients (57.4%) presented with penetrating trauma and 23 patients (42.6%) presented with blunt trauma. Gunshot wounds were the most common type of injury followed by motor vehicle accidents.

**Table 12. Injury Severity Classification for Patients, Study V005**

| Parameter | Extremity Group n=54 | Torso/Iatrogenic Group n=17 | Total n=71 |
|---|---|---|---|
| Abbreviated injury scale (AIS), n (%) | | | |
| Moderate | 0 (0%) | 2 (11.8%) | 2 (2.8%) |
| Serious | 14 (25.9%) | 1 (5.9%) | 15 (21.1%) |
| Severe | 26 (48.2%) | 4 (23.5%) | 30 (41.7%) |
| Critical | 14 (25.9%) | 6 (35.3%) | 20 (28.2%) |
| Missing | 0 (0%) | 4 (23.5%) | 4 (5.6%) |

Source: Derived from BLA 125812/0; Module 5.3.5.2, Clinical Study Report.
Abbreviations: AIS = abbreviated injury scale, n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:
The AIS scores were calculated by the investigator at the time of patient enrollment. This scale is a measurement tool for single injuries that allows for comparison of specific injuries and their relative severity. Overall, the distribution is as expected for this study population.

**Table 13. Injury Characteristics, Study V005**

| Parameter | Extremity Group n=54 | Torso/Iatrogenic Group n=17 | Total n=71 |
|---|---|---|---|
| Injury location, n (%) | | | |
| Abdomen | 0 (0%) | 1 (5.9%) | 1 (1.4%) |
| Chest | 0 (0%) | 3 (17.7%) | 3 (4.2%) |
| Pelvis | 0 (0%) | 1 (5.9%) | 1 (1.4%) |
| Lower extremity | 42 (77.8%) | 8 (47.1%) | 50 (70.4%) |
| Upper extremity | 12 (22.2%) | 4 (23.5%) | 16 (22.5%) |
| Artery category, n (%) | | | |
| Femoral artery | 21 (38.9%) | 7 (41.2%) | 28 (39.4%) |
| Popliteal artery | 21 (38.9%) | 1 (5.9%) | 22 (31.0%) |
| Brachial artery | 7 (13.0%) | 4 (23.5%) | 11 (15.5%) |
| Axillary artery | 5 (9.3%) | 1 (5.9%) | 6 (8.5%) |
| Other[1] | 0 (0%) | 4 (23.5%) | 4 (5.6%) |
| Mangled Extremity Severity Score, n (%) | | | |
| 8 | 4 (7.4%) | 0 (0%) | 4 (5.6%) |
| 7 | 2 (3.7%) | 0 (0%) | 2 (2.8%) |
| 6 | 14 (25.9%) | 0 (0%) | 14 (19.7%) |
| 5 | 11 (20.4%) | 4 (23.5%) | 15 (21.1%) |
| 4 | 12 (22.2%) | 2 (11.8%) | 14 (19.7%) |
| 3 | 7 (13.0%) | 5 (29.4%) | 12 (16.9%) |
| 2 | 2 (3.7%) | 3 (17.6%) | 5 (7.0%) |
| Missing | 3 (0%) | 3 (17.6%) | 6 (5.6%) |
| Cause of trauma, n (%) | | | |
| Arteriovenous fistula | 0 (0%) | 4 (23.5%) | 4 (5.6%) |
| Crush | 2 (3.7%) | 0 (0%) | 2 (2.8%) |
| Fall | 3 (5.6%) | 0 (0%) | 3 (4.2%) |
| Gunshot injury | 29 (53.7%) | 4 (23.5%) | 33 (46.5%) |
| Iatrogenic injury | 0 (0%) | 8 (47.1%) | 8 (11.3%) |
| Industrial accident | 3 (5.6%) | 0 (0%) | 3 (4.2%) |
| Motor vehicle accident | 14 (25.9%) | 1 (5.9%) | 15 (21.1%) |
| Other | 3 (5.6%) | 0 (0%) | 3 (4.2%) |
| Nature of trauma, n (%) | | | |
| Blunt trauma | 23 (42.6%) | 1 (5.9%) | 24 (33.8%) |
| Penetrating trauma | 31 (57.4%) | 16 (94.1%) | 47 (66.2%) |
| Deep tissue injury | 53 (98.1%) | 5 (29.4%) | 57 (80.3%) |
| Open fracture injury | 32 (59.3%) | 5 (29.4%) | 36 (50.7%) |
| Contaminated wound[2] | 51 (94.4%) | 9 (52.9%) | 59 (83.1%) |

Source: FDA reviewer. Derived from clinical study report and case summaries.
[1]other includes subclavian, common iliac, and external iliac arteries.
[2]Includes penetrating wounds, open wounds, wounds where a foreign body is present or added (example external fixators), degloving injuries, puncture wounds, and wounds in areas of the body with high concentrations of commensal flora (e.g., oral mucosa, genitals, armpits).
Abbreviations: n = sample size
Data Cut-off: January 15, 2024

Autologous vein is the primary source of repair for vascular trauma due to better long-term safety and patency. Table 14 lists the reasons for not using the autologous vein when enrolling patients into this study as provided by the Applicant.

Reviewer comment:
The injury characteristics of patients enrolled in study V005 are consistent with the types of injuries reported in the literature for extremity vascular trauma.

**Table 14. Reasons for Not Using Autologous Vein in Vascular Repair**

| Reason | Extremity Group n=54 | Torso/Iatrogenic Group n=17 | Total n=71 |
|---|---|---|---|
| Concomitant injury to the vein | 13 (24.1%) | 1 (5.9%) | 14 (19.7%) |
| Poor quality or size of the vein | 16 (29.6%) | 8 (47.1%) | 24 (33.8%) |
| Previously removed | 4 (7.4%) | 0 (0%) | 4 (5.6%) |
| Time limitation | 17 (31.5%) | 6 (35.3%) | 23 (32.4%) |
| Other[1] | 7 (13.0%) | 2 (11.8%) | 9 (12.7%) |

Source: CLN-PRO-V005 CSR Listing 16.2.4.4; BLA 125812/SN0000
Note that more than one reason may have been reported for a given patient, thus patients may be counted in more than one category.
[1]Other includes body habitus; both legs with external fixation made harvesting problematic; complexity of global care; contralateral limb trauma; heavy contamination, obesity resulting in difficult saphenous vein harvest; and prone positioning.
Abbreviations: n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:
The Applicant has provided reasons for not using the autologous vein which include use of the ATEV to save time and for technical reasons. The Applicant notes poor quality or size of the autologous vein as a reason for not using this option during vascular reconstruction. During review of individual cases, we noted that many of the patients presented to the OR following significant bleeding and were hypovolemic due to traumatic injury. This may have contributed to the high number of patients who did not receive autologous vein due to poor quality or size of the vein at the time of placement. Time limitation for autologous vein harvesting was included in earlier protocol versions when use of the autologous vein was considered “not desirable.” In the original BLA submission, the Applicant included patient preference as a possible reason for the ATEV use for several patients. These patients are included in the “Other” category in Table 14. During BIMO inspection, the primary investigator clarified that time limitation and poor vein quality were the reasons for the ATEV use in three patients who consented to ATEV use from this site.

### 6.1.10.1.3 Patient Disposition

A total of 72 patients were enrolled. 71 patients received the ATEV as a conduit and one patient (b) (6) received the ATEV as a patch and was excluded from the safety and efficacy analysis. 54 patients were included in the extremity group. 17 patients received the ATEV for a torso or iatrogenic injury.

Of the 54 patients in the extremity group who received the ATEV as a conduit, 13 (24.1%) were not evaluated at Day 30 due to death (n=4), amputation (n=5), ATEV explant (n=2) and loss to follow up (n=2). The ATEV was confirmed to be not patent at the time of loss to follow up for one of these patients.

**Table 15. Patients Evaluated at Different Timepoints, Study V005**

| Patient Disposition | Patients, n (%) |
|---|---|
| Total number of patients in the extremity group | 54 (100%) |
| Patients evaluated at Day 30 | 41 (75.9%) |
| Patients evaluated at Month 6 | 30 (55.6%) |
| Patients evaluated 1 year | 18 (33.3%) |
| Patients evaluated 3 years / end of study | 7 (13.0%) |

Source: Updated from Table 14.1.1.2 and Table 14.1.5 and clinical dataset
Abbreviations: n = sample size
Data Cut-off: January 15, 2024

Evaluation of long-term patency is limited by the large number of patients who discontinued from the study prior to completion at Month 36 (Table 16). 37 (68.5%) patients discontinued from the study due to lost to follow up, death, ATEV abandonment, or withdrawal of consent. Seven patients completed the study with 36 months of follow-up. At the time of this review, study V005 is ongoing with 10 patients who have received an ATEV still in follow-up and have not completed the per-protocol 36-month follow up.

**Table 16. Reasons for Early Discontinuation, Study V005**

| Reason for Study Discontinuation (<36 months) | Patients, n (%) |
|---|---|
| Total number of patients in the extremity group | 54 (100%) |
| Completed study | 7 (13.0%) |
| Evaluation ongoing | 10 (18.5%) |
| Early study discontinuation | 37 (68.5%) |
| Loss to follow up | 15 (27.8%) |
| ATEV abandoned/explanted | 9 (16.7%) |
| Amputation | 6 (11.1%) |
| Death | 6 (11.1%) |
| Withdrew consent | 1 (1.9%) |

Source: Updated from Table 14.1.1.2 and Table 14.1.5 and clinical dataset
Abbreviations: ATEV = acellular tissue engineered vessel, n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:
There is significant uncertainty regarding the safety and effectiveness of this product beyond 30 days due to the limited number of patients who have completed the expected follow up. The data in Table 16 is inclusive of updates received at the 120-day safety update. In the interim between the original data cutoff and the 120-day safety update, three patients were enrolled, one patient completed the study, and four patients were lost to follow up.

### 6.1.11 Efficacy Analyses

Efficacy analyses was conducted in the cohort of 54 patients who received ATEV as a conduit for non-iatrogenic extremity trauma.

#### 6.1.11.1 Analyses of Primary Endpoint(s)

The primary efficacy endpoint was the rate of primary patency at 30 days. Twelve of the 54 patients enrolled in the extremity group who were not evaluated at Day 30 (Table 17).

**Table 17. Reason For Not Having 30 Day Patency Data In the Extremity Group (n=54)**

| Reason for Early Termination (< 30 days) | n (%) |
|---|---|
| Total | 12 (22.2%)[1] |
| Amputation | 5 (9.3%) |
| Death | 4 (7.4%) |
| Intraoperative thrombus/abandoned | 2 (3.7%) |
| Loss to follow up | 1 (1.9%) |

Source: Adapted from clinical dataset and case summaries
Abbreviations: n = sample size
[1]13 patients were not evaluated at day 30. One patient lost to follow up following thrombosis at Day 20 counted as not patent.
Data Cut-off: January 15, 2024

All major amputations, deaths, loss to follow up and/or any other events that prevented assessment of primary patency were adjudicated by the Applicant's adjudication committee (AAC). For the purpose of imputing 30-day patency, the committee provided an assessment of the patency status of each patient who did not have 30-day patency data. One patient who deemed not patent on Day 20 was lost to follow up and not evaluated on Day 30. 12 patients were not evaluable at Day 30 and did not have evaluation of patency. The committee categorized three of these patients as nonpatent due to thrombus and ATEV explant. The remaining nine patients were adjudicated as patent by the AAC for purposes of calculating primary patency at day 30.

FDA similarly evaluated the patients without 30-day patency data to determine whether ATEV patency at 30 days would have been likely. Table 18 provides results of Humacyte and FDA adjudication for patients who were not evaluated at Day 30.

**Table 18. Adjudication of Patients Who Were Not Evaluated at Day 30, Study V005 (n=13)**

| Patient ID | Day of Study Exit | Summary |
|---|---|---|
| | | ***FDA and Applicant Agree on Patency at Day 30*** |
| (b) (6) | 1 | **Explanted** – intraoperative thrombosis, ATEV replaced by autologous vein. |
| (b) (6) | 1 | **Explanted** – intraoperative thrombosis, ATEV replaced by autologous vein. |
| (b) (6) | 17 | **Amputation** – infected ATEV explanted and replaced with PTFE following three thrombectomy procedures. |
| (b) (6) | 20 | **Loss to Follow Up** – Occlusion of ATEV on day 4 and considered not patent |
| | | ***Patients who FDA Considered Non-Patent and Applicant Considered Patent*** |
| (b) (6) | 4 | **Amputation** – 2 ATEV grafts used (artery/vein). Vein repair disrupted day 4. Muscle necrosis and crush injury progression led to amputation. Pulse in graft palpated at time of amputation. No duplex scan done. Non-occlusive thrombus identified on explant histology |
| (b) (6) | 4 | **Death** – ischemic bowel 2$^{o}$ to initial injuries. ATEV patency last confirmed on day 2 by Duplex. |
| (b) (6) | 4 | **Death** – asystole while on ECMO. Radial pulse detected by Doppler ultrasound, with capillary refill time < 2 seconds just prior to the time of death. No ATEV evaluation. |
| (b) (6) | 5 | **Loss to follow up –** Pulse and/or doppler signals proximal and distal to injury on day 5. |

| | | |
|---|---|---|
| (b) (6) | 6 | **Amputation** – Above knee amputation on Day 6 for nerve and soft tissue trauma. Intraluminal thrombi present on explant histology |
| (b) (6) | 8 | **Death** – sepsis, no ATEV evaluation |
| (b) (6) | 9 | **Amputation –** $2^{o}$ to bone injury. No ATEV evaluation |
| (b) (6) | 9 | **Death** – sepsis, no ATEV evaluation |
| (b) (6) | 19 | **Amputation** – due to insensate, paretic foot. Dorsalis pedis, posterior tibialis pulse assessed prior to amputation. No ATEV evaluation |

Source: Adapted from clinical dataset and case summaries
Data Cut-off: January 15, 2024
Abbreviations: ATEV = acellular tissue engineered vessel, ECMO = extracorporeal membrane oxygenation, n = sample size, PTFE = Polytetrafluoroethylene graft

Reviewer comment:
In discussion prior to BLA submission, FDA agreed to adjudication committee review of patients who underwent amputation or died prior to Day 30 to assess relationship to the ATEV. In all cases, the adjudication committee found that the ATEV was not the cause of amputation or death. The Applicant and the FDA discussed an imputation strategy to determine how best to evaluate subjects who were not evaluated at Day 30. No formal agreement was reached prior to BLA submission. In review of the 13 patients who were not evaluated at Day 30, FDA disagreed with imputation of Day 30 patency as the majority of patients discontinued from the study within the first week and all patients discontinued from the study by day 20. FDA findings in relation the Applicants are noted below:

- FDA agrees with non-patency for the three patients (b) (6) who were not patent due to thrombus and ATEV explant.
- FDA disagrees with the Applicant's conclusion of patency for one patient (b) (6) because the patient was amputated on Day 4 with worrisome explant histology including bacteria and thrombus present within the graft.
- FDA found no definitive assessment of patency prior to death or limb amputation to support the Applicant's conclusion of patency in seven patients.
- One patient was lost to follow up on Day 5 without imaging to support patency of the ATEV. The Applicant adjudicated this patient as patent. FDA statistical team advises that a patient who is lost to follow up should be considered a treatment failure and should not have patency imputed based on ATEV status before the patient was lost to follow up.

Table 19 summarizes the FDA analysis of primary patency at Day 30 for the primary efficacy analysis population (n=54).

**Table 19. FDA Results for Primary Patency at Day 30 in the Extremity Group**

| Analysis | Patency Rate % (n/N) | 95% CI |
|---|---|---|
| Primary efficacy analysis: Primary patency rate at Day 30 (While-on-treatment)[1] | 66.7% (36/54) | 53.4%, 77.8% |
| Supplementary analysis: Primary patency rate at Day 30 (Composite)[2] | 66.7% (36/54) | 53.4%, 77.8% |
| Supplementary analysis: Primary patency rate at Day 30 (Complete case)[3] | 78.3% (36/46) | 64.4%, 87.7% |

Source: FDA statistical reviewer.
[1]Ies were handled using while-on-treatment strategy, corresponding to the 'Main Estimator'.
[2]Ies were handled using composite strategy, where missing 30-day patency due to IE was considered not patent, corresponding to 'Sensitivity Estimator 5'.
[3]Ies were excluded as a complete case analysis, corresponding to the 'Sensitivity Estimator 3'.
Abbreviations: N = study population, n = sample size
Data Cut-off: January 15, 2024

FDA's final determination of the rate of primary patency at Day 30 after FDA adjudication was 66.7% (95% CI: 53.4%, 77.8%). This patency rate was the same using either the while-on-treatment strategy (primary efficacy analysis) and the composite strategy (supplementary analysis). The same result is explained by many of the patients not having data to support patency. An additional supplementary analysis, the complete case approach, resulted in a primary patency rate of 78.3% (95% CI: 64.4%, 87.7%), which is likely inflated due to selection bias.

Reviewer comment:
The Applicant concluded a primary patency rate at Day 30, using the while-on-treatment strategy, of 84.3% (95% CI: 72.0%, 91.8%) which FDA did not agree with. The Applicant's while-on-treatment strategy overestimated the primary patency rate as the adjudicated patients were assumed as patent for Day 30 despite the fact many died or were amputated within the first 10 days after implant and had no definitive imaging assessments (i.e., doppler ultrasound, computed tomography angiography or magnetic resonance imaging) prior to death or amputation to confirm patency of the ATEV. One patient was also lost to follow up on Day 5 without any ATEV patency assessment. The FDA and the Applicant had previously discussed an imputation strategy on how best to characterize these intercurrent events in the assessment of patency, but no consensus was reached prior to BLA submission.

#### 6.1.11.2 Analyses of Secondary Endpoints

<u>Key Secondary Endpoints:</u>

- Secondary patency at Day 30 after implant
- Conduit infection at Day 30 after implant
- Limb salvage rate at Day 30 after implant

<u>Secondary Patency at Day 30</u>
Secondary patency is defined as functional patency, with or without preceding successful interventional or surgical procedures to maintain or reestablish patency, until the ATEV is abandoned. Three patients were identified with secondary patency at Day

30 (b) (6) Adjudication for the 12 patients who were not evaluable at Day 30 in analyses of secondary patency remained consistent with adjudication of primary patency noted in section 6.1.11.1.

**Table 20. Secondary Patency Rate at Day 30 in the Extremity Group, Study V005**

| Analysis | Patency Rate % (n/N) | 95% CI |
|---|---|---|
| Key secondary efficacy endpoint: Secondary patency rate at Day 30 (While-on-treatment)[1] | 72.2% (39/54) | 59.1%, 82.4% |
| Supplementary analysis: Secondary patency rate at Day 30 (Composite)[2] | 72.2% (39/54) | 59.1%, 82.4% |
| Supplementary analysis: Secondary patency rate at Day 30 (Complete case)[3] | 84.8% (39/46) | 71.8%, 92.4% |

Source: FDA statistical reviewer.
[1]Ies were handled using while-on-treatment strategy, corresponding to the 'Main Estimator'.
[2]Ies were handled using composite strategy, where missing 30-day patency due to IE was considered not patent, corresponding to 'Sensitivity Estimator 5'.
[3]Ies were excluded as a complete case analysis, corresponding to the 'Sensitivity Estimator 3'.
Abbreviations: N = study population, n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:
The Applicant' concluded a secondary patency rate at Day 30, using the while-on-treatment strategy, of 90.2% (95% CI: 79.0%, 95.7%). As noted in the analyses of the primary patency endpoint, the Applicant's while-on-treatment strategy appears to overestimate the secondary patency rate as all patients with intercurrent events were adjudicated by the Applicant as patent for Day 30 despite the fact many died or were amputated within the first 10 days after implant and had no definitive imaging assessments prior to death or amputation.

When evaluating secondary patency using FDA's conservative adjudication of patency, the secondary patency rate of 72.2% would be considered clinically meaningful especially when taken in the context of patients who do not have alternative options for limb preservation.

Infection Rate at Day 30
In the BLA submission, the applicant identified one patient (1.9%) with infection in the 30 days following ATEV implantation. Infection was confirmed by positive culture on day 7. This patient (b) (6) underwent graftotomy on day 6 to remove a thrombus from the lumen of the ATEV and was taken back to the OR on day 7 following an episode of bleeding from the surgical site. In the OR, the surgeon reported that "sutures that had been placed at the graftotomy and puncture sites had pulled through." Histology from the excised ATEV indicated an infectious process starting in the surrounding tissues and eventually compromising the structural integrity of the ATEV.

Upon review of the case summaries, FDA identified a second patient who presented with bleeding from the surgical site on day 30 (b) (6) On Day 35, the ATEV was excised due to continued bleeding and the investigator noted that the infected wound had eroded into the ATEV graft. This infection was not counted toward the incidence of infection by

the Applicant. The relevant AE verbatim term "Erosion of proximal ATEV secondary to infected wound" was coded as "Vascular graft complication."

Reviewer comment:
The Applicant provided an infection rate at 30 days of 1.9%. Upon review of the case summaries, we found an additional patient who presented with bleeding from the surgical site on day 30 and was subsequently found to have clinical signs of ATEV infection and loss of ATEC integrity during surgical evaluation on day 35. Inclusion of the second patient yields an infection rate at day 30 of 3.7%. In both cases infection was only identified when the ATEV failed and revision was required. Additional infections were noted after day 30. Further discussion regarding infections noted after day 30 are included in section 6.1.12.5. We are concerned that identification of ATEV infection in this manner underestimates the true incidence of ATEV infection but note that there was no prespecified evaluation of infection included in the clinical protocol. Further evaluation of ATEV infection is recommended during the PMR observational study which will further characterize the risk of graft failure.

Amputation and Limb Salvage

There were eight amputations (14.8%) in the primary analysis population of 54 patients, five patients (9.3%) underwent amputation of the treated limb within the first 30 days and an additional three who underwent amputation of the treated limb by Month 36. The Applicant calculated a While-on-Treatment limb salvage rate of 90.2% at Day 30. Use of a while-on-treatment strategy does not take into consideration patients who are no longer at risk of amputation as a result of death. FDA therefore evaluated a limb salvage rate where patients who died, had ATEV explanted, or were lost to follow up were not included as amputation free. When taking into consideration these intercurrent events, the FDA calculated limb salvage rate at day 30 to be 75.9% (95% CI: 63.1%, 85.4%) in 41 out of 54 patients.

Reviewer comment:
The amputation rate for synthetic graft patients derived from a meta-analysis pool was 24.3% (95% CI: 8.7%, 43.7%). Taking into consideration limitations of interpreting the amputation rate, the amputation rate throughout the study was similar to the rate reported in the literature and suggests a potential benefit for the non-vein, non-synthetic graft population which is equal to available therapies.

6.1.11.3 Subpopulation Analyses

The type of injury and length of vascular graft used have previously been evaluated in existing therapies (i.e., autologous vein and synthetic graft). Literature suggests that these factors may contribute to patency following implantation. Therefore, FDA conducted post hoc exploratory subgroup analyses to assess the patency rate by the ATEV length and blunt versus penetrating trauma.

*Primary Patency at Day 30 by Graft Length*

The length of the ATEV used is dictated by the vascular injury being repaired. A review of the literature did not identify an accepted graft length that would suggest a threshold for subgroup analysis. Based on the median length of the ATEV used in all patients, FDA conducted subgroup analyses by length, <15 cm versus ≥15 cm. One patient (b) (6)

(b) (6) did not have length recorded. Twenty-seven (69.2%) patients were patent at Day 30 for those with the ATEV <15 cm, compared to 9 (60.0%) with the ATEV ≥15 cm.

Reviewer comment:
A subgroup analysis was performed evaluating graft length effect on patency at day 30. Patients with grafts less than 15 cm had 9% higher patency at day 30, but confounders such as the small population analyzed and differences in underlying injury which contribute to different graft lengths make it difficult to conclusively comment on the effects of graft length on patency at 30 days.

*Primary Patency at Day 30 by Trauma Type*
A subgroup analysis by blunt or penetrating trauma was performed and demonstrated similar rates of patency between the two groups. The primary patency rate at Day 30 among patients with penetrating trauma was 67.7% (95% CI: 50.1%, 81.4%) compared to 65.2% (95% CI: 44.9%, 81.2%) in patients presenting with blunt trauma.

Reviewer comment:
Penetrating and blunt trauma require different approach to management and are associated with different rates of complications such as the incidence of compartment syndrome. A subgroup analysis of primary patency did not demonstrate a meaningful difference between these two trauma populations.

*Infection by location of ATEV implantation*
A subgroup analysis evaluating infection by location of ATEV graft in the upper or lower limb was performed and found that 2 patients of the patients who had ATEV placed in the lower limb and one of the patients who had ATEV placed in the upper limb developed graft infection.

Reviewer comment:
It is difficult to derive a meaningful conclusion regarding risk of infection as attributed to placement of ATEV in the upper or lower limb due to the small number of patients identified with infection. The findings are consistent with the general trends seen in the literature where vascular grafts placed in the lower limb are at higher risk of graft infection.

### 6.1.11.4 Dropouts and/or Discontinuations

Table 21 characterizes the number of patients treated by duration of follow up and provides reason for study discontinuation at any point during the 36-month follow up. 7 patients have completed the study and 37 discontinued prior to evaluation at 36 months. An additional 10 patients are ongoing at the time of data cut-off for 120-day safety report on January 15, 2024.

**Table 21. Follow Up for Extremity Patients, Study V005 (n=54)**

| Parameter | n (%) |
|---|---|
| Duration of follow up, days | |
| Mean | 334.6 |
| Median (min, max) | 188.5 (1, 1134) |

| Parameter | n (%) |
|---|---|
| Reason for early study discontinuation, n (%) | |
| Total | 37 (68.5%) |
| Death | 6 (11.1%) |
| Limb amputation | 6 (11.1%) |
| Lost to follow up | 15 (27.8%) |
| ATEV abandoned/explanted following loss of patency | 9 (16.7%) |
| Withdrew consent | 1 (1.9%) |

Source: Applicant dataset and case summaries
Abbreviations: max = maximum, min = minimum, n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:
Roughly one third of patients were lost to follow up in this clinical study. The high number poses serious threat to the validity of the results of this study. However, a review of the literature for extremity vascular trauma repair identifies this as a common problem within this patient population. It is expected that the Applicant will complete 36-month follow up for the 10 patients currently enrolled in this study and provide updated data on those patients following study completion.

### 6.1.11.5 Exploratory and Post Hoc Analyses

*Long-Term Primary Patency Rate*

The 30-day primary patency Kaplan-Meier (KM) estimate was 68.5% (95% CI: 57.2%, 82.1%) and the 6-month estimate was 58.0% (95% CI: 45.9%, 73.2%). The KM plot for the primary patency rate is illustrated in Figure 1.

**Figure 1 Kaplan-Meier Plot for Primary Patency**




Source: FDA statistical reviewer.

*Long-Term Secondary Patency Rate*

The 30-day secondary patency KM estimate was 74.1% (95% CI: 63.3%, 86.7%) and the 6-month estimate was 63.5% (95% CI: 51.6%, 78.2%). The KM plot for secondary patency rate is illustrated in Figure 2.

**Figure 2. Kaplan-Meier Plot for Secondary Patency**




Source: FDA statistical reviewer

The KM analysis of primary and secondary patency are limited by the availability of long-term patency data after one year.

Reviewer comment:
The long-term patency rate was estimated by Kaplan-Meier Plot evaluate whether existing data could provide meaningful results regarding the long term patency of ATEV following implantation. These data suggest that further loss of patency can be expected beyond the Day 30 endpoint. However, due to the small number of patients enrolled and the high rate of patients who did not complete the 36 months of follow up, these estimates provide limited clinically meaningful conclusions.

6.1.12 Safety Analyses

6.1.12.1 Methods

Adverse events (AEs) were coded using Medical Dictionary for Regulatory Activities Version 26.0.

The Safety Population included all patients who received the ATEV in the study in both the extremity and torso/iatrogenic groups. Sub analysis of the safety population as either extremity group or torso/iatrogenic group is provided where applicable.

All AEs presented in the safety database were treatment-emergent adverse events (TEAEs), defined as any AEs that occur after the initiation of the surgical procedures to implant the ATEV or, if the AE was present at baseline, that the AE increased in severity after implantation of the ATEV.

The severity of AEs was graded according to the following definitions:

- Mild: Events require minimal or no treatment and do not interfere with the patient's daily activities.
- Moderate: Events result in a low level of inconvenience or concern with the therapeutic measures. Moderate events may cause some interference with functioning.
- Severe: Events interrupt a patient's usual daily activity and may require systemic drug therapy or other treatment. Severe events are usually incapacitating.
- Life-threatening: Any adverse event that places the patient or participant, in the view of the investigator, at immediate risk of death from the reaction as it occurred, i.e., it does not include a reaction that, had it occurred in a more severe form, might have caused death.
- Death: Death was related to the AE.

#### 6.1.12.2 Overview of Adverse Events

Adverse event severity is classified in Table 22.

**Table 22. Adverse Event Severity for Patients Enrolled in Study V005**

| Assessment | Extremity Group n=54 | Torso/Iatrogenic Group n=17 |
|---|---|---|
| Any AEs | 53 (98.1%)[1] | 17 (100%) |
| Any mild AEs | 38 (70.4%) | 15 (88.2%) |
| Any moderate AEs | 34 (63.0%) | 14 (82.4%) |
| Any severe AEs | 27 (50.0%) | 11 (64.7%) |
| Any life-threatening AEs | 10 (18.5%) | 3 (17.6%) |
| Any deaths | 6 (11.1%) | 6 (35.3%) |
| Any SAEs | 28 (51.9%) | 15 (88.2%) |
| Any AEs leading to premature ATEV removal | 4 (7.4%) | 1 (5.9%) |
| Any AEs leading to death | 5 (9.3%) | 6 (35.3%) |

Source: Reviewer table derived from clinical data set, JMP 17.0
[1]one patient did not have any AEs reported
Abbreviations: AE = adverse event, n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:
Severity of adverse events are similar to that seen with existing grafts, however a direct comparison cannot be made due to a paucity of data for current standard of care therapies. The reporting of adverse events is limited by the number of patients who discontinued from the study prior to the 36 month endpoint. Only 55.6% of patients were evaluated at Month 6 and 33.3% of patients were evaluated at 1 year. Therefore, late adverse events may not be accurately captured in the study data.

One patient in the extremity group died from an overdose and had two AEs reported. He recovered from a pseudomonas infection on day 24 prior to death on day 114. Adverse events appear to be underreported for this individual.

**Adverse Reactions:**
The subset of AEs that FDA determined to be reasonably associated with use of the investigational product are defined as adverse reactions. The most frequently occurring adverse reactions (≥3% of patients) reported following extremity implantation of the ATEV were thrombosis, pyrexia (fever), pain, anastomotic stenosis, rupture/anastomotic failure and ATEV infection (Table 23). Out of the five cases of anastomotic stenosis, two cases (3%) were assessed as serious adverse reactions.

**Table 23. Adverse Reactions With a Frequency of ≥3% Following Implantation With the ATEV in Study V005***

| Adverse Reaction | Extremity Patients, (n=54)** | Torso + Iatrogenic Patients, (n=17) |
|---|---|---|
| ATEV thrombosis | 15 (27.8%) | 5 (29.4%) |
| Pyrexia (fever) | 9 (16.7%) | 2 (11.8%) |
| Pain | 8 (14.8%) | 1 (5.9%) |
| Anastomotic stenosis | 5 (9.3%) | 1 (5.9%) |
| ATEV rupture | 4 (7.4%) | 3 (17.6%) |
| ATEV infection | 3 (5.6%) | 3 (17.6%) |

Source: Reviewer table derived from clinical dataset and case summaries
*Adverse reaction frequency based on limited long-term data within the study population
**Extremity patients are with arterial repair in upper or lower limbs
Abbreviation(s): ATEV = acellular tissue engineered vessel, n = sample size
Data Cut-off: January 15, 2024

### 6.1.12.3 Deaths

A total of 12 patients died during the study. Six deaths occurred in the extremity group representing 10.9% of patients in this cohort. Of these six deaths in the extremity group, four patients died before their Day 30 visit. Two additional patients in this group died 42 days and 114 days after the ATEV implantation. A subgroup analysis evaluating type of trauma demonstrated no difference in number of deaths between patients presenting with penetrating or blunt trauma. All deaths were adjudicated as not related to the ATEV.

**Table 24. Deaths on-Study for V005**

| Characteristic | Extremity Group (n=54) | All ATEV Group (n=71) |
|---|---|---|
| Death on-study[1] | 6 (11.1%) | 12 (16.9%) |
| Cause of death reported as an AE[2] | 5 (9.3%) | 9 (12.7%) |
| Time to death (days) | | |
| N | 6 | 12 |
| Mean | 29.7 | 224.3 |
| Median | 8.5 | 17.5 |
| Min, Max | 4, 114 | 4, 1119 |

Source: Adapted from clinical study report
[1] Values shown are cumulative over time; percentages for patient counts are calculated using the number of patients in the indicated patient group.
[2] Per protocol, fatal AEs were reported through Month 36, but only SAEs related to the ATEV were to be reported after Month 12; the death of 2 of the 10 patients in the All ATEV Group that happened after Month 12 were not reported as related AEs but are included in the total deaths
Abbreviations: AE = adverse event, ATEV = human acellular vessel, Max = maximum value, Min = minimum value, n = sample size, SAE, serious adverse event
Data Cut-off: January 15, 2024

**Table 25. Deaths Within Study V005**

| Patient ID | Study Group | Day of Death | Cause of Death |
|---|---|---|---|
| (b) (6) | Extremity | 4 | Asystole despite ventilator and maximum pressor support for multiple injuries related to motorcycle accident. |
| (b) (6) | Extremity | 4 | Multiorgan failure and ischemic bowel as a result of initial injuries. |
| (b) (6) | Extremity | 8 | Shock, hypoxia and MRSA sepsis related to multiple gunshot wounds in the left chest, flank and bilateral extremities. |
| (b) (6) | Extremity | 9 | Septic shock and liver failure in setting of ischemic bowel related to MOI (multi rollover MVC). |
| (b) (6) | Extremity | 39 | Diffuse brain injury following second gunshot wound to head on Day 39 after the HAV placement. |
| (b) (6) | Extremity | 114 | Drug overdose. |
| (b) (6) | Torso/iatrogenic | 11 | Cardiac arrest in setting of active bleeding from the proximal ATEV anastomosis and common iliac artery. |
| (b) (6) | Torso/iatrogenic | 12 | Respiratory failure due to influenza A and acute encephalopathy |
| (b) (6) | Torso/iatrogenic | 29 | Cardiac arrest. |
| (b) (6) | Torso/iatrogenic | 285 | Cardiac arrest in setting of COVID-19 acute respiratory distress syndrome |
| (b) (6) | Torso/iatrogenic | 1055 | Unknown causes unrelated to ATEV |
| (b) (6) | Torso/iatrogenic | 1119 | Malignant neoplasm of middle lobe of right lung. |

Source: Reviewer table derived from case summaries
Abbreviations: ATEV = acellular tissue engineered vessel, MOI = mechanism of injury, MRSA = Methicillin-resistant Staphylococcus aureus, MVC = motor vehicle crash

Narratives of Deaths in Study V005:

There were six deaths within the extremity group:

- *Patient* (b) (6) – 28-year-old male received the ATEV graft to the left superficial femoral artery to repair a worsening pseudoaneurysm approximately 1 month after a gunshot wound to affected area. The ATEV used due to concomitant injury to vein and poor quality or size of vein, and 1.5-centimeter superficial femoral artery (SFA) defect thought to be too large for primary repair. On Day 39 after the ATEV implant, the patient sustained multiple gunshots to the head, left upper extremity and proximal right lower extremity with obvious deformity and extensive bleeding. Supportive care withdrawn on Day 40 due to brain death.

- *Patient* (b) (6) – 41-year-old male sustained thoracoabdominal trauma (Grade 3 liver laceration and bilateral hemopneumothoraxes), brain injury and left upper extremity injuries in a motorcycle accident. Due to time limitations an autologous venous harvest was not possible and the ATEV was placed as a left brachial interposition graft. Patient remained hemodynamically unstable and on extracorporeal membrane oxygenation until he developed asystole on Day 4.

- *Patient* (b) (6) – 48-year-old male experienced a motor vehicle crush injury of the right lower extremity with subsequent occlusion of the right popliteal artery without reconstitution, open fracture of the right proximal tibia, traumatic compartment syndrome of right lower extremity, and closed fracture of upper end of right tibia. The ATEV was used as an interposition bypass graft from the right SFA proximally to tibioperoneal trunk distally. Recovery complicated by Pseudomonas infection of the surgical site, an abscess of the right lower

extremity, and acute kidney injury. Patient recovered and was discharged home before death on Day 128 due to a drug overdose.

- *Patient* (b) (6) – 19-year-old man who sustained multiple gunshot wounds to the right forearm, right thigh, and left and right buttocks. Two days after injury, the ATEV was placed in the superficial femoral artery. The following day continuous renal replacement therapy was initiated. The patient was returned to the operating room for bowel resection as a result of ischemic bowel secondary to the initial injuries. The following day the patient experienced the SAEs of acute respiratory distress syndrome and multiple organ failure on the day of death (Day 4).

- *Patient* (b) (6) – 72-year-old female with multiple injuries following a motor vehicle accident including bilateral rib fractures, displaced sternal manubrial fracture with small retrosternal hematoma, nondisplaced lumbar transverse process fractures right femoral intertrochanteric and diaphyseal fractures, displaced left distal femoral fracture, left lateral tibial plateau and inferior patellar pole fractures with a large joint effusion, and laceration of the left SFA at the level of the femoral fracture. Due to the bilateral injuries and length of ischemia time, it was decided to use the ATEV for repair of the left superficial femoral artery. Post operative course complicated by septic shock/necrotic distal small bowel, right colon, and gall bladder on Day 3, and a recurrence of septic shock on Day 8. She developed liver failure on Day 9 and became hemodynamically unstable. Despite increased pressor support, she died on Day 9.

- *Patient* (b) (6) – 30-year-old male who experienced multiple gunshot wounds to the bilateral upper extremities, left chest and flank. The ATEV was placed as an interposition graft in the brachial artery due to the complexity of global care. Patient developed necrotizing pneumonia and an acute pulmonary embolus on Day 5. On Day 8, the patient experienced worsening hypoxia and became increasingly hemodynamically unstable. Despite all interventions, including stress-dose steroids, vasopressors, neuromuscular blockade, and high-dose pressors, the patient's respiratory and hemodynamic status continued to worsen. The patient went into cardiac arrest and died on Day 8.

There were six deaths within the torso/iatrogenic group:

- *Patient* (b) (6) – 18-year-old man sustained gunshot wounds to the left hip and forearm. He sustained extensive venous injury to the right iliac vein and distal inferior vena cava was discovered and serially ligated. There was also a complete transection of the right external iliac artery at the level of the bifurcation and an incomplete transection of the left external iliac artery. He received a right iliac bypass with the ATEV. Second ATEV placed the next day from the common iliac to the external iliac. On Day 25 the patient developed a thrombosis of the left iliac artery ATEV graft. The thrombosis was attributed to the patient's hypercoagulable state secondary to critical illness. The patient experienced a cardiac arrest on Day 29 for which he was unable to recover.

- *Patient* (b) (6) – 61-year-old male with medical history that included Li-Fraumeni syndrome, prostate cancer, bladder cancer and lung adenocarcinoma metastatic to the brain, which was resected and treated with radiation in (b) (6) Treated



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 138 of 674

for sarcoma of the left thigh, due to concerns of seeding normal tissue with tumor cells the saphenous vein was not harvested and instead the ATEV was implanted as a left superficial femoral artery. The ATEV was documented as functional on Day 841. Study participation ended on Day 1119 due the patient's demise. Cause of death was malignant neoplasm of middle lobe of right lung.

- *Patient* (b) (6) – 24-year-old male sustained gunshot wounds to the abdomen. Due to concomitant vein injury, and time limitation, an autologous venous harvest was not possible. The ATEV was implanted from right mid common iliac artery to right external iliac artery. Sepsis of unknown origin on Day 8 and treated empirically. During hospitalization, the patient developed a pulmonary embolism. Cardiac arrest on Day 11 in setting of active bleeding from the proximal anastomosis of the ATEV and common iliac artery, and an infected hematoma. There was no return of spontaneous circulation, and the patient was pronounced dead. The graft was noted to be intact without mechanical defect other than failure of the suture line. The surgeon reported that there were signs of localized infection at the graft area however cultures or histological analysis of the ATEV were not performed.

- *Patient* (b) (6) – 73-year-old female with ESRD, who developed delayed onset dialysis access steal syndrome. Patient had the ATEV implanted to resolve a severe steal syndrome from her AV access, and dialysis was performed twice after implantation. One week after implantation on Day 12, the patient presented with sepsis, and died from respiratory failure due to influenza A and acute encephalopathy.

- *Patient* (b) (6) – 58-year-old male with ESRD received a ATEV Graft to remedy a steal syndrome on their arteriovenous fistula (AVF), which resulted in better flow after the procedure. Before the patient's Month 18 visit, a serious stenosis of the ATEV bypass was diagnosed and was subsequently treated with angioplasty, thus considered resolved. The patient's digits, hand and arm were salvaged. The patient continued on study until Month 33, and no other interventions were performed. Before the patient could complete the scheduled End-of-Study visit, the study site received a report that the patient had died of unknown causes that were unrelated to the ATEV.

- *Patient* (b) (6) – 54-year-old female with ESRD who developed symptomatic vascular steal syndrome from a left brachio-basilic AVF, due to a stenosis on the brachial artery. History notable for hypertension, asthma, anxiety and bipolar I disorder, obesity, anemia, agoraphobia, steal syndrome, keloid formation, osteoarthritis, cervical radiculopathy, herpetic gingivostomatitis, yeast infection, surgical decompression of cervical spine, gastroesophageal reflux disease, arteriovenous fistula surgery, gastric bypass, moderate mitral valve incompetence, and left ventricular hypertrophy. Inadequate size and quality of available veins led to the use of the ATEV to bypass the stenosis of her brachial artery for an iatrogenic indication. Primary patency at the Day 30 visit confirmed by Doppler Ultrasound. Day 169 – stenosis at the anastomosis. Day 285 – cardiac arrest in setting of COVID-19 acute respiratory distress syndrome.

Reviewer comment:
Review of the case summaries for the patients who died during study V005 reveals death often related to the initial mechanism of injury for most patients. Within the extremity group, no deaths were assessed as related to the ATEV.

Patient (b) (6) died following failure of the proximal ATEV anastomosis with the common iliac artery. While the graft was noted to be intact without mechanical defect other than failure of the suture line, the surgeon reported signs of localized infection at the graft during resuscitation however this was never confirmed. This death was adjudicated by the Applicant's adjudication committee as not related to the HAV, however this was done without evaluation of the graft and the segment with suture failure.

#### 6.1.12.4 Nonfatal Serious Adverse Events (SAE)

A total of 43 out of 71 patients experienced 135 nonfatal SAEs during the study. Within the extremity group, 28 out of 54 patients experienced 78 SAEs during the study. Nonfatal SAEs are categorized in Table 27.

**Table 26. Other Nonfatal Serious Adverse Events in Study V005**

| SAE Preferred Term | Extremity Group (n=54) | Torso+Iatrogenic Group (n=17) | All ATEV Group (n=71) |
|---|---|---|---|
| Any severe AEs | 27 (50.0%) | 11 (61.1%) | 38 (53.5%) |
| Any nonfatal SAEs | 28 (51.9%) | 15 (83.3%) | 43 (60.6%) |
| Vascular graft thrombosis | 11 (20.4%) | 1 (5.6%) | 12 (16.9%) |
| Vascular graft complication[1] | 2 (3.7%) | 3 (16.7%) | 5 (7.0%) |
| Anastomotic stenosis | 3 (5.6%) | 1 (5.6%) | 4 (5.6%) |
| Wound infection | 4 (7.4%) | 0 | 4 (5.6%) |
| Muscle necrosis | 3 (5.6%) | 1 (5.6%) | 4 (5.6%) |
| Postoperative wound infection | 3 (5.6%) | 0 | 3 (4.2%) |
| Shock hemorrhagic | 3 (5.6%) | 0 | 3 (4.2%) |
| Cardiac arrest | 1 (1.9%) | 2 (11.1%) | 3 (4.2%) |
| Respiratory failure | 1 (1.9%) | 2 (11.1%) | 3 (4.2%) |
| Acute kidney injury | 2 (3.7%) | 1 (5.6%) | 3 (4.2%) |
| Vascular graft haemorrhage[2] | 2 (3.7%) | 0 | 2 (2.8%) |
| Vascular graft occlusion | 2 (3.7%) | 0 | 2 (2.8%) |
| Vascular pseudoaneurysm ruptured | 0 | 2 (11.1%) | 2 (2.8%) |
| Sepsis | 0 | 2 (11.1%) | 2 (2.8%) |
| Soft tissue infection | 1 (1.9%) | 1 (5.6%) | 2 (2.8%) |
| Hypervolemia | 0 | 2 (11.1%) | 2 (2.8%) |
| Muscle necrosis | 3 (5.6%) | 1 (5.6%) | 4 (5.6%) |
| Cardiac arrest | 1 (1.9%) | 2 (11.1%) | 3 (4.2%) |
| Respiratory Failure | 1 (1.9%) | 2 (11.1%) | 3 (4.2%) |
| Anemia | 1 (1.9%) | 1 (5.6%) | 2 (2.8%) |
| Hypervolemia | 0 | 2 (11.1%) | 2 (2.8%) |
| Anemia | 1 (1.9%) | 1 (5.6%) | 2 (2.8%) |
| Abscess limb | 1 (1.9%) | 0 | 1 (1.4%) |
| Acute hepatic failure | 1 (1.9%) | 0 | 1 (1.4%) |
| Arterial hemorrhage | 0 | 0 | 0 (0%) |

Source: Clinical study report
[1]Vascular graft complication includes patients who had anastomotic breakdown following ATEV placement.
[2]Vascular graft hemorrhage includes patients who had bleeding from a mid-graft rupture or loss of ATEV integrity
Data Cut-off: January 15, 2024
Abbreviations: AE = adverse event, ATEV = acellular tissue engineered vessel, n = sample size, SAE = serious adverse event



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 141 of 674

Reviewer comment:

Vascular graft thrombosis is the most common nonfatal serious adverse event in study V005 consistent with expected findings from existing vascular graft options (i.e., autologous vein or synthetic graft). Vascular graft hemorrhage and vascular graft complications both include events where patients experienced bleeding from the ATEV following loss of integrity due to either mid-graft rupture or anastomotic failure. These events are discussed further in section 6.1.12.5.

6.1.12.5 Adverse Events of Special Interest

Adverse events of special interest (AESI) were defined in the statistical analysis plan as AEs of anastomotic failure or rupture of the ATEV, ATEV infection, thrombosis, pseudoaneurysm formation, and aneurysm formation. The frequency of the various AESI in the different patient groups is shown in Table 27. In the extremity group, 15 out of 54 patients (27.8%) experienced a thrombotic event involving the ATEV, and 5 out of 54 extremity patients (9.3%) developed anastomotic stenosis of the ATEV. Other complications of the ATEV include anastomotic failure or rupture (n=4, 7.3%), pseudoaneurysm (n=2, 3.7%), and aneurysm (n=1, 1.9%). These numbers reflect identification of AESI based on review of the clinical case summaries.

**Table 27. Adverse Events of Special Interest, Study V005**

| AESI Assessment | Extremity Group n=54 | Torso/Iatrogenic Group n=17 |
|---|---|---|
| AESI | | |
| Any Infection | 23 (42.6%) | 12 (70.6%) |
| Wound infection | 16 (29.6%) | 5 (27.8%) |
| ATEV Infection | 3 (5.6%) | 3 (17.6%) |
| ATEV anastomotic failure or rupture | 4 (7.4%) | 3 (17.6%) |
| ATEV pseudoaneurysm | 2 (3.7%) | 1 (5.9%) |
| ATEV aneurysm | 1 (1.9%) | 0 (0%) |
| ATEV occlusion/thrombosis | 15 (27.8%) | 5 (29.4%) |

Source: Reviewer table derived from individual case summaries of patients
Abbreviations: AESI = adverse event of special interest, n = sample size
Data Cut-off: January 15, 2024

Reviewer comment:

Following FDA review, the values for ATEV infection and ATEV rupture were found to be different.

- The applicant had identified two ATEV infections based on positive cultures. Following review of case summaries for enrolled patients, we identified an additional case in which the surgeon reported clinical signs of ATEV infection at the time of surgical revision.
- The Applicant classified one rupture as vascular graft complication which was reclassified to rupture for the purposes of analysis. The four patients in the extremity group listed as anastomotic failure or rupture in Table 28 include this reclassification.

Infection

All patients received prophylactic antibiotics. Two patients (3.7%) out of 54 in the extremity vascular group had evidence of ATEV infection in the 30 days following ATEV implant as discussed in section 6.1.11.2. One additional patient had evidence of ATEV infection on day 35, yielding an ATEV infection rate of 5.6% (95% CI: 3.0%, 17.9%) in



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 142 of 674

the 54 patients over the course of the study. Three additional cases, based on FDA review of the case summaries for each patient were identified. Table 28 demonstrates the confirmed ATEV infection rates in study V005. ATEV infection in the study V005 was only noted in cases where culture, histology or surgical evaluation of the ATEV was possible at the time of surgical reintervention. Narratives for the three infections in the extremity group and three patients with infection in the torso/iatrogenic group are included below.

**Table 28. Identified Infections for Patients, Study V005**

| Patient ID | Study Group | Day of ATEV Infection | Comment |
|---|---|---|---|
| (b) (6) | Extremity | 7 | infection identified by graft cultures taken on Day 7 following mid-graft rupture of the ATEV at site of previous thrombectomy. ATEV explanted and infection confirmed on histopathology. |
| (b) (6) | Extremity | 35 | infection identified by graft cultures taken on Day 35 following mid-graft rupture of the ATEV in the setting of overlying wound infection and subsequent graft air exposure. |
| (b) (6) | Extremity | 36 | infection identified on Day 36 when the investigator noted erosion of proximal ATEV secondary to infected wound during reintervention required due to bleeding from ATEV proximal anastomosis failure. |
| (b) (6) | Torso/iatrogenic | 11 | Clinical signs of graft infection noted by the surgeon in setting of active bleeding from the proximal ATEV anastomosis and common iliac artery. |
| (b) (6) | Torso/iatrogenic | 11 | ATEV explanted following mid-graft rupture on day 10. Histology report states “it is likely that the graft disruption was caused by a severe infectious process that extended into the graft from the surrounding infected and necrotic host tissues” |
| (b) (6) | Torso/iatrogenic | 40 | Infection identified by histology demonstrating gram positive cocci in the adventitia and abluminal surface of the graft following ATEV explant due to ruptured pseudoaneurysm and bleeding. |

Source: Reviewer table derived from case summaries
Abbreviations: ATEV = acellular tissue engineered vessel

Narratives of Infections in Study V005:

There were three infections within the extremity group:

- *Patient* (b) (6) – 65-year-old male received 28.0 cm ATEV to repair the right popliteal artery due to poor quality and size of veins following motor vehicle accident. Patient underwent subsequent open thrombectomy on Day 6. Mid-graft suture failure on Day 7. “Sutures that had been placed at the graftotomy, and puncture sites had pulled through” as per the case summary. 80% of distal ATEV excised and replaced with polytetrafluoroethylene (PTFE) graft. Subsequent right above knee amputation on Day 17.
  *Culture:* Day 7 ATEV culture positive for pseudomonas aeruginosa and Enterobacter cloacae
  *Histology:* Rod-shaped Gram-negative bacteria were observed in the thrombus, adventitia, and along the abluminal surface of the graft. In one section, rare rod-

shaped Gram-positive bacteria also were present in the thrombus. “Appearance of inflammatory cells and gram-negative bacteria in the adventitia and extending to the abluminal surface of the graft indicated an infectious process starting in the surrounding tissues and eventually compromising the structural integrity of the ATEV [Investigational product].”
*Clinical:* No comment from investigator

- *Patient* (b) (6) – 18-year-old male received 7.0 cm ATEV to repair the right axillobrachial artery due to size mismatch of autologous vein following machinery accident. The patient experienced a mid-graft rupture on Day 35 following overlying wound breakdown and subsequent air exposure. The patient ultimately required amputation on Day 43.
  *Culture:* Positive culture from graft segment explanted on Day 35
  *Histology:* Bacteria were not observed with Gram stain.
  *Clinical:* no comment from investigator
  *Additional notes:* This infection was not counted toward incidence of infection by the Applicant because the onset was after Day 30.

- *Patient* (b) (6) – 20-year-old male received 35.0 cm ATEV to repair right popliteal artery following motor vehicle accident. The native saphenous vein could not be used due to pre-existing stenosis. The patient developed graft thrombosis 5 days after surgery and again on Day 19 which required thrombectomy. On Day 30, the patient had bleeding from the surgical site with no source identified. On Day 35, the patient had significant bleeding with accompanied cognitive decline requiring resuscitation code and intubation. Angiography on Day 36 demonstrated active bleeding from the proximal anastomosis. ATEV replaced with autologous vein.
  *Culture:* None provided
  *Histology:* None
  *Clinical:* Investigator noted that the infected wound had eroded into the ATEV graft.
  *Additional note:* This infection was not counted toward the incidence of infection by the Applicant. The relevant AE verbatim term “Erosion of proximal ATEV secondary to infected wound” was coded as “Vascular graft complication.”

There were three infections within the torso/iatrogenic group:

- *Patient* (b) (6) – 62-year-old male received 8.5 cm ATEV to repair right superficial femoral artery due to concomitant venous injury following iatrogenic injury during tumor resection. Contained rupture of distal pseudoaneurysm on Day 30 with subsequent abscess formation and bleeding on Day 40. Graft replaced with interposition graft.
  *Culture:* None provided
  *Histology:* Gram-positive cocci observed in the adventitia and abluminal surface
  *Clinical:* No comment from investigator.

- *Patient* (b) (6) – 24-year-old male received 4.0 cm ATEV implanted from right mid common iliac artery to right external iliac artery due to concomitant vein injury and time limitation following gunshot wounds to the abdomen. Sepsis of unknown source was diagnosed on Day 8 and treated empirically. During

hospitalization, the patient also developed a pulmonary embolism. Cardiac arrest occurred on Day 11 in setting of active bleeding from the proximal anastomosis of the investigational graft and common iliac artery, and an infected hematoma in the area of the previously closed retroperitoneum. The graft was noted to be intact without mechanical defect other than failure of the suture line. The surgeon reported signs of localized infection at the graft area. There was no return of spontaneous circulation, and the patient was pronounced dead.
*Culture:* Fecal contaminant in abdominal cavity
*Histology:* None available. Graft reportedly explanted and sent for analysis but specimen never received in histology lab.
*Clinical:* Signs of localized infection at graft area noted by surgeon

- *Patient* (b) (6) – 20-year-old male received 31 cm ATEV to repair left subclavian artery due to time limitations following a motorcycle accident. Midgraft rupture of the subclavian artery on Day 10 with amputation and excision of graft on Day 11.
  *Culture:* none provided
  *Histology:* The histology report states "It is likely that the graft disruption was caused by a severe infectious process that extended into the graft from the surrounding infected and necrotic host tissues, ultimately causing degradation and disruption of the graft."
  *Clinical*: no comment by the investigator

Reviewer comment:
The ATEV infection rate includes patients who had graft infection confirmed by either positive graft culture, histology demonstrating bacteria in the graft or signs of graft infection noted by the surgeon. In all three cases, the identification of infection requires exposure of the ATEV through surgical reintervention. Despite infection being an AESI, there were no protocol specified evaluation of infection before Day 30 and all patients received prophylactic antibiotics. Therefore, the observed ATEV infection rate in the extremity group of 5.6% may not be an accurate assessment of the true ATEV infection rate.

There were three cases of ATEV infection that contribute to the 5.6% incidence of infection in the extremity group. However, there were two additional cases where ATEV infection in the extremity was plausible, but definitive data were not provided.

- Patient (b) (6) had an overlying wound infection positive for Acinetobacter treated with debridement, wound vacuum-assisted closure placement, and broad-spectrum antibiotics (cefepime). He subsequently developed pseudoaneurysm rupture on Day 19 leading to ATEV ligation and oversewing of the distal stump. There was no evaluation to see if erosion of the underlying graft due to infection may have contributed to the loss of ATEV integrity.
- Patient (b) (6) "developed ATEV infection secondary to surrounding infected necrotic tissue" and subsequent mid-graft rupture. The location of the ATEV infection is not further specified and could have occurred in the torso or the extremity or spanned both. This patient was classified as a torso injury in the absence of knowledge that the infection occurred in the axillary portion of the repair, the patient was included in the torso group for the purpose of safety analysis and the infection did not count toward infections in the extremity group.

Also contributing to uncertainty regarding the incidence of infection is the assumption that patients leaving the study within the first week after placement of the ATEV would remain infection free. This is corroborated by two patients with ATEV infection (b) (6) and (b) (6) who became symptomatic on Day 30 and 36 and who were confirmed to have infection when the ATEV was ultimately explanted.

One paper that enrolled civilian trauma patients with an injury severity score (mean: 21.1, median, 17.5) very similar to patients in study V005 (mean: 20.8, median, 17.0), did not report any graft infections following implantation of autologous vein graft (Stonko et al. 2022). Civilian trauma literature describes a synthetic graft infection rate of 2.5% which may provide an appropriate benchmark for interpreting the observed infection rate in study V005. Cross study comparisons do not identify better or worse outcomes between the HAV and synthetic grafts; nonetheless, the data do not support the Applicant's claim that the ATEV is infection resistant.

Rupture/Anastomotic Failure

In the provided case summaries, the Applicant has included any loss of integrity of the ATEV due to either anastomotic failure or a disruption in the continuity of the graft as a rupture. Four patients out of 54 in the Extremity Group implanted with the ATEV placed as a conduit in study V005 had post transplantation loss of ATEV integrity which resulted in bleeding from the ATEV site. One patient developed mid-graft rupture in the presence of overlying wound infection which eroded the overlying tissue and led to exposure of the ATEV to air. One patient had failure of sutures placed mid-graft following thrombectomy procedure. An additional two patients in the extremity group had loss of ATEV integrity at either the proximal or distal anastomosis site. Details of an additional four patients who developed mid-graft rupture or anastomotic failure from the ATEV in the torso/iatrogenic group or from study V017 are included in Table 29.

**Table 29. Patients With Rupture or Anastomotic Failure Within Study V005 or V017**

| Group, Study | Patient ID | Day of Rupture/ Failure | Length of ATEV Used (cm) | Summary |
|---|---|---|---|---|
| Extremity, V005 | (b) (6) | 10 | 28.0 | Repair of popliteal artery with subsequent open thrombectomy on Day 6. Mid-graft suture failure on Day 10 with positive explant culture. Subsequent amputation Day 17. |
| Extremity, V005 | (b) (6) | 19 | 6.5 | Distal anastomosis pseudoaneurysm rupture of axillary artery on Day 19. Graft oversewn with sufficient collateral circulation. |
| Extremity, V005 | (b) (6) | 35 | 7.0 | Mid-graft rupture of axillobrachial graft on Day 35 following overlying eschar and air exposure. Subsequent amputation on Day 43. |
| Extremity, V005 | (b) (6) | 30 | 35.0 | Proximal anastomosis rupture of popliteal artery on Day 36. Replaced with autologous vein. |
| Torso/iatrogenic, V005 | (b) (6) | 10 | 31.0 | Mid-graft rupture of the subclavian artery on Day 10 with amputation and excision of graft on Day 11. |
| Torso/iatrogenic, V005 | (b) (6) | 11 | 4.0 | Proximal anastomosis failure on Day 11 in setting of infected hematoma secondary to fecal contaminant. Patient death on Day 11. |
| Torso/iatrogenic, V005 | (b) (6) | 30 | 8.5 | Contained rupture of distal pseudoaneurysm on Day 30 with subsequent abscess formation and bleeding on Day 40. Graft replaced with interposition graft. |
| Extremity, V017 | (b) (6) | 8 | 34.0 | Mid-graft rupture of the superficial femoral artery on Day 8 and removed on Day 13. Signs of graft infection noted by surgeon during reintervention on Day 12. |

Source: Clinical case summaries

Reviewer comment:
The term rupture is used to include both instances of mid-graft loss of ATEV integrity as well as anastomotic failure consistent with the term used in the Applicant's case summaries. There is conflicting data on the true incidence of ruptures when using autologous vein or synthetic grafts, however the literature suggests a range of 0-6%. It is generally accepted that overlying wound infection can spread into an adjacent vessel increasing risk of graft rupture. Based on the data provided in this BLA, the rate of graft rupture is 7.4% within the 54 patients in the extremity group and 9.9% for all patients treated with ATEV as a conduit in study V005.

#### 6.1.12.6 Clinical Test Results

Duplex ultrasound examinations were performed to detect ATEV stenosis and aneurysm development and evaluate patency. For the primary efficacy endpoint evaluated at Day 30, 35 out of 42 patients (83.3%) had evaluation with duplex imaging. At Month 6, 23 of 32 (71.9%) evaluable patients had duplex imaging evaluation of the ATEV.

Reviewer comment:

Accurate evaluation with Duplex imaging is limited as the imaging studies varied across institutions. Complete evaluation of the ATEV inclusive of doppler flow and evaluation of structural abnormalities following transplantation (i.e., pseudoaneurysms, aneurysms) was not conducted across all study sites. Central review of imaging did not occur during this study. Incomplete evaluation of blood flow and potential structural abnormalities may overrepresent patency of the ATEV and underrepresent the incidence of structural abnormalities.

6.1.12.7 Dropouts and/or Discontinuations

37 patients discontinued prior to study completion in the extremity group:

- 15 lost to follow up
- 6 deaths
- 6 Limb amputation with ATEV removal
- 9 ATEV thrombosis with collateral flow
- 1 withdrew consent

6.1.13 Study Summary and Conclusions

Evaluation of primary and secondary efficacy endpoints for study V005 demonstrates effectiveness of this product with rates of 66.7% and 72.2% at Day 30, respectively. Data from this study also provides evidence of a clinically meaningful benefit in the indicated population with a limb salvage rate of 75.9% at Day 30. The complexity lies in the safety profile of this product. The Applicant has provided data from a small cohort of 54 patients who have had the ATEV placed in the extremities. The observed rate for anastomotic failure and rupture in the extremity group (7.4%) and across all patients in both the extremity and torso/iatrogenic group (9.9%) represents a significant risk which requires further characterization.

6.2 Study #2 – CLN-PRO-V017

Study Title: An Observational Multicenter Study to Evaluate the Safety and Efficacy of Humacyte Human Acellular Vessel [ATEV] in a Real World Setting for Arterial Replacement or Reconstruction in Ukrainian Patients with Life or Limb-threatening Vascular Trauma.”

Clinical Trial Registry Identifiers: NCT05873959

The study V017 provides data analysis from a real world evidence study evaluating the use of ATEV administered as Humanitarian aid in Ukraine. In June of 2022, Humacyte shipped 30 ATEV units to 5 hospitals in Ukraine. 19 ATEVs have been implanted between June 2022 and July 31, 2023 under the Humacyte Humanitarian Aid Program.

Reviewer comment:
This study serves as supportive evidence of safety and efficacy of the ATEV. However, this study does not provide substantial evidence of safety and efficacy which can be combined with the previous study due to the evaluation of this product in a different population comprised of lower severity injuries often treated in a not urgent manner. While data for 30-day patency was collected for enrolled patients, lack of active monitoring underestimates the incidence of adverse events and safety signals in this retrospective evaluation.

6.2.1 Objectives (Primary, Secondary, etc)

Primary Efficacy Objective:

- To determine the rate of primary patency at 30 days after the ATEV implantation.

Secondary Efficacy Objectives:

- To determine the rate of affected limb salvage/amputations up to 6 months after the ATEV implantation
- To determine the patency of the ATEV (primary, primary assisted and secondary) up to 6 months after implantation

6.2.2 Design Overview

This study is a retrospective, observational, multicenter study to evaluate the safety and efficacy of the ATEV in a real-world setting, for arterial replacement or reconstruction in patients with life- or limb-threatening vascular trauma sustained during the Ukraine-Russia conflict. The study was conducted at three sites across Ukraine.

A total of 19 patients (≥18 to ≤85 years old) received the ATEV for arterial replacement or reconstruction following vascular trauma.

6.2.3 Population

The inclusion and exclusion criteria are the same as those used in study V005 and included in section 6.1.3.

6.2.4 Study Treatments or Agents Mandated by the Protocol

All patients received a ATEV graft manufactured at Humacyte, Durham, North Carolina which was cut to the length required for arterial repair ranging in length from 1 to 40 cm.

6.2.5 Directions for Use

The directions for use are the same as those used in study V005 and included in section 6.1.5.

6.2.6 Sites and Centers

Thirty ATEV units were shipped to five hospitals in Ukraine for Humanitarian use. The Applicant states that 19 ATEV units have been used in three sites located in Ukraine in study results for study V017.

6.2.7 Surveillance/Monitoring

This was a retrospective observational study. No active monitoring was included. Patients who had vascular injury and received the ATEV are appropriate for inclusion into the study; they were informed about the study and invited to sign an informed consent to allow retrospective access to their data. Following informed consent provided by the patient already implanted with the ATEV, a retrospective review of their data was completed, as applicable and available.

**Table 30. Schedule of Events, Study V017**

| | Visit 1 | Post-implantation D30 | Post implantation after D30 and/or at M6 | Post implantation after M6 and/or until end of study |
|---|---|---|---|---|
| Informed consent | X | | | |
| Medical history and nature of trauma | X | | | |
| Concomitant medication | X | X | X | X |
| Physical examination [1] | X | X | X | X |
| Pre-op Ultrasound or CT angiography | X | | | |
| Eligibility (inclusion/exclusion criteria) | X | | | |
| Documentation on HAV implantation and intraoperative confirmation of patency [2] | X | | | |
| Documentation of surgery and any complications | X | | | |
| Duplex ultrasound [3] | | X | X | X |
| CT angiography | | X | X | X |
| SAEs and AESI | X | X | X | X |
| Documentation of HAV interventions (if available) | X | X | X | X |

Abbreviations: AEs, adverse events; ET, early termination; HAV, human acellular vessel; M, month

1. Physical examination may include clinical exam of the operative limb and HAV at all post-operative visits (incl. patency assessment) and physical exam to evaluate AEs; include distal vascular bed at the discretion of the investigator in the best interest of the patient.
2. Determination of intraoperative HAV patency by physical exam, Doppler, angiography or ultrasound at the discretion of the investigator in the best interest of the patient.
3. An alternative imaging method (CTA, MRI, etc.) may have been substituted for duplex ultrasound at the discretion of the investigator in the best interest of the patient.

Source: Appendix 1 Protocol CLN-PRO-V017 v1.0 in 16.1.1
Abbreviations: AESI = adverse event of special interest, CT = computed tomography, SAE = serious adverse event

Reviewer comment:
As this was a retrospective observational study, no active monitoring was included. The Applicant has provided 6 months of data for most patients, however, there remains a high possibility of missing data which can result from a patient presenting to another medical institution for treatment during this time period. Review of case summaries provides documentation of this occurring after day 30 in two patients.

### 6.2.8 Endpoints and Criteria for Study Success

Primary Efficacy Endpoint:

- Primary ATEV patency at Day 30 after implant

Key Secondary Efficacy Endpoints:

- Secondary patency at Day 30 days after implant
- Conduit infection at Day 30 after implant
- Limb salvage rate at Day 30 after implant

Other Secondary Endpoints:

- ATEV interventions to maintain/restore patency
- Long-term primary patency
- Long-term secondary patency
- Long-term limb salvage

### 6.2.9 Statistical Considerations & Statistical Analysis Plan

Study Hypothesis:
This was a retrospective, observational study in which patients received the ATEV. There was no formal hypothesis testing, no prespecified significance level and Type 1 error control, and no multiplicity adjustment. Descriptive statistical analysis was performed for safety and efficacy data.

Sample Size:
No formal power calculations were performed. The sample size was determined by the number of patients available who consented to the study at each site. Analyses of the primary and key secondary efficacy endpoints were the same as described in Section 6.1.9 for study V005. Missing data and intercurrent event handling strategies were also the same as study V005.

Analysis Population:
The analysis population included all patients who underwent non-iatrogenic arterial vascular repair with a ATEV in an extremity. One patient who underwent ATEV placement as a patch for iatrogenic repair was excluded from analysis.

### 6.2.10 Study Population and Disposition

Insert text here

#### 6.2.10.1 Populations Enrolled/Analyzed

In total, 19 patients received the ATEV in Ukraine under the Humanitarian program. Two patients were lost to follow up and could not be contacted for informed consent and inclusion in this study.

Among the remaining 17 patients, 16 patients were included in the extremity group for primary analysis. One patient had iatrogenic injury to the limb and was excluded.

##### 6.2.10.1.1 Demographics

All 16 patients (100.0%) in the extremity group were White males. The median age was 30.5 years, with a range of 22 to 54 years, and a mean age of 34.2 (SD 9.0). All patients were non-Hispanic.

##### 6.2.10.1.2 Medical/Behavioral Characterization of the Enrolled Population

Distribution of type of trauma in the extremity group was 87.8% penetrating trauma and 12.5% blunt trauma. Blasts and shrapnel injury represented the most frequent cause for vascular trauma in this study, involving 12 out of 16 patients (75%), followed by gunshot wounds in 2 patients (12.5%). Data from this study is limited by retrospective collection of data from patients who were treated with the ATEV on a humanitarian basis. The majority of patients had sustained traumatic injuries and were relatively young. Comorbid conditions were infrequent in this population.

Injury severity and baseline medical characteristics for the 16 patients in the extremity group are summarized in Injury Characteristics, Study V017, respectively. The majority of patients sustained injury to the femoral artery (68.8%) in the lower extremity (87.5%). The majority of patients were categorized severe (31.3%) on the AIS, followed by

serious (18.8%) and critical (12.5%). Four patients had missing AIS. The median ISS was 16, with a minimum score of 1 and a maximum score of 73.

**Table 31. Injury Severity, Study V017**

| Parameter | Extremity Group n=16 |
|---|---|
| Abbreviated Injury Scale (AIS), n (%) | |
| Minor | 2 (12.5%) |
| Serious | 3 (18.8%) |
| Severe | 5 (31.3%) |
| Critical | 2 (12.5%) |
| Missing | 4 (25.0%) |

Source: FDA reviewer.
Abbreviations: AIS = abbreviated injury scale, n = sample size

**Table 32. Injury Characteristics, Study V017**

| Parameter | Extremity Group n=16 |
|---|---|
| Injury severity score (ISS), n | 13 |
| Mean (SD) | 20.1 (18.9) |
| Median (minimum, maximum) | 16 (1, 73) |
| Injury location, n (%) | - |
| Lower extremity | 14 (87.5%) |
| Upper extremity | 2 (12.5%) |
| Artery category, n (%) | - |
| Femoral artery | 11 (68.8%) |
| Popliteal artery | 3 (18.8%) |
| Other | 2 (12.5%) |
| Cause of trauma, n (%) | - |
| Blast shrapnel injury | 12 (75.0%) |
| Gunshot injury | 2 (12.5%) |
| Industrial accident | 1 (6.3%) |
| Motor vehicle accident | 1 (6.3%) |
| Nature of trauma, n (%) | - |
| Blunt trauma | 2 (12.5%) |
| Penetrating trauma | 14 (87.8%) |
| Open fracture injury | 13 (81.3%) |

Source: FDA reviewer. Derived from clinical case summaries
Abbreviations: ISS = Injury Severity Score, n = sample size, SD = standard deviation

Reasons for not using autologous vein included: 4 (23.5%) for concomitant injury to the vein, 12 (70.6%) for poor quality or size of vein, 7 (41.2%) for time limitation-harvest not possible, and 3 (17.6%) for other.

**Table 33. Reasons for Not Using Autologous Vein, Study V017**

| Reason | Extremity Group (n=16) |
|---|---|
| Concomitant injury to the vein | 6 (37.5%) |
| Significant tissue defect | 1 (6.3%) |
| Estimated risk of injury to the vein due to adjacent injuries to the area (blast or crush injury) | 2 (12.5%) |
| Poor quality or size of the vein | 3 (18.8%) |
| Previously used for stenting | 2 (12.5%) |
| Time limitation | 1 (6.3%) |
| Thrombosis, sclerosis, ablation | 1 (6.3%) |

Source: CLN-PRO-V017 CSR Listing 16.2.4.4; BLA 125812/SN0000
Abbreviations: n = sample size

Reviewer comment:
43.8% of patients in this study had severe or critical injuries. By comparison the clinical trial conducted in the civilian population for study V005 had a 74% of patients being classified as severe or critical injuries as measured by the AIS. Differences in injury severity may have contributed to differences seen in adverse events within this group. Noteworthy is that some patients in this study were treated weeks after the initial injury and not in an urgent manner as per the indication. MESS scores were only available for 2 patients in this study as retrospective evaluation and thus cannot be used as a basis of comparison.

6.2.10.1.3 Patient Disposition

Seventeen patients provided informed consent for study V017, with a data cutoff date of July 31, 2023. Sixteen of the 17 patients, received the ATEV to repair non-iatrogenic vascular injuries to an extremity. The ATEV length ranged from 3.5 to 40 cm (mean =18.3 cm). The mean follow-up duration in study V017 was 139.5 days (range 13 to 180 days). All 16 patients in the extremity group were evaluated at Day 30. 3 patients (18.8%) did not have follow up past 30 days and 7 patients (43.8%) did not have follow up past 6 months. No patients died or underwent limb amputation.

6.2.11 Efficacy Analyses

6.2.11.1 Analyses of Primary Endpoint

In the Extremity Group, primary patency was confirmed with Duplex imaging in 15 out of 16 patients (93.8%; 95% CI: 71.7%, 98.9%) at Day 30. One patient had the ATEV replaced on Day 13 following rupture and was categorized as not patent for the 30-day endpoint.

6.2.11.2 Analyses of Secondary Endpoints

Secondary Patency at Day 30
The secondary patency rate at Day 30 was 93.8%, with one patient deemed not patent at 30 days due to ATEV explant on Day 13.

Infection Rate at Day 30
The ATEV infection rate in the extremity group was 6.3% (95% CI: 1.1%, 28.3%). One patient (b) (6) underwent the ATEV explant following repeated interventions for graft rupture and bleeding from the graft site on days 8, 12 and 13. Following explant,

histology identified the presence of bacteria along the abluminal surface, suggestive of extension of infection from the surrounding tissues.

Amputation and Limb Salvage
No patients required amputation of the limbs during the study period. All patients were included as having successful limb salvage at Day 30. Limb Salvage rate was 100%.

Reviewer comment:
The primary and secondary patency of the ATEV at Day 30 was 93.8%. This suggests a clinically meaningful benefit for the use of ATEV as an arterial graft in the extremities.

6.2.11.3 Subpopulation Analyses

None

6.2.11.4 Dropouts and/or Discontinuations

The ATEV was abandoned in two patients (12.5%) and three patients were lost to follow up (18.8%). Eleven (68.8%) patients have completed 6 months follow up.

6.2.11.5 Exploratory and Post Hoc Analyses

None

6.2.12 Safety Analyses

6.2.12.1 Methods

Method for analysis of AEs was consistent with those defined in study V005 and included in section 6.2.12.

The Safety Population consists of 16 patients who received the ATEV in the study, regardless of follow-up status.

6.2.12.2 Overview of Adverse Events
Table 34 summarizes the treatment-related AEs observed in study V017. Complications observed for the patients with extremity trauma repair within this study included thrombosis or occlusion in one patient (6.3%), infection in one patient (6.3%) and ATEV rupture in one patient (6.3%). No deaths or amputations were reported for patients in this study.

**Table 34. Adverse Events by System Organ Class and Preferred Term, Study V017**

| System Organ Class[1]<br>Preferred Term | Extremity Group<br>(n=16) |
|---|---|
| Any AEs | 4 (25.0%) |
| Infections and infestations | 4 (25.0%) |
| Wound infection | 3 (18.8%) |
| Coronavirus infection | 1 (6.3%) |
| Postoperative wound infection | 1 (6.3%) |
| Injury, poisoning and procedural complications | 2 (12.5%) |
| Vascular graft complication | 1 (6.3%) |
| Vascular graft occlusion | 1 (6.3%) |
| Vascular graft thrombus | 1 (6.3%) |
| Vascular disorders | 2 (12.5%) |
| Arterial hemorrhage | 1 (6.3%) |
| Peripheral ischemia | 1 (6.3%) |
| Metabolism and nutrition disorders | 1 (6.3%) |
| Diabetes mellitus | 1 (6.3%) |
| Hyperhomocysteinemia | 1 (6.3%) |

Source: Table 14.3.2.1 clinical study report
[1]Adverse events were coded using MedDRA version 26.0
Abbreviations: AE = adverse event, n = sample size

### 6.2.12.3 Deaths

No deaths were reported in this study.

### 6.2.12.4 Nonfatal Serious Adverse Events

Only one patient had an SAE. Patient (b) (6) underwent a mid superficial femoral artery to distal popliteal artery bypass using the ATEV. On Day 8, bleeding from the surgical site led to the discovery of a 2 mm rupture that was repaired with sutures. On Day 12, the patient was operated on again for bleeding from the sutured ATEV site. The ATEV was removed on Day 13 due to persistent bleeding and replaced with autologous saphenous vein. Histology analysis noted “the presence of bacteria along the abluminal surface [which] was suggestive of extension [of infection] from the surrounding tissues.” There were reportedly no clear signs of ATEV infection at time of first bleed on Day 8, but the “ATEV was thought to be too soft” to repair at the time of evaluation on Day 9 following second bleeding event. No cultures were taken from the ATEV. No further long-term information is provided for this patient following explant of the ATEV.

**Table 35. Serious Adverse Events by System Organ Class and Preferred Term, Study V017**

| System Organ Class<br>Preferred Term | Extremity Group<br>(n=16) |
|---|---|
| Any SAE, n(%) | 1 (6.3%) |
| Injury, poisoning and procedural complications | 1 (6.3%) |
| Vascular rupture | 1 (6.3%) |
| Vascular disorders | 1 (6.3%) |
| Arterial hemorrhage | 1 (6.3%) |

Source: Derived from clinical dataset
Abbreviations: n = sample size, SAE = serious adverse event

### 6.2.12.5 Adverse Events of Special Interest

ATEV infection and rupture were seen in one patient (b) (6) who underwent three interventions prior to Day 30 before the ATEV was explanted. A second patient (b) (6)

(b) (6) presented after Month 6 with a thrombosis of the ATEV which could not be resolved and resulted in abandonment of the graft.

No amputations, aneurysms or pseudoaneurysms were reported in this study.

**Table 36. Adverse Events of Special Interest, Study V017**

| AESI Assessment | Extremity Group n=16 |
|---|---|
| Any Infection | 5 (31.2%) |
| Wound infection | 4 (25.0%) |
| ATEV infection | 1 (6.3%)[1] |
| ATEV rupture | 1 (6.3%)[1] |
| ATEV occlusion/thrombosis | 1 (6.3%) |

Source: Derived from clinical study report and case summaries
Abbreviations: AESI = adverse event of special interest, n = sample size
[1]patient (b) (6)

Reviewer comment:
No amputations, aneurysms or pseudoaneurysms were reported in this study. Safety cannot be accurately characterized. The absence of active monitoring of emerging safety signals following ATEV implantation likely underestimate the true rate of adverse events. Therefore, it is difficult to make a comparison of safety results from this retrospective study to the prospective study discussed previously (V005).

6.2.12.6 Clinical Test Results

Data from clinical tests was obtained retrospectively from the medical record. 6.2.12.7 Dropouts and/or Discontinuations

**Table 37. Follow up for Extremity Patients, Study V017**

| Parameter | Study V017 n=16 |
|---|---|
| Duration of follow up, days | |
| Mean | 333 |
| Median (min, max) | 188 (1, 1134) |
| Patients treated, by duration of follow up, n (%) | |
| ≥1 day | 16 (100%) |
| ≥30 days | 15 (93.8%) |
| ≥6 months | 10 (62.5%) |
| Reason for study discontinuation, n (%) | |
| Lost to follow up | 3 (18.8%) |
| ATEV rupture/explant | 1 (6.3%) |
| ATEV thrombosis | 1 (6.3%) |

Source: Derived from clinical case summaries
Abbreviations: AESI = adverse event of special interest, max = maximum, min = minimum, n = sample size

6.2.13 Study Summary and Conclusions

Evaluation of primary and secondary efficacy endpoints for study V017 demonstrates effectiveness of this product with rate of 93.8% for both endpoints. Data from this study also provides evidence of a clinically meaningful benefit in the indicated population with a limb salvage rate of 100% at Day 30. The evaluation of safety is challenging due to the limitations of the retrospective study design which does not accurately capture emerging

safety signals following ATEV implantation in the absence of active monitoring. This has the potential to underestimate the true rate of adverse events.

# 7. Integrated Overview of Efficacy

## 7.1 Indication #1

The clinical reviewer does not recommend an integrated overview of efficacy (i.e., an analysis using pooled data from all patients treated with the ATEV) because study V017 offers only limited supportive evidence due to the different study population and settings, which makes comparing the two studies difficult. Efficacy of the ATEV is reviewed primarily in section Efficacy Analyses (Section 6.2.11)

### 7.1.8 Persistence of Efficacy

Long-term efficacy of this product has not been adequately evaluated due to the high number of patients who terminated the study early. Study V017 evaluated patients through at least 6 months in the protocol. The Applicant has provided some data beyond 180 days for patients from this study, but interpretation is limited by the lack of a standard assessment timeline which can reliably evaluate the investigational product. Evaluation of the ATEV at one year is limited to only 27.1% of all patients who received this investigational product as a conduit in an extremity (Table 38).

**Table 38. Follow Up for Extremity Patients, Study V005 and Study V017**

| Parameter | V005<br>n=54 | V017<br>n=16 | Total<br>n=70 |
|---|---|---|---|
| Duration of follow up, days | | | |
| Mean | 334.6 | 141.4 | 294.3 |
| Median (min, max) | 188.5 (1, 1134) | 180 (13, 180) | 180 (1,1134) |
| Patients treated, by duration of follow up, n (%) | | | |
| ≥1 day | 54 (100%) | 16 (100%) | 70 (100%) |
| ≥30 days | 41 (75.9%) | 15 (93.8%) | 56 (80.0%) |
| ≥3 months | 34 (63.0%) | 12 (75%) | 46 (65.7%) |
| ≥6 months | 30 (55.6%) | 12 (75%) | 43 (61.4%) |
| ≥12 months | 19 (35.2%) | 0 | 19 (27.1%) |
| 36 months/end of study | 7 (13.0%)* | 0 | 7 (10.0%) |
| Reason for early study discontinuation, n (%) | | | |
| Total | 37 (68.5%) | 5 (31.3%) | 42 (60%) |
| Death | 6 (11.1%) | 0 | 6 (8.6%) |
| Limb amputation | 6 (11.1%) | 0 | 6 (8.6%) |
| Lost to follow-up | 15 (27.8%) | 3 (18.8%) | 18 (25.7%) |
| ATEV abandoned/explanted | 9 (16.7%) | 2 (12.5%) | 11 (15.7%) |
| Withdrew consent | 1 (1.9%) | 0 | 1 (1.4%) |

Source: Applicant dataset and case summaries
Abbreviations: max = maximum, min = minimum, n = sample size

Review of the seven patients who completed study V005 is included in Table 39. Of the seven patients who completed 36 month follow up, all retained ATEV patency at Month 36 and none developed graft infection. One patient underwent below knee amputation following thrombosis of the ATEV due to development of forefoot gangrene.

**Table 39. Clinical Summary for Extremity Patients Completing 36 Months, Study V005**

| Patient ID | Days Followed | Narrative |
|---|---|---|
| (b) (6) | 1047 | 22-year-old male received ATEV for superficial femoral artery interposition graft following MVA. Primary patency of the ATEV was confirmed at all clinical visits. No interventions or procedures were performed on the ATEV, and no amputation of the affected limb was performed. |
| (b) (6) | 1086 | 37-year-old female received ATEV for popliteal artery injury following fall. Follow up complicated by infection, hematoma, and an abscess adjacent to the postsurgical site.. Primary patency of the ATEV was confirmed at all clinical visits. No interventions or procedures were performed on the ATEV, and no amputation of the affected limb was performed. |
| (b) (6) | 1095 | 39-year-old male received ATEV for popliteal artery injury following GSW. Patency of the ATEV was confirmed at day 30. Follow up complicated by aneurysm of ATEV noted on day 195 with distal pain and paresthesia. Aneurysm stable until Day 424 when patient developed worsening lower extremity pain and discoloration and found to have occluded SFA and complete thrombosis of the ATEV which was thrombolysed. On day 475 and 482 patient underwent forefoot and below knee amputation below the level of the ATEV. Second thrombus noted on day 760 but resolved without intervention. Patency at month 36 visit confirmed. |
| (b) (6) | 1104 | 45-year-old female received ATEV for popliteal artery injury following an occupational crush injury. Follow up complicated by wound and orthopedic hardware infection. Despite surrounding infection, primary patency of the ATEV was confirmed at all clinical visits. No interventions or procedures were performed on the ATEV, and no amputation of the affected limb was performed. |
| (b) (6) | 1111 | 31-year-old male received ATEV for superficial femoral artery injury following fall. Despite follow up complicated by wound infection primary patency maintained until Month 9 when anastomotic stenoses was diagnosed and successfully treated. ATEV confirmed patent at 36 months and limb retained. |
| (b) (6) | 1127 | 25-year-old male received ATEV as a right superficial femoral artery to right popliteal artery interposition bypass graft following GSW. Primary patency of the ATEV was confirmed at all clinical visits. No interventions or procedures were performed on the ATEV, and no amputation of the affected limb was performed. |
| (b) (6) | 1134 | 34 year old female received ATEV for superficial femoral artery injury following occupational crush injury. Follow up complicated by infections in the joint and surrounding soft tissue without definitive evaluation of the ATEV.. Primary patency of the ATEV was confirmed at all clinical visits. No interventions or procedures were performed on the ATEV, and no amputation of the affected limb was performed. |

Source: Applicant case summaries
Abbreviations: ATEV = acellular tissue engineered vessel, GSW = gunshot wound, MVA = motor vehicle accident, SFA = superficial femoral artery

Reviewer comment:
Long-term efficacy of ATEV has not been established as only 7 subjects completed the trial at the time of this review. Literature suggests that thrombosis and graft failure are known complications of autologous vein and synthetic grafts even more than one year after implantation. It is noteworthy that while an aneurysm and an anastomotic stenosis were observed in one patient each, patients retained the patency of the graft at 36 months. The cohort of patients who completed 36 month include patients who had no complications with the ATEV throughout the follow up period as well as patients with serious adjacent infections providing some evidence of benefit in the setting of comorbidities.

# 9. Additional Clinical Issues

## 9.1 Special Populations

### 9.1.1 Human Reproduction and Pregnancy Data

No clinical studies were conducted in pregnant patients, and no data are available to indicate whether the ATEV can cause fetal harm when administered to pregnant women or can affect reproductive capacity.

In study V005, there was one patient who became pregnant during study follow up. The 21-year-old woman received a left interposition brachial artery ATEV graft due to inadequate size of the great saphenous vein following a gunshot wound. During Month 6 visit, imaging demonstrated stenosis of the distal anastomosis. She was 11 weeks pregnant at the time and deferred angiography with intervention. The patient miscarried at 13 weeks gestation and was reported to have discontinued anticoagulation at some point thereafter. During the Month 9 visit (Day 331), primary patency was lost and occlusion was confirmed by duplex ultrasound. The ATEV was considered abandoned, and the patient was terminated from the study. Patient subsequently had a successful pregnancy with live birth 19 months after the ATEV placement. The draft labeling indicates that the ATEV should be used in pregnant women if clinically indicated.

### 9.1.2 Use During Lactation

The ATEV has not been evaluated in lactating patients.

### 9.1.3 Pediatric Use and PREA Considerations

This application triggers the Pediatric Research Equity Act (PREA) for a new active ingredient and indication and was presented to the FDA Pediatric Review Committee (PeRC) on June 4, 2024.

During the IND phase, the clinical study had been opened to enrollment of adolescent patients with protocol version 3.3 submitted under IND amendment 16746.64 on August 15, 2022 but the Applicant has not enrolled any adolescent patients by the time of this BLA submission. The Applicant states that it has been challenging to enroll pediatric patients due to the availability of an autologous vessel, vessel size mismatch and rarity of vascular trauma requiring repair in pediatric patients. There are also theoretical concerns that the product would be ineffective and/or unsafe in one or more of the pediatric groups for which a waiver is being requested due to uncertainty regarding the ability of this product to grow with the patient.

CBER agreed with granting the deferral of pediatric studies for adolescent patients who have reached a sexual maturity rating of Tanner Stage 5 because this product is ready for approval for use in adults and the amount of pediatric safety, efficacy and pharmacokinetic data are insufficient to ensure adequate safety/efficacy and instructions for dosing in this pediatric group. A partial waiver was also granted for the remainder of the pediatric population.

Based on discussion with the PeRC team, we recommend the following approach to labeling and PREA fulfillment:

1. The indication statement will include the qualifier “adults” since the product will not be approved for pediatric patients.
2. Section 8.4 of the prescribing information will include the statement that “the safety and efficacy of SYMVESS in pediatric patients (0 to 17 years old) have not been established.”
3. Section 8.4 of the prescribing information will not state that the product is not recommended for use in pediatric patients because there is no strong evidence to demonstrate that. The concern of potential safety in patients less than Tanner Maturity Rating Stage V is valid but there is no clinical, nonclinical or product data to support this safety concern.
4. The approval will include a PREA PMR for evaluation of adolescent patients who have reached Tanner Maturity Rating Stage V.

Reviewer comment:
No animal studies evaluated whether the ATEV will grow in length once implanted. The Applicant has previously conducted studies in adult baboons and swine which were not designed to study whether the ATEV remodels and grows with the patient. The capacity of the ATEV to remodel has also not been evaluated at a sufficient duration to definitively say that the ATEV can completely repopulate with vascular cells and remodel like a normal blood vessel.

Prior discussions with the FDA included the possibility of evaluating the ATEV in a juvenile baboon, and challenges that were acknowledged included diameter mismatch in the baboons and issues with the surgical procedure (thrombosis, occlusion, loss of patency), which would be technically challenging to conduct in smaller, lower weight animal models. FDA and the Applicant did not reach agreement on studies in a juvenile animal to support safety of studying the ATEV in children who have not reached their adult height, and none were ultimately required in concert with BLA submission because of the informal dispute resolution.

### 9.1.4 Immunocompromised Patients

The safety and effectiveness of the ATEV in immunocompromised patients have not been established.

### 9.1.5 Geriatric Use

Six adults ≥65 years of age (2 in extremity group) were enrolled and treated in the study. Sample size is too small to derive any definitive conclusions; however, findings appeared to be similar in this subpopulation compared to the overall population.

## 9.2 Aspect(s) of the Clinical Evaluation Not Previously Covered

Trauma patients in general and young men especially are known to have poor compliance with long-term follow up. This is reflected both in existing literature for extremity vascular trauma and in the submitted data for study V005.

# 10. Conclusions

There is an unmet medical need for an alternative vascular graft to preserve the limb when the autologous vein is not feasible following extremity vascular injury. Available alternatives include synthetic graft materials but their use is limited in the extremities due to the higher risk of complications including graft occlusion, infection, and graft failure due to repetitive motion in joint spaces (Desai, 2011). There remains a population for whom the absence of a suitable option to restore adequate blood flow to the effected limb will result in limb amputation.

The primary evidence of effectiveness is based on primary patency at 30 days following use of the ATEV graft for vascular repair in extremity trauma. The Trial V005 in 54 patients with extremity trauma demonstrated a primary patency rate at Day 30 of 66.7% (95% CI: 53.4%, 77.8%) and a secondary patency rate of 72.2% (95% CI: 59.1%, 82.4%). The limb salvage rate at Day 30 was 75.5% (95% CI: 62.4%, 85.1%). The ATEV infection rate was 1.9% in the first 30 days. Supporting data from Humanitarian use in the Ukraine provides a 30-day patency rate of 93.8%. No patients in study V017 required amputation. Day 30 outcomes in this acute trauma population is considered clinically meaningful, as this 30 day period of restoration of blood flow provides an opportunity to save a limb in clinical situations of imminent limb loss. Additionally, this period provides an opportunity for the establishment of the collateral circulation which would make later interventions possible, if needed. Based on these findings from both studies, the ATEV demonstrates a clinically meaningful benefit in restoring blood flow in the affected limb and ultimately limb salvage.

The safety database included 71 adult patients from study V005 and was supported by safety evaluation of 16 patients in the observational study V017. The primary potential serious risk with vascular placement of the ATEV was the risk of mid-graft rupture or anastomotic failure. While this is a known complication of autologous vein and synthetic vein grafts, it is considered to be relatively rare in the civilian population (Table 3). The observed rate of anastomotic failure or rupture of 9.1% in all patients from studies V005 and V017 is worrisome and requires further characterization.

When evaluating infection as a safety outcome, six (8.5%) of the 71 patients developed ATEV infection between days 7 and 40. Because there was no protocol specified evaluation of infection prior to Day 30, identified infections were limited to instances when reintervention to the graft was required due to bleeding from the ATEV. Definitive identification of adverse events including infection in the retrospective study V017 is further limited by the absence of active monitoring.

The provided data from both studies V005 and V017 support the conclusion that ATEV can provide meaningful clinical benefit in terms of patency and associated limb salvage when an autologous vein is not feasible. To address the identified risks, changes have been made to the indication to limit use of this product to the population who would have the greatest benefit from its use. We have also revised the USPI to highlight the

observed risks to the provider so that they may make an informed decision. For the indicated population, it is my assessment that the benefits outweigh the risks based on my review of the study data.

# 11. Risk-Benefit Considerations and Recommendations

## 11.1 Risk-Benefit Considerations

Risk-benefit considerations are listed in Table 40.

**Table 40. Risk-Benefit Considerations**

| Decision Factor | Evidence and Uncertainties | Conclusions and Reasons |
|---|---|---|
| Analysis of Condition | • Extremity vascular trauma can lead to limb loss or death. Repair is essential for bleeding control and limb preservation.<br>• Autologous veins are the primary choice for extremity vascular trauma repair<br>• Synthetic grafts may be used when autologous veins are not available | Arterial trauma is a serious condition. An alternative to synthetic grafts is needed for instances when the autologous vein is not a viable option. |
| Unmet Medical Need | • There are patients who do not have an available autologous vein<br>• Synthetic graft is not suitable for grossly contaminated wounds due to their propensity for infection. They also have lower long-term patency rates than autologous veins.<br>• Use of existing synthetic graft materials is limited in the extremities due to the higher risk of complications including graft occlusion, infection, and graft failure due to repetitive motion in joint spaces. | • Currently approved therapies are reasonably well tolerated and have demonstrated efficacy. There is an unmet medical need for a safe and effective alternative when the autologous vein is not feasible |
| Clinical Benefit | • Two studies in adults were submitted. Primary evidence of effectiveness was demonstrated in Study V005, which was primary patency at 30 days. Long-term data evaluation was limited by missing data and loss to follow up.<br>• Primary patency at 30 days: 66.7%, secondary patency at 30 days: 72.2%<br>• Limb amputation rate: 9.1% at 30 days, 14.5% overall.<br>• Limb salvage rate taking into consideration patients who died or had their graft explanted during the study period was 75.9%.<br>• Supporting data from Study V017 further supports the observed benefit through Day 30 primary and secondary patency rates of 93.8%. Additionally, all patients in study V017 had limb salvaged at Day 30. | • The evidence for clinical benefit is based on 66.7% primary patency and 72.2% secondary patency at 30 days in patients for whom autologous vein was not feasible.<br>• The clinical meaningfulness of the observed patency rate was supported by the limb salvage rate. |
| Risk | • Risk of mid-graft rupture and anastomotic failure is 9.1% across all patients in both studies. Graft failure resulted in life threatening bleeding requiring immediate attention to preserve life in seven out of 71 patients from study V005. There was one death in the setting of proximal anastomotic failure following placement in the torso.<br>• ATEV infection was only identified following graft failure when there was confirmation either by culture, histology or examination of the graft by the surgeon during graft reintervention. There was no protocol specified evaluation of infection before Day 30.<br>• The long term risks of this product have not been characterized.<br>• The perceived time saving convenience of using this product over existing therapies may place patients at undue risk. | • The long-term risk of the ATEV has not been adequately characterized. Patients receiving vascular grafts are known to be difficult to follow clinically. The Applicant has agreed to conduct a post marketing study to further characterize identified risks with ATEV placement.<br>• The known risk of anastomotic failure or rupture is 9.1%. This is higher than expected for available therapies and requires further characterization. |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 163 of 674

| Decision Factor | Evidence and Uncertainties | Conclusions and Reasons |
|---|---|---|
| Risk Management | • The most substantial risks with implantation of the ATEV is either rupture or anastomotic failure which can result in serious arterial bleeding.<br>• Post marketing studies would provide sufficient data to evaluate safety especially in the military setting, as the civilian population would have the same challenges with follow up seen both in this study and in the literature.<br>• Further characterization of infection will be included in the post marketing study which will include a larger population and provide the opportunity for better evaluation. | • Limiting the indication to the extremity population helps to mitigate risk in the event of graft failure.<br>• Providers have also been advised of the risk of graft failure through inclusion of a box warning in the USPI.<br>• The Applicant has agreed to conduct a post marketing study to further characterize the risk of graft failure and infection with ATEV placement. |

### 11.2 Risk-Benefit Summary and Assessment

There is an unmet medical need for an alternative vascular graft to preserve the limb when the autologous vein is not feasible following extremity vascular injury. Use of existing synthetic graft materials is limited in the extremities due to the higher risk of complications including graft occlusion, infection, and graft failure due to repetitive motion in joint spaces. This product would address the unmet need in the population for whom the absence of a suitable option to restore adequate blood flow to the effected limb will result in limb amputation.

The benefit of ATEV was demonstrated in study V005. The study demonstrated a Day 30 primary patency rate of 66.7% and a Day 30 secondary patency rate of 72.2% which is considered a clinically meaningful benefit in the indicated population. Furthermore, ATEV's effects on the key secondary endpoint of limb salvage provides supportive evidence of benefit with a rate of 75.9% at Day 30. Study V017 further supports the observed benefit through Day 30 primary and secondary patency rates of 93.8%. Additionally, all patients in study V017 had limb salvaged at Day 30. ATEV is indicated for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible. Data submitted to the BLA suggest a benefit in terms of limb preservation for patients who receive the ATEV under this indication.

Vascular graft thrombosis, pyrexia, pain, and anastomotic stenosis were common adverse reactions identified during this study and consistent with the risks seen with existing vascular repair options. SYMVESS infection was also identified as a risk in the setting of overlying wound infection during this study and is consistent with the risk seen in existing vascular grafts. More concerning is the risk of mid-graft rupture or anastomotic failure of SYMVESS. Characterization of this risk is incomplete due to the limited number of patients enrolled and the limited follow up. While the risk of mid-graft rupture or anastomotic failure is seen in other vascular grafts (i.e., autologous vein or synthetic graft), there is a paucity of data in the literature to identify a benchmark by which to compare the rates seen following ATEV implantation. Limited literature suggests that the rate of graft failure seen in Study V005 is higher than reported with existing vascular graft options. Therefore, we have limited use of this product to patients with an extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible in order to ensure that the benefit outweighs the risk. Revisions to the USPI via the Boxed Warning for graft failure and Warnings and Precautions section for graft rupture or anastomotic failure have also been included to inform providers of the risks identified in the clinical study. Furthermore, the Applicant has agreed to a postmarketing requirement to further characterize the risk of graft failure and infection in patients with extremity vascular injury who have received SYMVESS for the approved indication. Based on the totality of presented data and the unmet need, the benefit outweighs the risks for this product.

### 11.3 Discussion of Regulatory Options

The regulatory options include: (1) traditional approval; or (2) Complete Response.

The Applicant submitted a package that has provided evidence of safety and effectiveness from an open label prospective study supported by a retrospective observational study which shows patency at 30 days and subsequent limb preservation.

Identified safety concerns related to the use of this investigational product have been adequately mitigated. Approval action is recommended.

### 11.4 Recommendations on Regulatory Actions

The Applicant has provided evidence of effectiveness based on patency at Day 30 from a prospective open label study and supportive data from a retrospective study. ATEV is indicated for a population in which the autologous vein is not feasible for urgent revascularization to avoid imminent limb loss. The observed safety risks of graft failure will be further evaluated in a postmarketing study and mitigated with safety measures including a boxed warning identifying the risk of mid-graft rupture or anastomotic failure. Based on the totality of presented data demonstrating limb preservation when the autologous vein is not feasible and in consideration of the added safety measures described, the benefits outweigh the risks for this product. This reviewer therefore recommends traditional approval.

### 11.5 Labeling Review and Recommendations

The review team made substantial changes to each section of the prescribing information, based on available clinical trial data and FDA guidance on product labeling to suitably convey known information regarding safety and efficacy results shown in clinical studies of the ATEV. A narrow indication was identified where it would be used in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible.

### 11.6 Recommendations on Postmarketing Actions

The following postmarketing studies have been discussed and agreed upon mutually between FDA and the Applicant for this submission:

PMR#1: Conduct a prospective, multi-center, open-label study, to assess the safety and efficacy of SYMVESS in patients 17 years of age or younger who have reached Tanner Sexual Maturity Rating Stage 5, in the approved indication. The study will enroll a minimum of 10 patients who will be followed for a minimum of 1 year and will evaluate primary and secondary patency rate, and characterize the incidence of graft thrombosis, rupture, anastomotic failure, infection, limb amputation, and safety and tolerability.

PMR#2: Conduct long-term observational study to further characterize the risk of graft failure and infection in patients with extremity vascular injury who have received SYMVESS for the approved indication. The study should evaluate a minimum of 100 patients for a minimum follow up period of 1 year and should evaluate the incidence of graft rupture, anastomotic failure, and thrombosis, and describe the incidence of limb amputation and death.

PMC#10: Complete and submit the study report and dataset for study CLN-PRO-V005, an open-label, single-arm study conducted in patients treated with SYMVESS as a vascular replacement or reconstruction in life or limb-threatening vascular trauma.

There are seven supplemental CMC PMC studies related to product manufacturing and shipping. Please see CMC review for additional details.

## 12. Literature Reviewed

During review of the BLA, this reviewer consulted FDA regulatory guidance documents, as well as academic literature, for background and context regarding the targeted disease and the mechanism of action of the product. The literature consulted follows below.

Akingba, AG, EA Robinson, AL Jester, BM Rapp, A Tsai, RL Motaganahalli, MC Dalsing, and MP Murphy, 2013, Management of vascular trauma from dog bites, Journal of vascular surgery, 58(5):1346-1352.

Biancari, F, M Railo, J Lundin, A Albäck, I Kantonen, A Lehtola, and M Lepäntalo, 2001, Redo bypass surgery to the infrapopliteal arteries for critical leg ischaemia, European Journal of Vascular and Endovascular Surgery, 21(2):137-142.

Clouse, WD, TE Rasmussen, MA Peck, JL Eliason, MW Cox, AN Bowser, DH Jenkins, DL Smith, and NM Rich, 2007, In-theater management of vascular injury: 2 years of the Balad Vascular Registry, Journal of the American College of Surgeons, 204(4):625-632.

DeRose, G and J Provan, 1984, Infected arterial grafts: clinical manifestations and surgical management, The Journal of Cardiovascular Surgery, 25(1):51-57.

Desai M, Hamilton G. Graft Materials Past and Future. In: Fitridge R, Thompson M, editors. Mechanisms of Vascular Disease: A Reference Book for Vascular Specialists [Internet]. Adelaide (AU): University of Adelaide Press; 2011. 28. Available from: https://www.ncbi.nlm.nih.gov/books/NBK534281/

DV, F, 1985, Five-year experience with PTFE grafts in vascular wounds, J Trauma, 25:71-82.

Eastridge, BJ, M Hardin, J Cantrell, L Oetjen-Gerdes, T Zubko, C Mallak, CE Wade, J Simmons, J Mace, and R Mabry, 2011, Died of wounds on the battlefield: causation and implications for improving combat casualty care, Journal of Trauma and Acute Care Surgery, 71(1):S4-S8.

Faulconer, ER, BC Branco, MN Loja, K Grayson, J Sampson, TC Fabian, JB Holcomb, T Scalea, D Skarupa, and K Inaba, 2018, Use of open and endovascular surgical techniques to manage vascular injuries in the trauma setting: a review of the American Association for the Surgery of Trauma PROspective Observational Vascular Injury Trial registry, Journal of Trauma and Acute Care Surgery, 84(3):411-417.

Feliciano DV, Mattox KL, Graham JM, Bitondo CG. Five-year experience with PTFE grafts in vascular wounds. J Trauma. 1985 Jan;25(1):71-82.

Forsyth, A, MH Haqqani, DB Alfson, SP Shaikh, F Brea, A Richman, JJ Siracuse, D Rybin, A Farber, and TS Brahmbhatt, 2024, Long-term outcomes of autologous vein bypass for repair of upper and lower extremity major arterial trauma, Journal of Vascular Surgery, 79(6):1339-1346.

Fox CJ, Gillespie DL, O'Donnell SD, Rasmussen TE, Goff JM, Johnson CA, Galgon RE, Sarac TP, Rich NM. Contemporary management of wartime vascular trauma. J Vasc Surg. 2005 Apr;41(4):638-44.

Frech, A, L Pellegrini, G Fraedrich, G Goebel, and J Klocker, 2016, Long-term clinical outcome and functional status after arterial reconstruction in upper extremity injury, European Journal of Vascular and Endovascular Surgery, 52(1):119-123.

Gennarelli, TA and E Wodzin, 2006, AIS 2005: a contemporary injury scale, Injury, 37(12):1083-1091.

Greer, LT, B Patel, KC Via, JN Bowman, MA Weber, and CJ Fox, 2012, Management of secondary hemorrhage from early graft failure in military extremity wounds, Journal of Trauma and Acute Care Surgery, 73(4):818-824.

Helfet, D, T Howey, R Sanders, and K Johansen, 1990, Limb Salvage Versus Amputation: Preliminary Results of the Mangled Extremity Severity Score, Clinical Orthopaedics and Related Research (1976-2007), 256:80-86.

Holcomb, JB, NR McMullin, L Pearse, J Caruso, CE Wade, L Oetjen-Gerdes, HR Champion, M Lawnick, W Farr, and S Rodriguez, 2007, Causes of death in US Special Operations Forces in the global war on terrorism: 2001–2004, Annals of surgery, 245(6):986-991.

Huber TS, Carter JW, Carter RL, Seeger JM. Patency of autogenous and polytetrafluoroethylene upper extremity arteriovenous hemodialysis accesses: a systematic review. J Vasc Surg. 2003 Nov;38(5):1005-11.

Johansen, K, M DAINES, T HOWEY, D HELFET, and ST HANSEN Jr, 1990, Objective criteria accurately predict amputation following lower extremity trauma, Journal of Trauma and Acute Care Surgery, 30(5):568-573.

Kelly, JF, AE Ritenour, DF McLaughlin, KA Bagg, AN Apodaca, CT Mallak, L Pearse, MM Lawnick, HR Champion, and CE Wade, 2008, Injury severity and causes of death from Operation Iraqi Freedom and Operation Enduring Freedom: 2003–2004 versus 2006, Journal of trauma and acute care surgery, 64(2):S21-S27.

Laverty RB, Brock SG, Walters TJ, Kauvar DS. Outcomes of Arterial Grafts for the Reconstruction of Military Lower Extremity Arterial Injuries. Ann Vasc Surg. 2021 Oct;76:59-65. doi: 10.1016/j.avsg.2021.03.006.

Lin CH, Consuegra MDL, Lin TS. Revisiting Management Strategies for Popliteal Artery Injuries. Ann Plast Surg. 2022 Mar 1;88(1s Suppl 1):S44-S49. Nelson, JA, JP Fischer, R Grover, SJ Kovach, DW Low, SK Kanchwala, LS Levin, JM Serletti, and LC Wu, 2015, Vein grafting your way out of trouble: Examining the utility and efficacy of vein grafts in microsurgery, Journal of Plastic, Reconstructive & Aesthetic Surgery, 68(6):830-836.

Perler, B, C Vander Kolk, C Dufresne, and G Williams, 1991, Can infected prosthetic grafts be salvaged with rotational muscle flaps?, Surgery, 110(1):30-34.

Rasmussen T, Stockinger Z, Antevil J, White C, Fernandez N, White J, White P. Joint Trauma System Clinical Practice Guideline: Vascular Injury. 12 August 2016. https://jts.health.mil/assets/docs/cpgs/Vascular_Injury_12_Aug_2016_ID46.pdf

Rayamajhi S, Murugan N, Nicol A, Edu S, Klopper J, Naidoo N, Navsaria P. Penetrating femoral artery injuries: an urban trauma centre experience. Eur J Trauma Emerg Surg. 2019 Oct;45(5):909-917.

Rehman ZU. Outcomes of Popliteal Artery Injuries Repair: Autologous Vein versus Prosthetic Interposition Grafts. Ann Vasc Surg. 2020 Nov;69:141-145.

Reilly B, Khan S, Dosluoglu H, Harris L, O'Brien-Irr M, Lukan J, Dryjski M, Blochle R. Comparison of Autologous Vein and Bovine Carotid Artery Graft as a Bypass Conduit in Arterial Trauma. Ann Vasc Surg. 2019 Nov;61:246-253.

Rudström H, Bergqvist D, Ogren M, Björck M. Iatrogenic vascular injuries in Sweden. A nationwide study 1987-2005. Eur J Vasc Endovasc Surg. 2008 Feb;35(2):131-8.

Seeger, JM, 2000, Management of patients with prosthetic vascular graft infection, The American Surgeon, 66(2):166-177.

Sharrock AE, Tai N, Perkins Z, White JM, Remick KN, Rickard RF, Rasmussen TE. Management and outcome of 597 wartime penetrating lower extremity arterial injuries from an international military cohort. J Vasc Surg. 2019 Jul;70(1):224-232.

Stonko DP, Betzold RD, Abdou H, Edwards J, Azar FK, Elansary NN, Treffalls RN, Savidge SG, DuBose JJ, Feliciano DV, Morrison JJ; AAST PROOVIT Study Group. In-hospital outcomes in autogenous vein versus synthetic graft interposition for traumatic arterial injury: A propensity-matched cohort from PROOVIT. J Trauma Acute Care Surg. 2022 Feb 1;92(2):407-412.

Urrechaga E, Jabori S, Kang N, Kenel-Pierre S, Lopez A, Rattan R, Rey J, Bornak A. Traumatic Lower Extremity Vascular Injuries and Limb Salvage in a Civilian Urban Trauma Center. Ann Vasc Surg. 2022 May;82:30-40.

Vertrees A, Fox CJ, Quan RW, Cox MW, Adams ED, Gillespie DL. The use of prosthetic grafts in complex military vascular trauma: a limb salvage strategy for patients with severely limited autologous conduit. J Trauma. 2009 Apr;66(4):980-3.

Watson JD, Houston R 4th, Morrison JJ, Gifford SM, Rasmussen TE. A retrospective cohort comparison of expanded polytetrafluorethylene to autologous vein for vascular reconstruction in modern combat casualty care. Ann Vasc Surg. 2015;29(4):822-9. doi: 10.1016/j.avsg.2014.12.026.Wilson, SE, 2001, New alternatives in management of the infected vascular prosthesis, Surgical infections, 2(2):171-177.

Zeltsman, D, CD Tzarnas, and MD Kerstein, 1999, Management of vascular prosthetic infections: results of long-term follow-up, The American surgeon, 65(4):331-333.

# 13. Appendices

## 13.1 Appendix 1. Mangled Extremity Severity Score (MESS)

**Table 40. Mangled Extremity Severity Score (MESS)**

| Characteristic | Points |
|---|---|
| Skeletal/soft tissue injury | |
| Low energy (stab; simple fracture; "civilian" GSW) | 1 |
| Medium energy (open or multiple fractures, dislocation) | 2 |
| High energy (close-range shotgun or "military" GSW, crush injury) | 3 |
| Very high energy (above+ gross contamination, soft-tissue avulsion) | 4 |
| Limb ischemia | |
| Pulse reduced or absent but perfusion normal | 1* |
| Pulseless; paresthesia, diminished capillary refill | 2* |
| Cool, paralyzed, insensate, numb | 3* |
| Shock | |
| Systolic BP always > 90 mm Hg | 0 |
| Hypotensive transiently | 1 |
| Persistent hypotension | 2 |
| Age (years) | |
| < 30 | 0 |
| 30 – 50 | 1 |
| > 50 | 2 |

Source: JOHANSEN, KAJ M.D., Ph.D.; DAINES, MICHAEL M.D.; HOWEY, THOMAS M.D.; HELFET, DAVID M.D.; HANSEN, SIGVARD T. Jr. M.D.. Objective Criteria Accurately Predict Amputation following Lower Extremity Trauma. The Journal of Trauma: Injury, Infection, and Critical Care 30(5):p 568-573, May 1990. [Table 2]
*Score doubled for ischemia > 6 hours
Abbreviations: BP = blood pressure, GSW = gunshot wound, mm Hg = millimeters mercury

## 13.2 Appendix 2. Abbreviated Injury Score (AIS)

**Table 41. Abbreviated Injury Score (AIS)**

| AIS Severity Score | Injury Severity Description |
|---|---|
| 1 | Minor |
| 2 | Moderate |
| 3 | Serious, not life threatening |
| 4 | Severe, life-threatening |
| 5 | Critical, survival uncertain |
| 6 | Maximum (untreatable) |

Source: Gennarelli, TA; Wodzin, E. AIS 2005: A contemporary injury scale. Injury 37(12):pp 1083-1091, 2006.
Abbreviations: AIS = abbreviated injury score

# EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2023**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-39532**

# Humacyte, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **85-1763759** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2525 East North Carolina Highway 54**<br>**Durham, NC** | **27713** |
| (Address of principal executive offices) | (Zip code) |

**(919) 313-9633**
(Registrant's telephone number, including area code)

Securities registered pursuant to 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **HUMA** | **The Nasdaq Stock Market LLC** |
| **Redeemable Warrants, each whole warrant exercisable for one share of Common Stock at an exercise price of $11.50** | **HUMAW** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 30, 2023, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of common stock held by non-affiliates of the registrant was approximately $178.2 million (based on the closing price of the registrant's common stock as reported on The Nasdaq Global Select Market on that date).

As of March 21, 2024, 119,083,728 shares of common stock, par value $0.0001, were issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Proxy Statement relative to the 2024 Annual Meeting of Shareholders are incorporated by reference in Part III hereof.

**Table of Contents**

| | | Page No. |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 57 |
| Item 1B. | Unresolved Staff Comments | 92 |
| Item 1C. | Cybersecurity | 92 |
| Item 2. | Properties | 93 |
| Item 3. | Legal Proceedings | 93 |
| Item 4. | Mine Safety Disclosures | 93 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 94 |
| Item 6. | [Reserved] | 94 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 94 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 106 |
| Item 8. | Financial Statements and Supplementary Data | 107 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 144 |
| Item 9A. | Controls and Procedures | 144 |
| Item 9B. | Other Information | 144 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 144 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 145 |
| Item 11. | Executive Compensation | 145 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 145 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 145 |
| Item 14. | Principal Accountant Fees and Services | 145 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | 146 |
| Item 16. | Form 10-K Summary | 149 |
| **SIGNATURES** | | 150 |

## FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements that involve substantial risks and uncertainties. "Forward-looking statements," as that term is defined in the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act") are statements that are not historical facts and involve a number of risks and uncertainties. These statements include, without limitation, statements regarding the financial position, business strategy and the plans and objectives of management for future operations. These statements constitute projections, forecasts and forward-looking statements, and are not guarantees of performance. Such statements can be identified by the fact that they do not relate strictly to historical or current facts. When used therein, words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "strive," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Such statements are based on the beliefs of, as well as assumptions made by and information currently available to, our management.

Forward-looking statements may include, for example, statements about:

- our plans and ability to execute product development, process development and preclinical development efforts successfully and on our anticipated timelines;
- our plans and ability to obtain marketing approval from the United States ("U.S.") Food and Drug Administration ("FDA") and other regulatory authorities, including the European Medicines Agency ("EMA"), for our bioengineered human acellular vessels ("HAVs") and other product candidates;
- the outcome of the FDA's review of our Biologics License Application ("BLA") seeking approval of the HAV in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated and when autologous vein use is not feasible;
- our ability to design, initiate and successfully complete clinical trials and other studies for our product candidates and our plans and expectations regarding our ongoing or planned clinical trials, including for our V007 and V012 Phase 3 clinical trials;
- the outcome of our ongoing discussions with the FDA concerning the design of our clinical trials;
- our anticipated growth rate and market opportunities;
- the potential liquidity and trading of our securities;
- our ability to raise additional capital in the future;
- our ability to use our proprietary scientific technology platform to build a pipeline of additional product candidates;
- the characteristics and performance of our HAVs;
- our plans and ability to commercialize our HAVs and other product candidates, if approved by regulatory authorities;
- the expected size of the target populations for our product candidates;
- the anticipated benefits of our HAVs relative to existing alternatives;
- our assessment of the competitive landscape;
- the degree of market acceptance of HAVs, if approved, and the availability of third-party coverage and reimbursement;
- our ability to manufacture HAVs and other product candidates in sufficient quantities to satisfy our clinical trial and commercial needs;
- our expectations regarding our strategic partnership with Fresenius Medical Care Holdings, Inc. ("Fresenius Medical Care") to sell, market and distribute our 6 millimeter HAV for certain specified indications and in specified markets;
- the performance of other third parties on which we rely, including our third-party manufacturers, our licensors, our suppliers and the organizations conducting our clinical trials;

- our ability to obtain and maintain intellectual property protection for our product candidates as well as our ability to operate our business without infringing, misappropriating or otherwise violating the intellectual property rights of others;
- our ability to maintain the confidentiality of our trade secrets, particularly with respect to our manufacturing process;
- our compliance with applicable laws and regulatory requirements, including FDA regulations, healthcare laws and regulations, and anti-corruption laws;
- our ability to attract, retain and motivate qualified personnel and to manage our growth effectively;
- our future financial performance and capital requirements;
- our ability to implement and maintain effective internal controls; and
- the impact of the overall global economy and increasing interest rates and inflation on our business.

We caution readers not to place undue reliance on any such forward-looking statements, which speak only as of the date they are made. Any forward-looking statements are based on information current as of the date of this Annual Report on Form 10-K and speaks only as of the date on which such statement is made. Actual events or results may differ materially from the results, plans, intentions or expectations anticipated in these forward-looking statements as a result of a variety of factors, many of which are beyond our control. More information on factors that could cause actual results to differ materially from those anticipated is included from time to time in our reports filed with the Securities and Exchange Commission (the “SEC”), including, but not limited to, those described in the sections of this Annual Report on Form 10-K titled “Risk Factors” and “Management’s Discussion and Analysis of Financial Condition and Results of Operations.” We disclaim any obligation, except as specifically required by law, to publicly update or revise any such statements to reflect any change in our expectations or in events, conditions or circumstances on which any such statements may be based, or that may affect the likelihood that actual results will differ from those set forth in the forward-looking statements.

# PART I

## Item 1. Business

### Business Overview

***Executive Summary***

Humacyte, Inc. is pioneering the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs and organ systems with the goal of improving the lives of patients and transforming the practice of medicine. We believe our regenerative medicine technology has the potential to overcome limitations in existing standards of care and address the lack of significant innovation in products that support tissue repair, reconstruction and replacement. We are leveraging our novel, scalable technology platform to develop proprietary, bioengineered, acellular human tissues for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

We are initially using our proprietary, scientific technology platform to engineer and manufacture Human Acellular Vessels™, or HAVs™. Our investigational HAVs are designed to be easily implanted into any patient without inducing a foreign body response or leading to immune rejection. We are developing a portfolio, or "cabinet", of HAVs with varying diameters and lengths. The HAV cabinet would initially target the vascular repair, reconstruction and replacement market, including vascular trauma, arteriovenous ("AV") access for hemodialysis, and peripheral artery disease ("PAD"). We are also developing the HAV for coronary artery bypass grafting ("CABG") and pediatric heart surgery. Over the longer term, we are developing our HAV for the delivery of cellular therapies, including pancreatic islet cell transplantation to treat Type 1 diabetes (our BioVascular Pancreas™ or "BVP"). We will continue to explore the application of our technology across a broad range of markets and indications including the development of urinary conduit, trachea, esophagus and other novel cell delivery systems.

For the HAV, we believe there is substantial clinical demand for safe and effective vascular conduits to replace and repair blood vessels throughout the body. Vascular injuries resulting from trauma are common in civilian and military populations, frequently resulting in the loss of either life or limb. Existing treatment options in the vascular repair, reconstruction and replacement market include the use of autologous vessels and synthetic grafts, which we believe suffer from significant limitations. For example, the use of autologous veins to repair traumatic vascular injuries can lead to significant morbidity associated with the surgical wounds created for vein harvest and prolonged times to restore blood flow to injured limbs, leading to an increased risk of complications such as amputation and reperfusion injury. In addition, in many instances of vascular trauma the patient may not have adequate vein available, or the time between injury and treatment is too long, to make autologous graft repair feasible. Synthetic grafts are often contraindicated in the setting of vascular trauma due to higher infection risk that can lead to prolonged hospitalization and limb loss. Given the competitive advantages our HAVs are designed to have over existing vascular substitutes, we believe that HAVs have the potential to become the standard of care and lead to improved patient outcomes and lower healthcare costs.

As of December 31, 2023, our HAVs have been implanted in approximately 573 patients. We and our collaborators are currently conducting Phase 3 and Phase 2 trials of our 6 millimeter HAV across three therapeutic indications: vascular trauma, AV access for hemodialysis and PAD. We were granted Fast Track designation by the FDA for our 6 millimeter HAV for use in AV access for hemodialysis in 2014. We also received the first Regenerative Medicine Advanced Therapy ("RMAT") designation from the FDA, for the creation of vascular access for performing hemodialysis, in March 2017. In May 2023, we were granted the RMAT designation for the HAV for urgent arterial repair following extremity vascular trauma. In addition, in 2018 our HAV product candidate was assigned a priority designation by the Secretary of Defense under Public Law 115-92, enacted to expedite the FDA's review of products that are intended to diagnose, treat or prevent serious or life-threatening conditions facing American military personnel. In September 2023, we announced positive top line results from our V005 Phase 2/3 trial in vascular trauma, and in December 2023 we filed a BLA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible In February 2024, the FDA accepted the BLA filing and granted Priority Review and set a Prescription Drug User Fee Act ("PDUFA") date, the FDA action date for its regulatory decision regarding the BLA, of August 10, 2024. In April 2023, we announced completion of enrollment of our V007 Phase 3 trial of the HAV for use in AV access for hemodialysis. Upon anticipated completion of our V007 Phase 3 trial in 2024, and dependent upon clinical results, we intend to submit a BLA supplement to the FDA for an indication in AV access for hemodialysis.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 179 of 674

We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. We have an 83,000 square foot bioprocessing facility housing our modular manufacturing process with the ability to manufacture HAVs of different diameters and lengths at commercial scale. As we continue to expand production, we believe we will have the ability to take advantage of economies of scale to reduce costs of production. We believe our established, controlled manufacturing process demonstrates a significant competitive advantage in the regenerative medicine market.

Our technology is protected by our patent portfolio, which includes certain patents licensed from parties as well as intellectual property generated internally at Humacyte. Our patent portfolio is comprised of 18 families of patents, many of which generally relate to the scaffolds used to make our vessels, the composition of our vessels and systems and methods of manufacturing our vessels. For more information, see "— Intellectual Property" below.

We intend to continue to shape our commercial and distribution strategy by indication and pursue collaborations with partners in markets where such partners provide strategic opportunities in launching our product candidates and enabling access to specific patient populations.

Our world-class senior management team and board of directors will be instrumental in helping us achieve our goals. Our President and Chief Executive Officer, Laura Niklason M.D., PhD., who founded Legacy Humacyte (as defined below), is an internationally respected physician scientist and a world leader in regenerative medicine technologies. Dr. Niklason is also a member of three national academies — Inventors, Medicine and Engineering. Our current Chairman of the Board is Kathleen Sebelius, the former Secretary of the Department of Health and Human Services ("HHS"), and the former Governor of Kansas.

***Merger***

On August 26, 2021 (the "Closing Date"), Humacyte, Inc. ("Legacy Humacyte"), a Delaware corporation, and Alpha Healthcare Acquisition Corp. ("AHAC"), a Delaware corporation, consummated a merger pursuant to that certain Business Combination Agreement, dated as of February 17, 2021 (the "Merger Agreement"), by and among Legacy Humacyte, AHAC and Hunter Merger Sub ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of AHAC. As contemplated by the Merger Agreement, Merger Sub merged with and into Legacy Humacyte, with Legacy Humacyte continuing as the surviving corporation and as a wholly owned subsidiary of AHAC (the "Merger" and collectively with the other transactions described in the Merger Agreement, the "Reverse Recapitalization"). On the Closing Date, AHAC changed its name to Humacyte, Inc. and Legacy Humacyte changed its name to Humacyte Global, Inc.

Unless the context indicates otherwise, references in this Annual Report on Form 10-K to the "Company," "Humacyte," "we," "us," "our" and similar terms refer to Humacyte, Inc. (formerly known as Alpha Healthcare Acquisition Corp.) and its consolidated subsidiaries (including Humacyte Global, Inc.) following the Merger. References to "AHAC" refer to Alpha Healthcare Acquisition Corp. prior to the Merger.

***Our Approach***

We have developed an approach that relies on two key complementary elements to address the significant market opportunity for the global treatment of patients in need of vascular replacement, repair and reconstruction, vascular access for dialysis and potential future indications including complex tissue and organ replacement and treatment of Type-1 diabetes:

- our proprietary scientific and engineering technology platform allows us to grow human tissues, which are ultimately decellularized and therefore expected to be non-immunogenic and universally implantable; and

- our novel, scalable manufacturing paradigm is designed to allow us to produce thousands of HAVs per year at the time of commercial launch, with the ability to expand manufacturing capacity and breadth to meet expected future global demand and the planned expansion of our pipeline of product candidates.

In the first employment of these platform and manufacturing approaches, we intend to develop a readily available "cabinet" of HAVs of varying diameters and lengths to address the significant unmet needs across multiple potential indications in vascular repair, reconstruction and replacement.

***Our Proprietary Scientific Technology Platform***

Our proprietary scientific technology platform uses primary human aortic vascular cells from a working cell stock, isolated from donor tissues and cryopreserved. The working cell stock is expanded using traditional cell culture techniques, and the cells are transferred onto a biocompatible, biodegradable polymer mesh within a flexible, single-use bioreactor bag. Over the course of weeks, the cells proliferate and build extracellular matrix while the polymer mesh degrades. The resulting bioengineered vessel is comprised of the aortic vascular cells and their deposited extracellular matrix. After completion of the culture period, we decellularize the bioengineered vessel using a proprietary combination of solutions. The resulting HAV retains the extracellular matrix constituents and, therefore, the biomechanical properties of the bioengineered vessel, but is cleansed of the cells and cellular components that could induce a foreign body response or immune rejection following implantation. Our functionally closed system allows for the HAV to be grown, decellularized and ultimately shipped within the same flexible bioreactor bag. Our HAVs are designed to be shipped to hospitals, trauma centers and outpatient surgical settings, where they can then be stored at refrigerated temperatures for immediate use by removing each HAV from its packaging.

The following image summarizes key information about our proprietary scientific technology platform:




***Our Novel Manufacturing Paradigm***

We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. Our proprietary manufacturing process was designed with a modular approach allowing us to produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing. The manufacturing system used to supply our clinical trials from 2016 to 2021, including our Phase 3 trials conducted during that time period, utilized a single tray within one growth drawer holding ten HAVs per batch. In 2021 we commenced supplying our ongoing clinical trials with HAVs produced in our current, commercial-scale LUNA200™ system, which consists of 20 growth drawers per production unit for a total of 200 HAVs per batch. Each growth drawer is capable of producing ten 42cm HAVs, each of which is contained within an individual bioreactor bag. Inside a LUNA200, a tubing network connects all HAVs, allowing the entire system to share nutritive media. In this way, a single LUNA200 can produce up to 200 HAVs (42cm in length) per batch while maintaining the critical operating parameters, such as biomechanical pulsing, that affect growth.

A thorough comparability assessment was performed to evaluate HAV batches produced in the single drawer system and used in Phase 3 studies versus the 20-drawer LUNA200 system. The study assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product. In this study, we observed that HAVs produced in the LUNA200 system were comparable to HAVs produced in the single-drawer system. Additionally, a crossover study, called V011, was conducted in 30 subjects to evaluate HAVs that were manufactured on Humacyte's commercial LUNA200 platform with the primary goal to evaluate the safety, efficacy and immunogenicity of the LUNA200-manufactured HAVs. In this trial we have observed comparable safety profile between HAV used in previous studies and the HAV manufactured in the LUNA200 commercial system. The results of the comparability assessment and the results from the V011 crossover study were submitted to the FDA. In 2021, the FDA authorized the use of HAVs produced in the commercial LUNA200 system to supply our ongoing clinical trials. We also plan to use the LUNA200 system to manufacture HAVs for anticipated commercial launch of the HAV if it is approved.

Our current 83,000 square foot manufacturing facility has space to further expand manufacturing capacity as needed to over 40 LUNA200 systems. Currently, eight LUNA200 systems are installed and operational.




We believe that the LUNA200 can produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline. We currently intend to introduce a 13cm-long HAV line extension after the commercial launch of the 42cm HAV for surgeries that require shorter segments of HAV in the setting of vascular trauma and repair. Using our existing LUNA200 manufacturing equipment without modification, we believe we have the ability to generate 400 HAVs (13cm in length) or 200 HAVs (42cm in length) per manufactured batch. We have designed our manufacturing system to be functionally closed, to utilize single-use disposable materials with aseptic connections, and to be fully automated, which allows us to control and maximize HAV production.

Based on observations to date, the HAV has withstood maximal pressures that are comparable to those reported for native arteries. For example, the human aorta is reported to have rupture strengths around 1,400 mmHg, while human cerebral arteries rupture around 1,800 mmHg. We have observed HAVs withstanding maximal pressures of approximately 3,200 mmHg before rupturing, making their mechanical properties on par with native human blood vessels.

***Our Market Opportunity***

We are a biotechnology company with Phase 3 clinical trials in two indications and a strong pipeline for additional products and indications. Additionally, we have had significant interest from surgeons to use our HAV in life and limb saving surgeries as demonstrated by their requests to the FDA to use our HAV in multiple expanded access (compassionate use) cases where no alternative was available, as well as requests from Ukrainian surgeons that led to a humanitarian program conducted during the conflict in that country.

*Our Initial Market Opportunity in Vascular Repair, Reconstruction and Replacement*

We believe there is a significant market opportunity for our technology across a number of important clinical areas within vascular reconstruction and replacement including vascular trauma, AV access for hemodialysis, PAD, and adult cardiac surgery. To treat these diseases and conditions, patients often require invasive vascular and cardiovascular surgery, which involves the use of alternative vascular synthetic materials or autologous vessels harvested from elsewhere in the body. For more information about our evaluation of market opportunity, see "Risk Factors — Risks Related to the Development and Commercialization of Our Product Candidates — The sizes of the market opportunities for our product candidates have not been established with precision and are estimates that management believes to be reasonable. If these market opportunities are smaller than we estimate or if any approval that we obtain is based on a narrower definition of the relevant patient population, our revenue and ability to achieve profitability might be materially and adversely affected."




<u>Vascular Trauma</u>: Arterial injuries resulting from vascular trauma are common in military and civilian populations, frequently resulting in the loss of life or limb. In military populations, as the rate of battlefield fatalities has been declining due to faster evacuations and more robust protection from body armor, the rate of survivable vascular injuries has been increasing. In civilian populations, trauma injuries are primarily caused by motor vehicle, workplace and sporting accidents, gun violence, mass casualty terrorist attacks, stabbings, blunt trauma, and iatrogenic injuries (injuries caused by medical treatment or examination). We estimate that central or peripheral vascular injuries in civilian patients account for approximately 150,000 of all injuries reported in global trauma patients. Furthermore, these injuries account for greater than 20% of all trauma-related deaths.

Civilian patients with central or peripheral vascular injuries are estimated to account for approximately 80,000 of all injuries reported in trauma patients in the United States, inclusive of urgent and iatrogenic vascular trauma injuries, and account for greater than 20% of all trauma-related deaths. Based on an analysis of the Definitive Healthcare Claims (DHC) Database 2023, we estimate that approximately 26,000 patients per year will be eligible for the HAV within the United States (analysis was based on inclusion of patients with major repairs to injuries of the extremities, and the exclusion of patients with vein injuries, injuries to the torso, head, neck, wrist, hand, ankle or foot, or who received ligation or endovascular repair).

We believe our HAVs will be a promising alternative that can address critical gaps in existing treatment options for acute vascular injuries due to trauma. We are developing our HAVs with the goal of providing an effective solution in all time-constrained surgical environments and in resource-limited, infection prone battlefield conditions. The ability to provide immediately available, non-immunogenic, universally implantable human vessels that are less susceptible to infection represents a clinically significant advantage over existing treatment options.

<u>AV Access for Hemodialysis</u>: An estimated $5 to $6 billion per year is spent on hospital admissions in hemodialysis patients with infection and access complications. In 2022, there were over 565,000 patients receiving hemodialysis in the United States. Annually, at

least 160,000 existing or new dialysis patients require a new AV access in the U.S. and an additional 150,000 patients require a new AV access in Europe and Japan.

Hemodialysis patients are a chronically ill population, suffering an average of 1.8 hospital admissions, three visits to the emergency department, and four days hospitalized for infections each year. The two most common causes of hospital admissions in hemodialysis patients are infection and access complications. For hemodialysis patients, an infected access site can lead to sepsis, a life-threatening complication that is the most expensive cause for hospitalization in the United States and carries at least a 10% overall mortality rate.

We believe that our HAVs, when used as AV access for hemodialysis, can decrease infections and dialysis access failures, which would improve patient outcomes and lower the burden of dialysis costs on the healthcare system. We expect to file a BLA with the FDA, seeking approval for the use of HAV in AV access for hemodialysis, and to target our commercialization efforts particularly toward those patients who are at high risk of fistula failure or non-maturation, or for those patients at high risk of vascular access infection.

Peripheral Artery Disease (PAD): PAD is a cardiovascular disease of blood vessels located outside the brain and heart. PAD occurs when plaque builds up in arteries that carry blood to the head, organs, and limbs. PAD usually affects arteries in the legs, but it can also affect arteries that carry blood from the heart to the head, arms, kidneys, and stomach. We believe our HAVs can be used as a bypass conduit in patients with PAD. Peripheral arterial bypass procedures are common with over 230,000 PAD related procedures reported annually in the U.S. Annual peripheral bypass procedures are over 200,000 per year in Europe, and approximately 220,000 per year in Asia.

While endovascular techniques have become more available over the past ten years to treat an array of vascular occlusions, depending on the nature and length of the blockage these types of treatment options have met with both mixed success and durability compared to conventional surgical bypass. Both angioplasty and stenting procedures provide near term success, however long-term durability has remained a question, as highlighted in the results of the recent BEST-CLI clinical trial published in the *New England Journal of Medicine* demonstrating that patients treated with surgical bypass had fewer major amputations and less need for repeat procedures than those treated with endovascular therapy.

Type I Diabetes: Type 1 diabetes, caused by auto-immune destruction of insulin-producing cells in the islets of the pancreas, is a devastating disease affecting more than 1.7 million people in the United States, and costing at least $10 billion to $14 billion annually. In the EU4 (France, Germany, Italy and Spain) and the UK, the number of patients suffering with Type 1 diabetes is estimated at approximately 1.5 million. Even with the newer insulin delivery technologies, less than one-third of patients achieve consistent target blood sugar levels.

Pancreas transplantation is limited due to the associated morbidity and cost of the whole pancreas organ transplantation procedure. As an alternative to pancreas transplantation, the “Edmonton Protocol” has been developed whereby insulin producing cells are transplanted into the portal vein in the liver. However, the majority of the injected cells are lost to inflammation and clotting, and only 16% of Type 1 diabetes patients who receive the Protocol are cured long term.

We believe our HAVs present a means to deliver a therapeutic number of pancreatic islets to patients with Type 1 diabetes. Pancreatic islets are embedded on the outer surface of our HAV and implanted as an AV graft, analogous to the outpatient procedure done for hemodialysis access. After implantation, the islets have the potential to sense blood glucose and then respond by secreting appropriate levels of insulin to maintain proper glucose levels in the blood. We have termed this new paradigm for pancreatic islet cell delivery the “Biovascular Pancreas (BVP).”

We believe that a reliable, low-risk, and easily implantable islet cell delivery method that could ensure the survival and functionality of a therapeutic number of islet cells in a human adult would be transformational for the treatment of Type 1 diabetes.

Coronary Artery Bypass Graft (“CABG”): CABG is a surgery used to treat a blockage or narrowing of one or more of the coronary arteries to restore the blood supply to the heart muscle. We believe our HAVs can replace existing vascular substitutes and improve patient outcomes, particularly in obese patients or those suffering from diabetes, in whom the risks of saphenous vein harvesting are more substantial. CABG procedures are common, with more than 200,000 CABG procedures reported annually in the U.S. and over 765,000 annual CABG procedures globally.

Typically, a CABG operation involves the use of both the patient’s own artery and vein. In patients who are obese, have diabetes, or who are very elderly, there are higher risks for vein harvest complications, including failure to heal the vein harvest incision, infection, and prolonged swelling of the operative leg. Furthermore, complications from the vein harvest incision site are more common than complications from the chest incision in CABG patients. It is estimated that approximately 20% of patients requiring

bypass surgery have no suitable grafts available, with sources reporting as high as 45% of CABG patients are without suitable autologous vein.

Pediatric Heart Surgery: We have evaluated in preclinical testing a smaller diameter HAV product for use in pediatric heart surgery as a Blalock Taussig (“BT”) shunt. The BT shunt is a surgical procedure that is used to increase pulmonary blood flow for the treatment of babies born with a complex congenital heart defect called Tetralogy of Fallot, a common type of “blue baby syndrome”. In 2022, there were 3.7 million babies born in the United States and approximately 1,500 to 2,000 of these babies were born with Tetralogy of Fallot. The BT shunt is a life-saving procedure for these babies, and we plan to submit an orphan drug application for use of our HAV as a BT shunt for infants born with cyanotic congenital heart defects. Although 3 – 4mm inner diameter expanded polytetrafluoroethylene (“ePTFE”) grafts are currently used as the most common BT shunt, they suffer from limitations that impact morbidity and mortality in these infants.

***Our Clinical and Pre-Clinical Stage Product Pipeline***

The following table highlights key information about the most active programs within our current product pipeline:




We began clinical evaluations of our HAVs in December 2012, with the enrollment of the first Phase 2 patient in our V001 hemodialysis access trial in Europe. Since then, we have completed one pivotal and one Phase 2 trial in the United States, and currently have seven trials either actively enrolling or in long-term follow-up. HAVs have been implanted in approximately 85 clinical centers in seven countries around the world, and by more than 100 practicing surgeons.

*Overview of Clinical Trials Assessing the Safety and Efficacy of the HAV in Multiple Indications*

| Clinical Trial Number | Indication | Begin Enrollment | Design/Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| **Vascular Trauma** | | | | | | |
| V005 | Vascular Trauma | 2018 | Phase 2/3 Single-arm Historical Comparator Unblinded | 72 total. Primary analysis based on a total of 51 patients with injuries of extremities | BLA under review by FDA | 30-day PP: 84.3%<br>30-day SP: 90.2%<br>Infection Rate: 2.0%<br>Amputation Rate: 9.8% |
| V017 | Vascular Trauma | 2022 | Retrospective observational study to evaluate the HAV in real-world setting of humanitarian program conducted during wartime in Ukraine | 19 total treated under humanitarian program. 17 consented for inclusion in study, 16 of whom had injuries of extremities and were included in primary analysis | Included in BLA submission | 30-day PP: 93.8%<br>30-day SP: 93.8%<br>Infection Rate: 0%<br>Amputation Rate: 0% |
| **Dialysis Access** | | | | | | |
| V001 | Dialysis Access | 2012 | Phase 2 Single-arm | 40 | 10-year follow-up ongoing | 30-day PP: 95%<br>6-month SP: 100%<br>12-month SP: 97%<br>60-month SP: 58%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V003 | Dialysis Access | 2013 | Phase 2 Single-arm | 20 | Complete 2-year follow-up | 30-day PP: 95%<br>6-month SP: 89%<br>12-month SP: 81%<br>Infection Rate/yr: 4% (1 event)<br>Number of Rejections: 0 |
| V006 | Dialysis Access | 2016 | Phase 3 Prospective Randomized Blinded | 355 total; 177 received HAV 178 received ePTFE | 5-year follow-up in process | 30-day PP HAV: 93%<br>12-month SP HAV: 82%<br>24-month SP HAV: 67%<br>12-month SP ePTFE: 80%<br>24-month SP ePTFE: 74%<br>Infection Rate HAV/yr: 0.93%<br>Infection Rate ePTFE/yr: 4.5%<br>Number of HAV Rejections: 0 |
| V007 | Dialysis Access | 2017 | Phase 3 Prospective Randomized Blinded | 242 total | Enrollment completed April 2023 | Trial is currently in 12-month follow up |
| V011 | Dialysis Access | 2019 | Phase 2 (LUNA200 Manufacturing System Bridging Study) | 30 | 3-year follow-up ongoing | 30-day PP: 97%<br>30-day SP: 100%<br>12-month SP: 83%<br>Infection Rate HAV/yr: 0%<br>Number of HAV Rejections: 0 |
| V012 | Dialysis Access | 2023 | Phase 3 Prospective Randomized Blinded | Target 150 women total | Enrollment ongoing | Trial is currently enrolling |
| **Peripheral Artery Disease** | | | | | | |
| V002 | PAD | 2013 | Phase 2 Single-arm | 20 | 10-year follow-up ongoing | 30-day PP: 100%<br>6-month SP: 84%<br>12-month SP: 84%<br>72-month SP: 60%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V004 | PAD | 2016 | Phase 2 Single-arm | 15 | Completed | 30-day PP: 100%<br>6-month SP: 86%<br>12-month SP: 64%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0<br>Number of Amputations: 0 |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

As of December 31, 2023, approximately 573 patients worldwide have received our HAVs for the treatment of vascular trauma, AV access for hemodialysis, PAD, and in expanded access cases resulting in approximately 1,203 subject-years of exposure to the HAV. Our cumulative HAV exposure is approximately 945 subject-years in the hemodialysis access population, 158 subject-years in the PAD population, and 100 subject-years in the arterial trauma population. The longest our HAV has been in a patient and used for dialysis is more than ten years and there have been more than 113,000 estimated dialysis sessions using our HAVs. A total of 27 expanded access/compassionate use cases have been granted by the FDA, and another 28 patients with severe PAD have been treated with the HAV under an investigator IND at the Mayo Clinic. Lastly, 19 patients suffering vascular injuries during the conflict in Ukraine have been treated with the HAV under a humanitarian program. Throughout all of these trials and other programs, we have observed that our HAVs functioned as intended and provided functional blood flow to affected limbs. We have also observed consistent durability with a strong tolerability profile. Furthermore, we have observed no evidence of clinically relevant immunologic reactions to our HAVs, supporting the potential use of our HAVs as off-the-shelf, universally implantable, bioengineered human tissues.

Overall, the HAV has functioned well and as intended, across ten different clinical trials in three clinical indications. The HAV has been implanted in approximately 573 patients, across more than 85 clinical sites in seven countries, over more than ten years (as of December 31, 2023). Rates of primary and secondary patency were similar across trial designs and disease states, with 30-day primary patency ranging from 84% – 100%. Six-month secondary patency ranges from 84% – 100%, and 12-month secondary patency ranges from 81% – 97%, across multiple clinical trials, disease states, and patient age ranges and demographics.

We have observed zero instances of clinical rejection of the HAV in any clinical trial over the past ten years, suggesting that the HAV was not immunologically rejected after implantation.

Based on clinical trial results to date, we have observed that the HAVs were highly resistant to infection, with an infection rate averaging approximately 1.0% per patient-year in our AV access trials, and low infection rates currently in our trauma and PAD trials. Vascular graft infections are a potentially serious complication and can result in adverse outcomes such as sepsis, hospitalization, long-term antibiotic use, repeat procedures and even death.

*HAVs Remodel with Host Cells After Implantation*

Additionally, based on clinical samples obtained during our Phase 2 AV access trials and published in three peer reviewed journals, *The Lancet* in 2016, *Science Translational Medicine* in 2019, and in the *Journal of Vascular Surgery* in 2020, we observed that the HAV became populated with healthy, vascular cells from the patient. As described in these publications, over time the patient's cells have been observed to transform the HAV into a multi-layered living tissue similar to native blood vessels. In these trials we have also observed ongoing cellular repair of HAV tissues that had been previously injured during cannulation with dialysis needles, which suggests that the recellularized HAV may be capable of self-healing. The image below shows an HAV that had been implanted in a hemodialysis patient for 44 weeks, that had developed alpha-actin positive vascular smooth muscle cells throughout the wall (red staining in the left-hand panel), and had developed a layer of CD31+ endothelial cells on the inner luminal surface of the HAV (line of red endothelial cells indicated in the right-hand panel).

*Histological Images of HAV Repopulated with the Patient's Own Vascular Cells*



*HAVs Resistance to Infection*

In July 2023, a preclinical study that supported a possible scientific basis for the low rates of infection that have been observed in clinical trials of the HAV was published in the *Journal of Vascular Surgery – Vascular Science*. This work compared the infection resistance of the HAV to ePTFE grafts, which are made of plastic. The laboratory results suggest that the bioengineered human tissue of the HAV may have superior compatibility with the body's own white blood cells as compared to ePTFE. Histology performed in the preclinical study suggests that while human white blood cells die when they come in contact with ePTFE, the cells survive and function in contact with the HAV, which may improve the ability of the HAV to fight dangerous infections once implanted in the body.

*Existing Options for Surgical Treatment of Vascular Disease Are Not Sufficient*

The table below contains a summary of the efficacy of autologous veins, ePTFE grafts, cryopreserved human cadaveric veins, and preserved bovine veins. For the treatment of vascular trauma, saphenous vein presents challenges in terms of time to procure the vein, and ePTFE grafts carry extremely high infection rates: 24% – 29% per patient year in the studies below. Similarly, autogenous fistulas and ePTFE grafts for dialysis access have low functional patencies at six and 12 months, and ePTFE is burdened with high rates of annual infection: 3% – 17% in the studies below. Both cryopreserved human cadaver vein, and preserved bovine veins, have low patency at 12 months, and also suffer from high rates of aneurysm formation. Lastly, for bypass of PAD, vein has acceptable patency but is not available for all subjects, while ePTFE carries lower patencies and higher infection risk, and bovine vein becomes aneurysmal at unacceptably high rates.

*Published Studies in Vascular Surgery*

We derived the data in the table below from data contained in certain published papers on vascular trauma, hemodialysis and PAD between 2002 and the present. These data are from different studies and thus are not directly comparable. In addition, many of these papers reported on additional endpoints that are not included in the table below.

| Clinical Indication | Type of Conduit | Year | Number of Patients | Published Secondary Patency Outcome | Infection (per patient-year) | Rejection Outcome |
|---|---|---|---|---|---|---|
| **Vascular Trauma** | Saphenous Vein (autologous) | 2002 – 2012 | 24 | 12 months: ~78% function | 4% | N/A |
| | | 2014 | 152 | 30 days: ~90% function | N/A | |
| | ePTFE (synthetic graft) | 2002 – 2012 | 25 | 12 months: ~50% function | 24% | N/A |
| | | 2005 | 14 of 95 | 30 days: ~79% function | 29% | |
| **Hemodialysis Access** | Fistula (autogenous) | Post-2005 | 2,800 | 12 months: 75% | 2% | N/A |
| | | 2019 | 14,892 | 6 months: 51% | N/A | |
| | | 2017 | 6,439 | N/A | 4% | |
| | | 2018 | 602 | 6 months: 61% | N/A | |
| | ePTFE (synthetic graft) | 2013 | 128 | 6 months: ~60% | N/A | N/A |
| | | 2019 | > 400 | N/A | 3% – 17% | |
| | | 2020 | > 3,000 | 12 months: 70% | 9% | |
| | Cryovein (cryopreserved human cadaver vein) | 2002 | 45 | 12 months: 80% | N/A | 100% |
| | | 2004 | 49 | 12 months: ~65% Aneurysm rate: 18% | 0% | ~100% |
| | Procol (bovine vein) | 2005 | 186 | 12 months: 66% Aneurysm rate: 3.2% | 5.3% | N/A |
| **PAD** | Saphenous Vein (autologous) | 2008 | 60 | 12 months: ~86% | N/A | N/A |
| | ePTFE (synthetic graft) | 2008 | 61 | 12 months: ~80% | N/A | N/A |
| | | 2013 | 101 | 12 months: 76% – 89% | N/A | |
| | | 2011 | 273 | 12 months: 81% | | |
| | | 2013 | 496 | N/A | 3.8% | |
| | Procol (bovine vein) | 2008 | 7 | 6 months: 50% 12 months: 50% Aneurysm Rate: 29% | N/A | N/A |

Table of Contents

***Proposed Indication #1: Use of HAV to Repair Vascular Trauma***

*Overview of Vascular Trauma*

Arterial injuries resulting from vascular trauma are common in military and civilian populations, frequently resulting in the loss of life or limb. In military populations, as the rate of battlefield fatalities has been declining due to faster evacuations and more robust protection from body armor, the rate of survivable vascular injuries has been increasing. In civilian populations, trauma injuries are primarily caused by motor vehicle, workplace and sporting accidents, gun violence, mass casualty terrorist attacks, stabbings, blunt trauma and iatrogenic injuries (injuries caused by medical treatment or examination). Consequently, we believe there is an increasingly urgent unmet need for novel materials that are immediately available for permanent vascular repair for both civilian and military vascular trauma.

*Options in Surgical Treatment of Vascular Trauma*




Autologous vein is the preferred conduit for vascular repair. However, harvesting of autologous vein is not always feasible, due to damage to vein or lower limb, prior vein harvest, inadequate size of the vein or venous disease. Harvesting autologous vein is a serious operation that requires additional time and resources. Delaying the time from injury to operative intervention from less than one hour, to three hours or greater, more than doubles the risk of limb amputation. Limb amputation, in turn, almost triples the length of intensive care unit stay, nearly doubles the length of hospital stay, and is devastating to patient quality of life. Additionally, the morbidity associated with saphenous vein harvest includes surgical site infections, chronic pain, and limb swelling. Synthetic materials have been shown to be inferior to autologous vein in resistance to infection and durability and, therefore, are generally only used for vascular repair when autologous vein is not an option.

*The HAV as a Solution for Vascular Trauma*

We believe our HAVs will be a promising alternative that can address critical gaps in existing treatment options for acute vascular injuries due to trauma. We are developing our HAVs with the goal of providing an effective solution in all time-constrained surgical environments and in resource-limited, infection prone battlefield environments. The ability to create immediately available, non-immunogenic, universally implantable material that is less susceptible to infection represents a clinically significant advantage over existing options.

Humacyte has a strong working relationship with the Department of Defense (“DoD”) that has led to a partnership over the last decade to support their unmet need to reconstruct and repair vascular injuries through the development of our HAVs. As a result of this collaboration and partnership with the DoD, we anticipate Humacyte would supply HAVs for use in military hospitals to treat injured soldiers and veterans. The DoD assigned a priority designation to the HAV technology under Public Law 115-92. Under this law, FDA and DoD work together to expedite the development and review of critical technologies and therapies requested by DoD. Additionally, we have received an approximately $6.8 million grant from the DoD for the continued development of our HAVs for vascular reconstruction and repair.

*Regulatory Status of HAV for Vascular Trauma*

In May 2023, the FDA granted RMAT designation for use of the HAV in urgent arterial repair following extremity vascular trauma. In December 2023, the Company filed a BLA with the FDA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible. The BLA submission is supported by results from the V005 Phase 2/3 clinical trial, and real-world outcomes from the treatment of wartime injuries in Ukraine, both of which are described below. In February 2024, the FDA accepted the BLA filing and granted Priority Review, setting a PDUFA date of August 10, 2024.

*V005 Phase 2/3 Trial for Vascular Trauma*

**Trial Design:** Our V005 trial is a single-arm, multi-center, non-randomized clinical trial to evaluate the efficacy, safety and tolerability of our 6 millimeter HAV in replacement or reconstruction of vascular tissues in patients with life or limb-threatening vascular trauma for whom the standard of care, saphenous vein, was not feasible or available for vascular repair. As a single-arm study, the comparators for the HAV results were systematic literature reviews and meta-analysis of studies evaluating synthetic grafts in vascular injury repair. A total of 72 patients were enrolled in the V005 trial, of which 51 had vascular injury of the extremities and comprised the primary evaluation group for the study. The primary efficacy endpoint was patency of the HAV at 30 days, with 30-day rates of infection and amputation comprising the secondary endpoints.

*Status of Phase 2/3 Trial of HAV in Vascular Trauma (as of December 31, 2023)*

| Clinical Trial Number | Indication | Begin Enrollment | Design/Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| V005 | Vascular Trauma | 2018 | Phase 2/3 Single-arm Historical Comparator Unblinded | 72 total. Primary analysis based on a total of 51 patients with injuries of extremities | BLA under review by FDA | 30-day PP: 84.3%<br>30-day SP: 90.2%<br>Infection Rate: 2.0%<br>Amputation Rate: 9.8% |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

**V005 Trial Results:**

For the primary analysis group of 51 patients with extremity injury, the range of trauma injuries in V005 were broad, including penetrating trauma cases and blunt injury cases. Mechanisms of injury included motor vehicle accidents, gunshot wounds, industrial accidents, and falls in the V005 trial. The HAVs were placed throughout the body, including in the lower limbs and upper limb and were used to repair the axillary artery, femoral artery, popliteal artery and vein, and the brachial artery. Many of the injuries treated in the V005 trial were contaminated injuries that are at elevated risk of graft infection.

The most common reasons reported by clinicians for using the HAV in the V005 trial instead of the standard of care, saphenous vein, was the need to avoid the time required to harvest saphenous vein (32.3%), the quality of the patient's vein (25.8%), and concomitant injuries to the vein (16.1%), suggesting that the ready, off-the-shelf feature of the HAV has the potential to save valuable time for surgeons in the restoration of blood flow.

As summarized in the table below, the V005 trial met its objectives, and the HAV was observed to have a higher 30-day secondary patency rate, lower amputation rate and lower rate of infection compared to that historically reported for synthetic grafts. Primary patency for the HAV could not be compared to synthetic grafts as this measure was not reported in the benchmark publications. V005 results included in the BLA submission to the FDA, and presented in November 2023 VEITHsymposium®, a major vascular surgery conference in New York City, are summarized in the following table.

*V005 Phase 2/3 HAV Results in Vascular Trauma Compared to Synthetic Graft Benchmark*

| 30-Day Endpoint | V005 Trial HAV Extremity Group (%) | Synthetic Graft Benchmark (%) |
|---|---|---|
| Primary Patency | 84.3% | Not reported |
| Secondary Patency | 90.2% | 78.9% |
| Conduit Infections | 2.0% | 8.4% |
| Amputations | 9.8% | 24.3% |

The safety profile of the HAV in the V005 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV. A summary of adverse events for the duration of the study (mean duration of follow up is 295 days) is included in the table below.

*V005 Phase 2/3 HAV Adverse Events*

| Adverse Event | V005 Trial - HAV Extremity Group (n=51) Number of Patients (%) |
|---|---|
| Total Adverse Events | 50 (98.0%) |
| Non-Fatal Serious Adverse Events | 28 (54.9%) |
| Deaths: | |
| At Day 30 | 3 (5.9%) |
| Over Duration of Study | 4 (7.8%) |
| HAV Infections | 2 (3.9%) |
| HAV Rupture | 1 (2.0%) |
| HAV Occlusion/Thrombosis | 15 (29.4%) |
| Pseudoaneurysm | 1 (2.0%) |
| Aneurysm | 1 (2.0%) |
| Other | 2 (3.9%) |

There were no unexpected safety signals for the HAV in the V005 trial. The most common adverse events were thrombosis, anemia, pyrexia, thrombocytopenia, constipation, nausea, peripheral edema, and tachycardia. The most common non-fatal Serious Adverse Events were thrombosis, anastomotic stenosis, wound infection, muscle necrosis, wound infection, hemorrhage shock, and cardiac arrest. Deaths occurring prior to day 30 were adjudicated as not casually related to the HAV by an Independent Adjudication Committee.

We believe the V005 trial results indicate that for patients in need of extremity arterial repair, when use of autologous vein was not suitable, and who were at high-risk level for wound infection, the HAV may offer an effective option for revascularization. A case study from the trial is shown in the figure below, a photograph of an HAV that was used to repair both an artery and a vein in the knee of a patient who suffered a gunshot wound. This patient was doing well at the 30-day follow-up visit with both repairs remaining patent and functional.

*Intra-operative photograph of HAV repair of popliteal artery (left) and vein (right) in V005 subject.*


vein
repair
artery
repair

*Ukraine Humanitarian Program, - V017 Trial*

**V017 Background and Results:**

In the second quarter of 2022, Humacyte launched a humanitarian initiative to provide its HAVs to hospitals in Ukraine for the treatment of wounded civilians and soldiers with vascular trauma injuries. Ukrainian surgeons presented patient outcomes from the use of the HAV to treat wartime vascular trauma at two vascular conferences in December 2022, the VI Congress of Vascular Surgeons, Phlebologists, and Angiologists of Ukraine in Kyiv, Ukraine, and the 11th Munich Vascular Conference (MAC) 2022. The surgeons described long-standing limitations in vascular tissue repair and replacement as well as the injuries that they have observed during the Russian-Ukrainian conflict. Surgeons utilized the HAV to treat patients with wartime injuries including blast trauma, shrapnel injuries, and gunshot wounds. The surgeons observed that access to the HAV, a biologic conduit, has improved their ability to perform vascular reconstructions by eliminating the need to harvest a venous conduit. A total of 19 vascular patients were treated under this humanitarian program, and results were presented at the Military Health System Research Symposium (MHSRS) conference in August 2023.

The FDA advised Humacyte to include in the BLA submission patient outcomes from the Ukraine humanitarian program. We refer to the results for the 16 patients from Ukraine with extremity vascular trauma who provided consent for use of their results in the BLA filing as the V017 trial. A high success rate for the 16 extremity patients in the V017 trial was observed, despite the presence of contaminated wound beds, as summarized in the table below.

*V017 Ukraine Humanitarian HAV Results in Vascular Trauma*

| 30-Day Endpoint | V017 Trial HAV Extremity Group (%) |
|---|---|
| Primary Patency | 93.8% |
| Secondary Patency | 93.8% |
| Conduit Infections | 0.0% |
| Amputations | 0.0% |

The safety profile of the HAV in the V017 trial was consistent with previous studies and there were no cases of clinical rejection of the HAV. A summary of adverse events for the duration of the study (mean duration of follow up is 139 days) is included in the table below.

*V017 Ukraine Humanitarian HAV Adverse Events*

| Adverse Event | V017 Trial - HAV Extremity Group (n=16) Number of Patients (%) |
|---|---|
| Total Adverse Events | 4 (25.0%) |
| Non-Fatal Serious Adverse Events | 1 (6.3%) |
| Deaths: | |
| At Day 30 | 0 (0.0%) |
| Over Duration of Study | 0 (0.0%) |
| HAV Infections | 0 (0.0%) |
| HAV Rupture* | 1 (6.3%) |
| HAV Occlusion/Thrombosis | 1 (6.3%) |
| Pseudoaneurysm | 0 (0.0%) |
| Aneurysm | 0 (0.0%) |

*One HAV rupture associated with extensive shrapnel remnants that caused bleeding.

In the figure below, photographs are shown of the first patient treated under the humanitarian program in Ukraine. The patient was a 42-year-old male who suffered a gunshot wound in the leg which damaged his femoral artery. The patient was initially treated using synthetic graft which became infected, and the patient experienced critical right lower extremity ischemia. The HAV was implanted as a right superficial femoral artery reconstruction to achieve wound healing and limb salvage. After three months, the HAV was reported to have retained primary patency with no evidence of HAV infection.

*Intra-operative photographs of attempted synthetic graft repair of femoral artery (left) and subsequent repair with HAV (right) in patient from Ukraine humanitarian program.*







*Combined V005 and V017 Results of HAV for Vascular Trauma*

The BLA submission is supported by the combined results from the V005 Phase 2/3 clinical trial and real-world outcomes from the treatment of wartime injuries in Ukraine in the V017 trial. Combined results included in the BLA submission to the FDA, and presented in VEITHsymposium, are summarized in the following table.

*Combined V005 Phase 2/3 HAV and V017 Ukraine Real-World Results in Vascular Trauma Compared to Synthetic Graft Benchmark*

| 30-Day Endpoint | V005 Trial HAV Extremity Group (%) | Synthetic Graft Benchmark (%) |
|---|---|---|
| Secondary Patency | 91.5% | 78.9% |
| Conduit Infections | 0.9% | 8.4% |
| Amputations | 4.5% | 24.3% |

The HAV demonstrated a higher 30-day secondary patency rate, and patients treated with the HAV were only 40% as likely to lose blood flow through their conduit after one month compared to the rate historically reported for synthetic grafts, which is a key period for recovery after traumatic injury. In addition, patients treated with the HAV had approximately 1/5th the amputation rate, and approximately 1/9th rate of infection compared to that historically reported for synthetic grafts.

***Proposed Indication #2: Use of the HAV for AV Access for Hemodialysis***

*Overview of Hemodialysis and Existing Methods of AV Access for Hemodialysis*

End-stage renal disease ("ESRD") develops when chronic kidney disease progresses to a point where either dialysis or a kidney transplant is required for the patient to survive. For hemodialysis to be conducted, a point of vascular access to the patient's circulatory system must be created, termed vascular access, so that blood can be transported from the body to the dialyzer and then back to the body. The demand for vascular access conduits includes the need for both new hemodialysis patients who have progressed to ESRD requiring an initial access, and existing patients that require the replacement of their existing access. There are currently three traditional methods for obtaining vascular access for hemodialysis: an AV fistula, a synthetic graft, and a catheter. Each of these vascular access methods has substantial limitations, as outlined below:

*Three Traditional Methods for Obtaining Vascular Access for Hemodialysis*




Fistula. An AV fistula is created by surgically connecting a vein to an artery, typically in the patient's arm. Fistulae are often considered the preferred means of access for hemodialysis due to lower infection rates of approximately 0.5% – 1.5% per patient-year as well as long-term durability. However, many patients are not suitable candidates for fistula placement, due to small vessel anatomy, advanced age, obesity or other comorbidities. Approximately 40% of patients who undergo surgery for fistula creation will not gain any benefit from the surgery because the fistula lacks sufficient vein enlargement and increased blood flow, a process called fistula maturation, that is necessary for hemodialysis. Additionally, during the period in which the fistula is maturing, catheters are generally used to provide the patient access for dialysis. There is a high risk of infection and morbidity, and health care cost, associated with prolonged catheter dependence while waiting for the fistula to mature.

Catheters. A catheter, which is tunneled underneath the skin and placed directly into a large vein in the patient, is generally the least desirable access solution. Given the time necessary for fistulae to mature, the vast majority of patients in the United States begin hemodialysis using a catheter while awaiting fistula maturation. Catheters have rates of blood stream infections as high as 200% per patient-year, with high associated morbidity and health care costs.

Synthetic graft. A synthetic graft, typically made from ePTFE and sewn between an artery and vein in the patient's arm, is generally used in patients who are not candidates for fistulae. The drawbacks of synthetic grafts include higher infection rates, which can be as high as 10% – 15% per patient-year, and gradual degradation of the non-healing ePTFE graft material caused by persistent needle punctures. A recent systematic meta-analysis measuring the functional patency of ePTFE grafts shows that, on average, only 70% of ePTFE dialysis access grafts remain functional one year after implantation.

*Distribution of Hemodialysis Access Modes in Use in the United States*

| Access Type | Fistulae | Catheters | Synthetic Grafts |
|---|---|---|---|
| Incident Patients: At Initiation of Hemodialysis | 16.7 % | 80.3 % | 3.0 % |
| Prevalent Patients: For Ongoing Hemodialysis | 64.5 % | 18.9 % | 16.6 % |

Table of Contents

*Published Data in Hemodialysis Access*

We derived the data in the table below from data contained in certain published papers on hemodialysis between 2002 and the present. These data are from different studies and thus are not directly comparable. In addition, many of these papers reported on additional endpoints that are not included in the table below.

| Clinical Indication | Type of Conduit | Year | Number of Patients | Published Secondary Patency Outcome | Infection (per patient-year) | Rejection Outcome |
|---|---|---|---|---|---|---|
| | Fistula (autogenous) | Post-2005 | 2,800 | 12 months: 75% | 2% | N/A |
| | | 2019 | 14,892 | 6 months: 51% | N/A | |
| Hemodialysis Access | | 2017 | 6,439 | N/A | 4% | |
| | | 2018 | 602 | 6 months: 61% | N/A | |
| | ePTFE (synthetic graft) | 2013 | 128 | 6 months: ~60% | N/A | N/A |
| | | 2019 | > 400 | N/A | 3% – 17% | |
| | | 2020 | > 3,000 | 12 months: 70% | 9% | |
| | Cryovein (cryopreserved cadaver vein) | 2002 | 45 | 12 months: 80% | N/A | 100% |
| | | 2004 | 49 | 12 months: ~65%<br>Aneurysm rate: 18% | 0% | ~100% |
| | Procol (bovine vein) | 2005 | 186 | 12 months: 66%<br>Aneurysm rate: 3.2% | 5.3% | N/A |

**Overview of HAV Experience in Hemodialysis Access:** A table listing our clinical trials of the HAV in hemodialysis access is included below. We have implanted the HAV into approximately 392 total patients for hemodialysis access, for a total of more than 945 patient-years of exposure, as of December 31, 2023. Throughout these trials, we have observed consistent and sustained high primary patency rates, ranging from 95% – 100% at 30 days. Secondary patency of the HAV at 6 months ranges from 84% – 100%. Consistently, we have observed zero instances of clinical rejection of any HAV in any hemodialysis access trial.

*Implantation of HAV for Hemodialysis*




We have also observed in multiple clinical trials that our HAVs had a low infection susceptibility during use for hemodialysis, with a rate lower than 1% per patient-year across all studies. The low infection susceptibility we observed in our trials of our HAVs may be a result of the HAV's potential to become a living tissue as it becomes populated by cells from the patient's body. Since living tissues are known to have resisted infection due to interactions with host white blood cells and immunological defense systems, it is possible that the repopulated HAV resists infection for the same reasons that native arteries and veins resist infections, as is observed with autogenous fistulas.

We have also observed early evidence of potential healing from the cells that repopulate the HAV after needle puncture for hemodialysis. In examining HAV explanted segments we have observed healed needle cannulation tracts with cells expressing smooth muscle markers. This self-healing indicates that the HAV may have repaired itself while being used as a hemodialysis access, which we believe is a distinct feature not present in synthetic materials, and, to our knowledge, has not been observed before for any other regenerative medicine product.

*Our Current Phase 2 and Phase 3 Trials of the HAV in Hemodialysis Access*

| Clinical Trial Number | Indication | Begin Enrollment | Design/Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| V001 | Dialysis Access | 2012 | Phase 2 Single-arm | 40 | 10-year follow-up ongoing | 30-day PP: 95%<br>6-month SP: 100%<br>12-month SP: 97%<br>60-month SP: 58%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V003 | Dialysis Access | 2013 | Phase 2 Single-arm | 20 | Complete 2-year follow-up | 30-day PP: 95%<br>6-month SP: 89%<br>12-month SP: 81%<br>Infection Rate/yr: 4% (1 event)<br>Number of Rejections: 0 |
| V006 | Dialysis Access | 2016 | Phase 3 Prospective Randomized Blinded | 355 total; 177 received HAV 178 received ePTFE | 5-year follow-up in process | 30-day PP HAV: 93%<br>12-month SP HAV: 82%<br>24-month SP HAV: 67%<br>12-month SP ePTFE: 80%<br>24-month SP ePTFE: 74%<br>Infection Rate HAV/yr: 0.93%<br>Infection Rate ePTFE/yr: 4.5%<br>Number of HAV Rejections: 0 |
| V007 | Dialysis Access | 2017 | Phase 3 Prospective Randomized Blinded | 242 total | Enrollment completed in April 2023 | Trial is currently in 12-month follow up |
| V011 | Dialysis Access | 2019 | Phase 2 (LUNA200 Manufacturing System Bridging Study) | 30 | 3-year follow-up ongoing | 30-day PP: 97%<br>30-day SP: 100%<br>12-month SP: 83%<br>Infection Rate HAV/yr: 0%<br>Number of HAV Rejections: 0 |
| V012 | Dialysis Access | 2023 | Phase 3 Prospective Randomized Blinded | Target 150 women total | Enrollment ongoing | Trial is currently enrolling |

---

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

*Long-Term Data from Early Phase 2 Trials in Hemodialysis: V001 and V003*

**Phase 2 Trial Design and Current Outcomes:** We have completed or are in long-term follow-up on two open-label Phase 2 trials in 60 hemodialysis patients in the United States and Poland from December 2012 through May 2014, which we refer to as our V003 trial and V001 trial, respectively. Both the V001 and V003 studies were designed as single-arm trials to assess the safety and efficacy of the HAV for hemodialysis access, with assessments of patency at 6, 12, 18 and 24 months. In the 60 patients enrolled in these two studies, blood flow through all HAVs was appropriate for hemodialysis, averaging over 1,200 mL/minute. Secondary patency for the two combined trials was 97% at six months, 89% at 12-months, and 81% at 18-months. These results compare favorably to published reports of secondary patency for fistula of 51% – 61% at six months and 75% at 12 months. Long-term results from the V001 trial showing five-year secondary patency of 58% were published in the *European Journal of Vascular and Endovascular Surgery* companion journal *EJVES Vascular Forum* in February 2022, and patients from the V001 trial are currently in a 10-year follow-up period.

*Images and long-term results from Phase 2 V001 trial of HAV in AV Access*




**HAV Secondary Patency (%)**




*Phase 3 V006 AV Access Study*

**Trial Design:** Our V006 HUMANITY study is a prospective, multi-center, multinational, open-label, randomized, two-arm, comparative study. Eligible study subjects were randomized to receive either a HAV or a commercially available ePTFE graft and followed to 24 months post-implantation by routine study visits. After 24 months, subjects with a patent conduit are followed to five years post-implantation using a questionnaire at six-month intervals to ascertain patient and conduit status. The primary endpoint for the V006 HUMANITY trial was a non-inferiority analysis of secondary patency compared to ePTFE, to be assessed when all subjects are at least 18 months post-implantation. There were a total of 37 sites that participated in the study, enrolling a combined total of 355 subjects.

**24-Month Results:** The V006 study enrolled 355 subjects who were roughly equally matched in terms of demographics and co-morbidities. HAV subjects trended older (p=0.06) and had more prior strokes (p=0.02) than did ePTFE subjects.

*Phase 3 V006 HUMANITY trial subject demographics*

| V006 Demographics (N=355) | ePTFE (n=178) | HAV (n=177) | p-value |
|---|---|---|---|
| Age(years) | 59.9 | **62.6** | 0.06 |
| Male (%) | 49.4% | **49.7%** | NS |
| Caucasian (%) | 65.2% | **69.5%** | NS |
| Black (%) | 27.5% | **24.9%** | NS |
| Hispanic (%) | 11.2% | **14.7%** | NS |
| Asian / Other (%) | 3.4% | **2.3%** | NS |
| Body Mass Index (BMI) | 29.2 | **28.9** | NS |
| Hypertension (%) | 79.8% | **79.7%** | NS |
| Cardiac Disease (%) | 50.6% | **57.1%** | NS |
| Diabetes (%) | 29.2% | **32.8%** | NS |
| Prior Stroke (%) | 5.6% | **12.4%** | 0.02 |

The secondary patency of the HAV was greater than that of ePTFE at six and 12 months but lower at 18 and 24 months, an outcome that had not been modelled in the V006 trial design. As per the pre-specified Cox Proportional Hazards test, the HAV did not achieve its primary efficacy endpoint regarding secondary patency. In terms of safety, the HAV had a statistically significant lower rate of conduit infections compared to ePTFE. Substantial differences in antibiotic use and need for hospitalization for infection were also noted in the V006 trial, all favoring the HAV. The safety advantage of the HAV over ePTFE may be clinically important as infection and sepsis are the second most common cause of death in dialysis patients.

*Phase 3 V006 HUMANITY trial secondary patency results*

| Secondary Patency | 6 months | 12 months | 18 months | 24 months |
|---|---|---|---|---|
| **HAV HUMANITY** [Mean (95% CI)] | 92% (87 – 95%) | 82% (75 – 87%) | 73% (65 – 79%) | 67% (59 – 74%) |
| ePTFE HUMANITY [Mean (95% CI)] | 87% (81 – 85%) | 80% (73 – 85%) | 77% (70 – 83%) | 74% (67 – 81%) |

Cox Proportional Hazards Model for Time to Loss of Secondary Patency

| **Treatment Group (HAV vs ePTFE)** | | **Hazard Ratio** | | **Non-inferiority Margin Hazard** | **Non-inferiority Demonstrated (Yes/No)** |
|---|---|---|---|---|---|
| | | **Estimate** | **95% CI** | | |
| | 12 months | 0.869 | (0.528, 1.431) | 1.491 | Yes |
| | 24 months | 1.284 | (0.867, 1.903) | 1.488 | No |

*Phase 3 V006 HUMANITY trial rates of infection*




The reported Serious Adverse Events ("SAEs") related to the HAV and ePTFE in the V006 trial, in this patient population, which typically has a high prevalence of existing medical conditions, are detailed in the table below.

*SAEs Reported in V006 Phase 3 Clinical Study in AV Access*

| Description of SAE | Number of SAEs (% of total subjects) | |
|---|---|---|
| | HAV | ePTFE |
| Number of subjects in V006 study | 177 | 178 |
| General disorders and administration conditions: | | |
| Implant site extravasation | 0(0.0)% | 1(0.6)% |
| Infections and infestations: | | |
| Vascular access site infection | 0(0.0)% | 5(2.8)% |
| Injury, poisoning and procedural complications: | | |
| Anastomotic stenosis | 1(0.6)% | (0.0)% |
| Vascular access site hematomas | 1(0.6)% | (0.0)% |
| Vascular access site hemorrhage | 0(0.0)% | 3(1.7)% |
| Vascular access site pain | 1(0.6)% | 0(0.0)% |
| Vascular access site pseudoaneurysm | 10(5.6)% | 0(0.0)% |
| Vascular access site rupture | 2(1.1)% | 0(0.0)% |
| Vascular access site thrombosis | 41(23.2)% | 28(15.7)% |
| Skin and subcutaneous tissue disorders: | | |
| Skin necrosis | 0(0.0)% | 1(0.6)% |
| Vascular disorders: | | |
| Steal syndrome | 2(1.1)% | 2(1.1)% |
| Subclavian vein occlusion | 0(0.0)% | 1(0.6)% |
| Vascular stenosis | 34(19.2)% | 27(15.2)% |
| Venous stenosis | 3(1.7)% | 9(5.1)% |

Through an Analysis of Panel Reactive Antibodies ("PRA") in the V006 trial, we observed that subjects that received the ePTFE grafts were more likely to develop antibodies against human tissues, and to become more difficult to crossmatch for a future kidney transplant, than were patients who received the HAV. While the cause of this improvement in patient responses with the HAV is not clear, this may have been related to the lower number of severe infection events in HAV patients as compared to ePTFE patients in V006. The percentage of women becoming sensitized (i.e. cPRA values > 20%) was notably higher in the ePTFE group than the HAV group.

*Phase 3 V006 HUMANITY trial % of patients developing antibodies against human tissues*




We also observed differences in the remodeling of the HAV and ePTFE implants in the V006 trial. Consistent with earlier observations from Phase 2 studies, microscopic examination of samples from HAV and ePTFE subjects suggest that the HAVs may have repopulated with host cells and microvasculature, while ePTFE grafts did not repopulate with cells and, in certain cases, fractured at sites of needle cannulation for hemodialysis ("G" is graft; "D" is defect' "T" is thrombus (clot); "L" is lumen; and "A" is adventitia):

*Phase 3 V006 HUMANITY trial microscopic examination of samples from ePTFE and HAV subjects*




Comparison of flow rates within the HAV and ePTFE conduits revealed similarities in blood flow and diameter over the 24-month period of the trial. Bar graphs below display average blood flow rate, maximal blood flow rate, and mid-graft diameters, all of which were measured by periodic ultrasound examinations. Diameters of the HAV remained close to the nominal 6.0 millimeter diameter. Average blood flow rates exceeded 1.0 liters/minute, which is generally considered suitable for efficient hemodialysis.

*Phase 3 V006 HUMANITY trial blood-flow rates and vessel diameters*




Overall, although the primary efficacy endpoint concerning secondary patency was not met, the HAV performed in the V006 trial as was expected, based upon HAV performance in previous Phase 2 trials in hemodialysis and in other clinical applications. This outcome was due at least in part to unexpectedly high patency of the ePTFE grafts, particularly after 12 months. While the cause of this unexpectedly high patency is not clear, it is possible that study-mandated ultrasounds and examinations may have led to more aggressive vigilance with ePTFE grafts to maintain patency. In addition, the age and comorbidities of HAV subjects in V006 was somewhat worse than for ePTFE subjects.

In the V006 trial, the HAV displayed significantly fewer infections than did the ePTFE grafts. This was associated with fewer instances of immune sensitization in HAV subjects as compared to ePTFE subjects, which could translate to easier kidney transplantation at future times. Similar to prior studies, we observed that the HAV had good durability, blood flow rates and diameters similar to ePTFE grafts, and also host cell remodelling that was superior to that of ePTFE grafts.

Phase 3 V007 AV Access Study

**Trial Design:** In April 2023 we completed enrollment of a Phase 3 trial, called V007, in 242 patients with ESRD. V007 is a Phase 3, prospective, multi-center, open label, randomized, two-arm comparative study conducted in the United States. The V007 trial is designed to assess the usability of the HAV for dialysis at six and 12 months as a comparison to autogenous fistulas, which are known to exhibit a high rate of early maturation failure of approximately 40% at six months. Patients in the study are randomized to receive either the HAV for vascular access or an autogenous AV fistula. The objective of V007 is to compare the safety and efficacy of our 6 millimeter HAV to autogenous AV fistula for functional hemodialysis access.

Eligible study subjects in V007 are randomized to receive either an HAV or an autogenous fistula and followed to 24 months post-implantation by routine study visits. After 24 months, patients with functional accesses will be followed for up to five years. Efficacy endpoints include useability for dialysis at six and 12 months, as well as a comparison of secondary patency via a time-to-event analysis of all subjects at 12 months. Additional safety endpoints include the rate of dialysis access-related infections for HAV and fistula subjects.

**Current Trial Status:** As of December 31, 2023, there were 242 patients enrolled in the V007 trial, and enrollment was completed in April 2023. We currently expect, upon completion of the V007 trial in 2024 and, dependent upon results, to file a BLA supplement for the use of HAV in AV access for hemodialysis.

Market Phase 3 V012 AV Access Study in Women

In collaboration with our corporate partner Fresenius Medical Care and its subsidiary Frenova Renal Research, we conducted a study to review the outcomes of 178,575 adult patients who received in-center dialysis at Fresenius Kidney Care dialysis centers. Among the areas of study were the complications and cost of treatment by patient demographic. The objective of the study was to

further define patient subgroups who could most benefit from the HAV. The study showed that women, particularly obese and diabetic women, have higher complication rates, including infections and access failures, and higher treatment costs.

Based on the results of the results of this research, we have commenced a clinical study designed to demonstrate the clinical and health economic benefits of the HAV in women dialysis patients, a high-unmet-need population. We have commenced a Phase 3 trial, which we refer to as the V012 trial, in up to 150 patients with ESRD. V012 is a Phase 3, prospective, multi-center, open label, randomized, two-arm comparative study conducted in the United States. The V012 trial is designed to assess the usability of the HAV for dialysis in comparison to autogenous fistulas, in female patients currently receiving hemodialysis via catheter. The primary measure of efficacy will be total days free from in-dwelling catheter ("catheter-free days") until 365 days, or until access abandonment, whichever occurs first. The primary measure of safety will be number and severity of infections related to all accesses (including catheters) from access creation until 365 days.

***Proposed Indication #3: PAD***

PAD involves partial or complete occlusion of blood vessels in the peripheral circulation and is a major cause of morbidity and mortality in the developed world. Patients with severe PAD undergo peripheral arterial bypass surgery where a conduit is implanted above and below the area of the arterial obstruction, to provide a "bypass" route for blood to flow around the blocked artery. The vast majority of these operations are performed in the lower limb. Other surgical alternatives include minimally invasive approaches such as stenting and angioplasties that are suitable for smaller atherosclerotic lesions and can delay — but oftentimes not prevent — the ultimate need for surgical revascularization.

*Published Data in PAD*

We derived the data in the table below from data contained in certain published papers on PAD between 2008 and the present. These data are from different studies and thus are not directly comparable. In addition, many of these papers reported on additional endpoints that are not included in the table below.

| Clinical Indication | Type of Conduit | Year | Number of Patients | Published Secondary Patency Outcome | Infection (per patient-year) | Rejection Outcome |
|---|---|---|---|---|---|---|
| PAD | Saphenous Vein (autologous) | 2008 | 60 | 12 months: – 86% | N/A | N/A |
| | ePTFE | 2008 | 61 | 12 months: – 80% | | |
| | (synthetic graft) | 2013 | 101 | 12 months: 76% – 89% | N/A | N/A |
| | | 2011 | 273 | 12 months: 81% | | |
| | | 2013 | 496 | N/A | 3.8% | |
| | | | | 6 months: 50% | N/A | N/A |
| | Procol | 2008 | 7 | 12 months: 50% | | |
| | (bovine vein) | | | Aneurysm Rate: 29% | | |

We have observed strong patency rates and no reported cases of infection for the HAV in PAD in clinical studies to date. We are developing our 6 millimeter HAV for use as a bypass conduit for patients with PAD. We are conducting two Phase 2 trials to evaluate the safety and efficacy of our 6 millimeter HAV for use as a bypass conduit with PAD, which we refer to as our V002 and V004 trials. For both of these Phase 2 trials, the HAV is being implanted as a femoral popliteal bypass graft in patients with PAD.

*Our Current Phase 2 Trials of the HAV in PAD*

| Clinical Trial Number | Indication | Begin Enrollment | Design/ Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| V002 | Peripheral Artery Disease | 2013 | Phase 2 Single-arm | 20 | 10-year follow-up ongoing | 30-day PP: 100%<br>6-month SP: 84%<br>12-month SP: 84%<br>72-month SP: 60%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V004 | Peripheral Artery Disease | 2016 | Phase 2 Single-arm | 15 | Completed | 30-day PP: 100%<br>6-month SP: 86%<br>12-month SP: 64%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0<br>Number of Amputations: 0 |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

**Trial Design:** Both our V004 and V002 trials were prospective, open-label, single treatment arm, multi-center studies. We enrolled 20 patients in our V002 trial in Poland, and 15 patients in our V004 trial in the United States. Both trials had the primary objectives of evaluating the safety of the HAV as a femoral-to-popliteal bypass graft, and determining the primary, primary assisted, and secondary patency over 12 and 24 months.

**Current Trial Status and Outcomes:** V002 enrolled a total of 20 patients between the ages of 54 and 79 at three clinical sites. 24-month results of the V002 trial were published in 2020. After censoring for three deaths (none of which were determined to be related to the HAV or the implant procedure), we observed 24-month primary, primary assisted and secondary patency rates of 58%, 58%, and 74%, respectively. We observed through ultrasound data that the HAVs were mechanically stable during the follow-up period and did not develop aneurysmal dilatation in any patient. Overall, we also determined through the histological assessment of explanted specimens that there were normal vascular cells within the HAV and there was no infection or signs of immunological reaction to the graft.

There have been no HAV-related infections reported during the V002 trial as of December 31, 2023, and no amputations of the treated extremity. A sub-set of seven V002 subjects consented for long-term follow-up computerized tomography ("CT") angiograms, which were obtained at 48 to 52 months after HAV implantation. In all cases, the HAV maintained normal architecture and function. A representative image is shown below, taken 50 months post-implantation. Proximal and distal anastomoses of HAV with recipient's vasculature are noted, as is the scale bar on the right-hand side of each image. The image presents two views of the same subject, and shows uniform HAV diameter along the length of the implant.

*A CT Angiogram from a V002 Subject at 51 months after HAV implantation*




Patients in the V002 trial are currently in long-term follow-up out to ten years. In 2022, six-year results from V002 were published in *Journal of Vascular Surgery – Vascular Science*. The article, entitled "6-Year Outcomes of a Phase 2 Study of Human-Tissue Engineered Blood Vessels for Peripheral Arterial Bypass," reported overall secondary patency rate of 60% at 72 months, including all patients originally enrolled, as estimated by Kaplan Meier analysis. There was no evidence of graft rejection or infection, and no patients underwent amputation of the affected limb out to six years.

*Long-term results from V002 Phase 2 study in PAD*

| Result from V002 Phase 2 Trial in PAD *(as of April 2021)* | Pre-Op | 1 yr | 2 yr | 3 yr | 4 yr | 5 yr | 6 yr | Avg |
|---|---|---|---|---|---|---|---|---|
| Secondary Patency | — | 84% | 74% | 73% | 66% | 60% | **60%** | — |
| Ankle-Brachial Index (median) | 0.64 | 0.90 | 0.96 | — | 1.07 | 0.98 | 0.94 (n=2) | 0.97 (post-op) |
| HAV Infection Rate | — | 0% | 0% | 0% | 0% | 0% | **0%** | 0% |

The V004 trial enrolled 15 subjects in the United States, with the 12-month follow-up of the last enrolled patient occurring in December 2020. Patients in the V004 trial included Rutherford 4 and 5 subjects, with severe, debilitating limb ischemia. (Rutherford 4 and 5 patients are classified as patients with pain at rest due to limb ischemia (stage 4), and those patients suffering tissue loss in the limb as a result of ischemia (stage 5)). In addition, enrollment in V004 required that no autologous vein be available for bypass. Hence, the subjects enrolled in the V004 trial had severe and debilitating limb ischemia due to PAD and had no autologous vein that was suitable for lesion bypass and revascularization.

*12-month results from V004 Phase 2 study in PAD*

| Result from V004 Trial (as of April 2021) | Pre-Op | 6 mos | 12 mos |
|---|---|---|---|
| Secondary Patency | — | 86% | 64% |
| Ankle-Brachial Index (median) | 0.51 | 0.85 | 0.90 |
| Rate of Amputation | **—** | **0%** | **0%** |
| VascuQol Quality of Life Assessment | 3.1 | 5.6 | 5.9 |

In the V004 trial, HAV secondary patency was 86% at 6 months, and 64% at 12 months. While lower than patency values observed in the V002 trial, patients in the V004 trial had more severe PAD, which is associated with poorer arterial "run-off" and higher propensity for conduit occlusion. Assessment of Quality of Life by the validated VascuQol assessment demonstrated an increase in overall quality of life for V004 patients at 6 and 12 months. In addition, ankle-brachial index, a measurement of blood pressure in the operative limb, was increased at 6 and 12 months. There were no infections of the HAV reported in the V004 trial, despite the severity of the PAD and the often-associated tissue infection that can accompany this disease. There were zero reports of clinical HAV rejection. Lastly, there were zero reported amputations of any operative limb in the first 12 months of follow-up.

The SAEs reported for the HAV in our V002 and V004 Phase 2 clinical studies in PAD in 35 subjects, a patient population which typically has a high prevalence of existing medical conditions, are summarized in the table below.

*SAEs Reported in V002 and V004 Phase 2 Clinical Studies in PAD*

| **Description of SAE** | **Number of SAEs (% of total subjects)** |
|---|---|
| Number of subjects in V002 and V004 studies | N=35 |
| Arterial bypass thrombosis | 3(8)% |
| Anastomotic stenosis | 1(3)% |
| Graft Thrombosis | 2(6)% |
| Vascular Graft Complication | 1(3)% |

Published literature reports of patients with Rutherford stage 4 and 5 PAD and no autologous vein available for revascularization show that outcomes can include amputation. For Rutherford 4 and 5 patients with no vein and no revascularization procedure, amputation rates at 6 months are reported at 31%. For stage 4 and 5 patients who do undergo saphenous vein revascularization, the amputation rate at one year is approximately 10%. The lack of amputation for stage 4 and 5 patients in the V004 trial at one year, none of whom had saphenous vein for revascularization, supports the use of the HAV in severe PAD.

*Examples of the Use of Our 6 millimeter HAVs in Expanded Access Cases*

The FDA has granted use of the HAV in 27 special expanded access cases through December 31, 2023. Each of these compassionate use cases was conducted under an individual, investigator-initiated IND with the FDA. Two cases are highlighted below.

*70-year-old with Critical Limb Ischemia*

The patient is a 70-year-old male with critical limb ischemia and no vein available to perform a bypass, as the vein was previously used for a CABG. He underwent a successful bypass with the HAV. Imaging at one year demonstrated a patent graft as illustrated below. The patient is in long-term follow up.




*42-year-old with Infected Dacron Graft*

An HAV was used in a 42-year-old female to replace an 8 mm Dacron iliac artery bypass graft that had become infected. The patient refused harvesting of the femoral vein for reconstruction and requested the HAV. The patient was seen at one, three, six, nine, and 12 months after HAV implantation. At all visits, the HAV appeared normal with unobstructed patency. Flow and velocities were normal. At three months, the patient was released to full activity. At six and 12 months, the graft was functioning well. At one-year imaging, the HAV was patent and appeared remarkably similar to the patient's native blood vessels. The patient had no signs of infection in the HAV and continues to have no limitations or complications during normal activity or exercise.

*Mayo Clinic Study in Severe PAD*

The Mayo Clinic, Rochester, MN, is conducting a study in up to 30 patients with chronic limb-threatening ischemia (CLTI), the end stage of PAD, under an investigator IND filed with the FDA. In September 2023, researchers presented interim results at the Midwestern Vascular Conference including their conclusion that in the clinical study the HAV was a safe, resilient, and effective conduit for arterial bypass and limb salvage. This is an important result since approximately 40% of patients requiring lower extremity bypass do not have saphenous vein available, which is the standard of care for treating this challenging disease state. The presentation reported the outcomes of 29 patients, with a mean age of 71 and having no available vein to use as a bypass graft, who underwent HAV implantation. Of these 29 patients, 97% had previously experienced unsuccessful revascularization procedures on the extremity and 21 (72%) had tissue loss or gangrene. Based on the state of this disease, this patient group had a 30-50% one-year risk of amputation. Notably, surgery in 22 (76%) patients necessitated a tibial artery target, a surgical procedure involving the fusion of two 42 cm long HAVs to achieve the required bypass length. Surgeons reported that the operations to implant the HAV achieved a 100% technical success rate, without any HAV-related major adverse events reported. At a median follow-up of nine months, the secondary patency rate for patients implanted with the HAV was 72%. The limb salvage rate was 86%, corresponding to only a 14% amputation rate.

***Preclinical Pipeline***

*Pancreatic Islet Transplantation for Type 1 Diabetes ("Biovascular Pancreas")*

The Biovascular Pancreas ("BVP") is a modification of Humacyte's HAV product, leveraging the HAV to deliver therapeutic cells within close proximity of the patient's bloodstream. We believe that the HAV extracellular matrix material is both highly biocompatible, as evidenced by adaptive cellular repopulation after implantation, and also highly angiogenic, as evidenced by extensive formation of microvessels surrounding the HAV in vivo. These attributes mean that the HAV may serve as a suitable conduit for delivering large numbers of therapeutic cells to a patient.

Pancreatic islets, which sense blood glucose and respond by secreting insulin, are destroyed by an auto-immune attack in patients with Type I diabetes. The outer surface of our 42cm HAV has sufficient surface area to accommodate a monolayer of approximately 800,000 human pancreatic islets, which is approximately the number in an entire adult pancreas, and can reverse diabetes and restore glucose control.

We have performed mathematical modelling studies that predict, we believe, that a 42cm HAV could maintain viability of a therapeutic number of islets after implantation of the HAV into the arterial bloodstream, or after implantation as an AV conduit similar to that used for hemodialysis access. Bioreactor experiments have confirmed these mathematical conclusions. Furthermore, we have implanted rat-sized BVPs into the aortas of diabetic rats, and observed that the BVP could restore normal glucose levels in all treated animals, while control animals ("No Flow" in red in figure below) did not restore glucose control.







In April 2023, Humacyte and JDRF International (JDRF), the leading global organization funding type 1 diabetes research, announced a collaboration to advance the development of the BVP product candidate. During 2023, we commenced testing the BVP in primates. In these experiments, researchers observed that insulin-producing cells in the BVP survive for multiple weeks after implantation into the animal and continue to make insulin after implantation. We consider these results to be extremely encouraging as they support the potential ability of the BVP to deliver a curative number of insulin-producing islets into diabetic subjects. Additional work in large animals is currently ongoing, including using the BVP in diabetic large animals.

*Coronary Artery Bypass Graft (CABG)*

Evaluation of 3- and 4mm diameter HAVs for coronary artery bypass is ongoing at Humacyte. Our initial pilot studies have included the use of our engineered vessels for CABG in canines, demonstrating functional patency and adequate blood flow for up to one month. To further evaluate the utility and durability of the HAV in a large animal model, we have initiated a preclinical study at Duke University to evaluate the use of our small diameter HAV for CABG in adult primates (baboons). The goal of this study is to assess patency and function for six to 12 months, as well as host responses and cellular remodeling. HAVs are followed by ultrasound imaging of the heart, and angiographic imaging of the conduits. In July 2022, preclinical data on use of the small-diameter HAV in CABG was presented at American Heart Association Basic Cardiovascular Sciences Scientific Sessions. Coronary bypass in a non-human primate model, with follow-up of six months, showed that the HAV maintained structural integrity and functioned well to conduct blood flow to the heart. In addition, the HAV was observed to have robust cell repopulation with vascular cells over time, becoming a living vascular tissue supplying the heart muscle. During 2023 we commenced IND-enabling preclinical studies in large animals to support potential advancement of the HAV into human clinical trials, and these studies are currently ongoing.

*Before (left) and after (right) implantation of HAV CABG in baboon*




*Pediatric Heart Surgery: Modified Blalock-Taussig-Thomas (mBTT) Shunt*

Tetrology of Fallot is a relatively common congenital heart defect, that is often treated using a modified Blalock-Taussig-Thomas ("mBTT"). To support a potential future IND filing with the FDA, we have evaluated the use of our HAV as an mBTT shunt for up to six months in juvenile primates at the Research Institute at Nationwide Children's Hospital in Columbus, Ohio.

*BT Shunt Implant Schematic*




In October 2023, results of the preclinical study were published in the open-access *Journal of Thoracic and Cardiovascular Surgery (JTCVS Open)*. In the study, researchers implanted 3.5mm diameter HAVs into a juvenile large-animal model of pediatric heart disease. The 3.5mm HAV was implanted between the subclavian and pulmonary arteries, to mimic a commonly-performed surgical procedure used to treat babies born with Tetralogy of Fallot, one of the most common pediatric heart conditions. The study assessed the HAV's patency, structure, and blood flow from one week to six months after the implant. The 3.5mm diameter HAV has smaller product dimensions but is manufactured using a similar process as Humacyte's 6mm HAV system currently being evaluated in clinical trials in vascular trauma, AV access for hemodialysis, and PAD. We believe that the production of the functional 3.5mm HAV is indicative of the potentially broad application of our proprietary bioengineered tissue platform and manufacturing processes.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 219 of 674

*Imaging of 3.5mm HAV mBTT shunt in juvenile primate followed for 6 months*




*Engineered Trachea for Treatment of Severe Airway Injuries*

Each year in the United States, approximately 4,000 operations are performed to repair or reconstruct the trachea or mainstem bronchi. But unlike most other connective tissues in the body — such as blood vessel, bone, skin and tendon — there currently are no replacements for tracheal tissue that are in widespread clinical use. For long tracheal or bronchial defects, some sort of tracheal replacement is often needed, yet none exists currently. The lack of a functional tracheal conduit commits patients to, sometimes, slow suffocation.

We have modified the HAV production process to enable the embedding of a biocompatible medical-grade stent within the wall of the engineered vessel. Combining a non-degradable stent with the degradable polymer scaffold used for HAV production results in a composite scaffold that can be seeded with smooth muscle cells and grown in culture. After decellularization, the engineered trachea consists of the extracellular matrix contained in the HAV, along with an embedded stent that prevents the collapse of the engineered airway with inspiration or neck movements.

*Summary of Process to Generate Engineered Tracheas*




In models where engineered tracheas were implanted into rats and non-human primates, we have observed that the implants repopulate with cells from the host, including cuboidal respiratory epithelium that lines the native airway progressively from two to eight weeks after implantation. We have further observed that the engineered tracheas can function out to two months. Future studies in large animal models are planned.

*Photograph (A) of Implantation of Engineered Trachea into Non-Human Primate Airway; Microscope Imaging of Cells Repopulating the Trachea after 2 and 8 weeks (B, C)*



*Engineered Whole Lung Organs*

End-stage lung disease is the fourth leading cause of death in the U.S., and lung transplantation remains severely limited by donor organ shortages. Dr. Niklason's laboratory at Yale University has pioneered the development of using decellularized native lungs, combined with targeted recellularization of the lung scaffolds within biomimetic bioreactors, to produce whole lungs that are capable of exchanging gas. Gas exchange for several hours has been observed in studies in rodents. Efforts to scale-up the technology to human-sized organs are ongoing.

*Structure of Lung, Scaffold for Lung Engineering, and Implanted Engineered Lung*




***Manufacturing***

We have developed a novel paradigm for manufacturing human tissues that mimics key aspects of human physiology. Recognizing that commercial scale production capacity of bioengineered tissue has been non-existent, we prioritized the development of a scalable, reproduceable, commercial biomanufacturing process. At our 83,000 square foot manufacturing facility in Durham, North Carolina, we have industrialized this concept and created a scalable modular manufacturing process that enables us to engineer our HAVs in commercial quantities in a system designed for cGMP compliance.

Our proprietary manufacturing process was designed with a modular approach allowing us to produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing. The system used to produce HAVs for use in our clinical trials from 2016 to 2021, including Phase 3 trials, utilized a single tray within one growth drawer holding ten HAVs per batch. These batches were manufactured at a contract manufacturer. The current, commercial-scale LUNA200 system utilizes 20 growth drawers holding ten HAVs each for a total of 200 HAVs per batch. Since 2021 this system has been utilized to produce clinical product for use in our ongoing Phase 3 trials, and is planned for use to supply our anticipated commercial launches upon approval.

Our manufacturing process utilizes our LUNA200 system, consisting of 20 "growth drawers." Each growth drawer is capable of producing ten 42cm HAVs and each HAV remains contained within an individual bioreactor bag. Inside a LUNA200, a closed tubing network connects all 20 growth drawers as well as the ten bioreactor bags in each drawer, allowing the entire system to share cells and nutritive media. In this way, a single LUNA200 can produce up to 200 HAVs per batch while maintaining the critical operating parameters that direct growth, creating a gross capacity of approximately 900 HAVs per system annually.

A thorough comparability assessment was performed to evaluate HAV batches produced in the single-drawer system versus batches produced in the 20-drawer LUNA200 system. The study assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product. In this study, we observed that HAVs produced in the LUNA200 system were comparable to HAVs produced in the single-drawer system. Additionally, a crossover study, called V011, enrolled 30 subjects to evaluate HAVs that were manufactured on Humacyte's commercial LUNA200 platform with the primary goal to evaluate the safety, efficacy and immunogenicity of the LUNA200-manufactured HAVs. In this trial we observed comparable safety profile between HAV used in previous studies and the HAV manufactured in the LUNA200 commercial system. The results of the comparability assessment and from the V011 crossover study were submitted to the FDA. In 2021, the FDA authorized the use of HAVs produced in the commercial LUNA200 system to supply our ongoing clinical trials. We plan to also use the LUNA200 system for anticipated commercial launches of the HAV if it is approved.

We have designed the LUNA200 to have the ability to produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline. We intend to introduce a 13cm HAV line extension after commercial launch of the 42cm HAV. Using our existing LUNA manufacturing equipment, we can generate 400 13cm HAVs per batch. Our modular manufacturing platform can be scaled without impacting the operating parameters that support the HAV growth process. We have designed our manufacturing system to be functionally closed, to utilize single-use disposable materials with aseptic connections, and to be fully automated.

*Modular Manufacturing Platform Allows for Production of Multiple Product Lengths Using the Same Equipment*




We currently have eight LUNA200 systems installed, commissioned and qualified in our manufacturing facility, creating an annual gross HAV capacity of approximately 7,200 HAVs. Our manufacturing facility contains space to increase capacity in future years to approximately 40 LUNA200 systems in total. As we continue to expand production, we believe that we will have the ability to take advantage of economies of scale and reduce production costs. The initiation and pace of the expansion of vessel capacity will be determined based on our assessment of market opportunity.




We initiate HAV production using primary human aortic vascular cells from a working cell stock ("WCS") that is isolated from FDA-compliant donor tissues and cryopreserved. The WCS vials are stored at two separate qualified facilities to mitigate the risk of single site storage. We qualify all new WCSs for use in HAV manufacturing utilizing biochemical and gene expression assays. Each qualified primary isolation can produce approximately 500,000 to one million HAVs.

The WCS expanded using traditional cell culture techniques, and the cells are transferred onto a biocompatible, biodegradable polymer mesh within a flexible, single-use bioreactor bag. Cells inoculated onto this tubular mesh are cultured utilizing a proprietary culture medium and subjected to cyclic mechanical stretch for a period of approximately eight weeks. During this period, the cells proliferate and build extracellular matrix while the polymer mesh degrades. The resulting bioengineered vessel is comprised of the aortic vascular cells and their deposited extracellular matrix. After completion of the culture period, we decellularize the bioengineered vessel using a proprietary combination of salts, enzymes and detergents, followed by numerous washes in excipient grade neutral pH buffered saline. The resulting HAV retains the human extracellular matrix constituents and, therefore, the biomechanical properties of the bioengineered vessel, but cells and cellular components, which could induce a foreign body response or immune rejection following implantation, are removed. After decellularization, our HAVs are packaged for distribution inside the same flexible bioreactor bag in which they were produced, with sterile phosphate buffered saline as the excipient. Once the package is delivered to the operating room, the HAV is removed from the bioreactor bag by the surgical staff.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 224 of 674

### Suppliers

We source critical components and necessary raw materials from vendors that have been approved and qualified through our vendor management program. SeraCare, which was subsequently acquired by LGC Clinical Diagnostics, Inc. ("SeraCare"), is the current single source supplier of human plasma used in our manufacturing process and Confluent Medical Technologies, Inc. ("Confluent") is the current single source supplier of the polymer mesh we use. We source custom, Humacyte-designed, pre-sterilized (gamma irradiated) assemblies and single-use tubing sets through multiple approved vendors. We source bioprocess solutions, including culture media and decellularization buffers, from a division of Thermo Fisher Scientific, which has a second production site to provide redundant media/buffer production capacity. We continue to explore the development redundant vendors for all critical materials and we manage all vendor changes through a robust change control process.

*Supply Agreement with SeraCare*

In January 2014, we entered into a supply agreement with SeraCare for the supply of human plasma, which was amended in October 2018. We refer to the supply agreement, as amended, as the SeraCare Agreement. Under the SeraCare Agreement, we agreed to purchase at least a substantial majority of our human plasma requirements from SeraCare. In the event SeraCare is unable to fulfill our requirements, and subject to certain conditions, we may engage another plasma supplier during the period in which SeraCare is unable to fulfill our requirements. The SeraCare Agreement is subject to annual price modifications in the case of significant changes in SeraCare's cost of raw materials, with any modification to be determined at least three months prior to the end of the relevant year. The initial term of the SeraCare Agreement expires on October 12, 2023, but automatically extends for subsequent one-year periods unless terminated by either party at least 18 months prior to the end of the initial term. Either party may terminate the SeraCare Agreement for uncured material breach or for the insolvency of the other party at any time. In addition, either party may terminate the SeraCare Agreement without cause upon 12 months' written notice. We may also terminate the agreement in the event of certain supply interruptions. Each party also agreed to indemnify the other against certain third-party claims up to a specified cap.

*Supply Agreement with Confluent*

In August 2015, we entered into an agreement for the supply of polymer mesh, which we refer to as the mesh supply agreement, with Biomedical Structures LLC. Biomedical Structures' rights and obligations under the mesh supply agreement were subsequently assigned to Confluent in connection with Confluent's acquisition of Biomedical Structures in 2016. In 2020, the agreement was amended to align with the growth expected with the transition to commercial distribution following FDA approval. Pursuant to the mesh supply agreement, the price of polymer mesh we purchase from Confluent is subject to potential adjustment if Confluent's cost of raw materials increases above a specified threshold pursuant to good faith negotiations from both parties, which negotiation Confluent may not request more than once in a 12-month period. The 2020 amendment also provided volume driven discounts. Confluent is obligated to partner with Humacyte in order to establish redundant facilities for the manufacture of the polymer mesh at established contractual volume thresholds. The amended mesh supply agreement has a term of three years, which can be automatically extended for subsequent one-year periods and will continue to do so unless either party provides notice of non-renewal at least 120 days prior to the end of the then-current term or otherwise terminates in accordance with the agreement. We and Confluent are each also permitted to terminate the mesh supply agreement for convenience, however Confluent must provide us with at least 365 days written notice and we are obligated to provide 180 days' notice, prior to such a termination. In addition, each party is permitted to terminate the mesh supply agreement for an uncured material breach by the other party following failure to remedy the breach during a sixty-day cure period. Both parties have agreed to indemnify one another for certain third-party claims.

### Distribution

*Commercialization Strategy Within United States and for Earlier-Stage Pipeline Programs*

For our vascular repair and replacement applications of our technology, including renal replacement therapy for dialysis access, the treatment of PAD, and the treatment of vascular trauma, we have retained the right to commercialize our HAV within the United States, and expect to commercialize the HAV through a combination of our own direct sales and marketing team combined with our partnership with Fresenius Medical Care, described below. We plan to own end-to-end commercialization while pursuing collaborations with appropriate strategic partners who have established distribution channels for supplying customer care centers.

Our first expected market launch, in the treatment of vascular trauma, is a highly concentrated market of approximately 200 Level I Trauma Centers that may be reached with a small field sales forces of no more than 20 representatives. Many of the major trauma centers already have familiarity with our HAV product candidate through their participation in our clinical trials. Our sales effort will include dual targeting of surgeons to create pull-through demand and hospital administration (trauma center Value Analysis Committees) to assure adoption and uptake of the HAV in vascular trauma.

We expect that the large market potential of earlier-stage applications of our technology platform such as CABG and BVP for diabetes will provide additional collaboration opportunities, and we expect explore strategic partnerships for these product candidates as preclinical and clinical results providing additional proof of concept are generated.

*Distribution Agreement with Fresenius Medical Care*

We entered into a distribution agreement with Fresenius Medical Care in June 2018 which, as amended as of February 16, 2021, granted Fresenius Medical Care and its affiliates exclusive rights to develop outside the United States and European Union (the "EU") and commercialize outside of the United States our 6 millimeter x 42cm HAV and all improvements thereto, and modifications and derivatives thereof (including any changes to the length, diameter or configuration of the foregoing), for use in vascular creation, repair, replacement or construction, including renal replacement therapy for dialysis access, the treatment of PAD, and the treatment of vascular trauma, but excluding coronary artery bypass graft, pediatric heart surgery, or adhering pancreatic islet cells onto the outer surface of the distribution product for use in diabetic patients. Within the United States, Fresenius Medical Care will collaborate with Humacyte in its commercialization of the product in the field, including adoption of the distribution product as a standard of care in patients for which such use is supported by clinical results and health economic analyses.

We are responsible for developing and seeking regulatory approval for the distribution product in the field in the United States. For countries outside the United States, the parties agreed to use commercially reasonable efforts to satisfy certain agreed minimum market entry criteria for the distribution product in the field in such country. For the EU, once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory approval for the distribution product in the field in the applicable country, we agreed to use commercially reasonable efforts to obtain such regulatory approval (other than pricing approval), and Fresenius Medical Care agreed to use commercially reasonable efforts to obtain the corresponding pricing approval. For the rest of the world (i.e., outside the United States and the EU), once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory and pricing approval for the distribution product in the field in the applicable country, Fresenius Medical Care agreed to use commercially reasonable efforts to obtain such approvals, and we agreed to use commercially reasonable efforts to support Fresenius Medical Care in its efforts.

Under the distribution agreement, we grant an exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by us during the term to commercialize the distribution product in the field outside the United States, subject to our retained rights to carry out our obligations under the distribution agreement. We also grant a non-exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by us during the term to develop the distribution product in accordance with the terms of the distribution agreement. In addition, we grant to Fresenius Medical Care, among other things, a perpetual, irrevocable, non-exclusive sublicensable license under the patents and know-how that primarily relate to the distribution product or its manufacture and that were created, conceived or developed solely or jointly by or on behalf of Fresenius Medical Care in the performance of its activities under the distribution agreement.

The distribution agreement provides that we will own all know-how and patents that primarily relate to the distribution product or its manufacture that are created, conceived or developed by or on behalf of either party in the performance of activities under the distribution agreement. Ownership of all other know-how, patents, materials and other intellectual property created, conceived or developed during the performance of activities under the distribution agreement will be determined in accordance with U.S. patent laws for determining inventorship.

We are obligated to make payments to Fresenius Medical Care based on a share of aggregate net sales by or on behalf of us of the distribution product in the United States in the field. Such revenue-share payments will be a percentage of net sales in the low double digits, without regard to the calendar year in which such net sales are attributable, until such time that we have paid to Fresenius Medical Care a certain total amount, at which time the revenue-share will decrease to a percentage of net sales in the mid-single digits. The amounts that Fresenius Medical Care will be obligated to pay us under the distribution agreement for sales of the distribution product in the field outside of the United States will vary. Fresenius Medical Care agreed to pay us initially, on a country-by-country basis for sales outside of the United States, the amount equal to the average cost of manufacturing our distribution product plus a fixed dollar amount per unit. Following a specified period, on a

country-by-country basis outside of the United States, Fresenius Medical Care will pay us a fixed percentage of net sales for each unit sold in such country, such that the Company will receive more than half of such net sales.

The distribution agreement will generally continue on a country-by-country basis until the later of the tenth anniversary of the launch date of the distribution product in the relevant country or (b) the expiration of the last-to-expire valid claim of specified patents in such country. Each party is permitted to terminate the distribution agreement for insolvency of, or, under certain circumstances, including various cure periods, material breach by the other party. Subject to a cure period, Fresenius Medical Care may also terminate the distribution agreement in its entirety or on a country-by-country basis (i) for certain withdrawals of regulatory approval or (ii) for termination or expiration of any of our in-licenses that is necessary for the exercise of Fresenius Medical Care's rights, or the satisfaction of its obligations, under the distribution agreement. In addition, Fresenius Medical Care may terminate the distribution agreement for convenience on a country-by-country basis upon not less than 12 months' written notice to us, although Fresenius Medical Care is not permitted to give such notice prior to the end of the second year following launch of the distribution product in such country. Each party is required to indemnify one another for certain third-party claims.

***Third-Party Reimbursement***

We anticipate that coverage and reimbursement by the Centers for Medicare and Medicaid Services ("CMS") and private payors will be essential for most patients and health care providers to afford our treatments, particularly in the applications of renal replacement therapy for dialysis access and the treatment of PAD. Accordingly, sales of our products will depend substantially, both domestically and abroad, on reimbursement by government authorities, private health coverage insurers and other third-party payors. Our strategy around HAV reimbursement focuses on achieving alignment and agreement from CMS on coding and payment pathways; both are critical to influencing and achieving optimal reimbursement payment from private payor sources. Therefore, Humacyte continues to develop a comprehensive reimbursement strategy including CMS, private payors, and other key stakeholders to ensure a clear and sustainable reimbursement path for all HAV product opportunities.

We are pursuing a dual regulatory and legislative reimbursement strategy to ensure separate Medicare payment for the HAV at an appropriate price. The regulatory strategy includes (1) engaging CMS political and career staff directly on coverage, payment, and coding followed by (2) submission of formal applications in these areas once FDA approval is obtained. Currently, no RMAT tissue engineered product has established coverage and reimbursement by CMS, and it is difficult to predict what CMS will decide with respect to coverage and reimbursement for fundamentally novel products. See "Risk Factors — Risks Related to the Development and Commercialization of Our Product Candidates" for further information. Even if we receive marketing approval for our HAVs, there is uncertainty with respect to third-party coverage and reimbursement of our HAVs. They may also be subject to unfavorable pricing regulations, third-party reimbursement practices or healthcare reform initiatives, any of which could harm our business, prospects, operating results and financial condition.

Containment of healthcare costs has been a priority of federal, state, and foreign governments, and the prices of drug products have been a focus of this effort. Governments have shown significant interest in implementing cost-containment programs. This interest has resulted in significant proposed and enacted reform measures affecting healthcare reimbursement and drug pricing, including the enactment in August 2022 of significant changes to potential Medicare drug product reimbursement through government negotiation of certain drug prices, as well as manufacturer discount and inflation rebate obligations under the Inflation Reduction Act (the "IRA").

***Intellectual Property***

We strive to protect and enhance the proprietary technology, inventions and improvements that are commercially important to the development of our business, including seeking, maintaining, and defending patent rights, whether developed internally or licensed from third parties. We also rely on trade secrets relating to our proprietary technology platform and on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen and maintain our proprietary position that may be important for the development of our business. We additionally may rely on regulatory protection afforded through data exclusivity, market exclusivity and patent term extensions where available.

Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, preserve the confidentiality of our trade secrets, and operate without infringing the valid and enforceable patents and proprietary rights of third parties.

As of December 31, 2023, our patent estate is comprised of 18 families of patents. Of these families, 14 are solely owned by Humacyte, one is jointly owned by Humacyte and Global Life Sciences Solutions USA LLC, one is jointly owned by Humacyte and Yale University, one is exclusively licensed to Humacyte from Duke University and one is exclusively licensed to Humacyte from Yale University. For more information regarding these license agreements, see "— License Agreement with Duke University" and "— License Agreements with Yale University."

Our 18 families of patents are comprised of:

(i) nine issued U.S. patents, 76 foreign patents in Austria, Australia, Belgium, Canada, China, Cyprus, Denmark, France, Germany, Greece, Hong Kong, Hungary, Ireland, Italy, Japan, Netherlands, Portugal,Spain, Sweden, Switzerland, Turkey, and the UK, ten pending U.S. non-provisional patent applications, one pending PCT patent application and eight pending foreign applications in Australia, Canada, China, Europe, Japan and Hong Kong, which are solely owned by us,

(ii) three issued U.S. patents, 19 issued foreign patents in Australia, Austria, Belgium, Canada, Denmark, France, Germany, Ireland, Italy, Japan, Netherlands, Spain, Sweden, Switzerland, Turkey, and the UK, one pending U.S. non-provisional patent application, and three pending foreign patent applications in Europe and Canada, which we co-own, and

(iii) one issued U.S. patents, two issued or granted foreign patents in Europe and Japan, one pending U.S. non-provisional patent application, and six pending foreign patent applications in Australia, Canada, Europe, Japan, China, and Hong Kong, which we exclusively license.

Many of these patents and patent applications generally relate to the scaffolds used to make our vessels, the composition of our vessels, and systems and methods of manufacturing our vessels. Excluding any patent term adjustment or patent term extension, the U.S. patent relating to the scaffold used to make our vessels expires in 2032, the U.S. patents relating to the composition of our vessels expire in 2032 and the U.S. patents relating to the systems and methods of manufacturing our vessels expires in 2032. The U.S. patent relating to the entangler machinery used to make tubular scaffolds expires in 2035. Included in our patent portfolio are 12 pending, Humacyte-owned non-provisional applications relating to the manufacturing of engineered tissues at commercial scale, as well as other technologies and product candidates. If these non-provisional applications are allowed, such additional patents issuing therefrom would be expected to expire around 2043.

As with other biotechnology and pharmaceutical companies, our ability to maintain and solidify our proprietary and intellectual property position for our product candidates will depend on our success in obtaining effective patent claims and enforcing those claims if granted. However, our owned and licensed pending patent applications, and any patent applications that we may in the future file or license from third parties, may not result in the issuance of patents. For more information, see "Risk Factors — Risks Related to Our Intellectual Property."

We have also registered trademarks for use in connection with our products. These include registrations for SYMVESS™ in the United States, Europe, United Kingdom and Ukraine, HUMACYL™ in the United States, Europe, Australia, Canada, China, and Israel; HUMAGRAFT™ in Australia, China, Europe, and Israel; HUMAPASS™ in Europe, Australia, and Israel; and HUMACYTE, in the United States, Europe, Australia, Canada, and Israel. We may pursue additional registrations for future products in markets of interest.

In addition to the above, we have established expertise and development capabilities focused in the areas of preclinical research and development, manufacturing process scale-up, cGMP manufacturing, quality control, quality assurance, compliance, regulatory affairs and clinical trial design and execution. We believe that our focus and expertise will help us develop and expand technology-based applications leveraging our proprietary intellectual property.

Finally, we rely, in some circumstances, on trade secrets to protect our technology. We seek to protect our proprietary technology and processes, in part, by entering into confidentiality agreements with our employees, consultants, scientific advisors and contractors. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems.

In addition to the intellectual property that we have developed internally, we license rights to certain intellectual property that is material to our business prospects. We have summarized our material license agreements below.

*License Agreement with Duke University*

In March 2006, we entered into a license agreement with Duke University ("Duke"), which was subsequently amended in 2011, 2014, 2015, 2018, 2019 and January 2022. We refer to the license agreement, as amended, as the Duke License Agreement. Under the Duke License Agreement, Duke granted us a worldwide, exclusive, sublicensable license to certain patents related to decellularized tissue engineering, which we refer to as the patent rights, as well as a non-exclusive license to use and practice certain know-how related to the patent rights. The relevant licensed patent on decellularization of tissue expired in 2021. We have agreed to use commercially reasonable efforts to develop, register, market and sell products utilizing the patent rights, which we refer to as the licensed products. Any services provided to a third party utilizing licensed products are referred to as licensed services. We have also agreed to meet certain benchmarks in our development efforts, including as to development events, clinical trials, regulatory submissions and marketing approval, within specified timeframes. Under the Duke License Agreement, Duke retains the right to use the patent rights for its own educational and research purposes, and to provide the patent rights to other non-profit, governmental or higher-learning institutions for non-commercial purposes without paying royalties or other fees.

In connection with our entry into the Duke License Agreement, we granted equity consideration to Duke in the form of 52,693 shares of our post-Merger common stock. Under the Duke License Agreement, we have also agreed to pay Duke: a low single-digit percentage royalty on eligible sales of licensed products and licensed services, plus a low double-digit percentage of any sublicensing revenue; an annual minimum royalty beginning in 2012, which increases in the calendar year immediately following the first commercial sale of licensed products or licensed services (whichever occurs first); and an additional amount in license fees, as certain scientific milestones are met.

The Duke License Agreement remains effective until the latter of (i) the last of the patent rights expires or (ii) four years after our first commercial sale, unless earlier terminated. Either party may terminate the agreement for fraud, willful misconduct or illegal conduct, or uncured material breach. Duke may terminate the agreement if we become insolvent. Duke may also terminate the license, convert the license into a non-exclusive license or seek assignment of any sublicense if we fail to reach diligence milestones within the applicable time period. If we abandon any claim, patent or patent application, our rights under the license with respect to such patent rights will be terminated in the territory in which we abandon such rights. We may terminate the Duke License Agreement unilaterally upon three months' prior notice to Duke. We agree to indemnify Duke against certain third-party claims.

*License Agreements with Yale University*

*Large Diameter HAV*

In August 2019, we entered into a license agreement with Yale University ("Yale") that granted us a worldwide license to the patents jointly owned with us related to tubular prostheses which are large diameter versions of our vessels, which may or may not contain a stent. The license granted under the agreement is exclusive in the field of engineered urinary conduits, engineered tracheae/airways and engineered esophagi, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. We have agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. We are also obligated to provide Yale periodically an updated and revised copy of our plan, which must indicate progress of our development and commercialization. We may also sublicense our rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with our entry into the Yale License Agreement, we paid Yale an upfront cash fee of less than $0.1 million. We have also agreed to pay to Yale: an annual maintenance fee, increasing between the first anniversary of the agreement until the fifth anniversary up to a maximum of less than $0.1 million per year; milestone payments upon achievement of certain regulatory and commercial milestones of $0.2 million and $0.6 million for this license; a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and a low double-digit percentage of sublicensing income.

If we or any of our future sublicensees bring a patent challenge against Yale or assist another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The agreement expires on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Issued patents and additional patents issuing from this licensed portfolio will expire no earlier than 2032, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Issued U.S. patent No. 10,172,707 will expire no earlier than 2035. Issued patents and additional patents issuing from this licensed portfolio will expire no earlier than 2032, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Issued U.S. patent No. 10,172,707 will expire no earlier than 2035. Yale may terminate the agreement if we fail to (i) provide written diligence reports, (ii) provide a commercially reasonable diligence plan, (iii) implement the plan in accordance with the obligations under the agreement, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreement; however, any such termination right would be limited in scope to the country or countries to which such failure relates. Yale may also terminate for our non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of our product or insolvency. We may terminate the license agreement (i) on 90 days' prior written notice to Yale, provided we are not in breach of the license agreement and have made all required payments to Yale thereunder and (ii) on written notice to Yale following an uncured material breach. Under certain circumstances, Yale may, at its option, convert the exclusive license to a non-exclusive license if we decline to initiate certain infringement or interference proceedings with respect to the licensed patents. We have agreed to indemnify Yale against certain third-party claims.

*Biovascular Pancreas*

In August 2019, we entered into a license agreement with Yale that granted us a worldwide license to its patents related to a BVP. The license granted under the agreement is exclusive in the field of acellular vascular tissues that deliver pancreatic islet cells to patients, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. We have agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. We are also obligated to provide Yale periodically an updated and revised copy of our plan, which must indicate progress of our development and commercialization. We may also sublicense our rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with our entry into the Yale License Agreement, we paid Yale an upfront cash fee of less than $0.1 million. We have also agreed to pay to Yale: an annual maintenance fee, increasing between the first anniversary of the agreement until the fifth anniversary up to a maximum of less than $0.1 million per year; milestone payments upon achievement of certain regulatory and commercial milestones of $0.1 million and $0.2 million for this license; a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and a low double-digit percentage of sublicensing income.

If we or any future sublicensees bring a patent challenge against Yale or assist another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The agreement expires on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Patents issuing from this licensed portfolio will expire no earlier than 2039, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Patents issuing from this licensed portfolio will expire no earlier than 2039, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Yale may terminate the agreement if we fail to (i) provide written diligence reports, (ii) provide a commercially reasonable diligence plan, (iii) implement the plan in accordance with the obligations under the agreement, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreement; however, any such termination right would be limited in scope to the country or countries to which such failure relates. Yale may also terminate for our non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of our product or insolvency. We may terminate the license agreement (i) on 90 days' prior written notice to Yale, provided we are not in breach of the license agreement and have made all required payments to Yale thereunder and on written notice to Yale following an uncured material breach. Our rights under the license agreement will also terminate automatically with respect to a patent application or patent within the licensed patents in a specified country if, upon receipt of written notice from Yale, we do not agree to pay the patent filing, prosecution and maintenance fees incurred by Yale for such patent applications or patents in the specified country. Under certain circumstances, Yale may, at its option, convert the exclusive license to a non-exclusive license if we decline to initiate certain infringement or interference proceedings with respect to the licensed patents. We have agreed to indemnify Yale against certain third-party claims.

***Competition***

Despite the magnitude and critical nature of the diseases and conditions we are targeting, no significant advances in the open surgical market have been made in the last 35 years, and current treatment and products used in vascular repair, reconstruction and replacement suffer from various drawbacks. The large majority of vascular repair, reconstruction and replacement procedures rely on either harvesting autologous veins or using synthetic grafts. However, each method presents significant limitations as discussed below:

*Autologous Veins*

The harvest of autologous veins is a serious operation that can result in numerous complications, including infection, chronic pain, and limb swelling that severely impact the patient's quality of life. In addition, this procedure can often result in long recovery times, increased hospital stays, and increased risk of hospital readmission. In order to obtain an autologous vein, such as a saphenous vein, for use in a surgical procedure, a second operation must be performed on the patient to harvest the vein. The harvesting process must be completed before the bypass procedure occurs and can take significant time to complete, which increases costs related to the additional operative time and staff required to perform the operation. Even if successful, the patient's recovery time could increase as the patient must recover from two surgical procedures instead of one, further increasing morbidity and cost. Additionally, a significant percentage of patients are not suitable for vein harvesting either due to vein or limb damage, limited vein supply from prior harvest, venous disease or the surgeon's desire to preserve the vein for future coronary or other bypass procedures. In acute trauma, the time to restore blood flow to injured limbs is delayed when a vein must be harvested from the patient, which puts the limbs at greater risk of reduced function or amputation. For patients suffering from vascular trauma, some types of injury preclude the harvesting of autologous saphenous vein due to concomitant injuries of one or both legs. Furthermore, time is required to prepare the vein harvest site and to remove the vein from the leg, which adds to ischemia time and can increase the risk of tissue and limb loss. Rates of traumatic limb loss are strongly tied to ischemia time, and therefore rapid revascularization using an off-the-shelf HAV conduit may decrease ischemia time and lead to better outcomes.

The use of autologous vein for creating an AV fistula for use in hemodialysis is often limited by vein size and location. The vast majority of veins must go through a process of enlargement, known as maturation, prior to use for hemodialysis. For approximately 40% of patients receiving fistulae, the vein does not mature sufficiently to allow for hemodialysis even after six months. Even in patients having adequate veins for fistula creation, the fistula often becomes large, tortuous and disfiguring and can be at risk for sometimes fatal rupture.

*Synthetic Grafts*

Use of synthetic materials, such as ePTFE and Dacron, while widely available, have known complications, such as continuous chronic risk of infection and clotting inside the graft. Risk of infection is significantly increased in acute battlefield and civilian injuries, as well as in contaminated wounds. The body recognizes any synthetic materials as foreign and, therefore, can mount a host foreign body response following implantation. Synthetic materials also have been shown to be inferior to autologous vein in resisting infection, and generally only are used for vascular repair when autologous vein is not an option.

In hemodialysis access, persistent puncture presents an ongoing risk of graft infection. The annual risk of infection of ePTFE grafts in hemodialysis patients can be as high as 10% – 15% per patient-year. Furthermore, gradual degradation of the non-healing ePTFE graft material caused by persistent needle punctures can eventually lead to graft failure. In traumatic vascular injury, ePTFE grafts are generally contraindicated, due to the high rates of contamination of the wound that can lead to synthetic graft infection and failure.

Two lesser used products, cryopreserved human blood vessels, known as allografts, and animal-derived vessels, known as xenografts, also involve significant limitations.

*Cryopreserved Blood Vessels*

To eliminate the need for harvesting autologous vein, some surgeons use allogeneic vessels that have been previously harvested from cadavers and cryogenically preserved. These allogeneic vessels are stored at -80 degrees Celsius and must be thawed prior to use, which can take up to 60 minutes. The supply of cryopreserved vessels is limited by the number of cadaveric donors available, and the vessels are often non-uniform in size. In addition, because the vessels contain human cells from a donor, they can generate an immune rejection response that can lead to aneurismal degradation or catastrophic failure. Furthermore, development of antibodies to the implanted cryopreserved human vessel frequently has a detrimental impact on the ability of the patient to receive a transplant in the future. Cryopreserved blood vessels are only rarely used in the treatment of vascular trauma, due to the time required for procurement and thawing, and the high rates of rejection response.

*Animal-Derived Vessels*

Xenogeneic tissues, including cow, pig or sheep-derived vessels, are used less frequently in vascular surgery, in part due to the risk of thrombosis and structural deterioration over time. The limited clinical data that are available for existing xenografts in vascular reconstruction indicates lower patency rates and higher incidence of complications when compared to autologous vein. Xenografts are all chemically treated in efforts to minimize rejection to animal components, and therefore do not respond like living tissue. Some of these products require rinsing to remove toxic chemicals used for storage.

*Our Solution*

We believe our HAVs combine the off-the-shelf availability of synthetic grafts with the regenerative capabilities of autologous vessels. We believe these and other attributes have the potential to address unmet clinical needs in a range of disease states, including atherosclerosis, end-stage kidney disease, coronary artery disease, vascular trauma, pediatric congenital heart disease, airway disease, and others. We believe that the HAV's multiple key characteristics will drive rapid clinical adoption amongst surgeons and the broader healthcare community:

- Off-the-Shelf: Our "cabinet" of HAVs of varying diameters and lengths is designed to be stored on-site at facilities such as hospitals, trauma centers and outpatient surgical centers.

- Immediately Available: When needed, our HAVs are available for immediate use by opening and removing the HAV from its original flexible bioreactor bag. Since our HAV does not need flushing, harvesting or thawing, as is common with other vascular substitute alternatives, we believe hospitals will be able to use our HAVs for vascular surgery more quickly with smaller surgical teams, reduced logistics and decreased overall cost.

- No Surgical Harvesting: The use of our HAVs does not subject patients to the serious operation of harvesting an autologous vein, which can result in greater procedure and recovery time, potential scarring and disfigurement, increased costs, and numerous potential health complications.

- Non-Immunogenic and No Foreign Body Response: Given their acellular nature, our HAVs have the potential to be universally implantable and durable across patients. Because our HAVs are derived from human tissue (but cleansed of all cells and cellular components), we believe (and have observed in clinical trials to date) that they do not generate the foreign body response associated with the use of synthetic grafts, or the immune response associated with cryopreserved vessels.

- Low Infection Susceptibility: In clinical trials to date, we have observed reduced rates of infection in our HAVs as compared to synthetic materials. As a result, we believe our HAVs may be used in complicated and potentially contaminated wounds with fewer patient complications following the initial procedure.

- Uniform and Predictable Size, Structure and Quality: Harvested veins vary in size, structure and quality by donor. We manufacture our HAVs to precise specifications under controlled quality standards, which will allow surgeons the flexibility to quickly and easily select an HAV in the appropriate size and shape for each indication.

- Regenerative Potential: Our HAVs repopulate with the patient's own vascular cells, creating a living vascular tissue with the associated long-term benefits of self-healing and infection resistance.

If approved, we expect our HAVs would compete with the use of a patient's own blood vessels, as well as a variety of marketed products, such as conventional synthetic grafts, xenografts, and allografts, as well as developing technologies. We expect the key competitive factors affecting the commercial success of our HAVs to likely be efficacy, safety, convenience, pricing and reimbursement.

*Other Commercial Entities*

There are several conventional synthetic grafts made of ePTFE or Dacron presently on the market from companies such as Bard Peripheral Vascular, Inc., W.L. Gore & Associates, Inc., Terumo Medical Systems, and Atrium (Maquet Getinge Group) that are used for both AV access for hemodialysis and vascular repair. Xenograft and allograft products are also available, but not widely used. Xenografts, such as Artegraft® and Procol®, are processed animal-derived vessels, while allografts are processed allogeneic cellular vessels, such as CryoVein® and AngioGRAFT®.

There are also a number of companies of which we are aware that have preclinical and early clinical-stage research programs underway to develop products that could potentially compete with our HAVs, including NovaHep AB, Xeltis AG, Hancock Jaffe, and Vascudyne Inc. We may face competition from these and other emerging technologies such as bioabsorbable polymetric implants and electrospun or 3D printed tubular conduits.

Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are more effective, safer, have fewer or less severe side effects, are more convenient or are less expensive than the products that we develop. Our competitors also may obtain FDA or other marketing approval for their products more rapidly than we may obtain the same approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market.

***Government Regulation***

*Overview*

The FDA and comparable regulatory authorities in state and local jurisdictions and in other countries impose substantial and burdensome requirements on the research, development, testing, manufacture, quality control, safety, effectiveness, packaging, labeling, storage, record keeping, marketing, advertising and promotion, import/export, and distribution of our vessels.

In the United States, the FDA regulates pharmaceutical drugs, medical devices and biologic products under the Federal Food, Drug, and Cosmetic Act ("FDCA"), the Public Health Service Act ("PHSA"), FDA implementing regulations, and other laws. Our vessels are subject to regulation by the FDA as biologics. Biologics require the submission of a BLA and approval by the FDA before being marketed in the United States. None of our vessels have been approved by the FDA for marketing in the United States, and we currently have one BLA pending. If we fail to comply with applicable FDA or other requirements at any time during the product development process, clinical testing, and the approval process or after approval, we may become subject to administrative or judicial sanctions. These sanctions could include the FDA's refusal to approve pending applications, license suspension or revocation, withdrawal of an approval, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, civil penalties or criminal prosecution. Any FDA enforcement action could have a material adverse effect on us.

*Marketing Approval — Biological Products in the United States*

Before a biologic is approved in the United States, an applicant must submit a BLA that includes sufficient evidence to establish the safety, purity, and potency of the product candidate for its intended indications, including from the results of preclinical studies and clinical trials. A BLA must also contain extensive information about manufacturing and product quality control testing, and the applicant must pass an FDA preapproval inspection of the manufacturing facility or facilities at which the biologic product is produced and distributed from to assess compliance with current good manufacturing practices ("cGMPs").

The steps for obtaining FDA approval of a BLA to market a biologic product in the United States generally include:

- Completion of extensive preclinical laboratory tests and preclinical animal studies performed in accordance with the FDA's current good laboratory practice ("GLP") regulations;

- Submission to the FDA of an Investigational New Drug application ("IND"), which must become effective before human clinical trials in the United States may begin;

- Approval of the protocol and related documentation by an Institutional Review Board ("IRB") or ethics committee representing each clinical site before each clinical trial may be initiated;

- Performance of adequate and well-controlled human clinical trials according to the FDA's regulations commonly referred to as GCPs and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the product candidate for each proposed indication;
- Submission to the FDA of a BLA;
- Satisfactory completion of an FDA inspection of the manufacturing facility or facilities and distribution site at which the product is produced: to assess compliance with cGMP regulations; to assure that the facilities, production methods, testing and controls are adequate; and, if applicable, to assure compliance with cGTP requirements for human cellular and tissue-derived products;
- Potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA;
- Review of the product candidate by an FDA advisory committee, if applicable;
- Payment of user fees for FDA review of the BLA (unless a fee waiver applies); and
- FDA review and approval, or licensure, of the BLA prior to any commercial marketing, sale or shipment of the product.

*U.S. Biological Products Development Process*

The testing and approval process requires substantial time, effort and financial resources, and we cannot be certain that any approvals for our vessels will be granted on a timely basis, if at all.

Once a product candidate is identified for development, that biologic candidate enters the preclinical testing stage. Preclinical studies include laboratory evaluations of product chemistry, toxicity, formulation and stability, as well as animal studies to evaluate the product's potential safety and activity. The results of the preclinical studies, together with manufacturing information, analytical data, and at least one protocol for clinical study, are submitted to the FDA as part of an IND. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions about the conduct of the clinical trial, including concerns that human research subjects will be exposed to unreasonable health risks. This is known as a "clinical hold." In such a case, the IND sponsor must resolve all of the FDA's concerns to the agency's satisfaction before the clinical trial can begin. Submission of an IND may result in the FDA not allowing the clinical trials to commence or not allowing the clinical trials to commence on the terms originally specified in the IND. A separate submission to an existing IND must also be made for each successive clinical trial conducted during product development, and the FDA must grant permission, either explicitly or implicitly by not objecting, before each clinical trial can begin. Even after a clinical trial has begun, the FDA can issue a clinical hold at any time if it concludes that certain conditions exist, such as patients may be exposed to an unreasonable and significant risk of illness or injury.

Clinical trials involve the use of the product candidate in human subjects under the supervision of qualified investigators. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, the parameters to be used in monitoring safety and the effectiveness criteria to be used. Each protocol must be submitted to the FDA as part of the IND. An independent IRB for each medical center proposing to conduct a clinical trial must also review and approve a plan for any clinical trial before it can begin at that center and the IRB must monitor the clinical trial until it is completed. The IRB must review and approve, among other things, the study protocol and informed consent information to be provided to study subjects. Some trials are overseen by an independent group of qualified experts organized by the trial sponsor, known as a data safety monitoring board or committee. This group provides authorization as to whether or not a trial may move forward at designated check points based on access that only the group maintains to available data from the study. Clinical testing also must satisfy extensive GCP requirements, including the requirements for informed consent. Information about clinical trials must be submitted within specific timeframes to the National Institutes of Health ("NIH") for public dissemination on its ClinicalTrials.gov website.

For purposes of BLA submission and approval, clinical trials are typically conducted in three sequential phases, which may overlap or be combined. For certain of Humacyte's development of product candidates, Phase 1 and Phase 2 trials have heretofore been combined into a single trial design.

- *Phase 1.* The biological product is initially introduced into human subjects and tested for safety. These initial trials to evaluate the potential toxicity and pharmacological activity of the investigational product (including pharmacokinetics, if applicable), and, if possible, gain early evidence on effectiveness.

- *Phase 2*. The biological product is evaluated in a limited patient population to identify potential adverse events and safety risks, to evaluate preliminarily the efficacy of the product candidate for specific targeted indications in patients with the disease or condition under trial, and, when applicable, to evaluate dosage tolerance and appropriate dosage.
- *Phase 3.* The biological product is administered to an expanded patient population, often large numbers of patients of several hundred to several thousand and generally at geographically dispersed clinical trial sites. These trials are designed to generate enough data to statistically evaluate clinical effectiveness and safety as well as to establish the overall benefit-risk relationship of the investigational new biological product, and to provide an adequate basis for product approval. FDA typically requires at least two Phase 3 trials to support approval, but in some cases may approve an application on the basis of one trial.

In some cases, the FDA may condition approval of a BLA on the sponsor's agreement to conduct additional clinical trials to further assess the biologic's safety and effectiveness after BLA approval. Such post-approval clinical trials are typically referred to as Phase 4 clinical trials.

During all phases of clinical development, regulatory agencies require extensive monitoring and auditing of all clinical activities, clinical data, and clinical trial investigators. Annual progress reports detailing the progress of the clinical trials must be submitted to the FDA. Written IND safety reports must be promptly submitted to the FDA and the investigators detailing serious and unexpected adverse events, any findings from other studies that suggest a significant risk to human patients, tests in laboratory animals or in vitro testing that suggest a significant risk for human patients, or any clinically important increase in the rate of a serious suspected adverse reaction over that listed in the protocol or investigator brochure. The sponsor must submit an IND safety report within 15 calendar days after the sponsor determines that the information qualifies for reporting. The sponsor also must notify the FDA of any unexpected fatal or life-threatening suspected adverse reaction within seven calendar days after the sponsor's initial receipt of the information.

The FDA or the sponsor may suspend or terminate a clinical trial at any time on various grounds, including a finding that the research patients are being exposed to an unacceptable health risk, including risks inferred from other trials on other products. Similarly, an IRB can suspend or terminate approval of a clinical trial at its institution if the clinical trial is not being conducted in accordance with the IRB's requirements or if the biological product has been associated with unexpected serious harm to patients.

Concurrent with clinical trials, companies usually complete additional animal trials and must also develop additional information about the characteristics of the biologic and finalize a process for manufacturing the biologic in commercial quantities in accordance with cGMP and, when applicable, GTP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its shelf life.

*BLA Review Process*

The results of preclinical studies and of the clinical trials, together with other detailed information, including extensive manufacturing information, information on the composition of the biologic, and proposed labeling, are submitted to the FDA in the form of a BLA requesting approval to market the biologic in the United States for one or more specified indications. The FDA reviews a BLA to determine, among other things, whether a biologic is safe and effective for its intended use.

The FDA has 60 days from its receipt of a BLA to determine whether the application will be accepted for filing based on the FDA's threshold determination that the application is sufficiently complete to permit substantive review. The FDA may refuse to file any BLA that it deems incomplete or not properly reviewable at the time of submission and may request additional information. In this event, the BLA must be resubmitted with the additional information. The resubmitted application also is subject to review before the FDA accepts it for filing. After the BLA submission is accepted for filing, the FDA reviews the BLA to determine, among other things, whether the proposed product is safe and potent, or effective, for its intended use, and has an acceptable purity profile, and whether the product is being manufactured in accordance with cGMPs (and, where applicable, GTPs) to assure and preserve the product's identity, safety, strength, quality, potency, and purity, and biological product standards. The FDA may refer applications for novel biological products or biological products that present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes outside clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved and, if so, under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions.

Before approving an application, the FDA will, among other things, inspect the facility or the facilities at which the biologic product is manufactured and distributed, and will not approve the product unless cGMP compliance is satisfactory. The FDA may also inspect the sites at which the clinical trials were conducted to assess their compliance, and may refuse to approve the biologic if compliance with GCP requirements is found to be unsatisfactory. For a human cellular or tissue product the FDA also may refuse to approve the product if the manufacturer is not in compliance with GTP requirements, in addition to cGMPs.

The FDA also has authority to require a Risk Evaluation and Mitigation Strategy ("REMS") from manufacturers to ensure that the benefits of a biological product outweigh its risks. A sponsor may also voluntarily propose a REMS as part of the BLA submission. The need for a REMS is determined as part of the review of the BLA. Based on statutory standards, elements of a REMS may include "dear doctor letters," a medication guide, more elaborate targeted educational programs, and in some cases restrictions on distribution and/or use. These elements are negotiated as part of the BLA approval, and in some cases may delay the approval date. Once adopted, REMS are subject to periodic assessment and modification.

The testing and approval processes require substantial time, effort and financial resources, and each may take several years to complete. The FDA may not grant approval on a timely basis, or at all. Even if we believe a clinical trial has demonstrated safety and efficacy of one of our vessels for the treatment of a disease, the results may not be satisfactory to the FDA. Preclinical and clinical data may be interpreted by the FDA in different ways, which could delay, limit or prevent regulatory approval. We may encounter difficulties or unanticipated costs in our efforts to secure necessary governmental approvals, which could delay or preclude us from marketing our vessels. The FDA may limit the indications for use or place other conditions on any approvals that could restrict the commercial application of the products.

Biologics may be marketed only for the FDA approved indications and in accordance with the provisions of the approved labeling. Further, if there are any modifications to the biologic, including changes in indications, labeling, or manufacturing processes or facilities, the applicant may be required to submit and obtain FDA approval of a new BLA or BLA supplement, which may require developing additional data or conducting additional preclinical studies and clinical trials. As with new BLAs, the review process is often significantly extended by FDA requests for additional information or clarification.

The Biologics Price Competition and Innovation Act ("BPCIA"), amended the PHSA to authorize the FDA to approve similar versions of innovative biologics, commonly known as biosimilars. A competitor seeking approval of a biosimilar must file an application to establish its product as highly similar to an approved innovator biologic, among other requirements. The BPCIA, however, bars the FDA from approving biosimilar applications for 12 years after an innovator biological product receives initial marketing approval. This bar does not apply to submission or approval of full BLAs. Because FDA has determined that our HAVs are regulated as biologics and require a BLA for marketing, we believe that our lead product will be entitled to 12 years of exclusivity upon approval. Nevertheless, the BPCIA is complex and is only beginning to be interpreted and implemented by the FDA. As a result, its ultimate impact, implementation and meaning is subject to uncertainty.

*Expedited Development and Review Programs*

The FDA offers various programs, including Fast Track designation, Breakthrough Therapy Designation, accelerated approval, priority review and RMAT designation, that are intended to expedite the process for the development and FDA review of biological products that are intended for the treatment of serious or life-threatening diseases or conditions. To be eligible for Fast Track designation, biological product candidates must be intended to treat a serious or life-threatening disease or condition and demonstrate the potential to address unmet medical needs for the disease or condition. Fast Track designation applies to the combination of the product and the specific indication for which it is being studied. The sponsor of a biological product candidate may request the FDA to designate the biologic as a Fast Track product at any time during the clinical development of the product. The sponsor of a Fast Track product has opportunities for more frequent interactions with the applicable FDA review team during product development and, once a BLA is submitted, the product candidate may be eligible for priority review. A Fast Track product may also be eligible for rolling review, where the FDA may consider for review sections of the BLA on a rolling basis before the complete application is submitted, if the sponsor provides a schedule for the submission of the sections of the BLA, the FDA agrees to accept sections of the BLA and determines that the schedule is acceptable, and the sponsor pays any required user fees upon submission of the first section of the BLA.

A biological product candidate may be eligible for Breakthrough Therapy Designation if it is intended to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the product candidate, alone or in combination with one or more other drugs or biologics, may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. Breakthrough Therapy Designation provides all the features of Fast Track designation in addition to intensive guidance on an efficient development program beginning as early as Phase 1, and FDA organizational commitment to expedited development, including involvement of senior managers and experienced review staff in a cross-disciplinary review, where appropriate.

Any marketing application for a biological product submitted to the FDA for approval, including a product candidate with a Fast Track designation and/or Breakthrough Therapy Designation, may be eligible for other types of FDA programs intended to expedite the FDA review and approval process, such as priority review and accelerated approval. Any product candidate is eligible for priority review if it is designed to treat a serious or life-threatening disease or condition, and if approved, would provide a significant improvement in safety or effectiveness compared to available alternatives for such disease or condition. The FDA will attempt to direct additional resources to the evaluation of an application for a biological product candidate designated for priority review in an effort to facilitate the review. Under priority review, the FDA's goal is to review an application within six months of the 60-day filing date, compared to ten months for a standard review.

Additionally, FDA may grant accelerated approval to a product candidate intended to treat a serious or life-threatening disease or condition upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments. As a condition of approval, the FDA may require that a sponsor of a biological product receiving accelerated approval perform adequate and well-controlled post-marketing clinical trials to verify and describe the anticipated effect on irreversible morbidity or mortality or other clinical benefit. Products receiving accelerated approval may be subject to expedited withdrawal procedures if the sponsor fails to conduct the required post-marketing studies or if such studies fail to verify the predicted clinical benefit. In addition, the FDA currently requires as a condition for accelerated approval pre-approval of promotional materials, which could adversely impact the timing of the commercial launch of the product.

In 2017, the FDA established a new RMAT designation as part of its implementation of the 21st Century Cures Act. The RMAT designation program is intended to fulfill the 21st Century Cures Act requirement that the FDA facilitate an efficient development program for, and expedite review of, any biological product that meets the following criteria: (i) the biological product qualifies as an RMAT, which is defined as a cell therapy, therapeutic tissue engineering product, human cell and tissue product, or any combination product using such therapies or products, with limited exceptions; (ii) the biological product is intended to treat, modify, reverse, or cure a serious or life-threatening disease or condition; and preliminary clinical evidence indicates that the biological product has the potential to address unmet medical needs for such a disease or condition. RMAT designation provides all the benefits of Breakthrough Therapy Designation, including more frequent meetings with the FDA to discuss the development plan for the product candidate and eligibility for rolling review and priority review. Product candidates granted RMAT designation may also be eligible for accelerated approval on the basis of a surrogate or intermediate endpoint reasonably likely to predict long-term clinical benefit, or reliance upon data obtained from a meaningful number of clinical trial sites, including through expansion of trials to additional sites.

Fast Track designation, Breakthrough Therapy Designation, priority review, accelerated approval, and RMAT designation do not change the standards for approval but may expedite the development or approval process. Even if a product candidate qualifies for one or more of these programs, the FDA may later decide that the product no longer meets the conditions for qualification or decide that the time period for FDA review or approval will not be shortened.

Additionally, on December 12, 2017, Public Law No. 115-92 amended the FDCA to, among other things, allow the DoD to request, and FDA to provide assistance to expedite development and the FDA's review of products to diagnose, prevent, treat or mitigate a specific and life-threatening risk to the U.S. military. Similar to the designations described above that FDA may grant, a priority designation by the DoD does not change the standards for approval but may expedite the development or approval process.

*Orphan Drug Designation*

Under the Orphan Drug Act, the FDA may grant orphan designation to a biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a biological product available in the United States for this type of disease or condition will be recovered from sales of the product. Orphan product designation must be requested before submitting a BLA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan product designation does not convey any advantage in or shorten the duration of the regulatory review and approval process.

Orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages and user-fee waivers. If a product that has orphan designation subsequently receives the first FDA approval for the disease or condition for which it has such designation, the product is entitled to orphan product exclusivity, which means that the FDA may not approve any other applications, including a full BLA, to market the same biological product for the same indication for seven years, except in limited circumstances, such as a showing of clinical superiority to the product with orphan exclusivity, or if the FDA finds that the holder of the orphan drug exclusivity has not shown that it can assure the availability of sufficient quantities of the orphan drug to meet the needs of patients with the disease or condition for which the drug was designated. Competitors, however, may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity.

A designated orphan drug many not receive orphan drug exclusivity if it is approved for a use that is broader than the indication for which it received orphan designation. In addition, orphan drug exclusive marketing rights in the United States may be lost if the FDA later determines that the request for designation was materially defective or, as noted above, if a second applicant demonstrates that its product is clinically superior to the approved product with orphan exclusivity or the manufacturer of the approved product is unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition.

*Other U.S. Regulatory Requirements*

For biologics that are human cells, tissues, and cellular and tissue-based products (“HTC/Ps”), manufacturers must also comply with the FDA’s HCT/P regulations at 21 C.F.R. Part 1271. These regulations impose a variety of specialized requirements as follows:

*HCT/P registration and listing.* Every establishment that manufactures an HCT/P must register with the FDA and provide a list of every HCT/P that the establishment manufactures. The definition of manufacture is broad and includes any and all steps in the recovery, processing, storage, labeling, packaging or distribution of any human cell or tissue and the screening or testing of the cell or tissue donor.

*Donor eligibility.* HCT/P manufacturers must maintain procedures for testing, screening and determining the eligibility of donors of cells and tissues used in HCT/Ps. An HCT/P may not be transferred or implanted into an individual until the donor has been determined to be eligible under these procedures. These procedures must involve, among other things, testing donors for certain communicable diseases and the use of quarantines for HCT/Ps that have not yet been shown to meet the eligibility requirements. Manufacturers must keep detailed records regarding donor eligibility determinations.

*Current Good Tissue Practices.* HCT/Ps must be recovered, processed, stored, labeled, packaged and distributed in a manner that is consistent with the FDA’s cGTP regulations. Cells and tissues must also be screened and tested according to these regulations. The goal of cGTPs is to prevent the introduction, transmission or spread of communicable diseases. The FDA’s cGTPs regulations require companies to establish a comprehensive quality program and to comply with rules related to personnel, facilities and equipment used to manufacture HCT/Ps, as well as rules on how these HCT/Ps are processed, labeled and stored. Companies must also keep detailed manufacturing records and product complaint files.

*Adverse Reaction Reports.* Manufacturers of nonreproductive HCT/Ps must investigate and report to the FDA certain adverse reactions.

*Inspections.* Establishments that manufacture HCT/Ps must allow the FDA to inspect the establishment and company records.

*Post-Approval Requirements*

Any biologics manufactured or distributed by us or our collaborators pursuant to FDA approvals would be subject to continuing post-approval regulation by the FDA, including recordkeeping requirements and reporting of adverse experiences associated with the product, as well as any post-marketing surveillance requested by the FDA as a condition to BLA approval. Manufacturers and their subcontractors are required to register their establishments with the FDA and certain state agencies, and are subject to periodic unannounced inspections by the FDA and certain state agencies for compliance with ongoing regulatory requirements, including cGMPs, which impose certain procedural and documentation requirements upon us and our third-party manufacturers. Failure to comply with the statutory and regulatory requirements can subject a manufacturer to possible legal or regulatory action, such as warning letters, suspension of manufacturing, seizure of product, injunctive action or possible civil penalties. We cannot be certain that we or our present or future third-party manufacturers or suppliers will be able to comply with the cGMP regulations and other ongoing FDA regulatory requirements. If we or our present or future third-party manufacturers or suppliers are not able to comply with these requirements, the FDA may halt our clinical trials, require us to recall our product from distribution or withdraw approval of the BLA for that product.

The FDA closely regulates the post-approval marketing and promotion of biologics to healthcare professionals, including standards and regulations for direct-to-consumer advertising, false or misleading claims, off-label promotion, industry-sponsored scientific and educational activities, and promotional activities involving the Internet. Failure to comply with these requirements can result in adverse publicity, warning letters, corrective advertising, and potential civil and criminal penalties. Physicians may prescribe legally available biologics for uses that are not described in the product's labelling and that differ from those tested by us and approved by the FDA. Such off-label uses are common across medical specialties. Physicians may believe that such off-label uses are the best treatment for many patients in varied circumstances. The FDA does not regulate the behavior of physicians in their choice of treatments. The FDA does, however, impose stringent restrictions on manufacturers' communications regarding off-label use.

*U.S. Healthcare Reform*

Political, economic and regulatory influences are subjecting the healthcare industry in the United States to fundamental changes. There have been, and we expect there will continue to be, legislative and regulatory proposals to significantly change the healthcare system. For example, the Patient Protection and Affordable Care Act (the "ACA") was enacted to broaden access to health insurance, reduce or constrain the growth of healthcare spending, enhance remedies against fraud and abuse, add transparency requirements for the healthcare and health insurance industries, impose new taxes and fees on the health industry and impose additional health policy reforms. In December 2017, portions of the ACA dealing with the individual mandate insurance requirement were effectively repealed by the Tax Cuts and Jobs Act of 2017.

*U.S. Third-Party Payor Coverage and Reimbursement*

Although none of our vessels have been commercialized for any indication, if they are approved for marketing, commercial success of our vessels will depend, in part, upon the availability of coverage and reimbursement from third-party payors at the federal, state and private levels. Government payor programs, including Medicare and Medicaid, private health care insurance companies and managed-care plans have attempted to control costs by limiting coverage and the amount of reimbursement for particular procedures or treatments. The U.S. Congress and state legislatures from time to time propose and adopt initiatives aimed at cost-containment. Ongoing federal and state government initiatives directed at lowering the total cost of health care will likely continue to focus on health care reform and on the reform of the Medicare and Medicaid payment systems. Examples of how limits on coverage and reimbursement in the United States may cause reduced payments for products in the future include: changing Medicare reimbursement methodologies; fluctuating decisions on which drugs to include in formularies; allowing the federal government to negotiate drug prices for federal healthcare programs; revising drug rebate calculations under the Medicaid program; and reforming drug importation laws.

Some third-party payors also require pre-approval of coverage for new or innovative devices or therapies before they will reimburse health care providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, the announcement or adoption of these proposals could have a material adverse effect on our ability to obtain adequate prices for our vessels and operate profitably. Significant cost containment pressure and downward pricing pressures exist in the U.S. and around the world, which may negatively affect reimbursement at any time.

*Other Healthcare Laws and Regulations*

We are also subject to healthcare regulation and enforcement by the federal government and the states and foreign governments in which we conduct our business. The laws that may affect our ability to operate include but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, persons from knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual for, or the purchase, order or recommendation of, any good or service for which payment may be made under federal healthcare programs such as the Medicare and Medicaid programs;

- federal false claims laws which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid, or other third-party payors that are false or fraudulent;

- federal criminal laws that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

- the federal Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act (collectively, "HIPAA"), which governs the conduct of certain electronic healthcare transactions and protects the security and privacy of protected health information;

- the federal Physician Payments Sunshine Act, which requires drug and device companies to annually report to CMS all payments and transfers of value provided to physicians and teaching hospitals for posting on a public website; and

- state law equivalents of many of the above federal laws, including anti-kickback and false claims laws that may apply to items or services reimbursed by any third-party payor, including commercial insurers.

If our operations are found to be in violation of any of the laws described above or any other governmental laws and regulations that apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, the curtailment or restructuring of our operations, the exclusion from participation in federal and state healthcare programs and imprisonment, any of which could adversely affect our ability to operate our business and impact our financial results.

*International Regulation*

In addition to regulations in the United States, we will be subject to a variety of foreign regulations governing clinical trials and commercial sales and distribution of our future products. Whether or not we obtain FDA approval for a product, we must obtain approval of a product by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country, and the time may be longer or shorter than that required for FDA approval. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country.

*EU Requirements Applicable to Medicinal Products*

In the EU, medicinal products are subject to extensive pre-and post-market regulation by regulatory authorities at both the EU and national levels.

*Clinical Trials*

Clinical trials of medicinal products in the EU must be conducted in accordance with EU (previously, Directive 2001/20/EC applied; as of January 31, 2022, Regulation EU No 536/2014 applies) and national regulations and the International Conference on Harmonization ("ICH") guidelines on GCP.

Prior to commencing a clinical trial, the sponsor must obtain a clinical trial authorization from the competent authority, and a positive opinion from an independent ethics committee of the relevant EU Member State in which the clinical trial will be carried out. Any substantial changes to the trial protocol or other information submitted with the clinical trial applications must be notified to or approved by the relevant competent authorities and ethics committees.

The sponsor of a clinical trial must register the clinical trial in advance, and certain information related to the clinical trial will be made public as part of the registration. The results of the clinical trial must be submitted to the competent authorities and, with the

exception of non-pediatric Phase 1 trials, will be made public at the latest within 12 months after the end of the trial.

During the development of a medicinal product, the EMA and national medicines regulators within the EU provide the opportunity for dialogue and guidance on the development program. At the EMA level, this is usually done in the form of scientific advice, which is given by the Scientific Advice Working Party of the Committee for Medicinal Products for Human Use ("CHMP"). Advice is not legally binding with regard to any future marketing authorization application of the product concerned. To date, we have not initiated any scientific advice procedures with the EMA, but we have obtained confirmation from the EMA that our HAVs would be eligible for the EMA's scientific advice procedures.

*Marketing Authorizations*

After completion of the required clinical testing, we must obtain a marketing authorization before we may place a medicinal product on the market in the EU. There are various application procedures available, depending on the type of product involved.

All application procedures require an application in the common technical document format, which includes the submission of detailed information about the manufacturing and quality of the product, and non-clinical and clinical trial information. There is an increasing trend in the EU towards greater transparency and, while the manufacturing or quality information is currently generally protected as confidential information, the EMA and national regulatory authorities are now liable to disclose much of the non-clinical and clinical information in marketing authorization dossiers, including the full clinical study reports, proactively or in response to freedom of information requests after the marketing authorization has been granted.

The centralized procedure gives rise to marketing authorizations that are valid throughout the EU. Applicants file marketing authorization applications with the EMA, where they are reviewed by a relevant scientific committee, in most cases the CHMP (although other specialist committees may also be involved; for example, the Committee for Advanced Therapies will also be involved in the review of advanced therapy medicinal products ("ATMP"), and HAVs could potentially be classified as an ATMP). The EMA forwards CHMP opinions to the European Commission, which uses them as the basis for deciding whether to grant a marketing authorization. The centralized procedure is compulsory for medicinal products that (1) are derived from biotechnology processes, (2) contain a new active substance indicated for the treatment of certain diseases, such as HIV/AIDS, cancer, diabetes, neurodegenerative disorders, viral diseases or autoimmune diseases and other immune dysfunctions, (3) are orphan medicinal products or (4) are advanced therapy medicinal products. For medicines that do not fall within these categories, an applicant may voluntarily submit an application for a centralized marketing authorization to the EMA, as long as the CHMP agrees that (i) the medicine concerned contains a new active substance, (ii) the medicine is a significant therapeutic, scientific, or technical innovation, or if its authorization under the centralized procedure would be in the interest of public health.

For those medicinal products for which the centralized procedure is not available, the applicant must submit marketing authorization applications to the national medicines regulators through one of three procedures: (1) a national procedure, which results in a marketing authorization in a single EU member state; (2) the decentralized procedure, in which applications are submitted simultaneously in two or more EU member states; and (3) the mutual recognition procedure, in which the EU member states are required to grant an authorization recognizing an existing authorization in another EU member state, unless they identify a serious risk to public health.

*Data Exclusivity*

Marketing authorization applications for generic medicinal products do not need to include the results of preclinical and clinical trials, but instead can refer to the data included in the marketing authorization of a reference product for which regulatory data exclusivity has expired. If a marketing authorization is granted for a medicinal product containing a new active substance or to a different marketing authorization holder that has carried out a complete set of pre-clinical tests and clinical trials, that product benefits from eight years of data exclusivity, during which generic marketing authorization applications referring to the data of that product may not be accepted by the regulatory authorities, and a further two years of market exclusivity, during which such generic products may not be placed on the market. The two-year period may be extended to three years if during the first eight years a new therapeutic indication with significant clinical benefit over existing therapies is approved.

There is a special regime for biosimilars, or biological medicinal products that are similar to a reference medicinal product but that do not meet the definition of a generic medicinal product, for example, because of differences in raw materials or manufacturing processes. For such products, while a full set of pre-clinical tests and trials are not necessary, the results of appropriate preclinical or clinical trials must be provided, and guidelines from the EMA detail the type of quantity of supplementary data to be provided for different types of biological product.

*Pediatric Development*

In the EU, companies developing a new medicinal product must agree to a Pediatric Investigation Plan ("PIP") with the EMA and must conduct pediatric clinical trials in accordance with that PIP. The marketing authorization application for the product must ordinarily include the results of pediatric clinical trials conducted in accordance with the PIP. It is possible to obtain a deferral, in which case the pediatric clinical trials must be completed at a later date, or a complete waiver from the obligation to conduct pediatric clinical trials (e.g., because the relevant disease or condition occurs only in adults).

*Post-Approval Controls*

The holder of a marketing authorization is subject to various post-approval controls, such as obligations to maintain a pharmacovigilance system and report adverse reactions, and requirements relating to promotional activities, including a prohibition on the promotion of prescription medicines to the general public. Manufacturers/importers and distributors of medicinal products must obtain authorizations from the competent national authorities and are subject to periodic inspections for compliance with cGMPs and current good distribution practices ("cGDPs"), respectively. The regulatory authorities may also impose specific obligations as a condition of the marketing authorization, such as additional safety monitoring or the conduct of additional clinical trials or post-authorization safety studies.

*EU Requirements Applicable to Medical Devices*

Under the previous medical devices directive, Directive 93/42/EEC, our HAVs were not classified as medical devices in the EU because, with limited exceptions, products incorporating or derived from tissues or cells of human origin are expressly excluded from the scope of the EU medical devices rules under Directive 93/42. However, as of May 26, 2021, Regulation (EU) 2017/745 applies, and this will bring us within the scope of the EU medical device rules products containing or derived from tissues or cells of human origin that are non-viable or are rendered non-viable.

Medical devices are generally governed by Regulation (EU) 2017/745 on Medical Devices that directly applies in all EU Member States and harmonizes the conditions for placing medical devices on the EU market. This Regulation, however, does not regulate certain important marketing aspects, such as pricing and reimbursement, which remain governed by national law. Additionally, certain areas, such as advertising, may be governed by additional national requirements.

A medical device may be placed on the market within the EU if it conforms to certain "general product safety requirements" or "GSPRs." These are general in nature and broad in scope. A fundamental GSPR, for example, is that a device must be designed and manufactured in such a way that it will not compromise the clinical condition or safety of patients, or the safety and health of users or other persons.

The manufacturer is obliged to demonstrate that the device conforms to the relevant GSPRs through a conformity assessment procedure. Once the appropriate conformity assessment procedure for a medical device has been completed, the manufacturer must draw up a written declaration of conformity and affix the CE mark to the device. The device can then be marketed throughout the EU.

The nature of the conformity assessment depends upon the classification of the device. The classification rules are mainly based on three criteria: the length of time the device is in contact with the body, the degree of invasiveness, and the extent to which the device affects the anatomy. As a general rule, Class I (low risk) devices are those that do not enter or interact with the body; Class IIa and IIb (medium risk) devices are invasive or implantable or interact with the body; and Class III (high risk) devices are those that affect the vital organs.

Conformity assessment procedures for all but the lowest risk classification of device involve a notified body, which are non-governmental, private entities licensed to provide independent certification of certain classes of medical device. EU regulatory bodies are not involved in the premarket approval of medical devices, with only very limited exceptions (such as medical devices that incorporate a medicinal product as an ancillary substance, in which case these regulatory bodies review the medicinal product). The onus of ensuring a device is safe enough to be placed on the market is ultimately the responsibility of the manufacturer and the notified body.

As part of the conformity assessment procedure, the manufacture will need to conduct a clinical evaluation of the device. This clinical evaluation may consist of an analysis of the scientific literature relating to similar devices, new clinical investigations of the device, or a combination of the two. For Class III and implantable devices, the conduct of clinical investigations is mandatory (with

limited exceptions). If a manufacturer wishes to conduct a clinical investigation in the EU, the manufacturer must notify the competent national regulatory authorities in advance and obtain ethics committee approval of the study.

*EU Requirements Applicable to Human Cells and Tissues*

EU rules, notably Directive 2004/23/EC and other implementing directives, govern the donation, procurement, testing and storage of human cells and tissues intended for human application, whether or not they are medicinal products. These rules also cover the donation, testing, processing, preservation, storage and distribution of human cell and tissues that are not medicinal products. Establishments that conduct such activities must be licensed and are subject to inspection by regulatory authorities. Such establishments must implement appropriate quality systems and maintain appropriate records to ensure that cells and tissues can be traced from the donor to the recipient and vice versa. There are also requirements to report SAEs and reactions linked to the quality and safety of cells and tissues. More detailed rules may exist at the national level.

In addition to regulations in Europe and the United States, we will be subject to a variety of foreign regulations governing clinical trials and commercial distribution of our future products.

***Facilities***

Our corporate headquarters, manufacturing, and research and development facilities are located in Durham, North Carolina where we lease approximately 83,000 square feet of space. This space includes approximately 55,000 square feet for production and distribution operations including manufacturing, bioprocessing, quality control, mechanical space and inventory. The remainder of the facility consists of offices, laboratories, and common spaces.

***Employees and Human Capital Management***

As of December 31, 2023, we had 185 employees, of which 183 were full-time. None of our employees are represented by a collective bargaining agreement, and we have never experienced any work stoppage. We believe we have good relations with our employees.

***Additional Information***

We were incorporated in Delaware on July 1, 2020, under the name Alpha Healthcare Acquisition Corp. in order to effectuate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities. AHAC completed its initial public offering on September 22, 2020. On August 26, 2021, AHAC and Legacy Humacyte consummated the transactions contemplated by the Merger Agreement. In connection with the closing of the Merger, we changed our name to Humacyte, Inc.

Our principal executive office is located at 2525 East North Carolina Highway 54, Durham, North Carolina 27713, and our telephone number is (919) 313-9633.

Our website address is www.humacyte.com and our investor relations website is located at https://investors.humacyte.com. The information posted on our website is not incorporated into this Annual Report on Form 10-K. The U.S. SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at http://www.sec.gov. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to reports filed or furnished pursuant to Sections 13(a) and 15(d) of the Exchange Act are also available free of charge on our investor relations website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

We provide notifications of news or announcements regarding our financial performance, including SEC filings, investor events, and press releases, as part of our investor relations website. The contents of these websites are not intended to be incorporated by reference into this report or in any other report or document we file.

**Item 1A. Risk Factors**

*Our operations and financial results are subject to a high degree of risk. These risks include, but are not limited to, those described below, each of which may have a material and adverse effect on our business, prospects, operating results, financial condition and the trading price of our securities. You should carefully consider the risks described below, together with all of the other information included in this Annual Report on Form 10-K. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business. In that event, the trading price of our securities could decline and you could lose all or part of your investment.*

**Summary of Risk Factors**

The following is a summary of the principal risks to which our business, operations and financial performance are subject. Each of these risks is more fully described in the individual risk factors immediately following this summary.

- We have never generated product revenue and have incurred significant losses to date. We expect to continue to incur losses for the foreseeable future and may never generate product revenue or be profitable. We will need to raise additional capital to finance our operations, which we may not be able to do on acceptable terms or at all.

- If our clinical trials fail to demonstrate safety and efficacy to the satisfaction of the FDA or similar regulatory authorities outside the United States or do not otherwise produce favorable results, we may incur significant additional costs or experience significant delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates.

- Our near-term prospects are dependent on the success of our 6 millimeter HAV, and if we are unable to successfully develop and commercialize it, our business, operating results and financial condition will be materially harmed.

- We may experience delays or difficulties in the enrollment of patients in our clinical trials, which may delay or prevent additional clinical trials and our receipt of necessary marketing approvals.

- Lack of experience by investigators and surgeons with our HAVs can lead to incorrect implantation or follow-up procedures which could harm the results of our clinical trials and market acceptance of our HAVs, if approved.

- We may not be successful in our efforts to use our proprietary scientific technology platform to build a pipeline of additional product candidates.

- Even if our HAVs receive marketing approval in the future for one or more of our product candidates, they may fail to achieve the degree of market acceptance by physicians, patients, third-party payors and others in the medical community necessary for commercial success.

- The sizes of the market opportunities for our product candidates have not been established with precision and are estimates that management believes to be reasonable. If these market opportunities are smaller than we estimate or if any approval that we obtain is based on a narrower definition of the relevant patient population, our revenue and ability to achieve profitability might be materially and adversely affected.

- Our distribution agreement with Fresenius Medical Care imposes obligations on us that may restrict our ability to operate our business in ways we believe to be in our long-term best interest.

- If we receive approval for a product candidate that is not subject to our distribution agreement with Fresenius Medical Care, and we are unable to establish our own marketing, sales and distribution capabilities or are unable to enter into agreements with third parties do so, we may not be able to generate product revenue and will have to alter our development and commercialization plans.

- The manufacture of our product candidates is complex, we have not manufactured commercial product, and we may encounter difficulties in production. If we or any third-party manufacturer encounter such difficulties, our ability to supply our product candidates for clinical trials or, if approved, for commercial sale could be delayed or halted entirely.

- The terms of the Purchase Agreement may limit our ability to incur future debt.

- We rely on third parties to conduct and support our clinical trials, and those third parties may not perform satisfactorily, including by failing to adhere to regulatory requirements or our stated protocols or to meet deadlines for the completion of such trials.
- We rely on third-party suppliers, including sole source suppliers, to provide certain components for our product candidates. Any failure by a third-party supplier to supply these components for manufacture may delay or impair our ability to complete our clinical trials and to commercialize our product candidates.
- We intend to rely on our strategic, global partnership with Fresenius Medical Care to undertake, or assist with, the marketing, sale and distribution of certain of our product candidates in certain markets if we receive marketing approval from relevant regulatory authorities. Disruption of this arrangement could materially adversely affect our business, prospects, operating results and financial condition.
- Our ability to successfully commercialize our products may be impaired if we are unable to obtain and maintain effective intellectual property rights for our proprietary scientific technology platform and product candidates.
- We may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.

**Risks Related to the Development and Commercialization of Our Product Candidates**

***If our clinical trials are delayed, do not produce favorable results, or otherwise fail to demonstrate safety and efficacy to the satisfaction of the FDA or similar regulatory authorities outside the United States, we may incur significant additional costs or experience significant delays in completing, or ultimately be unable to complete, the development, approval, and commercialization of our product candidates. If we experience significant delays or significant additional costs, our business will be materially harmed.***

Before obtaining marketing approval for any of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of our product candidates in humans. Clinical testing is expensive and time-consuming, and its outcomes are uncertain.

A number of factors may impact the timing of our preclinical and clinical programs and the development and commercialization of our product candidates. These include factors such as inability to recruit sufficient numbers of patients, delays in obtaining IRB approval for planned trials, or disagreements with regulatory agencies on clinical trial design and/or imposition of clinical holds. We cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all, or that they will be successful. Any inability to successfully complete development of our product candidates would likely result in significant additional costs to us, create delays in filing a BLA for regulatory approval of our product candidates and impair our ability to generate revenue.

We believe the novelty of our research and development efforts, which are focused on the development of bioengineered human, acellular, tissue-based vessels for use across a wide spectrum of applications in vascular surgery, augments this uncertainty. The scientific discoveries that form the basis for our efforts to develop our product candidates are relatively new, and the scientific evidence to support the feasibility of developing product candidates based on these discoveries is both preliminary and limited. At this time, no products based on HAVs have been approved in the United States, Europe or in any other jurisdiction. The clinical trial requirements of the FDA and other regulatory agencies and the criteria these regulators use to determine the safety and efficacy of a product candidate vary substantially according to the type, complexity, novelty and intended use and market of the potential product. In addition, because of the nature of the HAVs, many of our clinical trials are "open label," meaning that both the patient and the investigator know whether the patient is receiving the investigational product candidate. These studies often require the use of historical control arms consisting of patients previously treated with alternative therapies in the normal course of medical care. Use of open label study designs further complicates the clinical development process. Because of these and other factors, we may experience substantial difficulties in agreeing with FDA and other regulatory authorities on clinical trial design.

If our studies are not successful, we be delayed in obtaining marketing approval or may not receive marketing approval at all. For example, our V006 trial did not meet its primary endpoint, which has delayed development of the HAV for the hemodialysis access indication. If we fail to achieve the primary endpoint of our other ongoing or future clinical trials, or if safety issues arise, or the results from our clinical trials are otherwise inadequate to support regulatory approval of our product candidates, we may incur significant

additional costs or experience significant delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates.

Even if our clinical trials achieve their primary endpoints, the FDA may still determine that such trials do not adequately establish the safety and effectiveness of our products. Data obtained from preclinical and clinical studies are subject to varying interpretations, which may delay, limit, or prevent marketing approval. In such a circumstance, the FDA may require that we design and conduct new, additional clinical trials to demonstrate safety and effectiveness, or may determine not to approve our products at all.

Additionally, even if we receive FDA approval for our HAVs, we may face a number of difficulties if the results of our clinical trials are unfavorable, inconclusive, or only modestly favorable or if there are safety concerns, such as adverse events ("AEs") or SAEs, which could include clotting, mechanical failure, immunological rejection or infection, that could outweigh potential benefits associated with such product candidates. This could result in:

- obtaining approval for indications or patient populations that are not as broad as intended or desired;
- obtaining approval with, or later becoming subject to, labelling that includes significant use or distribution restrictions or significant safety warnings;
- being subject to a REMS or equivalent requirement from a comparable foreign regulatory agency, to ensure that the benefits of a biological product outweigh its risks or to change the way the product is used;
- being required to perform additional clinical trials to support approval or comparability or being subject to additional post-marketing testing requirements;
- having regulatory authorities withdraw their approval of the product;
- being sued; or
- suffering damage to our reputation.

Any of these events could cause us to incur significant additional costs, significant delays and prevent us from achieving or maintaining market acceptance of or commercializing one or more of our product candidates.

***Our progress in early stage clinical trials may not be indicative of long-term efficacy in late stage clinical trials, and our progress in trials for one product candidate may not be indicative of progress in trials for another product candidate.***

The product candidates in our pipeline are at various stages of development. Trial designs and results from previous studies are not necessarily predictive of our future clinical trial designs or results, and initial results of ongoing trials may not be confirmed upon full analysis of the complete trial data. A number of companies in the biotechnology industry have suffered significant setbacks in late-stage clinical trials even after achieving promising results in earlier stage clinical trials, and we may experience similar setbacks. Favorable results in clinical trials for one of our product candidates also do not necessarily indicate that we will obtain positive results in clinical trials related to other product candidates. The novelty of our proprietary scientific technology platform adds another layer of risk that early-stage clinical trials may not be indicative of long-term efficacy in our late-stage clinical trials. If we are unable to demonstrate favorable results in future clinical trials for our various product candidates, we expect that our business, prospects, operating results and financial condition will be materially adversely affected.

Additionally, several of our past, planned and ongoing clinical trials utilize an "open-label" trial design. An "open-label" clinical trial is one where both the patient and investigator know whether the patient is receiving the investigational product candidate. Some open-label clinical trials test only the investigational product candidate without a comparator. Open-label clinical trials are subject to various limitations that may exaggerate any therapeutic effect as patients in open-label clinical trials are aware when they are receiving treatment. Open-label clinical trials may be subject to a "patient bias" where patients perceive their symptoms to have improved merely due to their awareness of receiving an experimental treatment. In addition, open-label clinical trials may be subject to an "investigator bias" where those assessing and reviewing the physiological outcomes of the clinical trials are aware of which patients have received treatment and may interpret the information of the treated group more favorably given this knowledge. The results from an open-label trial may not be predictive of future clinical trial results with any of our product candidates when studied in an environment with an active control.

***Interim, "topline," and preliminary data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary or topline data from our clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, although we may not have received or had the opportunity to fully and carefully evaluate all data at the time such preliminary or topline results are released. As a result, the topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Topline data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, topline data should be viewed with caution until the final data are available. From time to time, we may also disclose interim data from our clinical trials. Interim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available, or as patients from our clinical trials continue other treatments for their disease. Adverse differences between preliminary or interim data and final data could significantly harm our business prospects.

In addition, the information we choose to publicly disclose regarding a particular clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure.

***If SAEs occur at an unacceptable rate or other unacceptable side effects are identified in our HAVs we may need to delay, abandon or limit development and marketing of our product candidates.***

Our HAVs may prove to have undesirable or unintended side effects, toxicities or other characteristics that may preclude us from obtaining marketing approval. If our HAVs are associated with undesirable side effects in clinical trials or have negative characteristics that are unexpected, we may need to perform additional clinical trials, abandon their development or limit development to more narrow uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective. Even if one of our product candidates is approved, the FDA and other regulatory authorities may limit the scope of that approval, require us to include detailed warnings and/or contraindications in product labeling, and/or implement a REMS, which may include restrictions on distribution or use of the product. If serious safety concerns emerge after product approval, FDA and other regulatory authorities may take steps to withdraw the product from the market. Any of these events could cause us to delay, abandon or limit the development and, if approved, marketing of our product candidates. For more information, see the section of this Annual Report on Form 10-K titled "Business."

***We may experience delays or difficulties in the enrollment of patients in our clinical trials, which may delay or prevent additional clinical trials and our receipt of necessary marketing approvals.***

We are currently enrolling patients in several clinical trials, including in our V012 trial, which is a Phase 3 clinical trial comparing the safety and efficacy of our 6 millimeter HAV to AV fistula for hemodialysis access in women. Identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends in part on the rate at which we can recruit patients to participate in such trials. We may not be able to initiate or continue clinical trials for our product candidates if we are unable to locate and enroll a sufficient number of eligible patients to participate in these trials as required by the FDA and other regulatory authorities, and as such our product candidates could be delayed or otherwise adversely affected. Patient enrollment and trial completion is affected by many factors including the:

- size of the patient population and process for identifying subjects;
- availability of clinical trial research resources at clinical sites due to ongoing effects of the COVID-19 pandemic;
- design of the trial protocol;
- inclusion and exclusion criteria;
- safety profile to date of the product candidate under study;

- perceived risks and benefits of the product candidate under study;
- availability of competing therapies and clinical trials;
- severity of the disease under investigation;
- degree of progression of the subject's disease at the time of enrollment;
- proximity and availability of clinical trial sites for prospective subjects;
- the ongoing impact of the COVID-19 pandemic or future pandemics or similar events on patients' willingness and ability to participate in clinical trials or on study site policies;
- ability to obtain and maintain subject consent;
- risk that enrolled subjects will drop out before completion of the trial;
- patient referral practices of physicians; and
- ability to monitor subjects adequately during and after treatment.

If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay, limit or terminate ongoing or planned clinical trials, any of which would have an adverse effect on our business, financial condition, results of operations and prospects.

***Lack of experience by investigators and surgeons with our HAVs can lead to incorrect implantation or follow-up procedures which could harm the results of our clinical trials and market acceptance of our HAVs, if approved.***

Our HAVs are currently in various stages of preclinical and clinical testing. We do not have the personnel capacity to directly conduct or manage all of the clinical trials that are necessary for the development of our HAVs. Therefore, we rely, and will continue to rely, on third parties to assist us in managing, monitoring and conducting our clinical trials. Some of the investigators in our clinical trials have not been, and, if our HAVs receive marketing approval, surgeons may not be, previously exposed to the implantation and follow-up procedures related to their use. As a result, our HAVs may be, and have been in the past, incorrectly implanted and follow-up procedures may be performed incorrectly, resulting in increased interventions or failure of the HAV, and complicating interpretation of clinical trial results. Our efforts to educate investigators, surgeons and interventionalists regarding the proper techniques for use of our HAVs both during clinical trials and following potential commercialization may be costly, prove unsuccessful and could materially harm our ability to continue the clinical trials or commence marketing of our HAVs. Regulatory authorities may also seek to impose restrictive labeling or proactive communication obligations on any marketing approval granted for use of our HAVs as a result, which could reduce market acceptance of any of our HAVs that receive marketing approval.

***Our near-term prospects are dependent on the success of our 6 millimeter HAV, and if we are unable to successfully develop and commercialize it, our business, operating results and financial condition will be materially harmed.***

We currently have no products approved for sale and, while we are developing a number of product candidates, we have invested and continue to invest a substantial portion of our efforts and financial resources in the development of our 6 millimeter HAV. None of our remaining product geometries and modifications have advanced beyond preclinical development. As a result, in the near term we are dependent on the success of our 6 millimeter HAV, and if we are unable to successfully develop, obtain marketing approval for, and commercialize it, our business, along with our operating results and financial condition, will be materially harmed. Even if we succeed with the development of our 6 millimeter HAV, our ability to generate product revenue and become profitable from our 6 millimeter HAV depends on our assumptions regarding the relevant market opportunity and the degree of market acceptance for our products, once approved, for which our estimates may prove inaccurate, and market acceptance in any approved indication, which may never occur.

***We may not be successful in our efforts to use our proprietary scientific technology platform to build a pipeline of additional product candidates.***

A key element of our strategy is to use our proprietary scientific technology platform to expand our pipeline of HAVs and to progress other product candidates into and through clinical development. We may not be able to identify or develop future product

candidates that are safe and effective. Even if we are successful in building our pipeline, the potential product candidates that we identify may not be suitable for clinical development, including if they have harmful side

effects or other characteristics that render them unlikely to receive marketing approval or achieve market acceptance. Research programs to identify new product candidates require substantial technical, financial and human resources, and we may focus our efforts and resources on potential programs or product candidates that ultimately prove to be unsuccessful. If we do not successfully develop and commercialize additional product candidates based upon our technology, we may have difficulty generating product revenue in the future, which could result in significant harm to our business, prospects, operating results and financial condition and adversely affect our stock price.

***Even if our HAVs receive marketing approval in the future for one or more of our product candidates, they may fail to achieve the degree of market acceptance by physicians, patients, third-party payors and others in the medical community necessary for commercial success.***

Even with the requisite approvals from the FDA in the United States, the European Commission in the EU and other regulatory authorities internationally, the commercial success of our HAVs will depend, in part, on the acceptance of physicians, patients and health care payors, as medically necessary, cost-effective and safe. Any product that we commercialize may not gain acceptance by physicians, patients, health care payors and others in the medical community due to ethical, social, medical and legal concerns. If these products do not achieve an adequate level of acceptance, we may not generate significant product revenue and may not become profitable.

The degree of market acceptance of any of our product candidates that receives marketing approval will depend on a number of factors, including:

- the efficacy and potential advantages of our product candidates compared with alternative products or methods, including convenience and ease of administration;
- the prices we charge for our products, if approved;
- the availability of third-party coverage and adequate reimbursement;
- the willingness of the target patient population to try new products and methods and of physicians to use these products and methods;
- the quality of our relationships with patient advocacy groups;
- the strength of marketing and distribution support;
- the availability of the product and our ability to meet market demand;
- the prevalence and severity of any side effects; and
- any restrictions on the use of our products, if approved.

***The sizes of the market opportunities for our product candidates have not been established with precision and are estimates that management believes to be reasonable. If these market opportunities are smaller than we estimate or if any approval that we obtain is based on a narrower definition of the relevant patient population, our revenue and ability to achieve profitability might be materially and adversely affected.***

Our estimates of the market opportunity for certain of our product candidates are based on a number of internal and third-party estimates. While we believe our assumptions and the data underlying these estimates are reasonable, they may be inaccurate or based on imprecise data. In addition, the assumptions and conditions underlying the estimates may change at any time. For example, the number of patients who ultimately use our product candidates, if approved by regulatory authorities, and our total market opportunities for such product candidates, will depend on, among other things, pricing and reimbursement, market acceptance of those product candidates and patient access, and may be lower than we estimate. Additionally, any approval we receive for our product candidates may be based on a narrower definition of the relevant patient population than we have estimated. Either of these circumstances could materially harm our business, financial condition, results of operations and prospects.

***We face and will continue to face substantial competition, which may result in others discovering, developing or commercializing competing products before or more successfully than we do, which may adversely affect our ability to successfully market or commercialize our HAVs.***

The development and commercialization of new biological products is highly competitive and subject to rapid change and technological advancements. If approved, we expect our HAVs would compete with the use of a patient's own blood vessels, as well as a variety of marketed products, such as conventional synthetic grafts, xenografts, and allografts, as well as developing technologies.

We expect to face competition with respect to any additional product candidates that we may seek to develop or commercialize in the future from a variety of sources, including major pharmaceutical companies, specialty pharmaceutical companies and biotechnology companies, hospital product-focused companies, as well as public and private universities and research organizations.

Many of our existing or potential competitors, either alone or with their strategic partners, have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining marketing approvals and marketing and commercializing approved products than we do. Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These competitors also compete with us in recruiting and retaining qualified scientific and management personnel and establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs. Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient or are less expensive than the products that we develop. Our competitors also may obtain FDA or other marketing approval for their products more rapidly than we may obtain the same approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market.

We plan to seek marketing approval for our HAVs in the United States as a biologic and in the EU as a medicinal product. In both the United States and the EU, our competitors may try to market vascular conduits similar to our product candidates as medical devices. Such competitive products could have comparable characteristics and could function similarly in the body (and could even be protein-based like our product candidates). Companies may be able to obtain marketing approval for such products on the basis of less data than the data required for a BLA and marketing similar products as devices could permit our competitors to circumvent regulatory exclusivity for biologics in the United States and medicinal products in the EU.

***Our distribution agreement with Fresenius Medical Care imposes obligations on us that may restrict our ability to operate our business in ways we believe to be in our long-term best interest.***

We expect to rely on our strategic, global relationship with Fresenius Medical Care for the development and commercialization of certain of our product candidates. As discussed in more detail in the section of this Annual Report on Form 10-K titled "Business — Distribution — Distribution Agreement with Fresenius Medical Care," Fresenius Medical Care will have the exclusive right to develop outside of the United States and EU and commercialize outside of the United States, among other things, our 6 millimeter x 42 centimeter HAV and all improvements thereto, and modifications and derivatives thereof (including any changes to the length, diameter, or configuration of the foregoing), which we refer to as the distribution product, for use in vascular creation, repair, replacement or construction (including renal replacement therapy for dialysis access, the treatment of vascular trauma, and the treatment of PAD, but excluding coronary artery bypass graft, pediatric heart surgery, or adhering pancreatic islet cells onto the outer surface of the distribution product for use in diabetic patients). We refer to these indications wherein Fresenius Medical Care has rights to develop and commercialize Humacyte's products as the field. The distribution agreement also imposes a number of restrictions on our business. For instance, outside the United States, the distribution agreement restricts our ability to engage a distributor for the distribution product outside the field or for HAV products other than the distribution product: we have granted Fresenius Medical Care (i) an exclusive right of first negotiation for exclusive distribution rights outside the United States for the distribution product for use outside the field, and (ii) an exclusive right of first negotiation for exclusive distribution rights outside the United States for our other HAV products, if any, subject, in each case, to certain conditions. These and other obligations may restrict our ability to operate our business in ways we believe are in our long-term best interest, which could harm our business and our prospects.

***If we receive approval for a product candidate that is not subject to our distribution agreement with Fresenius Medical Care, and we are unable to establish our own marketing, sales and distribution capabilities or are unable to enter into agreements with third parties do so, we may not be able to generate product revenue and will have to alter our development and commercialization plans.***

We currently have limited internal marketing, sales or distribution capabilities, and our management team has limited experience commercializing products following marketing approval. If one of our product candidates that is not subject to the distribution agreement with Fresenius Medical Care receives marketing approval, we will be required either to develop these capabilities internally or to make arrangements with third parties for the marketing, sales and distribution of the relevant product candidate. The establishment and development of our own marketing, sales and distribution functions will be expensive and time-consuming and may delay any product launch, and we may ultimately be unable to successfully develop the product candidate. In addition, or in the alternative, we could seek one or more partners to handle some or all of the marketing, sales and distribution activities associated with any such product candidate. However, we may face significant competition in seeking appropriate strategic partners, and the negotiation process is time consuming and complex. Therefore, we may not be able to enter into arrangements with third parties to do so on favorable terms or at all. In the event we are unable to develop our own marketing, sales and distribution functions or collaborate with a third-party organization for this purpose, we may not be able to successfully commercialize a product candidate that is not subject to the distribution agreement with Fresenius Medical Care, which would adversely affect our ability to generate revenue. Further, whether we commercialize any such product candidate on our own or rely on a third party to do so, our ability to generate revenue will be dependent on the effectiveness of the organization performing these functions.

***Even if we receive marketing approval for our HAVs, there is uncertainty with respect to third-party coverage and reimbursement of our HAVs. They may also be subject to unfavorable pricing regulations, third-party reimbursement practices or healthcare reform initiatives, any of which could harm our business, prospects, operating results and financial condition.***

There is uncertainty around third-party coverage and reimbursement of newly approved regenerative medicine type products, even those with the RMAT designation from FDA, such as our 6 millimeter HAV for urgent arterial repair following extremity vascular trauma, which received the RMAT designation in 2023, and our 6 millimeter HAV for AV access for performing hemodialysis, which received the RMAT designation in 2017. In the United States, third-party payors, including government payors such as the Medicare and Medicaid programs, play an important role in determining the extent to which medical products and biologics will be covered and reimbursed. The Medicare and Medicaid programs increasingly are used as models for how private payors and government payors develop their coverage and reimbursement policies. Currently, no RMAT tissue engineered product has established coverage and reimbursement by the CMS. Even if our HAVs receive approval from regulatory authorities, it is difficult to predict what CMS or any comparable foreign regulatory agency will decide with respect to coverage and reimbursement for novel products such as ours, as there is no body of established practices and precedents for these types of products.

The healthcare industry is acutely focused on cost containment, both in the United States and elsewhere. Government authorities and third-party payors have attempted to control costs by limiting coverage and the amount of reimbursement. These payors may not view our products, if any, as cost-effective, and coverage and reimbursement may not be available to our customers or may not be sufficient to allow our products, if any, to be marketed on a competitive basis. Cost-control initiatives could also cause us to decrease any price we might establish for products, which could result in lower than anticipated product revenue. Moreover, eligibility for reimbursement does not imply that any product will be paid for in all cases or at a rate that covers our costs, including our costs related to research, development, manufacture, sale and distribution. Reimbursement rates may vary, by way of example, according to the use of the product and the clinical setting in which it is used. If the prices for our products, if any, decrease or if governmental and other third-party payors do not provide adequate coverage or reimbursement, our business, prospects, operating results and financial condition will suffer, perhaps materially.

On August 16, 2022, President Biden signed the IRA into law, which sets forth meaningful changes to drug product reimbursement by Medicare. Among other actions, the IRA permits HHS to engage in price-capped negotiation to set the price of certain drugs and biologics reimbursed under Medicare Part B and Part D. The IRA contains statutory exclusions to the negotiation program, including for certain orphan designated drugs for which the only approved indication (or indications) is for the orphan disease or condition. Should our product candidates be approved and covered by Medicare Part B or Part D, and fail to fall within a statutory exclusion, such as that for an orphan drug, those products could, after a period of time, be selected for negotiation and become subject to prices representing a significant discount from average prices to wholesalers and direct purchasers. The IRA also establishes a rebate obligation for drug manufacturers that increase prices of Medicare Part B and Part D covered drugs at a rate greater than the rate of inflation. The inflation rebates

may require us to pay rebates if we increased the cost of a covered Medicare Part B or Part D approved product faster than the rate of inflation. In addition, the law eliminates the “donut hole” under Medicare Part D beginning in 2025 by significantly lowering the beneficiary maximum out-of-pocket cost and requiring manufacturers to subsidize, through a newly established manufacturer discount program, 10% of Part D enrollees’ prescription costs for brand drugs below the out-of-pocket maximum and 20% once the out-of-pocket maximum has been reached. Our cost-sharing responsibility for any approved product covered by Medicare Part D could be significantly greater under the newly designed Part D benefit structure compared to the pre-IRA benefit design. Additionally, manufacturers that fail to comply with certain provisions of the IRA may be subject to penalties, including civil monetary penalties. The IRA is anticipated to have significant effects on the pharmaceutical industry and may reduce the prices we can charge and reimbursement we can receive for our products, among other effects.

Any reduction in reimbursement from Medicare resulting from the IRA or other legislative or policy changes, or from other government programs may result in a similar reduction in payments from private payers. These healthcare reforms and the implementation of any future cost containment measures or other reforms may prevent us from being able to generate sufficient revenue, attain and/or maintain profitability or commercialize our drug candidates. We cannot be sure whether additional legislative changes will be enacted, or the effect of forthcoming guidance implementing the IRA, or whether FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on our product candidates or the marketing approvals of our product candidates, if any, may be.

In some countries, particularly in Europe, the pricing of our product may be subject to governmental control. In these countries, pricing negotiations with governmental authorities can take considerable time after the receipt of marketing approval for a product. To obtain reimbursement or pricing approval in some countries, we may be required to conduct a clinical trial that compares the cost-effectiveness of our product candidate to other available therapies. If reimbursement of our products, if approved, is unavailable or more limited in scope or amount than we anticipate, or if pricing is set at even lower levels than we anticipate, our business could be harmed, possibly materially.

***Product liability lawsuits against us could cause us to incur substantial liabilities that may not be covered by our limited product liability insurance and may limit the development, approval and commercialization of our HAVs and any other product candidates that we develop in the future.***

We face an inherent risk of product liability exposure related to the testing of our product candidates in human clinical trials and will face an even greater risk, if and when we commercially sell our HAVs and any other product candidates that we may develop. If we cannot successfully defend ourselves against claims that our product candidates or products caused injuries, we will incur substantial liabilities. Regardless of merit or eventual outcome, product liability claims may result in:

- decreased demand for any product candidates or products that we develop or sell, leading to loss of revenue;
- injury to our reputation and significant negative media attention;
- withdrawal, or slower enrollment, of clinical trial participants;
- significant costs to defend the related litigation and reduced resources of our management to pursue our business strategy;
- substantial monetary awards to trial participants or patients; and
- inability to further develop or commercialize our product candidates.

We currently hold limited product liability insurance coverage, and it may not be adequate to cover all liabilities that we may incur. We also may not be able to maintain insurance coverage at a reasonable cost or in an amount adequate to satisfy any liability that may arise.

## Risks Related to Manufacturing Our Product Candidates

***The manufacture of our product candidates is complex, we have not manufactured commercial product, and we have in the past and may in the future encounter difficulties in production. If we or any third-party manufacturer encounter such difficulties, our ability to supply our product candidates for clinical trials or, if approved, for commercial sale could be delayed or halted entirely.***

The process of manufacturing our HAVs is complex, highly regulated and subject to multiple risks. The manufacture of biologics such as our HAVs has been, and continues to be, susceptible to product loss due to a range of factors including contamination, equipment failure, temporary power outages, improper installation or operation of equipment, damage to facilities, vendor or operator error, inconsistency in yields, variability in product characteristics and difficulties in scaling the production process. Even minor deviations from normal manufacturing processes has resulted, and could in the future result, in reduced production yields, product defects and other supply disruptions. If microbial, viral or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, manufacturing may be delayed for an extended period of time to investigate and remedy the contamination, which would harm our business, operating results and financial condition as well as our reputation. We depend on cell banks in our manufacturing process, and the loss of our master cell banks would result in significant disruptions to that process.

We currently manufacture the 6 millimeter HAVs for our clinical trials at our manufacturing facility in Durham, North Carolina, where we have created a scalable modular manufacturing process, which we refer to as the LUNA200 system, that we believe will enable us to manufacture our HAVs, if approved, in commercial quantities in compliance with cGMPs. Our efforts to scale out our manufacturing operations may not succeed. Scaling out a biologic manufacturing process is a difficult task, as there are risks including, among others, cost overruns, process reproducibility, stability issues, lot consistency and timely availability of raw materials. We have limited years of experience manufacturing our HAVs in-house with the LUNA200 system, and no experience manufacturing the volume that we anticipate will be required to supply all of our clinical trials or to achieve planned levels of commercial sales following marketing approval, if received. Additionally, our manufacturing process has evolved over time and we may not have the experience, resources, or facility capacity to handle adoption of future changes or expansion of capacity. The forecasts of demand we plan to use to determine order quantities and lead times for components from outside suppliers may be incorrect, and we may be unable to obtain such components when needed and at a reasonable cost. We also have experienced interruptions in the supply of the raw materials required to manufacture our product candidates, and increased costs due to supply chain disruptions or inflation in the cost of goods, services or other operating inputs. Likewise, supply chain interruptions could affect the transport of clinical trial materials, such as our HAVs and other supplies used in our clinical trials, which would negatively impact our ability to conduct our clinical trials. In addition, we may not be able to develop and implement efficient manufacturing capabilities and processes to manufacture our HAVs in sufficient volumes that also satisfy the legal, regulatory, quality, price, durability, engineering, design and production standards required to commercialize our HAVs successfully.

If we are unable to produce sufficient quantities of our HAVs for our clinical trial needs or commercialization, we may need to make additional changes to our manufacturing processes and procedures. Such changes to our manufacturing platform could trigger the need to conduct additional bridging studies between our prior clinical supply and that of any new manufacturing processes and procedures. Should we experience delays or be unable to produce sufficient quantities of our HAVs utilizing our current or a modified version of our manufacturing system, we expect that our development and commercialization efforts would be impaired as a result, which would likely materially adversely affect our business, prospects, operating results and financial condition.

***Manufacturing facilities are subject to significant government regulations and approvals, which are often costly and could result in adverse consequences to our business if we fail to comply with the regulations or maintain the approvals.***

Our manufacturing facility is subject to ongoing regulation and periodic inspection by the FDA and other regulatory authorities to ensure compliance with cGMPs. Failure to follow and document adherence to such regulations or other regulatory requirements may (i) lead to significant delays in the availability of product for our clinical trials, (ii) result in the termination of or a hold being placed on one or more of our clinical trials, (iii) require significant modifications to our manufacturing facility, personnel, and procedures, (iv) delay or prevent filing or approval of marketing applications for our HAVs, (v) result in temporary or permanent closures of our manufacturing facilities, and/or (vi) result in other civil or criminal penalties.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 267 of 674

## Risks Related to Our Reliance on Third Parties

***We rely on third parties to conduct and support our clinical trials, and those third parties may not perform satisfactorily, including by failing to adhere to regulatory requirements or our stated protocols or to meet deadlines for the completion of such trials.***

We do not independently conduct clinical trials for our product candidates and instead rely on third parties, such as CROs, clinical data management organizations, medical institutions and clinical investigators, to perform various functions, including implanting our HAVs and monitoring patients. The FDA and other regulatory authorities require us and these third parties to comply with GCP and, where applicable, cGTPs for conducting, recording and reporting the results of clinical trials to assure that data and reported results are credible and accurate and that the rights, integrity and confidentiality of patients in clinical trials are protected; ultimately, we remain responsible for ensuring that each of our clinical trials is conducted in accordance with the general investigational plan and trial protocol. Failure by us or these third parties to do so could require us to enroll additional trial subjects beyond those we anticipate, could require us to modify our protocol, which may cause us to lose previously established Special Protocol Assessment ("SPA") agreements with the FDA or similar agreements with other regulatory authorities concerning whether the design and size of our clinical trial adequately addresses scientific and regulatory requirements to support marketing approval, or could materially harm our ability to complete our clinical trials, including as a result of the need to remove trial sites and participants from the trial, and could result in civil or criminal penalties. We have in the past and may in the future need to terminate trial sites due to failure to conduct a trial in accordance with its protocol, applicable regulations, GCPs, and generally accepted research standards.

The performance of the sites for our clinical trials may also be adversely affected by various other issues, including the lack of familiarity with the properties of our HAVs, intervention rates, insufficient training of personnel, variances in medical infrastructure, lack of familiarity with conducting clinical trials in accordance with international regulatory standards, communication difficulties or changes in local regulations. If these third parties do not successfully conduct our clinical trials in accordance with regulatory requirements or our stated protocols, carry out their contractual duties, or meet expected deadlines, we may not be able to obtain, or may be delayed in obtaining, marketing approvals for our product candidates and may not be able to, or may be delayed in our efforts to, successfully commercialize our products if approved by regulatory authorities.

***We rely on third-party suppliers, including sole source suppliers, to provide certain components for our product candidates. Any failure by a third-party supplier to supply these components for manufacture may delay or impair our ability to complete our clinical trials and to commercialize our product candidates.***

We currently rely, and expect to continue to rely, on third parties for the supply of certain components necessary for our product candidates, such as donor tissue, other biologically derived substances, the PGA polymer mesh and the bioreactor bags in which our HAVs are grown. Our suppliers for certain of these materials, including SeraCare for the supply of human plasma and Confluent for the supply of polymer mesh, are sole source suppliers. Failure of one or more of our suppliers, including these sole source suppliers, to deliver components necessary for the production of our HAVs in a timely and sufficient manner, whether due to shortages of such materials, difficulties in scaling up supply to satisfy our clinical trial and commercial needs, contamination, recall, the COVID-19 pandemic or otherwise, or to source or manufacture such components in accordance with cGMPs and cGTPs, as applicable, could delay our ability to complete our clinical trials, obtain marketing approval and commercialize our product candidates. Establishing additional or replacement suppliers for these components could take a substantial amount of time and it may be difficult to establish replacement suppliers who meet regulatory requirements. In addition, as part of the FDA's approval of our product candidates, the FDA must review and approve the individual components of our production process, which includes raw materials, the manufacturing processes and facilities of our suppliers. Some of our current suppliers have not undergone this process nor have they had any components included in any product approved by the FDA. If our suppliers fail to comply with applicable regulations, and if we do not qualify alternate suppliers, the clinical development, marketing approval or commercialization of our product candidates could be delayed, thereby increasing our costs to complete clinical development and to obtain marketing approval and depriving us of potential product revenue.

***We intend to rely on our strategic, global relationship with Fresenius Medical Care to undertake, or assist with, the development and commercialization of certain of our product candidates if we receive marketing approval from relevant regulatory authorities. Disruption of this arrangement could materially adversely affect our business, prospects, operating results and financial condition.***

Under the distribution agreement, Fresenius Medical Care has the exclusive right to sell and distribute the distribution product in the field outside of the United States. In addition, under the terms of the distribution agreement, Fresenius Medical Care will collaborate with Humacyte in its commercialization of the distribution product in the field in the United States, including adoption of the distribution product as a standard of care in patients for which such use is supported by clinical results and health economic analyses. As a result of our arrangement with Fresenius Medical Care, we expect to be reliant on Fresenius Medical Care to undertake or assist with the development and commercialization, as well as, in some cases, obtaining and maintaining regulatory approval, of the distribution product in the field and for Fresenius Medical Care to do so in a manner consistent with applicable law and regulatory requirements outside of the United States. If Fresenius Medical Care otherwise fails to undertake or assist with the development or commercialization, or obtaining or maintaining regulatory approvals, of the distribution product in accordance with the terms of the distribution agreement, our business, prospects, operating results and financial condition would be adversely affected, perhaps materially.

Fresenius Medical Care also maintains certain discretionary termination rights on a country-by-country basis with respect to any country outside of the United States under the distribution agreement, as discussed in more detail in the section of this Annual Report on Form 10-K titled “Business — Distribution — Distribution Agreement with Fresenius Medical Care.” If the distribution agreement is terminated, we may not be able to secure an alternative distributor in the applicable country on a timely basis or at all, in which case our ability to generate revenues from the distribution product in such country would be harmed.

In addition, if Fresenius Medical Care fails to undertake or assist with the development or commercialization, or obtaining or maintaining regulatory approval, as applicable, of the distribution product in a manner consistent with applicable law and regulatory requirements, patient access to, and demand for, the distribution product could be reduced, our reputation could be damaged, and, under certain circumstances, we could be exposed to potential liability. Furthermore, while Fresenius Medical Care has certain commercialization diligence obligations, Fresenius Medical Care is not restricted from offering its own products and services or the products and services of other companies that compete with the distribution product, and may not undertake or assist with the development or commercialization of the distribution product effectively.

**Risks Related to Our Financial Position and Need for Additional Funding**

***We have never generated product revenue and have incurred significant losses to date. We expect to continue to incur losses for the foreseeable future and may never generate product revenue or be profitable.***

Since inception, we have generated no product revenue, and prior to receipt of marketing approval from regulatory authorities, we will be unable to do so. We incurred net losses of $110.8 million and $12.0 million for the years ended December 31, 2023 and 2022, respectively. As of December 31, 2023 and 2022, we had an accumulated deficit of $537.3 million and $426.5 million, respectively. We have historically financed our operations primarily through the sale of equity securities and convertible debt, proceeds from the Merger and related PIPE Financing, borrowings under loan facilities, the Purchase Agreement and, to a lesser extent, through grants from governmental agencies. We have devoted substantially all of our financial resources and efforts to research and development, including preclinical studies and clinical trials and development of manufacturing technology, and we anticipate that our expenses will continue to increase over the next several years as we continue these activities.

To become and remain profitable, we must succeed in obtaining marketing approval for our HAVs in the United States, in commercializing our HAVs, and in developing and commercializing additional product candidates that generate significant revenue. We may never succeed in these activities and, even if we do, may never generate revenue that is sufficient to achieve profitability.

Even if we do achieve profitability, we may not be able to sustain or increase profitability. Our failure to become and remain profitable would depress the value of our company and could impair our ability to maintain our research and development efforts, expand our business, diversify our product offerings or even continue our operations. A decline in the value of Humacyte could also cause you to lose all or part of your investment in our securities.

***Our ability to use our net operating loss and tax credit carryforwards to offset future taxable income may be subject to certain limitations.***

As of December 31, 2023, we had net operating loss carryforwards for federal and state tax purposes of approximately $384.0 million and $383.0 million, respectively, which begin to expire in 2025. In addition, we had tax credit carryforwards for federal and state tax purposes of approximately $20.1 million as of December 31, 2023, which begin to expire in 2025 and will expire completely in 2043. The future utilization of net operating loss and tax credit carryforwards may be limited due to changes in ownership. In general, if we experience a greater than 50% aggregate change in ownership of certain significant stockholders or groups over a three-year period (which constitutes an ownership change under Section 382 of the Internal Revenue Code of 1986, as amended (the "Code")), utilization of our pre-change net operating loss carryforwards is subject to an annual limitation under Section 382 of the Code (and similar state laws). The annual limitation generally is determined by multiplying the value of our stock at the time of such ownership change (subject to certain adjustments) by the applicable long-term tax-exempt rate. Such limitations may result in expiration of a portion of the pre-change net operating loss carryforwards before utilization and may be substantial. In the past we may have experienced, and in the future may experience, ownership changes as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset United States federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

***We expect to need to raise additional funding, which may not be available on acceptable terms, or at all, and any failure to obtain capital when needed may force us to delay, limit or terminate our product development or commercialization efforts.***

We expect to incur significant expenses in connection with our ongoing activities as we seek to (i) scale out our manufacturing facility to satisfy potential demand if our HAVs receive marketing approval in the United States, (ii) continue our preclinical and clinical development efforts, including the ongoing clinical trials, and (iii) obtain marketing approval for our 6 millimeter HAV, and, if marketing approval is obtained, to commercialize our HAVs for one or more approved indications. We will need additional funding in connection with these activities. Our future capital requirements will depend on many factors, including:

- the progress and results of our clinical trials and interpretation of those results by the FDA and other regulatory authorities;
- the cost, timing and outcome of regulatory review of our product candidates, particularly for approval of our HAVs in the United States;
- the scope, progress, results and costs of preclinical development, laboratory testing and clinical trials for our additional product candidates;
- the cost and timing of our future commercialization activities, including product manufacturing, marketing and distribution for our HAVs if approved by the FDA, and any other product candidate for which we receive marketing approval in the future;
- the amount and timing of revenues, if any, that we receive from commercial sales of any product candidates for which we receive marketing approval; and
- the costs and timing of preparing, filing and prosecuting patent applications, maintaining and enforcing our intellectual property rights and defending any intellectual property-related claims.

Adequate capital may not be available to us when needed or on acceptable terms. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition. As of December 31, 2023, we had cash and cash equivalents of $80.4 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering (defined below), which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement (defined below). Based upon our current operating plan, we believe that our cash and cash equivalents will be sufficient to fund our operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K.

***Pursuant to the terms of the Purchase Agreement, we may be limited in our ability to incur future debt.***

On May 12, 2023, the Company and Global entered into the Purchase Agreement with the Purchasers and another affiliate of Oberland, as agent for the Purchasers (the "Agent"), to obtain financing with respect to the further development and commercialization of the Company's HAV, to repay the Company's credit facility with Silicon Valley Bank ("SVB"), and for other general corporate purposes. Pursuant to the terms of the Purchase Agreement, we are limited in our ability to incur additional indebtedness without the prior written consent of the Purchasers. The Purchasers have an option to terminate the Purchase Agreement and to require Global to repurchase the Revenue Interests in the event that we incur additional indebtedness in violation of the terms of the Purchase Agreement.

We cannot assure you that our business will generate sufficient cash flow from operations, that we will be able to incur future debt on favorable terms or at all, or that future financing will be available to us in amounts sufficient to fund our operations.

***To date, we have not obtained marketing approval for, or commercialized, any of our product candidates, which may make it difficult for you to evaluate the success of our business to date and to assess our future viability.***

We are a development-stage company. Our operations to date, with respect to the development of our product candidates, have been limited to organizing and staffing our company, business planning, raising capital, identifying markets for our product candidates, undertaking preclinical studies and clinical trials of our product candidates for various potential indications and establishing research and development, manufacturing and distributing collaborations. We have not yet demonstrated the ability to obtain marketing approval for a product, to manufacture an approved product at commercial scale or to successfully commercialize an approved product. Consequently, any predictions you make about our financial prospects may not be as accurate as they could be if we had received marketing approval and begun commercializing a product.

**Risks Related to Government Regulation**

***We may not obtain marketing approval from the FDA for any of our product candidates even if we successfully complete our clinical trials, which failure would materially harm our business, prospects, operating results and financial condition.***

Prior to commercialization, biologics, like our HAVs, require the submission of a BLA to, and approval of the BLA by, the FDA. A BLA must be supported by extensive preclinical and clinical data, as well as extensive information regarding chemistry, manufacturing and controls ("CMC"), sufficient to demonstrate the safety, purity, potency and effectiveness of the applicable product candidate to the satisfaction of the FDA. In February 2024, the FDA accepted and granted priority review for our first BLA seeking approval of our HAV for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated and autologous vein use is not feasible, but there can be no assurance that we will obtain FDA approval for that indication or for any of our product candidates.

The BLA approval process is expensive and uncertain, it may take several years to complete, and we may not be successful in obtaining such approval. The FDA has substantial discretion in the approval process and decisions made by the FDA can be unpredictable. The number and types of preclinical studies and clinical trials that will be required for BLA approval varies depending on the product candidate, the disease or the condition that the product candidate is designed to target and the regulations applicable to any particular product candidate. The FDA could delay, limit or deny approval of our product candidates for many reasons, including because it:

- may not deem the product candidate to be adequately safe or effective;
- may not find the data from preclinical studies, clinical trials or CMC data sufficient to support approval;
- may not approve the manufacturing processes or facilities associated with the product candidate;
- may conclude that the long-term integrity of the product candidate for which approval is being sought has not been sufficiently demonstrated;
- may change approval policies or adopt new regulations; or
- may not accept a submission due to, among other reasons, the content or formatting of the submission.

In some cases, the FDA may agree to an SPA for a clinical trial, when it determines that the trial is adequately designed to provide necessary data to support a license application. Even in such cases, however, the FDA may subsequently abandon the SPA if a substantial scientific issue essential to determining the safety or effectiveness of the product candidate has been identified after the testing has begun. In addition, if a company alters the protocol for a trial, the SPA may no longer apply. Further, the results of pivotal clinical trials are always subject to thorough FDA review. Even highly significant and favorable clinical trial results are no guarantee of approval.

***Even if we obtain and maintain approval for our HAVs from the FDA, we may never obtain approval for our HAVs outside of the United States, where the regulatory process is also complex and subject to significant uncertainty. Failure to do so would limit our market opportunities and adversely affect our business.***

Even if we receive FDA approval to market any biologic in the United States, we must comply with the numerous and varying regulatory and compliance related requirements of other countries, including the submission of extensive preclinical and clinical data, manufacturing and quality information regarding the process and facility, scientific data characterizing the relevant product candidate and other supporting data in order to establish safety and effectiveness. Approval procedures vary among countries and can involve additional product testing and additional administrative review periods, including obtaining reimbursement and pricing approval in select markets. The time required to obtain approval in other countries might differ from that required to obtain FDA approval. The marketing approval process in other countries may include all of the risks associated with FDA approval as well as additional, presently unanticipated, risks. Marketing approval in one country does not ensure marketing approval in another, but a failure or delay in obtaining marketing approval in one country may negatively impact the regulatory process in others, including the risk that our product candidates may not be approved for all indications requested and that such approval may be subject to limitations on the indicated uses for which the product candidate may be marketed.

***Even if we seek "rolling review" or priority review, the review time for BLAs for our product candidates may be longer and more expensive than for other products because of the novelty and complexity of our product candidates, which would delay our ability to begin commercialization and earn product revenues.***

The marketing approval process for novel product candidates such as ours may take longer to complete and be more expensive than the process for other, better known or extensively studied pharmaceutical or other product candidates. On December 12, 2023, we submitted our BLA for the HAV in urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated and autologous vein use is not feasible. We submitted our BLA using a "rolling review," which means we may submit completed modules of a BLA rather than waiting until every module of the BLA is completed before submitting the full BLA for FDA review. Such "rolling review" is common for indications that are part of one of FDA's expedited programs, such as our 6 millimeter HAV, which has received Fast Track and RMAT designations for AV access in hemodialysis, and RMAT designation for urgent arterial repair following extremity vascular trauma. In February 2024, the FDA accepted our BLA in the vascular trauma indication and granted priority review of that BLA. Under priority review, the FDA's goal is to review an application within six months of the 60-day filing date, compared to ten months for a standard review. Even though we have utilized a "rolling review" and we have received priority review for that BLA, it may not lead to a shorter review period. The FDA could require us to submit major amendments to the BLA, which could lead to a longer review time. The FDA could also decide to consult an advisory committee as part of our BLA review process, which often leads to a longer review time. We are not permitted to commercialize our product candidates in the United States until they have been approved by the FDA, and if we experience a lengthier review period than expected, our ability to generate product revenues would be materially harmed.

***We may in the future seek orphan drug designation for the use of our HAVs to treat congenital pediatric heart defects. We may be unable to obtain such designation or to maintain the benefits associated with orphan drug designation, including market exclusivity, which may cause our revenue, if any, to be reduced.***

Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biologic intended to treat a rare disease or condition, defined as a disease or condition with a patient population of fewer than 200,000 in the United States, or a patient population of 200,000 or more in the United States when there is no reasonable expectation that the cost of developing and making available the drug or biologic in the United States will be recovered from sales in the United States for that drug or biologic. Orphan drug designation must be requested before submitting a BLA. In the United States, orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages and user-fee waivers. After the FDA grants orphan drug designation, the generic identity of the drug or biologic and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

In addition, if FDA approves a BLA for a biologic that has received orphan drug designation, then FDA may not approve another application for the same drug or biologic for the same disease or condition until the expiration of seven years from the date of the approval of the orphan BLA. This is known as orphan exclusivity. However, even if one of our biological product candidates receives orphan exclusivity, the FDA can still approve different drugs or biologics for use in treating the same indication or disease, as well as the same drug or biologic for a different indication or disease. The FDA can also approve the same drug or biologic for the same indication or disease if the subsequent drug or biologic demonstrates clinical superiority. Furthermore, the FDA can waive orphan exclusivity if we are unable to manufacture sufficient supply of our product.

***Inadequate funding for the FDA and other government agencies, including from government shut downs, global health concerns or other disruptions to these agencies' operations, could hinder their ability to hire and retain key leadership and other personnel, prevent new products and services from being developed or commercialized in a timely manner or otherwise prevent those agencies from performing normal business functions on which the operation of our business may rely, which could negatively impact our business.***

The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept the payment of user fees, and statutory, regulatory, policy changes, and the effects of the COVID-19 pandemic. Average review times at the FDA have fluctuated in recent years as a result.

Disruptions at the FDA and other agencies may also slow the time necessary for new product candidates to be reviewed and/or approved by necessary government agencies, which could adversely affect our business. In addition, government funding of other government agencies on which our operations may rely, including those that fund research and development activities, is subject to the political process, which is inherently fluid and unpredictable.

We may experience delays or rejections based upon additional government regulation from future legislation or administrative action, or changes in regulatory agency policy during the period of product development, clinical trials and the review process. In addition, disruptions at the FDA and other agencies may also slow the time necessary for new product candidates to be reviewed and/or approved by necessary government agencies, which would adversely affect our business. For example, over the last several years the U.S. government has shut down several times and certain regulatory agencies, such as the FDA, have had to furlough critical FDA and other government employees and stop critical activities. If a prolonged government shutdown occurs, it could significantly impact the ability of the FDA to timely review and process our regulatory submissions, which could have a material adverse effect on our business. Further, future government shutdowns could impact our ability to access the public markets and obtain necessary capital in order to properly capitalize and continue our operations.

***Even if we receive marketing approval for a product candidate, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense and subject us to significant penalties if we fail to comply with applicable regulatory requirements.***

If we obtain marketing approval for any of our product candidates, the approved product will be subject to ongoing regulatory requirements from the FDA and, if applicable, non-U.S. regulatory authorities. Any marketing approval that we receive for our product candidates may be subject to limitations on the indicated uses for which the product may be marketed or contain requirements for potentially costly post-marketing follow-up trials to monitor the safety and efficacy of the product. The FDA could also approve our product candidates with a REMS, which could include significant restrictions on distribution and/or use of our products. In addition, if the FDA and non-U.S. regulatory authorities approve any of our product candidates, we will be subject to extensive and ongoing regulatory requirements by the FDA and other regulatory authorities with regard to the manufacturing, labelling, packaging, AE reporting, storage, advertising, distribution, promotion and recordkeeping for our products. If we, our product candidates or the manufacturing facilities for our product candidates fail to comply with regulatory requirements of the FDA and, if relevant, other non-U.S. regulatory authorities, we could be subject to administrative or judicially imposed sanctions, including the following:

- issuance of warning letters or untitled letters by regulatory authorities asserting that we are in violation of the law;
- imposition of injunctions or significant civil monetary penalties or pursuit by regulatory authorities of civil or criminal prosecutions and fines or other civil and/or criminal penalties against us or our responsible officers;
- suspension or withdrawal of marketing approval;

- suspension of any ongoing clinical trials or refusal by regulatory authorities to approve pending marketing applications or supplements to approved applications;
- seizure of products or refusal to allow us to enter into supply contracts, including government contracts, or to import or export products;
- voluntary or mandatory product recalls and publicity requirements; and
- restrictions on operations, including marketing efforts, or restrictions that mandate costly new manufacturing requirements.

Any of these events could reduce market acceptance of any or our product candidates that had received marketing approval, substantially reduce our revenue, increase the costs of operating our business, and cause us significant reputational damage, among other consequences. If we ultimately receive approval for any product candidates in jurisdictions outside the U.S., we expect to be subject to similar ongoing regulatory oversight by the relevant foreign regulatory authorities.

Our products may be subject to product recalls that could harm our reputation and could materially and adversely affect our business, financial condition, operating results, cash flows and prospects. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, if approved. In particular, while the FDA permits the dissemination of truthful and non-misleading information about an approved product, the FDA restricts our ability to promote a product for uses that are not approved by the FDA. The misuse or off-label use of our product may harm our reputation in the marketplace, result in injuries that lead to product liability suits or result in costly investigations, fines or sanctions by regulatory authorities if we are deemed to have engaged in the promotion of these uses, any of which could be costly to our business. We may also face risks in other non-U.S. jurisdictions from product recalls and advertising/promotion rules.

We could also face product liability suits or regulatory delays due to defects in our products, which could be expensive and time-consuming and result in substantial damages payable by us and increases in our insurance rates.

***Designation of our product candidates for expedited programs, such as Fast Track designation, Breakthrough Therapy Designation, or RMAT designation, or accelerated approval by the FDA, or priority designation by the Department of Defense, may not lead to a faster development or regulatory review or approval process, and even if granted, will not increase the likelihood that our product candidates will receive marketing approval.***

In 2014, the FDA granted Fast Track designation for our 6 millimeter HAV for use in the creation of AV access for hemodialysis, in 2017, the FDA granted RMAT designation for our 6 millimeter HAV for the creation of vascular access for performing hemodialysis and in 2023, the FDA granted RMAT designation for our 6 millimeter HAV for urgent arterial repair following extremity vascular trauma. We have not received designations pursuant to any of the FDA's expedited programs for PAD or our other indications, although we may in the future seek such designations if such product candidates meet the criteria for that designation. In addition, even with one or more of these designations, we may not experience a faster development process, or faster review or approval, for our product candidates compared to product candidates that are not part of the expedited programs. Further, the FDA may withdraw a designation if it believes that the designation is no longer supported by data from our clinical development program. In addition, a product candidate may no longer demonstrate a potential to address unmet medical need if, for example, a new product is approved that addresses the same need, which could lead to loss of a designation. The loss of a designation under an expedited program, including a Fast Track designation, Breakthrough Therapy Designation, or RMAT designation, could significantly increase the costs of development and length of time required before we could seek marketing approval of such a product candidate.

In addition, in 2018, our HAV product candidate was assigned a priority designation by the Secretary of Defense under Public Law 115-92. Similar to the designations described above that FDA may grant, a priority designation by the Department of Defense does not change the standards for approval but may expedite the development or approval process.

***Healthcare reform measures could hinder or prevent our product candidates' commercial success.***

Our industry is highly regulated, and changes in or revisions to laws and regulations that make gaining coverage of and adequate reimbursement for our product candidates more difficult or subject to different criteria and standards may adversely impact our business, prospects, operating results and financial condition. In the United States, there have been and we expect there will continue to be a number of legislative, regulatory and other changes to the healthcare system to contain or reduce healthcare costs that may adversely affect our ability to set a price we believe is fair for our product candidates, our ability to generate revenues and achieve or maintain profitability, and the availability of capital.

Federal and state lawmakers regularly propose and, at times, enact legislation that would result in significant changes to the healthcare system, some of which are intended to contain or reduce the costs of medical products and services. At the federal level, for example, the Inflation Reduction Act of 2022, or IRA, was signed into law on August 16, 2022. Among other key provisions, the IRA:

- Requires manufacturers to pay rebates for a Medicare Part B or Part D drug if the price increases for the drug exceed the rate of inflation.
- Eliminates the "donut hole" under Medicare Part D beginning in 2025 by significantly lowering the beneficiary maximum out-of-pocket cost and requiring manufacturers to subsidize 10% of Part D enrollees' prescription costs for brand drugs below the out-of-pocket maximum and 20% once the out-of-pocket maximum has been reached.
- Delays the rebate rule that would require pass through of pharmacy benefit manager rebates to beneficiaries.
- Directs the Centers for Medicare & Medicaid Services, or CMS, to engage in price-capped negotiation for certain Medicare Part B and Part D drugs and biologics. Specifically, the IRA's Price Negotiation Program applies to high-expenditure single-source drugs and biologics that have been approved for at least 7 or 11 years, respectively, among other negotiation selection criteria, beginning with ten high-cost Part D drugs starting in 2026, followed by 15 Part D drugs in 2027, 15 Part B or Part D drugs in 2028, and 20 Part B or Part D drugs in 2029 and beyond. The negotiated prices will be capped at a statutorily determined ceiling price. There are statutory exemptions from the IRA's Price Negotiation Program, including for a drug that has only a single orphan drug designation and is approved only for an indication or indications within the scope of such designation. The IRA's Price Negotiation Program is currently the subject of legal challenges.

Manufacturers that fail to comply with the IRA may be subject to various penalties, including civil monetary penalties or a potential excise tax. The IRA permits the Secretary of Health and Human Services, or HHS Secretary, to implement many of the IRA's provisions through guidance, as opposed to regulation, for the initial years. The IRA is anticipated to have significant effects on the pharmaceutical industry and may reduce the prices pharmaceutical manufacturers can charge and the reimbursement pharmaceutical manufacturers can receive for approved products, among other effects.

The Biden administration has indicated that lowering prescription drug prices is a priority. On October 14, 2022, President Biden signed an executive order to lower prescription drug costs for Americans. In response to this directive, the Center for Medicare and Medicaid Innovation is developing new models intended to lower drug costs under Medicare and Medicaid. These models include designing new payment methods for drugs approved under accelerated approval to encourage timely confirmatory trial completion and improve access to post-market safety and efficacy data, with the goal of reducing Medicare spending on drugs that have no confirmed clinical benefit; creating a list of generic drugs for which the out-of-pocket Part D costs will be capped at $2 a month per drug; and establishing a new approach for administering outcomes-based agreements for cell and gene therapies. President Biden also signed an executive order on July 9, 2021, affirming the administration's policy to support legislative reforms that would lower the prices of prescription drugs, including by supporting the development and market entry of lower-cost generic drugs and biosimilars, and support the enactment of a public health insurance option. Among other things, the executive order directs the HHS Secretary to provide a report on actions to combat excessive pricing of prescription drugs, continue to clarify and improve the approval framework for generic drugs and identify and address any efforts to impede generic drug competition, enhance the domestic drug supply chain, reduce the price that the Federal government pays for drugs, and address price gouging in the industry.

The American Rescue Plan Act of 2021 eliminates the statutory Medicaid drug rebate cap, currently set at 100% of a drug's average manufacturer price, for single source and innovator multiple source drugs, beginning January 1, 2024. In addition, individual states have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing.

We cannot predict how further developments of or changes to these laws and regulations will affect our business.

The FDA also released a final rule on September 24, 2020, which went into effect on November 30, 2020, providing guidance for states to build and submit plans for importation of drugs from Canada. Additionally, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The 2020 rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers. Pursuant to a court order, HHS subsequently delayed the effective date for aspects of the rule, including those relating to pharmacy benefit managers, until 2023. The rule was then effectively delayed until January 1, 2026, as part of the Infrastructure Investment and Jobs Act, which was signed into law on November 15, 2021. In addition, on November 19, 2021, the House of Representatives passed a version of the Build Back Better Act that includes a provision prohibiting the implementation, administration, or enforcement of the rule. Although a number of these, and other proposed measures may require authorization through additional legislation to become effective, and the Biden administration may reverse or otherwise change these measures, Congress has indicated that it will continue to seek new legislative measures to control drug costs.

The ultimate content, timing, or effect of any healthcare reform legislation or executive order or the impact that the resulting changes may have on us is uncertain, but we expect there will continue to be legislative and regulatory proposals at the federal and state levels directed at containing or lowering the cost of health care.

***If we fail to comply with healthcare regulations, we could face substantial penalties and our business, prospects, operating results and financial condition could be adversely affected.***

Certain federal and state healthcare laws and regulations pertaining to fraud and abuse and patients' rights are and will be applicable to our business even though we do not and will not control referrals of healthcare services. We could also be subject to patient privacy regulation by both the U.S. Government and the states in which we conduct our business. Our employees, independent contractors, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements. The regulations that may affect our ability to operate include, without limitation:

- the federal Anti-Kickback Statute, which prohibits, among other things, any person from knowingly and willfully offering, soliciting, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual for, or the purchase, order or recommendation of, any good or service for which payment may be made under federal healthcare programs, such as the Medicare and Medicaid programs, even if the person does not have actual knowledge of the statute or specific intent to violate it;

- the federal False Claims Act, which prohibits, among other things, individuals or entities from knowingly presenting, or causing to be presented, false claims, or knowingly using false statements, to obtain payment from the U.S. Government;

- federal criminal laws that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

- the anti-inducement law, which prohibits, among other things, the offering or giving of remuneration, which includes, without limitation, any transfer of items or services for free or for less than fair market value (with limited exceptions), to a Medicare or Medicaid beneficiary that the person knows or should know is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of items or services reimbursable by a federal or state governmental program;

- the federal transparency requirements under the ACA, including the provision commonly referred to as the Physician Payments Sunshine Act and its implementing regulations, which require applicable manufacturers of drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid, or the State Children's Health Insurance Program to report annually to CMS information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by the physicians described above and their immediate family members. Effective January 1, 2022, these reporting obligations were extended to include transfers of value made to certain non-physician providers such as physician assistants and nurse practitioners;

- federal government price reporting laws, which require us to calculate and report complex pricing metrics in an accurate and timely manner to government programs;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- HIPAA, which governs the conduct of certain electronic healthcare transactions and protects the security and privacy of protected health information; and

- state law equivalents of each of the above federal laws, such as anti-kickback and false claims laws which may apply to items or services reimbursed by any third-party payor, including commercial insurers.

If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, exclusion from participating in federal health care programs and the curtailment or restructuring of our operations. Any penalties, damages, fines, curtailment, exclusion, or restructuring of our operations could adversely affect our ability to operate our business, prospects, operating results and financial condition. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. Moreover, achieving and sustaining compliance with applicable federal and state privacy and fraud and abuse laws may prove costly.

***Our business and operations, including our development programs, could be materially disrupted in the event of system failures, security breaches, violations of data protection laws or data loss or damage by us or third parties on which we rely, including our CROs or other contractors or consultants.***

Our internal computer systems (including our LUNA200 manufacturing system) and those of third parties on which we rely, including our CROs and other contractors and consultants, are vulnerable to damage from computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. These risks may be compounded as our information technology hardware ages. If such an event were to occur and cause interruptions in our operations, it could have a material adverse effect on our business operations, including a material disruption of our development program. Unauthorized disclosure of sensitive or confidential patient or employee data, including personally identifiable information, whether through breach of computer systems, systems failure, employee negligence, fraud or misappropriation, or otherwise, or unauthorized access to or through our information systems and networks, whether by our employees or third parties, could result in negative publicity, legal liability and damage to our reputation. Unauthorized disclosure of personally identifiable information could also expose us to sanctions for violations of data privacy laws and regulations around the world. To the extent that any disruption or security breach resulted in a loss of or damage to our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and the further development of our product candidates could be delayed. For example, the loss of or damage to clinical trial data, such as from completed or ongoing clinical trials, for any of our product candidates would likely result in delays in our marketing approval efforts and significantly increased costs in an effort to recover or reproduce the data.

We have previously been, and expect to remain, the target of cyber-attacks. During late 2020 and early 2021, a professional services firm providing services to the Company was the target of a cyber-attack. The Company believes that it was not materially impacted by the attack. Our third-party service providers and partners, with whom we may share data, are subject to similar risks as we are relating to cybersecurity, privacy violations, business interruption, and systems, as well as employee failures. While we have procedures in place for selecting and managing our relationships with third-party service providers and other business partners, we do not have control over their business operations or governance and compliance systems, practices and procedures, and our management of multiple third party service providers increases our operational complexity. If we fail to adequately monitor our third party service providers' and partners' performance,

including for compliance with our agreements and regulatory and legal requirements, we may have to incur additional costs to correct errors, our reputation could be harmed or we could be subject to litigation, claims, legal or regulatory proceedings, inquiries or investigations. These risks may also be present if our third party service providers and partners use separate information systems that are not integrated with our systems and suffer a cybersecurity incident. As a result, we are subject to the risk that the activities associated with our third party service providers and partners will adversely affect our business, even if the cyber incident does not directly impact our systems or information.

As we become more dependent on information technologies to conduct our operations, cyber incidents, including deliberate attacks, such as ransomware attacks, and attempts to gain unauthorized access to computer systems (including our LUNA200 manufacturing system) and networks, may increase in frequency and sophistication. These incidents pose a risk to the security of our systems and networks, the confidentiality and the availability and integrity of our data and these risks apply both to us, and to third parties on whose systems we rely for the conduct of our business. While the effect of these incidents has not historically been material to our results of operations, financial condition or prospects, cyber threats are persistent and constantly evolving. Such threats have increased in frequency, scope and potential impact in recent years, which increase the difficulty of detecting and successfully defending against them. As cyber threats continue to evolve, we may be required to incur additional expenses in order to enhance our protective measures or to remediate any information security vulnerability. There can be no assurance that we or our third-party providers will be successful in preventing cyber-attacks or successfully mitigating their effects. Similarly, there can be no assurance that our collaborators, CROs, third-party logistics providers, distributors and other contractors and consultants will be successful in protecting our clinical and other data that is stored on their systems. Any cyber-attack or destruction or loss of data could have a material adverse effect on our business and prospects. In addition, we may suffer reputational harm or face litigation or adverse regulatory action as a result of cyber-attacks or destruction or loss of data and may incur significant additional expense to implement further data protection measures. It is also possible that unauthorized access to data may be obtained through inadequate use of security controls by our suppliers or other vendors. In 2021, a remote code execution vulnerability in Apache Log4j was identified as affecting large amounts of systems worldwide. We were not impacted by the Log4j vulnerability, however we cannot provide assurance that these and other attacks will not have an impact in the future.

Although we have general liability insurance coverage, our insurance may not cover all claims, continue to be available on reasonable terms or be sufficient in amount to cover one or more large claims. Additionally, the insurer may disclaim coverage as to any claim. The successful assertion of one or more large claims against us that exceed or are not covered by our insurance coverage or changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material adverse effect on our business, prospects, operating results and financial condition.

Moreover, if our data management systems do not effectively collect, store, process and report relevant data for the operation of our business (whether due to equipment malfunction or constraints, software deficiencies, cybersecurity attack and/or human error), our ability to effectively plan, forecast and execute our business plan and comply with applicable laws and regulations will be impaired, perhaps materially. Any such impairment could materially and adversely affect our financial condition, results of operations, cash flows and the timeliness with which we report our internal and external operating results.

***If we fail to comply with environmental, health and safety laws and regulations, we could become subject to fines and penalties or incur costs that could harm our business.***

We are subject to numerous environmental, health and safety laws and regulations, including those governing laboratory procedures and the handling, use, storage, treatment and disposal of hazardous materials and wastes. Our operations involve the use of hazardous and flammable materials, including chemicals and biological materials and produce hazardous waste products. We generally contract with third parties for the disposal of these materials and wastes. In the event of contamination or injury resulting from our use or production of hazardous materials, we could be held liable for any resulting damages even if we contract with a third party for their disposal, and any liability could exceed our resources. We also could incur significant costs associated with civil or criminal fines and penalties resulting from contamination or injury from our use or production of hazardous materials. Although we maintain workers' compensation insurance to cover us for costs and expenses we may incur due to injuries to our employees resulting from the use or production of hazardous materials, this insurance may not provide adequate coverage against potential liabilities. We do not maintain insurance for environmental liability or toxic tort claims that may be asserted against us in connection with our storage or disposal of biological, hazardous materials.

In addition, we may be required to incur substantial costs to comply with future environmental, health and safety laws and regulations. Compliance with such laws and regulations may divert resources away from our research, development and manufacturing efforts. Failure to comply with these laws and regulations also may result in substantial fines, penalties or other sanctions.

***Failure to comply with health and data protection laws and regulations could lead to government enforcement actions (which could include civil or criminal penalties), private litigation and adverse publicity and could negatively affect our operating results and business.***

We and any potential collaborators may be subject to federal, state and foreign data protection laws and regulations (*i.e.*, laws and regulations that address privacy and data security). In the United States, numerous federal and state laws and regulations, including federal health information privacy laws, state data breach notification laws, state privacy and health information privacy laws and federal and state consumer protection laws (*e.g.*, Section 5 of the Federal Trade Commission Act), that govern the collection, use, disclosure and protection of health-related and other personal information could apply to our operations or the operations of our collaborators. In addition, we may obtain health information from third parties (including research institutions from which we obtain clinical trial data) that are subject to privacy and security requirements under HIPAA. Depending on the facts and circumstances, we could be subject to civil or criminal penalties if we obtain, use, or disclose individually identifiable health information maintained by a HIPAA-covered entity in a manner that is not authorized or permitted by HIPAA.

International data protection laws, including Regulation 2016/679, known as the General Data Protection Regulation ("GDPR"), may also apply to health-related and other personal information obtained outside of the United States. The GDPR will increase our responsibility and liability in relation to personal data that we process, and we may be required to put in place additional mechanisms to ensure compliance with the new EU (which also includes the European Economic Area, or "EEA") data protection rules. Further, the United Kingdom's separation from the EU has created more uncertainty with regard to data protection regulation in the United Kingdom (the "UK"). The UK retained the GDPR in UK law, which sits alongside the amended version of the Data Protection Act 2018. The EU adopted an adequacy decision so data can be transferred from the EU to the UK. Additionally, there are no new requirements for transfer from the UK to the EU. However, going forward, the EU and UK's data protection rules could diverge and data transfers may not be possible and/or new arrangements may need to be put in place. In particular, it is unclear to what extent the UK regime will begin diverging from the GDPR and how data transfers to and from the UK will be regulated.

In addition, California recently enacted the California Consumer Privacy Act ("CCPA"), which creates new individual privacy rights for California consumers (as defined in the law) and places increased privacy and security obligations on entities handling personal data of consumers or households, and the CCPA was supplemented by the California Consumer Rights Act ("CPRA"). There are a number of other states that have considered similar privacy proposals, with states like Virginia and Colorado enacting their own privacy laws. These privacy laws may impact our business activities and exemplify the vulnerability of our business to the evolving regulatory environment related to personal data.

Compliance with U.S. and international data protection laws and regulations could require us to take on more onerous obligations in our contracts, restrict our ability to collect, use and disclose data, or in some cases, impact our ability to operate in certain jurisdictions. Failure to comply with U.S. and international data protection laws and regulations could result in government enforcement actions (which could include civil or criminal penalties), private litigation and adverse publicity and could negatively affect our operating results and business. Moreover, clinical trial subjects about whom we or our potential collaborators obtain information, as well as the providers who share this information with us, may contractually limit our ability to use and disclose the information. Claims that we have violated individuals' privacy rights, failed to comply with data protection laws, or breached our contractual obligations, even if we are not found liable, could be expensive and time-consuming to defend and could result in adverse publicity that could harm our business.

***We or the third parties upon which we depend may be adversely affected by natural disasters, and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.***

Natural disasters such as hurricanes could severely disrupt our operations and have a material adverse effect on our business, prospects, operating results and financial condition. In addition, flooding, lightning strikes, meteor strikes, and polar vortices could affect our building operations. If a natural disaster, power outage or other unforeseen event occurred that prevented us from using all or a significant portion of our headquarters, that damaged critical infrastructure, such as our in-house manufacturing facility, or that otherwise significantly disrupted our operations, it may be difficult or, in certain cases, impossible for us to continue our business for a substantial period of time. The disaster recovery and business continuity plans we have in place currently may prove inadequate in the event of a natural disaster or similar event. We

may incur substantial expenses as a result of any natural disaster, which could have a material adverse effect on our business.

***We are subject to anti-corruption and a variety of other laws governing our international operations. If we fail to comply with these laws, we could be subject to, among other things, civil or criminal penalties, other sanctions and remedial measures, and reputational damage, which could adversely affect our business, prospects, operating results and financial condition.***

Our operations are subject to anti-corruption laws, including the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act and other anti-corruption laws. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors, and partners from authorizing, promising, offering, or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. We are conducting certain of our trials at a number of trial sites around the world. Certain of these jurisdictions pose a risk of potential FCPA violations, and we have relationships with third parties, including government-affiliated hospitals and universities, whose actions could potentially subject us to liability under the FCPA or local anti-corruption laws.

We are also subject to other laws and regulations governing our international operations, including regulations administered by the U.S. Department of Commerce's Bureau of Industry and Security, the U.S. Department of the Treasury's Office of Foreign Assets Control, and various non-U.S. government entities, including applicable economic sanctions on countries and persons, customs requirements, currency exchange regulations and transfer pricing regulations.

If we fail to comply with applicable anti-corruption laws and other legal requirements, we may become subject to criminal and civil penalties, disgorgement and other sanctions and remedial measures, including the loss of export or import privileges and debarment, and face substantial legal expenses. Likewise, even an investigation by U.S. or foreign authorities of potential violations of such laws could damage our reputation. In either case, our business, prospects, operating results and financial condition could be adversely affected. Under certain circumstances, we could also be held liable for the activities of our employees, contractors, and partners that violate anti-corruption laws, even if we do not explicitly authorize or have actual knowledge of such activities. Even allegations of such violations could potentially damage our reputation and harm our business.

**Risks Related to Our Intellectual Property**

***Our ability to successfully commercialize our products may be impaired if we are unable to obtain and maintain effective intellectual property rights for our proprietary scientific technology platform and product candidates.***

Our success depends in large part on our and our licensors' ability to obtain and maintain patent and other intellectual property protection in the United States and in other countries with respect to our proprietary scientific technology platform and products. We have sought to protect our proprietary position by filing patent applications in the United States and abroad related to our novel technologies and product candidates that we and/or our licensors view as important to our business. This process is expensive and time-consuming, and we and our licensors may not be able to file and prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner. It is also possible that we and/or our licensors will fail to identify patentable aspects of our research and development output before it is too late to obtain patent protection. In some circumstances, we may not have the right to control the preparation, filing and prosecution of patent applications, or to maintain the patents or enforce the patents, covering technology or products that we license from third parties. Our existing patents and any future patents and the existing and any future licenses to third-party patents we obtain may not be sufficiently broad to prevent others from using our technologies or from developing competing products and technologies.

The patent position of biotechnology companies generally is highly uncertain and involves complex legal and factual questions for which legal principles remain unresolved. In recent years, patent rights have been the subject of significant litigation. As a result, the issuance, scope, validity, enforceability and commercial value of our and our licensors' patent rights are highly uncertain. Additionally, changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of our owned or licensed patents or narrow the scope of our patent protection. The laws of foreign countries may not protect our rights to the same extent as the laws of the United States.

Even if our owned and licensed patent applications issue as patents, they may not issue in a form that will provide us with any meaningful protection, prevent competitors from competing with us or otherwise provide us with any competitive advantage. We, or our licensors, may fail to identify patentable aspects of inventions made in the course of development and commercialization activities before it is too late to obtain patent protection on them. Therefore, we may miss potential opportunities to strengthen our patent position. Our competitors may be able to circumvent our owned or licensed patents by developing similar or alternative technologies or products in a non-infringing manner. The issuance of a patent is not conclusive as to its scope, validity or enforceability, and our owned and licensed patents may be challenged in the courts or patent offices in the United States and abroad. Such challenges may result in patent claims being narrowed, invalidated or held unenforceable, which could limit our ability to stop or prevent us from stopping others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and products. Given the amount of time required for the development, testing and regulatory review of future product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours or otherwise provide us with a competitive advantage.

***The patent protection we obtain for our product candidates may not be sufficient enough to provide us with any competitive advantage or our owned or licensed patents may be challenged.***

In some instances, agreements through which we license patent rights may not give us control over patent prosecution or maintenance, so that we may not be able to control which claims or arguments are presented, how claims are amended, and may not be able to secure, maintain, or successfully enforce necessary or desirable patent protection from those patent rights. We have not had and do not have primary control over patent prosecution and maintenance for certain of the patents and patent applications we license and therefore cannot guarantee that these patents and applications will be prosecuted or maintained in a manner consistent with the best interests of our business. We cannot be certain that patent prosecution and maintenance activities by our licensors have been or will be conducted in compliance with applicable laws and regulations or will result in valid and enforceable patents. Moreover, some of our in-licensed patents and patent applications are, and our future owned and licensed patents may be, co-owned with third parties. If we are unable to obtain an exclusive license to any such third-party co-owners' interest in any future patents or patent applications, such co-owners may be able to license their rights to other third parties, including our competitors, and our competitors could market competing products and technology. In addition, we may need the cooperation of any such co-owners of our patents in order to enforce such patents against third parties, and such cooperation may not be provided to us.

It is possible that defects of form in the preparation or filing of our owned or licensed patents or patent applications may exist, or may arise in the future, for example with respect to proper priority claims, inventorship, claim scope, or requests for patent term adjustments or extensions. If we or our partners, collaborators, licensees, or licensors, whether current or future, fail to establish, maintain or protect such patents and other intellectual property rights, such rights may be reduced or eliminated. If our partners, collaborators, licensees, or licensors, are not fully cooperative or disagree with us as to the prosecution, maintenance or enforcement of any patent rights, such patent rights could be compromised. If there are material defects in the form, preparation, prosecution, or enforcement of our owned or licensed patents or patent applications, such patents may be invalid and/or unenforceable, and such applications may never result in valid, enforceable patents. Any of these outcomes could impair our ability to prevent competition from third parties, which may have an adverse impact on our business.

Pending patent applications cannot be enforced against third parties practicing the technology claimed in such applications unless and until a patent issues from such applications. Assuming the other requirements for patentability are met, currently, the first to file a patent application is generally entitled to the patent.

However, prior to March 16, 2013, in the United States, the first to invent was entitled to the patent. Publications of discoveries in the scientific literature often lag behind the actual discoveries, and patent applications in the United States and other jurisdictions are not published until 18 months after filing, or in some cases not at all. Therefore, we cannot be certain that we were the first to make the inventions claimed in our patents or pending patent applications, or that we were the first to file for patent protection of such inventions. Similarly, we cannot be certain that parties from whom we do or may license or purchase patent rights were the first to make relevant claimed inventions, or were the first to file for patent protection for them. If third parties have filed prior patent applications on inventions claimed in our owned or licensed patents or applications that were filed on or before March 15, 2013, an interference proceeding in the United States can be initiated by such third parties to determine who was the first to invent any of the subject matter covered by the patent claims of such owned or licensed patent applications. If third parties have filed such prior applications after March 15, 2013, a derivation proceeding in the United States can be initiated by such third parties to determine whether our owned or licensed invention was derived from theirs.

Moreover, because the issuance of a patent is not conclusive as to its inventorship, scope, validity or enforceability, our owned and licensed patents or pending patent applications may be challenged in the courts or patent offices in the United States and abroad. There is no assurance that all of the potentially relevant prior art relating to our owned or licensed patents and patent applications has been found. If such prior art exists, it may be used to invalidate a patent, or may prevent a patent from issuing from a pending patent application. For example, such patent filings may be subject to a third-party submission of prior art to the U.S. Patent and Trademark Office ("USPTO"), or to other patent offices around the world. Alternately or additionally, we may become involved in post-grant review procedures, oppositions, derivation proceedings, *ex parte* reexaminations, *inter partes* review, supplemental examinations, or interference proceedings or challenges in district court, in the United States or in various foreign patent offices, including both national and regional, challenging patents or patent applications in which we have rights, including patents on which we rely to protect our business. An adverse determination in any such challenges may result in loss of the patent or in patent or patent application claims being narrowed, invalidated or held unenforceable, in whole or in part, or in denial of the patent application or loss or reduction in the scope of one or more claims of the patent or patent application, any of which could limit our ability to stop others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and products. In addition, given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized.

Pending and future patent applications may not result in patents being issued that protect our business, in whole or in part, or which effectively prevent others from commercializing competitive products.

Competitors may also be able to design around our owned or licensed patents. Changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of our owned or licensed patents or narrow the scope of our patent protection. In addition, the laws of foreign countries may not protect our rights to the same extent or in the same manner as the laws of the United States. For example, patent laws in various jurisdictions, including significant commercial markets such as Europe, restrict the patentability of methods of treatment of the human body more than United States law does. Any such developments could have a material adverse effect on our ability to generate revenue.

Issued patents that we have or may obtain or license may not provide us with any meaningful protection, prevent competitors from competing with us or otherwise provide us with any competitive advantage. Our competitors may be able to circumvent our owned or licensed patents by developing similar or alternative technologies or products in a non-infringing manner. Our competitors may also seek approval to market their own products similar to or otherwise competitive with our products. In these circumstances, we may need to defend or assert our owned or licensed patents, or both, including by filing lawsuits alleging patent infringement. In any of these types of proceedings, a court or other agency with jurisdiction may find our owned or licensed patents invalid or unenforceable, or that our competitors are competing in a non-infringing manner. Thus, even if we have valid and enforceable patents, these patents still may not provide protection against competing products or processes sufficient to achieve our business objectives. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We may become involved in lawsuits to protect or enforce our patents, which could be expensive, time-consuming and unsuccessful.***

Competitors may infringe, misappropriate or violate our owned or licensed patents or other intellectual property. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours is invalid or unenforceable, in whole or in part. There is also a risk that, even if the validity of such patents is upheld, the court will construe the patent's claims narrowly and refuse to stop the other party from using the technology at issue on the grounds that our owned or licensed patents do not cover such technology. The standards that courts use to interpret patents are not always applied predictably or uniformly and can change, particularly as new technologies develop. As a result, we do not know how much protection, if any, will be given to our owned or licensed patents if we attempt to enforce them and they are challenged in court. An adverse result in any litigation proceeding could put one or more of our owned or licensed patents at risk of being invalidated or interpreted narrowly.

Inequitable conduct is frequently raised as a defense during intellectual property litigation. It is believed that all parties involved in the prosecution of our patent applications have complied with their duties of disclosure in the course of prosecuting our patent applications; however, it is possible that legal claims to the contrary could be asserted if we were engaged in intellectual property litigation, and the results of any such legal claims are uncertain due to the inherent uncertainty of litigation. If a court determines that any party involved in the prosecution of our owned or licensed patents failed to comply with its duty of candor, the subject patent could be held to be unenforceable.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. Intellectual property litigation or other legal proceedings may cause us to incur significant expenses and may also absorb significant management time. Uncertainties resulting from our participation in patent litigation or other proceedings could have a material adverse effect on our business.

***Third parties may initiate legal proceedings alleging that we are infringing, misappropriating or otherwise violating their intellectual property rights, the outcome of which would be uncertain and could harm our business, prospects, operating results and financial condition.***

Third parties may assert infringement, misappropriation or other claims against us, or other parties we have agreed to indemnify, based on existing third-party patents or patents that may be granted in the future as well as other intellectual property rights. There may be existing third-party patents or patent applications covering aspects of our technology. Furthermore, because patent applications are published sometime after filing, and because applications can take several years to issue, there may be additional currently pending third-party patent applications that are unknown to us, which may later result in issued patents. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. We may not have sufficient resources to bring these actions to a successful conclusion. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of shares of our common stock.

Because of the inevitable uncertainty in intellectual property litigation, we could lose a patent infringement or other action asserted against us regardless of our perception of the merits of the case. If we are found to infringe upon, misappropriate or otherwise violate a third party’s intellectual property rights, we could be required to obtain a license from such third party to continue developing and commercializing our products and technology. However, we may not be able to obtain any required license on commercially reasonable terms or at all. Even if we are able to obtain a license, it may be non-exclusive, thereby giving our competitors access to the same technologies licensed to us. We could be forced, including by court order, to cease commercializing the implicated technology or product. In addition, in any such proceeding or litigation, we could be found liable for monetary damages, which could be significant, including treble damages and attorneys’ fees, if we are found to have willfully infringed a patent. A finding of infringement, misappropriation or that we otherwise violated intellectual property rights could prevent us from commercializing our product candidates or force us to cease some or all of our business operations.

***If we fail to comply with our obligations in our intellectual property licenses with third parties, we could lose license rights that are important to our business.***

We are a party to intellectual property license agreements with third parties. For example, we have licenses with each of Duke University and Yale University for patents associated with our proprietary technology, among others, and may enter into additional license agreements in the future. Our existing license agreements impose, and we expect that our future license agreements will impose, various diligence, royalty payment, milestone payment, insurance and other obligations on us. If we fail to comply with these obligations or other obligations in our license agreements, our licensors may have the right to terminate these agreements, in which event we may not be able to develop and market any product or use any platform technology that is covered by these agreements. If our license agreements terminate, or we experience a reduction or elimination of licensed rights under these agreements, we may have to negotiate new or reinstated licenses with less favorable terms or we may not have sufficient intellectual property rights to operate our business. The occurrence of such events could materially harm our business.

Further, the agreements under which we currently license intellectual property or technology from third parties are complex, and certain provisions in such agreements may be susceptible to multiple interpretations. Accordingly, disputes may arise between us and our licensor, our licensor and its licensors, regarding intellectual property subject to a license agreement, including those relating to:

- the scope of rights, if any, granted under the license agreement and other interpretation-related issues;
- whether and the extent to which our technology and processes infringe on intellectual property of the licensor that is not subject to the license agreement;
- whether our licensor or its licensor had the right to grant the license agreement;
- whether third parties are entitled to compensation or equitable relief, such as an injunction, for our use of the intellectual property without their authorization;
- our right to sublicense patent and other rights to third parties under collaborative development relationships;
- whether we are complying with our obligations with respect to the use of the licensed technology in relation to our development and commercialization of product candidates;
- our involvement in the prosecution of the licensed patents and our licensors' overall patent enforcement strategy;
- the allocation of ownership of inventions and know-how resulting from the joint creation or use of intellectual property by our licensors and by us and our partners; and
- the amounts of royalties, milestones or other payments due under the license agreement.

The resolution of any contract interpretation disagreement that may arise could narrow what we believe to be the scope of our rights to the relevant intellectual property or technology, or increase what we believe to be our financial or other obligations under the relevant agreement. If disputes over intellectual property that we have licensed prevent or impair our ability to maintain our current licensing arrangements on acceptable terms, or are insufficient to provide us the necessary rights to use the intellectual property, we may be unable to successfully develop and commercialize the affected product candidates. If we or any such licensors fail to adequately protect this intellectual property, our ability to commercialize our products could suffer. Any disputes with our licensors or any termination of the licenses on which we depend could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We may not be successful in obtaining necessary intellectual property rights to product candidates for our development pipeline through acquisitions and in-licenses.***

Although we intend to develop product candidates through our own internal research, we may need to obtain additional licenses from others to advance our research or allow commercialization of our product candidates. However, we may be unable to acquire or in-license intellectual property rights relating to, or necessary for, any such product candidates from third parties on commercially reasonable terms or at all. In that event, we may be unable to develop or commercialize such product candidates. We may also be unable to identify additional, future product candidates that we believe are an appropriate strategic fit for our company and intellectual property relating to, or necessary for, such product candidates.

The in-licensing and acquisition of third-party intellectual property is a competitive area, and a number of more established companies are also pursuing strategies to in-license or acquire third-party intellectual property rights that we may consider attractive or necessary. These established companies may have a competitive advantage over us due to their size, cash resources and greater clinical development and commercialization capabilities. Furthermore, companies that perceive us to be a competitor may be unwilling to assign or license rights to us. In addition, we expect that competition for the in-licensing or acquisition of third-party intellectual property rights for product candidates that are attractive to us may increase in the future, which may mean fewer suitable opportunities for us as well as higher acquisition or licensing costs. We may be unable to in-license or acquire the third-party intellectual property rights for product candidates on terms that would allow us to make an appropriate return on our investment. If we are unable to successfully obtain rights to suitable product candidates, our business, financial condition, results of operations and prospects for growth could suffer.

***We may be unable to protect the confidentiality of our trade secrets, particularly in light of our reliance on third parties, which increases the possibility that such trade secrets will be disclosed or misappropriated, thus harming our business and competitive position.***

In addition to our patented technology and products, we rely upon trade secrets, including unpatented know-how, technology and other proprietary information to develop and maintain our competitive position, particularly with respect to our manufacturing process. We seek to protect our trade secrets, in part, through confidentiality agreements with our employees, collaborators and consultants. We seek to have agreements with our employees and selected consultants that obligate them to assign any inventions created during their tenure with us. However, we may not obtain these agreements in all circumstances and the assignment of intellectual property under such agreements may not be self-executing. If the employees, collaborators or consultants that are parties to these agreements breach or violate their respective terms, we may not have adequate remedies for any such breach or violation. Our trade secrets could also be misappropriated by our competitors. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret is difficult, expensive, time-consuming and potentially distracting, and the outcome is unpredictable. In addition, some courts inside and outside the United States are less willing or unwilling to protect trade secrets. If any of our trade secrets were to be lawfully obtained or independently developed by a competitor or other third party, we would have no right to prevent such a party from using that technology or information to compete with us. If our trade secrets are disclosed to or misappropriated or independently developed by a third party, it would harm our ability to protect our rights and could materially harm our business and competitive position.

***Third parties may assert that our employees or consultants have wrongfully used or disclosed confidential information or misappropriated trade secrets.***

We may employ individuals or engage consultants that previously worked with other organizations, including our competitors or potential competitors. Although we seek to ensure that such persons do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or they, or both, have inadvertently or otherwise used or disclosed intellectual property, including trade secrets or other proprietary information, of a former employer or other third party. Litigation may be necessary to defend against these claims. If we fail in defending any such claims or settling those claims, we may lose valuable intellectual property rights or personnel in addition to paying monetary damages or a settlement. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Patent terms may be inadequate to protect our competitive position on our HAVs or our other product candidates for an adequate amount of time.***

Patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. Various extensions may be available, but the life of a patent, and the protection it affords, is limited. Even if patents covering our HAVs are obtained, once the patent life has expired, we may face competition, including from other competing technologies. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours.

***We may not be able to protect our intellectual property rights throughout the world.***

Filing, prosecuting, maintaining, defending and enforcing patents on our product candidates in all countries throughout the world would be prohibitively expensive, and our intellectual property rights in some countries outside the United States can be less extensive than those in the United States. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the United States. Consequently, we may not be able to prevent third parties from practicing our inventions in countries outside the United States, or from selling or importing products made using our inventions in and into or other jurisdictions. Competitors may use our technologies in jurisdictions where we have not obtained patent protection to develop their own products and may also export infringing products to territories where we have patent protection, but enforcement rights are not as strong as those in the United States. These products may compete with our products, to the extent approved, and our owned or licensed patents or other intellectual property rights may not be effective or sufficient to prevent them from doing so.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents, trade secrets, and other intellectual property protection, particularly those relating to biotechnology products, which could make it difficult for us to stop the infringement of our owned or licensed patents or marketing of

competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions, whether or not successful, could result in substantial costs and divert our efforts and attention from other aspects of our business, could put our owned or licensed patents at risk of being invalidated or interpreted narrowly and our patent applications at risk of not issuing and could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate, and the damages or other remedies awarded to us, if any, may not be commercially meaningful.

Many countries have compulsory licensing laws under which a patent owner may be compelled under specified circumstances to grant licenses to third parties. In addition, many countries limit the enforceability of patents against government agencies or government contractors. In those countries, we may have limited remedies if patents are infringed or if we are compelled to grant a license to a third party, which could materially diminish the value of those patents. This could limit our potential revenue opportunities. Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we develop or license, which could adversely affect our business, financial condition, results of operations, and prospects.

***Some of our internal intellectual property and most of our in-licensed intellectual property has been generated under U.S. Government grants and contracts that trigger certain obligations and U.S. Government rights and thus is subject to federal regulations such as "march-in" rights, certain reporting requirements and a preference for U.S.-based companies. Compliance with such regulations may limit our exclusive rights and limit our ability to contract with non-U.S. manufacturers.***

Some of our internal intellectual property and most of our in-licensed intellectual property has been generated under U.S. Government grants and contracts that trigger certain obligations and U.S. Government rights under federal statutes and regulations, including the Bayh-Dole Act of 1980 and the Federal Technology Transfer Act of 1986. For example, the U.S. Government has a non-exclusive, non-transferable, irrevocable worldwide license to inventions conceived or first actually reduced to practice in the performance of a U.S. Government agreement. In addition, the U.S. Government has certain "march-in" rights to require us to grant exclusive, partially exclusive, or non-exclusive licenses to such inventions for the benefit of a third party if the U.S. Government determines that: (i) action is necessary to alleviate health or safety needs not reasonably met by us, our assignees, our licensees, or, in some cases, our licensors, (ii) action is necessary due to noncompliance with a U.S.-based manufacturing requirement applicable to exclusive licenses, (iii) action is necessary to meet requirements for public use specified by federal regulations and such requirements are not reasonably satisfied by us, our assignees, our licensees, and, in some cases, our licensors, and (iv) with respect to inventions made under funding agreements, adequate steps have not been taken to achieve practical application of the invention. The U.S. Government also has the right to take title to these inventions if we, or the applicable licensor, fails to disclose, elect title to, file or prosecute a patent application for, or defend or obtain a patent covering such inventions within time limits specified in particular funding agreements. The U.S. Government also has varying rights to use and disclose information, including copyrighted works, generated or delivered under a U.S. Government agreement depending on the terms of the agreement and the nature of the information. Intellectual property generated under a U.S. Government agreement is also subject to certain reporting requirements, compliance with which may require us or the applicable licensor to expend substantial resources. In addition, when inventions that are conceived or first actually reduced to practice under a U.S. Government funding agreement are exclusively licensed, products embodying or produced through the use of such inventions must be manufactured substantially in the United States. This U.S.-based manufacturing requirement may limit our ability to contract with non-U.S. companies to produce a covered product, although this requirement can be waived in certain circumstances. To the extent that any of our licensors' current or future intellectual property is generated in the performance of U.S. Government grants or contracts, these requirements may apply to such intellectual property.

***If our trademarks and trade names are not adequately protected, then we may not be able to build name recognition in our marks of interest and our business may be adversely affected.***

Our trademarks or trade names may be challenged, infringed, circumvented or declared generic or determined to be infringing on other marks. We may not be able to protect our rights to these trademarks and trade names or may be forced to stop using these names, which we need for name recognition by potential partners or customers in our markets of interest. During trademark registration proceedings, we may receive rejections. Although we would be given an opportunity to respond to those rejections, we may be unable to overcome such rejections. In addition, in the USPTO and in comparable agencies in many foreign jurisdictions, third parties are given an opportunity to oppose pending trademark applications and to seek to cancel registered trademarks. Opposition or cancellation proceedings may be filed against our trademarks, and our trademarks may not survive such proceedings. If we are unable to establish name recognition based on our trademarks and trade names, we may not be able to compete effectively and our business may be adversely affected.

***Intellectual property rights do not necessarily address all potential threats.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations and may not adequately protect our business or permit us to maintain our competitive advantage. For example:

- others may be able to make products that are similar to any product candidates we may develop or utilize similar technology but that are not covered by the claims of the patents that we own or license or may own or license in the future;
- we, or our current or future licensors might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or license or may own or license in the future;
- we, or our current or future licensors might not have been the first to file patent applications covering certain of our or their inventions;
- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our owned or licensed intellectual property rights;
- it is possible that our and our licensors' pending owned or licensed patent applications or those that we may own or license in the future will not lead to issued patents;
- issued patents that we hold rights to may be held invalid or unenforceable, including as a result of legal challenges by our competitors;
- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;
- we may not develop additional proprietary technologies that are patentable;
- the patents of others may harm our business; and
- we may choose not to file a patent in order to maintain certain trade secrets or know-how, and a third party may subsequently file a patent covering such intellectual property.

Should any of these events occur, they could harm our business, financial condition, results of operations, and prospects.

**Risks Related to Business Matters and Our Ability to Manage Growth**

***Our future success depends on our ability to retain our key employees, consultants and advisors and to attract, retain and motivate qualified personnel.***

We are highly dependent on the research and development, clinical, regulatory, financial, commercial, and manufacturing expertise of the principal members of our management, scientific and clinical teams. The loss of the services of our executive officers or other key employees could impede the achievement of our research, development and commercialization objectives and seriously harm our ability to successfully implement our business strategy. Furthermore, losing or replacing executive officers and key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and experience required to successfully develop, gain marketing approval of and commercialize our product candidates. Competition to hire from this limited pool is intense. We also experience competition for the hiring of scientific and clinical personnel from public and private universities and research institutions. In addition, we rely on consultants and advisors, including scientific, commercial and clinical advisors, to assist us in formulating our research and development and commercialization strategy. Our consultants and advisors may have commitments under employment, consulting or advisory contracts with other entities that may limit their availability to us. If we are unable to continue to attract and retain high quality personnel, our ability to pursue our growth strategy will be limited.

***We expect to increase the size of our workforce in the future, and we may encounter difficulties in managing this growth, which could harm our operations.***

As of December 31, 2023, we had 185 employees. As we move forward in our efforts to commercialize our HAVs, if approved, we expect to continue to experience significant growth in the number of our employees and the scope of our operations, particularly in the areas of development, regulatory affairs, manufacturing, sales and marketing and quality and compliance and support functions. Due to our limited financial resources, we may not be able to effectively manage the expansion of our operations, maintain competitive compensation packages, or recruit and train additional qualified personnel. The expansion of our operations may lead to significant costs and may divert our management and business development resources. Any inability to manage this growth effectively could delay the execution of our business plans or harm our operations.

**Risks Related to Ownership of Our Securities**

***The price of our common stock may be volatile.***

The price of our common stock may fluctuate due to a variety of factors, including:

- actual or anticipated fluctuations in our quarterly and annual results and those of other public companies in our industry;
- mergers and strategic alliances in the industry in which we operate;
- market prices and conditions in the industry in which we operate;
- changes in government regulation;
- potential or actual military conflicts or acts of terrorism;
- announcements concerning the Company or our competitors; and
- the general state of the securities markets.

These market and industry factors may materially reduce the market price of our common stock, regardless of our operating performance.

***Reports published by analysts, including projections in those reports that differ from our actual results, could adversely affect the price and trading volume of our common stock.***

We expect that securities research analysts will establish and publish their own periodic projections for our business. These projections may vary widely and may not accurately predict the results we actually achieve. Our stock price may decline if our actual results do not match the projections of these securities research analysts. Similarly, if one or more of the analysts who write reports on the Company downgrades our stock or publishes inaccurate or unfavorable research about our business, our stock price could decline. If one or more of these analysts ceases coverage of the Company or fails to publish reports on the Company regularly, our stock price or trading volume could decline.

***We may issue additional shares of common stock or other equity securities without stockholder approval, which would dilute your ownership interests and may depress the market price of our common stock.***

As of December 31, 2023, we had warrants outstanding to purchase up to an aggregate of 5,588,506 shares of our common stock and options outstanding to purchase up to an aggregate of 11,919,421 shares of our common stock. Under the Humacyte, Inc. 2021 Long-Term Incentive Plan (the "2021 Plan") and the Humacyte, Inc. 2021 Employee Stock Purchase Plan (the "ESPP"), as of December 31, 2023 we also have the ability to issue 1,492,057 shares and 1,030,033 shares, respectively. In addition, the aggregate number of shares under the 2021 Plan and the ESPP will automatically increase on January 1 of each year commencing January 1, 2022, in an amount equal to 5% and 1%, respectively, of the number of shares of our capital stock outstanding on December 31 of the preceding year, unless our board of directors (the "Board") acts prior to January 1 of a given year to provide that the increase for such year will be a lesser number. As of December 31, 2023, we had the Option outstanding to purchase up to $10 million worth of shares of our common stock. We may also issue additional shares of common stock or other equity securities of equal or senior rank in the future in connection with, among other things, future acquisitions or repayment of outstanding indebtedness, without stockholder approval, in a number of circumstances.

Our issuance of additional shares of common stock or other equity securities of equal or senior rank would have the following effects:

- our existing stockholders' proportionate ownership interest in the Company will decrease;
- the amount of cash available per share, including for payment of dividends in the future, may decrease;
- the relative voting strength of each previously outstanding share of common stock may be diminished; and
- the market price of shares of our common stock may decline.

***Because we do not anticipate paying any cash dividends on our common stock in the foreseeable future, capital appreciation, if any, will be your sole source of gains and you may never receive a return on your investment.***

We intend to retain future earnings, if any, for future operations, expansion and debt repayment and have no current plans to pay any cash dividends for the foreseeable future. Any decision to declare and pay dividends as a public company in the future will be made at the discretion of the Board and will depend on, among other things, our results of operations, financial condition, cash requirements, contractual restrictions and other factors that the Board may deem relevant. In addition, our ability to pay dividends may be limited by covenants of any existing and future outstanding indebtedness we or our subsidiaries incur. As a result, you may not receive any return on an investment in our securities unless you sell your securities for a price greater than that which you paid for it.

***The Public Warrants may not be in the money in the future, and they may expire worthless, and the terms of the Public Warrants may be amended in a manner adverse to a holder if holders of at least 50% of the then outstanding Public Warrants approve of such amendment.***

In connection with the Merger, the Company assumed 5,000,000 publicly-traded warrants ("Public Warrants") and 177,500 private placement warrants issued to AHAC Sponsor LLC (the "Sponsor"), Oppenheimer & Co. Inc. and Northland Securities, Inc, in connection with AHAC's initial public offering ("Private Placement Warrants" and, together with the Public Warrants, the "Warrants"). The Warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and our predecessor AHAC. The warrant agreement provides that the terms of the Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision or correct any mistake, but requires the approval by the holders of at least 50% of the then-outstanding Public Warrants to make any change that adversely affects the interests of the registered holders of Public Warrants. Accordingly, we may amend the terms of the Public Warrants in a manner adverse to a holder if holders of at least 50% of the then-outstanding Public Warrants approve of such amendment and, solely with respect to any amendment to the terms of the Private Placement Warrants or any provision of the warrant agreement with respect to the Private Placement Warrants, holders of at least 50% of the number of the then outstanding Private Placement Warrants. Although our ability to amend the terms of the Public Warrants with the consent of at least 50% of the then-outstanding Public Warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the Warrants, convert the Warrants into cash, shorten the exercise period or decrease the number of shares of common stock purchasable upon exercise of a Warrant.

***We may redeem your unexpired Public Warrants prior to their exercise at a time that is disadvantageous to you, thereby making your Public Warrants worth less than they would be if you held and exercised them at a later time.***

We have the ability to redeem outstanding Public Warrants prior to their expiration, at a price of $0.01 per Warrant, provided that the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for share subdivisions, share dividends, rights issuances, subdivisions, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date we send the notice of redemption to the holders thereof. If and when the Public Warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding Public Warrants could force you to: (i) exercise your Public Warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so; (ii) sell your Public Warrants at the then-current market price when you might otherwise wish to hold your Public Warrants; or (iii) accept the nominal redemption price which, at the time the outstanding Public Warrants are called for redemption, is likely to be substantially less than the market value of your Public Warrants.

The value received upon exercise of the Public Warrants (i) may be less than the value the holders would have received if they had exercised their Public Warrants at a later time where the underlying share price is higher and (ii) may not compensate the holders for the value of the Public Warrants.

The Private Placement Warrants are not subject to the same risk of redemption as the Public Warrants as the Private Placement Warrants are not redeemable so long as they are held by the Sponsor, the underwriters of AHAC's initial public offering or their permitted transferees. If the Private Placement Warrants are held by holders other than the Sponsor, the underwriters or their permitted transferees, the Private Placement Warrants will be redeemable by us.

***We have derivative securities that are accounted for as liabilities and the changes in value of such derivative securities could have a material effect on our financial results.***

Included on the Company's consolidated balance sheets as of December 31, 2023 are derivative liabilities related to the Contingent Consideration, the Private Placement Warrants, and the Purchasers' put option under the Purchase Agreement. Accounting Standards Codification 815, Derivatives and Hedging ("ASC 815"), provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statement of operations. As a result of the recurring fair value measurement, our financial statements and results of operations may fluctuate quarterly, based on factors which are outside of our control. Due to the recurring fair value measurement, we expect that we will recognize non-cash gains or losses on the Contingent Consideration and the Private Placement Warrants each reporting period and that the amount of such gains or losses could be material.

***Our business could be adversely impacted by inflation.***

Increases in inflation may have an adverse effect on our business. Current and future inflationary effects may be driven by, among other things, supply chain disruptions and governmental stimulus or fiscal policies. Continuing increases in inflation could impact the overall demand for our products, our costs for labor, material and services, and the margins we are able to realize on our products, all of which could have an adverse impact on our business, financial position, results of operations and cash flows. Inflation may also result in higher interest rates, which in turn would result in higher interest expense related to our variable rate indebtedness and any borrowings we undertake to refinance existing fixed rate indebtedness.

***We may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

We may be forced to write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in losses. Even though these charges may be non-cash items and may not have an immediate impact on our liquidity, the fact that we may report charges of this nature could contribute to negative market perceptions about our securities. In addition, charges of this nature may cause us to be unable to obtain future financing on favorable terms or at all. Accordingly, a stockholder could suffer a reduction in the value of their shares.

***The obligations associated with being a public company involve significant expenses and will require significant resources and management attention, which may divert from our business operations.***

As a public company, we are subject to the reporting requirements of the Exchange Act and the Sarbanes-Oxley Act. The Exchange Act requires the filing of annual, quarterly and current reports with respect to a public company's business and financial condition. The Sarbanes-Oxley Act requires, among other things, that a public company establish and maintain effective internal control over financial reporting. As a result, we will incur significant legal, accounting and other expenses. Our entire management team and many of its other employees devotes substantial time to compliance.

These rules and regulations result in our incurring substantial legal and financial compliance costs and will make some activities more time-consuming and costly. For example, these rules and regulations have made it more difficult and more expensive for Humacyte to obtain director and officer liability insurance, and it has accepted reduced coverage. As a result, it may be difficult for us to attract and retain qualified people to serve on the Board or committees of the Board or as executive officers.

***We are an "emerging growth company" and a "smaller reporting company" within the meaning of the rules adopted by the SEC, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies and smaller reporting companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are an emerging growth company as defined in the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years from the closing of AHAC's initial public offering, although circumstances could cause us to lose that status earlier, including if the market value of our common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that an emerging growth company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company for so long as (1) the market value of our common stock held by non-affiliates is less than $250 million as of the last business day of the second fiscal quarter, or (2) our annual revenues in our most recent fiscal year completed before the last business day of our second fiscal quarter are less than $100 million and the market value of our common stock held by non-affiliates is less than $700 million as of the last business day of the second fiscal quarter. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public companies difficult or impossible.

***If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results. As a result, stockholders could lose confidence in our financial and other public reporting, which would harm our business and the trading price of our common stock.***

Effective internal control over financial reporting is necessary for us to provide reliable financial reports. Any failure to implement new or improved controls necessary to maintain effective internal control over financial reporting, or difficulties encountered in their implementation, could cause us to fail to meet our reporting obligations.

In addition, any testing by us conducted in connection with Section 404 of the Sarbanes-Oxley Act, or our independent registered public accounting firm, may identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Our failure to remediate any material weaknesses or failure to identify and address any material weaknesses or control deficiencies could result in inaccuracies in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis, which could cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of our common stock.

As long as we are an emerging growth company under the JOBS Act or a non-accelerated filer and a "smaller reporting company" as defined in Rule 12b-2 of the Exchange Act, our independent registered public accounting firm will not be required to attest to the effectiveness of our internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act. An independent assessment of the effectiveness of our internal control over financial reporting could detect deficiencies that our management's assessment might not. Undetected material weaknesses in our internal control over financial reporting could lead to financial statement restatements and require us to incur the expense of remediation.

***Anti-takeover provisions in our Second Amended and Restated Certificate of Incorporation and under Delaware law could make an acquisition of the Company, which may be beneficial to our stockholders, more difficult, and may prevent attempts by our stockholders to replace or remove our current management.***

Our Second Amended and Restated Certificate of Incorporation (the "Charter") contains provisions that may delay or prevent an acquisition of the company or change in our management. These provisions may make it more difficult for stockholders to replace or remove members of the Board. Because the Board is responsible for appointing the members of the management team, these provisions could in turn frustrate or prevent any attempt by our stockholders to replace or remove our current management. In addition, these provisions could limit the price that investors might be willing to pay in the future for shares of our common stock. Among other things, these provisions include:

- the limitation of the liability of, and the indemnification of, our directors and officers;
- provisions that permit only (i) the chairperson of the Board, (ii) our chief executive officer or (iii) a majority of our Board to call special meetings of stockholders and therefore do not permit our stockholders to call stockholder meetings;
- a prohibition on actions by our stockholders by written consent; and
- the ability of the Board to issue preferred stock without stockholder approval.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a person who owns 15% or more of our outstanding voting stock from merging or combining with us for a period of three years after the date of the transaction in which the person acquired 15% or more of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner. This could discourage, delay or prevent a third party from acquiring or merging with us, whether or not it is desired by, or beneficial to, our stockholders. This could also have the effect of discouraging others from making tender offers for our common stock, including transactions that may be in our stockholders' best interests. Finally, these provisions establish advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings. These provisions would apply even if the offer may be considered beneficial by some stockholders.

***Our Charter provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware and the federal district courts of the United States of America are the exclusive forums for substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our Charter provides that the Court of Chancery of the State of Delaware will be the exclusive forum for the following types of actions or proceedings under Delaware statutory or common law:

- any derivative action or proceeding brought on our behalf;
- any action asserting a breach of fiduciary duty;
- any action asserting a claim against us arising under the DGCL, our Charter or our amended and restated bylaws (the "Bylaws");

- any action or proceeding asserting a claim as to which the DGCL confers jurisdiction upon the Court of Chancery of the State of Delaware; and
- any action asserting a claim against us that is governed by the internal affairs doctrine or otherwise related to our internal affairs.

This exclusive forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims. We cannot be certain that a court will decide that this provision is either applicable or enforceable, and if a court were to find the choice of forum provision contained in our Charter to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

This exclusive forum provision will not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. In addition, unless we consent in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act or the rules and regulations promulgated thereunder.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 1C. Cybersecurity.**

**Cybersecurity Risk Management and Strategy**

We have certain processes for assessing, identifying, and managing material risks from cybersecurity threats, which are integrated into our enterprise risk management processes. Specifically, we have processes for:

- **Identifying and Managing Cybersecurity Risks** — We have implemented a cross-functional approach to assessing, identifying and managing material cybersecurity threats and incidents. We periodically review, assess, update and test our policies, standards, processes and practices in a manner intended to address cybersecurity threats and events. The results of such reviews, assessments and tests are evaluated by management and periodically reported to our Audit Committee of the Board of Directors, and our Board of Directors.
- **Technical Safeguards** — We have integrated cybersecurity into our overall information technology operations and designed our processes and systems to help protect our information assets and operations from internal and external cyber threats, protect employee and patient information from unauthorized access or attack as well as secure our networks and systems.
- **Incident Response and Recovery Planning** — To better facilitate our cybersecurity program, our cybersecurity team works collaboratively across our Company to implement programs designed to protect our information systems from cybersecurity threats and to promptly respond to any material cybersecurity incidents. We conduct regular tabletop exercises, including incident simulations to test these plans and ensure personnel are familiar with their roles and responsibilities in a response scenario.
- **Third-Party Risk Management** — We maintain a risk-based approach to identifying and overseeing material cybersecurity threats presented by third parties and the systems of third parties that could adversely impact our business in the event of a material cybersecurity incident affecting those third-party systems.
- **Education and Awareness** — We provide training regarding cybersecurity threats as a means to equip our employees, directors and consultants with tools to make employees, directors and consultants aware of and to address cybersecurity threats, and to communicate our evolving information security policies, standards, processes and practices. We also use technology-based tools to mitigate cybersecurity risks and to bolster our employee-based cybersecurity programs.

We adjust our cybersecurity policies, standards, processes, and practices as necessary based on the information provided by our assessments, audits and reviews. Such processes include (i) procedural and technical safeguards, (ii) response plans, (iii) annual tests on our systems, (iv) incident simulations and (v) routine review of our cybersecurity policies and procedures to identify risks and improve our practices. We engage certain external cybersecurity firms to enhance our cybersecurity oversight. We include confidentiality provisions in all contracts with third-party service providers, and data protection provisions in certain contracts with third-party service providers where applicable, to help protect us and our employees and patients from any related vulnerabilities.

**Governance**

Our Board of Directors is responsible for exercising oversight of management's identification and management of, and planning for, risks from cybersecurity threats. While the full Board of Directors has overall responsibility for risk oversight, the Board of Directors has delegated oversight responsibility related to risks from cybersecurity threats to the Audit Committee. The Audit Committee reports to the Board of Directors at least annually, and notifies the Board of Directors as necessary regarding significant new cybersecurity threats or incidents. The Audit Committee of our Board of Directors meets not less than annually to discuss our approach to overseeing cybersecurity threats with management, including with members of our internal cybersecurity team. Any material cybersecurity incidents are promptly reported by management to our Audit Committee.

We use an internal management committee to run our information and technology function, comprised of information technology, finance, and legal employees, and led by our Vice President – Information Technology and Automation, and Chief Financial Officer, each of whom have experience managing the information and technology functions, and cybersecurity safeguards, at multiple prior companies. Through ongoing communications with this management committee, senior management is informed about and monitors the prevention, detection, mitigation and remediation of cybersecurity threats and incidents in real-time and reports such threats and incidents to the Audit Committee, when appropriate. Management updates the Audit Committee annually with an overview of our cybersecurity threat risk management and strategy processes. Members of the Audit Committee are also encouraged to regularly engage in ad hoc conversations with management on cybersecurity-related topics and discuss any updates to our cybersecurity risk management and strategy programs. The Audit Committee is notified between such updates regarding material new cybersecurity threats or incidents that meet pre-established reporting thresholds and any ongoing updates regarding any risk, as needed.

We have not identified any risks from cybersecurity threats, including as a result of any previous cybersecurity incidents, that have materially affected or are reasonably likely to materially affect our company, including our business strategy, results of operations or financial condition. However, as discussed under "Risk Factors" in Part I, Item 1A of this Annual Report on Form 10-K, cybersecurity threats could pose multiple risks to us. As cybersecurity threats become more frequent, sophisticated, and coordinated, it is reasonably likely that we will be required to expend greater resources to continue to modify and enhance our protective measures.

**Item 2. Properties.**

Our corporate headquarters, manufacturing, and research and development facilities are located in Durham, North Carolina where we lease approximately 83,000 square feet of space. This space includes approximately 55,000 square feet for production and distribution operations including manufacturing, bioprocessing, quality control, mechanical space and inventory. The remainder of the facility consists of offices, laboratories, and common spaces.

**Item 3. Legal Proceedings**

The Company currently is not aware of any legal proceedings or claims that management believes will have, individually or in the aggregate, a material adverse effect on the Company's business, financial condition, results of operations, or cash flows.

**Item 4. Mine Safety Disclosures.**

None.

## Part II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

**Market Information**

Our common stock is currently listed on The Nasdaq Global Select Market under the symbol "HUMA." As of March 21, 2024, there were 195 holders of record of our common stock.

**Dividend Policy**

We have never declared or paid any dividends on shares of our common stock. We anticipate that we will retain all of our future earnings, if any, for use in the operation and expansion of our business and do not anticipate paying cash dividends in the foreseeable future. Any decision to declare and pay dividends in the future will be made at the sole discretion of our Board will depend on, among other things, our results of operations, cash requirements, financial condition, contractual restrictions and other factors that our board of directors may deem relevant.

### Item 6. [Reserved]

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our accompanying consolidated financial statements and the related notes contained in Part II, Item 8 of this Annual Report on Form 10-K. Unless the context indicates otherwise, references in this Annual Report on Form 10-K to the "Company," "Humacyte," "we," "us," "our" and similar terms refer to Humacyte, Inc. (formerly known as Alpha Healthcare Acquisition Corp.) and its consolidated subsidiaries (including Humacyte Global, Inc.) following the Merger (defined below); references to "Legacy Humacyte" refer to Humacyte, Inc. prior to the Merger; and references to "AHAC" refer to Alpha Healthcare Acquisition Corp. prior to the Merger.*

**Cautionary Statement Regarding Forward-Looking Statements**

In addition to historical information, some of the information contained in this discussion and analysis or set forth elsewhere in this Annual Report on Form 10-K, including information with respect to our plans and strategy for our business, future financial performance, expense levels and liquidity sources, includes forward-looking statements that involve risks and uncertainties. You should read the sections of this Annual Report on Form 10-K titled "Forward-Looking Statements" and "Risk Factors" for a discussion of important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis.

**Overview**

We are pioneering the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs and organ systems with the goal of improving the lives of patients and transforming the practice of medicine. We believe our regenerative medicine technology has the potential to overcome limitations in existing standards of care and address the lack of significant innovation in products that support tissue repair, reconstruction and replacement. We are leveraging our novel, scalable technology platform to develop proprietary bioengineered, acellular human tissues for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

We are initially using our proprietary, scientific technology platform to engineer and manufacture HAVs. Our investigational HAVs are designed to be easily implanted into any patient without inducing a foreign body response or leading to immune rejection. We are developing a portfolio, or "cabinet", of HAVs with varying diameters and lengths. The HAV cabinet would initially target the vascular repair, reconstruction and replacement market, including use in vascular trauma, AV access for hemodialysis, and PAD. We are also developing the HAV for CABG and pediatric heart surgery. Over the longer term, we are developing our HAV for the delivery of cellular therapies, including pancreatic islet cell transplantation to treat Type 1 diabetes (our BVP). We will continue to explore the application of our technology across a broad range of markets and indications, including the development of urinary conduit, trachea, esophagus and other novel cell delivery systems.

For the HAV, we believe there is substantial clinical demand for safe and effective vascular conduits to replace and repair blood vessels throughout the body. Vascular injuries resulting from trauma are common in civilian and military populations, frequently resulting in the loss of either life or limb. Existing treatment options in the vascular repair, reconstruction and replacement market include the use of autologous vessels and synthetic grafts, which we believe suffer from significant limitations. For example, the use of autologous veins to repair traumatic vascular injuries can lead to significant morbidity associated with the surgical wounds created for vein harvest and prolonged times to restore blood flow to injured limbs, leading to an increased risk of complications such as amputation and reperfusion injury. In addition, in many instances of vascular trauma the patient may not have adequate vein available, or the time between injury and treatment is too long, to make autologous graft repair feasible. Synthetic grafts are often contraindicated in the setting of vascular trauma due to higher infection risk that can lead to prolonged hospitalization and limb loss. Given the competitive advantages our HAVs are designed to have over existing vascular substitutes, we believe that HAVs have the potential to become the standard of care and lead to improved patient outcomes and lower healthcare costs.

As of December 31, 2023, our HAVs have been implanted in approximately 573 patients. We and our collaborators are currently conducting Phase 3 and Phase 2 trials of our 6 millimeter HAV across three therapeutic indications: vascular trauma, AV access for hemodialysis, and PAD. We were granted Fast Track designation by the FDA for our 6 millimeter HAV for use in AV access for hemodialysis in 2014. We also received the first RMAT designation from the FDA, for the creation of vascular access for performing hemodialysis, in March 2017. In May 2023, we were granted the RMAT designation for the HAV for urgent arterial repair following extremity vascular trauma. In addition, in 2018 our HAV product candidate was assigned a priority designation by the Secretary of Defense under Public Law 115-92, enacted to expedite the FDA's review of products that are intended to diagnose, treat or prevent serious or life-threatening conditions facing American military personnel. In September 2023, we announced positive top line results from our V005 Phase 2/3 trial in vascular trauma, and in December 2023 we filed a BLA for urgent arterial repair following extremity vascular trauma when synthetic graft is not indicated, and when autologous vein use is not feasible. In February 2024, the FDA accepted the BLA filing and granted priority review and set a PDUFA) date of August 10, 2024.

In April 2023, we announced completion of enrollment of our V007 Phase 3 trial of the HAV for use in AV access for hemodialysis. Upon anticipated completion of our V007 Phase 3 trial in 2024, and dependent upon clinical results, we intend to submit a BLA supplement to the FDA for an indication in AV access for hemodialysis.

We have generated no product revenue and incurred operating losses and negative cash flows from operations in each year since our inception in 2004. As of December 31, 2023 and 2022, we had an accumulated deficit of $537.3 million and $426.5 million, respectively, and working capital of $64.8 million and $134.6 million, respectively. Our operating losses were approximately $100.0 million and $84.6 million for the years ended December 31, 2023 and 2022, respectively. Net cash flows used in operating activities were $73.3 million and $71.1 million during the years ended December 31, 2023 and 2022, respectively. Substantially all of our operating losses resulted from costs incurred in connection with our research and development programs and from general and administrative costs associated with our operations. We expect to incur substantial operating losses and negative cash flows from operations for the foreseeable future as we advance our product candidates.

As of December 31, 2023, we had cash and cash equivalents of $80.4 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering (defined below), which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement (defined below) We believe our cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K. See Note 1 — Organization and Description of Business in the notes to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for additional information regarding this assessment.

Our need for additional capital will depend in part on the scope and costs of our development and commercial manufacturing activities. To date, we have not generated any revenue from the sale of commercialized products. Our ability to generate product revenue will depend on the successful development and eventual commercialization of one or more of our product candidates. Until such time, if ever, we expect to finance our operations through the use of existing cash and cash equivalents, the sale of equity or debt, proceeds from the Purchase Agreement, borrowings under credit facilities, or through potential collaborations, other strategic transactions or government and other grants. Adequate capital may not be available to us when needed or on acceptable terms. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition. See "Risk Factors" for additional information.

We expect to continue to incur significant expenses and to increase operating losses for at least the next several years. We anticipate that our expenses will increase substantially as we seek to:

- obtain marketing approval for our 6 millimeter HAV for vascular repair, reconstruction and replacement, including for indications in vascular trauma and AV access for hemodialysis;
- commercialize the HAV via U.S. market launches for an indication in vascular trauma and hemodialysis AV access;
- scale out our manufacturing facility to the extent required to satisfy potential demand following any receipt of marketing approval;
- continue our preclinical and clinical development efforts;
- maintain, expand and protect our intellectual property portfolio;
- add operational, financial and management information systems and personnel to support, among other things, our product development and commercialization efforts and operations; and
- continue operating as a public company, which includes higher costs associated with hiring additional personnel, director and officer insurance premiums, audit and legal fees and expenses for compliance with public company reporting requirements under the Exchange Act and rules implemented by the SEC and The Nasdaq Stock Market LLC ("Nasdaq").

**Recent Developments**

On February 29, 2024, we entered into an underwriting agreement (the "Underwriting Agreement") with Cowen and Company, LLC and Cantor Fitzgerald & Co. as representatives of the several underwriters named therein (collectively, the "Underwriters"), relating to the issuance and sale in an underwritten offering (the "Offering") of 15,410,000 shares of our Common Stock, which included a full exercise of the Underwriters' option to purchase additional shares, at a price to the public of $3.00 per share (the "Shares"). The net proceeds to us from the Offering were approximately $43.1 million after deducting underwriting discounts and commissions and estimated Offering expenses. The Offering closed on March 5, 2024.

**Components of Results of Operations**

*Revenue*

To date, we have not generated revenue from the sale of any products. All of our revenue has been derived from government and other grants. From inception through December 31, 2023, we have been awarded grants, including grants from the California Institute of Regenerative Medicine ("CIRM"), NIH, and the DoD, to support our development, production scaling and clinical trials of our product candidates. We may generate revenue in the future from government and other grants, payments from future license or collaboration agreements and, if any of our product candidates receive marketing approval, from product sales. We expect that any revenue we generate will fluctuate from quarter to quarter. If we fail to complete the development of, or obtain marketing approval for, our product candidates in a timely manner, our ability to generate future revenue, and our results of operations and financial position, would be materially adversely affected.

*Research and Development Expenses*

Since our inception, we have focused our resources on our research and development activities, including conducting preclinical studies and clinical trials, developing our manufacturing process and activities related to regulatory filings for our product candidates. We recognize research and development expenses as they are incurred. Our research and development expenses consist primarily of:

- salaries and related overhead expenses for personnel in research and development functions, including stock-based compensation and benefits;
- fees paid to consultants and CROs, including in connection with our clinical trials, and other related clinical trial fees, such as for investigator grants, patient screening, laboratory work and statistical compilation and analysis;

- allocation of facility lease and maintenance costs;
- depreciation of leasehold improvements, laboratory equipment and computers;
- costs related to purchasing raw materials and producing our product candidates for clinical trials;
- costs related to compliance with regulatory requirements;
- costs related to our manufacturing development and expanded-capabilities initiatives; and
- license fees related to in-licensed technologies.

The majority of our research and development resources are currently focused on our Phase 2 and 3 clinical trials for our 6 millimeter HAV and other work needed to obtain marketing approval for our 6 millimeter HAV for use for vascular repair, reconstruction and replacement, including vascular trauma and AV access in hemodialysis in the United States. We have incurred and expect to continue to incur significant expenses in connection with these and our other clinical development efforts, including expenses related to regulatory filings, trial enrollment and conduct, data analysis, patient follow up and study report generation for our Phase 2 and Phase 3 clinical trials. We do not allocate all of our costs by each research and development program for which we are developing our cabinet of HAVs, as a significant amount of our development activities broadly support multiple programs that use our technology platform. We plan to further increase our research and development expenses for the foreseeable future as we continue the development of our proprietary scientific technology platform and our novel manufacturing paradigm.

The successful development of our preclinical and clinical product candidates is highly uncertain. At this time, we cannot estimate with any reasonable certainty the nature, timing or costs of the efforts that will be necessary to complete the remainder of the development of any of our preclinical or clinical product candidates or the period, if any, in which material net cash inflows from these product candidates may commence. This is due to the numerous risks and uncertainties associated with the development of our product candidates, including:

- the scope, rate of progress, expense and results of our preclinical development activities, our ongoing clinical trials and any additional clinical trials that we may conduct, and other research and development activities;
- successful patient enrollment in and the initiation and completion of clinical trials;
- the timing, receipt and terms of any marketing approvals from applicable regulatory authorities including the FDA and non-U.S. regulators;
- the extent of any required post-marketing approval commitments to applicable regulatory authorities;
- development of clinical and commercial manufacturing capabilities or making arrangements with third-party manufacturers in order to ensure that it or its third-party manufacturers are able to successfully manufacture our product;
- obtaining, maintaining, defending and enforcing patent claims and other intellectual property rights;
- significant and changing government regulations;
- launching commercial sales of our product candidates, if approved, whether alone or in collaboration with others;
- the degree of market acceptance of any product candidates that obtain marketing approval; and
- maintaining a continued acceptable safety profile following approval, if any, of our product candidates.

A change in the outcome of any of these variables could lead to significant changes in the costs and timing associated with the development of our product candidates. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we currently anticipate being required to conduct in order to complete the clinical development of any of our product candidates, or if we experience significant delays in the enrollment or the conduct of any of our clinical trials, we could be required to expend significant additional financial resources and time on the completion of clinical development.

*General and Administrative Expenses*

General and administrative expenses consist primarily of salaries and related costs for employees in executive, finance, human resources, commercialization, and administrative support functions, which also include stock-based compensation expenses and benefits for such employees. Other significant general and administrative expenses include facilities costs, professional fees for accounting and legal services and expenses associated with obtaining and maintaining patents.

We expect our general and administrative expenses will continue to increase for the foreseeable future to support our expanded infrastructure and increased costs of operating as a public company and as we prepare for our anticipated commercial launch of the HAV. These increases are expected to include increased employee-related expenses, increased sales and marketing expenses, and increased director and officer insurance premiums, audit and legal fees, and expenses for compliance with public company reporting requirements under the Exchange Act and rules implemented by the SEC, as well as Nasdaq rules.

*Other Income (Expense), Net*

Total other income (expense), net consists of (i) the change in fair value of the Contingent Earnout Liability that was accounted for as a liability as of the date of the Merger, and is remeasured to fair value at each reporting period, resulting in a non-cash gain or loss, (ii) interest income earned on our cash and cash equivalents and short-term investments, (iii) interest expense incurred on the Purchase Agreement (defined below), finance leases, and our former loan agreement with SVB during the periods each were outstanding, (iv) the change in fair value of our derivative liabilities including the private placement Common Stock warrant liabilities related to the Private Placement Warrants, which we assumed in connection with the Merger; the contingent derivative liability related to the Purchase Agreement; a liability related to a freestanding option agreement related to the Purchase Agreement; and the derivative liability related to our agreement with JDRF (defined below), all of which are subject to remeasurement to fair value at each balance sheet date resulting in a non-cash gain or loss, (v) a loss on debt extinguishment related to the prepayment of our loan agreement with SVB in May 2023, and (vi) an employee retention credit we recognized in June 2023.

**Results of Operations**

*Comparison of the Years Ended December 31, 2023 and 2022*

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| ***($ in thousands)*** | **2023** | **2022** | **$** | **%** |
| **Grant revenue** | $ — | $ 1,565 | $ (1,565) | (100)% |
| **Operating expenses:** | | | | |
| Research and development | 76,550 | 63,260 | 13,290 | 21 % |
| General and administrative | 23,497 | 22,883 | 614 | 3 % |
| Total operating expenses | 100,047 | 86,143 | 13,904 | 16 % |
| **Loss from operations** | **(100,047)** | **(84,578)** | **(15,469)** | 18 % |
| Other income (expense), net: | | | | |
| Interest income | 5,467 | 2,629 | 2,838 | 108 % |
| Change in fair value of Contingent Earnout Liability | (10,023) | 75,767 | (85,790) | (113)% |
| Employee retention credit | 3,107 | — | 3,107 | 100 % |
| Loss on extinguishment of debt | (2,421) | — | (2,421) | (100)% |
| Interest expense | (6,599) | (6,200) | (399) | 6 % |
| Change in fair value of derivative liabilities | (260) | 417 | (677) | (162)% |
| Total other income (expense), net | (10,729) | 72,613 | (83,342) | (115)% |
| **Net loss** | **$ (110,776)** | **$ (11,965)** | **$ (98,811)** | 826 % |

*Grant Revenue*

There was no revenue for the year ended December 31, 2023, compared to $1.6 million in grant revenue for the year ended December 31, 2022. Revenue for 2022 related to the reimbursement of qualifying expenses incurred in connection with our grant from DoD, which totaled approximately $6.8 million over the life of the grant before this program ended in November 2022.

*Research and Development Expenses*

The following table discloses the breakdown of research and development expenses for the periods indicated:

| | Year Ended December 31, | | Change | |
|---|---|---|---|---|
| **($ in thousands)** | **2023** | **2022** | **$** | **%** |
| External services | $ 19,136 | $ 15,583 | $ 3,553 | 23 % |
| Materials and supplies | 13,705 | 11,210 | 2,495 | 22 % |
| Payroll and personnel expenses | 30,118 | 23,678 | 6,440 | 27 % |
| Other research and development expenses | 13,591 | 12,789 | 802 | 6 % |
| | **$ 76,550** | **$ 63,260** | **$ 13,290** | **21 %** |

Research and development expenses were $76.6 million for the year ended December 31, 2023, representing an increase of $13.3 million, or 21%, from $63.3 million for the year ended December 31, 2022. The increase was primarily driven by expenses incurred to support our expanded research and development initiatives, including the completion of our V005 Phase 2/3 trial and the V017 study for the use of the HAV in extremity vascular trauma, and our related BLA filing in December 2023, increased product manufacturing and development, and clinical development of the HAV for use in AV access for hemodialysis. Expense increases were primarily comprised of (i) a $6.4 million increase in payroll and personnel expenses, (ii) a $3.6 million increase in external services, including the support of clinical studies, (iii) a $2.5 million increase in the purchase of materials and supplies, and (iv) a $0.8 million increase in other research and development expenses.

*General and Administrative Expenses*

General and administrative expenses were $23.5 million and $22.9 million for the years ended December 31, 2023 and 2022, respectively. The slight net increase in general and administrative expenses during the year ended December 31, 2023 of $0.6 million, or 3%, compared to the year ended December 31, 2022 was primarily driven by preparation for the planned commercial launch of the HAV for an indication in vascular trauma, including a $1.3 million increase in payroll and personnel expenses and a $0.3 million increase in insurance expense, partially offset by a $1.0 million decrease in professional fees, including a reduction in legal fees.

*Total Other Income (Expense), net*

Total other income (expense), net was expense of $10.7 million for the year ended December 31, 2023, compared to income of $72.6 million for the year ended December 31, 2022. The increase in expense of $83.3 million primarily resulted from the remeasurement of the Contingent Earnout Liability as of December 31, 2023, which resulted in non-cash expense of $10.0 million for the year ended December 31, 2023, compared to a $75.8 million non-cash gain for the year ended December 31, 2022, and a $2.4 million loss on extinguishment of debt related to the prepayment of balances outstanding under our loan agreement with SVB, partially offset by a $3.1 million employee retention credit and a $2.8 million increase in interest income earned on our cash, cash equivalents and short-term investments during 2023 primarily due to higher interest rates.

**Liquidity and Capital Resources**

*Sources of Liquidity*

We have historically financed our operations primarily through the sale of equity securities and convertible debt, proceeds from the Merger and related PIPE Financing (as defined in Note 1 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K), borrowings under loan facilities, the Purchase Agreement (defined below), and, to a lesser extent, through grants from governmental and other agencies. Since our inception, we have incurred significant operating losses and negative cash flows. As of December 31, 2023 and 2022, we had an accumulated deficit of $537.3 million and $426.5 million, respectively.

As of December 31, 2023 and 2022, we had working capital of $64.8 million and $134.6 million, respectively. As of December 31, 2023, we had cash and cash equivalents of $80.4 million and as of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. Subsequent to December 31, 2023, in March 2024 we completed the Offering which provided approximately $43.1 million in net proceeds and received an additional $20.0 million under the Purchase Agreement. We believe our cash and cash equivalents will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Annual Report on Form 10-K. See Note 1 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for additional information regarding our assessment. We believe that our longer-term working capital, planned research and development, capital expenditures and other general corporate funding requirements may be satisfied through the sale of equity, debt, borrowings under credit facilities or through potential collaborations with other companies, other strategic transactions or government or other grants. Our liquidity plans are subject to a number of risks and uncertainties, including those described in the sections of this Annual Report on Form 10-K titled "Forward-Looking Statements" and "Risk Factors." Adequate capital may not be available to us when needed or on acceptable terms. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition.

On May 12, 2023, we entered into a Revenue Interest Purchase Agreement (the "Purchase Agreement") with two purchasers (the "Purchasers"), both affiliates of Oberland Capital Management LLC ("Oberland"), and another affiliate of Oberland, as agent for the Purchasers (the "Agent"), to obtain financing in respect to the further development and commercialization of our HAV, to repay our then outstanding credit facility with SVB, and for other general corporate purposes. Pursuant to the Purchase Agreement, on May 12, 2023, the Purchasers purchased certain revenue interests (the "Revenue Interests") from us in exchange for an aggregate investment amount of up to $150.0 million (the "Investment Amount"). On May 12, 2023, we received an initial payment of $40.0 million, less certain transaction expenses, which was used to repay in full all of the outstanding obligations under our loan agreement with SVB. We will be entitled to receive up to approximately $110.0 million in subsequent installments subject to the terms and conditions set forth in the Purchase Agreement, as follows: (i) $20.0 million upon our BLA for an indication in vascular trauma being accepted on or prior to March 31, 2024, (ii) $40.0 million, at our option, upon us receiving FDA approval of the HAV for the vascular trauma indication on or prior to December 31, 2024 and (iii) $50.0 million, at our option, upon reaching $35.0 million trailing worldwide three-month net sales any time prior to December 31, 2025. Each tranche is dependent on the satisfaction of the conditions and receipt of funds from the previous tranche.

On February 18, 2024, we agreed with the Purchasers and the Agent, to waive certain breaches related to, and extend the deadline for certain post-closing obligations under, the Purchase Agreement, including the requirement for a leasehold mortgage over our headquarters. Giving effect to the extension and waiver, we are obligated to deliver by no later than April 30, 2024 (or such later date as the Agent may agree in its sole discretion), an executed leasehold mortgage (or alternative documentation satisfactory to the Agent in its sole discretion) over our headquarters. Concurrently with such agreement, we delivered a request that the Purchasers fund the second payment under the Purchase Agreement in an aggregate amount equal to $20.0 million, which was funded on March 11, 2024. As of March 15, 2024, we had received funding of $60.0 million under the Purchase Agreement.

For additional information about this financing transaction, see Note 6 to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K.

On February 29, 2024, we entered into the Underwriting Agreement with the Underwriters, relating to the issuance and sale in an underwritten offering of 15,410,000 shares of our Common Stock at a price to the public of $3.00 per share. The net proceeds to us from the Offering were approximately $43.1 million, after deducting underwriting discounts and commissions and estimated Offering expenses. The Offering closed on March 5, 2024.

*Material Cash Requirements*

Our known material cash requirements include: (1) the purchase of supplies and services that are primarily for research and development; (2) repayments pursuant to the Purchase Agreement (for additional information see below and Note 6 to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K); (3) employee wages, benefits, and incentives; (4) financing and operating lease payments (for additional information see below and Note 8 to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K), and (5) payments under the JDRF Agreement (for additional information see Note 13 to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K). We have also entered into contracts with CROs primarily for clinical trials. These contracts generally provide for termination upon limited notice, and therefore we believe that our non-cancellable obligations under these agreements are not material. Moreover, we may be subject to additional material cash requirements that are contingent upon the occurrence of certain events, for example, legal contingencies, uncertain tax positions, and other matters.

As of December 31, 2023, we had non-cancellable purchase commitments of $20.2 million for supplies and services that are primarily for research and development. We have existing license agreements with Duke University and Yale University, a distribution agreement with Fresenius Medical Care and the JDRF Agreement. The amount and timing of any potential milestone payments, license fee payments, royalties and other payments that we may be required to make under these agreements are unknown or uncertain at December 31, 2023. For additional information regarding our agreements with Duke University, Yale University, and Fresenius Medical Care, and the nature of payments that could become due thereunder, see the sections in this Annual Report on Form 10-K titled “Business — Distribution” and “Business — Intellectual Property.” For additional information about the JDRF Agreement, see Note 13 — Commitments and Contingencies to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K.

*Revenue Interest Purchase Agreement*

On May 12, 2023, we entered into the Purchase Agreement and repaid in full all of the then-existing obligations under our loan agreement with SVB. Under the Purchase Agreement, as of December 31, 2023, we had $38.6 million recorded as a revenue interest liability on our consolidated financial statements. On February 18, 2024, we delivered a request that the Purchasers fund the second payment under the Purchase Agreement in an aggregate amount of $20.0 million, which was funded on March 11, 2024. For additional information regarding repayment, see Note 6 — Revenue Interest Purchase Agreement to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K.

*Leases*

Our finance lease relates to our headquarters facility containing our manufacturing, research and development and general and administrative functions, which was substantially completed in June 2018 and is being leased through May 2033, and our operating lease relates to the land lease associated with our headquarters. See Note 8 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for further information regarding our leases. Our future contractual obligations under our lease agreements as of December 31, 2023 are as follows:

| ***($ in thousands)*** | **Total** | **Less than 1 year** | **1 – 3 years** | **3 – 5 years** | **More than 5 years** |
|---|---|---|---|---|---|
| Finance leases | $ 25,168 | $ 4,065 | $ 8,404 | $ 4,818 | $ 7,881 |
| Operating leases | 889 | 105 | 210 | 210 | 364 |

*ATM Facility*

On September 1, 2022, we entered into an agreement for the sale from time to time up to $80.0 million of shares of Common Stock pursuant to a sales agreement (the “ATM Facility”). As of December 31, 2023, we have not conducted any sales of Common Stock under the ATM Facility.

*Future Funding Requirements*

We expect to incur significant expenses in connection with our ongoing activities as we seek to (i) continue clinical development of our 6 millimeter HAV for use in vascular trauma and hemodialysis AV access and submit BLAs for FDA approval, (ii) if marketing approval is obtained, to launch and commercialize our HAVs for an indication in vascular trauma and hemodialysis AV access in the U.S. market, including subsequent launches in key international markets, (iii) advance our pipeline in major markets, including PAD Phase 3 trials and continue preclinical development and advance to planned clinical studies in CABG and BVP for diabetes, and (iv) scale out our manufacturing facility as required to satisfy potential demand if our HAVs receive marketing approval. We will need additional funding in connection with these activities.

Our future funding requirements, both short-term and long-term, will depend on many factors, including:

- the progress and results of our clinical trials and interpretation of those results by the FDA and other regulatory authorities;
- the cost, timing and outcome of regulatory review of our product candidates, particularly for marketing approval of our HAVs in the United States;
- the scope, progress, results and costs of preclinical development, laboratory testing and clinical trials for our additional product candidates;
- the cost and timing of our future commercialization activities, including product manufacturing, marketing and distribution for our HAVs if approved by the FDA, and any other product candidate for which we receive marketing approval in the future;
- the amount and timing of revenues, if any, that we receive from commercial sales of any product candidates for which we receive marketing approval;
- the costs and timing of preparing, filing and prosecuting patent applications, maintaining and enforcing our intellectual property rights and defending any intellectual property-related claims; and
- the costs of operating as a public company, including hiring additional personnel as well as increased director and officer insurance premiums, audit and legal fees, and expenses for compliance with public company reporting requirements under the Exchange Act and rules implemented by the SEC and Nasdaq.

Until such time, if ever, as we are able to successfully develop and commercialize one or more of our product candidates, we expect to continue financing our operations through the sale of equity, debt, borrowings under credit facilities or through potential collaborations with other companies, other strategic transactions or government or other grants. Adequate capital may not be available to us when needed or on acceptable terms. Other than the funds that may become available to us under the Purchase Agreement upon the achievement of specified milestones, we do not currently have any committed external source of funds. To the extent that we raise additional capital through the sale of equity or convertible debt securities, the ownership interest of our stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect the rights of stockholders. Debt financing and preferred equity financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making acquisitions or capital expenditures. Debt financing would also result in fixed payment obligations. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition.

Our principal use of cash in recent periods has been primarily to fund our operations, including the clinical and preclinical development of our product candidates. Our future capital requirements, both short-term and long-term, will depend on many factors, including the progress and results of our clinical trials and preclinical development, timing and extent of spending to support development efforts, cost and timing of future commercialization activities, and the amount and timing of revenues, if any, that we receive from commercial sales. See “Risk Factors” for additional risks associated with our substantial capital requirements.

*Cash Flows*

The following table shows a summary of our cash flows for each of the periods shown below:

| | Year Ended December 31, | |
|---|---|---|
| *($ in thousands)* | 2023 | 2022 |
| Net loss | $ (110,776) | $ (11,965) |
| Non-cash adjustments to reconcile net loss to net cash used in operating activities[(1)]: | 30,900 | (60,193) |
| Changes in operating assets and liabilities: | 6,571 | 1,029 |
| Net cash used in operating activities | (73,305) | (71,129) |
| Net cash provided by (used in) investing activities | (173) | 4,845 |
| Net cash provided by (used in) financing activities | 4,507 | (1,446) |
| Net decrease in cash, cash equivalents and restricted cash | $ (68,971) | $ (67,730) |
| Cash, cash equivalents and restricted cash at the beginning of the period | $ 149,772 | $ 217,502 |
| Cash, cash equivalents and restricted cash at the end of the period | $ 80,801 | $ 149,772 |

______________________________

(1) Includes depreciation, amortization related to our leases and our debt discount, stock-based compensation expense, non-cash interest expense related to our revenue interest liability and our JDRF Award liability (defined below), the changes in fair value of our Contingent Earnout Liability and our derivative liabilities, and in 2023 includes a loss on extinguishment of debt and an immaterial amount of loss on disposal of property and equipment.

*Cash Flow from Operating Activities*

The increase in net cash used in operating activities from 2022 to 2023 was primarily due to increased spending on pre-clinical, clinical and pre-commercial activities as well as payroll and personnel expenses, primarily those related to preparation for the completion of our trial for the use of the HAV in vascular trauma and our related BLA filing, expansion of clinical development of the HAV for use in AV access, and preparation for the planned commercial launch of the HAV for an indication in vascular trauma.

*Cash Flow from Investing Activities*

Net cash used in investing activities for the year ended December 31, 2023 consisted of purchases of property and equipment partially offset by proceeds from the maturity of our short-term investments (certificates of deposit). Net cash provided by investing activities for the year ended December 31, 2022 was primarily due to a net cash inflow of $5.9 million related to our certificates of deposit classified as short-term investments.

*Cash Flow from Financing Activities*

Net cash provided by financing activities for the year ended December 31, 2023 consisted primarily of net proceeds from the Purchase Agreement, partially offset by the repayment of our loan agreement with SVB. Net cash used in financing activities for the year ended December 31, 2022 consisted primarily of principal payments of our finance leases.

*Off-Balance Sheet Arrangements*

We did not have during the periods presented, and we do not currently have, any off-balance sheet arrangements, as defined in SEC rules and regulations.

### *Critical Accounting Estimates*

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of our consolidated financial statements requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and disclosure of contingent liabilities. We base our estimates and assumptions on historical experience and other factors that we believe to be reasonable under the circumstances. We evaluate our estimates and assumptions on an ongoing basis. Although we believe that our estimates, assumptions, and judgments are reasonable, they are based upon information presently available. Actual results may differ significantly from these estimates based on different assumptions, judgments, or conditions.

An accounting estimate or assumption is considered critical if both (a) the nature of the estimate or assumption involves a significant level of estimation uncertainty, and (b) the impact within a reasonable range of outcomes of the estimate and assumption is material to our financial condition. Our critical accounting policies are summarized below.

*Contingent Earnout Liability*

In connection with the Reverse Recapitalization, Legacy Humacyte equity holders are entitled to receive as additional merger consideration of up to 15,000,000 shares of our common stock in the aggregate, in two equal tranches of 7,500,000 shares of common stock per tranche, for no consideration upon the occurrence of certain triggering events, including a change of control event that is not solely indexed to the common stock. In accordance with ASC 815-40, as the Contingent Earnout Shares were not indexed to the common stock, they were accounted for as a liability at the Reverse Recapitalization date and subsequently remeasured at each reporting date with changes in fair value recorded as a component of other income (expense), net in the consolidated statements of operations and comprehensive loss.

The estimated fair value of the Contingent Earnout Shares was determined using a Monte Carlo simulation valuation model using a distribution of potential outcomes on a monthly basis over a 10-year period prioritizing the most reliable information available. The assumptions utilized in the calculation were based on the achievement of certain stock price milestones, including our current common stock price, expected volatility, risk-free rate, expected term and expected dividend yield. See Note 9 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for further information regarding the assumptions used in the valuations at December 31, 2023 and 2022.

The Contingent Earnout Shares are categorized as a Level 3 fair value measurement (see "Fair Value of Financial Instruments" accounting policy described in Note 2 to our financial statements contained elsewhere in this Annual Report on Form 10-K) because we estimated projections over a ten-year period utilizing unobservable inputs. Contingent earnout payments involve certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

*Revenue Interest Liability*

On May 12, 2023, we entered into the Purchase Agreement to obtain financing in respect to the further development and commercialization of our HAV, to repay our credit facility with SVB, and for other general corporate purposes. We recorded a revenue interest liability related to the Purchase Agreement on our consolidated balance sheet on the date we entered into the Purchase Agreement, which is presented net of issuance costs and a debt discount. We impute interest expense associated with this liability using the effective interest rate method. The estimated effective interest rate is calculated based on the rate that would enable the debt to be repaid in full over the anticipated life of the arrangement. Interest expense and amortization of our issuance costs and debt discount is recognized over the estimated term in our consolidated statements of operations and comprehensive loss. The interest rate on the liability may vary during the term of the agreement primarily due to the level of forecasted net sales. We evaluate the interest rate quarterly based on our current net sales forecasts utilizing the prospective method. A significant increase or decrease in net sales could materially impact the revenue interest liability, interest expense and the time period for repayment.

At December 31, 2023, the revenue interest liability is calculated using our current estimate of forecasted global net sales of our products for our planned commercial launch, and impacted by a debt discount comprising the estimated fair value of a bifurcated derivative liability related to the Purchasers' put option under the Purchase Agreement, the estimated fair value of a freestanding option agreement related to the Purchase Agreement, and issuance and transaction costs incurred. As our product candidates are not yet approved for sale, the estimated probability and timing or amounts of repayment is likely to change each reporting period.

The fair value of the contingent derivative liability is valued using a "with-and-without" method. The "with-and-without" methodology involves valuing the whole instrument on an as-is basis and then valuing the instrument without the individual embedded derivative. The difference between the entire instrument with the embedded derivative compared to the instrument without the embedded derivative was the fair value of the contingent derivative liability. The estimated probability and timing of underlying events triggering the exercisability of the contingent derivative liability bifurcated from within the Purchase Agreement, forecasted cash flows and the discount rate are significant unobservable inputs used to determine the estimated fair value of the entire instrument with the embedded derivative.

*Stock-Based Compensation*

We measure and recognize compensation expense for all options based on the estimated fair value of the award on the grant date. We use the Black-Scholes option-pricing model to estimate the fair value of option awards. The fair value is recognized as expense on a straight-line basis over the requisite service period. We account for forfeitures as they occur.

The determination of the grant date fair value of options using an option pricing model is affected principally by our estimated fair value of shares of our common stock and requires management to make a number of other assumptions, including the expected term of the option, the volatility of the underlying shares, the risk-free interest rate and expected dividends. The assumptions used in our Black-Scholes option-pricing model represent management's good faith estimates at the time of measurement. These estimates are complex, involve a number of variables, uncertainties and assumptions and the application of management's judgment, as they are inherently subjective. If any assumptions change, our stock-based compensation expense could be materially different in the future.

These assumptions are estimated as follows:

- *Fair Value of Common Stock*. The fair value of our Common Stock has been determined based on the closing price of the shares on Nasdaq.
- *Expected Term*. The expected term represents the period that stock options are expected to be outstanding. We calculated the expected term using the simplified method for options, which is available where there is insufficient historical data about exercise patterns and post-vesting employment termination behavior. The simplified method is based on the vesting period and the contractual term for each grant, or for each vesting-tranche for awards with graded vesting. The mid-point between the vesting date and the maximum contractual expiration date is used as the expected term under this method. For awards with multiple vesting-tranches, the times from grant until the mid-points for each of the tranches may be averaged to provide an overall expected term.
- *Expected Volatility*. The expected volatility was determined based on a blended approach using the historical share volatility of our Common Stock and that of several publicly traded peer companies over a period of time equal to the expected term of the options, as we have limited trading history. For purposes of identifying these peer companies, we considered the industry, stage of development, size and financial leverage of potential comparable companies.
- *Risk-Free Interest Rate*. The risk-free interest rate was based on the yields of U.S. Treasury zero-coupon securities with maturities similar in duration to the expected term of the options.
- *Expected Dividend Yield*. We have not paid dividends on our Common Stock nor do we expect to pay dividends in the foreseeable future. Accordingly, we have estimated the dividend yield to be zero.

*Common Stock Warrants*

Under the Merger, we assumed 5,000,000 publicly-traded warrants ("Public Warrants") and 177,500 private placement warrants issued to AHAC in connection with AHAC's initial public offering ("Private Placement Warrants" and, together with the Public Warrants, the "Common Stock Warrants"). We account for the Common Stock Warrants in accordance with the guidance contained in ASC Topic 480, *Distinguishing Liabilities from Equity* and ASC Topic 815, *Derivatives and Hedging (*"ASC 815").

We account for the Private Placement Warrants in accordance with the guidance contained in ASC 815, under which the warrants do not meet the criteria for equity treatment and must be recorded as liabilities. As the Private Placement Warrants meet the definition of a derivative under ASC 815, we recorded these warrants as liabilities on the consolidated balance sheet at fair value, with subsequent changes in their respective fair values recognized in the consolidated statements of operations and comprehensive loss at each reporting date. The fair value of the warrants was estimated using a Monte Carlo simulation value model utilizing assumptions including our current common stock price, expected volatility, risk-free rate, expected term and expected dividend yield. The fair value of the Private Placement Warrants is based on significant unobservable inputs, which represent Level 3 fair value measurements within the fair value hierarchy (see “Fair Value of Financial Instruments” accounting policy described in Note 2 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K). Determining the fair value of the Private Placement Warrants involves certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

The Public Warrants are considered to be “indexed to the Company’s own stock” and as we have a single class of common stock, a qualifying cash tender offer of more than 50% of the Company’s common stock will always result in a change-in-control and would not preclude permanent equity classification of the Public Warrants. Based on this evaluation, we concluded that the Public Warrants meet the criteria to be classified within stockholders’ equity.

***Emerging Growth Company and Smaller Reporting Company Status***

We are an “emerging growth company” as defined in the Jumpstart our Business Startups Act of 2012 (the “JOBS Act”), and may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies until it is no longer an emerging growth company. Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the extended transition period afforded by the JOBS Act for the implementation of new or revised accounting standards. We expect to use the extended transition period and, therefore, while we are an emerging growth company we will not be subject to new or revised accounting standards at the same time that they become applicable to other public companies that are not emerging growth companies, unless we choose to early adopt a new or revised accounting standard. This may make it difficult or impossible to compare our financial results with the financial results of another public company because of the potential differences in accounting standards used.

Additionally, we are a “smaller reporting company” as defined in Item 10(f)(1) of Regulation S-K under the Exchange Act (“Regulation S-K”). Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company if (1) the market value of Common Stock held by non-affiliates is less than $250 million as of the last business day of the second fiscal quarter, or (2) our annual revenues in our most recent fiscal year completed before the last business day of its second fiscal quarter are less than $100 million and the market value of Common Stock held by non-affiliates is less than $700 million as of the last business day of the second fiscal quarter.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

We qualify as a smaller reporting company, as defined by Item 10 of Regulation S-K and, thus, are not required to provide the information required by this Item.

**Item 8. Financial Statements and Supplementary Data.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**
**HUMACYTE, INC.**


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID 238) | 108 |
| Consolidated Balance Sheets as of December 31, 2023 and 2022 | 109 |
| Consolidated Statements of Operations and Comprehensive Loss for the Years ended December 31, 2023 and 2022 | 110 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years ended December 31, 2023 and 2022 | 111 |
| Consolidated Statements of Cash Flows for the Years ended December 31, 2023 and 2022 | 112 |
| Notes to Consolidated Financial Statements | 113 |

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Humacyte, Inc.

***Opinion on the Financial Statements***

We have audited the accompanying consolidated balance sheets of Humacyte, Inc. and its subsidiary (the "Company") as of December 31, 2023 and 2022, and the related consolidated statements of operations and comprehensive loss, of changes in stockholders' equity and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2022, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

Raleigh, North Carolina

March 28, 2024

We have served as the Company's auditor since 2013.

**HUMACYTE, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands except for share and per share amounts)**

| | As of December 31, | |
|---|---|---|
| | 2023 | 2022 |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 80,448 | $ 149,772 |
| Prepaid expenses and other current assets | 2,830 | 2,298 |
| Short-term investments | — | 2,107 |
| Accounts receivable | — | 31 |
| Total current assets | 83,278 | 154,208 |
| Property and equipment, net | 26,791 | 30,039 |
| Finance lease right-of-use assets, net | 17,313 | 19,373 |
| Other long-term assets | 841 | 682 |
| **Total assets** | **$ 128,223** | **$ 204,302** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accounts payable | $ 6,490 | $ 1,595 |
| Accrued expenses | 9,340 | 7,108 |
| Finance lease obligation, current portion | 2,560 | 2,256 |
| Operating lease obligation, current portion | 53 | 50 |
| SVB loan payable, current portion | — | 8,571 |
| Total current liabilities | 18,443 | 19,580 |
| Revenue interest liability | 38,600 | — |
| Contingent Earnout Liability | 37,916 | 27,893 |
| Finance lease obligation, net of current portion | 16,293 | 18,853 |
| Contingent derivative liability | 2,636 | — |
| Other long-term liabilities | 789 | 712 |
| SVB loan payable, net of current portion | — | 20,336 |
| **Total liabilities** | **114,677** | **87,374** |
| **Commitments and contingencies (Note 13)** | | |
| **Stockholders' equity** | | |
| Preferred stock, $0.0001 par value; 20,000,000 shares designated as of December 31, 2023 and 2022; 0 shares issued and outstanding as of December 31, 2023 and 2022 | — | — |
| Common stock, $0.0001 par value; 250,000,000 shares authorized as of December 31, 2023 and 2022; 103,673,728 and 103,229,013 shares issued and outstanding as of December 31, 2023 and 2022, respectively | 10 | 10 |
| Additional paid-in capital | 550,850 | 543,456 |
| Accumulated deficit | (537,314) | (426,538) |
| Total stockholders' equity | 13,546 | 116,928 |
| **Total liabilities and stockholders' equity** | **$ 128,223** | **$ 204,302** |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(in thousands except for share and per share amounts)**

| | Year Ended December 31, | |
|---|---|---|
| | **2023** | **2022** |
| **Grant revenue** | $ — | $ 1,565 |
| **Operating expenses:** | | |
| Research and development | 76,550 | 63,260 |
| General and administrative | 23,497 | 22,883 |
| Total operating expenses | 100,047 | 86,143 |
| **Loss from operations** | **(100,047)** | **(84,578)** |
| Other income (expense), net | | |
| Interest income | 5,467 | 2,629 |
| Change in fair value of Contingent Earnout Liability | (10,023) | 75,767 |
| Employee retention credit | 3,107 | — |
| Loss on extinguishment of debt | (2,421) | — |
| Interest expense | (6,599) | (6,200) |
| Change in fair value of derivative liabilities | (260) | 417 |
| Total other income (expense), net | (10,729) | 72,613 |
| **Net loss and comprehensive loss** | **$ (110,776)** | **$ (11,965)** |
| Net loss per share attributable to common stockholders, basic and diluted | $ (1.07) | $ (0.12) |
| Weighted-average shares outstanding used in computing net loss per share attributable to common stockholders, basic and diluted | 103,420,238 | 103,051,366 |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(in thousands except for share amounts)**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance as of December 31, 2021** | **103,003,646** | **$ 10** | **$ 536,737** | **$ (414,573)** | **$ 122,174** |
| Proceeds from the exercise of stock options | 225,367 | — | 535 | — | 535 |
| Stock-based compensation | — | — | 6,184 | — | 6,184 |
| Net loss | — | — | — | (11,965) | (11,965) |
| **Balance as of December 31, 2022** | **103,229,013** | **$ 10** | **$ 543,456** | **$ (426,538)** | **$ 116,928** |
| Proceeds from the exercise of stock options | 444,715 | — | 566 | — | 566 |
| Stock-based compensation | — | — | 6,828 | — | 6,828 |
| Net loss | — | — | — | (110,776) | (110,776) |
| **Balance as of December 31, 2023** | **103,673,728** | **$ 10** | **$ 550,850** | **$ (537,314)** | **$ 13,546** |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, | |
|---|---|---|
| | **2023** | **2022** |
| **Cash flows from operating activities** | | |
| Net loss | $ (110,776) | $ (11,965) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation expense | 5,659 | 6,151 |
| Stock-based compensation expense | 6,828 | 6,184 |
| Change in fair value of Contingent Earnout Liability | 10,023 | (75,767) |
| Loss on extinguishment of debt | 2,421 | — |
| Non-cash interest expense | 3,099 | — |
| Change in fair value of derivative liabilities | 260 | (417) |
| Loss on disposal of property and equipment | 18 | 6 |
| Amortization expense | 2,060 | 2,059 |
| Non-cash operating lease costs | 50 | 45 |
| Amortization of SVB debt discount | 482 | 1,546 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 31 | 145 |
| Prepaid expenses and other current assets | (388) | 1,364 |
| Accounts payable | 4,811 | (509) |
| Accrued expenses | 2,167 | 247 |
| Operating lease obligation | (50) | (45) |
| Deferred payroll taxes | — | (173) |
| Net cash used in operating activities | (73,305) | (71,129) |
| **Cash flows from investing activities** | | |
| Proceeds from maturity of short-term investments (certificates of deposit) | 2,107 | 16,000 |
| Purchase of property and equipment | (2,280) | (1,048) |
| Purchase of short-term investments (certificates of deposit) | — | (10,107) |
| Net cash provided by (used in) investing activities | (173) | 4,845 |
| **Cash flows from financing activities** | | |
| Proceeds from revenue interest purchase agreement, net of issuance costs | 39,377 | — |
| Payments of transaction costs related to revenue interest purchase agreement | (1,450) | — |
| Principal payments on SVB loan | (31,500) | — |
| Payments for debt prepayment and extinguishment costs | (310) | — |
| Proceeds from the exercise of stock options | 566 | 535 |
| Proceeds from JDRF Agreement | 80 | — |
| Payments of finance lease principal | (2,256) | (1,981) |
| Net cash provided by (used in) financing activities | 4,507 | (1,446) |
| Net decrease in cash, cash equivalents and restricted cash | (68,971) | (67,730) |
| Cash, cash equivalents and restricted cash at the beginning of the period | 149,772 | 217,502 |
| **Cash, cash equivalents and restricted cash at the end of the period** | **$ 80,801** | **$ 149,772** |
| **Supplemental disclosure:** | | |
| Cash paid for interest on SVB loan | $ 1,613 | $ 2,668 |
| **Supplemental disclosure of noncash activities:** | | |
| Purchase of property and equipment in accounts payable and accrued expenses | $ 284 | $ 135 |
| Initial fair value of contingent derivative liability related to revenue interest liability | $ 2,354 | $ — |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. Organization and Description of Business

### Organization

Humacyte, Inc. and subsidiary (unless the context indicates otherwise, collectively, the "Company") is pioneering the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs and organ systems designed to improve the lives of patients and transform the practice of medicine. The Company is leveraging its regenerative medicine technology platform to develop proprietary product candidates for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

On August 26, 2021 (the "Closing Date"), Alpha Healthcare Acquisition Corp. ("AHAC") consummated a merger pursuant to a Business Combination Agreement, dated as of February 17, 2021 (the "Merger Agreement"), by and among Humacyte, Inc., a Delaware Corporation ("Legacy Humacyte"), AHAC and Hunter Merger Sub, Inc. ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of AHAC. As contemplated by the Merger Agreement, Merger Sub merged with and into Legacy Humacyte, with Legacy Humacyte continuing as the surviving corporation and as a wholly-owned subsidiary of AHAC (such transactions, the "Merger," and, collectively with the other transactions described in the Merger Agreement, the "Reverse Recapitalization"). On the Closing Date, AHAC changed its name to Humacyte, Inc. and Legacy Humacyte changed its name to Humacyte Global, Inc. ("Global"). The Merger was accounted for as a reverse recapitalization in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"), and under this method of accounting, AHAC was treated as the acquired company for financial reporting purposes and Legacy Humacyte was treated as the acquirer. Operations prior to the Merger are those of Legacy Humacyte.

Concurrently with the execution of the Merger Agreement, certain investors (the "PIPE Investors") purchased an aggregate of 17,500,000 shares of the Company's common stock, par value $0.0001 per share ("Common Stock" and such shares purchased by the PIPE Investors, the "PIPE Shares"), in a private placement for an aggregate purchase price of $175 million (the "PIPE Financing"). The Company received $242.4 million in proceeds from the Merger and related PIPE Financing, and incurred $3.9 million of transaction costs, consisting of banking, legal, and other professional fees.

### Liquidity and Going Concern

Since its inception in 2004, the Company has generated no product revenue and has incurred operating losses and negative cash flows from operations in each year. To date, the Company has financed its operations primarily through the sale of equity securities and convertible debt, proceeds from the Reverse Recapitalization, borrowings under loan facilities, proceeds from a revenue interest purchase agreement and, to a lesser extent, through governmental and other grants. At December 31, 2023 and December 31, 2022, the Company had an accumulated deficit of $537.3 million and $426.5 million, respectively. The Company's operating losses were $100.0 million and $84.6 million for the years ended December 31, 2023 and 2022, respectively. Net cash flows used in operating activities were $73.3 million and $71.1 million during the years ended December 31, 2023 and 2022, respectively. Substantially all of the Company's operating losses resulted from costs incurred in connection with the Company's research and development programs and from general and administrative costs associated with the Company's operations. The Company expects to incur substantial operating losses and negative cash flows from operations for the foreseeable future as the Company advances its product candidates.

As of December 31, 2023, the Company had cash and cash equivalents of $80.4 million. On March 5, 2024, the Company closed the Offering (defined below), raising net proceeds of approximately $43.1 million. On March 11, 2024, the Company received an additional $20.0 million under the Purchase Agreement. See Note 15 — Subsequent Events for further information. The Company believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these financial statements. Adequate capital may not be available to the Company when needed or on acceptable terms. If the Company is unable to raise capital, it could be forced to delay, reduce, suspend or cease its research and development programs or any future commercialization efforts, which would have a negative impact on its business, prospects, operating results and financial condition.

**2. Summary of Significant Accounting Policies**

**Basis of Presentation**

The Company has prepared the accompanying financial statements in conformity with U.S. GAAP. The Company's consolidated financial statements reflect the operations of the Company and its wholly owned subsidiary. All intercompany accounts and transactions have been eliminated in consolidation.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates in the financial statements include stock-based compensation costs, right-of-use assets, accruals for research and development activities, contingent earnout liability, revenue interest liability, derivative liabilities, fair value of common stock warrants and income taxes. The Company evaluates its estimates and assumptions on an ongoing basis using historical experience and other factors and adjusts those estimates and assumptions when facts and circumstances dictate. Actual results could differ from those estimates.

**Reclassifications**

Certain prior year amounts have been reclassified to conform to the current year presentation. None of these reclassifications had a material impact on the Company's consolidated financial statements.

**Segments**

The Company operates and manages its business as one reportable and operating segment. The Company is developing proprietary, bioengineered, acellular human tissues, advanced tissue constructs and organ systems that are designed to be used in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas. The Company's chief executive officer, who is the chief operating decision maker, reviews financial information on an aggregate basis for purposes of evaluating financial performance and allocating resources.

**Comprehensive Loss**

Comprehensive loss includes net loss as well as other changes in stockholders' equity that result from transactions and economic events other than those with stockholders. There was no difference between net loss and comprehensive loss for the years ended December 31, 2023 and 2022.

**Cash and Cash Equivalents**

The Company considers all short-term, highly liquid investments, including certificates of deposit ("CDs") purchased with an original maturity of three months or less at the date of purchase, to be cash equivalents. Cash deposits are held with financial institutions with investment-grade ratings in the U.S. Cash deposits typically exceed federally insured limits. As of December 31, 2023, cash and cash equivalents consisted of cash on deposit with banks denominated in U.S. dollars and investments in money market funds. As of December 31, 2022, cash and cash equivalents consisted of cash on deposit with banks denominated in U.S. dollars, investments in money market funds, and CDs maturing within three months of their purchase date.

**Restricted Cash**

The Company classifies as restricted cash all cash pledged as collateral to secure long-term obligations and all cash whose use is otherwise limited by contractual provisions. As of December 31, 2023, restricted cash consisted of $0.2 million in funds maintained in a separate deposit account to secure a letter of credit for the benefit of the lessor of the Company's headquarters lease, and $0.1 million in cash balances held as collateral for the Company's employee credit card program. There was no restricted cash as of December 31, 2022.

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the consolidated balance sheets to the total of the amounts shown in the consolidated statements of cash flows as of December 31, 2023 and 2022.

| | As of December 31, | |
|---|---|---|
| ***($ in thousands)*** | **2023** | **2022** |
| Cash and cash equivalents | $ 80,448 | $ 149,772 |
| Restricted cash included in prepaid expenses and other current assets | 144 | — |
| Restricted cash included in other long-term assets | 209 | — |
| Total cash, cash equivalents and restricted cash | $ 80,801 | $ 149,772 |

**Short-term Investments**

The Company classifies its certificates of deposit as cash and cash equivalents or short-term investments and reassesses the appropriateness of the classification of its investments at the end of each reporting period. Certificates of deposit held for investment with an original maturity greater than three months are carried at amortized cost and reported as short-term investments on the consolidated balance sheets. The type of certificates of deposit that the Company invests in are not considered debt securities under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 320, Investments - Debt Securities.

As of December 31, 2022, the Company had approximately $10.1 million in CDs. These cash deposits were deposited at a bank that is a member of the Certificate of Deposit Account Registry Service ("CDARS"), in which large deposits are divided into smaller amounts and placed with other Federal Deposit Insurance Corporation ("FDIC") insured banks which are also members of the CDARS network. Those members issue CDs in amounts under $250,000, so that the entire deposit balance is eligible for FDIC insurance. As of December 31, 2022, the Company classified $8.0 million of its CDs as cash and cash equivalents and $2.1 million of its CDs as short-term investments on its consolidated balance sheets. The Company did not have any CDs as of December 31, 2023.

**Employee Retention Credit**

The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") provided refundable employee retention credits, which could be used to offset payroll tax liabilities. Under the provisions of the extension of the CARES Act, the Company qualified for the employee retention credit for the first three quarters of 2021, and the Company applied for the credit in February 2023. As there is no authoritative guidance under U.S. GAAP for accounting for grants to for-profit business entities, the Company accounted for the grant by applying Accounting Standards Codification ("ASC") 450, *Contingencies*. The Company received an employee retention credit of $3.1 million in July 2023, and recognized the credit as income during the second quarter of 2023 after the Company received notices from the Internal Revenue Service, (the "IRS"), specifying the amount of the credit receivable, and all uncertainties were resolved regarding receipt of the credit. The Company recognized the credit as a component of other income (expense), net on the consolidated statement of operations and comprehensive loss during the year ended December 31, 2023.

**Revenue Interest Liability**

On May 12, 2023, Humacyte, Inc. and Global entered into a Revenue Interest Purchase Agreement (the "Purchase Agreement") with two purchasers, both affiliates of Oberland Capital Management LLC (the "Purchasers"), and another affiliate of Oberland, as agent for the Purchasers (the "Agent"). The revenue interest liability associated with the Purchase Agreement is presented net of a debt discount comprised of issuance costs, transaction costs, the fair value of a freestanding option agreement related to the Purchase Agreement, and the fair value of embedded derivatives requiring bifurcation on the consolidated balance sheets. The Company imputes interest expense associated with this liability using the effective interest rate method. The effective interest rate is calculated based on the rate that would enable the debt to be repaid in full over the anticipated life of the arrangement. The interest rate on the liability may vary during the term of the agreement depending on a number of factors, including the level and expected timing of forecasted net sales. If the level and timing of any forecasted net sales and related payments change, the Company will prospectively adjust the effective interest and the related amortization of the liability and related issuance costs on a quarterly basis.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 340 of 674

**Contingent Derivative Liability**

The Purchase Agreement contains certain features that meet the definition of embedded derivatives requiring bifurcation as a separate compound financial instrument apart from the Revenue Interest Liability. The contingent derivative liability related to the Put Option, as defined in Note 6 — Revenue Interest Purchase Agreement, was initially measured at fair value upon issuance and is subject to remeasurement at each reporting period with changes in fair value recognized as other income (expense) in the consolidated statements of operations and comprehensive loss, classified in change in fair value of derivative liabilities.

**JDRF Award**

On April 1, 2023, the Company entered into an Industry Discovery and Development Partnership Agreement with JDRF International ("JDRF," and such agreement, the "JDRF Agreement") to further develop and perform preclinical testing of the Company's Biovascular Pancreas ("BVP"), a product candidate designed to deliver insulin-producing islets using the HAV as a means of treating patients with type 1 diabetes. According to the terms of the JDRF Agreement, JDRF will provide funding up to $0.8 million ("JDRF Award") based on the achievement of certain research and development milestones related to the BVP. The JDRF Agreement refers to the total cumulative payments the Company has received from JDRF as of any point in time as the "Actual Award."

The Company received the first milestone payment of $80 thousand in April 2023 upon execution of the JDRF Agreement. The Company determined that the JDRF Actual Award payments are to be classified as long-term debt under ASC 470, *Debt* in the consolidated balance sheets. The JDRF liability related to the Actual Award payments is reported at amortized cost, and as of December 31, 2023 the carrying value is $69 thousand and is included in other long-term liabilities in the consolidated balance sheet.

In the event of a license, sale or transfer of the Company's rights to the product's technology identified in the JDRF Agreement or a change of control transaction, the Company is obligated to pay JDRF a payment equal to 10% of any license or purchase price payments received by the Company up to an amount equal to four times the Actual Award (the "Royalty Cap"), less any previous royalty payments paid towards the Royalty Cap (the "Disposition Payment"). The derivative liability related to the Disposition Payment, was initially measured at fair value upon issuance and is subject to remeasurement at each reporting period with changes in fair value recognized as other income (expense) in the consolidated statements of operations and comprehensive loss, classified in change in fair value of derivative liabilities.

**Revenue Recognition**

The Company's revenues generally consist of grant revenues, including revenues generated under government and other awarded grants.

***Grant Revenue***

The Company generates revenue primarily from government and other awarded grants that reimburse the Company for certain allowable costs related to research and development efforts.

In August 2017, the Department of Defense ("DoD") granted the Company a cash award for work to support human tissue engineered blood vessels for vascular reconstruction in the injured warfighter. The final amount awarded to the Company totaled $6.8 million and the program ended in November 2022. Based on the terms of the research project award agreement associated with the DoD grant, allowable costs were reimbursed to the Company based on the percentage of completion of project milestones in accordance with milestone payment schedules set forth in the agreement. During the year ended December 31, 2022, the Company recognized revenue of $1.6 million, for reimbursement of certain allowable costs related to this grant. Revenue related to the DoD grant is included in grant revenue in the Company's consolidated statements of operations and comprehensive loss.

The Company has determined that the grant was not within the scope of ASC 606 as it did not meet the definition of a contract with a customer. The Company concluded that the grant met the definition of a contribution and was a nonexchange transaction and applied the contribution accounting model in Subtopic 958-605, Not-for-Profit-Entities-Revenue Recognition by analogy.

The Company recognizes funding received from grants as revenue, rather than as a reduction of research and development expenses, because the Company is the principal in conducting the research and development activities and these grants are central to the Company's ongoing operations. The Company recognizes revenue only after the qualifying expenses related to the grants have been incurred and it is reasonably assured that the expenses will be reimbursed and the revenue will be collectible. The related costs incurred are included in research and development expense in the Company's consolidated statements of operations and comprehensive loss.

***Revenue from Customers***

Under ASC 606, revenue is recognized when a customer obtains control of promised goods or services and is recognized in an amount that reflects the consideration that an entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the entity performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. ASC 606 also impacts certain other areas, such as the accounting for costs to obtain or fulfill a contract.

In addition, ASC 606 requires disclosure of the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers.

For contracts where the period between when the Company transfers a promised good or service to the customer and when the customer pays is one year or less, the Company has elected the practical expedient to not adjust the promised amount of consideration for the effects of a significant financing component.

**Concentration of Credit Risk**

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents and short-term investments consisting of CDs. Total cash balances exceeded insured balances by the FDIC as of December 31, 2023 and 2022. The Company has cash equivalents that are invested in highly rated money market funds that are invested only in obligations of the U.S. government and its agencies.

During the year ended December 31, 2022, 100% of the Company's total revenue related to the award it received from the DoD in August 2017. As of December 31, 2022, 100% of the Company's accounts receivable related to the DoD grant.

**Net Loss per Share Attributable to Common Stockholders**

Basic net loss per share attributable to common stockholders is computed by dividing net loss attributable to common stockholders by the weighted-average number of common shares outstanding during the period without consideration of potentially dilutive Common Stock. Diluted net loss per share attributable to common stockholders reflects the potential dilution that could occur if securities or other contracts to issue Common Stock were exercised or converted into Common Stock or resulted in the issuance of Common Stock that then shared in the earnings of the Company unless inclusion of such shares would be anti-dilutive. As the Company has incurred losses for the years ended December 31, 2023 and 2022, basic and diluted net loss per share is the same for each period.

The following potential shares of Common Stock were excluded from the computation of diluted net loss per share for each period because including them would have had an antidilutive effect:

| | Year Ended December 31, | |
|---|---|---|
| | **2023** | **2022** |
| Exercise of options under stock plan | 11,919,421 | 7,203,874 |
| Warrants to purchase common stock | 5,588,506 | 5,588,506 |

The 15,000,000 Contingent Earnout Shares (defined below) are excluded from the anti-dilutive table for all periods presented, as such shares are contingently issuable until the share price of the Company exceeds specified thresholds that have not yet been achieved, or upon the occurrence of a change in control. The Option Agreement, as defined in Note 6 — Revenue Interest Purchase Agreement, is excluded from the anti-dilutive table for the year ended December 31, 2023, based on the Company's assumption that the Option Agreement will not be exercised unless the Company's stock price exceeds $7.50 per share, the minimum purchase price under the Option Agreement.

**Fair Value of Financial Instruments**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. ASC 820, *Fair Value Measurement and Disclosures*, establishes a hierarchy whereby inputs to valuation techniques used in measuring fair value are prioritized, or the fair value hierarchy. There are three levels to the fair value hierarchy based on reliability of inputs, as follows:

- Level 1 — Observable inputs that reflect unadjusted quoted prices for identical assets or liabilities in active markets.
- Level 2 — Inputs other than quoted prices included in Level 1 that are observable for the asset or liability, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3 — Unobservable inputs in which little or no market data exists, therefore requiring the Company to develop its own assumptions.

The Company evaluates assets and liabilities subject to fair value measurements on a recurring basis to determine the appropriate level at which to classify them for each reporting period, utilizing valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. The determination requires significant judgments to be made by the Company.

**Property and Equipment, Net**

Property and equipment, net are recorded at cost less accumulated depreciation. Expenditures for major additions and improvements are capitalized and minor replacements, maintenance, and repairs are charged to expense as incurred. When property and equipment are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the balance sheet accounts and any resulting gain or loss is included in the results of operations for the respective period. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets. The estimated useful lives for significant asset categories are as follows:

| Property and equipment | Estimated Useful Lives (Years) |
|---|---|
| Scientific equipment | 5 – 7 |
| Computer equipment | 5 |
| Software | 3 |
| Furniture and fixtures | 5 – 7 |
| Leasehold improvements | Lesser of useful life or life of lease |
| Construction in progress | N/A |

**Impairment of Long-Lived Assets**

The Company reviews the carrying value of property and equipment for indicators of possible impairment whenever events and circumstances indicate that the carrying value of an asset or asset group may not be recoverable from the estimated future net undiscounted cash flows expected to result from its use and eventual disposition. In cases where estimated future net undiscounted cash flows are less than the carrying value, an impairment loss is recognized equal to an amount by which the carrying value exceeds the fair value of the asset or asset group. The factors considered by management in performing this assessment include current operating results, trends and prospects, the manner in which the property is used, and the effects of obsolescence, demand, competition, and other economic factors. Based on this assessment, during the years ended December 31, 2023 and 2022, respectively, the Company concluded there were no such events or changes in circumstances requiring review of the carrying amount of the Company's long-lived assets and there was no impairment during the years ended December 31, 2023 and 2022.

**Income Taxes**

Income taxes are computed using the asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the Company's financial statements. In estimating future tax consequences, the Company considers all expected future events other than enactment of changes in tax laws or rates. A valuation allowance is recorded, if necessary, to reduce net deferred tax assets to their realizable values if management does not believe it is more likely than not that the net deferred tax assets will be realized. As of December 31, 2023 and 2022, the Company has recorded a full valuation allowance against its deferred tax assets.

The Company applies the accounting guidance for uncertainties in income taxes, which prescribes a recognition threshold and measurement process for recording uncertain tax positions taken, or expected to be taken, in a tax return in the financial statements. Additionally, the guidance also prescribes the treatment for derecognition, classification, accounting in interim periods and disclosure requirements for uncertain tax positions. The Company accrues for the estimated amount of taxes for uncertain tax positions if it is more likely than not that the Company would be required to pay such additional taxes.

The Company recognizes the benefit of an income tax position only if it is more likely than not (greater than 50%) that the tax position will be sustained upon tax examination, based solely on the technical merits of the tax position. Otherwise, no benefit can be recognized. Assessing an uncertain tax position begins with the initial determination of the sustainability of the position and is measured at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement. As of each balance sheet date, unresolved uncertain tax positions must be reassessed. Additionally, the Company must accrue interest and related penalties, if applicable, on all tax exposures for which reserves have been established consistent with jurisdictional tax laws.

The Company has analyzed its filing positions in all significant Federal and state jurisdictions where it is required to file income tax returns, as well as open tax years in these jurisdictions. As of December 31, 2023 and 2022, the Company has determined that no uncertain tax positions would have a material impact on the financials statements of the Company. The Company is no longer subject to Federal, state, and local tax examinations by tax authorities for years before 2020 although carry-forward attributes that were generated prior to 2020 may still be adjusted upon examination by the taxing authorities if they either have been or will be used in a future period. No income tax returns are currently under examination by taxing authorities.

As of December 31, 2023 and 2022, the Company had not recorded any amounts for unrecognized tax benefits. The Company's policy is to recognize interest and penalties related to uncertain tax positions in the provision for income taxes. As of December 31, 2023 and 2022, the Company had no accrued interest or penalties related to uncertain tax positions, and no amounts had been recognized in the Company's statements of operations and comprehensive loss.

**Intellectual Property**

The Company seeks to protect its intellectual property by filing patent applications in the United States and abroad related to novel technologies and product candidates that it views as important to its business. The patent positions of biotechnology companies generally, including the Company's patent positions, is highly uncertain and involves complex legal and factual questions for which legal principles remain unresolved. Patent costs have been expensed as incurred as general and administrative expense.

**Research and Development**

The Company expenses research and development costs as operating expenses as incurred. Research and development expenses consist primarily of:

- salaries and related overhead expenses for personnel in research and development functions, including stock-based compensation and benefits;
- fees paid to consultants and CROs, including in connection with clinical trials, and other related clinical trial fees, such as for investigator grants, patient screening, laboratory work and statistical compilation and analysis; allocation of facility lease and maintenance costs;
- depreciation of leasehold improvements, laboratory equipment and computers;
- costs related to purchasing raw materials for and producing product candidates for clinical trials;
- costs related to compliance with regulatory requirements;
- costs related to the manufacturing scale-out initiative; and
- license fees related to in-licensed technologies.

**Accrued Research and Development**

The Company has entered into various agreements with CROs, which conduct preclinical studies and clinical trials. The Company's research and development accruals are estimated based on the level of services performed, progress of the studies, including the phase or completion of events, and contracted costs. The estimated costs of research and development provided, but not yet invoiced, are included in accrued expenses on the balance sheet. If the actual timing of the performance of services or the level of effort varies from the original estimates, the Company will adjust the accrual accordingly. Payments made under these arrangements in advance of the performance of the related services are recorded as prepaid expenses and other current assets until the services are rendered.

**Stock-Based Compensation**

The Company accounts for stock-based compensation for employees and non-employees measured at grant date, based on the fair value of the award. The Company measures the fair value of awards granted using the Black-Scholes option pricing model and recognizes the expense over the requisite service period using the straight-line method. Option valuation models, including the Black-Scholes option-pricing model, require the input of highly subjective assumptions, and changes in the assumptions used can materially affect the grant-date fair value of an award. These assumptions include the risk-free rate of interest, expected dividend yield, expected volatility, the expected term of the award, and the fair value of the underlying Common Stock on the date of grant. Forfeitures are accounted for as they occur.

**Common Stock Warrants**

In connection with the Merger, the Company assumed 5,000,000 publicly-traded warrants ("Public Warrants") and 177,500 private placement warrants issued to AHAC Sponsor LLC (the "Sponsor"), Oppenheimer & Co. Inc. and Northland Securities, Inc, in connection with AHAC's initial public offering ("Private Placement Warrants" and, together with the Public Warrants, the "Common Stock Warrants"). The Common Stock Warrants entitle the holder to purchase one share of the Company's Common Stock, at an exercise price of $11.50 per share. The Public Warrants are publicly traded and are exercisable for cash unless certain conditions occur, such as the failure to have an effective registration statement related to the shares issuable upon exercise or redemption by the Company under certain conditions, at which time the warrants may be eligible for a cashless exercise. The Private Placement Warrants are non-redeemable for cash so long as they are held by the initial purchasers or their permitted transferees. If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants are redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

The Company evaluated the Common Stock Warrants to determine the appropriate financial statement classification upon the consummation of the Merger. The Common Stock Warrants are not mandatorily redeemable and are considered to be freestanding instruments as they are separately exercisable into common shares. As such, the Common Stock Warrants were not classified as liabilities under FASB ASC Topic 480, *Distinguishing Liabilities from Equity* ("ASC 480"). The Company then evaluated the Common Stock Warrants under FASB ASC Topic 815, *Derivatives and Hedging*.

The agreement governing the Common Stock Warrants includes a provision ("Replacement of Securities Upon Reorganization"), the application of which could result in a different settlement value for the Private Placement Warrants depending on their holder. Because the holder of an instrument is not an input into the pricing of a fixed-for-fixed option on the Company's ordinary shares, the Private Placement Warrants are not considered to be "indexed to the Company's own stock" and therefore are not classified in stockholders' equity. As the Private Placement Warrants meet the definition of a derivative, the Company recorded these warrants as liabilities on the consolidated balance sheet at fair value, with subsequent changes in their respective fair values recognized in the consolidated statements of operations and comprehensive loss at each reporting date.

The Public Warrants are considered to be "indexed to the Company's own stock". The agreement provides that in the event of a tender or exchange offer made to and accepted by holders of more than 50% of the outstanding shares of the Company's common shares, all holders of the Common Stock Warrants (both the Public Warrants and the Private Placement Warrants) would be entitled to receive cash for all of their Common Stock Warrants. As the Company has a single class of common stock, a qualifying cash tender offer of more than 50% of the Company's common stock will always result in a change-in-control and would not preclude permanent equity classification of the Public Warrants. Based on this evaluation, the Company concluded that the Public Warrants meet the criteria to be classified within stockholders' equity.

**Contingent Earnout Liability**

Pursuant to the Merger Agreement, following the closing of the Merger (the "Closing"), Legacy Humacyte equity holders are entitled to receive additional merger consideration of up to 15,000,000 shares of the Company's Common Stock (the "Contingent Earnout Shares"), comprised of two separate tranches of 7,500,000 shares per tranche, for no consideration upon the occurrence of certain triggering events, including a change of control event that is not solely indexed to the Common Stock. In accordance with ASC 815-40, as the earnout shares were not indexed to the common stock, they were accounted for as a liability ("Contingent Earnout Liability") at the Reverse Recapitalization date and subsequently remeasured at each reporting date with changes in fair value recorded as a component of other income (expense), net in the consolidated statements of operations and comprehensive loss.

The estimated fair value of the Contingent Earnout Liability was determined using a Monte Carlo simulation using a distribution of potential outcomes on a monthly basis over a 10-year period prioritizing the most reliable information available. The assumptions utilized in the calculation were based on the achievement of certain stock price milestones, including the current Common Stock price, expected volatility, risk-free rate, expected term and expected dividend yield.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 350 of 674

The Contingent Earnout Shares are categorized as a Level 3 fair value measurement (see “Fair Value of Financial Instruments” accounting policy described above) because the Company estimated projections over a 10-year period utilizing unobservable inputs. Contingent earnout payments involve certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

**Leases**

The Company accounts for its leases under ASC 842, *Leases*. The Company determines if an arrangement is or contains a lease and the classification of that lease at inception of a contract. The Company’s operating lease assets are included in “other long-term assets”, and the current and non-current portions of the operating lease liabilities are included in “operating lease obligation, current portion”, and “other long-term liabilities”, respectively, on the balance sheets. The Company’s finance lease assets are included in “finance lease right-of-use assets, net”, and the current and non-current portions of the finance lease liabilities are included in “finance lease obligation, current portion”, and “finance lease obligation, net of current portion”, respectively, on the consolidated balance sheets.

Under this guidance, arrangements meeting the definition of a lease are classified as operating or finance leases, and are recorded on the balance sheet as both a right-of-use asset and lease liability, calculated by discounting fixed lease payments over the lease term at the rate implicit in the lease or the Company’s incremental borrowing rate. Lease right-of-use assets and lease obligations are recognized based on the present value of the future minimum lease payments over the lease term at commencement date. Operating lease right-of-use assets are adjusted for (i) payments made at or before the commencement date, (ii) initial direct costs incurred, and (iii) tenant incentives under the lease. As the implicit rate for the operating leases were not determinable, the Company used an incremental borrowing rate based on the information available at the respective lease commencement dates in determining the present value of future payments. The incremental borrowing rate represents the interest rate the Company would expect to incur at lease commencement to borrow an amount equal to the lease payments on a collateralized basis over the term of a lease. The Company determined the incremental borrowing rate by considering various factors, such as its credit rating, interest rates of similar debt instruments of entities with comparable credit ratings, the lease term and the currency in which the lease was denominated. The Company considers a lease term to be the noncancelable period that it has the right to use the underlying asset, including any periods where it is reasonably certain the Company will exercise any option to extend the contract.

Lease expenses for minimum lease payments for operating leases are recognized on a straight-line basis over the lease term. Amortization expense of the right-of-use asset for finance leases is recognized on a straight-line basis over the lease term and interest expense for finance leases is recognized based on the incremental borrowing rate. Lease liabilities are increased by interest and reduced by payments each period, and the right of use asset is amortized over the lease term.

In calculating the right-of-use assets and lease liabilities, the Company has elected to combine lease and non-lease components for all asset classes. The Company excludes short-term leases, if any, having initial terms of 12 months or less from the new guidance as an accounting policy election, and recognizes rent expense on a straight-line basis over the lease term.

**Other Risks and Uncertainties**

The Company is subject to risks and uncertainties common to early-stage companies in the biotechnology industry, including, but not limited to, successful discovery and development of its product candidates, the success of clinical trials and other studies for its product candidates, including its V005 Phase 2/3 clinical trial and ongoing V007 Phase 3 clinical trial, the regulatory approval and commercialization of its HAVs and other product candidates, the expected size of the target populations for the Company’s product candidates, the degree of market acceptance of the HAVs, if approved, the availability of third-party coverage and reimbursement, development by competitors of new technological innovations, the ability to manufacture HAVs and other product candidates in sufficient quantities, expectations regarding the Company’s strategic partnerships, dependence on third parties, key personnel and the ability to attract and retain qualified employees, protection of proprietary technology and confidentiality of trade secrets, compliance with governmental regulations, the Company’s implementation and maintenance of effective internal controls, and the ability to secure additional capital to fund operations and the commercial success of its product candidates.

Product candidates currently under development will require extensive preclinical and clinical testing and regulatory approval prior to commercialization. These efforts require significant amounts of additional capital, adequate personnel, and infrastructure and extensive compliance-reporting capabilities. Even if the Company's commercialization efforts are successful, it is uncertain when, if ever, the Company will realize significant revenue from product sales, and the Company may depend on certain strategic relationships to distribute its products, including the Company's strategic partnership with Fresenius Medical Care to sell, market and distribute its 6 millimeter HAV for certain specified indications outside the United States.

**Recently Adopted Accounting Pronouncements**

The Company did not adopt any new standards or updates issued by the FASB during the year ended December 31, 2023 that had a material impact on the Company's consolidated financial statements and related disclosures.

**Recently Issued Accounting Pronouncements**

In November 2023, the FASB issued ASU No. 2023-07, "Segment Reporting (Topic 280), Improvements to Reportable Segment Disclosures" ("ASU 2023-07"). The FASB issued this update to improve the disclosures about an entity's reportable segments, including providing more detailed information about a reportable segment's expenses, enhancing interim disclosure requirements and providing new segment disclosure requirements for entities with a single reportable segment. This standard is effective for fiscal years beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024, with early adoption permitted. Entities should apply the amendments retrospectively to all prior periods presented in the financial statements. This ASU is applicable to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024, and subsequent interim periods. The Company is currently evaluating the impact of adopting ASU 2023-07 on its disclosures included in the notes to the consolidated financial statements.

In December 2023, the FASB issued ASU No. 2023-09, "Income Taxes (Topic 740), Improvements to Income Tax Disclosures" ("ASU 2023-09"). The FASB issued this update to improve the transparency and comparability of income tax disclosures, including requiring consistent categories and greater disaggregation of information in the rate reconciliation and further disaggregation of income taxes paid by jurisdiction. This standard is effective for fiscal years beginning after December 15, 2024, with early adoption is permitted. Entities should apply the amendments prospectively, with retrospective application permitted. This ASU is applicable to the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2025. The Company is currently evaluating the impact of adopting ASU 2023-09 on its disclosures included in the notes to the consolidated financial statements.

**3. Fair Value Measurements**

The Company's assets and liabilities that were measured at fair value on a recurring basis were as follows:

| | Fair Value Measured as of December 31, 2023 | | | |
|---|---|---|---|---|
| ***($ in thousands)*** | **Level 1** | **Level 2** | **Level 3** | **Total** |
| Assets: | | | | |
| Cash equivalents (money market funds) | $ 78,995 | $ — | $ — | $ 78,995 |
| Total financial assets | $ 78,995 | $ — | $ — | $ 78,995 |
| Liabilities: | | | | |
| Contingent Earnout Liability | $ — | $ — | $ 37,916 | $ 37,916 |
| Contingent derivative liability | — | — | 2,636 | 2,636 |
| Private Placement Warrants liability | — | — | 78 | 78 |
| Option Agreement liability | — | — | 35 | 35 |
| JDRF Agreement derivative liability | — | — | 28 | 28 |
| Total financial liabilities | $ — | $ — | $ 40,693 | $ 40,693 |

| ($ in thousands) | Fair Value Measured as of December 31, 2022 Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Assets: | | | | |
| Cash equivalents (money market funds) | $ 141,159 | $ — | $ — | $ 141,159 |
| Cash equivalents (certificates of deposit) | — | 8,000 | — | 8,000 |
| Short-term investments (certificates of deposit) | — | 2,107 | — | 2,107 |
| Total financial assets | $ 141,159 | $ 10,107 | $ — | $ 151,266 |
| Liabilities: | | | | |
| Contingent Earnout Liability | $ — | $ — | $ 27,893 | $ 27,893 |
| Private Placement Warrants liability | — | — | 80 | 80 |
| Total financial liabilities | $ — | $ — | $ 27,973 | $ 27,973 |

The Company's money market funds are classified within Level 1 of the fair value hierarchy because they are valued using quoted market prices. Certificates of deposit were carried at amortized cost in the Company's consolidated balance sheets, which approximated their fair value based on Level 2 inputs. The carrying values of other receivables, accounts payable and accrued expenses as of December 31, 2023 and 2022 approximated their fair values due to the short-term nature of these items.

The fair value of the Contingent Earnout Liability, Private Placement Warrants liability, Contingent derivative liability related to the Put Option (as defined in Note 6 — Revenue Interest Purchase Agreement and discussed below), Option Agreement liability (as defined in Note 6 — Revenue Interest Purchase Agreement), and the derivative liability associated with the JDRF Agreement Disposition Payment are based on significant unobservable inputs, which represent Level 3 measurements within the fair value hierarchy. The fair values of the Private Placement Warrants liability, the Option Agreement liability and the derivative liability associated with the JDRF Agreement Disposition Payment, are included in other long-term liabilities on the consolidated balance sheets.

**Contingent Earnout Liability**

The following table presents a summary of the changes in the fair value of the Contingent Earnout Liability:

| ($ in thousands) | Contingent Earnout Liability Year Ended December 31, 2023 | 2022 |
|---|---|---|
| Fair value as of beginning of period | $ (27,893) | $ (103,660) |
| Change in fair value included in other income (expense), net | (10,023) | 75,767 |
| Fair value as of end of period | $ (37,916) | $ (27,893) |

In determining the fair value of the Contingent Earnout Liability, the Company used the Monte Carlo simulation value model using a distribution of potential outcomes on a monthly basis over a 10-year period prioritizing the most reliable information available. The assumptions utilized in the calculation were based on the achievement of certain stock price milestones, including the current Common Stock price, expected volatility, risk-free rate, expected term and expected dividend yield (see Note 9 — Stockholders' Equity). Contingent earnout payments involve certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

**Private Placement Warrants Liability**

The following table presents a summary of the changes in the fair value of the Private Placement Warrants liability:

| | Private Placement Warrants | |
|---|---|---|
| | Year Ended December 31, | |
| ***($ in thousands)*** | **2023** | **2022** |
| Fair value as of beginning of period | $ (80) | $ (497) |
| Change in fair value included in other income (expense), net | 2 | 417 |
| Fair value as of end of period | $ (78) | $ (80) |

In determining the fair value of the Private Placement Warrants liability, the Company used the Monte Carlo simulation valuation model to estimate the fair value utilizing assumptions including the current Company stock price, expected volatility, risk-free rate, expected term and expected dividend yield (see Note 9 — Stockholders' Equity).

**Derivative liabilities**

*Contingent derivative liability*

The debt pursuant to the Purchase Agreement contains an embedded derivative related to the Put Option, as defined in Note 6, requiring bifurcation as a single compound derivative instrument. The Company estimated the fair value of the derivative liability using a "with-and-without" methodology. The "with-and-without" methodology involves valuing the whole instrument on an as-is basis and then valuing the instrument without the individual embedded derivative. The difference between the entire instrument with the embedded derivative compared to the instrument without the embedded derivative was the fair value of the derivative liability at May 12, 2023 and December 31, 2023. In determining the fair value of the contingent derivative liability, the Company used the Monte Carlo simulation value model using a distribution of potential outcomes on a monthly basis over a 10-year period. The estimated probability and timing of underlying events triggering the exercisability of the put option contained within the Purchase Agreement, forecasted cash flows and the discount rates are significant unobservable inputs used to determine the estimated fair value of the entire instrument with the embedded derivative. As of May 12, 2023, the discount rates used to calculate the value of the contingent derivative liability were 12.7% to calculate the present-value of the revenue forecast and 12.1% to calculate the present-value of the payoff of the Put Option. As of December 31, 2023, the discount rates used to calculate the value of the contingent derivative liability were 14.5% to calculate the present-value of the revenue forecast and 17.1% to calculate the present-value of the payoff of the Put Option.

The following table presents a summary of the changes in the fair value of the contingent derivative liability, which is classified as a Level 3 financial instrument.

| ***($ in thousands)*** | **Year Ended December 31, 2023** |
|---|---|
| Fair value as of beginning of period | $ — |
| Initial fair value of contingent derivative liability | (2,354) |
| Change in fair value included in other income (expense), net | (282) |
| Fair value as of end of period | $ (2,636) |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 355 of 674

## 4. Property and Equipment, Net

Property and equipment, net consist of the following:

| *($ in thousands)* | As of December 31, 2023 | As of December 31, 2022 |
|---|---|---|
| Scientific and manufacturing equipment | $ 28,400 | $ 27,821 |
| Computer equipment | 125 | 167 |
| Software | 682 | 209 |
| Furniture and fixtures | 1,066 | 988 |
| Leasehold improvements | 27,844 | 26,355 |
| Construction in progress | — | 680 |
| | 58,117 | 56,220 |
| Accumulated depreciation | (31,326) | (26,181) |
| Property and equipment, net | $ 26,791 | $ 30,039 |

Depreciation expense totaled $5.7 million and $6.2 million for the years ended December 31, 2023 and 2022, respectively. All long-lived assets are maintained in the United States.

## 5. Accrued Expenses

Accrued expenses consisted of the following:

| *($ in thousands)* | As of December 31, 2023 | As of December 31, 2022 |
|---|---|---|
| Accrued external research, development and manufacturing costs | $ 3,845 | $ 2,437 |
| Accrued employee compensation and benefits | 5,238 | 4,227 |
| Accrued professional fees | 257 | 444 |
| Total | $ 9,340 | $ 7,108 |

## 6. Revenue Interest Purchase Agreement

### Revenue Interest Purchase Agreement

On May 12, 2023, Humacyte, Inc. and Global entered into the Purchase Agreement with the Purchasers and another affiliate of Oberland, as agent for the Purchasers, to obtain financing with respect to the further development and commercialization of the Company's HAV, to repay the Company's credit facility with SVB, and for other general corporate purposes. Pursuant to the Purchase Agreement, on May 12, 2023, the Purchasers purchased certain revenue interests (the "Revenue Interests") from Global in exchange for an aggregate investment amount of up to $150.0 million (the "Investment Amount"). On May 12, 2023, the Company received an initial payment of $40.0 million, less certain transaction expenses, which was used to repay in full the Company's then-existing obligations under the Loan Agreement, as defined in Note 7 — Debt. The Company will also be entitled to receive up to approximately $110.0 million in subsequent installments subject to the terms and conditions set forth in the Purchase Agreement, as follows: (i) $20.0 million upon the Company's BLA for an indication in vascular trauma being accepted on or prior to March 31, 2024, (ii) $40.0 million, at the Company's option, upon the Company receiving FDA approval of the HAV for the vascular trauma indication on or prior to December 31, 2024 and (iii) $50.0 million, at the Company's option, upon reaching $35.0 million trailing worldwide three-month net sales any time prior to December 31, 2025. Each tranche is dependent on the satisfaction of the conditions and receipt of funds from the previous tranche.

Pursuant to the Purchase Agreement, the Revenue Interests entitle the Purchasers to receive a royalty initially equal to 7.5% (the "Rate") of global net sales of the Company's products (subject to a lower rate for net sales by specified licensees outside the United States), to be paid on a calendar quarterly basis (the "Revenue Interest Payments").

If the Purchasers do not receive cumulative Revenue Interest Payments equal to 100% of the amount funded to date (the "Cumulative Purchaser Payments") by the last business day of 2028 (the "Test Date"), the Rate will increase to a rate that, had such increased rate applied during the period from May 12, 2023 through the Test Date, would have provided the Purchasers with cumulative Revenue Interest Payments equal to the Cumulative Purchaser Payments as of the Test Date. Additionally, Global will be required to pay the Purchasers an amount equal to 100% of the Cumulative Purchaser Payments as of the Test Date less the total Revenue Interest Payments made by Global to the Purchasers under the Purchase Agreement as of the Test Date. Global's obligation to make Revenue Interest Payments terminates on the date on which the Purchasers have received Revenue Interest Payments of 150% of the Cumulative Purchaser Payments unless the Purchase Agreement is terminated earlier due to the Purchaser's exercise of a Put Option, the Company's exercise of a call option, or by mutual consent. However, if the Purchasers have not received such Revenue Interest Payments as of such date, the Purchase Agreement will instead terminate on the date on which the Purchasers receive Revenue Interest Payments of 195% of the Cumulative Purchaser Payments.

Under the Purchase Agreement, Global has an option (the "Call Option") to repurchase the Revenue Interests and terminate the Purchase Agreement at any time upon advance written notice. Additionally, the Purchasers have an option (the "Put Option") to terminate the Purchase Agreement and to require Global to repurchase the Revenue Interests upon enumerated events such as a bankruptcy event, an uncured material breach, a material adverse effect or a change of control. If the Put Option is exercised prior to August 12, 2024 by the Purchasers (except pursuant to a change of control), the required repurchase price will be 125% of the Cumulative Purchaser Payments (minus the aggregate Revenue Interest payments Global has made to the Purchasers as of such date). If (i) the Put Option is exercised on or prior to August 12, 2024 by the Purchasers after the occurrence of a change of control, (ii) the Put Option is exercised after August 12, 2024 until May 12, 2026, or (iii) the Call Option is exercised on or prior to May 12, 2026, then in each case, the required repurchase price will be 175% of the Cumulative Purchaser Payments (minus the aggregate Revenue Interest Payments Global has made to the Purchasers as of such date). If a Put Option or Call Option is exercised after May 12, 2026, the required repurchase price will be 195% of the Cumulative Purchaser Payments (minus the aggregate Revenue Interest Payments Global has made to the Purchasers as of such date).

The Purchase Agreement contains customary representations and warranties and affirmative covenants for transactions of this type, including, among others, the provision of financial and other information to the Purchaser, notice to the Purchaser upon the occurrence of certain material events, and compliance with applicable laws. The Purchase Agreement also contains customary negative covenants, including certain restrictions on the ability to incur indebtedness and grant liens or security interests on assets.

On February 18, 2024, the Company agreed with the Purchasers and the Agent, to waive certain breaches related to, and extend the deadline for certain post-closing obligations under, the Purchase Agreement, including the requirement for a leasehold mortgage over the Company's headquarters. Giving effect to the extension and waiver, the Company is obligated to deliver by no later than April 30, 2024 (or such later date as the Agent may agree in its sole discretion), an executed leasehold mortgage (or alternative documentation satisfactory to the Agent in its sole discretion) over the Company's headquarters. Concurrently with such agreement, the Company delivered a request that the Purchasers fund the second payment under the Purchase Agreement in an aggregate amount equal to $20.0 million, which was funded on March 11, 2024.

The Company has provided a parent company guaranty to guarantee the payment in full of the obligations under the Purchase Agreement. The Company's obligations under the parent company guaranty and Global's obligations under the Purchase Agreement and the Revenue Interests are secured by a perfected security interest on substantially all of the Company's and Global's assets.

The Purchase Agreement is considered a sale of future revenues and accounted for as long-term debt recorded at amortized cost using the effective interest rate method.

As of December 31, 2023, $38.6 million was recorded as a revenue interest liability on the accompanying consolidated balance sheets (net of transaction costs, the fair value allocated to the Option Agreement and the fair value of the bifurcated contingent derivative liability). The revenue interest liability is based on the Company's contractual repayment obligation to the Purchasers, based on the current estimates of future revenues, over the life of the Purchase Agreement. The Company imputes interest expense associated with this liability using the effective interest rate method. The effective interest rate is calculated based on the rate that would enable the debt to be repaid in full over the anticipated life of the arrangement. The interest rate on this liability may vary during the term of the agreement depending on a number of factors, including the level and expected timing of forecasted net sales. The estimated effective annual interest rate as of December 31, 2023 was 14.1%. The Company evaluates the interest rate quarterly based on its current net sales forecasts. If the level and timing of any forecasted net sales and related payments change, the Company will prospectively adjust the effective interest and the related amortization of the liability and related issuance costs. The Company recorded $3.1 million in interest expense related to the Purchase Agreement for the year ended December 31, 2023.

The Put Option under the Purchase Agreement that is exercisable by the Purchasers upon certain contingent events was determined to be an embedded derivative requiring bifurcation and separately accounted for as a single compound derivative instrument. The Company recorded the initial fair value of the derivative liability of $2.4 million as a debt discount, which is being amortized to interest expense over the expected term of the debt using the effective interest method. See Note 3 — Fair Value Measurements for a further discussion of the fair value of the contingent derivative liability associated with the Put Option.

For the year ended December 31, 2023, the Company incurred and paid $2.1 million of issuance and transaction costs in connection with the Purchase Agreement. The issuance and transaction costs were capitalized to debt discount and are being amortized to interest expense over the estimated term of the debt.

Revenue Interest Payments made as a result of the Company's net product sales will reduce the revenue interest liability. During the year ended December 31, 2023, the Company did not record any product sales revenue.

The following table summarizes the revenue interest liability activity during the year ended December 31, 2023:

| ***($ in thousands)*** | |
|---|---|
| Revenue interest liability at inception | $ — |
| Proceeds from revenue interest purchase agreement, gross | 40,000 |
| Less issuance costs | (623) |
| Proceeds from revenue interest purchase agreement, net | 39,377 |
| Transaction costs paid | (1,450) |
| Debt discount from embedded contingent derivative liability | (2,354) |
| Debt discount from fair value of Option Agreement | (55) |
| Interest expense recognized | 3,082 |
| Revenue interest liability at December 31, 2023 | $ 38,600 |

**Option Agreement**

In connection with the Purchase Agreement, the Company also entered into an option agreement with TPC Investments III LP and TPC Investment Solutions LP (the "Option Agreement"), which gives TPC Investments III LP and TPC Investment Solutions LP (the "Holders") the right to purchase, in the aggregate, up to $10.0 million worth of shares of common stock of the Company (the "Option") at a purchase price per share equal to the greater of $7.50, or the 15 day volume-weighted average price as of the exercise date, exercisable in cash only at any time prior to the earlier of (i) December 31, 2026 and (ii) the closing date of a corporate reorganization. The Holders also received certain registration rights relating to the shares underlying the Option pursuant to the Option Agreement.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 359 of 674

The Option granted to the Holders represents a freestanding instrument separate from the purchaser commitments outlined in the Purchase Agreement. The Option Agreement does not qualify for the equity contract scope exception under ASC 815-40 and the Company recorded the Option as a liability ("Option Agreement liability") on the consolidated balance sheet at an initial fair value of $55 thousand, with subsequent changes in fair value recognized in the consolidated statements of operations and comprehensive loss at each reporting date. The fair value of the Option Agreement liability as of December 31, 2023 was $35 thousand.

**7. Debt**

Pursuant to the Purchase Agreement, on May 12, 2023, $40.0 million, less certain transaction expenses, was funded to the Company, which was used to repay in full the Company's existing obligations under its term loan agreement with SVB and SVB Innovation Credit Fund VIII, L.P., entered into on March 30, 2021, as amended in June 2021 and September 2021 (the "Loan Agreement").

The Loan Agreement provided a term loan facility in tranches of up to $50.0 million with a maturity date of March 1, 2025. The initial term loan tranche of $20.0 million was drawn on March 31, 2021, and on October 13, 2021, the Company borrowed an additional $10.0 million under the Loan Agreement. In connection with the Loan Agreement, the Company granted warrants to the lenders to purchase shares of Common Stock at an exercise price of $10.28 per share, of which 287,704 warrants were immediately exercisable. The warrants were classified within stockholders' equity, as the settlement of the warrants is indexed to the Common Stock. The Company recognized the fair value of the warrants immediately exercisable within stockholders' equity using a Black-Scholes valuation model at issuance.

At issuance, the Company initially determined that the funding of an additional tranche was not probable, and therefore no value was ascribed to the remaining 123,302 warrants that were only exercisable upon the funding of the first additional tranche. As a result of the Company's additional $10.0 million borrowings under the Loan Agreement on October 13, 2021, the warrants to purchase the additional 123,302 shares of Common Stock became exercisable at an exercise price of $10.28 per share and the value of the warrants was recorded as of that date. The additional warrants were classified within stockholders' equity using a Black-Scholes valuation model, as the settlement of the warrants is indexed to the Common Stock.

The fair value of warrants ($3.3 million), a 5% final payment fee ($1.5 million) and debt issuance costs ($0.3 million) were being accreted to interest expense over the term of the loan using the effective interest method.

In connection with the termination of the Loan Agreement, the Company paid a prepayment premium of $0.3 million and recorded a loss on extinguishment of debt of $2.4 million during the year ended December 31, 2023 in other income (expense), net in the consolidated statements of operations and comprehensive loss. The loss on extinguishment of debt consists of the prepayment premium, the unamortized debt discount and issuance costs and the unaccreted final payment fee.

**8. Leases**

The Company's finance lease relates to its headquarters, which was substantially completed in June 2018 and is being leased through May 2033, and its operating lease relates to the land lease associated with its headquarters.

At December 31, 2023 and 2022, the Company had finance lease liabilities of $18.9 million and $21.1 million, respectively, and right-of-use assets of $17.3 million and $19.4 million, respectively, and operating lease liabilities of $0.6 million and $0.7 million, respectively, and right-of-use assets of $0.6 million and $0.7 million, respectively, all of which were included in the consolidated balance sheets. As of December 31, 2023 and 2022, operating lease right-of-use assets are included in other long-term assets on the consolidated balance sheets. As of both December 31, 2023 and 2022, approximately $0.6 million of the operating lease liabilities is included in other long-term liabilities on the consolidated balance sheets, and the remaining balance is classified in operating lease obligation, current portion on the consolidated balance sheets.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 360 of 674

The Company's leases do not require any contingent rental payments, impose any financial restrictions, or contain any residual value guarantees. Certain of the Company's leases include renewal options and escalation clauses; renewal options have been included in the calculation of the lease liabilities and right of use assets as the Company is reasonably certain to exercise the options due to the specialized nature of the leased building. Variable expenses generally represent the Company's share of the landlord's operating expenses. The Company does not act as a lessor in any lease arrangements.

The following summarizes quantitative information about the Company's leases:

| | Year Ended December 31, | |
|---|---|---|
| *($ in thousands)* | 2023 | 2022 |
| Finance lease cost | | |
| Amortization of right-of-use assets | $ 2,060 | $ 2,059 |
| Interest on lease liabilities | 1,709 | 1,887 |
| Total finance lease cost | 3,769 | 3,946 |
| Operating lease cost | 105 | 105 |
| Total lease cost | $ 3,874 | $ 4,051 |

| | Year Ended December 31, 2023 | | Year Ended December 31, 2022 | |
|---|---|---|---|---|
| *($ in thousands)* | Finance Leases | Operating Leases | Finance Leases | Operating Leases |
| Operating cash flows from leases | $ (1,709) | $ (105) | $ (1,887) | $ (105) |
| Financing cash flows from leases | $ (2,256) | $ — | $ (1,981) | $ — |
| Weighted-average remaining lease term | 4.13 | 4.74 | 4.57 | 5.24 |
| Weighted-average discount rate | 8.50 % | 8.50 % | 8.50 % | 8.50 % |

As of December 31, 2023, the maturities of the Company's lease liabilities were as follows:

| *($ in thousands)* | Finance Leases | Operating Leases |
|---|---|---|
| 2024 | $ 4,065 | $ 105 |
| 2025 | 4,167 | 105 |
| 2026 | 4,237 | 105 |
| 2027 | 2,673 | 105 |
| 2028 | 2,145 | 105 |
| Thereafter | 7,881 | 364 |
| Total | 25,168 | 889 |
| Less: present value discount | (6,315) | (257) |
| Lease liabilities | $ 18,853 | $ 632 |

## 9. Stockholders' Equity

### Common Stock

On August 26, 2021, the Merger and related PIPE Financing was consummated and the Company issued 27,346,449 shares of Common Stock for proceeds of $242.4 million. The Company incurred $3.9 million of transaction costs, consisting of banking, legal, and other professional fees. Legacy Humacyte assumed $15.2 million of liabilities, including PIPE Financing fees and legal fees, and $0.1 million of assets from AHAC. Immediately following the Merger, there were 103,003,384 shares of Common Stock outstanding with a par value of $0.0001 per share.

As of December 31, 2023, the Company's Second Amended and Restated Certificate of Incorporation authorized the Company to issue 250,000,000 shares of Common Stock. The number of authorized shares of Common Stock may be increased or decreased (but

not below the number of shares then outstanding or reserved for issuance) by the affirmative vote of the holders of a majority in interest of the Common Stock.

The holders of Common Stock are entitled to receive dividends from time to time as may be declared by the Company's board of directors. Through December 31, 2023, no dividends have been declared.

The holders of Common Stock are entitled to one vote for each share held with respect to all matters voted on by the common stockholders of the Company.

In the event of a reorganization of the Company, after payment to any preferred stockholders of their liquidation preferences, holders of Common Stock are entitled to share ratably in all remaining assets of the Company.

As of December 31, 2023 and 2022, the Company had reserved Common Stock for future issuances as follows:

| | December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Common stock reserved for Contingent Earnout Shares | 15,000,000 | 15,000,000 |
| Common stock reserved for Option Agreement | 1,333,334 (1) | — |
| Exercise of options outstanding under stock plans | 11,919,421 | 7,203,874 |
| Options available for issuance under stock plans | 1,492,057 | 6,700,888 |
| Shares available for grant under ESPP | 1,030,033 | 1,030,033 |
| Warrants to purchase Common Stock | 5,588,506 | 5,588,506 |
| | 36,363,351 | 35,523,301 |

(1) Assumes the exercise of the entire Option as provided for in the Option Agreement at the minimum purchase price of $7.50 per share.

**Preferred Stock**

The Company's Second Amended and Restated Certificate of Incorporation provides the Company's board of directors with the authority to issue preferred stock, par value $0.0001 per share, in one more series and to establish from time to time the number of shares to be included in each such series, by adopting a resolution and filing a certification of designations. Voting powers, designations, powers, preferences and relative, participating, optional, special and other rights shall be stated and expressed in such resolutions. There were 20,000,000 shares designated as preferred stock and none were outstanding as of December 31, 2023 and 2022.

**Warrants**

The Company had the following Common Stock warrants outstanding as of December 31, 2023 and 2022:

| | Common Stock Warrants Outstanding |
|---|---|
| Legacy Humacyte Common Stock Warrants | 411,006 |
| Private Placement Warrants | 177,500 |
| Public Warrants | 5,000,000 |
| Total Common Stock Warrants | 5,588,506 |

See Note 7 — Debt for a discussion of Common Stock warrants issued in conjunction with the Loan Agreement in 2021 (such warrants, "Legacy Humacyte Common Stock Warrants"). There were no issuances, exercises or expirations of warrants during the years ended December 31, 2023 and 2022.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 363 of 674

***Private Placement Warrants***

The Private Placement Warrants were initially recognized as a liability on the Closing Date at a fair value of $0.6 million, and the liability was remeasured to an estimated fair value of $0.1 million as of December 31, 2022. See Note 3 — Fair Value Measurements for a summary of the change in the fair value of the Private Placement Warrants during the years ended December 31, 2023 and 2022. The remeasurement of the Private Placement Warrant liability to a fair value of $0.1 million as of December 31, 2023 resulted in an insignificant non-cash gain for the year ended December 31, 2023, and a non-cash gain of $0.4 million for the year ended December 31, 2022. The remeasurement of the Private Placement Warrant liability is classified within Change in fair value of derivative liabilities in the consolidated statements of operations and comprehensive loss.

The Private Placement Warrants were valued using the following assumptions under the Monte Carlo simulation value model:

| | As of December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Market price of public stock | $ 2.84 | $ 2.11 |
| Exercise price | $ 11.50 | $ 11.50 |
| Expected term (years) | 2.65 | 3.65 |
| Expected share price volatility | 75.0 % | 78.3 % |
| Risk-free interest rate | 4.09 % | 4.14 % |
| Estimated dividend yield | 0 % | 0 % |

***Public Warrants***

The Public Warrants may only be exercised for a whole number of shares and will expire five years after the completion of the Merger. The Public Warrants became exercisable 30 days after the completion of the Merger.

The Public Warrants were initially recognized as equity on the Closing Date at a fair value of $2.80 per share.

***Contingent Earnout Liability***

Following the Closing, former holders of Legacy Humacyte common and preferred shares are eligible to receive up to 15,000,000 Contingent Earnout Shares in the aggregate, in two equal tranches of 7,500,000 shares of Common Stock per tranche. The first and second tranches are issuable if the closing volume weighted average price (“VWAP”) per share of Common Stock quoted on Nasdaq (or the exchange on which the shares of Common Stock are then listed), is greater or equal to $15.00 and $20.00, respectively, over any 20 trading days within any 30 consecutive trading day period.

Upon the Closing, the contingent obligation to issue Contingent Earnout Shares was accounted for as a liability because the triggering events that determine the number of Contingent Earnout Shares required to be issued include events that are not solely indexed to the Common Stock. The estimated fair value of the total Contingent Earnout Shares at the Closing on August 26, 2021 was $159.4 million based on a Monte Carlo simulation valuation model using a distribution of potential outcomes on a monthly basis over a 10-year period using the most reliable information available.

See Note 3 — Fair Value Measurements for a summary of the change in the fair value of the Contingent Earnout Liability during the years ended December 31, 2023 and 2022. The remeasurement of the Contingent Earnout Liability to a fair value of $37.9 million at December 31, 2023 from a fair value of $27.9 million at December 31, 2022, resulted in a non-cash loss of $10.0 million for the year ended December 31, 2023, compared to a non-cash gain of $75.8 million for the year ended December 31, 2022 related to the remeasurement of the Contingent Earnout Liability. The remeasurement of the Contingent Earnout Liability is classified within Change in fair value of Contingent Earnout Liability in the consolidated statements of operations and comprehensive loss.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 364 of 674

Assumptions used in the valuations are described below:

| | As of December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Current stock price | $ 2.84 | $ 2.11 |
| Expected share price volatility | 86.7 % | 89.0 % |
| Risk-free interest rate | 3.88 % | 3.88 % |
| Estimated dividend yield | 0 % | 0 % |
| Expected term (years) | 10.00 | 10.00 |

**10. Stock-based Compensation**

At Closing, the 2021 Long-Term Incentive Plan, (the "2021 Plan"), and the 2021 Employee Stock Purchase Plan, (the "ESPP"), became effective. Under the 2021 Plan, the Company can grant non-statutory stock options, incentive stock options, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock, performance awards and other forms of awards. Under the ESPP, when and if implemented, eligible employees will be permitted to purchase shares of the Company's Common Stock at the lower of 85% of the closing trading price per share of the Company's Common Stock on the first day of the offering or 85% of the closing trading price per share on the exercise date, which will occur on the last day of each offering.

The 2021 Plan and ESPP provide that on January 1 of each year commencing January 1, 2022, the 2021 Plan and the ESPP reserve will automatically increase in an amount equal to the lesser of (a) 5% and 1%, respectively, of the number of shares of the Company's Common Stock outstanding on December 31 of the preceding year and (b) a number of shares of Common Stock determined by the Company's board of directors. The Company's board of directors determined there would be no automatic increase in the number of shares reserved under the 2021 Plan on either January 1, 2022 or January 1, 2023. The 2021 Plan share reserve automatically increased on January 1, 2024 by 5% of the number of shares of the Company's Common Stock outstanding on December 31, 2023. Since the inception of the ESPP, the Company's board of directors has determined that there would be no automatic increase in the number of shares reserved under the ESPP. As of December 31, 2023, 1,492,057 and 1,030,033 shares of Common Stock were available under the 2021 Plan and ESPP, respectively.

Prior to the Closing, Legacy Humacyte had two equity incentive plans, the 2015 Omnibus Incentive Plan, as amended, (the "2015 Plan"), and the 2005 Stock Option Plan (the "2005 Plan"). As a result of the Merger, no further awards may be granted under either the 2015 Plan or the 2005 Plan. All awards previously granted and outstanding as of the effective date of the Merger were adjusted to reflect the impact of the Merger as set forth in the Merger Agreement, but otherwise remain in effect pursuant to their original terms. The shares underlying any award granted under the 2021 Plan or the 2015 Plan that are forfeited, cancelled or reacquired by the Company prior to vesting, that expire or that are paid out in cash rather than shares will become available for grant and issuance under the 2021 Plan. As of December 31, 2023, 8,493,808, 3,407,550 and 18,063 shares of Common Stock remain reserved for outstanding options issued under the 2021 Plan, the 2015 Plan and the 2005 Plan, respectively. The Company has sufficient authorized and unissued shares to issue Common Stock in satisfaction of any outstanding awards and any awards available for grant under the 2021 Plan.

The Company's stock option plans allow for the grant of awards that the Company believes aid in aligning the interests of award recipients with those of its stockholders. The Company's board of directors or compensation committee determines the specific terms of equity incentive grants, including the exercise price per share and vesting period for option awards. Option awards are granted with an exercise price equal to the fair market value of the Company's Common Stock at the date of grant.

The Company has granted options that include either a service-based or performance-based vesting condition, or both, and a 10-year contractual term. The service-based vesting condition for the plans is generally satisfied over 36 to 48 months from the date of grant. The performance-based vesting conditions are satisfied upon the attainment of certain product development milestones. The Company recognizes stock-based compensation expense based on the grant date fair value of the awards measured using the Black-Scholes option pricing model. Compensation expense related to awards with service-based vesting conditions is recognized on a straight-line basis over the requisite service period.

Compensation expense related to awards with performance-based vesting conditions is recognized over the requisite service period using the accelerated attribution method to the extent achievement of the performance-based condition is probable. The Company does not recognize compensation expense related to awards with performance-based vesting conditions until it is probable that the performance-based vesting condition will be achieved. Forfeitures are accounted for as they occur.

Option awards under the Company's option plans generally provide for accelerated vesting of the unvested portions of any option award in the event of an involuntary termination, as such term is defined in the relevant stock option agreement, of a grantee's employment during the period that commences 30 days prior to the effective date of a corporate transaction and that ends 12 months following the effective date of such transaction. Additionally, the Company's board of directors may, in its sole discretion, accelerate the vesting of any unvested stock options in the event of a corporate transaction.

The Company estimated the fair value of the stock options on the date of grant using the following assumptions in the Black-Scholes option-pricing model:

| | Year Ended December 31, | |
|---|---|---|
| | **2023** | **2022** |
| Estimated dividend yield | 0 % | 0 % |
| Expected share price volatility (weighted average and range, if applicable) | 88.6% (88.5% to 89.8%) | 88.8% (87.4% to 100.0%) |
| Risk-free interest rate (weighted average and range, if applicable) | 4.22% (3.58% to 4.39%) | 3.50% (1.89% to 3.69%) |
| Expected term of options (in years) | 6.25 | 6.25 |

- *Fair Value of Common Stock.* The fair value of the Common Stock has been determined based on the closing price of the shares on Nasdaq.

- *Expected Term.* The expected term represents the period that stock options are expected to be outstanding. The Company calculated the expected term using the simplified method for options, which is available where there is insufficient historical data about exercise patterns and post-vesting employment termination behavior. The simplified method is based on the vesting period and the contractual term for each grant, or for each vesting-tranche for awards with graded vesting. The mid-point between the vesting date and the maximum contractual expiration date is used as the expected term under this method. For awards with multiple vesting-tranches, the times from grant until the mid-points for each of the tranches may be averaged to provide an overall expected term.

- *Expected Volatility.* The expected volatility was determined based on a blended approach using the historical share volatility of the Company's Common Stock and that of several publicly traded peer companies over a period of time equal to the expected term of the options, as the Company has a limited trading history. For purposes of identifying these peer companies, the Company considered the industry, stage of development, size and financial leverage of potential comparable companies.

- *Risk-Free Interest Rate.* The risk-free interest rate was based on the yields of U.S. Treasury zero-coupon securities with maturities similar in duration to the expected term of the options.

- *Expected Dividend Yield.* The Company has not paid dividends on its Common Stock nor does it expect to pay dividends in the foreseeable future. Accordingly, the Company has estimated the dividend yield to be zero.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 367 of 674

The following table shows a summary of stock-based compensation expense included in the consolidated statements of operations and comprehensive loss for the years ended December 31, 2023 and 2022:

| | Year Ended December 31, | |
|---|---|---|
| *($ in thousands)* | 2023 | 2022 |
| Research and development | $ 1,716 | $ 1,034 |
| General and administrative | 5,112 | 5,150 |
| Total | $ 6,828 | $ 6,184 |

A summary of option activity under the Company's stock option plans during the year ended December 31, 2023 is presented below:

| | Number of Shares | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| Options outstanding at December 31, 2022 | 7,203,874 | $ 5.90 | 7.5 | $ 429 |
| Granted | 5,750,912 | 2.86 | | |
| Exercised | (444,715) | 1.27 | | |
| Forfeited | (590,650) | 5.18 | | |
| Options outstanding at December 31, 2023 | 11,919,421 | $ 4.64 | 8.3 | $ 383 |
| Vested and exercisable, December 31, 2023 | 4,200,305 | $ 7.24 | 6.0 | $ 134 |
| Vested and expected to vest, December 31, 2023 | 11,919,421 | $ 4.64 | 8.3 | $ 383 |

The weighted-average grant-date fair value per share of options granted during the years ended December 31, 2023 and 2022 was $2.20 and $2.70, respectively. The total intrinsic value of options exercised during the years ended December 31, 2023 and 2022 was $0.8 million and $0.3 million, respectively. As of December 31, 2023, unrecognized stock-based compensation cost for options was $17.9 million and is expected to be recognized over a weighted-average period of 3.1 years.

## 11. Income Taxes

The Company did not record any income tax expense or benefit during the years ended December 31, 2023 and 2022. The Company has a net operating loss and has provided a valuation allowance against net deferred tax assets due to uncertainties regarding the Company's ability to realize these assets. All losses before income taxes arose in the U.S.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and deferred tax liabilities, including valuation allowances, are as follows:

| | As of December 31, | |
|---|---|---|
| *($ in thousands)* | 2023 | 2022 |
| Deferred tax assets: | | |
| Net operating loss | $ 80,785 | $ 67,879 |
| Capitalized research and development | 50,968 | 43,818 |
| Research credits | 20,099 | 18,054 |
| Stock-based compensation | 1,140 | 3,047 |
| Right of use lease liability | 133 | 144 |
| Accrued expenses | 69 | 65 |
| Other | 1 | 1 |
| Total deferred tax asset | 153,195 | 133,008 |
| Less: valuation allowance | (151,677) | (131,151) |
| Total net deferred tax asset | 1,518 | 1,857 |
| | | |
| Deferred tax liabilities: | | |
| Basis difference in fixed assets | (1,385) | (1,713) |
| Right of use lease assets | (133) | (144) |
| Total deferred tax liability | (1,518) | (1,857) |
| Total net deferred tax asset/(liability) | $ — | $ — |

A valuation allowance is provided for deferred tax assets where the recoverability of the assets is uncertain. The determination to provide a valuation allowance is dependent upon the assessment of whether it is more likely than not that sufficient future taxable income will be generated to utilize the deferred tax assets. Based on the weight of the available evidence, which includes the Company's historical operating losses, lack of taxable income and the accumulated deficit, the Company provided a full valuation allowance against the deferred tax assets resulting from the tax loss and credits carried forward as of December 31, 2023 and December 31, 2022.

On November 18, 2021, North Carolina enacted the 2021 Appropriations Act, which included a gradual corporate income tax rate decrease from the current 2.5% to 0% by 2030. The Company is in a cumulative loss position and does not have significant deferred tax liabilities that can be utilized as a source of taxable income in the future. Therefore, the Company has reduced its North Carolina deferred tax assets, including the net operating losses, to zero, as no benefit is expected to be realized from these deferred tax assets prior to 2030 when there would be no income tax in North Carolina. The reduction in the value of the deferred tax assets are fully offset by a corresponding reduction in the valuation allowance. If the Company becomes profitable prior to 2030, the Company will recognize an income tax benefit related to the portion of its North Carolina deferred tax assets utilized.

The reasons for the difference between the actual income tax benefit for the years ended December 31, 2023 and 2022, and the amount computed by applying the statutory Federal income tax rate to losses before income taxes are as follows:

| | December 31, | | | |
|---|---|---|---|---|
| | 2023 | | 2022 | |
| *($ in thousands)* | Amount | Rate | Amount | Rate |
| Income tax benefit at statutory rate | $ (23,263) | 21.0 % | $ (2,512) | 21.0 % |
| State income taxes, net of federal benefit | (2,066) | 1.9 % | (1,767) | 14.8 % |
| Tax credits | (1,917) | 1.7 % | (2,325) | 19.4 % |
| Other nondeductible expenses | 1,759 | (1.6)% | (15,735) | 131.5 % |
| Deferred rate changes | 2,100 | (1.9)% | 1,698 | (14.2)% |
| Deferred tax true-up[(1)] | 2,860 | (2.6)% | 1,065 | (8.9)% |
| Change in valuation allowance | 20,527 | (18.5)% | 19,576 | (163.6)% |
| Provision for income taxes | $ — | 0.0 % | $ — | 0.0 % |

(1) The deferred tax true-up for 2023 and 2022 primarily relates to executive compensation subject to IRC Section 162(m) limitations and the 2021 research and development and net operating loss carryforwards were adjusted due to application of the employee retention credit determined in 2022.

As of December 31, 2023 the Company had approximately $384.0 million and $383.0 million of Federal and state net operating losses, respectively. Of this amount, $222.7 million of Federal net operating losses are subject to an 80% limitation on taxable income, do not expire and will carry forward indefinitely, while the remaining amount begins to expire in 2025. Some of these state net operating losses included in these amounts follow the Federal Tax Cuts and Jobs Act and are carried over indefinitely. The Company's state net operating losses began to expire in 2020 and will expire completely in 2043. The state operating loss carryforwards are inclusive of North Carolina net operating losses, which are recorded at a zero benefit.

As of December 31, 2023 and 2022, the Company had Federal and state research tax credit carryforwards of $20.1 million and $18.1 million, respectively. These credit carryforwards will begin to expire in 2025 and will expire completely in 2043.

Net operating loss carryforwards and tax credit carryforwards are subject to review and possible adjustment by the IRS, and may become subject to an annual limitation in the event of certain cumulative changes in the ownership interest of significant stockholders or groups over a three-year period in excess of 50% as defined under Sections 382 and 383 in the Internal Revenue Code, which could limit the amount of tax attributes that can be utilized annually to offset future taxable income or tax liabilities. The amount of the annual limitation is determined based on the value immediately prior to the ownership change. Subsequent ownership changes may further affect the limitation in future years. The Company has not determined whether there have been any cumulative ownership changes or the impact on the utilization of the loss carryforwards if such changes have occurred. A section 382 study will be performed at a time when forthcoming profitability is reasonably anticipated.

## 12. Retirement Plan

The Company currently maintains a defined contribution employee retirement plan, or 401(k) plan, for all employees upon their date of hire. The 401(k) plan is intended to qualify as tax-qualified plans under Section 401(k) of the Internal Revenue Code of 1986, as amended. The plan permits employees to contribute, on a pre-tax basis, a portion of their salary up to the Federally mandated limits. The Company matches an employee's contribution up to 4% of the employee's compensation. Contributions to the 401(k) plan by the Company totaled $1.0 million and $0.7 million for the years ended December 31, 2023 and 2022, respectively.

## 13. Commitments and Contingencies

### Patent License Agreements

*Duke University*

In March 2006, the Company entered into a license agreement with Duke University ("Duke"), which was subsequently amended in 2011, 2014, 2015, 2018, 2019 and 2022. Under this license agreement, Duke granted the Company a worldwide, exclusive, sublicensable license to certain patents related to decellularized tissue engineering, referred to as the patent rights, as well as a non-exclusive license to use and practice certain know-how related to the patent rights. The relevant licensed patent on decellularization of tissue expired in 2021. The Company has agreed to use commercially reasonable efforts to develop, register, market and sell products utilizing the patent rights, referred to as the licensed products. Any services provided to a third party utilizing licensed products are referred to as licensed services. The Company has also agreed to meet certain benchmarks in its development efforts, including as to development events, clinical trials, regulatory submissions and marketing approval, within specified timeframes. Under the license agreement, Duke retains the right to use the patent rights for its own educational and research purposes, and to provide the patent rights to other non-profit, governmental or higher-learning institutions for non-commercial purposes without paying royalties or other fees.

In connection with the Company's entry into the license agreement, the Company granted equity consideration to Duke in the form of 52,693 shares of Common Stock. Under the license agreement, the Company also agreed to pay Duke:

- a low single-digit percentage royalty on eligible sales of licensed products and licensed services, plus a low double-digit percentage of any sublicensing revenue;
- an annual minimum royalty beginning in 2012, which increases in the calendar year immediately following the first commercial sale of licensed products or licensed services (whichever occurs first); and
- an additional amount in license fees, as certain milestones are met.

The license agreement remains effective until the later of (i) the last of the patent rights expires or (ii) four years after the Company's first commercial sale, unless terminated earlier. Either party may terminate the agreement for fraud, willful misconduct or illegal conduct, or uncured material breach. Duke may terminate the agreement if the Company becomes insolvent. Duke may also terminate the license, convert the license into a non-exclusive license or seek assignment of any sublicense if the Company fails to reach diligence milestones within the applicable time period. If the Company abandons any claim, patent or patent application, its rights under the license with respect to such patent rights will be terminated in the territory in which the Company abandons such rights. The Company may terminate the license agreement unilaterally upon three months' prior notice to Duke. The Company agrees to indemnify Duke against certain third-party claims.

In December 2023, the Company filed a BLA with the FDA for an indication in extremity vascular trauma. Based on the achievement of this milestone under the Duke license agreement, the Company recorded license fee expense of $0.5 million during the fourth quarter of 2023 in research and development expense in its consolidated statements of operations and comprehensive loss. As of December 31, 2023 there was $0.5 million of license expense payable to Duke included in accounts payable in the Company's consolidated balance sheets. Payments to Duke under the license agreement were immaterial during the year ended December 31, 2022.

*Yale University*

In February 2014, the Company entered into a license agreement with Yale University ("Yale") that granted the Company a worldwide license to the patents related to coatings for small-diameter vessels to inhibit clotting (the "Small Diameter Vessel License Agreement"). The license granted under the Small Diameter Vessel License Agreement is exclusive in the field of engineered vascular tissues and extracellular matrix-based implants used for vascular repair, reconstruction and replacement (provided that all uses are vascular tissues within the range of 1 – 12mm in diameter), except that it was subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. The Company agreed to pay to Yale an annual maintenance fee, increasing between the first and fourth anniversaries of the Small

Diameter Vessel License Agreement up to a maximum of less than $0.1 million per year for this license. In December 2022, in accordance with the

terms of the Small Diameter Vessel License Agreement, the Company provided Yale with 90 days written notice of termination, effective March 21, 2023.

In August 2019, the Company entered into a license agreement with Yale that granted the Company a worldwide license to the patents related to the BVP (the "BVP License Agreement"). The license granted under the BVP License Agreement is exclusive in the field of engineered vascular tissues that deliver pancreatic islet cells to patients, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. The Company has agreed to pay to Yale an annual maintenance fee, increasing between the first and fourth anniversaries of the BVP License Agreement up to a maximum of less than $0.1 million per year for this license.

In August 2019, the Company entered into a license agreement with Yale that granted the Company a worldwide license to the patents related to tubular prostheses (the "Tubular Prosthesis License Agreement"). The license granted under the Tubular Prosthesis License Agreement is exclusive in the field of engineered urinary conduits, engineered tracheas/airways, and engineered esophagi, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. The Company has agreed to pay to Yale an annual maintenance fee, increasing between the first and fourth anniversaries of the Tubular Prosthesis License Agreement up to a maximum of less than $0.1 million per year for this license.

The Company has agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. The Company is also obligated to provide Yale periodically an updated and revised copy of its plan for each license, which must indicate progress of its development and commercialization. The Company may also sublicense the Company's rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with its entry into the Tubular Prosthesis License Agreement, the Company paid Yale upfront cash fees. The Company has also agreed to pay Yale:

- annual maintenance fees, increasing between the first anniversary of the Tubular Prosthesis License Agreement until the fifth anniversary for the Small Diameter Vessel License Agreement (through the termination of the agreement on March 21, 2023) and the BVP License Agreement and until the fourth anniversary for the Tubular Prostheses License Agreement up to a maximum of less than $0.1 million per year;
- milestone payments upon achievement of certain regulatory and commercial milestones of $0.2 million and $0.6 million, respectively;
- a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and
- a low double-digit percentage of sublicensing income.

If the Company or any of its future sublicensees bring a patent challenge against Yale or assists another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The BVP License Agreement and Tubular Prosthesis License Agreement expire on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Yale may terminate the BVP License Agreement and Tubular Prosthesis License Agreement if the Company fails to (i) provide written diligence reports, (ii) provide commercially reasonable diligence plans, (iii) implement the plans in accordance with the obligations under the agreements, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreements; however, any such termination right would be limited in scope to the country to which such failure relates. Yale may also terminate for the Company's non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of the Company's products or insolvency. The Company may terminate the BVP License Agreement and Tubular Prosthesis License Agreement (i) on 90 days' prior written notice to Yale, provided the Company is not in breach of the license agreements and has made all required payments to Yale thereunder and (ii) on written notice to Yale following an uncured material breach. With respect to the BVP License Agreement, the Company's rights under the agreement will also terminate automatically with respect to a patent application or patent within the licensed patents in a specified country if,

upon receipt of written notice from Yale, the Company does not agree to pay the patent filing, prosecution and maintenance fees incurred by Yale for such patent applications or patents in the specified country. Under certain circumstances, Yale may, at its option, convert the exclusive licenses to non-exclusive licenses if the Company declines to initiate certain infringement or interference proceedings with respect to the licensed patents. The Company has agreed to indemnify Yale against certain third-party claims. Payments to Yale under the Small Diameter Vessel License Agreement, BVP License Agreement and Tubular Prosthesis License Agreement were immaterial during the periods presented.

**JDRF Agreement**

On April 1, 2023, the Company entered into the JDRF Agreement to further develop and perform preclinical testing of the BVP, as discussed in Note 2 — Summary of Significant Accounting Policies. According to the terms of the JDRF Agreement, JDRF will provide funding up to $0.8 million based on the achievement of certain research and development milestones. The Company received the first milestone payment of $80 thousand in April 2023 upon execution of the agreement.

In accordance with the JDRF Agreement, the Company has agreed to pay JDRF:

- a one-time royalty in an amount equal to four times the Actual Award, to be paid in three equal installments following the first commercial sale of any product containing the Company's technology identified in the JDRF Agreement;
- an additional royalty equal to the Actual Award at a specified payment date after net sales exceed $250 million; and
- in the event of a license, sale or transfer of the Company's rights to the product's technology identified in the JDRF Agreement or a change of control transaction, a payment equal to 10% of any license or purchase price payments received by the Company up to the Royalty Cap, less any previous royalty payments paid towards the Royalty Cap.

The JDRF Agreement expires on the date on which the Company has paid all of the royalty payments described above. Either party may terminate the JDRF Agreement for cause by providing the other party with written notice and allowing the other party 30 days to cure such breach. JDRF may terminate the JDRF Agreement without cause by providing 90 days' notice to the Company at any time after April 1, 2024. Royalties on previously received milestone payments would remain due after a termination by JDRF without cause.

**Legal Matters**

The Company currently is not aware of any legal proceedings or claims that management believes will have, individually or in the aggregate, a material adverse effect on the Company's business, financial condition, results of operations, or cash flows.

**Indemnification**

To the extent permitted under Delaware law, the Company has agreed to indemnify its directors and officers for certain events or occurrences while the director or officer is, or was serving, at the Company's request in such capacity. The indemnification period covers all pertinent events and occurrences during the director's or officer's service. The maximum potential amount of future payments the Company could be required to make under these indemnification arrangements is not specified in such arrangements; however, the Company has director and officer insurance coverage that is intended to reduce its exposure and enable the Company to recover a portion of any potential future amounts the Company could be required to make. To date, the Company has not incurred any costs as a result of such obligations and has not accrued any liabilities related to such obligations in the consolidated financial statements.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 375 of 674

## 14. Related Party Transactions

*Fresenius Medical Care investments and distribution agreement*

In June 2018, the Company completed a $150 million financing transaction pursuant to which Fresenius Medical Care purchased shares of series D redeemable convertible preferred stock that at the Closing converted into 15,812,735 shares of Common Stock. In August 2021, Fresenius Medical Care invested $25 million as part of the PIPE Financing and received an additional 2.5 million shares of Common Stock.

In addition, the Company entered into a distribution agreement with Fresenius Medical Care in June 2018 which, as amended as of February 16, 2021, granted Fresenius Medical Care and its affiliates exclusive rights to develop outside the United States and EU and commercialize outside of the United States the Company's 6 millimeter x 42 centimeter HAV and all improvements thereto, and modifications and derivatives thereof (including any changes to the length, diameter or configuration of the foregoing), for use in vascular creation, repair, replacement or construction, including renal replacement therapy for dialysis access, the treatment of PAD, and the treatment of vascular trauma, but excluding coronary artery bypass graft, pediatric heart surgery, or adhering pancreatic islet cells onto the outer surface of the distribution product for use in diabetic patients. Within the United States, Fresenius Medical Care will collaborate with the Company in its commercialization of the product in the field, including adoption of the distribution product as a standard of care in patients for which such use is supported by clinical results and health economic analyses.

The Company is responsible for developing and seeking regulatory approval for the distribution product in the field in the United States. For countries outside the United States, the parties agreed to use commercially reasonable efforts to satisfy certain agreed minimum market entry criteria for the distribution product in the field in such country. For the EU, once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory approval for the distribution product in the field in the applicable country, the Company agreed to use commercially reasonable efforts to obtain such regulatory approval (other than pricing approval), and Fresenius Medical Care agreed to use commercially reasonable efforts to obtain the corresponding pricing approval. For the rest of the world (i.e., outside the United States and the EU), once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory and pricing approval for the distribution product in the field in the applicable country, Fresenius Medical Care agreed to use commercially reasonable efforts to obtain such approvals, and the Company agreed to use commercially reasonable efforts to support Fresenius Medical Care in its efforts.

Under the distribution agreement, the Company grants an exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by the Company during the term to commercialize the distribution product in the field outside the United States, subject to the Company's retained rights to carry out its obligations under the distribution agreement. The Company also grants a non-exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by the Company during the term to develop the distribution product in accordance with the terms of the distribution agreement. In addition, the Company grants to Fresenius Medical Care, among other things, a perpetual, irrevocable, non-exclusive sublicensable license under the patents and know-how that primarily relate to the distribution product or its manufacture and that were created, conceived or developed solely or jointly by or on behalf of Fresenius Medical Care in the performance of its activities under the distribution agreement.

The distribution agreement provides that the Company will own all know-how and patents that primarily relate to the distribution product or its manufacture that are created, conceived or developed by or on behalf of either party in the performance of activities under the distribution agreement. Ownership of all other know-how, patents, materials and other intellectual property created, conceived or developed during the performance of activities under the distribution agreement will be determined in accordance with U.S. patent laws for determining inventorship.

The Company is obligated to make payments to Fresenius Medical Care based on a share of aggregate net sales by or on behalf of the Company of the distribution product in the United States in the field. Such revenue-share payments will be a percentage of net sales in the low double digits, without regard to the calendar year in which such net sales are attributable, until such time that the Company has paid to Fresenius Medical Care a certain total amount, at which time the revenue-share will decrease to a percentage of net sales in the mid-single digits. The amounts that Fresenius Medical Care will be obligated to pay the Company under the distribution agreement for sales of the distribution product in the field outside of the United States will vary. Fresenius Medical Care agreed to pay the Company initially, on a country-by-

country basis for sales outside of the United States, the amount equal to the average cost of manufacturing the Company's distribution product plus a fixed dollar amount per unit. Following a specified period, on a country-by-country basis outside of the United States, Fresenius Medical Care will pay the Company a fixed percentage of net sales for each unit sold in such country, such that the Company will receive more than half of such net sales.

The distribution agreement will generally continue on a country-by-country basis until the later of (a) the tenth anniversary of the launch date of the distribution product in the relevant country or (b) the expiration of the last-to-expire valid claim of specified patents in such country. Each party is permitted to terminate the distribution agreement for insolvency of, or, under certain circumstances, including various cure periods, material breach by the other party. Subject to a cure period, Fresenius Medical Care may also terminate the distribution agreement in its entirety or on a country-by-country basis (i) for certain withdrawals of regulatory approval or (ii) for termination or expiration of any of our in-licenses that is necessary for the exercise of Fresenius Medical Care's rights, or the satisfaction of its obligations, under the distribution agreement. In addition, Fresenius Medical Care may terminate the distribution agreement for convenience on a country-by-country basis upon not less than 12 months' written notice to the Company, although Fresenius Medical Care is not permitted to give such notice prior to the end of the second year following launch of the distribution product in such country. Each party is required to indemnify one another for certain third-party claims.

The Company expensed approximately $0.2 million during each of the years ended December 31, 2023 and 2022 for clinical research services performed by Frenova Renal Research ("Frenova"), a subsidiary of Fresenius Medical Care. There was $0.1 million payable to Frenova included in accounts payable on the Company's consolidated balance sheets as of December 31, 2022, and there were no amounts payable to Frenova as of December 31, 2023.

*Arrangements with Yale University*

Dr. Niklason serves as an Adjunct Professor in Anesthesia at Yale University. As of December 31, 2023 and 2022, the Company was a party to license agreements with Yale University, as described in Note 13 — Commitments and Contingencies above.

The following table shows a summary of related party expenses pertaining to Yale University included in the statements of operations and comprehensive loss for the years ended December 31, 2023 and 2022:

| | Year Ended December 31, | |
|---|---|---|
| ***($ in thousands)*** | **2023** | **2022** |
| License expenses | 55 | 100 |
| Other | 25 | 19 |
| Total | $ 80 | $ 119 |

There was $50 thousand of license expenses payable to Yale University included in accounts payable on the Company's consolidated balance sheets as of December 31, 2022, and there was an insignificant amount payable to Yale as of December 31, 2023.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 378 of 674

**15. Subsequent Events**

On February 29, 2024, the Company entered into an underwriting agreement (the "Underwriting Agreement") with Cowen and Company, LLC and Cantor Fitzgerald & Co. as representatives of the several underwriters named therein (collectively, the "Underwriters"), relating to the issuance and sale in the Offering of 15,410,000 shares of the Company's Common Stock, which included a full exercise of the Underwriters' option to purchase additional shares, at a price to the public of $3.00 per share (the "Shares"). The net proceeds to the Company from the Offering were approximately $43.1 million after deducting underwriting discounts and commissions and estimated Offering expenses. The Offering closed on March 5, 2024. In a separate transaction on March 11, 2024, the Company received an additional $20.0 million under the Purchase Agreement.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 379 of 674

## Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

As of December 31, 2023, our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2023.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with U.S. GAAP. A control system, no matter how well designed and operated, can only provide reasonable, not absolute, assurance that the objectives of the control system are met. Because of these inherent limitations, management does not expect that our internal controls over financial reporting will prevent all errors and all fraud. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with our policies and procedures may deteriorate. Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued in 2013 by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of its evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2023.

### Attestation Report of the Registered Public Accounting Firm

This Annual Report on Form 10-K does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting as we are an "emerging growth company" as defined in the JOBS Act. For as long as we remain an "emerging growth company," we are exempt from the auditor attestation requirement in the assessment of the effectiveness of our internal control over financial reporting.

### Changes in Internal Control Over Financial Reporting

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act) during the three months ended December 31, 2023 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 9B. Other Information

### Director and Officer Trading Arrangements

During the three months ended December 31, 2023, no director or officer (as defined in Rule 16a-1(f) under the Exchange Act) of the Company adopted or terminated any "Rule 10b5-1 trading arrangement" or any "non Rule 10b5-1 trading arrangement," as each term is defined in Item 408(a) of Regulation S-K.

## Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections

None.

## Part III

### Item 10. Directors, Executive Officers and Corporate Governance.

Incorporated by reference from the information in our Proxy Statement for our 2024 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 11. Executive Compensation.

Incorporated by reference from the information in our Proxy Statement for our 2024 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

Incorporated by reference from the information in our Proxy Statement for our 2024 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Incorporated by reference from the information in our Proxy Statement for our 2024 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 14. Principal Accountant Fees and Services

Incorporated by reference from the information in our Proxy Statement for our 2024 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

## Part IV

### Item 15. Exhibits and Financial Statement Schedules.

(a) The following financial statements are included in this Annual Report on Form 10-K:

*(1) List of Financial Statements:*

The financial statements required by this item are listed in Item 8, "Financial Statements and Supplementary Data" herein.

*(2) List of Financial Statement Schedules:*

All financial statement schedules have been omitted because they are not applicable, not required or the information required is shown in the financial statements or notes thereto.

*(3) List of Exhibits:*

| Exhibit No. | Description |
|---|---|
| 3.1 | Second Amended and Restated Certificate of Incorporation of Humacyte, Inc. (incorporated by reference to Exhibit 3.1 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 3.2 | Amended and Restated By Laws of Humacyte, Inc. (incorporated by reference to Exhibit 3.2 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on December 12, 2022). |
| 4.1 | Warrant Agreement, dated September 17, 2020, by and between Alpha Healthcare Acquisition Corp. and Continental Stock Transfer & Trust Company, as warrant agent (incorporated by reference to Exhibit 4.1 to Alpha Healthcare Acquisition Corp.'s Annual Report on Form 10–K/A, filed with the SEC on May 14, 2021). |
| 4.2 | Form of Subscription Agreement (incorporated by reference to Exhibit 10.3 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on August 2, 2021). |
| 4.3* | Form of Investor Rights and Lock–up Agreement (incorporated by reference to Exhibit A of Annex A to the proxy statement/prospectus contained in Humacyte, Inc.'s Registration Statement on S-4/A, filed with the SEC on August 2, 2021). |
| 4.4 | Warrant to Purchase Common Stock, dated March 30, 2021 (incorporated by reference to Exhibit 10.6.1 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 4.5 | Warrant to Purchase Common Stock, dated March 30, 2021 (incorporated by reference to Exhibit 10.6.2 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 4.6! | Description of the Company's securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended. |
| 10.1.1 | Revenue Interest Purchase Agreement, dated as of May 12, 2023, by and among Humacyte Global, Inc., Humacyte, Inc. and Hook SA LLC. (incorporated by reference to Exhibit 10.1 to Humacyte, Inc.'s Quarterly Report on Form 10-Q filed with the SEC on August 14, 2023). |
| 10.1.2!* | Waiver, dated as of February 18, 2024, by and among Humacyte Global, Inc., Humacyte, Inc. and Hook SA LLC. |
| 10.2 | Option Agreement, dated as of May 12, 2023, by and among Humacyte, Inc., TPC Investments III LP and TPC Investments Solutions LP. (incorporated by reference to Exhibit 4.1 to Humacyte, Inc.'s Registration Statement on Form S-3, filed with the SEC on June 9, 2023). |
| 10.3 | Open Market Sale Agreement, dated September 1, 2022, by and between Humacyte, Inc. and Jefferies LLC, (incorporated by reference to Exhibit 1.2 to Humacyte, Inc.'s Registration Statement on Form S-3 (File No. 333-267225), filed with the SEC on September 1, 2022). |
| 10.4^ | Distribution Agreement, dated June 25, 2018, by and between Fresenius Medical Care Holdings, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.4.1^ | First Amendment to Distribution Agreement, dated October 2, 2019, by and between Fresenius Medical Care Holdings, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.4.2^ | Second Amendment to Distribution Agreement, effective as of February 16, 2021, by and between Fresenius Medical Care Holdings, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |

| Exhibit No. | Description |
|---|---|
| 10.5^ | Exclusive License Agreement, dated February 25, 2014, by and between Yale University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.8 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.6^ | Exclusive License Agreement, dated August 13, 2019, by and between Yale University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.9 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.7^ | Exclusive License Agreement, dated August 25, 2019, by and between Yale University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.8^ | Exclusive Patent License Agreement, dated March 14, 2006, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.1^ | First Amendment to Exclusive Patent License Agreement, dated February 25, 2011, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.2^ | Second Amendment to Exclusive Patent License Agreement, dated April 24, 2014, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.3^ | Third Amendment to Exclusive Patent License Agreement, dated June 26, 2015, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.4^ | Fourth Amendment to Exclusive Patent License Agreement, dated January 2, 2018, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.5^ | Fifth Amendment to Exclusive Patent License Agreement, dated December 31, 2019, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.5 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.6^ | Sixth Amendment to Exclusive Patent License Agreement, dated January 10, 2022, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.7.6 to Humacyte, Inc.'s Annual Report on Form 10-K filed with the SEC on March 29, 2022). |
| 10.9^ | Supply Agreement, dated January 9, 2014, between SeraCare Life Sciences, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.11 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.9.1^ | First Amendment to Supply Agreement, dated October 12, 2018, between SeraCare Life Sciences, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.11.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.9.2^ * | Second Amendment to Supply Agreement, dated March 24, 2021, between SeraCare Life Sciences, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.12.2 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.10^ * | Supply Agreement, dated June 1, 2020, between Confluent Medical Technologies and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.13 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.11+* | Executive Employment Agreement, dated February 3, 2021, between Laura Niklason, M.D., Ph.D. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.13 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.12+ | Executive Employment Agreement, dated May 18, 2021, between Dale Sander and Humacyte, Inc. (incorporated by reference to Exhibit 10.11 to Humacyte, Inc.'s Annual Report on Form 10-K, filed with the SEC on March 24, 2023). |
| 10.13+ | Executive Employment Agreement, dated September 13, 2019 between Heather Prichard, Ph.D. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.16 to Humacyte, Inc.'s Registration Statement on S-4, filed with the SEC on March 23, 2021). |
| 10.14+ | Humacyte, Inc. 2021 Long–Term Incentive Plan (incorporated by reference to Exhibit 10.4 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 10.14.1+ | Form of Stock Option Agreement under Humacyte, Inc. 2021 Long–Term Incentive Plan (incorporated by reference to Exhibit 10.4.1 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 10.15+ | Humacyte, Inc. 2021 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.5 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 10.16+ | Humacyte, Inc. Annual Bonus Plan (incorporated by reference to Exhibit 10.8 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |

| Exhibit No. | Description |
|---|---|
| 10.17+ | Humacyte, Inc. 2005 Stock Option Plan (incorporated by reference to Exhibit 10.18 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.1+ | First Amendment of Humacyte, Inc. 2005 Stock Option Plan, dated March 31, 2008 (incorporated by reference to Exhibit 10.18.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.2+ | Second Amendment of Humacyte, Inc. 2005 Stock Option Plan, dated October 28, 2011 (incorporated by reference to Exhibit 10.18.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.3+ | Third Amendment of Humacyte, Inc. 2005 Stock Option Plan, dated November 22, 2013 (incorporated by reference to Exhibit 10.18.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.4+ | Form of Incentive Stock Option Agreement under Humacyte, Inc. 2005 Stock Option Plan (incorporated by reference to Exhibit 10.18.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.5+ | Form of Nonqualified Stock Option Agreement under Humacyte, Inc. 2005 Stock Option Plan (incorporated by reference to Exhibit 10.18.5 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.18+ | Humacyte, Inc. 2015 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.19 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.18.1+ | First Amendment to Humacyte, Inc. 2015 Omnibus Incentive Plan, dated February 23, 2018 (incorporated by reference to Exhibit 10.19.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.18.2+ | Second Amendment to Humacyte, Inc. 2015 Omnibus Incentive Plan, dated June 6, 2018 (incorporated by reference to Exhibit 10.19.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.18.3+ | Form of Incentive Stock Option Agreement under Humacyte, Inc. 2015 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.19.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.18.4+ | Form of Nonqualified Stock Option Agreement under Humacyte, Inc. 2015 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.19.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.19+ | Form of Indemnity Agreement by and between Humacyte, Inc. and each of its directors and executive officers (incorporated by reference to Exhibit 10.23 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on July 1, 2021). |
| 10.20 | Lease Agreement, dated December 31, 2015, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.20.1 | First Amendment to Lease, dated September 30, 2016, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.20.2 | Second Amendment to Lease, dated February 8, 2017, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.20.3 | Third Amendment to Lease, dated April 21, 2017, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.20.4 | Fourth Amendment to Lease, dated October 31, 2017, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 21.1 | Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 23.1! | Consent of PricewaterhouseCoopers LLP. |
| 31.1! | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2! | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1! | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

| Exhibit No. | Description |
|---|---|
| 32.2! | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 97+! | Humacyte, Inc. Compensation Clawback Policy. |
| 101! | The following materials from Humacyte, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2023, formatted in Inline XBRL (Inline eXtensible Business Reporting Language): (i) Consolidated Balance Sheets as of December 31, 2023 and 2022, (ii) Consolidated Statements of Operations and Comprehensive Loss for the years ended December 31, 2023 and 2022, (iii) Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2023 and 2022, (iv) Consolidated Statements of Cash Flows for the years ended December 31, 2023 and 2022, and (v) Notes to Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

! Filed herewith.

* Annexes, schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The registrant agrees to furnish supplementally a copy of any omitted attachment to the Securities and Exchange Commission on a confidential basis upon request.

^ Certain confidential information contained in this exhibit, market by brackets, has been omitted because the information (i) is not material and (ii) is the type of information the company both customarily and actually treats as private or confidential.

+ Management contract or compensatory plan or arrangement.

**Item 16. Form 10-K Summary.**

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, as amended, the registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**HUMACYTE, INC.**

By: /s/ Laura E. Niklason
Name: Laura E. Niklason, M.D., Ph.D.
Title: President and Chief Executive Officer

Date: March 28, 2024

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Position | Date |
|---|---|---|
| /s/ Laura E. Niklason<br>Laura E. Niklason, M.D., Ph.D. | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 28, 2024 |
| /s/ Dale A. Sander<br>Dale A. Sander | Chief Financial Officer, Chief Corporate Development Officer and Treasurer<br>(Principal Financial and Accounting Officer) | March 28, 2024 |
| /s/ Kathleen Sebelius<br>Kathleen Sebelius | Director | March 28, 2024 |
| /s/ Gordon M. Binder<br>Gordon M. Binder | Director | March 28, 2024 |
| Emery N. Brown, M.D., Ph.D. | Director | March 28, 2024 |
| /s/ Michael T. Constantino<br>Michael T. Constantino | Director | March 28, 2024 |
| /s/ Brady W. Dougan<br>Brady W. Dougan | Director | March 28, 2024 |
| /s/ C. Bruce Green<br>C. Bruce Green, M.D. | Director | March 28, 2024 |
| /s/ Todd M. Pope<br>Todd M. Pope | Director | March 28, 2024 |
| /s/ Diane Seimetz<br>Diane Seimetz, Ph.D. | Director | March 28, 2024 |
| /s/ Rajiv Shukla<br>Rajiv Shukla | Director | March 28, 2024 |
| /s/ Max Wallace<br>Max Wallace, J.D. | Director | March 28, 2024 |
| /s/ Susan Windham-Bannister<br>Susan Windham-Bannister, Ph.D. | Director | March 28, 2024 |

# EXHIBIT 6

# Humacyte Announces FDA Approval of SYMVESS™ (acellular tissue engineered vessel-tyod) for the Treatment of Extremity Vascular Trauma

*– SYMVESS is a first-in-class bioengineered human tissue designed to be a universally implantable vascular conduit for use in arterial replacement and repair –*

*– In clinical testing SYMVESS was observed to have high rates of patency, or blood flow, and low rates of amputation and infection –*

*– Highly experienced sales team already recruited and trained in preparation for commercial launch –*

DURHAM, N.C., Dec. 19, 2024 (GLOBE NEWSWIRE) -- Humacyte, Inc. (Nasdaq: HUMA), a biotechnology platform company developing universally implantable, bioengineered human tissues at commercial scale, today announced that the U.S. Food and Drug Administration (FDA) has granted a full approval for SYMVESS (acellular tissue engineered vessel-tyod) for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and when autologous vein graft is not feasible.

"We are very excited and proud to provide patients suffering from arterial injury with a novel treatment option. SYMVESS has been made possible by our innovative bioengineering science along with the contributions of many patients, healthcare providers and Humacyte team members." said Laura Niklason, M.D., Ph.D., Founder and Chief Executive Officer of Humacyte. "SYMVESS approval in this first indication for arterial injury repair is a milestone for regenerative medicine overall, as well as for Humacyte. The FDA's full approval of SYMVESS is a transformational event for the Company and our bioengineering technology platform. Even more importantly, we believe SYMVESS provides a new means of treating patients with devastating arterial injuries, which is a population that has not benefited from substantial innovation in decades. We look forward with great excitement to our upcoming commercial launch of SYMVESS, and we have recruited and trained a terrific team to execute on our sales and marketing missions."

"The approval of a vascular conduit that resists infection and remodels into native arteries is an extraordinary technological advancement that will have a huge impact on the quality of trauma care around the world," said Charles J. Fox, MD, FACS, Director of Vascular Surgery at the University of Maryland Capital Region, a clinical investigator in the V005 clinical trial. "SYMVESS is perfectly sized to treat most injuries, has excellent handling properties, and reduces time necessary to save both life and limbs. The Humacyte team has responsibly and scientifically solved a major clinical problem that I believe will reduce the amputation rate for traumatic vascular injury. They should be congratulated on an accomplishment that will undoubtedly advance our specialty to the next level."

"I believe that SYMVESS will revolutionize vascular trauma care and be profoundly beneficial to our patients," said Rishi Kundi, MD, Surgical Critical Care, Vascular Surgery, University of Maryland Medical System. "From my experience so far, SYMVESS will allow reconstructions that are currently impracticable because of contamination and infection. It will make reconstructions that we now perform with prosthetic or even biologic grafts more successful. I am most excited about the promise that SYMVESS holds for the long-term experience of our patients. I hope that, with SYMVESS, the 19-year-old patient with vascular reconstruction after trauma will no longer spend the six decades after their surgery anticipating disaster, but that their chances for reintervention will be no different than if they had autologous conduit."

SYMVESS, or the ATEV™, is a first-in-class bioengineered human tissue that is designed to be a universally implantable vascular conduit for use in arterial replacement and repair. While harvesting vein from a trauma patient takes valuable surgical time, SYMVESS is available off-the-shelf, and does not require further injuring the patient to obtain vascular repair material. Humacyte's BLA included positive results from the V005 pivotal Phase 2/3 clinical study, as well as real-world evidence from the treatment of wartime injuries in Ukraine under a humanitarian aid program. SYMVESS was used to repair many types of traumatic injuries including car accidents, gunshot wounds, blast wounds, and industrial accidents. It was utilized by vascular and trauma surgeons in Level 1 Trauma centers throughout the U.S. and Israel to repair severe limb-threatening and life-threatening injuries, and in front-line hospitals in Ukraine to treat wartime injuries. Results from these studies were published in *JAMA Surgery* on November 20, 2024. In the civilian and military clinical studies, SYMVESS was observed to have high rates of patency, or blood flow, and low rates of amputation and infection.

"Finally, we have an innovative technology for battlefield vascular injuries using a tissue engineered human arterial replacement that can resist infections that are so prevalent in modern combat zones," added Dr. Fox. "SYMVESS shows promise to reduce amputation rates since an alternative conduit for war injuries is often needed but up until now has not been a good option."

"The FDA approval of SYMVESS will make it the preferred conduit for complex vascular injuries, and particularly those at risk for infection." said Ernest E. Moore, MD, FACS, Director of Research at the Ernest E. Moore Shock Trauma Center at Denver Health, a clinical investigator in the V005 trial. "I look forward to using SYMVESS in my practice."

Arterial injuries resulting from vascular trauma are common in civilian and military populations, frequently resulting in the loss of life or limb. In civilian populations, trauma injuries are primarily caused by motor vehicle, workplace and sporting accidents, gun violence, mass casualty terrorist attacks, stabbings, blunt trauma, and iatrogenic injuries (injuries caused by medical treatment or examination). Autologous vein, which is harvested from the patient's body through a separate surgical incision, is the current preferred conduit for arterial repair. However, harvesting of autologous vein is not always feasible due to damage to veins or to the limbs. Harvesting autologous vein is also an invasive procedure that requires additional time and resources, delaying the time from injury to restoration of blood flow for the injured patient. In contrast, SYMVESS may be removed from its packaging and ready for implantation within minutes and does not involve creating additional incisions in already-injured patients.

The SYMVESS trauma program was granted Regenerative Medicine Advanced Therapy (RMAT) designation by the FDA in May 2023, a Biologic License Application (BLA) was submitted to the FDA in December 2023, and in February 2024 the FDA granted a Priority Review. On August 9, 2024, the FDA informed Humacyte that it needed additional time to complete its review of the BLA, although there were no outstanding pre-approval requirements for SYMVESS as of that date. The FDA completed its review today, granting full approval.

**INDICATION**

SYMVESS is an acellular tissue engineered vessel indicated for use in adults as a vascular conduit for extremity arterial injury when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible.

**IMPORTANT SAFETY INFORMATION**

**BOXED WARNING: GRAFT FAILURE**

Loss of SYMVESS integrity due to mid-graft rupture or anastomotic failure can result in life threatening hemorrhage.

**CONTRAINDICATIONS**

DO NOT use SYMVESS in patients who have a medical condition that would preclude long-term antiplatelet therapy (such as aspirin or clopidogrel) after resolution of acute injuries.

**WARNINGS AND PRECAUTIONS**

- **Graft Rupture**

Vascular graft rupture has occurred in patients treated with SYMVESS. Advise patients that arterial bleeding can be life-threatening and to seek emergent medical evaluation for any signs or symptoms of graft rupture such as bleeding, pain and swelling in the extremity, or signs of extremity ischemia.

- **Anastomotic Failure**

Anastomotic failure has occurred in patients treated with SYMVESS. In clinical studies of SYMVESS, anastomotic failure occurred within the first 36 days post-implantation. Monitor patients for signs of anastomotic failure such as pain and swelling at the surgical site, decreasing hemoglobin or other signs and symptoms of bleeding. Advise patients to seek urgent medical evaluation if they have any signs or symptoms that may be indicative of anastomotic failure such as bleeding, swelling or worsening pain at the surgical site or changes in color of overlying skin.

- **Thrombosis**

Thrombosis has occurred in patients treated with SYMVESS. In clinical trials of SYMVESS, patients received antiplatelet therapy following implantation of SYMVESS to reduce the risk of thrombosis. The risk of thrombosis may increase in patients who discontinue antiplatelet therapy. Anti-platelet therapy is recommended following treatment with SYMVESS.

- **Transmission of Infectious Diseases**

SYMVESS is manufactured using cells and reagents that may transmit infectious diseases or infectious agents. The cells used in the manufacture of SYMVESS are derived from a donor who met the donor eligibility requirements for transmissible infectious diseases which includes screening and testing of risks associated with human immunodeficiency virus 1 (HIV-1), human immunodeficiency virus 2 (HIV-2), hepatitis B virus (HBV), hepatitis C virus (HCV), and syphilis (Treponema pallidum). The cell banks are tested negative for human and animal viruses, retroviruses, bacteria, fungi, yeast, and mycoplasma. While all animal-derived reagents are tested for animal viruses, bacteria, fungi, and mycoplasma before use, these measures do not eliminate the risk of transmitting these or other transmissible infectious diseases and disease agents. Fetal bovine serum is sourced to minimize the risk of transmitting a prion protein that causes bovine spongiform encephalopathy and the cause of a rare fatal condition in humans called variant Creutzfeldt-Jakob disease. No transmissible agent infections have been reported during clinical testing.

**ADVERSE REACTIONS**

The most common adverse reactions (occurring at ≥ 10%), were vascular graft thrombosis, pyrexia (fever) and pain.

**Please see full Prescribing Information, including Boxed Warning, for SYMVESS.**

Humacyte filed the BLA with trauma clinical data based upon the accepted statistical analysis plan. These data were also peer reviewed and published in *JAMA Surgery* on November 20, 2024. In the package insert, the FDA elected to exclude the synthetic graft comparator that was in the statistical analysis plan. The FDA also applied a different imputing methodology for SYMVESS patients who did not have a day 30 assessment. Nine patients without day 30 data were imputed as failures of patency in the package insert, despite the fact that they had favorable patency results at the last assessment. In addition, multiple patients who never underwent an amputation were imputed as failures of limb salvage.

**About Humacyte**

Humacyte, Inc. (Nasdaq: HUMA) is developing a disruptive biotechnology platform to deliver universally implantable bioengineered human tissues, advanced tissue constructs, and organ systems designed to improve the lives of patients and transform the practice of medicine. The Company develops and manufactures acellular tissues to treat a wide range of diseases, injuries, and chronic conditions. Humacyte's initial product candidates, a portfolio of acellular tissue engineered vessels (ATEVs), are currently in late-stage clinical trials targeting multiple vascular applications, including vascular trauma repair, arteriovenous (AV) access for hemodialysis, and peripheral artery disease. A Biologics License Application for the ATEV in the vascular trauma indication was approved by the FDA in December 2024. Preclinical development is also underway in coronary artery bypass grafts, pediatric heart surgery, treatment of type 1 diabetes, and multiple novel cell and tissue applications. Humacyte's 6mm ATEV for AV access in hemodialysis was the first product candidate to receive the FDA's Regenerative Medicine Advanced Therapy (RMAT) designation and has also received FDA Fast Track designation. Humacyte's 6mm ATEV for urgent arterial repair following extremity vascular trauma and for advanced PAD also have received an RMAT designations. The ATEV received priority designation for the treatment of vascular trauma by the U.S. Secretary of Defense. For more information, visit www.Humacyte.com.

For uses other than the FDA approval in the extremity vascular trauma indication, the ATEV is an investigational product and has not been approved for sale by the FDA or any other regulatory agency.

**Forward-Looking Statements**

This press release contains forward-looking statements that are based on beliefs and assumptions and on information currently available. In some cases, you can identify forward-looking statements by the following words: "may," "will," "could," "would," "should," "expect," "intend," "plan," "anticipate," "believe," "estimate," "predict," "project," "potential," "continue," "ongoing" or the negative of these terms or other comparable terminology, although not all forward-looking statements contain these words. These statements involve risks, uncertainties, and other factors that may cause actual results, levels of activity, performance, or achievements to be materially different from the information expressed or implied by these forward-looking statements. Although we believe that we have a reasonable basis for each forward-looking statement contained in this press release, we caution you that these statements are based on a combination of facts and factors currently known by us and our projections of the future, about which we cannot be certain. Forward-looking statements in this press release include, but are not limited to, our plans and ability to commercialize our ATEV in the United States under the brand name SYMVESS in vascular trauma repair; the statements regarding the initiation, timing, progress, and results of our preclinical and clinical trials; the anticipated characteristics and performance of our ATEVs; our ability to successfully complete, preclinical and clinical trials for our ATEVs; the anticipated benefits of the ATEV relative to existing alternatives; the anticipated commercialization of our ATEVs and our ability to manufacture at commercial scale; the implementation of our business model and strategic plans for our business; and the timing or likelihood of regulatory filings, acceptances and approvals. We cannot assure you that the forward-looking statements in this press release will prove to be accurate. These forward-looking statements are subject to a number of significant risks and uncertainties that could cause actual results to differ materially from expected results, including, among others, changes in applicable laws or regulations, the possibility that Humacyte may be adversely affected by other economic, business, and/or competitive factors, and other risks and uncertainties, including those described under the header "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2023, our quarterly report on Form 10-Q for the quarter ended September 30, 2024, each filed by Humacyte with the SEC, and in future SEC filings. Most of these factors are outside of Humacyte's control and are difficult to predict. Furthermore, if the forward-looking statements prove to be inaccurate, the inaccuracy may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified time frame, or at all. Except as required by law, we have no current intention of updating any of the forward-looking statements in this press release. You should, therefore, not rely on these forward-looking statements as representing our views as of any date subsequent to the date of this press release.

**Humacyte Investor Contact:**
Joyce Allaire
LifeSci Advisors LLC
+1-617-435-6602
jallaire@lifesciadvisors.com
investors@humacyte.com

**Humacyte Media Contact:**
Rich Luchette
Precision Strategies
+1-202-845-3924
rich@precisionstrategies.com
media@humacyte.com

Humacyte

Source: Humacyte, Inc

# EXHIBIT 7

S&P Global
Market Intelligence

# Humacyte, Inc. NasdaqGS:HUMA
# FQ4 2023 Earnings Call Transcripts
## Friday, March 22, 2024 12:00 PM GMT
## S&P Global Market Intelligence Estimates

| | -FQ4 2023- | | | -FQ1 2024- | -FY 2023- | | | -FY 2024- |
|---|---|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS |
| **EPS (GAAP)** | (0.24) | (0.24) | NM | (0.24) | (1.06) | (1.07) | NM | (0.95) |
| **Revenue (mm)** | 0.05 | 0.00 | ▼(100.00 %) | 0.02 | 0.05 | 0.00 | ▼(100.00 %) | 2.93 |

Currency: USD
Consensus as of Mar-08-2024 8:44 AM GMT




| - EPS (GAAP) - | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ1 2023** | (0.21) | (0.36) | NM |
| **FQ2 2023** | (0.22) | (0.22) | NM |
| **FQ3 2023** | (0.26) | (0.25) | NM |
| **FQ4 2023** | (0.24) | (0.24) | NM |

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Table of Contents


Call Participants .......................................................................... 3

Presentation .......................................................................... 4

Question and Answer .......................................................................... 8


COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Call Participants

## EXECUTIVES

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

**Laura E. Niklason**
*Founder, President, CEO & Director*

## ANALYSTS

**Allison Marie Bratzel**
*Piper Sandler & Co., Research Division*

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

**Lauren Marek**
*LifeSci Capital, LLC, Research Division*

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

**Unknown Analyst**

**Vernon Tolentino Bernardino**
*H.C. Wainwright & Co, LLC, Research Division*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

# Presentation

**Operator**

Good morning, ladies and gentlemen, and welcome to the Humacyte 2023 Fourth Quarter and Year-end Results Conference Call. [Operator Instructions] As a reminder, this conference call is being recorded.

I'll now turn the call over to Lauren Marek with LifeSci Advisors.

**Lauren Marek**
*LifeSci Capital, LLC, Research Division*

Thank you, operator. Before we proceed with the call, I would like to remind everyone that certain statements made during this call are forward-looking statements under U.S. federal securities laws. These statements are subject to risks and uncertainties that could cause actual results to differ materially from historical experience or present expectations. Additional information concerning factors that could cause actual results to differ from statements made on this call is contained in our period reports filed with the SEC. The forward-looking statements made during this call speak only as of the date hereof, and the company undertakes no obligation to update or revise the forward-looking statements, except as required by law. Information presented on this call is contained in the press release we issued this morning and in our Form 10-K, which after filing may be accessed from the Investors page of the Humacyte website.

Joining me on today's call from Humacyte are Dr. Laura Niklason, President and Chief Executive Officer; Dale Sander, Chief Financial Officer and Chief Corporate Development Officer; and Dr. Heather Prichard, Chief Operating Officer. Dr. Niklason will provide a summary of the company's progress during the year and recent weeks, and Dale will review the company's financial results for the quarter and year ended December 31, 2023. Following their prepared remarks, the management team will be available for your questions.

I will now turn the call over to Dr. Niklason.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Thank you, Lauren. Good morning, everyone, and thank you for joining us for our 2023 financial results and business update call. Our fourth quarter and the start of 2024 have been highly productive for Humacyte. Importantly, Humacyte completed submission of our BLA in December, and the FDA accepted our biologics license application for the HAV in the vascular trauma indication in February of this year. Over the course of 2023, we also made progress on our broader HAV pipeline, including the completion of enrollment of our Phase III trial in dialysis access, presentation and publication of clinical trial results in peripheral arterial disease and publication of preclinical results for our small caliber HAV in the juvenile heart model.

During today's call, I'll review these developments in more detail before turning the call over to Dale for a review of our financial results. Then we'll be happy to open up the call to your questions.

I'll begin with our HAV program in vascular trauma. In December 2023, we submitted our BLA to the FDA. This was supported by a robust data package that included positive results from our V005 Phase II/III clinical trial. The BLA package also included real-world evidence from the treatment of wartime injuries in Ukraine under the humanitarian aid program that was supported by the FDA. Our data package showed that the HAV had higher rates of patency and lower rates of amputation and infection as compared to historic synthetic graft benchmarks.

In the 2 trials combined, the 30-day patency or presence of blood flow for the HAV was 91.5% for extremity patients compared to 78.9% historically reported for synthetic grafts. The HAV also demonstrated lower amputation rates with a rate of 4.5% as compared to 24.3% for synthetic grafts. And furthermore, the HAV had lower infection rates at 30 days, with a rate of 0.9% as compared to 8.4% historically for synthetic grafts. In other words, patients treated with the HAV where only 40% as likely

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to lose blood flow through their conduit after 1 month, which is a key period for recovery after traumatic injury. HAV patients were also only 1/5 as likely to suffer an amputation and only 1/9 as likely to have an infection of their graft as compared to patients who were treated with the synthetic graft. These results were also provided in November at multiple presentations at the VEITHsymposium, which is a major vascular surgery meeting held in New York.

In February of 2024, the FDA accepted our BLA and vascular trauma, also granting priority review and establishing a Prescription Drug User Fee Act, or PDUFA goal date for action of August 10, 2024. The FDA's decision to grant priority review aligns with their prior grant of a regenerative medicine advanced therapy or RMAT designation for the HAV for urgent arterial repair. We believe this also reflects their recognition that many patients with severe injuries are underserved by the current standards of care. Priority review is also consistent with the priority designation that was given by the Secretary of Defense under a law enacted to expedite the FDA's review of products that are intended to diagnose, treat or prevent serious life-threatening conditions that are facing American military personnel.

The BLA acceptance brings us another step closer to our goal of providing an innovative regenerative medicine product for patients who are suffering traumatic vascular injury. Based on the strength of the data package, from our V005 trial in vascular trauma, combined with data from the humanitarian experience in Ukraine, we look forward to the PDUFA date with confidence.

In preparation for an anticipated FDA approval, Humacyte is also working to build out the commercial team as part of our go-to-market strategy. Health economic models have been developed which are derived from large national databases of traumatic injury care in the U.S. Based upon historical results for synthetic graft outcomes, it's clear that the HAV can provide important health benefits as well as important economic benefits for the health care system. Costs of conduit infection, sepsis and amputation are extremely high adding tens or even hundreds of thousands of dollars to the cost of trauma care. Avoidance of these costly complications will, we believe, help to drive market uptake of this revolutionary product candidate in the care of traumatically injured patients.

Turning now to our program in peripheral artery disease. In the fall, results were presented from an FDA-regulated and investigator-sponsored clinical study that's being conducted at the Mayo Clinic of the HAV in patients with chronic limb-threatening ischemia, which is the end stage of PAD. Most patients treated as part of the program required bypass surgery below the knee, which is a type of disease that is typically not well treated with stents and angioplasty procedures. Treated patients did not have suitable vein of their own to perform a needed bypass procedure. And so received the HAV to revascularize their critically ischemic lower limbs.

In presentations at the VEITHsymposium and at the Midwestern Vascular Conference, researchers observed that in the clinical study, the HAV was a safe, resilient and effective conduit for arterial bypass and limb salvage in patients who did not have vein to provide a conduit to restore blood flow. This is an important result since approximately 40% of patients requiring lower extremity bypass do not have saphenous vein available for revascularization.

With regard to publications, in October of 2023, a publication in the Journal of Thoracic and Cardiovascular Surgery described a preclinical study showing the potential for the investigational small diameter HAV to treat Tetralogy of Fallot. This is a heart condition that affects 1 in every 2,000 babies born in the U.S. each year. In this preclinical study, researchers from Nationwide Children's Hospital in Columbus, Ohio, implanted 3.5 millimeter diameter HAVs into a juvenile large animal model of pediatric heart disease. In long-term follow-up in these animals, the 3.5-millimeter HAVs remained patent for up to 6 months and showed evidence of cellular repopulation by host cells, which is similar to what's been observed in human patients.

The pediatric heart study also demonstrated the extension of Humacyte's manufacturing platform, adding the 3.5-millimeter vessels to the 6-millimeter vessels that have been manufactured for more than a decade. As a reminder, our 3.5-millimeter vessels are currently being evaluated in IND-enabling preclinical studies in large animals, to support future advancement of the HAV into human clinical trials in coronary artery bypass. We've previously reported excellent long-term 6-month results in coronary artery bypass in

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

large animals. And cardiac implantations are continuing this year as we gather data in support of an IND filing in heart bypass surgery.

In July, results of a preclinical study were also published in the Journal of Vascular Surgery, Vascular Science. This study provides a scientific basis for the low rates of infection that have been observed in our clinical trials of the HAV. Researchers found that compared to synthetic graphs, the HAV had a significantly lower bacterial infection rate. The infection resistance may be due to the HAV's native-like tissue structure that supports superior compatibility with the body zone immune cells. These results have broad implications for all of our intended HAV indications and further support the HAV's potential as a solution to the limitations of synthetic graphs in a wide range of medical conditions.

And with that, I'll now turn it over to Dale for a review of our financial results and other business development.

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Thank you, Laura. We had cash and cash equivalents of $80.4 million as of December 31, 2023. We also completed 2 transactions in early 2024, which added substantially to our cash balances. On March 5, 2024, we closed an underwritten public offering of common stock and raised net proceeds of approximately $43.1 million. In addition, on March 11, 2024, we've received $20 million in proceeds from an additional draw under our revenue purchase agreement with Oberland Capital. Total net cash used was $69.0 million for the year ended December 31, 2023, compared to $67.7 million for the year ended December 31, 2022. We believe that our cash and cash equivalents are adequate to finance operations well past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication. There was no revenue for the fourth quarters of 2023 and 2022, and there were no revenues for the year ended December 31, 2023.

Revenue was $1.6 million for the year ended December 31, 2022, and was related to a grant supporting development of the HAV that was completed during 2022. Research and development expenses were $20.2 million for the fourth quarter of 2023 compared to $15 million for the fourth quarter of 2022, and were $70.6 million for the year ended December 31, 2023 compared to $63.3 million for the year ended December 31, 2022. The 2023 increases resulted primarily from increased personnel, external services expenses and materials expenses supporting the expanded research and development initiatives in our clinical studies, including the completion of our V005 Phase II/III trial, and our V017 Ukraine humanitarian trial for use of HAV and extremity vascular trauma as well as our BLA filing in December and the clinical development of the HAV for use in dialysis access.

General and administrative expenses were $6 million for the fourth quarter of 2023 compared to $5.8 million for the fourth quarter of 2022 and were $23.5 million for the year ended December 31, 2023, compared to $22.9 million for the year ended December 31, 2022. The 2023 slight net increases in G&A expenses resulted primarily from increased personnel costs, primarily driven by preparation for the planned commercial launch of HAV in the vascular trauma indication. Other net income or expense was net income of $1.1 million for the fourth quarter of 2023 compared to net income of $17.1 million for the fourth quarter of 2022 and was net expense of $10.7 million for the year ended December 31, 2023, compared to net income of $72.6 million for the year ended December 31, 2022.

The reduction in other net income in the fourth quarter of 2023 and the increase in other net expense for the year ended December 31, 2023, resulted primarily from the noncash remeasurement of the contingent earn-out liability associated with the August 2021 merger with Alpha Healthcare Acquisition Corp. Net loss was $25.1 million for the fourth quarter of 2023 compared to $3.7 million for the fourth quarter of 2022. The net loss was $110.8 million for the year ended December 31, 2023 compared to $12 million for the year ended December 31, 2022. The 2023 increases in net loss resulted primarily from the noncash remeasurement of the contingent earn-out liability and increased operating expenses, both described above.

With that, I'll turn it back to Laura for concluding remarks.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Thank you, Dale. This is a very exciting time for Humacyte and all of our stakeholders. I'd like to take a moment to thank the Humacyte team as well as our partners for their continued commitment to our programs. The entire team has worked incredibly hard to reach this point, and we're approaching what could be a transformational time not only for the company, but for patients suffering from a variety of vascular diseases and complications. Across our clinical programs, the HAV has already accumulated more than 1,200 patient years of experience including in vascular trauma repair, dialysis access and peripheral artery disease. And we are continuing to study the HAV in our earlier programs in order to maximize the full potential of our technology platform and its value. We look forward to keeping you updated with our progress and thank you all for joining us today.
Operator, we're ready to take questions.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Question and Answer

**Operator**

[Operator Instructions] And our first question is from the line of Ryan Zimmerman with BTIG.

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

Can you hear me okay?

**Laura E. Niklason**
*Founder, President, CEO & Director*

We can hear you.

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

Congrats on the progress. It's so close you can reach out and touch it. Maybe just to start, as we think about commercial preparation, Dale, you alluded to some of the health economic work you're doing. I think 1 of the questions that investors have is kind of where the HAV lives economically in the spectrum of product offerings and kind of how you think about where you'd like it to be priced at? And to the extent that you can elaborate on kind of what the target opportunity looks like and the ramp that we should be thinking about as you prepare for commercial activity?

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes. Thanks, Ryan, and I'll try to take those in somewhat order. But obviously, the HAV is the biologic, which has produced clinical results which are far superior the comparable standard of care today, particularly synthetic grafts, it's going to be priced at higher acquisition costs than the current standard of care. But we believe that our budget impact models, which are largely developed at this stage will show that due to the reduction in complications such as amputations and infections and in the case of saphenous vein re-perfusion injury and other complications like that, that are very expensive for the providers, in this case, the hospitals that the overall cost of treating a patient with HAV will be very favorable.

And as you know, pricing itself is usually determined and announced at the time of launch because you don't want to do that in a vacuum. You want to do that in combination with the clinical story and the health economic story. But I think as we've talked about in the past, if you look at our earliest SEC filings, we had suggested something in the $25,000 range for the product, could be somewhat lower, could be somewhat higher. But wherever it falls within that range. Clearly, the health economic benefits that are going to be demonstrated due to this reduction of complications is going to be meaningful and certainly will support the pricing of the product.

Beyond that, I think you had a question about market size. There's around 80,000 vascular trauma cases each year within the United States. And when we drill down and look very specifically at kind of the low-hanging fruit and the ones that are most immediately applicable to the HAV by looking at hospital billing codes and other information like that, there's at least 26,000 cases, we believe, that are clear candidates for the HAV to be used within the United States, which suggest that this is a market that could be somewhere in the $600-plus million range dependent on pricing. So hopefully, I've answered your questions, but [indiscernible].

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

No, no. It's still early. I know these are not fully flushed out. As you get closer, I think more clarity will emerge there. The other question is just around cash burn guidance. I think pro forma with the recent

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

equity offering and some of the tranches from Overland. I think you're around the $140 million range as of today, if I'm not mistaken, about [ $143.5 million ], and that's based on the gross proceeds from the recent equity offering. So I'm just curious what you can say for 2024 around cash burn, maybe any directional commentary on operating spend as you do kind of prepare for this commercial launch?

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes. Yes, certainly. I think your math is right. The way we look at it is we ended December 31 with a little more than -- well, right around $81 million in cash. And when we add on the $63-plus million that we achieved through the equity financing as well as the additional draw into our Overland facility. That means we're entering the year with about $144 million in cash, which leaves us very well positioned our net cash burn for 2023 rounded to about $69 million. But if you back out the effect of some net financing transactions from an operating cash point of view and from a capital expenditure point of view, we've burned about $73.5 million in 2023 in those activities. So suggesting we're very well positioned with the cash that we have on hand right now.

In terms of how we'll proceed in the upcoming year, we haven't given super specific guidance, but I'll share what we've guided in the past is that certainly, we expect to expand our commercialization activities during the year, including near the time of launch, bringing on a relatively small sales force to address this very concentrated market. So we will have, obviously, higher commercialization expenses during this year. But we do also have a wind down of certain clinical costs during the year with the V005 study just in long-term follow-up and not as intensive activities as we had during 2023 as we prepared for the close out of that study and for filing of the BLA.

And then also our dialysis trial V007 will be winding down in the second half of the year, too. So we expect somewhat of an increase in overall cash burn for the upcoming year, but not to a great extent on a net basis. And we believe that the cash on hand is certainly adequate to take us well past the commercial launches in trauma and AV access and well past or certainly through 2026. So we certainly don't have any cash concerns at this point in time.

**Operator**

Our next question is from the line of Kristen Kluska with Cantor Fitzgerald.

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

Congrats as well on the progress. I wanted to touch on manufacturing as this is often something that FDA scrutinizes on very closely during PDUFA and drug approval. So I wanted to ask how you're feeling about your manufacturing? And also anything you're doing to prepare for upcoming inspections and meetings that the FDA will be conducting?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Yes, Kristen, this is Laura Niklason. Thank you for that question. So yes, certainly, after the BLA file was accepted and we got our PDUFA date in August, the FDA moved rapidly to begin scheduling interim meetings and also our inspection, which is upcoming in the near future. As far as what we've been doing to prepare for this, we've actually run 2 mock inspections, 1 last summer and 1 just last month in February, where we brought consultants in to Humacyte who were all ex FDA inspectors. And they really did a deep dive on 2 separate occasions, really helping us be as prepared as possible for this upcoming inspection.

I would say that since we began preparing for this last summer, we've really been able to execute on all of the remediations that were picked out, certainly from 2023. And we're feeling very confident about how this inspection is going to go. We believe that the facility is in great shape. Our manufacturing processes are well characterized and well understood. Obviously, with the Center for Biologics, you're right, a big

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

focus is always on manufacturing and the facility and the robustness of the process. But we believe we're in good shape.

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

Great. And then the preclinical study that you talked about in the juvenile animal model, it seems to highlight the different applications of the HAV platform. So how are you thinking about the flexibility for your current platform as it relates to different vessels and how you might go about implementing this on pilot or larger-scale program?

**Laura E. Niklason**
*Founder, President, CEO & Director*

So the -- 1 of the beauties of the platform, and this was designed with intention is that our Luna manufacturing machines each of which right now can make up to about 1,000 40-centimeter HAVs per year. Those were designed specifically so as to be modular and flexible. So using the same machine, we can grow tissues of different diameters and different lengths without changing the machinery itself. It really only involves changing some of the plastic bag sizes and some of the tubing. So as we mentioned in the call, we've been making 3.5 millimeter vessels that are suitable for heart bypass and pediatric heart surgery, we've been making those in our current system for the last couple of years, and we've been testing them in animals.

It's also, for us, we believe, a short hop to modify our system and make 6-millimeter vessels, but -- that are shorter or longer, shorter vessels may have added utility in the trauma indication in the future because many traumatic injuries don't require 40 centimeters of conduit. They can utilize a shorter vessel. Conversely, in peripheral arterial disease, where we're also working pretty actively with our Phase II programs, it may be that in the future, some patients would benefit from a longer vessel, which can extend from the growing down to below the knee and we believe that we can also make longer vessels, again, using the same equipment. So we were very intentional when we designed the platform so that we could pivot and make vessels of different shapes and sizes. And I would say we're already doing that. And that will be after approval, going forward, follow-on product candidates will be manufactured in our same system just using slight modifications of the tubing.

**Operator**

Our next question is from the line of Josh Jennings with TD Cowen.

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

I wanted to just follow up on Ryan's question on health economics data, thanks for the download there. But just wanted to better understand any -- if there's any color on [indiscernible] discussions with payers and just how you expect Medicare and private payer reimbursement for HAV and the vascular trial indication to evolve the DRGs in place. And just any color as you think about launch time and then how reimbursement and payment can kind of evolve from there?

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes. Yes, certainly. So in parallel to date, we've had discussions with hospital administrators, interactions with CMS and also interactions with private payers. And those discussions will -- are intensifying with the data in hand. And as we start rolling out our budget impact model. The budget impact model itself, which really supports the value proposition of HAV and the implications of using the HAV and the extent to which you can save the cost of other complications. It is essentially -- will essentially be presented and then published through the course of the year, presumably in advance of launch. Beyond that, though, specific -- your specific questions around reimbursement, how the HAV is reimbursed is going to be dependent upon the indication and also where the patient is being served.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

So specifically with regards to trauma, that's an inpatient surgical setting. And so the hospitals are generally going to be reimbursed on a DRG or a fixed price basis as you implied. And so the HAV would be an acquisition cost by the hospital, which is not separately reversed at its core, which is why the health economic implications of HAV, the ability to save the cost of these complications is so important. But keep in mind that as a new technology and also as a biologic HAV, we believe, will qualify for an NTAP or new technology add-on payment reimbursement, which will give the hospitals an additional reimbursement that they would not get under the normal DRGs. And clearly, the HAV qualifies for an NTAP reimbursement because it's innovative and because it provides a meaningful patient benefit.

But I think both CMS and then private payers who can provide the equivalent of an NTAP reimbursement will be motivated to do so because not only are the savings associated with the HAV present during the time the patient is in the hospital. But once the patient leaves the hospital, the reduction in amputations and other complications will save the payers a substantial amount of money in terms of ongoing rehabilitation and prosthetics and other costs like that. So we believe that within the existing DRGs, the use of HAV will be very favorable because of the production and complications, but that we will also get NTAP in the equivalent from private pay due to the innovative nature of the product and the savings that it provides once the patient leaves the hospital.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Dale -- and the only thing I would add there, and that this is also in the public domain, but Humacyte as part of applying for the NTAP, it's necessary to obtain an ICD-10 code from CMS. And we had a recent meeting with CMS that was in the public domain on the ICD-10 coding and CMS has recommended that the HAV be given a unique code. And so that's an important step. It's an important precursor to filing for the NTAP application later this year. So I just wanted to say that from a CMS standpoint, in terms of coding and reimbursement we're definitely on track. And I also want to reiterate Dale's points, which I think are very important for CMS and for all private payers and Medicaid also is that the initial hospital costs for severe traumatic injury, the initial hospital costs are only part of the equation. Readmissions and complications due to amputation and infection and sepsis are huge cost drivers and the insurers are going to understand this. And the case for providing add-on payments to support HAV adoption in trauma, I think, is going to be very strong.

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

Excellent. And just a follow-up on the AV access indication. And you've done work with Fresenius through their large data set on patients that could benefit most from HAV as well as health economics, I'm not sure if there's any details you can share from that or timing of when more intel could come from that collaboration? And then just also remind us how you can leverage the vascular trauma indication in the filing for the AV access indication as we move down the year here?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Well, as we've said on several calls, we're looking forward to sharing that information. I think we have -- so I can say that we're going to do a KOL event actually next week, where we're going to present a lot of the Franova data that we've gathered with our partner, Fresenius, for more than a year, that really paints a very clear picture of how costly some of the most costly patients are and who those patients are. So we're really looking forward to that, and that will be next week.

As far as how the trauma data will be leveraged for a potential follow-on BLA supplement in dialysis access. As you know, the agency tends to look at safety and efficacy data within indication, that will be their primary focus. Although, of course, the long-term safety updates that we're going to be providing as part of our drug safety update report and also just trauma follow-on, I'm sure will be part of that file. But just realistically, I think that particularly from an efficacy standpoint, since dialysis really is a different indication from trauma. I think the efficacy focus will be on the dialysis data, but I would anticipate that safety information from all indications, but especially from trauma would factor into the FDA's thinking.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

Excellent. And also you can -- my assumption is you can leverage the modules on manufacturing and [indiscernible].

**Laura E. Niklason**
*Founder, President, CEO & Director*

Oh yes, of course. Absolutely. Yes. Thank you for that. Yes. No, the -- since the product is identical, all of the preclinical and all of the shelf life and manufacturing data are identical. Yes, that would all be leveraged. So that will be very helpful. And efficiency generating.

**Operator**

Our next question is from the line of Suraj Kalia with Oppenheimer.

**Unknown Analyst**

This is Sheamus on for Suraj. Just to start, I know the HAV for dialysis access has been almost a year fully enrolled. I guess, at this point, when could we expect some top line results filing? Any updates you can give us on that?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Sure. So our enrollment completed actually in late April last year. So technically, we'll hit the 12-month point next month. This is a large trial that went on for a while. It started pre-COVID at many centers. So it's going to take us several months to pull this data together. So what we've guided the market is that we would expect top line results on the V007 trial in dialysis sometime in the third quarter of this year.

**Unknown Analyst**

Got it. And then just thinking through the initial sales force for trauma. I know you've said somewhere around 20 individuals. How should we think about kind of the ramp for hiring as you do what you'll have roughly around the PDUFA date. Any updates you can give us there where you would be and I guess, percentage-wise of those 20 people?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Yes. Go ahead, Dale.

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Go ahead.

**Laura E. Niklason**
*Founder, President, CEO & Director*

No, you go ahead.

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes. Yes, I think we've indicated with a relatively concentrated market in level and trauma centers. There are about 200 of them within the United States that we expect the sales force somewhat less than 20 to be able to reach that market. In terms of when that group will be brought on the exact sizing will be probably more specific around that as we get closer to launch. But much of the infrastructure for the sales team is being built right now in terms of the management of that team and complementing our current commercialization group. In terms of the actual sales reps, they will be brought on much, much closer

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to the exact time of approval as opposed to too far in advance. We'll make a decision as to whether that entire team will be brought on day 1 to accommodate the launch or whether it will be layered into 1 or 2 segments that facilitate the launch that way. But those are decisions that are under active discussion right now, and we'll decide as we get close.

**Unknown Analyst**

Understood. And just 1 last quick one for me. The NTAP cycle, do you guys believe it's going to be a 2025 event or 2026?

**Laura E. Niklason**
*Founder, President, CEO & Director*

So based on the revised rules for when you can file an NTAP application, our earliest that we can file will be October of this year. Typically, decisions are made a couple of quarters after that. And -- but then the NTAP reimbursement would be scheduled to kick in, I believe, to the best of my knowledge in October of 2025. Again, we expect an NTAP application to be successful, but the -- our earliest date when we can apply is this October.

**Operator**

Our next question is from the line of Allison Bratzel with Piper Sandler.

**Allison Marie Bratzel**
*Piper Sandler & Co., Research Division*

Congrats on all the progress. Really just 1 for me. A follow-up on the dialysis vascular access setting. Just on the V007 trial reading out in Q3, could you just remind us kind of what you see as the bar for success that would lead to the HAP being widely adopted for dialysis access. What do you hope to show when that trial reads out? And then just related, how does the ongoing trial in female patients just play into your plans for filing and commercialization in that indication?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Yes, Allison, thanks for these questions. So again, the V007 trial is a prospect of randomized blinded trial that compares the HAV to fistula in a broad range of patients at more than 20 sites in the U.S. So the primary endpoints for this trial are looking at usability for dialysis and patency at 6 and 12 months, and this is a superiority trial. Again, we are blinded, and we don't have top line, so we don't know how it's going to go. Obviously, our goal and our hope is that across the board, we will have superiority across the whole trial and for all patient groups.

However, it is possible that we would have subgroups that would show more superiority or increased beneficial effects as compared to other groups. Again, it's very hard to predict in advance of the data. And so I don't want to give specific guidance here, but I would hope that if we had superiority in either across the trial or within a subgroup, that, that clinical data in combination with an already approved HAV product in the trauma indication, our hope that would be that would be sufficient to file a supplemental BLA perhaps sometime in 2025 for the dialysis indication. As far as the female-only trial, that's a trial that we've very newly initiated that really focuses on -- it's a smaller trial, and it focuses on women comparing the HAV to fistula in women. And again, we're going to be discussing this more at the KOL event next week.

And so I don't want to get ahead of the information and the story here on this call. But again, based on our health economic data and looking at the complications that are suffered by dialysis patients, it's become clear from our work with Franova that women in general, and there are certain subsets of women that have extraordinarily high complication rates and are extraordinarily expensive for the system. And we believe that the Franova data in combination with additional data that we're going to gather in our clinical trials will really help make the health economic case around the HAV in female patients who have very high complication rates.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

Our next question is from the line of Vernon Bernardino with H.C. Wainright.

**Vernon Tolentino Bernardino**
*H.C. Wainwright & Co, LLC, Research Division*

Congrats on the progress, definitely looking forward to the approval later this year and launch. Just wanted to follow up on a few questions. One of them being the expenses rising according to what you said, Dale, this year. You anticipate -- you said there's probably going to be a ramp down as far as R&D maybe. And so therefore, maybe most of the ramp-up and OpEx would be from G&A? And do you anticipate that will be mostly heavily weighted towards the back of the year, of course, because that's when the expected launch would be? And then I have a follow-up question.

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes, you're right. Much of -- I mean we do have a very meaningful commercial team in place right now, which is undertaking much of the activities that are longer lead time to get ready for a successful launch. And those include the budget impact model and the applications for ICD-10 codes and other activities like that, that are ongoing, but much of the heavy increase in terms of commercialization expenses will come in the second half of the year with the addition of the sales force. And you're right, there is somewhat of a wind down of certain R&D expenses in part because certain clinical trials are winding down and also in part because everything we do from a manufacturing point of view kind of rolls into R&D expense to date. But as we move towards commercialization, a number of those manufacturing costs are going to be appearing in cost of sales, which has the effect of reducing R&D expense. So with that, we expect on an overall net basis, just really a slight increase in overall burn for 2024 compared to 2023.

**Vernon Tolentino Bernardino**
*H.C. Wainwright & Co, LLC, Research Division*

And then regarding -- Laura, you had alluded to using the same manufacturing and so on. Do you anticipate margins improving over time since you're using the same equipment regardless of whether or not you're making, let's say, mostly large versus small or whatever mix of diameter of what HAVs?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Yes. There are 2 main sources of decreasing COGS over time. And I would say that both apply regardless of whether we're making a 40-centimeter vessel or, say, a short vessel in the future, for example, down the road. The first is just a more efficient use of our facility. Right now, we have built out only a fraction of our manufacturing floor because we have 8 Lunas installed, although we have room for 40. So we're essentially amortizing all of the facility costs across a smaller amount of production as production increases, that inherent overhead obviously will fall linearly.

But in addition, we believe that there are additional reductions in COGS that will result from efficiencies of how we use our raw materials, how we prepare and bring in our raw materials, which as we go to greater scale and as we're able to negotiate improved contracts with some of our suppliers, some of those cost inputs will also come down. So it's -- we anticipate that regardless of what type of product we're making COGS should fall at a fairly predictable rate.

**Vernon Tolentino Bernardino**
*H.C. Wainwright & Co, LLC, Research Division*

And 1 further follow-up, if I may. Regarding, let's say, the launch this year. I know that with vascular trauma, you would expect not to really have insight into a really much longer than, let's say, a short-term vision of need. But do you have any idea of vision, let's say, that you might have, at some point, what you could describe as an inventory patients who need something such that you could predict the need for example, much longer than, let's say, the next week, 2 weeks, maybe even a month, but longer term, 2 or

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

3 months. Or is that really just going to be for when you have the AV access and PAD and CABG markets where HAV has approval for application?

**Laura E. Niklason**
*Founder, President, CEO & Director*

So Vincent (sic) [ Vernon ], I'm going to try to answer your question. I'm not completely sure I understood the question, but let me take a shot. So certainly, trauma care, there is some variability. There's some seasonal variability. But overall, it's not a hugely variable market in the aggregate. There are some centers that will have more trauma some months than others. But in the aggregate, it's not a hugely variable market. So we have shared in some of our filings that -- and on this call that we think the total addressable market in trauma is about 26,000 patients. Of those, we would expect to capture at full saturation at 3 or 5 or 7 years at full market saturation, we would expect to capture a reasonable fraction of those. Might be 30%, might be 50% of those patients, could be more.

So -- and we've shared that we expect market penetration in dialysis and peripheral artery disease, ultimately at full penetration to be at around 20% because we -- again, we are targeting the HAV toward patients who do not have their needs met by the current standard of care. But trauma overall, even though it's locally episodic is globally a little bit more predictable. So we believe we'll be able to ramp production, tracking demand, we'll be able to ramp production and add more Luna capacity and meet that as it grows. Does that answer your question?

**Vernon Tolentino Bernardino**
*H.C. Wainwright & Co, LLC, Research Division*

No, that's perfect. And by the way, it's Vernon, Vincent is my evil twin.

**Operator**
I'm showing no further questions in the queue at this time. This will conclude the Humacyte 2023 Results Conference Call. Thank you all for participating.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.


Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 411 of 674

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.

# EXHIBIT 8

S&P Global
Market Intelligence

# Humacyte, Inc. NasdaqGS:HUMA

# FQ1 2024 Earnings Call Transcripts

## Friday, May 10, 2024 12:00 PM GMT

## S&P Global Market Intelligence Estimates

| | -FQ1 2024- | | | -FQ2 2024- | -FY 2024- | -FY 2025- |
|---|---|---|---|---|---|---|
| | CONSENSUS | ACTUAL | SURPRISE | CONSENSUS | CONSENSUS | CONSENSUS |
| **EPS (GAAP)** | (0.22) | (0.29) | NM | (0.23) | (0.90) | (0.73) |
| **Revenue (mm)** | 0.00 | 0.00 | 0.00 | 0.00 | 2.85 | 30.14 |

Currency: USD
Consensus as of Apr-10-2024 9:34 PM GMT




| - EPS (GAAP) - | CONSENSUS | ACTUAL | SURPRISE |
|---|---|---|---|
| **FQ2 2023** | (0.22) | (0.22) | NM |
| **FQ3 2023** | (0.26) | (0.25) | NM |
| **FQ4 2023** | (0.24) | (0.24) | NM |
| **FQ1 2024** | (0.22) | (0.29) | NM |

COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved

# Table of Contents


| | | |
|---|---|---|
| Call Participants | ........................................................................... | 3 |
| Presentation | ........................................................................... | 4 |
| Question and Answer | ........................................................................... | 8 |


COPYRIGHT © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved
spglobal.com/marketintelligence

# Call Participants

EXECUTIVES

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

**Heather Ledbetter Prichard**
*Chief Operating Officer*

**Laura E. Niklason**
*Founder, President, CEO & Director*

ANALYSTS

**Bruce David Jackson**
*The Benchmark Company, LLC, Research Division*

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

ATTENDEES

**Thomas Johnson**
*Lifesci Advisors, LLC*

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence


Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 416 of 674

# Presentation

**Operator**

Good morning, ladies and gentlemen, and welcome to the Humacyte First Quarter 2024 Results Conference Call. [Operator Instructions] As a reminder, this conference call is being recorded.

I'll now turn the call over to Tom Johnson with LifeSci Advisors. Please go ahead.

**Thomas Johnson**
*Lifesci Advisors, LLC*

Thank you, operator. Before we proceed with the call, I would like to remind everyone that certain statements made during this call are forward-looking statements under U.S. federal securities law. These statements are subject to risks and uncertainties that could cause actual results to differ materially from historical experience or present expectations. Additional information concerning factors that could cause actual results to differ from statements made on this call is contained in our periodic reports filed with the SEC. The forward-looking statements made during this call speak only as of the date hereof, and the company undertakes no obligation to update or revise the forward-looking statements, except as required by law. Information presented on this call is contained in the press release we issued this morning and on our Form 10-Q, which, after filing, may be accessible from the Investor page of the Humacyte website.

Joining me on today's call from Humacyte are Dr. Laura Niklason, President and Chief Executive Officer; Dale Sander, Chief Financial Officer and Chief Corporate Development Officer; Dr. Heather Prichard, Chief Operating Officer. Dr. Niklason will provide a summary of the company's progress during the year and recent weeks, and Dale will review the company's financial results for the quarter ended March 31, 2024. Following their prepared remarks, the management team will be available for your questions.

I will now turn over the call to Dr. Niklason.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Thank you, Tom. Good morning, everyone, and thank you for joining us for our first quarter 2024 financial results and business update call.

The start of 2024 has been highly productive for Humacyte. Notably, the FDA accepted our Biologics License Application for the HAV in the vascular trauma indication in February of this year. The HAV was granted Priority Review by the FDA with a PDUFA date set for August 10, 2024. The entire Humacyte team has been actively engaged in commercial readiness activities to support our anticipated U.S. market launch. In addition, the HAV continues to be featured in a variety of medical and scientific presentations, highlighting its significant promise across our broader HAV pipeline, including in dialysis access, type 1 diabetes using the BioVascular Pancreas and in cardiac bypass surgery using a small-caliber version of the HAV. Finally, we strengthened our balance sheet with a $43 million equity raise in February of 2024 and $20 million in funding under our arrangement with Oberland Capital, enabling us to continue executing on our corporate strategy.

During today's call, I'll review these developments in more detail before turning the call over to Dale for a review of our financial results. Then we'll be happy to open the call up for your questions.

I'll begin with our HAV program in vascular trauma. You'll recall that in December of 2023, we submitted our BLA to the FDA. During our last quarterly call, we discussed in detail the robust data package supporting our submission, which included positive results from our V005 Phase II/III clinical trial as well as real-world evidence from the treatment of wartime injuries in Ukraine under the humanitarian aid program that was supported by the FDA.

In February of 2024. the FDA accepted our BLA in vascular trauma, granting Priority Review and establishing a PDUFA goal date for action of August 10. The FDA has completed its pre-licensing inspection

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

of our manufacturing facilities in Durham, North Carolina as part of the BLA review process. We remain on track with our BLA review and commercial launch preparations, and we remain confident in the approvability of the HAV in vascular trauma.

Building upon the positive clinical results and the Priority Review grant by the FDA, we've implemented a company-wide multidisciplinary program that's designed to ensure U.S. launch readiness upon the anticipated approval of the HAV. Among the major recent accomplishments is the completion of a budget impact model, which illustrates the potential economic value of the HAV as compared to the current standard of care in vascular trauma. Presentations of clinical results and the budget impact model are planned at upcoming medical meetings and in publications throughout the remainder of 2024.

In addition, our medical affairs team is continuing to build awareness through demonstrations of the HAV at medical and military conferences and at meetings conducted across the U.S. at trauma medical centers. We're also having productive discussions with payers, and we're in the process of achieving an ICD-10 code for HAV implantation procedures with the Centers for Medicare & Medicaid Services, or CMS.

Lastly, we've commenced the recruiting of a high-quality sales team to support the planned market launch. Humacyte is pleased to announce that we've hired Morgan Rankin as Vice President of Sales, joining Humacyte after 12 years at Teleflex Medical. Morgan most recently served as the Vice President of Sales, Trauma and Emergency Medicine at Teleflex, where she led a team of approximately 100 sales professionals who were focused on vascular access and hemorrhage control.

We are on the cusp of being able to provide an innovative regenerative medicine product for patients who are suffering from traumatic vascular injury. Based on the strength of our BLA data package, combined with our Priority Review and the RMAT designation from the FDA, we're looking forward to the PDUFA date.

Turning now to our program in dialysis access. In March of 2024, we hosted a key opinion leader webinar entitled Hemodialysis Care: A Crossroads of Care (sic) [ Hemodialysis Access: A Crossroads of Care ], which featured the HAV as a potential solution for arteriovenous access in patients with end-stage kidney disease requiring hemodialysis. A replay of that webinar can be found on the Investors section of the Humacyte website. Dr. Timmy Lee, Dr. Prabir Roy-Chaudhury and Dr. Michael Curi provided a thorough picture of the unmet need in dialysis access and discussed real-world patient examples of the gaps in hemodialysis access care.

We also presented results from a study that we conducted with our corporate partner, Fresenius Medical Care, and its subsidiary, Frenova Renal Research. In that study, we reviewed outcomes of nearly 180,000 adult patients who received in-center dialysis at Fresenius Kidney Care dialysis centers. The objective of the study was to further define the patient subgroups who could most benefit from the HAV in hemodialysis. Strikingly, the study revealed that women, particularly those who are obese or diabetic, are much more likely to have higher dialysis access complication rates.

These complications of dialysis access include infections, access removals, thromboses and access failures. The cost of maintaining dialysis access in patients, including the cost of infections and fistula failures, can average approximately $22,000 to $55,000 per year for these high-cost, high-complication patient groups. In addition, data indicate that vascular access costs in the upper quintile of patients exceeded approximately $91,000 per year. Based on these results, we believe that female patients could benefit from more reliable AV access by avoiding infections and other complications that are associated with the current standard of care.

To that end, we've initiated a study that will collect comprehensive data on the outcomes and complications in women receiving the HAV for dialysis access as compared to those receiving autogenous fistula. The study, named the V012 study, is not only designed to evaluate the efficacy and safety of the HAV as compared to fistula in women but will also capture important information on access complications and resulting health economic data. This study is the first is kind, and it will help to quantify the potential health economic benefits of the HAV and should provide additional support for reimbursement in women. We're very excited about this study, and we'll provide you with updates as it progresses.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Results from our V007 Phase III trial of the HAV in patients with end-stage renal disease remain on track to be reported in the third quarter of 2024. As a reminder, we completed enrollment of 242 patients in this trial in April of 2023. The trial is designed to evaluate the usability of the HAV for dialysis during the first 12 months, and participants will be followed for 24 months after implantation. We look forward to sharing these results when they become available.

On the diabetes front, results from our studies with the HAV in our earlier-stage programs are slated to be featured in several upcoming medical meetings. Results from ongoing preclinical studies support the potential of our BioVascular Pancreas, or BVP, which is a product candidate to enable the delivery and survival of insulin-producing islets as a potential treatment for type 1 diabetes. In 3-month studies conducted in nonhuman primates, researchers observed that insulin-producing cells in the BVP survived after implantation for 3 months and continued to make insulin. In addition, we have advanced the manufacturing of islets from human stem cells and have shown that these human stem cell-derived islets can arrest diabetes in rodent models. These and other preclinical results will be presented at the American Diabetes Association Annual Meeting being held in June in Orlando, Florida.

We'll also be presenting results from studies of our small 3.5 millimeter diameter HAV in cardiac bypass graft surgery, or CABG. Preclinical 6-month studies have been conducted in nonhuman primates to support the planned advancement of the small diameter HAV into human clinical trials in CABG. We have observed remodeling of the HAV to a diameter that closely matches that of the native coronary vessels in the nonhuman primates, which is an outcome that has not been observed with any other conduit. These promising results of HAV patency and remodeling will be presented at the Tissue Engineering and Regenerative Medicine Conference in June.

And with that, I'll now turn it over to Dale for a review of our financial results and other business developments.

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Thank you, Laura. As of March 31, 2024, we had cash and cash equivalents of $115.5 million. Total net cash provided was $35.1 million for the first 3 months of 2024 compared to net cash used of $20.2 million for the first 3 months of 2023. The increase in net cash provided resulted primarily from $43 million in net proceeds from a public offering of Humacyte's common stock in March 2024 and $20 million in proceeds from an additional draw under our funding arrangement with Oberland Capital Management. We believe that our cash and cash equivalents will be adequate to finance operations for at least 12 months from the date of this financial report, well past the currently anticipated timelines for FDA approval and commercialization of the HAV in the vascular trauma indication.

There were no revenues for either the first quarter of 2024 or the first quarter of 2023.

I will run through the normal year-to-year comparison of expenses, but first I wanted to highlight that our overall expense run rate for the first quarter of 2024 is virtually identical to the fourth quarter of 2023. Total operating expenses, which include noncash expenses, were $26.6 million for the first quarter of 2024, largely unchanged compared to the $26.2 million incurred in the fourth quarter of 2023.

Regarding the year-over-year comparisons, research and development expenses were $21.3 million for the first quarter of 2024 compared to $17.3 million for the first quarter of 2023. The current year increase resulted primarily from increased materials and personnel expenses to support expanded research and development initiatives and our clinical trials, including the ongoing clinical development of the HAV for use in AV access for hemodialysis.

General and administrative expenses were $5.3 million for the first quarter of 2024 compared to $5.2 million for the first quarter of 2023. The slight increase during the 3 months ended March 31, 2024, compared to the prior year period resulted primarily from increased professional fees and external service costs.

Other net expense was $5.3 million for the first quarter of 2024 compared to net expense of $14.5 million for the first quarter of 2023. The decrease in other net expense from the first quarter of 2024 compared

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

to 2023 resulted primarily from the noncash remeasurement of the contingent earnout liability associated with the August 2021 merger with Alpha Healthcare Acquisition Corp.

Net loss was $31.9 million for the first quarter of 2024 compared to $37.0 million for the first quarter of 2023. The current period decrease in net loss resulted primarily from the noncash remeasurement of the contingent earnout liability described previously.

I will now turn it back to Laura for concluding remarks.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Thank you, Dale. This is a very exciting time for Humacyte and for all of our stakeholders. I'd like to take a moment again to thank the Humacyte team as well as all of our partners for their continued commitment to our programs. Our team's dedication has been instrumental in reaching this crucial and exciting stage in our company's development. Not only are we nearing our first anticipated regulatory approval but we're also making meaningful progress across our broader pipeline, bringing us closer to delivering a potential solution to patients with a variety of vascular diseases and complications. We look forward to keeping you updated with our progress, and thank you all for joining us today.
Operator, we're now ready to take questions.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.
spglobal.com/marketintelligence

# Question and Answer

**Operator**

[Operator Instructions] Our first question comes from the line of Ryan Zimmerman with BTIG.

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

Well, congrats on all the progress, getting closer to PDUFA here. Laura, can you talk about the facility inspection with FDA? Any observations? Anything that you guys had to correct? How clean was that? And just help us know that we're kind of checking those boxes before PDUFA.

**Laura E. Niklason**
*Founder, President, CEO & Director*

So I'm going to ask our COO, Heather Prichard. She and our Head of Quality really oversaw that inspection. I'm going to ask her to take this question.

**Heather Ledbetter Prichard**
*Chief Operating Officer*

Ryan, yes, as Laura stated, we completed our pre-license inspection of our manufacturing facility and had a very successful outcome. And based on the outcome of the inspection and all of the other FDA interactions on the whole, we remain very confident in approval of the HAV in vascular trauma. And we won't necessarily comment on any single interaction or the details, but we do feel very confident. It was a very successful interaction that we have with the FDA, and we feel like it concluded very successfully.

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

Okay. I appreciate that. And then Dale, your SG&A costs were running a little lower than we expected, at least this quarter. They were, as you noted, in line with last quarter. Just help us understand kind of when that step-up occurs as you prepare for commercializations. We've talked in the past about needing a smallish kind of modest sales force for the vascular trauma indication. When do we think about that increase in cash and those needs? And I guess, help us understand what you're doing today in terms of preparing for commercialization.

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes. Yes, certainly, Ryan. And so SG&A expenses are where we expected. Keep in mind that even though we're feverishly preparing for the commercial launch, we have had a core commercial team, which is primarily on the marketing side that has been in place for some time, which is why the SG&A expenses are somewhat level. Because a number of the activities that we've been undertaking to prepare for launch, including preparation of the budget impact model that demonstrates the potential savings of use of the HAV in vascular trauma versus standard of care and other longer-time items like that, such as working with payors and working with CMS to get the coding that we need, have been underway for quite some time.

In terms of the actual ramp-up associated with the sales force, as indicated in the press release, we're pleased that we brought our Vice President of Sales, Morgan Rankin, onboard. The actual sales team itself, which as we've discussed in the past, will be relatively small because the vascular trauma market is very concentrated with only about 200 level 1 trauma centers in the United States. That will be brought on closer to the time of approval. So you don't see those expenses in place right now.

In terms of the sizing of that sales force, we haven't given absolute guidance other than to point out that based on the level 200 trauma centers in the U.S., that sales force will be somewhat less than 20 representatives, most likely.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

Okay. Very helpful, and congrats on all the progress.

**Operator**

Our next question comes from the line of Kristen Kluska with Cantor Fitzgerald.

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

Let me also add my congratulations on all the progress the team is making 3 months now into the PDUFA. Maybe for me, I'll start with the question on AV access. It's exciting top line results a quarter away here. So can you -- maybe in light of all of these findings that you presented for us at your KOL event, can you talk to us about how you're going to present the data as a whole, but then also maybe look at some of these subset analyses, in particular, where you've highlighted maybe the greatest unmet medical need and how that's going to ultimately play into future conversations with the agency?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Kristen, this is Laura, and that's a great set of questions. And our partnership with Fresenius is really what has allowed us to leverage their enormous database, that's really worldwide, on dialysis access complications and which demographics fare well and which fare poorly. And so I just want to give a shout-out to our team members at Fresenius. We could not have done this research without them.

But you're right, Kristen, it is clear that not all dialysis patients are created equal. And there's clear quantitative evidence now that female patients, diabetics, obese patients all have more trouble with their access and are more expensive to care for than our male patients, particularly male patients who aren't burdened with those other disease processes.

So you're right. We're going to look at the V07 data in -- through the lens of all patients writ large, but also through the lens of these different demographic subsets. Because again, the benefits that accrue to some of these patients, particularly perhaps women or the elderly or diabetics, those relative benefits as compared to fistula may be even greater. And so we anticipate that this will be part of our discussions with the agency, both for the V07 trial, but then also, obviously, for the V012 trial, which is our women-only trial, once we start to get those data in hand.

**Kristen Brianne Kluska**
*Cantor Fitzgerald & Co., Research Division*

Okay. And then moving on to vascular trauma. You've clearly also done a lot of work with the community here and educating them about the benefits of this product. But I know it's going to require a relatively small sales force to bring this out. But do you think that this is going to be a product where word of mouth is going to be essential and that initially you'll target surgeons that are more open to trying new therapies and then they'll essentially tell their colleagues at conferences, events, et cetera? And then have you gated from the surgeons that participated in the trial that they would be open to using it in a commercial setting as well?

**Laura E. Niklason**
*Founder, President, CEO & Director*

So I'll take the second question first. Some of our -- while many of our surgeons in the trauma trial, particularly our highest enrolling surgeons at the busiest centers, so for example, surgeons at Denver trauma center, at Baltimore Shock Trauma, at Johns Hopkins and at Grady medical center in Atlanta, these surgeons have expressed a lot of enthusiasm for the vessel and really see the enormous clinical benefits of having something that can be immediately available, both for vascular surgeons and for trauma surgeons, quite frankly, in the care of vascular injuries.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

I do think it's important to point out that while vascular surgeons are obviously very experienced at harvesting vein, trauma surgeons who take care of a large fraction of these patients, that's not really part of their training. And so for a trauma surgeon to have at their fingertips a conduit that is immediately available, that they don't have to dig out of the patient and that will resist infection, I think that, that will have enormous appeal for many of these surgical caregivers.

That said, you're correct. We're going to have to work in medical center by medical center, surgeon by surgeon and in these major centers in metropolitan areas around the country. And in fact, as we mentioned earlier on the call, our medical affairs team is already doing that. We're already essentially doing road shows that are educational because we're not marketing the product, but we are educating surgeons about biological conduits and their usefulness in trauma. And we're targeting major medical centers, but also just specific geographies. And there is, within geographies, if the leading academic center in a particular metropolitan area, if that center adopts the HAV, then there is word of mouth even within the local geography that we think will help spur adoption.

**Operator**

Our next question comes from the line of Bruce Jackson with The Benchmark Company.

**Bruce David Jackson**
*The Benchmark Company, LLC, Research Division*

Most of my questions have been answered. If maybe you could just give us a little bit of a flavor of the interaction with the FDA. What types of questions are they asking? And how close do you think you're getting to concluding the BLA?

**Laura E. Niklason**
*Founder, President, CEO & Director*

Well, as with any BLA filing, part of the standard procedure is that after you file and after they accept the file, there is a lot of back and forth that they ask for clarifying. They ask clarifying questions. They ask for additional information. And that's been going on, frankly, since January. And those interactions have been going very smoothly, and we've been able to address all of the questions that they've been asking. There are also specific meetings that are part of the normal process. There is what's called a mid-cycle meeting, which we've already completed.

So I think that -- and as we mentioned, we've already completed the inspection of our facility. So things are tracking along exactly as we would have expected, given the timelines for a Priority Review. So again, we see no reason that the PDUFA date will shift. Of course, what -- exactly what the FDA does is always out of our control, but we have no indication that we're not on track. Everything just seems to be progressing along as we would've expected.

**Bruce David Jackson**
*The Benchmark Company, LLC, Research Division*

Okay. That's great. Congratulations again on all the progress.

**Operator**

Our next question comes from the line of Josh Jennings with TD Cowen.

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

I was hoping that just with the -- assuming that this August PDUFA date is held up by the FDA and BLA is approved, was just hoping you could walk us through the steps from there, just in terms of the initial commercialization effort. I mean, maybe talk about back approvals we've heard from some other device companies, that, that process is taking a little bit longer. And ultimately, what I'm trying to get at is, I mean, should we be expecting initial revenues in 4Q or do you think we should take a more conservative approach in our modeling and think about 1Q 2024? And then I just have one follow-up regarding 2025.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Dale, would you like to take that question?

**Dale A. Sander**
*CFO, Chief Corporate Development Officer & Treasurer*

Yes, absolutely. Thanks, Josh. And you're right. We are a biologic. But I think in terms of the process of getting through hospitals, it will not be too dissimilar from the med tech world and devices.

But in terms of launch, as you would expect, I mean, typically, the timeline post launch is driven a little bit by the magnitude of changes to package inserts and labeling and just some of the logistics of getting, if required, new packaging done and things like that to get the launch out there. So typically, there is the approval. There's some period of time, which could be a few weeks, to implement any packaging or package insert changes. And then typically, there's a soft launch where the company is positioned to start responding to orders and filling orders and then shortly thereafter, a full promotional effort, which is the major formal launch of the product.

We would certainly expect that for most hospitals, there'll be some type of a value analysis committee program. I guess with launches I've been associated with in the past, you get surprised. Sometimes there's hospitals that order on day 1, either avoiding the process or just ordering in parallel while the process is going on. And there's other hospitals that routinely go through the full VAC process which, as you know, historically has averaged about 6 months to get through -- to get to a hospital and get to that process.

The feedback we've gotten from a number of trauma surgeons and vascular surgeons who have been real advocates within hospitals for the product is they feel pretty confident that they have a great deal -- ability to influence that process and then -- particularly in the area of trauma and vascular trauma because the ends are not so great in terms of the number of patients necessarily being seen on a week-to-week basis within a hospital. But they feel like they've had a pretty high success rate and would expect, in their words, a high success rate of getting the HAV through the process on an expeditious manner.

**Joshua Thomas Jennings**
*TD Cowen, Research Division*

That's super helpful. And just -- I know it's been a little while since you hosted us at your headquarters and gave us the tour of the manufacturing facility. But just wanted to get a reminder of where manufacturing capacity sits today, what steps you needed to take -- the team needs to take to kind of ramp up capacity in these early days as the vascular trauma indication is opened up with this BLA approval on tap.

**Laura E. Niklason**
*Founder, President, CEO & Director*

I'm going to ask Heather, our COO, to take that question.

**Heather Ledbetter Prichard**
*Chief Operating Officer*

Thanks, Laura. So Josh, as our manufacturing capacity stands now, as you know, at about 8,000 HAVs growth per year. And as far as scaling that out with the LUNA system that we have that manufactures our product, that is just a case of putting in more LUNA lines. Our facility is already ready in a shelled out space that's already plumbed for electrical and gases and utilities for us to add additional units LUNAs, up to about 40,000 HAVs per year annual gross yield.

So we're prepared, and we're prepared for a launch to be able to produce enough vessels in the first few years. And then we're also prepared and have begun planning for that expansion within the space. So as demand grows, we can produce enough HAVs for the market.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

**Operator**

[Operator Instructions] Our next question is a follow-up from the line of Ryan Zimmerman with BTIG.

**Ryan Benjamin Zimmerman**
*BTIG, LLC, Research Division*

Sorry, I just had one follow-up I want to ask. You did talk about ICD-10s for Humacyte -- for the HAV, excuse me. And I'm just wondering if you could speak a little bit to kind of how you're thinking about that process, any timing that you think you could -- you want to put out there in terms of potentially getting a code for implantation of the HAV, be it vascular trauma or AV access or so forth.

**Laura E. Niklason**
*Founder, President, CEO & Director*

Yes, Ryan. So we submitted the application with CMS for the ICD-10 code in trauma because the ICD-10 code in this case is going to be indication-specific. So we submitted the application in December, and we had a public forum meeting on the ICD-10 code application in March. And this is in the public domain. The CMS recommendation at the time was that the HAV be granted its own ICD-10 code for the implantation of a bioengineered vessel in the upper or lower extremities. CMS doesn't execute on the final decision on that, I don't think, until June. But based on the CMS recommendation, which is already in the public domain, we expect that to go through and to have that in hand before approval.

And just as a side note, also with respect to CMS, we are planning to apply for a new technology add-on payment with CMS after our projected approval date. So you can apply for an NTAP once per year, that the application date is typically around October 1, and we plan on hitting that allocation date and applying this year.

**Operator**
Thank you. I'm showing no further questions at this time in queue. This concludes the Humacyte First Quarter Results Conference Call. Thank you all for participating. You may now disconnect your lines.

Copyright © 2024 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

Copyright © 2024 by S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.

These materials have been prepared solely for information purposes based upon information generally available to the public and from sources believed to be reliable. No content (including index data, ratings, credit-related analyses and data, research, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions, regardless of the cause, for the results obtained from the use of the Content. THE CONTENT IS PROVIDED ON "AS IS" BASIS. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages. S&P Global Market Intelligence's opinions, quotes and credit-related and other analyses are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence may provide index data. Direct investment in an index is not possible. Exposure to an asset class represented by an index is available through investable instruments based on that index. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain nonpublic information received in connection with each analytical process.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.ratingsdirect.com and www.globalcreditportal.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.
© 2024 S&P Global Market Intelligence.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 426 of 674

# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from to**

**Commission file number 001-39532**

# Humacyte, Inc.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **85-1763759** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **2525 East North Carolina Highway 54**<br>**Durham, NC** | **27713** |
| (Address of principal executive offices) | (Zip code) |

**(919) 313-9633**
(Registrant's telephone number, including area code)

Securities registered pursuant to 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **HUMA** | **The Nasdaq Stock Market LLC** |
| **Redeemable Warrants, each whole warrant exercisable for one share of Common Stock at an exercise price of $11.50** | **HUMAW** | **The Nasdaq Stock Market LLC** |

Securities registered pursuant to 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

As of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of common stock held by non-affiliates of the registrant was approximately $165.9 million (based on the closing price of the registrant's common stock as reported on The Nasdaq Global Select Market on that date).

As of March 10, 2023, 103,329,133 shares of common stock, par value $0.0001, were issued and outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Proxy Statement relative to the 2023 Annual Meeting of Shareholders are incorporated by reference in Part III hereof.

## Table of Contents


| | | Page No. |
|---|---|---|
| | **PART I** | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 55 |
| Item 1B. | Unresolved Staff Comments | 92 |
| Item 2. | Properties | 92 |
| Item 3. | Legal Proceedings | 92 |
| Item 4. | Mine Safety Disclosures | 92 |
| | **PART II** | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 93 |
| Item 6. | [Reserved] | 93 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 93 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 106 |
| Item 8. | Financial Statements and Supplementary Data | 107 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 140 |
| Item 9A. | Controls and Procedures | 140 |
| Item 9B. | Other Information | 140 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 140 |
| | **PART III** | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 141 |
| Item 11. | Executive Compensation | 141 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 141 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 141 |
| Item 14. | Principal Accountant Fees and Services | 141 |
| | **PART IV** | |
| Item 15. | Exhibits and Financial Statement Schedules | 142 |
| Item 16. | Form 10-K Summary | 145 |
| **SIGNATURES** | | 146 |

## FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements that involve substantial risks and uncertainties. "Forward-looking statements," as that term is defined in the Private Securities Litigation Reform Act of 1995, Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act") are statements that are not historical facts and involve a number of risks and uncertainties. These statements include, without limitation, statements regarding the financial position, business strategy and the plans and objectives of management for future operations. These statements constitute projections, forecasts and forward-looking statements, and are not guarantees of performance. Such statements can be identified by the fact that they do not relate strictly to historical or current facts. When used therein, words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "strive," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Such statements are based on the beliefs of, as well as assumptions made by and information currently available to, our management.

Forward-looking statements may include, for example, statements about:

- our plans and ability to execute product development, process development and preclinical development efforts successfully and on our anticipated timelines;
- our plans and ability to obtain marketing approval from the U.S. Food and Drug Administration ("FDA") and other regulatory authorities, including the European Medicines Agency ("EMA"), for our bioengineered human acellular vessels ("HAVs") and other product candidates;
- our ability to design, initiate and successfully complete clinical trials and other studies for our product candidates and our plans and expectations regarding our ongoing or planned clinical trials, including for our ongoing V005 Phase 2/3 clinical trial and V007 Phase 3 clinical trial;
- the outcome of our ongoing discussions with the FDA concerning the design of our clinical trials;
- our anticipated growth rate and market opportunities;
- the potential liquidity and trading of our securities;
- our ability to raise additional capital in the future;
- our ability to use our proprietary scientific technology platform to build a pipeline of additional product candidates;
- the characteristics and performance of our HAVs;
- our plans and ability to commercialize our HAVs and other product candidates, if approved by regulatory authorities;
- the expected size of the target populations for our product candidates;
- the anticipated benefits of our HAVs relative to existing alternatives;
- our assessment of the competitive landscape;
- the degree of market acceptance of HAVs, if approved, and the availability of third-party coverage and reimbursement;
- our ability to manufacture HAVs and other product candidates in sufficient quantities to satisfy our clinical trial and commercial needs;
- our expectations regarding our strategic partnership with Fresenius Medical Care Holdings, Inc. ("Fresenius Medical Care") to sell, market and distribute our 6 millimeter HAV for certain specified indications and in specified markets;
- the performance of other third parties on which we rely, including our third-party manufacturers, our licensors, our suppliers and the organizations conducting our clinical trials;
- our ability to obtain and maintain intellectual property protection for our product candidates as well as our ability to operate our business without infringing, misappropriating or otherwise violating the intellectual property rights of others;

- our ability to maintain the confidentiality of our trade secrets, particularly with respect to our manufacturing process;
- our compliance with applicable laws and regulatory requirements, including FDA regulations, healthcare laws and regulations, and anti-corruption laws;
- our ability to attract, retain and motivate qualified personnel and to manage our growth effectively;
- our future financial performance and capital requirements;
- our ability to implement and maintain effective internal controls;
- the impact of the ongoing effects of the COVID-19 pandemic on our business, including our manufacturing efforts and clinical trials; and
- the impact of the overall global economy and increasing interest rates and inflation on our business.

We caution readers not to place undue reliance on any such forward-looking statements, which speak only as of the date they are made. Any forward-looking statement is based on information current as of the date of this Annual Report on Form 10-K and speaks only as of the date on which such statement is made. Actual events or results may differ materially from the results, plans, intentions or expectations anticipated in these forward-looking statements as a result of a variety of factors, many of which are beyond our control. More information on factors that could cause actual results to differ materially from those anticipated is included from time to time in our reports filed with the Securities and Exchange Commission (the “SEC”), including, but not limited to, those described in the sections of this Annual Report on Form 10-K titled “Risk Factors” and “Management’s Discussion and Analysis of Financial Condition and Results of Operations.” We disclaim any obligation, except as specifically required by law, to publicly update or revise any such statements to reflect any change in our expectations or in events, conditions or circumstances on which any such statements may be based, or that may affect the likelihood that actual results will differ from those set forth in the forward-looking statements.

# PART I

## Item 1. Business

## Business Overview

***Executive Summary***

Humacyte, Inc. is pioneering the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs and organ systems with the goal of improving the lives of patients and transforming the practice of medicine. We believe our regenerative medicine technology has the potential to overcome limitations in existing standards of care and address the lack of significant innovation in products that support tissue repair, reconstruction and replacement. We are leveraging our novel, scalable technology platform to develop proprietary, bioengineered, acellular human tissues for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

We are initially using our proprietary, scientific technology platform to engineer and manufacture Human Acellular Vessels™, or HAVs™. Our investigational HAVs are designed to be easily implanted into any patient without inducing a foreign body response or leading to immune rejection. We are developing a portfolio, or "cabinet", of HAVs with varying diameters and lengths. The HAV cabinet would initially target the vascular repair, reconstruction and replacement market, including vascular trauma; arteriovenous ("AV") access for hemodialysis; peripheral artery disease ("PAD"); and coronary artery bypass grafting ("CABG"). In addition, we are developing our HAVs for pediatric heart surgery and the delivery of cellular therapies, including pancreatic islet cell transplantation to treat Type 1 diabetes. We will continue to explore the application of our technology across a broad range of markets and indications including the development of urinary conduit, trachea, esophagus and other novel cell delivery systems.

We believe there is substantial clinical demand for safe and effective vascular conduits to replace and repair blood vessels throughout the body. Vascular injuries resulting from trauma are common in civilian and military populations, frequently resulting in the loss of either life or limb. Existing treatment options in the vascular repair, reconstruction and replacement market include the use of autologous vessels and synthetic grafts, which we believe suffer from significant limitations. For example, the use of autologous veins to repair traumatic vascular injuries can lead to significant morbidity associated with the surgical wounds created for vein harvest and prolonged times to restore blood flow to injured limbs, leading to an increased risk of amputation and infection. In addition, in many instances of vascular trauma, the patient may not have adequate vein available to make autologous graft repair feasible. Synthetic grafts are often contraindicated in the setting of vascular trauma due to higher infection risk that can lead to prolonged hospitalization and limb loss. Given the competitive advantages our HAVs are designed to have over existing vascular substitutes, we believe that HAVs have the potential to become the standard of care and lead to improved patient outcomes and lower healthcare costs.

As of December 31, 2022, our HAVs have been implanted in approximately 533 patients. We are currently conducting Phase 2 and Phase 3 trials of our 6 millimeter HAV across two therapeutic indications, vascular trauma and AV access for hemodialysis, as well as continuing long-term follow up of patients in our Phase 2 PAD studies. We were granted Fast Track designation by the FDA for our 6 millimeter HAV for use in AV access for hemodialysis in 2014. We also received the first Regenerative Medicine Advanced Therapy ("RMAT") designation from the FDA, for the creation of vascular access for performing hemodialysis, in March 2017. In addition, in 2018 our HAV product candidate was assigned a priority designation by the Secretary of Defense under Public Law 115-92, enacted to expedite the FDA's review of products that are intended to diagnose, treat or prevent serious or life-threatening conditions facing American military personnel. Upon completion of our Phase 3 trials, we intend to submit a Biologics License Application ("BLA") to the FDA for an indication in vascular trauma and AV access for hemodialysis.

We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. We have an 83,000 square foot bioprocessing facility housing our modular manufacturing process with the ability to manufacture HAVs of different diameters and lengths at commercial scale. As we continue to expand production, we believe we will have the ability to take advantage of economies of scale to reduce costs of production. We believe our established, controlled manufacturing process demonstrates a significant competitive advantage in the regenerative medicine market.

Our technology is protected by our patent portfolio, which includes certain patents licensed from parties as well as intellectual property generated internally at Humacyte. Our patent portfolio is comprised of 18 families of patents, many of which generally relate to the scaffolds used to make our vessels, the composition of our vessels and systems and methods of manufacturing our vessels. For more information, see "— Intellectual Property" below.

We intend to continue to shape our commercial and distribution strategy by indication and pursue collaborations with partners in markets where such partners provide strategic opportunities in launching our product candidates and enabling access to specific patient populations.

Our world-class senior management team and board of directors will be instrumental in helping us achieve our goals. Our President and Chief Executive Officer, Laura Niklason M.D., PhD., who founded Legacy Humacyte (as defined below), is an internationally respected physician scientist and a world leader in regenerative medicine technologies. Dr. Niklason is also a member of three national academies — Inventors, Medicine and Engineering. Our current Chairman of the Board is Kathleen Sebelius, the former Secretary of the Department of Health and Human Services ("HHS"), and the former Governor of Kansas.

***Merger***

On August 26, 2021 (the "Closing Date"), Humacyte, Inc. ("Legacy Humacyte"), a Delaware corporation, and Alpha Healthcare Acquisition Corp. ("AHAC"), a Delaware corporation, consummated a merger pursuant to that certain Business Combination Agreement, dated as of February 17, 2021 (the "Merger Agreement"), by and among Legacy Humacyte, AHAC and Hunter Merger Sub ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of AHAC. As contemplated by the Merger Agreement, Merger Sub merged with and into Legacy Humacyte, with Legacy Humacyte continuing as the surviving corporation and as a wholly owned subsidiary of AHAC (the "Merger"). On the Closing Date, AHAC changed its name to Humacyte, Inc. and Legacy Humacyte changed its name to Humacyte Global, Inc.

Unless the context indicates otherwise, references in this Annual Report on Form 10-K to the "Company," "Humacyte," "we," "us," "our" and similar terms refer to Humacyte, Inc. (formerly known as Alpha Healthcare Acquisition Corp.) and its consolidated subsidiaries (including Humacyte Global, Inc.) following the Merger. References to "AHAC" refer to Alpha Healthcare Acquisition Corp. prior to the Merger.

***Our Approach***

We have developed an approach that relies on two key complementary elements to address the significant market opportunity for the global treatment of patients in need of vascular replacement, repair and reconstruction, vascular access for dialysis and potential future indications including complex tissue and organ replacement and treatment of Type-1 diabetes:

- our proprietary scientific and engineering technology platform allows us to grow human tissues, which are ultimately decellularized and therefore expected to be non-immunogenic and universally implantable; and
- our novel, scalable manufacturing paradigm is designed to allow us to produce thousands of HAVs per year at the time of commercial launch, with the ability to expand manufacturing capacity and breadth to meet expected future global demand and the planned expansion of our pipeline of product candidates.

In the first employment of these platform and manufacturing approaches, we intend to develop a readily available "cabinet" of HAVs of varying diameters and lengths to address the significant unmet needs across multiple potential indications in vascular repair, reconstruction and replacement.

*Illustration of our Proposed HAV "Cabinet" for Vascular Repair, Reconstruction, and Replacement*




***Our Proprietary Scientific Technology Platform***

Our proprietary scientific technology platform uses primary human aortic vascular cells from a working cell stock, isolated from donor tissues and cryopreserved. The working cell stock is expanded using traditional cell culture techniques, and the cells are transferred onto a biocompatible, biodegradable polymer mesh within a flexible, single-use bioreactor bag. Over the course of weeks, the cells proliferate and build extracellular matrix while the polymer mesh degrades. The resulting bioengineered vessel is comprised of the aortic vascular cells and their deposited extracellular matrix. After completion of the culture period, we decellularize the bioengineered vessel using a proprietary combination of solutions. The resulting HAV retains the extracellular matrix constituents and, therefore, the biomechanical properties of the bioengineered vessel, but is cleansed of the cells and cellular components that could induce a foreign body response or immune rejection following implantation. Our functionally closed system allows for the HAV to be grown, decellularized and ultimately shipped within the same flexible bioreactor bag. Our HAVs are designed to be shipped to hospitals, trauma centers and outpatient surgical settings, where they can then be stored at refrigerated temperatures for immediate use by removing each HAV from its packaging.

The following image summarizes key information about our proprietary scientific technology platform:




***Our Novel Manufacturing Paradigm***

We have developed a novel paradigm for manufacturing human tissues that is intended to mimic key aspects of human physiology. Our proprietary manufacturing process was designed with a modular approach allowing us to produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing. The manufacturing system used to supply our clinical trials from 2016 to 2021, including our Phase 3 trials, utilized a single tray within one growth drawer holding ten HAVs per batch. In 2021 we commenced supplying our ongoing clinical trials with HAVs produced in our current, commercial-scale LUNA200™ system, which consists of 20 growth drawers per production unit for a total of 200 HAVs per batch. Each growth drawer is capable of producing ten 42cm HAVs, each of which is contained within an individual bioreactor bag. Inside a LUNA200, a tubing network connects all HAVs, allowing the entire system to share nutritive media. In this way, a single LUNA200 can produce up to 200 HAVs (42cm in length) per batch while maintaining the critical operating parameters, such as biomechanical pulsing, that affect growth.

A thorough comparability assessment was performed to evaluate HAV batches produced in the single drawer system and used in Phase 3 studies versus the 20-drawer LUNA200 system. The study assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product. In this study, we observed that HAVs produced in the LUNA200 system were comparable to HAVs produced in the single-drawer system. Additionally, a crossover study, called V011, was conducted in 30 subjects to evaluate HAVs that are manufactured on Humacyte's commercial LUNA200 platform with the primary goal to evaluate the safety, efficacy and immunogenicity of the LUNA200-manufactured HAVs. In this trial we have observed comparable safety profile between HAV used in previous studies and the HAV manufactured in the LUNA200 commercial system. The results of the comparability assessment and the results from the V011 crossover study were submitted to the FDA. In 2021, the FDA authorized the use of HAVs produced in the commercial LUNA200 system to supply our ongoing clinical trials. We also plan to use the LUNA200 system for anticipated commercial launches of the HAV if it is approved.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 438 of 674

Our current 83,000 square foot manufacturing facility has space to further expand manufacturing capacity as needed to over 40 LUNA200 systems. Currently, eight LUNA200 systems are installed and operational.




We believe that the LUNA200 can produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline. We currently intend to introduce a 13cm-long HAV line extension after commercial launch of the 42cm HAV for surgeries that require shorter segments of HAV in the setting of vascular trauma and repair. Using our existing LUNA200 manufacturing equipment without modification, we believe we have the ability to generate 400 HAVs (13cm in length) or 200 HAVs (42cm in length) per manufactured batch. We have designed our manufacturing system to be functionally closed, to utilize single-use disposable materials with aseptic connections, and to be fully automated, which allows us to control and maximize HAV production.

Based on observations to date, the HAV has withstood maximal pressures that are comparable to those reported for native arteries. For example, the human aorta is reported to have rupture strengths around 1,400 mmHg, while human cerebral arteries rupture around 1,800 mmHg. We have observed HAVs withstanding maximal pressures of approximately 3,200 mmHg before rupturing, making their mechanical properties on par with native human blood vessels.

***Our Market Opportunity***

We are a biotechnology company with Phase 3 clinical trials in two indications and a strong pipeline for additional products and indications. Additionally, we have had significant interest from surgeons to use our HAV in life and limb saving surgeries as demonstrated by their requests to the FDA to use our HAV in multiple expanded access (compassionate use) cases where no alternative was available.

*Our Initial Market Opportunity in Vascular Repair, Reconstruction and Replacement*

We believe there is a significant market opportunity for our technology across a number of important clinical areas within vascular reconstruction and replacement including vascular trauma, AV access for hemodialysis, peripheral artery disease, and adult cardiac surgery. To treat these diseases and conditions, patients often require invasive cardiovascular surgery, which involves the use of alternative vascular synthetic materials or autologous vessels harvested from elsewhere in the body. For more information about our evaluation of market opportunity, see "Risk Factors — Risks Related to the Development and Commercialization of Our Product Candidates — The sizes of the market opportunities for our product candidates have not been established with precision and are estimates that management believes to be reasonable. If these market opportunities are smaller than we estimate or if any approval that we obtain is based on a narrower definition of the relevant patient population, our revenue and ability to achieve profitability might be materially and adversely affected."




Vascular Trauma: Arterial injuries resulting from vascular trauma are common in military and civilian populations, frequently resulting in the loss of life or limb. In military populations, as the rate of battlefield fatalities has been declining due to faster evacuations and more robust protection from body armor, the rate of survivable vascular injuries has been increasing. In civilian populations, trauma injuries are primarily caused by motor vehicle, workplace and sporting accidents, gun violence, mass casualty terrorist attacks, stabbings, blunt trauma, and iatrogenic injuries (injuries caused by medical treatment or examination). We estimate that central or peripheral vascular injuries in civilian patients account for approximately 150,000 of all injuries reported in global trauma patients. Furthermore, these injuries account for greater than 20% of all trauma-related deaths.

Civilian patients with central or peripheral vascular injuries are estimated to account for approximately 80,000 of all injuries reported in trauma patients in the United States, inclusive of urgent and iatrogenic vascular trauma injuries. However, these injuries account for greater than 20% of all trauma-related deaths.

We believe our HAVs will be a promising alternative that can address critical gaps in existing treatment options for acute vascular injuries due to trauma. We are developing our HAVs with the goal of providing an effective solution in all time-constrained surgical environments and in resource-limited, infection prone battlefield environments. The ability to provide immediately available, non-immunogenic, universally implantable human vessels that are less susceptible to infection represents a clinically significant advantage over existing treatment options.

Arteriovenous Access for Hemodialysis: An estimated $5 to $6 billion per year is spent on hospital admissions in hemodialysis patients with infection and access complications. In 2021, there were over 550,000 patients receiving hemodialysis in the United States. Annually, at least 160,000 existing or new dialysis patients require a new AV access in the U.S. and an additional 150,000 patients require a new AV access in Europe and Japan.

Hemodialysis patients are a chronically ill population, suffering an average of 1.8 hospital admissions, three visits to the emergency department, and four days hospitalized for infections each year. The two most common causes of hospital admissions in hemodialysis patients are infection and access complications. For hemodialysis patients, an infected access site can lead to sepsis, a life-threatening complication that is the most expensive cause for hospitalization in the United States and carries at least a 10% overall mortality rate.

We believe that our HAVs, when used as AV access for hemodialysis, can decrease infections and dialysis access failures, which would improve patient outcomes and lower the burden of dialysis costs on the healthcare system. We expect to file a BLA with the FDA, seeking approval for the use of HAV in AV access for hemodialysis, and to target our commercialization efforts particularly toward those patients who are at high risk of fistula failure or non-maturation, or for those patients at high risk of vascular access infection.

Peripheral Artery Disease (PAD): PAD is a cardiovascular disease of blood vessels located outside the brain and heart. PAD occurs when plaque builds up in arteries that carry blood to the head, organs, and limbs. PAD usually affects arteries

in the legs, but it can also affect arteries that carry blood from the heart to the head, arms, kidneys, and stomach. We believe our HAVs can be used as a bypass conduit in patients with PAD. Peripheral arterial bypass procedures are common with over 230,000 PAD related procedures reported annually in the U.S. Annual peripheral bypass procedures are over 200,000 per year in Europe, and approximately 220,000 per year in Asia.

While endovascular techniques have become more available over the past ten years to treat an array of vascular occlusions, depending on the nature and length of the blockage these types of treatment options have met with both mixed success and durability compared to conventional surgical bypass. Both angioplasty and stenting procedures provide near term success, however long-term durability has remained a question, as highlighted in the results of the recent BEST-CLI clinical trial published in the *New England Journal of Medicine* demonstrating that patients treated with surgical bypass had fewer major amputations and less need for repeat procedures than those treated with endovascular therapy.

Type I Diabetes: Type 1 diabetes, caused by auto-immune destruction of insulin-producing cells in the islets of the pancreas, is a devastating disease affecting more than 1.7 million people in the United States, and costing at least $10 billion to $14 billion annually. In the EU4 (France, Germany, Italy and Spain) and the UK, the number of patients suffering with Type 1 diabetes is estimated at approximately 1.5 million. Even with the newer insulin delivery technologies, less than one-third of patients achieve consistent target blood sugar levels.

Pancreas transplantation is limited due to the associated morbidity and cost of the whole pancreas organ transplantation procedure. As an alternative to pancreas transplantation, the “Edmonton Protocol” has been developed whereby insulin producing cells are transplanted into the portal vein in the liver. However, the majority of the injected cells are lost to inflammation and clotting, and only 16% of Type 1 diabetes patients who receive the Protocol are cured long term.

We believe our HAVs present a means to deliver a therapeutic number of pancreatic islets to patients with Type 1 diabetes. Pancreatic islets are embedded on the outer surface of our HAV and implanted as an AV graft, analogous to the outpatient procedure done for hemodialysis access. After implantation, the islets have the potential to sense blood glucose and then respond by secreting appropriate levels of insulin to maintain glucose levels in the blood. We have termed this new paradigm for pancreatic islet cell delivery the “Biovascular Pancreas (BVP).” Proof-of-concept studies in rodents and pigs have shown promise that the BVP can reduce glucose levels. Studies in non-human primates are planned to commence in 2023.

We believe that a reliable, low-risk, and easily implantable islet cell delivery method that could ensure the survival and functionality of a therapeutic number of islet cells in a human adult would be transformational for the treatment of Type 1 diabetes.

Coronary Artery Bypass Graft (“CABG”): CABG is a surgery used to treat a blockage or narrowing of one or more of the coronary arteries to restore the blood supply to the heart muscle. We believe our HAVs can replace existing vascular substitutes and improve patient outcomes, particularly in obese patients or those suffering from diabetes, in whom the risks of saphenous vein harvesting are more substantial. CABG procedures are common, with more than 200,000 CABG procedures reported annually in the U.S. and over 765,000 annual CABG procedures globally.

Typically, a CABG operation involves the use of both the patient’s own artery and vein. In patients who are obese, have diabetes, or who are very elderly, there are higher risks for vein harvest complications, including failure to heal the vein harvest incision, infection, and prolonged swelling of the operative leg. Furthermore, complications from the vein harvest incision site are more common than complications from the chest incision in CABG patients. It is estimated that approximately 20% of patients requiring bypass surgery have no suitable grafts available, with sources reporting as high as 45% of CABG patients are without suitable autologous vein.

Pediatric Heart Surgery: We are developing a smaller diameter HAV product for use in pediatric heart surgery as a Blalock Taussig (“BT”) shunt. The BT shunt is a surgical procedure that is used to increase pulmonary blood flow for the treatment of babies born with a complex congenital heart defect called Tetralogy of Fallot, a common type of “blue baby syndrome”. In 2021, there were 3.7 million babies born in the United States and approximately 1,500 to 2,000 of these babies were born with Tetralogy of Fallot. The BT shunt is a life-saving procedure for these babies, and we plan to submit an orphan drug application for use of our HAV as a BT shunt for infants born with cyanotic congenital heart defects. Although 3 – 4mm inner diameter expanded polytetrafluoroethylene (“ePTFE”) grafts are currently used as the most common BT shunt, they suffer from limitations that impact morbidity and mortality in these infants.

***Our Clinical and Pre-Clinical Stage Product Pipeline***

The following table highlights key information about our current product pipeline:




We began clinical evaluations of our HAVs in December 2012, with the enrollment of the first Phase 2 patient in our V001 hemodialysis access trial in Europe. Since then, we have completed one Phase 2 trial in the United States, and currently have seven trials either actively enrolling or in long-term follow-up. HAVs have been implanted in approximately 85 clinical centers in seven countries around the world, and by more than 100 practicing surgeons.

Table of Contents

*Overview of Clinical Trials Assessing the Safety and Efficacy of the HAV in Multiple Indications*

| Clinical Trial Number | Indication | Begin Enrollment | Design/Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| **Vascular Trauma** | | | | | | |
| V005 | Vascular Trauma | 2018 | Phase 2/3 Single-arm Historical Comparator Unblinded | A total of 60 patients enrolled as of December 31, 2022. Primary analysis will be based on a total of 50 patients with injuries of extremities, 42 of which have been enrolled as of December 31, 2022 | Enrolling | Trial is currently enrolling |
| **Dialysis Access** | | | | | | |
| V001 | Dialysis Access | 2012 | Phase 2 Single-arm | 40 | 10-year follow-up ongoing | 30-day PP: 95%<br>6-month SP: 100%<br>12-month SP: 97%<br>60-month SP: 58%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V003 | Dialysis Access | 2013 | Phase 2 Single-arm | 20 | Complete 2-year follow-up | 30-day PP: 95%<br>6-month SP: 89%<br>12-month SP: 81%<br>Infection Rate/yr: 4% (1 event)<br>Number of Rejections: 0 |
| V006 | Dialysis Access | 2016 | Phase 3 Prospective Randomized Blinded | 355 total; 177 received HAV 178 received ePTFE | 5-year follow-up ongoing | 30-day PP HAV: 93%<br>12-month SP HAV: 82%<br>24-month SP HAV: 67%<br>12-month SP ePTFE: 80%<br>24-month SP ePTFE: 74%<br>Infection Rate HAV/yr: 0.93%<br>Infection Rate ePTFE/yr: 4.5%<br>Number of HAV Rejections: 0 |
| V007 | Dialysis Access | 2017 | Phase 3 Prospective Randomized Blinded | Target 240 total; 230 enrolled (as of December 31, 2022) | Enrolling | Trial is currently enrolling |
| V011 | Dialysis Access | 2019 | Phase 2 (LUNA200 manufacturing system) | 30 | 3-year follow-up ongoing | 30-day PP: 97%<br>30-day SP: 100%<br>12-month SP: 83%<br>Infection Rate HAV/yr: 0%<br>Number of HAV Rejections: 0 |
| **Peripheral Artery Disease** | | | | | | |
| V002 | Peripheral Artery Disease | 2013 | Phase 2 Single-arm | 20 | 10-year follow-up ongoing | 30-day PP: 100%<br>6-month SP: 84%<br>12-month SP: 84%<br>72-month SP: 60%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V004 | Peripheral Artery Disease | 2016 | Phase 2 Single-arm | 15 | 5-year follow-up ongoing | 30-day PP: 100%<br>6-month SP: 86%<br>12-month SP: 64%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0<br>Number of Amputations: 0 |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

As of December 31, 2022, approximately 533 patients worldwide have received our HAVs for the treatment of trauma, AV access for hemodialysis, PAD, and in expanded access cases resulting in approximately 1,080 subject-years of exposure to the HAV. Our cumulative HAV exposure is approximately 880 subject-years in the hemodialysis access population, 130 subject-years in the PAD population, and 70 subject-years in the arterial trauma population. The longest our HAV has been in a patient and used for dialysis is more than nine years and there have been more than 106,000 estimated dialysis sessions using our HAVs. Additionally, a total of 26 expanded access/compassionate use cases have been granted by the FDA, and another 18 patients with severe PAD have been treated with the HAV under an investigator IND at the Mayo Clinic. Lastly, ten patients suffering vascular injuries during the conflict in Ukraine have been treated with the HAV under a humanitarian program. Throughout all of these trials and other programs, we have observed that our HAVs functioned as intended and provided functional blood flow to affected limbs. We have also observed consistent durability with a strong tolerability profile. Furthermore, we have observed no evidence of clinically relevant immunologic reactions to our HAVs, supporting the potential use of our HAVs as off-the-shelf, universally implantable, bioengineered human tissues.

Overall, the HAV has functioned well and as intended, across eight different clinical trials in three clinical indications. The HAV has been implanted in approximately 533 patients, across approximately 85 clinical sites in seven countries, over more than nine years (as of December 31, 2022). Rates of primary and secondary patency were similar across trial designs and disease states, with 30-day primary patency ranging from 95% – 100%. Six-month secondary patency ranges from 84% – 100%, and 12-month secondary patency ranges from 81% – 97%, across multiple clinical trials, disease states, and patient age ranges and demographics.

We have observed zero instances of clinical rejection of the HAV in any clinical trial over the past nine years, suggesting that the HAV was not immunologically rejected after implantation.

Based on clinical trial results to date, we have observed that the HAVs were highly resistant to infection, with an infection rate averaging approximately 1.0% per patient-year in our AV access trials, and low infection rates currently in our trauma and PAD trials. Vascular graft infections are a potentially serious complication and can result in adverse outcomes such as sepsis, hospitalization, long-term antibiotic use, repeat procedures and even death.

*HAVs Remodel with Host Cells After Implantation*

Additionally, based on clinical samples obtained during our Phase 2 AV access trials and published in three peer reviewed journals, *The Lancet* in 2016, *Science Translational Medicine* in 2019, and in the *Journal of Vascular Surgery* in 2020, we observed that the HAV became populated with healthy, vascular cells from the patient. As described in these publications, over time the patient's cells have been observed to transform the HAV into a multi-layered living tissue similar to native blood vessels. In these trials we have also observed ongoing cellular repair of HAV tissues that had been previously injured during cannulation with dialysis needles, which suggests that the recellularized HAV may be capable of self-healing. The image below shows an HAV that had been implanted in a hemodialysis patient for 44 weeks, that had developed alpha-actin positive vascular smooth muscle cells throughout the wall (red staining in the left-hand panel), and had developed a layer of CD31+ endothelial cells on the inner luminal surface of the HAV (line of red endothelial cells indicated in the right-hand panel).

*Histological Images of HAV Repopulated with the Patient's Own Vascular Cells*



*Existing Options for Surgical Treatment of Vascular Disease Are Not Sufficient*

The table below contains a summary of the efficacy of autologous veins, ePTFE grafts, cryopreserved human cadaveric veins, and preserved bovine veins. For the treatment of vascular trauma, saphenous vein presents challenges in terms of time to procure the vein, and ePTFE grafts carry extremely high infection rates: 24% – 29% per patient year in the studies below. Similarly, autogenous fistulas and ePTFE grafts for dialysis access have low functional patencies at six and 12 months, and ePTFE is burdened with high rates of annual infection: 3% – 17% in the studies below. Both cryopreserved human cadaver vein, and preserved bovine veins, have low patency at 12 months, and also suffer from high rates of aneurysm formation. Lastly, for bypass of PAD, vein has acceptable patency but is not available for all subjects, while ePTFE carries lower patencies and higher infection risk, and bovine vein becomes aneurysmal at unacceptably high rates.

*Published Studies in Vascular Surgery*

We derived the data in the table below from data contained in certain published papers on vascular trauma, hemodialysis and PAD between 2002 and the present. These data are from different studies and thus are not directly comparable. In addition, many of these papers reported on additional endpoints that are not included in the table below.

| Clinical Indication | Type of Conduit | Year | Number of Patients | Published Secondary Patency Outcome | Infection (per patient-year) | Rejection Outcome |
|---|---|---|---|---|---|---|
| **Vascular Trauma** | Saphenous Vein (autologous) | 2002 – 2012 | 24 | 12 months: ~78% function | 4% | N/A |
| | 2014 | 152 | 30 days: ~90% function | N/A | | |
| | ePTFE (synthetic graft) | 2002 – 2012 | 25 | 12 months: ~50% function | 24% | N/A |
| | 2005 | 14 of 95 | 30 days: ~79% function | 29% | | |
| **Hemodialysis Access** | Fistula (autogenous) | Post-2005 | 2,800 | 12 months: 75% | 2% | N/A |
| | 2019 | 14892 | 6 months: 51% | N/A | | |
| | | 2017 | 6,439 | N/A | 4% | |
| | | 2018 | 602 | 6 months: 61% | N/A | |
| | ePTFE (synthetic graft) | 2013 | 128 | 6 months: ~60% | N/A | N/A |
| | 2019 | > 400 | N/A | 3% – 17% | | |
| | | 2020 | > 3,000 | 12 months: 70% | 9% | |
| | Cryovein (cryopreserved human cadaver vein) | 2002 | 45 | 12 months: 80% | N/A | 100% |
| | 2004 | 49 | 12 months: ~65% Aneurysm rate: 18% | 0% | ~100% | |
| | Procol (bovine vein) | 2005 | 186 | 12 months: 66% Aneurysm rate: 3.2% | 5.3% | N/A |
| Peripheral Artery Disease | Saphenous Vein (autologous) | 2008 | 60 | 12 months: ~86% | N/A | N/A |
| | ePTFE (synthetic graft) | 2008 | 61 | 12 months: ~80% | N/A | N/A |
| | 2013 | 101 | 12 months: 76% – 89% | | | |
| | | 2011 | 273 | 12 months: 81% | | |
| | | 2013 | 496 | N/A | 3.8% | |
| | Procol (bovine vein) | 2008 | 7 | 6 months: 50% 12 months: 50% Aneurysm Rate: 29% | N/A | N/A |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 449 of 674

***Proposed Indication #1: Use of HAV to Repair Vascular Trauma***

*Overview of Vascular Trauma*

Arterial injuries resulting from vascular trauma are common in military and civilian populations, frequently resulting in the loss of life or limb. In military populations, as the rate of battlefield fatalities has been declining due to faster evacuations and more robust protection from body armor, the rate of survivable vascular injuries has been increasing. In civilian populations, trauma injuries are primarily caused by motor vehicle, workplace and sporting accidents, gun violence, mass casualty terrorist attacks, stabbings, blunt trauma and iatrogenic injuries (injuries caused by medical treatment or examination). Consequently, we believe there is an increasingly urgent unmet need for novel materials that are immediately available for permanent vascular repair for both civilian and military vascular trauma.

*Options in Surgical Treatment of Vascular Trauma*




Autologous vein is the preferred conduit for vascular repair. However, harvesting of autologous vein is not always feasible, due to damage to vein or lower limb, prior vein harvest, inadequate size of the vein or venous disease. Harvesting autologous vein is a serious operation that requires additional time and resources. Delaying the time from injury to operative intervention from less than one hour, to three hours or greater, more than doubles the risk of limb amputation. Limb amputation, in turn, almost triples the length of intensive care unit stay, nearly doubles the length of hospital stay, and is devastating to patient quality of life. Additionally, the morbidity associated with saphenous vein harvest includes surgical site infections, chronic pain, and limb swelling. Synthetic materials have been shown to be inferior to autologous vein in resistance to infection and durability and, therefore, are generally only used for vascular repair when autologous vein is not an option.

*Our Solution for Vascular Trauma*

We believe our HAVs will be a promising alternative that can address critical gaps in existing treatment options for acute vascular injuries due to trauma. We are developing our HAVs with the goal of providing an effective solution in all time-constrained surgical environments and in resource-limited, infection prone battlefield environments. The ability to create immediately available, non-immunogenic, universally implantable material that is less susceptible to infection represents a clinically significant advantage over existing options.

Humacyte has a strong working relationship with the Department of Defense (“DoD”) that has led to a partnership over the last decade to support their unmet need to reconstruct and repair vascular injuries through the development of our HAVs. As a result of this collaboration and partnership with the DoD, we anticipate Humacyte would supply HAVs for use in military hospitals to treat injured soldiers and veterans. The DoD assigned a priority designation to the HAV technology under Public Law 115-92. Under this law, FDA and DoD work together to expedite the development and review of critical technologies and therapies requested by DoD. Additionally, we have received an approximately $6.8 million grant from the DoD for the continued development of our HAVs for vascular reconstruction and repair.

*Our Current Phase 2/3 Trial for Vascular Trauma*

**Trial Design:** Our ongoing V005 trial is a single-arm, multi-center, non-randomized clinical trial to evaluate the efficacy, safety and tolerability of our 6 millimeter HAV in replacement or reconstruction of vascular tissues in patients with life or limb-threatening vascular trauma. Since the V005 trial is a single-arm, non-randomized, open label study, we have the ability to track ongoing efficacy and safety. The primary efficacy endpoint will evaluate patency of the HAV at 30 days based on an assessment of 50 patients from the V005 trial who have vascular trauma of the extremity, excluding torso injuries and iatrogenic trauma patients. The Company plans to file a BLA with the FDA for an indication in vascular trauma approximately four months after completion of the V005 trial. The Company plans to seek accelerated approval of the HAV for urgent arterial repair following extremity vascular trauma when synthetic graft is contraindicated and when autologous vein is not feasible. Results from patients from V005 outside of the primary endpoint population, as well as results from patients treated in the Ukraine humanitarian program, will be included in the BLA as supportive data.

*Status of Phase 3 Trial of HAV in Vascular Trauma (as of December 31, 2022)*

| Clinical Trial Number | Indication | Begin Enrollment | Design/Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| V005 | Vascular Trauma | 2018 | Phase 2/3 Single-arm Historical Comparator Unblinded | A total of 60 patients enrolled as of December 31, 2022. Primary analysis will be based on a total of 50 patients with injuries of extremities, 42 of which have been enrolled as of December 31, 2022 | Enrolling | Trial is currently enrolling |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

**Current Trial Status:** As of December 31, 2022, we had 17 clinical trial sites for the V005 trial in the United States and four in Israel. We are in the process of adding to the trial sites in Ukraine which are currently participating in the ongoing humanitarian program.

The range of trauma injuries in V005 has been broad, including penetrating trauma cases, blunt injury cases, and iatrogenic injuries. Mechanisms of injury have included motor vehicle accidents, gunshot wounds, industrial accidents, falls, and iatrogenic injuries from other interventional or surgical procedures. The HAVs have been placed throughout the body, including in the lower limbs, upper limb, and torso. The HAV has been used to repair the axillary artery, femoral artery, popliteal artery and vein, and the brachial artery in the V005 trial. Many of the injuries treated in the V005 trial, including industrial accidents, motor vehicle accidents, and some gunshot wounds, are contaminated injuries that are at elevated risk of graft infection. Nonetheless, as of December 31, 2022, there has been only one report of HAV infection in any V005 subject, despite a number of instances where the HAV has been implanted into contaminated surgical fields of acute vascular wounds. There have been several instances of local wound infections, but importantly only one of these instances has led to infection of the HAV material itself, which we believe represents a significant advantage of the HAV over ePTFE grafts, which have a higher propensity to become infected in contaminated or infected wound beds. There have been no reports of limb amputation that occurred as a result of HAV malfunction or loss of patency. The resistance to

infection we have observed in trials to date is particularly important in traumatic injuries which are often caused by infected material (i.e., knife, car accident, blast injury).

In the figure below, a photograph is shown of an HAV that was used to repair both an artery and a vein in the knee of a patient who suffered a gunshot wound. This patient was doing well at the 30-day follow-up visit with both repairs remaining patent and functional.

*Intra-operative photograph of HAV repair of popliteal artery (left) and vein (right) in V005 subject.*




In the second quarter of 2022, Humacyte launched a humanitarian initiative to provide its HAVs to hospitals in Ukraine for the treatment of wounded civilians and soldiers with vascular trauma injuries. Ukrainian surgeons presented patient outcomes from the use of the HAV to treat wartime vascular trauma at two vascular conferences in December 2022, the VI Congress of Vascular Surgeons, Phlebologists, and Angiologists of Ukraine in Kyiv, Ukraine, and the 11th Munich Vascular Conference (MAC) 2022. The surgeons described long-standing limitations in vascular tissue repair and replacement as well as the injuries that they have observed during the Russian-Ukrainian conflict. Surgeons have utilized the HAV to treat patients with wartime injuries including blast trauma, shrapnel injuries, and gunshot wounds. The surgeons observed that access to the HAV, a biologic conduit, has improved their ability to perform vascular reconstructions by eliminating the need to harvest a venous conduit. As of December 31, 2022, a total of ten vascular patients have been treated under this humanitarian program, and all patients are reported to have primary patency at 30 days and zero cases of infection despite the presence of contaminated wound beds.

In the figure below, photographs are shown of the first patient treated under the humanitarian program in Ukraine. The patient was a 42-year-old male who suffered a gunshot wound in the leg which damaged his femoral artery. The patient was initially treated using synthetic graft which became infected, and the patient experienced critical right lower extremity ischemia. The HAV was implanted as a right superficial femoral artery reconstruction to achieve wound healing and limb salvage. After three months, the HAV was reported to have retained primary patency with no evidence of HAV infection.

*Intra-operative photographs of attempted synthetic graft repair of femoral artery (left) and subsequent repair with HAV (right) in patient from Ukraine humanitarian program.*






[Table of Contents](#)

***Proposed Indication #2: Use of the HAV for Arteriovenous Access for Hemodialysis***

*Overview of Hemodialysis and Existing Methods of Arteriovenous Access for Hemodialysis*

End-stage renal disease ("ESRD") develops when chronic kidney disease progresses to a point where either dialysis or a kidney transplant is required for the patient to survive. For hemodialysis to be conducted, a point of vascular access to the patient's circulatory system must be created, termed vascular access, so that blood can be transported from the body to the dialyzer and then back to the body. The demand for vascular access conduits includes the need for both new hemodialysis patients who have progressed to ESRD requiring an initial access, and existing patients that require the replacement of their existing access. There are currently three traditional methods for obtaining vascular access for hemodialysis: an AV fistula, a synthetic graft, and a catheter. Each of these vascular access methods has substantial limitations, as outlined below:

*Three Traditional Methods for Obtaining Vascular Access for Hemodialysis*




Fistula. An AV fistula is created by surgically connecting a vein to an artery, typically in the patient's arm. Fistulae are often considered the preferred means of access for hemodialysis due to lower infection rates of approximately 0.5% – 1.5% per patient-year as well as long-term durability. However, many patients are not suitable candidates for fistula placement, due to small vessel anatomy, advanced age, obesity or other comorbidities. Approximately 40% of patients who undergo surgery for fistula creation will not gain any benefit from the surgery because the fistula lacks sufficient vein enlargement and increased blood flow, a process called fistula maturation, that is necessary for hemodialysis. Additionally, during the period in which the fistula is maturing, catheters are generally used to provide the patient access for dialysis. There is a high risk of infection and morbidity, and health care cost, associated with prolonged catheter dependence while waiting for the fistula to mature.

Catheters. A catheter, which is tunneled underneath the skin and placed directly into a large vein in the patient, is generally the least desirable access solution. Given the time necessary for fistulae to mature, the vast majority of patients in the United States begin hemodialysis using a catheter while awaiting fistula maturation. Catheters have rates of blood stream infections as high as 200% per patient-year, with high associated morbidity and health care costs.

Synthetic graft. A synthetic graft, typically made from ePTFE and sewn between an artery and vein in the patient's arm, is generally used in patients who are not candidates for fistulae. The drawbacks of synthetic grafts include higher infection rates, which can be as high as 10% – 15% per patient-year, and gradual degradation of the non-healing ePTFE graft material caused by persistent needle punctures. A recent systematic meta-analysis measuring the functional patency of ePTFE grafts shows that, on average, only 70% of ePTFE dialysis access grafts remain functional one year after implantation.

*Distribution of Hemodialysis Access Modes in Use in the United States*

| Access Type | Fistulae | Catheters | Synthetic Grafts |
|---|---|---|---|
| Incident Patients: At Initiation of Hemodialysis | 16.7 % | 80.3 % | 3.0 % |
| Prevalent Patients: For Ongoing Hemodialysis | 64.5 % | 18.9 % | 16.6 % |

*Published Data in Hemodialysis Access*

We derived the data in the table below from data contained in certain published papers on hemodialysis between 2002 and the present. These data are from different studies and thus are not directly comparable. In addition, many of these papers reported on additional endpoints that are not included in the table below.

| Clinical Indication | Type of Conduit | Year | Number of Patients | Published Secondary Patency Outcome | Infection (per patient-year) | Rejection Outcome |
|---|---|---|---|---|---|---|
| | Fistula (autogenous) | Post-2005 | 2,800 | 12 months: 75% | 2% | N/A |
| | | 2019 | 14,892 | 6 months: 51% | N/A | |
| Hemodialysis Access | | 2017 | 6,439 | N/A | 4% | |
| | | 2018 | 602 | 6 months: 61% | N/A | |
| | ePTFE (synthetic graft) | 2013 | 128 | 6 months: ~60% | N/A | N/A |
| | | 2019 | > 400 | N/A | 3% – 17% | |
| | | 2020 | > 3,000 | 12 months: 70% | 9% | |
| | Cryovein (cryopreserved cadaver vein) | 2002 | 45 | 12 months: 80% | N/A | 100% |
| | | 2004 | 49 | 12 months: ~65%<br>Aneurysm rate: 18% | 0% | ~100% |
| | Procol (bovine vein) | 2005 | 186 | 12 months: 66%<br>Aneurysm rate: 3.2% | 5.3% | N/A |

**Overview of HAV Experience in Hemodialysis Access:** A table listing our clinical trials of the HAV in hemodialysis access is included below. We have implanted the HAV into approximately 384 total patients for hemodialysis access, for a total of more than 880 patient-years of exposure, as of December 31, 2022. Throughout these trials, we have observed consistent and sustained high primary patency rates, ranging from 95% – 100% at 30 days. Secondary patency of the HAV at 6 months ranges from 84% – 100%. Consistently, we have observed zero instances of clinical rejection of any HAV in any hemodialysis access trial.

*Implantation of HAV for Hemodialysis*




We have also observed in multiple clinical trials that our HAVs had a low infection susceptibility during use for hemodialysis, with a rate lower than 1% per patient-year across all studies. The low infection susceptibility we observed in our trials of our HAVs may be a result of the HAV's potential to become a living tissue as it becomes populated by cells from the patient's body. Since living tissues are known to have resisted infection due to interactions with host white blood cells and immunological defense systems, it is possible that the repopulated HAV resists infection for the same reasons that native arteries and veins resist infections, as is observed with autogenous fistulas.

We have also observed early evidence of potential healing from the cells that repopulate the HAV after needle puncture for hemodialysis. In examining HAV explanted segments we have observed healed needle cannulation tracts with cells expressing smooth muscle markers. This self-healing indicates that the HAV may have repaired itself while being used as a hemodialysis access, which we believe is a distinct feature not present in synthetic materials, and, to our knowledge, has not been observed before for any other regenerative medicine product.

*Our Current Phase 2 and Phase 3 Trials of the HAV in Hemodialysis Access*

| Clinical Trial Number | Indication | Begin Enrollment | Design/Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| V001 | Dialysis Access | 2012 | Phase 2 Single-arm | 40 | 10-year follow-up ongoing | 30-day PP: 95%<br>6-month SP: 100%<br>12-month SP: 97%<br>60-month SP: 58%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V003 | Dialysis Access | 2013 | Phase 2 Single-arm | 20 | Complete 2-year follow-up | 30-day PP: 95%<br>6-month SP: 89%<br>12-month SP: 81%<br>Infection Rate/yr: 4% (1 event)<br>Number of Rejections: 0 |
| V006 | Dialysis Access | 2016 | Phase 3 Prospective Randomized Blinded | 355 total; 177 received HAV 178 received ePTFE | 5-year follow-up ongoing | 30-day PP HAV: 93%<br>12-month SP HAV: 82%<br>24-month SP HAV: 67%<br>12-month SP ePTFE: 80%<br>24-month SP ePTFE: 74%<br>Infection Rate HAV/yr: 0.93%<br>Infection Rate ePTFE/yr: 4.5%<br>Number of HAV Rejections: 0 |
| V007 | Dialysis Access | 2017 | Phase 3 Prospective Randomized Blinded | Target 240 total; 230 enrolled (as of December 31, 2022) | Enrolling | Trial is currently enrolling |
| V011 | Dialysis Access | 2019 | Phase 2 (LUNA200 manufacturing system) | 30 | 3-year follow-up ongoing | 30-day PP: 97%<br>30-day SP: 100%<br>12-month SP: 83%<br>Infection Rate HAV/yr: 0%<br>Number of HAV Rejections: 0 |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

*Long-Term Data from Early Phase 2 Trials in Hemodialysis: V001 and V003*

**Phase 2 Trial Design and Current Outcomes:** We have completed or are in long-term follow-up on two open-label Phase 2 trials in 60 hemodialysis patients in the United States and Poland from December 2012 through May 2014, which we refer to as our V003 trial and V001 trial, respectively. Both the V001 and V003 studies were designed as single-arm trials to assess the safety and efficacy of the HAV for hemodialysis access, with assessments of patency at 6, 12, 18 and 24 months. In the 60 patients enrolled in these two studies, blood flow through all HAVs was appropriate for hemodialysis, averaging over 1,200 mL/minute. Secondary patency for the two combined trials was 97% at six months, 89% at 12-months, and 81% at 18-months. These results compare favorably to published reports of secondary patency for fistula of 51% – 61% at six months and 75% at 12 months. Long-term results from the V001 trial showing five-year secondary patency of 58% were published in the *European Journal of Vascular and Endovascular Surgery* companion journal *EJVES Vascular Forum* in February 2022, and patients from the V001 trial are currently in a 10-year follow-up period.

*Images and long-term results from Phase 2 V001 trial of HAV in AV Access*




**HAV Secondary Patency (%)**




*Phase 3 V006 AV Access Study*

**Trial Design:** Our V006 HUMANITY study is a prospective, multi-center, multinational, open-label, randomized, two-arm, comparative study. Eligible study subjects were randomized to receive either a HAV or a commercially available ePTFE graft and followed to 24 months post-implantation by routine study visits. After 24 months, subjects with a patent conduit are followed to five years post-implantation using a questionnaire at six-month intervals to ascertain patient and conduit status. The primary endpoint for the V006 HUMANITY trial was a non-inferiority analysis of secondary patency compared to ePTFE, to be assessed when all subjects are at least 18 months post-implantation. There were a total of 37 sites that participated in the study, enrolling a combined total of 355 subjects.

**24-Month Results:** The V006 study enrolled 355 subjects who were roughly equally matched in terms of demographics and co-morbidities. HAV subjects trended older (p=0.06) and had more prior strokes (p=0.02) than did ePTFE subjects.

*Phase 3 V006 HUMANITY trial subject demographics*

| V006 Demographics (N=355) | ePTFE (n=178) | HAV (n=177) | p-value |
|---|---|---|---|
| Age(years) | 59.9 | **62.6** | 0.06 |
| Male (%) | 49.4% | **49.7%** | NS |
| Caucasian (%) | 65.2% | **69.5%** | NS |
| Black (%) | 27.5% | **24.9%** | NS |
| Hispanic (%) | 11.2% | **14.7%** | NS |
| Asian / Other (%) | 3.4% | **2.3%** | NS |
| Body Mass Index (BMI) | 29.2 | **28.9** | NS |
| Hypertension (%) | 79.8% | **79.7%** | NS |
| Cardiac Disease (%) | 50.6% | **57.1%** | NS |
| Diabetes (%) | 29.2% | **32.8%** | NS |
| Prior Stroke (%) | 5.6% | **12.4%** | 0.02 |

The secondary patency of the HAV was greater than that of ePTFE at six and 12 months but lower at 18 and 24 months, an outcome that had not been modelled in the V006 trial design. As per the pre-specified Cox Proportional Hazards test, the HAV did not achieve its primary efficacy endpoint regarding secondary patency. In terms of safety, the HAV had a statistically significant lower rate of conduit infections compared to ePTFE. Substantial differences in antibiotic use and need for hospitalization for infection were also noted in the V006 trial, all favoring the HAV. The safety advantage of the HAV over ePTFE may be clinically important as infection and sepsis are the second most common cause of death in dialysis patients.

*Phase 3 V006 HUMANITY trial secondary patency results*

| Secondary Patency | 6 months | 12 months | 18 months | 24 months |
|---|---|---|---|---|
| **HAV HUMANITY** [Mean (95% CI)] | 92%(87 – 95%) | 82% (75 – 87%) | 73% (65 – 79%) | 67% (59 – 74%) |
| ePTFE HUMANITY [Mean (95% CI)] | 87% (81 – 85%) | 80% (73 – 85%) | 77% (70 – 83%) | 74% (67 – 81%) |

Cox Proportional Hazards Model for Time to Loss of Secondary Patency

| Treatment Group (HAV vs ePTFE) | | Hazard Ratio Estimate | Hazard Ratio 95% CI | Non-inferiority Margin Hazard | Non-inferiority Demonstrated (Yes/No) |
|---|---|---|---|---|---|
| | 12 months | 0.869 | (0.528, 1.431) | 1.491 | Yes |
| | 24 months | 1.284 | (0.867, 1.903) | 1.488 | No |

*Phase 3 V006 HUMANITY trial rates of infection*







The reported SAEs related to the HAV and ePTFE in the V006 trial, in this patient population, which typically has a high prevalence of existing medical conditions, are detailed in the table below.

*SAEs Reported in V006 Phase 3 Clinical Study in AV Access*

| Description of SAE | Number of SAEs (% of total subjects) | |
|---|---|---|
| | HAV | ePTFE |
| Number of subjects in V006 study | 177 | 178 |
| General disorders and administration conditions: | | |
| Implant site extravasation | 0(0.0)% | 1(0.6)% |
| Infections and infestations: | | |
| Vascular access site infection | 0(0.0)% | 5(2.8)% |
| Injury, poisoning and procedural complications: | | |
| Anastomotic stenosis | 1(0.6)% | (0.0)% |
| Vascular access site hematomas | 1(0.6)% | (0.0)% |
| Vascular access site hemorrhage | 0(0.0)% | 3(1.7)% |
| Vascular access site pain | 1(0.6)% | 0(0.0)% |
| Vascular access site pseudoaneurysm | 10(5.6)% | 0(0.0)% |
| Vascular access site rupture | 2(1.1)% | 0(0.0)% |
| Vascular access site thrombosis | 41(23.2)% | 28(15.7)% |
| Skin and subcutaneous tissue disorders: | | |
| Skin necrosis | 0(0.0)% | 1(0.6)% |
| Vascular disorders: | | |
| Steal syndrome | 2(1.1)% | 2(1.1)% |
| Subclavian vein occlusion | 0(0.0)% | 1(0.6)% |
| Vascular stenosis | 34(19.2)% | 27(15.2)% |
| Venous stenosis | 3(1.7)% | 9(0.0)% |

Through an Analysis of Panel Reactive Antibodies ("PRA") in the V006 trial, we observed that subjects that received the ePTFE grafts were more likely to develop antibodies against human tissues, and to become more difficult to crossmatch for a future kidney transplant, than were patients who received the HAV. While the cause of this improvement in patient responses with the HAV is not clear, this may have been related to the lower number of severe infection events in HAV patients as compared to ePTFE patients in V006. The percentage of women becoming sensitized (i.e. cPRA values > 20%) was notably higher in the ePTFE group than the HAV group.

*Phase 3 V006 HUMANITY trial % of patients developing antibodies against human tissues*




We also observed differences in the remodeling of the HAV and ePTFE implants in the V006 trial. Consistent with earlier observations from Phase 2 studies, microscopic examination of samples from HAV and ePTFE subjects suggest that the HAVs may have repopulated with host cells and microvasculature, while ePTFE grafts did not repopulate with cells and, in certain cases, fractured at sites of needle cannulation for hemodialysis ("G" is graft; "D" is defect' "T" is thrombus (clot); "L" is lumen; and "A" is adventitia):

*Phase 3 V006 HUMANITY trial microscopic examination of samples from ePTFE and HAV subjects*




Comparison of flow rates within the HAV and ePTFE conduits revealed similarities in blood flow and diameter over the 24-month period of the trial. Bar graphs below display average blood flow rate, maximal blood flow rate, and mid-graft diameters, all of which were measured by periodic ultrasound examinations. Diameters of the HAV remained close to the nominal 6.0 millimeter diameter. Average blood flow rates exceeded 1.0 liters/minute, which is generally considered suitable for efficient hemodialysis.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 464 of 674

*Phase 3 V006 HUMANITY trial blood-flow rates and vessel diameters*




Overall, although the primary efficacy endpoint concerning secondary patency was not met, the HAV performed in the V006 trial as was expected, based upon HAV performance in previous Phase 2 trials in hemodialysis and in other clinical applications. This outcome was due at least in part to unexpectedly high patency of the ePTFE grafts, particularly after 12 months. While the cause of this unexpectedly high patency is not clear, it is possible that study-mandated ultrasounds and examinations may have led to more aggressive vigilance with ePTFE grafts to maintain patency. In addition, the age and comorbidities of HAV subjects in V006 was somewhat worse than for ePTFE subjects.

In the V006 trial, the HAV displayed significantly fewer infections than did the ePTFE grafts. This was associated with fewer instances of immune sensitization in HAV subjects as compared to ePTFE subjects, which could translate to easier kidney transplantation at future times. Similar to prior studies, we observed that the HAV had good durability, blood flow rates and diameters similar to ePTFE grafts, and also host cell remodelling that was superior to that of ePTFE grafts.

Phase 3 V007 AV Access Study

**Trial Design:** We are currently enrolling a Phase 3 trial, called V007, in 240 patients with ESRD. V007 is a Phase 3, prospective, multi-center, open label, randomized, two-arm comparative study conducted in the United States. The V007 trial is designed to assess the usability of the HAV for dialysis at six and 12 months as a comparison to autogenous fistulas, which are known to exhibit a high rate of early maturation failure of approximately 40% at six months. Patients in the study are randomized to receive either the HAV for vascular access or an autogenous AV fistula. The objective of V007 is to compare the safety and efficacy of our 6 millimeter HAV to autogenous AV fistula for functional hemodialysis access.

Eligible study subjects in V007 are randomized to receive either an HAV or an autogenous fistula and followed to 24 months post-implantation by routine study visits. After 24 months, patients with functional accesses will be followed for up to five years. Efficacy endpoints include useability for dialysis at six and 12 months, as well as a comparison of secondary patency via a time-to-event analysis of all subjects at 12 months. Additional safety endpoints include the rate of dialysis access-related infections for HAV and fistula subjects.

**Current Trial Status:** As of December 31, 2022, there were 230 patients enrolled in the V007 trial, out of a target enrollment of 240 total. We currently expect, upon completion of the V007 trial, to file a BLA for the use of HAV in AV access for hemodialysis.

***Proposed Indication #3: Peripheral Artery Disease***

PAD involves partial or complete occlusion of blood vessels in the peripheral circulation and is a major cause of morbidity and mortality in the developed world. Patients with severe PAD undergo peripheral arterial bypass surgery where a conduit is implanted above and below the area of the arterial obstruction, to provide a "bypass" route for blood to flow around the blocked artery. The vast majority of these operations are performed in the lower limb. Other surgical alternatives include minimally invasive approaches such as

stenting and angioplasties that are suitable for smaller atherosclerotic lesions and can delay — but oftentimes not prevent — the ultimate need for surgical revascularization.

*Published Data in PAD*

We derived the data in the table below from data contained in certain published papers on PAD between 2008 and the present. These data are from different studies and thus are not directly comparable. In addition, many of these papers reported on additional endpoints that are not included in the table below.

| Clinical Indication | Type of Conduit | Year | Number of Patients | Published Secondary Patency Outcome | Infection (per patient-year) | Rejection Outcome |
|---|---|---|---|---|---|---|
| Peripheral Artery Disease | Saphenous Vein (autologous) | 2008 | 60 | 12 months: – 86% | N/A | N/A |
| | ePTFE | 2008 | 61 | 12 months: – 80% | | |
| | (synthetic graft) | 2013 | 101 | 12 months: 76% – 89% | N/A | N/A |
| | | 2011 | 273 | 12 months: 81% | | |
| | | 2013 | 496 | N/A | 3.8% | |
| | | | | 6 months: 50% | N/A | N/A |
| | Procol | 2008 | 7 | 12 months: 50% | | |
| | (bovine vein) | | | Aneurysm Rate: 29% | | |

We have observed strong patency rates and no reported cases of infection for the HAV in PAD in clinical studies to date. We are developing our 6 millimeter HAV for use as a bypass conduit for patients with PAD. We are conducting two Phase 2 trials to evaluate the safety and efficacy of our 6 millimeter HAV for use as a bypass conduit with PAD, which we refer to as our V002 and V004 trials. For both of these Phase 2 trials, the HAV is being implanted as a femoral popliteal bypass graft in patients with PAD.

*Our Current Phase 2 Trials of the HAV in PAD*

| Clinical Trial Number | Indication | Begin Enrollment | Design/ Phase | Number of Subjects | Status | Outcomes** |
|---|---|---|---|---|---|---|
| V002 | Peripheral Artery Disease | 2013 | Phase 2 Single-arm | 20 | 10-year follow-up ongoing | 30-day PP: 100%<br>6-month SP: 84%<br>12-month SP: 84%<br>72-month SP: 60%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0 |
| V004 | Peripheral Artery Disease | 2016 | Phase 2 Single-arm | 15 | 5-year follow-up ongoing | 30-day PP: 100%<br>6-month SP: 86%<br>12-month SP: 64%<br>Infection Rate/yr: 0%<br>Number of Rejections: 0<br>Number of Amputations: 0 |

** PP: Primary Patency, which is the interval of time of access placement until any intervention designed to maintain or reestablish patency, access thrombosis, or the time of measurement of patency, i.e. patent without interventions.

SP: Secondary Patency, which is the interval from the time of access placement until abandonment, i.e. patent with or without interventions.

**Trial Design:** Both our V004 and V002 trials are prospective, open-label, single treatment arm, multi-center studies. We enrolled 20 patients in our V002 trial in Poland, and 15 patients in our V004 trial in the United States. Both trials have the primary objectives of evaluating the safety of the HAV as a femoral-to-popliteal bypass graft, and determining the primary, primary assisted, and secondary patency over 12 and 24 months.

**Current Trial Status and Outcomes:** V002 enrolled a total of 20 patients between the ages of 54 and 79 at three clinical sites. 24-month results of the V002 trial were published in 2020. After censoring for three deaths (none of which were determined to be related to the HAV or the implant procedure), we observed 24-month primary, primary assisted and secondary patency rates of 58%, 58%, and 74%, respectively. We observed through ultrasound data that the HAVs were mechanically stable during the follow-up period and did not develop aneurysmal dilatation in any patient. Overall, we also determined through the histological assessment of explanted specimens that there were normal vascular cells within the HAV and there was no infection or signs of immunological reaction to the graft.

There have been no HAV-related infections reported during the V002 trial as of December 31, 2022, and no amputations of the treated extremity. A sub-set of seven V002 subjects consented for long-term follow-up computerized tomography ("CT") angiograms, which were obtained at 48 to 52 months after HAV implantation. In all cases, the HAV maintained normal architecture and function. A representative image is shown below, taken 50 months post-implantation. Proximal and distal anastomoses of HAV with recipient's vasculature are noted, as is the scale bar on the right-hand side of each image. The image presents two views of the same subject, and shows uniform HAV diameter along the length of the implant.

*A CT Angiogram from a V002 Subject at 51 months after HAV implantation*




Patients in the V002 trial are currently in long-term follow-up out to ten years. In 2022, six-year results from V002 were published in *Journal of Vascular Surgery – Vascular Science*. The article, entitled "6-Year Outcomes of a Phase 2 Study of Human-Tissue Engineered Blood Vessels for Peripheral Arterial Bypass," reported overall secondary patency rate of 60% at 72 months, including all patients originally enrolled, as estimated by Kaplan Meier analysis. There was no evidence of graft rejection or infection, and no patients underwent amputation of the affected limb out to six years.

*Long-term results from V002 Phase 2 study in PAD*

| Result from V002 Phase 2 Trial in PAD *(as of April 2021)* | Pre-Op | 1 yr | 2 yr | 3 yr | 4 yr | 5 yr | 6 yr | Avg |
|---|---|---|---|---|---|---|---|---|
| Secondary Patency | — | 84% | 74% | 73% | 66% | 60% | **60%** | — |
| Ankle-Brachial Index (median) | 0.64 | 0.90 | 0.96 | — | 1.07 | 0.98 | 0.94 (n=2) | 0.97 (post-op) |
| HAV Infection Rate | — | 0% | 0% | 0% | 0% | 0% | **0%** | 0% |

The V004 trial enrolled 15 subjects in the United States, with the 12-month follow-up of the last enrolled patient occurring in December 2020. Patients in the V004 trial included Rutherford 4 and 5 subjects, with severe, debilitating limb ischemia. (Rutherford 4 and 5 patients are classified as patients with pain at rest due to limb ischemia (stage 4), and those patients suffering tissue loss in the limb as a result of ischemia (stage 5)). In addition, enrollment in V004 required that no autologous vein be available for bypass. Hence, the subjects enrolled in the V004 trial had severe and debilitating limb ischemia due to PAD and had no autologous vein that was suitable for lesion bypass and revascularization.

*12-month results from V004 Phase 2 study in PAD*

| Result from V004 Trial (as of April 2021) | Pre-Op | 6 mos | 12 mos |
|---|---|---|---|
| Secondary Patency | — | 86% | 64% |
| Ankle-Brachial Index (median) | 0.51 | 0.85 | 0.90 |
| Rate of Amputation | **—** | **0%** | **0%** |
| VascuQol Quality of Life Assessment | 3.1 | 5.6 | 5.9 |

In the V004 trial, HAV secondary patency was 86% at 6 months, and 64% at 12 months. While lower than patency values observed in the V002 trial, patients in the V004 trial had more severe PAD, which is associated with poorer arterial “run-off” and higher propensity for conduit occlusion. Assessment of Quality of Life by the validated VascuQol assessment demonstrated an increase in overall quality of life for V004 patients at 6 and 12 months. In addition, ankle-brachial index, a measurement of blood pressure in the operative limb, was increased at 6 and 12 months. There were no infections of the HAV reported in the V004 trial, despite the severity of the PAD and the often-associated tissue infection that can accompany this disease. There were zero reports of clinical HAV rejection. Lastly, there were zero reported amputations of any operative limb in the first 12 months of follow-up.

The SAEs reported for the HAV in our V002 and V004 Phase 2 clinical studies in PAD in 35 subjects, a patient population which typically has a high prevalence of existing medical conditions, are summarized in the table below.

*SAEs Reported in V002 and V004 Phase 2 Clinical Studies in PAD*

| **Description of SAE** | **Number of SAEs (% of total subjects)** |
|---|---|
| Number of subjects in V002 and V004 studies | N=35 |
| Arterial bypass thrombosis | 3(8)% |
| Anastomotic stenosis | 1(3)% |
| Graft Thrombosis | 2(6)% |
| Vascular Graft Complication | 1(3)% |

Published literature reports of patients with Rutherford stage 4 and 5 PAD and no autologous vein available for revascularization show that outcomes can include amputation. For Rutherford 4,5 patients with no vein and no revascularization procedure, amputation rates at 6 months are reported at 31%. For stage 4,5 patients who do undergo saphenous vein revascularization, the amputation rate at one year is approximately 10%. The lack of amputation for stage 4,5 patients in the V004 trial at one year, none of whom had saphenous vein for revascularization, supports the use of the HAV in severe PAD.

*Examples of the Use of Our 6 millimeter HAVs in Expanded Access Cases*

The FDA has granted use of the HAV in 26 special expanded access cases through December 31, 2022. Each of these compassionate use cases was conducted under an individual, investigator-initiated IND with the FDA. Two cases are highlighted below.

*70-year-old with Critical Limb Ischemia*

The patient is a 70-year-old male with critical limb ischemia and no vein available to perform a bypass, as the vein was previously used for a CABG. He underwent a successful bypass with the HAV. Imaging at one year demonstrated a patent graft.




*42-year-old with Infected Dacron Graft*

An HAV was used in a 42-year-old female to replace an 8 mm Dacron iliac artery bypass graft that had become infected. The patient refused harvesting of the femoral vein for reconstruction and requested the HAV. The patient was seen at one, three, six, nine, and 12 months after HAV implantation. At all visits, the HAV appeared normal with unobstructed patency. Flow and velocities were normal. At three months, the patient was released to full activity. At six and 12 months, the graft was functioning well. At one-year imaging, the HAV was patent and appeared remarkably similar to the patient's native blood vessels. The patient had no signs of infection in the HAV and continues to have no limitations or complications during normal activity or exercise.

*Mayo Clinic Study in Severe PAD*

The Mayo Clinic, Rochester, MN, is conducting a study in up to 25 patients with severe PAD under an investigator IND filed with the FDA. As of December 25, 2022, 18 patients have been implanted with the HAV under the study.

***Preclinical Pipeline***

*Pancreatic Islet Transplantation for Type 1 Diabetes ("Biovascular Pancreas")*

The Biovascular Pancreas ("BVP") is a modification of Humacyte's HAV product, leveraging the HAV to deliver therapeutic cells within close proximity of the patient's bloodstream. We believe that the HAV extracellular matrix material is both highly biocompatible, as evidenced by adaptive cellular repopulation after implantation, and also highly angiogenic, as evidenced by extensive formation of microvessels surrounding the HAV in vivo. These attributes mean that the HAV may serve as a suitable conduit for delivering large numbers of therapeutic cells to a patient.

Pancreatic islets, which sense blood glucose and respond by secreting insulin, are destroyed by an auto-immune attack in patients with Type I diabetes. The outer surface of our 42cm HAV has sufficient surface area to accommodate a monolayer of approximately 800,000 human pancreatic islets, which is approximately the number in an entire adult pancreas, and can reverse diabetes and restore glucose control.

We have performed mathematical modelling studies that predict, we believe, that a 42cm HAV could maintain viability of a therapeutic number of islets after implantation of the HAV into the arterial bloodstream, or after implantation as an AV conduit similar to that used for hemodialysis access. Bioreactor experiments have confirmed these mathematical conclusions. Furthermore, we have implanted rat-sized BVPs into the aortas of diabetic rats, and observed that the BVP could restore normal glucose levels in all treated animals, while control animals ("No Flow" in red in figure below) did not restore glucose control. Studies in large animal models are planned to commence in 2023 as the next step in the development of this product candidate.







*Coronary Artery Bypass Graft (CABG)*

Evaluation of 3- and 4mm diameter HAVs for coronary artery bypass is ongoing at Humacyte. Our initial pilot studies have included the use of our engineered vessels for CABG in canines, demonstrating functional patency and adequate blood flow for up to one month. To further evaluate the utility and durability of the HAV in a large animal model, we have initiated a preclinical study at Duke University to evaluate the use of our small diameter HAV for CABG in adult primates (baboons). The goal of this study is to assess patency and function for six to 12 months, as well as host responses and cellular remodeling. HAVs are followed by ultrasound imaging of the heart, and angiographic imaging of the conduits. In July 2022, preclinical data on use of the small-diameter HAV in CABG was presented at American Heart Association Basic Cardiovascular Sciences Scientific Sessions. Coronary bypass in a non-human primate model, with follow-up of six months, showed that the HAV maintained structural integrity and functioned well to conduct blood flow to the heart. In addition, the HAV was observed to have robust cell repopulation with vascular cells over time, becoming a living vascular tissue supplying the heart muscle. During 2023 we plan to commence IND-enabling preclinical studies in large animals to support potential advancement of the HAV into human clinical trials.

*Before (left) and after (right) implantation of HAV CABG in baboon*



*Pediatric Heart Surgery: Modified Blalock-Taussig-Thomas (mBTT) Shunt*

Tetrology of Fallot is a relatively common congenital heart defect, that is often treated using a modified Blalock-Taussig-Thomas (“mBTT”). To support a potential future IND filing with the FDA, we have evaluated the use of our HAV as an mBTT shunt for up to six months in juvenile primates at the Research Institute at Nationwide Children’s Hospital in Columbus, Ohio.

*BT Shunt Implant Schematic*




In November 2021, the results for this preclinical study were presented at the American Heart Association’s Scientific Sessions 2021 meeting. In this study, five non-immunosuppressed juvenile primates were surgically implanted with the 3.5mm diameter HAVs as mBTT shunts. The 3.5mm HAVs were implanted into primates as mBTT shunts using standard surgical techniques, and the animals were studied for three to six months. Each of the HAVs remained parent during the study and exhibited repopulation with vascular cells. Two of the primates showed a stronger xenogeneic to the human HAV material.

The 3.5mm diameter HAV has smaller product dimensions but is manufactured using a similar process as Humacyte's 6mm HAV system currently being evaluated in clinical trials in vascular trauma, AV access for hemodialysis, and PAD. We believe that the production of the functional 3.5mm HAV is indicative of the potentially broad application of our proprietary bioengineered tissue platform and manufacturing processes.

*Imaging of 3.5mm HAV mBTT shunt in juvenile primate followed for 6 months*




*Engineered Trachea for Treatment of Severe Airway Injuries*

Each year in the United States, approximately 4,000 operations are performed to repair or reconstruct the trachea or mainstem bronchi. But unlike most other connective tissues in the body — such as blood vessel, bone, skin and tendon — there currently are no replacements for tracheal tissue that are in widespread clinical use. For long tracheal or bronchial defects, some sort of tracheal replacement is often needed, yet none exists currently. The lack of a functional tracheal conduit commits patients to, sometimes, slow suffocation.

We have modified the HAV production process to enable the embedding of a biocompatible medical-grade stent within the wall of the engineered vessel. Combining a non-degradable stent with the degradable polymer scaffold used for HAV production results in a composite scaffold that can be seeded with smooth muscle cells and grown in culture. After decellularization, the engineered trachea consists of the extracellular matrix contained in the HAV, along with an embedded stent that prevents the collapse of the engineered airway with inspiration or neck movements.

*Summary of Process to Generate Engineered Tracheas*




In models where engineered tracheas were implanted into rats and non-human primates, we have observed that the implants repopulate with cells from the host, including cuboidal respiratory epithelium that lines the native airway progressively from two to eight weeks after implantation. We have further observed that the engineered tracheas can function out to two months. Future studies in large animal models are planned.

*Photograph (A) of Implantation of Engineered Trachea into Non-Human Primate Airway; Microscope Imaging of Cells Repopulating the Trachea after 2 and 8 weeks (B, C)*




*Engineered Whole Lung Organs*

End-stage lung disease is the fourth leading cause of death in the U.S., and lung transplantation remains severely limited by donor organ shortages. Dr. Niklason's laboratory at Yale University has pioneered the development of using decellularized native lungs, combined with targeted recellularization of the lung scaffolds within biomimetic bioreactors, to produce whole lungs that are capable of exchanging gas. Gas exchange for several hours has been observed in studies in rodents. Efforts to scale-up the technology to human-sized organs are ongoing.

*Structure of Lung, Scaffold for Lung Engineering, and Implanted Engineered Lung*



***Manufacturing***

We have developed a novel paradigm for manufacturing human tissues that mimics key aspects of human physiology. Recognizing that commercial scale production capacity of bioengineered tissue has been non-existent, we prioritized the development of a scalable, reproduceable, commercial biomanufacturing process. At our 83,000 square foot manufacturing facility in Durham, North Carolina, we have industrialized this concept and created a scalable modular manufacturing process that enables us to engineer our HAVs in commercial quantities in a system designed for cGMP compliance.

Our proprietary manufacturing process was designed with a modular approach allowing us to produce HAVs in smaller batches for clinical trials and scale out to larger batches for commercial manufacturing. The system used to produce HAVs for use in our clinical trials from 2016 to 2021, including Phase 3 trials, utilized a single tray within one growth drawer holding ten HAVs per batch. These batches were manufactured at a contract manufacturer. The current, commercial-scale LUNA200 system utilizes 20 growth drawers holding ten HAVs each for a total of 200 HAVs per batch. Since 2021 this system has been utilized to produce clinical product for use in our ongoing Phase 3 trials, and is planned for use to supply our anticipated commercial launches upon approval.

Our manufacturing process utilizes our LUNA200 system, consisting of 20 "growth drawers." Each growth drawer is capable of producing ten 42cm HAVs and each HAV remains contained within an individual bioreactor bag. Inside a LUNA200, a closed tubing network connects all 20 growth drawers as well as the ten bioreactor bags in each drawer, allowing the entire system to share cells and nutritive media. In this way, a single LUNA200 can produce up to 200 HAVs per batch while maintaining the critical operating parameters that direct growth, creating a gross capacity of approximately 900 HAVs per system annually.

A thorough comparability assessment was performed to evaluate HAV batches produced in the single-drawer system versus batches produced in the 20-drawer LUNA200 system. The study assessed 22 separate comparisons on the identity, strength, quality, purity, and potency of the HAV product. In this study, we observed that HAVs produced in the LUNA200 system were comparable to HAVs produced in the single-drawer system. Additionally, a crossover study, called V011, enrolled 30 subjects to evaluate HAVs that were manufactured on Humacyte's commercial LUNA200 platform with the primary goal to evaluate the safety, efficacy and immunogenicity of the LUNA200-manufactured HAVs. In this trial we observed comparable safety profile between HAV used in previous studies and the HAV manufactured in the LUNA200 commercial system. The results of the comparability assessment and from the V011 crossover study were submitted to the FDA. In 2021, the FDA authorized the use of HAVs produced in the commercial LUNA200 system to supply our ongoing clinical trials. We plan to also use the LUNA200 system for anticipated commercial launches of the HAV if it is approved.

We have designed the LUNA200 to have the ability to produce HAVs in diameter sizes from 3mm to 10mm and lengths from 10cm to 42cm, making the equipment suitable for the varied array of product candidates in our pipeline. We intend to introduce a 13cm HAV line extension after commercial launch of the 42cm HAV. Using our existing LUNA manufacturing equipment, we can generate 400 13cm HAVs per batch. Our modular manufacturing platform can be scaled without impacting the operating parameters that support the HAV growth process. We have designed our manufacturing system to be functionally closed, to utilize single-use disposable materials with aseptic connections, and to be fully automated.

*Modular Manufacturing Platform Allows for Production of Multiple Product Lengths Using the Same Equipment*



We currently have eight LUNA200 systems installed, commissioned and qualified in our manufacturing facility, creating an annual gross HAV capacity of approximately 7,200 HAVs. Our manufacturing facility contains space to increase capacity in future years to approximately 40 LUNA200 systems in total. As we continue to expand production, we believe that we will have the ability to take advantage of economies of scale and reduce production costs. The initiation and pace of the expansion of vessel capacity will be determined based on our assessment of market opportunity.




We initiate HAV production using primary human aortic vascular cells from a working cell stock ("WCS") that is isolated from FDA-compliant donor tissues and cryopreserved. The WCS vials are stored at two separate qualified facilities to mitigate the risk of single site storage. We qualify all new WCSs for use in HAV manufacturing utilizing biochemical and gene expression assays. Each qualified primary isolation can produce approximately 500,000 to one million HAVs.

The WCS expanded using traditional cell culture techniques, and the cells are transferred onto a biocompatible, biodegradable polymer mesh within a flexible, single-use bioreactor bag. Cells inoculated onto this tubular mesh are cultured utilizing a proprietary culture medium and subjected to cyclic mechanical stretch for a period of approximately eight weeks. During this period, the cells proliferate and build extracellular matrix while the polymer mesh degrades. The resulting bioengineered vessel is comprised of the aortic vascular cells and their deposited extracellular matrix. After completion of the culture period, we decellularize the bioengineered vessel using a proprietary combination of salts, enzymes and detergents, followed by numerous washes in excipient grade neutral pH buffered saline. The resulting HAV retains the human extracellular matrix constituents and, therefore, the biomechanical properties of the bioengineered vessel, but cells and cellular components, which could induce a foreign body response or immune rejection following implantation, are removed. After decellularization, our HAVs are packaged for distribution inside the same flexible bioreactor bag in which they were produced, with sterile phosphate buffered saline as the excipient. Once the package is delivered to the operating room, the HAV is removed from the bioreactor bag by the surgical staff.

***Suppliers***

We source critical components and necessary raw materials from vendors that have been approved and qualified through our vendor management program. SeraCare, which was subsequently acquired by LGC Clinical Diagnostics, Inc. ("SeraCare"), is the current single source supplier of human plasma used in our manufacturing process and Confluent Medical Technologies, Inc. ("Confluent") is the current single source supplier of the polymer mesh we use. We source custom, Humacyte-designed, pre-sterilized (gamma irradiated) assemblies and single-use tubing sets through multiple approved vendors. We source bioprocess solutions, including culture media and decellularization buffers, from a division of Thermo Fisher Scientific, which has a second production site to provide redundant media/buffer production capacity. We are in the process of developing redundant vendors for all critical materials and we manage all vendor changes through a robust change control process.

*Supply Agreement with SeraCare*

In January 2014, we entered into a supply agreement with SeraCare for the supply of human plasma, which was amended in October 2018. We refer to the supply agreement, as amended, as the SeraCare Agreement. Under the SeraCare Agreement, we agreed to purchase at least a substantial majority of our human plasma requirements from SeraCare. In the event SeraCare is unable to fulfill our requirements, and subject to certain conditions, we may engage another plasma supplier during the period in which SeraCare is unable to fulfill our requirements. The SeraCare Agreement is subject to annual price modifications in the case of significant changes in SeraCare's cost of raw materials, with any modification to be determined at least three months prior to the end of the relevant year. The initial term of the SeraCare Agreement expires on October 12, 2023, but automatically extends for subsequent one-year periods unless terminated by either party at least 18 months prior to the end of the initial term. Either party may terminate the SeraCare Agreement for uncured material breach or for the insolvency of the other party at any time. In addition, either party may terminate the SeraCare Agreement without cause upon 12 months' written notice. We may also terminate the agreement in the event of certain supply interruptions. Each party also agreed to indemnify the other against certain third-party claims up to a specified cap.

*Supply Agreement with Confluent*

In August 2015, we entered into an agreement for the supply of polymer mesh, which we refer to as the mesh supply agreement, with Biomedical Structures LLC. Biomedical Structures' rights and obligations under the mesh supply agreement were subsequently assigned to Confluent in connection with Confluent's acquisition of Biomedical Structures in 2016. In 2020, the agreement was amended to align with the growth expected with the transition to commercial distribution following FDA approval. Pursuant to the mesh supply agreement, the price of polymer mesh we purchase from Confluent is subject to potential adjustment if Confluent's cost of raw materials increases above a specified threshold pursuant to good faith negotiations from both parties, which negotiation Confluent may not request more than once in a 12-month period. The 2020 amendment also provided volume driven discounts. Confluent is obligated to partner with Humacyte in order to establish redundant facilities for the manufacture of the polymer mesh at established contractual volume thresholds. The amended mesh supply agreement has a term of three years, which can be automatically extended for subsequent one-year periods and will continue to do so unless either party provides notice of non-renewal at least 120 days prior to the end of the then-current term or otherwise terminates in accordance with the agreement. We and Confluent are each also permitted to terminate the mesh supply agreement for convenience, however Confluent must provide us with at least 365 days written notice and we are obligated to provide 180 days' notice, prior to such a termination. In addition, each party is permitted to terminate the mesh supply agreement for an uncured material breach by the other party following failure to remedy the breach during a sixty-day cure period. Both parties have agreed to indemnify one another for certain third-party claims.

***Distribution***

*Commercialization Strategy Within United States and for Earlier-Stage Pipeline Programs*

For our vascular repair and replacement applications of our technology, including renal replacement therapy for dialysis access, the treatment of PAD, and the treatment of vascular trauma, we have retained the right to commercialize our HAV within the United States, and expect to commercialize the HAV through a combination of our own direct sales and marketing team combined with our partnership with Fresenius Medical Care described below. We plan to own end-to-end commercialization while pursuing collaborations with appropriate strategic partners who have established distribution channels for supplying customer care centers.

Our first expected market launch, in the treatment of vascular trauma, is a highly concentrated market of approximately 200 Level I Trauma Centers that may be reached with a small field sales forces of no more than 20 representatives. Many of the major trauma centers already have familiarity with our HAV product candidate through their participation in our clinical trials. Our sales effort will include dual targeting of surgeons to create pull-through demand and hospital administration (trauma center Value Analysis Committees) to assure adoption and uptake of the HAV in vascular trauma.

We expect that the large market potential of earlier-stage applications of our technology platform such as CABG and biovascular pancreas for diabetes will provide additional collaboration opportunities, and we expect explore strategic partnerships for these product candidates as preclinical and clinical results providing additional proof of concept are generated.

*Distribution Agreement with Fresenius Medical Care*

We entered into a distribution agreement with Fresenius Medical Care in June 2018 which, as amended as of February 16, 2021, granted Fresenius Medical Care and its affiliates exclusive rights to develop outside the United States and European Union (the "EU") and commercialize outside of the United States our 6 millimeter x 42cm HAV and all improvements thereto, and modifications and derivatives thereof (including any changes to the length, diameter or configuration of the foregoing), for use in vascular creation, repair, replacement or construction, including renal replacement therapy for dialysis access, the treatment of peripheral artery disease, and the treatment of vascular trauma, but excluding coronary artery bypass graft, pediatric heart surgery, or adhering pancreatic islet cells onto the outer surface of the distribution product for use in diabetic patients. Within the United States, Fresenius Medical Care will collaborate with Humacyte in its commercialization of the product in the field, including adoption of the distribution product as a standard of care in patients for which such use is supported by clinical results and health economic analyses.

We are responsible for developing and seeking regulatory approval for the distribution product in the field in the United States. For countries outside the United States, the parties agreed to use commercially reasonable efforts to satisfy certain agreed minimum market entry criteria for the distribution product in the field in such country. For the EU, once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory

approval for the distribution product in the field in the applicable country, we agreed to use commercially reasonable efforts to obtain such regulatory approval (other than pricing approval), and Fresenius Medical Care agreed to use commercially reasonable efforts to obtain the corresponding pricing approval. For the rest of the world (i.e., outside the United States and the EU), once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory and pricing approval for the distribution product in the field in the applicable country, Fresenius Medical Care agreed to use commercially reasonable efforts to obtain such approvals, and we agreed to use commercially reasonable efforts to support Fresenius Medical Care in its efforts.

Under the distribution agreement, we grant an exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by us during the term to commercialize the distribution product in the field outside the United States, subject to our retained rights to carry out our obligations under the distribution agreement. We also grant a non-exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by us during the term to develop the distribution product in accordance with the terms of the distribution agreement. In addition, we grant to Fresenius Medical Care, among other things, a perpetual, irrevocable, non-exclusive sublicensable license under the patents and know-how that primarily relate to the distribution product or its manufacture and that were created, conceived or developed solely or jointly by or on behalf of Fresenius Medical Care in the performance of its activities under the distribution agreement.

The distribution agreement provides that we will own all know-how and patents that primarily relate to the distribution product or its manufacture that are created, conceived or developed by or on behalf of either party in the performance of activities under the distribution agreement. Ownership of all other know-how, patents, materials and other intellectual property created, conceived or developed during the performance of activities under the distribution agreement will be determined in accordance with U.S. patent laws for determining inventorship.

We are obligated to make payments to Fresenius Medical Care based on a share of aggregate net sales by or on behalf of us of the distribution product in the United States in the field. Such revenue-share payments will be a percentage of net sales in the low double digits, without regard to the calendar year in which such net sales are attributable, until such time that we have paid to Fresenius Medical Care a certain total amount, at which time the revenue-share will decrease to a percentage of net sales in the mid-single digits. The amounts that Fresenius Medical Care will be obligated to pay us under the distribution agreement for sales of the distribution product in the field outside of the United States will vary. Fresenius Medical Care agreed to pay us initially, on a country-by-country basis for sales outside of the United States, the amount equal to the average cost of manufacturing our distribution product plus a fixed dollar amount per unit. Following a specified period, on a country-by-country basis outside of the United States, Fresenius Medical Care will pay us a fixed percentage of net sales for each unit sold in such country, such that the Company will receive more than half of such net sales.

The distribution agreement will generally continue on a country-by-country basis until the later of the tenth anniversary of the launch date of the distribution product in the relevant country or (b) the expiration of the last-to-expire valid claim of specified patents in such country. Each party is permitted to terminate the distribution agreement for insolvency of, or, under certain circumstances, including various cure periods, material breach by the other party. Subject to a cure period, Fresenius Medical Care may also terminate the distribution agreement in its entirety or on a country-by-country basis (i) for certain withdrawals of regulatory approval or (ii) for termination or expiration of any of our in-licenses that is necessary for the exercise of Fresenius Medical Care’s rights, or the satisfaction of its obligations, under the distribution agreement. In addition, Fresenius Medical Care may terminate the distribution agreement for convenience on a country-by-country basis upon not less than 12 months’ written notice to us, although Fresenius Medical Care is not permitted to give such notice prior to the end of the second year following launch of the distribution product in such country. Each party is required to indemnify one another for certain third-party claims.

***Third-Party Reimbursement***

We anticipate that coverage and reimbursement by the Centers for Medicare and Medicaid Services (“CMS”) and private payors will be essential for most patients and health care providers to afford our treatments, particularly in the applications of renal replacement therapy for dialysis access and the treatment of PAD. Accordingly, sales of our products will depend substantially, both domestically and abroad, on reimbursement by government authorities, private health coverage insurers and other third-party payors. Our strategy around HAV reimbursement focuses on achieving alignment and agreement from CMS on coding and payment pathways; both are critical to influencing and achieving optimal reimbursement payment from private payor sources. Therefore, Humacyte continues to develop a comprehensive reimbursement strategy including CMS, private payors, and other key stakeholders to ensure a clear and sustainable reimbursement path for all HAV product opportunities.

We are pursuing a dual regulatory and legislative reimbursement strategy to ensure separate Medicare payment for the HAV at an appropriate price. The regulatory strategy includes (1) engaging CMS political and career staff directly on coverage, payment, and coding followed by (2) submission of formal applications in these areas once FDA approval is obtained. Currently, no RMAT tissue engineered product has established coverage and reimbursement by CMS, and it is difficult to predict what CMS will decide with respect to coverage and reimbursement for fundamentally novel products. See "Risk Factors — Risks Related to the Development and Commercialization of Our Product Candidates" for further information. Even if we receive marketing approval for our HAVs, there is uncertainty with respect to third-party coverage and reimbursement of our HAVs. They may also be subject to unfavorable pricing regulations, third-party reimbursement practices or healthcare reform initiatives, any of which could harm our business, prospects, operating results and financial condition.

Containment of healthcare costs has been a priority of federal, state, and foreign governments, and the prices of drug products have been a focus of this effort. Governments have shown significant interest in implementing cost-containment programs. This interest has resulted in significant proposed and enacted reform measures affecting healthcare reimbursement and drug pricing, including the enactment in August 2022 of significant changes to potential Medicare drug product reimbursement through government negotiation of certain drug prices, as well as manufacturer discount and inflation rebate obligations under the Inflation Reduction Act (the "IRA").

***Intellectual Property***

We strive to protect and enhance the proprietary technology, inventions and improvements that are commercially important to the development of our business, including seeking, maintaining, and defending patent rights, whether developed internally or licensed from third parties. We also rely on trade secrets relating to our proprietary technology platform and on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen and maintain our proprietary position that may be important for the development of our business. We additionally may rely on regulatory protection afforded through data exclusivity, market exclusivity and patent term extensions where available.

Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, preserve the confidentiality of our trade secrets, and operate without infringing the valid and enforceable patents and proprietary rights of third parties.

As of December 31, 2022, our patent estate is comprised of 18 families of patents. Of these families, 14 are solely owned by Humacyte, one is jointly owned by Humacyte and Global Life Sciences Solutions USA LLC, one is jointly owned by Humacyte and Yale University, one is exclusively licensed to Humacyte from Duke University and one is exclusively licensed to Humacyte from Yale University. For more information regarding these license agreements, see "— License Agreement with Duke University" and "— License Agreements with Yale University."

Our 18 families of patents are comprised of:

(i) eight issued U.S. patents, 74 foreign patents in Austria, Australia, Belgium, Canada, China, Cyprus, Denmark, France, Germany, Greece, Hong Kong, Hungary, Ireland, Italy, Japan, Netherlands, Portugal,Spain, Sweden, Switzerland, Turkey, and the UK, nine pending U.S. non-provisional patent applications, one pending PCT patent application and seven pending foreign applications in Australia, Canada, China, Europe and Japan, which are solely owned by us,

(ii) three issued U.S. patents, 19 issued foreign patents in Australia, Austria, Belgium, Canada, Denmark, France, Germany, Ireland, Italy, Japan, Netherlands, Spain, Sweden, Switzerland, Turkey, and the UK, one pending U.S. non-provisional patent application, and two pending foreign patent applications in Europe and Canada, which we co-own, and

(iii) one issued U.S. patents, seven issued foreign patents in Canada, France, Germany, Italy, Spain, Sweden, and the UK, one pending U.S. non-provisional patent application, and six pending foreign patent applications in Australia, Canada, Europe, Japan, China, and Hong Kong, which we exclusively license.

Many of these patents and patent applications generally relate to the scaffolds used to make our vessels, the composition of our vessels, and systems and methods of manufacturing our vessels. Excluding any patent term adjustment or patent term extension, the U.S. patent relating to the scaffold used to make our vessels expires in 2032, the U.S. patents relating to the composition of our vessels expire in 2032 and the U.S. patents relating to the systems and methods of manufacturing our vessels expires in 2032. The U.S. patent relating to the entangler machinery used to make tubular

scaffolds expires in 2035. Included in our patent portfolio are nine pending, Humacyte-owned non-provisional applications relating to the manufacturing of engineered tissues at commercial scale, as well as other technologies and product candidates. If these non-provisional applications are allowed, such additional patents issuing therefrom would be expected to expire around 2043.

As with other biotechnology and pharmaceutical companies, our ability to maintain and solidify our proprietary and intellectual property position for our product candidates will depend on our success in obtaining effective patent claims and enforcing those claims if granted. However, our owned and licensed pending patent applications, and any patent applications that we may in the future file or license from third parties, may not result in the issuance of patents. For more information, see "Risk Factors — Risks Related to Our Intellectual Property."

We have also registered trademarks for use in connection with our products. These include registrations for HUMACYL™ in the United States, Europe, Australia, Canada, China, and Israel; HUMAGRAFT™ in Australia, China, Europe, and Israel; HUMAPASS™ in Europe, Australia, and Israel; and HUMACYTE, in the United States, Europe, Australia, Canada, and Israel. We may pursue additional registrations for future products in markets of interest.

In addition to the above, we have established expertise and development capabilities focused in the areas of preclinical research and development, manufacturing process scale-up, cGMP manufacturing, quality control, quality assurance, compliance, regulatory affairs and clinical trial design and execution. We believe that our focus and expertise will help us develop and expand technology-based applications leveraging our proprietary intellectual property.

Finally, we rely, in some circumstances, on trade secrets to protect our technology. We seek to protect our proprietary technology and processes, in part, by entering into confidentiality agreements with our employees, consultants, scientific advisors and contractors. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems.

In addition to the intellectual property that we have developed internally, we license rights to certain intellectual property that is material to our business prospects. We have summarized our material license agreements below.

*License Agreement with Duke University*

In March 2006, we entered into a license agreement with Duke University ("Duke"), which was subsequently amended in 2011, 2014, 2015, 2018, 2019 and January 2022. We refer to the license agreement, as amended, as the Duke License Agreement. Under the Duke License Agreement, Duke granted us a worldwide, exclusive, sublicensable license to certain patents related to decellularized tissue engineering, which we refer to as the patent rights, as well as a non-exclusive license to use and practice certain know-how related to the patent rights. The relevant licensed patent on decellularization of tissue expired in 2021. We have agreed to use commercially reasonable efforts to develop, register, market and sell products utilizing the patent rights, which we refer to as the licensed products. Any services provided to a third party utilizing licensed products are referred to as licensed services. We have also agreed to meet certain benchmarks in our development efforts, including as to development events, clinical trials, regulatory submissions and marketing approval, within specified timeframes. Under the Duke License Agreement, Duke retains the right to use the patent rights for its own educational and research purposes, and to provide the patent rights to other non-profit, governmental or higher-learning institutions for non-commercial purposes without paying royalties or other fees.

In connection with our entry into the Duke License Agreement, we granted equity consideration to Duke in the form of 52,693 shares of our post-Merger common stock. Under the Duke License Agreement, we have also agreed to pay Duke: a low single-digit percentage royalty on eligible sales of licensed products and licensed services, plus a low double-digit percentage of any sublicensing revenue; an annual minimum royalty beginning in 2012, which increases in the calendar year immediately following the first commercial sale of licensed products or licensed services (whichever occurs first); and an additional amount in license fees, as certain scientific milestones are met.

The Duke License Agreement remains effective until the latter of (i) the last of the patent rights expires or (ii) four years after our first commercial sale, unless earlier terminated. Either party may terminate the agreement for fraud, willful misconduct or illegal conduct, or uncured material breach. Duke may terminate the agreement if we become insolvent. Duke may also terminate the license, convert the license into a non-exclusive license or seek assignment of any sublicense if we fail to reach diligence milestones within the applicable time period. If we abandon any claim, patent or patent application, our rights under the license with respect to such patent rights will be terminated in the territory in which we abandon such rights. We may terminate the Duke License Agreement unilaterally upon three months' prior notice to Duke. We agree to indemnify Duke against certain third-party claims.

*License Agreements with Yale University*

*Large Diameter HAV*

In August 2019, we entered into a license agreement with Yale University ("Yale") that granted us a worldwide license to the patents jointly owned with us related to tubular prostheses which are large diameter versions of our vessels, which may or may not contain a stent. The license granted under the agreement is exclusive in the field of engineered urinary conduits, engineered tracheae/airways and engineered esophagi, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. We have agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. We are also obligated to provide Yale periodically an updated and revised copy of our plan, which must indicate progress of our development and commercialization. We may also sublicense our rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with our entry into the Yale License Agreement, we paid Yale an upfront cash fee of less than $0.1 million. We have also agreed to pay to Yale: an annual maintenance fee, increasing between the first anniversary of the agreement until the fifth anniversary up to a maximum of less than $0.1 million per year; milestone payments upon achievement of certain regulatory and commercial milestones of $0.2 million and $0.6 million for this license; a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and a low double-digit percentage of sublicensing income.

If we or any of our future sublicensees bring a patent challenge against Yale or assist another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The agreement expires on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Issued patents and additional patents issuing from this licensed portfolio will expire no earlier than 2032, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Issued U.S. patent No. 10,172,707 will expire no earlier than 2035. Issued patents and additional patents issuing from this licensed portfolio will expire no earlier than 2032, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Issued U.S. patent No. 10,172,707 will expire no earlier than 2035. Yale may terminate the agreement if we fail to (i) provide written diligence reports, (ii) provide a commercially reasonable diligence plan, (iii) implement the plan in accordance with the obligations under the agreement, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreement; however, any such termination right would be limited in scope to the country or countries to which such failure relates. Yale may also terminate for our non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of our product or insolvency. We may terminate the license agreement (i) on 90 days' prior written notice to Yale, provided we are not in breach of the license agreement and have made all required payments to Yale thereunder and (ii) on written notice to Yale following an uncured material breach. Under certain circumstances, Yale may, at its option, convert the exclusive license to a non-exclusive license if we decline to initiate certain infringement or interference proceedings with respect to the licensed patents. We have agreed to indemnify Yale against certain third-party claims.

*Small Diameter HAV Coating*

In February 2014, we entered into a license agreement with Yale that granted us a worldwide license to the patents related to coatings for small-diameter vessels to inhibit clotting. The license granted under the agreement is exclusive in the field of engineered vascular tissues and tissues and extracellular matrix-based implants used for vascular repair, reconstruction and replacement (provided that all uses are vascular tissues within the range of 1-12mm in diameter), except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. We have agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. We are also obligated to provide Yale periodically an updated and revised copy of our plan, which must indicate progress of our development and commercialization. We may also sublicense our rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with our entry into the Yale License Agreement, we paid Yale an upfront cash fee of less than $0.1 million. We have also agreed to pay to Yale: an annual maintenance fee, increasing between the first anniversary of the agreement until the fifth anniversary up to a maximum of less than $0.1 million per year; milestone payments upon

achievement of certain regulatory and commercial milestones of $0.2 million and $0.6 million for this license; a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and a low double-digit percentage of sublicensing income.

If we or any of our future sublicensees bring a patent challenge against Yale or assist another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The agreement expires on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Issued patents and additional patents issuing from this licensed portfolio will expire no earlier than 2034, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Issued patents and additional patents issuing from this licensed portfolio will expire no earlier than 2034, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Yale may terminate the agreement if we fail to (i) provide written diligence reports, (ii) provide a commercially reasonable diligence plan, (iii) implement the plan in accordance with the obligations under the agreement, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreement; however, any such termination right would be limited in scope to the country or countries to which such failure relates. Yale may also terminate for our non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of our product or insolvency. We may terminate the license agreement (i) on 90 days' prior written notice to Yale, provided we are not in breach of the license agreement and have made all required payments to Yale thereunder and (ii) on written notice to Yale following an uncured material breach. Our rights under the license agreement will also terminate automatically with respect to a patent application or patent within the licensed patents in a specified country if, upon receipt of written notice from Yale, we do not agree to pay the patent filing, prosecution and maintenance fees incurred by Yale for such patent applications or patents in the specified country. Under certain circumstances, Yale may, at its option, convert the exclusive license to a non-exclusive license if we decline to initiate certain infringement or interference proceedings with respect to the licensed patents. We have agreed to indemnify Yale against certain third-party claims.

On December 21, 2022, we provided notice to Yale that we were terminating the license effective March 21, 2023 as we do not intend to use the technology underlying the patents.

*Biovascular Pancreas*

In August 2019, we entered into a license agreement with Yale that granted us a worldwide license to its patents related to a biovascular pancreas. The license granted under the agreement is exclusive in the field of acellular vascular tissues that deliver pancreatic islet cells to patients, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. We have agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. We are also obligated to provide Yale periodically an updated and revised copy of our plan, which must indicate progress of our development and commercialization. We may also sublicense our rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with our entry into the Yale License Agreement, we paid Yale an upfront cash fee of less than $0.1 million. We have also agreed to pay to Yale: an annual maintenance fee, increasing between the first anniversary of the agreement until the fifth anniversary up to a maximum of less than $0.1 million per year; milestone payments upon achievement of certain regulatory and commercial milestones of $0.1 million and $0.2 million for this license; a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and a low double-digit percentage of sublicensing income.

If we or any future sublicensees bring a patent challenge against Yale or assist another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The agreement expires on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Patents issuing from this licensed portfolio will expire no earlier than 2039, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Patents issuing from this licensed portfolio will expire no earlier than 2039, and the term of each patent may be extended by patent term adjustment, patent term extension, or foreign equivalents thereof. Yale may terminate the agreement if we fail to (i) provide written diligence reports, (ii) provide a commercially reasonable diligence plan, (iii) implement the plan in accordance with the obligations under the agreement, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreement; however, any such termination right would be limited in scope to the

country or countries to which such failure relates. Yale may also terminate for our non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of our product or insolvency. We may terminate the license agreement (i) on 90 days' prior written notice to Yale, provided we are not in breach of the license agreement and have made all required payments to Yale thereunder and on written notice to Yale following an uncured material breach. Our rights under the license agreement will also terminate automatically with respect to a patent application or patent within the licensed patents in a specified country if, upon receipt of written notice from Yale, we do not agree to pay the patent filing, prosecution and maintenance fees incurred by Yale for such patent applications or patents in the specified country. Under certain circumstances, Yale may, at its option, convert the exclusive license to a non-exclusive license if we decline to initiate certain infringement or interference proceedings with respect to the licensed patents. We have agreed to indemnify Yale against certain third-party claims.

***Competition***

Despite the magnitude and critical nature of the diseases and conditions we are targeting, no significant advances in the open surgical market have been made in the last 35 years, and current treatment and products used in vascular repair, reconstruction and replacement suffer from various drawbacks. The large majority of vascular repair, reconstruction and replacement procedures rely on either harvesting autologous veins or using synthetic grafts. However, each method presents significant limitations as discussed below:

*Autologous Veins*

The harvest of autologous veins is a serious operation that can result in numerous complications, including infection, chronic pain, and limb swelling that severely impact the patient's quality of life. In addition, this procedure can often result in long recovery times, increased hospital stays, and increased risk of hospital readmission. In order to obtain an autologous vein, such as a saphenous vein, for use in a surgical procedure, a second operation must be performed on the patient to harvest the vein. The harvesting process must be completed before the bypass procedure occurs and can take significant time to complete, which increases costs related to the additional operative time and staff required to perform the operation. Even if successful, the patient's recovery time could increase as the patient must recover from two surgical procedures instead of one, further increasing morbidity and cost. Additionally, a significant percentage of patients are not suitable for vein harvesting either due to vein or limb damage, limited vein supply from prior harvest, venous disease or the surgeon's desire to preserve the vein for future coronary or other bypass procedures. In acute trauma, the time to restore blood flow to injured limbs is delayed when a vein must be harvested from the patient, which puts the limbs at greater risk of reduced function or amputation. For patients suffering from vascular trauma, some types of injury preclude the harvesting of autologous saphenous vein due to concomitant injuries of one or both legs. Furthermore, time is required to prepare the vein harvest site and to remove the vein from the leg, which adds to ischemia time and can increase the risk of tissue and limb loss. Rates of traumatic limb loss are strongly tied to ischemia time, and therefore rapid revascularization using an off-the-shelf HAV conduit may decrease ischemia time and lead to better outcomes.

The use of autologous vein for creating an AV fistula for use in hemodialysis is often limited by vein size and location. The vast majority of veins must go through a process of enlargement, known as maturation, prior to use for hemodialysis. For approximately 40% of patients receiving fistulae, the vein does not mature sufficiently to allow for hemodialysis even after six months. Even in patients having adequate veins for fistula creation, the fistula often becomes large, tortuous and disfiguring and can be at risk for sometimes fatal rupture.

*Synthetic Grafts*

Use of synthetic materials, such as ePTFE and Dacron, while widely available, have known complications, such as continuous chronic risk of infection and clotting inside the graft. Risk of infection is significantly increased in acute battlefield and civilian injuries, as well as in contaminated wounds. The body recognizes any synthetic materials as foreign and, therefore, can mount a host foreign body response following implantation. Synthetic materials also have been shown to be inferior to autologous vein in resisting infection, and generally only are used for vascular repair when autologous vein is not an option.

In hemodialysis access, persistent puncture presents an ongoing risk of graft infection. The annual risk of infection of ePTFE grafts in hemodialysis patients can be as high as 10% – 15% per patient-year. Furthermore, gradual degradation of the non-healing ePTFE graft material caused by persistent needle punctures can eventually lead to graft failure. In traumatic vascular injury, ePTFE grafts are generally contraindicated, due to the high rates of contamination of the wound that can lead to synthetic graft infection and failure.

Two lesser used products, cryopreserved human blood vessels, known as allografts, and animal-derived vessels, known as xenografts, also involve significant limitations.

*Cryopreserved Blood Vessels*

To eliminate the need for harvesting autologous vein, some surgeons use allogeneic vessels that have been previously harvested from cadavers and cryogenically preserved. These allogeneic vessels are stored at -80 degrees Celsius and must be thawed prior to use, which can take up to 60 minutes. The supply of cryopreserved vessels is limited by the number of cadaveric donors available, and the vessels are often non-uniform in size. In addition, because the vessels contain human cells from a donor, they can generate an immune rejection response that can lead to aneurismal degradation or catastrophic failure. Furthermore, development of antibodies to the implanted cryopreserved human vessel frequently has a detrimental impact on the ability of the patient to receive a transplant in the future. Cryopreserved blood vessels are only rarely used in the treatment of vascular trauma, due to the time required for procurement and thawing, and the high rates of rejection response.

*Animal-Derived Vessels*

Xenogeneic tissues, including cow, pig or sheep-derived vessels, are used less frequently in vascular surgery, in part due to the risk of thrombosis and structural deterioration over time. The limited clinical data that are available for existing xenografts in vascular reconstruction indicates lower patency rates and higher incidence of complications when compared to autologous vein. Xenografts are all chemically treated in efforts to minimize rejection to animal components, and therefore do not respond like living tissue. Some of these products require rinsing to remove toxic chemicals used for storage.

*Our Solution*

We believe our HAVs combine the off-the-shelf availability of synthetic grafts with the regenerative capabilities of autologous vessels. We believe these and other attributes have the potential to address unmet clinical needs in a range of disease states, including atherosclerosis, end-stage kidney disease, coronary artery disease, vascular trauma, pediatric congenital heart disease, airway disease, and others. We believe that the HAV's multiple key characteristics will drive rapid clinical adoption amongst surgeons and the broader healthcare community:

- Off-the-Shelf: Our "cabinet" of HAVs of varying diameters and lengths is designed to be stored on-site at facilities such as hospitals, trauma centers and outpatient surgical centers.
- Immediately Available: When needed, our HAVs are available for immediate use by opening and removing the HAV from its original flexible bioreactor bag. Since our HAV does not need flushing, harvesting or thawing, as is common with other vascular substitute alternatives, we believe hospitals will be able to use our HAVs for vascular surgery more quickly with smaller surgical teams, reduced logistics and decreased overall cost.
- No Surgical Harvesting: The use of our HAVs does not subject patients to the serious operation of harvesting an autologous vein, which can result in greater procedure and recovery time, potential scarring and disfigurement, increased costs, and numerous potential health complications.
- Non-Immunogenic and No Foreign Body Response: Given their acellular nature, our HAVs have the potential to be universally implantable and durable across patients. Because our HAVs are derived from human tissue (but cleansed of all cells and cellular components), we believe (and have observed in clinical trials to date) that they do not generate the foreign body response associated with the use of synthetic grafts, or the immune response associated with cryopreserved vessels.
- Low Infection Susceptibility: In clinical trials to date, we have observed reduced rates of infection in our HAVs as compared to synthetic materials. As a result, we believe our HAVs may be used in complicated and potentially contaminated wounds with fewer patient complications following the initial procedure.
- Uniform and Predictable Size, Structure and Quality: Harvested veins vary in size, structure and quality by donor. We manufacture our HAVs to precise specifications under controlled quality standards, which will allow surgeons the flexibility to quickly and easily select an HAV in the appropriate size and shape for each indication.
- Regenerative Potential: Our HAVs repopulate with the patient's own vascular cells, creating a living vascular tissue with the associated long-term benefits of self-healing and infection resistance.

If approved, we expect our HAVs would compete with the use of a patient's own blood vessels, as well as a variety of marketed products, such as conventional synthetic grafts, xenografts, and allografts, as well as developing technologies. We expect the key competitive factors affecting the commercial success of our HAVs to likely be efficacy, safety, convenience, pricing and reimbursement.

*Other Commercial Entities*

There are several conventional synthetic grafts made of ePTFE or Dacron presently on the market from companies such as Bard Peripheral Vascular, Inc., W.L. Gore & Associates, Inc., Terumo Medical Systems, and Atrium (Maquet Getinge Group) that are used for both AV access for hemodialysis and vascular repair. Xenograft and allograft products are also available, but not widely used. Xenografts, such as Artegraft® and Procol®, are processed animal-derived vessels, while allografts are processed allogeneic cellular vessels, such as CryoVein® and AngioGRAFT®.

There are also a number of companies of which we are aware that have preclinical and early clinical-stage research programs underway to develop products that could potentially compete with our HAVs, including NovaHep AB, Xeltis AG, Hancock Jaffe, and Vascudyne Inc. We may face competition from these and other emerging technologies such as bioabsorbable polymetric implants and electrospun or 3D printed tubular conduits.

Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are more effective, safer, have fewer or less severe side effects, are more convenient or are less expensive than the products that we develop. Our competitors also may obtain FDA or other marketing approval for their products more rapidly than we may obtain the same approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market.

***Government Regulation***

*Overview*

The FDA and comparable regulatory authorities in state and local jurisdictions and in other countries impose substantial and burdensome requirements on the research, development, testing, manufacture, quality control, safety, effectiveness, packaging, labeling, storage, record keeping, marketing, advertising and promotion, import/export, and distribution of our vessels.

In the United States, the FDA regulates pharmaceutical drugs, medical devices and biologic products under the Federal Food, Drug, and Cosmetic Act ("FDCA"), the Public Health Service Act ("PHSA"), FDA implementing regulations, and other laws. Our vessels are subject to regulation by the FDA as biologics. Biologics require the submission of a BLA and approval by the FDA before being marketed in the United States. None of our vessels have been approved by the FDA for marketing in the United States, and we currently have no BLAs pending. If we fail to comply with applicable FDA or other requirements at any time during the product development process, clinical testing, and the approval process or after approval, we may become subject to administrative or judicial sanctions. These sanctions could include the FDA's refusal to approve pending applications, license suspension or revocation, withdrawal of an approval, warning letters, product recalls, product seizures, total or partial suspension of production or distribution, injunctions, fines, civil penalties or criminal prosecution. Any FDA enforcement action could have a material adverse effect on us.

*Marketing Approval — Biological Products in the United States*

Before a biologic is approved in the United States, an applicant must submit a BLA that includes sufficient evidence to establish the safety, purity, and potency of the product candidate for its intended indications, including from the results of preclinical studies and clinical trials. A BLA must also contain extensive information about manufacturing and product quality control testing, and the applicant must pass an FDA preapproval inspection of the manufacturing facility or facilities at which the biologic product is produced and distributed from to assess compliance with current good manufacturing practices, or cGMPs.

The steps for obtaining FDA approval of a BLA to market a biologic product in the United States generally include:

- Completion of extensive preclinical laboratory tests and preclinical animal studies performed in accordance with the FDA's current good laboratory practice ("GLP") regulations;

- Submission to the FDA of an Investigational New Drug application ("IND"), which must become effective before human clinical trials in the United States may begin;

- Approval of the protocol and related documentation by an Institutional Review Board ("IRB") or ethics committee representing each clinical site before each clinical trial may be initiated;
- Performance of adequate and well-controlled human clinical trials according to the FDA's regulations commonly referred to as GCPs and any additional requirements for the protection of human research subjects and their health information, to establish the safety and efficacy of the product candidate for each proposed indication;
- Submission to the FDA of a BLA;
- Satisfactory completion of an FDA inspection of the manufacturing facility or facilities and distribution site at which the product is produced: to assess compliance with cGMP regulations; to assure that the facilities, production methods, testing and controls are adequate; and, if applicable, to assure compliance with cGTP requirements for human cellular and tissue-derived products;
- Potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA;
- Review of the product candidate by an FDA advisory committee, if applicable;
- Payment of user fees for FDA review of the BLA (unless a fee waiver applies); and
- FDA review and approval, or licensure, of the BLA prior to any commercial marketing, sale or shipment of the product.

*U.S. Biological Products Development Process*

The testing and approval process requires substantial time, effort and financial resources, and we cannot be certain that any approvals for our vessels will be granted on a timely basis, if at all.

Once a product candidate is identified for development, that biologic candidate enters the preclinical testing stage. Preclinical studies include laboratory evaluations of product chemistry, toxicity, formulation and stability, as well as animal studies to evaluate the product's potential safety and activity. The results of the preclinical studies, together with manufacturing information, analytical data, and at least one protocol for clinical study, are submitted to the FDA as part of an IND. The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions about the conduct of the clinical trial, including concerns that human research subjects will be exposed to unreasonable health risks. This is known as a "clinical hold." In such a case, the IND sponsor must resolve all of the FDA's concerns to the agency's satisfaction before the clinical trial can begin. Submission of an IND may result in the FDA not allowing the clinical trials to commence or not allowing the clinical trials to commence on the terms originally specified in the IND. A separate submission to an existing IND must also be made for each successive clinical trial conducted during product development, and the FDA must grant permission, either explicitly or implicitly by not objecting, before each clinical trial can begin. Even after a clinical trial has begun, the FDA can issue a clinical hold at any time if it concludes that certain conditions exist, such as patients may be exposed to an unreasonable and significant risk of illness or injury.

Clinical trials involve the use of the product candidate in human subjects under the supervision of qualified investigators. Clinical trials are conducted under protocols detailing, among other things, the objectives of the clinical trial, the parameters to be used in monitoring safety and the effectiveness criteria to be used. Each protocol must be submitted to the FDA as part of the IND. An independent IRB for each medical center proposing to conduct a clinical trial must also review and approve a plan for any clinical trial before it can begin at that center and the IRB must monitor the clinical trial until it is completed. The IRB must review and approve, among other things, the study protocol and informed consent information to be provided to study subjects. Some trials are overseen by an independent group of qualified experts organized by the trial sponsor, known as a data safety monitoring board or committee. This group provides authorization as to whether or not a trial may move forward at designated check points based on access that only the group maintains to available data from the study. Clinical testing also must satisfy extensive GCP requirements, including the requirements for informed consent. Information about clinical trials must be submitted within specific timeframes to the National Institutes of Health ("NIH") for public dissemination on its ClinicalTrials.gov website.

For purposes of BLA submission and approval, clinical trials are typically conducted in three sequential phases, which may overlap or be combined. For Humacyte's development of product candidates, Phase 1 and Phase 2 trials have heretofore been combined into a single trial design.

- *Phase 1.* The biological product is initially introduced into human subjects and tested for safety. These initial trials to evaluate the potential toxicity and pharmacological activity of the investigational product (including pharmacokinetics, if applicable), and, if possible, gain early evidence on effectiveness.
- *Phase 2*. The biological product is evaluated in a limited patient population to identify potential adverse events and safety risks, to evaluate preliminarily the efficacy of the product candidate for specific targeted indications in patients with the disease or condition under trial, and, when applicable, to evaluate dosage tolerance and appropriate dosage.
- *Phase 3.* The biological product is administered to an expanded patient population, often large numbers of patients of several hundred to several thousand and generally at geographically dispersed clinical trial sites. These trials are designed to generate enough data to statistically evaluate clinical effectiveness and safety as well as to establish the overall benefit-risk relationship of the investigational new biological product, and to provide an adequate basis for product approval. FDA typically requires at least two Phase 3 trials to support approval, but in some cases may approve an application on the basis of one trial.

In some cases, the FDA may condition approval of a BLA on the sponsor's agreement to conduct additional clinical trials to further assess the biologic's safety and effectiveness after BLA approval. Such post-approval clinical trials are typically referred to as Phase 4 clinical trials.

During all phases of clinical development, regulatory agencies require extensive monitoring and auditing of all clinical activities, clinical data, and clinical trial investigators. Annual progress reports detailing the progress of the clinical trials must be submitted to the FDA. Written IND safety reports must be promptly submitted to the FDA and the investigators detailing serious and unexpected adverse events, any findings from other studies that suggest a significant risk to human patients, tests in laboratory animals or in vitro testing that suggest a significant risk for human patients, or any clinically important increase in the rate of a serious suspected adverse reaction over that listed in the protocol or investigator brochure. The sponsor must submit an IND safety report within 15 calendar days after the sponsor determines that the information qualifies for reporting. The sponsor also must notify the FDA of any unexpected fatal or life-threatening suspected adverse reaction within seven calendar days after the sponsor's initial receipt of the information.

The FDA or the sponsor may suspend or terminate a clinical trial at any time on various grounds, including a finding that the research patients are being exposed to an unacceptable health risk, including risks inferred from other trials on other products. Similarly, an IRB can suspend or terminate approval of a clinical trial at its institution if the clinical trial is not being conducted in accordance with the IRB's requirements or if the biological product has been associated with unexpected serious harm to patients.

Concurrent with clinical trials, companies usually complete additional animal trials and must also develop additional information about the characteristics of the biologic and finalize a process for manufacturing the biologic in commercial quantities in accordance with cGMP and, when applicable, GTP requirements. The manufacturing process must be capable of consistently producing quality batches of the product candidate. Additionally, appropriate packaging must be selected and tested and stability studies must be conducted to demonstrate that the product candidate does not undergo unacceptable deterioration over its shelf life.

*BLA Review Process*

The results of preclinical studies and of the clinical trials, together with other detailed information, including extensive manufacturing information, information on the composition of the biologic, and proposed labeling, are submitted to the FDA in the form of a BLA requesting approval to market the biologic in the United States for one or more specified indications. The FDA reviews a BLA to determine, among other things, whether a biologic is safe and effective for its intended use.

The FDA has 60 days from its receipt of a BLA to determine whether the application will be accepted for filing based on the FDA's threshold determination that the application is sufficiently complete to permit substantive review. The FDA may refuse to file any BLA that it deems incomplete or not properly reviewable at the time of submission and may request additional information. In this event, the BLA must be resubmitted with the additional information. The resubmitted application also is subject to review before the FDA accepts it for filing. After the BLA submission is accepted for filing, the FDA reviews the BLA to determine, among other things, whether the proposed product is safe and potent, or effective, for its intended use, and has an acceptable purity profile, and whether the product is being manufactured in accordance with cGMPs (and, where applicable, GTPs) to assure and preserve the product's identity, safety, strength, quality, potency, and purity, and biological product standards. The FDA may refer applications for novel biological products or biological

products that present difficult questions of safety or efficacy to an advisory committee, typically a panel that includes outside clinicians and other experts, for review, evaluation and a recommendation as to whether the application should be approved and, if so, under what conditions. The FDA is not bound by the recommendations of an advisory committee, but it considers such recommendations carefully when making decisions.

Before approving an application, the FDA will, among other things, inspect the facility or the facilities at which the biologic product is manufactured and distributed, and will not approve the product unless cGMP compliance is satisfactory. The FDA may also inspect the sites at which the clinical trials were conducted to assess their compliance, and may refuse to approve the biologic if compliance with GCP requirements is found to be unsatisfactory. For a human cellular or tissue product the FDA also may refuse to approve the product if the manufacturer is not in compliance with GTP requirements, in addition to cGMPs.

The FDA also has authority to require a Risk Evaluation and Mitigation Strategy ("REMS") from manufacturers to ensure that the benefits of a biological product outweigh its risks. A sponsor may also voluntarily propose a REMS as part of the BLA submission. The need for a REMS is determined as part of the review of the BLA. Based on statutory standards, elements of a REMS may include "dear doctor letters," a medication guide, more elaborate targeted educational programs, and in some cases restrictions on distribution and/or use. These elements are negotiated as part of the BLA approval, and in some cases may delay the approval date. Once adopted, REMS are subject to periodic assessment and modification.

The testing and approval processes require substantial time, effort and financial resources, and each may take several years to complete. The FDA may not grant approval on a timely basis, or at all. Even if we believe a clinical trial has demonstrated safety and efficacy of one of our vessels for the treatment of a disease, the results may not be satisfactory to the FDA. Preclinical and clinical data may be interpreted by the FDA in different ways, which could delay, limit or prevent regulatory approval. We may encounter difficulties or unanticipated costs in our efforts to secure necessary governmental approvals, which could delay or preclude us from marketing our vessels. The FDA may limit the indications for use or place other conditions on any approvals that could restrict the commercial application of the products.

Biologics may be marketed only for the FDA approved indications and in accordance with the provisions of the approved labeling. Further, if there are any modifications to the biologic, including changes in indications, labeling, or manufacturing processes or facilities, the applicant may be required to submit and obtain FDA approval of a new BLA or BLA supplement, which may require developing additional data or conducting additional preclinical studies and clinical trials. As with new BLAs, the review process is often significantly extended by FDA requests for additional information or clarification.

The Biologics Price Competition and Innovation Act ("BPCIA"), amended the PHSA to authorize the FDA to approve similar versions of innovative biologics, commonly known as biosimilars. A competitor seeking approval of a biosimilar must file an application to establish its product as highly similar to an approved innovator biologic, among other requirements. The BPCIA, however, bars the FDA from approving biosimilar applications for 12 years after an innovator biological product receives initial marketing approval. This bar does not apply to submission or approval of full BLAs. Because FDA has determined that our HAVs are regulated as biologics and require a BLA for marketing, we believe that our lead product will be entitled to 12 years of exclusivity upon approval. Nevertheless, the BPCIA is complex and is only beginning to be interpreted and implemented by the FDA. As a result, its ultimate impact, implementation and meaning is subject to uncertainty.

*Expedited Development and Review Programs*

The FDA offers various programs, including Fast Track designation, Breakthrough Therapy Designation, accelerated approval, priority review and RMAT designation, that are intended to expedite the process for the development and FDA review of biological products that are intended for the treatment of serious or life-threatening diseases or conditions. To be eligible for Fast Track designation, biological product candidates must be intended to treat a serious or life-threatening disease or condition and demonstrate the potential to address unmet medical needs for the disease or condition. Fast Track designation applies to the combination of the product and the specific indication for which it is being studied. The sponsor of a biological product candidate may request the FDA to designate the biologic as a Fast Track product at any time during the clinical development of the product. The sponsor of a Fast Track product has opportunities for more frequent interactions with the applicable FDA review team during product development and, once a BLA is submitted, the product candidate may be eligible for priority review. A Fast Track product may also be eligible for rolling review, where the FDA may consider for review sections of the BLA on a rolling basis before the complete application is submitted, if the sponsor provides a schedule for the submission of the sections of the BLA, the FDA agrees to accept sections of the BLA and

determines that the schedule is acceptable, and the sponsor pays any required user fees upon submission of the first section of the BLA.

A biological product candidate may be eligible for Breakthrough Therapy Designation if it is intended to treat a serious or life-threatening disease or condition and preliminary clinical evidence indicates that the product candidate, alone or in combination with one or more other drugs or biologics, may demonstrate substantial improvement over existing therapies on one or more clinically significant endpoints, such as substantial treatment effects observed early in clinical development. Breakthrough Therapy Designation provides all the features of Fast Track designation in addition to intensive guidance on an efficient development program beginning as early as Phase 1, and FDA organizational commitment to expedited development, including involvement of senior managers and experienced review staff in a cross-disciplinary review, where appropriate.

Any marketing application for a biological product submitted to the FDA for approval, including a product candidate with a Fast Track designation and/or Breakthrough Therapy Designation, may be eligible for other types of FDA programs intended to expedite the FDA review and approval process, such as priority review and accelerated approval. Any product candidate is eligible for priority review if it is designed to treat a serious or life-threatening disease or condition, and if approved, would provide a significant improvement in safety or effectiveness compared to available alternatives for such disease or condition. The FDA will attempt to direct additional resources to the evaluation of an application for a biological product candidate designated for priority review in an effort to facilitate the review. Under priority review, the FDA's goal is to review an application within six months of the 60-day filing date, compared to ten months for a standard review.

Additionally, FDA may grant accelerated approval to a product candidate intended to treat a serious or life-threatening disease or condition upon a determination that the product has an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit, or on a clinical endpoint that can be measured earlier than irreversible morbidity or mortality, that is reasonably likely to predict an effect on irreversible morbidity or mortality or other clinical benefit, taking into account the severity, rarity, or prevalence of the condition and the availability or lack of alternative treatments. As a condition of approval, the FDA may require that a sponsor of a biological product receiving accelerated approval perform adequate and well-controlled post-marketing clinical trials to verify and describe the anticipated effect on irreversible morbidity or mortality or other clinical benefit. Products receiving accelerated approval may be subject to expedited withdrawal procedures if the sponsor fails to conduct the required post-marketing studies or if such studies fail to verify the predicted clinical benefit. In addition, the FDA currently requires as a condition for accelerated approval pre-approval of promotional materials, which could adversely impact the timing of the commercial launch of the product.

In 2017, the FDA established a new RMAT designation as part of its implementation of the 21st Century Cures Act. The RMAT designation program is intended to fulfill the 21st Century Cures Act requirement that the FDA facilitate an efficient development program for, and expedite review of, any biological product that meets the following criteria: (i) the biological product qualifies as an RMAT, which is defined as a cell therapy, therapeutic tissue engineering product, human cell and tissue product, or any combination product using such therapies or products, with limited exceptions; (ii) the biological product is intended to treat, modify, reverse, or cure a serious or life-threatening disease or condition; and preliminary clinical evidence indicates that the biological product has the potential to address unmet medical needs for such a disease or condition. RMAT designation provides all the benefits of Breakthrough Therapy Designation, including more frequent meetings with the FDA to discuss the development plan for the product candidate and eligibility for rolling review and priority review. Product candidates granted RMAT designation may also be eligible for accelerated approval on the basis of a surrogate or intermediate endpoint reasonably likely to predict long-term clinical benefit, or reliance upon data obtained from a meaningful number of clinical trial sites, including through expansion of trials to additional sites.

Fast Track designation, Breakthrough Therapy Designation, priority review, accelerated approval, and RMAT designation do not change the standards for approval but may expedite the development or approval process. Even if a product candidate qualifies for one or more of these programs, the FDA may later decide that the product no longer meets the conditions for qualification or decide that the time period for FDA review or approval will not be shortened.

Additionally, on December 12, 2017, Public Law No. 115-92 amended the FDCA to, among other things, allow the DoD to request, and FDA to provide assistance to expedite development and the FDA's review of products to diagnose, prevent, treat or mitigate a specific and life-threatening risk to the U.S. military. Similar to the designations described above that FDA may grant, a priority designation by the DoD does not change the standards for approval but may expedite the development or approval process.

*Orphan Drug Designation*

Under the Orphan Drug Act, the FDA may grant orphan designation to a biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a biological product available in the United States for this type of disease or condition will be recovered from sales of the product. Orphan product designation must be requested before submitting a BLA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan product designation does not convey any advantage in or shorten the duration of the regulatory review and approval process.

Orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages and user-fee waivers. If a product that has orphan designation subsequently receives the first FDA approval for the disease or condition for which it has such designation, the product is entitled to orphan product exclusivity, which means that the FDA may not approve any other applications, including a full BLA, to market the same biological product for the same indication for seven years, except in limited circumstances, such as a showing of clinical superiority to the product with orphan exclusivity, or if the FDA finds that the holder of the orphan drug exclusivity has not shown that it can assure the availability of sufficient quantities of the orphan drug to meet the needs of patients with the disease or condition for which the drug was designated. Competitors, however, may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity.

A designated orphan drug many not receive orphan drug exclusivity if it is approved for a use that is broader than the indication for which it received orphan designation. In addition, orphan drug exclusive marketing rights in the United States may be lost if the FDA later determines that the request for designation was materially defective or, as noted above, if a second applicant demonstrates that its product is clinically superior to the approved product with orphan exclusivity or the manufacturer of the approved product is unable to assure sufficient quantities of the product to meet the needs of patients with the rare disease or condition.

*Other U.S. Regulatory Requirements*

For biologics that are human cells, tissues, and cellular and tissue-based products (“HTC/Ps”), manufacturers must also comply with the FDA’s HCT/P regulations at 21 C.F.R. Part 1271. These regulations impose a variety of specialized requirements as follows:

*HCT/P registration and listing.* Every establishment that manufactures an HCT/P must register with the FDA and provide a list of every HCT/P that the establishment manufactures. The definition of manufacture is broad and includes any and all steps in the recovery, processing, storage, labeling, packaging or distribution of any human cell or tissue and the screening or testing of the cell or tissue donor.

*Donor eligibility.* HCT/P manufacturers must maintain procedures for testing, screening and determining the eligibility of donors of cells and tissues used in HCT/Ps. An HCT/P may not be transferred or implanted into an individual until the donor has been determined to be eligible under these procedures. These procedures must involve, among other things, testing donors for certain communicable diseases and the use of quarantines for HCT/Ps that have not yet been shown to meet the eligibility requirements. Manufacturers must keep detailed records regarding donor eligibility determinations.

*Current Good Tissue Practices.* HCT/Ps must be recovered, processed, stored, labeled, packaged and distributed in a manner that is consistent with the FDA’s cGTP regulations. Cells and tissues must also be screened and tested according to these regulations. The goal of cGTPs is to prevent the introduction, transmission or spread of communicable diseases. The FDA’s cGTPs regulations require companies to establish a comprehensive quality program and to comply with rules related to personnel, facilities and equipment used to manufacture HCT/Ps, as well as rules on how these HCT/Ps are processed, labeled and stored. Companies must also keep detailed manufacturing records and product complaint files.

*Adverse Reaction Reports.* Manufacturers of nonreproductive HCT/Ps must investigate and report to the FDA certain adverse reactions.

*Inspections.* Establishments that manufacture HCT/Ps must allow the FDA to inspect the establishment and company records.

*Post-Approval Requirements*

Any biologics manufactured or distributed by us or our collaborators pursuant to FDA approvals would be subject to continuing post-approval regulation by the FDA, including recordkeeping requirements and reporting of adverse experiences associated with the product, as well as any post-marketing surveillance requested by the FDA as a condition to BLA approval. Manufacturers and their subcontractors are required to register their establishments with the FDA and certain state agencies, and are subject to periodic unannounced inspections by the FDA and certain state agencies for compliance with ongoing regulatory requirements, including cGMPs, which impose certain procedural and documentation requirements upon us and our third-party manufacturers. Failure to comply with the statutory and regulatory requirements can subject a manufacturer to possible legal or regulatory action, such as warning letters, suspension of manufacturing, seizure of product, injunctive action or possible civil penalties. We cannot be certain that we or our present or future third-party manufacturers or suppliers will be able to comply with the cGMP regulations and other ongoing FDA regulatory requirements. If we or our present or future third-party manufacturers or suppliers are not able to comply with these requirements, the FDA may halt our clinical trials, require us to recall our product from distribution or withdraw approval of the BLA for that product.

The FDA closely regulates the post-approval marketing and promotion of biologics to healthcare professionals, including standards and regulations for direct-to-consumer advertising, false or misleading claims, off-label promotion, industry-sponsored scientific and educational activities, and promotional activities involving the Internet. Failure to comply with these requirements can result in adverse publicity, warning letters, corrective advertising, and potential civil and criminal penalties. Physicians may prescribe legally available biologics for uses that are not described in the product's labelling and that differ from those tested by us and approved by the FDA. Such off-label uses are common across medical specialties. Physicians may believe that such off-label uses are the best treatment for many patients in varied circumstances. The FDA does not regulate the behavior of physicians in their choice of treatments. The FDA does, however, impose stringent restrictions on manufacturers' communications regarding off-label use.

*U.S. Healthcare Reform*

Political, economic and regulatory influences are subjecting the healthcare industry in the United States to fundamental changes. There have been, and we expect there will continue to be, legislative and regulatory proposals to significantly change the healthcare system. For example, the Patient Protection and Affordable Care Act (the "ACA") was enacted to broaden access to health insurance, reduce or constrain the growth of healthcare spending, enhance remedies against fraud and abuse, add transparency requirements for the healthcare and health insurance industries, impose new taxes and fees on the health industry and impose additional health policy reforms. In December 2017, portions of the ACA dealing with the individual mandate insurance requirement were effectively repealed by the Tax Cuts and Jobs Act of 2017.

*U.S. Third-Party Payor Coverage and Reimbursement*

Although none of our vessels have been commercialized for any indication, if they are approved for marketing, commercial success of our vessels will depend, in part, upon the availability of coverage and reimbursement from third-party payors at the federal, state and private levels. Government payor programs, including Medicare and Medicaid, private health care insurance companies and managed-care plans have attempted to control costs by limiting coverage and the amount of reimbursement for particular procedures or treatments. The U.S. Congress and state legislatures from time to time propose and adopt initiatives aimed at cost-containment. Ongoing federal and state government initiatives directed at lowering the total cost of health care will likely continue to focus on health care reform and on the reform of the Medicare and Medicaid payment systems. Examples of how limits on coverage and reimbursement in the United States may cause reduced payments for products in the future include: changing Medicare reimbursement methodologies; fluctuating decisions on which drugs to include in formularies; allowing the federal government to negotiate drug prices for federal healthcare programs; revising drug rebate calculations under the Medicaid program; and reforming drug importation laws.

Some third-party payors also require pre-approval of coverage for new or innovative devices or therapies before they will reimburse health care providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, the announcement or adoption of these proposals could have a material adverse effect on our ability to obtain adequate prices for our vessels and operate profitably. Significant cost containment pressure and downward pricing pressures exist in the U.S. and around the world, which may negatively affect reimbursement at any time.

*Other Healthcare Laws and Regulations*

We are also subject to healthcare regulation and enforcement by the federal government and the states and foreign governments in which we conduct our business. The laws that may affect our ability to operate include but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, persons from knowingly and willfully soliciting, receiving, offering or paying remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual for, or the purchase, order or recommendation of, any good or service for which payment may be made under federal healthcare programs such as the Medicare and Medicaid programs;

- federal false claims laws which prohibit, among other things, individuals or entities from knowingly presenting, or causing to be presented, claims for payment from Medicare, Medicaid, or other third-party payors that are false or fraudulent;

- federal criminal laws that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

- the federal Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act (collectively, "HIPAA"), which governs the conduct of certain electronic healthcare transactions and protects the security and privacy of protected health information;

- the federal Physician Payments Sunshine Act, which requires drug and device companies to annually report to CMS all payments and transfers of value provided to physicians and teaching hospitals for posting on a public website; and

- state law equivalents of many of the above federal laws, including anti-kickback and false claims laws that may apply to items or services reimbursed by any third-party payor, including commercial insurers.

If our operations are found to be in violation of any of the laws described above or any other governmental laws and regulations that apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, the curtailment or restructuring of our operations, the exclusion from participation in federal and state healthcare programs and imprisonment, any of which could adversely affect our ability to operate our business and impact our financial results.

*International Regulation*

In addition to regulations in the United States, we will be subject to a variety of foreign regulations governing clinical trials and commercial sales and distribution of our future products. Whether or not we obtain FDA approval for a product, we must obtain approval of a product by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country, and the time may be longer or shorter than that required for FDA approval. The requirements governing the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country.

*EU Requirements Applicable to Medicinal Products*

In the EU, medicinal products are subject to extensive pre-and post-market regulation by regulatory authorities at both the EU and national levels.

*Clinical Trials*

Clinical trials of medicinal products in the EU must be conducted in accordance with EU (previously, Directive 2001/20/EC applied; as of January 31, 2022, Regulation EU No 536/2014 applies) and national regulations and the International Conference on Harmonization ("ICH") guidelines on GCP.

Prior to commencing a clinical trial, the sponsor must obtain a clinical trial authorization from the competent authority, and a positive opinion from an independent ethics committee of the relevant EU Member State in which the clinical trial will be carried out. Any substantial changes to the trial protocol or other information submitted with the clinical trial applications must be notified to or approved by the relevant competent authorities and ethics committees.

The sponsor of a clinical trial must register the clinical trial in advance, and certain information related to the clinical trial will be made public as part of the registration. The results of the clinical trial must be submitted to the competent authorities and, with the exception of non-pediatric Phase 1 trials, will be made public at the latest within 12 months after the end of the trial.

During the development of a medicinal product, the European Medicines Agency ("EMA") and national medicines regulators within the EU provide the opportunity for dialogue and guidance on the development program. At the EMA level, this is usually done in the form of scientific advice, which is given by the Scientific Advice Working Party of the Committee for Medicinal Products for Human Use ("CHMP"). Advice is not legally binding with regard to any future marketing authorization application of the product concerned. To date, we have not initiated any scientific advice procedures with the EMA, but we have obtained confirmation from the EMA that our HAVs would be eligible for the EMA's scientific advice procedures.

*Marketing Authorizations*

After completion of the required clinical testing, we must obtain a marketing authorization before we may place a medicinal product on the market in the EU. There are various application procedures available, depending on the type of product involved.

All application procedures require an application in the common technical document format, which includes the submission of detailed information about the manufacturing and quality of the product, and non-clinical and clinical trial information. There is an increasing trend in the EU towards greater transparency and, while the manufacturing or quality information is currently generally protected as confidential information, the EMA and national regulatory authorities are now liable to disclose much of the non-clinical and clinical information in marketing authorization dossiers, including the full clinical study reports, in response to freedom of information requests after the marketing authorization has been granted.

The centralized procedure gives rise to marketing authorizations that are valid throughout the EU. Applicants file marketing authorization applications with the EMA, where they are reviewed by a relevant scientific committee, in most cases the CHMP (although other specialist committees may also be involved; for example, the Committee for Advanced Therapies will also be involved in the review of advanced therapy medicinal products ("ATMP"), and HAVs could potentially be classified as an ATMP). The EMA forwards CHMP opinions to the European Commission, which uses them as the basis for deciding whether to grant a marketing authorization. The centralized procedure is compulsory for medicinal products that (1) are derived from biotechnology processes, (2) contain a new active substance (not yet approved on 20 November 2005) indicated for the treatment of certain diseases, such as HIV/AIDS, cancer, diabetes, neurodegenerative disorders, viral diseases or autoimmune diseases and other immune dysfunctions, (3) are orphan medicinal products or (4) are advanced therapy medicinal products. For medicines that do not fall within these categories, an applicant may voluntarily submit an application for a centralized marketing authorization to the EMA, as long as the CHMP agrees that (i) the medicine concerned contains a new active substance (not yet approved on November 20, 2005), (ii) the medicine is a significant therapeutic, scientific, or technical innovation, or if its authorization under the centralized procedure would be in the interest of public health.

For those medicinal products for which the centralized procedure is not available, the applicant must submit marketing authorization applications to the national medicines regulators through one of three procedures: (1) a national procedure, which results in a marketing authorization in a single EU member state; (2) the decentralized procedure, in which applications are submitted simultaneously in two or more EU member states; and (3) the mutual recognition procedure, in which the EU member states are required to grant an authorization recognizing an existing authorization in another EU member state, unless they identify a serious risk to public health.

*Data Exclusivity*

Marketing authorization applications for generic medicinal products do not need to include the results of preclinical and clinical trials, but instead can refer to the data included in the marketing authorization of a reference product for which regulatory data exclusivity has expired. If a marketing authorization is granted for a medicinal product containing a new active substance or to a different marketing authorization holder that has carried out a complete set of pre-clinical tests and clinical trials, that product benefits from eight years of data exclusivity, during which generic marketing authorization applications referring to the data of that product may not be accepted by the regulatory authorities, and a further two years of market exclusivity, during which such generic products may not be placed on the market. The two-year period may be extended to three years if during the first eight years a new therapeutic indication with significant clinical benefit over existing therapies is approved.

There is a special regime for biosimilars, or biological medicinal products that are similar to a reference medicinal product but that do not meet the definition of a generic medicinal product, for example, because of differences in raw materials or manufacturing processes. For such products, while a full set of pre-clinical tests and trials are not necessary, the results of appropriate preclinical or clinical trials must be provided, and guidelines from the EMA detail the type of quantity of supplementary data to be provided for different types of biological product.

*Pediatric Development*

In the EU, companies developing a new medicinal product must agree to a Pediatric Investigation Plan (“PIP”) with the EMA and must conduct pediatric clinical trials in accordance with that PIP. The marketing authorization application for the product must ordinarily include the results of pediatric clinical trials conducted in accordance with the PIP. It is possible to obtain a deferral, in which case the pediatric clinical trials must be completed at a later date, or a complete waiver from the obligation to conduct pediatric clinical trials (e.g., because the relevant disease or condition occurs only in adults).

*Post-Approval Controls*

The holder of a marketing authorization is subject to various post-approval controls, such as obligations to maintain a pharmacovigilance system and report adverse reactions, and requirements relating to promotional activities, including a prohibition on the promotion of prescription medicines to the general public. Manufacturers/importers and distributors of medicinal products must obtain authorizations from the competent national authorities and are subject to periodic inspections for compliance with cGMPs and current good distribution practices (“cGDPs”), respectively. The regulatory authorities may also impose specific obligations as a condition of the marketing authorization, such as additional safety monitoring or the conduct of additional clinical trials or post-authorization safety studies.

*EU Requirements Applicable to Medical Devices*

Under the previous medical devices directive, Directive 93/42/EEC, our HAVs were not classified as medical devices in the EU because, with limited exceptions, products incorporating or derived from tissues or cells of human origin are expressly excluded from the scope of the EU medical devices rules under Directive 93/42. However, as of May 26, 2021, Regulation (EU) 2017/745 applies, and this will bring us within the scope of the EU medical device rules products containing or derived from tissues or cells of human origin that are non-viable or are rendered non-viable.

Medical devices are generally governed by Regulation (EU) 2017/745 on Medical Devices that directly applies in all EU Member States and harmonizes the conditions for placing medical devices on the EU market. This Regulation, however, does not regulate certain important marketing aspects, such as pricing and reimbursement, which remain governed by national law. Additionally, certain areas, such as advertising, may be governed by additional national requirements.

A medical device may be placed on the market within the EU if it conforms to certain “general product safety requirements” or “GSPRs.” These are general in nature and broad in scope. A fundamental GSPR, for example, is that a device must be designed and manufactured in such a way that it will not compromise the clinical condition or safety of patients, or the safety and health of users or other persons.

The manufacturer is obliged to demonstrate that the device conforms to the relevant GSPRs through a conformity assessment procedure. Once the appropriate conformity assessment procedure for a medical device has been completed, the manufacturer must draw up a written declaration of conformity and affix the CE mark to the device. The device can then be marketed throughout the EU.

The nature of the conformity assessment depends upon the classification of the device. The classification rules are mainly based on three criteria: the length of time the device is in contact with the body, the degree of invasiveness, and the extent to which the device affects the anatomy. As a general rule, Class I (low risk) devices are those that do not enter or interact with the body; Class IIa and IIb (medium risk) devices are invasive or implantable or interact with the body; and Class III (high risk) devices are those that affect the vital organs.

Conformity assessment procedures for all but the lowest risk classification of device involve a notified body, which are non-governmental, private entities licensed to provide independent certification of certain classes of medical device. EU regulatory bodies are not involved in the premarket approval of medical devices, with only very limited exceptions (such as medical devices that incorporate a medicinal product as an ancillary substance, in which case these regulatory bodies

review the medicinal product). The onus of ensuring a device is safe enough to be placed on the market is ultimately the responsibility of the manufacturer and the notified body.

As part of the conformity assessment procedure, the manufacture will need to conduct a clinical evaluation of the device. This clinical evaluation may consist of an analysis of the scientific literature relating to similar devices, new clinical investigations of the device, or a combination of the two. For Class III and implantable devices, the conduct of clinical investigations is mandatory (with limited exceptions). If a manufacturer wishes to conduct a clinical investigation in the EU, the manufacturer must notify the competent national regulatory authorities in advance and obtain ethics committee approval of the study.

*EU Requirements Applicable to Human Cells and Tissues*

EU rules, notably Directive 2004/23/EC and other implementing directives, govern the donation, procurement, testing and storage of human cells and tissues intended for human application, whether or not they are medicinal products. These rules also cover the donation, testing, processing, preservation, storage and distribution of human cell and tissues that are not medicinal products. Establishments that conduct such activities must be licensed and are subject to inspection by regulatory authorities. Such establishments must implement appropriate quality systems and maintain appropriate records to ensure that cells and tissues can be traced from the donor to the recipient and vice versa. There are also requirements to report SAEs and reactions linked to the quality and safety of cells and tissues. More detailed rules may exist at the national level.

In addition to regulations in Europe and the United States, we will be subject to a variety of foreign regulations governing clinical trials and commercial distribution of our future products.

***Facilities***

Our corporate headquarters, manufacturing, and research and development facilities are located in Durham, North Carolina where we lease approximately 83,000 square feet of space. This space includes approximately 55,000 square feet for production and distribution operations including manufacturing, bioprocessing, quality control, mechanical space and inventory. The remainder of the facility consists of offices, laboratories, and common spaces.

***Employees and Human Capital Management***

As of December 31, 2022, we had 164 employees that were all full-time. None of our employees are represented by a collective bargaining agreement, and we have never experienced any work stoppage. We believe we have good relations with our employees.

***Financing Arrangements***

In March 2021, Legacy Humacyte entered into a Loan Agreement with Silicon Valley Bank and SVB Innovation Credit Fund VIII, L.P., which provides a term loan facility of up to $50.0 million with a maturity date of March 1, 2025. We became a co-borrower under the Loan Agreement in connection with the Merger. The obligations of Humacyte and Legacy Humacyte under the Loan Agreement are secured by substantially all of their assets, except for their intellectual property. In connection with the Loan Agreement, the lenders were each granted a warrant to purchase Legacy Humacyte common stock, with an exercise price of $2.699 per share, subject to customary adjustments. In connection with the closing of the Merger, these warrants were exchanged for warrants to purchase 287,704 shares of our common stock at an exercise price of $10.28 per share. On October 13, 2021, we borrowed an additional $10.0 million under the Loan Agreement, and in connection with that borrowing, issued Silicon Valley Bank and SVB Innovation Credit Fund VIII, L.P. warrants to purchase an aggregate of 123,302 shares of our common stock at an exercise price of $10.28 per share. The Loan Agreement contains certain customary covenants, including, but not limited to, those relating to additional indebtedness, liens, asset divestitures, and affiliate transactions. We may use the proceeds of borrowings under the Loan Agreement as working capital and to fund our general business requirements.

As of February 28, 2023, we had borrowed $30.0 million of principal under the Loan Agreement.

***Additional Information***

We were incorporated in Delaware on July 1, 2020, under the name Alpha Healthcare Acquisition Corp. ("AHAC"), in order to effectuate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities. AHAC completed its initial public offering on September 22, 2020.

On August 26, 2021, AHAC and Legacy Humacyte consummated the transactions contemplated by the Merger Agreement. In connection with the closing of the Merger, we changed our name to Humacyte, Inc.

Our principal executive office is located at 2525 East North Carolina Highway 54, Durham, North Carolina 27713, and our telephone number is (919) 313-9633.

Our website address is www.humacyte.com and our investor relations website is located at https://investors.humacyte.com. The information posted on our website is not incorporated into this Annual Report on Form 10-K. The U.S. Securities and Exchange Commission ("SEC") maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC at http://www.sec.gov. Our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to reports filed or furnished pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended, (the "Exchange Act") are also available free of charge on our investor relations website as soon as reasonably practicable after we electronically file such material with, or furnish it to, the SEC.

We provide notifications of news or announcements regarding our financial performance, including SEC filings, investor events, and press releases, as part of our investor relations website. The contents of these websites are not intended to be incorporated by reference into this report or in any other report or document we file.

**Item 1A. Risk Factors**

*Our operations and financial results are subject to a high degree of risk. These risks include, but are not limited to, those described below, each of which may have a material and adverse effect on our business, prospects, operating results, financial condition and the trading price of our common stock. You should carefully consider the risks described below, together with all of the other information included in this Annual Report on Form 10-K. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties not presently known to us or that we currently believe to be immaterial may also adversely affect our business. In that event, the trading price of our common stock could decline and you could lose all or part of your investment.*

**Summary of Risk Factors**

The following is a summary of the principal risks to which our business, operations and financial performance are subject. Each of these risks is more fully described in the individual risk factors immediately following this summary.

- We have never generated product revenue and have incurred significant losses to date. We expect to continue to incur losses for the foreseeable future and may never generate product revenue or be profitable. We will need to raise additional capital to finance our operations, which we may not be able to do on acceptable terms or at all.
- If our clinical trials fail to demonstrate safety and efficacy to the satisfaction of the FDA or similar regulatory authorities outside the United States or do not otherwise produce favorable results, we may incur significant additional costs or experience significant delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates.
- Our near-term prospects are dependent on the success of our 6 millimeter HAV, and if we are unable to successfully develop and commercialize it, our business, operating results and financial condition will be materially harmed.
- We may experience delays or difficulties in the enrollment of patients in our clinical trials, which may delay or prevent additional clinical trials and our receipt of necessary marketing approvals.
- Lack of experience by investigators and surgeons with our HAVs can lead to incorrect implantation or follow-up procedures which could harm the results of our clinical trials and market acceptance of our HAVs, if approved.
- We may not be successful in our efforts to use our proprietary scientific technology platform to build a pipeline of additional product candidates.
- Even if our HAVs receive marketing approval in the future for one or more of our product candidates, they may fail to achieve the degree of market acceptance by physicians, patients, third-party payors and others in the medical community necessary for commercial success.

- The sizes of the market opportunities for our product candidates have not been established with precision and are estimates that management believes to be reasonable. If these market opportunities are smaller than we estimate or if any approval that we obtain is based on a narrower definition of the relevant patient population, our revenue and ability to achieve profitability might be materially and adversely affected.
- Our distribution agreement with Fresenius Medical Care imposes obligations on us that may restrict our ability to operate our business in ways we believe to be in our long-term best interest.
- If we receive approval for a product candidate that is not subject to our distribution agreement with Fresenius Medical Care, and we are unable to establish our own marketing, sales and distribution capabilities or are unable to enter into agreements with third parties do so, we may not be able to generate product revenue and will have to alter our development and commercialization plans.
- The ongoing effects of the COVID-19 pandemic may continue to adversely impact our business, including our manufacturing efforts and clinical trials.
- The manufacture of our product candidates is complex, we have not manufactured commercial product, and we may encounter difficulties in production. If we or any third-party manufacturer encounter such difficulties, our ability to supply our product candidates for clinical trials or, if approved, for commercial sale could be delayed or halted entirely.
- The terms of our existing indebtedness may limit our ability to incur future debt.
- We rely on third parties to conduct and support our clinical trials, and those third parties may not perform satisfactorily, including by failing to adhere to regulatory requirements or our stated protocols or to meet deadlines for the completion of such trials.
- We rely on third-party suppliers, including sole source suppliers, to provide certain components for our product candidates. Any failure by a third-party supplier to supply these components for manufacture may delay or impair our ability to complete our clinical trials and to commercialize our product candidates.
- We intend to rely on our strategic, global partnership with Fresenius Medical Care to undertake, or assist with, the marketing, sale and distribution of certain of our product candidates in certain markets if we receive marketing approval from relevant regulatory authorities. Disruption of this arrangement could materially adversely affect our business, prospects, operating results and financial condition.
- Our ability to successfully commercialize our products may be impaired if we are unable to obtain and maintain effective intellectual property rights for our proprietary scientific technology platform and product candidates.
- We may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.

**Risks Related to the Development and Commercialization of Our Product Candidates**

***If our clinical trials fail to demonstrate safety and efficacy to the satisfaction of the FDA or similar regulatory authorities outside the United States or do not otherwise produce favorable results, we may incur significant additional costs or experience significant delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates. If we experience significant delays or significant additional costs, our business will be materially harmed.***

Before obtaining marketing approval for any of our product candidates, we must conduct extensive clinical trials to demonstrate the safety and efficacy of our product candidates in humans. Clinical testing is expensive and time-consuming, and its outcomes are uncertain. We believe the novelty of our research and development efforts, which are focused on the development of bioengineered human, acellular, tissue-based vessels for use across a wide spectrum of applications in vascular surgery, augments this uncertainty. The scientific discoveries that form the basis for our efforts to develop our product candidates are relatively new, and the scientific evidence to support the feasibility of developing product candidates based on these discoveries is both preliminary and limited. At this time, no products based on HAVs have been approved in the United States or in Europe. The clinical trial requirements of the FDA and other regulatory agencies and the criteria these regulators use to determine the safety and efficacy of a product candidate vary substantially according to

the type, complexity, novelty and intended use and market of the potential product, and we may not succeed in obtaining marketing approval even if we view our clinical trials as successful. Data obtained from preclinical and clinical activities, and manufacturing comparability studies, are also subject to varying interpretations, which may delay, limit or prevent marketing approval. In such circumstances, we could experience significant delays, or be prevented from, developing or commercializing our HAVs, and our business, prospects, operating results and financial condition could be materially harmed.

Our V006 trial did not meet its primary endpoint, and if we fail to achieve the primary endpoint of our other ongoing or future clinical trials, or if safety issues arise, or the results from our clinical trials are otherwise inadequate to support regulatory approval of our product candidates, we may incur significant additional costs or experience significant delays in completing, or ultimately be unable to complete, the development and commercialization of our product candidates. Even if our clinical trials achieve their primary endpoints, the FDA may still determine that such trials do not adequately establish the safety and effectiveness of our products. In such a circumstance, the FDA may require that we design and conduct new, additional clinical trials to demonstrate safety and effectiveness, or may determine not to approve our products at all.

Even if we receive FDA approval for our HAVs, we may face a number of difficulties if the results of our clinical trials are unfavorable, inconclusive, or only modestly favorable or if there are safety concerns, such as adverse events ("AEs") or serious adverse events ("SAEs"), which could include clotting, mechanical failure, immunological rejection or infection, that could outweigh potential benefits associated with such product candidates. This could result in:

- obtaining approval for indications or patient populations that are not as broad as intended or desired;
- obtaining approval with, or later becoming subject to, labelling that includes significant use or distribution restrictions or significant safety warnings;
- being subject to a REMS or equivalent requirement from a comparable foreign regulatory agency, to ensure that the benefits of a biological product outweigh its risks or to change the way the product is used;
- being required to perform additional clinical trials to support approval or comparability or being subject to additional post-marketing testing requirements;
- having regulatory authorities withdraw their approval of the product;
- being sued; or
- suffering damage to our reputation.

Any of these events could cause us to incur significant additional costs, significant delays and prevent us from achieving or maintaining market acceptance of or commercializing one or more of our product candidates.

***If we experience failures or delays in our preclinical and clinical programs, we would be prevented from developing and commercializing our product candidates in a timely matter, if at all.***

A number of factors impact the timing of our preclinical and clinical programs and the development and commercialization of our product candidates. We cannot guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all. Events that prevent successful or timely completion of the development of our product candidates beyond unfavorable or inconclusive clinical trial results include, among others, the following:

- delays in the testing, validation, manufacturing or delivery of our product candidates to the clinical sites;
- delays in reaching — or inability to reach — agreement with the FDA or other regulatory agencies on trial design;
- delays in reaching agreement on acceptable terms with prospective clinical research organizations ("CROs") and clinical trial sites;
- delays in obtaining required IRB approval at each clinical trial site;
- delays in recruiting suitable patients in sufficient volume to participate in our clinical trials and in having those patients complete participation in our clinical trials or return for follow-up, including delays related to the ongoing effects of the

COVID-19 pandemic;

- the occurrence of SAEs associated with any of our product candidates that are viewed to outweigh their potential benefits;
- imposition of a clinical hold by regulatory agencies, including after an inspection of our clinical trial sites;
- failure by CROs, other third parties or us to adhere to clinical trial requirements;
- failure to perform in accordance with the FDA's good clinical practices ("GCP") or current good tissue practices ("cGTP"), or applicable regulatory guidelines in other countries;
- clinical trial sites dropping out of, or being removed from, a trial; or
- changes in regulatory requirements and guidance that require amending or submitting new clinical protocols or data.

Any inability to successfully complete development of our product candidates would likely result in significant additional costs to us, create delays in filing a BLA for regulatory approval of our product candidates and impair our ability to generate revenue. Clinical trial delays could also allow our competitors to bring products to market before we do, which could materially impair our ability to successfully commercialize our product candidates and may harm our business and prospects.

***Our progress in early stage clinical trials may not be indicative of long-term efficacy in late stage clinical trials, and our progress in trials for one product candidate may not be indicative of progress in trials for another product candidate.***

The product candidates in our pipeline are at various stages of development. Trial designs and results from previous studies are not necessarily predictive of our future clinical trial designs or results, and initial results of ongoing trials may not be confirmed upon full analysis of the complete trial data. A number of companies in the biotechnology industry have suffered significant setbacks in late-stage clinical trials even after achieving promising results in earlier stage clinical trials, and we may experience similar setbacks. Favorable results in clinical trials for one of our product candidates also do not necessarily indicate that we will obtain positive results in clinical trials related to other product candidates. The novelty of our proprietary scientific technology platform adds another layer of risk that early-stage clinical trials may not be indicative of long-term efficacy in our late-stage clinical trials. If we are unable to demonstrate favorable results in future clinical trials for our various product candidates, we expect that our business, prospects, operating results and financial condition will be materially adversely affected.

Additionally, several of our past, planned and ongoing clinical trials utilize an "open-label" trial design. An "open-label" clinical trial is one where both the patient and investigator know whether the patient is receiving the investigational product candidate. Some open-label clinical trials test only the investigational product candidate without a comparator. Open-label clinical trials are subject to various limitations that may exaggerate any therapeutic effect as patients in open-label clinical trials are aware when they are receiving treatment. Open-label clinical trials may be subject to a "patient bias" where patients perceive their symptoms to have improved merely due to their awareness of receiving an experimental treatment. In addition, open-label clinical trials may be subject to an "investigator bias" where those assessing and reviewing the physiological outcomes of the clinical trials are aware of which patients have received treatment and may interpret the information of the treated group more favorably given this knowledge. The results from an open-label trial may not be predictive of future clinical trial results with any of our product candidates when studied in an environment with an active control.

***Interim, "topline," and preliminary data from our clinical trials that we announce or publish from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may publicly disclose preliminary or topline data from our clinical trials, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, although we may not have received or had the opportunity to fully and carefully evaluate all data at the time such preliminary or topline results are released. As a result, the topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Topline data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously published. As a result, topline data should be viewed with caution until the final data are

available. From time to time, we may also disclose interim data from our clinical trials. Interim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available, or as patients from our clinical trials continue other treatments for their disease. Adverse differences between preliminary or interim data and final data could significantly harm our business prospects.

If the interim, topline, or preliminary data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for, and commercialize, our product candidates may be harmed, which could harm our business, operating results, prospects or financial condition. In addition, the information we choose to publicly disclose regarding a particular clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is material or otherwise appropriate information to include in our disclosure.

***If SAEs occur at an unacceptable rate or other unacceptable side effects are identified in our HAVs we may need to delay, abandon or limit development and marketing of our product candidates.***

Our HAVs may prove to have undesirable or unintended side effects, toxicities or other characteristics that may preclude us from obtaining marketing approval. The reported SAEs related to the HAV for hemodialysis access, a patient population which typically has a high prevalence of existing medical conditions, are detailed in the table below which summarizes results from our V006 HUMANITY Phase 3 study in which subjects were randomized to receive either a HAV or a commercially available expanded polytetrafluoroethylene (“ePTFE”) graft.

**SAEs Reported in V006 Phase 3 Clinical Study in AV Access**

| Description of SAE | Number of SAEs (% of total subjects) | |
|---|---|---|
| | **HAV** | **ePTFE** |
| Number of subjects in V006 study | 177 | 178 |
| General disorders and administration conditions: | | |
| Implant site extravasation | 0(0.0)% | 1(0.6)% |
| Infections and infestations | | |
| Vascular access site infection | 0(0.0)% | 5(2.8)% |
| Injury, poisoning and procedural complications: | | |
| Anastomotic stenosis | 1(0.6)% | (0.0)% |

| Description of SAE | Number of SAEs (% of total subjects) | |
|---|---|---|
| | **HAV** | **ePTFE** |
| Vascular access site hematomas | 1(0.6)% | (0.0)% |
| Vascular access site hemorrhage | 0(0.0)% | 3(1.7)% |
| Vascular access site pain | 1(0.6)% | 0(0.0)% |
| Vascular access site pseudoaneurysm | 10(5.6)% | 0(0.0)% |
| Vascular access site rupture | 2(1.1)% | 0(0.0)% |
| Vascular access site thrombosis | 41(23.2)% | 28(15.7)% |
| Skin and subcutaneous tissue disorders: | | |
| Skin necrosis | 0(0.0)% | 1(0.6)% |
| Vascular disorders: | | |
| Steal syndrome | 2(1.1)% | 2(1.1)% |
| Subclavian vein occlusion | 0(0.0)% | 1(0.6)% |
| Vascular stenosis | 34(19.2)% | 27(15.2)% |
| Venous stenosis | 3(1.7)% | 9(0.0)% |

In our V002 and V004 Phase 2 clinical studies in PAD in 35 subjects, another patient population which typically has a high prevalence of existing medical conditions, the SAEs reported for the HAV are detailed in the table below.

**SAEs Reported in V002 and V004 Phase 2 Clinical Studies in PAD**

| **Description of SAE** | **Number of SAEs (% of total subjects)** |
|---|---|
| Number of subjects in V002 and V004 studies | N=35 |
| Arterial bypass thrombosis | 3(8)% |
| Anastomotic stenosis | 1(3)% |
| Graft thrombosis | 2(6)% |
| Vascular graft complication | 1(3)% |

If our HAVs are associated with undesirable side effects in clinical trials or have negative characteristics that are unexpected, we may need to perform additional clinical trials, abandon their development or limit development to more narrow uses or subpopulations in which the undesirable side effects or other characteristics are less prevalent, less severe or more acceptable from a risk-benefit perspective. Even if one of our product candidates is approved, the FDA and other regulatory authorities may take action to withdraw it from the market if serious safety concerns emerge. Any of these events could cause us to delay, abandon or limit the development and, if approved, marketing of our product candidates.

***We may experience delays or difficulties in the enrollment of patients in our clinical trials, which may delay or prevent additional clinical trials and our receipt of necessary marketing approvals.***

We are currently enrolling patients in several clinical trials, including in our V005 trial, which is a Phase 2/3 clinical trial of our 6 millimeter HAV in traumatic vascular repair and our V007 trial, which is a Phase 3 clinical trial comparing the safety and efficacy of our 6 millimeter HAV to AV fistula for hemodialysis access. Identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends in part on the rate at which we can recruit patients to participate in such trials. Additionally, the COVID-19 pandemic has had and may continue to have a sustained impact on our ability to recruit and follow up with patients. We may not be able to initiate or continue clinical trials for our product candidates if we are unable to locate and enroll a sufficient number of eligible patients to participate in these trials as required by the FDA and other regulatory authorities, and as such our product candidates could be delayed or otherwise adversely affected. Patient enrollment and trial completion is affected by many factors including the:

- size of the patient population and process for identifying subjects;
- availability of clinical trial research resources at clinical sites due to ongoing effects of the COVID-19 pandemic;
- design of the trial protocol;
- inclusion and exclusion criteria;
- safety profile to date of the product candidate under study;
- perceived risks and benefits of the product candidate under study;
- availability of competing therapies and clinical trials;
- severity of the disease under investigation;
- degree of progression of the subject’s disease at the time of enrollment;
- proximity and availability of clinical trial sites for prospective subjects;
- the ongoing impact of the COVID-19 pandemic or future pandemics or similar events on patients’ willingness and ability to participate in clinical trials or on study site policies;
- ability to obtain and maintain subject consent;

- risk that enrolled subjects will drop out before completion of the trial;

- patient referral practices of physicians; and
- ability to monitor subjects adequately during and after treatment.

If we have difficulty enrolling a sufficient number of patients to conduct our clinical trials as planned, we may need to delay, limit or terminate ongoing or planned clinical trials, any of which would have an adverse effect on our business, financial condition, results of operations and prospects.

***Lack of experience by investigators and surgeons with our HAVs can lead to incorrect implantation or follow-up procedures which could harm the results of our clinical trials and market acceptance of our HAVs, if approved.***

Our HAVs are currently in various stages of preclinical and clinical testing and have not been widely used. We do not have the personnel capacity to directly conduct or manage all of the clinical trials that are necessary for the development of our HAVs. Therefore, we rely, and will continue to rely, on third parties to assist us in managing, monitoring and conducting our clinical trials. Some of the investigators in our clinical trials have not been, and, if our HAVs receive marketing approval, surgeons may not be, previously exposed to the implantation and follow-up procedures related to their use. As a result, our HAVs may be, and have been in the past, incorrectly implanted and follow-up procedures may be performed incorrectly, resulting in violations of our trial protocols, increased interventions or failure of the HAV. Our efforts to educate investigators, surgeons and interventionalists regarding the proper techniques for use of our HAVs both during clinical trials and following potential commercialization may be costly, prove unsuccessful and could materially harm our ability to continue the clinical trials or marketing of our HAVs. Regulatory authorities may also seek to impose restrictive labeling or proactive communication obligations on any marketing approval granted for use of our HAVs as a result, which could reduce market acceptance of any of our HAVs that receive marketing approval.

***Our near-term prospects are dependent on the success of our 6 millimeter HAV, and if we are unable to successfully develop and commercialize it, our business, operating results and financial condition will be materially harmed.***

We currently have no products approved for sale and, while we are developing a number of product candidates, we have invested and continue to invest a substantial portion of our efforts and financial resources in the development of our 6 millimeter HAV. None of our remaining product geometries and modifications have advanced beyond preclinical development. As a result, in the near term we are dependent on the success of our 6 millimeter HAV, and if we are unable to successfully develop, obtain marketing approval for, and commercialize it, our business, along with our operating results and financial condition, will be materially harmed. Even if we succeed with the development of our 6 millimeter HAV, our ability to generate product revenue and become profitable from our 6 millimeter HAV depends on our assumptions regarding the relevant market opportunity and the degree of market acceptance for our products, once approved, for which our estimates may prove inaccurate, and market acceptance in any approved indication, which may never occur.

***We may not be successful in our efforts to use our proprietary scientific technology platform to build a pipeline of additional product candidates.***

A key element of our strategy is to use our proprietary scientific technology platform to expand our pipeline of HAVs and to progress other product candidates into and through clinical development. We may not be able to identify or develop future product candidates that are safe and effective. Even if we are successful in building our pipeline, the potential product candidates that we identify may not be suitable for clinical development, including if they have harmful side effects or other characteristics that render them unlikely to receive marketing approval or achieve market acceptance. Research programs to identify new product candidates require substantial technical, financial and human resources, and we may focus our efforts and resources on potential programs or product candidates that ultimately prove to be unsuccessful. If we do not successfully develop and commercialize additional product candidates based upon our technology, we may have difficulty generating product revenue in the future, which could result in significant harm to our business, prospects, operating results and financial condition and adversely affect our stock price.

***Even if our HAVs receive marketing approval in the future for one or more of our product candidates, they may fail to achieve the degree of market acceptance by physicians, patients, third-party payors and others in the medical community necessary for commercial success.***

Even with the requisite approvals from the FDA in the United States, the European Commission in the EU and other regulatory authorities internationally, the commercial success of our HAVs will depend, in part, on the acceptance of physicians, patients and health care payors, as medically necessary, cost-effective and safe. Any product that we commercialize may not gain acceptance by physicians, patients, health care payors and others in the medical community

due to ethical, social, medical and legal concerns. If these products do not achieve an adequate level of acceptance, we may not generate significant product revenue and may not become profitable.

The degree of market acceptance of any of our product candidates that receives marketing approval will depend on a number of factors, including:

- the efficacy and potential advantages of our product candidates compared with alternative products or methods, including convenience and ease of administration;
- the prices we charge for our products, if approved;
- the availability of third-party coverage and adequate reimbursement;
- the willingness of the target patient population to try new products and methods and of physicians to use these products and methods;
- the quality of our relationships with patient advocacy groups;
- the strength of marketing and distribution support;
- the availability of the product and our ability to meet market demand;
- the prevalence and severity of any side effects; and
- any restrictions on the use of our products, if approved.

***The sizes of the market opportunities for our product candidates have not been established with precision and are estimates that management believes to be reasonable. If these market opportunities are smaller than we estimate or if any approval that we obtain is based on a narrower definition of the relevant patient population, our revenue and ability to achieve profitability might be materially and adversely affected.***

Our estimates of the market opportunity for certain of our product candidates are based on a number of internal and third-party estimates. While we believe our assumptions and the data underlying these estimates are reasonable, they may be inaccurate or based on imprecise data. In addition, the assumptions and conditions underlying the estimates may change at any time. For example, the number of patients who ultimately use our product candidates, if approved by regulatory authorities, and our total market opportunities for such product candidates, will depend on, among other things, pricing and reimbursement, market acceptance of those product candidates and patient access, and may be lower than we estimate. Additionally, any approval we receive for our product candidates may be based on a narrower definition of the relevant patient population than we have estimated. Either of these circumstances could materially harm our business, financial condition, results of operations and prospects.

***We face and will continue to face substantial competition, which may result in others discovering, developing or commercializing competing products before or more successfully than we do, which may adversely affect our ability to successfully market or commercialize our HAVs.***

The development and commercialization of new biological products is highly competitive and subject to rapid change and technological advancements. If approved, we expect our HAVs would compete with the use of a patient's own blood vessels, as well as a variety of marketed products, such as conventional synthetic grafts, xenografts, and allografts, as well as developing technologies.

We expect to face competition with respect to any additional product candidates that we may seek to develop or commercialize in the future from a variety of sources, including major pharmaceutical companies, specialty pharmaceutical companies and biotechnology companies, hospital product-focused companies, as well as public and private universities and research organizations.

Many of our existing or potential competitors, either alone or with their strategic partners, have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining marketing approvals and marketing and commercializing approved products than we do. Mergers and acquisitions in the pharmaceutical and biotechnology industries may result in even more resources being concentrated among a smaller number of our competitors. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These competitors also

compete with us in recruiting and retaining qualified scientific and management personnel and establishing clinical trial sites and patient registration for clinical trials, as well as in acquiring technologies complementary to, or necessary for, our programs. Our commercial opportunity could be reduced or eliminated if our competitors develop and commercialize products that are safer, more effective, have fewer or less severe side effects, are more convenient or are less expensive than the products that we develop. Our competitors also may obtain FDA or other marketing approval for their products more rapidly than we may obtain the same approval for ours, which could result in our competitors establishing a strong market position before we are able to enter the market.

We plan to seek marketing approval for our HAVs in the United States as a biologic and in the EU as a medicinal product. In both the United States and the EU, our competitors may try to market vascular conduits similar to our product candidates as medical devices. Such competitive products could have comparable characteristics and could function similarly in the body (and could even be protein-based like our product candidates). Companies may be able to obtain marketing approval for such products on the basis of less data than the data required for a BLA and marketing similar products as devices could permit our competitors to circumvent regulatory exclusivity for biologics in the United States and medicinal products in the EU.

***Our distribution agreement with Fresenius Medical Care imposes obligations on us that may restrict our ability to operate our business in ways we believe to be in our long-term best interest.***

We expect to rely on our strategic, global relationship with Fresenius Medical Care for the development and commercialization of certain of our product candidates. As discussed in more detail in the section of this Annual Report on Form 10-K titled "Business — Distribution — Distribution Agreement with Fresenius Medical Care," Fresenius Medical Care will have the exclusive right to develop outside of the United States and EU and commercialize outside of the United States, among other things, our 6 millimeter x 42 centimeter HAV and all improvements thereto, and modifications and derivatives thereof (including any changes to the length, diameter, or configuration of the foregoing), which we refer to as the distribution product, for use in vascular creation, repair, replacement or construction (including renal replacement therapy for dialysis access, the treatment of vascular trauma, and the treatment of PAD, but excluding coronary artery bypass graft, pediatric heart surgery, or adhering pancreatic islet cells onto the outer surface of the distribution product for use in diabetic patients). We refer to these indications wherein Fresenius Medical Care has rights to develop and commercialize Humacyte's products as the field. The distribution agreement also imposes a number of restrictions on our business. For instance, outside the United States, the distribution agreement restricts our ability to engage a distributor for the distribution product outside the field or for HAV products other than the distribution product: we have granted Fresenius Medical Care (i) an exclusive right of first negotiation for exclusive distribution rights outside the United States for the distribution product for use outside the field, and (ii) an exclusive right of first negotiation for exclusive distribution rights outside the United States for our other HAV products, if any, subject, in each case, to certain conditions. These and other obligations may restrict our ability to operate our business in ways we believe are in our long-term best interest, which could harm our business and our prospects.

***If we receive approval for a product candidate that is not subject to our distribution agreement with Fresenius Medical Care, and we are unable to establish our own marketing, sales and distribution capabilities or are unable to enter into agreements with third parties do so, we may not be able to generate product revenue and will have to alter our development and commercialization plans.***

We currently have limited internal marketing, sales or distribution capabilities, and our management team has limited experience commercializing products following marketing approval. If one of our product candidates that is not subject to the distribution agreement with Fresenius Medical Care receives marketing approval, we will be required either to develop these capabilities internally or to make arrangements with third parties for the marketing, sales and distribution of the relevant product candidate. The establishment and development of our own marketing, sales and distribution functions will be expensive and time-consuming and may delay any product launch, and we may ultimately be unable to successfully develop the product candidate. In addition, or in the alternative, we could seek one or more partners to handle some or all of the marketing, sales and distribution activities associated with any such product candidate. However, we may face significant competition in seeking appropriate strategic partners, and the negotiation process is time consuming and complex. Therefore, we may not be able to enter into arrangements with third parties to do so on favorable terms or at all. In the event we are unable to develop our own marketing, sales and distribution functions or collaborate with a third-party organization for this purpose, we may not be able to successfully commercialize a product candidate that is not subject to the distribution agreement with Fresenius Medical Care, which would adversely affect our ability to generate revenue. Further, whether we commercialize any such product candidate on our own or rely on a third party to do so, our ability to generate revenue will be dependent on the effectiveness of the organization performing these functions.

***Even if we receive marketing approval for our HAVs, there is uncertainty with respect to third-party coverage and reimbursement of our HAVs. They may also be subject to unfavorable pricing regulations, third-party reimbursement practices or healthcare reform initiatives, any of which could harm our business, prospects, operating results and financial condition.***

There is uncertainty around third-party coverage and reimbursement of newly approved regenerative medicine type products, even those with the RMAT designation from FDA, such as our 6 millimeter HAV for AV access for performing hemodialysis, which received the RMAT designation in 2017. In the United States, third-party payors, including government payors such as the Medicare and Medicaid programs, play an important role in determining the extent to which medical products and biologics will be covered and reimbursed. The Medicare and Medicaid programs increasingly are used as models for how private payors and government payors develop their coverage and reimbursement policies. Currently, no RMAT tissue engineered product has established coverage and reimbursement by the CMS. Even if our HAVs receive approval from regulatory authorities, it is difficult to predict what CMS or any comparable foreign regulatory agency will decide with respect to coverage and reimbursement for novel products such as ours, as there is no body of established practices and precedents for these types of products.

The healthcare industry is acutely focused on cost containment, both in the United States and elsewhere. Government authorities and third-party payors have attempted to control costs by limiting coverage and the amount of reimbursement. These payors may not view our products, if any, as cost-effective, and coverage and reimbursement may not be available to our customers or may not be sufficient to allow our products, if any, to be marketed on a competitive basis. Cost-control initiatives could also cause us to decrease any price we might establish for products, which could result in lower than anticipated product revenue. Moreover, eligibility for reimbursement does not imply that any product will be paid for in all cases or at a rate that covers our costs, including our costs related to research, development, manufacture, sale and distribution. Reimbursement rates may vary, by way of example, according to the use of the product and the clinical setting in which it is used. If the prices for our products, if any, decrease or if governmental and other third-party payors do not provide adequate coverage or reimbursement, our business, prospects, operating results and financial condition will suffer, perhaps materially.

On August 16, 2022, President Biden signed the IRA into law, which sets forth meaningful changes to drug product reimbursement by Medicare. Among other actions, the IRA permits HHS to engage in price-capped negotiation to set the price of certain drugs and biologics reimbursed under Medicare Part B and Part D. The IRA contains statutory exclusions to the negotiation program, including for certain orphan designated drugs for which the only approved indication (or indications) is for the orphan disease or condition. Should our product candidates be approved and covered by Medicare Part B or Part D, and fail to fall within a statutory exclusion, such as that for an orphan drug, those products could, after a period of time, be selected for negotiation and become subject to prices representing a significant discount from average prices to wholesalers and direct purchasers. The IRA also establishes a rebate obligation for drug manufacturers that increase prices of Medicare Part B and Part D covered drugs at a rate greater than the rate of inflation. The inflation rebates may require us to pay rebates if we increased the cost of a covered Medicare Part B or Part D approved product faster than the rate of inflation. In addition, the law eliminates the “donut hole” under Medicare Part D beginning in 2025 by significantly lowering the beneficiary maximum out-of-pocket cost and requiring manufacturers to subsidize, through a newly established manufacturer discount program, 10% of Part D enrollees’ prescription costs for brand drugs below the out-of-pocket maximum and 20% once the out-of-pocket maximum has been reached. Our cost-sharing responsibility for any approved product covered by Medicare Part D could be significantly greater under the newly designed Part D benefit structure compared to the pre-IRA benefit design. Additionally, manufacturers that fail to comply with certain provisions of the IRA may be subject to penalties, including civil monetary penalties. The IRA is anticipated to have significant effects on the pharmaceutical industry and may reduce the prices we can charge and reimbursement we can receive for our products, among other effects.

Any reduction in reimbursement from Medicare resulting from the IRA or other legislative or policy changes, or from other government programs may result in a similar reduction in payments from private payers. These healthcare reforms and the implementation of any future cost containment measures or other reforms may prevent us from being able to generate sufficient revenue, attain and/or maintain profitability or commercialize our drug candidates. We cannot be sure whether additional legislative changes will be enacted, or the effect of forthcoming guidance implementing the IRA, or whether FDA regulations, guidance or interpretations will be changed, or what the impact of such changes on our product candidates or the marketing approvals of our product candidates, if any, may be.

In some countries, particularly in Europe, the pricing of our product may be subject to governmental control. In these countries, pricing negotiations with governmental authorities can take considerable time after the receipt of marketing approval for a product. To obtain reimbursement or pricing approval in some countries, we may be required to conduct a

clinical trial that compares the cost-effectiveness of our product candidate to other available therapies. If reimbursement of our products, if approved, is unavailable or more limited in scope or amount than we anticipate, or if pricing is set at even lower levels than we anticipate, our business could be harmed, possibly materially.

***Product liability lawsuits against us could cause us to incur substantial liabilities that may not be covered by our limited product liability insurance and may limit development, approval and commercialization of our HAVs and any other product candidates that we develop in the future.***

We face an inherent risk of product liability exposure related to the testing of our product candidates in human clinical trials and will face an even greater risk, if and when we commercially sell our HAVs and any other product candidates that we may develop. If we cannot successfully defend ourselves against claims that our product candidates or products caused injuries, we will incur substantial liabilities. Regardless of merit or eventual outcome, product liability claims may result in:

- decreased demand for any product candidates or products that we develop or sell, leading to loss of revenue;
- injury to our reputation and significant negative media attention;
- withdrawal, or slower enrollment, of clinical trial participants;
- significant costs to defend the related litigation and reduced resources of our management to pursue our business strategy;
- substantial monetary awards to trial participants or patients; and
- inability to further develop or commercialize our product candidates.

We currently hold limited product liability insurance coverage, and it may not be adequate to cover all liabilities that we may incur. We also may not be able to maintain insurance coverage at a reasonable cost or in an amount adequate to satisfy any liability that may arise.

***The ongoing effects of the COVID-19 pandemic may continue to adversely impact our business, including our manufacturing efforts and clinical trials.***

The ongoing effects of the COVID-19 pandemic has impacted our business and we expect it to continue to do so. We have experienced delays in the ongoing enrollment of our clinical trials as a result of COVID-19. If there is a resurgence of COVID-19 in the United States and elsewhere, we may experience disruptions that could severely impact our business and clinical trials, including:

- further delays or difficulties in enrolling patients in our clinical trials;
- delays or difficulties in clinical site initiation, including difficulties in recruiting clinical site investigators and clinical site staff;
- delays in clinical sites receiving the supplies and materials needed to conduct our clinical trials, including interruption in global shipping that may affect the transport of clinical trial materials;
- shortages of clinical trial site and hospital and clinic staff supporting the conduct of our clinical trials;
- risk that participants enrolled in our clinical trials will acquire COVID-19 while the clinical trial is ongoing, or will withdraw from the clinical trial due to concerns over COVID-19, which could impact the results of the clinical trial, including by increasing the number of observed adverse events, or reducing the statistical power of the clinical trials;
- delays in necessary interactions with regulators, ethics committees and other important agencies and contractors due to limitations in employee resources;
- changes to the clinical endpoints, statistical analysis plan, or enrollment plans for ongoing clinical trials due to limitations in patients, resources, or sites, including due to COVID-19; and
- unanticipated deaths of clinical trial patients due to COVID-19 or due to lack of healthcare resources and follow-up as a consequence of COVID-19.

The extent to which ongoing effects of the COVID-19 pandemic impacts our business and clinical trials will depend on future developments, which are highly uncertain and cannot be predicted with confidence.

**Risks Related to Manufacturing Our Product Candidates**

***The manufacture of our product candidates is complex, we have not manufactured commercial product, and we may encounter difficulties in production. If we or any third-party manufacturer encounter such difficulties, our ability to supply our product candidates for clinical trials or, if approved, for commercial sale could be delayed or halted entirely.***

The process of manufacturing our HAVs is complex, highly regulated and subject to multiple risks. The manufacture of biologics such as our HAVs has been, and continues to be, susceptible to product loss due to contamination, equipment failure, temporary power outages, improper installation or operation of equipment, damage to facilities, vendor or operator error, inconsistency in yields, variability in product characteristics and difficulties in scaling the production process. Even minor deviations from normal manufacturing processes has resulted, and could in the future result, in reduced production yields, product defects and other supply disruptions. If microbial, viral or other contaminations are discovered in our product candidates or in the manufacturing facilities in which our product candidates are made, such manufacturing facilities may need to be closed for an extended period of time to investigate and remedy the contamination, which would harm our business, operating results and financial condition as well as our reputation. We depend on cell banks in our manufacturing process, and the loss of our master cell banks would result in significant disruptions to that process.

We currently manufacture the 6 millimeter HAVs for our clinical trials at our manufacturing facility in Durham, North Carolina, where we have created a scalable modular manufacturing process, which we refer to as the LUNA200 system, that we believe will enable us to manufacture our HAVs, if approved, in commercial quantities in compliance with current good manufacturing practices ("cGMPs"). Our efforts to scale out our manufacturing operations may not succeed. Scaling out a biologic manufacturing process is a difficult task, as there are risks including, among others, cost overruns, process reproducibility, stability issues, lot consistency and timely availability of raw materials. Prior to the establishment of our internal manufacturing facility, we employed a contract manufacturer who produced our HAVs using a smaller-production system known as the AURA system. We have limited years of experience manufacturing our HAVs in-house with the LUNA200 system, and no experience manufacturing the volume that we anticipate will be required to supply all of our clinical trials or to achieve planned levels of commercial sales following marketing approval, if received. Additionally, our manufacturing process has evolved over time and we may not have the experience, resources, or facility capacity to handle adoption of future changes or expansion of capacity. The forecasts of demand we plan to use to determine order quantities and lead times for components from outside suppliers may be incorrect, and we may be unable to obtain such components when needed and at a reasonable cost. We also may experience interruptions in the supply of the raw materials required to manufacture our product candidates, or increased costs due to supply chain disruptions or inflation in the cost of goods, services or other operating inputs. Likewise, supply chain interruptions could affect the transport of clinical trial materials, such as our HAVs and other supplies used in our clinical trials, which would negatively impact our ability to conduct our clinical trials. In addition, we may not be able to develop and implement efficient manufacturing capabilities and processes to manufacture our HAVs in sufficient volumes that also satisfy the legal, regulatory, quality, price, durability, engineering, design and production standards required to commercialize our HAVs successfully.

If we are unable to produce sufficient quantities of our HAVs for our clinical trial needs or commercialization due to production system limitations, we may need to make additional changes to our manufacturing processes and procedures. Such changes to our manufacturing platform could trigger the need to conduct additional bridging studies between our prior clinical supply and that of any new manufacturing processes and procedures. Should we experience delays or be unable to produce sufficient quantities of our HAVs utilizing our current or a modified version of our manufacturing system, we expect that our development and commercialization efforts would be impaired as a result, which would likely materially adversely affect our business, prospects, operating results and financial condition.

***Manufacturing facilities are subject to significant government regulations and approvals, which are often costly and could result in adverse consequences to our business if we fail to comply with the regulations or maintain the approvals.***

Our manufacturing facility is subject to ongoing regulation and periodic inspection by the FDA and other regulatory authorities to ensure compliance with cGMPs. Failure to follow and document adherence to such regulations or other regulatory requirements may (i) lead to significant delays in the availability of product for our clinical trials, (ii) result in the termination of or a hold being placed on one or more of our clinical trials, or (iii) delay or prevent filing or approval of marketing applications for our HAVs.

To monitor compliance with applicable regulations, the FDA routinely conducts inspections of facilities and may identify potential deficiencies. For example, the FDA issues what are referred to as “Form 483s” that set forth observations

and concerns that are identified during its inspections. Failure to satisfactorily address the concerns or potential deficiencies identified in a Form 483 could result in the issuance of a warning letter, which is a notice of the issues that the FDA believes to be significant regulatory violations requiring prompt corrective actions. Failure to respond adequately to a warning letter, or to otherwise fail to comply with applicable regulatory requirements could result in enforcement, remedial or punitive actions by the FDA or other regulatory authorities.

**Risks Related to Our Reliance on Third Parties**

***We rely on third parties to conduct and support our clinical trials, and those third parties may not perform satisfactorily, including by failing to adhere to regulatory requirements or our stated protocols or to meet deadlines for the completion of such trials.***

We do not independently conduct clinical trials for our product candidates and instead rely on third parties, such as CROs, clinical data management organizations, medical institutions and clinical investigators, to perform various functions, including implanting our HAVs and monitoring patients. The FDA and other regulatory authorities require us and these third parties to comply with GCP and, where applicable, cGTPs for conducting, recording and reporting the results of clinical trials to assure that data and reported results are credible and accurate and that the rights, integrity and confidentiality of patients in clinical trials are protected; ultimately, we remain responsible for ensuring that each of our clinical trials is conducted in accordance with the general investigational plan and trial protocol. Failure by us or these third parties to do so could require us to enroll additional trial subjects beyond those we anticipate, could require us to modify our protocol, which may cause us to lose previously established Special Protocol Assessment ("SPA") agreements with the FDA or similar agreements with other regulatory authorities concerning whether the design and size of our clinical trial adequately addresses scientific and regulatory requirements to support marketing approval, or could materially harm our ability to complete our clinical trials, including as a result of the need to remove trial sites and participants from the trial. We have in the past and may in the future need to terminate trial sites due to failure to conduct a trial in accordance with its protocol, applicable regulations, and generally accepted research standards.

The performance of the sites for our clinical trials may also be adversely affected by various other issues, including the lack of familiarity with the properties of our HAVs, intervention rates, insufficient training of personnel, variances in medical infrastructure, lack of familiarity with conducting clinical trials in accordance with international regulatory standards, communication difficulties or changes in local regulations. If these third parties do not successfully conduct our clinical trials in accordance with regulatory requirements or our stated protocols, carry out their contractual duties, or meet expected deadlines, we may not be able to obtain, or may be delayed in obtaining, marketing approvals for our product candidates and may not be able to, or may be delayed in our efforts to, successfully commercialize our products if approved by regulatory authorities.

***We rely on third-party suppliers, including sole source suppliers, to provide certain components for our product candidates. Any failure by a third-party supplier to supply these components for manufacture may delay or impair our ability to complete our clinical trials and to commercialize our product candidates.***

We currently rely, and expect to continue to rely, on third parties for the supply of certain components necessary for our product candidates, such as donor tissue, other biologically derived substances, the PGA polymer mesh and the bioreactor bags in which our HAVs are grown. Our suppliers for certain of these materials, including SeraCare for the supply of human plasma and Confluent for the supply of polymer mesh, are sole source suppliers. Failure of one or more of our suppliers, including these sole source suppliers, to deliver components necessary for the production of our HAVs in a timely and sufficient manner, whether due to shortages of such materials, difficulties in scaling up supply to satisfy our clinical trial and commercial needs, contamination, recall, the COVID-19 pandemic or otherwise, or to source or manufacture such components in accordance with cGMPs and cGTPs, as applicable, could delay our ability to complete our clinical trials, obtain marketing approval and commercialize our product candidates. Establishing additional or replacement suppliers for these components could take a substantial amount of time and it may be difficult to establish replacement suppliers who meet regulatory requirements. In addition, as part of the FDA's approval of our product candidates, the FDA must review and approve the individual components of our production process, which includes raw materials, the manufacturing processes and facilities of our suppliers. Some of our current suppliers have not undergone this process nor have they had any components included in any product approved by the FDA. If our suppliers fail to comply with applicable regulations, and if we do not qualify alternate suppliers, the clinical development, marketing approval or commercialization of our product candidates could be delayed, thereby increasing our costs to complete clinical development and to obtain marketing approval and depriving us of potential product revenue.

***We intend to rely on our strategic, global relationship with Fresenius Medical Care to undertake, or assist with, the development and commercialization of certain of our product candidates if we receive marketing approval from relevant regulatory authorities. Disruption of this arrangement could materially adversely affect our business, prospects, operating results and financial condition.***

Under the distribution agreement, Fresenius Medical Care has the exclusive right to sell and distribute the distribution product in the field outside of the United States. In addition, under the terms of the distribution agreement, Fresenius Medical Care will collaborate with Humacyte in its commercialization of the distribution product in the field in the United States, including adoption of the distribution product as a standard of care in patients for which such use is supported by clinical results and health economic analyses. As a result of our arrangement with Fresenius Medical Care, we expect to be reliant on Fresenius Medical Care to undertake or assist with the development and commercialization, as well as, in some cases, obtaining and maintaining regulatory approval, of the distribution product in the field and for Fresenius Medical Care to do so in a manner consistent with applicable law and regulatory requirements outside of the United States. If Fresenius Medical Care otherwise fails to undertake or assist with the development or commercialization, or obtaining or maintaining regulatory approvals, of the distribution product in accordance with the terms of the distribution agreement, our business, prospects, operating results and financial condition would be adversely affected, perhaps materially.

Fresenius Medical Care also maintains certain discretionary termination rights on a country-by-country basis with respect to any country outside of the United States under the distribution agreement, as discussed in more detail in the section of this Annual Report on Form 10-K titled "Business — Distribution — Distribution Agreement with Fresenius Medical Care." If the distribution agreement is terminated, we may not be able to secure an alternative distributor in the applicable country on a timely basis or at all, in which case our ability to generate revenues from the distribution product in such country would be harmed.

In addition, if Fresenius Medical Care fails to undertake or assist with the development or commercialization, or obtaining or maintaining regulatory approval, as applicable, of the distribution product in a manner consistent with applicable law and regulatory requirements, patient access to, and demand for, the distribution product could be reduced, our reputation could be damaged, and, under certain circumstances, we could be exposed to potential liability. Furthermore, while Fresenius Medical Care has certain commercialization diligence obligations, Fresenius Medical Care is not restricted from offering its own products and services or the products and services of other companies that compete with the distribution product, and may not undertake or assist with the development or commercialization of the distribution product effectively.

**Risks Related to Our Financial Position and Need for Additional Funding**

***We have never generated product revenue and have incurred significant losses to date. We expect to continue to incur losses for the foreseeable future and may never generate product revenue or be profitable.***

Since inception, we have generated no product revenue, and prior to receipt of marketing approval from regulatory authorities, we will be unable to do so. We incurred net losses of $12.0 million and $26.5 million for the years ended December 31, 2022 and 2021, respectively. As of December 31, 2022 and 2021, we had an accumulated deficit of $426.5 million and $414.6 million, respectively. Up to the date of the consummation of the Merger, we financed our operations primarily through the sale of equity securities and convertible debt and, to a lesser extent, through grants from governmental agencies. We have devoted substantially all of our financial resources and efforts to research and development, including preclinical studies and clinical trials and development of manufacturing technology, and we anticipate that our expenses will continue to increase over the next several years as we continue these activities. Our V005 and V007 trials are currently enrolling, and we currently intend to submit a BLA to the FDA relating to vascular trauma and a subsequent BLA filing related to AV access for hemodialysis. We also intend to continue scaling out our manufacturing facility to satisfy potential demand if the FDA approves our BLA, advancing preclinical and clinical development of additional clinical applications for our HAVs and funding our operations. Accordingly, we expect to continue to incur substantial operating losses for the foreseeable future, which may fluctuate significantly from quarter-to-quarter and year-to-year.

To become and remain profitable, we must succeed in obtaining marketing approval for our HAVs in the United States, in commercializing our HAVs, and in developing and commercializing additional product candidates that generate significant revenue. We may never succeed in these activities and, even if we do, may never generate revenue that is sufficient to achieve profitability.

Even if we do achieve profitability, we may not be able to sustain or increase profitability. Our failure to become and remain profitable would depress the value of our company and could impair our ability to maintain our research and

development efforts, expand our business, diversify our product offerings or even continue our operations. A decline in the value of Humacyte could also cause you to lose all or part of your investment in our securities.

***Our ability to use our net operating loss and tax credit carryforwards to offset future taxable income may be subject to certain limitations.***

As of December 31, 2022, we had net operating loss carryforwards for federal and state tax purposes of approximately $322.4 million and $323.9 million, respectively, which begin to expire in 2025. In addition, we had tax credit carryforwards for federal and state tax purposes of approximately $18.1 million, as of December 31, 2022, which begin to expire in 2025 and will expire completely in 2042. The future utilization of net operating loss and tax credit carryforwards may be limited due to changes in ownership. In general, if we experience a greater than 50% aggregate change in ownership of certain significant stockholders or groups over a three-year period (which constitutes an ownership change under Section 382 of the Internal Revenue Code of 1986, as amended (the "Code")), utilization of our pre-change net operating loss carryforwards is subject to an annual limitation under Section 382 of the Code (and similar state laws). The annual limitation generally is determined by multiplying the value of our stock at the time of such ownership change (subject to certain adjustments) by the applicable long-term tax-exempt rate. Such limitations may result in expiration of a portion of the pre-change net operating loss carryforwards before utilization and may be substantial. In the past we may have experienced, and in the future may experience, ownership changes as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset United States federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

***We expect to need to raise additional funding, which may not be available on acceptable terms, or at all, and any failure to obtain capital when needed may force us to delay, limit or terminate our product development or commercialization efforts.***

We expect to incur significant expenses in connection with our ongoing activities as we seek to (i) scale out our manufacturing facility to satisfy potential demand if our HAVs receive marketing approval in the United States, (ii) continue our preclinical and clinical development efforts, including the ongoing clinical trials, and (iii) obtain marketing approval for our 6 millimeter HAV, and, if marketing approval is obtained, to commercialize our HAVs for one or more approved indications. We will need additional funding in connection with these activities. Our future capital requirements will depend on many factors, including:

- the progress and results of our clinical trials and interpretation of those results by the FDA and other regulatory authorities;
- the cost, timing and outcome of regulatory review of our product candidates, particularly for approval of our HAVs in the United States;
- the scope, progress, results and costs of preclinical development, laboratory testing and clinical trials for our additional product candidates;
- the cost and timing of our future commercialization activities, including product manufacturing, marketing and distribution for our HAVs if approved by the FDA, and any other product candidate for which we receive marketing approval in the future;
- the amount and timing of revenues, if any, that we receive from commercial sales of any product candidates for which we receive marketing approval; and
- the costs and timing of preparing, filing and prosecuting patent applications, maintaining and enforcing our intellectual property rights and defending any intellectual property-related claims.

Adequate capital may not be available to us when needed or on acceptable terms. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition. As of December 31, 2022 and 2021, we had $151.9 million and $225.5 million, respectively, in cash and cash equivalents and short-term investments. Based upon our current operating plan, we believe that our cash and cash equivalents and short-term investments will be sufficient to fund our operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this Annual Report on Form 10-K.

***Pursuant to the terms of our outstanding indebtedness, we may be limited in our ability to incur future debt.***

In March 2021, Humacyte Global, Inc., or Legacy Humacyte, entered into a Loan and Security Agreement (as amended, the "Loan Agreement") with Silicon Valley Bank and SVB Innovation Credit Fund VIII, L.P., which provides a term loan facility of up to $50.0 million with a maturity date of March 1, 2025. We became a co-borrower under the Loan Agreement in connection with the Merger. The obligations of Humacyte and Legacy Humacyte under the Loan Agreement are secured by substantially all of their assets, except for their intellectual property.

Pursuant to the terms of the Loan Agreement, we are limited in our ability to incur additional indebtedness. In addition, a failure to comply with the covenants under the Loan Agreement could result in an event of default and an acceleration of amounts due. If an event of default occurs that is not waived by the lenders, and the lenders accelerate any amounts due, we may not be able to make accelerated payments, and the lenders could seek to enforce their security interests in the collateral securing such indebtedness, which could have a material adverse effect on our business and results of operations. Our payment obligations under the Loan Agreement reduce cash available to fund working capital, capital expenditures, research and development and other corporate purposes, and limit our ability to obtain additional financing for working capital, capital expenditures, expansion plans and other investments, which may in turn limit our ability to implement our business strategy, heighten our vulnerability to downturns in our business, the industry, or in the general economy, limit our flexibility in planning for, or reacting to, changes in our business and the industry and prevent us from taking advantage of business opportunities as they arise. If market rates increase, we will have to pay additional interest on this indebtedness, which would further reduce cash available for our other business needs.

We cannot assure you that our business will generate sufficient cash flow from operations or that future financing will be available to us in amounts sufficient to enable us to make required and timely payments on our indebtedness, or to fund our operations.

***To date, we have not requested or obtained marketing approval for, or commercialized, any of our product candidates, which may make it difficult for you to evaluate the success of our business to date and to assess our future viability.***

We are a development-stage company. Our operations to date, with respect to the development of our product candidates, have been limited to organizing and staffing our company, business planning, raising capital, identifying markets for our product candidates, undertaking preclinical studies and clinical trials of our product candidates for various potential indications and establishing research and development, manufacturing and distributing collaborations. We have not yet demonstrated the ability to obtain marketing approval for a product, to manufacture an approved product at commercial scale or to successfully commercialize an approved product. Consequently, any predictions you make about our financial prospects may not be as accurate as they could be if we had received marketing approval and begun commercializing a product.

**Risks Related to Government Regulation**

***We may not obtain marketing approval from the FDA for any of our product candidates even if we successfully complete our clinical trials, which failure would materially harm our business, prospects, operating results and financial condition.***

Prior to commercialization, biologics, like our HAVs, require the submission of a BLA to, and approval of the BLA by, the FDA. A BLA must be supported by extensive preclinical and clinical data, as well as extensive information regarding chemistry, manufacturing and controls ("CMC"), sufficient to demonstrate the safety, purity, potency and effectiveness of the applicable product candidate to the satisfaction of the FDA. We have never submitted a BLA for approval or otherwise obtained FDA approval for any of our product candidates.

The BLA approval process is expensive and uncertain, it may take several years to complete, and we may not be successful in obtaining such approval. The FDA has substantial discretion in the approval process and decisions made by the FDA can be unpredictable. The FDA may use its discretion at any time to withdraw statements or representations, including written statements, that it has made or may make to us regarding our product candidates, clinical trials or the BLA process. The number and types of preclinical studies and clinical trials that will be required for BLA approval varies depending on the product candidate, the disease or the condition that the product candidate is designed to target and the regulations applicable to any particular product candidate. The FDA could delay, limit or deny approval of our product candidates for many reasons, including because it:

- may not deem the product candidate to be adequately safe or effective;

- may not find the data from preclinical studies, clinical trials or CMC data sufficient to support approval;
- may not approve the manufacturing processes or facilities associated with the product candidate;
- may conclude that the long-term integrity of the product candidate for which approval is being sought has not been sufficiently demonstrated;
- may change approval policies or adopt new regulations; or
- may not accept a submission due to, among other reasons, the content or formatting of the submission.

In some cases, the FDA may agree to an SPA for a clinical trial, when it determines that the trial is adequately designed to provide necessary data to support a license application. Even in such cases, however, the FDA may subsequently abandon the SPA if a substantial scientific issue essential to determining the safety or effectiveness of the product candidate has been identified after the testing has begun. In addition, if a company alters the protocol for a trial, the SPA may no longer apply. Further, the results of pivotal clinical trials are always subject to thorough FDA review. Even highly significant clinical trial results are no guarantee of approval.

We currently intend to submit a BLA to the FDA relating to vascular trauma and a BLA for AV access in hemodialysis, based on the results and trial design of our V005 and V007 trials, respectively. The FDA may decline to approve our 6 millimeter HAV on the basis of these or other trial results, or for other reasons.

***Even if we obtain and maintain approval for our HAVs from the FDA, we may never obtain approval for our HAVs outside of the United States, where the regulatory process is also complex and subject to significant uncertainty. Failure to do so would limit our market opportunities and adversely affect our business.***

Even if we receive FDA approval to market any biologic in the United States, we must comply with the numerous and varying regulatory and compliance related requirements of other countries, including the submission of extensive preclinical and clinical data, manufacturing and quality information regarding the process and facility, scientific data characterizing the relevant product candidate and other supporting data in order to establish safety and effectiveness. Approval procedures vary among countries and can involve additional product testing and additional administrative review periods, including obtaining reimbursement and pricing approval in select markets. The time required to obtain approval in other countries might differ from that required to obtain FDA approval. The marketing approval process in other countries may include all of the risks associated with FDA approval as well as additional, presently unanticipated, risks. Marketing approval in one country does not ensure marketing approval in another, but a failure or delay in obtaining marketing approval in one country may negatively impact the regulatory process in others, including the risk that our product candidates may not be approved for all indications requested and that such approval may be subject to limitations on the indicated uses for which the product candidate may be marketed.

***Even if we seek "rolling review" or priority review, the review time for BLAs for our product candidates may be longer and more expensive than for other products because of the novelty and complexity of our product candidates, which would delay our ability to begin commercialization and earn product revenues.***

The marketing approval process for novel product candidates such as ours may take longer to complete and be more expensive than the process for other, better known or extensively studied pharmaceutical or other product candidates. We may be eligible for a "rolling review" of a BLA, which means we may submit completed modules of a BLA rather than waiting until every module of the BLA is completed before submitting the full BLA for FDA review. Such "rolling review" is common for indications that are part of one of FDA's expedited programs, such as our 6 millimeter HAV, which has received Fast Track and RMAT designations for AV access in hemodialysis. The FDA may also designate one or more of our product candidates for priority review after we submit a BLA. Under priority review, the FDA's goal is to review an application within six months of the 60-day filing date, compared to ten months for a standard review. Even if we are able to utilize a "rolling review" and/or the FDA designates one or more of our product candidates for priority review, it may not lead to a shorter review period. The FDA could also decide to consult an advisory committee as part of our BLA review process, which often leads to a longer review time. We are not permitted to commercialize our product candidates in the United States until they have been approved by the FDA, and if we experience a lengthier review period than expected, our ability to generate product revenues would be materially harmed.

***We may in the future seek orphan drug designation for the use of our HAVs to treat congenital pediatric heart defects. We may be unable to obtain such designation or to maintain the benefits associated with orphan drug designation, including market exclusivity, which may cause our revenue, if any, to be reduced.***

Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biologic intended to treat a rare disease or condition, defined as a disease or condition with a patient population of fewer than 200,000 in the United States, or a patient population of 200,000 or more in the United States when there is no reasonable expectation that the cost of developing and making available the drug or biologic in the United States will be recovered from sales in the United States for that drug or biologic. Orphan drug designation must be requested before submitting a BLA. In the United States, orphan drug designation entitles a party to financial incentives such as opportunities for grant funding towards clinical trial costs, tax advantages and user-fee waivers. After the FDA grants orphan drug designation, the generic identity of the drug or biologic and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation does not convey any advantage in, or shorten the duration of, the regulatory review and approval process. Even if one of our product candidates receives orphan exclusivity, the FDA can still approve other drugs that have a different active ingredient for use in treating the same indication or disease, as well as the same drug or biologic for a different indication or disease. The FDA can also approve the same drug or biologic for the same indication or disease if the subsequent drug or biologic demonstrates clinical superiority. Furthermore, the FDA can waive orphan exclusivity if we are unable to manufacture sufficient supply of our product.

***Inadequate funding for the FDA and other government agencies, including from government shut downs, global health concerns or other disruptions to these agencies' operations, could hinder their ability to hire and retain key leadership and other personnel, prevent new products and services from being developed or commercialized in a timely manner or otherwise prevent those agencies from performing normal business functions on which the operation of our business may rely, which could negatively impact our business.***

The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept the payment of user fees, and statutory, regulatory, policy changes, and the effects of the COVID-19 pandemic. Average review times at the FDA have fluctuated in recent years as a result.

Disruptions at the FDA and other agencies may also slow the time necessary for new product candidates to be reviewed and/or approved by necessary government agencies, which could adversely affect our business. In addition, government funding of other government agencies on which our operations may rely, including those that fund research and development activities, is subject to the political process, which is inherently fluid and unpredictable.

We may experience delays or rejections based upon additional government regulation from future legislation or administrative action, or changes in regulatory agency policy during the period of product development, clinical trials and the review process. In addition, disruptions at the FDA and other agencies may also slow the time necessary for new product candidates to be reviewed and/or approved by necessary government agencies, which would adversely affect our business. For example, over the last several years the U.S. government has shut down several times and certain regulatory agencies, such as the FDA, have had to furlough critical FDA and other government employees and stop critical activities. If a prolonged government shutdown occurs, it could significantly impact the ability of the FDA to timely review and process our regulatory submissions, which could have a material adverse effect on our business. Further, future government shutdowns could impact our ability to access the public markets and obtain necessary capital in order to properly capitalize and continue our operations.

***Even if we receive marketing approval for a product candidate, we will be subject to ongoing regulatory obligations and continued regulatory review, which may result in significant additional expense and subject us to significant penalties if we fail to comply with applicable regulatory requirements.***

If we obtain marketing approval for any of our product candidates, the approved product will be subject to ongoing regulatory requirements from the FDA and, if applicable, non-U.S. regulatory authorities. Any marketing approval that we receive for our product candidates may be subject to limitations on the indicated uses for which the product may be marketed or contain requirements for potentially costly post-marketing follow-up trials to monitor the safety and efficacy of the product. The FDA could also approve our product candidates with a REMS, which could include significant restrictions on distribution and/or use of our products. In addition, if the FDA and non-U.S. regulatory authorities approve any of our product candidates, we will be subject to extensive and ongoing regulatory requirements by the FDA and other regulatory authorities with regard to the manufacturing, labelling, packaging, AE reporting, storage, advertising, distribution, promotion and recordkeeping for our products. If we, our product candidates or the manufacturing facilities

for our product candidates fail to comply with regulatory requirements of the FDA and, if relevant, other non-U.S. regulatory authorities, we could be subject to administrative or judicially imposed sanctions, including the following:

- issuance of warning letters or untitled letters by regulatory authorities asserting that we are in violation of the law;
- imposition of injunctions or significant civil monetary penalties or pursuit by regulatory authorities of civil or criminal prosecutions and fines against us or our responsible officers;
- suspension or withdrawal of marketing approval;
- suspension of any ongoing clinical trials or refusal by regulatory authorities to approve pending marketing applications or supplements to approved applications;
- seizure of products or refusal to allow us to enter into supply contracts, including government contracts, or to import or export products;
- voluntary or mandatory product recalls and publicity requirements; and
- restrictions on operations, including marketing efforts, or restrictions that mandate costly new manufacturing requirements.

Any of these events could reduce market acceptance of any or our product candidates that had received marketing approval, substantially reduce our revenue, increase the costs of operating our business, and cause us significant reputational damage, among other consequences. If we ultimately receive approval for any product candidates in jurisdictions outside the U.S., we expect to be subject to similar ongoing regulatory oversight by the relevant foreign regulatory authorities.

Our products may be subject to product recalls that could harm our reputation and could materially and adversely affect our business, financial condition, operating results, cash flows and prospects. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, if approved. In particular, while the FDA permits the dissemination of truthful and non-misleading information about an approved product, the FDA restricts our ability to promote a product for uses that are not approved by the FDA. The misuse or off-label use of our product may harm our reputation in the marketplace, result in injuries that lead to product liability suits or result in costly investigations, fines or sanctions by regulatory authorities if we are deemed to have engaged in the promotion of these uses, any of which could be costly to our business. We may also face risks in other non-U.S. jurisdictions from product recalls and advertising/promotion rules.

We could also face product liability suits or regulatory delays due to defects in our products, which could be expensive and time-consuming and result in substantial damages payable by us and increases in our insurance rates.

***Designation of our product candidates for expedited programs, such as Fast Track designation, Breakthrough Therapy Designation, or RMAT designation, or accelerated approval by the FDA, or priority designation by the Department of Defense, may not lead to a faster development or regulatory review or approval process, and even if granted, will not increase the likelihood that our product candidates will receive marketing approval.***

In 2014, the FDA granted Fast Track designation for our 6 millimeter HAV for use in the creation of AV access for hemodialysis, and, in 2017, the FDA granted RMAT designation for our 6 millimeter HAV for the creation of vascular access for performing hemodialysis. We have submitted a request for RMAT designation of the HAV for vascular trauma but there is no guarantee that the FDA will grant this request. And we have not received designations pursuant to any of the FDA's expedited programs for peripheral artery disease or our other indications, although we may in the future seek such designations if such product candidates meet the criteria for that designation. As a result, even if we submit a BLA for trauma, our Fast Track and RMAT designations, and their attendant benefits, may not apply to this requested indication unless the FDA grants our request for RMAT designation. In addition, even with one or more of these designations, we may not experience a faster development process, or faster review or approval, for our product candidates compared to product candidates that are not part of the expedited programs. Further, the FDA may withdraw a designation if it believes that the designation is no longer supported by data from our clinical development program. In addition, a product candidate may no longer demonstrate a potential to address unmet medical need if, for example, a new product is approved that addresses the same need, which could lead to loss of a designation. The loss of a designation under an expedited program, including a Fast Track designation, Breakthrough Therapy Designation, or RMAT designation, could significantly increase the costs of development and length of time required before we could seek marketing approval of such a product candidate.

We may seek accelerated approval for our HAV relating to vascular trauma. A product candidate may be eligible for accelerated approval if it treats a serious or life-threatening condition, generally provides a meaningful advantage over available therapies, and demonstrates an effect on a surrogate endpoint that is reasonably likely to predict clinical benefit. As a condition of accelerated approval, the FDA may require that a sponsor of a product receiving accelerated approval perform adequate and well-controlled confirmatory clinical trials post-approval. These confirmatory trials must be completed with due diligence. In addition, the FDA currently requires the pre-approval of promotional materials as a condition for accelerated approval, which could adversely impact the timing of the commercial launch of the product. Even if we do receive accelerated approval, we may not experience a faster development or regulatory review or approval process, and receiving accelerated approval does not provide assurance of ultimate full FDA approval. Accelerated approval may also be withdrawn if, among other things, a confirmatory trial required to verify the predicted clinical benefit of the product fails to verify such benefit or if such trial is not conducted with due diligence.

In addition, in 2018, our HAV product candidate was assigned a priority designation by the Secretary of Defense under Public Law 115-92. Similar to the designations described above that FDA may grant, a priority designation by the Department of Defense does not change the standards for approval but may expedite the development or approval process.

***Healthcare reform measures could hinder or prevent our product candidates' commercial success.***

Our industry is highly regulated, and changes in or revisions to laws and regulations that make gaining coverage of and adequate reimbursement for our product candidates more difficult or subject to different criteria and standards may adversely impact our business, prospects, operating results and financial condition. In the United States, there have been and we expect there will continue to be a number of legislative, regulatory and other changes to the healthcare system to contain or reduce healthcare costs that may adversely affect our ability to set a price we believe is fair for our product candidates, our ability to generate revenues and achieve or maintain profitability, and the availability of capital.

Federal and state lawmakers regularly propose and, at times, enact legislation that would result in significant changes to the healthcare system, some of which are intended to contain or reduce the costs of medical products and services. For example, ACA, enacted in 2010 and amended by the Health Care and Education Reconciliation Act, contains a number of provisions that were intended to broaden access to health insurance, reduce or constrain the growth of healthcare spending, enhance remedies for fraud and abuse, add transparency requirements for the healthcare and health insurance industries, impose new taxes and fees on the health industry, and impose additional health policy reforms. The Bipartisan Budget Act of 2018, among other things, amended the ACA to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole," in part by requiring greater discounts from manufacturers. Various members of Congress have expressed a desire to repeal all or portions of the ACA, and in December 2017, portions of the ACA dealing with the individual mandate insurance requirement were effectively repealed by the Tax Cuts and Jobs Act of 2017. On February 10, 2021, the Biden administration withdrew the federal government's support for overturning the ACA. Further, on January 28, 2021, President Biden issued an executive order to initiate a special enrollment period for purposes of obtaining health insurance coverage through the ACA marketplace, which ran until August 15, 2021. The executive order also instructs certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. In June 2021, the United States Supreme Court held that the individual plaintiffs and states lacked standing to challenge the constitutionality of the ACA.

Additionally, in December 2018, CMS published a final rule permitting further collections and payments to and from certain ACA qualified health plans and health insurance issuers under the ACA risk adjustment program in response to the outcome of federal district court litigation regarding the method CMS uses to determine this risk adjustment. Since then, the ACA risk adjustment program payment parameters have been updated annually. In addition, CMS published a final rule that gave states greater flexibility, starting in 2020, in setting benchmarks for insurers in the individual and small group marketplaces, which may have the effect of relaxing the essential health benefits required under the ACA for plans sold through such marketplaces.

At this time, it remains unclear whether there will be further changes made to the ACA. The ACA, as currently enacted or as amended in the future, may adversely affect our business and operating results, and we do not know how future federal or state legislative or administrative changes relating to healthcare reform will affect our business. Other legislative changes that have been adopted since enactment of the ACA could also affect potential pricing and utilization of our product candidates.

In addition, the Secretary of Health and Human Services, various members of Congress and CMS have made statements and issued proposals regarding containment of drug prices through various means, including enabling CMS to negotiate U.S. drug pricing to align with foreign drug pricing, pricing transparency measures, reform of drug rebate programs, and conditioning coverage and reimbursement of certain drugs upon the prior failure or inadequacy of less expensive therapies, sometimes referred to as “step therapy.” Additionally, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, reduce the cost of prescription drugs under Medicare, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies. At the federal level, on March 11, 2021, President Biden signed the American Rescue Plan Act of 2021 into law, which eliminates the statutory Medicaid drug rebate cap, currently set at 100% of a drug’s average manufacturer price, for single source and innovator multiple source drugs, beginning January 1, 2024. In addition, at the state level, individual states have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing.

Beginning in fiscal year 2018, CMS altered the reimbursement formula on specified covered outpatient drugs (“SCODs”). A SCOD drug product may also be a covered outpatient drug under the 340B program, which allows 340B-participating hospitals to purchase the drug product at the 340B discounted rate and, when prescribing it to a Medicare patient, be reimbursed at the Medicare rate. Under the prior Medicare reimbursement rate, this created a significant, positive gap for 340B-participating health care facilities. CMS’s change in the Medicare reimbursement rate for SCODs significantly impacted, or eliminated, the positive gap for 340B-participating health care facilities. The District Court for the District of Columbia invalidated the formula change, but the U.S. Court of Appeals for the District of Columbia Circuit reversed the district court’s decision and found that the changes were within the Secretary’s authority. The case is currently under review by the U.S. Supreme Court, and a decision is expected by summer of 2022. It is unlikely the Medicare rate litigation will impact 340B pricing for our approved products in the future, but it possible it could affect covered hospitals who might purchase our products.

The FDA also released a final rule on September 24, 2020, which went into effect on November 30, 2020, providing guidance for states to build and submit importation plans for drugs from Canada. Additionally, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The 2020 rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers. Pursuant to a court order, HHS subsequently delayed the effective date for aspects of the rule, including those relating to pharmacy benefit managers, until 2023. The rule was then effectively delayed until January 1, 2026, as part of the Infrastructure Investment and Jobs Act, which was signed into law on November 15, 2021. In addition, on November 19, 2021, the House of Representatives passed a version of the Build Back Better Act that includes a provision prohibiting the implementation, administration, or enforcement of the rule. Although a number of these, and other proposed measures may require authorization through additional legislation to become effective, and the Biden administration may reverse or otherwise change these measures, Congress has indicated that it will continue to seek new legislative measures to control drug costs.

The ultimate content, timing, or effect of any healthcare reform legislation or executive order or the impact that the resulting changes may have on us is uncertain, but we expect there will continue to be legislative and regulatory proposals at the federal and state levels directed at containing or lowering the cost of health care.

***If we fail to comply with healthcare regulations, we could face substantial penalties and our business, prospects, operating results and financial condition could be adversely affected.***

Certain federal and state healthcare laws and regulations pertaining to fraud and abuse and patients’ rights are and will be applicable to our business even though we do not and will not control referrals of healthcare services. We could also be subject to patient privacy regulation by both the U.S. Government and the states in which we conduct our business. Our employees, independent contractors, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements. The regulations that may affect our ability to operate include, without limitation:

- the federal Anti-Kickback Statute, which prohibits, among other things, any person from knowingly and willfully offering, soliciting, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either

the referral of an individual for, or the purchase, order or recommendation of, any good or service for which payment may be made under federal healthcare programs, such as the Medicare and Medicaid programs, even if the person does not have actual knowledge of the statute or specific intent to violate it;

- the federal False Claims Act, which prohibits, among other things, individuals or entities from knowingly presenting, or causing to be presented, false claims, or knowingly using false statements, to obtain payment from the U.S. Government;

- federal criminal laws that prohibit executing a scheme to defraud any healthcare benefit program or making false statements relating to healthcare matters;

- the anti-inducement law, which prohibits, among other things, the offering or giving of remuneration, which includes, without limitation, any transfer of items or services for free or for less than fair market value (with limited exceptions), to a Medicare or Medicaid beneficiary that the person knows or should know is likely to influence the beneficiary's selection of a particular provider, practitioner, or supplier of items or services reimbursable by a federal or state governmental program;

- the federal transparency requirements under the ACA, including the provision commonly referred to as the Physician Payments Sunshine Act and its implementing regulations, which require applicable manufacturers of drugs, devices, biologics and medical supplies for which payment is available under Medicare, Medicaid, or the State Children's Health Insurance Program to report annually to CMS information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by the physicians described above and their immediate family members. Effective January 1, 2022, these reporting obligations were extended to include transfers of value made to certain non-physician providers such as physician assistants and nurse practitioners;

- federal government price reporting laws, which require us to calculate and report complex pricing metrics in an accurate and timely manner to government programs;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- HIPAA, which governs the conduct of certain electronic healthcare transactions and protects the security and privacy of protected health information; and

- state law equivalents of each of the above federal laws, such as anti-kickback and false claims laws which may apply to items or services reimbursed by any third-party payor, including commercial insurers.

If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to penalties, including civil and criminal penalties, damages, fines, exclusion from participating in federal health care programs and the curtailment or restructuring of our operations. Any penalties, damages, fines, curtailment, exclusion, or restructuring of our operations could adversely affect our ability to operate our business, prospects, operating results and financial condition. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. Moreover, achieving and sustaining compliance with applicable federal and state privacy and fraud and abuse laws may prove costly.

***Our business and operations, including our development programs, could be materially disrupted in the event of system failures, security breaches, violations of data protection laws or data loss or damage by us or third parties on which we rely, including our CROs or other contractors or consultants.***

Our internal computer systems (including our LUNA200 manufacturing system) and those of third parties on which we rely, including our CROs and other contractors and consultants, are vulnerable to damage from computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. These risks may be compounded as our information technology hardware ages. If such an event were to occur and cause interruptions in our operations, it could have a material adverse effect on our business operations, including a material disruption of our development program. Unauthorized disclosure of sensitive or confidential patient or employee data, including personally identifiable information, whether through breach of computer systems, systems failure, employee negligence, fraud or misappropriation, or otherwise, or unauthorized access to or through our information systems and networks, whether by our

employees or third parties, could result in negative publicity, legal liability and damage to our reputation. Unauthorized disclosure of personally identifiable information could also expose us to sanctions for violations of data privacy laws and regulations around the world. To the extent that any disruption or security breach resulted in a loss of or damage to our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and the further development of our product candidates could be delayed. For example, the loss of or damage to clinical trial data, such as from completed or ongoing clinical trials, for any of our product candidates would likely result in delays in our marketing approval efforts and significantly increased costs in an effort to recover or reproduce the data.

We have previously been, and expect to remain, the target of cyber-attacks. During late 2020 and early 2021, a professional services firm providing services to the Company was the target of a cyber-attack. The Company believes that it was not materially impacted by the attack. As we become more dependent on information technologies to conduct our operations, cyber incidents, including deliberate attacks, such as ransomware attacks, and attempts to gain unauthorized access to computer systems (including our LUNA200 manufacturing system) and networks, may increase in frequency and sophistication. These incidents pose a risk to the security of our systems and networks, the confidentiality and the availability and integrity of our data and these risks apply both to us, and to third parties on whose systems we rely for the conduct of our business. While the effect of these incidents has not historically been material to our results of operations, financial condition or prospects, cyber threats are persistent and constantly evolving. Such threats have increased in frequency, scope and potential impact in recent years, which increase the difficulty of detecting and successfully defending against them. As cyber threats continue to evolve, we may be required to incur additional expenses in order to enhance our protective measures or to remediate any information security vulnerability. There can be no assurance that we or our third-party providers will be successful in preventing cyber-attacks or successfully mitigating their effects. Similarly, there can be no assurance that our collaborators, CROs, third-party logistics providers, distributors and other contractors and consultants will be successful in protecting our clinical and other data that is stored on their systems. Any cyber-attack or destruction or loss of data could have a material adverse effect on our business and prospects. In addition, we may suffer reputational harm or face litigation or adverse regulatory action as a result of cyber-attacks or destruction or loss of data and may incur significant additional expense to implement further data protection measures. It is also possible that unauthorized access to data may be obtained through inadequate use of security controls by our suppliers or other vendors. In 2021, a remote code execution vulnerability in Apache Log4j was identified as affecting large amounts of systems worldwide. We were not impacted by the Log4j vulnerability, however we cannot provide assurance that these and other attacks will not have an impact in the future.

Although we have general liability insurance coverage, our insurance may not cover all claims, continue to be available on reasonable terms or be sufficient in amount to cover one or more large claims. Additionally, the insurer may disclaim coverage as to any claim. The successful assertion of one or more large claims against us that exceed or are not covered by our insurance coverage or changes in our insurance policies, including premium increases or the imposition of large deductible or co-insurance requirements, could have a material adverse effect on our business, prospects, operating results and financial condition.

***If we fail to comply with environmental, health and safety laws and regulations, we could become subject to fines and penalties or incur costs that could harm our business.***

We are subject to numerous environmental, health and safety laws and regulations, including those governing laboratory procedures and the handling, use, storage, treatment and disposal of hazardous materials and wastes. Our operations involve the use of hazardous and flammable materials, including chemicals and biological materials and produce hazardous waste products. We generally contract with third parties for the disposal of these materials and wastes. In the event of contamination or injury resulting from our use or production of hazardous materials, we could be held liable for any resulting damages even if we contract with a third party for their disposal, and any liability could exceed our resources. We also could incur significant costs associated with civil or criminal fines and penalties resulting from contamination or injury from our use or production of hazardous materials. Although we maintain workers' compensation insurance to cover us for costs and expenses we may incur due to injuries to our employees resulting from the use or production of hazardous materials, this insurance may not provide adequate coverage against potential liabilities. We do not maintain insurance for environmental liability or toxic tort claims that may be asserted against us in connection with our storage or disposal of biological, hazardous materials.

In addition, we may be required to incur substantial costs to comply with future environmental, health and safety laws and regulations. Compliance with such laws and regulations may divert resources away from our research, development and manufacturing efforts. Failure to comply with these laws and regulations also may result in substantial fines, penalties or other sanctions.

***Failure to comply with health and data protection laws and regulations could lead to government enforcement actions (which could include civil or criminal penalties), private litigation and adverse publicity and could negatively affect our operating results and business.***

We and any potential collaborators may be subject to federal, state and foreign data protection laws and regulations (*i.e.*, laws and regulations that address privacy and data security). In the United States, numerous federal and state laws and regulations, including federal health information privacy laws, state data breach notification laws, state privacy and health information privacy laws and federal and state consumer protection laws (*e.g.*, Section 5 of the Federal Trade Commission Act), that govern the collection, use, disclosure and protection of health-related and other personal information could apply to our operations or the operations of our collaborators. In addition, we may obtain health information from third parties (including research institutions from which we obtain clinical trial data) that are subject to privacy and security requirements under HIPAA. Depending on the facts and circumstances, we could be subject to civil or criminal penalties if we obtain, use, or disclose individually identifiable health information maintained by a HIPAA-covered entity in a manner that is not authorized or permitted by HIPAA.

International data protection laws, including Regulation 2016/679, known as the General Data Protection Regulation ("GDPR"), may also apply to health-related and other personal information obtained outside of the United States. The GDPR will increase our responsibility and liability in relation to personal data that we process, and we may be required to put in place additional mechanisms to ensure compliance with the new EU (which also includes the European Economic Area, or "EEA") data protection rules. Further, the United Kingdom's vote in favor of exiting the EU, often referred to as Brexit, has created more uncertainty with regard to data protection regulation in the United Kingdom (the "UK"). The UK retained the GDPR in UK law, which sits alongside the amended version of the Data Protection Act 2018. The EU adopted an adequacy decision so data can be transferred from the EU to the UK. Additionally, there are no new requirements for transfer from the UK to the EU. However, going forward, the EU and UK's data protection rules could diverge and data transfers may not be possible and/or new arrangements may need to be put in place. In particular, it is unclear to what extent the UK regime will begin diverging from the GDPR and how data transfers to and from the UK will be regulated.

In addition, California recently enacted the California Consumer Privacy Act ("CCPA"), which creates new individual privacy rights for California consumers (as defined in the law) and places increased privacy and security obligations on entities handling personal data of consumers or households. The CCPA became effective on January 1, 2020, but the California Consumer Rights Act ("CPRA") was recently enacted to strengthen elements of the CCPA effective January 1, 2023. In addition, there are a number of other states that have considered similar privacy proposals, with states like Virginia and Colorado enacting their own privacy laws (also scheduled to come into effect in January 1, 2023 and July 1, 2023, respectively). These privacy laws may impact our business activities and exemplify the vulnerability of our business to the evolving regulatory environment related to personal data.

Compliance with U.S. and international data protection laws and regulations could require us to take on more onerous obligations in our contracts, restrict our ability to collect, use and disclose data, or in some cases, impact our ability to operate in certain jurisdictions. Failure to comply with U.S. and international data protection laws and regulations could result in government enforcement actions (which could include civil or criminal penalties), private litigation and adverse publicity and could negatively affect our operating results and business. Moreover, clinical trial subjects about whom we or our potential collaborators obtain information, as well as the providers who share this information with us, may contractually limit our ability to use and disclose the information. Claims that we have violated individuals' privacy rights, failed to comply with data protection laws, or breached our contractual obligations, even if we are not found liable, could be expensive and time-consuming to defend and could result in adverse publicity that could harm our business.

***We or the third parties upon which we depend may be adversely affected by natural disasters, and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.***

Natural disasters such as hurricanes could severely disrupt our operations and have a material adverse effect on our business, prospects, operating results and financial condition. In addition, flooding, lightning strikes, meteor strikes, and polar vortices could affect our building operations. If a natural disaster, power outage or other unforeseen event occurred that prevented us from using all or a significant portion of our headquarters, that damaged critical infrastructure, such as our in-house manufacturing facility, or that otherwise significantly disrupted our operations, it may be difficult or, in certain cases, impossible for us to continue our business for a substantial period of time. The disaster recovery and business continuity plans we have in place currently may prove inadequate in the event of a natural disaster or similar event. We may incur substantial expenses as a result of any natural disaster, which could have a material adverse effect on our business.

***We are subject to anti-corruption and a variety of other laws governing our international operations. If we fail to comply with these laws, we could be subject to, among other things, civil or criminal penalties, other sanctions and remedial measures, and reputational damage, which could adversely affect our business, prospects, operating results and financial condition.***

Our operations are subject to anti-corruption laws, including the U.S. Foreign Corrupt Practices Act ("FCPA"), the U.K. Bribery Act and other anti-corruption laws. Anti-corruption laws are interpreted broadly and prohibit companies and their employees, agents, contractors, and partners from authorizing, promising, offering, or providing, directly or indirectly, improper payments or anything else of value to recipients in the public or private sector. We are conducting certain of our trials at a number of trial sites around the world. Certain of these jurisdictions pose a risk of potential FCPA violations, and we have relationships with third parties, including government-affiliated hospitals and universities, whose actions could potentially subject us to liability under the FCPA or local anti-corruption laws.

We are also subject to other laws and regulations governing our international operations, including regulations administered by the U.S. Department of Commerce's Bureau of Industry and Security, the U.S. Department of the Treasury's Office of Foreign Assets Control, and various non-U.S. government entities, including applicable economic sanctions on countries and persons, customs requirements, currency exchange regulations and transfer pricing regulations.

If we fail to comply with applicable anti-corruption laws and other legal requirements, we may become subject to criminal and civil penalties, disgorgement and other sanctions and remedial measures, including the loss of export or import privileges and debarment, and face substantial legal expenses. Likewise, even an investigation by U.S. or foreign authorities of potential violations of such laws could damage our reputation. In either case, our business, prospects, operating results and financial condition could be adversely affected. Under certain circumstances, we could also be held liable for the activities of our employees, contractors, and partners that violate anti-corruption laws, even if we do not explicitly authorize or have actual knowledge of such activities. Even allegations of such violations could potentially damage our reputation and harm our business.

**Risks Related to Our Intellectual Property**

***Our ability to successfully commercialize our products may be impaired if we are unable to obtain and maintain effective intellectual property rights for our proprietary scientific technology platform and product candidates.***

Our success depends in large part on our and our licensors' ability to obtain and maintain patent and other intellectual property protection in the United States and in other countries with respect to our proprietary scientific technology platform and products. We have sought to protect our proprietary position by filing patent applications in the United States and abroad related to our novel technologies and product candidates that we and/or our licensors view as important to our business. This process is expensive and time-consuming, and we and our licensors may not be able to file and prosecute all necessary or desirable patent applications at a reasonable cost or in a timely manner. It is also possible that we and/or our licensors will fail to identify patentable aspects of our research and development output before it is too late to obtain patent protection. In some circumstances, we may not have the right to control the preparation, filing and prosecution of patent applications, or to maintain the patents or enforce the patents, covering technology or products that we license from third parties. Our existing patents and any future patents and the existing and any future licenses to third-party patents we obtain may not be sufficiently broad to prevent others from using our technologies or from developing competing products and technologies.

The patent position of biotechnology companies generally is highly uncertain and involves complex legal and factual questions for which legal principles remain unresolved. In recent years, patent rights have been the subject of significant litigation. As a result, the issuance, scope, validity, enforceability and commercial value of our and our licensors' patent rights are highly uncertain. Additionally, changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of our owned or licensed patents or narrow the scope of our patent protection. The laws of foreign countries may not protect our rights to the same extent as the laws of the United States.

Even if our owned and licensed patent applications issue as patents, they may not issue in a form that will provide us with any meaningful protection, prevent competitors from competing with us or otherwise provide us with any competitive advantage. We, or our licensors, may fail to identify patentable aspects of inventions made in the course of development and commercialization activities before it is too late to obtain patent protection on them. Therefore, we may miss potential opportunities to strengthen our patent position. Our competitors may be able to circumvent our owned or licensed patents by developing similar or alternative technologies or products in a non-infringing manner. The issuance of a patent is not conclusive as to its scope, validity or enforceability, and our owned and licensed patents may be challenged in the courts or patent offices in the United States and abroad. Such challenges may result in patent claims being narrowed, invalidated or

held unenforceable, which could limit our ability to stop or prevent us from stopping others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and products. Given the amount of time required for the development, testing and regulatory review of future product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours or otherwise provide us with a competitive advantage.

***The patent protection we obtain for our product candidates may not be sufficient enough to provide us with any competitive advantage or our owned or licensed patents may be challenged.***

In some instances, agreements through which we license patent rights may not give us control over patent prosecution or maintenance, so that we may not be able to control which claims or arguments are presented, how claims are amended, and may not be able to secure, maintain, or successfully enforce necessary or desirable patent protection from those patent rights. We have not had and do not have primary control over patent prosecution and maintenance for certain of the patents and patent applications we license and therefore cannot guarantee that these patents and applications will be prosecuted or maintained in a manner consistent with the best interests of our business. We cannot be certain that patent prosecution and maintenance activities by our licensors have been or will be conducted in compliance with applicable laws and regulations or will result in valid and enforceable patents. Moreover, some of our in-licensed patents and patent applications are, and our future owned and licensed patents may be, co-owned with third parties. If we are unable to obtain an exclusive license to any such third-party co-owners' interest in any future patents or patent applications, such co-owners may be able to license their rights to other third parties, including our competitors, and our competitors could market competing products and technology. In addition, we may need the cooperation of any such co-owners of our patents in order to enforce such patents against third parties, and such cooperation may not be provided to us.

It is possible that defects of form in the preparation or filing of our owned or licensed patents or patent applications may exist, or may arise in the future, for example with respect to proper priority claims, inventorship, claim scope, or requests for patent term adjustments or extensions. If we or our partners, collaborators, licensees, or licensors, whether current or future, fail to establish, maintain or protect such patents and other intellectual property rights, such rights may be reduced or eliminated. If our partners, collaborators, licensees, or licensors, are not fully cooperative or disagree with us as to the prosecution, maintenance or enforcement of any patent rights, such patent rights could be compromised. If there are material defects in the form, preparation, prosecution, or enforcement of our owned or licensed patents or patent applications, such patents may be invalid and/or unenforceable, and such applications may never result in valid, enforceable patents. Any of these outcomes could impair our ability to prevent competition from third parties, which may have an adverse impact on our business.

Pending patent applications cannot be enforced against third parties practicing the technology claimed in such applications unless and until a patent issues from such applications. Assuming the other requirements for patentability are met, currently, the first to file a patent application is generally entitled to the patent.

However, prior to March 16, 2013, in the United States, the first to invent was entitled to the patent. Publications of discoveries in the scientific literature often lag behind the actual discoveries, and patent applications in the United States and other jurisdictions are not published until 18 months after filing, or in some cases not at all. Therefore, we cannot be certain that we were the first to make the inventions claimed in our patents or pending patent applications, or that we were the first to file for patent protection of such inventions. Similarly, we cannot be certain that parties from whom we do or may license or purchase patent rights were the first to make relevant claimed inventions, or were the first to file for patent protection for them. If third parties have filed prior patent applications on inventions claimed in our owned or licensed patents or applications that were filed on or before March 15, 2013, an interference proceeding in the United States can be initiated by such third parties to determine who was the first to invent any of the subject matter covered by the patent claims of such owned or licensed patent applications. If third parties have filed such prior applications after March 15, 2013, a derivation proceeding in the United States can be initiated by such third parties to determine whether our owned or licensed invention was derived from theirs.

Moreover, because the issuance of a patent is not conclusive as to its inventorship, scope, validity or enforceability, our owned and licensed patents or pending patent applications may be challenged in the courts or patent offices in the United States and abroad. There is no assurance that all of the potentially relevant prior art relating to our owned or licensed patents and patent applications has been found. If such prior art exists, it may be used to invalidate a patent, or may prevent a patent from issuing from a pending patent application. For example, such patent filings may be subject to a third-party submission of prior art to the U.S. Patent and Trademark Office ("USPTO"), or to other patent offices around the world. Alternately or additionally, we may become involved in post-grant review procedures, oppositions, derivation

proceedings, *ex parte* reexaminations, *inter partes* review, supplemental examinations, or interference proceedings or challenges in district court, in the United States or in various foreign patent offices, including both national and regional, challenging patents or patent applications in which we have rights, including patents on which we rely to protect our business. An adverse determination in any such challenges may result in loss of the patent or in patent or patent application claims being narrowed, invalidated or held unenforceable, in whole or in part, or in denial of the patent application or loss or reduction in the scope of one or more claims of the patent or patent application, any of which could limit our ability to stop others from using or commercializing similar or identical technology and products, or limit the duration of the patent protection of our technology and products. In addition, given the amount of time required for the development, testing and regulatory review of new product candidates, patents protecting such candidates might expire before or shortly after such candidates are commercialized.

Pending and future patent applications may not result in patents being issued that protect our business, in whole or in part, or which effectively prevent others from commercializing competitive products.

Competitors may also be able to design around our owned or licensed patents. Changes in either the patent laws or interpretation of the patent laws in the United States and other countries may diminish the value of our owned or licensed patents or narrow the scope of our patent protection. In addition, the laws of foreign countries may not protect our rights to the same extent or in the same manner as the laws of the United States. For example, patent laws in various jurisdictions, including significant commercial markets such as Europe, restrict the patentability of methods of treatment of the human body more than United States law does. If these developments were to occur, they could have a material adverse effect on our ability to generate revenue.

Issued patents that we have or may obtain or license may not provide us with any meaningful protection, prevent competitors from competing with us or otherwise provide us with any competitive advantage. Our competitors may be able to circumvent our owned or licensed patents by developing similar or alternative technologies or products in a non-infringing manner. Our competitors may also seek approval to market their own products similar to or otherwise competitive with our products. In these circumstances, we may need to defend or assert our owned or licensed patents, or both, including by filing lawsuits alleging patent infringement. In any of these types of proceedings, a court or other agency with jurisdiction may find our owned or licensed patents invalid or unenforceable, or that our competitors are competing in a non-infringing manner. Thus, even if we have valid and enforceable patents, these patents still may not provide protection against competing products or processes sufficient to achieve our business objectives. Any of the foregoing could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We may become involved in lawsuits to protect or enforce our patents, which could be expensive, time-consuming and unsuccessful.***

Competitors may infringe, misappropriate or violate our owned or licensed patents or other intellectual property. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours is invalid or unenforceable, in whole or in part. There is also a risk that, even if the validity of such patents is upheld, the court will construe the patent’s claims narrowly and refuse to stop the other party from using the technology at issue on the grounds that our owned or licensed patents do not cover such technology. The standards that courts use to interpret patents are not always applied predictably or uniformly and can change, particularly as new technologies develop. As a result, we do not know how much protection, if any, will be given to our owned or licensed patents if we attempt to enforce them and they are challenged in court. An adverse result in any litigation proceeding could put one or more of our owned or licensed patents at risk of being invalidated or interpreted narrowly.

Inequitable conduct is frequently raised as a defense during intellectual property litigation. It is believed that all parties involved in the prosecution of our patent applications have complied with their duties of disclosure in the course of prosecuting our patent applications; however, it is possible that legal claims to the contrary could be asserted if we were engaged in intellectual property litigation, and the results of any such legal claims are uncertain due to the inherent uncertainty of litigation. If a court determines that any party involved in the prosecution of our owned or licensed patents failed to comply with its duty of candor, the subject patent could be held to be unenforceable.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. Intellectual property litigation or other legal proceedings may cause us to incur significant expenses and may also absorb significant management time. Uncertainties resulting from our participation in patent litigation or other proceedings could have a material adverse effect on our business.

***Third parties may initiate legal proceedings alleging that we are infringing, misappropriating or otherwise violating their intellectual property rights, the outcome of which would be uncertain and could harm our business, prospects, operating results and financial condition.***

Third parties may assert infringement, misappropriation or other claims against us, or other parties we have agreed to indemnify, based on existing third-party patents or patents that may be granted in the future as well as other intellectual property rights. There may be existing third-party patents or patent applications covering aspects of our technology. Furthermore, because patent applications are published sometime after filing, and because applications can take several years to issue, there may be additional currently pending third-party patent applications that are unknown to us, which may later result in issued patents. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. We may not have sufficient resources to bring these actions to a successful conclusion. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of shares of our common stock.

Because of the inevitable uncertainty in intellectual property litigation, we could lose a patent infringement or other action asserted against us regardless of our perception of the merits of the case. If we are found to infringe upon, misappropriate or otherwise violate a third party's intellectual property rights, we could be required to obtain a license from such third party to continue developing and commercializing our products and technology. However, we may not be able to obtain any required license on commercially reasonable terms or at all. Even if we are able to obtain a license, it may be non-exclusive, thereby giving our competitors access to the same technologies licensed to us. We could be forced, including by court order, to cease commercializing the implicated technology or product. In addition, in any such proceeding or litigation, we could be found liable for monetary damages, which could be significant, including treble damages and attorneys' fees, if we are found to have willfully infringed a patent. A finding of infringement, misappropriation or that we otherwise violated intellectual property rights could prevent us from commercializing our product candidates or force us to cease some or all of our business operations.

***If we fail to comply with our obligations in our intellectual property licenses with third parties, we could lose license rights that are important to our business.***

We are a party to intellectual property license agreements with third parties. For example, we have licenses with each of Duke University and Yale University for patents associated with our proprietary technology, and may enter into additional license agreements in the future. Our existing license agreements impose, and we expect that our future license agreements will impose, various diligence, royalty payment, milestone payment, insurance and other obligations on us. If we fail to comply with these obligations or other obligations in our license agreements, our licensors may have the right to terminate these agreements, in which event we may not be able to develop and market any product or use any platform technology that is covered by these agreements. If our license agreements terminate, or we experience a reduction or elimination of licensed rights under these agreements, we may have to negotiate new or reinstated licenses with less favorable terms or we may not have sufficient intellectual property rights to operate our business. The occurrence of such events could materially harm our business.

Further, the agreements under which we currently license intellectual property or technology from third parties are complex, and certain provisions in such agreements may be susceptible to multiple interpretations. Accordingly, disputes may arise between us and our licensor, our licensor and its licensors, regarding intellectual property subject to a license agreement, including those relating to:

- the scope of rights, if any, granted under the license agreement and other interpretation-related issues;
- whether and the extent to which our technology and processes infringe on intellectual property of the licensor that is not subject to the license agreement;
- whether our licensor or its licensor had the right to grant the license agreement;
- whether third parties are entitled to compensation or equitable relief, such as an injunction, for our use of the intellectual property without their authorization;
- our right to sublicense patent and other rights to third parties under collaborative development relationships;
- whether we are complying with our obligations with respect to the use of the licensed technology in relation to our development and commercialization of product candidates;

- our involvement in the prosecution of the licensed patents and our licensors' overall patent enforcement strategy;
- the allocation of ownership of inventions and know-how resulting from the joint creation or use of intellectual property by our licensors and by us and our partners; and
- the amounts of royalties, milestones or other payments due under the license agreement.

The resolution of any contract interpretation disagreement that may arise could narrow what we believe to be the scope of our rights to the relevant intellectual property or technology, or increase what we believe to be our financial or other obligations under the relevant agreement. If disputes over intellectual property that we have licensed prevent or impair our ability to maintain our current licensing arrangements on acceptable terms, or are insufficient to provide us the necessary rights to use the intellectual property, we may be unable to successfully develop and commercialize the affected product candidates. If we or any such licensors fail to adequately protect this intellectual property, our ability to commercialize our products could suffer. Any disputes with our licensors or any termination of the licenses on which we depend could have a material adverse effect on our business, financial condition, results of operations and prospects.

***We may not be successful in obtaining necessary intellectual property rights to product candidates for our development pipeline through acquisitions and in-licenses.***

Although we intend to develop product candidates through our own internal research, we may need to obtain additional licenses from others to advance our research or allow commercialization of our product candidates. However, we may be unable to acquire or in-license intellectual property rights relating to, or necessary for, any such product candidates from third parties on commercially reasonable terms or at all. In that event, we may be unable to develop or commercialize such product candidates. We may also be unable to identify additional, future product candidates that we believe are an appropriate strategic fit for our company and intellectual property relating to, or necessary for, such product candidates.

The in-licensing and acquisition of third-party intellectual property is a competitive area, and a number of more established companies are also pursuing strategies to in-license or acquire third-party intellectual property rights that we may consider attractive or necessary. These established companies may have a competitive advantage over us due to their size, cash resources and greater clinical development and commercialization capabilities. Furthermore, companies that perceive us to be a competitor may be unwilling to assign or license rights to us. In addition, we expect that competition for the in-licensing or acquisition of third-party intellectual property rights for product candidates that are attractive to us may increase in the future, which may mean fewer suitable opportunities for us as well as higher acquisition or licensing costs. We may be unable to in-license or acquire the third-party intellectual property rights for product candidates on terms that would allow us to make an appropriate return on our investment. If we are unable to successfully obtain rights to suitable product candidates, our business, financial condition, results of operations and prospects for growth could suffer.

***We may be unable to protect the confidentiality of our trade secrets, particularly in light of our reliance on third parties, which increases the possibility that such trade secrets will be disclosed or misappropriated, thus harming our business and competitive position.***

In addition to our patented technology and products, we rely upon trade secrets, including unpatented know-how, technology and other proprietary information to develop and maintain our competitive position, particularly with respect to our manufacturing process. We seek to protect our trade secrets, in part, through confidentiality agreements with our employees, collaborators and consultants. We seek to have agreements with our employees and selected consultants that obligate them to assign any inventions created during their tenure with us. However, we may not obtain these agreements in all circumstances and the assignment of intellectual property under such agreements may not be self-executing. If the employees, collaborators or consultants that are parties to these agreements breach or violate their respective terms, we may not have adequate remedies for any such breach or violation. Our trade secrets could also be misappropriated by our competitors. Enforcing a claim that a party illegally disclosed or misappropriated a trade secret is difficult, expensive, time-consuming and potentially distracting, and the outcome is unpredictable. In addition, some courts inside and outside the United States are less willing or unwilling to protect trade secrets. If any of our trade secrets were to be lawfully obtained or independently developed by a competitor or other third party, we would have no right to prevent such a party from using that technology or information to compete with us. If our trade secrets are disclosed to or misappropriated or independently developed by a third party, it would harm our ability to protect our rights and could materially harm our business and competitive position.

***Third parties may assert that our employees or consultants have wrongfully used or disclosed confidential information or misappropriated trade secrets.***

We may employ individuals or engage consultants that previously worked with other organizations, including our competitors or potential competitors. Although we seek to ensure that such persons do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or they, or both, have inadvertently or otherwise used or disclosed intellectual property, including trade secrets or other proprietary information, of a former employer or other third party. Litigation may be necessary to defend against these claims. If we fail in defending any such claims or settling those claims, we may lose valuable intellectual property rights or personnel in addition to paying monetary damages or a settlement. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Patent terms may be inadequate to protect our competitive position on our HAVs or our other product candidates for an adequate amount of time.***

Patents have a limited lifespan. In the United States, if all maintenance fees are timely paid, the natural expiration of a patent is generally 20 years from its earliest U.S. non-provisional filing date. Various extensions may be available, but the life of a patent, and the protection it affords, is limited. Even if patents covering our HAVs are obtained, once the patent life has expired, we may face competition, including from other competing technologies. As a result, our owned and licensed patent portfolio may not provide us with sufficient rights to exclude others from commercializing products similar or identical to ours.

***We may not be able to protect our intellectual property rights throughout the world.***

Filing, prosecuting, maintaining, defending and enforcing patents on our product candidates in all countries throughout the world would be prohibitively expensive, and our intellectual property rights in some countries outside the United States can be less extensive than those in the United States. In addition, the laws of some foreign countries do not protect intellectual property rights to the same extent as federal and state laws in the United States. Consequently, we may not be able to prevent third parties from practicing our inventions in countries outside the United States, or from selling or importing products made using our inventions in and into or other jurisdictions. Competitors may use our technologies in jurisdictions where we have not obtained patent protection to develop their own products and may also export infringing products to territories where we have patent protection, but enforcement rights are not as strong as those in the United States. These products may compete with our products, to the extent approved, and our owned or licensed patents or other intellectual property rights may not be effective or sufficient to prevent them from doing so.

Many companies have encountered significant problems in protecting and defending intellectual property rights in foreign jurisdictions. The legal systems of certain countries, particularly certain developing countries, do not favor the enforcement of patents, trade secrets, and other intellectual property protection, particularly those relating to biotechnology products, which could make it difficult for us to stop the infringement of our owned or licensed patents or marketing of competing products in violation of our proprietary rights generally. Proceedings to enforce our patent rights in foreign jurisdictions, whether or not successful, could result in substantial costs and divert our efforts and attention from other aspects of our business, could put our owned or licensed patents at risk of being invalidated or interpreted narrowly and our patent applications at risk of not issuing and could provoke third parties to assert claims against us. We may not prevail in any lawsuits that we initiate, and the damages or other remedies awarded to us, if any, may not be commercially meaningful.

Many countries have compulsory licensing laws under which a patent owner may be compelled under specified circumstances to grant licenses to third parties. In addition, many countries limit the enforceability of patents against government agencies or government contractors. In those countries, we may have limited remedies if patents are infringed or if we are compelled to grant a license to a third party, which could materially diminish the value of those patents. This could limit our potential revenue opportunities. Accordingly, our efforts to enforce our intellectual property rights around the world may be inadequate to obtain a significant commercial advantage from the intellectual property that we develop or license, which could adversely affect our business, financial condition, results of operations, and prospects.

***Some of our internal intellectual property and most of our in-licensed intellectual property has been generated under U.S. Government grants and contracts that trigger certain obligations and U.S. Government rights and thus is subject to federal regulations such as "march-in" rights, certain reporting requirements and a preference for U.S.-based companies. Compliance with such regulations may limit our exclusive rights and limit our ability to contract with non-U.S. manufacturers.***

Some of our internal intellectual property and most of our in-licensed intellectual property has been generated under U.S. Government grants and contracts that trigger certain obligations and U.S. Government rights under federal statutes and regulations, including the Bayh-Dole Act of 1980 and the Federal Technology Transfer Act of 1986. For example, the U.S. Government has a non-exclusive, non-transferable, irrevocable worldwide license to inventions conceived or first actually reduced to practice in the performance of a U.S. Government agreement. In addition, the U.S. Government has certain "march-in" rights to require us to grant exclusive, partially exclusive, or non-exclusive licenses to such inventions for the benefit of a third party if the U.S. Government determines that: (i) action is necessary to alleviate health or safety needs not reasonably met by us, our assignees, our licensees, or, in some cases, our licensors, (ii) action is necessary due to noncompliance with a U.S.-based manufacturing requirement applicable to exclusive licenses, (iii) action is necessary to meet requirements for public use specified by federal regulations and such requirements are not reasonably satisfied by us, our assignees, our licensees, and, in some cases, our licensors, and (iv) with respect to inventions made under funding agreements, adequate steps have not been taken to achieve practical application of the invention. The U.S. Government also has the right to take title to these inventions if we, or the applicable licensor, fails to disclose, elect title to, file or prosecute a patent application for, or defend or obtain a patent covering such inventions within time limits specified in particular funding agreements. The U.S. Government also has varying rights to use and disclose information, including copyrighted works, generated or delivered under a U.S. Government agreement depending on the terms of the agreement and the nature of the information. Intellectual property generated under a U.S. Government agreement is also subject to certain reporting requirements, compliance with which may require us or the applicable licensor to expend substantial resources. In addition, when inventions that are conceived or first actually reduced to practice under a U.S. Government funding agreement are exclusively licensed, products embodying or produced through the use of such inventions must be manufactured substantially in the United States. This U.S.-based manufacturing requirement may limit our ability to contract with non-U.S. companies to produce a covered product, although this requirement can be waived in certain circumstances. To the extent that any of our licensors' current or future intellectual property is generated in the performance of U.S. Government grants or contracts, these requirements may apply to such intellectual property.

***If our trademarks and trade names are not adequately protected, then we may not be able to build name recognition in our marks of interest and our business may be adversely affected.***

Our trademarks or trade names may be challenged, infringed, circumvented or declared generic or determined to be infringing on other marks. We may not be able to protect our rights to these trademarks and trade names or may be forced to stop using these names, which we need for name recognition by potential partners or customers in our markets of interest. During trademark registration proceedings, we may receive rejections. Although we would be given an opportunity to respond to those rejections, we may be unable to overcome such rejections. In addition, in the USPTO and in comparable agencies in many foreign jurisdictions, third parties are given an opportunity to oppose pending trademark applications and to seek to cancel registered trademarks. Opposition or cancellation proceedings may be filed against our trademarks, and our trademarks may not survive such proceedings. If we are unable to establish name recognition based on our trademarks and trade names, we may not be able to compete effectively and our business may be adversely affected.

***Intellectual property rights do not necessarily address all potential threats.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations and may not adequately protect our business or permit us to maintain our competitive advantage. For example:

- others may be able to make products that are similar to any product candidates we may develop or utilize similar technology but that are not covered by the claims of the patents that we own or license or may own or license in the future;
- we, or our current or future licensors might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or license or may own or license in the future;
- we, or our current or future licensors might not have been the first to file patent applications covering certain of our or their inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our owned or licensed intellectual property rights;
- it is possible that our and our licensors' pending owned or licensed patent applications or those that we may own or license in the future will not lead to issued patents;
- issued patents that we hold rights to may be held invalid or unenforceable, including as a result of legal challenges by our competitors;
- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;
- we may not develop additional proprietary technologies that are patentable;
- the patents of others may harm our business; and
- we may choose not to file a patent in order to maintain certain trade secrets or know-how, and a third party may subsequently file a patent covering such intellectual property.

Should any of these events occur, they could harm our business, financial condition, results of operations, and prospects.

**Risks Related to Business Matters and Our Ability to Manage Growth**

***Our future success depends on our ability to retain our key employees, consultants and advisors and to attract, retain and motivate qualified personnel.***

We are highly dependent on the research and development, clinical, regulatory, financial, commercial, and manufacturing expertise of the principal members of our management, scientific and clinical teams. The loss of the services of our executive officers or other key employees could impede the achievement of our research, development and commercialization objectives and seriously harm our ability to successfully implement our business strategy. Furthermore, losing or replacing executive officers and key employees may be difficult and may take an extended period of time because of the limited number of individuals in our industry with the breadth of skills and experience required to successfully develop, gain marketing approval of and commercialize our product candidates. Competition to hire from this limited pool is intense. We also experience competition for the hiring of scientific and clinical personnel from public and private universities and research institutions. In addition, we rely on consultants and advisors, including scientific, commercial and clinical advisors, to assist us in formulating our research and development and commercialization strategy. Our consultants and advisors may have commitments under employment, consulting or advisory contracts with other entities that may limit their availability to us. If we are unable to continue to attract and retain high quality personnel, our ability to pursue our growth strategy will be limited.

***We expect to increase the size of our workforce in the future, and we may encounter difficulties in managing this growth, which could harm our operations.***

As of December 31, 2022, we had 164 employees. As we move forward in our efforts to commercialize our HAVs, if approved, we expect to continue to experience significant growth in the number of our employees and the scope of our operations, particularly in the areas of development, regulatory affairs, manufacturing and quality and compliance and support functions. Due to our limited financial resources, we may not be able to effectively manage the expansion of our operations, maintain competitive compensation packages, or recruit and train additional qualified personnel. The expansion of our operations may lead to significant costs and may divert our management and business development resources. Any inability to manage this growth effectively could delay the execution of our business plans or harm our operations.

**Risks Related to Ownership of Our Securities**

***The price of our common stock may be volatile.***

The price of our common stock may fluctuate due to a variety of factors, including:

- actual or anticipated fluctuations in our quarterly and annual results and those of other public companies in our industry;

- mergers and strategic alliances in the industry in which we operate;
- market prices and conditions in the industry in which we operate;
- changes in government regulation;
- potential or actual military conflicts or acts of terrorism;
- announcements concerning Humacyte or our competitors; and
- the general state of the securities markets.

These market and industry factors may materially reduce the market price of our common stock, regardless of our operating performance.

***Reports published by analysts, including projections in those reports that differ from our actual results, could adversely affect the price and trading volume of our common stock.***

We expect that securities research analysts will establish and publish their own periodic projections for the business of Humacyte. These projections may vary widely and may not accurately predict the results we actually achieve. Our stock price may decline if our actual results do not match the projections of these securities research analysts. Similarly, if one or more of the analysts who write reports on Humacyte downgrades our stock or publishes inaccurate or unfavorable research about our business, our stock price could decline. If one or more of these analysts ceases coverage of Humacyte or fails to publish reports on Humacyte regularly, our stock price or trading volume could decline.

***We may issue additional shares of common stock or other equity securities without stockholder approval, which would dilute your ownership interests and may depress the market price of our common stock.***

As of December 31, 2022, we had warrants outstanding to purchase up to an aggregate of 5,588,506 shares of our common stock and options outstanding to purchase up to an aggregate of 7,203,874 shares of our common stock. Under the Humacyte, Inc. 2021 Long-Term Incentive Plan (the "2021 Plan") and the Humacyte, Inc. 2021 Employee Stock Purchase Plan (the "ESPP"), as of December 31, 2022 we also have the ability to issue 6,700,888 shares and 1,030,033 shares, respectively. In addition, the aggregate number of shares under the 2021 Plan and the ESPP will automatically increase on January 1 of each year commencing January 1, 2022, in an amount equal to 5% and 1%, respectively, of the number of shares of our capital stock outstanding on December 31 of the preceding year, unless our board of directors (the "Board") acts prior to January 1 of a given year to provide that the increase for such year will be a lesser number. At the end of 2021 and 2022, our Board elected not to increase the number of shares under the 2021 Plan and the ESPP. We may also issue additional shares of common stock or other equity securities of equal or senior rank in the future in connection with, among other things, future acquisitions or repayment of outstanding indebtedness, without stockholder approval, in a number of circumstances.

Our issuance of additional shares of common stock or other equity securities of equal or senior rank would have the following effects:

- our existing stockholders' proportionate ownership interest in Humacyte will decrease;
- the amount of cash available per share, including for payment of dividends in the future, may decrease;
- the relative voting strength of each previously outstanding share of common stock may be diminished; and
- the market price of shares of our common stock may decline.

***Because we do not anticipate paying any cash dividends on our common stock in the foreseeable future, capital appreciation, if any, will be your sole source of gains and you may never receive a return on your investment.***

We may retain future earnings, if any, for future operations, expansion and debt repayment and have no current plans to pay any cash dividends for the foreseeable future. Any decision to declare and pay dividends as a public company in the future will be made at the discretion of the Board and will depend on, among other things, our results of operations, financial condition, cash requirements,

contractual restrictions and other factors that the Board may deem relevant. In addition, our ability to pay dividends may be limited by covenants of any existing and future outstanding indebtedness we

or our subsidiaries incur. As a result, you may not receive any return on an investment in our securities unless you sell your securities for a price greater than that which you paid for it.

***The Public Warrants may not be in the money in the future, and they may expire worthless, and the terms of the Public Warrants may be amended in a manner adverse to a holder if holders of at least 50% of the then outstanding Public Warrants approve of such amendment.***

In connection with the Merger, the Company assumed 5,000,000 publicly-traded warrants ("Public Warrants") and 177,500 private placement warrants issued to AHAC Sponsor LLC (the "Sponsor"), Oppenheimer & Co. Inc. and Northland Securities, Inc, in connection with AHAC's initial public offering ("Private Placement Warrants" and, together with the Public Warrants, the "Warrants"). The Warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and our predecessor AHAC. The warrant agreement provides that the terms of the Warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision or correct any mistake, but requires the approval by the holders of at least 50% of the then-outstanding Public Warrants to make any change that adversely affects the interests of the registered holders of Public Warrants. Accordingly, we may amend the terms of the Public Warrants in a manner adverse to a holder if holders of at least 50% of the then-outstanding Public Warrants approve of such amendment and, solely with respect to any amendment to the terms of the Private Placement Warrants or any provision of the warrant agreement with respect to the Private Placement Warrants, holders of at least 50% of the number of the then outstanding Private Placement Warrants. Although our ability to amend the terms of the Public Warrants with the consent of at least 50% of the then-outstanding Public Warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the Warrants, convert the Warrants into cash, shorten the exercise period or decrease the number of shares of common stock purchasable upon exercise of a Warrant.

***We may redeem your unexpired Public Warrants prior to their exercise at a time that is disadvantageous to you, thereby making your Public Warrants worth less than they would be if you held and exercised them at a later time.***

We have the ability to redeem outstanding Public Warrants prior to their expiration, at a price of $0.01 per Warrant, provided that the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for share subdivisions, share dividends, rights issuances, subdivisions, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date we send the notice of redemption to the holders thereof. If and when the Public Warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. Redemption of the outstanding Public Warrants could force you to: (i) exercise your Public Warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so; (ii) sell your Public Warrants at the then-current market price when you might otherwise wish to hold your Public Warrants; or (iii) accept the nominal redemption price which, at the time the outstanding Public Warrants are called for redemption, is likely to be substantially less than the market value of your Public Warrants.

The value received upon exercise of the Public Warrants (i) may be less than the value the holders would have received if they had exercised their Public Warrants at a later time where the underlying share price is higher and (ii) may not compensate the holders for the value of the Public Warrants.

The Private Placement Warrants are not subject to the same risk of redemption as the Public Warrants as the Private Placement Warrants are not redeemable so long as they are held by the Sponsor, the underwriters of AHAC's initial public offering or their permitted transferees. If the Private Placement Warrants are held by holders other than the Sponsor, the underwriters or their permitted transferees, the Private Placement Warrants will be redeemable by us.

***We have derivative securities that are accounted for as liabilities and the changes in value of such derivative securities could have a material effect on our financial results.***

Included on the Company's consolidated balance sheets as of December 31, 2022 are derivative liabilities related to the Contingent Consideration and the Private Placement Warrants. Accounting Standards Codification 815, Derivatives and Hedging ("ASC 815"), provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statement of operations. As a result of the recurring fair value measurement, our financial statements and results of operations may fluctuate quarterly, based on factors which are outside of our control. Due to the recurring fair value measurement, we expect that we will recognize non-cash gains or losses on the Contingent Consideration and the Private Placement Warrants each reporting period and that the amount of such gains or losses could be material.

Prior to the Merger, on April 12, 2021, the Acting Director of the Division of Corporation Finance and Acting Chief Accountant of the SEC together issued a statement regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")" (the "SEC Statement"). Specifically, the SEC Statement focused on certain settlement terms and provisions related to certain tender offers following a business combination, which terms are similar to those contained in the Public Warrants. As a result of the SEC Statement, prior to the Merger, AHAC reevaluated the accounting treatment of the Public Warrants and determined to classify the Public Warrants as derivative liabilities measured at fair value, with changes in fair value each period reported in earnings. As a result, included on AHAC's balance sheet as of December 31, 2020 are derivative liabilities related to embedded features contained within the Public Warrants.

In connection with its Amended Annual Report on Form 10-K/A for the year ended December 31, 2020, AHAC reached a determination to restate certain previously issued financial statements and related disclosures for the periods disclosed in order to correct the accounting treatment for the Warrants following the publication of the SEC Statement. As a result, prior to the Merger, AHAC incurred unanticipated costs for accounting and legal fees in connection with or related to the restatement, and we may become subject to additional risks and uncertainties related to the restatement.

AHAC restated certain previously issued financial statements and related disclosures for the periods disclosed, and as of September 30, 2021, our management concluded that the conditions causing the material weakness that led to these restatements did not exist. However, in the future, we may determine that we have additional material weaknesses. Our failure to remediate any material weaknesses or failure to identify and address any material weaknesses or control deficiencies could result in inaccuracies in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis, which could cause investors to lose confidence in our reported financial information, which may result in volatility in and a decline in the market price of our common stock.

***Our business could be adversely impacted by inflation.***

Increases in inflation may have an adverse effect on our business. Current and future inflationary effects may be driven by, among other things, supply chain disruptions and governmental stimulus or fiscal policies. Continuing increases in inflation could impact the overall demand for our products, our costs for labor, material and services, and the margins we are able to realize on our products, all of which could have an adverse impact on our business, financial position, results of operations and cash flows. Inflation may also result in higher interest rates, which in turn would result in higher interest expense related to our variable rate indebtedness and any borrowings we undertake to refinance existing fixed rate indebtedness.

***We may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

We may be forced to write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in losses. Even though these charges may be non-cash items and may not have an immediate impact on our liquidity, the fact that we may report charges of this nature could contribute to negative market perceptions about our securities. In addition, charges of this nature may cause us to be unable to obtain future financing on favorable terms or at all. Accordingly, a stockholder could suffer a reduction in the value of their shares.

***The obligations associated with being a public company involve significant expenses and will require significant resources and management attention, which may divert from our business operations.***

As a public company, we are subject to the reporting requirements of the Exchange Act and the Sarbanes-Oxley Act. The Exchange Act requires the filing of annual, quarterly and current reports with respect to a public company's business and financial condition. The Sarbanes-Oxley Act requires, among other things, that a public company establish and maintain effective internal control over financial reporting. As a result, we will incur significant legal, accounting and other expenses that we did not incur as a private company. Our entire management team and many of its other employees will need to devote substantial time to compliance, and may not effectively or efficiently manage our transition into a public company.

These rules and regulations will result in our incurring substantial legal and financial compliance costs and will make some activities more time-consuming and costly. For example, these rules and regulations have made it more difficult and more expensive for Humacyte to obtain director and officer liability insurance, and it has accepted reduced coverage. As a

result, it may be difficult for us to attract and retain qualified people to serve on the Board or committees of the Board or as executive officers.

***We are an "emerging growth company" and a "smaller reporting company" within the meaning of the rules adopted by the SEC, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies and smaller reporting companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.***

We are an emerging growth company as defined in the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies, including not being required to comply with the auditor attestation requirements of Section 404(b) of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years from the closing of AHAC's initial public offering, although circumstances could cause us to lose that status earlier, including if the market value of our common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that an emerging growth company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such an election to opt out is irrevocable. We have elected not to opt out of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

Additionally, we are a "smaller reporting company" as defined under the Exchange Act. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company for so long as (1) the market value of our common stock held by non-affiliates is less than $250 million as of the last business day of the second fiscal quarter, or (2) our annual revenues in our most recent fiscal year completed before the last business day of our second fiscal quarter are less than $100 million and the market value of our common stock held by non-affiliates is less than $700 million as of the last business day of the second fiscal quarter. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public companies difficult or impossible.

***If we fail to maintain an effective system of internal control over financial reporting, we may not be able to accurately report our financial results. As a result, stockholders could lose confidence in our financial and other public reporting, which would harm our business and the trading price of our common stock.***

Effective internal control over financial reporting is necessary for us to provide reliable financial reports. Any failure to implement new or improved controls necessary to maintain effective internal control over financial reporting, or difficulties encountered in their implementation, could cause us to fail to meet our reporting obligations.

In addition, any testing by us conducted in connection with Section 404 of the Sarbanes-Oxley Act, or our independent registered public accounting firm, may identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Ineffective internal control over financial reporting could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock. In connection with its

Amended Annual Report on Form 10-K/A for the year ended December 31, 2020, AHAC reached a determination to restate certain previously issued financial statements and related disclosures for the periods disclosed in order to correct the accounting treatment for the Warrants following the publication of the SEC Statement.

Our assessment is that, after the Merger, we have a sufficiently staffed and technically experienced finance and accounting team to address the financial reporting requirements of a public company. Because the conditions causing the material weakness no longer existed, and are not expected to exist in the foreseeable future, we determined the material weakness did not exist in internal control over financial reporting as of September 30, 2021. Prior to the Merger, AHAC's management concluded that its disclosure controls and procedures were not effective as of December 31, 2020, and that its internal control over financial reporting was not effective as of December 31, 2020, as a result of a material weakness in controls related to the accounting for the Warrants. As a result, AHAC incurred unanticipated costs for accounting and legal fees in connection with or related to the restatement, and we may become subject to additional risks and uncertainties related to the restatement, such as a negative impact on investor confidence in the accuracy of our financial disclosures, and may face reputational risks for our business. Effective as of the closing of the Merger, our management is responsible for internal control over financial reporting and the former management of AHAC no longer participates in financial reporting.

As long as we are an emerging growth company under the JOBS Act or a non-accelerated filer and a "smaller reporting company" as defined in Rule 12b-2 of the Exchange Act, our independent registered public accounting firm will not be required to attest to the effectiveness of our internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act. An independent assessment of the effectiveness of our internal control over financial reporting could detect deficiencies that our management's assessment might not. Undetected material weaknesses in our internal control over financial reporting could lead to financial statement restatements and require us to incur the expense of remediation.

***Anti-takeover provisions in our Second Amended and Restated Certificate of Incorporation and under Delaware law could make an acquisition of our company, which may be beneficial to our stockholders, more difficult, and may prevent attempts by our stockholders to replace or remove our current management.***

Our Second Amended and Restated Certificate of Incorporation (the "Charter") contains provisions that may delay or prevent an acquisition of the company or change in our management. These provisions may make it more difficult for stockholders to replace or remove members of the Board. Because the Board is responsible for appointing the members of the management team, these provisions could in turn frustrate or prevent any attempt by our stockholders to replace or remove our current management. In addition, these provisions could limit the price that investors might be willing to pay in the future for shares of our common stock. Among other things, these provisions include:

- the limitation of the liability of, and the indemnification of, our directors and officers;
- provisions that permit only (i) the chairperson of the Board, (ii) our chief executive officer or (iii) a majority of our Board to call special meetings of stockholders and therefore do not permit our stockholders to call stockholder meetings;
- a prohibition on actions by our stockholders by written consent; and
- the ability of the Board to issue preferred stock without stockholder approval.

Moreover, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law (the "DGCL"), which prohibits a person who owns 15% or more of our outstanding voting stock from merging or combining with us for a period of three years after the date of the transaction in which the person acquired 15% or more of our outstanding voting stock, unless the merger or combination is approved in a prescribed manner. This could discourage, delay or prevent a third party from acquiring or merging with us, whether or not it is desired by, or beneficial to, our stockholders. This could also have the effect of discouraging others from making tender offers for our common stock, including transactions that may be in our stockholders' best interests. Finally, these provisions establish advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings. These provisions would apply even if the offer may be considered beneficial by some stockholders.

***Our Charter provides that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware and the federal district courts of the United States of America are the exclusive forums for***

***substantially all disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our Charter provides that the Court of Chancery of the State of Delaware will be the exclusive forum for the following types of actions or proceedings under Delaware statutory or common law:

- any derivative action or proceeding brought on our behalf;
- any action asserting a breach of fiduciary duty;
- any action asserting a claim against us arising under the DGCL, our Charter or our amended and restated bylaws (the "Bylaws");
- any action or proceeding asserting a claim as to which the DGCL confers jurisdiction upon the Court of Chancery of the State of Delaware; and
- any action asserting a claim against us that is governed by the internal affairs doctrine or otherwise related to our internal affairs.

This exclusive forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims. We cannot be certain that a court will decide that this provision is either applicable or enforceable, and if a court were to find the choice of forum provision contained in our Charter to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

This exclusive forum provision will not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. In addition, unless we consent in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act or the rules and regulations promulgated thereunder.

**Item 1B. Unresolved Staff Comments.**

None.

**Item 2. Properties.**

Our corporate headquarters, manufacturing, and research and development facilities are located in Durham, North Carolina where we lease approximately 83,000 square feet of space. This space includes approximately 55,000 square feet for production and distribution operations including manufacturing, bioprocessing, quality control, mechanical space and inventory. The remainder of the facility consists of offices, laboratories, and common spaces.

**Item 3. Legal Proceedings**

The Company currently is not aware of any legal proceedings or claims that management believes will have, individually or in the aggregate, a material adverse effect on the Company's business, financial condition, results of operations, or cash flows.

**Item 4. Mine Safety Disclosures.**

None.

## Part II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

**Market Information**

Our common stock is currently listed on The Nasdaq Global Select Market under the symbol "HUMA." Prior to the consummation of the Merger, our common stock was listed on The Nasdaq Global Select Market under the symbol "AHAC." As of March 10, 2023, there were 201 holders of record of our common stock.

**Dividend Policy**

We have never declared or paid any dividends on shares of our common stock. We anticipate that we will retain all of our future earnings, if any, for use in the operation and expansion of our business and do not anticipate paying cash dividends in the foreseeable future. We are currently not permitted to pay cash dividends under the Loan Agreement with Silicon Valley Bank and SVB Innovation Credit Fund VIII, L.P. Any decision to declare and pay dividends in the future will be made at the sole discretion of our Board will depend on, among other things, our results of operations, cash requirements, financial condition, contractual restrictions and other factors that our board of directors may deem relevant.

### Item 6. [Reserved]

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis of our financial condition and results of operations should be read in conjunction with our accompanying consolidated financial statements and the related notes contained in Part II, Item 8 of this Annual Report on Form 10-K. Unless the context indicates otherwise, references in this Annual Report on Form 10-K to the "Company," "Humacyte," "we," "us," "our" and similar terms refer to Humacyte, Inc. (formerly known as Alpha Healthcare Acquisition Corp.) and its consolidated subsidiaries (including Humacyte Global, Inc.) following the Merger (defined below); references to "Legacy Humacyte" refer to Humacyte, Inc. prior to the Merger; and references to "AHAC" refer to Alpha Healthcare Acquisition Corp. prior to the Merger.*

**Cautionary Statement Regarding Forward-Looking Statements**

In addition to historical information, some of the information contained in this discussion and analysis or set forth elsewhere in this Annual Report on Form 10-K, including information with respect to our plans and strategy for our business, future financial performance, expense levels and liquidity sources, includes forward-looking statements that involve risks and uncertainties. You should read the sections of this Annual Report on Form 10-K titled "Forward-Looking Statements" and "Risk Factors" for a discussion of important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis.

**Overview**

We are pioneering the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs and organ systems with the goal of improving the lives of patients and transforming the practice of medicine. We believe our regenerative medicine technology has the potential to overcome limitations in existing standards of care and address the lack of significant innovation in products that support tissue repair, reconstruction and replacement. We are leveraging our novel, scalable technology platform to develop proprietary product candidates for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

We are initially using our proprietary, scientific technology platform to engineer and manufacture HAVs. Our investigational HAVs are designed to be easily implanted into any patient without inducing a foreign body response or leading to immune rejection. We are developing a portfolio, or "cabinet", of HAVs with varying diameters and lengths. The HAV cabinet would initially target the vascular repair, reconstruction and replacement market, including use in vascular trauma; AV access for hemodialysis; PAD; and CABG. In addition, we are developing our HAVs for pediatric heart surgery and the delivery of cellular therapies, including pancreatic islet cell transplantation to treat Type 1 diabetes (our biovascular pancreas). We will continue to explore the application of our technology across a broad range of markets and indications, including the development of urinary conduit, trachea, esophagus and other novel cell delivery systems.

We believe there is substantial clinical demand for safe and effective vascular conduits to replace and repair blood vessels throughout the body. Vascular injuries resulting from trauma are common in civilian and military populations, frequently resulting in the loss of either life or limb. Existing treatment options in the vascular repair, reconstruction and replacement market include the use of autologous vessels and synthetic grafts, which we believe suffer from significant limitations. For example, the use of autologous veins to repair traumatic vascular injuries can lead to significant morbidity associated with the surgical wounds created for vein harvest and prolonged times to restore blood flow to injured limbs leading to an increased risk of amputation and infection. Synthetic grafts are often contraindicated in the setting of vascular trauma due to higher infection risk that can lead to prolonged hospitalization and limb loss. Given the competitive advantages our HAVs are designed to have over existing vascular substitutes, we believe that HAVs have the potential to become the standard of care and lead to improved patient outcomes and lower healthcare costs.

We are currently conducting Phase 2 and Phase 3 trials of our 6 millimeter HAV across two therapeutic indications, vascular trauma and AV access for hemodialysis, as well as continuing long-term follow up of patients in our Phase 2 PAD studies. We were granted Fast Track designation by the FDA for our 6 millimeter HAV for use in AV access for hemodialysis in 2014. We also received the first RMAT designation from the FDA, for the creation of vascular access for performing hemodialysis, in March 2017. In addition, in 2018 our HAV product candidate was assigned a priority designation by the Secretary of Defense under Public Law 115-92, enacted to expedite the FDA's review of products that are intended to diagnose, treat or prevent serious or life-threatening conditions facing American military personnel. Upon completion of our Phase 3 trials, we intend to submit a BLA to the FDA for an indication in vascular trauma.

We have generated no product revenue and incurred operating losses and negative cash flows from operations in each year since our inception in 2004. As of December 31, 2022 and 2021, we had an accumulated deficit of $426.5 million and $414.6 million, respectively, and working capital of $134.6 million and $218.3 million, respectively. Our operating losses were approximately $84.6 million and $81.2 million for the years ended December 31, 2022 and 2021, respectively. Net cash flows used in operating activities were $71.1 million and $81.2 million during the years ended December 31, 2022 and 2021, respectively. Substantially all of our operating losses resulted from costs incurred in connection with our research and development programs and from general and administrative costs associated with our operations. We expect to incur substantial operating losses and negative cash flows from operations for the foreseeable future as we advance our product candidates.

As of December 31, 2022, we had cash and cash equivalents and short-term investments of $151.9 million. We believe our cash and cash equivalents and short-term investments on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least the next 12 months from the date of this Annual Report on Form 10-K. See Note 1 — Organization and Description of Business in the notes to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for additional information regarding this assessment.

Our need for additional capital will depend in part on the scope and costs of our development and commercial manufacturing activities. To date, we have not generated any revenue from the sale of commercialized products. Our ability to generate product revenue will depend on the successful development and eventual commercialization of one or more of our product candidates. Until such time, if ever, we expect to finance our operations through the use of existing cash and cash equivalents and short-term investments, the sale of equity or debt, borrowings under credit facilities, or through potential collaborations, other strategic transactions or government and other grants. Adequate capital may not be available to us when needed or on acceptable terms. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition. See "Risk Factors" for additional information.

We expect to continue to incur significant expenses and to increase operating losses for at least the next several years. We anticipate that our expenses will increase substantially as we seek to:

- obtain marketing approval for our 6 millimeter HAV for vascular repair, reconstruction and replacement, including for vascular trauma and AV access for hemodialysis;
- commercialize the HAV via U.S. market launches in vascular trauma and hemodialysis AV access;
- scale out our manufacturing facility to the extent required to satisfy potential demand following any receipt of marketing approval;
- continue our preclinical and clinical development efforts;

- maintain, expand and protect our intellectual property portfolio;
- add operational, financial and management information systems and personnel to support, among other things, our product development and commercialization efforts and operations; and
- continue operating as a public company, which includes higher costs associated with hiring additional personnel, director and officer insurance premiums, audit and legal fees, expenses for compliance with public company reporting requirements under the Exchange Act and rules implemented by the SEC and The Nasdaq Stock Market LLC ("Nasdaq").

**Merger**

On August 26, 2021 (the "Closing Date"), Legacy Humacyte and AHAC consummated a merger pursuant to that certain Business Combination Agreement, dated as of February 17, 2021 (the "Merger Agreement"), by and among Legacy Humacyte, AHAC and Hunter Merger Sub, Inc. ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of AHAC. As contemplated by the Merger Agreement, Merger Sub merged with and into Legacy Humacyte, with Legacy Humacyte continuing as the surviving corporation and as a wholly owned subsidiary of AHAC (the "Merger"). On the Closing Date, AHAC changed its name to Humacyte, Inc. and Legacy Humacyte changed its name to Humacyte Global, Inc. Operations prior to the Merger included in this Annual Report on Form 10-K are those of Legacy Humacyte.

Pursuant to the terms of the Merger Agreement, at the effective time of the Merger (the "Effective Time"), (1) each outstanding share of common stock of Legacy Humacyte ("Legacy Humacyte common stock") was cancelled and converted into the right to receive approximately 0.26260 shares of the Company's common stock, par value $0.0001 per share ("Common Stock"), and (2) each outstanding share of preferred stock of Legacy Humacyte ("Legacy Humacyte preferred stock") was cancelled and converted into the aggregate number of shares of Common Stock that would be issued upon conversion of the shares of Legacy Humacyte preferred stock based on the applicable conversion ratio immediately prior to the Effective Time, multiplied by approximately 0.26260, resulting in the issuance of a total of 75,656,935 shares of Common Stock. Prior holders of shares of Legacy Humacyte common stock and Legacy Humacyte preferred stock also received the contingent right to receive certain Contingent Earnout Shares (as defined below), for each share owned by each such Legacy Humacyte stockholder that was outstanding immediately prior to the closing of the Merger (the "Closing"). In addition, certain investors purchased an aggregate of 17,500,000 shares of Common Stock (such investors, the "PIPE Investors") in a private placement that closed concurrently with the Closing for an aggregate purchase price of $175 million (the "PIPE Financing"). Additionally, at the Closing, 2,500,000 shares of AHAC's Class B common stock ("Founder Shares") automatically converted into shares of Common Stock on a one-for-one basis.

Following the Closing Date, former holders of Legacy Humacyte common stock and Legacy Humacyte preferred stock may receive up to 15,000,000 additional shares of Common Stock ("Contingent Earnout Shares") in the aggregate in two equal tranches if the volume-weighted average closing sale price of our Common Stock is greater than or equal to $15.00 and $20.00, respectively, for any 20 trading days within any 30 consecutive trading day period.

Unless otherwise noted, the Company has retroactively adjusted all common and preferred share and related price information to give effect to the exchange ratio established in the Merger Agreement.

**Impact of COVID-19**

The COVID-19 outbreak and government measures taken in response have had a significant impact, both direct and indirect, on our business, as supply chains have been disrupted and enrollment in clinical trials has been delayed. To date, the COVID-19 pandemic has not resulted in material financial impacts or impairment losses in the carrying values of our assets and we are not aware of any specific related event or circumstance that would require us to revise the estimates reflected in our financial statements. The extent to which the ongoing effects of the COVID-19 pandemic will directly or indirectly impact our business, results of operations and financial condition, including current and future clinical trials and research and development costs and timelines, will depend on future developments that are highly uncertain, including as a result of new information that may emerge concerning COVID-19, the emergence of new virus variants, and the duration and intensity of the related economic impact of the COVID-19 pandemic.

**Components of Results of Operations**

*Revenue*

To date, we have not generated revenue from the sale of any products. All of our revenue has been derived from government and other grants. Since inception we have been awarded grants from the California Institute of Regenerative Medicine (“CIRM”), NIH, and the DoD, to support our development, production scaling and clinical trials of our product candidates. We may generate revenue in the future from government and other grants, payments from future license or collaboration agreements and, if any of our product candidates receive marketing approval, from product sales. We expect that any revenue we generate will fluctuate from quarter to quarter. If we fail to complete the development of, or obtain marketing approval for, our product candidates in a timely manner, our ability to generate future revenue, and our results of operations and financial position, would be materially adversely affected.

*Research and Development Expenses*

Since our inception, we have focused our resources on our research and development activities, including conducting preclinical studies and clinical trials, developing our manufacturing process and activities related to regulatory filings for our product candidates. We recognize research and development expenses as they are incurred. Our research and development expenses consist primarily of:

- salaries and related overhead expenses for personnel in research and development functions, including stock-based compensation and benefits;
- fees paid to consultants and CROs, including in connection with our clinical trials, and other related clinical trial fees, such as for investigator grants, patient screening, laboratory work and statistical compilation and analysis;
- allocation of facility lease and maintenance costs;
- depreciation of leasehold improvements, laboratory equipment and computers;
- costs related to purchasing raw materials and producing our product candidates for clinical trials;
- costs related to compliance with regulatory requirements;
- costs related to our manufacturing development and expanded-capabilities initiatives; and
- license fees related to in-licensed technologies.

The majority of our research and development resources are currently focused on our Phase 2 and 3 clinical trials for our 6 millimeter HAV and other work needed to obtain marketing approval for our 6 millimeter HAV for use for vascular repair, reconstruction and replacement, including vascular trauma and AV access in hemodialysis in the United States. We have incurred and expect to continue to incur significant expenses in connection with these and our other clinical development efforts, including expenses related to regulatory filings, trial enrollment and conduct, data analysis, patient follow up and study report generation for our Phase 2 and Phase 3 clinical trials. We do not allocate all of our costs by each research and development program for which we are developing our cabinet of HAVs, as a significant amount of our development activities broadly support multiple programs that use our technology platform. We plan to further increase our research and development expenses for the foreseeable future as we continue the development of our proprietary scientific technology platform and our novel manufacturing paradigm.

The successful development of our preclinical and clinical product candidates is highly uncertain. At this time, we cannot estimate with any reasonable certainty the nature, timing or costs of the efforts that will be necessary to complete the remainder of the development of any of our preclinical or clinical product candidates or the period, if any, in which material net cash inflows from these product candidates may commence. This is due to the numerous risks and uncertainties associated with the development of our product candidates, including:

- the scope, rate of progress, expense and results of our preclinical development activities, our ongoing clinical trials and any additional clinical trials that we may conduct, and other research and development activities;
- successful patient enrollment in and the initiation and completion of clinical trials;

- the timing, receipt and terms of any marketing approvals from applicable regulatory authorities including the FDA and non-U.S. regulators;
- the extent of any required post-marketing approval commitments to applicable regulatory authorities;
- development of clinical and commercial manufacturing capabilities or making arrangements with third-party manufacturers in order to ensure that it or its third-party manufacturers are able to successfully manufacture our product;
- obtaining, maintaining, defending and enforcing patent claims and other intellectual property rights;
- significant and changing government regulations;
- launching commercial sales of our product candidates, if approved, whether alone or in collaboration with others;
- the degree of market acceptance of any product candidates that obtain marketing approval; and
- maintaining a continued acceptable safety profile following approval, if any, of our product candidates.

A change in the outcome of any of these variables could lead to significant changes in the costs and timing associated with the development of our product candidates. For example, if the FDA or another regulatory authority were to require us to conduct clinical trials beyond those that we currently anticipate being required to conduct in order to complete the clinical development of any of our product candidates, or if we experience significant delays in the enrollment or the conduct of any of our clinical trials, we could be required to expend significant additional financial resources and time on the completion of clinical development.

*General and Administrative Expenses*

General and administrative expenses consist primarily of salaries and related costs for employees in executive, finance, human resources, commercialization, and administrative support functions, which also include stock-based compensation expenses and benefits for such employees. Other significant general and administrative expenses include facilities costs, professional fees for accounting and legal services and expenses associated with obtaining and maintaining patents.

We expect our general and administrative expenses will continue to increase for the foreseeable future to support our expanded infrastructure and increased costs of operating as a public company and as we prepare for our anticipated commercial launch of the HAV. These increases are expected to include increased employee-related expenses, increased sales and marketing expenses, and increased director and officer insurance premiums, audit and legal fees, and expenses for compliance with public company reporting requirements under the Exchange Act and rules implemented by the SEC, as well as Nasdaq rules.

*Other Income (Expense), Net*

Total other income (expense), net consists of (i) the change in fair value of the Contingent Earnout Liability that was accounted for as a liability as of the date of the Merger, and is remeasured to fair value at each reporting period, resulting in a non-cash gain or loss, (ii) interest income earned on our cash and cash equivalents and short-term investments, (iii) interest expense incurred on our Loan Agreement, finance leases, and our PPP loan during the periods each were outstanding, (iv) a change in fair value of private placement common stock warrant liabilities related to the Private Placement Warrants, which we assumed in connection with the Merger, and which are subject to remeasurement to fair value at each balance sheet date resulting in a non-cash gain or loss, (v) a non-cash gain on PPP loan forgiveness during the year ended December 31, 2021, and (vi) during the year ended December 31, 2021, legal, accounting, and underwriting fees and other costs directly related to the consummation of the Merger that were associated with the aforementioned warrant liabilities.

### Results of Operations

*Comparison of the Years Ended December 31, 2022 and 2021*

| *($ in thousands)* | Year Ended December 31, 2022 | Year Ended December 31, 2021 | Change $ | Change % |
|---|---|---|---|---|
| **Grant revenue** | $ 1,565 | $ 1,263 | $ 302 | 24 % |
| **Operating expenses:** | | | | |
| Research and development | 63,260 | 61,341 | 1,919 | 3 % |
| General and administrative | 22,883 | 21,130 | 1,753 | 8 % |
| Total operating expenses | 86,143 | 82,471 | 3,672 | 4 % |
| **Loss from operations** | **(84,578)** | **(81,208)** | **(3,370)** | 4 % |
| Other income (expense), net: | | | | |
| Interest income | 2,629 | 16 | 2,613 | * |
| Change in fair value of Contingent Earnout Liability | 75,767 | 55,772 | 19,995 | 36 % |
| Gain on PPP loan forgiveness | — | 3,284 | (3,284) | (100)% |
| Interest expense | (6,200) | (4,348) | (1,852) | 43 % |
| Other income, net | 417 | 7 | 410 | * |
| Total other income, net | 72,613 | 54,731 | 17,882 | 33 % |
| **Net loss** | **$ (11,965)** | **$ (26,477)** | **$ 14,512** | (55)% |

** Not meaningful*

*Grant Revenue*

For the years ended December 31, 2022 and 2021, revenue was approximately $1.6 million and $1.3 million, respectively, and related to the reimbursement of qualifying expenses incurred in connection with our grant from DoD. The increase in revenue of $0.3 million, or 24%, relates to the timing of reimbursement of certain allowable costs related to our grant from DoD, which totaled approximately $6.8 million over the life of the grant before this program ended in November 2022.

*Research and Development Expenses*

The following table discloses the breakdown of research and development expenses:

| **($ in thousands)** | Year Ended December 31, 2022 | Year Ended December 31, 2021 | Change $ | Change % |
|---|---|---|---|---|
| External services | $ 15,583 | $ 15,786 | $ (203) | (1) % |
| Materials and supplies | 11,210 | 10,901 | 309 | 3 % |
| Payroll and personnel expenses | 23,678 | 23,227 | 451 | 2 % |
| Other research and development expenses | 12,789 | 11,427 | 1,362 | 12 % |
| | **$ 63,260** | **$ 61,341** | **$ 1,919** | **3 %** |

Research and development expenses increased from $61.3 million for the year ended December 31, 2021 to $63.3 million for the year ended December 31, 2022. The increase of $1.9 million, or 3%, was primarily driven by expenses incurred to support our expanded research and development initiatives, including a $1.4 million increase in other research and development expenses driven by expanded preclinical studies of our earlier-stage pipeline programs combined with smaller increases in supplies and personnel.

*General and Administrative Expenses*

General and administrative expenses were $22.9 million and $21.1 million for the years ended December 31, 2022 and 2021, respectively. The increase in general and administrative expenses during this period of $1.8 million, or 8%, was

primarily driven by expenses associated with the transition to public company status and company growth, including (i) a $1.2 million increase in salaries and benefits and recruiting costs primarily due to higher headcount, including the initial members of the planned commercial launch team, (ii) a $1.1 million increase in external services, (iii) a $0.6 million increase in insurance costs, (iv) a $0.6 million increase in other general and administrative expenses, including software costs, travel and expenses related to our board of directors, partially offset by a $1.8 million decrease in non-cash stock compensation expense primarily due to higher costs in 2021 resulting from restructuring of the management team to accommodate the transition to being a public company.

*Total Other Income, net*

Total other income, net was $72.6 million and $54.7 million for the years ended December 31, 2022 and 2021, respectively. The increase of $17.9 million in income primarily resulted from (i) a $20.0 million increase in the non-cash gain related to the remeasurement of the Contingent Earnout Liability during the year ended December 31, 2022 compared to the year ended December 31, 2021, (ii) a $2.6 million increase in interest income, and (iii) a $0.4 million increase in the non-cash gain related to the remeasurement of our private placement warrant liability, partially offset by (i) a $3.3 million gain on PPP loan forgiveness we recognized during the year ended December 31, 2021 and (ii) a $1.9 million increase in interest expense primarily related to our loan facility with Silicon Valley Bank, which commenced in March 2021.

**Liquidity and Capital Resources**

*Sources of Liquidity*

To date, we have financed our operations primarily through the sale of equity securities and convertible debt, proceeds from the Merger and related PIPE Financing, borrowings under loan facilities and, to a lesser extent, through grants from governmental and other agencies. Since our inception, we have incurred significant operating losses and negative cash flows. As of December 31, 2022 and 2021, we had an accumulated deficit of $426.5 million and $414.6 million, respectively.

As of December 31, 2022 and 2021, we had cash and cash equivalents and short-term investments of $151.9 million and $225.5 million, respectively. We believe our cash and cash equivalents and short-term investments will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements for at least 12 months from the date of this Annual Report on Form 10-K. See Note 1 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for additional information on our assessment. We believe that our longer-term working capital, planned research and development, capital expenditures and other general corporate funding requirements will be satisfied through the sale of equity, debt, borrowings under credit facilities or through potential collaborations with other companies, other strategic transactions or government or other grants. Our liquidity plans are subject to a number of risks and uncertainties, including those described in the sections of this Annual Report on Form 10-K titled "Forward-Looking Statements" and "Risk Factors."

As of December 31, 2022 and 2021, we had working capital of $134.6 million and $218.3 million, respectively. As of December 31, 2022, we had $30.0 million outstanding principal and $20.0 million of contingent borrowing capacity under our Loan Agreement (as defined below). We do not currently have any committed external source of funds beyond the Loan Agreement.

*Material Cash Requirements*

Our known material cash requirements include: (1) the purchase of supplies and services that are primarily for research and development; (2) debt repayments (for additional information, see below and Note 7 to our consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K); (3) employee wages, benefits, and incentives; and (4) financing and operating lease payments (for additional information see below and Note 8 to our accompanying consolidated financial statements in Part II, Item 8 of this Annual Report on Form 10-K). We have also entered into contracts with CROs primarily for clinical trials. These contracts generally provide for termination upon limited notice, and therefore we believe that our non-cancellable obligations under these agreements are not material. Moreover, we may be subject to additional material cash requirements that are contingent upon the occurrence of certain events, for example, legal contingencies, uncertain tax positions, and other matters.

As of December 31, 2022, we had non-cancellable purchase commitments of $32.0 million for supplies and services that are primarily for research and development. We have existing license agreements with Duke University and Yale University and have a distribution agreement with Fresenius Medical Care. The amount and timing of any potential milestone payments, license fee payments, royalties and other payments that we may be required to make under these

agreements are unknown or uncertain at December 31, 2022. For additional information regarding these agreements and the nature of payments that could become due thereunder, see the sections in this Annual Report on Form 10-K titled "Business — Distribution" and "Business — Intellectual Property."

*Debt*

In March 2021, we entered into the Loan Agreement with Silicon Valley Bank and SVB Innovation Credit Fund VIII, L.P., as amended in June and September 2021, which provides a term loan facility of up to $50.0 million, with a maturity date of March 1, 2025. The initial term loan tranche of $20.0 million was funded upon the closing of the Loan Agreement, and on October 13, 2021, we borrowed an additional $10.0 million under the Loan Agreement. The additional $20.0 million becomes accessible in two tranches of $10.0 million each contingent on the achievement of certain business and clinical development milestones, although we currently do not expect to make any additional borrowings under the Loan Agreement. As a result of the additional borrowing in October 2021, the commencement of repayment of principal was deferred until no earlier than July 2023 and potentially later if the remaining tranches are drawn. As of December 31, 2022, principal of $30.0 million was outstanding under the Loan Agreement and we were in compliance with all covenants in all material respects. Assuming no additional borrowings under the Loan Agreement, we expect to make interest payments of approximately $5.1 million under the Loan Agreement from January 1, 2023 through March 1, 2025, approximately $3.4 million of which we expect to pay during the year ended December 31, 2023.

Our obligations under the Loan Agreement are secured by substantially all of our assets, except for our intellectual property. The Loan Agreement contains certain customary covenants, including, but not limited to, those relating to additional indebtedness, liens, asset divestitures, and affiliate transactions. We may use the proceeds of borrowings under the Loan Agreement as working capital and to fund our general business requirements.

Borrowings under the Loan Agreement bear interest at a rate of 7.5% or the sum of the Wall Street Journal Prime Rate plus 4.25%, whichever is greater (11.75% as of December 31, 2022). In addition, the lenders were granted warrants to purchase common stock. Interest-only payments on the principal amount outstanding are due monthly beginning in the first month after the loan is dispersed. We are required to repay principal beginning on July 1, 2023, unless we draw the remaining two loan tranches, in which case repayment of the outstanding principal amount will begin no later than April 1, 2024. Additionally, we are obligated to pay to the lenders a final payment fee of $1.5 million upon the maturity of the loan.

Our contractual obligations under the Loan Agreement as of December 31, 2022, include $8.6 million in cash payments related to principal within one year and $21.4 million within one to three years.

In April 2020, we received loan proceeds in the amount of approximately $3.3 million under the PPP established under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). The loan and accrued interest were forgivable after a 24-week period as long as we used the loan proceeds for eligible purposes, including payroll, benefits, rent and utilities, and maintained our payroll levels. On May 25, 2021, the Small Business Administration approved the forgiveness of the outstanding amount of the PPP loan and we recognized a gain from loan extinguishment in the amount of $3.3 million during the year ended December 31, 2021.

*Leases*

Our finance lease relates to our headquarters facility containing our manufacturing, research and development and general and administrative functions, which was substantially completed in June 2018 and leased through May 2033, and our operating lease relates to the land lease associated with our headquarters. See Note 8 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for further information regarding our leases. Our future contractual obligations under our lease agreements as of December 31, 2022 are as follows:

| ***($ in thousands)*** | **Total** | **Less than 1 year** | **1 – 3 years** | **3 – 5 years** | **More than 5 years** |
|---|---|---|---|---|---|
| Finance leases | $ 29,133 | $ 3,965 | $ 8,232 | $ 6,910 | $ 10,026 |
| Operating leases | 994 | 105 | 210 | 210 | 469 |

*ATM Facility*

On September 1, 2022, we entered into an agreement for the sale from time to time up to $80.0 million of shares of Common Stock pursuant to a sales agreement (the "ATM Facility"). As of December 31, 2022, we have not conducted any sales of Common Stock under the ATM Facility.

*Future Funding Requirements*

We expect to incur significant expenses in connection with our ongoing activities as we seek to (i) continue clinical development of our 6 millimeter HAV for use in vascular trauma and hemodialysis AV access and submit biologics license applications for FDA approval, (ii) if marketing approval is obtained, to launch and commercialize our HAVs for hemodialysis AV access and vascular repair in the U.S. market, including subsequent launches in key international markets, (iii) advance our pipeline in major markets, including PAD Phase 3 trials and continue preclinical development and advance to planned clinical studies in CABG and biovascular pancreas for diabetes, and (iv) scale out our manufacturing facility as required to satisfy potential demand if our HAVs receive marketing approval. We will need additional funding in connection with these activities.

Our future funding requirements, both short-term and long-term, will depend on many factors, including:

- the progress and results of our clinical trials and interpretation of those results by the FDA and other regulatory authorities;
- the cost, timing and outcome of regulatory review of our product candidates, particularly for marketing approval of our HAVs in the United States;
- the scope, progress, results and costs of preclinical development, laboratory testing and clinical trials for our additional product candidates;
- the cost and timing of our future commercialization activities, including product manufacturing, marketing and distribution for our HAVs if approved by the FDA, and any other product candidate for which we receive marketing approval in the future;
- the amount and timing of revenues, if any, that we receive from commercial sales of any product candidates for which we receive marketing approval;
- the costs and timing of preparing, filing and prosecuting patent applications, maintaining and enforcing our intellectual property rights and defending any intellectual property-related claims; and
- the costs of operating as a public company, including hiring additional personnel as well as increased director and officer insurance premiums, audit and legal fees, and expenses for compliance with public company reporting requirements under the Exchange Act and rules implemented by the SEC and Nasdaq.

Until such time, if ever, as we are able to successfully develop and commercialize one or more of our product candidates, we expect to continue financing our operations through the sale of equity, debt, borrowings under credit facilities or through potential collaborations with other companies, other strategic transactions or government or other grants. Adequate capital may not be available to us when needed or on acceptable terms. We do not currently have any committed external source of funds beyond the Loan Agreement. To the extent that we raise additional capital through the sale of equity or convertible debt securities, the ownership interest of our stockholders will be diluted, and the terms of these securities may include liquidation or other preferences that adversely affect the rights of stockholders. Debt financing and preferred equity financing, if available, may involve agreements that include covenants limiting or restricting our ability to take specific actions, such as incurring additional debt, making acquisitions or capital expenditures. Debt financing would also result in fixed payment obligations. If we are unable to raise capital, we could be forced to delay, reduce, suspend or cease our research and development programs or any future commercialization efforts, which would have a negative impact on our business, prospects, operating results and financial condition.

Our principal use of cash in recent periods has been primarily to fund our operations, including the clinical and preclinical development of our product candidates. Our future capital requirements, both short-term and long-term, will depend on many factors, including the progress and results of our clinical trials and preclinical development, timing and extent of spending to support development efforts, cost and timing of future commercialization activities, and the amount and timing of revenues, if any, that we receive from commercial sales. See “Risk Factors” for additional risks associated with our substantial capital requirements.

*Cash Flows*

The following table shows a summary of our cash flows for each of the periods shown below:

| | Year Ended December 31, | |
|---|---|---|
| ***($ in thousands)*** | **2022** | **2021** |
| Net loss | $ (11,965) | $ (26,477) |
| Non-cash adjustments to reconcile net loss to net cash used in operating activities[1]: | (60,193) | (39,695) |
| Payment of liabilities assumed in Merger | — | (14,461) |
| Changes in operating assets and liabilities: | 1,029 | (557) |
| Net cash used in operating activities | (71,129) | (81,190) |
| Net cash provided by (used in) investing activities | 4,845 | (8,220) |
| Net cash (used in) provided by financing activities | (1,446) | 266,983 |
| Net (decrease) increase in cash and cash equivalents | $ (67,730) | $ 177,573 |
| Cash and cash equivalents at the beginning of the period | $ 217,502 | $ 39,929 |
| Cash and cash equivalents at the end of the period | $ 149,772 | $ 217,502 |

______________________________

[1] Includes depreciation, amortization related to our leases and our debt discount, stock-based compensation expense, the change in fair value of our Contingent Earnout Liability and our common stock warrant liabilities, and in 2021 includes a gain on PPP loan forgiveness.

*Cash Flow from Operating Activities*

The decrease in net cash used in operating activities from 2021 to 2022 was primarily due to $14.5 million in payments of liabilities acquired in the Merger during the year ended December 31, 2021, partially offset by increased spending on pre-clinical, clinical and pre-commercial activities as well as payroll and personnel expenses.

Cash Flow from Investing Activities

The increase in net cash provided by investing activities from 2021 to 2022 was primarily due to a net cash inflow of $5.9 million related to investments in certificates of deposit classified as short-term investments on our consolidated balance sheets.

*Cash Flow from Financing Activities*

The decrease in net cash provided by financing activities for the year ended 2022 was primarily due to $242.4 million of proceeds received in August 2021 in connection with the Merger, including proceeds from the trust account that we obtained in connection with the closing of the Merger, as well as from the PIPE Financing, along with $29.7 million of net proceeds in connection with draws under our loan facility with Silicon Valley Bank in March 2021.

*Off-Balance Sheet Arrangements*

We did not have during the periods presented, and we do not currently have, any off-balance sheet arrangements, as defined in SEC rules and regulations.

***Critical Accounting Estimates***

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of our consolidated financial statements requires us to make estimates, assumptions and judgments that affect the reported amounts of assets, liabilities, revenues, and expenses, and disclosure of contingent liabilities. We base our estimates and assumptions on historical experience and other factors that we believe to be reasonable under the circumstances. We evaluate our estimates and assumptions on an ongoing basis. Although we believe that our estimates, assumptions, and judgments are reasonable, they are based upon information presently available. Actual results may differ significantly from these estimates based on different assumptions, judgments, or conditions.

An accounting estimate or assumption is considered critical if both (a) the nature of the estimate or assumption involves a significant level of estimation uncertainty, and (b) the impact within a reasonable range of outcomes of the estimate and assumption is material to our financial condition. Our critical accounting policies are summarized below.

*Common Stock Warrants*

Under the Merger, we assumed 5,000,000 publicly-traded warrants ("Public Warrants") and 177,500 private placement warrants issued to AHAC in connection with AHAC's initial public offering ("Private Placement Warrants" and, together with the Public Warrants, the "Common Stock Warrants"). We account for the Common Stock Warrants in accordance with the guidance contained in ASC Topic 480, *Distinguishing Liabilities from Equity* and ASC Topic 815, *Derivatives and Hedging (*"ASC 815").

We account for the Private Placement Warrants in accordance with the guidance contained in ASC 815, under which the warrants do not meet the criteria for equity treatment and must be recorded as liabilities. As the Private Placement Warrants meet the definition of a derivative under ASC 815, we recorded these warrants as liabilities on the consolidated balance sheet at fair value, with subsequent changes in their respective fair values recognized in the consolidated statements of operations and comprehensive loss at each reporting date. The fair value of the warrants was estimated using a Monte Carlo simulation value model utilizing assumptions including our current common stock price, expected volatility, risk-free rate, expected term and expected dividend yield. The fair value of the Private Placement Warrants is based on significant unobservable inputs, which represent Level 3 fair value measurements within the fair value hierarchy (see "Fair Value of Financial Instruments" accounting policy described in Note 2 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K). Determining the fair value of the Private Placement Warrants involves certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

The Public Warrants are considered to be "indexed to the Company's own stock" and as we have a single class of common stock, a qualifying cash tender offer of more than 50% of the Company's common stock will always result in a change-in-control and would not preclude permanent equity classification of the Public Warrants. Based on this evaluation, we concluded that the Public Warrants meet the criteria to be classified within stockholders' equity.

*Contingent Earnout Liability*

In connection with the Reverse Recapitalization, Legacy Humacyte equity holders are entitled to receive as additional merger consideration of up to 15,000,000 shares of our common stock in the aggregate, in two equal tranches of 7,500,000 shares of common stock per tranche, for no consideration upon the occurrence of certain triggering events, including a change of control event that is not solely indexed to the common stock. In accordance with ASC 815-40, as the Contingent Earnout Shares were not indexed to the common stock, they were accounted for as a liability at the Reverse Recapitalization date and subsequently remeasured at each reporting date with changes in fair value recorded as a component of other income (expense), net in the consolidated statements of operations and comprehensive loss.

The estimated fair value of the Contingent Earnout Shares was determined using a Monte Carlo simulation valuation model using a distribution of potential outcomes on a monthly basis over a 10-year period prioritizing the most reliable information available. The assumptions utilized in the calculation were based on the achievement of certain stock price milestones, including our current common stock price, expected volatility, risk-free rate, expected term and expected dividend yield. See Note 9 to our accompanying consolidated financial statements contained in Part II, Item 8 of this Annual Report on Form 10-K for further information regarding the assumptions used in the valuation at December 31, 2022 and 2021.

The Contingent Earnout Shares are categorized as a Level 3 fair value measurement (see "Fair Value of Financial Instruments" accounting policy described in Note 2 to our financial statements contained elsewhere in this Annual Report on Form 10-K) because we estimated projections over a ten-year period utilizing unobservable inputs. Contingent earnout payments involve certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

*Stock-Based Compensation*

We measure and recognize compensation expense for all options based on the estimated fair value of the award on the grant date. We use the Black-Scholes option-pricing model to estimate the fair value of option awards. The fair value is recognized as expense on a straight-line basis over the requisite service period. We account for forfeitures as they occur.

The determination of the grant date fair value of options using an option pricing model is affected principally by our estimated fair value of shares of our common stock and requires management to make a number of other assumptions, including the expected term of the option, the volatility of the underlying shares, the risk-free interest rate and expected dividends. The assumptions used in our Black-Scholes option-pricing model represent management's good faith estimates at the time of measurement. These estimates are complex, involve a number of variables, uncertainties and assumptions and the application of management's judgment, as they are inherently subjective. If any assumptions change, our stock-based compensation expense could be materially different in the future.

These assumptions are estimated as follows:

- *Fair Value of Common Stock*. Subsequent to the Merger, the fair value of our Common Stock has been determined based on the closing price of the shares on Nasdaq. Prior to the Merger, as our common stock was not publicly traded, the fair value of the shares of our common stock underlying the options was determined by our board of directors with input from management, after considering independent third-party valuation reports. See "—Fair Value of Common Stock" and "—Common Stock Valuation Methodology."

- *Expected Term*. The expected term represents the period that stock options are expected to be outstanding. We calculated the expected term using the simplified method for options, which is available where there is insufficient historical data about exercise patterns and post-vesting employment termination behavior. The simplified method is based on the vesting period and the contractual term for each grant, or for each vesting-tranche for awards with graded vesting. The mid-point between the vesting date and the maximum contractual expiration date is used as the expected term under this method. For awards with multiple vesting-tranches, the times from grant until the mid-points for each of the tranches may be averaged to provide an overall expected term.

- *Expected Volatility*. The expected volatility was determined based on a blended approach using the historical share volatility of our Common Stock and that of several publicly traded peer companies over a period of time equal to the expected term of the options, as we have limited trading history. For purposes of identifying these peer companies, we considered the industry, stage of development, size and financial leverage of potential comparable companies.

- *Risk-Free Interest Rate*. The risk-free interest rate was based on the yields of U.S. Treasury zero-coupon securities with maturities similar in duration to the expected term of the options.

- *Expected Dividend Yield*. We have not paid dividends on our Common Stock nor do we expect to pay dividends in the foreseeable future. Accordingly, we have estimated the dividend yield to be zero.

*Fair Value of Common Stock Post-Merger*

Following the closing of the Merger, the fair value of our Common Stock is determined based on the closing price of our Common Stock on Nasdaq on the date stock options or other awards are granted under the 2021 Plan.

*Fair Value of Common Stock Pre-Merger*

Historically, for all periods prior to the Merger, the fair values of the shares of common stock underlying our options were determined on each grant date by our board of directors with input from management. In order to determine the fair value, our board of directors considered, among other things, contemporaneous valuations of our common stock and preferred stock prepared by an unrelated third-party valuation firm in accordance with the guidance provided by the American Institute of Certified Public Accountants 2013 Practice Aid, Valuation of Privately-Held-Company Equity

Securities Issued as Compensation (the "Practice Aid"). Given the absence of a public trading market of our capital stock, the assumptions used to determine the estimated fair value of our common stock were based on a number of objective and subjective factors, including:

- our stage of development and business strategy;
- the prices, rights, preferences and privileges of our redeemable convertible preferred stock relative to our common stock;
- our business, financial condition and results of operations, including related industry trends affecting our operations;
- the likelihood of achieving a liquidity event, such as an initial public offering or sale of our company, given prevailing market conditions;
- the lack of marketability of our common stock;
- the market performance of comparable publicly traded companies; and
- U.S. and global economic and capital market conditions and outlook.

*Common Stock Valuation Methodology*

The Practice Aid identifies various available methods for allocating enterprise value across classes and series of capital stock to determine the estimated fair value of common stock at each valuation date. In accordance with the Practice Aid, we considered the following methods:

- Option Pricing Method. Under the option pricing method ("OPM"), shares are valued by creating a series of call options with exercise prices based on the liquidation preferences and conversion terms of each equity class. The estimated fair values of the preferred and common stock are inferred by analyzing these options.
- Probability-Weighted Expected Return Method. The probability-weighted expected return method ("PWERM") is a scenario-based analysis that estimates value per share based on the probability-weighted present value of expected future investment returns, assuming various outcomes, as well as the economic and control rights of each share class.

Based on our early stage of development, we determined that the PWERM method, incorporating the OPM as one of several scenarios, was the most appropriate method for allocating our enterprise value to determine the estimated fair value of Legacy Humacyte common stock for valuations performed as of November 13, 2020 and October 23, 2019, which resulted in common stock valuations of $10.28 and $8.48 per share, respectively. In January, February, March and June 2021, stock options were granted at fair market value with an exercise price of $10.28, consistent with the fair market value determined two months earlier in November 2020. The $10.28 exercise price is greater than the public trading price of the AHAC Class A common stock as of the date of grant and also greater than the share price reflected in the $800 million equity value agreed upon in connection with the Merger. We also utilized the PWERM method for our valuation as of June 25, 2018, which resulted in a common stock valuation of $8.48 per share. In determining the estimated fair value of Legacy Humacyte common stock, our board of directors also considered the fact that our stockholders could not freely trade our common stock in the public markets. Accordingly, we applied discounts to reflect the lack of marketability of our common stock based on the weighted-average expected time to liquidity. The estimated fair value of our common stock at each grant date reflected a non-marketability discount partially based on the anticipated likelihood and timing of a future liquidity event.

*Income Taxes*

Income taxes are computed using the asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in our financial statements. In estimating future tax consequences, we consider all expected future events other than enactment of changes in tax laws or rates. A valuation allowance is recorded to reduce net deferred tax assets to their realizable values if management does not believe it is more likely than not that the net deferred tax assets will be realized. As of December 31, 2022 and 2021, we have recorded a full valuation allowance against our net deferred tax assets.

We recognize the benefit of an income tax position only if it is more likely than not (greater than 50%) that the tax position will be sustained upon tax examination, based solely on the technical merits of the tax position. Otherwise, no benefit can be recognized. Assessing an uncertain tax position begins with the initial determination of the sustainability of the position and is measured at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement. As of each balance sheet date, unresolved uncertain tax positions must be reassessed. Additionally, we must accrue interest and related penalties, if applicable, on all tax exposures for which reserves have been established consistent with jurisdictional tax laws. We have not identified any uncertain tax positions for the years ended December 31, 2022 and 2021.

We have analyzed our filing positions in all significant Federal and state jurisdictions where we are required to file income tax returns, as well as open tax years in these jurisdictions. As of December 31, 2022 and 2021, we have determined that no uncertain tax positions would have a material impact on our financial statements. We are no longer subject to U.S. Federal, state, and local tax examinations by tax authorities for years before 2019 although carry-forward attributes that were generated prior to 2019 may still be adjusted upon examination by the taxing authorities if they either have been or will be used in a future period. No income tax returns are currently under examination by taxing authorities.

As of December 31, 2022 and 2021, we had not recorded any amounts for unrecognized tax benefits. Our policy is to recognize interest and penalties related to uncertain tax positions in the provision for income taxes, if any. As of December 31, 2022 and 2021, we had no accrued interest or penalties related to uncertain tax positions, and no amounts had been recognized in our statements of operations and comprehensive loss.

*Emerging Growth Company and Smaller Reporting Company Status*

We are an “emerging growth company” as defined in the Jumpstart our Business Startups Act of 2012 (the “JOBS Act”), and may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies until it is no longer an emerging growth company. Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the extended transition period afforded by the JOBS Act for the implementation of new or revised accounting standards. We expect to use the extended transition period and, therefore, while we are an emerging growth company we will not be subject to new or revised accounting standards at the same time that they become applicable to other public companies that are not emerging growth companies, unless we choose to early adopt a new or revised accounting standard. This may make it difficult or impossible to compare our financial results with the financial results of another public company because of the potential differences in accounting standards used.

Additionally, we are a “smaller reporting company” as defined in Item 10(f)(1) of Regulation S-K under the Exchange Act (“Regulation S-K”). Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company if (1) the market value of Common Stock held by non-affiliates is less than $250 million as of the last business day of the second fiscal quarter, or (2) our annual revenues in our most recent fiscal year completed before the last business day of its second fiscal quarter are less than $100 million and the market value of Common Stock held by non-affiliates is less than $700 million as of the last business day of the second fiscal quarter.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

We qualify as a smaller reporting company, as defined by Item 10 of Regulation S-K and, thus, are not required to provide the information required by this Item.

**Item 8. Financial Statements and Supplementary Data.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**
**HUMACYTE, INC.**


| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID 238) | 108 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | 109 |
| Consolidated Statements of Operations and Comprehensive Loss for the Years ended December 31, 2022 and 2021 | 110 |
| Consolidated Statements of Changes in Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit) for the Years ended December 31, 2022 and 2021 | 111 |
| Consolidated Statements of Cash Flows for the Years ended December 31, 2022 and 2021 | 112 |
| Notes to Consolidated Financial Statements | 113 |

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Stockholders of Humacyte, Inc.

***Opinion on the Financial Statements***

We have audited the accompanying consolidated balance sheets of Humacyte, Inc. and its subsidiary (the "Company") as of December 31, 2022 and 2021, and the related consolidated statements of operations and comprehensive loss, of changes in redeemable convertible preferred stock and stockholders' equity (deficit) and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

Raleigh, North Carolina

March 24, 2023

We have served as the Company's auditor since 2013.

**HUMACYTE, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands except for share and per share amounts)**

| | As of December 31, | |
|---|---|---|
| | 2022 | 2021 |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 149,772 | $ 217,502 |
| Short-term investments | 2,107 | 8,000 |
| Accounts receivable | 31 | 176 |
| Prepaid expenses and other current assets | 2,298 | 3,662 |
| Total current assets | 154,208 | 229,340 |
| Finance lease right-of-use assets, net | 19,373 | 21,432 |
| Operating lease right-of-use assets, net | 682 | 727 |
| Property and equipment, net | 30,039 | 35,034 |
| **Total assets** | **$ 204,302** | **$ 286,533** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accounts payable | $ 1,595 | $ 2,094 |
| Accrued expenses | 7,108 | 6,757 |
| SVB loan payable, current portion | 8,571 | — |
| Finance lease obligation, current portion | 2,256 | 1,981 |
| Operating lease obligation, current portion | 50 | 45 |
| Deferred payroll tax | — | 173 |
| Total current liabilities | 19,580 | 11,050 |
| Contingent Earnout Liability | 27,893 | 103,660 |
| SVB loan payable, net of current portion | 20,336 | 27,361 |
| Finance lease obligation, net of current portion | 18,853 | 21,109 |
| Operating lease obligation, net of current portion | 632 | 682 |
| Common stock warrant liabilities | 80 | 497 |
| **Total liabilities** | **87,374** | **164,359** |
| **Commitments and contingencies (Note 13)** | | |
| **Stockholders' equity** | | |
| Preferred stock, $0.0001 par value; 20,000,000 shares designated as of December 31, 2022 and 2021; 0 shares issued and outstanding as of December 31, 2022 and 2021 | — | — |
| Common stock, $0.0001 par value; 250,000,000 shares authorized as of December 31, 2022 and 2021; 103,229,013 and 103,003,646 shares issued and outstanding as of December 31, 2022 and 2021, respectively | 10 | 10 |
| Additional paid-in capital | 543,456 | 536,737 |
| Accumulated deficit | (426,538) | (414,573) |
| Total stockholders' equity | 116,928 | 122,174 |
| **Total liabilities and stockholders' equity** | **$ 204,302** | **$ 286,533** |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**
**(in thousands except for share and per share amounts)**

| | Year Ended December 31, | |
|---|---|---|
| | **2022** | **2021** |
| **Grant revenue** | $ 1,565 | $ 1,263 |
| **Operating expenses:** | | |
| Research and development | 63,260 | 61,341 |
| General and administrative | 22,883 | 21,130 |
| Total operating expenses | 86,143 | 82,471 |
| **Loss from operations** | **(84,578)** | **(81,208)** |
| Other income (expense), net | | |
| Interest income | 2,629 | 16 |
| Change in fair value of Contingent Earnout Liability | 75,767 | 55,772 |
| Change in fair value of common stock warrant liabilities | 417 | 56 |
| Gain on PPP loan forgiveness | — | 3,284 |
| Interest expense | (6,200) | (4,348) |
| Transaction costs expensed | — | (49) |
| Total other income, net | 72,613 | 54,731 |
| **Net loss and comprehensive loss** | **$ (11,965)** | **$ (26,477)** |
| Net loss per share attributable to common stockholders, basic and diluted | $ (0.12) | $ (0.66) |
| Weighted-average shares outstanding used in computing net loss per share attributable to common stockholders, basic and diluted | 103,051,366 | 39,970,398 |

The accompanying notes are an integral part of these financial statements.

# HUMACYTE, INC.
## CONSOLIDATED STATEMENTS OF CHANGES IN REDEEMABLE CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)
### (in thousands except for share amounts)

| | Redeemable Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' (Deficit) Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| **Balance as of December 31, 2020** | **69,613,562** | **420,989** | **5,822,396** | **$ 1** | **$ 37,778** | **$ (388,096)** | **$ (350,317)** |
| Issuance of warrants in conjunction with debt | — | — | — | — | 3,275 | — | 3,275 |
| Conversion of redeemable convertible preferred stock into common stock in connection with the Merger and related PIPE financing | (69,613,562) | (420,989) | 69,613,562 | 7 | 420,982 | — | 420,989 |
| The Merger and related PIPE financing, net of transaction costs and acquired liabilities | — | — | 27,346,449 | 2 | 209,478 | — | 209,480 |
| Public warrants assumed upon the Merger, net of transaction costs | — | — | — | — | 13,912 | — | 13,912 |
| Contingent Earnout Liability recognized upon closing of the reverse recapitalization | — | — | — | — | (159,432) | — | (159,432) |
| Proceeds from the exercise of stock options | — | — | 221,239 | — | 598 | — | 598 |
| Stock-based compensation | — | — | — | — | 10,146 | — | 10,146 |
| Net loss | — | — | — | — | — | (26,477) | (26,477) |
| **Balance as of December 31, 2021** | **—** | **—** | **103,003,646** | **$ 10** | **$ 536,737** | **$ (414,573)** | **$ 122,174** |
| Proceeds from the exercise of stock options | — | — | 225,367 | — | 535 | — | 535 |
| Stock-based compensation | — | — | — | — | 6,184 | — | 6,184 |
| Net loss | — | — | — | — | — | (11,965) | (11,965) |
| **Balance as of December 31, 2022** | **—** | **—** | **103,229,013** | **$ 10** | **$ 543,456** | **$ (426,538)** | **$ 116,928** |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, 2022 | Year Ended December 31, 2021 |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net loss | $ (11,965) | $ (26,477) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation expense | 6,151 | 6,181 |
| Stock-based compensation expense | 6,184 | 10,146 |
| Change in fair value of Contingent Earnout Liability | (75,767) | (55,772) |
| Change in fair value of common stock warrant liabilities | (417) | (56) |
| Loss on disposal of property and equipment | 6 | — |
| Amortization expense | 2,059 | 2,060 |
| Non-cash operating lease costs | 45 | 42 |
| Amortization of SVB debt discount | 1,546 | 977 |
| Accrued interest on PPP loan obligation | — | 11 |
| Gain on PPP loan forgiveness | — | (3,284) |
| Payment of liabilities assumed in Merger | — | (14,461) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 145 | (63) |
| Prepaid expenses and other current assets | 1,364 | (2,174) |
| Accounts payable | (509) | (197) |
| Accrued expenses | 247 | 2,035 |
| Operating lease obligation | (45) | (42) |
| Deferred payroll taxes | (173) | (116) |
| Net cash used in operating activities | (71,129) | (81,190) |
| **Cash flows from investing activities** | | |
| Purchase of short-term investments (certificates of deposit) | (10,107) | (8,000) |
| Proceeds from maturity of short-term investments (certificates of deposit) | 16,000 | — |
| Purchase of property and equipment | (1,048) | (220) |
| Net cash provided by (used in) investing activities | 4,845 | (8,220) |
| **Cash flows from financing activities** | | |
| Proceeds from the exercise of stock options | 535 | 598 |
| Payment of finance lease principal | (1,981) | (1,729) |
| Proceeds from Merger and PIPE financing, net of offering costs paid | — | 242,400 |
| Payment of transaction costs related to Merger | — | (3,945) |
| Proceeds from SVB loan | — | 29,659 |
| Net cash (used in) provided by financing activities | (1,446) | 266,983 |
| Net (decrease) increase in cash and cash equivalents | (67,730) | 177,573 |
| Cash and cash equivalents at the beginning of the period | 217,502 | 39,929 |
| **Cash and cash equivalents at the end of the period** | **149,772** | **217,502** |
| **Supplemental disclosure** | | |
| Cash paid for interest on SVB loan | $ 2,668 | $ 1,123 |
| **Supplemental disclosure of noncash activities:** | | |
| Purchase of property and equipment in accounts payable and accrued expenses | $ 135 | $ 21 |
| Issuance of warrants in conjunction with debt | $ — | $ 3,275 |
| Unpaid liabilities assumed in connection with Merger | $ — | $ 130 |
| Conversion of redeemable convertible preferred stock into common stock in connection with the reverse capitalization | $ — | $ 420,989 |
| Contingent Earnout Liability recognized upon the closing of the reverse recapitalization | $ — | $ 159,432 |

The accompanying notes are an integral part of these financial statements.

**HUMACYTE, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1. Organization and Description of Business

### Organization

Humacyte, Inc. and subsidiary (the "Company"), is pioneering the development and manufacture of off-the-shelf, universally implantable, bioengineered human tissues, advanced tissue constructs and organ systems designed to improve the lives of patients and transform the practice of medicine. The Company is leveraging its regenerative medicine technology platform to develop proprietary product candidates for use in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas.

On August 26, 2021 (the "Closing Date"), Alpha Healthcare Acquisition Corp. ("AHAC") consummated a merger pursuant to a Business Combination Agreement, dated as of February 17, 2021 (the "Merger Agreement"), by and among Humacyte, Inc., a Delaware Corporation ("Legacy Humacyte"), AHAC and Hunter Merger Sub, Inc. ("Merger Sub"), a Delaware corporation and wholly owned subsidiary of AHAC. As contemplated by the Merger Agreement, Merger Sub merged with and into Legacy Humacyte, with Legacy Humacyte continuing as the surviving corporation and as a wholly-owned subsidiary of AHAC (such transactions, the "Merger," and, collectively with the other transactions described in the Merger Agreement, the "Reverse Recapitalization"). On the Closing Date, AHAC changed its name to Humacyte, Inc. ("New Humacyte") and Legacy Humacyte changed its name to Humacyte Global, Inc. The Merger is accounted for as a reverse recapitalization in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"), and under this method of accounting, AHAC is treated as the acquired company for financial reporting purposes and Legacy Humacyte is treated as the acquirer. Operations prior to the Merger are those of Legacy Humacyte.

Refer to Note 3 — Reverse Recapitalization for further details of the Merger.

### Liquidity and Going Concern

Since its inception in 2004, the Company has generated no product revenue and has incurred operating losses and negative cash flows from operations in each year. To date, the Company has financed its operations primarily through the sale of equity securities and convertible debt, proceeds from the Reverse Recapitalization, borrowings under loan facilities and, to a lesser extent, through governmental and other grants. At December 31, 2022 and December 31, 2021, the Company had an accumulated deficit of $426.5 million and $414.6 million, respectively. The Company's operating losses were $84.6 million and $81.2 million for the years ended December 31, 2022 and 2021, respectively. Net cash flows used in operating activities were $71.1 million and $81.2 million during the years ended December 31, 2022 and 2021, respectively. Substantially all of the Company's operating losses resulted from costs incurred in connection with the Company's research and development programs and from general and administrative costs associated with the Company's operations. The Company expects to incur substantial operating losses and negative cash flows from operations for the foreseeable future as the Company advances its product candidates.

As of December 31, 2022, the Company had cash and cash equivalents and short-term investments of $151.9 million. The Company believes its combined cash and cash equivalents and short-term investments on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these financial statements.

### Impact of COVID-19

The COVID-19 outbreak and government measures taken in response have had a significant impact, both direct and indirect, on the Company's business, as supply chains have been disrupted and enrollment in clinical trials has been delayed. To date, there have been no material financial impacts or impairment losses in the carrying values of the Company's assets as a result of the pandemic and the Company is not aware of any specific related event or circumstance that would require it to revise the estimates reflected in these financial statements. The extent to which the ongoing effects of the COVID-19 pandemic will directly or indirectly impact the Company's business, results of operations and financial condition, including current and future clinical trials and research and development costs and timelines, will depend on future developments that are highly uncertain, including as a result of new information that may emerge concerning COVID-19, the emergence of new virus variants, and the duration and intensity of the related economic impact of the pandemic.

HUMACYTE, INC.

NOTES TO FINANCIAL STATEMENTS

## 2. Summary of Significant Accounting Policies

### Basis of Presentation

The Company has prepared the accompanying financial statements in conformity with U.S. GAAP. The Company's consolidated financial statements reflect the operations of the Company and its wholly owned subsidiaries. All intercompany accounts and transactions have been eliminated in consolidation.

Unless otherwise noted, the Company has retroactively adjusted all common and preferred share and related share price information to give effect to the exchange ratio established in the Merger Agreement. Operations prior to the Merger are those of Legacy Humacyte.

### Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Significant estimates in the financial statements include stock-based compensation costs, right-of-use assets, accruals for research and development activities, contingent earnout liability, fair value of common stock warrants, redeemable convertible preferred stock and income taxes. The Company evaluates its estimates and assumptions on an ongoing basis using historical experience and other factors and adjusts those estimates and assumptions when facts and circumstances dictate. Actual results could differ from those estimates.

### Segments

The Company operates and manages its business as one reportable and operating segment. The Company is developing proprietary, bioengineered, acellular human tissues, advanced tissue constructs and organ systems that are designed to be used in the treatment of diseases and conditions across a range of anatomic locations in multiple therapeutic areas. The Company's chief executive officer, who is the chief operating decision maker, reviews financial information on an aggregate basis for purposes of evaluating financial performance and allocating resources.

### Comprehensive Loss

Comprehensive loss includes net loss as well as other changes in stockholders' equity that result from transactions and economic events other than those with stockholders. There was no difference between net loss and comprehensive loss for the years ended December 31, 2022 and 2021.

### Cash and Cash Equivalents

The Company considers all short-term, highly liquid investments, including certificates of deposit ("CDs") purchased with an original maturity of three months or less at the date of purchase, to be cash equivalents. Cash deposits are held with financial institutions with investment-grade ratings in the United States of America, or U.S. Cash deposits typically exceed federally insured limits. As of December 31, 2022 and 2021, cash and cash equivalents consisted of cash on deposit with banks denominated in U.S. dollars, investments in money market funds, and CDs maturing within three months of their purchase date.

### Short-term Investments

The Company classifies its certificates of deposit as cash and cash equivalents or short-term investments and reassesses the appropriateness of the classification of its investments at the end of each reporting period. Certificates of deposit held for investment with an original maturity greater than three months are carried at amortized cost and reported as short-term investments on the consolidated balance sheets. The type of certificates of deposit that the Company invests in are not considered debt securities under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 320, Investments - Debt Securities.

As of December 31, 2022 and 2021, the Company had approximately $10.1 million and $10.0 million, respectively, in CDs. These cash deposits are deposited at a bank that is a member of the Certificate of Deposit Account Registry Service

("CDARS"), in which large deposits are divided into smaller amounts and placed with other Federal Deposit Insurance Corporation ("FDIC") insured banks which are also members of the CDARS network. Those members issue CDs in amounts under $250,000, so that the entire deposit balance is eligible for FDIC insurance. As of December 31, 2022, the Company classified $8.0 million of its CDs as cash and cash equivalents and $2.1 million of its CDs as short-term investments on its consolidated balance sheets. As of December 31, 2021, the Company classified $2.0 million of its CDs as cash and cash equivalents and $8.0 million of its CDs as short-term investments on its consolidated balance sheets.

**Revenue Recognition**

The Company's revenues generally consist of grant revenues, including revenues generated under government and other awarded grants.

***Grant Revenue***

The Company generates revenue primarily from government and other awarded grants that reimburse the Company for certain allowable costs related to research and development efforts.

In August 2017, the Department of Defense ("DoD") granted the Company a cash award for work to support human tissue engineered blood vessels for vascular reconstruction in the injured warfighter. The final amount awarded to the Company totaled $6.8 million and the program ended in November 2022. Based on the terms of the research project award agreement associated with the DoD grant, allowable costs were reimbursed to the Company based on the percentage of completion of project milestones in accordance with milestone payment schedules set forth in the agreement. During the years ended December 31, 2022 and 2021, the Company recognized revenue of $1.6 million and $1.3 million, respectively, for reimbursement of certain allowable costs related to this grant. Revenue related to the DoD grant is included in grant revenue in the Company's consolidated statements of operations and comprehensive loss. As of December 31, 2022 and 2021, there was $31 thousand and $176 thousand, respectively, of accounts receivable related to the DoD grant included in the Company's consolidated balance sheets.

The Company has determined that the grant is not within the scope of ASC 606 as it does not meet the definition of a contract with a customer. The Company has concluded that the grant meets the definition of a contribution and is a nonexchange transaction and has applied the contribution accounting model in Subtopic 958-605, Not-for-Profit-Entities-Revenue Recognition by analogy.

The Company recognizes funding received from grants as revenue, rather than as a reduction of research and development expenses, because the Company is the principal in conducting the research and development activities and these grants are central to the Company's ongoing operations. The Company recognizes revenue only after the qualifying expenses related to the grants have been incurred and it is reasonably assured that the expenses will be reimbursed and the revenue will be collectible. The related costs incurred are included in research and development expense in the Company's consolidated statements of operations and comprehensive loss.

***Revenue from Customers***

Under ASC 606, revenue is recognized when a customer obtains control of promised goods or services and is recognized in an amount that reflects the consideration that an entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the entity performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. ASC 606 also impacts certain other areas, such as the accounting for costs to obtain or fulfill a contract.

In addition, ASC 606 requires disclosure of the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers.

For contracts where the period between when the Company transfers a promised good or service to the customer and when the customer pays is one year or less, the Company has elected the practical expedient to not adjust the promised amount of consideration for the effects of a significant financing component.

**Concentration of Credit Risk**

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents and short-term investments consisting of CDs. Total cash balances exceeded insured balances by the FDIC as of December 31, 2022 and 2021. The Company has cash equivalents that are invested in highly rated money market funds that are invested only in obligations of the U.S. government and its agencies.

During the years ended December 31, 2022 and 2021, 100% of the Company's total revenue relates to the award it received from the DoD in August 2017. As of December 31, 2022 and 2021, 100% of the Company's accounts receivable relates to the DoD grant.

**Net Loss per Share Attributable to Common Stockholders**

The Company follows the two-class method to compute basic and diluted net loss per share attributable to common stockholders when shares meet the definition of participating securities. The two-class method determines net loss per common share for each class of common and participating securities according to dividends declared or accumulated and participation rights in undistributed earnings. The two-class method requires income available to common stockholders for the period to be allocated between common and participating securities based upon their respective rights to share in the earnings as if all income for the period had been distributed. During periods of loss, there is no allocation required under the two-class method since the redeemable convertible preferred stock did not have a contractual obligation to share in the Company's losses.

Basic net loss per share attributable to common stockholders is computed by dividing net loss attributable to common stockholders by the weighted-average number of common shares outstanding during the period without consideration of potentially dilutive common stock. Diluted net loss per share attributable to common stockholders reflects the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock that then shared in the earnings of the Company unless inclusion of such shares would be anti-dilutive. As the Company has incurred losses for the years ended December 31, 2022 and 2021, basic and diluted net loss per share is the same for each period.

The potential shares of common stock that were excluded from the computation of diluted net loss per share for each period because including them would have had an antidilutive effect were as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Exercise of options under stock plan | 7,203,874 | 6,711,192 |
| Warrants to purchase common stock | 5,588,506 | 5,588,506 |

The 15,000,000 Contingent Earnout Shares, as defined in Note 3, are excluded from the anti-dilutive table for all periods presented, as such shares are contingently issuable until the share price of the Company exceeds specified thresholds that have not yet been achieved, or upon the occurrence of a change in control.

**Fair Value of Financial Instruments**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in the principal or most advantageous market in an orderly transaction between market participants at the measurement date. ASC 820, *Fair Value Measurement and Disclosures*, establishes a hierarchy whereby inputs to valuation techniques used in measuring fair value are prioritized, or the fair value hierarchy. There are three levels to the fair value hierarchy based on reliability of inputs, as follows:

- Level 1 — Observable inputs that reflect unadjusted quoted prices for identical assets or liabilities in active markets.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 624 of 674

- Level 2 — Inputs other than quoted prices included in Level 1 that are observable for the asset or liability, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3 — Unobservable inputs in which little or no market data exists, therefore requiring the Company to develop its own assumptions.

The Company evaluates assets and liabilities subject to fair value measurements on a recurring basis to determine the appropriate level at which to classify them for each reporting period, utilizing valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs to the extent possible. The determination requires significant judgments to be made by the Company.

**Property and Equipment, Net**

Property and equipment, net are recorded at cost less accumulated depreciation. Expenditures for major additions and improvements are capitalized and minor replacements, maintenance, and repairs are charged to expense as incurred. When property and equipment are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the balance sheet accounts and any resulting gain or loss is included in the results of operations for the respective period. Depreciation is calculated using the straight-line method over the estimated useful lives of the related assets. The estimated useful lives for significant asset categories are as follows:

| Property and equipment | Estimated Useful Lives (Years) |
| --- | --- |
| Scientific equipment | 5 – 7 |
| Computer equipment | 5 |
| Software | 3 |
| Furniture and fixtures | 5 – 7 |
| Leasehold improvements | Lesser of useful life or life of lease |
| Construction in progress | N/A |

**Impairment of Long-Lived Assets**

The Company reviews the carrying value of property and equipment for indicators of possible impairment whenever events and circumstances indicate that the carrying value of an asset or asset group may not be recoverable from the estimated future net undiscounted cash flows expected to result from its use and eventual disposition. In cases where estimated future net undiscounted cash flows are less than the carrying value, an impairment loss is recognized equal to an amount by which the carrying value exceeds the fair value of the asset or asset group. The factors considered by management in performing this assessment include current operating results, trends and prospects, the manner in which the property is used, and the effects of obsolescence, demand, competition, and other economic factors. Based on this assessment, during the years ended December 31, 2022 and 2021, respectively, the Company concluded there were no such events or changes in circumstances requiring review of the carrying amount of the Company's long-lived assets and there was no impairment during the years ended December 31, 2022 and 2021.

**Income Taxes**

Income taxes are computed using the asset and liability approach that requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been recognized in the Company's financial statements. In estimating future tax consequences, the Company considers all expected future events other than enactment of changes in tax laws or rates. A valuation allowance is recorded, if necessary, to reduce net deferred tax assets to their realizable values if management does not believe it is more likely than not that the net deferred tax assets will be realized. As of December 31, 2022 and 2021, the Company has recorded a full valuation allowance against its deferred tax assets.

The Company applies the accounting guidance for uncertainties in income taxes, which prescribes a recognition threshold and measurement process for recording uncertain tax positions taken, or expected to be taken, in a tax return in the financial statements.

Additionally, the guidance also prescribes the treatment for derecognition, classification,

accounting in interim periods and disclosure requirements for uncertain tax positions. The Company accrues for the estimated amount of taxes for uncertain tax positions if it is more likely than not that the Company would be required to pay such additional taxes.

The Company recognizes the benefit of an income tax position only if it is more likely than not (greater than 50%) that the tax position will be sustained upon tax examination, based solely on the technical merits of the tax position. Otherwise, no benefit can be recognized. Assessing an uncertain tax position begins with the initial determination of the sustainability of the position and is measured at the largest amount of benefit that is greater than 50% likely of being realized upon ultimate settlement. As of each balance sheet date, unresolved uncertain tax positions must be reassessed. Additionally, the Company must accrue interest and related penalties, if applicable, on all tax exposures for which reserves have been established consistent with jurisdictional tax laws.

The Company has analyzed its filing positions in all significant Federal and state jurisdictions where it is required to file income tax returns, as well as open tax years in these jurisdictions. As of December 31, 2022 and 2021, the Company has determined that no uncertain tax positions would have a material impact on the financials statements of the Company. The Company is no longer subject to Federal, state, and local tax examinations by tax authorities for years before 2019 although carry-forward attributes that were generated prior to 2019 may still be adjusted upon examination by the taxing authorities if they either have been or will be used in a future period. No income tax returns are currently under examination by taxing authorities.

As of December 31, 2022 and 2021, the Company had not recorded any amounts for unrecognized tax benefits. The Company's policy is to recognize interest and penalties related to uncertain tax positions in the provision for income taxes. As of December 31, 2022 and 2021, the Company had no accrued interest or penalties related to uncertain tax positions, and no amounts had been recognized in the Company's statements of operations and comprehensive loss.

**Intellectual Property**

The Company seeks to protect its intellectual property by filing patent applications in the United States and abroad related to novel technologies and product candidates that it views as important to its business. The patent positions of biotechnology companies generally, including the Company's patent positions, is highly uncertain and involves complex legal and factual questions for which legal principles remain unresolved. Patent costs have been expensed as incurred as general and administrative expense.

**Research and Development**

The Company expenses research and development costs as operating expenses as incurred. Research and development expenses consist primarily of:

- salaries and related overhead expenses for personnel in research and development functions, including stock-based compensation and benefits;
- fees paid to consultants and CROs, including in connection with clinical trials, and other related clinical trial fees, such as for investigator grants, patient screening, laboratory work and statistical compilation and analysis; allocation of facility lease and maintenance costs;
- depreciation of leasehold improvements, laboratory equipment and computers;
- costs related to purchasing raw materials for and producing product candidates for clinical trials;
- costs related to compliance with regulatory requirements;
- costs related to the manufacturing scale-out initiative; and
- license fees related to in-licensed technologies.

HUMACYTE, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Accrued Research and Development**

The Company has entered into various agreements with CROs and a CMO, which conduct preclinical studies and clinical trials and contract manufacturing activities. The Company's research and development accruals are estimated based on the level of services performed, progress of the studies, including the phase or completion of events, and contracted costs. The estimated costs of research and development provided, but not yet invoiced, are included in accrued expenses on the balance sheet. If the actual timing of the performance of services or the level of effort varies from the original estimates, the Company will adjust the accrual accordingly. Payments made under these arrangements in advance of the performance of the related services are recorded as prepaid expenses and other current assets until the services are rendered. The Company terminated its agreement with its CMO on March 6, 2020. The remaining HAV inventory at the CMO was fully depleted during the year ended December 31, 2021.

**Stock-Based Compensation**

The Company accounts for stock-based compensation for employees and non-employees measured at grant date, based on the fair value of the award. The Company measures the fair value of awards granted using the Black-Scholes option pricing model and recognizes the expense over the requisite service period using the straight-line method. Option valuation models, including the Black-Scholes option-pricing model, require the input of highly subjective assumptions, and changes in the assumptions used can materially affect the grant-date fair value of an award. These assumptions include the risk-free rate of interest, expected dividend yield, expected volatility, the expected term of the award, and the fair value of the underlying common stock on the date of grant. Forfeitures are accounted for as they occur.

**Common Stock Warrants**

In connection with the Merger, the Company assumed 5,000,000 publicly-traded warrants ("Public Warrants") and 177,500 private placement warrants issued to AHAC Sponsor LLC (the "Sponsor"), Oppenheimer & Co. Inc. and Northland Securities, Inc, in connection with AHAC's initial public offering ("Private Placement Warrants" and, together with the Public Warrants, the "Common Stock Warrants"). The Common Stock Warrants entitle the holder to purchase one share of the Company's Common stock, par value $0.0001 ("Common Stock"), at an exercise price of $11.50 per share. The Public Warrants are publicly traded and are exercisable for cash unless certain conditions occur, such as the failure to have an effective registration statement related to the shares issuable upon exercise or redemption by the Company under certain conditions, at which time the warrants may be eligible for a cashless exercise. The Private Placement Warrants are non-redeemable for cash so long as they are held by the initial purchasers or their permitted transferees. If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants are redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

The Company evaluated the Common Stock Warrants to determine the appropriate financial statement classification upon the consummation of the Merger. The Common Stock Warrants are not mandatorily redeemable and are considered to be freestanding instruments as they are separately exercisable into common shares. As such, the Common Stock Warrants were not classified as liabilities under FASB ASC Topic 480, *Distinguishing Liabilities from Equity* ("ASC 480"). The Company then evaluated the Common Stock Warrants under FASB ASC Topic 815, *Derivatives and Hedging*.

The agreement governing the Common Stock Warrants includes a provision ("Replacement of Securities Upon Reorganization"), the application of which could result in a different settlement value for the Private Placement Warrants depending on their holder. Because the holder of an instrument is not an input into the pricing of a fixed-for-fixed option on the Company's ordinary shares, the Private Placement Warrants are not considered to be "indexed to the Company's own stock" and therefore are not classified in stockholders' equity. As the Private Placement Warrants meet the definition of a derivative, the Company recorded these warrants as liabilities on the consolidated balance sheet at fair value, with subsequent changes in their respective fair values recognized in the consolidated statements of operations and comprehensive loss at each reporting date.

The Public Warrants are considered to be "indexed to the Company's own stock". The agreement provides that in the event of a tender or exchange offer made to and accepted by holders of more than 50% of the outstanding shares of the Company's common shares, all holders of the Common Stock Warrants (both the Public Warrants and the Private Placement Warrants) would be entitled to receive cash for all of their Common Stock Warrants. As the Company has a single class of common stock, a qualifying cash tender offer of more than 50% of the Company's common stock will

always result in a change-in-control and would not preclude permanent equity classification of the Public Warrants. Based on this evaluation, the Company concluded that the Public Warrants meet the criteria to be classified within stockholders' equity.

**Contingent Earnout Liability**

In connection with the Reverse Recapitalization and pursuant to the Merger Agreement, Legacy Humacyte equity holders are entitled to receive as additional merger consideration of up to 15,000,000 shares of the Company's Common Stock (the "Contingent Earnout Shares"), comprised of two separate tranches of 7,500,000 shares per tranche, for no consideration upon the occurrence of certain triggering events, including a change of control event that is not solely indexed to the common stock. In accordance with ASC 815-40, as the earnout shares were not indexed to the common stock, they were accounted for as a liability at the Reverse Recapitalization date and subsequently remeasured at each reporting date with changes in fair value recorded as a component of other income (expense), net in the consolidated statements of operations and comprehensive loss.

The estimated fair value of the Contingent Earnout Shares was determined using a Monte Carlo simulation using a distribution of potential outcomes on a monthly basis over a 10-year period prioritizing the most reliable information available. The assumptions utilized in the calculation were based on the achievement of certain stock price milestones, including the current Company common stock price, expected volatility, risk-free rate, expected term and expected dividend yield.

The Contingent Earnout Shares are categorized as a Level 3 fair value measurement (see "Fair Value of Financial Instruments" accounting policy described above) because the Company estimated projections over a 10-year period utilizing unobservable inputs. Contingent earnout payments involve certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

**Leases**

The Company accounts for its leases under ASC 842, *Leases*. The Company determines if an arrangement is or contains a lease and the classification of that lease at inception of a contract. The Company's operating lease assets are included in "operating lease right-of-use assets, net", and the current and non-current portions of the operating lease liabilities are included in "operating lease obligation, current portion", and "operating lease obligation, net of current portion", respectively, on the balance sheets. The Company's finance lease assets are included in "finance lease right-of-use assets, net", and the current and non-current portions of the finance lease liabilities are included in "finance lease obligation, current portion", and "finance lease obligation, net of current portion", respectively, on the consolidated balance sheets.

Under this guidance, arrangements meeting the definition of a lease are classified as operating or finance leases, and are recorded on the balance sheet as both a right-of-use asset and lease liability, calculated by discounting fixed lease payments over the lease term at the rate implicit in the lease or the Company's incremental borrowing rate. Lease right-of-use assets and lease obligations are recognized based on the present value of the future minimum lease payments over the lease term at commencement date. Operating lease right-of-use assets are adjusted for (i) payments made at or before the commencement date, (ii) initial direct costs incurred, and (iii) tenant incentives under the lease. As the implicit rate for the operating leases were not determinable, the Company used an incremental borrowing rate based on the information available at the respective lease commencement dates in determining the present value of future payments. The incremental borrowing rate represents the interest rate the Company would expect to incur at lease commencement to borrow an amount equal to the lease payments on a collateralized basis over the term of a lease. The Company determined the incremental borrowing rate by considering various factors, such as its credit rating, interest rates of similar debt instruments of entities with comparable credit ratings, the lease term and the currency in which the lease was denominated. The Company considers a lease term to be the noncancelable period that it has the right to use the underlying asset, including any periods where it is reasonably certain the Company will exercise any option to extend the contract.

Lease expenses for minimum lease payments for operating leases are recognized on a straight-line basis over the lease term. Amortization expense of the right-of-use asset for finance leases is recognized on a straight-line basis over the lease term and interest expense for finance leases is recognized based on the incremental borrowing rate. Lease liabilities are increased by interest and reduced by payments each period, and the right of use asset is amortized over the lease term.

In calculating the right-of-use assets and lease liabilities, the Company has elected to combine lease and non-lease components for all asset classes. The Company excludes short-term leases, if any, having initial terms of 12 months or less from the new guidance as an accounting policy election, and recognizes rent expense on a straight-line basis over the lease term.

**Other Risks and Uncertainties**

The Company is subject to risks and uncertainties common to early-stage companies in the biotechnology industry, including, but not limited to, successful discovery and development of its product candidates, the success of clinical trials and other studies for its product candidates, including for its ongoing V005 Phase 2/3 clinical trial and V007 Phase 3 clinical trial, the regulatory approval and commercialization of its HAVs and other product candidates, the expected size of the target populations for the Company's product candidates, the degree of market acceptance of the HAVs, if approved, the availability of third-party coverage and reimbursement, development by competitors of new technological innovations, the ability to manufacture HAVs and other product candidates in sufficient quantities, expectations regarding the Company's strategic partnerships, dependence on third parties, key personnel and the ability to attract and retain qualified employees, protection of proprietary technology and confidentiality of trade secrets, compliance with governmental regulations, the impact of the COVID-19 pandemic, the Company's implementation and maintenance of effective internal controls, and the ability to secure additional capital to fund operations and commercial success of its product candidates.

Product candidates currently under development will require extensive preclinical and clinical testing and regulatory approval prior to commercialization. These efforts require significant amounts of additional capital, adequate personnel, and infrastructure and extensive compliance-reporting capabilities. Even if the Company's commercialization efforts are successful, it is uncertain when, if ever, the Company will realize significant revenue from product sales, and the Company may depend on certain strategic relationships to distribute its products, including the Company's strategic partnership with Fresenius Medical Care Holdings, Inc., ("Fresenius Medical Care") to sell, market and distribute its 6 millimeter HAV for certain specified indications outside the United States.

**Recently Adopted Accounting Pronouncements**

In May 2021, the FASB issued ASU No. 2021-04, "Earnings Per Share (Topic 260), Debt-Modifications and Extinguishments (Subtopic 470-50), Compensation-Stock Compensation (Topic 718), and Derivatives and Hedging-Contracts in Entity's Own Equity (Subtopic 815-40): Issuer's Accounting for Certain Modifications or Exchanges of Freestanding Equity-Classified Written Call Options" ("ASU 2021-04"). The FASB issued this update to clarify and reduce diversity in an issuer's accounting for modifications or exchanges of freestanding equity classified written call options (for example, warrants) that remain equity classified after modification or exchange. ASU 2021-04 is effective for all entities for fiscal years beginning after December 15, 2021, including interim periods within those fiscal years. An entity should apply the amendments prospectively to modifications or exchanges occurring after the effective date of the amendments. The Company adopted ASU 2021-04 as of January 1, 2022. The adoption of this ASU had no impact on the Company's consolidated financial statements and disclosures.

In November 2021, the FASB issued ASU No. 2021-10, "Government Assistance (Topic 832): Disclosures by Business Entities about Government Assistance" ("ASU 2021-10") to improve financial reporting by requiring disclosures that increase the transparency of transactions with a government accounted for by applying a grant or contribution model by analogy (for example, guidance on contributions for not-for-profit-entities in ASC 958-605). For transactions within the scope, ASU 2021-10 requires the disclosure of (i) the types of transactions, (ii) an entity's accounting for those transactions, and (iii) the effect of those transactions on an entity's financial statements. ASU 2021-10 is effective for all entities within their scope for financial statements issued for annual periods beginning after December 15, 2021. The Company adopted ASU 2021-10 effective January 1, 2022 and elected to apply the amendments prospectively to all transactions within the scope of the amendment that are reflected in the financial statements at the date of adoption. The adoption did not have a material impact to the Company's consolidated financial statements or disclosures. See the above section titled "Grant Revenue" for disclosure related to the Company's government grants.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 632 of 674

**3. Reverse Recapitalization**

On August 26, 2021, Merger Sub, a wholly-owned subsidiary of AHAC, merged with Legacy Humacyte, with Legacy Humacyte surviving as a wholly-owned subsidiary of AHAC. At the effective time of the Merger:

- each outstanding share of Legacy Humacyte common stock was converted into approximately 0.26260 shares of Common Stock;
- each outstanding share of preferred stock of Legacy Humacyte was cancelled and converted into the aggregate number of shares of Common Stock that would be issued upon conversion of the shares of Legacy Humacyte preferred stock based on the applicable conversion ratio immediately prior to the effective time, multiplied by approximately 0.26260; and
- each outstanding option or warrant to purchase Legacy Humacyte common stock was converted into an option or warrant, as applicable, to purchase a number of shares of Common Stock equal to the number of shares of Legacy Humacyte common stock subject to such option or warrant multiplied by approximately 0.26260, at an exercise price per share equal to the current exercise price per share for such option or warrant divided by approximately 0.26260;

in each case, rounded down to the nearest whole share.

In addition, upon the closing of the Merger (the "Closing"), 2,500,000 Class B shares of AHAC (the "Founder Shares") automatically converted into shares of Common Stock, on a one-for-one basis.

Former holders of the Legacy Humacyte common stock and Legacy Humacyte preferred stock are eligible to receive up to an aggregate of 15,000,000 additional shares of Common Stock (the "Contingent Earnout Shares") in the aggregate, comprised of two equal tranches of 7,500,000 shares per tranche if the volume-weighted average closing sale price of the Common Stock is greater than or equal to $15.00 and $20.00, respectively, for any 20 trading days within any 30 consecutive trading day period. At the Closing on August 26, 2021, the Company recorded a liability ("Contingent Earnout Liability") of $159.4 million, based on the estimated fair value of the 15,000,000 Contingent Earnout Shares with a corresponding reduction of additional paid-in capital in the equity section of the Company's consolidated balance sheet.

Concurrently with the execution of the Merger Agreement, AHAC entered into subscription agreements (the "Subscription Agreements") with certain investors (the "PIPE Investors"). Pursuant to the Subscription Agreements, the PIPE Investors purchased an aggregate of 17,500,000 shares of Common Stock (the "PIPE Shares") in a private placement at a price of $10.00 per share for an aggregate purchase price of $175 million (the "PIPE Financing"). The PIPE Financing was consummated in connection with the Closing.

The number of shares of Common Stock outstanding immediately following the consummation of the Merger was:

| | Shares |
|---|---|
| Common stock of AHAC, outstanding prior to Merger | 10,355,000 |
| Less redemption of AHAC shares | (3,008,551) |
| Common stock of AHAC | 7,346,449 |
| AHAC Founder Shares | 2,500,000 |
| New Humacyte shares issued to PIPE Investors | 17,500,000 |
| Issuance of common stock upon reverse recapitalization and PIPE Financing | 27,346,449 |
| New Humacyte shares issued in Merger to Legacy Humacyte stockholders | 75,656,935 (1) |
| Total shares of Common Stock immediately after Merger | 103,003,384 |

(1) Includes 69,613,562 shares of Common Stock issued upon conversion of Legacy Humacyte's redeemable convertible preferred stock.

The Merger was accounted for as a reverse recapitalization in accordance with U.S. GAAP. Under this method of accounting, AHAC was treated as the acquired company for financial reporting purposes and Legacy Humacyte was treated as the acquirer. This determination was primarily based on the fact that subsequent to the Merger, the Legacy Humacyte stockholders held a majority of the voting rights of the combined company, Legacy Humacyte comprised all of the ongoing operations of the combined company, Legacy Humacyte comprised a majority of the governing body of the combined company, and Legacy Humacyte's senior management comprised all of the senior management of the combined company. Accordingly, for accounting purposes, the Merger was treated as the equivalent of Legacy Humacyte issuing shares for the net assets of AHAC, accompanied by a recapitalization. The net assets of AHAC were stated at historical costs. No goodwill or other intangible assets were recorded. Operations prior to the Merger are those of Legacy Humacyte.

In connection with the Merger, the Company received $242.4 million in proceeds from the Merger and related PIPE Financing. The Company incurred $3.9 million of transaction costs, consisting of banking, legal, and other professional fees, of which $3.9 million was recorded as a reduction of proceeds to additional paid-in capital, and less than $0.1 million related to the Private Placement Warrants, which are classified as liabilities in the consolidated balance sheets, was expensed in the consolidated statements of operations and comprehensive loss. All transaction costs were paid as of December 31, 2021. Legacy Humacyte assumed $15.2 million of liabilities, including PIPE Financing fees and legal fees, and $0.1 million of assets from AHAC. Of the $15.2 million of liabilities assumed from AHAC, $0.1 million was included in accrued expenses as of December 31, 2021, and there were no unpaid liabilities as of December 31, 2022.

## 4. Fair Value Measurements

The Company's assets and liabilities that were measured at fair value on a recurring basis were as follows:

| | Fair Value Measured as of December 31, 2022 | | | |
|---|---|---|---|---|
| *($ in thousands)* | Level 1 | Level 2 | Level 3 | Total |
| Assets: | | | | |
| Cash equivalents (money market funds) | $ 141,159 | $ — | $ — | $ 141,159 |
| Cash equivalents (certificates of deposit) | — | 8,000 | — | 8,000 |
| Short-term investments (certificates of deposit) | — | 2,107 | — | 2,107 |
| Total financial assets | $ 141,159 | $ 10,107 | $ — | $ 151,266 |
| Liabilities: | | | | |
| Contingent Earnout Liability | $ — | $ — | $ 27,893 | $ 27,893 |
| Private Placement Warrants liability | — | — | 80 | 80 |
| Total financial liabilities | $ — | $ — | $ 27,973 | $ 27,973 |

| | Fair Value Measured as of December 31, 2021 | | | |
|---|---|---|---|---|
| *($ in thousands)* | Level 1 | Level 2 | Level 3 | Total |
| Assets: | | | | |
| Cash equivalents (money market funds) | $ 208,821 | $ — | $ — | $ 208,821 |
| Cash equivalents (certificates of deposit) | — | 2,000 | — | 2,000 |
| Short-term investments (certificates of deposit) | — | 8,000 | — | 8,000 |
| Total financial assets | $ 208,821 | $ 10,000 | $ — | $ 218,821 |
| Liabilities: | | | | |
| Contingent Earnout Liability | $ — | $ — | $ 103,660 | $ 103,660 |
| Private Placement Warrants liability | — | — | 497 | 497 |
| Total financial liabilities | $ — | $ — | $ 104,157 | $ 104,157 |

The following tables present a summary of the changes in the fair value of the Company's Level 3 financial instruments:

| | Contingent Earnout Liability | |
|---|---|---|
| | Year Ended December 31, | |
| *($ in thousands)* | 2022 | 2021 |
| Fair value as of beginning of period | $ (103,660) | $ — |
| Contingent Earnout Liability recognized upon the closing of the reverse recapitalization | — | (159,432) |
| Change in fair value included in other income, net | 75,767 | 55,772 |
| Fair value as of end of period | $ (27,893) | $ (103,660) |

| | Private Placement Warrants | |
|---|---|---|
| | Year Ended December 31, | |
| *($ in thousands)* | 2022 | 2021 |
| Fair value as of beginning of period | $ (497) | $ — |
| Private Placement Warrants liability acquired as part of the Merger | — | (553) |
| Change in fair value included in other income, net | 417 | 56 |
| Fair value as of end of period | $ (80) | $ (497) |

The fair value of the Contingent Earnout Liability and Private Placement Warrants (as defined in Note 9 — Stockholders' Equity (Deficit)) liability are based on significant unobservable inputs, which represent Level 3 measurements within the fair value hierarchy.

In determining the fair value of the Contingent Earnout Liability, the Company used the Monte Carlo simulation value model using a distribution of potential outcomes on a monthly basis over a 10-year period prioritizing the most reliable information available. The assumptions utilized in the calculation were based on the achievement of certain stock price milestones, including the current Common Stock price, expected volatility, risk-free rate, expected term and expected dividend yield (see Note 9 — Stockholders' Equity (Deficit)). Contingent earnout payments involve certain assumptions requiring significant judgment and actual results can differ from assumed and estimated amounts.

In determining the fair value of the Private Placement Warrants liability, the Company used the Monte Carlo simulation valuation model to estimate the fair value utilizing assumptions including the current Company stock price, expected volatility, risk-free rate, expected term and expected dividend yield (see Note 9 — Stockholders' Equity (Deficit)).

The Company's money market funds are classified within Level 1 of the fair value hierarchy because they are valued using quoted market prices. Certificates of deposit are carried at amortized cost in the Company's consolidated balance sheets, which approximates their fair value based on Level 2 inputs. The carrying values of other receivables, accounts payable and accrued expenses as of December 31, 2022 and 2021 approximated their fair values due to the short-term nature of these items.

## 5. Property and Equipment, Net

Property and equipment, net consist of the following:

| *($ in thousands)* | As of December 31, 2022 | As of December 31, 2021 |
|---|---|---|
| Scientific equipment[(1)] | $ 27,821 | $ 27,641 |
| Computer equipment | 167 | 155 |
| Software | 209 | 335 |
| Furniture and fixtures | 988 | 988 |
| Leasehold improvements | 26,355 | 26,355 |
| Construction in progress | 680 | — |
| | 56,220 | 55,474 |
| Accumulated depreciation | (26,181) | (20,440) |
| Property and equipment, net | $ 30,039 | $ 35,034 |

(1) As of December 31, 2021, includes $3.6 million related to scientific equipment not depreciated until being placed into service during the third quarter of 2022.

Depreciation expense totaled $6.2 million for each of the years ended December 31, 2022 and 2021. All long-lived assets are maintained in the United States.

## 6. Accrued Expenses

Accrued expenses consisted of the following:

| *($ in thousands)* | As of December 31, 2022 | As of December 31, 2021 |
|---|---|---|
| Accrued external research, development and manufacturing costs | $ 2,437 | $ 2,520 |
| Accrued employee compensation and benefits | 4,227 | 3,943 |
| Accrued professional fees | 444 | 294 |
| Total | $ 7,108 | $ 6,757 |

## 7. Debt

On March 30, 2021, the Company entered into a term loan agreement with Silicon Valley Bank ("SVB") and SVB Innovation Credit Fund VIII, L.P., as amended in June 2021 and September 2021 (the "Loan Agreement"), which provides a term loan facility of up to $50.0 million with a maturity date of March 1, 2025, or the Loan Agreement. The Company's obligations under the Loan Agreement are secured by substantially all of its assets except for its intellectual property. The Loan Agreement contains certain customary covenants, including, but not limited to, those relating to additional indebtedness, liens, asset divestitures, and affiliate transactions. If a minimum liquidity amount is not maintained, 50% of the outstanding principal and interest will become cash collateralized. As of December 31, 2022, the Company was in compliance with all covenants. The Company may use the proceeds of borrowings under the Loan Agreement as working capital and to fund its general business requirements.

The Loan Agreement provides that the term loans will be distributed in tranches. The initial term loan tranche of $20.0 million was drawn on March 31, 2021, and on October 13, 2021, the Company borrowed an additional $10.0 million under the Loan Agreement. Borrowings under the Loan Agreement are accounted for net of issuance costs which are being accreted to interest expense over the term of the loan using the effective interest method. As of December 31, 2022, two subsequent $10.0 million term loan tranches will be

eligible to be drawn at the request of the Company during specified draw periods prior to May 15, 2023, the first tranche subject to submission by the Company of its first Biologics License

Application (“BLA”) to the FDA for its HAV prior to March 31, 2023, and the second tranche subject to the first approval from the FDA of any BLA for the HAV prior to March 31, 2023 and the Company having borrowed the first remaining tranche.

Borrowings bear interest at the greater of 7.5% or the Wall Street Journal Prime Rate plus 4.25% (11.75% as of December 31, 2022). Interest only payments on the principal amount outstanding are due monthly beginning in the first month after the loan is dispersed. Repayment of principal may begin as soon as July 1, 2023 under the level of borrowing outstanding at December 31, 2022, and no later than April 1, 2024 if the remaining two loan tranches are drawn. The term loans may only be prepaid in full, and such prepayment requires 30 days’ advance notice and was subject initially to a prepayment fee of 3.00% (that was decreased to 2.00% after March 30, 2022 (with a further decrease to 1.00% after March 30, 2023). The Company is not obligated to pay a prepayment fee if the Company makes a prepayment after March 30, 2024.

In connection with the Loan Agreement, the Company granted warrants to the lenders to purchase shares of Common Stock at an exercise price of $10.28 per share, of which 287,704 warrants were immediately exercisable. The warrants are classified within stockholders’ equity as the settlement of the warrants is indexed to the Common Stock. The Company recognized the fair value of the warrants immediately exercisable within stockholders’ equity using a Black-Scholes valuation model at issuance.

At issuance, the Company initially determined that the funding of an additional tranche was not probable, and therefore no value was ascribed to the remaining 123,302 warrants that were only exercisable upon the funding of the first additional tranche. As a result of the Company’s additional $10.0 million borrowings under the Loan Agreement on October 13, 2021, the warrants to purchase the additional 123,302 shares of Common Stock became exercisable at an exercise price of $10.28 per share and the value of the warrants was recorded as of that date. The additional warrants are classified within stockholders’ equity using a Black-Scholes valuation model, as the settlement of the warrants is indexed to the Common Stock.

As of December 31, 2022, the fair value of warrants ($3.3 million), a 5% final payment fee ($1.5 million) and debt issuance costs ($0.3 million) are being accreted to interest expense over the term of the loan using the effective interest method.

SVB loan payable and net discount or premium balances are as follows:

| ***($ in thousands)*** | **December 31, 2022** |
|---|---|
| Principal amount of SVB loan payable | $ 30,000 |
| Final payment amount of SVB loan payable | 1,500 |
| Net premium associated with accretion of final payment and other debt issuance costs | (2,593) |
| SVB loan payable, current and noncurrent | 28,907 |
| Less SVB loan payable, current portion | (8,571) |
| SVB loan payable, noncurrent portion | $ 20,336 |

Future minimum payments of principal on the Company’s outstanding variable rate borrowings as of December 31, 2022 are as follows:

| ***Year ending December 31:*** | ***($ in thousands)*** |
|---|---|
| 2023 | $ 8,571 |
| 2024 | 17,143 |
| 2025 | 4,286 |
| Total future payments | $ 30,000 |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 640 of 674

On April 30, 2020, the Company received loan proceeds in the amount of approximately $3.3 million under the Paycheck Protection Program ("PPP"). The loan and accrued interest were forgivable after a 24-week period as long as the Company used the loan proceeds for eligible purposes, including payroll, benefits, rent and utilities, and maintained its payroll levels. On May 25, 2021, the PPP loan was forgiven and the Company recognized a gain from loan extinguishment in the amount of $3.3 million during the year ended December 31, 2021.

**8. Leases**

The Company's finance lease relates to its headquarters, which was substantially completed in June 2018 and leased through May 2033, and its operating lease relates to the land lease associated with its headquarters.

At December 31, 2022 and 2021, the Company had finance lease liabilities of $21.1 million and $23.1 million, respectively, and right-of-use assets of $19.4 million and $21.4 million, respectively, and operating lease liabilities of $0.7 million and $0.7 million, respectively, and right-of-use assets of $0.7 million and $0.7 million, respectively, all of which were included in the consolidated balance sheets.

The Company's leases do not require any contingent rental payments, impose any financial restrictions, or contain any residual value guarantees. Certain of the Company's leases include renewal options and escalation clauses; renewal options have been included in the calculation of the lease liabilities and right of use assets as the Company is reasonably certain to exercise the options due to the specialized nature of the leased building. Variable expenses generally represent the Company's share of the landlord's operating expenses. The Company does not act as a lessor in any lease arrangements.

The following summarizes quantitative information about the Company's leases:

| | Year Ended December 31, | |
|---|---|---|
| ***($ in thousands)*** | **2022** | **2021** |
| Finance lease cost | | |
| Amortization of right-of-use assets | $ 2,059 | $ 2,060 |
| Interest on lease liabilities | 1,887 | 2,044 |
| Total finance lease cost | 3,946 | 4,104 |
| Operating lease cost | 105 | 105 |
| Total lease cost | $ 4,051 | $ 4,209 |

| | Year Ended December 31, 2022 | | Year Ended December 31, 2021 | |
|---|---|---|---|---|
| ***($ in thousands)*** | **Finance Leases** | **Operating Leases** | **Finance Leases** | **Operating Leases** |
| Operating cash flows from leases | $ (1,887) | $ (105) | $ (2,044) | $ (105) |
| Financing cash flows from leases | $ (1,981) | $ — | $ (1,729) | $ — |
| Weighted-average remaining lease term | 4.57 | 5.24 | 5.04 | 5.74 |
| Weighted-average discount rate | 8.50 % | 8.50 % | 8.50 % | 8.50 % |



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 641 of 674

As of December 31, 2022, the maturities of the Company's lease liabilities were as follows:

| *($ in thousands)* | Finance Leases | Operating Leases |
|---|---|---|
| 2023 | $ 3,965 | $ 105 |
| 2024 | 4,065 | 105 |
| 2025 | 4,167 | 105 |
| 2026 | 4,237 | 105 |
| 2027 | 2,673 | 105 |
| Thereafter | 10,026 | 469 |
| Total | 29,133 | 994 |
| Less: present value discount | (8,024) | (312) |
| Lease liabilities | $ 21,109 | $ 682 |

**9. Stockholders' Equity (Deficit)**

**Redeemable Convertible Preferred Stock**

Immediately prior to the Merger, Legacy Humacyte had outstanding series A redeemable convertible preferred stock, series B redeemable convertible preferred stock, series C redeemable convertible preferred stock and series D redeemable convertible preferred stock, which are collectively referred to as "redeemable convertible preferred stock."

In connection with the Merger, all previously issued and outstanding redeemable convertible preferred stock was converted into an equivalent number of shares of Common Stock of the Company on a one-for-one basis, then multiplied by the exchange ratio pursuant to the Merger Agreement and the amounts were reclassified as additional paid-in capital.

**Common Stock**

On August 26, 2021, the Merger and related PIPE Financing was consummated and the Company issued 27,346,449 shares of Common Stock for proceeds of $242.4 million. The Company incurred $3.9 million of transaction costs, consisting of banking, legal, and other professional fees. Legacy Humacyte assumed $15.2 million of liabilities, including PIPE Financing fees and legal fees, and $0.1 million of assets from AHAC. Immediately following the Merger, there were 103,003,384 shares of Common Stock outstanding with a par value of $0.0001 per share.

As of December 31, 2022, the Company's Second Amended and Restated Certificate of Incorporation authorized the Company to issue 250,000,000 shares of Common Stock. The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares then outstanding or reserved for issuance) by the affirmative vote of the holders of a majority of the capital stock of the Company entitled to vote and may require a separate class vote of the Common Stock.

The holders of Common Stock are entitled to receive dividends from time to time as may be declared by the Company's board of directors. Through December 31, 2022, no dividends have been declared.

The holders of Common Stock are entitled to one vote for each share held with respect to all matters voted on by the common stockholders of the Company.

In the event of a reorganization of the Company, after payment to the preferred stockholders of their liquidation preferences, holders of Common Stock are entitled to share ratably in all remaining assets of the Company.

As of December 31, 2022 and 2021, the Company had reserved Common Stock for future issuances as follows:

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Common stock reserved for Contingent Earnout Shares | 15,000,000 | 15,000,000 |
| Exercise of options under stock plans | 7,203,874 | 6,711,192 |
| Issuance of options under stock plans | 6,700,888 | 7,418,937 |
| Shares available for grant under ESPP | 1,030,033 | 1,030,033 |
| Warrants to purchase Common Stock | 5,588,506 | 5,588,506 |
| | 35,523,301 | 35,748,668 |

### Preferred Stock

The Company's Second Amended and Restated Certificate of Incorporation provides the Company's board of directors with the authority to issue preferred stock, par value $0.0001 per share, in one more series and to establish from time to time the number of shares to be included in each such series, by adopting a resolution and filing a certification of designations. Voting powers, designations, powers, preferences and relative, participating, optional, special and other rights shall be stated and expressed in such resolutions. There were 20,000,000 shares designated as preferred stock and none were outstanding as of December 31, 2022 and 2021.

### Warrants

The Company had the following common stock warrants outstanding as of December 31, 2022 and 2021:

| | Common Stock Warrants Outstanding |
|---|---|
| Legacy Humacyte Common Stock Warrants | 411,006 |
| Private Placement Warrants | 177,500 |
| Public Warrants | 5,000,000 |
| Total Common Stock Warrants | 5,588,506 |

See Note 7 — Debt for a discussion of common stock warrants issued in conjunction with the Company's Loan Agreement in 2021 (such warrants, "Legacy Humacyte Common Stock Warrants"). There were no issuances, exercises or expirations of warrants during the year ended December 31, 2022. During the year ended December 31, 2021, there were 32,961 warrants exercised that were issued in conjunction with a long-term debt agreement repaid in a prior reporting period. There were no expirations of warrants during the year ended December 31, 2021.

#### *Private Placement Warrants*

The Private Placement Warrants were initially recognized as a liability on the Closing Date, at a fair value of $0.6 million, and the liability was remeasured to an estimated fair value of $0.5 million as of December 31, 2021. See Note 4 — Fair Value Measurements for a summary of the change in the fair value of the Private Placement Warrants during the years ended December 31, 2022 and 2021. The remeasurement of the Private Placement Warrant liability to a fair value of $0.1 million as of December 31, 2022 resulted in a non-cash gain of $0.4 million for the year ended December 31, 2022, compared to a non-cash gain of $0.1 million for the year ended December 31, 2021. The remeasurement of the Private Placement Warrant liability is classified within Change in fair value of common stock warrant liabilities in the consolidated statements of operations and comprehensive loss.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 643 of 674

The Private Placement Warrants were valued using the following assumptions under the Monte Carlo simulation value model:

| | As of December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Market price of public stock | $ 2.11 | $ 7.25 |
| Exercise price | $ 11.50 | $ 11.50 |
| Expected term (years) | 3.65 | 4.65 |
| Expected share price volatility | 78.3 % | 61.0 % |
| Risk-free interest rate | 4.14 % | 1.21 % |
| Estimated dividend yield | 0 % | 0 % |

***Public Warrants***

The Public Warrants may only be exercised for a whole number of shares and will expire five years after the completion of the Merger. The Public Warrants became exercisable 30 days after the completion of the Merger.

The Public Warrants were initially recognized as equity on the Closing Date at a fair value of $2.80 per share. There were no exercises of the Public Warrants during the year ended December 31, 2022.

***Contingent Earnout Liability***

Following the Closing, former holders of Legacy Humacyte common and preferred shares may receive up to 15,000,000 additional shares of Common Stock in the aggregate, in two equal tranches of 7,500,000 shares of Common Stock per tranche. The first and second tranches are issuable if the closing volume weighted average price ("VWAP") per share of Common Stock quoted on Nasdaq (or the exchange on which the shares of Common Stock are then listed) is greater or equal to $15.00 and $20.00, respectively, over any 20 trading days within any 30 consecutive trading day period.

Upon the Closing, the contingent obligation to issue Contingent Earnout Shares was accounted for as a liability because the triggering events that determine the number of Contingent Earnout Shares required to be issued include events that are not solely indexed to the Common Stock. The estimated fair value of the total Contingent Earnout Shares at the Closing on August 26, 2021 was $159.4 million based on a Monte Carlo simulation valuation model using a distribution of potential outcomes on a monthly basis over a 10-year period using the most reliable information available. The estimated fair value of the total Contingent Earnout Shares at December 31, 2021 was $103.7 million.

See Note 4 — Fair Value Measurements for a summary of the change in the fair value of the Contingent Earnout Liability during the years ended December 31, 2022 and 2021. The remeasurement of the Contingent Earnout Liability to a fair value of $27.9 million as of December 31, 2022, resulted in a non-cash gain of $75.8 million for the year ended December 31, 2022, compared to a non-cash gain of $55.8 million for the year ended December 31, 2021. The remeasurement of the Contingent Earnout Liability is classified within Change in fair value of Contingent Earnout Liability in the consolidated statements of operations and comprehensive loss.

Assumptions used in the valuations are described below:

| | As of December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Current stock price | $ 2.11 | $ 7.25 |
| Expected share price volatility | 89.0 % | 85.8 % |
| Risk-free interest rate | 3.88 % | 1.52 % |
| Estimated dividend yield | 0 % | 0 % |
| Expected term (years) | 10.00 | 10.00 |

**10. Stock-based Compensation**

At Closing, the 2021 Long-Term Incentive Plan, (the “2021 Plan”), and the 2021 Employee Stock Purchase Plan, (the “ESPP”), became effective. As of December 31, 2022, 6,700,888 and 1,030,033 shares of Common Stock were available under the 2021 Plan and ESPP, respectively. The 2021 Plan and ESPP provide that on January 1 of each year commencing January 1, 2022, the 2021 Plan and the ESPP reserve will automatically increase in an amount equal to the lesser of (a) 5% and 1%, respectively, of the number of shares of the Company’s Common Stock outstanding on December 31 of the preceding year and (b) a number of shares of Common Stock determined by the Company’s board of directors. In both December 2021 and 2022, the Company’s board of directors determined that there would be no automatic increase in the number of shares reserved under the 2021 Plan or the ESPP on either January 1, 2022 or January 1, 2023.

Under the 2021 Plan, the Company can grant non-statutory stock options, (“NSOs”), incentive stock options, ISOs, stock appreciation rights, restricted stock, restricted stock units, unrestricted stock, performance awards and other forms of awards. Under the ESPP, when and if implemented, eligible employees will be permitted to purchase shares of the Company’s Common Stock at the lower of 85% of the closing trading price per share of the Company’s Common Stock on the first day of the offering or 85% of the closing trading price per share on the exercise date, which will occur on the last day of each offering.

Prior to the Closing, Legacy Humacyte had two equity incentive plans, the 2015 Omnibus Incentive Plan, as amended, (the “2015 Plan”), and the 2005 Stock Option Plan (the “2005 Plan”). As a result of the Merger, no further awards may be granted under either the 2015 plan or the 2005 Plan. All awards previously granted and outstanding as of the effective date of the Merger were adjusted to reflect the impact of the Merger as set forth in the Merger Agreement, but otherwise remain in effect pursuant to their original terms. The shares underlying any award granted under the 2021 Plan or the 2015 Plan that are forfeited, cancelled or reacquired by the Company prior to vesting, that expire or that are paid out in cash rather than shares will become available for grant and issuance under the 2021 Plan. As of December 31, 2022, 3,632,237 and 484,562 shares of Common Stock remain reserved for outstanding options issued under the 2015 Plan and 2005 Plan, respectively.

The Company’s stock option plans allow for the grant of awards that the Company believes aid in aligning the interests of award recipients with those of its stockholders. The Company’s board of directors or compensation committee determines the specific terms of equity incentive grants, including the exercise price per share and vesting period for option awards. Option awards are granted with an exercise price equal to the fair market value of the Company’s Common Stock at the date of grant.

The Company has granted options that include either a service-based or performance-based vesting condition, or both, and a 10-year contractual term. The service-based vesting condition for the plans is generally satisfied over 36 to 48 months from the date of grant. The performance-based vesting conditions are satisfied upon the attainment of certain product development milestones. The Company recognizes stock-based compensation expense based on the grant date fair value of the awards measured using the Black-Scholes option pricing model. Compensation expense related to awards with service-based vesting conditions is recognized on a straight-line basis over the requisite service period.

Compensation expense related to awards with performance-based vesting conditions is recognized over the requisite service period using the accelerated attribution method to the extent achievement of the performance-based condition is probable. The Company does not recognize compensation expense related to awards with performance-based vesting conditions until it is probable that the performance-based vesting condition will be achieved. Forfeitures are accounted for as they occur.

Option awards under the Company’s option plans generally provide for accelerated vesting of the unvested portions of any option award in the event of an involuntary termination, as such term is defined in the relevant stock option agreement, of a grantee’s employment during the period that commences 30 days prior to the effective date of a corporate transaction and that ends 12 months following the effective date of such transaction. Additionally, the Company’s board of directors may, in its sole discretion, accelerate the vesting of any unvested stock options in the event of a corporate transaction.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 646 of 674

The Company estimated the fair value of the stock options on the date of grant using the following assumptions in the Black-Scholes option-pricing model:

| | Year Ended December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Estimated dividend yield | 0 % | 0 % |
| Expected share price volatility (weighted average and range, if applicable) | 88.8% (87.4% to 100.0%) | 91.4% (90.7% to 93.1%) |
| Risk-free interest rate (weighted average and range, if applicable) | 3.50% (1.89% to 3.69%) | 0.78% (0.62% to 1.32%) |
| Expected term of options (in years) (weighted average and range, if applicable) | 6.25 | 6.05 (6.00 to 6.25) |

- *Fair Value of Common Stock.* Prior to the Merger, as the Company's common stock was not publicly traded, the fair value of the shares of its common stock underlying the options was determined by the Company's board of directors with input from management, after considering independent third-party valuation reports. Subsequent to the Merger, the fair value of the Common Stock has been determined based on the closing price of the shares on Nasdaq.

- *Expected Term.* The expected term represents the period that stock options are expected to be outstanding. The Company calculated the expected term using the simplified method for options, which is available where there is insufficient historical data about exercise patterns and post-vesting employment termination behavior. The simplified method is based on the vesting period and the contractual term for each grant, or for each vesting-tranche for awards with graded vesting. The mid-point between the vesting date and the maximum contractual expiration date is used as the expected term under this method. For awards with multiple vesting-tranches, the times from grant until the mid-points for each of the tranches may be averaged to provide an overall expected term.

- *Expected Volatility.* The expected volatility was determined based on a blended approach using the historical share volatility of the Company's Common Stock and that of several publicly traded peer companies over a period of time equal to the expected term of the options, as the Company has a limited trading history. For purposes of identifying these peer companies, the Company considered the industry, stage of development, size and financial leverage of potential comparable companies.

- *Risk-Free Interest Rate.* The risk-free interest rate was based on the yields of U.S. Treasury zero-coupon securities with maturities similar in duration to the expected term of the options.

- *Expected Dividend Yield.* The Company has not paid dividends on its Common Stock nor does it expect to pay dividends in the foreseeable future. Accordingly, the Company has estimated the dividend yield to be zero.

At December 31, 2022, there were 6,700,888 options remaining available for grant under the 2021 Plan. The Company has sufficient authorized and unissued shares to issue Common Stock in satisfaction of any awards available for grant under the 2021 Plan.

The following table shows a summary of stock-based compensation expense included in the consolidated statements of operations and comprehensive loss for the years ended December 31, 2022 and 2021:

| | Year Ended December 31, | |
|---|---|---|
| *($ in thousands)* | 2022 | 2021 |
| Research and development | $ 1,034 | $ 3,220 |
| General and administrative | 5,150 | 6,926 |
| Total | $ 6,184 | $ 10,146 |

A summary of option activity under the Company's stock option plans during the year ended December 31, 2022 is presented below:

| | Number of Shares | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (in thousands) |
|---|---|---|---|---|
| Options outstanding at December 31, 2021 | 6,711,192 | $ 7.48 | 5.3 | $ 8,276 |
| Granted | 2,791,029 | 3.54 | | |
| Exercised | (225,367) | 2.37 | | |
| Forfeited | (2,072,980) | 8.21 | | |
| Options outstanding at December 31, 2022 | 7,203,874 | $ 5.90 | 7.5 | $ 429 |
| Vested and exercisable, December 31, 2022 | 3,375,289 | $ 6.46 | 5.3 | $ 429 |
| Vested and expected to vest, December 31, 2022 | 7,203,874 | $ 5.90 | 7.5 | $ 429 |

The weighted-average grant-date fair value per share of options granted during the years ended December 31, 2022 and 2021 was $2.70 and $7.63, respectively. The total intrinsic value of options exercised during the years ended December 31, 2022 and 2021 was $0.3 million and $1.4 million, respectively. As of December 31, 2022, unrecognized stock-based compensation cost for options was $13.3 million and is expected to be recognized over a weighted-average period of 2.4 years.

**11. Income Taxes**

The Company did not record any income tax expense or benefit during the years ended December 31, 2022 and 2021. The Company has a net operating loss and has provided a valuation allowance against net deferred tax assets due to uncertainties regarding the Company's ability to realize these assets. All losses before income taxes arose in the U.S.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 648 of 674

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets and deferred tax liabilities, including valuation allowances, are as follows:

| | As of December 31, | |
|---|---|---|
| *($ in thousands)* | 2022 | 2021 |
| Deferred tax assets: | | |
| Net operating loss | $ 67,879 | $ 58,646 |
| Capitalized research and development | 43,818 | 36,830 |
| Research credits | 18,054 | 16,765 |
| Stock-based compensation | 3,047 | 1,323 |
| Right of use lease liability | 144 | 153 |
| Accrued expenses | 65 | 92 |
| Other | 1 | 1 |
| Total deferred tax asset | 133,008 | 113,810 |
| Less: valuation allowance | (131,151) | (111,575) |
| Total net deferred tax asset | 1,857 | 2,235 |
| | | |
| Deferred tax liabilities: | | |
| Basis difference in fixed assets | (1,713) | (2,082) |
| Right of use lease assets | (144) | (153) |
| Total deferred tax liability | (1,857) | (2,235) |
| Total net deferred tax asset/(liability) | $ — | $ — |

A valuation allowance is provided for deferred tax assets where the recoverability of the assets is uncertain. The determination to provide a valuation allowance is dependent upon the assessment of whether it is more likely than not that sufficient future taxable income will be generated to utilize the deferred tax assets. Based on the weight of the available evidence, which includes the Company's historical operating losses, lack of taxable income and the accumulated deficit, the Company provided a full valuation allowance against the deferred tax assets resulting from the tax loss and credits carried forward as of December 31, 2022 and December 31, 2021.

On November 18, 2021, North Carolina enacted the 2021 Appropriations Act, which included a gradual corporate income tax rate decrease from the current 2.5% to 0% by 2030. The Company is in a cumulative loss position and does not have significant deferred tax liabilities that can be utilized as a source of taxable income in the future. Therefore, the Company has reduced its North Carolina deferred tax assets, including the net operating losses, to zero, as no benefit is expected to be realized from these deferred tax assets prior to 2030 when there would be no income tax in North Carolina. The reduction in the value of the deferred tax assets resulted in $6.9 million of tax expense in 2021, which was offset fully by the reduction in the corresponding valuation allowance. If the Company becomes profitable prior to 2030, the Company will recognize an income tax benefit related to the portion of its North Carolina deferred tax assets utilized.



Case 1:24-cv-00954-TDS-JEP Document 41-1 Filed 07/25/25 Page 649 of 674

The reasons for the difference between the actual income tax benefit for the years ended December 31, 2022 and 2021, and the amount computed by applying the statutory Federal income tax rate to losses before income taxes are as follows:

| | December 31, | | | |
|---|---|---|---|---|
| | 2022 | | 2021 | |
| *($ in thousands)* | Amount | Rate | Amount | Rate |
| Income tax benefit at statutory rate | $ (2,512) | 21.0 % | $ (5,560) | 21.0 % |
| State income taxes, net of federal benefit | (1,767) | 14.8 % | (1,706) | 6.4 % |
| Tax credits | (2,325) | 19.4 % | (2,662) | 10.1 % |
| Other nondeductible expenses | (15,735) | 131.5 % | (11,991) | 45.3 % |
| Deferred rate changes | 1,698 | (14.2)% | 8,981 | (33.9)% |
| Deferred tax true-up[1] | 1,065 | (8.9)% | 3,120 | (11.8)% |
| Change in valuation allowance | 19,576 | (163.6)% | 9,818 | (37.1)% |
| Provision for income taxes | $ — | 0.0 % | $ — | 0.0 % |

(1) The deferred tax true-up for 2022 and 2021 primarily relates to executive compensation subject to IRC Section 162(m) limitations and the 2021 research and development and net operating loss carryforwards were adjusted due to application of the employee retention credit determined in 2022.

As of December 31, 2022 the Company had approximately $322.4 million and $323.9 million of Federal and state net operating losses, respectively. Of this amount, $161.1 million of Federal net operating losses are subject to an 80% limitation on taxable income, do not expire and will carry forward indefinitely, while the remaining amount begins to expire in 2025. Some of these state net operating losses included in these amounts follow the Federal Tax Cuts and Jobs Act and are carried over indefinitely. The Company's state net operating losses began to expire in 2020 and will expire completely in 2042. The state operating loss carryforwards are inclusive of North Carolina net operating losses, which are recorded at a zero benefit.

As of December 31, 2022 and 2021, the Company had Federal and state research tax credit carryforwards of $18.1 million and $15.7 million, respectively. These credit carryforwards will begin to expire in 2025 and will expire completely in 2042.

Net operating loss carryforwards and tax credit carryforwards are subject to review and possible adjustment by the Internal Revenue Service, or IRS, and may become subject to an annual limitation in the event of certain cumulative changes in the ownership interest of significant stockholders or groups over a three-year period in excess of 50% as defined under Sections 382 and 383 in the Internal Revenue Code, which could limit the amount of tax attributes that can be utilized annually to offset future taxable income or tax liabilities. The amount of the annual limitation is determined based on the value immediately prior to the ownership change. Subsequent ownership changes may further affect the limitation in future years. The Company has not determined whether there have been any cumulative ownership changes or the impact on the utilization of the loss carryforwards if such changes have occurred. A section 382 study will be performed at a time when forthcoming profitability is reasonably anticipated.

**12. Retirement Plan**

The Company maintains two defined contribution employee retirement plans, or 401(k) plans, for all employees upon their date of hire. The 401(k) plans are intended to qualify as tax-qualified plans under Section 401(k) of the Internal Revenue Code of 1986, as amended. The plans permit employees to contribute, on a pre-tax basis, a portion of their salary up to the Federally mandated limits. The Company matches an employee's contribution up to 4% of the employee's compensation. Contributions to the plans by the Company totaled $0.7 million and $0.6 million for the years ended December 31, 2022 and 2021, respectively.

## 13. Commitments and Contingencies

### Patent License Agreements

*Duke University*

In March 2006, the Company entered into a license agreement with Duke University ("Duke"), which was subsequently amended in 2011, 2014, 2015, 2018, 2019 and January 2022. Under this license agreement, Duke granted the Company a worldwide, exclusive, sublicensable license to certain patents related to decellularized tissue engineering, referred to as the patent rights, as well as a non-exclusive license to use and practice certain know-how related to the patent rights. The relevant licensed patent on decellularization of tissue expired in 2021. The Company has agreed to use commercially reasonable efforts to develop, register, market and sell products utilizing the patent rights, referred to as the licensed products. Any services provided to a third party utilizing licensed products are referred to as licensed services. The Company has also agreed to meet certain benchmarks in its development efforts, including as to development events, clinical trials, regulatory submissions and marketing approval, within specified timeframes. Under the license agreement, Duke retains the right to use the patent rights for its own educational and research purposes, and to provide the patent rights to other non-profit, governmental or higher-learning institutions for non-commercial purposes without paying royalties or other fees.

In connection with the Company's entry into the license agreement, the Company granted equity consideration to Duke in the form of 52,693 shares of the Company's common stock. Under the license agreement, the Company also agreed to pay Duke:

- a low single-digit percentage royalty on eligible sales of licensed products and licensed services, plus a low double-digit percentage of any sublicensing revenue;
- an annual minimum royalty beginning in 2012, which increases in the calendar year immediately following the first commercial sale of licensed products or licensed services (whichever occurs first); and
- an additional amount in license fees, as certain milestones are met.

The license agreement remains effective until the later of (i) the last of the patent rights expires or (ii) four years after the Company's first commercial sale, unless terminated earlier. Either party may terminate the agreement for fraud, willful misconduct or illegal conduct, or uncured material breach. Duke may terminate the agreement if the Company becomes insolvent. Duke may also terminate the license, convert the license into a non-exclusive license or seek assignment of any sublicense if the Company fails to reach diligence milestones within the applicable time period. If the Company abandons any claim, patent or patent application, its rights under the license with respect to such patent rights will be terminated in the territory in which the Company abandons such rights. The Company may terminate the license agreement unilaterally upon three months' prior notice to Duke. The Company agrees to indemnify Duke against certain third-party claims. Payments to Duke under the license agreement were immaterial during the periods presented.

*Yale University*

In February 2014, the Company entered into a license agreement with Yale University ("Yale") that granted the Company a worldwide license to the patents related to coatings for small-diameter vessels to inhibit clotting. The license granted under the agreement is exclusive in the field of engineered vascular tissues and tissues and extracellular matrix-based implants used for vascular repair, reconstruction and replacement (provided that all uses are vascular tissues within the range of 1 – 12mm in diameter), except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. The Company has agreed to pay to Yale an annual maintenance fee, increasing between the first and fourth anniversaries of the agreement up to a maximum of less than $0.1 million per year for this license. In December 2022, in accordance with the terms of the agreement, the Company provided Yale with 90 days written notice of termination, effective March 21, 2023.

In August 2019, the Company entered into a license agreement with Yale that granted the Company a worldwide license to the patents related to Bioartificial Vascular Pancreas ("BVP"). The license granted under the agreement is exclusive in the field of engineered vascular tissues that deliver pancreatic islet cells to patients, except that it is subject to

Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. The Company has agreed to pay to Yale an annual maintenance fee, increasing between the first and fourth anniversaries of the agreement up to a maximum of less than $0.1 million per year for this license.

In August 2019, the Company entered into a license agreement with Yale that granted the Company a worldwide license to the patents related to tubular prostheses. The license granted under the agreement is exclusive in the field of engineered urinary conduits, engineered tracheas/airways, and engineered esophagi, except that it is subject to Yale's non-exclusive right, on behalf of itself and all other non-profit academic institutions, to use the licensed products for research, teaching, and other non-commercial purposes. The Company has agreed to pay to Yale an annual maintenance fee, increasing between the first and fourth anniversaries of the agreement up to a maximum of less than $0.1 million per year for this license.

The Company has agreed to use reasonable commercial efforts to develop and commercialize the licensed patents and any licensed products and methods, and to use reasonable efforts to make the licensed products available to patients in low and low-middle income countries. The Company is also obligated to provide Yale periodically an updated and revised copy of its plan for each license, which must indicate progress of its development and commercialization. The Company may also sublicense the Company's rights without Yale's prior written consent, but such sublicense is subject to certain conditions.

In connection with its entry into the license agreement, the Company paid Yale upfront cash fees. The Company has also agreed to pay Yale:

- annual maintenance fees, increasing between the first anniversary of the agreement until the fifth anniversary for the coating (see above) and BVP licenses and until the fourth anniversary for the tubular prostheses license up to a maximum of less than $0.1 million per year;
- milestone payments upon achievement of certain regulatory and commercial milestones of $0.2 million and $0.6 million, respectively;
- a low single-digit percentage royalty on worldwide net sales, subject to reductions for third-party license fees; and
- a low double-digit percentage of sublicensing income.

If the Company or any of its future sublicensees bring a patent challenge against Yale or assists another party in bringing a patent challenge against Yale, the license fees described above will be subject to certain increases and penalties.

The agreements expire on a country-by-country basis on the date on which the last of the patents in such country expires, lapses or is declared invalid. Yale may terminate the agreements if the Company fails to (i) provide written diligence reports, (ii) provide commercially reasonable diligence plans, (iii) implement the plans in accordance with the obligations under the agreements, or (iv) reach certain research and development milestones within the scheduled timeframe set forth in the agreements; however, any such termination right would be limited in scope to the country to which such failure relates. Yale may also terminate for the Company's non-payment, uncured material breach, failure to obtain adequate insurance, bringing or assisting in bringing of a patent challenge against Yale, abandonment of the research and development of the Company's products or insolvency. The Company may terminate the license agreements (i) on 90 days' prior written notice to Yale, provided the Company is not in breach of the license agreements and has made all required payments to Yale thereunder and (ii) on written notice to Yale following an uncured material breach. With respect to the license agreements related to small-diameter vessels and BVP, the Company's rights under the license agreements will also terminate automatically with respect to a patent application or patent within the licensed patents in a specified country if, upon receipt of written notice from Yale, the Company does not agree to pay the patent filing, prosecution and maintenance fees incurred by Yale for such patent applications or patents in the specified country. Under certain circumstances, Yale may, at its option, convert the exclusive licenses to non-exclusive licenses if the Company declines to initiate certain infringement or interference proceedings with respect to the licensed patents. The Company has agreed to indemnify Yale against certain third-party claims. Payments to Yale under the license agreement were immaterial during the periods presented.

**Legal Matters**

The Company currently is not aware of any legal proceedings or claims that management believes will have, individually or in the aggregate, a material adverse effect on the Company's business, financial condition, results of operations, or cash flows.

**Indemnification**

To the extent permitted under Delaware law, the Company has agreed to indemnify its directors and officers for certain events or occurrences while the director or officer is, or was serving, at the Company's request in such capacity. The indemnification period covers all pertinent events and occurrences during the director's or officer's service. The maximum potential amount of future payments the Company could be required to make under these indemnification arrangements is not specified in such arrangements; however, the Company has director and officer insurance coverage that is intended to reduce its exposure and enable the Company to recover a portion of any potential future amounts the Company could be required to make. To date, the Company has not incurred any costs as a result of such obligations and has not accrued any liabilities related to such obligations in the consolidated financial statements.

**14. Related Party Transactions**

*Fresenius Medical Care investments and distribution agreement*

In June 2018, the Company completed a $150 million financing transaction pursuant to which Fresenius Medical Care purchased shares of series D redeemable convertible preferred stock that at the Closing of the Merger converted into 15,812,735 shares of the Company's common stock. In August 2021, Fresenius Medical Care invested $25 million as part of the PIPE Financing and received an additional 2.5 million shares of the Company's common stock.

In addition, the Company entered into a distribution agreement with Fresenius Medical Care in June 2018 which, as amended as of February 16, 2021, granted Fresenius Medical Care and its affiliates exclusive rights to develop outside the United States and EU and commercialize outside of the United States the Company's 6 millimeter x 42 centimeter HAV and all improvements thereto, and modifications and derivatives thereof (including any changes to the length, diameter or configuration of the foregoing), for use in vascular creation, repair, replacement or construction, including renal replacement therapy for dialysis access, the treatment of peripheral artery disease, and the treatment of vascular trauma, but excluding coronary artery bypass graft, pediatric heart surgery, or adhering pancreatic islet cells onto the outer surface of the distribution product for use in diabetic patients. Within the United States, Fresenius Medical Care will collaborate with the Company in its commercialization of the product in the field, including adoption of the distribution product as a standard of care in patients for which such use is supported by clinical results and health economic analyses.

The Company is responsible for developing and seeking regulatory approval for the distribution product in the field in the United States. For countries outside the United States, the parties agreed to use commercially reasonable efforts to satisfy certain agreed minimum market entry criteria for the distribution product in the field in such country. For the EU, once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory approval for the distribution product in the field in the applicable country, the Company agreed to use commercially reasonable efforts to obtain such regulatory approval (other than pricing approval), and Fresenius Medical Care agreed to use commercially reasonable efforts to obtain the corresponding pricing approval. For the rest of the world (i.e., outside the United States and the EU), once such criteria have been satisfied for the applicable country, or if the parties otherwise mutually agree to obtain regulatory and pricing approval for the distribution product in the field in the applicable country, Fresenius Medical Care agreed to use commercially reasonable efforts to obtain such approvals, and the Company agreed to use commercially reasonable efforts to support Fresenius Medical Care in its efforts.

Under the distribution agreement, the Company grants an exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by the Company during the term to commercialize the distribution product in the field outside the United States, subject to the Company's retained rights to carry out its obligations under the distribution agreement. The Company also grants a non-exclusive, sublicensable license to Fresenius Medical Care under the patents, know-how and regulatory materials controlled by the Company during the term to develop the distribution product in accordance with the terms of the distribution agreement. In addition, the Company grants to Fresenius Medical Care, among other things, a perpetual, irrevocable,

non-exclusive sublicensable license under the patents and know-how that primarily relate to the distribution product or its manufacture and that were created, conceived or

developed solely or jointly by or on behalf of Fresenius Medical Care in the performance of its activities under the distribution agreement.

The distribution agreement provides that the Company will own all know-how and patents that primarily relate to the distribution product or its manufacture that are created, conceived or developed by or on behalf of either party in the performance of activities under the distribution agreement. Ownership of all other know-how, patents, materials and other intellectual property created, conceived or developed during the performance of activities under the distribution agreement will be determined in accordance with U.S. patent laws for determining inventorship.

The Company is obligated to make payments to Fresenius Medical Care based on a share of aggregate net sales by or on behalf of the Company of the distribution product in the United States in the field. Such revenue-share payments will be a percentage of net sales in the low double digits, without regard to the calendar year in which such net sales are attributable, until such time that the Company has paid to Fresenius Medical Care a certain total amount, at which time the revenue-share will decrease to a percentage of net sales in the mid-single digits. The amounts that Fresenius Medical Care will be obligated to pay the Company under the distribution agreement for sales of the distribution product in the field outside of the United States will vary. Fresenius Medical Care agreed to pay the Company initially, on a country-by-country basis for sales outside of the United States, the amount equal to the average cost of manufacturing the Company's distribution product plus a fixed dollar amount per unit. Following a specified period, on a country-by-country basis outside of the United States, Fresenius Medical Care will pay the Company a fixed percentage of net sales for each unit sold in such country, such that the Company will receive more than half of such net sales.

The distribution agreement will generally continue on a country-by-country basis until the later of (a) the tenth anniversary of the launch date of the distribution product in the relevant country or (b) the expiration of the last-to-expire valid claim of specified patents in such country. Each party is permitted to terminate the distribution agreement for insolvency of, or, under certain circumstances, including various cure periods, material breach by the other party. Subject to a cure period, Fresenius Medical Care may also terminate the distribution agreement in its entirety or on a country-by-country basis (i) for certain withdrawals of regulatory approval or (ii) for termination or expiration of any of our in-licenses that is necessary for the exercise of Fresenius Medical Care's rights, or the satisfaction of its obligations, under the distribution agreement. In addition, Fresenius Medical Care may terminate the distribution agreement for convenience on a country-by-country basis upon not less than 12 months' written notice to the Company, although Fresenius Medical Care is not permitted to give such notice prior to the end of the second year following launch of the distribution product in such country. Each party is required to indemnify one another for certain third-party claims.

*Arrangements with Yale University*

Dr. Niklason serves as an Adjunct Professor in Anesthesia at Yale University. As of December 31, 2022 and 2021, the Company was a party to license agreements with Yale University, as described in Note 13 — Commitments and Contingencies above.

The following table shows a summary of related party expenses included in the statements of operations and comprehensive loss for the years ended December 31, 2022 and 2021:

| | **Year Ended December 31,** | |
|---|---|---|
| ***($ in thousands)*** | **2022** | **2021** |
| License expenses | 100 | 85 |
| Other | 19 | 91 |
| Total | $ 119 | $ 176 |

There was $50 thousand of license expenses payable to Yale University included in accounts payable on the Company's consolidated balance sheets, as of December 31, 2022.

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Disclosure controls and procedures are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

As of December 31, 2022, our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2022.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with U.S. GAAP. A control system, no matter how well designed and operated, can only provide reasonable, not absolute, assurance that the objectives of the control system are met. Because of these inherent limitations, management does not expect that our internal controls over financial reporting will prevent all errors and all fraud. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with our policies and procedures may deteriorate. Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued in 2013 by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the results of its evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2022.

**Attestation Report of the Registered Public Accounting Firm**

This Annual Report on Form 10-K does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting as we are an "emerging growth company" as defined in the JOBS Act. For as long as we remain an "emerging growth company," we are exempt from the auditor attestation requirement in the assessment of the effectiveness of our internal control over financial reporting.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act) during the three months ended December 31, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

None.

## Part III

### Item 10. Directors, Executive Officers and Corporate Governance.

Incorporated by reference from the information in our Proxy Statement for our 2023 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 11. Executive Compensation.

Incorporated by reference from the information in our Proxy Statement for our 2023 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

Incorporated by reference from the information in our Proxy Statement for our 2023 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 13. Certain Relationships and Related Transactions, and Director Independence

Incorporated by reference from the information in our Proxy Statement for our 2023 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

### Item 14. Principal Accountant Fees and Services

Incorporated by reference from the information in our Proxy Statement for our 2023 Annual Meeting of Stockholders, which we will file with the SEC within 120 days of the end of the fiscal year to which this Annual Report on Form 10-K relates.

## Part IV

### Item 15. Exhibits and Financial Statement Schedules.

(a) The following financial statements are included in this Annual Report on Form 10-K:

*(1) List of Financial Statements:*

The financial statements required by this item are listed in Item 8, "Financial Statements and Supplementary Data" herein.

*(2) List of Financial Statement Schedules:*

All financial statement schedules have been omitted because they are not applicable, not required or the information required is shown in the financial statements or notes thereto.

*(3) List of Exhibits:*

| Exhibit No. | Description |
|---|---|
| 3.1 | Second Amended and Restated Certificate of Incorporation of Humacyte, Inc. (incorporated by reference to Exhibit 3.1 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 3.2 | Amended and Restated By Laws of Humacyte, Inc. (incorporated by reference to Exhibit 3.2 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on December 12, 2022). |
| 4.1 | Warrant Agreement, dated September 17, 2020, by and between Alpha Healthcare Acquisition Corp. and Continental Stock Transfer & Trust Company, as warrant agent (incorporated by reference to Exhibit 4.1 to Alpha Healthcare Acquisition Corp.'s Annual Report on Form 10–K/A, filed with the SEC on May 14, 2021). |
| 4.2 | Form of Subscription Agreement (incorporated by reference to Exhibit 10.3 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on August 2, 2021). |
| 4.3* | Form of Investor Rights and Lock–up Agreement (incorporated by reference to Exhibit A of Annex A to the proxy statement/prospectus contained in Humacyte, Inc.'s Registration Statement on S-4/A, filed with the SEC on August 2, 2021). |
| 4.4 | Warrant to Purchase Common Stock, dated March 30, 2021 (incorporated by reference to Exhibit 10.6.1 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 4.5 | Warrant to Purchase Common Stock, dated March 30, 2021 (incorporated by reference to Exhibit 10.6.2 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 4.6 | Description of the Company's securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (incorporated by reference to Exhibit 4.6 to Humacyte, Inc.'s Annual Report on Form 10-K filed with the SEC on March 29, 2022). |
| 10.1 | Open Market Sale Agreement, dated September 1, 2022, by and between Humacyte, Inc. and Jefferies LLC, (incorporated by reference to Exhibit 1.2 to Humacyte, Inc.'s Registration Statement on Form S-3 (File No. 333-267225), filed with the SEC on September 1, 2022). |
| 10.2 | Loan and Security Agreement, dated March 30, 2021, by and among Silicon Valley Bank, SVB Innovation Credit Fund VIII, L.P. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.2.1 | First Amendment to Loan and Security Agreement, dated June 30, 2021, by and among Silicon Valley Bank, SVB Innovation Credit Fund VIII, L.P. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6.1 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on July 23, 2021). |
| 10.2.2 | Second Amendment to Loan and Security Agreement, dated as of September 17, 2021, by and among Humacyte, Inc., Humacyte Global, Inc., Silicon Valley Bank and SVB Innovation Credit Fund VIII, L.P. (incorporated by reference to Exhibit 10.2.2 to Humacyte, Inc.'s Registration Statement on Form S–1, filed with the SEC on September 17, 2021). |
| 10.3^ | Distribution Agreement, dated June 25, 2018, by and between Fresenius Medical Care Holdings, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.3.1^ | First Amendment to Distribution Agreement, dated October 2, 2019, by and between Fresenius Medical Care Holdings, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |

| Exhibit No. | Description |
| --- | --- |
| 10.3.2^ | Second Amendment to Distribution Agreement, effective as of February 16, 2021, by and between Fresenius Medical Care Holdings, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.6.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.4^ | Exclusive License Agreement, dated February 25, 2014, by and between Yale University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.8 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.5^ | Exclusive License Agreement, dated August 13, 2019, by and between Yale University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.9 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.6^ | Exclusive License Agreement, dated August 25, 2019, by and between Yale University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.7^ | Exclusive Patent License Agreement, dated March 14, 2006, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.7.1^ | First Amendment to Exclusive Patent License Agreement, dated February 25, 2011, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.7.2^ | Second Amendment to Exclusive Patent License Agreement, dated April 24, 2014, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.7.3^ | Third Amendment to Exclusive Patent License Agreement, dated June 26, 2015, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.7.4^ | Fourth Amendment to Exclusive Patent License Agreement, dated January 2, 2018, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.7.5^ | Fifth Amendment to Exclusive Patent License Agreement, dated December 31, 2019, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.10.5 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.7.6^ | Sixth Amendment to Exclusive Patent License Agreement, dated January 10, 2022, between Duke University and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.7.6 to Humacyte, Inc.'s Annual Report on Form 10-K filed with the SEC on March 29, 2022). |
| 10.8^ | Supply Agreement, dated January 9, 2014, between SeraCare Life Sciences, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.11 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.1^ | First Amendment to Supply Agreement, dated October 12, 2018, between SeraCare Life Sciences, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.11.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.8.2^ * | Second Amendment to Supply Agreement, dated March 24, 2021, between SeraCare Life Sciences, Inc. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.12.2 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.9^ * | Supply Agreement, dated June 1, 2020, between Confluent Medical Technologies and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.13 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on June 14, 2021). |
| 10.10+* | Executive Employment Agreement, dated February 3, 2021, between Laura Niklason, M.D., Ph.D. and Humacyte Global, Inc. (incorporated by reference to Exhibit 10.13 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.11+! | Executive Employment Agreement, dated May 18, 2021, between Dale Sander and Humacyte, Inc. |
| 10.12+! | Executive Employment Agreement, effective as of April 4, 2022 between Shamik Parikh, MD and Humacyte, Inc. |
| 10.13+ | Humacyte, Inc. 2021 Long–Term Incentive Plan (incorporated by reference to Exhibit 10.4 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 10.13.1+ | Form of Stock Option Agreement under Humacyte, Inc. 2021 Long–Term Incentive Plan (incorporated by reference to Exhibit 10.4.1 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 10.14+ | Humacyte, Inc. 2021 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.5 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |

| Exhibit No. | Description |
| --- | --- |
| 10.15+ | Humacyte, Inc. Annual Bonus Plan (incorporated by reference to Exhibit 10.8 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 10.16+ | Humacyte, Inc. 2005 Stock Option Plan (incorporated by reference to Exhibit 10.18 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.16.1+ | First Amendment of Humacyte, Inc. 2005 Stock Option Plan, dated March 31, 2008 (incorporated by reference to Exhibit 10.18.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.16.2+ | Second Amendment of Humacyte, Inc. 2005 Stock Option Plan, dated October 28, 2011 (incorporated by reference to Exhibit 10.18.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.16.3+ | Third Amendment of Humacyte, Inc. 2005 Stock Option Plan, dated November 22, 2013 (incorporated by reference to Exhibit 10.18.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.16.4+ | Form of Incentive Stock Option Agreement under Humacyte, Inc. 2005 Stock Option Plan (incorporated by reference to Exhibit 10.18.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.16.5+ | Form of Nonqualified Stock Option Agreement under Humacyte, Inc. 2005 Stock Option Plan (incorporated by reference to Exhibit 10.18.5 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17+ | Humacyte, Inc. 2015 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.19 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.1+ | First Amendment to Humacyte, Inc. 2015 Omnibus Incentive Plan, dated February 23, 2018 (incorporated by reference to Exhibit 10.19.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.2+ | Second Amendment to Humacyte, Inc. 2015 Omnibus Incentive Plan, dated June 6, 2018 (incorporated by reference to Exhibit 10.19.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.3+ | Form of Incentive Stock Option Agreement under Humacyte, Inc. 2015 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.19.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.17.4+ | Form of Nonqualified Stock Option Agreement under Humacyte, Inc. 2015 Omnibus Incentive Plan (incorporated by reference to Exhibit 10.19.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.18+ | Form of Indemnity Agreement by and between Humacyte, Inc. and each of its directors and executive officers (incorporated by reference to Exhibit 10.23 to Humacyte, Inc.'s Registration Statement on S–4/A, filed with the SEC on July 1, 2021). |
| 10.19 | Lease Agreement, dated December 31, 2015, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.19.1 | First Amendment to Lease, dated September 30, 2016, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.1 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.19.2 | Second Amendment to Lease, dated February 8, 2017, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.2 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.19.3 | Third Amendment to Lease, dated April 21, 2017, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.3 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 10.19.4 | Fourth Amendment to Lease, dated October 31, 2017, between ARE–NC Region No. 5, LLC and Humacyte, Inc. (incorporated by reference to Exhibit 10.22.4 to Humacyte, Inc.'s Registration Statement on S–4, filed with the SEC on March 23, 2021). |
| 21.1 | Subsidiaries of the Registrant (incorporated by reference to Exhibit 21.1 to Humacyte, Inc.'s Current Report on Form 8–K, filed with the SEC on August 27, 2021). |
| 23.1! | Consent of PricewaterhouseCoopers LLP. |
| 31.1! | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2! | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |

| Exhibit No. | Description |
|---|---|
| 32.1! | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2! | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101! | The following materials from Humacyte, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2022, formatted in Inline XBRL (Inline eXtensible Business Reporting Language): (i) Consolidated Balance Sheets as of December 31, 2022 and 2021, (ii) Consolidated Statements of Operations and Comprehensive Loss for the years ended December 31, 2022 and 2021, (iii) Consolidated Statements of Changes in Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit) for the years ended December 31, 2022 and 2021, (iv) Consolidated Statements of Cash Flows for the years ended December 31, 2022 and 2021, and (v) Notes to Consolidated Financial Statements. |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101). |

! Filed herewith.

* Annexes, schedules and exhibits have been omitted pursuant to Item 601(b)(2) of Regulation S-K. The registrant agrees to furnish supplementally a copy of any omitted attachment to the Securities and Exchange Commission on a confidential basis upon request.

^ Certain confidential information contained in this exhibit, market by brackets, has been omitted because the information (i) is not material and (ii) is the type of information the company both customarily and actually treats as private or confidential.

+ Management contract or compensatory plan or arrangement.

**Item 16. Form 10-K Summary.**

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Act of 1934, as amended, the registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

**HUMACYTE, INC.**

By: /s/ Laura E. Niklason
Name: Laura E. Niklason, M.D., Ph.D.
Title: President and Chief Executive Officer

Date: March 24, 2023

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this Annual Report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

| Name | Position | Date |
|---|---|---|
| /s/ Laura E. Niklason<br>Laura E. Niklason, M.D., Ph.D. | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 24, 2023 |
| /s/ Dale A. Sander<br>Dale A. Sander | Chief Financial Officer, Chief Corporate Development Officer and Treasurer<br>(Principal Financial and Accounting Officer) | March 24, 2023 |
| Kathleen Sebelius | Director | March 24, 2023 |
| Gordon M. Binder | Director | March 24, 2023 |
| Emery N. Brown, M.D., Ph.D. | Director | March 24, 2023 |
| /s/ Michael T. Constantino<br>Michael T. Constantino | Director | March 24, 2023 |
| /s/ Brady W. Dougan<br>Brady W. Dougan | Director | March 24, 2023 |
| /s/ C. Bruce Green<br>C. Bruce Green, M.D. | Director | March 24, 2023 |
| /s/ Todd M. Pope<br>Todd M. Pope | Director | March 24, 2023 |
| /s/ Diane Seimetz<br>Diane Seimetz, Ph.D. | Director | March 24, 2023 |
| /s/ Rajiv Shukla<br>Rajiv Shukla | Director | March 24, 2023 |
| /s/ Max Wallace<br>Max Wallace, J.D. | Director | March 24, 2023 |
| /s/ Susan Windham-Bannister<br>Susan Windham-Bannister, Ph.D. | Director | March 24, 2023 |

# EXHIBIT 10

SEC Form 4

# FORM 4

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

1. Name and Address of Reporting Person*
Niklason Laura E
(Last) (First) (Middle)
2525 EAST NORTH CAROLINA HIGHWAY 54
(Street)
DURHAM NC 27713
(City) (State) (Zip)

2. Issuer Name **and** Ticker or Trading Symbol
Humacyte, Inc. [ HUMA ]

3. Date of Earliest Transaction (Month/Day/Year)
08/17/2023

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer
(Check all applicable)
X Director
10% Owner
X Officer (give title below)
Other (specify below)
President, CEO and Director

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

Rule 10b5-1(c) Transaction Indication

☐ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |
| Common Stock | 08/17/2023 | | S | | 570,174[(1)] | D | $3.68[(2)] | 9,420,562 | I | By Ayabudge LLC |
| Common Stock | 08/18/2023 | | S | | 626,979[(1)] | D | $3.57[(3)] | 8,793,583 | I | By Ayabudge LLC |
| Common Stock | 08/21/2023 | | S | | 602,443[(1)] | D | $3.39[(4)] | 8,191,140 | I | By Ayabudge LLC |
| Common Stock | | | | | | | | 1,270,240 | D | |
| Common Stock | | | | | | | | 510,161 | I | By spouse |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |

**Explanation of Responses:**

1. The sales were made by Ayabudge LLC, an entity controlled by Brady W. Dougan. The transactions enabled Mr. Dougan to pay down leverage while providing a mechanism for investors to acquire shares of the Issuer at a time that the Issuer was not conducting a financing transaction and was not making any additional shares available for purchase. Dr. Niklason is treated as indirectly beneficially owning the shares sold, resulting in the requirement to file this Form 4. However, no shares directly beneficially owned by Dr. Niklason were sold in these transactions.

2. The price is a weighted average price. The shares were sold in multiple transactions at per share prices ranging from $3.50 to $4.13. The Reporting Person undertakes to provide upon request to the SEC staff, or any stockholder of the Issuer, full information regarding the number of shares sold at each separate price within the range set forth in this footnote.

3. The price is a weighted average price. The shares were sold in multiple transactions at per share prices ranging from $3.50 to $3.75. The Reporting Person undertakes to provide upon request to the SEC staff, or any stockholder of the Issuer, full information regarding the number of shares sold at each separate price within the range set forth in this footnote.

4. The price is a weighted average price. The shares were sold in multiple transactions at per share prices ranging from $3.22 to $3.80. The Reporting Person undertakes to provide upon request to the SEC staff, or any stockholder of the Issuer, full information regarding the number of shares sold at each separate price

within the range set forth in this footnote.

**Remarks:**

| | |
|---|---|
| /s/ Laura E. Niklason by Dale A. Sander as Attorney-in-Fact | 08/21/2023 |
| ** Signature of Reporting Person | Date |

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 11

SEC Form 4

# FORM 4

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934 or Section 30(h) of the Investment Company Act of 1940

1. Name and Address of Reporting Person*
Prichard Heather Ledbetter

(Last) (First) (Middle)
2525 EAST NORTH CAROLINA HIGHWAY 54

(Street)
DURHAM NC 27713

(City) (State) (Zip)

2. Issuer Name **and** Ticker or Trading Symbol
Humacyte, Inc. [ HUMA ]

3. Date of Earliest Transaction (Month/Day/Year)
12/08/2022

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)
Director
10% Owner
X Officer (give title below)
Other (specify below)
Chief Operating Officer

6. Individual or Joint/Group Filing (Check Applicable Line)
X Form filed by One Reporting Person
Form filed by More than One Reporting Person

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Options (right to buy) | $3.07 | 12/08/2022 | | A | | 136,000 | | (1) | 12/08/2032 | Common Stock | 136,000 | $0 | 136,000 | D | |

**Explanation of Responses:**

1. The first 25% of the option becomes exercisable on December 8, 2023, after which 1/48 of the option will become exercisable on the 8th of each month through December 8, 2026.

**Remarks:**

/s/ Heather Ledbetter Prichard by Dale A. Sander as Attorney-in-Fact 12/12/2022

** Signature of Reporting Person Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

# EXHIBIT 12

SEC Form 4

# FORM 4

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

☐ Check this box if no longer subject to Section 16. Form 4 or Form 5 obligations may continue. *See* Instruction 1(b).

## STATEMENT OF CHANGES IN BENEFICIAL OWNERSHIP

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0287 |
| Estimated average burden hours per response: | 0.5 |

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

1. Name and Address of Reporting Person*

Prichard Heather Ledbetter

(Last) (First) (Middle)

2525 EAST NORTH CAROLINA HIGHWAY 54

(Street)

DURHAM NC 27713

(City) (State) (Zip)

2. Issuer Name **and** Ticker or Trading Symbol

Humacyte, Inc. [ HUMA ]

3. Date of Earliest Transaction (Month/Day/Year)

12/19/2024

4. If Amendment, Date of Original Filed (Month/Day/Year)

5. Relationship of Reporting Person(s) to Issuer (Check all applicable)

Director

10% Owner

X Officer (give title below)

Other (specify below)

Chief Operating Officer

6. Individual or Joint/Group Filing (Check Applicable Line)

X Form filed by One Reporting Person

Form filed by More than One Reporting Person

Rule 10b5-1(c) Transaction Indication

☐ Check this box to indicate that a transaction was made pursuant to a contract, instruction or written plan that is intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). See Instruction 10.

### Table I - Non-Derivative Securities Acquired, Disposed of, or Beneficially Owned

| 1. Title of Security (Instr. 3) | 2. Transaction Date (Month/Day/Year) | 2A. Deemed Execution Date, if any (Month/Day/Year) | 3. Transaction Code (Instr. 8) | | 4. Securities Acquired (A) or Disposed Of (D) (Instr. 3, 4 and 5) | | | 5. Amount of Securities Beneficially Owned Following Reported Transaction(s) (Instr. 3 and 4) | 6. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 7. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Code | V | Amount | (A) or (D) | Price | | | |

### Table II - Derivative Securities Acquired, Disposed of, or Beneficially Owned (e.g., puts, calls, warrants, options, convertible securities)

| 1. Title of Derivative Security (Instr. 3) | 2. Conversion or Exercise Price of Derivative Security | 3. Transaction Date (Month/Day/Year) | 3A. Deemed Execution Date, if any (Month/Day/Year) | 4. Transaction Code (Instr. 8) | | 5. Number of Derivative Securities Acquired (A) or Disposed of (D) (Instr. 3, 4 and 5) | | 6. Date Exercisable and Expiration Date (Month/Day/Year) | | 7. Title and Amount of Securities Underlying Derivative Security (Instr. 3 and 4) | | 8. Price of Derivative Security (Instr. 5) | 9. Number of derivative Securities Beneficially Owned Following Reported Transaction(s) (Instr. 4) | 10. Ownership Form: Direct (D) or Indirect (I) (Instr. 4) | 11. Nature of Indirect Beneficial Ownership (Instr. 4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Code | V | (A) | (D) | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | | |
| Stock Options (right to buy) | $10.28 | 12/19/2024 | | A | | 525 | | 12/19/2024[(1)] | 12/14/2030 | Common Stock | 525 | $0 | 2,625 | D | |

**Explanation of Responses:**

1. On December 14, 2020, Humacyte granted options to purchase 2,625 shares of common stock, which vested as follows: (i) one-fifth on the first anniversary of the vesting commencement date, (ii) two-fifths in equal installments over a period of 24 months commencing on the first anniversary of the vesting commencement date, (iii) one-fifth upon the submission of a Biologics License Application ("BLA") to the FDA and (iv) one-fifth upon FDA approval of one of Humacyte's product candidates. Humacyte previously reported three-fifths of the option grant on a Form 4 filed on August 27, 2021 and one-fifth of the option grant on a Form 4 filed on December 12, 2023. On December 19, 2024, Humacyte received FDA approval for its acellular tissue engineered vessel product candidate for an indication in vascular trauma. Accordingly, columns 5 and 7 of Table II report the number of securities equal to the final one-fifth of the 12/14/2020 option grant.

**Remarks:**

/s/ Heather Ledbetter Prichard by Dale A. Sander as Attorney-in-Fact — 12/20/2024

** Signature of Reporting Person — Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.

* If the form is filed by more than one reporting person, *see* Instruction 4 (b)(v).

** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).

Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.

**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**