# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE HUMACYTE, INC. SECURITIES LITIGATION | Case No.  1:24-cv-00954-TDS-JEP <br><br> <u>CLASS ACTION</u> |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **ORAL ARGUMENT REQUESTED** |

**TABLE OF CONTENTS**

Page

I.  PRELIMINARY STATEMENT ...................................................................................... 1

II.  BACKGROUND .............................................................................................................. 4

    A.  Procedural History ............................................................................................. 4

    B.  FAC's Allegations ............................................................................................. 4

        1.  Humacyte's Operations & Key Financing Arrangements ........................................................................ 4

        2.  HAV Product & BLA Submission ...................................................... 4

        3.  Defendants' Three-Prong Fraud ......................................................... 5

        4.  Concealed Negative Facts & Risks ..................................................... 7

        5.  Defendants Acted With Scienter ....................................................... 10

        6.  The Truth Began To Emerge .............................................................. 13

III.  APPLICABLE PLEADING STANDARDS ................................................................. 14

IV.  THE FAC SUFFICIENTLY PLEADS FALSITY .................................................... 16

    A.  The Product Safety Fraud ................................................................................. 16

        1.  Defendants Concealed Or Downplayed Safety Risks ...................... 16

        2.  Defendants Misled About The Trials ................................................ 18

        3.  Defendants Misled About The FDA Delay ...................................... 22

        4.  Defendants Misled About Quality Control ...................................... 22

    B.  The Facility Fraud ............................................................................................ 23

    C.  The Liquidity Fraud .......................................................................................... 26

V.  THE FAC SUFFICIENTLY PLEADS DEFENDANTS' SCIENTER ................. 29

    A.  Defendants Overstate The Pleading Burden ................................................. 29

B. The FAC Sufficiently Pleads Motive & Opportunity ................................ 30

    1. The Individual Defendants' Actions ................................................. 30

        a. Class Period Transactions Strongly Support Scienter .................................................................................. 30

        b. Defendants' Challenges Fail ................................................. 32

    2. Humacyte's Offerings ........................................................................ 34

C. The FAC Sufficiently Pleads Knowledge Or Recklessness ........................ 34

D. The FAC's Other Allegations Support Scienter .......................................... 38

E. Defendants' Competing Inferences Are Not More Compelling .................. 39

VI. THE FAC'S §20(A) CLAIM SHOULD BE UPHELD ......................................... 41

VII. CONCLUSION .......................................................................................................... 41

**Page(s)**

**Cases**

*Aramic LLC v. Revance Therapeutics, Inc.*,
    2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) ............................................................ 24

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
    496 F. Supp. 3d 952 (E.D. Va. 2020) ...................................................................... 39

*Christiansen v. Spectrum Pharms., Inc.*,
    2024 WL 246020 (S.D.N.Y. Jan. 23, 2024) ............................................................ 36

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l
    Gen. Holdings Corp.*,
    2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ............................................................ 33

*Cozzarelli v. Inspire Pharms, Inc.*,
    549 F.3d 618 (4th Cir. 2008) ........................................................................ 32, 34, 39

*Emps.' Ret. Sys. of City of Baton Rouge & Parish of E. Baton Rouge v. Macrogenics,
    Inc.*, 61 F.4th 369 (4th Cir. 2023) ....................................................... 17, 19, 25, 26, 28

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016) .......................................................................... 39

*George v. China Auto. Sys., Inc.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................................................... 33

*Hillson Partners Ltd. P'ship v. Adage, Inc.*,
    42 F.3d 204 (4th Cir. 1994) ...................................................................................... 25

*Hirtenstein v. Cempra, Inc.*,
    348 F. Supp. 3d 530 (M.D.N.C. 2018) ......................................................... 18, 25, 39

*In re Alstom SA Sec. Litig.*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 38

*In re Constellation Energy Grp. Sec. Litig.*,
    738 F. Supp. 2d 614 (D. Md. 2010) .......................................................................... 28

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023) ...................................................................... 33

Case 1:24-cv-00954-TDS-JEP    Document 42    Filed 09/25/25    Page 4 of 54

*In re Emergent BioSolutions Inc. Sec. Litig.*,
 2023 WL 5671608 (D. Md. Sept. 1, 2023) ................................................. 14, 30, 31, 37

*In re Genworth Fin. Inc. Sec. Litig.*,
 103 F. Supp. 3d 759 (E.D. Va. 2015) ............................................................ 21, 34, 38

*In re Genzyme Corp. Sec. Lit.*,
 754 F.3d 31 (1st Cir. 2014) .................................................................................. 24, 40

*In re James River Grp. Holdings Sec. Litig.*,
 2023 WL 5538218 (E.D. Va. Aug. 28, 2023) ............................................................ 28

*In re Lehman Bros. Sec. & ERISA Litig.*,
 799 F. Supp. 2d 258 (S.D.N.Y. 2011) ....................................................................... 28

*In re MicroStrategy, Inc. Sec. Litig.*,
 115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................ 30, 31, 38

*In re Novan, Inc. Sec. Litig.*,
 2018 WL 6732990 (M.D.N.C. Nov. 30, 2018) (Peake, J.) .................................... 19, 24

*In re Oxford Health Plans, Inc.*,
 187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................... 32

*In re PTC Therapeutics, Inc. Sec. Litig.*,
 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ............................................................... 17

*In re Red Hat, Inc. Sec. Litig.*,
 2006 WL 8563014 (E.D.N.C. May 12, 2006) ............................................................ 32

*In re SunEdison, Inc. Sec. Litig.*,
 300 F. Supp. 3d 444 (S.D.N.Y. 2018) ....................................................................... 28

*In re Triangle Cap. Corp. Sec. Litig.*,
 988 F.3d 743 (4th Cir. 2021) ............................................................................. 30, 36

*In re Under Armour Sec. Litig.*,
 540 F. Supp. 3d 513 (D. Md. 2021) ..................................................................... 14, 19

*In re Viropharma Inc. Sec. Litig.*,
 21 F. Supp. 3d 458 (E.D. Pa. 2014) .......................................................................... 18

Case 1:24-cv-00954-TDS-JEP    Document 42    Filed 09/25/25    Page 5 of 54

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
 19 F.4th 601 (4th Cir. 2021) ................................................................................ 30, 31

*Kiken v. Lumber Liquidators Holdings, Inc.*,
 155 F. Supp. 3d 593 (E.D. Va. 2015) ........................................................................ 15

*Latham v. Matthews*,
 662 F. Supp. 2d 441 (D.S.C. 2009)............................................................................ 38

*Luo v. Spectrum Pharms., Inc.*,
 2024 WL 4443323 (D. Nev. Oct. 7, 2024) ................................................................. 24

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
 876 F.3d 541 (4th Cir. 2017) ..................................................................................... 29

*Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*,
 576 F.3d 172 (4th Cir. 2009) ..................................................................................... 29

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011)...................................................................................... 15, 22, 41

*Moseley v. Branker*,
 550 F.3d 312 (4th Cir. 2008) ..................................................................................... 11

*Ollila v. Babcock & Wilson Enters.*,
 2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ...................................................... 22, 29, 36

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015)....................................................... 18, 24, 25, 26, 27, 28

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
 353 F.3d 338 (4th Cir. 2003) ............................................................................... 29, 30

*Pardi v. Tricida, Inc.*,
 2022 WL 3018144 (N.D. Cal. July 29, 2022)............................................................. 35

*Plymouth Cnty. Ret. Ass'n v. Primo Water Corp.*,
 966 F. Supp. 2d 525 (M.D.N.C. 2013) ...................................................................... 25

*Raab v. Gen. Physics Corp.*,
 4 F.3d 286 (4th Cir. 1993) ......................................................................................... 24

*Republican Party of N.C. v. Martin*,
 980 F.2d 943 (4th Cir. 1992) ..................................................................................... 14

Case 1:24-cv-00954-TDS-JEP   Document 42   Filed 09/25/25   Page 6 of 54

*Schaeffer v. Nabriva Therapeutics plc*,
2020 WL 7701463 (S.D.N.Y. Apr. 28, 2020) ............................................................... 24

*Scott v. Family Dollar Stores, Inc.*,
733 F.3d 105 (4th Cir. 2013) ...................................................................................... 41

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ........................................... 14, 18, 21, 22, 23, 24, 27, 28

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022) ................................................ 21, 22, 23, 24, 37, 38

*Svezzese v. Duratek, Inc.*,
67 F. App'x 169 (4th Cir. 2003) .................................................................................. 39

*Tchrs.' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ........................................................................... 14, 33, 37

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*,
2025 WL 416872 (E.D.N.Y. Feb. 6, 2025) ................................................................... 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ........................................................................................ 15, 29, 41

*Wikimedia Found. v. NSA*,
857 F.3d 193 (4th Cir. 2017) ........................................................................... 14, 20, 29

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ..................................................................................... 25

*Yates v. Mun. Mortg. & Equity, LLC*,
744 F.3d 874 (4th Cir. 2014) ........................................................................... 33, 37, 39

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ........................................... 15, 19, 20, 23, 29, 34, 41

## Statutes

15 U.S.C. §78u–5 ....................................................................................................... 25

15 U.S.C. §78u-4(b)(1) ............................................................................................... 14

Food, Drug, and Cosmetic Act ...................................................................................... 5

Private Securities Litigation Reform Act of 1995 .......................................... 1, 25, 28, 29

Case 1:24-cv-00954-TDS-JEP    Document 42    Filed 09/25/25    Page 7 of 54

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 14

L.R. 7.3(c)(1) ................................................................................................................ 41

SEC Rule 10b5-1 ............................................................................... 3, 31, 34, 40

