| | |
|---|---|
| IN RE HUMACYTE, INC. SECURITIES LITIGATION | Case No. 1:24-cv-954-TDS-JEP |
| | <u>CLASS ACTION</u> |
| This Document Relates to:<br><br>ALL ACTIONS | |

## <u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................... 1

ARGUMENT ................................................................................................................... 2

I. PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE
MISREPRESENTATION OR OMISSION. ............................................................ 2

    A.     Plaintiffs Fail to Plead any Actionable Misrepresentation or
Omission About the Alleged Product Safety Fraud. ..................................... 3

        1.     Plaintiffs Fail to Plead that Defendants Misled Investors
About Safety Risks. ............................................................................ 3

        2.     Plaintiffs Fail to Plead that Defendants Misled Investors
About Trials. ....................................................................................... 5

        3.     Plaintiffs Fail to Plead that Defendants Misled Investors
About the FDA Delay. ........................................................................ 8

        4.     Plaintiffs Fail to Plead that Defendants Misled Investors
About Quality Control. ....................................................................... 9

    B.     Plaintiffs Fail to Plead any Actionable Misrepresentation or
Omission About the Alleged Facility Fraud. ................................................ 9

    C.     Plaintiffs Fail to Plead any Actionable Misrepresentation or
Omission About the Alleged Liquidity Fraud. ........................................... 12

II. PLAINTIFFS FAIL TO PLEAD SCIENTER. ..................................................... 13

    A.     Plaintiffs Fail to Plead Scienter for Any of the Alleged Frauds. ................ 13

        1.     Plaintiffs Fail to Plead Scienter for the Alleged Product Safety
Fraud. ............................................................................................... 14

        2.     Plaintiffs Fail to Plead Scienter for the Alleged Facility Fraud. ...... 15

        3.     Plaintiffs Fail to Plead Scienter for the Alleged Liquidity
Fraud. ............................................................................................... 17

    B.     Plaintiffs Fail to Plead Motive or Opportunity. .......................................... 17

        1.     Niklason. ........................................................................................... 18

        2.     Prichard. ........................................................................................... 19

        3.     Sander ............................................................................................... 19

    C.     Plaintiffs' Miscellaneous Theories of Scienter Fail. .................................. 20

III. PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED. ................. 20

CONCLUSION ............................................................................................................. 20

i

**Page(s)**

**Cases**

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...............................................................17

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023).........................................................................18

*In re Emergent BioSolutions Inc. Sec. Litig.*,
2023 WL 5671608 (D. Md. Sept. 1, 2023)....................................................................2

*Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*,
61 F.4th 369 (4th Cir. 2023) ..............................................................................3, 4, 5

*In re Genzyme Corp. Sec. Litig.*,
754 F.3d 31 (1st Cir. 2014)........................................................................................10

*George v. China Auto. Sys., Inc.*,
2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012)..............................................................18

*Lerner v. Nw. Biotherapeutics*,
273 F. Supp. 3d 573 (D. Md. 2017) .............................................................................5

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
876 F.3d 541 (4th Cir. 2017) .....................................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................................................................................................7, 8

*In re Novan, Inc.*,
2018 WL 6732990 (M.D.N.C. Nov. 30, 2018).............................................................6

*Ottmann v. Hanger Orthopedic Group, Inc.*,
353 F.3d 338 (4th Cir. 2003) .....................................................................................13

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
918 F.3d 312 (4th Cir. 2019) .......................................................................................6

Case 1:24-cv-00954-TDS-JEP    Document 43    Filed 10/31/25    Page 3 of 28

*In re PEC Sols., Inc. Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) ....................................................................... 19

*Teachers' Ret. Sys. of La. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ....................................................................... 18

*In re Triangle Cap. Corp. Sec. Litig.*,
   988 F.3d 743 (4th Cir. 2021) ............................................................... 13, 17

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ....................................................................... 19

*Zak v. Chelsea Therapeutics, International, Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ..................................................................... 5, 6