# INDEX OF DEFINED TERMS

| Term | Meaning | FAC ¶ |
|---|---|---|
| 12/19/2024 Press Release | Humacyte's December 19, 2024 Press Release | ¶124 |
| 2023 10-K | Humacyte's Form 10-K for the fiscal year ended December 31, 2023 | ¶114 |
| 3/24/2025 *NYT* Article | March 24, 2025 New York Times Article | ¶50 |
| ATEV | Acellular Tissue Engineered Vessel, a/k/a Human Acellular Vessel, a/k/a Symvess™ | ¶3 |
| BDS | Bioreactor Disposal Set | ¶64 |
| BLA | Biologics License Application | ¶4 |
| CAPA | Corrective and Preventive Action | ¶41 |
| CEO | Chief Executive Officer | N/A |
| CFO | Chief Financial Officer | N/A |
| Class Period | August 14, 2023 through March 25, 2025 | ¶2 |
| Clinical Review Memo | FDA's December 18, 2024 Clinical Review Memorandum | ¶77 |
| CMO | Chief Medical Officer | ¶36 |
| Code of Conduct | Humacyte's Code of Conduct and Ethics | ¶195 |
| COO | Chief Operating Officer | ¶19 |
| CQO | Chief Quality Officer | ¶36 |
| CW | Confidential Witness | N/A |
| Defendants | Humacyte, Inc., Laura E. Niklason, Heather Prichard, and Dale A. Sander | ¶2 |
| DOD | U.S. Department of Defense | ¶24 |
| Durham Facility | Humacyte's Durham, NC facility | ¶4(b) |
| FAC | First Amended Class Action Complaint for Violations of the Federal Securities Laws, Dkt. 37 (May 22, 2025) | N/A |
| FDA | U.S. Food and Drug Administration | ¶3 |
| GMP | Good Manufacturing Practices | ¶27 |

| GTP | Good Tissue Practices | ¶28 |
|---|---|---|
| HAV | Human Acellular Vessel, a/k/a Acellular Tissue Engineered Vessel, a/k/a Symvess™ | ¶3 |
| Humacyte | Humacyte, Inc. | ¶16 |
| LCM Summary | Late-Cycle Meeting Summary | ¶65 |
| Lead Plaintiffs | Frederick Foote, Matthew Cognetti, and Damion Hopwood | ¶15 |
| LP Agreements | The September 24, 2024 Purchase Agreement and Registration Rights Agreement attached as Exhibits 10.1 and 10.2 to Humacyte's September 24, 2024 Form 8-K | ¶152 |
| Niklason | Dr. Laura E. Niklason, Humacyte President and Chief Executive Officer | ¶17 |
| *NYT* | New York Times | ¶9(a) |
| Oberland | Oberland Management LLC | ¶30 |
| Oberland Funding Agreement | The Revenue Interest Purchase Agreement with three affiliates of Oberland Management LLC | ¶30 |
| PDUFA | "Prescription Drug User Fee Act" | ¶115 |
| Prichard | Heather Prichard, Humacyte Chief Operating Officer | ¶19 |
| PSLRA | Private Securities Litigation Reform Act of 1995 | N/A |
| RMAT | Regenerative Medicine Advanced Therapy | ¶23 |
| SAE | Serious Adverse Event | ¶97 |
| Sander | Dale A. Sander, Humacyte Chief Financial Officer | ¶18 |
| SEC | U.S. Securities and Exchange Commission | N/A |
| SOX | Sarbanes-Oxley | N/A |
| Statistical Review Memo | FDA's Statistical Review | ¶69 |

*** FAC¶ column lists the FAC paragraph where the term was first defined.

Lead Plaintiffs hereby respectfully oppose Defendants' motion to dismiss (ECF 40) ("Motion") their Corrected First Amended Complaint (ECF 37) ("FAC").[1]

## I.  PRELIMINARY STATEMENT

The FAC is Lead Plaintiffs' first pleading, after their and Lead Counsel's appointment under the PSLRA and an extensive investigation into still-unfolding facts aided by consultation with an FDA expert and interviews with former Humacyte employees.  It is comprehensive, well-organized, pled with particularity, and legally sufficient under applicable standards.

Perhaps that is why Defendants open their dismissal motion by attacking a ***different*** pleading by a ***different*** litigant, the "Initial Complaint" by "Plaintiff," *i.e.*, Plaintiff James Cutshall, who initiated this lawsuit represented by ***different*** counsel.  Lead Plaintiffs need not answer for the timing or contents of Mr. Cutshall's complaint – which Defendants hyperbolically call a "conspiracy theory" – except to note that his complaint did not "collapse" and Lead Plaintiffs did not "reinvent their case" by fulfilling their court-appointed, statutory role.

During the Class Period, Humacyte was a one-trick pony in every sense – the HAV was its only near-commercial product, the Durham Facility its only manufacturing facility, and capital raises its only funding source.  Defendants bet the company, and their

---

[1]  Herein, "Memo" means Defendants' memorandum (ECF 41), "¶" are FAC-numbered paragraphs, "Ex." are Defendants' exhibits, all terms have FAC-assigned definitions (summarized in Index, *supra*), all emphasis is added, and all internal citations and quotation marks are omitted.

-1-

considerable equity stakes, both on the FDA approving the HAV and on the financial markets maintaining funding appetite in light of the HAV's approval prospects and timing.

In this context, the FAC pleads a coherent, three-pronged fraud.

First, Defendants misleadingly portrayed the HAV as being safer and their two HAV studies as being more successful than the data warranted. They disclaimed any "unexpected safety signals" despite the HAV's higher-than-disclosed propensity for catastrophic failures. They touted the V005 and V017 trials as demonstrating near-perfect 30-day patency, limb salvage, and survival, when, in reality,, they had counted deaths and amputations as "successes" and wrongly modified trial methodologies mid-trial, thereby increasing bias, decreasing reliability, and prompting FDA recalculations that showed less-impressive results. They downplayed FDA's delaying its closely-watched response (a/k/a PDUFA) deadline, omitting that FDA had serious safety and statistical concerns, conveyed to Defendants, and considered convening an Advisory Committee.

Second, they misrepresented the Durham Facility's readiness to safely manufacture the HAV at scale and an FDA inspection as "very successful." In reality, CWs detailed serious quality, oversight, and manufacturing problems causing high levels of batch failures, known to Defendants, and FDA's inspection yielded a Form 483 indicating possible statutory non-compliance and issues requiring remediation.

Third, they repeatedly claimed that after earlier fundraising, Humacyte had sufficient cash and cash equivalents on hand to fund operations, including clinical trials, for 12 months. They concealed that Humacyte had a limited cash runway, as Niklason

-2-

discussed at internal company-wide meetings, and depended on additional contingent funding accessible only upon meeting HAV milestones on anticipated timelines. When FDA delayed its decision beyond the PDUFA date, Humacyte immediately accessed the capital markets multiple times, at below-market pricing and disadvantageous dilution for its investors.

As nonpublic, negative information mounted, Defendants unloaded Humacyte shares at fraud-inflated prices. Niklason's sales (80%+ of her holdings) netted $38.8 million, Prichard's sales (100% of her holdings) netted $1.2 million, and Sanders netted $162,000 – all from transactions outside a Rule 10b5-1 trading plan. Humacyte raised $135.1 million, most of it after the PDUFA delay. These transactions were facially suspicious, timed shortly after key nonpublic events like FDA's inspection or its Late-Cycle Meeting with Humacyte leadership or shortly before alleged corrective disclosures – as illustrated on the accompanying Appendix A.

A series of partial corrective disclosures and events incrementally revealed the fraud, removing artificial inflation from Humacyte's stock. Among them, investigative reporting revealed serious misgivings and infighting within FDA over the HAV's ultimate approval, which was for a significantly narrowed indication and came with its most serious black box warning. By then, Defendants had self-enriched, while Humacyte's investors suffered serious losses. This lawsuit is their chance to recoup.

## II. BACKGROUND

### A. Procedural History

Plaintiff Cutshall filed the initial complaint (ECF 1) November 18, 2024, triggering the PSLRA's lead plaintiff process. After the motion deadline, Lead Plaintiffs filed a stipulation seeking their and Lead Counsel's appointment (ECF 17) on January 24, 2025, which was so-ordered on January 31, 2025 (ECF 21).

After their own investigation, Lead Plaintiffs filed their first pleading, the FAC on June 6, 2025. On July 25, 2025, Defendants moved to dismiss (ECFs 40, 41).

### B. FAC's Allegations

#### 1. Humacyte's Operations & Key Financing Arrangements

Defendant Niklason co-founded Humacyte to develop and manufacture implantable, bioengineered human tissues. ¶21. On August 26, 2021, Humacyte became publicly-traded by a "de-SPAC" transaction, raising $247.4 million. ¶¶25, 29. On May 12, 2023, it secured the Oberland Funding Agreement, raising ~$40 million with another $110 million contingent on timely meeting HAV milestones. ¶30.

Humacyte was controlled by Defendants Niklason (CEO), Sander (CFO), and Prichard (COO), along with its CMO and CQO . ¶¶35-36. This team was based at Humacyte's Durham Facility (¶¶35, 39, 179) where they met with FDA (¶¶65, 168).

#### 2. HAV Product & BLA Submission

The HAV, Humacyte's sole product, is an engineered, implantable blood vessel for various patients with injured or damaged blood vessels (¶¶3, 21), considered a biological product subject to FDA regulation (¶27). Humacyte pursued FDA approval and

-4-

commercialization for vascular trauma, its lead indication, as well as vascular access for hemodialysis and peripheral arterial disease. ¶¶21, 23. The HAV's name evolved to ATEV, then Symvess™. ¶3.

Humacyte submitted a BLA for the HAV in vascular trauma on December 12, 2023. ¶¶27-28, 32. FDA accepted it for filing on February 9, 2024, granted Priority Review, and gave an August 10, 2024 PDUFA date for FDA to respond. ¶¶32, 34. Humacyte's BLA was supported by results from the V005 (trauma patients) and V017 (Ukraine casualties) clinical trials. ¶33(a). FDA inspected Humacyte's Durham Facility in April 2024 to confirm GMP and GTP compliance and provided a Form 483 listing inspection observations and deficiencies. ¶45.[2] On August 9, 2024, Humacyte announced FDA needed more time to complete its review. ¶¶7, 147.

### 3. Defendants' Three-Prong Fraud

During the Class Period, Defendants allegedly perpetrated a three-pronged fraud (¶¶4(a)-(c)).