**Statutes**

15 U.S.C. § 78u-5c(1)................................................................................... 11

Case 1:24-cv-00954-TDS-JEP    Document 43    Filed 10/31/25    Page 4 of 28

# INDEX OF DEFINED TERMS

| | |
|---|---|
| ATEV | Acellular Tissue Engineered Vessel |
| BLA | Biologics License Application |
| Br. | Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Class Action Complaint filed July 25, 2025, ECF No. 41. |
| Class Period | August 14, 2023 through March 25, 2025 |
| Complaint | First Amended Class Action Complaint for Violations of the Federal Securities Laws, filed May 22, 2025, ECF No. 37 |
| Confidential Witnesses or CW(s) | Confidential Witness(es), as identified in the First Amended Class Action Complaint |
| Defendants | The Individual Defendants and the Company |
| Facility | Humacyte's Durham, North Carolina facility |
| FDA | United States Food and Drug Administration |
| BLA File | Public documents released in support of the FDA's decision to approve Symvess, including the Statistical Review Memorandum, Clinical Review Memorandum, and Summary Basis of Regulatory Action |
| HAV | Human Acellular Vessel |
| Humacyte | Humacyte, Inc. |
| Individual Defendants | Laura E. Niklason, Dale A. Sander, Heather Prichard |
| Initial Complaint | Complaint for Violations of the Federal Securities Laws—Class Action, filed November 18, 2024, ECF No. 1. |
| Opp'n. | Memorandum of Law in Opposition to Defendants' Motion to Dismiss First Amended Class Action Complaint, filed September 25, 2025, ECF No. 42. |
| Plaintiffs | Lead Plaintiffs Frederick Foote, Matthew Cognetti, and Damon Hopwood |
| PDUFA | "Prescription Drug User Free Act" date |
| PSLRA | Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z-1, 77z-2, 78a, 78j-1, 78t, 78u, 78u-4, 78u-5 |

**PRELIMINARY STATEMENT**

Plaintiffs' opposition takes pains to distance itself from the initial complaint in this action — describing it as "a ***different*** pleading by a ***different*** litigant . . . represented by ***different*** counsel" — but the Amended Complaint ("Complaint") is no better.  Opp'n. 1. Despite Plaintiffs' attempt to reinvent this case by cooking up new theories, none of the three "frauds" they allege states a claim.

As to the purported "product safety" fraud, Plaintiffs do not dispute that the FDA approved Symvess after determining that "the benefits outweigh the risks."  Ex. 1 at 17.[1] While Plaintiffs suggest that Humacyte misled investors about those risks, Humacyte disclosed both the risks associated with Symvess and the limitations of its clinical trials. That the FDA interpreted certain data differently or disagreed with aspects of Humacyte's clinical trial methodology does not amount to securities fraud.

Plaintiffs' remaining theories are even weaker.  In attempting to demonstrate a "facility" fraud, they rely on non sequiturs, arguing that it was misleading to describe the FDA inspection as "very successful" because confidential witnesses ("CWs") reported facilities issues unconnected to the FDA inspection.  Opp'n. 24.  Notwithstanding these irrelevant allegations, the FDA inspection was successful: the agency noted some issues, but all were minor and required only "voluntary" action by Humacyte, leading the agency

---

[1] Unless otherwise indicated, Exhibits cited are exhibits to Declaration of Mark P. Gimbel (ECF 41-1).

to conclude just a few months later that Humacyte "adequately responded to the observations" and "[a]ll inspectional issues were resolved." Ex. 1 at 10.

As to the "liquidity" fraud, Plaintiffs have no grounds for arguing that Defendants' careful financial disclosures misled investors. Humacyte accurately disclosed its financial situation — including that it had limited cash and depended on milestone-based financing — and there are no allegations demonstrating otherwise.

Just as Plaintiffs fail to plead an actionable misrepresentation or omission, they fail to plead scienter. The Complaint lacks any particularized allegations that Defendants had knowledge inconsistent with their public statements, and its motive and opportunity allegations also fall far short of giving rise to a strong inference of scienter.

## ARGUMENT

### I. Plaintiffs Fail to Plead any Actionable Misrepresentation or Omission.

Plaintiffs attempt to defend their scattershot pleading by finding another case in which a court sustained a complaint that was "far from a model of clarity," *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *12 (D. Md. Sept. 1, 2023), but the muddled pleading here is worse. Even after wading through the thicket of prolix and confusing allegations, there is no actionable misrepresentation or omission to be found.

2

**A.** **Plaintiffs Fail to Plead any Actionable Misrepresentation or Omission About the Alleged Product Safety Fraud.**

**1.** **Plaintiffs Fail to Plead that Defendants Misled Investors About Safety Risks.**

Plaintiffs allege Defendants misled investors by "concealing and downplaying" Symvess' safety risks. Opp'n. 16. But Defendants disclosed the risks Plaintiffs identify, including "thrombosis" and "rupture." Br. 15. Although the FDA used a more "conservative" approach to assess trial data, Ex. 4 at 19, and thus reached different conclusions on certain points than Humacyte did, a reasonable difference in interpretation is not actionable under federal securities laws. *See Employees' Ret. Sys. of the City of Baton Rouge & Par. of E. Baton Rouge v. MacroGenics, Inc.*, 61 F.4th 369, 385 (4th Cir. 2023).