Product Safety Fraud (¶¶103-125). Defendants touted the HAV's efficacy while downplaying and/or omitting known, dire safety concerns, and touted positive V005 and V017 trial results, while concealing inherent flaws in Humacyte's statistical analysis. ¶103. For instance, they said "[t]here were no unexpected safety signals for the HAV in the V005 and V017 studies," despite catastrophic risk of anastomotic failure (*i.e.*, surgical seal

---

[2] Per the cited FDA FAQs, a Form 483 informs company management "when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food, Drug, and Cosmetic Act and related Acts."

failure) and graft rupture (*i.e.*, transplanted tissue failure). ¶¶110(e), 125(a). They claimed "the HAV had higher rates of patency, and lower rates of amputation and infection, compared to historic synthetic graft benchmarks," but, unbeknownst to investors, compared against inappropriate benchmarks to which FDA never agreed. ¶¶105, 108(a), 110(a), 111(a), 112, 113(a), 113(b), 115, 125(d). They touted positive V017 trial safety results, including 30-day "patency (presence of blood flow) of 95%," "limb salvage of 100%," and "survival of 100%," with "zero cases of [HAV] infection," but counted patients lacking 30-day follow up (including deaths) as successes and concealed the trial's retrospective and observational nature. ¶¶104(a), 125(b), 125(f).[3] Contrary to Memo at 9-10, Defendants *misled* investors by attributing FDA's PDUFA delay to timing issues and FDA's purported "apology." In reality, FDA's dire, nonpublic safety and statistical concerns caused the delay and prompted FDA to tell Defendants it was considering an Advisory Committee. ¶¶118, 125(g).

Facility Fraud (¶¶126-137). Defendants misrepresented the Durham Facility's readiness to safely manufacture the HAV, its quality assurance and oversight for FDA approval, and FDA inspection results. ¶126. For instance, saying "[t]he HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities," while the facility experienced quality oversight and manufacturing problems with then-existing

---

[3]     Defendants quote a reviewer comment explaining FDA's agreement to a while-on-treatment strategy only if intercurrent events can be "confidently determined to be unrelated to the ATEV" (Memo at 6 (quoting Ex. 4)), while omitting that FDA's review found "inconsistent and/or inadequate methods to ascertain patency status in different patients."

production levels, preventing Humacyte from safely manufacturing HAVs at scale. ¶¶128, 129, 137. Post-FDA inspection, they said "we completed our pre-license inspection of our manufacturing facility and had a very successful outcome," despite FDA identifying serious quality assurance and oversight issues requiring correction. ¶¶133(b), 137.

Liquidity Fraud (¶¶138-143). Defendants misrepresented whether Humacyte had sufficient cash and cash equivalents to fund operations. ¶138. For instance, they repeatedly said, with minor modification, Humacyte "believes its cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the issuance date of these interim financial statements" and "its cash and cash equivalents will be adequate to finance operations...well past the currently anticipated timelines for FDA approval of commercialization of the HAV in the vascular trauma indication." ¶¶139(a)-(c) (August 14, 2023); ¶¶140(a)-(c) (November 9, 2023); ¶¶141(a)-(c) (March 28, 2024); ¶¶142(a)-(c) (May 13, 2024). But Humacyte could not fund operations and trials without raising capital at steep discounts and/or meeting Oberland's HAV benchmarks on Humacyte's anticipated timetable. ¶143.

### 4. Concealed Negative Facts & Risks

During the fraud, investors were unaware of extensive negative facts and risks.

(1) CWs 1-5 revealed quality control, manufacturing, and liquidity problems. ¶¶39-43. Humacyte had problems, contributing to low HAV yields, with BDS trays, gas exchangers, and tracking. ¶¶40(c), 40(d), 41(a). Manufacturing issues were so severe

Case 1:24-cv-00954-TDS-JEP    Document 42    Filed 09/25/25    Page 17 of 54

CW3 sent FDA a memo warning that Humacyte was unsure if batches were stable or viable, and Humacyte did not know why problems persisted. ¶40(e). Despite problems in late 2023, Humacyte did not replace or update equipment before FDA's inspection. ¶41(b). Humacyte's maintenance software system was inadequate and GMP noncompliant. ¶¶43(a)-(b). Humacyte misclassified GMP maintenance delays as "extensions" not "deviations," and senior managers instructed CW2 to close out uncompleted work orders, which was falsifying documents and forbidden in a GMP environment. ¶¶43(e), (g)-(h). Humacyte's quality assurance team had high turnover and was down a microbiology quality assurance overseer in April 2024. ¶¶41(c), 42(c). Microbial contamination testing happened only once monthly. ¶41(d). Humacyte's Class Period HAV yields were low – only 25%-40% of vessels passed quality inspection, with the rest scrapped. ¶41(e). Many vessels, up to half of each batch, failed suture testing. ¶41(f). Humacyte also struggled with liquidity, affecting performance and delaying preventative maintenance and calibration on equipment, outside GMP compliance. ¶¶41(h), 43(d).

(2) FDA's Form 483, released October 17, 2024, revealed glaring issues at the Durham Facility. FDA found no microbial assurance, no microbial testing, and inadequate quality oversight for several issues. ¶¶44-45. It found out-of-specification investigations open more than 100 days, with one open 710 days. ¶45.

(3) FDA's BLA approval letter had significant requirements and approved a far narrower indication – only "when urgent revascularization is needed to avoid imminent limb loss, and autologous vein graft is not feasible" – than Humacyte sought. ¶¶47-48.

FDA quietly posted a later series of documents – including the LCM Summary, Statistical Review Memo, and Clinical Review Memo – discussing serious problems (¶¶63-88), *inter alia*: (i) critical manufacturing issues still under FDA scrutiny in May 2024 (¶66); (ii) incomplete or inadequate studies, analyses, and plans (¶¶66(a)-(e)); (iii) insufficient long-term follow-up V005 trial data (¶67(a)); (iv) FDA considering a boxed warning for rupture risk in May 2024 (¶67(b)); (v) the V005 trial's lacking scientific rigor, with mid-trial changes to methodology and benchmarks (¶70(a)); (vi) FDA's internal efficacy analysis due to Humacyte's poor data quality (¶70(a)); (vii) FDA considered the retrospective and observational V017 trial biased and of limited value (¶70(b)); (viii) FDA's data showed worse primary patency, secondary patency, infection, and limb salvage results than those reported and against Humacyte's benchmarks (¶¶71, 80(a)-(d)); (ix) FDA's communications with Humacyte over statistical concerns were years-long (¶75); (x) the V005 trial was not adequate or well-controlled, with missing data (¶79(a)); (xi) 9.9% of V005 trial patients experienced graft failures and "major post implantation bleeding," from rupture and/or anastomotic failure (¶83); (xii) serious rupture risk warranted a boxed warning (¶83(a)); (xiii) long-term efficacy and safety data were not well-characterized (¶84); and (xiv) FDA reviewer Dr. Lee had concerns about the HAV's risk profile and its catastrophic failure mode (¶85).[4]

> (4) *NYT* and *Bloomberg* investigative reporting, published March 24-25, 2025,

---

[4] While Dr. Lee's dissent was public (Memo at 12 (citing Ex. 4)), the approval pressures he faced while urging an Advisory Committee were not. ¶¶57, 60, 158-159.

spotlighted FDA's issues, adding analysis and reporting that more fully revealed FDA's safety and statistical concerns. ¶¶50, 56. The *NYT* revealed, *e.g.*: (i) Humacyte's trial methodology improperly counted deaths and amputations as successes (¶51); (ii) FDA applied standard assessment criteria to Humacyte's data and recalculated a lower. 67%, HAV success rate (¶52);[5] (iii) Dr. Lee's case review showed an alarming risk of unpredictable, catastrophic, life-threatening ruptures or blowouts (¶53); and (iv) he unsuccessfully sought a public advisory hearing (¶55). *Bloomberg* revealed: (i) FDA reviewers were pressured to approve the BLA over safety concerns and disagreement among reviewers (¶¶57, 59) and (iv) Dr. Lee shared concerns with senior FDA leadership in July-August 2024 (¶¶60-61).

### 5. Defendants Acted With Scienter

The FAC holistically pleads Defendants' scienter. ¶¶164-200.

Although Defendants claimed ignorance of the PDUFA delay's reasons, Niklason, later admitted FDA had informed Humacyte that, at minimum, it was considering an Advisory Committee of outside experts and Humacyte "did not object to this" – establishing knowledge, which the FAC pleads preceded August 9, 2024 based on Dr. Lee's statements. ¶¶165-166.

The LCM Summary, released post-approval, demonstrated that Defendants knew by

---

[5] Defendants' Memo at 12 (citing Ex. 4) self-servingly claims FDA's *standard* approach was "conservative" and misleadingly suggests "both studies," independently, demonstrated HAV benefit, when their source said it was "[b]ased on [the] findings from both studies" viewed together.

-10-

no later than May 10-20, 2024 – "Late-Cycle Meeting Materials" were provided May 10, 2024 and the Late-Cycle Meeting occurred on May 20, 2024 – about FDA's safety and trial methodology concerns, and that FDA was considering a black-box warning. ¶¶167-170. The Statistical Review Memo showed Humacyte's proposed trials were regularly rejected by FDA over methodological concerns, Humacyte derived performance benchmarks mid-trials, and Humacyte and FDA communicated starting in 2016. ¶¶75, 173; Ex. 3 at 9-13. Humacyte's FDA access was extensive, given the HAV's pre-BLA RMAT and priority review designations. ¶175.

Lead Plaintiffs consulted Todd Clark to assess Humacyte's BLA and Defendants' knowledge based on these FDA documents.[6] He opined: (i) Defendants knew of deep flaws in Humacyte's clinical trials and data integrity, because the multiple mid-trial changes to study design, population, primary endpoints, and sample size violated standard clinical trial principles and introduced bias (¶91);[7] (ii) Humacyte made data design and analysis decisions FDA considers generally unacceptable, contrary to FDA recommendations (¶¶94-96); (iii) the V005 trial protocol mandated disclosure of SAEs – including deaths, ruptures, and anastomotic failures – to Humacyte within 24 hours (¶97); and (iv)

---

[6] Defendants fail to challenge the FAC's expert allegations (¶¶89-92, 100, 135(c), 125(g), 176) and waive the argument. *Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008) ("As a general rule, arguments...raised for the first time in reply, are deemed waived.").