In their opposition, Plaintiffs focus on three ways in which they say that the trial results Defendants reported differed from the FDA's evaluation of the data: (i) trial "successes"; (ii) "primary patency, secondary patency, infection rate, and limb salvage rates"; and (iii) the percentage of trial participants with "rupture or anastomotic failure." Opp'n. 16. But identifying differences between Humacyte's analysis and the FDA's does not show that Defendants made actionable misstatements. As the Fourth Circuit has said, "[i]t would be a stretch for us to find the existence of false or misleading statements where 'a defendant's competing analysis or interpretation of data is itself reasonable,' regardless of Plaintiffs' disagreement with the study's 'researchers and scientists.'" *Employees'*, 61 F.4th at 385 (citation omitted). Here, Plaintiffs plead no facts showing that Humacyte's assessment was unreasonable.

3

Plaintiffs try to distinguish that authority by asserting that it is not the *interpretation* of data that is at issue, but that "the data disclosed was *itself* false." Opp'n. 17. But Plaintiffs do not allege that Defendants disclosed any objectively false data. Rather, they allege that some of Humacyte's *assessments* of the data it collected differed from "the FDA's independent assessment" because Humacyte characterized an adverse event differently than the FDA or used a "while on treatment" approach for imputing results where patients dropped out before thirty days. *Id.* at 16, 18-19. These are differences about interpreting results — not misrepresentations of fact — and are therefore not actionable. *See Employees'*, 61 F.4th at 385.

Plaintiffs' remaining arguments are equally flawed:

- ***Characterization of risks.*** Plaintiffs concede that Defendants disclosed risks of thrombosis and rupture. Opp'n. 16-17. They argue that this disclosure "does not suffice" because Defendants did not characterize those risks as gravely as Dr. Robert E. Lee did. *Id.* at 17. But Defendants had no duty to express Dr. Lee's opinion to investors. And the FDA notably rejected Dr. Lee's view when it approved Symvess.

- ***"Unexpected" safety signals.*** Plaintiffs criticize Defendants for stating that they observed no "unexpected safety signals" in the trials. Opp'n. 2. But the adverse events Humacyte observed were not "unexpected." As the FDA noted, the risks observed in Symvess are present in all arterial-repair methods. *See* Ex. 1 at 17. Humacyte disclosed these risks, including the risk of "rupture," as serious adverse events that could result from the use of Symvess. *See, e.g.*, Ex. 9 at 59 (disclosure before Class Period of risk that "SAEs [serious adverse events] occur at an unacceptable rate," including types of "rupture" and "thrombosis"). Plaintiffs identify no safety issue observed in the trials that was not expected in treating a condition of this severity.

- ***FDA label.*** Plaintiffs acknowledge that Defendants' December 19, 2024 press release "quot[ed]" the FDA-approved label, including its statements about risks. Opp'n. 17. Nonetheless, they say that statement concealed the

4

"prevalence" and "extent" of those risks. *Id.* Plaintiffs offer no support for the proposition that *accurately quoting* an FDA label misleads investors about the risks summarized on the label.

- *Anastomotic failure.* Finally, Plaintiffs criticize Defendants for not identifying "anastomotic failure" as a risk in certain pre-approval statements. *Id.* at 16. Anastomotic failure is a type of rupture — a risk that Defendants disclosed. As the FDA explained, "[t]he term rupture is used to include both instances of mid-graft loss of ATEV integrity *as well as anastomotic failure.*" Ex. 4 at 60 (emphasis added). Plaintiffs' argument thus boils down to disingenuous semantics; they identify no undisclosed risk.

### 2. Plaintiffs Fail to Plead that Defendants Misled Investors About Trials.

Plaintiffs attempt to manufacture a securities fraud claim by alleging that Humacyte misled investors about limitations in its clinical trials. The entire premise of this claim is flawed, because "[w]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study." *Employees'*, 61 F.4th at 385. Here, Plaintiffs plead no facts suggesting that the results Defendants reported were inaccurate. Plaintiffs' arguments to the contrary are easily addressed.

***While-on-treatment method.*** Plaintiffs argue that, once Humacyte reported the trial results, it had to "explain[] that the results were generated with the while-on-treatment approach" to make its disclosures not misleading. Opp'n. 19. Plaintiffs are wrong. A company is not required to "second-guess" its clinical trial methodology. *Employees'*, 61 F.4th at 385. As long as Defendants do not "falsely or inaccurately report[] their conclusions," they cannot be held liable simply because someone might disagree with their "methodology for reaching those conclusions." *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 587 (D. Md. 2017) (collecting cases).