[7] Contrary to Memo at 7, 17 (citing Ex. 5), Humacyte only revealed susceptibility to "bias" because the studies were open-label, not because of mid-trial methodology changes. Ex. 5 at 59. Claiming data could have "varying interpretations" does not reveal the trial problems' *extent* and does not speak to *methodology*. Memo at 7, Ex. 5 at 59.

Humacyte's regular conferring with FDA gave advanced notice of problems (¶¶98-100).[8]

The FAC alleges Defendants' motive and opportunity to commit fraud, based on suspicious Humacyte securities transactions. ¶¶185-187; Appendix A. Niklason netted $38,804,277.82 in ill-gotten gains from suspicious sales of 8,259,852 shares of fraud-inflated Humacyte stock (80.47% of holdings) during the Class Period, mostly done via an entity, Ayabudge LLC, she co-owns with her husband, Humacyte Chairman Brady Dougan. ¶¶185(a), 187(a). Her sales were 29.81% higher than during the pre-Class Period and 33.5 times her total compensation. *Id.* She also suspiciously transferred 1,148,240 shares to a family trust on April 19, 2024, shielding them from SEC sale disclosure rules just two weeks after FDA's inspection and days after receiving the Form 483. ¶¶185(a), 186. Prichard sold all her 191,511 shares for $1,212,061.31 in net proceeds, selling fully out just 10 days after the Late-Cycle Meeting. ¶¶185(b), 186, 187(b). Sander sold 39,389 shares, netting $162,282.68 in proceeds. ¶¶185(c), 187(c). Humacyte also netted ~$135.1 million from offerings / capital raises, with the ability to raise $47.5 million more. ¶¶188-189. The stock sales and capital raises were suspiciously timed. ¶186; *see also* Appendix A (showing overlap of sales, capital raises, misstatements, key events).

Scienter is also pled based on: (i) the core operations doctrine (¶¶190-192); (ii) Defendants' signing, being quoted in, and/or SOX certifying the misstatements (¶¶193-194); (iii) Code of Conduct violations (¶¶195-197); and (iv) suspicious insider resignations (¶¶198-200).

---

[8] Mr. Clark's allegations include undisclosed facts and risks. ¶¶89-100.

### 6. The Truth Began To Emerge

The fraud was incrementally revealed by a series of partial corrective disclosures resulting in stock price drops that removed fraud inflation. ¶¶7-10; 144-163.

Problems with the Durham Facility and the HAV were revealed: (i) when Humacyte disclosed FDA needed more BLA review time, causing a 16.37% stock price drop August 12, 2024 (¶¶147-149); (ii) when FDA released the Form 483 identifying Durham Facility problems, causing a 16.35% stock price drop October 17, 2024 (¶¶154-155); and (iii) when the *NYT* and *Bloomberg* revealed that although FDA approved the BLA, reviewers had dire concerns about mid-graft ruptures and found the V005 and V017 trials "severely lacking," causing a 13.40% stock price drop March 25, 2025 (¶¶158-160).

Other revelations corrected the Liquidity Fraud, including Humacyte's announcing: (i) a $40.2 million underwritten public offering of new shares at a 31%+ discount below prevailing prices, causing a 25.52% stock drop February 29, 2024 (¶¶145-146); (ii) available cash and cash equivalents could no longer fund operations, because Humacyte could not imminently draw $40 million under the Oberland Funding Agreement, causing a 9.62% stock drop August 14, 2024 (¶¶150-151); (iii) the LP Agreements, allowing $50 million in new shares to be sold at a discount, causing a 10.87% stock drop September 24, 2024 (¶¶152-153); (iv) a $15 million registered direct offering of stock and warrants, causing a 9.36% stock drop November 14, 2024 (¶¶156-157); and (v) a $50 million underwritten public offering of new shares at a 30% discount below prevailing prices, causing a 30.43% stock drop March 26, 2025 (¶¶161-162).

These stock drops inflicted significant losses on investors.  ¶163.

## III.　　APPLICABLE PLEADING STANDARDS

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  A court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4th Cir. 2017).  Of the elements of a §10(b) claim, Defendants only challenge materially false or misleading statements (a/k/a falsity) (Memo at 14-28) and scienter (*id.* at 28-38). They waive argument regarding the rest.  *See* n.6, *supra*.[9]

For falsity, plaintiffs must "specify each statement alleged to have been misleading, and the reason or reasons why the statement is misleading." *Singer v. Reali*, 883 F.3d 425, 439 (4th Cir. 2018).  Allegations that a statement was untrue *or* omitted material fact(s) necessary so it was not misleading under the circumstances suffice.  *In re Under Armour Sec. Litig.*, 540 F. Supp. 3d 513, 521 (D. Md. 2021) (citing 15 U.S.C. §78u-4(b)(1)).  When a plaintiff alleges "*sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this 'misrepresentation' element." *Tchrs.' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174

---

[9]　　Defendants' "scattershot" critique (Memo at 14) fails.  The FAC sufficiently links specific, bolded, italicized misstatements to organized explanations of falsity, in each fraud. ¶¶125(a)-(h), 137, 143(a)-(e).  *See, e.g.*, *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *12 (D. Md. Sept. 1, 2023).

(4th Cir. 2007) ("*Hunter*") (emphases original). "As a general rule, the trier of fact decides whether a public statement is misleading," and a plaintiff need not "prove the falsity of the alleged misrepresentations at the pleading stage." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601 (E.D. Va. 2015).

For scienter, the FAC must allege Defendants' misstatements and omissions "present[ed] a danger of misleading" investors that was either known to Defendants or "so obvious" that they "must have been aware of it." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015). A complaint must plead sufficient facts "giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* "[A]ccept[ing] all factual allegations in the complaint as true," "[t]he inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-323 (2007) (emphasis original). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Scienter is adequately pled if, reviewing "all the allegations holistically," "a reasonable person would deem the inference…cogent and at least **as compelling** as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38, 48 (2011) (quoting *Tellabs*, 551 U.S. at 324, 326). "After comparing the 'malicious and innocent inferences cognizable from the facts pled,' a complaint will not be dismissed so long as the 'malicious inference is at least as compelling as any opposing innocent inference.'" *Zak*, 780 F.3d at

606. Unless Defendants' inference is *more* compelling, their motion must be denied.

## IV. THE FAC SUFFICIENTLY PLEADS FALSITY

### A. The Product Safety Fraud

#### 1. Defendants Concealed Or Downplayed Safety Risks

Defendants reported HAV safety and efficacy data, while allegedly concealing and downplaying grave safety risks, misleading the market by: (i) improperly using a "while-on-treatment" approach to trial participants with no 30-day follow up, which wrongly counted dead and amputated patients as successes, resulting in an elevated "success" rate (¶52); (ii) reporting primary patency, secondary patency, infection rate, and limb salvage rates inflated against the FDA's independent assessment (¶71); and (iii) hiding that ~10% of trial participants suffered rupture or anastomotic failure (¶83). Defendants' misrepresentations and omissions were material. As spotlighted by the *NYT* and *Bloomberg* articles, rupture and anastomotic failure risks were "unpredictable, catastrophic and life-threatening." ¶53.

Defendants (Memo at 6-7, 15) claim these risks were disclosed during the Class Period. Not so. Defendants consistently misreported data because Humacyte used the while-on-treatment methodology, tainting its numbers. Humacyte disclosed patient deaths (Ex. 5 at 17-18), but ***underreported ruptures*** (2023 10-K only reports two, *Id.*) and ***did not report anastomotic failure*** (*Id.*). The litany of "common non-fatal [SAEs]" reported for the V005 trial including "thrombosis, anastomotic stenosis, wound infection, hemorrhage shock, and cardiac arrest," (Ex. 5 at 17) are, as Defendants admit, risks associated with

-16-

*existing* arterial-repair treatments. Defendants did not disclose the "unpredictable, catastrophic, and life-threatening" rupture events observed by Dr. Lee, who the 3/24/2025 *NYT* Article quoted as saying, "Plastic arteries, they don't usually present with catastrophic hemorrhage, unexpected like this." ¶158(b). Reporting risk of "thrombosis" or "rupture," does not suffice. The 12/19/2024 Press Release (Ex. 6) is similarly off-topic, quoting Symvess's label that identified rupture and anastomotic failure as risks, but concealing their prevalence and the danger's extent. *Id.*

Defendants also miscast (Memo at 15-16) the FAC as complaining they "interpreted data differently" than FDA reviewers. To the contrary, it alleges Defendants reported data ***out-of-synch with routine FDA's standards***, wrongly accepting some patients as successes, which suggested greater HAV safety than reality – adverse facts known to them when making public statements about that data. ¶¶63-88, 93-96. The dispute is not between reasonable or unreasonable *interpretations* of data – the data disclosed was *itself* false and unfounded, unlike *Emps.' Ret. Sys. of City of Baton Rouge & Parish of E. Baton Rouge v. Macrogenics, Inc.*, 61 F.4th 369, 385 (4th Cir. 2023) ("*Employees'*"), where defendants gave a positive verbal spin to data that looked worse when graphed, and plaintiffs argued a duty to disclose the graph itself.

Defendants are also wrong (Memo at 16) that the alleged misstatements are opinions – they reported misleading data, *i.e.*, actionable statements of *fact*. *In re PTC Therapeutics, Inc. Sec. Litig.*, 2017 WL 3705801 at *14 (D.N.J. Aug. 28, 2017) (actionable statement where defendants "omitted facts, including the extent to which it was relying on post-hoc

statistical analysis, which made PTC's disclosure misleading"); *In re Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 468-70 (E.D. Pa. 2014) (statement that new labeling information derived from controlled clinical data sufficed where defendants omitted that FDA told them study was not adequate and well-controlled).[10] Even assuming, *arguendo*, their statements expressed opinions, they would still be actionable, given the lack of a credible basis. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) ("[A] reasonable investor may…understand an opinion statement to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.")