5

Plaintiffs' reliance on *Zak v. Chelsea Therapeutics, International, Ltd.*, 780 F.3d 597 (4th Cir. 2015) is completely misplaced. In *Zak*, the defendants misleadingly stated that the FDA had "agreed" that a new drug application could be submitted "without the need for any further efficacy studies," without disclosing that the FDA had informed them of its "expectation that two successful efficacy studies would be required for approval." *Id.* at 602-03, 609. The FDA then rejected the new drug application for failure to conduct the efficacy studies. *Id.* Here, Plaintiffs do not allege that Humacyte made any similar misrepresentation about the FDA's requirements for regulatory approval. To the contrary, unlike in *Zak*, the FDA never informed Humacyte that further studies were required and approved Symvess based on the same trials Plaintiffs criticize.[2]

***"Boilerplate" disclosures.*** Plaintiffs also criticize many of Defendants' disclosures about limitations in Humacyte's trial methodology as "boilerplate." Opp'n. 21 n.12. But Plaintiffs are wrong again. Humacyte disclosed specific limitations in its trial methodology: for instance, warning investors about potential "bias" in Humacyte's control method and that the "primary patency" endpoint "could not be compared to synthetic grafts." Ex. 5 at 16, 59. Because Defendants notified investors that Humacyte's clinical trials had significant limitations, further disclosures about additional limitations would not have altered "the total mix of information." *Paradise Wire & Cable Defined Benefit*

---

[2] To the extent Plaintiffs contend that Defendants should have explained the method because they discussed it with the FDA, companies have no duty to disclose the details of interim FDA communications. *See, e.g.*, *In re Novan, Inc.*, 2018 WL 6732990, at *11 (M.D.N.C. Nov. 30, 2018).

*Pension Plan v. Weil*, 918 F.3d 312, 319 (4th Cir. 2019).  The omissions Plaintiffs allege are therefore neither material nor actionable.

***"Cherry picking" disclosures.***   Plaintiffs also accuse Defendants of "cherry picking" the information about the trials that they disclosed to investors.  Opp'n. 20.  But allegations that a company did not tell its investors every detail about a particular matter, or explain those details in a particular way, do not establish securities fraud.  Rather, Plaintiffs must show that Defendants omitted material information they were obligated to disclose.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Plaintiffs do not do so.

***Literature review and meta-analysis.***   Finally, Plaintiffs assert that Defendant Niklason misled investors when she stated that the FDA agreed to "the structure of the literature review and the meta-analysis."  Opp'n. 20 (emphasis omitted).  But the Complaint pleads no facts suggesting that statement was false, Br. 18 n.3, and Plaintiffs identify none in their opposition.

The only fact that Plaintiffs do cite on this point is a comment by one FDA reviewer about a different aspect of Humacyte's trial methodology: that Humacyte chose "the performance benchmarks based on literature review" *during* the trial, rather than before.  Opp'n. 20.  But that statement only shows that, following the trial, one FDA reviewer took issue with Humacyte's *timing* in selecting performance benchmarks from medical literature; it does not disprove Niklason's statement that the FDA agreed to the *structure* of the literature review *itself*.

7

### 3. Plaintiffs Fail to Plead that Defendants Misled Investors About the FDA Delay.

Plaintiffs also assert that Defendants misled investors about the reasons for the FDA delay. Opp'n. 22. But Defendants made no statement concerning those reasons and were not required to speculate in that regard. Although Plaintiffs argue in their opposition that disclosing the *fact* of the delay created a duty to disclose the *reason* for it, that is not the law. Instead, disclosure only triggers the duty to disclose additional information if doing so is "necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 44. Defendants' disclosure of a delay, without commenting on the reasons, was a standalone, truthful statement that required no further disclosure.

In any event, no well-pleaded factual allegations establish that Defendants knew the reason for the FDA's delay. Plaintiffs offer only inconsistent speculation about what Defendants allegedly should have understood and when. For example, Plaintiffs speculate that after the late-cycle meeting with the FDA in May 2024, Defendants should have known that "the PDUFA date was at risk" because of "*[m]anufacturing* concerns." Compl. ¶ 169 (emphasis added). But they separately speculate that, when the FDA told Humacyte about the delay in August 2024, "it is highly likely that the FDA communicated to Humacyte that the PDUFA delay was to allow for the external review of HAV's *safety*." *Id.* ¶ 100 (emphasis added). In short, the Complaint does not establish that Defendants knew the reasons for the FDA delay — much less that they made any statement about the delay that was misleading absent further disclosure.