The FAC need not plead entirely false representations of fact, because *misleading* statements and omissions suffice. *Singer*, 883 F.3d at 440 ("disclosure of material information is required 'when necessary to make statements made, in the light of circumstances under which they were made, not misleading'"). Here, Defendants' statements about trial results were, at minimum, materially misleading.

### 2. Defendants Misled About The Trials

Defendants' argument (Memo at 16-17) that the FAC's claims boil down to differences in "scientific judgment" fails. Defendants allegedly misled investors by

---

[10] Defendants' case, *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 543, 556 (M.D.N.C. 2018), concerned generalized statements like "We are very pleased with the safety of this as well as the efficacy" properly considered opinions. The FAC challenges the factual presentation of percentage results, not spin.

employing the FDA-disfavored while-on-treatment statistical approach, despite FDA's communicating its concerns both before the trials began and at the Late-Cycle Meeting. ¶¶95, 125(b), 173-76. Lead Plaintiffs do not second-guess the design; they challenge Defendants' misrepresentation of *data* generated by the trials (however designed). Thus, *Employees'*, where plaintiffs challenged "general positivity and enthusiasm" about interim results, 61 F.4th at 388, is inapposite. Here, the data reported, not the spin, is the problem.

Once Defendants chose to report V005 and V017 trial results, they had a duty to make that disclosure not misleading, by explaining that the results were generated with the while-on-treatment approach. Concealment distinguishes *In re Novan, Inc. Sec. Litig.*, 2018 WL 6732990, at *10-11 (M.D.N.C. Nov. 30, 2018) (Peake, J.), where the Court found defendants, having *disclosed* there was FDA feedback, had no obligation to disclose details. This case is closer to *Zak*, 780 F.3d at 597, where defendants represented that FDA had agreed the company could submit a new drug application without new studies, despite FDA's "continuing expectation" that additional data was required. Whether Defendants "worked with the FDA on various trial-design issues" (Memo at 17) does not matter. Defendants' failure to faithfully report the trial-generated data raises claims.[11]

Defendants' argument (Memo at 18 n.3) that the FAC lacks facts demonstrating that their statements that FDA agreed to the literature and meta-analysis were *false* also fails. First, *misleading* statements are actionable, even if not false. *Under Armour*, 540 F. Supp.

---

[11] The FAC alleges Defendants' separate failure to disclose catastrophic rupture and anastomotic failure events during the trials (¶125(a)), of which Defendants had near real-time awareness (¶97), as separately raising claims.

-19-

Case 1:24-cv-00954-TDS-JEP    Document 42    Filed 09/25/25    Page 29 of 54

3d at 521.  <u>Second</u>, Niklason more broadly claimed FDA pre-agreed to "the *structure* of the literature review and the meta-analysis."  <u>Third</u>, the FAC pleads FDA's Statistical Review Memo findings that "In a well-controlled study, the performance benchmark should be chosen prior to trial initiation" but for Humacyte's trials, "the performance benchmarks based on literature review were derived while this open label trial was ongoing" and "finalized when all the primary and key secondary efficacy endpoints in the original submission were known."  ¶70(a).  Mr. Clark found this practice "violates clinical trial principles and introduces bias."  ¶93.  These allegations suffice now, when the FAC's well-pleaded facts are accepted as true and construed in the light most favorable to Lead Plaintiffs.  *Wikimedia*, 857 F.3d at 208.

Defendants incorrectly contend (Memo at 18) the FAC "cherry-picks" negative details.  Notwithstanding FDA's ultimate approval, Defendants allegedly misled investors by miscasting trial results (¶¶105-106, 110, 114) while omitting FDA's rupture, anastomotic failure, and methodology concerns (¶¶83, 86, 93-100, 103, 110, 114, 125).  They highlighted 30-day patency and limb salvage rates (¶¶33, 71, 95, 104-18, 123-24), but defined "success" to include dead or amputated patients—an approach FDA deemed biased (¶¶70-71, 79-80, 84, 87).  Cherry-picking favorable trial data while concealing weaknesses constitutes securities fraud.  *Zak*, 780 F.3d at 609–10 (where defendants "affirmatively elected" to speak, they failed to "disclose critical information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete").

-20-

Defendants' fallback—that FDA approval renders claims immaterial—fails. The FAC alleges Defendants knew of "deep flaws" in trial data. ¶¶93-100. Approval came with a Black Box warning—the most serious safety label—about rupture and sudden failure. ¶¶5, 67, 99, 125, 167. The delayed PDUFA date jeopardized Humacyte's liquidity. ¶¶30-31, 143, 150. Eventual approval does not retroactively validate misstatements. *See Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 520 (D. Md. 2022) (failure to disclose contamination issues causing delays constituted material omissions, even after FDA granted emergency use authorization for vaccine six months earlier).

Defendants wrongly claim (Memo at 7, 17) that boilerplate 10-K disclosures about potential "bias" and "limitations" immunize their trial-related statements. Generic warnings cannot shield misleading omissions where undisclosed facts alter the risk picture. *Singer*, 883 F.3d at 442 (general warnings deemed insufficient). The cited warnings were ineffective because they were generic, static, and untied to specific statements. *See* Ex. 5 at 59.[12] The warnings predated FDA's 2024 identification of ruptures and methodological flaws (¶¶93-100, 115-19, 123-24), yet were repeated without update. *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 781 (E.D. Va. 2015) (falsity alleged where defendants repeated earlier disclosures based on "old data not reflective of current reality"). They

---

[12] Defendants miscast the cited warnings (Memo at 7 (quoting Ex.5)), *e.g.*: (i) "subject to various limitations" referred to open-label clinical trials generally, not Humacyte's methodology; (ii) the "primary patency" warning was not presented as disclosing any "limitation" and appeared in a paragraph beginning "the V005 trial met its objectives"; (iii) "we may experience difficulties in agreeing with FDA" also referred to open-label trials generally.

also omitted that FDA reviewers already flagged data integrity issues. ¶¶93-100. *See, e.g.*, *Ollila v. Babcock & Wilson Enters.*, 2018 WL 792069, at \*5 (W.D.N.C. Feb. 8, 2018) (cautionary language meaningless if warning of materialized risks).

### 3. Defendants Misled About The FDA Delay

Defendants incorrectly argue the FAC fails to plead falsity regarding the PDUFA delay, and their admission that they "said nothing about the FDA's reasons" for the delay proves Lead Plaintiffs' point. Memo at 19. Once Defendants spoke publicly about the delay, they had a duty not to mislead investors. *Singer*, 883 F.3d at 440 (citing *Matrixx*, 563 U.S. at 44).

The FAC alleges that Defendants portrayed the delay as benign (¶¶118-22), but concealed that FDA had already raised concerns with Defendants. ¶¶ 50-100. On August 9 and November 8, 2024, Defendants claimed surprise and suggested the issues related to "post-marketing" or "labeling," despite knowing better. ¶¶118-122. Defendants wrongly claim the FAC lacks factual allegations about the delay. It cites FDA documents and expert analysis showing that rupture risk, statistical bias, and trial flaws prompted the delay (¶¶44–100). These allegations show that Defendants knew the true reason when they misleadingly assured investors Humacyte was "on track." By doing so, Defendants misled investors. *Sinnathurai*, 645 F. Supp. 3d at 520 (falsity where statement "left out another important factor in the [FDA approval] delay").

### 4. Defendants Misled About Quality Control

Defendants challenge the FAC's falsity allegations regarding quality control

because FDA ultimately found Humacyte could "yield SYMVESS with consistent quality attributes," and Humacyte's 2023 10-K warned of risks.  Memo at 19–20.  Not so.

First, quality control was embedded in Defendants' broader assurances about readiness and approvability, *e.g.*, their claims of "consistent durability" (¶114) and being "on track" with the BLA approval (¶¶4(b), 115-116), having "completed an inspection" (¶117(b)), and discussing "post-marketing and labeling" with FDA (¶¶119, 121).  However, Humacyte internally faced significant quality failures, contradicting these claims.  ¶125(h).  By touting manufacturing readiness while omitting known deficiencies, Defendants misled investors.  *Zak*, 780 F.3d at 609.

Second, FDA's Form 483 documented "no microbial quality assurance" and "inadequate" oversight at the Durham Facility (¶¶41, 45)—then-*present* deficiencies, not hypothetical risks.  *Singer*, 883 F.3d at 442.  The FAC plausibly alleges Defendants concealed known issues while reassuring investors; FDA approval in December 2024 does not erase earlier misrepresentations.  *Sinnathurai*, 645 F. Supp. 3d at 520.

Finally, Defendants' cited disclosures, untied to specific alleged misstatements, merely warned manufacturing "is complex" and subject to product loss.  Memo at 20.  Such boilerplate is insufficient where concrete problems were known.  *Singer*, 883 F.3d at 442.

**B.    The Facility Fraud**

Defendants' arguments challenging the Facility Fraud (Memo at 20-25) lack merit.

First, contrary to Memo at 20-21, the FAC does not allege only "fraud by hindsight" to attack pre-inspection statements about the Durham Facility's readiness.  On March 22,

-23-

2024, Niklason assured investors the facility was "in great shape" (¶130), but CWs confirmed that Defendants knew microbial quality and oversight were already deficient, *before* the Form 483 was issued (¶¶37–43, 137), making Defendants' authorities (*Raab*, *Aramic*, and *Luo*) distinguishable and inapposite. Couching statements as beliefs or opinions does not save them. Opinion statements are actionable if the speaker lacks reasonable basis or omits material facts necessary to make them not misleading. *Omnicare*, 575 U.S. at 188–89.