8

### 4. Plaintiffs Fail to Plead that Defendants Misled Investors About Quality Control.

Finally, Plaintiffs try to repurpose their allegations about issues at Humacyte's manufacturing facility into an additional safety-related claim by asserting that "quality control failure was a known risk at Humacyte," and that those product failures made Symvess unsafe. *Id.* ¶ 125(h). The argument fails because Plaintiffs identify no safety problem resulting from any manufacturing issue observed by the FDA. And Plaintiffs do not dispute that "FDA ultimately found Humacyte could 'yield SYMVESS with consistent quality attributes.'" Opp'n. 23.[3]

### B. Plaintiffs Fail to Plead any Actionable Misrepresentation or Omission About the Alleged Facility Fraud.

Plaintiffs plead no facts establishing any "facility fraud." They allege no false or misleading statements either before or after the FDA inspection. Nor do they allege any actionable misstatement about Humacyte's facilities generally.

In their opposition, Plaintiffs point to negative-sounding details about Humacyte's facilities and attempt to frame them as revelations that proved Defendants' statements false. Each argument is a non sequitur.

***Statements before inspection.*** Plaintiffs say it was unreasonable for Niklason to opine that the facility was "in great shape" when she knew about the circumstances that

---

[3] Plaintiffs allege that FDA identified problems at the Durham manufacturing facility *before Symvess was approved*, but do not allege that any of these issues led to any safety-related event when the device was used in a patient. To the contrary, as the FDA found, "[a]ll inspectional issues were resolved" before Symvess was approved. Ex. 1 at 10.

the FDA later observed in its Form 483.  Opp'n. 23-24.  But even if Niklason knew about the circumstances underlying the FDA's observations, that does not mean that her opinion was unreasonable: a facility that receives only two easily corrected observations in an FDA inspection *is* in good shape.

*Statements after inspection.*   Plaintiffs concede that Defendants had "no standalone duty to disclose the Form 483" after the inspection.  *Id.* at 24.  But they argue that it was still misleading for Defendants to opine that the inspection was "very successful" and that they had "no indication" that Humacyte was not on track for approval.  *Id.*  Again, Plaintiffs plead no facts showing that the inspection was unsuccessful or that the Form 483 observations put the BLA approval off track.  *See In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 41 (1st Cir. 2014) (defendants did not improperly fail to disclose Form 483 where "[t]he FDA did not postpone the PDUFA date . . . by way of the . . . Form 483, nor did the form otherwise state that the . . . BLA had been compromised").

*Manufacturing capabilities.*   Plaintiffs say Defendants' statements about Humacyte's ability to manufacture Symvess were false given CW statements about various facilities issues.  Opp'n. 26.  But the mere presence of facilities issues, which can be expected in any complex manufacturing environment, does not mean that Humacyte could not successfully manufacture Symvess.  Indeed, Defendants are currently manufacturing Symvess at scale.  Plaintiffs thus fail to plead falsity for any of Defendants' statements concerning Humacyte's manufacturing capabilities.

Plaintiffs also offer no persuasive response to the point that the PSLRA's safe harbor applies to certain of Defendants' facilities statements, such as their predictions about the results of the FDA inspection, future manufacturing capabilities, or that Humacyte remained on-track for BLA approval. Plaintiffs appear to take issue with whether these statements were *all* accompanied by meaningful cautionary language, by noting that that the "see, e.g." cite in Defendants' brief listing examples of cautionary statements does not cover every facilities statement in the Complaint. Opp'n. 25. But the argument is disingenuous because Defendants employed cautionary language in all instances of forward-looking statements.[4] And tellingly, Plaintiffs identify no instance in which Defendants did not use such language.

Moreover, even without regard to whether they are accompanied by cautionary language, forward-looking statements are immune from liability under the safe harbor unless Defendants had actual knowledge that they were false. 15 U.S.C. § 78u-5c(1). Plaintiffs do not and cannot plead that any Defendant had actual knowledge that any of these statements were false. Instead, they rely on non sequiturs that do not demonstrate actual knowledge of falsity — e.g., statements that because the Form 483 observations or CW statements identified certain facilities issues, Defendants' statements about manufacturing capabilities must have been false. *Id.* Plaintiffs' logic plainly fails, because

---

[4] As just a few examples demonstrating that Plaintiffs used such language as a matter of course, see Supplemental Declaration of Mark Gimbel ("Suppl. Gimbel Decl.") Ex. 13, November 17, 2023 Press Release at 2; Ex. 14, February 9, 2024 Press Release at 1-2; Ex. 15, May 10, 2024 Press Release at 3.

11

despite every unrelated facilities issue they identify, the FDA concluded that Humacyte's facility was "sufficient and acceptable."  Ex. 1 at 9.