Second, the Form 483 undisputedly outlined Durham Facility problems, making the challenged post-inspection misstatements ("we have *no indication* that we're not on track…"), at minimum, misleading. Memo at 21–22. Defendants wrongly contend otherwise, claiming no standalone duty to disclose the Form 483. The FAC does not allege this duty, thus Defendants' authorities (*Schaeffer* and *Novan*) are inapplicable. Instead, the FAC alleges that once Defendants characterized the inspection as "very successful," and stated they had "no indication" they were off track (¶133), they had to disclose the Form 483's findings of microbial quality assurance and oversight failures (¶45). *Singer*, 883 F.3d at 440. *In re Genzyme Corp. Sec. Lit.*, 754 F.3d 31, 41 (1st Cir. 2014) is distinguishable because, whereas those defendants delayed disclosure while "generally tout[ing] positive projections," Defendants here reassured investors while concealing then-present deficiencies. Again, eventual FDA approval does not cure these misstatements. *Sinnathurai*, 645 F. Supp. 3d at 520.

Third, Defendants' challenges (Memo at 22-23) to pre- and post-inspection

statements (*e.g.*, "on track" and "in good shape") as inactionable opinions fail. The FAC challenges factual assurances about readiness and approvability. *E.g.*, ¶129 ("The HAV can be produced at commercial scale in Humacyte's existing manufacturing facilities…."). These opinions were actionable because they were contradicted by known facts. *Omnicare*, 575 U.S. at 188–89. Defendants' authorities, *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 214 (4th Cir. 1994) and *Hirtenstein*, 348 F. Supp. 3d at 557, addressed vague optimism, in the absence of contrary facts. Here, the FAC adequately alleges Defendants' professed "beliefs" were neither genuinely nor reasonably held (¶137). *Employees'*, 61 F.4th at 383.

Fourth, Defendants invoke the PSLRA safe harbor (Memo at 23–24) but, as they concede, to qualify, statements must be more than simply forward-looking, they must be identified as such and paired with meaningful cautionary language or plaintiffs must fail to plead actual knowledge. 15 U.S.C. §78u–5; *see also Employees'*, 61 F.4th at 389. Neither condition is met (¶201). The FAC alleges Defendants' actual knowledge both before the Form 483 (established by CWs) and after, that microbial quality assurance and oversight were deficient. ¶¶45, 137. Defendants cite just four disclosures (Memo at 24), addressing regulatory delays, not underlying failures preventing safe manufacturing. Lead Plaintiffs allege at least *seven other* misstatements (¶¶127–29, 132, 134–36), and Defendants cite no incorporation by reference of warnings made elsewhere. Thus, Defendants' authorities (*Wochos* and *Plymouth Cnty.*) are inapposite, as they involved forward-looking projections *tethered* to warnings, unlike the present-tense assurances untethered to meaningful

-25-

accompanying warnings here.

Last, Defendants' challenge (Memo at 24-25) to misstatements about Humacyte's readiness to produce HAVs at commercial scale (*e.g.,* ¶128) fail. The FAC pleads specific facts establishing falsity: (i) CW2 described delayed or misclassified maintenance, poor documentation, and improper work order closures (¶43); (ii) CW3 said few HAVs met quality standards and contamination repeatedly spoiled batches (¶40); (iii) CW4 described equipment failures, poor vessel inspection passage rates (25–40%), inability to install new equipment pre-inspection, no quality assurance microbiologist, and infrequent contamination testing (¶41); and (iv) CW5 reported extensive FDA document requests post-inspection (¶42). These alleged facts undermine Defendants' assurances of scalable production. ¶137. Again, Defendants' opinion and safe harbor arguments (Memo at 25 & n.4) fail. *Employees'*, 61 F.4th at 389; *Omnicare*, 575 U.S. at 188–89.

### C. The Liquidity Fraud

Defendants' three Liquidity Fraud challenges (Memo at 25-28) fail.

First, Defendants misled about whether Humacyte had sufficient cash and cash equivalents to fund operations. ¶138. Humacyte's 10-Ks defined "cash equivalents" as including short-term, highly liquid investments. ¶138; *see also* Ex. 5 at 114. This definition **excludes** Oberland contingent funding. ¶138. Defendants' liquidity misstatements typically *excluded* the Oberland funding, *e.g.*, ¶139(c) ("We believe our cash and cash equivalents on hand will be sufficient to fund operations, including clinical trial expenses and capital expenditure requirements, for at least 12 months from the date of this

Quarterly Report."). *See also* ¶¶140(c); 141(a)-(c), 142(a)-(c).

The *one* early statement Defendants cite (Memo at 26) referencing Oberland (¶139(b)) said funding was adequate "past the anticipated timelines for approval and commercialization of the HAV in vascular trauma" as of August 14, 2023 – a different, longer time period than the 12-month statements. Moreover, Humacyte's $43 million offering and $20 million draw in March 2024 reset liquidity sufficiency expectations. ¶¶141(a), 143(b). That Defendants disclosed the milestone-dependent Oberland terms is immaterial –Defendants misled investors about *needing* Oberland funding *on Humacyte's expected timeline* set thereby. ¶143(c).

Second, Defendants' argument (Memo at 26-27) that Humacyte's capital raises do not render 12-month liquidity statements "false" fails. *Misleading* statements are also actionable. *Singer*, 883 F.3d at 440. The frequency and speed post-PDUFA delay (three in rapid succession), amounts raised (~$200 million), and heavy pricing discounts and dilution effects (¶143(a)-(d)) all evidence the fundraising was not merely "prudent." Negative stock price reaction to the offerings supports Lead Plaintiffs' case. ¶¶145-46, 152-53, 156-57, 161-62. There was no "reasonable basis" to believe cash and cash equivalents sufficed without the Oberland funding being accessed as anticipated / hoped. Immediately after the PDUFA delay, which delayed the next funding milestone, Humacyte first revealed cash and cash equivalents were ***insufficient*** and issued a ***going concern*** warning on August 13, 2024. ¶150.

Again, couching misstatements as opinions does not protect them. *Omnicare*, 575

U.S. at 176. Liquidity misstatements discussed cash and cash equivalents *on hand* – a then-present fact (¶¶139-42). Humacyte's contemporaneous, undisclosed *dependence* upon *contingent*, milestone-dependent cash made those statements, opinion or not, misleading under *Omnicare* (¶143). *In re James River Grp. Holdings Sec. Litig.*, 2023 WL 5538218, at *8 (E.D. Va. Aug. 28, 2023) (alleged under-reserving "cannot be squared" with opinions, about then-current facts, that reserves were reasonable and adequate).[13] Similarly, the PSLRA safe harbor is inapplicable (¶201). *Employees'*, 61 F.4th at 389. Even in mixed present / future statements, portions discussing then-present facts fall outside the safe harbor. *In re Constellation Energy Grp. Sec. Litig.*, 738 F. Supp. 2d 614, 626 (D. Md. 2010) Moreover, per the reasons above, the sole warning Defendants cite (Memo at 27; Ex. 5 at 3, 100 ("our liquidity plans are subject to a number of risks and uncertainties")) is generic boilerplate failing to acknowledge actual facts. *Singer*, 883 F.3d at 442.[14]

Finally, Defendants' "liquidity projections" (Memo at 27-28) were misleading because they concealed problems at the Durham Facility, as established by CW statements evidencing related cost-cutting measures, *e.g.*, CW2 explained Humacyte's cash shortfall caused GMP failures downstream. ¶¶43, 143(e). At minimum, these allegations, which must be accepted as true now, support the inference that the post-delay capital raises did not result from "prudent" financial management, but were needed to fund operations.

---

[13] *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 289 (S.D.N.Y. 2011), examined 12-month liquidity statements, but the complaint did not allege the company was relying on contingent funding as "cash and cash equivalents." ¶143.

[14] Defendants' authority (*SunEdison*) concerned misstatements more obviously forward-looking with more extensive warnings, which lacked key omissions alleged here.

*Wikimedia*, 857 F.3d at 208.

**V.      THE FAC SUFFICIENTLY PLEADS DEFENDANTS' SCIENTER**

**A.      Defendants Overstate The Pleading Burden**

"A flexible, case-specific analysis is appropriate in examining scienter pleadings." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 345-46 (4th Cir. 2003).  Alleged misstatements and omissions must "present a danger of misleading" that was "either known to the defendant or so obvious [he] must have been aware of it" and sufficient facts "giving rise to a strong inference that the defendant acted with the required state of mind."  *Zak*, 780 F.3d at 606.  Contrary to Memo at 29, under *Tellabs*, 551 U.S. at 322-23, the Court must review all alleged facts ***holistically***, not scrutinize individual allegations in isolation. *See* §III, *supra*; *Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 187-88 (4th Cir. 2009) (allegations insufficient alone "might complement each other to create an inference of sufficient strength to satisfy the PSLRA").

The FAC's scienter section (¶¶164-200) holistically pleads a strong, cogent, and compelling scienter inference based on extensive alleged *facts* derived from several well-pled sources.  Rather than "stack inference upon inference," it combines factual allegations demonstrating Defendants knew or must have known facts rendering their statements materially false or misleading with others, including their insider transactions and Humacyte's repeated capital raises and offerings, creating a strong inference as to their state of mind.  Holistically, these allegations suffice, even under Defendants' authorities, *Maguire* and *Ollila*.

### B. The FAC Sufficiently Pleads Motive & Opportunity

While motive allegations are not required for a strong scienter inference, *Ottmann*, 353 F.3d at 345-46, sufficiently pleading motive to defraud strengthens any scienter inference drawable from the allegations. *Cf., e.g.*, *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 752 (4th Cir. 2021) (lack of motive diminishes scienter inference's strength). The FAC does so via insider transactions (¶¶185-187) and corporate offerings (¶¶188-189).

### 1. The Individual Defendants' Actions

#### a. Class Period Transactions Strongly Support Scienter

As Defendants concede (Memo at 33), their Humacyte stock transactions can establish scienter if unusual or in timing or amount. *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 643 (E.D. Va. 2000). "To determine if an insider's sales were 'unusual in scope,' courts consider factors like 'the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved.'" *Emergent*, 2023 WL 5671608, at *25 (quoting *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 610 (4th Cir. 2021) (allegations of defendants inflating company's stock and "cashing" out "fairly give defendants a strong motive")).