### C. Plaintiffs Fail to Plead any Actionable Misrepresentation or Omission About the Alleged Liquidity Fraud.

Plaintiffs' liquidity fraud allegations are entirely meritless.  Plaintiffs argue that Defendants misled investors by projecting, in a series of disclosures between August 2023 and May 2024, that Humacyte's "cash and cash equivalents" could fund operations "for at least twelve months" — i.e., during twelve-month periods ending from August 2024 to May 2025.  Opp'n. 26; Compl. ¶ 143.  But Plaintiffs cite no facts showing that Humacyte did not have enough cash to fund operations during those twelve-month periods.  They point out instances in which Humacyte sought to save or raise money, such as by telling employees at the end of 2023 that it was cutting back spending, or by raising funds at points between February 2024 and March 2025.  Opp'n. 27-29.  But those allegations do not show that Humacyte was *illiquid* at those times.  Indeed, it is only prudent for companies to curb spending or raise capital well before they run out of cash.

Plaintiffs further speculate that Defendants overstated Humacyte's liquidity by including their expectation of future funding under the Oberland Funding Agreement in their projections about current "cash and cash equivalents."  Opp'n. 26-28.  But the factual allegations of the Complaint do not support this conclusion.  To the contrary, the SEC disclosures incorporated in the Complaint show that Humacyte kept its discussion of these sources of liquidity distinct by (i) explaining the terms of the Oberland Funding Agreement

12

in detail, and (ii) *separately*, making reasonable projections about their "cash and cash equivalents." *See, e.g.*, Ex. 5 at 100.

Plaintiffs argue that Defendants' August 2024 10-Q filing — which explained that, following the FDA delay, they foresaw risk to both the next tranche of Oberland funding and their ability to fund operations with cash for the next twelve months — revealed that Defendants had been including Oberland funds in their previous projections. Opp'n. 27. That does not follow. Defendants' August 2024 projection was a *new* projection about the period through August 2025 — three months beyond their previous projection. To the extent Defendants considered risk to Oberland funding in that new projection, that does not mean that they had been improperly counting that funding as already received in previous projections. Moreover, the August 2024 warnings do not otherwise suggest that previous projections were in any way misleading, because the August projections were informed by new facts, including that the FDA delay had delayed Humacyte's ability to generate revenue, forcing it to continue operating at a net loss for longer than anticipated. Suppl. Gimbel Decl., Ex. 16, Q2 2024 Form 10-Q at 33.

## II.     Plaintiffs Fail to Plead Scienter.

### A.      Plaintiffs Fail to Plead Scienter for Any of the Alleged Frauds.

Plaintiffs make no argument that Defendants *intended* to defraud investors. Rather, they try to establish scienter by alleging "recklessness." Opp'n. 34. But while "severe" recklessness can establish scienter, that requires showing conduct that is "so highly unreasonable" and "such an extreme departure from the standard of ordinary care" that the

13

danger of misleading investors was "either known to the defendant or so obvious that the defendant must have been aware of it." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (citation omitted). Plaintiffs do not meet that standard.

### 1. Plaintiffs Fail to Plead Scienter for the Alleged Product Safety Fraud.

Plaintiffs argue that Defendants were reckless because they "knew" about and "misleadingly understat[ed]" certain safety risks. Opp'n. 35. But Plaintiffs fail to allege that Defendants knew any statement about safety was misleading — let alone misleading "at the time they made" it, as required to allege scienter. *In re Triangle Cap. Corp. Sec. Litig.*, 988 F.3d 743, 756 (4th Cir. 2021)

*Trial data.* Plaintiffs assert that "Defendants knew reported trial data was misleadingly understating the HAV's safety risks," Opp'n. 35, apparently referring to their allegation that the FDA assessed certain data differently than Humacyte did, *id.* at 16. But they plead no facts showing that Defendants knew the data they reported understated any risk. To the extent Plaintiffs allege that the FDA *later* assessed certain data differently, that does not show that Defendants knew their data was misleading *when they reported it*.

*Trial methodology.* Plaintiffs say that "Defendants knew about FDA's serious concerns with Humacyte's trial methodologies." *Id.* at 34-35. But unlike the out-of-circuit cases they cite — in which defendants made statements they knew were false based on FDA communications — Plaintiffs identify no statements Defendants made that are inconsistent with any communication from the FDA.

14

***FDA labeling.*** Plaintiffs argue that Defendants knew they were "understating . . . risks of consequences like black box warnings or BLA approval with reduced indication." *Id.* at 35. But the Complaint does not allege that Defendants made *any* statement to investors about those risks — let alone a statement understating the risks.

***FDA delay.*** Plaintiffs speculate that it was "highly likely" that Defendants knew the FDA delayed approval of Symvess for safety reasons. *Id.* But the Complaint nowhere pleads facts establishing that the delay arose from safety concerns or that any of the Defendants knew that was the case. Plaintiffs' speculation is not enough: "an inference that [the defendant] *may* have known his statement was false does not alone satisfy the scienter requirement." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 547 (4th Cir. 2017) (emphasis added).