The FAC alleges (and charts) that: (i) Defendant Niklason sold 8,259,852 Humacyte shares, netting ~$38.8 million, and transferred 1,148,240 shares to a non-reporting family trust; (ii) Defendant Prichard sold 191,511 shares, netting ~$1.2 million; and (iii) Defendant Sander sold 39,389 shares, netting ~$162,000. ¶¶185(a)-(c); §II.B.5., *supra*.

Defendants *did not* use Rule 10b5-1 trading plans, *KBC*, 19 F.4th at 611, the only insider trading permitted by Humacyte's Code of Conduct. ¶196.

These transactions were highly suspicious in timing vis-à-vis the misstatements, corrective disclosures, and key events, thereby capitalizing on fraud-inflated pricing. ¶186; Appendix A. Niklason transferred *1.148 million+* shares to a non-reporting entity she controlled just 10 days after receiving the Form 483. *Id.* Prichard sold her *entire* holdings 10 days after the Late-Cycle Meeting. *Id.* Insider transactions beneficially timed around misstatements, corrective disclosures, or realization of undisclosed facts are suspicious. *MicroStrategy*, 115 F. Supp. 2d at 643-45 (sales within eight days of misstatement suspicious); *Emergent*, 2023 WL 5671608, at *25 (sales shortly after undisclosed destruction of vaccine batches suspicious).

Their transactions were highly suspicious in amount. ¶187. Niklason's ~$38.8 million net proceeds were *29.81%* above the same-length, pre-fraud control period; were *33.5x* her total compensation in 2023 and 2024; and reduced her holdings *80.47%*. ¶187(a). Prichard's ~$1.2 million net proceeds *fully liquidated* her pre-Class-Period position; were *double* her total compensation in 2023 and 2024; and compare suspiciously against a $7,391.36 net trading *loss* over the control period. ¶187(b). Sander's $162,000 net proceeds compare suspiciously against $9,060 net *expenditures* during the control period and were *32.5%* of his salary and *23.5%* of his total compensation in 2023 and 2024. ¶187(c). *MicroStrategy*, 115 F. Supp. 2d at 643-45 (sales representing between 10.3% and 85.6% of six defendants' holdings were suspicious); *KBC*, 19 F.4th at 611 (selling more

stock during class period than prior comparable "control period" strengthens scienter inference); *In re Red Hat, Inc. Sec. Litig.*, 2006 WL 8563014, at *5 (E.D.N.C. May 12, 2006) (stock sales suspicious compared to annual salary).

### b. Defendants' Challenges Fail

**Niklason** (Memo at 33-34). <u>First</u>, Niklason's acquisition of 121,851 shares mostly from below-market options exercises, costing ~$182,000, cannot credibly offset the clear inference from ***$38.8 million*** in net proceeds from selling 8.26 million shares at fraud-inflated prices, lest this Court set the fraudsters playbook – just sprinkle token purchases into your selling spree and no scienter! *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (low price options remain valuable even after stock drops, so sales still support scienter).[15] <u>Second</u>, Niklason's sales through Ayabudge, which she co-owns with her husband, Humacyte Chairman Dougan, strongly support her scienter. ¶185(a). The cited Form 4 showing Dougan's purported control over Ayabudge also states, "Niklason is treated as indirectly beneficially owning the shares sold, resulting in the requirement to file this Form 4" (Ex. 10), documenting the obvious – Ayabudge's net proceeds clearly benefitted her (including if they permitted her husband to pay down leverage by selling at fraud-inflated prices).[16] *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, 2025 WL 416872, at *10-11 (E.D.N.Y. Feb. 6, 2025) (trades by insiders via

---

[15] Niklason's 80%+ reduction in holdings renders Defendants' authority, *Cozzarelli v. Inspire Pharms, Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) inapposite.

[16] The other purported explanation, permitting other investors to buy shares, lacks basis – there is no evidence publicly-traded shares could not meet demand. Regardless, selling to investors at fraud-inflated prices (as Humacyte also did) supports scienter.

holding company supported scienter); *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*10 (S.D.N.Y. Aug. 8, 2012) (sales by defendants' wife supported scienter).[17]   <u>Last</u>, Niklason's transferring ***nearly all*** her directly-held stock (1.148 million shares) to her trust shieled those shares from SEC disclosures, just 10 days after the Form 483 (¶¶186-187) – highly suspicious context absent from Defendants' case (*DraftKings*), where transfer was unaccompanied by any fraud-inflated selling.

**Prichard** (Memo at 35-36).  Prichard did not "retain[] a large equity stake in the form of stock options" – options are not equity.  Prichard's failure to exercise options is not exonerating.[18]  That inaction reflects a *failure* to purchase stock (*i.e.*, failure to acquire equity), and Defendants made no proffer on the option strike prices and whether the options were underwater.  Defendants wrongly claim the FAC only adds that Prichard's sales happened shortly after the Late-Cycle Meeting.  But these were ***all*** of Prichard's Class Period sales (¶185(b)) – the facts alleged show sales ***highly suspicious*** in time and amount. The FDA discussed significant concerns at the meeting, *e.g.*, manufacturing, sterilization, and quality control issues and clinical trial concerns (¶¶66-67), at the alleged fraud's core. ¶¶185(b), 186, 187(b); Appendix A.  Her rapid selloff after receiving serious, negative, nonpublic news distinguishes Defendants' cited authorities, *Hunter* (sellout over 46-month class period) and *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014)

---

[17]   Defendants' case, *City of N. Miami*, involved sales by an insurance company majority owned by extended family "without any individual defendant also selling shares."
[18]   Defendants seek to exonerate Niklason for *exercising* options and Prichard for *not exercising* options.  Memo at 33-35.  Both cross-undermining arguments lack merit.

(sales at unremarkable times, some in Rule 10b5-1 plans, over 44-month class period).

**Sander** (Memo at 36). Hardly an "afterthought," Sanders's transactions were suspicious in timing and amount, *e.g.*, compared to control period trading and his compensation. ¶¶185(c), 187(c); Appendix A.

### 2. Humacyte's Offerings

Humacyte raised funds *five times* during the fraud, at suspicious times – *e.g.*, rapidly after the PDUFA delay – netting $135 million+ in 13 months. ¶188; Appendix A. Contrary to Memo at 37, this fundraising occurred before the fraud was fully corrected. ¶¶144-163, 188. Courts find fundraising at fraud-inflated prices support scienter, without requiring that it predate all alleged corrective disclosures. *Genworth*, 103 F. Supp. 3d at 786 (timing between misstatements and offering supported scienter).[19]

### C. The FAC Sufficiently Pleads Knowledge Or Recklessness

The FAC sufficiently pleads actual knowledge or recklessness. *Zak*, 780 F.3d at 606 ("[a]llegations of reckless conduct can satisfy the level of scienter necessary to survive a motion to dismiss" a §10(b) claim).

**Product Safety Fraud** (Memo at 29-30). Defendants downplay the Product Safety Fraud's scope and allegations. The FAC alleges Humacyte's HAV was far riskier than Defendants portrayed, and their public statements were materially misleading, despite any uncertainty that FDA would consequently impose a delay. Defendants knew about FDA's

---

[19] The FAC alleges Humacyte's capital raises were suspiciously timed, within a broader scienter pleading, not "merely from seeking capital to support a risky venture," as occurred in Defendants' case, *Cozzarelli*, 549 F.3d at 627.

serious concerns with Humacyte's trial methodologies and ignored associated problems. *See* §II.B.4.-5., *supra*. Thus, Defendants knew reported trial data was misleadingly understating the HAV's safety risks and attendant risks of consequences like black box warnings or BLA approval with reduced indication.

Defendants' argument, focused on knowledge that safety concerns caused the PDUFA delay – one corrective disclosure (¶147) in a larger fraud – is overly narrow. It ignores, *inter alia*, FDA's concerns over trial design, long-term follow up, trial benchmarks, trial changes, and the black box warning, indicating FDA's concerns extended beyond timing. ¶¶125(a)-(e). It ignores that FDA expressed those concerns early, and manufacturing quality control problems risking anastomotic failure were apparent. ¶¶125(g)-(h). The FAC alleges it is "highly likely" Defendants knew the PDUFA delay was for external review (¶100) and pleads supporting facts and expert opinion: (i) Dr. Lee's explanations and Mr. Clark's expert analysis (¶125(g)); (ii) Defendants' admissions (¶¶165-166); and (iii) close communications with FDA due to DOD priority review and RMAT designations (¶¶23-24, 175-176). It pleads Defendants' knowledge of safety issues during the clinical trials (¶¶67(b), 83, 86, 97, 99, 173) and that they recklessly disregarded FDA methodology guidance (¶174).

At the Late-Cycle Meeting, FDA raised clinical trial concerns, saying information requests would continue (¶¶168-171), and Humacyte remained engaged with FDA from at least May-August 2024. ¶172. These allegations show Defendants knew of FDA's undisclosed problems, contrary to their statements. *Pardi v. Tricida, Inc.*, 2022 WL

3018144, at *17-*18 (N.D. Cal. July 29, 2022) (scienter where defendants incompletely discussed issues raised at late-cycle meeting); *Christiansen v. Spectrum Pharms., Inc.*, 2024 WL 246020, at *16 (S.D.N.Y. Jan. 23, 2024) (FDA meetings discussing study problem supported scienter).[20]

**Facility Fraud** (Memo at 30-32). Defendants knew Humacyte could not safely manufacture the HAV at scale as of FDA's inspection, which was not "very successful" and resulted in the Form 483 and extensive remedial work. ¶137. CWs establish serious Durham Facility problems (¶¶40-43, 137; §IV.B., *supra*) and Defendants' knowledge thereof or recklessness thereto, *e.g.*: (i) Niklason, Prichard, and Sander had offices at the facility, Humacyte's sole manufacturing location, and Prichard (COO) was there full-time (CW1); (ii) Niklason frequently met with Prichard, who was a key FDA contact and internally discussed specific manufacturing problems and Humacyte's Form 483 response (CW3); (iii) Prichard knew about a CAPA for critical equipment failures, knew equipment was deliberately not installed, and discussed HAV yield rates with the maintenance team (CW4); (iv) Prichard knew Humacyte's maintenance management software led to GMP non-compliance and had "cracks," and Prichard's subordinate senior managers ordered staff to falsify GMP documents after she complained about those "cracks" (CW2); and (v) reports by engineers tracking failure rates circulated to "higher management" (CW4).