***Quality control problems.*** Plaintiffs argue that Defendants knew about "manufacturing quality control problems risking anastomotic failure." Opp'n. 35. But the factual allegations of the Complaint do not show that there ever were such problems, much less that Defendants knowingly misled investors about them.

### 2. Plaintiffs Fail to Plead Scienter for the Alleged Facility Fraud.

Plaintiffs rely on CW allegations to allege scienter for the facility fraud. *Id.* at 36-37. But the most those allegations show is that issues existed at Humacyte's manufacturing facilities — not that "Humacyte could not safely manufacture the HAV at scale as of FDA's inspection," *id.* at 36, as Plaintiffs contend. Indeed, the FDA concluded the opposite: that the inspectional issues were minor enough that only voluntary action was required. Ex. 1

15

at 10. And it ultimately found that "[a]ll inspectional issues were resolved" and that Humacyte's "manufacturing material, process, and controls can yield SYMVESS with consistent quality attributes." *Id.* at 6, 10.

Plaintiffs do not establish that Defendants had any reason to believe, contrary to these FDA determinations, that Humacyte could not manufacture Symvess safely at scale. For example, that Niklason and Prichard "discussed specific manufacturing problems and Humacyte's Form 483 response," that Niklason "knew about" or "discussed" certain manufacturing issues, and that "higher management" received "reports" about failure rates, prove nothing. Opp'n. 36. Those are things Defendants would be expected to discuss and address in preparing to manufacture, and none of these vague allegations show that Humacyte "could not safely manufacture the HAV at scale." *Id.*

Other allegations are totally irrelevant. Plaintiffs allege that certain "subordinate senior managers" — not Defendants themselves — directed employees on unspecified occasions to "close out incomplete work orders" even though the work hadn't been done, thereby "falsifying" documents. Compl. ¶ 43(g). Likewise, Plaintiffs allege that Humacyte had an outdated maintenance management system and occasionally deferred maintenance. *See id.* ¶ 43(c)-(d). Plaintiffs do not tie those problems to any significant manufacturing issue. Because Plaintiffs allege no facts showing that "Defendants knew Humacyte could not safely manufacture the HAV at scale," Opp'n. 36, they fail to plead scienter for the purported facility fraud.

16

### 3. Plaintiffs Fail to Plead Scienter for the Alleged Liquidity Fraud.

Plaintiffs similarly fail to allege scienter with respect to the purported liquidity fraud, relying on mundane allegations that prove nothing, such as the claim that Niklason "addressed Humacyte's limited cash runway at [a] company-wide meeting." *Id.* at 37. Dr. Niklason's statement is not inconsistent with any of the liquidity statements challenged in the Complaint, and matches Humacyte's regular warnings to investors that its cash *was* limited. *See, e.g.*, Ex. 5 at 113 (stating that while Humacyte expected its cash to be "sufficient" for the next twelve months, it anticipated "negative cash flows from operations for the foreseeable future"). Plaintiffs also argue that Defendants' statements about financial risks following the PDUFA delay and the decision to raise funds after the delay establish scienter. Opp'n. 37-38. But again, nothing about those disclosures is inconsistent with any public statement challenged in the Complaint — much less evidence that Defendants knew any challenged statement was false or misleading. *See, e.g.*, *In re Triangle*, 988 F.3d at 753 (scienter allegations failed where "nothing that [the defendant] said plausibly suggest[ed] that [defendants] *knew*" their statements were false).

### B. Plaintiffs Fail to Plead Motive or Opportunity.

Plaintiffs place great emphasis on their argument that the Individual Defendants' stock transactions show motive and opportunity. None of the transactions supports scienter.

17

### 1. Niklason.

Plaintiffs do not allege that Niklason personally sold any stock.  Rather, they point to (1) sales by the LLC that her husband, non-party Brady Dougan, owns; and (2) a transfer to Niklason's living trust.  Opp'n. at 32-33.  Neither supports scienter.

As to Dougan's sale, Plaintiffs offer no non-conclusory theory contradicting the innocent explanation in his Form 4 that the transactions were intended to reduce leverage and make shares available to other investors.  Br. 34-35.  Nor does a family member's sale demonstrate a defendant's scienter.  As one court remarked, "[t]he Court is unaware of any decision finding sufficient motive and opportunity to commit securities fraud when family members of an individual defendant sold shares without any individual defendant also selling shares."  *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at \*7 (S.D.N.Y. Jan. 21, 2021).  The case Plaintiffs cite is inapposite: although the defendant's wife sold shares in that case, the court noted that the defendant had "individually earned a net profit of approximately $13.45 million" from his *own* sales.  *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at \*10 (S.D.N.Y. Aug. 8, 2012).  Here, Niklason made no individual sales; instead, she acquired 121,851 shares during the Class Period.  Br. 33.