---

[20] Defendants' authorities do not counsel otherwise. *Ollila,* 2018 WL 792069, at *3, supports the FAC, finding scienter well-pled despite *lacking* "smoking gun documentation that defendants [] explicitly knew of these issues as they made public statements." *Triangle* had sufficient risk disclosures, absent here (as discussed above), "strengthen[ing] the competing inference of innocence."

¶¶39-43, 137, 177-184.  These allegations support a strong scienter inference.  *Sinnathurai*, 645 F. Supp. 3d at 524 (upholding complaint partly on CW scienter allegations); *Emergent*, 2023 WL 5671608, at *22 (CW allegations "strengthen[ed] the inferences of scienter").

While the FAC's allegations satisfy *Yates*, it is distinguishable because its undisclosed accounting fraud's "practical effect" "was relatively small," 744 F.3d at 889, whereas the FAC alleges a fraud concerning Humacyte's only product and only manufacturing facility.  Direct contact with Individual Defendants is not required – CWs need only be in position to possess the information alleged, *Hunter*, 477 F.3d at 174, something Defendants do not challenge.[21]  Regardless, the FAC ***does*** plead such contact.  For instance, CW3 attended quarterly town hall meetings with Niklason and Sander; attended "Go / No-Go" meetings with Prichard regarding the FDA inspection and critical related issues, and had weekly / bi-weekly, one-on-one, face-to-face meetings with Prichard to prepare for the FDA inspection, discuss operational problems, and provide answers Prichard took into C-suite meetings; CW3 recalled specific meeting dates and topics in June / July 2024.  ¶¶40, 180.  CW4 met with Prichard regarding vessel failure and attended company-wide meetings regarding Humacyte's finances.  ¶¶40, 181.

**Liquidity Fraud** (Memo at 32).  Niklason personally addressed Humacyte's limited cash runway at company-wide meeting attended by "higher management."  ¶181.  CWs generally described clinical trial, product, and facility issues that increased risks to the BLA's approval timeline.  *See* §II.B.4., *supra.*  Upon learning of the PDUFA delay,

---

[21]     Defendants waive argument regarding the CWs' *bona fides*.  *See* n.6, *supra*.

Defendants first disclosed Humacyte *lacked* sufficient cash and cash equivalents to fund 12 months of operations, contradicting prior statements (¶143(b)), then rapidly accessed capital markets three times (¶¶152-153, 156-157, 161-162), demonstrating knowledge or recklessness.[22]

### D. The FAC's Other Allegations Support Scienter

Contrary to Memo at 36–38, these allegations support a strong scienter inference:

**Core Operations** (¶¶190-92). This doctrine strongly supports scienter; the HAV was Humacyte's only commercial product and the Durham Facility its only manufacturing facility. *Sinnathurai*, 645 F. Supp. 3d at 527-28; *Genworth*, 103 F. Supp. 3d at 784.

**SOX Certifications & Related Actions** (¶¶193-94). Defendants signed, were quoted in, and SOX-certified the misstatements. The concealed trial flaws, inspection failures, and quality control issues fell within the controls certified. *See Latham v. Matthews*, 662 F. Supp. 2d 441, 466-67 (D.S.C. 2009) (SOX certifications); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 459 (S.D.N.Y. 2005) (signing SEC filings with misrepresentations). Defendants waived any SOX certification challenges. *See* n.6 *supra*.

**Code of Conduct** (¶¶195-97). Defendants violated Humacyte's Code of Conduct, which required "[f]ull, fair, accurate and timely disclosure" in SEC filings and "public communications," legal and regulatory compliance, and no transactions in Humacyte securities outside of 10b5-1 plans while possessing "material nonpublic information." *MicroStrategy*, 115 F. Supp. 2d at 638 (policy violations).

---

[22] Risk warnings referenced in Memo at 32 were insufficient. *See* §IV.C, *supra*.

**Suspicious Departures** (¶¶198-200; Appendix A). Two board members resigned pre-FDA approval, and Humacyte's CQO departed soon afterward, when problems surfaced publicly. *Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 671 (D.S.C. 2016) (resignation of senior officers); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 496 F. Supp. 3d 952, 967-68 (E.D. Va. 2020) (CFO resignation).

These allegations holistically support a strong scienter inference.[23]

**E.      Defendants' Competing Inferences Are Not More Compelling**

The FAC pleads a cogent, compelling, strong inference of Defendants' scienter. ¶¶164-200; §II.B.5., *supra*.  As competing inferences, Defendants posit:

•        Niklason's ~$182,000 in stock purchases, primarily through below-market option exercises, better evidence intent during the alleged fraud (Memo at 34) than reaping ~$38.8 million through indirect Ayabudge sales and shielding another 1.148 million shares from public disclosure via transfer to a personal trust;

•        Prichard's not exercising some possibly-underwater options better evidences intent (Memo at 35) than netting ~$1.2 million by liquidating her entire Humacyte position shortly after the Late-Cycle Meeting;

•        Sander's intent in selling ~$162,000 in stock is better explained as coming 2.5 weeks after the PDUFA delay announcement (Memo at 36) than as coming 4-6 weeks

---

[23]      Defendants' case, *Yates*, 744 F.3d at 888, found unsuspiciously-timed resignations insufficient and core operations untriggered where the misstatements had small impacts. Their other cases rejected certain allegations, pled ***alone*** – SOX certifications (*Cozzarelli*), post-fraud resignations (*Hirtenstein*), policy violations absent fraudulent intent (*Svezzese*).

before corrective disclosures announcing discounted LP Agreements fundraising and releasing the Form 483;

And in the context of these transactions, all outside Rule 10b5-1 plans…

• Defendants' concealment of the HAV's rupture risks and distortion of clinical trial data equates to "candid disclosure" demonstrating "no desire to mislead the market" (Memo at 30);

• Defendants did not disclose the Form 483 because they believed it would not cause a serious issue or jeopardize the PDUFA date (Memo at 31),[24] when CWs described extensive, serious issues, directly involving Prichard, at Humacyte's sole manufacturing facility where Niklason, Prichard, and Sander had offices;

• Prichard worked innocently and diligently to address issues (Memo at 32), when CWs establish that she expressed dissatisfaction with "cracks" in GMP documentation prompting her deputies to close out incomplete work orders and falsify GMP paperwork, as she sold all her stock; and

• By merely disclosing the Oberland Funding Agreement's existence and terms, Defendants did not mislead investors (Memo at 32) by omitting that Humacyte's operations depended on Oberland so much that when its funding was delayed, Humacyte needed three immediate, successive fund raises on disadvantageous and dilutive terms causing stock declines when announced.

---

[24] Defendants' reliance on *Genzyme* is misplaced. *See supra* at 24.

*None* of these competing inferences is ***more compelling*** than the FAC's strong scienter inference.  Defendants' motion must be denied.  *Matrixx*, 563 U.S. at 38, 48; *Tellabs*, 551 U.S. at 324, 326; *Zak*, 780 F.3d at 606.

## VI.    THE FAC'S §20(A) CLAIM SHOULD BE UPHELD

Defendants (Memo at 38-39) waive all §20(a) claim challenges beyond failure to plead a §10(b) claim.  *See* n.6, *supra*.  If the Court upholds the §10(b) claim, even partially, the §20(a) claim must follow.

## VII.    CONCLUSION

Lead Plaintiffs respectfully ask that Defendants' Motion be denied.[25]   Given the complexity of legal issues and high stakes of this securities class action, Lead Plaintiffs respectfully request oral argument, per L.R. 7.3(c)(1).

---

[25]    If not, Lead Plaintiffs ask leave to further amend to address the Court's concerns. *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 117 (4th Cir. 2013) (district court erred in denying leave to amend given the Fourth Circuit's "policy favoring liberal amendment").

DATED: September 25, 2025  **TIN FULTON WALKER & OWEN PLLC**


By: /s/ *Gagan Gupta*
     Gagan Gupta (NC Bar # 53119)
119 Orange Street
Durham, North Carolina 27701
Telephone: (919) 370-8807
ggupta@tinfulton.com

*Local Counsel for Co-Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood*

**POMERANTZ LLP**

By: /s/ *Matthew L. Tuccillo*
     Matthew L. Tuccillo (*special appearance*)
Jeremy A. Lieberman (*special appearance*)
Zachary Denver (*special appearance*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
mltuccillo@pomlaw.com
jalieberman@pomlaw.com
zdenver@pomlaw.com

*Counsel for Co-Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood, and Co-Lead Counsel for the Class*

-42-

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: /s/ *Reed Kathrein*

      Reed Kathrein *(special appearance)*
Lucas Gilmore (*special appearance*)
715 Hearst Avenue, Suite 300
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com

*Counsel for Co-Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood, and Co-Lead Counsel for the Class*

-43-

## CERTIFICATE OF COMPLIANCE WITH LR 7.3(d)(1)

Pursuant to Local Rule 7.3(d)(1) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina, and the Court's order modifying Rule 7.3(d)(1)'s word-limit, *see* ECF No. 39, counsel for Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damion Hopwood certify that the foregoing brief, which was prepared using Times New Roman 13-point proportional font, is 9,997 words.

**POMERANTZ LLP**

By: /s/ *Matthew L. Tuccillo*
      Matthew L. Tuccillo (*special appearance*)
Jeremy A. Lieberman (*special appearance*)
Zachary Denver (*special appearance*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
mltuccillo@pomlaw.com
jalieberman@pomlaw.com
zdenver@pomlaw.com

*Counsel for Co-Lead Plaintiffs Frederick Foote,*
*Matthew Cognetti, and Damion Hopwood, and*
*Co-Lead Counsel for the Class*

-44-