As to the transfer to the trust, Plaintiffs neither explain nor cite any authority suggesting how a stock transfer — which realizes no gain — supports scienter.  *See In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 176 n.31 (S.D.N.Y. 2023) ("transfer, unaccompanied by sale," was not "indicative of scienter").

18

### 2. Prichard.

Plaintiffs latch onto a single sale by Prichard in May 2024. But even a large sale is not inherently suspicious. *See Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007). And Plaintiffs allege no other facts suggesting that Prichard made that sale to benefit from fraud.

In their opposition, Plaintiffs assert it was suspicious that Prichard sold shares a week-and-a-half after one of Humacyte's ongoing meetings with the FDA. Opp'n. 33. But Plaintiffs allege no facts showing that Prichard learned anything at that meeting that would have prompted her to sell. Further, although Plaintiffs try to brush aside the fact that Prichard continued holding a large equity stake in stock options by saying that "options are not equity," *id.*, the reality is that Prichard could have exercised and sold options during the period of the alleged fraud and did not.

### 3. Sander

The single sale by Sander that Plaintiffs identify was not suspicious in its timing or amount. *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 390 (4th Cir. 2005) (to support scienter, "the timing and amount of the sale(s)" must be "unusual or suspicious" (citation omitted)). Indeed, it came after the FDA delay was announced and after Humacyte's stock dropped. Br. 36. In their opposition, Plaintiffs repeat the conclusion that Sander's transaction was suspicious without offering any explanation. Opp'n. 34. The single, conclusory sentence of argument they offer about Sander's sales plainly fails to give rise to a strong inference of scienter.

19

### C. Plaintiffs' Miscellaneous Theories of Scienter Fail.

Finally, Plaintiffs tack on other undeveloped scienter allegations. All are theories that the Fourth Circuit has rejected and/or that Plaintiffs fail to support. Br. 36-38. Plaintiffs' opposition offers no new facts or law to support these theories. And Plaintiffs only confirm that they do not seriously believe that these theories establish scienter by giving each only a brief, conclusory treatment. Opp'n. 34, 37-38.

### III. Plaintiffs' Section 20(a) Claim Should Be Dismissed.

Because Plaintiffs' Section 10(b) claim fails, their Section 20(a) claim does also. *See Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014). Plaintiffs do not dispute that, if their Complaint fails to state a claim under Section 10(b), the Section 20(a) claim necessarily fails. Opp'n. 41.

### CONCLUSION

For the forgoing reasons, the Complaint should be dismissed with prejudice.

By /s/ *Mark. P. Gimbel*

COVINGTON & BURLING LLP

Mark P. Gimbel
N.Y. State Bar No. 2998102
James H. Fitch
N.Y. State Bar No. 6150411
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Ph: (212) 841-1000
mgimbel@cov.com
jhfitch@cov.com

20

SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P.

*/s/ Clifton L. Brinson*
Clifton L. Brinson
N.C. Bar No. 34331
Mary Stewart Wilson
N.C. Bar No. 61169
P.O. Box 2611
Raleigh, NC  27602-2611
Ph:   (919) 821-1220
Fax: (919) 821-6800
cbrinson@smithlaw.com
mswilson@smithlaw.com

*Attorneys for Defendants*

21

## CERTIFICATE OF COMPLIANCE WITH LR 7.3(d)(1)

Pursuant to Local Rule 7.3(d)(1) of the Rules of Practice and Procedure of the United States District Court for the Middle District of North Carolina, and the Court's order modifying Rule 7.3(d)(1)'s word-limit, *see* ECF No. 39, counsel for Defendants Humacyte, Inc., Laura E. Niklason, Dale A. Sander, and Heather Prichard certify that the foregoing brief, which was prepared using Times New Roman 13-point proportional font, is 4,995 words.

By */s/ Mark P. Gimbel*

COVINGTON & BURLING LLP

Mark P. Gimbel
N.Y. State Bar No. 2998102
James H. Fitch
N.Y. State Bar No. 6150411
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Ph: (212) 841-1000
mgimbel@cov.com
jhfitch@cov.com

SMITH, ANDERSON, BLOUNT, DORSETT,
  MITCHELL & JERNIGAN, L.L.P.

*/s/ Clifton L. Brinson*
Clifton L. Brinson
N.C. Bar No. 34331
Mary Stewart Wilson
N.C. Bar No. 61169
P.O. Box 2611
Raleigh, NC  27602-2611
Ph:  (919) 821-1220
Fax: (919) 821-6800
cbrinson@smithlaw.com

22

mswilson@smithlaw.com

*Attorneys for Defendants*

23